UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                              Chapter 11

      96 Wythe Acquisition LLC,                      Case no.  21-22108 (RDD)

               Debtor.
---------------------------------------------------------x

## <u>ORDER TO SHOW CAUSE</u>

      Upon the annexed motion (the "Motion") of 96 Wythe Acquisition LLC (the "Debtor"), for interim and final orders approving use of cash collateral under sections 361, and 363(c), of the Bankruptcy Code and Bankruptcy Rules 2001, 4001, and 9014, and after due deliberation and sufficient cause appearing therefor; it is

      ORDERED, that pursuant to Bankruptcy Rule 4001(c) an interim hearing with respect to the relief requested by the Debtors in the Motion, will be held telephonically on March ___, 2021 at ___:00 __.m., or as soon thereafter as counsel can be heard before the Robert D. Drain through Court Solutions at www.court-solutions.com  (the "Interim Hearing"); and it is further

      ORDERED, that objections to the relief to be requested at the Interim Hearing shall be filed with Clerk of Court and served upon and received by Backenroth, Frankel & Krinsky, LLP on or before March ____, 2021 at _____ ___.m.; and it is further

      ORDERED, that the Debtors' shall serve a copy of this Order and Application upon  (a) all known creditors who have or assert a lien against the Debtors' assets, (b) the Office of the United States Trustee and (c) all parties filing a notice of appearance in these cases, by overnight delivery service on or before February ___, 2021.

Dated:     New York, New York
          February___, 2021

                                 _____

                                UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                          Chapter 11

      96 Wythe Acquisition LLC,                          Case no.  21-22108 (RDD)

                            Debtor.

--------------------------------------------------------x

## APPLICATION TO USE CASH COLLATERAL

        96 Wythe Acquisition LLC (the "Debtor"), as and for its application for an order

pursuant to § 363(c) of the Bankruptcy Code authorizing the use of "cash collateral" as that term is

defined in § 363(a) of the Code ("Cash Collateral"), respectfully represent as follows:

## BACKGROUND

        1.      On February 23, 2021, the Debtor filed a Chapter 11 petition under Title 11

of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

        2.      The Debtor owns and operates the Williamsburg Hotel (the "Hotel") located

at 96 Wythe Avenue, Brooklyn, New York, (the "Property"). The Property is a ten story, 147

room hotel with a rooftop pool, a bar and restaurant and a separate, elevated and enclosed bar that

sits above the pool referred to as the Water Tower Bar.  The Debtor has approximately 80

employees.

        3.      On December 13, 2017, the Debtor borrowed $68 million (the "Loan") from

Benefit Street Operating Partnership, L.P. under a loan agreement ("Loan Agreement") to

construct the Hotel.  The Loan was subsequently assigned to BSPRT 2018-FL3 Issuer, Ltd. (the

"Lender" or the "Mortgagee").

**Disputes with the Lender**

4.      The Debtor's financial problems pre-date the COVID-19 pandemic.  They

arise from the Mortgagee's misconduct in: (i) denying that the Debtor had completed construction;

(ii) Lender's consequent demands for additional interest as a result thereof; and (iii) Lender's

ultimate filing of a foreclosure complaint.  Lender's actions obstructed the Debtor's ability to

refinance the Loan.

5.      Under the Loan Agreement, the Debtor had a May 31, 2018 deadline to

complete construction (the "Completion Date"), failing which the Lender would be entitled to a

0.5% increase in the contract interest rate, which would reset once those conditions were satisfied.

6.      The maturity date was June 7, 2019 (the "Maturity Date").  The Debtor had

the option "to extend the term of the Loan beyond the initial Maturity Date for two (2) successive

terms (the 'Extension Option') of six (6) months each (each, an 'Extension Period') to (i)

December 9, 2019 if the first Extension Option was exercised and (ii) June 9, 2020 if the second

Extension Option was exercised.

**Reserve Accounts and Rate Increases**

7.      At the closing of the Loan in December 2017, $1,651,000 was placed in a

"Business Plan Reserve Account," to ensure adequate funding of the Debtor's contractors,

materials and services in the first instance.  Upon the Debtor's certification of completion of such

work, lien releases from all contractors and subcontractors, and Lender's construction site visit,

the Lender was obligated to "reimburse" the Debtor from the Business Plan Reserve Account.

2

8.      Work proceeded without controversy or incident, and the Debtor achieved "Completion" of the "Business Plan Work" as defined in the Loan Agreement by the end of June 2018.  The was open for business and operating with all amenities.  Guestrooms, pool and related facilities, and the food and beverage outlets were all operational.

9.      The Debtor notified Lender that it satisfied the Operating Condition by the end of June 2018, thereby terminating the 0.5% Rate Increase Event.

10.     Lender disagreed with Borrower's notification and claimed instead that the Operating Condition had not yet been satisfied. The Lender refused to terminate the 0.5% interest rate increase.  This 0.5% increase constituted, on average, an additional $29,000.00 of interest per month, wrongfully running in favor of Lender and against the Debtor as of, at least, June 30, 2018.

11.      There was no risk of non-payment of this additional interest in the near term as the Lender also held two months of interest reserve under the Loan Agreement.  But the parties would soon be at odds when, as turned out to be the case, the Lender paid itself more interest than was actually owed—by $29,000.00 per month on average—and demanded that the Debtor make up the difference by depositing an extra $29,000.00 of fresh funds into the Interest Reserve Account to keep the required two months of interest on deposit at all times.

12.     On a without prejudice basis, in an effort to maintain an amicable relationship with Lender and move the Project forward, the Debtor paid the excess interest rate for the months of June 2018 and July 2018, and topped up the interest reserve accordingly.

3

13.     By August 2018, however, Borrower had enough. Lender continued to refuse to accept that the Operating Condition was satisfied. Indeed, the Project had become fully operational, and yet Lender continued to saddle Borrower with the additional 0.5% interest rate averaging $29,000.00 per month. Accordingly, Borrower refused to continue to pay the higher interest rate.  Instead, Borrower made monthly payments from August 2018 through November 2018 sufficient to fund the Interest Reserve Account in accordance with the Loan Agreement at the agreed interest rate level, without the unauthorized 0.5% surcharge that had been assessed by Lender.

14.     In violation of the Loan Agreement, Lender nevertheless continued paying itself at the higher interest rate from the Interest Reserve Account. Between July 2018 and December 2018, Lender pocketed approximately $173,777.78 of unauthorized additional interest from Borrower, based on Lender's refusal to acknowledge that the Operating Condition was satisfied.

15.     Lender's actions caused the Interest Reserve Account to fall below the agreed two months of interest payable from the Debtor to Lender.  Naturally, the Lender had the upper hand.  It could declare the Debtor in default and demand a cure.  That demand would be made not only to the Debtor, but WH Mezz Lender, LLC, the mezzanine lender (the "Mezz Lender") who had made a $13,000,000 loan to the Debtor's parent company, secured by the membership interests in the Debtor.

16.     On November 28, 2018, therefore, in a further attempt to bring this matter to resolution, Debtor requested another Property site inspection in order to further confirm that the

4

construction work was completed and the Operating Condition was satisfied. Such an inspection would also trigger the release of a further construction draw from the Business Plan Reserve Account in the amount of $300,000.00. As explained above, the $300,000.00 construction draw would have simply shuffled Borrower's own money to the Interest Reserve Account, which Borrower also funded. In other words, Borrower was paying four times—first to fund the construction reserves, second for the construction itself, third for the interest reserve, and fourth to pay monthly interest.

17.    Instead of scheduling the site inspection within two to three days as had customarily occurred, Lender took two weeks to schedule the inspection despite Borrower furnishing sufficient documentation to support the inspection and making countless attempts to expedite the process. Nonetheless, Lender refused to schedule the inspection until December 11, 2018.

18.    On information and belief, Lender was in no hurry to schedule the Property site inspection since Lender knew that if it did not release the construction draw from the Business Plan Reserve Account until after December 7, 2018, which was the due date for Borrower's interest payment, Borrower might have considerable difficulty topping up the Interest Reserve Account by its December 2018 deadline.

**Borrower Payments and Attempts to Cure**

19.    Nonetheless, Borrower paid Lender over $300,000.00 between November 28 and December 10, 2018, and, with the rate cap provider, Lender was paid over $319,512.86 during this time frame.

5

20.     Borrower, aware of its impending December 2018 payment due date and the delayed property site inspection, made numerous requests to Lender in an effort to reach an agreement regarding the release of the $300,000.00 in the Business Plan Reserve Account.

21.     Specifically, Borrower requested that the $300,000.00 in the Business Plan Reserve Account be transferred to the Interest Reserve Account until the delayed inspection could be completed.  As both parties well knew, the requested transfer of Borrower's money from the Business Plan Reserve Account to the Interest Reserve Account would have cost Lender nothing but would have enabled Borrower to make its December 2018 payment without a technical Event of Default under the Loan Documents.

22.     Lender was not interested.  Indeed, its response revealed its true motives. Lender agreed to Borrower's request to transfer $300,000.00 from the Business Plan Reserve Account to the Interest Reserve Account, but only on the condition that Borrower acknowledge that the Business Plan Work had been completed, entitling the Lender to the higher interest rate since June 2018.

23.     At $29,000.00 per month of unwarranted interest from July 2018, the requested concession would likely have amounted to a $348,000 cost to simply move $300,000.00 of Borrower's money from one reserve account to the other.  The Debtor refused.

24.     As a result, the Debtor did not make the December 7, 2018 payment, in the belief that the needed funds would be in hand shortly after the December 11, 2018 construction site visit and would soon be paid from the Business Plan Reserve Account.

6

25.     On December 10, 2018—one day before Borrower's scheduled property site inspection—Borrower received a notice of default letter from Lender for Borrower's failure to make the December 2018 payment.  The default letter notified Borrower that various monetary defaults needed to be cured but did not specify the total amount it claimed to be due with per diem amounts accruing.  The Debtor calculated $1,239,365.45.

26.     Pursuant to an intercreditor agreement ("Intercreditor Agreement"), Mezz Lender also received notice of Borrower's purported default and was given the opportunity to cure such default.

27.     In retrospect, Lender's vagueness on the asserted cure amount intended to obstruct curing the putative "default."

28.     On December 19, 2018, Mezz Lender timely paid the $1,239,365.45 cure amount to Lender via wire transfer (the "First Mezz Lender Cure Payment"). Of the sum paid as a cure amount, Borrower contributed $240,000.00.

29.     The Debtor believes that the First Mezz Lender Cure Payment made Lender whole and cured the pending default in its entirety.  Lender never informed the Debtor it was claiming an additional $94,000.00 for default interest.  Had the Lender told the Debtor, the Debtor could have, and would have, paid the default interest on December 19, 2018.  Indeed, Borrower had well over $94,000.00 in the Interest Reserve Account.

30.     Instead, Lender hid the fact that $94,000.00 of default interest was owed, not once disclosing the owed default interest to Borrower despite the numerous communications

7

between Lender and Borrower regarding the default.  Lender's tactic was clear.  Lender not only

wanted to prevent Borrower from curing the alleged default, Lender also wanted the $94,000.00 to

compound and double in amount.

31.     Thereafter, the Lender sent monthly default letters and the Debtors and

Mezz Lender paid the cure the amounts due plus payment of the unwarranted higher interest rate

of 0.5% even though the Hotel was fully operational.

32.     On June 3, 2019, Borrower and Lender entered into negotiations in an

attempt to the resolve Borrower's alleged defaults under the Loan Documents.

33.     Borrower sought and obtained a term sheet to refinance with a new lender at

a low interest rate.  But based on the Loan default notices, the new lender advised that it could not

refinance the Loan because it could not lend money to a borrower that had a default under its loan

terms.

34.     On June 5, 2019, Borrower received a payoff letter from Lender good

through June 7, 2019.  On June 7, 2019, the Lender asserted a maturity default.

35.     Due to Lender's sequential, contrived and overlapping default notices,

Borrower was never given the ability to exercise its option under the Loan Agreement to extend

the Maturity Date prior to receiving the June 7, 2019 default letter.

**Lender Commences the Foreclosure Action**

36.     The lender commenced a foreclosure action in New York County, Supreme

Court (the "Foreclosure Action") four days later.

8

37.    Constantino Sagonas, was appointed temporary receiver ("Receiver") for the Hotel in the Foreclosure Action.  The Receiver is in poor health and a motion was made in the Foreclosure Action to relieve him of control.  Upon the filing of the bankruptcy case, the Receiver has agreed to cooperate in transferring control of the accounts he maintained to the Debtor.  The Debtor's day to day operations are managed by a hotel manager which has managed the business throughout Mr. Sagonas' appointment, as directed by the Court in the Foreclosure Action.  The Debtor intends to maintain the status quo with no change in day-to-day management.

38.    The COVID-19 pandemic and the attendant travel restrictions and quarantine requirements beginning in March 2020 had an immediate impact on the hospitality industry as a whole and caused the Hotel to shut down operations entirely for a period of time.  The Debtor has reopened and employs 80 workers.

## APPLICATION

39.    The Debtor seeks entry of an Order pursuant to §§363(c)(2) and 506(c) of the Bankruptcy Code authorizing the Debtor's use of Cash Collateral in accordance with the budget ("Budget," Exhibit "A") and under the terms and conditions set forth herein, granting the Lender the adequate protection described above, and setting a final hearing pursuant to Bankruptcy Rule 4001.

40.    Section 363(a) of the Bankruptcy Code provides that "cash collateral" includes both cash and cash equivalents in which a debtor and another entity have an interest. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless each entity that has an interest in such cash collateral consents or the Court, after notice and

9

a hearing, authorizes the use of cash collateral. Although the Debtor fully intends to focus its

immediate efforts post-petition on negotiating the consensual use of Cash Collateral, the Debtor is

filing this Cash Collateral Motion to obtain a prompt post-petition hearing to request entry of an

interim Cash Collateral order.

        41.     On Wednesday, February 24,2021, the Mortgagee consented to the Debtor's

payment of payroll on Friday February 25, 2021 for certain employees for pre-petition services,

but denied payment of payroll for six selected employees (the "Unpaid Employees"). The titles

and compensation of those employees are as follows: Director of Finance at $200,000, Finance

Manager at $140,000, Accounting & Operations Manager at $120,000, Operations Controller at

$110,000, Engineering Manager at $200,000, and Sales & Marketing Coordinator at $90,000. The

Unpaid Employees are critical to the Debtor's operations. Indeed, the Unpaid Employees prepared

the Budget for this motion and the payroll information necessary to make payroll. The Debtor

submits that the Unpaid Employees' compensation is low by industry standards and their retention

by the third-party disinterested receiver during the course of the receivership indicates that any

concern the Mortgagee may have arising from their relationship to the Debtor's management is

unfounded. Accordingly, in addition the amounts sought in the projections, the Debtor seeks

authority to pay the Unpaid Employees for their pre-petition for the one week pay period that

ended on February 21, 2021, in the same manner as all other employees.

        42.     Since the Debtor does not currently have Lender's express consent to use

cash collateral at this time, the Debtor seeks authorization from this Court to use Lender's Cash

Collateral. Needless to say, due to the Hotel operating on a limited basis as a result of the

COVID-19 pandemic, it currently has limited revenue. To adequately protect the Lender's interest

in Cash Collateral the Debtor requests this Court's authorization to utilize Lender's Cash

Collateral to pay ordinary operating expenses and maintain the Hotel.

43.    The Debtor's use of cash collateral in the ordinary course of business will

allow the Debtor to preserve and protect its Property, and thus the Debtor will be protecting the

Mortgagee's collateral, including cash collateral, so that it does not decline in value during this

case. As stated in *In re Pine Lake Village Apartment Co.* 16 B.R. 750, 756 (Bankr. S.D.N.Y.

1982)

> . . . the application of rent income solely to maintain and repair the property so as to
> prevent further deterioration will enhance the value of the property which serves as
> the collateral for the. . . plaintiff-mortgagee's claim. [The use of such funds]
> without any diversion ... to the debtor, clearly ensures that the plaintiff-mortgagee's
> investment is adequately protected.

*Accord, In re 499 W. Warren Street Associates, Ltd. Partnership* 142 B.R. 53 (Bankr.

N.D.N.Y.,1992); *In re Constable Plaza Associates, L.P*. 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991);

*In re Cardinal Industries, Inc*. 118 B.R. 971 (Bankr..S.D.Ohio 1990).

44.    As provided for in the Budget, therefore, the Debtor seeks to use Lender's

cash collateral to pay for ordinary expenses such as payroll, supplies, utilities, taxes, insurance,

and maintenance for the Hotel and Property.

45.    It is the Debtor's burden of proof to show adequate protection. The burden

of  proof is by a preponderance of the evidence. *See*, §363(p) of the Bankruptcy Code; *In re

Glastream Boats, Inc.*, 110 B.R. 611 (Bankr. M.D. Ga. 1990); *Grogan v. Gamer*, 498 U.S. 279

(1991).

46.     As noted above, at the time of the financing of the Property, there was a
substantial equity cushion. Since the valuation of the Debtor's assets is subject to later
determination by the Court, the Debtor proposes that it will use the Lender's Cash Collateral to (a)
maintain the value of the Property though payment of the normal monthly operating expenses
substantially in  accord with the Budget, (b) maintain the cash it collects over and above its
expenditures in its debtor in possession account pending further order of this Court, and (c) to the
extent that the Lender does not have a post-petition security interest in the Debtor's post-petition
assets, grant the Lender a security interest in such assets to the extent of any diminution of Cash
Collateral (subject and subordinate to, *inter alia*, the fees of the United States Trustee and the
professional fees of the Debtor's professionals). The foregoing, the Debtor believes, adequately
protects the Lender's claim.

47.     In addition, use of Cash Collateral to pay the operating expenses of the
Hotel preserves the Property under section 506(c) of the Bankruptcy Code.

48.     The Court may grant interim relief in respect of a motion filed pursuant to
section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid
immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR.
P.4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this
jurisdiction generally apply the same business judgment standard applicable to other business
decisions. *In re Ames Dept. Stores,* 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990).

49.     In that regard, the Debtor and its estate will suffer immediate and
irreparable harm if the interim relief requested herein, including authorizing the Debtor's ability to

12

use Cash Collateral on an interim basis pending a final hearing is not granted promptly after the filing of this Cash Collateral Motion. The Debtor has no cash to fund operations without immediate access to Cash Collateral. Accordingly, the Debtor has an immediate need for cash to continue the operation of the Hotel, maintain relationships with vendors, employees and guests, and otherwise satisfy operational needs for the Hotel, all of which is required to preserve and maintain the Debtor's value for the benefit of all parties in interest.

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date that is no earlier than 14 days after entry of the interim order as a final hearing for consideration of entry of the Final Order.

51.     The Debtor requests that it be authorized to serve a copy of the signed interim order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

52.     Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) counsel for the Lender (iii) the holders of the twenty (20) largest unsecured claims against the Debtor; and (iv) all parties who have filed appearances in this case and requests notices. The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

53.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court grant the relief

requested herein, and that the Court grant such other and further relief as the Court deems just and

proper.

Dated: New York, New York
         February 25, 2021

                        **BACKENROTH FRANKEL & KRINSKY, LLP**
                        **Attorneys for the Debtor**


                        By:     s/Mark Frankel
                                800 Third Avenue
                                New York, New York 10022
                                (212) 593-1100

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re                                                        Chapter 11

      96 Wythe Acquisition LLC,                    Case no.  21-22108 (RDD)

                 Debtor.              <u>VERIFICATION</u>

-----------------------------------------------------------x

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

      David Goldwasser states under penalty of perjury as follows:  I am the Chief Restructuring Officer of 96 Wythe Acquisition LLC, I have reviewed the annexed pleading and the facts therein are true and correct to the best of my knowledge, information and belief.

Dated: New York, New York
      February 25, 2021

                                         <u>s/David Goldwasser</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                    Chapter 11

      96 Wythe Acquisition LLC,                 Case no.  21-22108 (RDD)

                         Debtor.
----------------------------------------------------------x
STATE OF NEW YORK      )
                   ) ss.:
COUNTY OF NEW YORK  )

Mark A. Frankel states under penalty of perjury as follows:

       1.     I am a member of the firm of Backenroth Frankel & Krinsky, LLP ("BFK"),
which maintains an office for the practice of law at 800 Third Avenue, New York, New York
10022. I am fully familiar with the facts hereinafter stated, and make this affidavit in support of
the application of the above-captioned debtors (the "Debtors") for an order, among other things,
setting an expedited hearing on the Debtors' application to use cash collateral.

       2.     The Debtors are moving by order to show cause instead of by notice of
motion, because the minimum notice period under Bankruptcy Rule 4001 is fourteen days for use
of cash collateral, and to effectively manage their properties the Debtors must address pressing
obligations before the fourteen day notice period expires.

Dated: New York, New York
      February 25, 2021

                                 s/Mark Frankel

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                                    Chapter 11
\
      96 Wythe Acquisition LLC,                          Case no.  21-22108 (RDD)

                 Debtor.
----------------------------------------------------------x


### **INTERIM OREDER FOR USE OF CASH COLLATERAL**


          Upon the motion (the "Cash Collateral Motion") for an order pursuant to

§ 363(c)(2)(B) and 506(c) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking

the entry of an order (A) authorizing 96 Wythe Acquisition LLC (the "Debtor") to use cash

collateral as that term is defined in §363(a) of the Bankruptcy Code (the "Cash Collateral") on

an interim basis in general accordance with the Budget (the "Budget") annexed to the Cash

Collateral Motion as Exhibit "A", pending a final hearing, (B) granting adequate protection to

96 Wythe Acquisition LLC (the "Lender") and scheduling a final hearing pursuant to

Bankruptcy Rule 4001; and

      **UPON** proof of service of the Cash Collateral Motion in accordance with the

Bankruptcy Rules and such notice appearing adequate under the circumstances and sufficient

cause appearing to me therefor; it is

**ORDERED,** that the Debtor is authorized on an interim basis to use Cash Collateral

generated by the Hotel[1] on the terms set forth herein; and it is further

**ORDERED,** that **p**ending further order of this Court, pursuant to 11 U.S.C. §§

363(c)(2) and 506(c), the Cash Collateral shall be used by the Debtor in the ordinary course of

its business to pay the reasonable and necessary operating expenses of the Debtor in general

accordance with the Budget which is incorporated herein, and that without further order of the

Court, the Debtor may exceed any line-item in the Budget and make expenditures not on the

Budget for ordinary course of business expenses that it deems to be appropriate in its business

judgment as necessary to operate the business and maintain the Hotel and the Debtor's

Property; and it is further

**ORDERED,** that as adequate protection for the Debtor's use of Cash Collateral, the

Debtor will (a) maintain the value of the Property though payment of the normal monthly

expenditures in general accord with the Budget, (b) maintain the cash it collects over and

above its expenditures in its debtor in possession account pending further order of this Court,

(c) provide that all liens and security interests of the Lender, if any, in the Cash Collateral

used and consumed pursuant to this Order shall constitute a claim, secured by a lien in all of

the pre-petition and post-petition assets of the Debtor in the same order of priority as existed

prior to the Petition Date (the "Adequate Protection Lien") to the extent of any diminution in

the level of Cash Collateral as it existed as of the Petition Date, *provided however* that such

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Cash Collateral Motion

2

Adequate Protection Lien shall at all times be subordinate to (i) professional fees and reimbursement of expenses that may be awarded pursuant to 11 U.S.C. §§330 and 331 to professionals retained by the Debtor, (ii) any professionals employed by committees in this case and retained by order of this Court; and (iii) quarterly fees of the United States Trustee. If the Court subsequently determines that there has been no diminishment in the values of Cash Collateral since the Petition Date as a result of the Debtor's use of Cash Collateral, the Adequate Protection Lien and all claims and priorities granted herein with respect thereto shall be void; and it is further

ORDERED, that the terms of this Order shall be effective until a final order authorizing the use of Cash Collateral is entered. In the event a party files a motion objecting to the Debtor's continued use of Cash Collateral, the Debtor shall be authorized to continue to use Cash Collateral and their use of Cash Collateral may only be terminated until after the Court makes an adverse determination on such motion; and it is further

ORDERED, that if any or all of the provisions of this Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacation shall not affect the validity of any payments made hereunder or the validity and enforceability of any lien, security interest or priority authorized hereby with respect to any of the Cash Collateral which has been used pursuant to this Order, and notwithstanding such stay, modification or vacation, any use of Cash Collateral by the Debtor prior to the effective date of such modification, stay or vacation shall be governed in all respects by the original provisions of this Order; and it is further

3

ORDERED, that nothing herein shall constitute an admission or waiver by either Lender or the Debtor of any of their rights under the underlying note, mortgage, the property securing the note, or any of rights of any kind. Nor shall anything herein constitute an admission by the Debtor of the validity and amount of the Lender's claims against the Debtor or of the extent, priority and perfection of the Lender's security interests in the Debtor's assets and the Debtor reserves its rights to object to the Lender's claims and validity, extent and priority of the Lender's security interests in the Debtor's assets and seek direct relief against the Lender; and it is further

ORDERED, that that a final hearing to consider the Debtor's use of Cash Collateral shall be held, telephonically, on March ___, 2021 at     :00 a/p.m. before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street**,** White Plains, New York 10601; and it is further

**ORDERED**, that that any party who wishes to attend the telephonic hearing is required to make arrangements through Court Solutions at www.court-solutions.com .

Dated:          White Plains, New York
               February ___, 2021

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

4

# EXHIBIT A

**The Williamsburg Hotel**
96 Wythe Acquisition LLC
14 Week Budget - Cash Collateral Motion

| | Projected | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb-21 (2/22 to 2/28) | | Mar-21 | | Apr-21 | | May-21 | |
| | PTD | % | PTD | % | PTD | % | PTD | % |
| Number of Rooms | 147 | | 147 | | 147 | | 147 | |
| Days | 7 | | 31 | | 30 | | 31 | |
| Available Rooms | 1,029 | | 4,557 | | 4,410 | | 4,557 | |
| Occupied Rooms | 494 | | 2,210 | | 2,426 | | 2,734 | |
| Occupancy Percent | 48.00% | | 48.50% | | 55.00% | | 60.00% | |
| Average Daily Rate | $240.00 | | $242.50 | | $270.00 | | $280.00 | |
| RevPAR | $115.20 | | $117.61 | | $148.50 | | $168.00 | |
| **Revenue** | | | | | | | | |
| Rooms | $118,541 | 75.97% | $535,960 | 78.71% | $654,885 | 77.74% | $765,576 | 74.29% |
| Food & Beverage | $35,000 | 22.43% | $135,000 | 19.82% | $175,000 | 20.77% | $250,000 | 24.26% |
| Rental & Other Income | $2,500 | 1.60% | $10,000 | 1.47% | $12,500 | 1.48% | $15,000 | 1.46% |
| **Gross Revenue** | **$156,041** | **100.00%** | **$680,960** | **100.00%** | **$842,385** | **100.00%** | **$1,030,576** | **100.00%** |
| **Department Expenses** | | | | | | | | |
| **Rooms** | | | | | | | | |
| **Payroll** | | | | | | | | |
| Salaries & Wages | $23,708 | 20.00% | $101,832 | 19.00% | $121,154 | 18.50% | $137,804 | 18.00% |
| Payroll Taxes | $2,549 | 2.15% | $10,947 | 2.04% | $13,024 | 1.99% | $14,814 | 1.94% |
| Employee Benefits | $1,897 | 1.60% | $7,637 | 1.43% | $9,087 | 1.39% | $10,335 | 1.35% |
| Contract Labor | $356 | 0.30% | $1,072 | 0.20% | $1,310 | 0.20% | $1,723 | 0.23% |
| **Total Payroll** | **$28,509** | **24.05%** | **$121,489** | **22.67%** | **$144,574** | **22.08%** | **$164,675** | **21.51%** |
| **Other Expenses** | | | | | | | | |
| Allocated F&B Payroll | $948 | 0.80% | $4,073 | 0.76% | $4,846 | 0.74% | $5,512 | 0.72% |
| Amenities & Supplies | $3,675 | 3.10% | $16,615 | 3.10% | $20,301 | 3.10% | $23,350 | 3.05% |
| Dues, Subscriptions & Services | $1,600 | 1.35% | $7,235 | 1.35% | $8,514 | 1.30% | $9,187 | 1.20% |
| Linen & Uniforms - Laundry & Replacemen | $5,334 | 4.50% | $25,458 | 4.75% | $31,107 | 4.75% | $36,365 | 4.75% |
| Travel Agent Commissions | $11,854 | 10.00% | $52,256 | 9.75% | $62,214 | 9.50% | $70,816 | 9.25% |
| **Total Other Expenses** | **$23,412** | **19.75%** | **$105,638** | **19.71%** | **$126,982** | **19.39%** | **$145,230** | **18.97%** |
| **Total Rooms** | **$51,921** | **43.80%** | **$227,127** | **42.38%** | **$271,556** | **41.47%** | **$309,905** | **40.48%** |
| **Food & Beverage** | | | | | | | | |
| **Payroll** | | | | | | | | |
| Salaries & Wages | $17,500 | 50.00% | $63,788 | 47.25% | $80,500 | 46.00% | $111,250 | 44.50% |
| Payroll Taxes | $2,695 | 7.70% | $8,404 | 6.23% | $10,675 | 6.10% | $14,875 | 5.95% |
| Employee Benefits | $1,400 | 4.00% | $4,784 | 3.54% | $5,635 | 3.22% | $7,788 | 3.12% |
| Contract Labor | $0 | 0.00% | $3,038 | 2.25% | $3,850 | 2.20% | $5,000 | 2.00% |
| Allocated to Other Departments | ($1,807) | -5.16% | ($7,819) | -5.79% | ($9,479) | -5.42% | ($11,180) | -4.47% |
| **Total Payroll** | **$19,788** | **56.54%** | **$72,194** | **53.48%** | **$91,181** | **52.10%** | **$127,732** | **51.09%** |
| **Other Expenses** | | | | | | | | |
| Cost of Goods Sold | $9,100 | 26.00% | $33,750 | 25.00% | $42,875 | 24.50% | $58,750 | 23.50% |
| Equipment, Supplies & Services | $1,838 | 5.25% | $8,033 | 5.95% | $8,050 | 4.60% | $10,625 | 4.25% |
| Marketing & Promotion | $5,250 | 15.00% | $23,288 | 17.25% | $30,450 | 17.40% | $43,750 | 17.50% |
| **Total Other Expenses** | **$16,188** | **46.25%** | **$65,070** | **48.20%** | **$81,375** | **46.50%** | **$113,125** | **45.25%** |
| **Total Food & Beverage** | **$35,976** | **102.79%** | **$137,264** | **101.68%** | **$172,556** | **98.60%** | **$240,857** | **96.34%** |
| **Total Departmental Expenses** | **$87,897** | **56.33%** | **$364,391** | **53.51%** | **$444,112** | **52.72%** | **$550,762** | **53.44%** |
| **Departmental Profit** | | | | | | | | |
| Rooms | $66,620 | 56.20% | $308,834 | 57.62% | $383,329 | 58.53% | $455,671 | 59.52% |
| Food & Beverage | ($976) | -2.79% | ($2,264) | -1.68% | $2,444 | 1.40% | $9,143 | 3.66% |
| Rentals & Other Income | $2,500 | 100.00% | $10,000 | 100.00% | $12,500 | 100.00% | $15,000 | 100.00% |
| **Gross Operated Income** | **$68,144** | **43.67%** | **$316,569** | **46.49%** | **$398,273** | **47.28%** | **$479,814** | **46.56%** |

**The Williamsburg Hotel**
96 Wythe Acquisition LLC
14 Week Budget - Cash Collateral Motion

| | Projected | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Feb-21 (2/22 to 2/28) | | Mar-21 | | Apr-21 | | May-21 | |
| | PTD | % | PTD | % | PTD | % | PTD | % |
| **General Hotel Expenses** | | | | | | | | |
| **Administrative and General** | | | | | | | | |
| Payroll | $27,089 | 17.36% | $117,261 | 17.22% | $139,309 | 16.54% | $144,886 | 14.06% |
| Allocated F&B Payroll | $312 | 0.20% | $1,362 | 0.20% | $1,685 | 0.20% | $2,061 | 0.20% |
| Banking & CC Processing Fees | $5,227 | 3.35% | $21,791 | 3.20% | $26,535 | 3.15% | $31,948 | 3.10% |
| Admin & General Expenses | $5,508 | 3.53% | $24,038 | 3.53% | $27,630 | 3.28% | $32,051 | 3.11% |
| **Total Administrative & General** | **$38,136** | **24.44%** | **$164,452** | **24.15%** | **$195,160** | **23.17%** | **$210,946** | **20.47%** |
| | | | | | | | | |
| **Information & Telecom** | | | | | | | | |
| Cost of Phone & Internet Services | $1,248 | 0.80% | $4,903 | 0.72% | $4,886 | 0.58% | $4,947 | 0.48% |
| System Expenses | $2,029 | 1.30% | $8,172 | 1.20% | $8,845 | 1.05% | $9,275 | 0.90% |
| Dues, Subscriptions, Supplies & Service | $936 | 0.60% | $4,086 | 0.60% | $4,043 | 0.48% | $4,122 | 0.40% |
| **Total Information & Telecom** | **$4,213** | **2.70%** | **$17,160** | **2.52%** | **$17,774** | **2.11%** | **$18,344** | **1.78%** |
| | | | | | | | | |
| **Sales & Marketing** | | | | | | | | |
| Payroll | $4,114 | 2.64% | $24,327 | 3.57% | $30,094 | 3.57% | $35,787 | 3.47% |
| Allocated F&B Payroll | $234 | 0.15% | $1,021 | 0.15% | $1,264 | 0.15% | $1,546 | 0.15% |
| Dues, Subscriptions & Services | $1,170 | 0.75% | $3,405 | 0.50% | $4,212 | 0.50% | $5,153 | 0.50% |
| Marketing | $2,341 | 1.50% | $14,641 | 2.15% | $21,902 | 2.60% | $25,455 | 2.47% |
| **Total Sales & Marketing** | **$7,859** | **5.04%** | **$43,394** | **6.37%** | **$57,472** | **6.82%** | **$67,941** | **6.59%** |
| | | | | | | | | |
| **Property Operations & Maintenance** | | | | | | | | |
| Payroll | $10,283 | 6.59% | $44,463 | 6.53% | $53,142 | 6.31% | $62,221 | 6.04% |
| Allocated F&B Payroll | $312 | 0.20% | $1,362 | 0.20% | $1,685 | 0.20% | $2,061 | 0.20% |
| Repairs & Maintenance | $5,383 | 3.45% | $18,726 | 2.75% | $22,323 | 2.65% | $26,589 | 2.58% |
| Supplies | $390 | 0.25% | $1,702 | 0.25% | $2,106 | 0.25% | $2,576 | 0.25% |
| **Total Property Operations & Maintenance** | **$16,369** | **10.49%** | **$66,254** | **9.73%** | **$79,256** | **9.41%** | **$93,447** | **9.07%** |
| | | | | | | | | |
| **Utility Costs** | $13,966 | 8.95% | $53,115 | 7.80% | $44,646 | 5.30% | $41,738 | 4.05% |
| | | | | | | | | |
| **Total Undistributed Expenses** | **$80,543** | **51.62%** | **$344,375** | **50.57%** | **$394,308** | **46.81%** | **$432,417** | **41.96%** |
| | | | | | | | | |
| **Gross Operating Profit** | **($12,399)** | **-7.95%** | **($27,806)** | **-4.08%** | **$3,965** | **0.47%** | **$47,397** | **4.60%** |
| | | | | | | | | |
| Management Fee | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% |
| **Income Before Fixed Charges** | **($12,399)** | **-7.95%** | **($27,806)** | **-4.08%** | **$3,965** | **0.47%** | **$47,397** | **4.60%** |
| | | | | | | | | |
| **Fixed Charges** | | | | | | | | |
| Total Insurance | $5,000 | 3.20% | $20,000 | 2.94% | $20,000 | 2.37% | $20,000 | 1.94% |
| **Total Fixed Charges** | **$5,000** | **3.20%** | **$20,000** | **2.94%** | **$20,000** | **2.37%** | **$20,000** | **1.94%** |
| | | | | | | | | |
| **EBITDA** | **($17,399)** | **-11.15%** | **($47,806)** | **-7.02%** | **($16,035)** | **-1.90%** | **$27,397** | **2.66%** |