UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                                           Chapter 11

    96 Wythe Acquisition LLC,                                Case No.  21-22108

                           Debtor.                      **Local Rule Statement**
----------------------------------------------------------x
STATE OF NEW YORK         )
                          ) ss:
COUNTY OF NEW YORK    )

        David Goldwasser, as Chief Restructuring Officer of 96 Wythe Acquisition LLC (the "Debtor" or "Borrower"), deposes and says under penalty of perjury, as follows:

        I submit this declaration in accordance with Local Bankruptcy Rule 1007-2 in support of the Debtor's filing of a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

        1.     On or about February 22, 2021, I was appointed Chief Restructuring Officer ("CRO") reporting to Michael Lichtenstein and Toby Moscovits, who control the Debtor by and through the Debtor's parent entities.  I specialize in business restructuring, bankruptcy and litigation planning, including Chapter 11 reorganization, bankruptcy claims, tax liens, and rescue capital for distressed commercial real estate.  I have over 20 years of litigation and crisis management experience and have appeared on behalf of debtors in over thirty bankruptcy cases in the Southern and Eastern Districts of New York.

        2.     On February 23, 2021, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

3. The Debtor owns and operates the Williamsburg Hotel (the "Hotel") located at 96 Wythe Avenue, Brooklyn, New York, (the "Property"). The Property is a ten story, 147 room hotel with a rooftop pool, a bar and restaurant and a separate, elevated and enclosed bar that sits above the pool referred to as the Water Tower Bar. The Debtor has approximately 80 employees.

4. On December 13, 2017, the Debtor borrowed $68 million (the "Loan") from Benefit Street Operating Partnership, L.P. under a loan agreement ("Loan Agreement") to construct the Hotel. The Loan was subsequently assigned to BSPRT 2018-FL3 Issuer, Ltd. (the "Lender" or the "Mortgagee").

5. The Debtor's financial problems pre-date the COVID-19 pandemic. They arise from the Mortgagee's misconduct in: (i) denying that the Debtor had completed construction; (ii) Lender's consequent demands for additional interest as a result thereof; and (iii) Lender's ultimate filing of a foreclosure complaint. Lender's actions obstructed the Debtor's ability to refinance the Loan.

6. Under the Loan Agreement, the Debtor had a May 31, 2018 deadline to complete construction (the "Completion Date"), failing which the Lender would be entitled to a 0.5% increase in the contract interest rate, which would reset once those conditions were satisfied.

7. The maturity date was June 7, 2019 (the "Maturity Date"). The Debtor had the option "to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (the 'Extension Option') of six (6) months each (each, an 'Extension Period') to

(i) December 9, 2019 if the first Extension Option was exercised and (ii) June 9, 2020 if the second Extension Option was exercised.

8. At the closing of the Loan in December 2017, $1,651,000 was placed in a "Business Plan Reserve Account," to ensure adequate funding of the Debtor's contractors, materials and services in the first instance. Upon the Debtor's certification of completion of such work, lien releases from all contractors and subcontractors, and Lender's construction site visit, the Lender was obligated to "reimburse" the Debtor from the Business Plan Reserve Account.

9. Work proceeded without controversy or incident, and the Debtor achieved "Completion" of the "Business Plan Work" as defined in the Loan Agreement by the end of June 2018. The was open for business and operating with all amenities. Guestrooms, pool and related facilities, and the food and beverage outlets were all operational.

10. The Debtor notified Lender that it satisfied the Operating Condition by the end of June 2018, thereby terminating the 0.5% Rate Increase Event.

11. Lender disagreed with Borrower's notification and claimed instead that the Operating Condition had not yet been satisfied. The Lender refused to terminate the 0.5% interest rate increase. This 0.5% increase constituted, on average, an additional $29,000.00 of interest per month, wrongfully running in favor of Lender and against the Debtor as of, at least, June 30, 2018.

12. There was no risk of non-payment of this additional interest in the near term as the Lender also held two months of interest reserve under the Loan Agreement. But the parties would soon be at odds when, as turned out to be the case, the Lender paid itself more interest than was actually owed—by $29,000.00 per month on average—and demanded that the

Debtor make up the difference by depositing an extra $29,000.00 of fresh funds into the Interest Reserve Account to keep the required two months of interest on deposit at all times.

13. On a without prejudice basis, in an effort to maintain an amicable relationship with Lender and move the Project forward, the Debtor paid the excess interest rate for the months of June 2018 and July 2018, and topped up the interest reserve accordingly.

14. By August 2018, however, Borrower had enough. Lender continued to refuse to accept that the Operating Condition was satisfied. Indeed, the Project had become fully operational, and yet Lender continued to saddle Borrower with the additional 0.5% interest rate averaging $29,000.00 per month. Accordingly, Borrower refused to continue to pay the higher interest rate. Instead, Borrower made monthly payments from August 2018 through November 2018 sufficient to fund the Interest Reserve Account in accordance with the Loan Agreement at the agreed interest rate level, without the unauthorized 0.5% surcharge that had been assessed by Lender.

15. In violation of the Loan Agreement, Lender nevertheless continued paying itself at the higher interest rate from the Interest Reserve Account. Between July 2018 and December 2018, Lender pocketed approximately $173,777.78 of unauthorized additional interest from Borrower, based on Lender's refusal to acknowledge that the Operating Condition was satisfied.

16. Lender's actions caused the Interest Reserve Account to fall below the agreed two months of interest payable from the Debtor to Lender. Naturally, the Lender had the upper hand. It could declare the Debtor in default and demand a cure. That demand would be made not only to the Debtor, but WH Mezz Lender, LLC, the mezzanine lender (the "Mezz

Lender") who had made a $13,000,000 loan to the Debtor's parent company, secured by the membership interests in the Debtor.

17. On November 28, 2018, therefore, in a further attempt to bring this matter to resolution, Debtor requested another Property site inspection in order to further confirm that the construction work was completed and the Operating Condition was satisfied. Such an inspection would also trigger the release of a further construction draw from the Business Plan Reserve Account in the amount of $300,000.00. As explained above, the $300,000.00 construction draw would have simply shuffled Borrower's own money to the Interest Reserve Account, which Borrower also funded. In other words, Borrower was paying four times—first to fund the construction reserves, second for the construction itself, third for the interest reserve, and fourth to pay monthly interest.

18. Instead of scheduling the site inspection within two to three days as had customarily occurred, Lender took two weeks to schedule the inspection despite Borrower furnishing sufficient documentation to support the inspection and making countless attempts to expedite the process. Nonetheless, Lender refused to schedule the inspection until December 11, 2018.

19. On information and belief, Lender was in no hurry to schedule the Property site inspection since Lender knew that if it did not release the construction draw from the Business Plan Reserve Account until after December 7, 2018, which was the due date for Borrower's interest payment, Borrower might have considerable difficulty topping up the Interest Reserve Account by its December 2018 deadline.

20. Nonetheless, Borrower paid Lender over $300,000.00 between November 28 and December 10, 2018, and, with the rate cap provider, Lender was paid over $319,512.86 during this time frame.

21. Borrower, aware of its impending December 2018 payment due date and the delayed property site inspection, made numerous requests to Lender in an effort to reach an agreement regarding the release of the $300,000.00 in the Business Plan Reserve Account.

22. Specifically, Borrower requested that the $300,000.00 in the Business Plan Reserve Account be transferred to the Interest Reserve Account until the delayed inspection could be completed. As both parties well knew, the requested transfer of Borrower's money from the Business Plan Reserve Account to the Interest Reserve Account would have cost Lender nothing but would have enabled Borrower to make its December 2018 payment without a technical Event of Default under the Loan Documents.

23. Lender was not interested. Indeed, its response revealed its true motives. Lender agreed to Borrower's request to transfer $300,000.00 from the Business Plan Reserve Account to the Interest Reserve Account, but only on the condition that Borrower acknowledge that the Business Plan Work had been completed, entitling the Lender to the higher interest rate since June 2018.

24. At $29,000.00 per month of unwarranted interest from July 2018, the requested concession would likely have amounted to a $348,000 cost to simply move $300,000.00 of Borrower's money from one reserve account to the other. The Debtor refused.

25. As a result, the Debtor did not make the December 7, 2018 payment, in the belief that the needed funds would be in hand shortly after the December 11, 2018 construction site visit and would soon be paid from the Business Plan Reserve Account.

26. On December 10, 2018—one day before Borrower's scheduled property site inspection—Borrower received a notice of default letter from Lender for Borrower's failure to make the December 2018 payment. The default letter notified Borrower that various monetary defaults needed to be cured but did not specify the total amount it claimed to be due with per diem amounts accruing. The Debtor calculated $1,239,365.45.

27. Pursuant to an intercreditor agreement ("Intercreditor Agreement"), Mezz Lender also received notice of Borrower's purported default and was given the opportunity to cure such default.

28. In retrospect, Lender's vagueness on the asserted cure amount intended to obstruct curing the putative "default."

29. On December 19, 2018, Mezz Lender timely paid the $1,239,365.45 cure amount to Lender via wire transfer (the "First Mezz Lender Cure Payment"). Of the sum paid as a cure amount, Borrower contributed $240,000.00.

30. The Debtor believes that the First Mezz Lender Cure Payment made Lender whole and cured the pending default in its entirety. Lender never informed the Debtor it was claiming an additional $94,000.00 for default interest. Had the Lender told the Debtor, the Debtor could have, and would have, paid the default interest on December 19, 2018. Indeed, Borrower had well over $94,000.00 in the Interest Reserve Account.

31. Instead, Lender hid the fact that $94,000.00 of default interest was owed, not once disclosing the owed default interest to Borrower despite the numerous communications between Lender and Borrower regarding the default. Lender's tactic was clear. Lender not only wanted to prevent Borrower from curing the alleged default, Lender also wanted the $94,000.00 to compound and double in amount.

32. Thereafter, the Lender sent monthly default letters and the Debtors and Mezz Lender paid the cure the amounts due plus payment of the unwarranted higher interest rate of 0.5% even though the Hotel was fully operational.

33. On June 3, 2019, Borrower and Lender entered into negotiations in an attempt to the resolve Borrower's alleged defaults under the Loan Documents.

34. Borrower sought and obtained a term sheet to refinance with a new lender at a low interest rate. But based on the Loan default notices, the new lender advised that it could not refinance the Loan because it could not lend money to a borrower that had a default under its loan terms.

35. On June 5, 2019, Borrower received a payoff letter from Lender good through June 7, 2019. On June 7, 2019, the Lender asserted a maturity default.

36. Due to Lender's sequential, contrived and overlapping default notices, Borrower was never given the ability to exercise its option under the Loan Agreement to extend the Maturity Date prior to receiving the June 7, 2019 default letter.

37. The lender commenced a foreclosure action in New York County, Supreme Court (the "Foreclosure Action") four days later.

38. Constantino Sagonas, was appointed temporary receiver ("Receiver") for the Hotel in the Foreclosure Action. The Receiver is in poor health and a motion was made in the Foreclosure Action to relieve him of control. Upon the filing of the bankruptcy case, the Receiver has agreed to cooperate in transferring control of the accounts he maintained to the Debtor. The Debtor's day to day operations are managed by a hotel manager which has managed the business throughout Mr. Sagonas' appointment, as directed by the Court in the Foreclosure Action. The Debtor intends to maintain the status quo with no change in day-to-day management.

39. The COVID-19 pandemic and the attendant travel restrictions and quarantine requirements beginning in March 2020 had an immediate impact on the hospitality industry as a whole and caused the Hotel to shut down operations entirely for a period of time. The Debtor has reopened and employs 80 workers.

40. No pre-petition committee was organized prior to the Order for relief.

41. A summary of the Debtor's' assets and liabilities is forth on the Debtor's summary of schedules.

42. The names and addresses of the Debtor's twenty largest unsecured creditors, has been filed with the Petition.

43. All suits or proceedings in which the Debtor is named as a party will be listed in the Debtor's Statement of Financial Affairs to be filed.

44. The estimated operating expenses of the Debtors for the next **thirty days** is attached the Debtors' Cash Collateral Motion.

Dated: New York, New York
      February 25, 2021

                                                s/David Goldwasser, as Chief Restructuring Officer