KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
David Braun
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                        :
In re:                                                  :        Chapter 11
                                                        :
96 WYTHE ACQUISITION LLC,                               :        Case No. 21-22108 (RDD)
                                                        :
                              Debtor.                   :
                                                        :
----------------------------------------------------------------- X

**BENEFIT STREET'S OBJECTION TO DEBTOR'S**
**APPLICATION TO USE CASH COLLATERAL**

        Benefit Street Partners Realty Operating Partnership, L.P.[1] ("Benefit Street") submits this

objection to the Application of 96 Wythe Acquisition LLC (the "Debtor") to Use Cash Collateral

[ECF No. 4] (the "Motion").  In support of its Objection, Benefit Street represents as follows:

**PRELIMINARY STATEMENT**

        1.        The Debtor operates the Williamsburg Hotel in Brooklyn, New York.

Benefit Street provided the Debtor with a $68 million construction completion loan secured by all

of the assets of the Debtor.  That loan matured in early June 2019.  Rather than arrange a

refinancing or sale of the collateral, the Debtor has spent the ensuing 21 months litigating with

---
[1] Benefit Street is a wholly-owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.

Benefit Street to avoid its indisputable payment default.  A week before this case was filed, the Appellate Division, First Department rejected the Debtor's arguments on the merits and directed the entry of summary judgment for Benefit Street.

2.        In response, the Debtor has filed this chapter 11 case.  It offers no plan for the bankruptcy and no explanation of how it will repay Benefit Street on a matured secured loan with an outstanding balance in excess of $80 million.  Without even approaching Benefit Street to discuss a consensual adequate protection package, it seeks non-consensual use of Benefit Street's cash collateral to fund the case without any agreed process or customary milestones.  To "support" its application, it offers Benefit Street "adequate protection" consisting of (i) an alleged equity cushion that the Debtor makes no effort to prove, (ii) liens on collateral Benefit Street already holds, and (iii) the continued operation of the business by the Debtor based on a budget that the proposed order allows the Debtor to disregard in its discretion and that may allow improper payments to insiders and affiliates.  On its face, such a showing is inadequate to justify the relief the Debtor seeks, whether on an interim or a final basis.

3.        That said, Benefit Street agrees the Hotel's business should be preserved and is prepared to negotiate a consensual agreement on cash collateral that allows for the payment of bona fide expenses as part of an agreed process to repay Benefit Street and reorganize the Debtor.  Consistent with its longstanding litigation-only strategy, however, the Debtor has systematically starved Benefit Street of information concerning the Hotel's operations in violation of the parties' agreements.  To properly assess any use of cash collateral or begin negotiations, Benefit Street must receive full prompt access to the Debtor's books and records, including current and historic information concerning the Debtor's operating and financial results.  Furthermore, any use of cash collateral (consensual or not) must be subject to market terms such as: an agreed

line item budget with limited variances, timely and complete reporting to monitor compliance with that budget, case milestones to assure prompt progress towards a conclusion that addresses creditor concerns, an independent monitor to assure that the Debtor's operations are conducted for the benefit of the estate and not insiders or non-debtor affiliates, and current pay of interest and professional fees, etc.

4.     To allow Benefit Street to receive and digest the necessary information and then negotiate with the Debtor, Benefit Street is prepared to consent to a brief two-week interim use of cash collateral on terms to be negotiated. If the parties cannot reach agreement, they can return to the Court to schedule whatever additional briefing or hearings are needed with respect to a further use of cash collateral.

## BACKGROUND

### *Benefit Street's Loan and the Debtors' Defaults*

5.     In December 2017, Benefit Street loaned the Debtor $68 million (the "Loan") to finance the completion of construction of the Williamsburg Hotel (the "Hotel") in Williamsburg, Brooklyn. The loan was embodied in a loan agreement (the "Loan Agreement") and secured by mortgage liens on and security interests in, among other things, the Hotel, the real property on which it stood, and all improvements, easements, fixtures, personal property, leases, rents, proceeds and agreements of the Hotel.

6.     The Loan matured in June 2019 – eight months *before* the COVID-19 pandemic – but the Debtor has not repaid Benefit Street any portion of the balance due. In the months before the Loan matured, the Debtor repeatedly defaulted by, among other things, failing to (i) pay any monthly interest since December 2018, (ii) discharge mechanics' liens that had attached to the property, (iii) complete construction of the Hotel in accordance with the parties' agreements, and (iv) reimburse Benefit Street's costs and expenses. Beginning in January 2020,

the Debtor also stopped paying real estate taxes and other charges on the real property underlying the Hotel. As of today, nearly $3.2 million in unpaid taxes, late charges, and interest have accrued. *See* Ex. A.

7.     As is common with certain types of defaulting borrowers, the Debtor struggles mightily to lay these failures at the feet of Benefit Street. Despite devoting over half its Motion to this effort, however, the Debtor somehow leaves out that it has already presented the same allegations to the New York State courts, which *rejected them on the merits*.

*The New York Courts Reject Debtor's Arguments and Authorize Benefit Street to Foreclose*

8.     Shortly after the Loan matured, Benefit Street filed a foreclosure action in the Commercial Division of the New York State Supreme Court. In response, the Debtor asserted that Benefit Street had anticipatorily breached the Loan Agreement and otherwise prevented the Debtor from performing. Based on these allegations, the Debtor asserted some seventeen affirmative defenses, including estoppel, waiver, unclean hands, failure of conditions precedent, breach of contract, satisfaction, and setoff. To these, the Debtor added three counterclaims, including one premised upon the allegation that Benefit Street had breached the parties' agreements.

9.     When Benefit Street moved for summary judgment on its foreclosure claim, the trial court struck seven of the Debtor's affirmative defenses and two of its counterclaims. However, it denied the motion with respect to Benefit Street's foreclosure claim, and declined to strike ten of the Debtor's affirmative defenses and one of its counterclaims.

10.     Benefit Street appealed. On February 16, 2021, the Appellate Division, First Department, unanimously reversed the trial court's decision and granted Benefit Street's summary judgment motion in full. *See* Ex. B. In so ruling, the First Department held that:

- Benefit Street "established prima facie entitlement to summary judgment by producing the mortgage, note, and guaranty executed by the defendants, and evidence of defendants' default on their obligations thereunder, including their failure to timely repay the principal balance of the loan";

- The "Defendants failed to rebut that evidence";

- The defendants had "waived their affirmative defenses and counterclaims"; and

- "In any event, the defenses and counterclaims were not viable."
  *Id.*

This ruling is binding on the Debtor. It conclusively establishes that the Debtor has defaulted under the Loan, and precludes further attempts to blame Benefit Street for the Debtor's defaults.

*Benefit Street Has Been Denied Information Concerning the Debtor's Operations*[2]

11.     While the foreclosure litigation proceeded, the Debtor withheld information concerning the Hotel from Benefit Street in violation of the express terms of the Loan Agreement. Section 8.4 of the Loan Agreement requires the Debtor to provide Benefit Street with a detailed monthly Cash Application Statement that shows:

> the net operating income, the amounts and sources of Rents and other revenue received by or on behalf of Borrower and the amounts and purposes of Approved Operating Expenses and Approved Extraordinary Expenses paid by or on behalf of Borrower with respect to the Property for the previous month and year-to-date (including, in each case, a comparison to the Approved Annual Budget), or the portion thereof, paid out of Rents or other revenue for such calendar month or year-to-date, as applicable; amounts funded into any reserves hereunder; amounts paid to Manager, if any; shortfalls that exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account; any Operating Deficiency; and the amount of any distributions made during such month (and year-to-date) pursuant to Section 8.1(a) above or from Excess Operating Cash Flow Funds, together with a certification of Borrower that Borrower has not made any distributions in violation of the terms of Section 8.1(a); such statements also to include delinquency reports, tenant and expenses payable and receivable reports, and occupancy statistics. Each such monthly statement shall provide for comparisons with the same calendar month in the immediately preceding calendar year, including year-to-date information, to the  extent Borrower is in

---

[2] Because the Debtor devoted so much space to misstating the background of its dispute with the lender, Benefit Street is briefly addressing certain operative facts. Regardless, Benefit Street has a substantial secured claim in these cases and the Debtor has failed to tailor (or otherwise support) its request for cash collateral to what is immediately necessary pending further agreement or Court order.

possession of such information for the applicable month and/or year-to date for the preceding calendar year.

Similarly, Section 4.12 of the Loan Agreement further requires the Debtor to provide Benefit Street with monthly and quarterly financial information including, among other things, operating statements, rent rolls, occupancy reports, and cash flow projections.

12.     Despite these express contractual requirements, since February 2019 – a period of two years – the Debtor has failed to provide Benefit Street with periodic reports as required by the Loan Agreement.

13.     Benefit Street's filing of the foreclosure action did not materially improve the information flow.  Although the state court appointed a receiver for the Hotel and the terms of the appointment order required the receiver to furnish copies of the Debtors' books and records to Benefit Street and to provide all parties with monthly reporting concerning the operations of the Hotel, the receiver did not do so.  Only when the state court held a series of hearings concerning the receiver's conduct earlier this year, did the Debtor and the receiver begin to provide some information to Benefit Street.  Even then, the information provided was incomplete and inadequate.

14.     Indeed, both the Debtor and Benefit Street were before the state court at one of these hearings on the morning the Debtor filed its chapter 11 petition.  The state court directed Benefit Street to obtain a copy of the transcript "which may be of interest to the Bankruptcy Court." *See* Ex. C at 5.  It then stated that "[i]t is apparent that many of the concerns that [Benefit Street] has expressed about the good faith conduct of the defendants may have a basis in reality."  *Id.* Whether the enforced disclosure of information concerning the Hotel played any part in the Debtor's decision to file remains unclear.

15.     Because it has not received timely required information reporting from the Debtor or the court-appointed receiver, Benefit Street does not currently have a clear understanding of the assumptions underlying the proposed cash collateral budget or the immediate cash requirements of the Debtor's business and, thus, cannot properly assess the Debtor's request to use cash collateral on an interim or final basis.  For example, the Debtor criticizes Benefit Street's refusal to approve the use of cash collateral to pay certain employees of the Debtor.  *See* Motion ¶ 41.  But from the sporadic information that it has received, Benefit Street has observed a significant increase in payroll expense for administrative staff beginning in 2020.  Since April of last year, G&A payroll has increased by over $50,000 per month.  These increases appear to be attributable to new managerial staff whose purpose is unclear.

16.     The Court may have wondered how a Brooklyn debtor with a Brooklyn hotel wound up in a Westchester bankruptcy court.  The answer appears to be that, over the last two years, the Debtor's equity holders – who preside over a minor, crumbling real estate empire – have filed several of their other failed projects in this Court.[3]  In the current Debtor-created information vacuum, Benefit Street is concerned that reversals in the equity holders' other projects may have led them to put administrative staff devoted to those or other properties on the Hotel's payroll.  Indeed, its understanding (based on admittedly imperfect information) is that many of the new Hotel employees are current or former employees of the Debtor's ultimate parent who appear on the parent's website.  Of course, the Hotel is not a piggybank to sustain failing affiliates of the Debtor.  Perhaps there is another explanation, but the Debtor has not provided it to Benefit Street and transparency is required when seeking the use of cash collateral.

---

[3] Benefit Street reserves its rights as to the propriety of this bankruptcy filing in Westchester.

*The Debtor Has Identified No Restructuring Options*

17.     Even though the Loan matured over 20 months ago, the Debtor appears to have focused its efforts exclusively on litigating with Benefit Street.  Over that period, it has never presented Benefit Street with any proposal to refinance or repay the Loan.  Although the Debtor now appears to argue – without offering evidence – that it has substantial equity in the Hotel, Benefit Street is not aware that the Debtor has made any effort to sell the collateral or otherwise realize on that equity.  Indeed, its behavior suggests the opposite is true.  A rational hotel owner that believed it had significant equity would never pursue a litigation-only path for two years while default interest mounted on a matured loan balance.  Even now, at the same time it begins another round of litigation with Benefit Street in this Court, the Debtor does not explain what it hopes to achieve through the bankruptcy or how the use of Benefit Street's cash collateral will help accomplish it.  Chapter 11 is not a cost-free "option" for the Debtor's equity holders to preserve their equity at the expense of other stakeholders.

## OBJECTION

18.     A debtor-in-possession may not use cash collateral without the consent of each creditor that has an interest in the collateral or court approval. *See* 11 U.S.C. § 363(c)(2). Court approval requires the Debtor to demonstrate that it is providing adequate protection of each secured creditor's interest in the property. 11 U.S.C. § 363(e).

19.     Adequate protection protects the secured creditor from a diminution in value of its interest in collateral during the period of its use. *See In re Worldcom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004).  While adequate protection may take different forms, the Bankruptcy Code lists several examples, including periodic cash payments, replacement liens, and other relief that "will result in the realization . . . of the indubitable equivalent of [the secured creditor's] interest in such property." 11 U.S.C. § 361.

20.     The burden of proof is on *the debtor* to establish that the interests of its secured creditors are adequately protected. *See* 11 U.S.C. § 363(p)(1) ("In any hearing under this section…the trustee has the burden of proof on the issue of adequate protection.").  "A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis." *In re Mosello,* 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

21.     The standards for an interim use of cash collateral are even more stringent. Under Bankruptcy Rule 4001(b)(2), the court may authorize interim use of "*only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing*" (emphasis added).

22.     Despite these clear standards, the Debtor does not demonstrate that it will provide Benefit Street with adequate protection for the use of its cash collateral.  The Debtor suggests that Benefit Street enjoyed an equity cushion in its collateral when it made the loan *over three years ago*, Motion ¶ 46, but it offers no evidence to demonstrate such a cushion exists today – after one year of an ongoing pandemic and two years of default interest – let alone that it is large enough to provide Benefit Street with adequate protection.  Nor does the Debtor acknowledge, much less account for, the almost $3.2 million in unpaid real estate taxes, other charges, interest and fees that it has permitted to accumulate on the real property since January 1, 2020 *that directly impair Benefit Street's collateral*.   Even if the Debtor could sustain its burden of proof, an equity cushion alone may not constitute adequate protection where the Debtor's inadequate financial reporting and unexplained increases in G&A expenses (potentially for the benefit of insiders) have made the future value of the Debtor's business unclear.  *See Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.),* 159 B.R. 165,169 (Bankr. W.D. Pa. 1993) (explaining that "[w]hile the present value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's

future operational plans may result in a rapid deterioration of the collateral"); *In re Atrium Development Co,* 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("An equity cushion does not always respond to or answer fully the whole range of risks to the value of the creditor's encumbrance.").

23.     Similarly, "to the extent the Lender does not already have a post-petition security interest" in its collateral, the Debtor offers Benefit Street such an interest.  Motion ¶ 46. This is, however, an empty gesture.  As the Debtor well knows, Benefit Street already holds such post-petition security interests under the terms of its agreements and Section 552 of the Bankruptcy Code.

24.     The Debtor also suggests that merely paying normal course operating expenses in accordance with its proposed budget will provide Benefit Street with adequate protection.  Motion ¶ 46.  The Debtor, however, offers no authority for the proposition that preservation of ongoing business operations itself constitutes adequate protection (without any plan for the cases or agreement upon a sale or refinancing path).  Whatever the merit of the legal proposition, moreover, it has no bearing here, where the Debtor has offered no evidence to suggest that the spending provided for under the proposed budget will preserve or enhance value for Benefit Street. *See, e.g.*, *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (rejecting reliance on speculative projections); *In re YL West 87th Holdings I, LLC*, 423 B.R. 421 (Bankr. S.D.N.Y. 2010) (same); *Mosello,* 195 B.R. at 290 (same).  In fact, the Debtor's budget projects that the Hotel will operate *at a loss* for at least the next two months – hardly an indication that the payment of all expenses in the budget will enhance the value of the collateral.  Nor has any detail been provided that the payment of expenses is tied to projected operations (e.g., based upon existing room bookings) and, therefore, reasonable.

25.     Finally, the Debtor makes no effort to meet the standards for an interim use of cash collateral. Nowhere does it identify which line items in the proposed budget are necessary to avoid irreparable harm or explain why such payments are necessary. Instead, the Debtor relies on the conclusory assertion that it has an immediate need for cash to continue operations, maintain vendor, employee and guest relationships and otherwise satisfy operational needs for the Hotel. Motion ¶ 49. That is not a specific showing that any expense is necessary to avoid immediate and irreparable harm to the estate prior to a final hearing and thus cannot support an award of interim relief.

26.     Despite the Debtor's history of litigation and its failure to establish that it is providing adequate protection to Benefit Street in connection with its Motion, Benefit Street does not categorically oppose the Motion. Rather, Benefit Street is prepared to consent to the use of its cash collateral *subject to the negotiation of an agreed adequate protection package*. While the Debtor has made no effort to begin that negotiation, Benefit Street expects that any consensual agreement will include, at least, the following elements:

- Complete current and historic financial and operational information on the Hotel. As explained above, the Debtor has not complied with its reporting obligations under the Loan documents for two years. Benefit Street must have open access to all of the Debtor's current and historic books and records, as well as accurate current reporting of operating and financial information. This would include (but not be limited to) the following information which should be provided on an expedited basis:

    o Forward booking report for all revenue outlets (rooms, restaurant, banquet etc.).

    o Prepaid Revenue Report

    o Accounts Receivable Report

    o Accounts Payable Report

    o Last 12 months of hotel operating account bank statements and hotel general ledger.

- Build up for various revenue line items with support.

- Build up for various expense line items with support.

- Position by position personnel expense with compensation as of end of February 2021 and projected staffing changes for each month of their proposed budget with support.

- Forecast of real estate and other taxes

- Forecast of insurance financing and premium requirements

- <u>Agreed Budget with Limited Variance</u>.  Because it has been denied information on the Debtor's business for so long, Benefit Street cannot fairly assess the proposed budget attached to the Motion.  Once Benefit Street receives appropriate information, however, any use of cash collateral must be subject to an agreed budget.  Any such budget should include line items for such matters as the beginning cash balance, real estate taxes, professional and UST fees, and debt service, all of which are absent from the Debtor's proposed budget.  Furthermore, the form of order the Debtor has submitted allows the Debtor to exceed any line item in the budget without limitation based solely upon its business judgment.  This is plainly not market.  Any consensual use of cash collateral should allow for no more than a 5% variance from agreed-upon budgeted amounts.

- <u>Case Milestones</u>.  The Debtor has had two years to resolve its issues with Benefit Street but has made no tangible progress towards either refinancing or repaying the matured Loan.  Even now, having filed this case, it does not explain how it plans to use bankruptcy to achieve this result.  While Benefit Street is prepared to allow the Debtor to pursue a refinancing, the time for these efforts must be limited.  The continuing accrual of default interest will only make the refinancing process more difficult and further erode whatever equity the Debtor contends it has in the Hotel.  If the Debtor cannot refinance or otherwise repay Benefit Street within this agreed period, the Debtor should retain an acceptable broker and sell the Hotel under Section 363 of the Bankruptcy Code.  Benefit Street may credit bid its debt at any such sale.

- <u>Independent Monitor</u>.  The Debtor appears to have hired a "Chief Restructuring Officer," David Goldwasser.  Despite his title, publicly available information suggests that Mr. Goldwasser's independence is open to question.  One of the affiliate petitions that the Debtor cites as a basis for laying venue in this District indicates that "GC Realty Advisors, LLC. c/o David Goldwasser" holds a 20% interest in that affiliate.  *See In re MY2011 Grand LLC*, Case No. 19-23957 [ECF No. 9, at 17] (Bankr S.D.N.Y. 2019). Based on this information, Mr. Goldwasser may well be an affiliate and insider of the Debtor.  Similarly, publicly available information links a

David Goldwasser to an entity named FIA Heritage Holdings, LLC. *See* Ex. D. The Debtor's petition lists FIA Heritage Holdings, LLC, at the same address as GC Realty Advisors, as holding an over $3 million unsecured claim against the Debtor. [ECF No. 1 at 7.] Interestingly, this is the only claim the Debtor's petition does not indicate is "disputed." Finally, press reports indicate that Mr. Goldwasser was imprisoned for bank fraud in the past. *See* Ex. E. If true, this information gives creditors little comfort that the estate will be properly administered. To provide creditors with assurance that the Debtor is complying with its fiduciary obligations – especially given a concern that expenses may have been pushed onto the Hotel to benefit the Debtor's equity holders – a reputable financial professional should be appointed to monitor the Debtor's operations and report to the Court and creditors.

- Current pay of interest and professional fees. The use of cash collateral should be subject to the Debtor's payment of current interest (at a non-default rate for purposes of adequate protection only) and reimbursement of Benefit Street's professional fees and expenses.

- Super priority claims and replacement liens. Benefit Street should receive a replacement adequate protection lien on all assets of the Debtor together with a superpriority claim to the extent of any diminution in value, including the use of cash collateral, which liens and superpriority claims shall not be subject to any carve-out other than those agreed to between Benefit Street and the US Trustee and, solely in the event of a consensual use of cash collateral, those agreed to between Benefit Street and the Debtor for the payment of professional fees.

- Professional Fee Carve Out. The form of order the Debtor submitted imposes a professional fee carve-out on Benefit Street's collateral. Benefit Street has not consented to the use of its cash collateral for this purpose and will not consent in the absence of a global agreement on the use of cash collateral. *See e.g. In re Addison Ltd. P'ship*, 185 B.R. 766, 778 (Bankr. N.D. Ill. 1995) (cash collateral may not properly be used to pay administrative expenses unless the secured parties consent or the interest secured by the collateral is adequately protected); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) (denying use of rents to pay administrative expenses where debtors failed to prove that the secured creditor's interest would be adequately protected).

- Events of Default. Use of Benefit Street's cash collateral must be subject to customary restrictions and events of default.

27. To allow the Debtor to provide the required information to Benefit Street and for the parties to thereafter engage in good faith negotiations, Benefit Street is prepared to

consent to an interim order allowing for two-week use of cash collateral in accordance with the Debtor's proposed budget. If the parties cannot come to agreement, they will return to the Court to determine the best way to proceed.

## CONCLUSION

28.     For the foregoing reasons, the Court should deny the Debtor's Motion on the terms it has proposed, and instead enter an interim order allowing use of cash collateral in accordance with the Debtor's proposed budget for a period of two weeks, while the parties attempt to negotiate a consensual cash collateral order.


Dated: March 1, 2021
       New York, New York

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/ *P. Bradley O'Neill*
                              Adam C. Rogoff
                              P. Bradley O'Neill
                              David Braun
                              Kramer Levin Naftalis & Frankel LLP
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Telephone: (212) 715-9100
                              Facsimile:  (212) 715-8000
                              Email: arogoff@kramerlevin.com
                                     boneill@kramerlevin.com
                                     dbraun@kramerlevin.com

                              *Attorneys for Benefit Street Partners Realty*
                              *Operating Partnership, L.P.*

# EXHIBIT A

## Account Balance Summary

| Year | Charge Amt. | Discount | Interest | Other/Fees | Total |
|------|------------|----------|----------|------------|-------|
| 2020 | 831,956.40 | 0.00 | 209,735.31 | 0.00 | 1,041,691.71 |
| 2021 | 1,956,093.27 | 0.00 | 184,629.12 | 175.00 | 2,140,897.39 |
| Total: | 2,788,049.67 | 0.00 | 394,364.43 | 175.00 | 3,182,589.10 |

## Account Balance Details

| Year | Period | Charge Type | Account ID | Due Date | Charge Amt. | Discount | Interest | Other/Fees | Total |
|------|--------|-------------|------------|----------|-------------|----------|----------|------------|-------|
| 2020 | 3 | TAX | | 01/01/2020 | 831,956.40 | 0.00 | 209,735.31 | 0.00 | 1,041,691.71 |
| 2021 | 1 | ELEV | MULTI DEV | 07/01/2020 | 300.00 | 0.00 | 43.39 | 0.00 | 343.39 |
| 2021 | 1 | FIRE | | 07/01/2020 | 5,427.91 | 0.00 | 785.09 | 0.00 | 6,213.00 |
| 2021 | 1 | FIRE | | 07/01/2020 | 682.50 | 0.00 | 98.72 | 0.00 | 781.22 |
| 2021 | 1 | FIRE | | 07/01/2020 | 367.50 | 0.00 | 53.16 | 0.00 | 420.66 |
| 2021 | 1 | SIGN | 40001 | 07/01/2020 | 70.00 | 0.00 | 10.12 | 0.00 | 80.12 |
| 2021 | 1 | TAX | | 07/01/2020 | 958,998.72 | 0.00 | 138,709.36 | 0.00 | 1,097,708.08 |
| 2021 | 1 | TXCM | 3022950021 | 07/01/2020 | 0.00 | 0.00 | 0.00 | 175.00 | 175.00 |
| 2021 | 3 | FIRE | | 01/01/2021 | 2,670.00 | 0.00 | 121.14 | 0.00 | 2,791.14 |
| 2021 | 3 | TAX | | 01/01/2021 | 987,576.64 | 0.00 | 44,808.14 | 0.00 | 1,032,384.78 |
| Total: | | | | | 2,788,049.67 | 0.00 | 394,364.43 | 175.00 | 3,182,589.10 |

## Notes

To make a payment, visit www.nyc.gov/payonline.
Payments made today are not reflected in the balances above.

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

BENEFIT STREET PARTNERS OPERATING
PARTNERSHIP, L.P.,

                              Plaintiff,

                  - against -

96 WYTHE ACQUISITION LLC, TOBY
MOSKOVITS, YECHIEL MICHAEL
LICHTENSTEIN, RENT A UNIT NY INC.,
ADVANCED PLUMBING MECHANICAL &
SPRINKLERS CORP., MA2 FLAGS CONTRACTING
CORP., ROCK GROUP NY CORP., CRIMINAL
COURT OF THE CITY OF NEW YORK, NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE, and ENVIRONMENTAL CONTROL
BOARD OF THE CITY OF NEW YORK,

                              Defendants.

Index No. 653396/2019

Assigned Justice:
Hon. Barry R. Ostrager

Motion Sequence No. 3

**NOTICE OF ENTRY**

      **PLEASE TAKE NOTICE** that the within is a true copy of a Decision and Order of the

Supreme Court, Appellate Division, First Department, dated February 16, 2021, and duly entered

by the Clerk of said Court on February 16, 2021.

Dated: New York, New York
       February 16, 2021

                          SCHWARTZ SLADKUS REICH
                          GREENBERG ATLAS LLP
                          *Attorneys for Plaintiff*

                          By: */s/Ethan A. Kobre_____*
                             Ethan A. Kobre
                          444 Madison Avenue
                          New York, New York 10022

To:    Counsel of Record (*NYSCEF*)

# Supreme Court of the State of New York
# Appellate Division, First Judicial Department

Manzanet-Daniels, J.P., Webber, Oing, Kennedy, JJ.

13138    BENEFIT STREET PARTNERS OPERATING          Index No. 653396/19
         PARTNERSHIP, L.P.,                          Case No. 2020-03532
                Plaintiff-Appellant,

                        -against-

         96 WYTHE ACQUISITION LLC, et al.
                Defendants-Respondents,

         RENT A UNIT NY INC., et al.,
                Defendants

———————————————————————————

Schwartz Sladkus Reich Greenberg Atlas LLP, New York (Ethan A. Kobre of counsel),
for appellant.

Law Office of Abigail Shvartsman, P.C., Brooklyn (Abigail Shvartsman of counsel), for
respondents.

———————————————————————————

Order, Supreme Court, New York County (Barry R. Ostrager, J.), entered April 9,
2020, which, to the extent appealed from as limited by the briefs, denied plaintiff's
motion for summary judgment on its foreclosure claim as against defendants 96 Wythe
Acquisition LLC, Toby Moskovits, and Yechiel Michael Lichtenstein, and dismissing
defendants' remaining affirmative defenses and counterclaims, unanimously reversed,
on the law, with costs, and the motion granted.

Plaintiff established prima facie entitlement to summary judgment by producing
the mortgage, note, and guaranty executed by defendants, and evidence of defendants'
default on their obligations thereunder, including their failure to timely repay the
principal balance of the loan (*see Wilmington Trust v Sukhu*, 155 AD3d 591, 591-592

[1st Dept 2017]). Defendants failed to rebut that evidence, and they waived their

affirmative defenses and counterclaims (*see Fortress Credit Corp. v Hudson Yards, LLC*, 78 AD3d 577 [1st Dept 2010]; *Red Tulip LLC v Neiva*, 44 AD3d 204, 209–210

[2007], *lv dismissed* 10 NY3d 741 [2008]). The record does not support defendants'

contention that the waiver of defenses provisions was rendered ineffective because the

lender caused or contributed to the loan default. In any event, the defenses and

counterclaims were not viable.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: February 16, 2021

Susanna Molina Rojas
Clerk of the Court

2

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - CIVIL TERM - PART 61
-----------------------------------------------X
BENEFIT STREET PARTNERS OPERATING PARTNERSHIP,

                          Plaintiff,
                                                    Index No.
            -against-                               653396-2019

96 WYTHE ACQUISITION LLC, TOBY MOSKOVITS, YECHIEL
MICHAEL LICHTENSTEIN, RENT A UNIT NY INC, ADVANCED
PLUMBING MECHANICAL & SPRINKLERS CORP, MA2 FLAGS
CONTRACTING CORP, ROCK GROUP NY CORP, CRIMINAL COURT
OF THE CITY OF NEW YORK, NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE, and ENVIRONMENTAL CONTROL BOARD
OF THE CITY OF NEW YORK,

                          Defendants.
-----------------------------------------------X
                                          60 Centre Street
Microsoft Teams                           New York, New York
                                          February 23, 2021


   B E F O R E:

        HONORABLE BARRY OSTRAGER,

                    JUSTICE

cg

```
 1   A P P E A R A N C E S:

 2   SCHWARTZ SLADKUS REICH GREENBERG ATLAS LLP
     Attorneys for the Plaintiff
 3   444 Madison Avenue
     New York, New York 10022
 4   BY:  ETHAN KOBRE, ESQ.
          VICTORIA SERIGANO, ESQ.
 5

 6   KELLNER HERLIHY GETTY FRIEDMAN
     Attorneys for the Receiver
 7   470 Park Avenue
     New York, New York 10016
 8   BY:  DOUGLAS KELLNER, ESQ.
          STEPHANIE LIM, ESQ.
 9
     ALSO PRESENT:  CONSTANTIN SAGONAS, RECEIVER
10                  JONATHAN NOAH SCHWARTZ, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings

1      THE COURT:  Good morning, everyone.  We had

2  blocked out this time to accomplish a number of things,

3  including dealing with the motion of defendants' counsel to

4  withdraw and plotting a course forward in this case, which

5  could have been handled a lot differently by everybody

6  concerned, including me.

7      Be that as it may, I understand that at 9:01 a.m.

8  this morning, the debtor filed a bankruptcy petition and it

9  is my understanding, and anyone could correct me if I am

10  wrong, that at least for the next 30 days, there is an

11  automatic stay of all proceedings in this Court in this case

12  and that any relief that the plaintiff wishes to seek must

13  be sought in the bankruptcy court and it may even be that

14  any relief that the defendant's counsel wishes to seek may

15  have to be sought in the bankruptcy court.  But everyone

16  can put on the record whatever they think is appropriate to

17  put on the record of these proceedings, which I will ask

18  everyone to order a copy of.

19      MR. KOBRE:  Your Honor, Ethan Kobre for the

20  plaintiff.

21      I was obviously not aware of the bankruptcy filing

22  until I received it or -- Ms. Magaldi told me about it.   I

23  would say, as your Honor may have seen, we were trying to

24  work out a stipulation with counsel for the receiver for Mr.

25  Sagonas to step down and to be replaced by another temporary

1    receiver.   I believe that we have an agreement in principle

2    and we have actually drafted a stipulation to be so ordered

3    by your Honor.   I don't believe that a stipulation to that

4    effect would be barred by the automatic bankruptcy stay.   I

5    think it is -- you know, it is a consensual stipulation

6    between a party and a non-party, Mr. Sagonas.

7          I think that we can still enter that stipulation, I

8    believe your Honor can still so order that stipulation and I

9    would say while I don't think anyone on this meeting link is

10   surprised by the bankruptcy filing, I do think it

11   underscores the need to have a temporary receiver in the

12   hotel that will be assertive with these defendants who have

13   now chosen to file a bankruptcy petition.   So again, I

14   think it underscores the need for another temporary receiver

15   and I don't think it would violate the automatic bankruptcy

16   stay.

17         So I would respectfully ask that we conclude that

18   stipulation and again respectfully ask that your Honor so

19   order it, so that we can have a new receiver in place.

20         THE COURT:   I would be concerned that I would be

21   violating the automatic stay.   It is not my place to offer

22   legal advice, but I'm highly confident that the bankruptcy

23   judge to whom the bankruptcy of the defendant has been

24   referred could so order that stipulation and all of the

25   arguments that you orally advanced to me could easily and

Proceedings

1    quickly be advanced in an order to show cause before the

2    bankruptcy court and that is the Court that has jurisdiction

3    over the estate at this point in time.

4         Similarly, to the extent that defendants' counsel

5    wants to be relieved, that is an application that can be

6    made to the bankruptcy court as well.  I don't think there

7    is anything I have the power to do in this case effective

8    upon my receiving notice that the debtor has filed a

9    petition in bankruptcy.

10        So unless anybody has anything else to say, I am

11   going to direct you to order a copy of the transcript, which

12   may be of interest to the bankruptcy court.  It is apparent

13   that many of the concerns that the plaintiff has expressed

14   about the good faith conduct of the defendants may have a

15   basis in reality.

16        So, do we know the name of the bankruptcy judge to

17   whom the case has been assigned?

18        Well, do you, Mr. Kobre?

19        MR. KOBRE:  I am looking for it but I cannot find

20   it.

21        THE COURT:   Maybe Mr. Kellner does.

22        MR. KELLNER:   But I am also logging in now to see

23   if I could find it.

24        (Pause in proceedings)

25        MR. KELLNER:  All right.

Proceedings

1       MR. KOBRE:  Perhaps defendants' counsel knows the

2   judge assigned?

3       THE COURT:   I think Mr. Kellner is looking for it

4   as we speak.

5       MR. KELLNER:  That's right and I have the docket

6   report coming up and the judge is not yet assigned and it is

7   in the White Plains District Division.

8       THE COURT:   Well, there is only one bankruptcy

9   judge in the White Plains District.   I could be mistaken,

10  but I believe it is Judge Drain.

11      MR. KELLNER:  I think you're right.

12      THE COURT:   All right.

13      Well, you all know how to proceed from here.   As

14  indicated, you have to order a copy of the transcript and I

15  will await further advice concerning the developments in the

16  bankruptcy court and in the meantime, this case is stayed

17  pending further orders from the bankruptcy court.

18      All right.  Have a nice day, everyone.

19      MR. KELLNER:  Thank you, your Honor.

20      MR. KOBRE:  Thank you.

21              *        *        *

        Certified that the foregoing is a true and accurate
22  transcript of the original stenographic minutes of this
        case.
23
            --------------------
24            Claudette Gumbs
            Senior Court Reporter
25

# 1

**10016** [1] - 2:7
**10022** [1] - 2:3

# 2

**2021** [1] - 1:11
**23** [1] - 1:11

# 3

**30** [1] - 3:10

# 4

**444** [1] - 2:3
**470** [1] - 2:7

# 6

**60** [1] - 1:10
**61** [1] - 1:1
**653396-2019** [1] - 1:4

# 9

**96** [1] - 1:5
**9:01** [1] - 3:7

# A

**a.m** [1] - 3:7
**accomplish** [1] - 3:2
**accurate** [1] - 6:21
**ACQUISITION** [1] - 1:5
**advanced** [2] - 4:25, 5:1
**ADVANCED** [1] - 1:6
**advice** [2] - 4:22, 6:15
**agreement** [1] - 4:1
**ALSO** [1] - 2:9
**AND** [1] - 1:8
**apparent** [1] - 5:12
**application** [1] - 5:5
**appropriate** [1] - 3:16
**arguments** [1] - 4:25
**assertive** [1] - 4:12
**assigned** [3] - 5:17, 6:2, 6:6
**ATLAS** [1] - 2:2
**Attorneys** [2] - 2:2,
2:6
**automatic** [4] - 3:11, 4:4, 4:15, 4:21
**Avenue** [2] - 2:3, 2:7
**await** [1] - 6:15
**aware** [1] - 3:21

# B

**bankruptcy** [18] -
3:8, 3:13, 3:15, 3:21,
4:4, 4:10, 4:13, 4:15,
4:22, 4:23, 5:2, 5:6,
5:9, 5:12, 5:16, 6:8,
6:16, 6:17
**barred** [1] - 4:4
**BARRY** [1] - 1:14
**basis** [1] - 5:15
**BENEFIT** [1] - 1:2
**between** [1] - 4:6
**blocked** [1] - 3:2
**BOARD** [1] - 1:8

# C

**cannot** [1] - 5:19
**case** [6] - 3:4, 3:11,
5:7, 5:17, 6:16, 6:22
**Centre** [1] - 1:10
**Certified** [1] - 6:21
**chosen** [1] - 4:13
**CITY** [2] - 1:7, 1:8
**CIVIL** [1] - 1:1
**Claudette** [1] - 6:24
**coming** [1] - 6:6
**concerned** [2] - 3:6,
4:20
**concerning** [1] -
6:15
**concerns** [1] - 5:13
**conclude** [1] - 4:17
**conduct** [1] - 5:14
**confident** [1] - 4:22
**consensual** [1] - 4:5
**CONSTANTIN** [1] -
2:9
**CONTRACTING** [1] -
1:7
**CONTROL** [1] - 1:8
**copy** [3] - 3:18, 5:11,
6:14
**CORP** [3] - 1:6, 1:7
**correct** [1] - 3:9
**counsel** [5] - 3:3,
3:14, 3:24, 5:4, 6:1
**COUNTY** [1] - 1:1
**course** [1] - 3:4
**COURT** [8] - 1:1, 1:7,

**3:1, 4:20, 5:21, 6:3,
6:8, 6:12
**Court** [3] - 3:11, 5:2,
6:24
**court** [7] - 3:13, 3:15,
5:2, 5:6, 5:12, 6:16,
6:17
**CRIMINAL** [1] - 1:7

# D

**days** [1] - 3:10
**dealing** [1] - 3:3
**debtor** [2] - 3:8, 5:8
**defendant** [1] - 4:23
**defendant's** [1] -
3:14
**Defendants** [1] - 1:9
**defendants** [2] -
4:12, 5:14
**defendants'** [3] - 3:3,
5:4, 6:1
**DEPARTMENT** [1] -
1:7
**developments** [1] -
6:15
**differently** [1] - 3:5
**direct** [1] - 5:11
**District** [2] - 6:7, 6:9
**Division** [1] - 6:7
**docket** [1] - 6:5
**DOUGLAS** [1] - 2:8
**down** [1] - 3:25
**drafted** [1] - 4:2
**Drain** [1] - 6:10

# E

**easily** [1] - 4:25
**effect** [1] - 4:4
**effective** [1] - 5:7
**enter** [1] - 4:7
**ENVIRONMENTAL**
[1] - 1:8
**ESQ** [5] - 2:4, 2:4,
2:8, 2:8, 2:10
**estate** [1] - 5:3
**Ethan** [1] - 3:19
**ETHAN** [1] - 2:4
**expressed** [1] - 5:13
**extent** [1] - 5:4

# F

**faith** [1] - 5:14
**February** [1] - 1:11
**file** [1] - 4:13
**filed** [2] - 3:8, 5:8

**filing** [2] - 3:21, 4:10
**FINANCE** [1] - 1:8
**FLAGS** [1] - 1:6
**foregoing** [1] - 6:21
**forward** [1] - 3:4
**FRIEDMAN** [1] - 2:6

# G

**GETTY** [2] - 2:6
**GREENBERG** [1] -
2:2
**GROUP** [1] - 1:7
**Gumbs** [1] - 6:24

# H

**handled** [1] - 3:5
**HERLIHY** [1] - 2:6
**highly** [1] - 4:22
**Honor** [6] - 3:19,
3:23, 4:3, 4:8, 4:18,
6:19
**HONORABLE** [1] -
1:14
**hotel** [1] - 4:12

# I

**INC** [1] - 1:6
**including** [2] - 3:3,
3:6
**Index** [1] - 1:4
**indicated** [1] - 6:14
**interest** [1] - 5:12

# J

**JONATHAN** [1] -
2:10
**judge** [5] - 4:23,
5:16, 6:2, 6:6, 6:9
**Judge** [1] - 6:10
**jurisdiction** [1] - 5:2
**JUSTICE** [1] - 1:15

# K

**Kellner** [2] - 5:21, 6:3
**KELLNER** [7] - 2:6,
2:8, 5:22, 5:25, 6:5,
6:11, 6:19
**knows** [1] - 6:1
**Kobre** [1] - 3:19
**KOBRE** [5] - 2:4,
3:19, 5:19, 6:1, 6:20

**kobre** [1] - 5:18

# L

**least** [1] - 3:10
**legal** [1] - 4:22
**LICHTENSTEIN** [1] -
1:6
**LIM** [1] - 2:8
**link** [1] - 4:9
**LLC** [1] - 1:5
**LLP** [1] - 2:2
**logging** [1] - 5:22
**looking** [2] - 5:19,
6:3

# M

**MA2** [1] - 1:6
**Madison** [1] - 2:3
**magaldi** [1] - 3:22
**meantime** [1] - 6:16
**MECHANICAL** [1] -
1:6
**meeting** [1] - 4:9
**MICHAEL** [1] - 1:6
**Microsoft** [1] - 1:11
**minutes** [1] - 6:22
**mistaken** [1] - 6:9
**morning** [2] - 3:1,
3:8
**MOSKOVITS** [1] -
1:5
**motion** [1] - 3:3
**MR** [9] - 3:19, 5:19,
5:22, 5:25, 6:1, 6:5,
6:11, 6:19, 6:20
**must** [1] - 3:12

# N

**name** [1] - 5:16
**need** [2] - 4:11, 4:14
**NEW** [5] - 1:1, 1:1,
1:7, 1:8
**new** [1] - 4:19
**New** [6] - 1:11, 2:3,
2:7
**next** [1] - 3:10
**nice** [1] - 6:18
**NOAH** [1] - 2:10
**non** [1] - 4:6
**non-party** [1] - 4:6
**notice** [1] - 5:8
**number** [1] - 3:2
**NY** [2] - 1:6, 1:7

## O

**obviously** [1] - 3:21
**OF** [8] - 1:1, 1:1, 1:7, 1:8
**offer** [1] - 4:21
**one** [1] - 6:8
**OPERATING** [1] - 1:2
**orally** [1] - 4:25
**order** [7] - 3:18, 4:8, 4:19, 4:24, 5:1, 5:11, 6:14
**ordered** [1] - 4:2
**orders** [1] - 6:17
**original** [1] - 6:22
**OSTRAGER** [1] - 1:14

## P

**Park** [1] - 2:7
**PART** [1] - 1:1
**PARTNERS** [1] - 1:2
**PARTNERSHIP** [1] - 1:2
**party** [2] - 4:6
**Pause** [1] - 5:24
**pending** [1] - 6:17
**perhaps** [1] - 6:1
**petition** [3] - 3:8, 4:13, 5:9
**place** [2] - 4:19, 4:21
**Plains** [2] - 6:7, 6:9
**Plaintiff** [2] - 1:3, 2:2
**plaintiff** [3] - 3:12, 3:20, 5:13
**plotting** [1] - 3:4
**PLUMBING** [1] - 1:6
**point** [1] - 5:3
**power** [1] - 5:7
**PRESENT** [1] - 2:9
**principle** [1] - 4:1
**proceed** [1] - 6:13
**proceedings** [3] - 3:11, 3:17, 5:24
**put** [2] - 3:16, 3:17

## Q

**quickly** [1] - 5:1

## R

**reality** [1] - 5:15
**received** [1] - 3:22
**Receiver** [1] - 2:6

**receiver** [5] - 3:24, 4:1, 4:11, 4:14, 4:19
**RECEIVER** [1] - 2:9
**receiving** [1] - 5:8
**record** [2] - 3:16, 3:17
**referred** [1] - 4:24
**REICH** [1] - 2:2
**relief** [2] - 3:12, 3:14
**relieved** [1] - 5:5
**RENT** [1] - 1:6
**replaced** [1] - 3:25
**report** [1] - 6:6
**Reporter** [1] - 6:24
**respectfully** [2] - 4:17, 4:18
**ROCK** [1] - 1:7

## S

**SAGONAS** [1] - 2:9
**sagonas** [2] - 3:25, 4:6
**SCHWARTZ** [2] - 2:2, 2:10
**see** [1] - 5:22
**seek** [2] - 3:12, 3:14
**Senior** [1] - 6:24
**SERIGANO** [1] - 2:4
**show** [1] - 5:1
**similarly** [1] - 5:4
**SLADKUS** [1] - 2:2
**sought** [2] - 3:13, 3:15
**SPRINKLERS** [1] - 1:6
**STATE** [2] - 1:1, 1:7
**stay** [4] - 3:11, 4:4, 4:16, 4:21
**stayed** [1] - 6:16
**stenographic** [1] - 6:22
**step** [1] - 3:25
**STEPHANIE** [1] - 2:8
**still** [2] - 4:7, 4:8
**stipulation** [8] - 3:24, 4:2, 4:3, 4:5, 4:7, 4:8, 4:18, 4:24
**STREET** [1] - 1:2
**Street** [1] - 1:10
**SUPREME** [1] - 1:1
**surprised** [1] - 4:10

## T

**TAXATION** [1] - 1:8
**Teams** [1] - 1:11
**temporary** [3] - 3:25,

4:11, 4:14
**TERM** [1] - 1:1
**THE** [9] - 1:1, 1:7, 1:8, 3:1, 4:20, 5:21, 6:3, 6:8, 6:12
**TOBY** [1] - 1:5
**transcript** [3] - 5:11, 6:14, 6:22
**true** [1] - 6:21
**trying** [1] - 3:23

## U

**underscores** [2] - 4:11, 4:14
**UNIT** [1] - 1:6
**unless** [1] - 5:10
**up** [1] - 6:6

## V

**VICTORIA** [1] - 2:4
**violate** [1] - 4:15
**violating** [1] - 4:21

## W

**wants** [1] - 5:5
**White** [2] - 6:7, 6:9
**wishes** [2] - 3:12, 3:14
**withdraw** [1] - 3:4
**WYTHE** [1] - 1:5

## Y

**YECHIEL** [1] - 1:5
**YORK** [5] - 1:1, 1:1, 1:7, 1:8
**York** [6] - 1:11, 2:3, 2:7

# EXHIBIT D

[Webinar] Fighting Financial Crime: The White Box Company Data Revolution – listen to the recording. Listen now

# opencorporates

The Open Database Of The Corporate World

[Company name or number] [Search]

◉ Companies  ○ Officers

- Log in/Sign up

# FIA HERITAGE HOLDINGS LLC

Company Number
    L18000157319
Status
    Active
Incorporation Date
    27 June 2018 (over 2 years ago)
Company Type
    Florida Limited Liability
Jurisdiction
    Florida (US)
Agent Name
    DAVID GOLDWASSER
Agent Address
    3480 N 40TH STREET, HOLLYWOOD, FL 33021
Directors / Officers

- DAVID GOLDWASSER
- DAVID GOLDWASSER, agent

**Source** Florida Department of State Division of Corporations, http://www.sunbiz.org, 1 Jan 2021
Add data *(website, address, etc)*

## Company Addresses

Head Office Address

7280 W PALMETTO PARK ROAD, 203N, BOCA RATON, FL, 33433

Mailing Address

7280 W PALMETTO PARK ROAD, 203N, BOCA RATON, FL, 33433

## Explore company network



## Company network

Not yet available for this company. [Click to find out more](#)

## Latest Events

2018-06-27
   [Incorporated](#)
2018-06-27 - 2018-12-31
   [Addition of officer DAVID GOLDWASSER,](#)
2018-06-27 - 2018-12-31
   [Addition of officer DAVID GOLDWASSER, agent](#)

[See all events](#)

### Corporate Grouping [User Contributed](#)

None known. [Add one now?](#)
[See all corporate groupings](#)

## Identifiers

| Identifier System | Identifier | Categories | |
|---|---|---|---|
| US Federal EIN/TIN number | APPLIED FOR | Tax | [details](#) |

\* While we strive to keep this information correct and up-to-date, it is not the primary source, and the company registry ([see source](#), above) should always be referred to for definitive information
Data on this page last changed January 22 2021

**Problem/question about this data?** [Click here](#)

### 🟥API Open Data

Get this info as [json](#), [xml](#), [rdf](#)

# About us

- [About](#)
- [Blog](#)
- [Team](#)
- [Governance](#)
- [Jobs](#)

# Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

# Help

- API Reference
- Glossary
- Status

# Contact

- Twitter
- Medium
- Newsletter
- Problems with our data?
- Temporary redaction

# Impact

- Impact
- Grants

# EXHIBIT E

# Amid fraud case, a bevy of Brooklyn properties end up in bankruptcy court

*Two accused fraudsters and a mysterious real estate investor are linked in a recent series of Chapter 11 filings*

New York                                                              Jun. 17, 2019 07:00 AM

By Mary Diduch and Eddie Small



*Clockwise from left: 119 Rogers Avenue, 325 Franklin Avenue, 53-55 Stanhope Street and 73 Empire Boulevard (Credit: Google Maps)*

Nearly 20 limited liability companies for individual multifamily buildings that are linked to a federal fraud complaint are now bankrupt.

The filings late last month in a U.S. bankruptcy court in White Plains also relate to over a dozen foreclosure cases initiated by an affiliate of Maverick Real Estate Partners, which in court filings is seeking information on the identity of the owner behind the low-rise, residential properties, all of which are scattered throughout Brooklyn.

In April 2017, Israeli investors Jacob and Binyomin Schonberg, Binyomin Halpern and Raphael Barouch Elkaim alleged in a complaint filed in federal court in Brooklyn that Yechezkel Strulovich and Yechiel Oberlander defrauded them out of more than $20 million in a scheme carried out "in the style of Bernie Madoff."

Eleven properties that are now in Chapter 11 proceedings — located predominantly in the neighborhoods surrounding Williamsburg and Crown Heights — were also named as defendants in the fraud case against Strulovich and Oberlander. That case, which a judge dismissed in part and sent to arbitration in 2017, included more than 40 defendants, mostly LLCs that have not filed for bankruptcy.

The LLCs that are bankrupt and own the underlying Brooklyn properties all list David Goldwasser of GC Realty Advisors as their authorized signatory, according to court filings. GC Realty is described as a commercial real estate advisory firm, per its LinkedIn page, which notes that it is based in Boca Raton, Florida, and has offices in New York. The state's Division of Corporations shows that GC Realty has an address in East Midwood, Brooklyn.

Goldwasser is also listed as a principal at FIA Capital Partners, which is also based out of Florida and New York, according to his apparent LinkedIn profile. A message left with FIA was not returned by the time of this story. The firm specializes in acquiring distressed properties and portfolios, according to its website.

**Questions over control**

The series of bankruptcies filed in White Plains starting on May 20 show that all of the properties, which number at least 18, are also affiliated with 73 Empire Development LLC. The latter owns the ground lease on a roughly 30,000-square-foot development site — it's currently a vacant one-story retail building — at 73 Empire Boulevard in Crown Heights.

Empire Development, which is one of the defendants in the fraud case against Strulovich and Oberlander, also filed for bankruptcy in February. The debtor's plan, according to court records in White Plains, is to build a 58,000-square-foot, two-story retail property at 73 Empire Boulevard.



But the connection between Goldwasser's GC Realty, Empire Development and the 18 other bankrupt properties is not yet clear. Maverick, the debt fund led by **David Aviram** that buys distressed mortgages, wants some clarity on the matter.

A recent filing from the debtors claims that one of Maverick's affiliates, Brooklyn Lender LLC, took on 13 notes and mortgages — totaling $36 million — on 26 properties that originated with Signature Bank. As a result of the Chapter 11 filings, Maverick wants a judge to allow a full examination into who controls the various debtors, pointing to Goldwasser's name in court documents.

*Maverick's David Aviram*
*(Credit: LinkedIn)*

"To Brooklyn Lender's knowledge, Goldwasser was not previously involved with the Debtors, and understanding his new role and responsibilities with respect to these Bankruptcy Cases and the Debtors' management is of paramount importance," Maverick said in a recent filing.

Maverick noted that when the Signature Bank loans were made, Strulovich maintained that he was the 100 percent sole member of the debtor entities. In the fraud case, however, he admitted this was not the case. In October 2017, Maverick's Brooklyn Lender filed 14 foreclosure cases against the now bankrupt properties, alleging that the loans were in default, in part due to misrepresentations by their owners.

The petition made by Maverick in bankruptcy court now asserts that a further examination is needed to determine who actually owns the Brooklyn properties, citing a guilty plea by Goldwasser to defrauding two banks in the early 2000s. Goldwasser was sentenced to 27 months in federal prison — Federal Bureau of Prisons records show he was released in September 2005 — and ordered to pay $2.8 million in restitution. A judge also ordered that Goldwasser "is not to be employed in any position requiring fiduciary responsibilities."

All of the debtors in the bankruptcy cases, except Empire Development, have opposed the motion by Brooklyn Lender, claiming that its parent Maverick has an "unspoken agenda" and that they are working on a plan that includes paying back Maverick. Lists of unsecured creditors in the various bankruptcy cases show that Brooklyn Lender is owed between $2.7 million and nearly $5 million, while the New York-based law firm Abrams Fensterman is owed a little more than $150,000.

Mark Frankel, an attorney with New York's Backenroth Frankel & Krinsky representing the debtors in bankruptcy proceedings, declined to comment, as did Maverick's Aviram, which is being represented in bankruptcy court by Stroock & Stroock & Lavan. Strulovich and Oberlander could not be reached and their lawyers did not return requests for comment.

**Unresolved fraud claims**

In the fraud case against Strulovich and Oberlander, the defendants said that the money they received from the plaintiffs would be invested in Brooklyn properties that they would buy, develop and rent out, with returns on those investments coming in six to seven months. The plaintiffs also would receive 45 percent of the profits from the multifamily purchases.

But plaintiffs claimed that Strulovich, Oberlander and other defendants inflated the value of that real estate and used their money to acquire and develop properties for their own personal benefit, pay off personal debts and support their "lavish lifestyles," according to the civil complaint filed two years ago. The Brooklyn sites purchased with their funds were "left to languish, undeveloped and dilapidated," alleged the plaintiffs.

"The entire process was nothing more than an elaborate fraud to personally enrich the individual defendants," said their lawsuit.

Court filings in that litigation claim that Oberlander allegedly approached the plaintiffs in early 2012 about investing in a project with him and Strulovich at 908 Bergen Street in Crown Heights. Oberlander sent prospectuses for 19 properties between 2012 and 2014 that were meant to entice the plaintiffs into make more investments, they asserted in the dispute.

The defendants repeatedly told the plaintiffs it would cost more to buy the Brooklyn buildings than it actually did, according to court filings in the case. As an example, the plaintiffs claimed they were told that the cost of buying 908 Bergen Street would be $425,000, when the actual cost was $200,000. The plaintiffs ultimately gave more than $20 million to Strulovich and Oberlander, they claimed.

As for the defendants, they did enough work on the Brooklyn properties to renovate some of the smaller ones, refinance the original loans on them and refund the principal investments of the plaintiffs so they would be "lulled into a false sense of security," according to their lawsuit.

By early 2016, court records show that the plaintiffs became suspicious about the state of their investments when some of the larger properties, such as 657 Fifth Avenue and 980 Atlantic Avenue in Brooklyn, had not progressed. The plaintiffs soon found out that Strulovich and Oberlander were looking to sell some of the Brooklyn properties they had invested in, without their knowledge.

Despite the partial dismissal and arbitration ruling, the dispute between the parties appears to remain unresolved. The last court filing in the fraud case came in late February. Yitzchack Soloveichik of Bronstein, Gewirtz & Grossman, a new lawyer representing the plaintiffs, did not return a request for comment about the ongoing dispute.