UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                               Chapter 11

    96 Wythe Acquisition LLC                Case no.  21-22108

             Debtor.
----------------------------------------------------------x

## NOTICE OF HEARING

      PLEASE TAKE NOTICE, that a <u>telephonic</u> hearing will be held on July 20, 2021 at 10:00 a.m. (the "Hearing") before the Honorable Robert D. Drain, through www.court-solutions.com to consider the annexed application ("Application") of the above captioned debtor (the "Debtor") for the entry of an order extending their 120 day exclusive period to file a plan of reorganization and their 180 day period to solicit acceptances to a plan of reorganization under section 1121(d) of the Bankruptcy Code.

      PLEASE TAKE FURTHER NOTICE, that objections, if any, must be in writing, served upon the undersigned proposed Debtor's counsel, and filed with the Clerk of the Bankruptcy Court, with a courtesy copy to the Honorable Robert D. Drain's chambers, so as to be received at least seven (7) days before the Hearing date.

Dated: New York, New York
       June 21, 2021

                                     BACKENROTH FRANKEL & KRINSKY, LLP
                      By:   <u>s/ Mark Frankel</u>
                            800 Third Avenue
                            New York, New York  10022
                            (212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                                              Chapter 11

    96 Wythe Acquisition LLC                                     Case no.  21-22108

                      Debtor.
---------------------------------------------------------x

## MOTION TO EXTEND EXCLUSIVITY

        96 Wythe Acquisition LLC (the "Debtor"), as and for its motion for an order extending its 120 day exclusive period (the "120 Day Period") to file a plan of reorganization and its 180 day period (the "180 Day Period") to solicit acceptances to a plan of reorganization (collectively, the "Exclusive Periods") for 120 days each, respectfully states:

## BACKGROUND

        1.    On February 23, 2021, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

        2.    The Debtor owns and operates the Williamsburg Hotel (the "Hotel") located at 96 Wythe Avenue, Brooklyn, New York, (the "Property"). The Property is a thirteen story, 160 room hotel with a rooftop pool, a bar and restaurant and a separate, elevated and enclosed bar that sits above the pool referred to as the Water Tower Bar.  The Debtor has approximately 80 employees.

        3.    On December 13, 2017, the Debtor borrowed $68 million (the "Loan") from Benefit Street Operating Partnership, L.P. under a loan agreement ("Loan Agreement") to construct the Hotel.  The Loan was subsequently assigned to BSPRT 2018-FL3 Issuer, Ltd. (the "Lender" or the "Mortgagee").

**Disputes with the Lender**

4. The Debtor's financial problems pre-date the COVID-19 pandemic. They arise from the Mortgagee's misconduct in: (i) denying that the Debtor had completed construction; (ii) Lender's consequent demands for additional interest as a result thereof; and (iii) Lender's ultimate filing of a foreclosure complaint. Lender's actions obstructed the Debtor's ability to refinance the Loan.

5. Under the Loan Agreement, the Debtor had a May 31, 2018 deadline to complete construction (the "Completion Date"), failing which the Lender would be entitled to a 0.5% increase in the contract interest rate, which would reset once those conditions were satisfied.

6. The maturity date was June 7, 2019 (the "Maturity Date"). The Debtor had the option "to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (the 'Extension Option') of six (6) months each (each, an 'Extension Period') to (i) December 9, 2019 if the first Extension Option was exercised and (ii) June 9, 2020 if the second Extension Option was exercised.

**Reserve Accounts and Rate Increases**

7. At the closing of the Loan in December 2017, $1,651,000 was placed in a "Business Plan Reserve Account," to ensure adequate funding of the Debtor's contractors, materials and services in the first instance. Upon the Debtor's certification of completion of such work, lien releases from all contractors and subcontractors, and Lender's construction site visit, the Lender was obligated to "reimburse" the Debtor from the Business Plan Reserve Account.

8. Work proceeded without controversy or incident, and the Debtor achieved "Completion" of the "Business Plan Work" as defined in the Loan Agreement by the end of June 2018. The hotel was open for business and operating with all amenities. Guestrooms, pool and related facilities, and the food and beverage outlets were all operational.

9. The Debtor notified Lender that it satisfied the Operating Condition by the end of June 2018, thereby terminating the 0.5% Rate Increase Event.

10. Lender disagreed with Borrower's notification and claimed instead that the Operating Condition had not yet been satisfied. The Lender refused to terminate the 0.5% interest rate increase. This 0.5% increase constituted, on average, an additional $29,000.00 of interest per month, wrongfully running in favor of Lender and against the Debtor as of, at least, June 30, 2018.

11. There was no risk of non-payment of this additional interest in the near term as the Lender also held two months of interest reserve under the Loan Agreement. But the parties would soon be at odds when, as turned out to be the case, the Lender paid itself more interest than was actually owed—by $29,000.00 per month on average—and demanded that the Debtor make up the difference by depositing an extra $29,000.00 of fresh funds into the Interest Reserve Account to keep the required two months of interest on deposit at all times.

12. On a without prejudice basis, in an effort to maintain an amicable relationship with Lender and move the Project forward, the Debtor paid the excess interest rate for the months of June 2018 and July 2018, and topped up the interest reserve accordingly.

13. By August 2018, however, Borrower had enough. Lender continued to refuse to accept that the Operating Condition was satisfied. Indeed, the Project had become fully

operational, and yet Lender continued to saddle Borrower with the additional 0.5% interest rate averaging $29,000.00 per month. Accordingly, Borrower refused to continue to pay the higher interest rate. Instead, Borrower made monthly payments from August 2018 through November 2018 sufficient to fund the Interest Reserve Account in accordance with the Loan Agreement at the agreed interest rate level, without the unauthorized 0.5% surcharge that had been assessed by Lender.

14. In violation of the Loan Agreement, Lender nevertheless continued paying itself at the higher interest rate from the Interest Reserve Account. Between July 2018 and December 2018, Lender pocketed approximately $173,777.78 of unauthorized additional interest from Borrower, based on Lender's refusal to acknowledge that the Operating Condition was satisfied.

15. Lender's actions caused the Interest Reserve Account to fall below the agreed two months of interest payable from the Debtor to Lender. Naturally, the Lender had the upper hand. It could declare the Debtor in default and demand a cure. That demand would be made not only to the Debtor, but to WH Mezz Lender, LLC, the mezzanine lender (the "Mezz Lender") who had made a $13,000,000 loan to the Debtor's parent company, secured by the membership interests in the Debtor.

16. On November 28, 2018, therefore, in a further attempt to bring this matter to resolution, Debtor requested another Property site inspection in order to further confirm that the construction work was completed and the Operating Condition was satisfied. Such an inspection would also trigger the release of a further construction draw from the Business Plan Reserve Account in the amount of $300,000.00. As explained above, the $300,000.00

construction draw would have simply shuffled Borrower's own money to the Interest Reserve Account, which Borrower also funded. In other words, Borrower was paying four times—first to fund the construction reserves, second for the construction itself, third for the interest reserve, and fourth to pay monthly interest.

17. Instead of scheduling the site inspection within two to three days as had customarily occurred, Lender took two weeks to schedule the inspection despite Borrower furnishing sufficient documentation to support the inspection and making countless attempts to expedite the process. Nonetheless, Lender refused to schedule the inspection until December 11, 2018.

18. On information and belief, Lender was in no hurry to schedule the Property site inspection since Lender knew that if it did not release the construction draw from the Business Plan Reserve Account until after December 7, 2018, which was the due date for Borrower's interest payment, Borrower might have considerable difficulty topping up the Interest Reserve Account by its December 2018 deadline.

**Borrower Payments and Attempts to Cure**

19. Nonetheless, Borrower paid Lender over $300,000.00 between November 28 and December 10, 2018, and, with the rate cap provider, Lender was paid over $319,512.86 during this time frame.

20. Borrower, aware of its impending December 2018 payment due date and the delayed property site inspection, made numerous requests to Lender in an effort to reach an agreement regarding the release of the $300,000.00 in the Business Plan Reserve Account.

21. Specifically, Borrower requested that the $300,000.00 in the Business Plan Reserve Account be transferred to the Interest Reserve Account until the delayed inspection could be completed. As both parties well knew, the requested transfer of Borrower's money from the Business Plan Reserve Account to the Interest Reserve Account would have cost Lender nothing but would have enabled Borrower to make its December 2018 payment without a technical Event of Default under the Loan Documents.

22. Lender was not interested. Indeed, its response revealed its true motives. Lender agreed to Borrower's request to transfer $300,000.00 from the Business Plan Reserve Account to the Interest Reserve Account, but only on the condition that Borrower acknowledge that the Business Plan Work had not been completed, entitling the Lender to the higher interest rate since June 2018.

23. At $29,000.00 per month of unwarranted interest from July 2018, the requested concession would likely have amounted to a $348,000 cost to simply move $300,000.00 of Borrower's money from one reserve account to the other. The Debtor refused.

24. As a result, the Debtor did not make the December 7, 2018 payment, in the belief that the needed funds would be in hand shortly after the December 11, 2018 construction site visit and would soon be paid from the Business Plan Reserve Account.

25. On December 10, 2018—one day before Borrower's scheduled property site inspection—Borrower received a notice of default letter from Lender for Borrower's failure to make the December 2018 payment. The default letter notified Borrower that various monetary defaults needed to be cured but did not specify the total amount it claimed to be due with per diem amounts accruing. The Debtor calculated $1,239,365.45.

26. Pursuant to an intercreditor agreement ("Intercreditor Agreement"), Mezz Lender also received notice of Borrower's purported default and was given the opportunity to cure such default.

27. In retrospect, Lender's vagueness on the asserted cure amount was intended to obstruct curing the putative "default."

28. On December 19, 2018, Mezz Lender timely paid the $1,239,365.45 cure amount to Lender via wire transfer (the "First Mezz Lender Cure Payment"). Of the sum paid as a cure amount, Borrower contributed $240,000.00.

29. The Debtor believes that the First Mezz Lender Cure Payment made Lender whole and cured the pending default in its entirety. Lender never informed the Debtor it was claiming an additional $94,000.00 for default interest. Had the Lender told the Debtor, the Debtor could have, and would have, paid the default interest on December 19, 2018. Indeed, Borrower had well over $94,000.00 in the Interest Reserve Account.

30. Instead, Lender hid the fact that it clamed that $94,000.00 of default interest was owed, not once disclosing it to Borrower despite the numerous communications between Lender and Borrower regarding the default. Lender's tactic was clear. Lender not only wanted to prevent Borrower from curing the alleged default, Lender also wanted the $94,000.00 to compound and double in amount.

31. Thereafter, the Lender sent monthly default letters and the Debtors and Mezz Lender paid the cure amounts due plus payment of the unwarranted higher interest rate of 0.5% even though the Hotel was fully operational.

32. On June 3, 2019, Borrower and Lender entered into negotiations in an attempt to the resolve Borrower's alleged defaults under the Loan Documents.

33. Borrower sought and obtained a term sheet to refinance with a new lender at a low interest rate. But based on the Loan default notices, the new lender advised that it could not refinance the Loan because it could not lend money to a borrower that had a default under its loan terms.

34. On June 5, 2019, Borrower received a payoff letter from Lender good through June 7, 2019. On June 7, 2019, the Lender asserted a maturity default.

35. Due to Lender's sequential, contrived and overlapping default notices, Borrower was never given the ability to exercise its option under the Loan Agreement to extend the Maturity Date prior to receiving the June 7, 2019 default letter.

**Lender Commences the Foreclosure Action**

36. The Lender commenced a foreclosure action in New York County, Supreme Court (the "Foreclosure Action") four days later.

37. Constantino Sagonas, was appointed temporary receiver ("Receiver") for the Hotel in the Foreclosure Action. The Receiver developed health problems and a motion was made in the Foreclosure Action to relieve him of control. Upon the filing of the bankruptcy case, the Receiver has agreed to cooperate in transferring control of the accounts he maintained to the Debtor. The Debtor's day to day operations are managed by a hotel manager which has managed the business throughout Mr. Sagonas' appointment, as directed by the Court in the

Foreclosure Action. The Debtor has maintained the status quo with no change in day-to-day management.

38. The COVID-19 pandemic and the attendant travel restrictions and quarantine requirements beginning in March 2020 had an immediate impact on the hospitality industry as a whole and caused the Hotel to limit operations drastically for a period of time. The Debtor has reopened and employs more than 80 workers at this point in time.

39. As COVID-19 conditions have improved, so has the Debtor's. The Debtor's outdoor rooftop area has been a particular draw. The Debtor has consistently outperformed comparable hotels and its operating reports reflect it. The Debtor's receipts exceed projections and its expenses are generally at or below projections.

40. The Debtor is interviewing investment bankers and has opened a dialogue with the Lender to discuss the possible candidates. The Debtor is also participating in regular conference calls with the Lender to review issues raised by the Debtor's operating reports and use of cash collateral. The Debtor intends to prompltly make an application to retain an investment banker, and following that, will be able to have an informed dialogue with the Lender over benchmarks for the rest of this case, including the filing of a plan.

## RELIEF REQUESTED HEREIN

1. By this application, the Debtor seeks to extend the Exclusive Periods for 120 days so that the 120-day period would be extended to October 21, 2021 and the 180 day period extended to December 20, 2021.

2.  The Exclusive Periods established by section 1121 of the Bankruptcy Code allow a debtor to formulate and propose a plan of reorganization and to solicit acceptances of such plan without the deterioration and disruption to restructuring its businesses that might be caused by competing plans by non-debtor parties. If, as here, a debtor is proceeding in good faith, but the Exclusive Periods are likely to run before the debtor can propose a plan, 1121(d) of the Bankruptcy Code allows the Court to extend the periods for "cause."

3.  Specifically, section 1121(d) of the Bankruptcy Code provides:

> Subject to paragraph (2), on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section. (2) (A) The 120-day period specified in paragraph (1) may not be extended beyond a date that is 18 months after the date of the order for relief under this chapter. (B) The 180-day period specified in paragraph (1) may not be extended beyond a date that is 20 months after the date of the order for relief under this chapter. 11 U.S.C. § 1121(d).

4.  It is well established that a finding of "cause" to extend the exclusive periods is left to the sound discretion of the bankruptcy court and should be based upon the facts and circumstances of a particular case. *See In re Borders Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) ("The determination of cause under section 1121(d) is a fact-specific inquiry and the court has broad discretion in extending or terminating exclusivity.") (citation omitted); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific."). Although the Bankruptcy Code does not define "cause" for an extension of the Exclusive Periods, courts have looked to the legislative history of section 1121(d) of the Bankruptcy Code for guidance. *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405,

409 (E.D.N.Y. 1989); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). Courts have found that Congress did not intend that the 120- and 180- day periods be a hard and fast rule. *See Amko Plastics*, 197 B.R. at 77 (noting that Congress intended courts to have flexibility in dealing with extensions of exclusivity). Rather, Congress intended that the Exclusive Periods be of an adequate length, given the circumstances, for a debtor to formulate, negotiate, draft and confirm a viable plan of reorganization, which by definition means one supported by some or all of a debtor's key constituents, without the disruption to its business that would occur with competing plans. *See Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A.* (In re Geriatrics Nursing Home, Inc.), 187 B.R. 128, 133 (D.N.J. 1995) ("The opportunity to negotiate its plan unimpaired by competition . . . is meant to allow the debtor time to satisfy all creditors and win support for its restructuring scheme and thus ensure its survival as a business.").

        5.      When determining whether cause exists for an extension of the exclusive period, courts have relied on a variety of factors, each of which may provide sufficient grounds for granting such extension. Factors considered by the courts in making such a determination have included: (a) the size and complexity of the case; (b) the necessity of sufficient time to negotiate and prepare adequate information; (c) the existence of good-faith progress toward reorganization; (d) whether the debtor is paying its debts as they come due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiating with creditors; (g) the time the case has been pending;(h)whether the debtor is seeking the extension to pressure creditors; and (i)whether unresolved contingencies exist. *See, e.g., Adelphia*, 352 B.R. at 587; *In re Borders Group, Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011); *In re 221-06 Merrick Blvd. Assocs. LLC*, 2010 WL 5018265, at *4 (Bankr. E.D.N.Y. Dec. 3, 2010); *Continental Casualty Co. v. Burns & Roe Enters., Inc.* (*In re Burns &*

*Roe Enters., Inc.*), 2005 U.S. Dist. LEXIS 26247, at *11-12 (D.N.J. 2005); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. at 409-10. Applying these factors to the facts and circumstances demonstrates that the requested extensions are appropriate.

6. Not all of the *Adelphia* factors "are relevant in every case.... It is within the discretion of the bankruptcy court to decide which factors are relevant and give appropriate weight to each." *In re Hoffinger Industries, Inc.*, 292 B.R. 639, 644 (8th Cir BAP 2003.

7. Here, the Debtor concedes that this is not a "mega" case.

8. On the second element, the Debtor's operating results during lockdown onditions don't reflect its future prospects. As the economy reopens and business stabilizes, the Debtor will be able to develop the information necessary to make meaningful decisions as to its Chapter 11 plan options.

9. The Debtor respectfully suggests that under the circumstances the Debtor is making "good faith progress toward reorganization" based on its improved performance. The third element supports an extension.

10. The Debtor is generally paying its bills as they come due. Therefore, the Debtor submits that the fourth element supports an extension of exclusivity.

11. On the Debtor's reasonable prospects for reorganization, the Debtor is retaining an investment banker to advise on a Chapter 11 plan. The Lender and the Court have urged the Debtor to consider all of its options and the assistance of an investment banker will enable the Debtor to make an informed decision in light of improving operating performance.

12. On the sixth factor, i.e. progress in negotiations with its creditors, admittedly progress has been slow for the reasons stated. But that Debtor has opened a dialogue, participated in several conference calls, and produced additional information demanded by the Lender, and following the retention of an investment banker, progress may be made.

13. The seventh factor, i.e., consideration of how long the chapter 11 case has been pending and how many extensions of the exclusivity period the s have had, supports an extension. The Debtor has been in bankruptcy for less than four months and this is the Debtor's first request for an extension.

14. The eighth *Adelphia* factor examines whether the Debtor is seeking an extension to pressure creditors to submit to the Debtor's reorganization demands. Here, the Debtor has made no demands on any creditors, except to permit the Debtor to operate its hotel without the burden of unnecessary, time consuming and expensive reporting. The eighth factor supports an extension.

15. The last factor, i.e. the existence of an unresolved contingency, circles back to the Debtor's primary basis for an extension: the need to develop post-lockdown operating projections to be able to make an informed decision on the best Chapter 11 pan strategy. The ninth factor supports an extension of exclusivity.

16. In summary, almost all of the *Adelphia* factors support the Debtor's request for an extension of exclusivity.

17. The Debtor respectfully submits that cause exists to extend the Exclusive Periods as requested.

18.     No prior request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court an order extending the Exclusive Periods, and granting such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
       June 21, 2021

                    **BACKENROTH FRANKEL & KRINSKY, LLP**
                    **Attorneys for Debtor**

By:     s/Mark Frankel
        800 Third Avenue
        New York, New York 10022
        (212) 593-1100

14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                                                    Chapter 11

    96 Wythe Acquisition LLC                                  Case no.  21-22108

    Debtor.
---------------------------------------------------------x

# **ORDER**

Upon the application of 96 Wythe Acquisition LLC (the "Debtor") for an order extending the Debtor's 120 day exclusive period (the "120 Day Period") to file a plan of reorganization and the Debtor's 180 day period (the "180 Day Period") to solicit acceptances to a plan of reorganization, and upon the hearing held before this Court on _____, 2021; it is

ORDERED, that the 120 Day Exclusive Period is extended through and including _____; and it is further

ORDERED, that the 180 Day Exclusive Period is extended through and inclduing _____; and it is further

ORDERED, that this Order is without prejudice to the rights of the Debtor and/or other parties.

Dated:    New York, New York
                _____, 2021

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE