KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
David Braun
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                                               :
*In re:*                                                       :
                                                               :   Chapter 11
96 WYTHE ACQUISITION LLC,                                      :
                                                               :   Case No. 21-22108 (RDD)
                                        Debtor.                :
                                                               :
--------------------------------------------------------------- X

**BENEFIT STREET'S STATEMENT AND RESERVATION OF RIGHTS WITH
RESPECT TO THE DEBTOR'S FIRST REQUEST TO EXTEND THE EXCLUSIVE
PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

Benefit Street Partners Realty Operating Partnership, L.P.[1] ("**Benefit Street**" or the

"**Lender**"), a secured creditor in these proceedings, files this statement and reservation of rights

with respect to the Debtor's *Motion to Extend Exclusivity* [ECF No. 51] (the "**Motion**") and

respectfully states as follows:

**BACKGROUND**

1.      Benefit Street is a real estate investment trust focused on originating and managing

a diversified portfolio of commercial real estate investments. Its investors comprise both

---
[1] Benefit Street is a wholly-owned subsidiary of Franklin Resources, Inc. (NYSE: BEN), a company that, together with its subsidiaries, has approximately USD $1.5 trillion in assets under management and operates as Franklin Templeton.

institutions and retail investors.  As an affiliate of the fifth largest asset manager in the world, Benefit Street is not a predatory lender and does not make "loan-to-own" investments.  In fact, out of the over 400 real estate loans (worth over $8 billion) Benefit Street has made over the past several years under current management, it has had to foreclose on only **two** investments.  And during the same operating period, Benefit Street has experienced only one borrower filing for bankruptcy – 96 Wythe Acquisition LLC.[2]  Benefit Street's focus as a provider of real estate financing is always simply on recovering its debt – which, of course, in this particular case, is now over two years past maturity.

2.    The Williamsburg Hotel opened in December 2016, with certain work remaining to finish the project.  In December 2017, Benefit Street made an 18-month, $68 million construction completion loan to the Debtor secured by all of the Debtor's assets.  The Debtor failed to complete required construction work under the loan (causing the interest rate to increase) and defaulted in making debt service payments to Benefit Street in December 2018, necessitating the mezzanine lender to make such payments instead.  The loan subsequently matured in June 2019, *nine months before the pandemic,* with the Debtor having made no payments itself since December 2018 (a full 15 months before the pandemic).  In the more than two years since the June 2019 maturity, Benefit Street has received no payments at all even though the Debtor has continued to use its cash collateral to sustain ongoing operations.  Nor is Benefit Street aware of any post-loan maturity, prepetition process to sell the underlying hotel as a going concern or refinance the debt.

3.    Now, after nearly five months in bankruptcy, the Debtor seeks to extend the periods during which it has the exclusive right to file and solicit a chapter 11 plan by 120 days through

---

[2] Although the Debtor is the only borrower of Benefit Street's to file bankruptcy, in the past 12 months alone at least 2 additional affiliates of the Debtor have been subject to real estate foreclosure lawsuits due to maturity defaults under secured mortgage loans and have filed bankruptcy in this Court in an effort to stave off such foreclosures.

2

October 21, 2021 and December 20, 2021, respectively. Although Benefit Street has significant concerns about the progress of this case and, frankly the intentions of the Debtor, for purposes of the instant requested extension, it is not objecting to that relief but believes that, during this extension period, there must be better communication between the Debtor and Benefit Street and the Debtor must take tangible steps forward towards an exit from this case. This Statement explains several of Benefit Street's concerns so that they can be addressed to allow this case to advance towards an exit.

## STATEMENT

4.  This case is not exceptionally large or complex. While it involves an operating business, that business consists of a single operating location which generates less than $10 million in annual revenue and has somewhat more than 100 employees. The Debtor has one secured lender and its capital structure is straightforward. While the Debtor has scheduled a number of unsecured claims, the secured lender is the only creditor actively participating in the case.

5.  The case has been pending for almost five months. The Debtor has a large accounting staff (given the size of its operations) that has prepared and filed schedules and, after some initial problems, has generated agreed reporting of operating results for the last two months. The Debtor, however, has made little appreciable progress towards a reorganization or other exit from chapter 11 as a going concern. For example, six weeks ago, the Debtor informed the Court that it was interviewing financial professionals, but has yet to select and finalize an agreement with an advisor or file a motion to retain one.[3] As a result, a few short months from the fall seasonal downturn, the Debtor has not even begun to approach the market to explore any type of potential exit transaction, let alone formulated a proposed plan or begun plan discussions with Benefit Street

---

[3] *See* June 2, 2021 Hr'g Tr. at 3:1-18.

– its single largest creditor and the only active economic constituent in this case. The Debtor has, moreover, used the delays in hiring a broker or banker advisor to avoid negotiating milestones or a timeline for the progress of the case. *See* Motion at 9.

6.     At the same time the Debtor delays in developing and negotiating restructuring options, its business is underperforming its competitors and failing to pay significant operating expenses. Where, last year, the Debtor's revenue per available room (RevPAR) exceeded its competitors', according to the most recent information it has provided to Benefit Street, in May 2021, its RevPAR lagged its competitors' by 14%. *See* Ex. A.[4] Over the preceding 12-, 5-, and 3- month periods, moreover, its RevPAR has declined consistently, a fact that appears to stem from occupancy rates that have not recovered from the 2020 industry lows at the same rate as its competitors. *See id*. These disappointing results are consistent with the operating history of a hotel that opened in late 2016, and was already unable to pay its debt service a full 15 months before the pandemic even began, or repay its mortgage at maturity – again, before the pandemic.

7.     In bankruptcy, the Debtor's earnings have been underwhelming. Through the first week of June (the most recent actual numbers the Debtor's accounting staff has provided), the Debtor had generated slightly less than $115,000 in aggregate EBITDA. At the same time, the Debtor has failed to pay critical operating expenses. Almost $600,000 in real estate taxes – an amount almost five times larger than their postpetition EBITDA – fell due on July 1, 2021, but the Debtor did not pay it. Instead, the Debtor sought a payment plan from the City for those taxes, as well as the approximately $3.4 million in additional real estate taxes, interest and other charges that the Debtor had not paid *prepetition*. This payment plan provides for the continued accrual of

---

[4] STR Reports are generated by a third party market analyst and compare the hotel's performance to those of its competitors. The May 2021 STR Report, attached as Exhibit A, was provided by the Debtor as part of its agreed cash collateral reporting.

4

18% interest on the unpaid amounts. The *monthly* accrual of *interest* under this payment plan – running at essentially credit card rates – would be approximately $59,000 – or about half the actual EBITDA the Debtor has reported in this case. In short, heading into the summer months, the Debtor is nowhere near profitable (or even breaking even before the payment of debt service) and, in bankruptcy, is subjecting its assets to substantial additional secured claims.[5]

8.     Although the Debtor asserts that it is cooperating with Benefit Street, its actions belie its claim. While the Debtor's advisors have scheduled weekly calls with Benefit Street (at the Court's direction), they have nonetheless cancelled several. While Benefit Street is able to ask questions of the Debtor's CRO and counsel on those calls, the Debtor's advisors seldom provide substantive answers, deferring to others not present with whom they say they need to consult. For example, on June 3, the day after the Debtor unveiled the notion of entering a payment plan with the City to the Court at a cash collateral hearing, Benefit Street asked questions concerning the status of the Debtor's negotiations and the terms of the proposed payment plan, and requested copies of communications with the City. (This payment plan and the unpaid taxes generally have an obvious and material impact upon the lender's collateral). The Debtor's representatives were unable to answer questions on the call, but promised responses after speaking with their consultant. On a call on June 15, almost two weeks later, the Debtor's advisors still could not answer questions about the tax payment plan or appeal, but promised a call the following day between Benefit Street and the Debtor's tax consultant. They did not, however, arrange such a call the following day *or any time thereafter*. Two weeks later, on a call with Benefit Street on June 30, the Debtor's

---

[5] In the recent discovery dispute concerning the prepetition Paycheck Protection Program ("**PPP**") loan, the Debtor's counsel claimed that the Debtor generated close to $2 million in revenues in June. *See* ECF No. 66 at 2. Even if true – and it is very frustrating to see the Debtor relying on June financial results to obtain a litigation advantage when it has not reported those results to its creditors – it remains to be seen whether the EBITDA generated from this revenue equals or exceeds the monthly accrual of interest on the unpaid taxes.

5

advisors again deflected responses to questions regarding the unpaid taxes.

9. From the first day hearing, Benefit Street has raised concerns about the substantial unpaid prepetition real estate taxes as well as the postpetition taxes. Despite being asked repeatedly during the five weeks after the June 2 cash collateral hearing for a copy of the draft payment plan agreement it was negotiating with the City, the Debtor produced nothing until July 7, when it provided a *final, signed* agreement with the City dated *two weeks earlier*, on June 23. Several aspects of this agreement were notable. First, the agreement did not suspend the accrual of interest on the amounts due, which instead continues to accrue at 18%, compounded daily, until paid. Second, all the City appears to have agreed to do in return is not sell its tax liens, a trivial commitment because the automatic stay already prevents foreclosure. Third, the agreement calls for semi-annual payments in the amount of $443,201.41. This payment exceeds the $10,000 weekly accrual for real estate taxes in the Debtor's cash collateral budget by some 70%. Fourth, by its terms, the agreement provides for the Debtor to pay substantial prepetition claims on an administrative basis, but the Debtor has not presented it to the Court for approval on notice to creditors.[6] At a minimum, all of this underscores the lender's ongoing concern over lack of transparency and communication between the Debtor and Benefit Street.

10. These concerns were reinforced by the recent discovery in connection with the Receiver's motion. There, the Debtor initially refused to provide *any* documents to Benefit Street and, thereafter, has turned over only those documents the Court has directed it to produce. Even then, it has delayed and provided only the narrowest possible group of documents. As a result,

---

[6] In addition, the Debtor provided documentation concerning its effort to challenge the real property tax assessment for the hotel. In 2020-21, the hotel had an assessed value of $18,202,500. For 2021-22, the City reduced that assessed value to $11,216,700. The Debtor recently filed an application to have that assessment further reduced based on what it said was a market value of $3,735,000 – almost five times less than its 2020-21 assessment. Given the Debtor's contention that Benefit Street enjoys a significant equity cushion, this position was surprising, to say the least.

Benefit Street has discovered in stages that (i) its cash collateral is held in accounts in the name of the non-debtor Hotel Manager, not the Debtor, (ii) during the receivership, the Hotel Manager received and transferred almost $1.6 million to unidentified non-debtor accounts, (iii) these amounts were the proceeds of unspecified "government loans", (iv) the unspecified "government loans" were, in fact, made under the Paycheck Protection Program and similar programs, and (v) the workforce on which the Hotel Manager based its application for the $1.438 million PPP loan matches the number of *the Debtor's employees*.[7] Even after being forced to make these disclosures, the Debtor *still* refuses to produce the actual employee data it supplied to the bank that made the loan. While Benefit Street will be forced to request the Court to address this refusal at a forthcoming discovery conference, the Debtor's actions present two possibilities: (1) the Hotel Manager obtained the loans based on some business other than the Debtor's, but inexplicably refuses to produce the documents that would establish that fact; or (2) the Hotel Manager obtained funds to pay the Debtor's workforce from PPP and other programs but did not use the loan proceeds for that purpose, instead, allowing the Receiver to pay the Debtor's employees out of Benefit Street's cash collateral and leaving insufficient cash to pay millions of dollars in real property taxes. Neither explanation builds confidence in the Debtor's management or candor with its stakeholders. It also raises significant concerns over compliance with the PPP rules and CARES Act.

11. Although these facts raise substantial questions about whether the Debtor has made "good faith progress towards reorganization" as required by *In re Adelphia Commc'ns Corp.*, 352

---

[7] Under Benefit Street's loan agreement, the Debtor was obligated to get Benefit Street's consent before obtaining any such government loan, but did not do so. Moreover, the Debtor's entry into the PPP loan violated the New York state court order appointing the receiver, which prohibited the Debtor from entering into contracts that are not voidable on 30 days' notice. *See* Order Appointing a Receiver in a Non-Residential Mortgage Foreclosure Action [ECF No. 29-4].

7

B.R. 578, 587 (Bankr. S.D.N.Y. 2006), and also cast doubt on the Debtor's ability to satisfy the remaining *Adelphia* factors, Benefit Street does not oppose an extension of exclusivity at this point. As discussed above, Benefit Street's interest is in the repayment of its debt. But if the Debtor is going to receive the benefit of additional time in bankruptcy to seek to facilitate an exit, Benefit Street believes the Debtor must promptly retain an acceptable broker and/or banker with a broad mandate to implement an exit, including all options such as a sale of its assets. Shortly thereafter, it must launch a robust marketing process tied to express milestones, all while coordinating with Benefit Street about restructuring options.

12. In light of the Debtor's disappointing postpetition operating performance (even taking into account the reopening of the country post-pandemic) and lack of transparency or substantive communications, such milestones are necessary to ensure that the parties will not find themselves eight months into the case, with continued declining revenues and no viable plan of reorganization or other exit. Of course, if the Debtor fails to implement a timely marketing process or its operations deteriorate, Benefit Street reserves the right to seek to terminate exclusivity and proceed with a court-approved process to sell the business as a going concern for the benefit of all creditors.

*[remainder of page intentionally left blank]*

Dated: July 13, 2021
     New York, New York

                      KRAMER LEVIN NAFTALIS & FRANKEL LLP

                      /s/ *P. Bradley O'Neill*
                      Adam C. Rogoff
                      P. Bradley O'Neill
                      David Braun
                      Kramer Levin Naftalis & Frankel LLP
                      1177 Avenue of the Americas
                      New York, New York 10036
                      Telephone: (212) 715-9100
                      Facsimile:  (212) 715-8000
                      Email: arogoff@kramerlevin.com
                                boneill@kramerlevin.com
                                dbraun@kramerlevin.com

                      *Attorneys for Benefit Street Partners Realty*
                      *Operating Partnership, L.P.*

# EXHIBIT A



|  |  | My Prop | % Chg | Comp Set | % Chg | Index (MPI) | % Chg |
|---|---|---|---|---|---|---|---|
| **Occupancy** | Current Month | 60.0 | -30.1 | 68.6 | 0.0 | 87.5 | 0.0 |
|  | Year To Date | 58.0 | 47.8 | 48.6 | -2.9 | 119.4 | 52.2 |
|  | Running 3 Month | 58.1 | 52.2 | 56.1 | 0.0 | 103.7 | 0.0 |
|  | Running 12 Month | 54.5 | -2.9 | 38.7 | -47.0 | 140.8 | 83.3 |

|  |  | My Prop | % Chg | Comp Set | % Chg | Index (ARI) | % Chg |
|---|---|---|---|---|---|---|---|
| **ADR** | Current Month | 301.73 | 112.8 | 306.50 | 0.0 | 98.4 | 0.0 |
|  | Year To Date | 225.75 | 15.2 | 262.17 | 19.1 | 86.1 | -3.2 |
|  | Running 3 Month | 252.06 | 54.1 | 273.13 | 0.0 | 92.3 | 0.0 |
|  | Running 12 Month | 221.59 | -28.6 | 260.09 | -12.4 | 85.2 | -18.5 |

|  |  | My Prop | % Chg | Comp Set | % Chg | Index (RGI) | % Chg |
|---|---|---|---|---|---|---|---|
| **RevPAR** | Current Month | 180.96 | 48.9 | 210.11 | 0.0 | 86.1 | 0.0 |
|  | Year To Date | 130.90 | 70.4 | 127.31 | 15.6 | 102.8 | 47.3 |
|  | Running 3 Month | 146.55 | 134.4 | 153.10 | 0.0 | 95.7 | 0.0 |
|  | Running 12 Month | 120.73 | -30.7 | 100.67 | -53.6 | 119.9 | 49.3 |

| | |
|---|---|
| **Date Selection** | 2021-05 |
| **Property Selection** | 64468 |
| **Currency** | USD |
| **Report** | Monthly dSTAR |
| **Industry Segment** | East River-Queens/Brooklyn West, NY Independents |
| **Comp Set** | 1 (Excludes) |

This STR Report is a publication of STR, LLC and STR Global, Ltd., CoStar Group companies, and is intended solely for use by paid subscribers. The information in the STR Report is provided on an "as is" and "as available" basis and should not be construed as investment, tax, accounting or legal advice. Reproduction or distribution of this STR Report, in whole or part, without written permission is prohibited and subject to legal action. If you have received this report and are NOT a subscriber to this STR Report, please contact us immediately. Source: 2021 STR, LLC / STR Global, Ltd. trading as "STR". © CoStar Realty Information, Inc.