KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
96 WYTHE ACQUISITION LLC,                                        :    Case No. 21-22108 (RDD)
                                                                 :
                                          Debtor.                :
                                                                 :
----------------------------------------------------------------- X

**LENDER'S OBJECTION TO DEBTOR'S MOTION TO**
**AUTHORIZE INTERCOMPANY TRANSFERS [ECF NO. 83]**

Benefit Street Partners Realty Operating Partnership, L.P.[1] ("**Benefit Street**" or "**Lender**")

objects to 96 Wythe Acquisition LLC's ("**Debtor**") Motion to Authorize Intercompany Transfers

to The Williamsburg Hotel BK LLC ("**Hotel Manager**") [ECF No. 83] ("**Motion**").

> **Benefit Street initially prepared this objection to file last Friday, but did not**
> **because of the adjournment of the Debtor's Motion.  It does so now, because the Debtor,**
> **in supporting the Hotel Manager's Motion to Quash, has repeated its unfounded claims,**
> **made for the first time in the Motion, that the hotel management agreement attached as**
> **Exhibit A to the Motion legitimately governs its relationship with the Hotel Manager and**
> **should be enforced by this Court.  [ECF No. 102, ¶ 4].**

---

[1] Benefit Street is a wholly owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.

As the body of this objection demonstrates, this assertion is not only outrageously false, but it constitutes yet another instance of self-dealing and falsehoods by both the Debtor and the Hotel Manager – which are controlled by the exact same people.  Among other things:

- The management agreement on which the Debtor now relies has never before been disclosed to Benefit Street or to creditors – let alone scheduled as an executory contract as required under "oath";

- At the closing of Benefit Street's loan, the Debtor actually assigned Benefit Street a materially different, one-page management agreement in December 2017 – one far less favorable to the Hotel Manager than the one purportedly entered into in November 2017 – and there is simply no credible comparison between the two documents;

- At the closing of Benefit Street's loan, which occurred roughly three weeks after the date of this previously concealed management agreement, both the Debtor and the Hotel Manager (again, acting through the same common, controlling principals) expressly represented to Benefit Street that no other management agreement existed – let alone this alternative version that reflects blatant self-dealing in favor of the insiders' separately held Hotel Manager business; and

- The Debtor's and the Hotel Manager's assertion that this new management agreement somehow governs their successful relationship today indicates not only that they almost certainly defrauded Benefit Street at the closing of its loan, but also that they may be participating in an intentional fraudulent conveyance to the detriment of the estate's creditors and part of a pattern of dishonest behavior – claims that would be assets of this estate that cannot be pursued by these conflicted insiders and instead demand a prompt and thorough investigation by honest and independent fiduciaries.

Benefit Street files this objection now, so that the Court may have the benefit of the facts concerning the purported management agreement in connection with the Motion to Quash scheduled for hearing this Friday, September 10, 2021.

## PRELIMINARY STATEMENT

1.      For the first five and half months of this case, the Debtor represented to the Court and creditors that *it* operated The Williamsburg Hotel in Brooklyn, New York ("**Hotel**") and *it* employed the Hotel staff.  On this basis, it prepared schedules, engaged with its lender, and negotiated multiple cash collateral orders and budgets.  Now, halfway through its extended exclusive periods, the Debtor discloses that its representations were untrue, and that its affairs are entirely managed and its staff employed by a non-debtor Hotel Manager controlled by the same principals that control the Debtor.  In support of these assertions, it presents a previously undisclosed 18-page, single spaced management agreement that it asserts governs the affiliates' relationship and assets.  In its recent filing in support of the Hotel Manager's motion to quash Benefit Street's Rule 2004 subpoenas [ECF No. 102], the Debtor again relied on this agreement and unveiled $2 million in alleged fee claims held by the Hotel Manager under it that might be subordinated under a plan.

2.      This agreement came as a shock to the United States Trustee ("**UST**"), perhaps because the Debtor had not (i) identified this allegedly critical agreement in response to the UST's many inquiries, (ii) listed an agreement so allegedly material as an executory contract in its schedules, or (iii) disclosed $2 million in alleged affiliate claims under it.  The agreement came as a shock to Benefit Street for a different – and more troubling – reason.  The management agreement the Debtor now presents is dated November 21, 2017, just three weeks before the closing of Benefit Street's $68,000,000 loan.  At the closing of that loan, the Debtor disclosed and assigned a very different management agreement to Benefit Street (one far less disadvantageous to the estate) as collateral for its loan.  At the same time, the Debtor and the Hotel Manager (in a document executed by their controlling insiders) *expressly represented to Benefit Street that no*

*other such management agreement existed*. For the Debtor to now present a detailed agreement

signed by its insiders while Benefit Street's loan was being negotiated suggests that these

representations – made by fiduciaries of the Debtor – were not just false, but intentionally false.

3.      The Debtor's Motion informs the Court and stakeholders that the Debtor's

operations are run by the Hotel Manager, and that the Debtor's revenues (and Benefit Street's

collateral) are collected and held outside of the estate in bank accounts belonging to the Hotel

Manager. Relying in part on a previously undisclosed hotel management agreement, it asks this

Court to bless this insider arrangement. Approval is required, it argues, to avoid disruption of the

operations of the Hotel, and because using the Hotel Manager's accounts somehow limits claims

against the estate.

4.      None of these arguments justifies using insider-controlled, non-debtor

accounts to collect the Debtor's revenues (and the Lender's collateral), thereby unnecessarily

exposing those revenues to claims of the creditors of the Hotel Manager and shielding the funds

from estate oversight. Establishing Debtor accounts that are administered by a hotel manager,

*as agent*, should be straightforward to accomplish and would cause little to no disruption to

operations. Additionally, the Debtor cannot explain how the current bank account arrangements

limit claims against the Debtor. Claims are driven by the Debtor's contracts and conduct, not by

the bank accounts in which it collects revenues and from which it makes payments.

5.      More importantly, the Hotel Manager's misconduct militates against

allowing estate assets to pass directly into its account outside the estate. The Hotel Manager is not

a disinterested third party. It is controlled by the same insiders who control the Debtor. They are

the authors and signatories of the hotel management agreement attached to the Motion and the

parties who intentionally concealed it from Benefit Street and, until the UST required the Debtor

to file the Motion, the Court.  For the Debtor now to argue that this newly disclosed agreement authorizes the use of Hotel Manager accounts reflects serious misconduct.

6.      Furthermore, the newly disclosed agreement bears many of the hallmarks of an intentional fraudulent conveyance by the controlling-insiders for their own benefit, not least of which is the recently unveiled $2 million fee claim by the Hotel Manager.  ECF No. 102, ¶ 10. These concerns only reinforce those raised by the Hotel Manager's misconduct in connection with PPP loans that was outlined in Benefit Street's opposition to the Hotel Manager's motion to quash. ECF No. 100.  The troubling facts surrounding this newfound management agreement, as well as the potential avoidance and mismanagement claims against the Hotel Manager that they implicate, require that the Motion be denied and that Debtor's revenues not be placed in accounts held by the non-debtor Hotel Manager outside of the control of this Court.[2]

## STATEMENT OF FACTS

7.      As the Court is aware, throughout this chapter 11 case, the Debtor has represented that it owns and operates the Hotel.  In December 2017, Benefit Street provided the Debtor with a $68,000,000 construction completion loan ("**Loan**") secured by all of the assets of the Debtor.

### The Debtor Assigns a Specific Management Agreement to Benefit Street

8.      In late October 2017, when negotiations began concerning the Loan, Toby Moskovits, a controlling insider of both the Debtor and the Hotel Manager, informed Benefit Street that the Hotel Manager, an affiliate of the Debtor, managed the Hotel, but that no written management agreement existed.  *See* Email from Toby Moskovits to Benefit Street et al., dated

---

[2] This case warrants the immediate appointment of an independent fiduciary and, for that reason, Benefit Street will be filing a separate pleading joining and requesting the conversion of this case, dismissal, or appointment of a Chapter 11 trustee.  Benefit Street is prepared to work with a Court-appointed trustee (whether in chapter 7 or chapter 11) to preserve the ongoing operation of the Hotel.

October 30, 2017 ("Exhibit 1").   As additional collateral security for its loan, Benefit Street required that a management agreement be prepared and assigned to it.   At the closing of the Loan, on December 13, 2017, both the Debtor and the Hotel Manager signed an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees, dated as of the closing ("**Assignment of Management Agreement**").   *See* Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees, dated December 13, 2017 ("Exhibit 2").   Attached as Exhibit A to the Assignment of Management Agreement was a one-page Management Agreement ("**Management Agreement**").   Ex. 2, at Ex. A.

9.   The Assignment of Management Agreement provided for the Hotel Management Agreement to be assigned to Benefit Street as collateral security for its loan.   It further provided that all "liens, rights, privileges and interests . . . owed, claimed or held" by  the Hotel Manager under the Management Agreement were "subordinate and inferior in lien, payment and terms" to Benefit Street's loan documents and liens.   Ex. 2, §§ 1, 2.

10.   The Assignment of Management Agreement is signed by Ms. Moskovits on behalf of the Debtor and by Yechial Michael Lichtenstein on behalf of the Hotel Manager.   *See* Ex. 2 at 8.   Ms. Moskovits and Mr. Lichtenstein – the controlling insiders – are each 50% owners of both entities.

**The Debtor and the Manager Represent That No Other Management Agreement Exists**

11.   Consistent with Ms. Moskovits' earlier representations, in Section 3 of the Assignment of Management Agreement, entitled "Estoppel," both the Debtor and the Hotel Manager expressly represented that no other management agreements existed:

> *The Hotel Management Agreement* is in full force and effect and has not been modified, amended or assigned other than pursuant to this assignment and *constitutes the entire agreement between [the Hotel Manager] and [the Debtor] with respect to management of the Property.*

*Id.* § 3 (emphasis added).  The document does not describe an 18-page single-spaced management agreement purportedly executed by the very same signatories three weeks earlier.  Section 4 of the same document barred any subsequent amendment, termination or replacement of the Hotel Management Agreement without Benefit Street's express written consent:

> The [Debtor and the Hotel Manager] hereby agree . . . not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without [Benefit Street's] prior written consent which will not be unreasonably withheld delayed or conditioned.[3]

*Id.* § 4.

12.      These representations and agreements formed part of the basis of Benefit Street's loan.  The Hotel Manager not only signed the Assignment of Management Agreement, but expressly acknowledged that Benefit Street was relying on the Hotel Manager's representations and agreements in making the loan to the Debtor:

> Manager has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

*Id.* § 19.

13.      Underscoring the centrality of the issue, in the loan agreement entered by the parties and also signed by Ms. Moskovits, the Debtor again expressly represented to Benefit Street that no other management agreement existed.  *See* Loan Agreement between 96 Wythe Acquisition, LLC, as Borrower, and Benefit Street Partners Realty Operating Partnership, L.P., as Lender, dated as of December 13, 2017 ("**Loan Agreement**") (extracted pages of which are attached as "Exhibit 3").  In particular, in Section 3.31(d) and Exhibit I to the Loan Agreement,

---

[3] The Hotel Manager further acknowledged, consented to and agreed to act in conformity with Section 4.20 of the Loan Agreement, which contained similar prohibitions on the termination or amendment of the Hotel Management Agreement without the prior written consent of Benefit Street. *See* Ex. 2, § 7 and Ex. 3, § 4.20(b).

the Debtor represented to Benefit Street that it was not party to any "Major Contracts" with affiliates, which the Loan Agreement defined to include "any management (other than the Management Agreement [attached to the Assignment of Management Agreement]), brokerage or leasing agreement."  *Id*. at 15.

**Terms of the Management Agreement and the Assignment of Management Agreement**

14.    The Management Agreement assigned to Benefit Street was brief and concise.  It provided that:

- The Hotel Manager would "perform all work in connection with the on-site management of the Property."

- The Hotel Manager would "employ at its expense all personnel and facilities necessary and appropriate to enable it to perform the services required of it hereunder."

- "All accounting duties, including the keeping of proper and complete books of account for the [Debtor] shall be kept by or under the supervision of the [Debtor.]  The [Hotel Manager] shall assist in providing any information in its possession necessary or helpful for the accounting function."

- "Manager shall receive a management fee in the amount of 3.0% of gross rents as of January 1 of each year, payable on the first day of each month throughout the calendar year."

15.    Nowhere did the Management Agreement:

- grant the Hotel Manager any property rights in the Hotel's assets or the Debtor, including trademarks, tradenames or customer lists used in the operation of the Hotel;

- grant the Hotel Manager the right to usurp corporate opportunities of the Debtor;

- authorize the Hotel Manager to maintain the Debtor's bank accounts in the name of the Hotel Manager;

- award the Hotel Manager any fees in excess of 3% of the gross revenues of the Hotel;

- exempt the Hotel manager from liability for negligence in the management of the Hotel;

- grant the Hotel Manager complete discretion in the management of the Hotel while barring the Debtor from any role in management whatsoever; or

- prohibit the Debtor from assigning its interest in the Hotel Management Agreement without the consent of the Hotel Manager.

16.    The Assignment of Management Agreement also imposed certain limits on the Hotel Manager's rights.  It limited the Hotel Manager's fees to a maximum of 3% of gross rents collected. Ex. 2, § 6(c). It further provided that no such fees would be payable after an event of a default under the Loan.  *See id.* § 6(a).  Neither term appears consistent with a $2 million fee claim by the Hotel Manager.

17.    The Hotel Manager also agreed in Section 21 of the Assignment of Management Agreement that all amounts it collected were the sole property of the Debtor and that it was collecting such funds solely as agent for the Debtor and subject to Benefit Street's liens. Ex. 2, § 21.  The same section obligated the Hotel Manager to handle all revenues of the Hotel in accordance with Article 8 of the Loan Agreement:

> At all times during the term of the Loan all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by Manager, if any, shall be handled and applied in accordance with Article 8 of the Loan Agreement.

*Id*.

18.    Article 8 of the Loan Agreement lays out detailed cash management requirements for the Debtor.  Among these is the requirement that, upon an event of default under the Loan, the Debtor must establish a Clearing Account and a Cash Management Account *in the name of the Debtor* and deposit all revenues of the property received by the Debtor or the Manager into those accounts, including all amounts collected under the Management Agreement.  Ex. 3, §§ 8.5, 8.6.

9

**The Purported, Newly Disclosed Management Agreement**

19.    In the Motion, the Debtor acknowledges that the Hotel Manager has been collecting the Hotel's revenues in accounts held in the name of the Hotel Manager, and not the Debtor.  At the insistence of the UST, it has established DIP accounts in the name of the Debtor into which it claims to have transferred the revenues it collects.

20.    The Motion seeks authorization to continue this practice.  In support of that request, the Debtor attaches as Exhibit A to its Motion a new Hotel Management and Service Agreement, between the Hotel Manager and the Debtor, dated as of November 21, 2017 ("**Purported Management Agreement**") ("Exhibit 4").  Like the Assignment of Management Agreement, the Purported Management Agreement is signed by Ms. Moskovits on behalf of the Debtor and by Mr. Lichtenstein on behalf of the Hotel Manager.

21.    Before the filing of the Motion, neither the Debtor nor the Hotel Manager disclosed this agreement to Benefit Street, and Benefit Street was not aware of it.

22.    On its face, the Purported Management Agreement was entered into roughly three weeks before the closing of Benefit Street's Loan – which would render the representations made by both the Debtor and the Hotel Manager in the Assignment of Management Agreement and the Loan Agreement false.  Given that this extensive new agreement was apparently prepared and executed so close to closing of the Loan, while the same parties were negotiating the Assignment of Management Agreement and the Hotel Management Agreement assigned to Benefit Street, the inaccuracy of these representations appears to have been intentional.

23.    Not only did the Debtor and the Hotel Manager fail to disclose the Purported Management Agreement to Benefit Street, but the contract terms that the two insiders negotiated

for their own benefit materially depart from the terms of the Hotel Management Agreement and

improperly transfer rights, assets and authority to the non-debtor Hotel Manager.

      24.    Among other things, in the Purported Management Agreement, the Debtor

and the Hotel Manager allegedly agreed that:

- <u>Hotel's Intellectual Property Granted to Manager</u>.  All intellectual property of the Hotel belongs to the Hotel Manager, not the Debtor.  This includes all trademarks, tradenames and logos.  It also includes all confidential information used by the Manager in managing the Hotel, including customer lists, business plans, financial information, financial plans, designs, marketing plans, databases and all "information about Managers' and its affiliates customer, clients and business partners and its operations". Ex. 4, § 13.01; *see also id.* §§ 2.01, 4.01.  It further provides that if the Hotel Manager is terminated, the Hotel must immediately cease using this intellectual property. *See id.*

- <u>Hotel Manager Fees Enhanced</u>.  The Hotel Manager will be entitled not only to a fee equal to 3% of gross revenues, but also an "incentive fee" equal to 10% of net operating income.  The Hotel Manager is authorized to pay itself these fees and to accrue interest to the extent that Hotel lacks sufficient funds to pay it.  *Id.* §§ 10.01, 10.03-04.

- <u>Reimbursement of expenses</u>.  The Hotel is required to reimburse the Hotel Manager for all "Operating Expenses" of the Hotel it incurs in performing its duties.[4]  *See id.* § 7.01.  The Debtor is also required to provide all "Working Capital" necessary to fund the day-to-day operations of the Hotel. *See id.* § 8.01.

- <u>Discretion to Manage</u>.  The Hotel Manager is granted sweeping authority over the management of the Hotel, often to the exclusion of the Debtor.  In particular, the Debtor is barred from any role in the hiring or firing of Hotel staff.  The Hotel Manager, in turn, is expressly insulated from liability as a result of the actions of the employees that it hires. *See id.* §§ 3.02(a), 18.05(a).

- <u>Debtor Termination Rights Severely Limited</u>.  The Debtor is permitted to terminate the agreement based only on the Hotel Manager's fraud or willful misconduct.[5]  The Hotel Manager may not be deemed in breach of the

---

[4] The Purported Management Agreement uses, but does not define the term Operating Expenses.  Interestingly, the Purported Management Agreement has multiple such typos, undefined defined terms and cross references to sections that do not exist.

[5] Benefit Street submits that both fraud and willful misconduct have occurred here.

agreement based upon, the failure of the Hotel to meet financial performance goals, the acts of Hotel personnel the filing of lawsuit or judgment against the Hotel or the Hotel Manager. *See id.* § 15.01.

- <u>Bank Accounts in Name of Hotel Manager</u>. Hotel operating accounts are to be opened and held in the name of the Hotel Manager (and not the Debtor). *See id.* § 8.02.

- <u>Hotel Manager May Take Corporate Opportunities</u>. Section 18.05(b) specifically authorizes the Hotel Manager shall be free to manage other hotels and compete with the Debtor. It further provides that the Hotel Manager has no duty to communicate any corporate opportunities to the Debtor and may usurp corporate opportunities of the Debtor.[6] *See id.* § 18.05.

- <u>Secrecy</u>. Other than in certain limited circumstances, the Hotel Manager and the Debtor may not disclose the terms of the Purported Hotel Management Agreement to third parties. *See id.* §18.04.

## **ARGUMENT**

25. The Debtor asks the Court to approve what it calls its "cash management system." For the first time – almost six months into the case – it explains that its affiliate, the Hotel Manager, owned and controlled by the Debtor's insiders, collects all of the Hotel's rents and revenues in accounts held in the Hotel Manager's name. The Hotel Manager thereafter purports to transfer these rents and revenues into DIP accounts held in the name of the Debtor. The Debtor argues that these arrangements should be approved because they allegedly (i) limit the Hotel's liabilities for vendor and employee claims, (ii) will preserve a "business as usual" atmosphere and avoid disruption of vendor and employee relationships, and (iii) are necessary to allow the Hotel Manager to perform its duties under the Purported Hotel Management Agreement. None of these arguments have merit.

---

[6] As alluded to in footnote 4, above, Section 18.05(b) provides that it is subject to an exception contained in "subsection (d) below." Section 18.05, however, does not contain a subsection (c) or a subsection (d).

26.     The Debtor's assets (including its cash, which is also Benefit Street's collateral) should be held in accounts in the Debtor's own name.  Holding Hotel revenues in the Hotel Manager's accounts exposes estate assets to the claims of third party creditors of the Hotel Manager and potentially to claims of the Hotel Manager.

27.     The Debtor offers no valid reason why the estate must incur the risk of this exposure to its cash assets and place such assets outside of the oversight of this Court.  All accounts should be held in the name of the Debtor and administered by whatever manager it is permitted to retain, *as agent.*  Not only is this standard practice in the hospitality management industry, but is consistent with Benefit Street's Loan Agreement (which required all revenues of the Hotel to be deposited in accounts in the Debtor's name no later than the maturity default in June 2019), and the Assignment of Management Agreement (which provides that Hotel Manager collects Hotel rents and revenues solely as agent and holds them in trust for the Debtor and that it will honor the cash management provisions of the Loan Agreement).

28.     This result can be readily accomplished.  The Hotel Manager manages no other hotels.  The accounts it uses in the management of the Hotel should simply be transferred and retitled as Debtor accounts.  Alternatively, new accounts may be opened in the name of the Debtor.  Neither approach will result in commercial disruption.  At most, the estate would need to provide vendors and customers with a new set of payment instructions, something that occurs routinely in Chapter 11 cases.  Certainly, such minor administrative alterations do not even remotely amount to "aborting the Management Agreement," as the Debtor argues.  Motion ¶ 13. (Of course, as explained below, such relief is required by the Hotel Manager's apparent misconduct and self-dealing.)

29.     Nor is it clear how the account structure the Debtor advocates can possibly insulate the estate from the claims of contract counterparties, as the Debtor claims.  Whether vendors or employees have claims against the Debtor is determined by their agreements, not by the accounts in which revenues are received or from which payments are made.  Furthermore, far from being insulated from liabilities, the Debtor has been and continues to pay operating expense out of cash collateral from Hotel revenues.  In fact, under the Purported Management Agreement, the Debtor is required to reimburse the Hotel Manager for all operating expenses and cannot even assert claims against the Hotel Manager for the Hotel Manager's negligence.  *See* Ex. 4, §§ 4.03, 7.01 & 18.05(a).

30.     Putting aside the flimsiness of the arguments the Debtor offers for authorizing Debtor revenues to be collected and held in non-debtor Hotel Manager accounts, far more serious considerations militate against the approach the Debtor proposes.  Not only has the Debtor concealed from the Court, the UST, and creditors material information about the nature of the Hotel Manager's role in this case, but the Hotel Manager itself appears to have been guilty of deceptive conduct, if not outright fraud.

31.     First, the Purported Management Agreement that the Debtor attaches to the Motion demonstrates self-dealing by a fiduciary.  To induce Benefit Street to loan the Debtor $68,000,000, the Debtor and Hotel Manager each represented to Benefit Street that the Management Agreement that had been assigned to Benefit Street as collateral was the sole agreement between it and the Debtor concerning the management of the Hotel.  Ex. 2, § 3.  *See also id.* § 4 (barring any subsequent amendment, termination or replacement of the Hotel Management Agreement without Benefit Street's express written consent).  The Debtor's recent claim that Hotel management is actually governed by an 18-page single-spaced agreement between the Debtor and

14

the Hotel Manager dated *three weeks before the closing of the Loan,* suggests not only that these representations were false, but that they were intentionally false.  Not only was this Purported Management Agreement concealed from Benefit Street, but it was never disclosed to the Court nor included in the Debtor's bankruptcy Schedules.  Nor did the Debtor disclose, before yesterday, that the Hotel Manager is "owed over $2 million in accrued and unpaid management fees." ECF No. 102, ¶ 10.  These facts estop the Debtor from arguing that the Purported Management Agreement authorizes the use of accounts in the name of the Hotel Manager.

      32.    Furthermore, the terms of the Purported Management Agreement reflect self-dealing by controlling insiders purporting to act as fiduciaries in this case.  They are materially more favorable to the Hotel Manager than the Management Agreement assigned to Benefit Street at the closing of the Loan.  Among other things, they purport to: (i) award the Hotel's intellectual property (trademarks, tradenames, customer lists, etc.) to the Hotel Manager, (ii) entitle the Hotel Manager to materially higher management fees, (iii) authorize the Hotel Manager to usurp corporate opportunities of the Debtor without notice, and (iv) severely limit the circumstances in which the Debtor can terminate the Purported Hotel Management Agreement or hold the Hotel Manager liable for mismanagement.  Such an "agreement" bears the hallmarks of an intentional fraudulent conveyance.  If it was negotiated at all, it was negotiated among controlling insiders and their affiliates.  Its existence was concealed from Benefit Street at the closing of the Loan and from the Court, the UST, and other creditors for the first five plus months of this case.  The substantial entitlements it allegedly grants to the Hotel Manager appear to be far out of market and thus given for inadequate consideration.

      33.    In short, the Hotel Manager appears to have participated in an avoidable transaction intended to benefit the controlling insiders at the expense of creditors of the estate.  Not

only does this conduct give rise to claims against the Hotel Manager by the estate (as to which the

Debtor is clearly conflicted), but it reflects serious self-dealing by the entity that holds the Debtor's

revenues and manages its affairs.  Together with the apparently serious misconduct by the Hotel

Manager in connection with the PPP Loan explained in detail in Benefit Street's opposition to the

Hotel Manager's motion to quash [ECF No. 100], this apparently new, and apparently fraudulent,

management agreement represents a disqualifying impropriety.  Common sense dictates that such

entity should not be permitted to hold and control the estate's cash.

## **CONCLUSION**

34.    For the foregoing reasons, the Court should deny the Debtor's Motion and

grant Benefit Street such other and further relief as may be just and proper.

Dated: September 8, 2021
      New York, New York

                                    KRAMER LEVIN NAFTALIS &FRANKEL LLP

                                    /s/ P. Bradley O'Neill
                                    Adam C. Rogoff
                                    P. Bradley O'Neill
                                    Kramer Levin Naftalis & Frankel LLP
                                    1177 Avenue of the Americas
                                    New York, New York 10036
                                    Telephone: (212) 715-9100
                                    Facsimile:  (212) 715-8000
                                    Email: arogoff@kramerlevin.com
                                              boneill@kramerlevin.com

                                  *Attorneys for Benefit Street Partners Realty Operating Partnership, L.P.*

# EXHIBIT 1

**From:** Toby Moskovits <toby@heritage-equity.com>
**Sent:** Monday, October 30, 2017 11:02 AM
**To:** Wainger, Margot J. <mwainger@stroock.com>
**Cc:** marion gross <marion@northsidedev.com>; Touhill, Peter <p.touhill@benefitstreetpartners.com>;
Balshem, Eugene P. <ebalshem@stroock.com>; northsideacquisition@gmail.com>; Breinholt, Jacob
<j.breinholt@benefitstreetpartners.com>; Goodman, Micah <m.goodman@benefitstreetpartners.com>; Bays,
David <d.bays@benefitstreetpartners.com>; Fife, Sam <S.Fife@benefitstreetpartners.com>; Mollova, Tanya
<t.mollova@benefitstreetpartners.com>; Chorny, Allan <a.chorny@benefitstreetpartners.com>;
nycdevmanager@gmail.com Lichtenstein <nycdevmanager@gmail.com>; Nicholas J. Kaiser
<NKaiser@cohengresser.com>; Robert J. Gavigan <rgavigan@cohengresser.com>; Jeremy Rauch
<jeremy@heritage-equity.com>; Zangara, Michael R. <mzangara@stroock.com>
**Subject:** Re: BSP/Williamsburg Hotel - Management Agreement

We do not have a management agreement in place.

Toby Moskovits
Heritage Equity Partners
679 Driggs Avenue
Brooklyn, NY 11211
(347)-229-7527

On Oct 30, 2017, at 11:00 AM, Wainger, Margot J. <mwainger@stroock.com> wrote:

> Thanks Miriam.
> I believe on our call you mentioned that the management agreement was uploaded to the dropbox site. I
> can't seem to locate it. Could you please circulate a copy by email?
>
> **Margot Wainger**
> Associate
>
> **STROOCK**
> 200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
> T: 305.789.9314
>
> mwainger@stroock.com | vCard | www.stroock.com

> **From:** marion gross [mailto:marion@northsidedev.com]
> **Sent:** Monday, October 30, 2017 12:26 AM
> **To:** Wainger, Margot J.
> **Cc:** Touhill, Peter; Balshem, Eugene P.; Toby Moskovits; northsideacquisition@gmail.com;
> Breinholt, Jacob; Goodman, Micah; Bays, David; Fife, Sam; Mollova, Tanya; Chorny, Allan;
> nycdevmanager@gmail.com Lichtenstein; Nicholas J. Kaiser; Robert J. Gavigan; Jeremy Rauch;
> Zangara, Michael R.
> **Subject:** Re: BSP/Williamsburg Hotel - TCO
> See attached.

Miriam Gross

O: (718) 408-8849
C: (917) 652-9292

On Fri, Oct 27, 2017 at 6:04 PM, Wainger, Margot J. <mwainger@stroock.com> wrote:

The attached TCO that was posted to the data site is expired (expired 9/14). Do you have a copy of the renewal?

**Margot Wainger**
Associate

**STROOCK**
200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

**From:** Touhill, Peter [mailto:p.touhill@benefitstreetpartners.com]
**Sent:** Friday, October 27, 2017 11:11 AM
**To:** Wainger, Margot J.; Balshem, Eugene P.; 'Toby Moskovits';
'northsideacquisition@gmail.com'; 'Marion@northsidedev.com'; Breinholt, Jacob; Goodman,
Micah; Bays, David; Fife, Sam; Mollova, Tanya; Chorny, Allan; 'nycdevmanager@gmail.com
Lichtenstein'; 'Nicholas J. Kaiser'; 'Robert J. Gavigan'
**Cc:** Zangara, Michael R.
**Subject:** RE: BSP/Williamsburg Hotel - Checklist and kickoff materials

https://www.dropbox.com/sh/019wgha0lidsgmq/AACXA_xjGDj2y9YhE2naU1Bva?dl=0

**From:** Wainger, Margot J. [mailto:mwainger@stroock.com]
**Sent:** Friday, October 27, 2017 10:16 AM
**To:** Balshem, Eugene P. <ebalshem@stroock.com>; Touhill, Peter
<p.touhill@benefitstreetpartners.com>; 'Toby Moskovits' <toby@heritage-equity.com>;
'northsideacquisition@gmail.com' <northsideacquisition@gmail.com>;
'Marion@northsidedev.com' <Marion@northsidedev.com>; Breinholt, Jacob
<j.breinholt@benefitstreetpartners.com>; Goodman, Micah
<m.goodman@benefitstreetpartners.com>; Bays, David <d.bays@benefitstreetpartners.com>;
Fife, Sam <S.Fife@benefitstreetpartners.com>; Mollova, Tanya
<t.mollova@benefitstreetpartners.com>; Chorny, Allan <a.chorny@benefitstreetpartners.com>;
'nycdevmanager@gmail.com Lichtenstein' <nycdevmanager@gmail.com>; 'Nicholas J. Kaiser'
<NKaiser@CohenGresser.com>; 'Robert J. Gavigan' <rgavigan@cohengresser.com>
**Cc:** Zangara, Michael R. <mzangara@stroock.com>
**Subject:** RE: BSP/Williamsburg Hotel - Checklist and kickoff materials

Resending my email below with the attachments.


**Margot Wainger**
Associate

**STROOCK**

200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

---

**From:** Wainger, Margot J.
**Sent:** Friday, October 27, 2017 10:15 AM
**To:** Balshem, Eugene P.; 'Touhill, Peter'; 'Toby Moskovits'; 'northsideacquisition@gmail.com';
'Marion@northsidedev.com'; 'Breinholt, Jacob'; 'Goodman, Micah'; 'Bays, David'; 'Fife, Sam';
'Mollova, Tanya'; 'Chorny, Allan'; 'nycdevmanager@gmail.com Lichtenstein'; 'Nicholas J.
Kaiser'; 'Robert J. Gavigan'
**Cc:** Zangara, Michael R.
**Subject:** BSP/Williamsburg Hotel - Checklist and kickoff materials
**Importance:** High

Nicholas,

SSL will be serving as outside counsel to Benefit Street Partners ("BSP") in connection with the above-
referenced transaction, and will be working with BSP's internal personnel as they finalize the
underwriting, due diligence and credit approval process on the proposed loan. Please pass this email on to
anyone else who should receive it.

For your information, please find attached BSP's standard forms of (1) Survey requirements, (2) Title
requirements, (3) W-9 and (4) form legal opinion letter.


Also, for our mutual convenience and in anticipation of our kickoff call today, I have drafted a list of
items that, together with anything required by our client, will be necessary to close this transaction (which
list remains subject to change as the transaction progresses and more information becomes known). This
closing requirements list will serve as the legal closing checklist for the transaction, and we will
periodically update and circulate the list to keep everyone apprised of the status of legal closing
requirements.


The list is as follows:

    1) Loan documents – drafts sent by SSL on 10/26

    2) Identity of clearing account bank and confirmation of establishment of clearing account and
    cash management account – SSL coordinating with Wells Fargo

    3) Opinions(form attached)

        a. Due execution/authorization/local enforceability opinion

    b. NY enforceability opinion

    c. Delaware opinions

    d. Non-con opinion

4) Title commitment and underlying documents (requirements attached)

5) Survey (requirements attached)

6) Zoning report (to be ordered by Lender (survey required))

7) Temporary Certificate of Occupancy

8) Service Contracts and Equipment Leases

9) Construction Diligence - TBD

10) Search results (Lender will order, final organizational chart required)

11) Organizational chart – draft under review

12) Borrower formation documents

    a. Certificate of formation/articles of organization

    b. LLC Agreement

    c. Borrowing consents

    d. Certificate of good standing

    e. Certificate of foreign qualification, as applicable

    f. W-9

13) SPE Component Entity formation documents

    a. Certificate of Formation

    b. LLC Agreement

    c. Borrowing resolutions

    d. Certificate of good standing

14) Property management agreement

15) Estoppels/SNDAs (Borrower to confirm no commercial tenants)

16) Rate Cap confirmation (and counterparty signatures to Collateral Assignment)

17) Rate Cap counterparty opinion (Post Closing)

18) Form Lease (if applicable)

19) Mortgage Assignment

    a. Recorded originals of existing mortgages being assigned

    b. Originals of all prior notes

    c. Assignment of existing mortgages and allonge to the notes secured thereby

    d. Terminations of ALR/UCC3s

20) Payoff Statement(s)

Thanks and I look forward to working together.

**Margot Wainger**
Associate

**STROOCK**
200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This message may contain information that is legally privileged or confidential. If you received this transmission in error, please notify the sender by reply email, and delete the message and any attachments. This transmission is believed to be defect free; however, no responsibility is accepted by the sender for damage arising from its receipt.

All email and instant messages (including attachments) sent to or from Franklin Templeton Investments (FTI) personnel may be retained, monitored and/or reviewed by FTI and its agents, or other authorized parties as disclosed in Franklin Templeton's Privacy Notice, without further notice or consent. Refer to our country/region specific Privacy & Cookies Notice, which you can read here http://www.franklintempletonglobal.com/privacy to learn more. Depending on your location, other privacy laws and regulations may also apply to you.

# EXHIBIT 2

Execution Copy

## ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES

**THIS ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Assignment**") is made as of the 13th day of December, 2017, by **96 WYTHE ACQUISITION LLC**, a New York limited liability company, having an address at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Borrower**"), to **BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**, a Delaware limited partnership, having an address at 142 West 57th Street, Suite 1201, New York, New York 10019 (together with its successors and assigns, "**Lender**"), and is consented and agreed to by **WILLIAMSBURG HOTEL BK LLC**, a New York limited liability company, having its principal place of business at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Manager**").

### RECITALS:

A.       Borrower, by its Consolidation, Extension and Restatement of Notes Agreement of even date herewith given to Lender (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"), is indebted to Lender in the principal sum of up to $68,000,000.00 advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Loan Agreement and the Note (the indebtedness evidenced by the Loan Agreement and the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Loan Agreement and the Note.  Initially capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement.

B.       The Loan is secured by, among other things, the Security Instrument, which grants Lender a first lien on the Property.

C.       Borrower and Manager have agreed that Manager will manage the Property on terms set forth on <u>Exhibit A</u> attached hereto (the "**Hotel Management Agreement**") and Manager is entitled to certain hotel management fees (the "**Hotel Management Fees**") thereunder.

D.       Lender requires as a condition to the making of the Loan that Borrower assign the Hotel Management Agreement to Lender and that Manager subordinate its interest in the Hotel Management Fees in lien and payment to the Security Instrument as set forth below.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Assignment of Hotel Management Agreement</u>.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Hotel Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default under the Loan Agreement or any of the other Loan Documents and the failure of Borrower to cure such default within any applicable grace period.

2.    <u>Subordination of Hotel Management Agreement</u>.  Manager hereby agrees that the Hotel Management Agreement, the Hotel Management Fees and any and all liens, rights, privileges and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property pursuant to the Hotel Management Agreement or otherwise, are and shall be in all respects subordinate and inferior in lien, payment and terms to the lien, payment and terms of the Security Instrument, the Note, the Loan Agreement and the other Loan Documents, and to any renewals, extensions, modifications, assignments, replacements or consolidations thereof, and to the rights, privileges and powers of Lender thereunder.

3.    <u>Estoppel</u>.  Each of Borrower and Manager represents and warrants that (a) the Hotel Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and constitutes the entire agreement between Manager and Borrower with respect to management of the Property, (b) neither Manager nor Borrower is in default under any of the terms, covenants or provisions of the Hotel Management Agreement and neither Borrower or Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default by either Borrower or Manager under the Hotel Management Agreement, (c) neither Manager nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Hotel Management Agreement, (d) the Hotel Management Fees and all other sums due and payable to Manager under the Hotel Management Agreement have been paid in full, as of the date hereof, and (e) Manager is aware that the Leases and the Rents relating to the Property have been assigned to Lender pursuant to the Loan Documents.

4.    <u>Agreement by Borrower and Manager</u>.  Borrower and Manager hereby agree (a) not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without Lender's prior written consent which will not be unreasonably withheld, delayed or conditioned and (b) that in the event of a default (continuing beyond any applicable grace or cure period) under the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents (each, an "**Event of Default**") during the term of this Assignment or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Hotel Management Agreement in accordance with the Loan Agreement, Lender may require Borrower to terminate the Hotel Management Agreement and require Manager to transfer its responsibility for the management of the Property to a Qualified Manager in accordance with the terms of the Loan Agreement, effective as of the date set forth in Lender's notice to Manager.  In such event, Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4 or Section 5 hereinbelow unless either (i) a monetary Event of Default

2

(including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of the Loan Agreement has occurred.

5.    Lender's Right to Replace Manager.  In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Assignment, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar in location, size, class, use, operation and value as the Property, Lender may deliver written notice thereof to Borrower and Manager, which notice shall specify with particularity the grounds for Lender's determination.  If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Manager within thirty (30) days from receipt of such notice or that Borrower or Manager have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate Manager as manager of the Property and terminate the Hotel Management Agreement and to replace Manager with a Qualified Manager in accordance with the terms of the Loan Agreement, in which event Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.

6.    Hotel Management Fees.

(a)    Borrower and Manager hereby agree that Manager shall not be entitled to receive any Hotel Management Fees or other fee, commission or other amount payable to Manager under the Hotel Management Agreement from and after the occurrence of an Event of Default; provided, however, that notwithstanding anything to the contrary contained herein, Manager shall not be obligated to return or refund to Lender any Hotel Management Fees or other fee, commission or other amount received by Manager prior to the occurrence of the Event of Default, and to which Manager was entitled under the Hotel Management Agreement and this Assignment.

(b)    Neither Manager nor any other Person shall be entitled to a termination fee, liquidated damages or any other fees or payments as a result of the replacement of Manager pursuant to the terms of this Assignment or the Loan Agreement.

(c)    Manager agrees that, notwithstanding anything to the contrary contained in the Hotel Management Agreement, Manager shall not be entitled to receive compensation for its services conducted in connection with the Property in excess of three percent (3.0%) of gross rent collected from the Property.

7.    Consent and Agreement by Manager.  Manager hereby acknowledges and consents to the terms and provisions of this Assignment and Article 8 and Section 4.20 of the Loan Agreement.  Manager agrees that it will act in conformity with the provisions of this Assignment, such provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Hotel Management Agreement.  In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof or otherwise, Manager shall fully cooperate in transferring its responsibility to a new

MIA 31354908v7

management company and effectuate such transfer no later than thirty (30) days from the date the Hotel Management Agreement is terminated. Further, Manager shall (a) not contest or impede the exercise by Lender of any right it has under or in connection with this Assignment and (b) give at least thirty (30) days prior written notice to Lender of its intention to terminate the Hotel Management Agreement or otherwise discontinue its management of the Property. After exercise of Lender's rights under Section 1 of this Assignment, (i) Manager shall, subject to the terms and conditions contained herein, continue to provide management services in accordance with, and to the extent provided for in, the Hotel Management Agreement (and, if applicable, shall continue to maintain the liquor licenses at the Property for and on behalf of Lender and shall cooperate with Lender in any application by Lender to obtain new liquor licenses) and shall take no further instruction from Borrower or any Person (other than Lender) in connection therewith and (ii) neither Lender nor any successor owner of the Property shall be responsible or liable for any representation or warranty made by Borrower under the Hotel Management Agreement or for any act, omission or default by Borrower under the Hotel Management Agreement which occurred prior to exercise of Lender's rights under Section 1.

8.    <u>Termination</u>. At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Hotel Management Agreement shall terminate.

9.    <u>Notices</u>. All notices or other communications hereunder shall be in writing and shall be given in accordance with Section 15.5 of the Loan Agreement. Any notice or other communication to Manager shall be addressed as follows (or at such other address and Person as shall be designated by Manager from time to time):

If to Manager:        Williamsburg Hotel BK, LLC
                      1274 49th Street, Suite 184,
                      Brooklyn, New York 11219

10.    <u>No Verbal Change</u>. This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated verbally or by any act or failure to act on the part of Borrower, Lender or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11.    <u>Liability</u>. This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever. Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment. Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

12.    <u>Inapplicable Provisions</u>. If any provision of this Assignment is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Assignment, such provision shall be fully severable and this Assignment shall be construed and

4

enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

13.   <u>Governing Law; Submission to Jurisdiction</u>.   The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Manager substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Manager hereunder. Borrower and Manager hereby certify that they have received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).   In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 13, this Section 13 shall control.

14.   <u>Headings, etc</u>.   The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15.   **<u>Waiver Of Trial By Jury</u>.   BORROWER, MANAGER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, MANAGER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER**.

16.   <u>Duplicate Originals, Counterparts</u>.   This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.   This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.   <u>Number and Gender</u>.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.   <u>Secondary Market</u>.   Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in

the secondary mortgage market and, in connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19.      <u>Lender's Reliance on Representations</u>.  Manager has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

20.      <u>Management</u>. Borrower and Manager hereby agree that Manager will perform the management services for the Property set forth in the Hotel Management Agreement.

21.      <u>Manager Not Entitled to Gross Revenues</u>. At all times during the term of the Loan, all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by Manager, if any, shall be handled and applied in accordance with Article 8 of the Loan Agreement. Manager acknowledges and agrees that all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by it shall be solely in it is capacity as the agent for the Borrower, such monies are the sole property of the Borrower, encumbered by the lien of the Security Instrument and other Loan Documents in favor of Lender and Manager has no right to, or title in, such monies except as provided in the Management Agreement, or at law or equity. In any bankruptcy, insolvency or similar proceeding the Manager, or any trustee acting on behalf of the Manager, waives any claim to such monies other than pursuant to the terms and conditions of the Management Agreement or at law or equity.

22.      <u>Miscellaneous</u>.

(a)      Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)      Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender.

(c)      If more than one Person has executed this Assignment as "Borrower" or as "Manager," the obligations of all such Persons hereunder shall be joint and several.

6

23.    <u>Inconsistencies</u>.    In the event of any inconsistency between the terms and conditions of this Assignment and the terms and conditions of the Hotel Management Agreement, the terms and conditions set forth in this Assignment shall govern.

**[NO FURTHER TEXT ON THIS PAGE]**

7

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

BORROWER:

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: Toby Moskovits
Title: Authorized Signatory

LENDER:

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: _____
Name: Micah Goodman
Title: Authorized Signatory

MANAGER:

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company

By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By:     _____
Name: Toby Moskovits
Title:   Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By:     _____
Name: Micah Goodman
Title:   Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company

By:     _____
Name: _____
Title:   _____

## EXHIBIT A

## HOTEL MANAGEMENT AGREEMENT

Manager a real estate development and management firm, shall perform all work in connection with the on-site management of Property, including F&B operations.  Manager will employ at its expense all personnel and facilities necessary and appropriate to enable it to perform the services required of it hereunder.

All accounting duties, including the keeping of proper and complete books of account for the Borrower shall be kept by or under the supervision of the Borrower.  The Manager shall assist in providing any information in its possession necessary or helpful for the accounting function.

Manager shall receive a management fee in the amount of 3.0% of the gross rents as of January 1 of each year, payable on the first day of each month throughout the calendar year.

The term of the management services required hereunder shall be for one year, and shall automatically renew for an additional one-year term unless notice of termination is given by Borrower or Manager at least thirty (30) days prior to the expiration of the then current term.  Thereafter, for successive one-year terms unless such notice of termination is given as provided above.

# EXHIBIT 3

**Execution Copy**

# LOAN AGREEMENT

dated as of December 13, 2017

between

## 96 WYTHE ACQUISITION LLC,

as Borrower

and

## BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.,
as Lender

unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**Major Contract**" shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $150,000.00 or which extend beyond one year (unless cancelable by Borrower on thirty (30) days or less notice without penalty)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"**Major Lease**" shall mean any Lease and any instrument guaranteeing or providing credit support for any Lease.

"**Management Agreement**" shall mean the "Management Agreement" as defined in the Assignment of Management Agreement and any other management agreement entered into by and between Borrower and Manager in accordance with the terms of this Agreement, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean Williamsburg Hotel BK LLC, a New York limited liability company, or such other entity selected as the manager of the Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean, with respect to any Person, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal, state, local or foreign law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or take any action to consolidate or merge such Person with or into any other Person, or take any action to dissolve or liquidate such Person, or make any assignment for the benefit of creditors of such Person, or sell all or substantially all of such Person's assets, or admit in writing such Person's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, any SPE Component Entity, any Guarantor or the Property, (ii) the ability of Borrower or any Guarantor to perform their respective obligations under any of the Loan Documents, (iii) the enforceability or validity of any of the Loan Documents, the perfection or priority of any lien created under any of the Loan Documents or the rights, interests or remedies of Lender under any of the Loan Documents, or (iv) the value, use operation of, or cash flows from, the Property.

MIA 31354953v9

"**Patriot Act Offense**" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "**Government Lists**" means (A) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (B) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (C) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

**Section 3.28   Organizational Chart**.  The organizational chart attached as <u>Exhibit A</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

**Section 3.29   Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**Section 3.30   No Other Financing; Other Obligations and Liabilities**.  Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect.  Borrower has no known contingent liabilities other than pursuant to the Loan Documents.

**Section 3.31   Contracts**.

(a)      Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.

(b)      Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)      Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

(d)      Except for the Major Contracts set forth on <u>Exhibit I</u> attached hereto, no Major Contract has as a party an Affiliate of Borrower.  All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

**Section 3.32   Property Document Representations**.  With respect to each Property Document, Borrower hereby represents that (a) each Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Property Document by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of

MIA 31354953v9

thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

**Section 4.17   Notice of Default**.    Borrower shall promptly advise Lender of any material adverse change in Borrower's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**Section 4.18   Other Agreements**.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto.

**Section 4.19   Alterations**.    Notwithstanding anything contained herein (including, without limitation, Article 7 hereof) to the contrary, Lender's prior approval shall be required in connection with any alterations to any Improvements (other than the Business Plan Work) (a) that may have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval, in the case of clauses (a) and (c), may be granted or withheld in Lender's sole discretion, and in the case of clause (b), shall not be unreasonably withheld.  If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (i) cash, (ii) U.S. Obligations, (iii) other security acceptable to Lender (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same).  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, taking into account any Reserve Funds on deposit and available pursuant to the terms and conditions of the Loan Documents to pay such costs.

**Section 4.20   Management Agreement**.

(a)      Borrower shall (i) cause Manager to manage the Property in accordance with the Management Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, estimate, report and each material notice received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any

61

sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

(b)    Borrower shall not, without the prior written consent of Lender (which consent may be conditioned, without limitation, on Lender's receipt of evidence that the same would not result in a breach or violation of any Property Document), (i) surrender, terminate, cancel, materially modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement); provided, that, so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may replace Manager with a Qualified Manager pursuant to a Qualified Management Agreement, (ii) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, (iv) permit or suffer any transfer of the ownership, management or Control of an Affiliated Manager to occur, or (v) waive or release any of its rights and remedies under the Management Agreement in any material respect.

(c)    In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall enter into a Qualified Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

(d)    Lender shall have the right to require Borrower to replace Manager with a Qualified Manager chosen by Borrower which is not an Affiliated Manager to manage the Property pursuant to a Qualified Management Agreement upon the occurrence of any one or more of the following events:  (i) at any time following the occurrence of an Event of Default, (ii) if, at any time after the first (1st) anniversary of the Closing Date, the Debt Service Coverage Ratio (Combined) falls below 1.00 to 1.00, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iv) if Manager shall become insolvent or a debtor in any involuntary bankruptcy or insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof, or any voluntary bankruptcy or insolvency proceeding, (v) if at any time Manager has engaged in gross negligence, fraud or willful misconduct, or (vi) if there is an increase or consent to any increase in the amount of any management or other fees under the Management Agreement. Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4.20(d) unless either (i) a monetary Event of Default (including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of this Agreement has occurred.

(e)    Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender.

MIA 31354953v9

(f)     If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute an Assignment of Management Agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**Section 4.21   No Joint Assessment**.   Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**Section 4.22   ERISA**.

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Security Instrument, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

(B)     Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

(C)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)     Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan" (as each of the same is defined in Section 3.15 of this Agreement).

**Section 4.23   Special Purpose Entity**.   Borrower and each SPE Component Entity shall at all times comply with the requirements set forth on Exhibit C attached hereto and shall not

# ARTICLE 8

# CASH MANAGEMENT

**Section 8.1    Distribution of Cash Flow**.

(a)    Borrower shall cause all Rents and other revenue derived from the Property and received by Borrower or Manager, as the case may be, to be applied on a monthly basis for the following purposes and in the following order of priority:

(i)    First, funds sufficient to pay the Monthly Tax Deposit due for the then applicable Monthly Payment Date, if any;

(ii)    Then, funds sufficient to pay the Monthly Insurance Deposit due for the then applicable Monthly Payment Date, if any;

(iii)    Then, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any;

(iv)    Then, funds sufficient to pay Debt Service due for then applicable Monthly Payment Date;

(v)    Then, funds to pay the FF&E Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any;

(vi)    Then, funds sufficient to pay any other amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents, if any;

(vii)    Then, funds sufficient to pay Approved Operating Expenses and Approved Extraordinary Expenses incurred by Borrower for the then applicable period;

(viii)    Then, unless an Event of Default exists, funds sufficient to pay the amount of the Mezzanine Loan Monthly Debt Service that is then due; and

(ix)    Lastly, all amounts remaining after the payment of items (i) through (viii) above (the "**Excess Cash Flow**") shall be (x) unless Event of Default exists, held and applied strictly in the manner set forth in Section 8.2 below and (y) if an Event of Default exists, deposited into the Excess Cash Flow Account.

(b)    In the event that available revenue derived from the Property and received by Borrower shall not be sufficient to enable Borrower to make any of the payments described in subparagraphs (i) through (vii) above (such amount being referred to herein as the "**Operating Deficiency**"), Borrower shall not be relieved of its obligations to make such payments.

**Section 8.2    Excess Operating Cash Flow Funds**.  All Excess Cash Flow shall be held in trust by Borrower for the benefit of Lender as additional collateral for the Loan. Amounts held by Borrower pursuant to this Section 8.2 are referred to herein as the "**Excess Operating Cash Flow Funds**". Provided no Cash Sweep Period exists, Excess Operating Cash Flow Funds

90

may be used, enjoyed and distributed by Borrower. Upon the occurrence of an Event of Default, Borrower shall immediately deposit all Excess Operating Cash Flow Funds into the Excess Cash Flow Account.

**Section 8.3    Intentionally Omitted.**

**Section 8.4    Cash Application Statement**.    Until the Loan is paid in full, Borrower shall deliver to Lender monthly operating statements for the Property certified by an authorized representative of Borrower within twenty (20) days after the end of each month, which operating statements (each, a "**Cash Application Statement**") show in detail the net operating income, the amounts and sources of Rents and other revenue received by or on behalf of Borrower and the amounts and purposes of Approved Operating Expenses and Approved Extraordinary Expenses paid by or on behalf of Borrower with respect to the Property for the previous month and year-to-date (including, in each case, a comparison to the Approved Annual Budget), or the portion thereof, paid out of Rents or other revenue for such calendar month or year-to-date, as applicable; amounts funded into any reserves hereunder; amounts paid to Manager, if any; shortfalls that exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account; any Operating Deficiency; and the amount of any distributions made during such month (and year-to-date) pursuant to Section 8.1(a) above or from Excess Operating Cash Flow Funds, together with a certification of Borrower that Borrower has not made any distributions in violation of the terms of Section 8.1(a); such statements also to include delinquency reports, tenant and expenses payable and receivable reports, and occupancy statistics.  Each such monthly statement shall provide for comparisons with the same calendar month in the immediately preceding calendar year, including year-to-date information, to the extent Borrower is in possession of such information for the applicable month and/or year-to-date for the preceding calendar year.

**Section 8.5    Establishment of Certain Accounts**.

(a)    Borrower shall, upon the occurrence of an Event of Default, establish an Eligible Account (the "**Clearing Account**") pursuant to the Clearing Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property.  Pursuant to the Clearing Account Agreement, funds on deposit in the Clearing Account shall be transferred on each Business Day to the Cash Management Account.

(b)    Upon the occurrence of an Event of Default, Lender, on Borrower's behalf, shall establish an Eligible Account with Lender or Servicer, as applicable, in the name of Borrower for the sole and exclusive benefit of Lender (the "**Cash Management Account**").  All sums in the Cash Management Account shall be held as additional collateral for the Loan and shall be applied in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.6    Deposits into and Maintenance of Clearing Account**.

(a)    Borrower represents, warrants and covenants that, upon the occurrence of an Event of Default and thereafter for so long as the Debt remains outstanding, (i) Borrower shall,

91

or shall cause Manager to, immediately deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Clearing Account; (ii) Borrower shall instruct Manager to immediately deposit (A) all revenue derived from the Property collected by Manager, if any, pursuant to the Management Agreement (or otherwise) into the Clearing Account and (B) all funds otherwise payable to Borrower by Manager pursuant to the Management Agreement (or otherwise in connection with the Property) into the Clearing Account; (iii) Borrower shall send (1) a notice, in a form approved by Lender, to all Tenants now occupying space at the Property directing them to pay all rent and other sums due under the Lease to which they are a party into the Clearing Account (such notice, the "**Tenant Direction Notice**") and (2) a notice, in a form approved by Lender, to all credit card companies and credit card clearing banks with which Borrower or Manager has entered into agreements with respect to the Property directing them to pay all receipts payable with respect to the Property into the Clearing Account (such notice, the "**Credit Card Direction Notice**"), (B) (1) simultaneously with the execution of any Lease entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish each Tenant under each such Lease the Tenant Direction Notice and (2) simultaneously with the execution of any credit card company agreement, credit card bank agreement or similar agreement entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish the counterparty thereunder the Credit Card Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices and Credit Card Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property. From and after the occurrence of an Event of Default, until deposited into the Clearing Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower. Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.6 without Lender's prior written consent.

(b)    From and after the occurrence of an Event of Default, Borrower shall maintain the Clearing Account for the term of the Loan, which Clearing Account shall be under the sole dominion and control of Lender (subject to the terms hereof and of the Clearing Account Agreement). The Clearing Account shall have a title evidencing the foregoing in a manner reasonably acceptable to Lender. Borrower hereby grants to Lender a first-priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account. Borrower hereby authorizes Lender to file UCC Financing Statements and continuations thereof to perfect Lender's security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof. All costs and expenses for establishing and maintaining the Clearing Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt. Borrower shall pay all sums due under and otherwise comply with the Clearing Account Agreement. Borrower shall not alter or modify either the Clearing Account or the Clearing Account Agreement, in each case without the

92

prior written consent of Lender. The Clearing Account Agreement shall provide (and Borrower shall provide) Lender online access to bank and other financial statements relating to the Clearing Account (including, without limitation, a listing of the receipts being collected therein). In connection with any Secondary Market Transaction, Lender shall have the right to cause the Clearing Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Clearing Account. Lender shall provide Borrower with prompt written notice of any such renaming of the Clearing Account. Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. The Clearing Account (i) shall be an Eligible Account and (ii) shall not be commingled with other monies held by Borrower or Bank. Upon (A) Bank ceasing to be an Eligible Institution, (B) the Clearing Account ceasing to be an Eligible Account, (C) any resignation by Bank or termination of the Clearing Account Agreement by Bank or Lender and/or (D) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's request, (1) terminate the existing Clearing Account Agreement, (2) appoint a new Bank (which such Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (3) cause such Bank to open a new Clearing Account (which such account shall be an Eligible Account) and enter into a new Clearing Account Agreement with Lender on substantially the same terms and conditions as the previous Clearing Account Agreement and (4) send any new Credit Card Direction Notices, Tenant Direction Notices and other notices required pursuant to the terms hereof relating to such new Clearing Account Agreement and Clearing Account. Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section 8.6 in the name of Borrower in the event Borrower fails to do the same, provided that Lender will not exercise its rights herein granted unless an Event of Default exists. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(c)      Subject to the terms and conditions of the Clearing Account Agreement, all funds on deposit in the Clearing Account shall be transferred into the Cash Management Account.

**Section 8.7    Events of Default**. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (i) Borrower shall have no right to apply revenue derived from the Property for any purpose without Lender's prior written approval and (ii) Lender shall have all of the remedies available to it pursuant to this Agreement and pursuant to applicable law, including, without limitation, the institution of all of Lender's controls respecting deposits into and distributions from the Clearing Account and/or the Cash Management Account as more particularly set forth herein and in the Cash Management Agreement, and the exercise by Lender of the remedies specified in Article 8 and Article 10 hereof. Without limitation to the foregoing, upon the occurrence of an Event of Default, Lender shall have the continuing exclusive control of, right to withdraw and apply, the funds in the Clearing Account or the Cash Management Account to payment of any and all debts, liabilities and obligations of Borrower to Lender pursuant to or in connection with this Agreement, the Note, the Cash Management Agreement, the Clearing Account Agreement, the

Security Instrument and the other Loan Documents in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.8    Borrower Distributions; Acknowledgement**.    Any transfer of Borrower's funds to or for the benefit of the Mezzanine Lender or the Mezzanine Borrower pursuant to this Agreement or any of the other Loan Documents, is intended by the parties to constitute, and shall constitute, a distribution from the Borrower to the Mezzanine Borrower and shall be treated as such on the books and records of each party.    No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and the Mezzanine Lender.

## ARTICLE 9

## SECONDARY MARKET

**Section 9.1    Securitization**.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.    The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".    Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".    At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender in connection with any Secondary Market Transaction, Borrower shall assist Lender (at Borrower's sole cost and expense) in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the NRSROs in connection with such Secondary Market Transactions, including, without limitation, to:

(i)    provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, any SPE Component Entity and Manager including, without limitation, the information set forth on Exhibit E attached hereto, (B) updated budgets relating to the Property, (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

94

**EXHIBIT I**

**<u>MAJOR CONTRACTS</u>**

NONE

I-1

# EXHIBIT 4

HOTEL MANAGEMENT AND SERVICES AGREEMENT

between

**96 Wythe Acquisition LLC**
**("Owner")**

and

**The Williamsburg Hotel BK LLC**
**("Manager")**

November 21, 2017

This **HOTEL MANAGEMENT AND SERVICES AGREEMENT** is executed as of November 21, 2017 ("Effective Date"), by and between 96 Wythe Acquisition, a New York limited liability company ("Owner"), and The Williamsburg Hotel BK, LLC, a New York limited liability company ("Manager").

## RECITALS:

A.      Owner is the owner of a property located at 96 Wythe Avenue, Brooklyn, New York (the "Property"), and has developed a new building on the Property, including 147 guest rooms, lobby, restaurant, bars, rooftop, and other amenities (the "Hotel");

B.      Manager has overseen design, branding, programming, furnishing, promoting, managing and operating the property during the pre-development and development phase; and

C.      Owner desires to use the Williamsburg Hotel brand and to retain Manager to brand, manage and operate the Hotel in accordance with this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions, agreements and obligations hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged by the parties hereto, Owner and Manager agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01      Definitions. As used herein, the following terms shall have the indicated meanings:

Affiliate means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person. For purposes of this definition, the term "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement means this Hotel Management Agreement and all amendments, modifications, supplements, consolidations, extensions and revisions to this Hotel Management Agreement from time to time approved in writing by Owner and Manager.

Books and Records means the books and records of account maintained by the Manager necessary to prepare customary accounting records and financial reports in connection with the operation of the Hotel, but expressly excluding any and all sales and marketing files, guest lists and profiles (including Manager Owned Customer Lists), guest histories, detailed employee records and all standard Manager's materials.

Brand Name means The Williamsburg Hotel.

Budget means a proposed budget for the Hotel setting forth all anticipated income and expenditures to be received or incurred for any Fiscal Year and the marketing and operating plan for any Fiscal Year.

Competitor means a Person engaged, directly or indirectly through an Affiliate, in the business of owning, operating, licensing (as licensor), franchising (as franchisor), or managing a hotel brand or lodging system of hotels that is competitive with Manager or its Affiliates.

Emergency Repairs means, without limitation, repairs which, in Manager's good faith reasonable judgment are necessary to prevent (a) imminent personal injury, (b) imminent damage to the property of third parties, (c) imminent damage to the Hotel, (d) imminent loss or diminution of any material licenses or right to operate the Hotel for its intended purposes, (e) imminent loss or material diminution of any parking, ingress, egress or access relating to the Hotel or (f) a violation of any material Legal Requirements.

1

FF&E means all furniture, furnishings, wall coverings, fixtures, equipment and systems (except equipment and fixtures attached to and forming a part of the Improvements) located at the Hotel and required for the operation of the Improvements as a hotel, including (a) office furnishings and equipment, (b) specialized hotel equipment necessary for the operation of any portion of the Improvements as a hotel, including equipment for kitchens, laundries, dry cleaning facilities, bars, restaurants, dining rooms, public rooms, commercial spaces, and recreational facilities, including Operating Equipment, and all artwork, (c) all other furnishings and equipment (except equipment and fixtures attached to and forming a part of the Improvements) as necessary or desirable in the operation of the Hotel in accordance with the terms and conditions set forth in this Agreement.

Fiscal Year means (i) the period commencing on the first date that the Hotel generates any Gross Revenues and ending on December 31 of the calendar year in which such date occurs, and (ii) any successive yearly period (beginning January 1 and ending December 31) thereafter.

Force Majeure Event means (a) strikes, labor lock-outs, other industrial disputes, accidents, need to remove Hazardous Substances, inability to procure materials, loss of permitting or licensing, recession, governmental action or restriction, regulation or control, failure of power, water, fuel, electricity or other utilities, riots, insurrection, civil commotion, enemy or terrorist action or threat, war, acts of God (including inordinately severe weather conditions), fire or other casualty and (b) any other matter, cause or circumstances which is beyond the reasonable control of Manager in each case to the extent the same has not arisen by reason of any breach by Manager of any of Manager's obligations under this Agreement.

Gross Revenues means any and all income and proceeds of sales received for the use, occupancy or enjoyment of the Hotel or for the sale of any goods, services or other items sold on, or provided from, the Hotel including all proceeds from insurance and all income received from tenants, transient guests, licensees, concessionaires, lessees of retail space, spa and food and beverage service operations at the Hotel excluding the following: (i) any excise, sales or use taxes or similar government charges collected directly from patrons or guests, or as a part of the sales price of any goods, services or displays, such as gross receipts, value added, admission, cabaret or similar or (ii) any security deposits of Hotel tenants, subtenants, or concessionaires (unless and until applied) and any payments by such tenants, subtenants or concessionaires for taxes; (iii) proceeds of collection of accounts receivable; (iv) consideration received at the Hotel for hotel accommodations, goods and services to be provided at other hotels arranged by, for or on behalf of Manager; and (v) discounts, allowances and refunds or credits to patrons or guests.

Improvements means all buildings, structures, improvements and betterments now located or hereafter constructed on the Property and all fixtures and equipment attached to and forming a part of such buildings, structures and improvements (including heating, lighting, plumbing, sanitary sewer, air-conditioning, laundry, refrigeration, kitchen, elevators and similar items).

Independent Accountant means a third party independent certified public accounting firm jointly selected by Owner and Manager.

Legal Requirements means all present and future laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements pertaining to the Hotel and its operation including any applicable insurance, environmental, human health and safety, zoning or building, laws or regulations, Americans with Disabilities Act, fire and fire safety system laws, land use laws, ordinances, rules or regulations and all covenants, restrictions and conditions now or hereafter of record which may be applicable to the Hotel or any portion thereof, or to the use, occupancy, possession, operation, maintenance, alteration, construction or repair of any of the Improvements, including any rules, regulations and requirements of competent authorities relating to permits, consents, licenses and the like which are required for the use, occupancy, possession, operation, maintenance, alteration, construction or repair of any of the Hotel and/or Improvements.

2

Manager Directed Customers means customers of the Manager or its Affiliates, whether or not such customers have at any point in time stayed at the Hotel, hosted an event or was a guest at a food and beverage venue, or who were introduced to the Hotel by Manager or its Affiliates or through their historical relationship with Manager or its Affiliates, during the term of this agreement.

Manager Owned Customer Lists means the customer and guest information, preference and history relating to Manager Directed Customers.

Manager's Expenses means the out-of-pocket expenses and disbursements which are included in the Budget and are reasonably and necessarily incurred by Manager in the performance of its obligations under this Agreement, provided, however, that the same cost shall not be included in more than one category of expense. Manager's Expenses may include the following expenses: travel, business entertainment costs, telephone, air express and other incidental expenses. This shall include: (i) reasonable and customary out-of-pocket expenses properly incurred by Manager on behalf of the Hotel or Owner in order to facilitate the performance of Manager's duties under this Agreement; (ii) other reasonable and customary direct expenses incurred by the Manager in connection with the management or operation of the Hotel; (iii) all costs and expenses incurred by Manager on behalf of the Hotel or Owner, including out-of-pocket expenses related to the time spent by, and travel of, specifically to and from the Hotel in order to facilitate the transition of services in connection with the termination of this Agreement, and (iv) third party contracts with providers in the name of Manager or its Affiliates for the benefit of the Hotel (such as Google search terms, PMX and Synxis) that may be done on a group or individual basis, which amounts shall be included in the Budget (the "Third Party Contract Expenses").

Manager's Fees means, collectively, the Base Management Fee, the Incentive Fee, and any other fees payable to the Manager.

Operating Account means the bank account(s) opened and maintained in Owner's or Manager's name, with a banking institution selected by Manager and reasonably approved by Owner, into which all income, receipts and proceeds included in the definition of Gross Revenues (without exclusion of any of the items excluded from the definition of such term) shall be deposited and from which disbursements shall be made.

Operating Equipment means linens, chinaware, glassware, uniforms, utensils and other items of similar nature.

Person means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a limited liability company, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

Personnel means all individuals performing services for the benefit of the Hotel as employees of Manager or an Affiliate of Manager.

Personnel Costs means all costs associated with the hiring, employment or termination of Personnel (x) located at and providing services directly and exclusively to the Hotel, on behalf of the Manager, (y) who provide services to the Hotel, and other hotels under developed or operated by Manager and its Affiliates, on a non-exclusive basis, or (z) who are shared employees of any current or future hotels owned and/or operated by Manager or an Affiliate of Manager, including, in each case, compensation (i.e., salaries and bonuses) and benefits, employment taxes, social security contributions, training and severance payments, costs in connection with litigation or consultation and, subject to the Approved Budget, recruitment expenses and the costs of moving executive level Personnel, their families and their belongings to the area in which the Hotel is located at the commencement of their employment.

Working Capital means funds reasonably necessary for the day-to-day operation of the Hotel.

3

## ARTICLE II

### TERM OF AGREEMENT

Section 2.01    Term. The initial term of this Agreement (the "Initial Term") shall begin on the Effective Date and, subject to the termination rights expressly set forth herein, will terminate on the last day of the tenth (10th) full Fiscal Year. Thereafter, the Term shall automatically be extended for two successive terms of five (5) years each (each, a "Renewal Term") on the same terms and conditions as set forth in this Agreement unless Manager notifies Owner of its election not to renew at least six (6) months before the end of the Initial Term, or then current Renewal Term. The Initial Term and each Renewal Term are collectively, the "Term." In the event that the Owner is required to terminate this agreement due to lender covenants, immediately upon restoration of the Owner's rights to control the Property, this Agreement shall be immediately reinstated. At any time that the Manager is not in full control of the Property, use of all brand collateral, trademarks, digital and design assets, online presence including website and social media accounts in the name of The Williamsburg Hotel, shall ceased to be associated with the property in any manner and control and ownership of all brand collateral and online and social media accounts shall remain with the Manager.

## ARTICLE III

### OPERATION OF THE HOTEL

Section 3.01    Operation of the Hotel. Owner hereby retains Manager to manage and operate the Hotel commencing on the Effective Date in a professional manner in accordance with and subject to the terms of this Agreement, and to provide or cause to be provided all amenities in connection with the Hotel which are reasonable and customary for such an operation.

Section 3.02    Manager's Control and Discretion. Subject to the terms of this Agreement and the Budget, Manager shall manage and operate the Hotel. Without limiting the generality of the foregoing but subject to the other provisions of this Agreement, Manager's control and discretion shall include, and Manager shall be responsible for, the operation of the Hotel for all customary purposes, and, without limitation thereof, at its discretion to do the following:

(a)    Hire, directly or through an Affiliate, the general manager, the financial controller and other managerial and hourly staff of the Hotel who shall work solely and exclusively for the Manager; provided, that Owner shall have a reasonable opportunity to meet with the general manager before Manager shall hire such person; provided, further, however, that Owner shall have no approval right with respect to any such hiring. Manager shall also have the right to hire, supervise, promote and discharge all employees performing services in or about the Hotel, all of whom shall be employees of Manager or an Affiliate of Manager. Owner shall have no right to hire, supervise, promote or discharge any employees of the Hotel, and Owner agrees not to attempt to do so and, not in limitation of the foregoing, in no event shall Owner cause, suffer or permit any Affiliate of Owner, or any person holding, directly or indirectly, a beneficial interest in Owner (other than Manager or an Affiliate of Manager), to participate in or interfere with such supervision. On reasonable advance notice from Owner to Manager, senior executives of Manager's corporate office (as designated by Manager) shall meet with Owner, either in person or by telephone (at Manager's discretion), to review with Owner the financial performance the Hotel.

(b)    Retain such specialists and consultants as Manager may from time to time reasonably determine to be necessary for the successful operation of the Hotel.

(c)    Determine and implement all labor policies, including with respect to wage and salary rates and terms, fringe benefits, pension, retirement, vacation, bonus and employee benefit plans, all consistent with industry practice.

4

      (d)    Supervise and maintain accurate Books and Records, including the books of account and accounting procedures of the Hotel.

      (e)    Negotiate, enter into, and modify, leases, subleases, licenses and concession agreements for stores, restaurants, bars and other facilities, and services at the Hotel.

      (f)    Make or cause to be made all necessary repairs, replacements and/or additions to the Hotel so that it shall be adequately maintained and furnished at a level of a luxury boutique hotel

      (g)    Negotiate and enter into service contracts and software licenses in Owner's or Manager's name required in the ordinary course of business in operating the Hotel, including contracts for electricity, gas, telephone, detective agency protection, information technology, cleaning, trash removal, extermination and other services which Manager deems advisable.

      (h)    Select and obtain Consumable Supplies, Operating Equipment and FF&E for the operation of the Hotel in the normal course of business.

      (i)    Determine all terms for admittance, charges and rate schedules for guest rooms, function rooms, commercial space privileges, entertainment and food and beverages.

      (j)    Determine all credit policies with respect to the operation of the Hotel, including entering into customary credit card and barter agreements.

      (k)    Establish food and beverage policies (including pricing) with respect to the Hotel, including the right to conduct catering operations outside the Hotel but for the account of the Hotel.

      (l)    Establish and implement all advertising, public relations and promotional policies with respect to the Hotel including exercising the sole and exclusive control over all public statements, whether written or oral and no matter how disseminated, advertising, press releases and conferences;.

      (m)    Retain attorneys and other professionals as Manager may reasonably deem necessary to provide advice with respect to operating the Hotel, including with respect to zoning, environmental, employment and litigation matters, and institute any and all legal actions or proceedings as shall be reasonably necessary in the Manager's judgment to collect charges, rent or other income of the Hotel.

      (n)    Appear in, defend against and/or settle all legal actions or proceedings brought against Manager or Owner or both in connection with the operation of the Hotel.

      (o)    Establish any other policy or perform any other act or function which in the reasonable discretion of Manager is necessary or desirable to operate the Hotel on a day-to-day basis in accordance with the Operating Standard and the terms of this Agreement and perform all other acts within the scope of Manager's duties hereunder.

      Section 3.03    Manager Affiliate Services. In fulfilling its obligations under this Agreement, Manager is hereby authorized to use the services of Manager's Affiliates provided that such services and fees therefor shall be furnished on terms and conditions which are not less favorable to Owner than those obtained in the competitive, open market.

## ARTICLE IV

### MANAGER STATUS; EMPLOYEES

      Section 4.01    Manager Status. Nothing herein shall constitute or be construed to be or create a partnership, joint venture or any other similar type of association between Owner and Manager. Owner covenants that Manager's engagement under this Services Agreement hereunder and right to occupy and manage the Hotel shall be exclusive and undisturbed, subject only to the limitations of this Management

5

and Services Agreement. Owner further covenants that all intellectual property, including brand name, trademarks issued and filed, customer lists, website, social media accounts and all content including photos of the property are the sole property of the Manager. The Manager retains unlimited rights to any content including photos of the property utilized in the any media including all social media accounts of the Williamsburg Hotel, included but not limited to Instagram and Facebook.

Section 4.02   Employees.

(a)   All Personnel shall be employees of Manager or an Affiliate of Manager; provided, however, that Owner shall be obligated to reimburse Manager for all Personnel Costs for such Personnel in accordance with the terms of this Agreement. Reimbursement for Personnel Costs includes any costs incurred as a result of the termination of any Personnel including if such termination is as a result of the termination or sooner expiration of this Agreement. Manager shall have the right to transfer the Personnel to an Affiliate or cause an Affiliate to hire the Personnel, and notwithstanding the foregoing, Manager and its Affiliates shall, in their sole discretion, have any and all rights regarding such Personnel provided hereunder, and in relation thereto. Owner shall not give orders or instructions to any Personnel, including with respect to the operation of the Hotel. In furtherance of the foregoing, Owner and Manager hereby agree that the Manager shall determine, in its sole discretion, the number of employees required to operate the Hotel, the working conditions at the Hotel, the organizational concept and any necessary reorganization and the like in order to properly perform the duties of the Manager under this Agreement.

Section 4.03   Reimbursement of Employee Expenses. All Personnel Costs shall be billed by Manager to, and be reimbursed by, Owner as an operating expense under this Management services agreement. Manager may assign employees of Manager or any of Manager's Affiliates to perform services for the Hotel and Owner shall reimburse Manager for Personnel Costs associated with such employees as an Operating Expense. Employees of Manager other than those regularly employed at the Hotel or otherwise in the New York City metropolitan area shall be entitled to free room and board at such times as they visit the Hotel in connection with the management of the Hotel or are assigned temporarily to the Hotel to perform services for the Hotel. Owner shall reimburse Manager for all reasonable travel expenses to and from the Hotel for such employees. Not in limitation of the provisions of the foregoing, Owner authorizes Manager to make available to employees of Manager and its Affiliates certain benefits in the form of discounted room use at the Hotel as determined in accordance with Manager's then-effective employee discount policy, not to exceed 200 room nights per any calendar year. Owner hereby approves such benefits and acknowledges that it has no claim against Manager with respect thereto, to the extent such discounts do not materially exceed those customary to the hotel industry in the geographic region where the Hotel is located.

## ARTICLE V

## INDEMNIFICATION

Section 5.01   Indemnification by Owner.

(a)   Owner shall indemnify, defend, and hold Manager and its Affiliates and their respective directors, members, trustees, officers, employees, agents and assigns (collectively, "Manager Indemnified Parties") harmless from and against any and all claims, demands, damages, cost, expense, actions (including enforcement proceedings initiated by any government agency), penalties, suits, and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and costs and any other amounts that Manager is required to pay to third parties in connection with such matters) which they or any of them may have alleged against them, incur, become responsible for, or pay out for any reason related to the design, management, operation or maintenance of the Hotel or the performance by Manager of the responsibilities and obligations provided in this Agreement, provided, however, that in no event shall Owner's indemnification obligations cover or extend to conduct of Manager or any of Manager's Affiliates that constitutes gross negligence, willful misconduct or fraud. In case of any action, suit or proceeding

6

brought against Manager arising from or relating to matters covered by the indemnity Manager will notify Owner of such action, suit or proceeding, and Manager may, at Owner's expense, by notice to Owner, elect to defend such action, suit or proceeding or cause the same to be defended. Any compromise, settlement or offer of settlement of any claim, action or proceeding that Owner shall be obligated to indemnify Manager Indemnified Parties pursuant to the terms of this Agreement shall require the prior written consent of Manager; provided that no such consent shall be required for any such compromise, settlement or offer which provides for a full release of Manager and its Affiliates.

Section 5.02    Indemnification by Manager. Manager shall indemnify, defend and hold Owner and its Affiliates and their respective directors, members, officers, employees, agents and assigns (collectively, "Owner Indemnified Parties") harmless from and against any and all claims, demands, damages, cost, expense, actions (including enforcement proceedings initiated by any government agency), penalties, suits, and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and costs and any other amounts the Owner is required to pay to third parties in connection with such matters, but excluding consequential damages sustained by Owner), which they or any of them may have alleged against them, incur, become responsible for, or pay out for any reason, to the extent such matters are caused by conduct of Manager's or Manager's Affiliates corporate personnel that constitutes gross negligence, willful misconduct or fraud. In case of any action, suit or proceeding brought against Owner arising from or relating to matters covered by the indemnity, Owner will notify Manager of such action, suit, or proceeding, and Manager may, at Manager's expense, by notice to Owner, defend such action, suit, or proceeding, or cause the same to be defended. Any compromise, settlement or offer of settlement of any claim, action or proceeding that Manager shall be obligated to indemnify pursuant to the terms of this Agreement shall require the prior written consent of Owner; provided that no such consent shall be required for any such compromise, settlement or offer which provides for a full release of Owner and its Affiliates.

Section 5.03    Survival of Indemnity. The obligations set forth shall survive any termination or assignment of this Agreement. In no event shall the settlement by either party in good faith of any claim brought by a third party (including Personnel) in connection with the ownership or operation of the Hotel be deemed to create any presumption of the validity of the claim. Notwithstanding any contrary provisions, Owner and Manager mutually agree for the benefit of each other to look first to the appropriate insurance coverages in effect in the event any claim or liability occurs as a result of injury to person or damage to property, regardless of the cause of such claim or liability.

## ARTICLE VI

## BUDGETS

Section 6.01    Budget. Not later than sixty (60) days prior to the commencement of each Fiscal Year, Manager shall submit the Budget to Owner for Owner's review and approval. The Budget shall contain (i) an estimated profit and loss statement on a monthly basis, (ii) a budget of receipts and expenditures required for the operation of the Hotel pursuant to the terms of this Agreement, (iii) a description of proposed capital improvements to be made and itemized capital expenses, (iv) a statement of cash flow, including a schedule of Working Capital which may be maintained in a sub-account of the Operating Account and (v) any anticipated requirements for funding by Owner. Owner shall give its written approval or disapproval of the proposed Budget not later than thirty (30) days after receipt thereof. If Owner does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within such thirty (30) day period, and Manager gives notice (the "Reminder Notice") to Owner of such failure by Owner, then, if Owner still does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within thirty (30) days after receipt of the Reminder Notice, Owner shall be deemed to have approved such proposed Budget as submitted by Manager. Owner acknowledges that the projections contained in each proposed Budget and the Approved Budget are estimates and are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Manager's reasonable control, and the giving of such

7

projections shall not be construed as a guarantee or warranty by Manager to Owner of any matter or in any way whatsoever.

Section 6.02    Adherence to Budget.

(a)    If the usage of all or any portion of an income-producing facility of the Hotel or the guest occupancy related to such facility, in any period exceeds the usage or occupancy for such facility projected in the Approved Budget for such period, the expense categories in the Approved Budget for such period directly related to servicing such increase in usage or occupancy shall automatically be deemed increased by such reasonable amount as is necessary to accommodate such increased usage or occupancy. Subject to the foregoing sentence and the next following sentence, Manager shall, in the performance of its duties hereunder, (i) adhere to the Budget with respect to expense items set forth in such Budget (it being agreed that Manager shall have no liability for cost overruns beyond its reasonable control) and (ii) use its reasonable good faith efforts to adhere to or exceed the Budget with respect to income items set forth in such Budget.

(b)    If at any time during any Fiscal Year Manager shall, in the performance of its duties hereunder, determine that the Budget relating to such Fiscal Year is no longer appropriate because of unforeseen changes, Manager shall submit to Owner for Owner's review, a revised budget (the "Revised Budget") for the remainder of such Fiscal Year. Owner shall give its written approval or disapproval of the proposed Revised Budget not later than thirty (30) days after receipt thereof. If Owner does not give its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within such thirty (30) day period, and Manager gives the Reminder Notice to Owner, then, if Owner still does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within thirty (30) days after receipt of the Reminder Notice, Owner shall be deemed to have approved such proposed Revised Budget as submitted by Manager

## ARTICLE VII

### OPERATING EXPENSES

Section 7.01    Payment of Operating Expenses.    In performing its authorized duties hereunder, Manager shall promptly pay all Operating Expenses to the extent of available Working Capital. All Operating Expenses incurred by Manager in performing its authorized duties in accordance with the terms of this Agreement shall be reimbursed or borne by Owner. To the extent the funds necessary therefor are not generated by the operation of the Hotel, they shall be supplied by Owner to Manager in the manner provided in Article VIII. Manager shall in no event be required to advance any of its own funds for Operating Expenses.

## ARTICLE VIII

### WORKING CAPITAL AND BANK ACCOUNTS

Section 8.01    Working Capital.

(a)    Owner shall provide the initial funds necessary to supply the Hotel with Working Capital in accordance with the Budget. Thereafter, subject to the Budget, upon request of Manager, Owner shall promptly provide any additional funds necessary to maintain Working Capital at levels reasonably determined by Manager to be necessary to satisfy the needs of the Hotel as its management and operation may from time to time require. Working Capital so provided shall remain the property of Owner throughout the Term, subject to expenditure for Operating Expenses. Upon termination of this Agreement, Owner shall retain any unused Working Capital.

(b)    If Owner does not provide the additional funds required pursuant to Section 8.01(a) or as otherwise required hereunder within five (5) business days after the request is made therefor by

8

Manager, Manager may elect, but shall have no obligation, to provide such additional funds, and shall be promptly reimbursed therefor by Owner with interest thereon at a rate equal to the prime commercial lending rate (the "Prime Rate") plus six percent (6%) per annum, or the highest legal rate, whichever is lower, compounded monthly, such interest accruing from the date the Manager provides such additional funds through and including the date of reimbursement. If Manager is not reimbursed by Owner within five (5) days after Manager so provides such additional funds, Manager may reimburse itself (with interest as set forth above) out of the Operating Account. The aforementioned right of reimbursement shall be in addition to any other rights which Manager may have with respect to any provision of this Agreement or otherwise.

Section 8.02    Bank Accounts. All funds to be made available to Manager by Owner for the maintenance and operation of the Hotel shall be deposited in the Operating Account Manager may open separate accounts which are linked to the Operating Account for certain operational purposes, such as by way of example, payment of payroll expenses and travel agent commissions. Such bank accounts shall be opened and maintained in Manager's name, at the same bank as the Operating Account and provisions in this Agreement regarding the Operating Account shall apply to those accounts. Manager shall pay all Operating Expenses (including Manager's Expenses and Manager's Fees) and all other amounts as required in connection with the maintenance and operation of the Hotel in accordance with the provisions of this Agreement out of the Operating Accounts.

Section 8.03    Authorized Signatures. The Operating Account shall be in Owner's or Manager's name and Manager shall be authorized signatory. Checks or other documents of withdrawal shall be signed by duly authorized individual representatives of Manager; Upon expiration or termination of this Agreement, as provided in this Agreement, all remaining amounts in the referenced accounts shall be made available to Owner, subject to the obligation to pay all amounts due to Manager hereunder.

Section 8.04    Disbursements to Owner. Contemporaneously with furnishing each Monthly Statement and commencing after the first Fiscal Year, Manager shall disburse to Owner, in the manner directed by Owner, any funds remaining in the Operating Account at the end of such immediately preceding calendar month after: (i) payment of all Operating Expenses to be paid by Manager under this Agreement, Manager's Fees, Centralized Expenses, Manager's Expenses, and any other amounts Manager is permitted or required to make pursuant to this Agreement, (ii) retention of amounts in the Operating Account necessary to fund Working Capital if any and any other reserves reasonably established by Manager (such as a reserve for litigation costs) and (iii) payment or retention of such other amounts as may be agreed to in writing from time to time by Owner and Manager. Prior to the expiration of the first Fiscal Year, in order to allow the Hotel to stabilize, Manager shall not be required to make the foregoing monthly disbursements to Owner but shall use commercially reasonable efforts to disburse excess funds to Owner in Manager's discretion. Manager's willingness to defer payment of Management Fees shall not constitute a waiver of monies due to the Manager.

## ARTICLE IX

## BOOKS, RECORDS AND STATEMENTS

Section 9.01    Books and Records. Manager shall keep full and adequate Books and Records reflecting the results of operation of the Hotel on an accrual basis,, with such exceptions as may be required by the provisions of this Agreement. All Books and Records, wherever kept, shall be available to Owner and its representatives at all reasonable times for examination. Upon any termination of this Agreement, a copy of all of such Books and Records forthwith shall be turned over to Owner so as to insure the orderly continuance of the operation of the Hotel, but the original Books and Records, shall be retained by Manager.

9

## ARTICLE X

### MANAGER'S FEES

Section 10.01    Base Management Fee.  On the tenth (10th) day of each month during each Fiscal Year, , Owner shall pay to Manager a base management fee (the "Base Management Fee") equal to three percent (3.0%) of Gross Revenues in the first Fiscal Year and for all remaining Fiscal Years in the Term. The Base Management Fee shall be based on the actual monthly Gross Revenues as shown on the monthly Statement for the prior month.

Section 10.02    Reimbursement of Expenses.  From time to time as incurred, Owner shall promptly reimburse Manager for any Manager's Expenses to the extent such Manager's Expenses are incurred by Manager in accordance with the provisions of this Agreement.

Section 10.03    Incentive Fee.  Within ten (10) days after receipt of the Certified Financial Statements, Owner shall pay Manager an annual incentive management fee in an amount equal to ten percent (10%) of net operating income (the "Incentive Fee").

Section 10.04    Disbursement of Fees.  Manager is authorized to disburse to itself from the Operating Account the amounts owing as the Manager's Fees and for reimbursements provided for in the Budget or otherwise expressly permitted by this Agreement, all at the times and in the amounts provided for in this Agreement, but, if insufficient funds are available to do so, such amounts shall accrue with interest thereon at the Prime Rate plus six percent (6%) per annum, or the highest legal rate, whichever is lower, compounded monthly, from the date such payment is due through and including the date of payment, and Owner shall pay same to Manager within ten (10) days after demand by Manager.

## ARTICLE XI

### REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

Section 11.01    Repairs and Maintenance.

(a)    Manager shall from time to time make such expenditures for repairs and maintenance to the Hotel, and repairs, maintenance, replacements, renewals and additions to the FF&E, and minor capital improvements (collectively, "Repairs") as are set forth in the Budget.  Notwithstanding the foregoing, Manager shall not require the consent of Owner for, and shall be authorized to undertake, Emergency Repairs whether or not the cost of performing such repairs are in the Budget, and Manager may deviate from the Budget and incur additional expenses for Repairs.

## ARTICLE XII

### REAL AND PERSONAL PROPERTY TAXES,
### LOCAL TAXES, LEVIES AND OTHER ASSESSMENTS

Section 12.01    Payment of Real Estate Taxes.  Manager shall pay from the Operating Account prior to the dates the same become delinquent all real estate and personal property taxes and all betterment assessments levied against the Hotel or any of its component parts.  If Owner shall pay the real estate taxes, Owner shall furnish Manager proof of payments thereof upon request from Manager.

Section 12.02    Owner's Right to Contest.  Notwithstanding the foregoing, Owner may, as an Operating Expense, contest the validity or the amount of any such tax or assessment.  Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided that Manager is satisfied that the facts set forth in such documents or pleadings are accurate and that such execution or cooperation does not impose any unreasonable obligations on Manager, and Owner agrees to reimburse Manager as an Operating Expense for all expenses occasioned to Manager for any such cooperation.

10

## ARTICLE XIII

## TRADEMARKS AND HOTEL NAME

Section 13.01    Primary Name; Other Marks.    During the term of this Agreement, the Hotel shall at all times be known and designated by the name The Williamsburg Hotel (the "Hotel Brand"). Owner acknowledges that the Brand Name is the property of the Manager.

(a)    Manager's Tradename.    Owner and Manager agree that if the Manager utilizes any tradenames, trademarks, service marks, logos or designs owned, created or licensed by Manager or any Affiliate thereof (collectively, "Manager's Tradename") in connection with the management, operation and marketing of the Hotel, such Manager Tradenames shall remain within the sole control and ownership of the Manager. Manager shall have the right to cease using such agreed-upon Primary Name and any other Manager's Tradename with respect to the Hotel if at any time this Agreement is terminated or Owner prevents Manager from operating the Hotel at a level consistent with the Approved Budget and the Operating Standard. Owner hereby acknowledges that it has no right, title or interest in and to Manager's Tradename and covenants (i) not to claim any such interest and (ii) to take such steps as are necessary, in the negotiation, execution and delivery of agreements with third parties, and in any other circumstances which might otherwise suggest erroneously that Manager's Tradename is the property of Owner, to represent that Manager's Tradename is the property of Manager. Except as otherwise expressly provided herein, Owner shall have no right, at any time, to use Manager's Tradename, or any derivation thereof, or the name of any other hotel managed or operated by Manager or its Affiliates, or any derivation thereof, for any reason or purpose whatsoever, without obtaining the prior written consent of Manager, which consent may be withheld in Manager's sole discretion. As between Owner and Manager, all right, title and interest in Manager's Tradename shall, at all times, remain with Manager. Upon the termination of this Agreement for any reason or upon termination of the license agreement governing the use of Manager's Tradenames between Owner and Manager, Manager shall have the right to promptly remove Manager's Tradename from the Hotel and all items (including, by way of example and not by limitation, the Hotel building, all facilities, FF&E, advertising and marketing materials and Consumable Supplies) used at, in connection with or in reference to the Hotel.

(b)    Manager's Materials and Manager's Design Work.    Owner acknowledges that in the design, operation and management of the Hotel, Manager will make use of confidential information regarding Manager's business, operations, clients, investors and business partners and/or information not generally known by Owner in the form in which it is used by Manager, and which gives Owner a competitive advantage over other companies which do not have access to this information, including secret, confidential, or valuable proprietary information, trade secrets or work product of Manager and its Affiliates, conveyed orally or reduced to a tangible form in any medium, including but not limited to information concerning the operations, business plans, financial data and financial plans, architectural plans and designs, marketing plans, techniques and arrangements, manuals and form contracts, Personnel information and files, pricing policies, proprietary databases, internal communication and correspondence, including with Personnel, mailing lists, guest profiles and records, technology, research, future plans, business models, strategies, business methods and employees of Manager and its Affiliates, as well as information about Manager's and its Affiliates' customers, clients and business partners and its operations (collectively, the "Manager's Materials"). During the Term, in the event Owner has access to any Manager's Materials, its use of such Manager's Materials shall not (a) violate the terms of this Agreement, any applicable law or any privacy policies of Manager or any of its Affiliates, (b) interfere with, or be detrimental to, the use and exclusive operation of the Hotel by Manager, and (c) interfere with, or be detrimental to, the financial performance of the Hotel. Owner also acknowledges that in the design, operation and management of the Hotel, Manager may create logos and/or designs and commission artwork, photographs, website design, images of the Hotel, or other decorative specialty items (collectively, the "Manager's Design Work") to be used in connection with Manager's operation of the Hotel. Owner hereby acknowledges that it has no right,

11

title or interest in and to Manager's Materials or Manager's Design Work and covenants (i) not to claim any such interest, (ii) not to disclose or distribute, or contract to disclose or distribute, Manager's Materials or Manager's Design Work to any person without Manager's express written consent except as otherwise expressly provided herein or to the extent required by law, (iii) not to use Manager's Materials or Manager's Design Work in any manner except with the prior consent of Manager which may be withdrawn at any time, and (iv) upon termination of this Agreement for any reason, to cease all use of Manager's Materials (or any part thereof) and Manager's Design Work (or any part thereof) and return to Manager all copies and/or originals of Manager's Material and Manager's Design Work in its possession. When using Manager's Materials or Manager's Design Work with Manager's consent, the same shall be used only for the purpose of furthering the business of the Hotel and not for any other reason. All right, title and interest in and to Manager's Materials and Manager's Design Work, including all copyrights, trademarks and trade secret rights, shall always remain with Manager and may be removed from the Hotel by Manager at any time, including upon a termination or expiration of the Agreement, and Owner shall have no rights with respect thereto.

(c)     Solicitation. Owner shall not, and shall ensure that its Affiliates do not, directly, or indirectly, for itself or on behalf of any other person, firm or corporation, solicit, hire, retain as a consultant, or use the services of, any person who is, or was in the previous eighteen (18) months (other than a person whose services were terminated by Manager), either an employee (including Personnel) of Manager or an Affiliate of Manager, without Manager's express prior written approval. This provision of shall survive for eighteen (18) months after the termination or expiration of this Agreement.

(d)     Sales of Merchandise. Owner acknowledges that Manager's Materials, Manager's Design Work and Manager's Tradename are of great commercial value and that, without the covenants contained herein with respect thereto and with respect to Manager's employees set forth above, Manager would not enter into this Agreement. Nothing herein shall prohibit Manager from placing in rooms and other places at and around the Hotel items, such as picture books, identifying other hotels managed or operated by Manager and its Affiliates. In addition, Manager shall have the right to sell merchandise in the rooms in an unobtrusive manner or in the gift shop, at the front desk or in other appropriate locations at the Hotel, provided that the proceeds from such sales shall constitute Gross Revenues and Manager shall provide such merchandise to Owner at a price no less favorable to Owner than that which Manager provides such merchandise to any other hotel operated by Manager or its Affiliates.

## ARTICLE XIV

## ASSIGNMENTS; SALE OF HOTEL

Section 14.01    Assignment by Owner.    Owner shall have no right to transfer or assign any of Owner's interest in this Agreement without the prior written consent of Manager (which consent of Manager may be withheld by Manager in Manager's sole and absolute discretion), except that in connection with a sale of the Hotel or a permitted lease Owner shall, on thirty (30) days' prior written notice to Manager, cause this Agreement to be assigned to, and assumed by, the purchaser of the Hotel. For the avoidance of doubt, if Owner shall sell, assign, transfer or convey the Hotel or a controlling interest therein (including by transfer of ownership interest, merger or other disposition, in one or a series of related transactions) at any time during the Term, Owner shall have no right to terminate this Agreement as a result thereof, and, subject to Manager's right to terminate, this Agreement shall continue in full force and effect and bind Manager and Owner's successors and assigns.

Section 14.02    Assignment by Manager.    Manager is not entitled to assign this Agreement to a third party without the written consent of the Owner, except in connection with a merger or transfer of substantially all of the assets of its parent entity to any corporation, limited liability company, partnership or other business entity, provided that (i) the assignee will assume the obligations of Manager under this

12

Agreement, and (ii) the Hotel will continue to be operated under the Hotel Brand, in substantially the same manner as it was operated prior to such transfer.

## ARTICLE XV

### · TERMINATION

Section 15.01   Termination By Owner.

(a) Owner shall have the right to terminate this Agreement, without the payment of any fee or penalty, other than Manager's Expenses and accrued and unpaid Manager's Fees payable pursuant to this Agreement and the return of all monies advanced by the Manager, for the following reason only (each, following the provision of notice and the lapse of any applicable cure periods, an "Event of Default"): the commission by Manager of fraud or willful misconduct in the performance of the duties of Manager under this Agreement

(b) Owner shall have no right to terminate this Agreement unless Owner shall have given notice of any such event to Manager and such event shall continue unremedied for a period of ninety (90) days after notice, or if the breach is not susceptible of cure within ninety (90) days, such additional period as may be necessary to effect such cure provided that Manager commences such cure promptly within such sixty (60) day period and diligently prosecutes such cure to completion. In addition, but not in limitation of the foregoing, Owner shall have no right to terminate this Agreement unless Owner shall have given notice to Manager of the occurrence of the event which Owner claims is the basis for such termination, such notice to be given within 180 days after the date Owner first obtains actual knowledge of such occurrence or, if such occurrence is ongoing, the date on which Owner first obtains actual knowledge that such occurrence has ceased. Failure by Owner to give such notice within said 180-day period will constitute a waiver of the rights of Owner to terminate this Agreement by reason of the particular occurrence which would have been the basis for such termination, but not, for the avoidance of doubt, with respect to any other occurrence, and shall not limit Owner's other rights and remedies, if any, arising out of such occurrence.

(c) IN NO EVENT SHALL MANAGER BE DEEMED IN BREACH OF ITS DUTIES HEREUNDER, OR OTHERWISE AT LAW OR IN EQUITY, SOLELY BY REASON OF (I) THE FAILURE OF THE FINANCIAL PERFORMANCE OF THE HOTEL TO MEET OWNER EXPECTATIONS OR INCOME PROJECTIONS OR OTHER MATTERS INCLUDED IN THE OPERATING PLAN, (II) THE ACTS OF HOTEL PERSONNEL, (III) THE INSTITUTION OF LITIGATION OR THE ENTRY OF JUDGMENTS AGAINST OWNER, MANAGER OR THE HOTEL WITH RESPECT TO HOTEL OPERATIONS, OR (IV) ANY OTHER ACTS OR OMISSIONS NOT OTHERWISE CONSTITUTING A BREACH OF THIS AGREEMENT, IT BEING THE INTENTION AND AGREEMENT OF THE PARTIES THAT MANAGER'S SOLE OBLIGATION HEREUNDER SHALL BE TO ACT IN CONFORMITY WITH THE STANDARD OF SKILL, CARE AND DILIGENCE REQUIRED BY THE OPERATING STANDARD, AND OTHERWISE IN CONFORMITY WITH THE EXPRESS TERMS OF THIS AGREEMENT.

Section 15.02   Termination by Manager.

(a) Manager shall have the right to terminate this Agreement for the following reasons (each, following the provision of notice and the lapse of any applicable cure periods, an "Event of Default"): (i) a monetary or a material non-monetary breach of obligations by Owner under the terms of this Agreement; (ii) the event of any suspension for a period in excess of thirty (30) days or withdrawal or revocation of any material license or permit required for the Manager's performance under this Agreement or the operation of the Hotel in accordance with the terms hereof, but only if such suspension, withdrawal or revocation is due to circumstances beyond Manager's control or any Force Majeure Event; (iii) Manager is materially limited in operating and maintaining the Hotel in accordance with the requirements of this

13

Agreement because of (x) governmental laws, rules or regulations hereafter enacted of which Manager so notifies Owner in writing, and/or (y) Owner's failure to fund any amounts as required pursuant to the terms of this Agreement; (v) Manager makes a reasonable determination that continued operation of the Hotel will result in an imminent danger to public health or safety; (vi) a failure by Owner to deposit in the Operating Account funds requested by Manager in accordance with the terms hereof; (vii) Owner contests in any court or proceeding Manager's ownership of any of the Manager's Materials, Manager's Design Work and Manager's Tradename; (viii) Owner conceals revenue, maintains false books and records of accounts, submits false reports or information to Manager or otherwise attempts to defraud Manager.

Section 15.03    Transition Procedures.  Upon the expiration or termination of this Agreement, Owner and Manager shall have the following rights and cause the following to occur each of which shall be a covenant of the party obligated hereunder:

(a)    Licenses and Permits.  Manager shall execute all documents and instruments reasonably necessary to transfer (if transferable) to Owner all governmental permits and licenses held by Manager necessary to operate the Hotel.

(b)    Leases and Concessions.  Manager shall assign to Owner or its nominee, and Owner and its nominee, if any, shall assume, all leases and concession agreements in effect with respect to the Hotel in Manager's name.

(c)    Books and Records.  A copy of all Books and Records for the Hotel kept by Manager shall be turned over to Owner, so as to ensure the orderly continuance of the operation of the Hotel, but the original Books and Records, may be kept by Manager.

(d)    Bookings.  Manager shall provide to Owner a complete list of all future bookings together with the pertinent information relevant to such bookings, (i) to be used by Owner solely to honor and complete such bookings and for no other purpose (including marketing) and (ii) subject to Owner's written agreement to Manager's then-current data protection terms, including its privacy, security, access, correction, deletion, data transfer, and incident notification and response requirements. Manager may remove from the Hotel any information (whether in electronic or hard copy format) pertaining to the Manager Owned Customer Lists and/or Manager Directed Customers and Owner shall have no right to retain any originals or copies of the same. In addition, Manager may retain a copy of and utilize, any other customer and guest information, preference and history relating to customers of the Hotel other than Manager Directed Customers without charge. Owner shall have no rights whatsoever to Manager's guest loyalty programs, lists or the information contained therein, or any lists of followers, guests, held in any program utilized by Manager to manage the property, as well as social media platform included but not limited to Instagram and Facebook.

Owner shall pay to Manager all accrued Manager's Fees and Manager's Expenses due through the date of termination of this Agreement as a condition to effective termination.  Any and all costs incurred by the Manager and/or its Affiliates, including costs related to the time of, and costs incurred by Personnel, in connection with facilitating the foregoing transition procedures, shall be borne solely by Owner. Manager shall be entitled to take reasonable measures, including restricting access to computer servers or hard copies of files, in order to protect and prevent dissemination of any of the foregoing items set or otherwise that are the property of Manager.

Section 15.04    Termination Procedure.  Upon an election of a non-defaulting party to exercise their right to terminate this Agreement under, the non-defaulting party may, at its option, give to the defaulting party notice of intention to terminate this Agreement, which termination shall be effective after the expiration of a period of ninety (90) days following the date of such termination notice and, upon the expiration of such period, the Term shall expire on the date specified in the notice. Such termination shall be without prejudice to any right to any and all other remedies available at law or in equity subject to the terms of this Agreement.

14

## ARTICLE XVI

### NOTICES

Section 16.01    Notices.

(a)    Any notice, statement or demand required to be given under this Agreement shall be in writing and shall be deemed given or rendered if (i) delivered by hand (against a signed receipt), (ii) sent by certified or registered mail, postage prepaid, return receipt requested, (iii) sent by express or overnight courier, such as by FedEx or UPS, or (iii) sent by facsimile or email transmission, with a confirmation copy sent in a manner provided in one of subclauses (i)-(iii) above, addressed to the parties hereto at their respective addresses listed on Exhibit A.

(b)    All notices, statements, demands and requests shall be effective upon receipt or refusal of delivery. By giving to the other party at least thirty (30) days written notice thereof, either party shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses for notices, statements, demands and requests, provided such new address shall be within the United States of America. Any consent required to be given under this Agreement in writing shall be delivered in accordance with the terms of this Section 18.01.

## ARTICLE XVII

### ADJUDICATON BY JURY

Section 17.04    Adjudication. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by a Court of Law in New York, NY, before a judge and jury.

## ARTICLE XVIII

### MISCELLANEOUS

Section 18.01    Representations.

(a)    Owner, as an inducement to Manager to enter into this Agreement, hereby represents and warrants and covenants as follows: (a) this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof; (b) there is no claim, litigation, proceeding or governmental investigation pending (or, to Owner's knowledge, threatened) against Owner, the properties or business of Owner or the

Section 18.02    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Owner, its successors and/or permitted assigns, shall be binding upon and inure to the benefit of Manager, its successors and/or permitted assigns.

Section 18.03    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

Section 18.04    Confidentiality. Except disclosure to obtain the advice of professionals or consultants, in connection with the financing of the Hotel from a potential lender, to investors or potential investors in the Hotel, Owner, Manager or any of their respective Affiliates, in furtherance of a permitted assignment of this Agreement, or as may be required by law or by the order of any government or tribunal, Manager, Owner, the direct and indirect beneficial owners of Owner and their respective Affiliates shall each ensure that the terms of this Agreement are not disclosed to the press or to any other third party or entity without the prior consent of Owner and Manager. In addition, the parties agree to keep confidential

15

all information of a proprietary or confidential nature about or belonging to Owner or Manager to which such Person gains or has access by virtue of the relationship between Owner and Manager. Furthermore, Manager may not disclose any specific information regarding financial performance of the Hotel to any third party, except (i) to obtain the advice of professionals or consultants, (ii) as provided in this Agreement, (iii) on a confidential basis to potential partners and/or investors in the Manager or its Affiliates or to potential new owners of Standard branded properties, or (iv) to a professional data reporting agency in accordance with standard industry practice. The obligations set forth shall survive any termination of this Agreement for a period of two (2) years following such termination. The parties shall coordinate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement, or the performance by either Owner or Manager of their respective obligations hereunder. Neither party shall have any liability under this Section if such Person uses commercially reasonable efforts to maintain the confidentiality required hereby.

Section 18.05    Standard of Liability; Fiduciary Duties; Irrevocability of Contract; Competition.

(a)    Standard of Liability. Anything contained in any other provision of this Agreement to the contrary notwithstanding, Manager shall not be liable to Owner in any respect, whether during the Term or after any expiration or termination thereof, for the actions or activities of any employees, contractors, consultants or advisors employed or retained by the Hotel, whether or not recommended by Manager or employed by Manager or Manager's Affiliates other than for the gross negligence, fraud or willful misconduct on the part of Manager's corporate personnel in the performance of its duties hereunder. In addition, if an Event of Default by Manager shall have occurred and be continuing hereunder, Owner may seek compensation for actual damages sustained by Owner by reason of such breach, provided, however, that Owner shall not have the right to seek such damages from Manager for Manager's negligent (but not, for the avoidance of doubt, grossly negligent) conduct of its supervisory duties and in no event shall Manager be liable for punitive, exemplary, statutory or treble damages or any incidental or consequential damages with respect to any breach of a material obligation under this Agreement.

(b)    Competition and Corporate Opportunities. Except as provided in subsection (d) below, none of Manager, its Affiliates, nor any of their respective partners, principals, directors, officers, members, managers and employees, shall have any duty to refrain from engaging, directly or indirectly, in (i) the same or similar business activities or lines of business as the Owner or (ii) the business of managing hotels other than the Hotel. In the event that Manager, its Affiliate or any of their respective partners, principals, directors, officers, members, managers and employees, acquire knowledge of a potential transaction or matter which may be a corporate opportunity for any of Owner or Owner's Affiliates (i) neither Owner nor any Affiliate of Owner shall have any expectancy in such corporate opportunity, (ii) such Persons shall not have any duty to communicate or offer such corporate opportunity to Owner or any Affiliate of Owner and (C) such Persons may pursue or acquire such corporate opportunity or direct such corporate opportunity to another Person, including to Manager or any Affiliate of Manager.

Section 18.06    Entire Agreement. This Agreement constitutes the entire Agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written. Owner and Manager hereby represent each to the other, that in entering into this Agreement neither has relied on any projection of earnings, statements as to possibility of future success or other similar matters.

Section 18.07    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile or electronic mail (via portable document format (pdf)) which, upon transmission to the other Party, shall have the same force and effect as delivery of the original signed counterpart.

16

Section 18.08   Force Majeure.  A party will not be liable to the other party for its inability or failure to perform, or delay in performing, any of its obligations under this Agreement caused by a Force Majeure Event provided that the party affected takes all reasonable steps to reduce the effect of such Force Majeure Event. If a party is unable to perform, in whole or in part, its obligations under this Agreement by reason of a Force Majeure Event, then such party shall be relieved of those obligations to the extent such party is so unable to perform them and such inability to perform so caused shall not make such party liable to the other.

.

*[Signature page follows]*

IN WITNESS WHEREOF, Owner and Manager have executed this Management and Services Agreement as of the day and year first above written.

**OWNER:**

**96 WYTHE ACQUISITION LLC**

By: 96 W Development LLC, its sole member

By: 96 Wythe Holdings LLC, its Manager

By: _____

Name: Toby Moskovits
Title: Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC**

By: _____

Name: Yechial Michael Lichtenstein,
Title: Authorized Signatory

# Exhibit A

96 Wythe Acquisition LLC,
96 Wythe Avenue
Brooklyn, New York 11249
Attn: Toby Moskovits

The Williamsburg Hotel BK, LLC
1274 49TH Street, Suite 184
Brooklyn, New York 11219
Attn: Yechial Michael Lichtenstein