**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Jason I. Kirschner
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 506-1910

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>                    Debtor. | Chapter 11<br><br>Case No.: 21-22108 (RDD) |

## DISCLOSURE STATEMENT

**THIS DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE THE ONLY AUTHORIZED STATEMENTS WITH RESPECT TO THE PROPOSED CHAPTER 11 PLAN FILED CONCURRENTLY HEREWITH (THE "PLAN").  NO OTHER REPRESENTATIONS CONCERNING THE DEBTOR, ITS OPERATIONS, OR THE VALUE OF ITS PROPERTY HAS BEEN AUTHORIZED BY THE DEBTOR.**

**ANY REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

**THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HAVE NOT BEEN APPROVED BY THE COURT AND THEY ARE SUBJECT TO BANKRUPTCY COURT APPROVAL.**

743958897

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    HISTORY OF THE DEBTOR AND THE BANKRUPTCY FILING............................. 2

    1.    History of the Debtor and Description of the Debtor's Business ......................... 2

    2.    Loan Background................................................................................................ 3

    3.    Disputes with BSP and State Court Litigation..................................................... 4

        A.    Onsite Inspections and Related Draw Requests........................................ 4

        B.    BSP's Purported Default Notice and the Debtor's Subsequent Cure ........ 6

        C.    State Court Litigation................................................................................ 8

    4.    Events Leading to the Commencement of this Case ........................................... 11

        A.    BSP's Bad Faith and Unlawful Conduct ................................................. 11

        B.    COVID-19 and the Hotel's Operations.................................................... 12

    5.    Description of Debtor's Assets and Management ............................................... 13

III.    POST-PETITION DEVELOPMENTS....................................................................... 14

    1.    Professionals .................................................................................................... 14

    2.    Cash Collateral................................................................................................. 15

    3.    Discovery ......................................................................................................... 15

    4.    Paycheck Protection Program Settlement........................................................... 17

    5.    Current Business Status .................................................................................... 18

        A.    Appointment of the Chief Restructuring Officer ..................................... 18

        B.    Operations .............................................................................................. 19

        C.    Cash Management System........................................................................ 21

    6.    U.S. Trustee's Motion to Convert or Dismiss.................................................... 23

IV.    CLAIMS ............................................................................................................... 24

V.    THE PLAN OF REORGANIZATION........................................................................ 26

    1.    Classification of Claims.................................................................................... 27

    2.    Unclassified Claims/Administrative Claims....................................................... 27

    3.    Priority Tax Claims........................................................................................... 28

    4.    Professional Fee Claims.................................................................................... 29

    5.    U.S. Trustee Fees ............................................................................................. 30

    6.    Classified Claims ............................................................................................. 30

## TABLE OF CONTENTS
(continued)

Page

|   |   |   |   |
|---|---|---|---|
| | A. | Class 1 — Priority Claims | 31 |
| | B. | Class 2 — BSP Claims | 31 |
| | C. | Class 3 — Secured Property Tax Claims | 33 |
| | D. | Class 4 — Secured M&M Claims | 33 |
| | E. | Class 5 — Unsecured Claims | 34 |
| | F. | Class 6 — Subordinated Claims | 35 |
| | G. | Class 7 — Equity Interests | 35 |
| 7. | | Payment of Allowed Claims | 36 |
| 8. | | Objection to Claims | 36 |
| 9. | | Disputed Claims Reserve | 36 |
| 10. | | Setoffs | 37 |
| 11. | | Unclaimed Cash | 38 |
| 12. | | Fee Applications by Professionals | 38 |
| 13. | | Conditions to the Effective Date | 39 |
| 14. | | Period Prior to Effective Date | 39 |
| 15. | | Consummation of Plan | 39 |
| 16. | | Source of Distributions | 40 |
| 17. | | Vesting of Assets in Post-Confirmation Debtor | 40 |
| 18. | | Confirmation Order | 40 |
| 19. | | Assumption and/or Rejection of Executory Contracts | 41 |
| 20. | | Full and Final Satisfaction | 42 |
| 21. | | Releases | 42 |
| 22. | | Term of Injunctions or Stays | 42 |
| 23. | | Exculpation | 43 |
| 24. | | Preservation of Claims and Causes of Action for the Estate | 43 |
| 25. | | Miscellaneous | 43 |
| 26. | | Modification of the Plan | 44 |
| VI. | | MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR REJECTED | 44 |
| 1. | | Who May Vote | 44 |
| 2. | | Voting Procedures | 46 |

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  |  |
|---|---|---|
| A. | Solicitation Period | 46 |
| B. | Ballots | 46 |
| 3. | Confirmation of the Plan | 46 |
| A. | Confirmation Hearing | 46 |
| B. | Objections to Confirmation | 47 |
| 4. | Requirements for Confirmation of the Plan | 47 |
| A. | Best Interests Test | 47 |
| B. | Feasibility of the Plan | 48 |
| C. | Acceptance by Impaired Classes | 49 |
| D. | Cramdown | 49 |
| VII. | TAX CONSEQUENCES OF THE PLAN | 50 |
| VIII. | ALTERNATIVES TO THE PLAN | 51 |
| IX. | RETENTION OF JURISDICTION | 51 |
| X. | CONCLUSION | 53 |

## EXHIBITS

EXHIBIT A          Chapter 11 Plan

EXHIBIT B          Liquidation Analysis

EXHIBIT C          Plan Projections

EXHIBIT D          Letter of Intent

I.      **INTRODUCTION**

On February 23, 2021 (the "Filing Date"), 96 Wythe Acquisition LLC, (the "Debtor") filed a voluntary petition for reorganization pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Debtor retained Backenroth Frankel & Krinsky, LLP and Mayer Brown LLP as its main bankruptcy counsel, Getzler Henrich & Associates and Hilco Real Estate, LLC as financial advisors, and Leitner Berman as appraisers.[1]  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its assets as debtor-in-possession.  As of the date hereof, no creditors' committee has been appointed in this case.

The Debtor files this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.  This Disclosure Statement is provided to all of the Debtor's known creditors and parties in interest in order to disclose that information deemed material, important, and necessary for the Debtor's creditors to arrive at a reasonably informed decision in exercising their rights to vote on the proposed Plan, filed concurrently herewith.  A copy of the Plan accompanies this Disclosure Statement and is attached hereto as **Exhibit A**.

Pursuant to section 1125 of the Bankruptcy Code, after a hearing, and a notice to all creditors and other interested parties, the Debtor has obtained an order of the Bankruptcy Court dated [_____], 2021, approving this Disclosure Statement for submission to the holders of claims against, or interests in, the Debtor and setting the date of the hearing for the Bankruptcy Court to consider confirmation of the Plan.  [Docket No. [___]].

---

[1] Retention applications for Mayer Brown LLP, Getzler Henrich & Associates and Hilco Real Estate, LLC., and Leitner Berman are each pending Bankruptcy Court approval.

The Bankruptcy Court has set the [____]th day of [_____], 2021, at [_]:00 [a/p].m. (prevailing Eastern Time) as the date for a hearing on the confirmation of the Plan.

The purpose of this Disclosure Statement is to inform all claimholders of information that may be deemed material, important, and necessary for such claimholders to make an informed judgment about the Plan, and to vote for the acceptance or rejection of the Plan, where voting is necessary. Solicitation of acceptances from classes that are not entitled to vote on the plan, either because such class is not impaired or is conclusively deemed to have accepted or rejected the plan, is not required.

The approval by the Bankruptcy Court of this Disclosure Statement does not constitute a recommendation as to the merits of the Plan, only that the Disclosure Statement contains "adequate information" from which creditors may form an opinion as to the merits of the Plan. Each creditor should read the Disclosure Statement and the Plan in their entirety.

## II.    HISTORY OF THE DEBTOR AND THE BANKRUPTCY FILING

### 1.    History of the Debtor and Description of the Debtor's Business

The Debtor is a New York limited liability company with its principal place of business in Brooklyn, New York. The Debtor owns and operates the Williamsburg Hotel, a successful 10-story, 147-room independent hotel, constructed in 2017, and located at 96 Wythe Avenue, Brooklyn, New York (the "Hotel"). The Hotel is upscale and full-service, featuring a full food and beverage operation that includes a restaurant, bar/lounge, outdoor café, library lounge bar, water tower bar, and event ballrooms. Other amenities include additional meeting and conference rooms, on-site fitness center, and rooftop pool and bar with spectacular panoramic views across the East River to the New York City skyline. The Debtor is managed by a non-debtor affiliate, the Williamsburg Hotel BK LLC (the "Management Company"), which employs approximately eighty (80) people.

2

2.      **Loan Background**

On December 13, 2017, the Debtor and Benefit Street Partners Realty Operating Partnership, L.P. (together with BSPRT 2018-FL3 Issuer, Ltd., as successor, collectively, "BSP") entered into a $68 million loan transaction, which consolidated approximately fourteen (14) mortgages, by entering into that certain loan agreement, dated as of December 13, 2017 (the "Loan Agreement," together with any related documents, including consolidated note and mortgage, and guarantees, collectively, the "Loan Documents"). BSP asserts that the Debtor's obligations under the Loan Agreement are secured by all-asset and fixture filings with respect to the Hotel, as more fully set forth in the Loan Documents, as well as financing statements on Hotel revenues. As discussed below, the Debtor is reviewing whether the loans are properly perfected. The Loan Agreement was originally set to mature on June 7, 2019 (the "Initial Maturity Date"); however, the Debtor had two options to extend the terms of the Loan Agreement beyond the Initial Maturity Date for two successive 6-month terms, to: (a) December 9, 2019, if the Debtor exercised the first option; and (b) June 9, 2020, if the Debtor exercised the second option. Exercising these options was subject to the satisfaction of certain conditions precedent, including the absence of any events of default and payment of an extension fee.

At the closing of the Loan Agreement, funds were set aside for "Business Plan Reserve Funds" in a "Construction Reserve Account" to complete the agreed-upon construction of the Hotel and to ensure adequate funding for the Debtor's capital expenditures to complete the Hotel. The Loan Documents required BSP to reimburse the Debtor from this account upon: (i) the Debtor's certification of the completion of such work; (ii) the release of applicable liens; and (iii) BSP completing an onsite inspection.

After the parties entered into the Loan Agreement, construction on the Hotel continued. On March 22, 2018, the Debtor submitted its first draw request in compliance with the Loan

3

Documents.   After an inspection on March 27, 2018 by CBRE, a third-party engineer that conducted the onsite inspections at the Hotel, BSP funded the first draw request on June 1, 2018. On May 23, 2018, the Debtor submitted its second draw request, which BSP funded on June 14, 2018.   On June 20, 2018, the Debtor submitted its third draw request, which BSP funded on June 27, 2018.

### 3.    Disputes with BSP and State Court Litigation

#### A.    Onsite Inspections and Related Draw Requests

Pursuant to the Loan Agreement, May 31, 2018 was the initial "Completion Date," or the date by which "substantial completion of the [Hotel] . . . substantially in accordance with all Plans and Specifications . . . ." must occur.  *See* Loan Agreement, § 1.1.  The failure of the Debtor to meet this deadline would result in a 0.5% interest rate increase, which rate would then reset once the Debtor satisfied the conditions in the Loan Agreement.

By the end of June 2018, the Debtor met the qualifications for the Completion Date because the Hotel was open for business and operating with all amenities; guestrooms, the pool, food and beverage outlets, the ballroom space, and related facilities were all operational.  Reports prepared and issued by CBRE to BSP confirmed the Hotel's substantial completion, in addition to other documents, photos, and information provided to BSP.  The CBRE report also confirmed that the Construction Reserve Account had a remaining balance to fund post-completion items with respect to the Hotel.

The Debtor notified BSP that it satisfied the conditions under the Loan Agreement for the Completion Date, thereby terminating the 0.5% interest increase.  However, and notwithstanding the CBRE report and other information furnished to BSP, BSP disagreed with the Debtor and refused to terminate the interest rate increase, which constituted, on average, an additional $29,000.00 of interest per month.

4

In an effort to continue progress on the project and with the Hotel's operations, the Debtor initially paid the inflated interest rate, notwithstanding the fact that the Hotel met the definition of Completion Date in the Loan Agreement.  In August 2018, the Debtor again asserted that the increased interest rate was improper, however, it continued to fund the interest reserve requirements under the Loan Agreement at a higher rate, notwithstanding its compliance with the Loan Agreement.  Again, wanting to continue progress on the project, maintain uninterrupted operations, and potentially maintain a working relationship with BSP in hopes of, amongst other things, refinancing or extending the terms of the Loan Agreement, the Debtor complied with BSP's demand for increasing the interest reserve at the higher rate.  BSP continued to pay itself the higher interest rate from the Debtor's interest reserve account through December 2018, which ultimately caused the Debtor's interest reserve account balance to fall below the required amounts under the terms of the Loan Agreement.

After the completion of even more ancillary components of the Hotel (with the Hotel already fully operational), on September 14, 2018, the Debtor submitted a request for a further onsite inspection to release the remaining reserve funds.  On September 17, 2018, the Debtor submitted its fourth draw request on the Construction Reserve Account, and included photographs of the Hotel's completed roof and rooftop bar.  Thereafter, on September 21, 2018, the Debtor requested and BSP approved that the funds from this draw be used to fund the Debtor's interest reserve.

In November 2018, the Debtor contacted BSP and its advisors to schedule an onsite visit to confirm that the Hotel had met final completion, including the ancillary components (and met the Completion Date under the Loan Agreement, which required metrics for the final substantial completion), and to facilitate BSP's approval and release of an additional construction draw in the

743958897

amount of $300,000.00 (to cover, among other things, debt service due December 7, 2018 under the Loan Agreement). Prior site visits had taken approximately 2-3 days to schedule, however BSP did not schedule this visit until nearly two weeks later, on December 11, 2018, which was a deliberate ploy to attempt to call a default, as will be explained below. Because of this, the draw was also delayed and funding was withheld.

On December 3, 2018, the Debtor requested a fifth onsite visit and submitted its fifth draw request, which BSP did not complete until December 18, 2018. BSP ultimately demanded that in exchange for releasing funds to the Debtor, the Debtor acknowledge: (a) the applicable conditions under the Loan Agreement had not been satisfied; and (b) as such, BSP was entitled to the increased interest rate. Because the Debtor refused to make these statements (which it believed to be false), BSP would not release the funds that the Debtor was entitled to and the Debtor was unable to make the December 2018 interest payment.

### B.    BSP's Purported Default Notice and the Debtor's Subsequent Cure

On December 10, 2018, the Debtor advised BSP that a term sheet to pay off the loan was imminent and on this date the Debtor provided BSP a term sheet from Natixis Bank setting forth the terms of a transaction that would have paid off the loan in full. Also on this date, just one (1) day prior to the scheduled onsite inspection, which would have resulted in a release of the funds from the Construction Reserve Account, and allow for the funding of the interest reserve, BSP sent the Debtor a notice of default (the "December Default Notice") based on the Debtor's failure to make the December interest payment. In a blatant attempt to trigger a default, BSP first deliberately delayed the onsite construction inspection to prevent the Debtor from accessing their escrowed funds to make the interest reserve deposit, and then went further to actively derail the clear opportunity that the Debtor had in hand to pay BSP in full with this new loan from Natixis Bank, by deliberately sending a notice of default, which would scare off other potential lenders –

6

although the only reason for the delay in the interest payment was BSP's refusal to fund the $300,000.00 due to the Debtor.

Despite the blatant attempts by BSP to find defaults, WH Mezz Lender, LLC (the "Mezz Lender"), the Debtor's mezzanine lender, an unrelated third party who had previously invested in the Hotel and holds interests and liens in the Debtor's equity,[2] stepped in and assisted the Debtor to cure the alleged default by timely paying the $1,239,365.45 cure amount to BSP under the terms of the Loan Agreement, of which the Debtor contributed $240,000.00. At this time, the Debtor rightfully understood the purported default to be cured under both the terms of the Loan Agreement and the detail provided in the December Default Notice.

On January 7, 2019, the Debtor requested a payoff letter from BSP, and on January 8, 2019 the Debtor requested that BSP fund the previously-approved construction draw in the approximate amount of $270,000.00. In response, BSP maintained that the Debtor was still in default, notwithstanding the Debtor's cure payment of $1,239,365.45 in response to the December Default Notice, based on the Debtor's alleged failure to properly fund the interest reserve and outstanding expenses, provide financial information, and satisfy the completion of its obligations under the Loan Agreement. However, this ignored the fact that the payment was made, and further ignored the fact that based on a report issued by CBRE, the Debtor rightfully maintained BSP's claims were false, as it had met substantial completion of the Hotel under the terms of the Loan Agreement, and that all that remained was $76,000.00 worth of minor work to complete the multi-million dollar Hotel.

Shortly thereafter, on January 9, 2019, the Debtor received an invoice from BSP, which included BSP's disputed calculations of: (i) the additional interest rate of 0.5%; (ii) an additional

---

[2]The Mezz Lender holds interests in the equity of the Debtor and is not a scheduled creditor and did not file a proof of claim.

default rate, based on the December Default Notice, of 5.0%; and (iii) late fees totaling approximately $373,000.00.

On February 6, 2019, the Debtor received a backdated Interest Replenishment Notice dated January 10, 2019, stating that the Debtor was obligated to fund approximately $712,000.00 into the interest reserve account. The Mezz Lender timely advanced these funds on behalf of the Debtor to pay this amount. On March 10, 2019, the Debtor received a second, backdated Interest Replenishment Notice dated February 13, 2019, stating that the Debtor was required to fund approximately $635,000.00 into the interest reserve account. The Mezz Lender timely advanced funds on behalf of the Debtor to pay this amount. On April 5, 2019, the Debtor received a third, backdated Interest Replenishment Notice dated March 12, 2019, stating that the Debtor was obligated to fund approximately $671,000.00 into the interest reserve account. The Mezz Lender again timely advanced these funds on behalf of the Debtor to pay this amount.

On June 5, 2019, the Debtor received a payoff letter from BSP that indicated it expired two days later on January 7, 2019, claiming that $70,770,543.01 was due and owing in principal, interest, and various charges under the Loan Agreement. This payoff amount did not include credit for the balance of the final construction reserve draw request, nor did it include credit for the more than $3 million dollars paid towards interest payments by the Mezz Lender over the six (6) months from January to June of 2019 as aforementioned.

On June 7, 2019, the Debtor received a default notice for its alleged failure to repay the loan on that day, the Initial Maturity Date (the "Maturity Default Notice").

### C.    State Court Litigation

Four (4) days after the Debtor received the Maturity Default Notice on the date the loan was due (assuming no maturity extension), BSP commenced a foreclosure action in the Supreme Court of the State of New York, New York County (the "State Court"), Index No. 653396/2019

743958897

(the "Foreclosure Action").  The complaint in the Foreclosure Action alleged, among other things, the Debtor's purported default for:  (i) failure to pay the principal and interest when due as of the Initial Maturity Date; (ii) failure to make payments for debt service or fund reserve amounts, which were noted in the December Default Notice; and (iii) allowing the existence of certain mechanic's liens filed against the Hotel.  Simultaneously with the filing of the Foreclosure Action, BSP filed an *ex parte* motion for the appointment of a receiver, which the State Court approved on October 18, 2019, and eventually appointed Constantino Sagonas (the "Receiver") on February 21, 2020.  As discussed below, the Receiver continued to engage the Management Company to oversee the operations of the Hotel.

On August 30, 2019, the Debtor filed an answer and asserted affirmative defenses and counterclaims, which asserted that, among other things, BSP wrongfully prevented the Debtor from extending the maturity of the loan as permitted under the Loan Agreement, and that BSP blatantly ignored the fact that more than $3 million was paid towards interest payments while BSP continued to claim that a default was ongoing, despite the continued payment of interest.

On February 6, 2020, BSP filed a motion for summary judgement, which the State Court substantially denied on April 9, 2020.  In denying summary judgment, the State Court held that there were triable issues of fact regarding whether there was indeed an  existence of defaults arising from the alleged failure to timely complete the required elements of the Hotel and the Debtor's failure to pay increased interest as a result.  In its order denying BSP's motion, the State Court also declined to dismiss or sever the Debtor's counterclaim for breach of contract arising from BSP's refusal to recognize certain payments of interest it had accepted prior to the Initial Maturity Date by its refusal to give the Debtor all payments due, by continuing to charge default interest, and by improperly preventing the Debtor from extending the Initial Maturity Date.  The State Court denied

9

dismissal of a significant number of the Debtor's affirmative defenses and counterclaims, and allowed the Debtor's claims for lender liability against BSP to move forward.

BSP appealed the State Court's decision to the Appellate Division. On February 16, 2021, in a few sentences and without any discussion or analysis of the State Court's detailed record and findings, the Appellate Division ruled that: (a) BSP was entitled to summary judgement because it established a *prima facie* case (including with respect to the existence of a payment default); (b) the Debtor waived its affirmative defenses and counterclaims in the Loan Agreement (despite well-settled law that a borrower cannot waive future claims or defenses); (c) the waiver of defenses in the Loan Agreement were not rendered ineffective even though BSP caused or contributed to the Debtor's purported default; and (d) the Debtor's defenses and counterclaims were therefore not viable.

The oral argument before the Appellate Division suggests the court may have been improperly influenced by false claims and/or misrepresentations asserted by BSP's counsel, claiming the Debtor did not pay any interest or cure the purported defaults, despite the record and prior hearings held before the State Court that confirmed that interest was indeed paid timely and in full and that the defaults were indeed cured. As set forth in the *Debtor's Motion Seeking Entry of an Order (A) Extending the Time to File Notices of Removal of Civil Actions and (B) Granting Related Relief* [Docket No. 35], the Debtor is currently evaluating whether, and to what extent, the Appellate Division's decision was procured from misrepresentations and/or fraud and what remedies the Debtor has, and reserves all rights in this regard. The Debtor is also reviewing whether BSP's liens are properly perfected, as well as the extent, validity, and priority of the BSP Claim (as defined in the Plan). As to this, the Debtor questions, in particular, the interest, default interest, and default fees asserted by BSP, which total, in the aggregate, approximately $20 million.

743958897

Specifically, the Debtor is reviewing the BSP Claim, given BSP's bad faith course of conduct, that

a large portion of default interest and fees allegedly arose when the hospitality market was virtually

shut down due to the COVID-19 pandemic, and given equitable considerations as discussed below.

The Debtor believes the foregoing gives rise to claims and rights of offset against BSP, or, at the

very least, a claim for subordination.  The BSP Claim is discussed more fully below.

### 4.    Events Leading to the Commencement of this Case

### A.    BSP's Bad Faith and Unlawful Conduct

Due to BSP's sequential, contrived, and overlapping actions and the negative impact to the

hospitality sector in general and the Hotel as a result of COVID-19, as discussed below, the Debtor

was left with no choice but to file this case on February 23, 2021.  By initially refusing to accept

the Hotel's substantial completion, BSP was positioned to assert disputed theories, which resulted

in:  (a) charging the Debtor an increase to the contractual interest rate; (b) withholding additional

funds from the Construction Reserve Account; (c) claiming that the Debtor's interest reserve was

not sufficiently funded; and (d) asserting a series of events of default thereby blocking the

extension of the Initial Maturity Date, all which resulted in the Foreclosure Action.

As a direct result of BSP's actions, the Debtor suffered significant damages on both a pre-

and post-petition basis, including lost profits, lost income, additional and unnecessary costs,

improper increased interest rate charges, improper default interest rate charges, improper late fees,

and forced protective advances made by the Mezz Lender on the Debtor's behalf.

The Debtor also suffered significant opportunity costs as a result of BSP's actions.  First,

the Debtor was precluded from exercising its option under the Loan Agreement to extend the Initial

Maturity Date.  Second, the Debtor could not refinance the loan (despite having an offer from a

lender at a lower interest rate) due to the purported "default" in the December Default Notice.

Third, the Debtor could not explore a sale of its assets, despite receiving indications of interest to

purchase the Hotel in 2019 and in the beginning of 2020 prior to COVID-19. As with any prospective transaction, any sale transaction was precluded by the purported "defaults." The Debtor estimates a range of damages in the approximate amounts of $24.5 million to as high as $50 million after taking into account the Debtor's improper default interest rate payments to BSP, lost revenue, costs associated with the delay in the Hotel's stabilization, and lost opportunities to refinance the loan and/or sell the Hotel. The Debtor expressly retains all rights and remedies against BSP, including, but not limited to, all rights to offset and setoff and commencing and prosecuting all affirmative claims and causes of action against BSP with respect to the foregoing. To the extent such claims and issues with BSP are not consensually resolved by the parties, the Debtor reserves its rights to commence and prosecute all such claims and causes of action against BSP. BSP contests the foregoing.

### B.    COVID-19 and the Hotel's Operations

BSP already hamstrung the Debtor financially by artificially and improperly raising the interest rate, cutting off access to funds, and instituting the Foreclosure Action. Additionally, in the midst of the Foreclosure Action, the COVID-19 pandemic took hold of the world and virtually shut down the hospitality industry. Notwithstanding, the Debtor made the decision not to shut down the Hotel. However, operations were significantly impacted by the COVID-19 pandemic, consistent with emergency orders initially locking down business activity, and thereafter, restricting travel in both the business and leisure sectors on and after February 2020. Similarly, the restaurant, bar, and event business was completely shut down for months and significantly adversely impacted by the foregoing.

Despite the unprecedented effects of the ongoing COVID-19 pandemic that severely curtailed the Debtor's operations early on, and continues to wreak havoc on the hospitality industry

743958897

as a whole, the Hotel is open and fully operational, as opposed to most hotels in New York City – *operating profitably and exceeding financial projections*, as discussed below.

The bankruptcy filing provided a breathing spell for the Debtor to stabilize its operations having filed at a low point in the market, in particular, as business and leisure travel restarted and event bookings recommenced. The filing also provided the Debtor time to raise additional funds and capital for a restructuring, develop a plan to restructure its obligations, and position itself for future success. The Debtor's proposed Plan includes the infusion of up to $8 million in new money (together with estimated, available cash projected on the Effective Date (as defined in the Plan) in the approximate amount of $10 million), which forms the predicate for a plan of reorganization and emergence from the Reorganization Case, while preserving the going-concern value of the Hotel (which is significantly greater than in a forced liquidation) – for the benefit of not only the Debtor, but all constituents and creditors, including the mechanics and materialman, general unsecured creditors, and the Mezz Lender, who would otherwise receive significantly less (or nothing at all) in the context of a foreclosure or liquidation.

### 5.    Description of Debtor's Assets and Management

The Debtor's primary asset is the Hotel. The day-to-day operations of the Hotel are managed in the ordinary course of business by one of the debtor's affiliates, the Management Company, pursuant to that certain Hotel Management and Services Agreement, dated as of November 21, 2017 (the "Management Agreement"). The Receiver retained the Management Company in the Foreclosure Action, and since the Receiver's discharge upon the chapter 11 filing, the Debtor continued to retain the Management Company. Under the Management Agreement, the Management Company is the party that has contracted with and is obligated to pay the employees' salaries, as well as the other operating expenses for the Hotel. As discussed below,

during the bankruptcy case, the Hotel has been operating profitability under the management of the Management Company.

## III.   POST-PETITION DEVELOPMENTS

### 1.   Professionals

After the Filing Date, the Debtor filed an application to retain and employ Backenroth Frankel & Krinsky, LLP as its primary bankruptcy counsel [Docket No. 7], which the Bankruptcy Court approved thereafter.   As matters in the case became more complicated, the Debtor determined that it needed to hire additional bankruptcy counsel to assist with the Debtor's exit plan and related issues during this case, working with the other professionals, including financial advisors in developing and implementing a plan to emerge from bankruptcy, and in analyzing and potentially interposing objections to disallow, expunge and/or subordinate the BSP Claim (as well as to review whether the BSP Claim is secured by a valid and unavoidable lien in the Debtor's assets).   There is over $20 million dollars in various interest, default interest, and default fees, which claims the Debtor disputes.   BSP has refused to provide any funding for an investigation into its claims and liens (with a relatively di-minimis carve out provided of $10,000.00 in the event of a conversion of the case to chapter 7).

On August 19, 2021, the Debtor filed an application to retain and employ Mayer Brown LLP to act as co-bankruptcy counsel to Backenroth Frankel & Krinsky LLP to assist with certain defined matters [Docket No. 89].   A hearing to approve such retention is scheduled for October 6, 2021.   In addition, the Debtor determined that to successfully effectuate a reorganization, it required the services of a financial advisor with bankruptcy and restructuring expertise to assist in overseeing the bankruptcy case, formulating its plan (including related financial support and analysis), serving as expert in connection with any contested hearing(s), and assisting the Debtor in procuring and evaluating options for raising debt and/or equity.   As such, the Debtor filed an

14

application to retain and employ Getzler Henrich & Associates LLC and Hilco Real Estate LLC as co-financial advisors on August 27, 2021 [Docket No. 93], which is pending. The Debtor also engaged Leitner Berman, a prominent real estate appraisal firm, as appraisers, and will seek appropriate Bankruptcy Court approval for such retention.

2.     **Cash Collateral**

The Debtor filed a motion to approve use of cash collateral shortly after the Filing Date on February 26, 2021 [Docket No. 4] (the "Cash Collateral Motion"), which the Bankruptcy Court approved on an interim basis on March 5, 2021, March 19, 2021, April 21, 2021, June 21, 2021, and September 13, 2021 over the objection of BSP. [Docket Nos. 15, 21, 28, 52, and 111]. A final hearing has been set for October 6, 2021 to consider the continuing use of cash collateral, which is necessary to maintain and preserve the value of the Hotel. The interim cash collateral orders grant BSP additional adequate protection liens and a superpriority administrative claim to the extent of any diminution in the value of its interest in collateral during the bankruptcy case, and the fifth interim order expires on October 6, 2021, when a hearing is scheduled for the Bankruptcy Court to consider final use of cash collateral. The Debtor reserves the right to seek a further interim order as it proceeds with the Plan solicitation and confirmation process.

3.     **Discovery**

In connection with the bankruptcy case, BSP sought discovery, including much of the same documents that it has already been provided (presumably for the litigation purposes). The following documents, amongst others, have been provided to BSP:

From March 2020 through February 2021:

a)     General ledgers by month

b)     Bank account statements for the Debtor and the Management Company

c)     Available monthly STR reports

15

743958897

d)      Monthly profit & loss statements

e)      Quarterly financials provided to the Receiver

f)      Weekly expense approval emails

g)      Weekly payroll reports

h)      Weekly financial reports

i)      Credit card statements

j)      Receiver final accounting

k)      Emails to and from the Receiver

From March 2021 (after the Filing Date):

a)      Bank account statements for the Debtor and the Management Company

b)      General ledgers by month

c)      Monthly profit & loss statements

d)      Balance sheets for each month's end

e)      Monthly STR reports

f)      Accounts payable reports

g)      Accounts receivable reports

h)      Prepaid revenue reports

i)      Forward bookings reports

j)      Cash budgets and actual to budget variance reports

k)      Payroll reports with position-by-position detail

l)      Salaried Employees Position Changes

m)      Credit card statements upon request

The Debtor has also filed monthly financial reports with the Bankruptcy Court.

4.      **Paycheck Protection Program Settlement**

In addition to the foregoing, BSP has also sought additional discovery, including through a Federal Rule of Bankruptcy Procedure 2004 examination of the Management Company relating to certain Paycheck Protection Program ("PPP") loans received by the Management Company approved approximately one year prior to the bankruptcy filing and by document demands relating to the Cash Management Motion (as defined below).  The Debtor, the Management Company, and BSP are currently working on a consensual form order to address the foregoing.[3]

As to the payment of PPP loans, the Management Company is the party that has contracted with and obligated to pay the employees' salaries, as well as the other operating expenses for the Hotel.  As such, under the loan program, any PPP loans would necessarily be available only to the Management Company, as operator, and not the Debtor or BSP.  At the time of receipt of the PPP loans, the Management Company received $1,438,000.00, of which it reinvested approximately $400,000.00 into the hotel, and disbursed the remaining amount into other business activity.  BSP has asserted that the Debtor had some rights in and to the PPP loans.  The Debtor disputes such and maintains no such rights or claims exist, and that the PPP loans were strictly provided to the Management Company and no other parties had or has any rights or claims to any of these funds.

Notwithstanding the Debtor's position on the PPP loans and BSP's baseless claims, and in an effort to proceed with the Plan confirmation process and exit from this Reorganization Case, , the Debtor and Management Company have agreed to settle any and all purported claims relating to the PPP loans through agreement by the Management Company to defer repayment of over $2 million in claims for fees due to the Management Company through the Plan's Effective Date,

---

[3]The Management Company received an Economic Injury Disaster Loan (EIDL) in the amount of $149,000.00, which loan the Management Company is obligated to repay.  This EIDL loan is unrelated to the PPP loan, and unlike the PPP loan (which was intended to be used to pay payroll-related expenses), had no limitations to its use and has no connection to the Debtor.

17

until after all Allowed Claims (as defined in the Plan) have been paid, and the current equity holders, through the Plan Sponsor (as defined in the Plan), agreement to infuse up to $8 million (which, together with projected available cash on the Effective Date, equals approximately $10 million) into the Debtor, $1,438,000.00 of which is earmarked as a settlement payment (together with the forgiveness of debt by the Management Company) of any and all purported issues relating to the PPP loans. Accordingly, as part of the Plan, any purported claim, would be offset by any amounts due to the Management Company, and the infusion of new monies, amongst other things. The Debtor submits that the within settlement is fair and reasonable in light of the consideration provided pursuant to the within settlement which more than offsets any purported claim.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest including, but not limited to, the PPP Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate, and holders of Claims and Interests and is fair, equitable, and reasonable.

## 5.    **Current Business Status**

### A.    **Appointment of the Chief Restructuring Officer**

As noted above, the Debtor and the Hotel are back to full operations, and have regularly rented out rooms in excess of 80% capacity. The Hotel's day-to-day operations continue to be run

by the Management Company.  Shortly before the Filing Date, on February 22, 2021, the Debtor appointed David Goldwasser as its Chief Restructuring Officer (the "CRO") to help the Debtor navigate this case and the challenges that arise.  Subsequently, that arrangement was formalized pursuant to that certain Bankruptcy Management Agreement dated April 5, 2021 (the "Bankruptcy Management Agreement") between the Debtor and Mr. Goldwasser's company, G.C. Realty Advisors L.L.C. ("G.C. Realty").  G.C. Realty is a closely held, single-member limited liability company, run by its sole member, Mr. Goldwasser.  In his capacity as the principal and sole member of G.C. Realty, Mr. Goldwasser serves as the CRO through G.C. Realty under the Bankruptcy Management Agreement.

Mr. Goldwasser has been involved in this chapter 11 case since day one.  Mr. Goldwasser helped prepare and signed the chapter 11 petition, submitted the Local Rule Affidavit, and helped prepare and signed each monthly operating report to date as the responsible party.  Indeed, as CRO, Mr. Goldwasser has considerable authority over the Debtor's post-petition operations and restructuring efforts.  Mr. Goldwasser interacts frequently with the Management Company in its operations on behalf of the Hotel, as well as all estate professionals in overseeing the chapter 11 case and currently, in formulating the Debtor's proposed Plan. While the Bankruptcy Management Agreement provides that the CRO shall receive compensation of $15,000.00 per month, to date, no such monthly payments have been made and the Debtor shall seek Bankruptcy Court approval of the same.

### B.    Operations

As noted above, despite the unprecedented effects of the ongoing COVID-19 pandemic, and despite the fact that most hotels in New York City are either still being closed or operating only partially, the Hotel is open and fully operational – *operating profitably and exceeding financial projections*.  For example, in the Debtor's monthly operating report for the period ending

19

July 31, 2021 [Docket No. 91], the Debtor's net operating profit was over $670,000.00, and the Debtor held a cash balance of nearly $1.85 million. Additionally, in June, the Debtor's net operating profit was nearly $550,000.00, and it held a cash balance of over $1.3 million.

On August 11, 2021, in order to clarify its relationship with the Management Company and, in an abundance of caution, to seek authority for certain transfers between the Debtor and Management Company to fund Hotel expenses, the Debtor filed its Motion to Authorize Intercompany Transfers, which specifically detailed the Debtor's cash management system, including Debtor and non-Debtor accounts and certain transfers between them [Docket No. 83] (the "Cash Management Motion"). BSP filed opposition to such, which the Debtor contests. A hearing is scheduled for October 6, 2021 to consider approval of the Cash Management Motion.

As detailed in the Cash Management Motion, the Management Company performs a majority of the Hotel operations pursuant to the Management Agreement, including all relationships with Hotel vendors and employees (who are retained by the Management Company to service the Hotel, but are paid by the Debtor through the Management Company (pursuant to the Cash Management System (as defined and described below)). In particular, the Management Company contracts directly with Hotel vendors for services required and employs approximately eighty (80) full-time employees (and more employees seasonally) dedicated to servicing the Hotel and its guests.[4]

As further detailed in the Cash Management Motion, post-petition adherence to the Management Agreement provides a "business as usual" atmosphere, facilitates the Debtor's stabilization of its business operations, and assists the Debtor in its efforts to reorganize and

---

[4]The Office of the United States Trustee (the "U.S. Trustee") complains that in the Local Rule Affidavit, the Debtor stated that it has eighty (80) employees, but the Cash Management Motion stated that such employees were employed by the Management Company. As detailed above, while these employees are in fact employed by the Management Company, they provide services to the Hotel through the Management Company.

743958897

preserve value. *Cash Management Motion*, ¶ 12. Retention of a hotel manager is common practice in the hospitality industry and this prepetition arrangement of the Debtor was described in the Debtor's Local Rule Affidavit.[5] *See* [Docket No. 8].

Conversely, aborting the Management Agreement and operating the Hotel solely through the Debtor would disrupt relationships with vendors and other key counterparties, all of whom are accustomed to working with the Management Company, as, in the hospitality industry, is standard practice for hotels to work with management companies. *Cash Management Motion*, ¶ 13. In addition, ending the Management Agreement would expose the Debtor and its estate to a range of new liabilities, costs, and general disruption related to the operation of the business, including executing new vendor and employment agreements, as well as event and sales agreements. *Id.*

### C.   Cash Management System

Prior to the Filing Date, in the ordinary course of the Debtor's business, the Debtor and the Management Company employed a cash management system (the "Cash Management System"), as described in the Cash Management Motion, to implement the Management Agreement, and collect, transfer, and disburse funds generated by the Hotel and to cover Hotel expenses paid by the Management Company.

As the Debtor previously advised the U.S. Trustee at the initial debtor interview, the Debtor opened and presently maintains two (2) debtor-in-possession accounts at TD Bank, the last four digits of which are 0935 and 0927, respectively (collectively, the "DIP Accounts"). All revenue from the Debtor's operations is deposited into the main DIP Account (ending in 0935) (the "Central DIP Account").

---

[5]The Debtor's Local Rule Statement states as follows: "The Debtor's day to day operations are managed by a hotel manager which has managed the business through [the receiver's] appointment [in the Foreclosure Action], as directed by the court in the Foreclosure Action. The Debtor intends to maintain the status quo with no change in day-to-day management." *Local Rule Affidavit*, ¶ 38.

In order to pay the vendors and employees retained by the Management Company for services provided to the Hotel, as well as other Hotel expenditures handled by the Management Company, the Management Company maintains three separate non-Debtor accounts at TD Bank, which are affiliated with the DIP Accounts with TD Bank: (i) a general disbursement account, the last four digits of which are 1596 (the "Disbursement Account"); (ii) a payroll account, the last four digits of which are 1603 (the "Payroll Account"); and (iii) a sales tax reserve account, the last four digits of which are 1611 (the "Sales Tax Reserve Account," and together with the Disbursement and Payroll Accounts, collectively, the "Non-Debtor Accounts"). The Management Company opened the Non-Debtor Accounts post-petition, which are dedicated solely to post-petition disbursements made on behalf of the Hotel.

Under the Cash Management System, the Management Company reviews weekly with the Debtor all expenses due for services provided to the Hotel. The Debtor then transfers the exact amount needed to cover such expenses from the Central DIP Account to the Non-Debtor Accounts and the Management Company then disburses payments to the Hotel's vendors and employees, among other parties. The Debtor and the Management Company maintain current records of all transfers made and can readily ascertain, trace, and account for all such intercompany transactions.

In order to provide complete transparency into the Cash Management System and the relationship between the Debtor and the Management Company, relevant bank statements for the DIP Accounts and all three (3) affiliate Non-Debtor Accounts are attached as exhibits to the Debtor's monthly operating reports, which are provided to the U.S. Trustee and to BSP. Each outgoing transfer from the Central DIP Account has a corresponding incoming transfer into one of the Non-Debtor Accounts. In addition to disclosure in the monthly operating reports, the Hotel expenses covered by the intercompany transfers from the Debtor to the Management Company are

also guided by the Debtor's monthly budget attached to the Cash Collateral Motion and approved by the Bankruptcy Court on an interim basis. [Docket Nos. 15, 21, 28, and 52]. Specifically, the budget incorporates the various Hotel expenditures contracted for and paid by the Management Company but funded by the Debtor, including, among other things: (i) salaries and wages; (ii) employee benefits; (iii) contract labor; (iv) equipment, supplies and services; and (v) marketing and promotion. *See* [Docket No. 8].

As such, the Debtor's current Cash Management System represents the ordinary course of business between the Debtor and Management Company, which is the regular market practice in the hotel industry, and which has been in place in the Hotel since its opening in 2017. This system, along with all related accounts and accounts statements, have been fully disclosed by the Debtor through various filings and representations.

### 6.    U.S. Trustee's Motion to Convert or Dismiss

Notwithstanding the Debtor's current profitability and proposed plan for emergence from bankruptcy, the U.S. Trustee filed a motion seeking an order converting the Debtor's chapter 11 case to a forced liquidation under chapter 7 or dismissing the Debtor's chapter 11 case. [Docket No. 87]. The Debtor asserts that such motion is not only contrary to the interests of the Debtor, its estate, and its creditors, but there is absolutely no basis for such extraordinary relief under well-established law.

A party moving for relief under section 1112(b) of the Bankruptcy Code bears the burden of establishing cause by a preponderance of the evidence. Here, the sole basis for cause cited by the U.S. Trustee is the purported "gross mismanagement" of the estate under section 1112(b)(4)(B). As an initial matter, however, such allegation of gross mismanagement is belied by the fact that the Debtor is running a profitable hospitality business during a global pandemic while formulating a chapter 11 plan to reorganize and emerge from chapter 11 protection. Further,

743958897

and notwithstanding , in alleging mismanagement, the U.S. Trustee relies on discreet, technical discrepancies that have no effect on the estate or chapter 11 case, as well as a misunderstanding of the Debtor's Cash Management System discussed above – neither of which can support the extraordinary relief requested here.  The U.S. Trustee's motion has been scheduled for October 6, 2021.  The Debtor intends to file an opposition to the U.S. Trustee's motion, which the Debtor respectfully refers creditors to for a more detailed recitation of the details.

## IV.    CLAIMS

**In accordance with Bankruptcy Rule 3003(c)(3), the Bankruptcy Court fixed July 15, 2021 (the "Bar Date") as the last day by which general creditors would be permitted to file claims in the Debtor's chapter 11 case, and August 22, 2021 as the last day for governmental units to file claims in the Debtor's chapter 11 case (the "Governmental Bar Date").**Pursuant to Bankruptcy Rule 3003(c)(2), any creditor whose claim had not been scheduled by the Debtor or was scheduled as disputed, contingent, or unliquidated and has failed to file a proof of claim on or before the Bar Date or the Governmental Bar Date, as the case may be, is deemed not to be a creditor with respect to such claim for purposes of voting on and receiving a distribution under the Plan.

In addition to the creditors' claims scheduled by the Debtor, ten claimants filed claims against the Debtor by the Bar Date and Governmental Bar Date totaling $111,057,525.27, of which $90,354,075.79 were filed as secured, and some of these claims are disputed, which are summarized in the chart below:

743958897

| # | Claimant | Amount | Amount Secured | Amount Priority | Basis |
|---|---|---|---|---|---|
| 1 | Zurich Am. Ins. Co. | $1 | 0 | 0 | Unliquidated obligations under insurance policies |
| 2 | NYC Water Board | $100,522.64 | $100,522.64 | 0 | Water service; statutory lien |
| 3 | Cohen & Gresser | $798,807.20 | 0 | 0 | Legal services |
| 4 | NBE Plumbing Corp. | $103,048.62 | $103,048.62 | 0 | Plumbing services; mechanic's liens |
| 5 | Grandfield Realty Corp | $7,904,641.28 | 0 | 0 | Property damage and related damages (NY case 507323/2014) |
| 6 | Gerson Mencia | $8,000,000 | 0 | 0 | Personal injury |
| 7 | Philip Guarino | unknown | | | Personal injury |
| 8 | BSP | $89,543,755.49 | $89,543,755.49 | 0 | Loan plus interest, fees, and protective advances |
| 9 | OES-Williamsburg Hotel LLC | $4 million | | 0 | Breach of operating agreement of 96 Wythe Holdings LLC (one of two topcos); asserts mortgage lien |
| 10 | NYC Dept. of Finance | $606,749.04 | $606,749.04 | 0 | Real property taxes |
| | Totals | $111,057,525.27 | $90,354,075.79 | $0 | |

743958897

## V.    THE PLAN OF REORGANIZATION[6]

**THIS SECTION OF THIS DISCLOSURE STATEMENT PRESENTS ONLY A SUMMARY OF THE PLAN OF REORGANIZATION, WHICH IS ATTACHED HERETO AS EXHIBIT A.    CREDITORS ARE URGED TO CONSULT WITH COUNSEL IN ORDER TO DETERMINE WHETHER TO VOTE FOR OR AGAINST THE PLAN**.

The Plan will be implemented by and through a cash infusion in the amount of $8 million to be contributed from the Plan Sponsor, of which $1,438,000.00 million will be allocated for the PPP Settlement, as well as cash on hand, which the Debtor projects will aggregate approximately $2 million upon the Effective for a total available cash upon the Effective Date projected at about $10 million.  It should be noted that the amount of cash on hand from operations upon the Effective Date may be higher or lower than the $2 million projected, but this will not impact the Plan going Effective.  The Reorganized Debtor will continue to operate from and after the Effective Date. The Plan Sponsor's cash infusion and the income generated by the Reorganized Debtor's operations will be used to fund operating expenses and to pay the amounts necessary to fund the Plan payments.  The Plan Sponsor shall designate the managing member of the Debtor upon the Effective Date.

The Debtor believes that the Plan will provide all holders of claims against the Debtor with a greater recovery than would be available if all of the assets and interests of the Debtor were liquidated in a case under chapter 7 of the Bankruptcy Code and distributed by a chapter 7 trustee in accordance with the statutory scheme and priorities contained in the Bankruptcy Code. A liquidation analysis is attached hereto as **Exhibit B**.

---

[6]Capitalized terms used but not defined in this summary of the Plan shall have the meanings given to such terms as set forth in the Plan.

743958897

1.    **Classification of Claims**

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released, or otherwise satisfied or dealt with prior to the Effective Date.

The term "impaired" as used below shall have the same meaning it has pursuant to section 1124 of the Bankruptcy Code.  Thus, a Class of Claims is impaired under the Debtor's Plan unless, with respect to each and every Claim in the Class, the holder of such Claim receives, on the Effective Date of the Plan, the total allowed amount of such Claim in cash or the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder thereof.

2.    **Unclassified Claims/Administrative Claims**

Administrative Claims are not classified under the Plan.  Administrative Claims are Allowed Claims against the Debtor for any costs or expenses of the Reorganization Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including all actual and necessary expenses of preservation of the Debtor's Estate.  Such Allowed Administrative Claims are to be paid in full (to the extent not already paid during the Reorganization Case), in cash on the later of: (i) the Effective Date; (ii) the date such Claim becomes Allowed; and (iii) such other date and upon such other terms as may be agreed upon by the holder of such Claim and the Debtor, or as ordered by the Bankruptcy Court.

All requests for payment of Administrative Claims that accrued out of the ordinary course of business during the Administrative Period shall be filed and served on the Debtor's Attorneys

not later than thirty (30) calendar days after notice of the Confirmation Date, with the exception

of the Administrative Claims of Professional Persons retained pursuant to order of the Bankruptcy

Court, which are subject to Court approval after notice and hearing and shall be paid by the Debtor

and/or the Reorganized Debtor on or before the Effective Date or as otherwise ordered by the

Bankruptcy Court.   Notwithstanding anything in the Plan to the contrary, objections to such

requests shall be filed and served within sixty (60) calendar days after filing of each such request.

Except as specified above, all Allowed Administrative Claims shall receive cash from the

Reorganized Debtor in the amount of such Allowed Administrative Claim on the later of (i) the

Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative

Claim, or at such other date and upon such other terms as may be agreed upon the holder of the

Allowed Administrative Claims and the Debtor or ordered by the Bankruptcy Court.

Any Allowed Administrative Claim based on a liability incurred by the Debtor in the

ordinary course of business during the Reorganization Case may be paid in the ordinary course of

business in accordance with the terms and conditions of any agreement relating thereto, and any

Allowed Administrative Claim may be paid on such other terms as may be agreed on between the

holder of such Allowed Administrative Claim and the Debtor.

### 3.    Priority Tax Claims

Priority Tax Claims are not classified under the Plan.  Unless otherwise agreed to by the

Debtor and a holder of an Allowed Priority Tax Claim, such Allowed Claims will be paid 100%

of the amount of their Allowed Claim in equal deferred cash payments on a quarterly basis,

beginning on the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed

Claim.  In either case:  (x) payments will take place over the period of six (6) years, measured from

the date of the assessment of such taxes or, if there has been no assessment, from the Filing Date

(such period, the "Priority Tax Payment Period"); (y) with interest at a rate equal to 5% per annum;

743958897

(z) in equal installments sufficient to fully amortize the balance of such Claim over a period beginning on the Effective date and ending on the last day of the Priority Tax Payment Period.; *provided*, *however*, that the Debtor reserves the right to pay any Allowed Priority Tax Claim, or any remaining balance thereof, in full at any time on or after the Effective Date without premium or penalty; *provided*, *further*, that no holder of an Allowed Priority Tax Claim shall be entitled to any payment on account of any pre-Effective Date interest arising after the Filing Date with respect to or in connection with such Allowed Claim.

4.      **Professional Fee Claims**

Professional Fee Claims are not classified under the Plan.  Any Professional Person seeking allowance of a Professional Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date.  Any objections to such Professional Fee Claims must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

All Professional Persons seeking allowance by the Bankruptcy Court of a Professional Fee Claim shall be paid in full in cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such Professional Fee Claim and the Reorganized Debtor.  On the Effective Date, to the extent known, the Reorganized Debtor shall reserve and hold in a segregated account cash in an amount equal to all accrued but unpaid Professional Fee Claims as of the Effective Date, which cash shall be disbursed

29

solely to the holders of Allowed Professional Fee Claims with the remainder to be reserved until all Professional Fee Claims have been either Allowed and paid in full or disallowed by a Final Order, at which time any remaining cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtor.  All post-Confirmation Professional Fees and expenses for services rendered by the Professional Persons in connection with the Reorganization Case and the Plan shall be paid in the ordinary course by the Debtor or the Reorganized Debtor, as the case may be.

**5.    U.S. Trustee Fees**

The Debtor or Reorganized Debtor, as applicable, shall pay all outstanding U.S. Trustee Fees of the Debtor on an ongoing basis on the date such U.S. Trustee Fees become due and payable, until such time as a final decree is entered closing the Reorganization Case, the Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

**6.    Classified Claims**

The Plan provides for the division of claims into separate classes as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Claims | No | No (deemed to accept) |
| Class 2 | BSP Claims | Yes | Yes |
| Class 3 | Secured Property Tax Claims | Yes | Yes |
| Class 4 | Secured M&M Claims | Yes | Yes |
| Class 5 | Unsecured Claims | Yes | Yes |
| Class 6 | Subordinated Claims | Yes | No (deemed to reject) |
| Class 7 | Equity Interests | Yes | No (insiders) |

743958897

### A.    Class 1 — Priority Claims

Priority Claims are Allowed Priority Claims excluding Priority Tax Claims.  Class 1 Priority Claims are unimpaired under the Plan.  Unless otherwise agreed by the Debtor and such Claimant, each holder of a Class 1 Allowed Priority Claims shall be paid in cash, in full on the applicable distribution date.

### B.    Class 2 — BSP Claims

Class 2 Secured Claim includes the Allowed Claim of BSP, which is impaired under the Plan.  The BSP Undisputed Claim shall be allowed in the amount of $70.7 million.  The Debtor disputes the balance of any claims held by BSP, including the BSP Disputed Claim, and such claims shall be subject to subordination, disallowance, expungement, dismissal, and/or further agreement by and between the Debtor and BSP.

With respect to the BSP Undisputed Claim, subject to the Reorganized Debtor's right to pre-pay all or part of the BSP Undisputed Claim (and any portion of the BSP Disputed Claim that becomes an Allowed Claim) at any time without penalty, the BSP Undisputed Claim shall be paid in full, together with interest to be paid as follows: (i) the Reorganized Debtor shall pay BSP equal monthly payments of interest only at a rate of 4.5% per annum commencing on the Effective Date for four (4) years; (ii) commencing on the fourth (4th) anniversary of the Effective Date, the Reorganized Debtor shall pay interest at a rate of 5% per annum for an additional two (2) years; and (iii) on the sixth (6th) anniversary of the Effective Date, the Reorganized Debtor shall make a final payment consisting of the balance of the BSP Undisputed Claim.  In addition, on the Effective Date, the Reorganized Debtor shall (a) contribute $3 million into an interest account to serve as the Interest Reserve for the Reorganized Debtor's payments on account of the BSP Undisputed Claim, which such account shall be established at a third-party bank selected by the Debtor in its sole discretion and drawn on by the Reorganized Debtor to pay BSP interest payments in full or

31

partially in the event that the Reorganized Debtor has not paid the required monthly interest payment in full or partially by the twentieth (20th ) of the month when such payment becomes due; and (b) pre-pay BSP the first two (2) monthly interest payments required to be paid under clause (i) above, such that on the Effective Date, the Reorganized Debtor shall pay BSP a total of the first two (2) monthly interest payments as provided hereunder.

With respect to the BSP Disputed Claim, upon a Final Order adjudicating the BSP Disputed Claim or by written agreement between the Debtor or Reorganized Debtor (as applicable) and BSP, and subject to the Debtor's right to seek an estimation of such claim pursuant to section 502(c) of the Bankruptcy Code, the Debtor shall make additional distributions to BSP as follows:  (i) in the event that amounts due to BSP are adjudicated by Final Order or by written agreement between the Debtor or Reorganized Debtor (as applicable) and BSP to be in an amount that exceeds the BSP Undisputed Claim amount and if the BSP Disputed Claim is not subject to subordination, such additional Allowed Claim amounts shall receive the funds in the Interest Disputed Claim Reserve corresponding to the interest payments otherwise payable on account of any such additional Allowed Claim amount, with ongoing interest payments from the time of such adjudication to be paid pursuant to the treatment of the BSP Undisputed Claim; and (ii) any excess amounts held in the Interest Disputed Claim Reserve above the amounts required for distributions to BSP under the Plan and as provided herein, shall be released to the Reorganized Debtor, free and clear of any liens, claims, and encumbrances.

Subject to the Debtor's right to seek an estimation of the BSP Disputed Claim, any payments otherwise due to BSP on account of the BSP Disputed Claim shall be paid into the Interest Disputed Claim Reserve, concurrently with the payment of distributions to BSP on account of the BSP Undisputed Claim, and shall be subject to further Bankruptcy Court determination with

743958897

respect to the allowance of the BSP Disputed Claim.  Except as provided for in the Plan, which

shall control in all respects, including with regard to payment terms, default terms, or any terms

on pre-payment or refinance, all terms of the Loan Agreement and related documents that cover

the BSP Claims and collateral securing the BSP Claims shall apply.

### C.    Class 3 — Secured Property Tax Claims

Class 3 Secured Property Tax Claims includes the Allowed Secured Property Tax Claims,

which Claims are impaired under the Plan.  The Debtor has identified one (1) Secured Property

Tax Claim filed by one (1) holder in the amount of $3,092,874.62.  Unless otherwise agreed to by

the Debtor and a holder of an Allowed Secured Property Tax Claim, the Reorganized Debtor shall

assume that certain Property Payment Plan as between the Debtor and the relevant Taxing

Authority with respect to the payment of real estate taxes.  The Reorganized Debtor shall pay such

amounts as provided for under the Property Payment Plan.  Liens shall continue with the same

force and effect until such Allowed Secured Property Tax Claim has been paid in full as provided

under the Plan.  The Reorganized Debtor shall retain the Hotel and any other property that secures

any such Claim.

### D.    Class 4 — Secured M&M Claims

Class 4 Secured M&M Claims include Allowed Claims held by M&Ms.  Class 4 Priority

Claims are impaired under the Plan.  The Debtor has identified three (3) Secured M&M Claims

asserted by three (3) holders in the aggregate amount of approximately $353,306.00.[7]  Unless

otherwise agreed to by the Debtor and such holder of an Allowed Secured M&M Claim, the

Reorganized Debtor shall pay Allowed Secured M&M Claims 100% of the value of such Claim

as follows:  25% thirty (30) days after the Effective Date, with the balance to be paid in three (3)

---

[7]The Debtor reserves the right to object to any disputed amounts of these asserted Claims in either whole or part.

installments of 25% each on the first, second and third anniversary of the Effective Date, which installment payments shall accrue interest at a rate of 5% per annum.  Liens shall continue with respect to any Allowed Secured M&M Claim, with the same force and effect until such Allowed Secured M&M Claim has been paid in full as provided under the Plan. The Reorganized Debtor shall retain the Hotel and any other property that secures any such Claim.

### E.    Class 5 — Unsecured Claims

Class 5 includes all Allowed Unsecured Claims, which Claims are impaired under the Plan. The Debtor has identified approximately forty-one (41) Unsecured Claims, which it estimates aggregate between $1,970,936 to $2,570,936.00, subject to final reconciliation (the "Undisputed Unsecured Claim Amount").[8]  The Debtor will fund a pot plan in an amount of the Undisputed Claim Amount, through deferred payments in five (5) equal installments as provided below.  Such funds will be paid by the Debtor or Reorganized Debtor, as the case may be, on or before the date upon which deferred distributions are due to holders of Allowed Unsecured Claims.  Unless otherwise agreed by the Debtor and such Claimant, each holder of an Allowed Unsecured Claim will receive a pro rata distribution funded from the Undisputed Claim Amount in five (5) equal annual pro rata installment payments with interest at a rate of 5% per annum, commencing with the first pro-rata payment thirty (30) days after the Effective Date, and four (4) remaining pro rata installment payments each being due on the first, second, third and fourth anniversaries of the Effective Date.  To the extent Allowed Unsecured Claims aggregate the Undisputed Unsecured Claim Amount, such holder will be paid in full with interest as provided for in the Plan.  If Allowed Unsecured Claims exceed the Undisputed Unsecured Claim Amount, such holders will receive a pro rata distribution against the Undisputed Unsecured Claim Amount.

---

[8]This approximate amount excludes those Claims to which the Debtor disputes, and the Debtor reserves the right to object to any disputed amounts of these asserted Claims in either whole or part.

Although the Debtor's estimate of Allowed Unsecured Claims is generally the result of the Debtor's and its advisors' analysis of reasonably available information, the projected amount of Allowed Unsecured Claims set forth herein is subject to change (either higher or lower), which difference could affect Class 5 recoveries. Finally, the Debtor may object to certain proofs of Claim, and any such objections ultimately could cause the total amount of Allowed Unsecured Claims to change.  These changes could affect recoveries to holders of Allowed Unsecured Claims.

### F.    Class 6 — Subordinated Claims

Class 6 includes all Allowed Subordinated Claims, which are impaired under the Plan. Unless otherwise agreed by the Debtor and such claimant, holders of Allowed Subordinated Claims will be subordinated to Allowed Unsecured Claims and will not receive any distribution under the Plan.

### G.    Class 7 — Equity Interests

All Equity Interests will be cancelled, and the Plan Sponsor will be issued new Interests in the Reorganized Debtor, constituting of 100% ownership of the Reorganized Debtor.  In exchange for its Interests in the Reorganized Debtor and as a contribution (and as part of settlement of the PPP loans matter), the Plan Sponsor will contribute $8 million, $6.562 million of which as capital to the Reorganized Debtor.  The Plan Sponsor agrees that the Mezz Lender shall receive new Interests in the Reorganized Debtor, which new Interests shall be junior to the new Interests issued to the Plan Sponsor and to any sources of new equity provided to the Reorganized Debtor as part of the Plan.  The Mezz Lender will be paid from excess proceeds, if any, upon sale and/or refinance after payment of all Claims under the Plan and expressly as agreed by the Plan Sponsor and the Reorganized Debtor.  The Mezz Lender shall have no voting or approval rights in the Reorganized Debtor, nor hold any position of control over or have any Claims and/or rights against the Debtor, the Reorganized Debtor, and/or any of their respective assets.

743958897

7.      **Payment of Allowed Claims**

Payment is to be made only to those holders of Allowed Claims of the various Classes.

Notwithstanding anything to the contrary in the Plan, the Debtor may pre-pay all or part of any

Class of obligations under the Plan without penalty, at any time.

8.      **Objection to Claims**

The Debtor may file objections to claims of record in order to correct erroneous or

duplicative amounts or for any other reason that in its business judgment would be appropriate.

>       i.      General Procedures:  Unless another date is provided for in the Plan
>       or by the Bankruptcy Court, on or before sixty (60) days after entry of the
>       Confirmation Order, the Debtor and/or the Reorganized Debtor may file with the
>       Bankruptcy Court objections to Claims, including objections to the amount and
>       classification thereof, except Claims previously allowed by a Final Order, and shall
>       serve a copy of such objection upon the holder of the Claim to which such objection
>       pertains.  The resolution of any such objection shall be governed by the Bankruptcy
>       Code, the Bankruptcy Rules, and such provisions as may be established by the
>       Bankruptcy Court, or by the procedural rules of the court in which such objection
>       is to be litigated.  Any Claim as to which an objection is not timely filed in
>       accordance with the provisions of the Plan or orders of the Bankruptcy Court and
>       to which the Debtor's time to interpose objection has expired, shall be an Allowed
>       Claim, except that any Claim scheduled as disputed to which no proof of claim has
>       been filed shall be deemed disallowed and is expunged.  Notwithstanding the
>       foregoing, the Debtor shall have the right to enter into any settlement with respect
>       to any Claim for an amount equal to or less than $300,000.00 without further
>       approval of the Bankruptcy Court.
>
>       ii.      Prosecution of Objections: Unless otherwise ordered by the
>       Bankruptcy Court, the Debtor and/or the Reorganized Debtor shall litigate its
>       objections to Claims to judgment or settlement, or withdraw the objection at its sole
>       and absolute discretion.

9.      **Disputed Claims Reserve**

The Debtor shall establish reserves for the benefit of a Disputed Claim, including the BSP

Disputed Claim, consisting of the Interest Disputed Claim Reserve (as defined in the Plan) or cash

in an amount equal to the pro rata share of distributions that would have been made to the holder

of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of:  (a) the

liquidated amount set forth in the filed proof of Claim relating to such Disputed Claims or if no proof of Claim has been filed the liquidated amount set forth in the Schedules; (b) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as consisting and representing the maximum amount in which such Claim may ultimately become Allowed Claim; and (c) such other amount as may be agreed upon by the holder of such Claim and the Debtor.

At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgement of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order or the effective date of the relevant agreement between the Debtor and the holder of the applicable Disputed Claim. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim, including the BSP Disputed Claim, pending the entire resolution thereof by Final Order or agreement between the Debtor and the holder of the applicable Disputed Claim.

10. **Setoffs**

The Debtor shall have the right to set off against any payment to be made pursuant to the Plan to a Claimant, including BSP, claims of any nature whatsoever that the Debtor may have or have had, against the holder of such Claim including, but not limited to, judgments obtained pursuant to sections 547 and 548 of the Bankruptcy Code, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that it may have or have had against any such Claimant.

743958897

11.    **Unclaimed Cash**

In the event any Claimant fails to claim any distribution within three (3) months from the date of such distribution, by failing to present such distribution check for payment to the Debtor's bank, such Claimant shall forfeit all rights thereto.  Thereafter the distribution formerly available to the Claimant shall become the property of the Reorganized Debtor, and such Claimant shall have no further rights to share in any subsequent distributions which may be made.

For purposes of mailing distribution checks, the Debtor may rely on the addresses for holders of Allowed Claims as set forth in the Schedules unless superseded by the address for such holders set forth in the proofs of Claim filed by Claimants with the Bankruptcy Court.  If no proofs of Claim are filed and the Schedules filed by the Debtor fail to furnish valid addresses for holders of Allowed Claims, such Allowed Claims shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code at the expiration of the later of (a) six (6) months from the entry of the Confirmation Order and (b) three (3) months after an initial distribution is made to that Claimant and shall be returned to the Reorganized Debtor.

12.    **Fee Applications by Professionals**

An application for Professional Fees for services rendered by the Professional Persons in the Reorganization Case and the Plan up to and including the Confirmation Date shall be filed with the Bankruptcy Court and paid in accordance with the Plan or as otherwise ordered by the Bankruptcy Court. All Professional Fees and post-Confirmation expenses for services rendered by the Professional Persons in connection with the Reorganization Case and the Plan incurred after the Confirmation Date shall be paid in the ordinary course by the Debtor or the Reorganized Debtor, as the case may be.

743958897

13.    **Conditions to the Effective Date**

In order for the Plan to be deemed effective, the following events must occur:

  i.      the Disclosure Statement shall have been approved;

  ii.     there shall not have occurred a Force Majeure Event;

  iii.    entry of a Confirmation Order; and

  iv.     the Confirmation Order becoming a Final Order.

14.    **Period Prior to Effective Date**

During the period between the Confirmation Date and the Effective Date, the Debtor shall continue to exercise ownership and control of all Assets and property of its Estate (including the Hotel).

15.    **Consummation of Plan**

The Debtor anticipates that the Plan will be substantially consummated upon the commencement of distributions under the Plan on the Effective Date in accordance with section 1101(2)(C) of the Bankruptcy Code. The Plan is to be implemented in a manner consistent with section 1123 of the Bankruptcy Code. In addition, pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtor or the Reorganized Debtor, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. On or before the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, may file with the Bankruptcy Court any and all agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of the Plan and may execute such documents without the need for any further approvals, authorizations, or consents. There shall be no modification or stay of the Confirmation Order or entry of other court order prohibiting the transactions contemplated hereunder from being consummated.

16.    **Source of Distributions**

The Plan will be implemented by and through proceeds of the cash from the Plan Sponsor and from the Debtor's cash on hand upon the Effective Date. The Reorganized Debtor will continue to operate from and after the Effective Date. The Plan Sponsor's cash infusion and the income generated by the Debtor's and the Reorganized Debtor's operations will be used to fund operating expenses  and to pay the amounts necessary to fund the Plan payments. The Plan Sponsor shall designate the managing member of the Debtor upon the Effective Date.

The predicate for the Plan is to recapitalize the Debtor's business, to allow the Debtor to emerge from chapter 11, while preserving the going concern value of the Hotel (which is significantly greater than in a forced liquidation). The Debtor's proposed Plan would greatly benefit not only the Debtor, but all creditors, including the mechanics and materialmen and general unsecured creditors who would otherwise likely be wiped out by a forced liquidation. Further, while not a requirement under the Plan, the Debtor also intends to work with the assistance of financial advisors once the hospitality market has stabilized, to assist in raising additional capital and/or debt to pay off BSP's Allowed Claim. Under the Plan, the Debtor reserves its right to prepay BPS without penalty in this regard.

17.    **Vesting of Assets in Post-Confirmation Debtor**

As of the Confirmation Date, pursuant to the provisions of sections 1141(b) and (c) of the Bankruptcy Code, all property, assets, and effects of the Debtor (including the Hotel) shall vest in the Reorganized Debtor free and clear of all Claims and Interests except as otherwise expressly provided in the Plan.

18.    **Confirmation Order**

The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan is valid and enforceable pursuant to its terms. If any provisions of the Plan

are prohibited by the Bankruptcy Code, the Debtor reserves the right to sever such provisions from the Plan and to request that the Plan, as so modified, be confirmed.

### 19. Assumption and/or Rejection of Executory Contracts

Subject to the provisions of Section 5.7 of the Plan and with the exception of the Management Agreement and the Property Payment Plan, all executory contracts and unexpired leases, not previously assumed or rejected by the Debtor pursuant to an order entered by the Bankruptcy Court, and not terminated by their own terms, shall be deemed rejected as of the Effective Date under the Plan pursuant to section 365 of the Bankruptcy Code. The Property Payment Plan shall be assumed by the Debtor and the Management Agreement shall be assumed by the Reorganized Debtor as expressly modified hereunder to provide for the deferral of pre-Effective Date fees and extended through the date of the Final Distribution under the Plan. The Management Company will be paid a fee of 3% of the gross revenues collected from operation of the Hotel on and after the Effective Date as provided for under the Management Agreement. Any amounts or fees due to the Management Company under the Management Agreement through the Effective Date shall be deferred and shall not be paid under the Plan until after payment of all other Allowed Claims and Interests hereunder.

Any Claim arising from the rejection of any executory contract or unexpired lease hereunder shall be filed with the Bankruptcy Court on or before the thirtieth (30th) calendar day after the Effective Date, or any counterparty to such executory contract or unexpired lease shall be forever barred from receiving any distribution under the Plan. Objections to any such claim(s) shall be filed by the Debtor not later than sixty (60) days after the filing of such claim(s) and the Bankruptcy Court shall determine any such objection. Any Claims arising from the rejection of an executory contract or unexpired lease shall, to the extent Allowed, be treated as a Class 5 Unsecured Claim or a Class 6 Subordinated Claim, as appropriate with respect to such Claim.

41

20.  **Full and Final Satisfaction**

All payments, distributions, and transfers of cash and property under the Plan are in full and final satisfaction, settlement, release, and discharge of all Claims against the Debtor or of any nature whatsoever. Notwithstanding anything contained in the Plan to the contrary, the Confirmation Order shall discharge the Debtor from any debt that arose prior to the Confirmation Date, and any debt of a kind specified in sections 502(g) and 502(i) of the Bankruptcy Code. Under no circumstances shall any additional consideration be payable by the Debtor to holders of any such Claims other than as expressly provided under the Plan.

21.  **Releases**

**As an integral part and in consideration of the settlement and treatment of Claims and Interests under the Plan, any Persons and holders of any Claims or Interests that received actual or constructive notice of the Plan shall be and are permanently enjoined and precluded from asserting, commencing, or continuing in any manner any actions or from asserting any lien against the Debtor and the Released Parties, and against any of such parties' respective assets or properties, with respect to any debt, Claim, or interest including any guarantee by any of the Released Parties based upon any document, instrument or act, omission, transaction, or other activity of any kind or nature arising out of, based upon, or in any way related to, the conduct, actions, and transactions of the Debtor through the Confirmation Date.**

22.  **Term of Injunctions or Stays**

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Reorganization Case under sections 105 or 362 of the Bankruptcy Code or otherwise, shall remain in full force and effect through and inclusive of the Effective Date.**

42

23. **Exculpation**

**Neither the Debtor nor any of the Released Parties shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the Reorganization Case, the Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan other than for conduct which constitutes gross negligence, willful misconduct, or a violation of the criminal, tax, environmental, and antitrust laws of the United States**.

24. **Preservation of Claims and Causes of Action for the Estate**

After review of the Debtor's relevant books and records, the Debtor has determined that it may commence any causes of action pursuant to (a) sections 502, 542, 544, 545, 546, 550, and 553 of the Bankruptcy Code; (b) any preference claims pursuant to section 547 of the Bankruptcy Code; (c) any fraudulent transfer claims pursuant to section 548 of the Bankruptcy Code; (d) any claims relating to post-petition transactions pursuant to section 549 of the Bankruptcy Code; or (e) any prepetition and post-petition Claims arising under applicable state law. All of the Debtor's rights, Claims, and causes of action shall be, and hereby are, preserved, transferred and assigned to the Reorganized Debtor as of the Effective Date of the Plan, including, but not limited to, any and all Claims against BSP.

25. **Miscellaneous**

All fees payable under 28 U.S.C. §1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, shall be paid on or before the Effective Date. Prior to entry of a final decree, any Post-Confirmation Expenses shall be paid by the Reorganized Debtor. The Debtor will continue to file operating reports until such time as a final decree is issued.

26.     **Modification of the Plan**

The Debtor reserves its right to modify, revoke, or withdraw the Plan at any time prior to the date of the entry of the Confirmation Order, except as provided in the Plan. After the date of the Confirmation Order, the Debtor may, without approval of the Bankruptcy Court, remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan so long as it does not materially or adversely affect Claimants.

## VI.     **MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR REJECTED**

This Disclosure Statement has been approved by an order of the Bankruptcy Court dated [_____], 2021 as containing information of a kind and in sufficient detail that will enable holders of Claims to make an informed decision about the Plan. Accordingly, this Disclosure Statement is being used in connection with the solicitation of acceptances of the Plan from those Classes entitled to vote on confirmation.

In order for the Plan to be confirmed, various statutory conditions prescribed by the Bankruptcy Code must be satisfied, including: (a) acceptance of the Plan by at least one (1) impaired Class entitled to vote on the Plan; (b) provision for payment or distribution under the Plan to each creditor of money and/or other property at least equal in value to what that creditor would have received in a chapter 7 liquidation of the Debtor; (c) a finding by the Bankruptcy Court that the Plan is feasible; and (d) with respect to each Class, either acceptance by that Class or a finding by the Bankruptcy Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against that Class.

1.     **Who May Vote**

Only Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan. Generally, section 1124 of the Bankruptcy Code provides that a class of claims or interests

44

743958897

is considered impaired unless the allowed amount of class is paid in full upon consummation of the plan or a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest.  In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of a debtor or the commencement of a chapter 11 case, have been cured and the holders of claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance on any contractual provisions or applicable law to demand accelerated payment.

The Claims and Interests of creditors in Classes 2, 3, 4, 5, 6, and 7 are impaired by the Plan, and therefore the holders of Claims in such Classes (except for Classes 6 and 7, as discussed below) are entitled to vote to accept or reject the Plan.  The Claims in Class 6 will not receive any distribution, and are therefore deemed to reject the Plan.  The Interests in Class 7 will be cancelled under the Plan, and the Plan Sponsor will be issued new Interests in the Reorganized Debtor, constituting 100% ownership of the Reorganized Debtor.  As such, holders of Class 7 Interests will not vote on the Plan.  Thus, only the holders of claims in Classes 2, 3, 4, and 5 are entitled to vote to accept or reject the Plan.

A creditor is entitled to vote only if either:  (i) its Claim has been scheduled by the Debtor as not disputed, contingent, or unliquidated; or (ii) it has filed a proof of claim on or before the Bar Date established by the Bankruptcy Court and no objection to such Claim is pending.

ANY HOLDER OF A CLAIM AS TO WHICH AN OBJECTION IS PENDING IS NOT ENTITLED TO VOTE IN RESPECT OF SUCH CLAIM UNLESS THE CREDITOR HAS OBTAINED AN ORDER OF THE BANKRUPTCY COURT TEMPORARILY ALLOWING THE CLAIM FOR THE PURPOSE OF VOTING ON THE PLAN.  A CREDITOR'S VOTE MAY BE DISREGARDED IF THE BANKRUPTCY COURT DETERMINES THAT SUCH

743958897

ACCEPTANCE OR REJECTION WAS NOT SOLICITED OR PROCURED IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

2.      **Voting Procedures**

A.      **Solicitation Period**

In order to be counted, a ballot must be RECEIVED at the following address no later than 4:00 p.m. (prevailing Eastern time), on November 23, 2021:

> MAYER BROWN LLP
> Attorneys for 96 Wythe Acquisition LLC
> Debtor and Debtor in Possession
> 1221 Avenue of the Americas
> New York, New York 10020
> Attention:    Douglas Spelfogel, Leah Eisenberg,
>                      Jason I. Kirschner, Dabin Chung.

B.      **Ballots**

A ballot is enclosed herewith for each holder of a Claim eligible to vote on the Plan, which will serve as the ballot for indicating acceptance or rejection of the Plan pursuant to the requirements of sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018(c).

3.      **Confirmation of the Plan**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

A.      **Confirmation Hearing**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Bankruptcy Court has scheduled the confirmation hearing for December 13, 2021, at 10:00 a.m. (scheduling subject to final confirmation) in Judge Drain's Courtroom, located at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether such party is entitled to vote.

46

### B.      Objections to Confirmation

The Bankruptcy Court has directed that, on or before 4:00 p.m. (prevailing Eastern Time) on December 6, 2021, any objections to the Plan are required to be in writing and filed with the Bankruptcy Court, and a copy served upon the U.S. Trustee and counsel for the Debtor.  The Bankruptcy Court will schedule a hearing to consider objections to confirmation of the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.  While the Debtor anticipates that any hearing to consider objections to the confirmation of the Plan will be held in conjunction with the Confirmation Hearing, there can be no assurance that such will be the case.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT**.

### 4.      Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(b) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court may enter an order confirming the Plan.   These requirements include the following:

### A.      Best Interests Test

Confirmation of the Plan requires that with respect to each impaired Class of Creditors, each holder of an Allowed Claim in such Class has either accepted the Plan or will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount the holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  It is the Debtor's belief that creditors will receive a greater distributions pursuant to the Plan than through

a liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. In this regard, the Debtor believes that a forced fire sale of the Hotel in the current market will severely undermine any chance of preserving and maximizing the value of the Hotel, in particular, given the continuing adverse impact on the hospitality industry as a whole and the Hotel herein, which has only recently started to rebound. This, coupled with the BSP Claim, which BSP asserts is secured by all of the assets of the Hotel, and the unnecessary added administrative cost given the fees due to a trustee under chapter 7 of the Bankruptcy Code, which must be paid before any other unsecured or priority Claim under the Bankruptcy Code, would result in less available assets for creditors than under the Plan, which provides for 100% distributions to Allowed Secured Property Tax Claims, 100% distributions to Allowed M&M Claims, and up to 100% distributions to Allowed Unsecured Claims over time. A copy of the Debtor's liquidation analysis is attached hereto as **Exhibit B**.

### B.    Feasibility of the Plan

In order for the Plan to be confirmed, the Bankruptcy Court must determine that it is feasible; i.e., that as a practical matter, there are sufficient resources to meet the obligations under the Plan on a timely basis.

In this regard, as stated above, the funds necessary to effectuate the Plan will be derived from cash flow from the Debtor and the Reorganized Debtor and the proceeds of the cash provided by the Plan Sponsor. The Reorganized Debtor will continue to operate from and after the Effective Date. Annexed hereto as **Exhibit C** are (a) projections prepared by the Debtor and reviewed by Getzler Henrich and Hilco Real Estate, the Debtor's financial advisors, which provide that the cash flow from the Reorganized Debtor, cash on hand, and reserves, are sufficient to cover the debt service to BSP and to pay the deferred payments under the Plan and (b) payments under the Plan. In addition, annexed hereto as **Exhibit D** is a letter of intent from the Plan Sponsor, with respect to the cash infusion of $8 million, which will be fully funded on or before the Effective Date. The

48

Plan Sponsor's cash infusion and the income generated by the Reorganized Debtor's operations will be used to fund operating expenses and to pay the amounts necessary to fund the Plan payments. The Debtor also submits that on a reorganized basis, there is a significant equity cushion in the Hotel. As set forth above, the Debtor retained Leitner Berman to provide an appraisal of the Hotel on an "as is" market value basis, which appraisal values the Hotel at approximately $113 million. In addition, the value of the Hotel would be significantly lower upon a forced liquidation. *See* Liquidation Analysis, **Exhibit B**. The Plan Sponsor shall designate the managing member of the Debtor upon the Effective Date.

### C.     Acceptance by Impaired Classes

Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired Class must accept the Plan by the requisite votes for confirmation to occur. A Class of impaired creditors will have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims actually voting in the Class have accepted it.

### D.     Cramdown

Even though the Plan has not been accepted by all impaired classes, the Plan may nevertheless be confirmed by the Bankruptcy Court pursuant to its "cramdown" powers under section 1129(b) of the Bankruptcy Code if: (i) the Plan is accepted by at least one impaired Class and the Plan meets all of the other requirements of section 1129(a) of the Bankruptcy Code; (ii) the Plan does not discriminate unfairly; and (iii) the Plan is fair and equitable to the rejecting Classes. The Bankruptcy Court must determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any impaired dissenting Class of Claims. A plan will not discriminate unfairly if no class receives more than it is legally entitled to receive for its Claims and Interests. The meaning of the phrase "fair and equitable" is different when applied to secured claims and unsecured claims.

49

With respect to a Secured Claim, "fair and equitable" as applicable herein requires that any such Claim Holder retains their respective lien and receives present value interest on account of any deferred payout, equal to the Allowed amount of such Claim.  With respect to an Unsecured Claim, "fair and equitable" means either:  (x) an impaired unsecured creditor receives property of a value equal to the amount of its Allowed Claim; or (y) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under a plan unless such junior Claim or Interest makes a contribution of sufficient new value under the Plan.

If Claimants do not vote in numbers and amounts sufficient to accept the Plan as proposed, the Debtor will nonetheless seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  At such time the Bankruptcy Court will determine whether, as follows: (1) all of the requirements of section 1129(a) of the Bankruptcy Code have been met; (2) a class of creditors is receiving more than it is legally entitled for its respective Claims; and (3) if applicable, whether a dissenting secured class of creditors has retained their respective lien(s) in the Debtor's Assets and is receiving present value interest on account of any deferred payouts equal to the Allowed Amount of such Claim(s).  The Debtor believes that in a cramdown confirmation, the Plan satisfies the foregoing requirements.

## VII.    TAX CONSEQUENCES OF THE PLAN

Given both the complexity of federal, state, local, and foreign tax laws and the interplay between those tax laws and the Bankruptcy Code, each holder of a Claim should consult with its own tax advisor as to the specific tax consequences to such holder of the confirmation and implementation of the Plan, including the application and effect of federal, state, local, and foreign tax laws.  The Debtor and its attorneys and other advisors make no representations as to the tax consequences of the Plan.

743958897

## VIII.   ALTERNATIVES TO THE PLAN

The alternative to the Plan would be a conversion of the Debtor's case from chapter 11 to chapter 7.  However, as stated above and as shown in the liquidation analysis attached hereto as **Exhibit B**, liquidation under chapter 7 would result in a significant reduction in value given the state of the current hospitality market, and  an additional layer of administrative expenses, including chapter 7 trustee commissions and fees for professionals retained by the chapter 7 trustee, including attorneys, accountants, and brokers.  Pursuant to the provisions of the Bankruptcy Code, these commissions and fees are required to be paid prior to the general unsecured claims.

Based on the anticipated decrease in the value of the Debtor's assets in chapter 7, the significant administrative expenses which would result from a conversion to chapter 7, and given the significant Administrative Claims and Secured Claims, the value of the assets, as detailed above, available to satisfy Allowed Claims will be significantly less in a forced liquidation than a under the instant Plan.  Accordingly, the Debtor believes the Debtor's Plan provides holders of Claims with the best chance of receiving a greater distribution on account of their respective Allowed Claims.

## IX.   RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction of Debtor's case pursuant to and for the purposes set forth in section 1127(b) of the Bankruptcy Code and, inter alia, for the following purposes:

a)       to determine any and all objections to the allowance, classification, and/or valuation of Claims or Interests;

b) to determine any and all applications for compensations and reimbursement of expenses for Professional Fees, Administrative Claims, and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code;

c) to amend or modify the Plan to remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary or advisable to carry out the purpose and intent of the Plan to the extent authorized by the Bankruptcy Code or the Bankruptcy Rules;

d) to determine any and all controversies and disputes arising under or related to the Plan;

e) to construe and enforce any and all provisions of the Plan;

f) to determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases under section 365 of the Bankruptcy Code to which the Debtor is a party or with respect to which it may be liable, and to hear and determine and, if need be, to liquidate, any and all claims arising therefrom;

g) to determine the validity, priority, and extent of liens, Claims and encumbrances upon property of the Estate and to determine any questions and issues regarding title to and interests in any property of the estate and to enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor or the debtor in possession;

h) to determine any and all controversies and disputes arising under or related to any settlement of any Adversary Proceeding or contested matter approved by the Bankruptcy Court, and with respect to prosecution of any Adversary Proceeding

743958897

and/or Contested matter initiated prior to the Effective Date, either before or after the Confirmation Date;

i)    to order the transfer of any Asset of Debtor's estate free and clear of liens, claims and encumbrances, and to effectuate payments under and performance of the provisions of the Plan;

j)    to enforce any and all injunctions created pursuant to the terms of the Plan;

k)    to enter a Final Order or decree in the Debtor's Reorganization Case; and

l)    to determine such other matters as may be provided for in the Plan, Confirmation Order, or as may be authorized under the provisions of the Bankruptcy Code or the Bankruptcy Rules.

## X.    CONCLUSION

This Disclosure Statement was approved by the Bankruptcy Court after a notice and a hearing.  The U.S. Trustee has reviewed the Plan and this Disclosure Statement but is not otherwise responsible for the contents of either document.  The Plan has been negotiated and is proposed by the Debtor.  The Debtor believes that the Plan provides creditors with the best opportunity for recovery upon their Claims, and accordingly, recommends that creditors vote to accept the Plan.

**BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE BANKRUPTCY COURT APPROVAL OR RECOMMENDATION OF THE MERITS OF THE DEBTOR'S PLAN OF REORGANIZATION.**

Dated: New York, New York
            September 20, 2021

96 Wythe Acquisition LLC

_____ */s/ David Goldwasser* _____
David Goldwasser
Chief Restructuring Officer

53

743958897

**EXHIBIT A**

**CHAPTER 11 PLAN**

**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Jason I. Kirschner
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 506-1910

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

## CHAPTER 11 PLAN OF REORGANIZATION

743959589

# TABLE OF CONTENTS

**Page**

ARTICLE 1. DEFINITIONS ................................................................. 1

ARTICLE 2. CLASSIFICATION OF CLAIMS ................................... 8

    2.1. Classified Claims and Equity Interests ......................... 8

    2.2. Classification ................................................................ 8

    2.3. Resolution of Disputes ................................................. 9

ARTICLE 3. TREATMENT OF CLAIMS AND INTERESTS ............. 9

    3.1. Unclassified Claims ..................................................... 9

    3.2. Classified Claims ......................................................... 12

ARTICLE 4. PAYMENT OF CLAIMS ............................................... 18

    4.1. Payment of Allowed Claims ......................................... 18

ARTICLE 5. PLAN IMPLEMENTATION ISSUES ............................. 21

    5.1. Conditions to the Effective Date ................................... 21

    5.2. Period Prior to Effective Date ...................................... 21

    5.3. Consummation of Plan .................................................. 21

    5.4. Means for Implementation of Plan ............................... 22

    5.5. Vesting of Assets in Post-Confirmation Debtor ........... 23

    5.6. Confirmation Order ...................................................... 23

    5.7. Assumption and/or Rejection of Executory Contracts... 24

    5.8. Full and Final Satisfaction .......................................... 25

    5.9. Releases ........................................................................ 25

    5.10. Term of Injunctions or Stays ....................................... 26

    5.11. Exculpation ................................................................. 26

ARTICLE 6. PRESERVATION OF CLAIMS AND CAUSES OF ACTION FOR THE ESTATE ................................................. 26

ARTICLE 7. MISCELLANEOUS ....................................................... 27

    7.1. Bankruptcy Fees .......................................................... 27

ARTICLE 8. RETENTION OF JURISDICTION ................................ 27

ARTICLE 9. AMENDMENT AND INTERPRETATION OF THIS PLAN .......................... 29

    9.1. Modification of the Plan ............................................... 29

    9.2. Headings ....................................................................... 29

    9.3. Severability .................................................................. 29

743959589

## TABLE OF CONTENTS

**Page**

9.4.    Successors and Assigns.......................................................................... 29

9.5.    Rights if Plan Is Not Confirmed ........................................................... 30

9.6.    Internal References ............................................................................... 30

# CHAPTER 11 PLAN OF REORGANIZATION

96 Wythe Acquisition LLC, the above-captioned debtor and debtor-in-possession, hereby proposes the following Chapter 11 Plan of Reorganization pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

## ARTICLE 1.

## DEFINITIONS

For the purposes of this Plan, and to the extent not otherwise provided herein, the terms below shall have the meanings set forth in this section and, unless otherwise indicated, the singular shall include the plural and capitalized terms shall refer to the terms as defined in this Article 1 and, any term used in this Plan which is not defined below, but which is defined in the Bankruptcy Code, shall have the meaning designated in the Bankruptcy Code:

**1.1.** "**Administrative Claim**" means a Claim under sections 330, 331 or 503(b) of the Bankruptcy Code that is entitled to priority treatment under section 507(a)(1) of the Bankruptcy Code.

**1.2.** "**Administrative Period**" means the period beginning on the Filing Date and ending on the Confirmation Date.

**1.3.** "**Adversary Proceeding**" means any and all actions previously commenced, or to be commenced, by the Debtor to recover money or property on behalf of the Debtor's Estate.

**1.4.** "**Allowed Administrative Claim**" means an Allowed Claim that is entitled to priority as an Administrative Claim and that is not disputed.

**1.5.** "**Allowed Claim**" means: (a) any Claim listed on Debtor's Schedules filed in connection with its Reorganization Case, which is not designated as unliquidated, contingent or disputed; (b) any Claim against the Debtor, proof of which was filed on or before July 15, 2021, the general bar date, or August 22, 2021, the governmental unit bar date, established by Order of the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c) for filing Claims against Debtor's Estate entered on June 2, 2021, and for which no objection has been interposed on or before sixty (60) days after the Effective Date. For clarity, if an objection is interposed, any such claim shall not be an Allowed Claim until adjudicated by Final Order or settled by written agreement with the Debtor or the Reorganized Debtor; and/or (c) any Claim against the Debtor which is designated as an Allowed Claim under the Plan and/or reduced to writing, consented to by the Debtor and liquidated in amount, which writing has been approved by a Final Order.

**1.6.**    "**Allowed Interest**" means an Interest which has been allowed by Final Order of the Bankruptcy Court.

**1.7.**    "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**1.8.**    "**Allowed Secured Claim**" means that portion of an Allowed Claim excluding Priority Tax Claims, with a valid and enforceable lien against any property of the Debtor's Estate where such property has a value of which is equal to or greater than the amount of the Allowed Claim and as to which no objection has been interposed and to which the period for bringing such objection as provided hereunder has expired or which has been Allowed by Final Order.  In accordance with the definition set forth in section 506(a) of the Bankruptcy Code, "Allowed Secured Claim" specifically excludes that portion of an Allowed Claim of a Creditor having a lien against any property of Debtor's Estate to the extent the value of such creditor's interest in the property is less than the amount of such Allowed Claim.

**1.9.**    "**Allowed Unsecured Claim**" means any Allowed Claim not otherwise entitled to priority and not secured against the property of the Debtor.

**1.10.**    "**Assets**" means all property of the Debtor or its estate, whether tangible or intangible, and any proceeds, products, rents or profits thereof.

**1.11.**    "**Avoidance Actions**" means all claims, demands, proceedings, or causes of action of the Debtor against any Person or Entity which has been brought or could be brought in the name of the Debtor pursuant to sections 510, 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code or applicable state law.

**1.12.**    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*

**1.13.**    "**Bankruptcy Court**" means the Honorable Robert D. Drain, United States Bankruptcy Judge, the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140, having jurisdiction over the Debtor's Reorganization Case, or any such other Court as may hereafter exercise primary jurisdiction over the Debtor's Reorganization Case.

**1.14.**    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

**1.15.**    "**Bar Date**" means July 15, 2021, the date set by order of the Bankruptcy Court as the last day for filing general proofs of claim in the Debtor's Reorganization Case, and means August 22, 2021, the date set by order of the Bankruptcy Court as the last day for filing proofs of claim solely by governmental units in the Debtor's Reorganization Case.

**1.16.**    "**BSP**" means collectively, Benefit Street Partners Realty Operating Partnership, L.P. and BSPRT 2018-FL3 Issuer, Ltd. (as the successor-in-interest to Benefit Street Partners Realty Operating Partnership, L.P.).

**1.17.** "**BSP Claims**" means collectively, the BSP Disputed Claim and the BSP Undisputed Claim.

**1.18.** "**BSP Disputed Claim**" means the claim as described in Section 3.2 below.

**1.19.** "**BSP Loan Agreement**" means that certain loan agreement, dated as of December 13, 2017, between the Debtor and BSP.

**1.20.** "**BSP Undisputed Claim**" means the claim as described in Section 3.2 below.

**1.21.** "**Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" as that term is defined in Bankruptcy Rule 9006(a).

**1.22.** "**Cash Collateral Orders**" means the orders entered by the Bankruptcy Court on March 5, 2021, March 19, 2021, April 21, 2021, June 21, 2021, and September 13, 2021 [Docket Nos. 15, 21, 28, 52, and 111].

**1.23.** "**Claim**" as defined in section 101(5) of the Bankruptcy Code means: (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.24.** "**Claimant**" means the holder of a Claim.

**1.25.** "**Claims**" means any group of Claims as classified in Article II of this Plan.

**1.26.** "**Class**" means a class of Claims or Interests.

**1.27.** "**Confirmation**" means entry of a Final Order confirming the Plan in accordance with section 1129 of the Bankruptcy Code.

**1.28.** "**Confirmation Date**" means the date the Confirmation Order is entered on the Bankruptcy Court docket.

**1.29.** "**Confirmation Order**" means the order issued and entered confirming the Plan, pursuant to section 1129 of the Bankruptcy Code.

**1.30.** "**Consummation of the Plan**" means the occurrence of the Effective Date.

**1.31.** "**Debtor**" means 96 Wythe Acquisition LLC, as debtor-in-possession in the Reorganization Case.

**1.32.** "**Disclosure Statement**" means the disclosure statement regarding this Plan, filed pursuant to section 1125 of the Bankruptcy Code on September 20, 2021 by the Debtor, in connection with the Reorganization Case and approved by Final Order of the Bankruptcy Court as containing "adequate information" as that term is defined in section 1125(a)(1) of the Bankruptcy

743959589

Code, and all exhibits in connection therewith and any documents delivered in connection therewith, as the same may be amended from time to time by any duly authorized amendment or modification.

 **1.33.** "**Disputed Claim**" means any Claim designated as disputed, contingent, or unliquidated in the Debtor's Schedules filed in connection with its Reorganization Case, or any Claim against which an objection to the allowance thereof has been interposed and as to which such objection a Final Order has not been entered or any Claim against which the period for bringing such objection as provided hereunder has not expired.

 **1.34.** "**Disputed Claim Holder**" means the holder of a Disputed Claim.

 **1.35.** "**Disputed Claims Reserve**" means one or more reserves established by the Debtor or the Reorganized Debtor with respect to Disputed Claims.

 **1.36.** "**Effective Date**" means a Business Day selected by the Debtor, which is, unless the Confirmation Order directs otherwise, forty-five (45) Business Days after the date on which each of the conditions to the Plan's Effective Date set forth herein has either been satisfied or waived in accordance with the Plan.

 **1.37.** "**Equity Infusion**" means $8,000,000.00 in cash to be provided by the Plan Sponsor, of which $6,562,000.00 shall be allocated for capital contribution and $1,438,000.00 against the PPP Settlement.

 **1.38.** "**Equity Interests**" means the Interests in the Debtor outstanding immediately prior to the Effective Date.

 **1.39.** "**Estate**" means the estate created in the Reorganization Case pursuant to section 541 of the Bankruptcy Code.

 **1.40.** "**Exhibits**" means the exhibits filed in support of this Plan.

 **1.41.** "**Filing Date**" means February 23, 2021, the date of the commencement of the Debtor's Reorganization Case.

 **1.42.** "**Final Distribution**" means final payment to Allowed Unsecured Claims under the Plan.

 **1.43.** "**Final Order**" means an order or judgment entered by the Bankruptcy Court, or another court of competent jurisdiction, in connection with the Debtor's Reorganization Case, which order or judgment has not been reversed, stayed, modified, or amended and the time to appeal such order has expired.

 **1.44.** "**Force Majeure Event**" shall mean a significant global disruption in the markets caused by outbreak of war, terrorism, or other material incidents related to local, state, and federal laws, rules, regulations of mandates related to, among other things, the COVID-19 or other pandemic.

**1.45.** "**Hotel**" means the 147-room Williamsburg Hotel located at 96 Wythe Avenue, Brooklyn, New York 11249.

**1.46.** "**Interest**" means the legal, equitable and contractual rights of a holder of an Equity Security (as that term is defined in section 101(16) of the Bankruptcy Code) in the Debtor as of the Filing Date.

**1.47.** "**Interest Disputed Claims Reserve**" means a reserve account established by the Debtor or the Reorganized Debtor with respect to the BSP Disputed Claim into which interest payments will be deposited at the same interest rate as the BSP Undisputed Claim and shall be held in escrow until entry of a final order adjudicating the BSP Disputed Claim or written agreement with the Debtor or the Reorganized Debtor (as applicable) and BSP.

**1.48.** "**Interest Reserve**" means a reserve account established by the Debtor or the Reorganized Debtor in the amount of $3,000,000.00 to fund payments of interest to BSP in accordance with Section 3.2(b) of the Plan.

**1.49.** "**M&M**" means the holder of a Secured Claim arising pursuant to the applicable mechanics and materialmen lien statute.

**1.50.** "**Management Company**" means The Williamsburg Hotel BK, LLC.

**1.51.** "**Other Secured Claim**" means any Secured Claim against the Debtor other than the BSP Disputed Claim and the BSP Undisputed Claim.

**1.52.** "**Person**" means an individual, corporation, partnership, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.53.** "**Property Payment Plan**" means that certain property collection agreement dated as of June 23, 2021, executed by the Debtor and the City of New York, Department of Finance, relating to the payment plan of certain real estate taxes, assessments, and related charges.

**1.54.** "**Plan**" means this document entitled "Plan of Reorganization" dated September 20, 2021, and any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended from time to time by any duly authorized amendment or modification.

**1.55.** "**Post-Confirmation Expenses**" means all reasonable fees, expenses and disbursements of Professional Persons incurred after the Confirmation Date.

**1.56.** "**PPP Loans**" means loans received by the Management Company pursuant to the Paycheck Protection Program in connection with the operation of the Hotel.

**1.57.** "**PPP Settlement**" means that certain settlement between the Debtor and the Management Company to resolve any claims, if any, with respect the Management Company's receipt of the PPP Loans.

743959589

**1.58.** "**Priority Claim**" means all claims that are entitled to priority under section 507(a) of the Bankruptcy Code and that are not Administrative Claims or Priority Tax Claims.

**1.59.** "**Priority Tax Claim**" means a Claim entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.

**1.60.** "**Professional Fee Claim**" means a Claim owed to a Professional Person for Professional Fees.

**1.61.** "**Professional Fees**" means all allowances of compensation, indemnification, or reimbursement of expenses Allowed, or to be allowed, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, to any Professional Person retained pursuant to section 327 of the Bankruptcy Code.

**1.62.** "**Professional Person**" means any Entity retained in the Reorganization Case pursuant to a Final Order in accordance with sections 326, 327, and 328 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

**1.63.** "**Plan Sponsor**" means 96 Wythe New Acquisition LLC.

**1.64.** "**Receiver**" means Constantino Sagonas.

**1.65.** "**Released Parties**" means the Debtor and the Management Company and each of their respective agents, managers, members, officers, directors, shareholders, advisors, attorneys, and representatives.  For the avoidance of doubt, BSP shall not be a Released Party.

**1.66.** "**Reorganization Case**" means the bankruptcy case of the Debtor designated as Chapter Case 11 No. 21-22108 (RDD), pending before United States Bankruptcy Judge Robert D. Drain, commenced on the Filing Date by the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and ending upon the entry of a Final Order closing the Debtor's case.

**1.67.** "**Reorganized Debtor**" means the Debtor on and after the Effective Date.

**1.68.** "**Schedules**" mean the Chapter 11 schedules filed with the Bankruptcy Court on May 5, 2021 [Docket No. 31].

**1.69.** "**Secured Claim**" means a Claim, excluding any Secured Property Tax Claims, the BSP Disputed Claim and the BSP Undisputed Claim, secured by a "lien", as that term is defined at section 101(37) of the Bankruptcy Code, against any property of the Debtor, including, but not limited to, a "judicial lien" as that term is defined at section 101(36) of the Bankruptcy Code, but only to the extent such lien was properly perfected and of the "value", as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012 or as otherwise agreed to, of such Creditor's interest in the Estate's interest in such property.

**1.70.** "**Secured Creditor**" means the holder of a Secured Claim.

**1.71.** "**Secured M&M Claim**" means a Claim owed to an M&M.

**1.72.** "**Secured Property Tax Claim**" means any claim owed to a Taxing Authority on account of any tax or assessment levied on real estate.

**1.73.** "**Subordinated Claim**" means any Claim that is subordinated to the payment of Unsecured Claims under applicable law or equity, including, without limitation, pursuant to any subsection of section 510 of the Bankruptcy Code.

**1.74.** "**Taxing Authority**" means any federal, state, or local entity with the authority to assess and collect taxes.

**1.75.** "**Unclaimed Distributions**" means those funds allocated under the Plan for payment to any holders of Allowed Claims which holders, after due diligence, the Debtor or its attorneys are unable to locate.

**1.76.** "**Unsecured Claim**" means any Claim which does not qualify as an Administrative Claim, Secured Claim, or Priority Tax Claim.

**1.77.** "**Unsecured Creditor**" means the holder of an Unsecured Claim.

**1.78.** "**Unsecured Creditor Distribution Fund**" means the amount of $1,970,936 to $2,570,936.00, subject to final reconciliation, to be funded by the Debtor and/or the Reorganized Debtor, as applicable, to pay Allowed Unsecured Claims, with 20% of such amount paid thirty (30) calendar days after the Effective Date, with the balance paid in four (4) equal payments of 20% each on the first, second, third, and fourth anniversaries of the Effective Date. Holders of Allowed Unsecured Claims shall also receive interest at 5% on account of their respective deferred distributions under the Plan.

**1.79.** "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

**1.80.** "**U.S. Trustee Fees**" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.81.** "**Wythe Borrower**" means 96 Wythe Borrower DE LLC.

**1.82.** "**Wythe Mezz**" means 96 Wythe Mezz DE LLC.

A terms used and not defined herein or in the Bankruptcy Code shall have their common and ordinary meaning.

743959589

# ARTICLE 2.

## CLASSIFICATION OF CLAIMS

### 2.1.    Classified Claims and Equity Interests

The following table is a designation of the Classes of Claims and Interests under the Plan. This classification of Claims and Interests is made for purposes of voting on the Plan and making distributions hereunder and for ease of administration hereof.  All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes described below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below in Article 3, have not been classified and thus are excluded from the Classes described below.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released, or otherwise satisfied or dealt with prior to the Effective Date.

### 2.2.    Classification

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Claims | No | No (deemed to accept) |
| Class 2 | BSP Claims | Yes | Yes |
| Class 3 | Secured Property Tax Claims | Yes | Yes |
| Class 4 | Secured M&M Claims | Yes | Yes |
| Class 5 | Unsecured Claims | Yes | Yes |

743959589

| Class 6 | Subordinated Claims | Yes | No (deemed to reject) |
| Class 7 | Equity Interests | Yes | No (deemed to reject) |

### 2.3.  Resolution of Disputes

Disputes regarding the proper classification of any Claim shall be resolved pursuant to the procedures established by the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Bankruptcy Court, and this Plan, and such resolution shall not be a condition precedent to Confirmation or Consummation of this Plan.

## ARTICLE 3.

## TREATMENT OF CLAIMS AND INTERESTS

In addition to any waivers or releases of Claims or other causes of action provided for elsewhere in this Plan, Claims shall be treated as set forth below.  Except as explicitly provided in this Plan, all distributions under this Plan shall be free and clear of all Claims, liens, security interests and encumbrances of any nature or kind whatsoever.

### 3.1.  Unclassified Claims

(a)    Administrative Claims

Administrative Claims are not classified under the Plan.  Administrative Claims are Allowed Claims against the Debtor for any costs or expenses of the Reorganization Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including all actual and necessary expenses of preservation of the Debtor's Estate.  Such Allowed Administrative Claims are to be paid in full (to the extent not already paid during the Reorganization Case), in cash on the later of: (i) the Effective Date; (ii) the date such Claim becomes Allowed; and (iii) such other date and upon such other terms as may be agreed upon by the holder of such Claim and the Debtor, or as ordered by the Bankruptcy Court.

743959589

All requests for payment of Administrative Claims that accrued out of the ordinary course of business during the Administrative Period shall be filed and served on the Debtor's Attorneys not later than thirty (30) calendar days after notice of the Confirmation Date, with the exception of the Administrative Claims of Professional Persons retained pursuant to order of the Bankruptcy Court, which are subject to Court approval after notice and hearing and shall be paid by the Debtor and/or the Reorganized Debtor on or before the Effective Date or as otherwise ordered by the Bankruptcy Court.  Notwithstanding anything in the Plan to the contrary, objections to such requests shall be filed and served within sixty (60) calendar days after filing of each such request.

Except as specified above, all Allowed Administrative Claims shall receive cash from the Reorganized Debtor in the amount of such Allowed Administrative Claim on the later of (i) the Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or at such other date and upon such other terms as may be agreed upon the holder of the Allowed Administrative Claims and the Debtor or ordered by the Bankruptcy Court.

Any Allowed Administrative Claim based on a liability incurred by the Debtor in the ordinary course of business during the Reorganization Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto, and any Allowed Administrative Claim may be paid on such other terms as may be agreed on between the holder of such Allowed Administrative Claim and the Debtor.

(b)    Priority Tax Claims

Priority Tax Claims are not classified under the Plan.  Unless otherwise agreed to by the Debtor and a holder of an Allowed Priority Tax Claim, such Allowed Claims will be paid 100% of the amount of their Allowed Claim in equal deferred cash payments on a quarterly basis, beginning on the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed

743959589

Claim.  In either case:  (x) payments will take place over the period of six (6) years, measured from

the date of the assessment of such taxes or, if there has been no assessment, from the Filing Date

(such period, the "Priority Tax Payment Period"); (y) with interest at a rate equal to 5% per annum;

(z) in equal installments sufficient to fully amortize the balance of such Claim over a period

beginning on the Effective date and ending on the last day of the Priority Tax Payment Period;

*provided*, *however*, that the Debtor reserves the right to pay any Allowed Priority Tax Claim, or

any remaining balance thereof, in full at any time on or after the Effective Date without premium

or penalty; *provided*, *further*, that no holder of an Allowed Priority Tax Claim shall be entitled to

any payment on account of any pre-Effective Date interest arising after the Filing Date with respect

to or in connection with such Allowed Claim.

(c)    Professional Fee Claims

Professional Fee Claims are not classified under the Plan.  Any Professional Person seeking

allowance of a Professional Fee Claim shall file, with the Bankruptcy Court, its final application

for allowance of compensation for services rendered, and reimbursement of expenses incurred

prior to the Effective Date and in connection with the preparation and prosecution of such final

application no later than forty-five (45) calendar days after the Effective Date.  Any objections to

such Professional Fee Claims must be filed and served pursuant to the procedures set forth in the

Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such

other date as established by the Bankruptcy Court.

All Professional Persons seeking allowance by the Bankruptcy Court of a Professional Fee

Claim shall be paid in full in cash in such amounts as are approved by the Bankruptcy Court:

(i) upon the later of (x) the Effective Date and (y) fourteen (14) calendar days after the date upon

which the order relating to the allowance of any such Professional Fee Claim is entered; or

11

743959589

(ii) upon such other terms as may be mutually agreed upon between the holder of such Professional Fee Claim and the Reorganized Debtor.  On the Effective Date, to the extent known, the Reorganized Debtor shall reserve and hold in a segregated account cash in an amount equal to all accrued but unpaid Professional Fee Claims as of the Effective Date, which cash shall be disbursed solely to the holders of Allowed Professional Fee Claims with the remainder to be reserved until all Professional Fee Claims have been either Allowed and paid in full or disallowed by a Final Order, at which time any remaining cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtor.  All post-Confirmation Professional Fees and expenses for services rendered by the Professional Persons in connection with the Reorganization Case and the Plan shall be paid in the ordinary course by the Debtor or the Reorganized Debtor, as the case may be.

(d)    U.S. Trustee Fees

The Debtor or the Reorganized Debtor, as applicable, shall pay all outstanding U.S. Trustee Fees of the Debtor on an ongoing basis on the date such U.S. Trustee Fees become due and payable, until such time as a final decree is entered closing the Reorganization Case, the Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

**3.2.    Classified Claims**

(a)    Class 1 — Priority Claims

(i)    *Treatment*:  The legal, equitable, and contractual rights of the holders of Priority Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Claim agrees to different treatment, on the applicable distribution date, each holder of an Allowed Priority Claim shall receive cash in an amount equal to such Allowed Claim.

12

743959589

(ii)     *Voting*:  The Priority Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Claims.

(b)     <u>Class 2 — BSP Claims</u>

(i)     *Allowance*:  The BSP Undisputed Claim shall be allowed in the amount of $70,700,000.00.  The Debtor disputes the balance of any claims held by BSP, including the BSP Disputed Claim, and such claims shall be subject to subordination, disallowance, expungement, dismissal, and/or further agreement by and between the Debtor and BSP.

(ii)     *Treatment*:

(1)     **Treatment of the BSP Undisputed Claim.**  Subject to the Reorganized Debtor's right to pre-pay all or part of the BSP Undisputed Claim (and any portion of the BSP Disputed Claim that becomes an Allowed Claim) at any time without penalty, the BSP Undisputed Claim shall be paid in full, together with interest to be paid as follows: (i) the Reorganized Debtor shall pay BSP equal monthly payments of interest at a rate of 4.5% per annum commencing on the Effective Date for four (4) years; (ii) commencing on the fourth (4th) anniversary of the Effective Date, the Reorganized Debtor shall pay interest at a rate of 5% per annum for an additional two (2) years; and (iii) on the sixth (6th) anniversary of the Effective Date, the Reorganized Debtor shall make a final payment consisting of the balance of the BSP Undisputed Claim.  In addition, on the Effective Date, the Reorganized Debtor shall: (a) contribute $3,000,000.00 into an interest account to serve as the Interest Reserve for the Reorganized Debtor's payments on account of the BSP Undisputed Claim, which such account shall be established at a third-party bank selected by the Debtor in its sole discretion and drawn on by the Reorganized Debtor to pay BSP interest payments, in full or partially, in the event that the Reorganized Debtor has not paid the required monthly interest payment, in full or partially, by the twentieth (20th) of the month when such payment becomes due; and (b) pre-pay BSP the first two (2)

13

monthly interest payments required to be paid under subsection (i) above, such that on the Effective Date the Reorganized Debtor shall pay BSP a total of the first two (2) monthly interest payments as provided hereunder.

(2)     **Treatment of the BSP Disputed Claim**.  Upon a Final Order adjudicating the BSP Disputed Claim or by written agreement between the Debtor or the Reorganized Debtor (as applicable) and BSP, and subject to the Debtor's right to seek an estimation of such claim pursuant to section 502(c) of the Bankruptcy Code, the Debtor shall make additional distributions to BSP as follows:  (i) in the event that amounts due to BSP are adjudicated by Final Order or by written agreement between the Debtor or the Reorganized Debtor (as applicable) and BSP to be in an amount that exceeds the BSP Undisputed Claim amount and if the BSP Disputed Claim is not subject to subordination, such additional Allowed Claim amounts shall receive the funds in the Interest Disputed Claim Reserve corresponding to the interest payments otherwise payable on account of any such additional Allowed Claim amount, with ongoing interest payments from the time of such adjudication to be paid pursuant to the treatment of the BSP Undisputed Claim; and (ii) any excess amounts held in the Interest Disputed Claim Reserve above the amounts required for distributions to BSP under the Plan and as provided herein, shall be released to the Reorganized Debtor, free and clear of any liens, claims, and encumbrances.

(iii)    *Disputed Claim Reserve for the BSP Disputed Claims*.  Subject to the Debtor's right to seek an estimation of the BSP Disputed Claim, any payments otherwise due to BSP on account of the BSP Disputed Claim shall be paid into the Interest Disputed Claim Reserve, concurrently with the payment of distributions to BSP on account of the BSP Undisputed Claim, and shall be subject to further Bankruptcy Court determination with respect to the allowance of the BSP Disputed Claim.

(iv)    *Loan Documents*:  Except as provided for in this Plan which shall control in all respects, including with regard to payment terms, default terms, or any terms on pre-

payment or refinance, all terms of the BSP Loan Agreement, and any related documents that cover the BSP Claims and collateral securing the BSP Claims shall apply.

(v)      *Voting*:  The BSP Claims are impaired and  BSP is therefore entitled to vote to accept or reject the Plan.

(c)      Class 3 — Secured Property Tax Claims

(i)      *Treatment*:  Unless otherwise agreed to by the Debtor and a holder of an Allowed Secured Property Tax Claim, the Reorganized Debtor shall assume that certain Property Payment Plan as between the Debtor and the relevant Taxing Authority with respect to the payment of real estate taxes.  The Reorganized Debtor shall pay such amounts as provided for under the Property Payment Plan.  Liens shall continue with the same force and effect until such Allowed Secured Property Tax Claim has been paid in full as provided under this Plan.

(ii)      *Voting*:  The Secured Property Tax Claims are impaired Claims. Holders of such Claims are therefore entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Secured Property Tax Claims.

(d)      Class 4 — Secured M&M Claims

(i)      *Treatment*:  Unless otherwise agreed to by the Debtor and such holder of an Allowed Secured M&M Claim, the Reorganized Debtor shall pay Allowed Secured M&M Claims 100% of the value of such Claim as follows:  25% thirty (30) calendar days after the Effective Date, with the balance to be paid in three (3) installments of 25% each on the first, second and third anniversary of the Effective Date, which installment payments shall accrue interest at a rate of 5% per annum.  Liens shall continue with respect to any Allowed Secured M&M Claim, with the same force and effect until such Allowed Secured M&M Claim has been paid in full as provided under this Plan.

743959589

(ii)    *Voting*:  The Secured M&M Claims are impaired Claims.  Holders of such Claims are therefore entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Secured M&M Claims.

(e)    <u>Class 5 — Unsecured Claims</u>

(i)    *Treatment*:  Unless otherwise agreed by the Debtor and such Claimant, each holder of an Allowed Unsecured Claim shall be paid pro rata solely from the Unsecured Creditor Distribution Fund, which distribution shall be calculated by determining the pro rata share of such fund attributable to each Allowed Unsecured Claim, with payments to holders of Allowed Unsecured Claims to be made in five (5) equal annual pro rata installment payments, to be paid as follows:  the first pro rata installment shall be paid thirty (30) calendar days after the Effective Date, and the four (4) remaining pro rata installment payments shall be paid on the first, second, third, and fourth anniversaries of the Effective Date.  Holders of Allowed Unsecured Claims shall also receive interest at 5% on account of their respective deferred distributions under the Plan.  To the extent Allowed Unsecured Claims aggregate the total Unsecured Creditor Distribution Fund, such holder will be paid in full with interest as provided for in the Plan.  If Allowed Unsecured Claims exceed the total Unsecured Creditor Distribution Fund, such holders will receive a pro rata distribution against the total undisputed Unsecured Claim Amount.

(ii)    *Voting*:  The Unsecured Claims are impaired Claims.  Holders of such Claims are therefore entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Unsecured Claims.

743959589

(f)    Class 6 — Subordinated Claims

(i)    *Treatment*:  Unless otherwise agreed by the Debtor and such claimant, holders of Allowed Subordinated Claims will be subordinated to Allowed Unsecured Claims and will not receive any distribution under the Plan.

(ii)    *Voting*:  The Subordinated Claims are impaired Claims and holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Claims.

(g)    Class 7 — Equity Interests

(i)    *Treatment*:  All Equity Interests will be cancelled, and the Plan Sponsor will be issued new Interests in the Reorganized Debtor, constituting of 100% ownership of the Reorganized Debtor.  In exchange for its Interests in the Reorganized Debtor and in furtherance of the PPP Settlement, upon the Effective Date, the Plan Sponsor will contribute $8,000,000.00 into the Reorganized Debtor, $1,438,000.00 of which will be earmarked as a settlement payment with respect to the PPP Settlement (together with the forgiveness of debt by the Management Company as provided for in Section 5.4 below) and $6,562,000.00 as the Equity Infusion to the Reorganized Debtor.  The Plan Sponsor agrees that Wythe Mezz shall receive new Interests in the Reorganized Debtor, which new Interests shall be junior to the new Interests issued to the Plan Sponsor and to any sources of new equity provided to the Reorganized Debtor as part of the Plan.  Wythe Mezz will be paid from excess proceeds, if any, upon sale and/or refinance after payment of all Claims under the Plan and expressly as agreed by the Plan Sponsor and the Reorganized Debtor.  Wythe Mezz shall have no voting or approval rights in the Reorganized

17

Debtor, nor hold any position of control over or have any Claims and/or rights against the Debtor, the Reorganized Debtor, and/or any of their respective assets.

(ii)    *Voting*:  Equity Interests are impaired under this Plan.  The holders of Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Equity Interests.

## ARTICLE 4.

## PAYMENT OF CLAIMS

### 4.1.    Payment of Allowed Claims

Payment is to be made only to those holders of Allowed Claims of the various Classes. Notwithstanding anything to the contrary herein, the Debtor may pre-pay all or part of any Class of obligations under the Plan without penalty, at any time.

(a)    Objection to Claims

The Debtor may file objections to claims of record in order to correct erroneous or duplicative amounts or for any other reason that in its business judgment would be appropriate.

(i)    General Procedures.  Unless another date is provided for in this Plan or by the Bankruptcy Court, on or before sixty (60) days after entry of the Confirmation Order, the Debtor and/or the Reorganized Debtor may file with the Bankruptcy Court objections to Claims, including objections to the amount and classification thereof, except Claims previously allowed by a Final Order, and shall serve a copy of such objection upon the holder of the Claim to which such objection pertains.  The resolution of any such objection shall be governed by the Bankruptcy Code, the Bankruptcy Rules, and such provisions as may be established by the Bankruptcy Court, or by the procedural rules of the court in which such objection is to be litigated.

18

Any Claim as to which an objection is not timely filed in accordance with the provisions of the Plan or orders of the Bankruptcy Court and to which the Debtor's time to interpose objection has expired, shall be an Allowed Claim, except that any Claim scheduled as disputed to which no proof of claim has been filed shall be deemed disallowed and is expunged. Notwithstanding the foregoing, the Debtor shall have the right to enter into any settlement with respect to any Claim for an amount equal to or less than $300,000.00 without further approval of the Bankruptcy Court.

(ii)    <u>Prosecution of Objections</u>.    Unless otherwise ordered by the Bankruptcy Court, the Debtor and/or the Reorganized Debtor shall litigate its objections to Claims to judgment or settlement, or withdraw the objection at its sole and absolute discretion.

(iii)    <u>Disputed Claims Reserve</u>.    The Debtor shall establish one or more reserves for the benefit of a Disputed Claim, including the BSP Disputed Claim, consisting of the Interest Disputed Claim Reserve, or consisting of cash in an amount equal to the pro rata share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of:  (i) the liquidated amount set forth in the filed proof Claim relating to such Disputed Claims or if no proof of Claim has been filed the liquidated amount set forth in the Schedules; (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as consisting and representing the maximum amount in which such Claim may ultimately become Allowed Claim; and (iii) such other amount as may be agreed upon by the holder of such Claim and the Debtor.

At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgement of the Bankruptcy Court allowing such Disputed Claim

743959589

becomes a Final Order or the effective date of the relevant agreement between the Debtor and the holder of the applicable Disputed Claim.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim, including the BSP Disputed Claim, pending the entire resolution thereof by Final Order or agreement between the Debtor and the holder of the applicable Disputed Claim.

(b)    Setoffs

The Debtor shall have the right to set off against any payment to be made pursuant to the Plan to a Claimant, including BSP, claims of any nature whatsoever that the Debtor may have or have had, against the holder of such Claim including, but not limited to, judgments obtained pursuant to sections 547 and 548 of the Bankruptcy Code, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that it may have or have had against any such Claimant.

(c)    Unclaimed Cash

(i)    In the event any Claimant fails to claim any distribution within three (3) months from the date of such distribution, by failing to present such distribution check for payment to the Debtor's bank, such Claimant shall forfeit all rights thereto.  Thereafter, the distribution formerly available to the Claimant shall become the property of the Reorganized Debtor, and such Claimant shall have no further rights to share in any subsequent distributions that may be made.

(ii)    For purposes of mailing distribution checks, the Debtor may rely on the addresses for holders of Allowed Claims as set forth in the Schedules unless superseded by the address for such holders set forth in the proofs of Claim filed by the Claimants with the Bankruptcy Court.  If no proofs of Claim are filed and the Schedules filed by the Debtor fail to furnish valid

743959589

addresses for holders of Allowed Claims, such Allowed Claims shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code at the expiration of the later of (a) six (6) months from the entry of the Confirmation Order and (b) three (3) months after an initial distribution is made to that Claimant and shall be returned to the Reorganized Debtor.

## ARTICLE 5.

## PLAN IMPLEMENTATION ISSUES

### 5.1.    Conditions to the Effective Date

In order for the Plan to be deemed effective, the following events must occur:

> (i)     the Disclosure Statement shall have been approved;

> (ii)    there shall not have occurred a Force Majeure Event;

> (iii)   entry of a Confirmation Order; and

> (iv)    the Confirmation Order becoming a Final Order.

### 5.2.    Period Prior to Effective Date

During the period between the Confirmation Date and the Effective Date, the Debtor shall continue to exercise ownership and control of all Assets and property of its Estate.

### 5.3.    Consummation of Plan

The Debtor anticipates that this Plan will be substantially consummated upon the commencement of distributions under this Plan on the Effective Date in accordance with section 1101(2)(C) of the Bankruptcy Code.  The Plan is to be implemented in a manner consistent with section 1123 of the Bankruptcy Code.  In addition, pursuant to the Confirmation Order and upon confirmation of this Plan, the Debtor or the Reorganized Debtor, as the case may be, will be authorized to take all necessary steps and perform all necessary acts to consummate the terms and conditions of this Plan.  On or before the Effective Date, the Debtor or the Reorganized Debtor, as

743959589

the case may be, may file with the Bankruptcy Court any and all agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of this Plan and may execute such documents without the need for any further approvals, authorizations or consents.  There shall be no modification or stay of the Confirmation Order or entry of other court order prohibiting the transactions contemplated hereunder from being consummated.

### 5.4.    Means for Implementation of Plan

The Plan Sponsor shall contribute $8,000,000.00 to the Reorganized Debtor upon the Effective Date, $6,562,000.00 of which shall be paid as a capital contribution as provided in Section 3.2(g) above.  In addition, and as set forth more fully in the Disclosure Statement, while the Debtor and the Management Company dispute any allegations made with respect to the PPP Loans and believe such claims are baseless, the Debtor and Management Company have agreed to settle any and all claims, if any, relating to the PPP Loans pursuant to the PPP Settlement.  Pursuant to the PPP Settlement, which is approved herein, the Management Company has agreed to defer repayment of over $2,000,000.00 in claims for fees due to the Management Company through the Plan's Effective Date, until after all Allowed Claims have been paid, and the Plan Sponsor has agreed to infuse an additional $1,438,000.00 to the Reorganized Debtor (for a total payment of $8,000,000.00 including such infusion and capital contribution of $6,562,000.00) which shall be earmarked as a settlement payment (together with deferral of debt by the Management Company) pursuant to the PPP Settlement.

The Plan will be implemented by and through proceeds of the $8,000,000.00 in cash from the Plan Sponsor to be funded upon the Effective Date as part of the PPP Settlement and the Equity Infusion, any cash otherwise held by the Debtor upon the Effective Date, and ongoing income from the Debtor's operations.  The Reorganized Debtor will continue to operate from and after the

743959589

Effective Date.  The Plan Sponsor's cash infusion and the income generated by the Debtor's and the Reorganized Debtor's operations will be used to fund operating expenses  and to pay the amounts necessary to fund the Plan payments.  The Plan Sponsor shall designate the managing member of the Debtor upon the Effective Date.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or to any distribution to be made on account of such Allowed Claim or Interest, including, but not limited to, the PPP Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate, and holders of Claims and Interests and is fair, equitable, and reasonable.

### 5.5.    Vesting of Assets in Post-Confirmation Debtor

As of the Confirmation Date, pursuant to the provisions of sections 1141(b) and (c) of the Bankruptcy Code, all property, assets, and effects of the Debtor (including the Hotel) shall vest in the Reorganized Debtor free and clear of all Claims and Interests except as otherwise expressly provided in the Plan.

### 5.6.    Confirmation Order

The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan is valid and enforceable pursuant to its terms.  If any provisions of the Plan

743959589

are prohibited by the Bankruptcy Code, the Debtor reserves the right to sever such provisions from the Plan and to request that the Plan, as so modified, be confirmed.

### 5.7.    Assumption and/or Rejection of Executory Contracts

Subject to the provisions of this paragraph and with the exception of the Management Agreement and the Property Payment Plan, all executory contracts and unexpired leases, not previously assumed or rejected by the Debtor pursuant to an order entered by the Bankruptcy Court, and not terminated by their own terms, shall be deemed rejected as of the Effective Date under the Plan pursuant to section 365 of the Bankruptcy Code.  The Property Payment Plan shall be assumed by the Debtor and the Management Agreement shall be assumed by the Reorganized Debtor as expressly modified hereunder to provide for the deferral of pre-Effective Date fees and extended through the date of the Final Distribution under the Plan.  The Management Company will be paid a fee of 3% of the gross revenues collected from operation of the Hotel on and after the Effective Date as provided for under the Management Agreement.  Any amounts or fees due to the Management Company under the Management Agreement through the Effective Date shall be deferred and shall not be paid under the Plan until after payment of all other Allowed Claims and Interests hereunder.

Any Claim arising from the rejection of any executory contract or unexpired lease hereunder shall be filed with the Bankruptcy Court on or before the thirtieth (30th) calendar day after the Effective Date, or any counterparty to such executory contract or unexpired lease shall be forever barred from receiving any distribution under this Plan.  Objections to any such claim(s) shall be filed by the Debtor not later than sixty (60) days after the filing of such claim(s) and the Bankruptcy Court shall determine any such objection.  Any Claims arising from the rejection of

743959589

an executory contract or unexpired lease shall, to the extent Allowed, be treated as a Class 5 Unsecured Claim or a Class 6 Subordinated Claim, as appropriate with respect to such Claim.

### 5.8.    Full and Final Satisfaction

All payments, distributions, and transfers of cash and property under this Plan are in full and final satisfaction, settlement, release, and discharge of all Claims against the Debtor or of any nature whatsoever.   Notwithstanding anything contained in this Plan to the contrary, the Confirmation Order shall discharge the Debtor from any debt that arose prior to the Confirmation Date and any debt of a kind specified in sections 502(g) and 502(i) of the Bankruptcy Code.  Under no circumstances shall any additional consideration be payable by the Debtor to holders of any such Claims other than as expressly provided under this Plan.

### 5.9.    Releases

**As an integral part and in consideration of the settlement and treatment of Claims and Interests under the Plan, any Persons and holders of any Claims or Interests that received actual or constructive notice of this Plan shall be and are permanently enjoined and precluded from asserting, commencing, or continuing in any manner any actions or from asserting any lien against the Debtor, the Released Parties, and against any of such parties' respective assets or properties, with respect to any debt, Claim, or interest, including any guarantee by any of the Released Parties based upon any document, instrument or act, omission, transaction, or other activity of any kind or nature arising out of, based upon, or in any way related to, the conduct, actions, and transactions of the Debtor through the Confirmation Date.**

743959589

**5.10.    Term of Injunctions or Stays**

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Reorganization Case under sections 105 or 362 of the Bankruptcy Code or otherwise, shall remain in full force and effect through and inclusive of the Effective Date.**

**5.11.    Exculpation**

**Neither the Debtor nor any of the Released Parties shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the Reorganization Case, the Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan other than for conduct that constitutes gross negligence, willful misconduct, or a violation of the criminal, tax, environmental, and antitrust laws of the United States.**

## ARTICLE 6.

## PRESERVATION OF CLAIMS AND CAUSES OF ACTION FOR THE ESTATE

The Debtor has determined that it may commence any causes of action pursuant to (a) sections 502, 542, 544, 545, 546, 550, and 553 of the Bankruptcy Code, (b) any preference claims pursuant to section 547 of the Bankruptcy Code, (c) any fraudulent transfer claims pursuant to section 548 of the Bankruptcy Code, (d) any claims relating to post-petition transactions pursuant to section 549 of the Bankruptcy Code, or (e) any pre-petition and post-petition Claims arising under applicable state law.  All of the Debtor's rights, Claims, and causes of action shall be, and hereby are, preserved, transferred and assigned to the Reorganized Debtor as of the Effective Date of the Plan, including, but not limited to, any and all Claims against BSP.

743959589

# ARTICLE 7.

# MISCELLANEOUS

### 7.1.   Bankruptcy Fees

All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of this Plan, shall be paid on or before the Effective Date.  Prior to entry of a final decree, any Post-Confirmation Expenses shall be paid by the Reorganized Debtor.  The Debtor will continue to file operating reports until such time as a final decree is issued.

# ARTICLE 8.

# RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction of Debtor's case pursuant to and for the purposes set forth in section 1127(b) of the Bankruptcy Code and, inter alia, for the following purposes:

(a)   to determine any and all objections to the allowance, classification, and/or valuation of Claims or Interests;

(b)   to determine any and all applications for compensations and reimbursement of expenses for Professional Fees, Administrative Claims, and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code;

(c)   to amend or modify the Plan to remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary or advisable to carry out the purpose and intent of the Plan to the extent authorized by the Bankruptcy Code or the Bankruptcy Rules;

(d)   to determine any and all controversies and disputes arising under or related to the Plan;

743959589

(e)      to construe and enforce any and all provisions of the Plan;

(f)      to determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases under section 365 of the Bankruptcy Code to which the Debtor is a party or with respect to which it may be liable, and to hear and determine and, if need be, to liquidate, any and all claims arising therefrom;

(g)      to determine the validity, priority, and extent of liens, Claims, and encumbrances upon property of the Estate and to determine any questions and issues regarding title to and interests in any property of the estate and to enter any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor;

(h)      to determine any and all controversies and disputes arising under or related to any settlement of any Adversary Proceeding or contested matter approved by the Bankruptcy Court, and with respect to prosecution of any Adversary Proceeding and/or Contested matter initiated prior to the Effective Date, either before or after the Confirmation Date;

(i)      to order the transfer of any Asset of Debtor's estate free and clear of liens, claims, and encumbrances and to effectuate payments under and performance of the provisions of the Plan;

(j)      to enforce any and all injunctions created pursuant to the terms of the Plan;

(k)      to enter a Final Order or decree in the Debtor's Reorganization Case; and

(l)      to determine such other matters as may be provided for in the Plan or Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code or the Bankruptcy Rules.

743959589

# ARTICLE 9.

## AMENDMENT AND INTERPRETATION OF THIS PLAN

### 9.1.    Modification of the Plan

The Debtor reserves its right to modify, revoke, or withdraw this Plan at any time prior to the date of the entry of the Confirmation Order, except as provided in this Plan.  After the date of the Confirmation Order, the Debtor may, without approval of the Bankruptcy Court, remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan so long as it does not materially or adversely affect Claimants.

### 9.2.    Headings

The headings of Articles and Sections used in this Plan are inserted for convenience only, and neither constitute a portion of this Plan nor in any manner affect the provisions or interpretations hereof.

### 9.3.    Severability

Should any provisions of this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other provisions or provision of this Plan, except to the extent that any provision so determined to be unenforceable is or was a condition precedent to this Plan set forth in Article V of this Plan.  If there are any inconsistencies between the Plan and Disclosure Statement, the terms of the Plan shall control.

### 9.4.    Successors and Assigns

The rights and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the executors, administrators, successors, trustee, and assigns of such Person.

743959589

**9.5.    Rights if Plan Is Not Confirmed**

If Confirmation of the Plan does not occur, the Plan shall be deemed null and void, and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any entity in any further proceedings involving the Debtor.

**9.6.    Internal References**

The words "herein," "hereof," "hereto," "hereunder," and any other words of similar import refer to this Plan as a whole and not to any particular Section, subsection, or clause contained in this Plan.

Dated: September 20, 2021
       New York, New York

96 Wythe Acquisition LLC

_/s/ David Goldwasser_____
David Goldwasser
Chief Restructuring Officer

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

**96 WYTHE ACQUISITION, LLC**
**LIQUIDATION ANALYSIS**
**AS OF DECEMBER 1, 2021**

| | Chapter 11 | Chapter 7 |
|---|---|---|
| **Sources:** | | |
| Cash on Hand | 2,279,864 | 2,279,864 |
| [1] Restricted Cash | 727,012 | 727,012 |
| Cash Infusion | 8,000,000 | - |
| [2] Sale Proceeds | - | 79,310,000 |
| | 11,006,877 | 82,316,877 |
| | | |
| **Administrative Fees and Expenses:** | | |
| Chapter 7 Trustee Statutory Commission | N/A | 2,492,756 |
| Chapter 7 Trustee Professionals | N/A | 400,000 |
| [2] Accrued Property Taxes | N/A | 3,928,924 |
| M&M Liens | N/A | 340,947 |
| [3] Broker Fees | N/A | 1,982,750 |
| [4] Closing Costs | N/A | 793,100 |
| | - | 9,145,377 |
| | | |
| **Uses Prior to Plan Payments:** | | |
| Administrative Expenses | 513,147 | 513,147 |
| Professional Fee Claims | 765,000 | 765,000 |
| US Trustee Fees | 22,472 | 22,472 |
| Interest Reserve | 3,000,000 | - |
| | 4,300,619 | 1,300,619 |
| | | |
| **Funds Available Prior to Effective Date/Chapter 7 Distributions** | 6,706,257 | 71,870,881 |
| | | |
| **PLAN CLASS** | | |
| Priority Claims (Class 1) | 100.0% | 100.0% |
| BSP Claims - Undisputed (Class 2) | 100.0% | 100.0% |
| BSP Claims - Disputed (Class 2) | TBD | TBD |
| Secured Property Tax Claims (Class 3) | 100.0% | 100.0% |
| Secured M&M Claims (Class 4) | 100.0% | 100.0% |
| Unsecured Claims (Class 5) | 100.0% | 45.5% |
| Subordinated Claims (Class 6) | 0.0% | 0.0% |
| Equity Interests (Class 7) | 0.0% | 0.0% |

**Notes**

[1] Cash reserved for payment of accrued sales tax and property tax

[2] Liquidation sale proceeds based on a 30% discount to appraised value of $113.3 million

[3] Reflects property tax claim settlement of $3.9MM

[4] Estimated to be 2.5% of sale proceeds

[5] Estimated to be 1.0% of sale proceeds

**EXHIBIT C**

**PLAN PROJECTIONS**

743958897

**96 WYTHE ACQUISITION, LLC**
**THE WILLIAMSBURG HOTEL**
**FINANCIAL PROJECTIONS**
**FOR THE MARCH 1, 2022-FEBRUARY 28, 2028 PERIOD**

| | 2022/23 | | | | 2023/24 | | | | 2024/25 | | | | 2025/26 | | | | 2026/27 | | | | 2027/28 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Units | 147 | | | | 147 | | | | 147 | | | | 147 | | | | 147 | | | | 147 | | | |
| Number of Annual Rooms Available | 53,655 | | | | 53,655 | | | | 53,655 | | | | 53,655 | | | | 53,655 | | | | 53,655 | | | |
| Number of Rooms Occupied | 40,241 | | | | 42,924 | | | | 45,607 | | | | 45,607 | | | | 45,607 | | | | 45,607 | | | |
| Annual Occupancy | 75.0% | | | | 80.0% | | | | 85.0% | | | | 85.0% | | | | 85.0% | | | | 85.0% | | | |
| Average Daily Rate | $326.90 | | | | $343.20 | | | | $355.10 | | | | $365.70 | | | | $376.70 | | | | $388.00 | | | |
| RevPAR | $245.18 | | | | $274.56 | | | | $301.84 | | | | $310.85 | | | | $320.20 | | | | $329.80 | | | |
| | Amount | Ratio | Amount/ Room | Per Occ. Room | Amount | Ratio | Amount/ Room | Per Occ. Room | Amount | Ratio | Amount/ Room | Per Occ. Room | Amount | Ratio | Amount/ Room | Per Occ. Room | Amount | Ratio | Amount/ Room | Per Occ. Room | Amount | Ratio | Amount/ Room | Per Occ. Room |
| **Revenues:** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rooms | $13,154,865 | 53.0% | $89,489 | $326.90 | $14,731,517 | 52.8% | $100,214 | $343.20 | $16,194,957 | 51.3% | $110,170 | $355.10 | $16,678,388 | 51.3% | $113,458 | $365.70 | $17,180,063 | 51.3% | $116,871 | $376.70 | $17,695,419 | 51.3% | $120,377 | $388.00 |
| Food & Beverage | $11,374,071 | 45.9% | $77,375 | $282.65 | $12,829,682 | 46.0% | $87,277 | $298.89 | $14,999,102 | 47.5% | $102,035 | $328.88 | $15,449,075 | 47.5% | $105,096 | $338.75 | $15,912,548 | 47.5% | $108,249 | $348.91 | $16,389,924 | 47.5% | $111,496 | $359.37 |
| Other Income & Guest Services | $275,179 | 1.1% | $1,872 | $6.84 | $316,959 | 1.1% | $2,156 | $7.38 | $362,882 | 1.1% | $2,469 | $7.96 | $373,768 | 1.2% | $2,543 | $8.20 | $384,981 | 1.1% | $2,619 | $8.44 | $396,530 | 1.1% | $2,697 | $8.69 |
| **Total** | $24,804,115 | 100.0% | $168,735 | $616.39 | $27,878,158 | 100.0% | $189,647 | $649.48 | $31,556,941 | 100.0% | $214,673 | $691.94 | $32,501,232 | 100.0% | $221,097 | $712.64 | $33,477,591 | 100.0% | $227,739 | $734.05 | $34,481,874 | 100.0% | $234,571 | $756.07 |
| **Departmental Expenses:** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rooms | $3,850,659 | 29.3% | $26,195 | $95.69 | $4,335,049 | 29.4% | $29,490 | $100.99 | $4,858,402 | 30.0% | $33,051 | $106.53 | $5,004,242 | 30.0% | $34,042 | $109.73 | $5,154,369 | 30.0% | $35,064 | $113.02 | $5,309,000 | 30.0% | $36,116 | $116.41 |
| Food and Beverage | $7,925,159 | 69.7% | $53,913 | $196.94 | $8,979,205 | 70.0% | $61,083 | $209.19 | $10,124,394 | 67.5% | $68,873 | $221.99 | $10,428,126 | 67.5% | $70,940 | $228.65 | $10,740,970 | 67.5% | $73,068 | $235.51 | $11,063,199 | 67.5% | $75,260 | $242.58 |
| Other Income & Guest Services | $142,028 | 51.6% | $966 | $3.53 | $160,918 | 50.8% | $1,095 | $3.75 | $181,441 | 50.0% | $1,234 | $3.98 | $186,884 | 50.0% | $1,271 | $4.10 | $192,490 | 50.0% | $1,309 | $4.22 | $198,265 | 50.0% | $1,349 | $4.35 |
| **Total** | $11,917,846 | 48.0% | $81,074 | $296.16 | $13,475,172 | 48.3% | $91,668 | $313.93 | $15,164,322 | 48.1% | $103,159 | $332.50 | $15,619,252 | 48.1% | $106,253 | $342.48 | $16,087,829 | 48.1% | $109,441 | $352.75 | $16,570,464 | 48.1% | $112,724 | $363.33 |
| **Departmental Profit** | $12,886,269 | 52.0% | $87,662 | $320.23 | $14,402,985 | 51.7% | $97,979 | $335.55 | $16,392,619 | 51.9% | $111,514 | $359.43 | $16,881,980 | 51.9% | $114,843 | $370.16 | $17,389,762 | 51.9% | $118,298 | $381.30 | $17,911,410 | 51.9% | $121,846 | $392.74 |
| **Undistributed Operating Expenses:** | | | | | | | | | | | | | | | | | | | | | | | | |
| Administrative and General | $3,175,764 | 12.8% | $21,604 | $78.92 | $3,320,598 | 11.9% | $22,589 | $77.36 | $3,471,243 | 11.0% | $23,614 | $76.11 | $3,575,401 | 11.0% | $24,322 | $78.40 | $3,682,663 | 11.0% | $25,052 | $80.75 | $3,793,143 | 11.0% | $25,804 | $83.17 |
| Sales & Marketing | $1,147,824 | 4.6% | $7,808 | $28.52 | $1,203,886 | 4.3% | $8,190 | $28.05 | $1,262,278 | 4.0% | $8,587 | $27.68 | $1,300,146 | 4.0% | $8,845 | $28.51 | $1,339,150 | 4.0% | $9,110 | $29.36 | $1,379,325 | 4.0% | $9,383 | $30.24 |
| Property Operation and Maintenance | $1,004,346 | 4.0% | $6,832 | $24.96 | $1,053,400 | 3.8% | $7,166 | $24.54 | $1,104,493 | 3.5% | $7,514 | $24.22 | $1,137,628 | 3.5% | $7,739 | $24.94 | $1,171,757 | 3.5% | $7,971 | $25.69 | $1,206,909 | 3.5% | $8,210 | $26.46 |
| Utilities | $876,616 | 3.5% | $5,963 | $21.78 | $911,024 | 3.3% | $6,197 | $21.22 | $946,708 | 3.0% | $6,440 | $20.76 | $975,109 | 3.0% | $6,633 | $21.38 | $1,004,363 | 3.0% | $6,832 | $22.02 | $1,034,494 | 3.0% | $7,037 | $22.68 |
| **Total** | $6,204,550 | 25.0% | $42,208 | $154.18 | $6,488,907 | 23.3% | $44,142 | $151.17 | $6,784,742 | 21.5% | $46,155 | $148.77 | $6,988,285 | 21.5% | $47,539 | $153.23 | $7,197,933 | 21.5% | $48,966 | $157.83 | $7,413,871 | 21.5% | $50,434 | $162.56 |
| Franchise Fees | $0 | 0.0% | $0 | $0.00 | $0 | 0.0% | $0 | $0.00 | $0 | 0.0% | $0 | $0.00 | $0 | 0.0% | $0 | $0.00 | $0 | 0.0% | $0 | $0.00 | $0 | 0.0% | $0 | $0.00 |
| Management Fee | $744,123 | 3.0% | $5,062 | $18.49 | $836,345 | 3.0% | $5,689 | $19.48 | $946,708 | 3.0% | $6,440 | $20.76 | $975,037 | 3.0% | $6,633 | $21.38 | $1,004,328 | 3.0% | $6,832 | $22.02 | $1,034,456 | 3.0% | $7,037 | $22.68 |
| **Gross Operating Profit** | $5,937,596 | 23.9% | $40,392 | $147.55 | $7,077,733 | 25.4% | $48,148 | $164.89 | $8,661,168 | 27.4% | $58,920 | $189.91 | $8,918,659 | 27.4% | $60,671 | $195.56 | $9,187,501 | 27.4% | $62,500 | $201.45 | $9,463,082 | 27.4% | $64,375 | $207.49 |
| **Fixed Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes | $1,300,000 | 5.2% | $8,844 | $32.31 | $1,326,000 | 4.8% | $9,020 | $30.89 | $1,352,520 | 4.3% | $9,201 | $29.66 | $1,379,570 | 4.2% | $9,385 | $30.25 | $1,407,162 | 4.2% | $9,573 | $30.85 | $1,435,305 | 4.2% | $9,764 | $31.47 |
| Insurance | $147,000 | 0.6% | $1,000 | $3.65 | $149,940 | 0.5% | $1,020 | $3.49 | $152,939 | 0.5% | $1,040 | $3.35 | $155,998 | 0.5% | $1,061 | $3.42 | $159,118 | 0.5% | $1,082 | $3.49 | $162,300 | 0.5% | $1,104 | $3.56 |
| Other | $7,350 | 0.0% | $50 | $0.18 | $7,571 | 0.0% | $52 | $0.18 | $7,798 | 0.0% | $53 | $0.17 | $8,032 | 0.0% | $55 | $0.18 | $8,272 | 0.0% | $56 | $0.18 | $8,521 | 0.0% | $58 | $0.19 |
| **Total** | $1,454,350 | 5.9% | $9,894 | $36.14 | $1,483,511 | 5.3% | $10,092 | $34.56 | $1,513,256 | 4.8% | $10,294 | $33.18 | $1,543,600 | 4.7% | $10,501 | $33.85 | $1,574,552 | 4.7% | $10,711 | $34.52 | $1,606,126 | 4.7% | $10,926 | $35.22 |
| **Total Expenses** | $20,320,869 | 81.9% | $138,237 | $504.98 | $22,283,935 | 79.9% | $151,591 | $519.15 | $24,409,029 | 77.3% | $166,048 | $535.21 | $25,126,173 | 77.3% | $170,926 | $550.93 | $25,864,642 | 77.3% | $175,950 | $567.12 | $26,624,917 | 77.2% | $181,122 | $583.79 |
| **Income Before Reserves** | $4,483,246 | 18.1% | $30,498 | $111.41 | $5,594,223 | 20.1% | $38,056 | $130.33 | $7,147,912 | 22.7% | $48,625 | $156.73 | $7,375,059 | 22.7% | $50,170 | $161.71 | $7,612,950 | 22.7% | $51,789 | $166.93 | $7,856,957 | 22.8% | $53,449 | $172.28 |
| **FF&E Reserves** | $744,123 | 3.0% | $5,062 | $18.49 | $836,345 | 3.0% | $5,689 | $19.48 | $946,708 | 3.0% | $6,440 | $20.76 | $975,037 | 3.0% | $6,633 | $21.38 | $1,004,328 | 3.0% | $6,832 | $22.02 | $1,034,456 | 3.0% | $7,037 | $22.68 |
| **Net Operating Income after Reserves** | $3,739,122 | 15.1% | $25,436 | $92.92 | $4,757,878 | 17.1% | $32,367 | $110.84 | $6,201,204 | 19.7% | --------- | $135.97 | $6,400,022 | 19.7% | $43,538 | $140.33 | $6,608,622 | 19.7% | $44,957 | $144.90 | $6,822,500 | 19.8% | $46,412 | $149.59 |
| **Plan Payments** | $4,958,938 | | | | $5,600,545 | | | | $5,570,574 | | | | $5,455,366 | | | | $5,403,188 | | | | $5,403,188 | | | |
| **Surplus/(Deficit)** | ($1,219,815) | | | | ($842,666) | | | | $630,630 | | | | $944,657 | | | | $1,205,434 | | | | $1,419,313 | | | |
| **Cash on Hand**[1] | $5,435,255 | | | | $4,215,440 | | | | $3,372,774 | | | | $4,003,404 | | | | $4,948,060 | | | | $6,153,495 | | | |
| **Interest Reserve** | $3,000,000 | | | | $3,000,000 | | | | $3,000,000 | | | | $3,000,000 | | | | $3,000,000 | | | | $3,000,000 | | | |
| **Ending Balance** | $7,215,440 | | | | $6,372,774 | | | | $7,003,404 | | | | $7,948,060 | | | | $9,153,495 | | | | $10,572,807 | | | |

[1] As of December 1, 2021

**96 WYTHE ACQUISITION, LLC**
**SUMMARY OF PROPOSED POR PAYMENTS**
**PLAN OF REORGANIZATION**

| Class | Description | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Class 1 | Priority Tax Claims | - | - | - | - | - | - | - | Paid 100% on a quarterly basis over 6 years with interest at 5% |
| Class 2 | BSP Claims (undisputed) | 530,250 | 3,181,500 | 3,181,500 | 3,181,500 | 3,181,500 | 3,575,000 | 3,575,000 | Paid over 6 years; years 1-4 interest only @ 4.5%; years 5-6 interest only @ 5.0% |
| Class 2 | BSP Claims (disputed) | 141,328 | 847,969 | 847,969 | 847,969 | 847,969 | 942,188 | 942,188 | Paid over 6 years; years 1-4 interest only @ 4.5%; years 5-6 interest only @ 5.0% |
| | Credit 2 months pre-payment | | (671,578) | | | | | | Pay 2 months upfront on effective date; credit back in year 1 |
| Class 3 | Secured Property Tax Claims | - | 886,000 | 886,000 | 886,000 | 886,000 | 886,000 | 886,000 | Paid per payment plan |
| Class 4 | Secured M&M Claims | 85,237 | 98,022 | 93,760 | 89,499 | - | - | - | 25% paid one month after Effective Date; 3 annual installments 25%; 5% interest |
| Class 5 | Unsecured Claims[1] | 514,187 | 617,025 | 591,315 | 565,606 | 539,897 | - | - | 100% per year over five years, 5% interest (20% per year) |
| Class 6 | Subordinated Claims | - | - | - | - | - | - | - | |
| Class 7 | Equity Interests | - | - | - | - | - | - | - | |
| | | $ 1,271,002 | $4,958,938 | $5,600,545 | $5,570,574 | $5,455,366 | $5,403,188 | $5,403,188 | |

**Notes:**

[1] The Debtor estimates Unsecured Claims to range from 1.97 million to $2.57 million, and is utilizing the high end of the range for the purposes of forecasting Plan payments

**EXHIBIT D**

**LETTER OF INTENT**



LOCKWOOD

Lockwood Development Partners
70 S E 4th Ave
Delray Beach Fl 33483

September 19, 2021

96 Wythe New Acquisition LLC
Toby Moskovits
Michael Lichtenstein
679 Driggs Avenue
Brooklyn, New York 11211

**Re:    Investment into a NewCo formed to fund the plan or reorganization for 96 Wythe Acquisition LLC a/k/a The Williamsburg Hotel (the "Debtor") to be implemented through a Chapter 11 Plan (the "Plan") sponsored by a new company formed for this purpose – 96 Wythe New Acquisition LLC (the "Company").**

Dear Ms. Moskovits and Mr. Lichtenstein:

We are pleased to summarize the basis upon which Lockwood Development Partners ("Lockwood"), collectively with its successors and assigns (the "Capital Member"), is prepared to make a preferred equity investment for a term of seventy-two (72) months (the "Investment") in a special purpose holding company controlled by Toby Moskovits and Michael Lichtenstein (collectively, the "Sponsor") that is recapitalizing the Debtor and providing monies to fund a plan of reorganization for the Debtor . The Transaction contemplated is the purchase of a preferred equity ownership interest (the "Investment") by Capital Member in the Company, which will own the Debtor as a reorganized entity pursuant to a plan of reorganization and subject to approval by the Bankruptcy Court.

1.  **Contributions**: Each party to LLC Operating Agreement shall contribute on the following terms:
    a.  Lockwood, or its assignees, will invest Ten Million Dollars ($10,000,000) as the Investment (the "Investment Amount") to be treated as Equity with a Preferred Return of 8% and 20% of Profits thereafter.

    b.  The operating member ("Operating Member") will be one or more persons related to or otherwise affiliated with the Sponsor. The Operating Member or an affiliate of the Operating Member will be the initial manager (the "Manager") of the Company and will generally be responsible for management of the Company. Control of the Manager will reside with Toby Moskovits and Michael Lichtenstein (the "Key Person").

    c.  Hotel Manager. The Williamsburg Hotel BK, a non-debtor affiliate, will be the hotel manager and will generally be responsible for day-to-day operations of the Property, as per the Property Management Agreement ("Hotel Management Agreement"), and a Hotel Management Fee ("Hotel Management Fee") of no greater than 3.00% shall be paid as per the Hotel Management Agreement.

2.  **Distribution:** The Company will ensure that the Debtor allocate cash flow derived from the Property in the following priority :
    a.  To fund (i) any tax or insurance payments (or escrows therefor required by the Senior Mortgage Loan documents); (ii) debt service/plan payments to creditors including on the Senior Mortgage Loan as provided under the plan of reorganization ; (iii) operating expenses of the Property (including the property management fee as defined in the approved property management agreement); and (iv) any remaining reserves or escrows required under the Senior Mortgage Loan documents, all in the order set forth above unless a different order is required under the Senior Loan documents and plan of reorganization; b. upon payment of all required payments under the plan of reorganization, next to repayment of the Investment



Amount in full including the Preferred Return (defined below), Lockwood shall participate in any such profit distributions as provided below. Preferred Return shall mean;

b.   100% of any distribution to Lockwood, until Lockwood has received an 8% annual preferred return. The 8% preferred return will accrue when not legally permissible and will be current pay in all other instances.

c.   Thereafter, 20% of any distribution to Lockwood and 80% to Sponsor, respectively.

3. **Closing Requirements.** 1) The completion by Lockwood of its due diligence with respect to the Property and Sponsor; 2) The approval by the Bankruptcy Court of Plan; 3) Receipt and approval of a budget for the operation of the hotel.

4. **Brokers**: Lockwood is not responsible for any brokerage fees associated with this agreement and subsequent transactions and Sponsor shall indemnify Lockwood against claims with respect to a brokerage fee.

5. **Authorization:** The parties executing this LOI on behalf of Sponsor represent that they have received all necessary approvals and consents, including for the constituent owners and/or governing body of Sponsor, for this letter and the consummation of the LLC Operating Agreement. The instant transactions will be effectuated through a plan of reorganization and shall be subject to final approval by the bankruptcy court.

6. **Covenants: Subject to any requirements to the holder to the Senior Mortgage Loan** , in addition to affirmative covenants requiring the Operating Member to operate the Property appropriately and in accordance with law, the following actions by Operating Member/Company may not be taken without the prior written consent of the Capital Member:

   a.   Encumbering, transferring or granting a security interest of any nature whatsoever in all or a portion of the Debor, Property or its assets in excess of $100,000.00;

   b.   Incurring indebtedness on behalf of the Debtor, except for trade payables in an outstanding amount no greater than 2.0% of the original Senior Mortgage Loan balance;

   c.   Making any of the following with respect to the Property not referenced in an approved Operating Budget or Construction Budget: (A) capital or other material improvement, renovation or refurbishment, (B) removal, demolition or material alteration of the improvements or the equipment (other than routine replacement of such equipment), (C) material increase in the square footage or gross leasable area of the improvements;

   d.   Making loans to, or guaranteeing the indebtedness of, any third party;

   e.   Binding the Debtor or the Property to Material Contracts ("Material Property Contracts" being any contract or agreement excluding the Management Agreement and the Property Tax Agreement as defined in the plan of reorganization that (i) has a term longer than one year and is not cancellable by the Company on thirty (30) days' notice or less (with no penalty in other similar payment), (ii) requires payment or performance by the Company of a value exceeding $25,000 annually or (iii) is not in the ordinary course of business.);

   f.   Except with respect to prosecution and/or defense of any claims in connection with the bankruptcy case (including with respect to the adjudication and/or settlement of proof of claims filed against the Debtor) settling any litigation, arbitration or administrative proceedings, or confessing judgment, in each case requiring payment in excess of $50,000 (unless any excess above $50,000 is funded by insurance proceeds, subject to applicable deductibles) or instituting any legal action for damages in excess of $50,000;

   g.   Making any material change in the method of conducting the business of the Company or making any modification to any organizational documents of the Company;

   h.   Causing the Company to acquire any direct or indirect interest in land or other real property or interest



therein other than the Property;

i.   Placing restrictions on the Property.

7.   **Casualty and Condemnation**. In a case where the Senior Mortgage Loan exercises its right to apply proceeds from a casualty or condemnation event (a "Full Casualty Event") to pay down principal of the Senior Mortgage Loan, any excess proceeds after satisfaction of claims provided for under the Plan from that event will be used to pay to the Capital Member the Required Redemption Amount exclusive of the Redemption Premium.

   a.   In cases where the Senior Mortgagee allows the Company to apply casualty insurance proceeds to restore the Property subject to an approval/draw (or similar) process, Operating Member will obtain Capital Member's approval (not to be unreasonably withheld or delayed) for any plans, specifications, construction contracts, and draw requests in a manner that does not unreasonably burden or impede Operating Member's actions to restore the Property.

8.   **Recourse Liabilities.** The Sponsor shall indemnify the Capital Member for losses on the Investment and related damages resulting from any of the following (other than losses arising due to the conduct of Capital Member or its affiliate while Capital Member or its affiliate is acting as Manager of the Company):

   a.   Physical waste at or of the Property resulting from the intentional acts of the Operating Member despite the availability of sufficient revenue from the Property to prevent such waste;

   b.   Misappropriation or conversion by the Operating Member (or any affiliated asset manager or affiliated Property Manager) of rents, security deposits, personal property, insurance and condemnation awards or other proceeds;

   c.   Lapse of coverage on insurance policies required to be maintained by the Operating Member due to failure to pay premiums or otherwise;

   d.   Failure to pay taxes, assessments, or charges for labor or materials that create liens on the Property, despite the availability of sufficient revenue from the Property to pay such expenses;

   e.   The Company's (while Operating Member is the manager thereof), Operating Member's or Sponsor's supplying to the Capital Member materially misleading financial statements or reports, or the failure to supply a financial statement or report when due (given a 20 day cure period after notice from Capital Member);

   f.   Environmental matters;

   g.   Property level reps and warranties;

9.   **Documentation.** The Investment will be documented through an LLC operating agreement customary for similar transactions and in any event in form and substance satisfactory to Capital Member and Sponsor (the "Operating Agreement"). The LLC Operating Agreement will be governed by New York law. All other documentation evidencing the Investment will be governed by New York law. For purposes of this Term Sheet, "Documentation" shall mean all documents entered into between the Capital Member and the Operating Member, Sponsor or their affiliates, including without limitation the Operating Agreement, Guaranty and Property Manager Agreement. The Sponsor shall deliver to Lockwood all required due diligence customary for similar transactions.

10.   **Confidentiality:** Except to the extent required by law or as necessary to submit to the bankruptcy court in connection with the plan approval process, , all parties agree not to disclose, and to permit officers, directors, employees and agents to disclose, the contents of any documentation drafted in furtherance of this Term Sheet (other than the Term Sheet, which the parties acknowledge may be filed with the bankruptcy court) this Term Sheet (other than the Term Sheet, which the parties acknowledge may be filed with the bankruptcy court), to any person other than your attorneys and other advisors, employees, officers and investors who need to know



such information for the purpose of causing the consummation of the Investment (provided that all such parties will be informed of the confidential nature of such information and directed to keep such information in the strictest confidence). All aspects of the subject matter of this non-binding expression of interest are strictly confidential and will not be communicated to any person or entity at any time without written consent from the other party. Notwithstanding the foregoing, the parties may engage advisors, consultants, attorneys, accountants, prospective investors and lenders (provided, however, that such advisors, consultants, attorneys, accountants, prospective investors and lenders agree to treat such disclosures confidentially) and further, either party may make disclosures which either are required by law or regulation.

11. **Non-Binding/Binding Provisions:** This is not intended to constitute a contract to Joint Venture on the development of the Subject Property nor to otherwise create any legal obligation to purchase the Property but is intended only to summarize the general terms and conditions under which Sponsor and Lockwood agree to negotiate in good faith a new, single-purpose entity for purposes of sponsoring a plan of reorganization for the instant Debtor . Legal obligations shall arise only upon the negotiation, full execution and delivery of any subsequent agreed upon operating agreements and final approval of a plan of reorganization by the bankruptcy court, except for the provisions of Paragraph 10 set forth above, which paragraphs shall be binding upon Sponsor through the closing date.

Very truly yours,
Lockwood Development Partners

By: _____

Charles Everhardt
Principal

ACKNOWLEDGED AND AGREED THIS_____DAY OF SEPTEMBER 2021.

SPONSOR – 96 Wythe New Acquisitions LLC

By: _____
Name: Toby Moskovits
Title: