**Hearing Date and Time:  October 6, 2021 @ 10:00 AM (ET)**

**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Jason I. Kirschner
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 506-1910

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

**OBJECTION TO THE UNITED STATES TRUSTEE'S MOTION FOR AN ORDER TO
CONVERT THIS CHAPTER 11 CASE TO A CHAPTER 7 CASE OR,
ALTERNATIVELY, TO DISMISS THIS CHAPTER 11 CASE**

TO:     THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE:

        96 Wythe Acquisition LLC, the above-captioned debtor and debtor-in-possession  (the

"Debtor"), by its undersigned attorneys, Mayer Brown LLP, submits this Objection (the

744051918.1

"Objection")[1] to the motion of the United States Trustee (the "UST") for an order to convert this

Chapter 11 case (the "Chapter 11 Case") to a Chapter 7 case or, alternatively, to dismiss this

Chapter 11 case (the "Motion" or "Mot."), and in support thereof, respectfully states as follows:

## **INTRODUCTION**

The Debtor owns and operates the property located at 96 Wythe Avenue in Brooklyn (the

"Property"), including the 147-room Williamsburg Hotel with a restaurant and multiple bars (the

"Hotel").  Despite the unprecedented effects of the ongoing COVID-19 pandemic that severely

curtailed the Debtor's operations early on, and continues to wreak havoc on the hospitality

industry as a whole, the Hotel is open and fully operational – *operating profitably and exceeding*

*financial projections*.  For example, in June 2021, the Debtor's net operating profit was nearly

$550,000 and it held a cash balance of over $1.3 million and in July 2021, the Debtor's net profit

was nearly $671,000 and it held a cash balance of approximately $1.8 million.[2]

In addition, the Debtor recently brought on a team of new advisors, including new

bankruptcy counsel and financial advisor Hilco Real Estate/Getzler Henrich to assist in preparing

for an exit from bankruptcy.[3]  Specifically, the Debtor, through its advisors, has finalized terms

for its plan of reorganization [Dkt. 115] (the "Plan"), which includes the infusion of $8 million in

new money (coupled with the over $2 million in cash the Debtor anticipates as of the effective

date of the Plan, for a total of $10 million), forming the predicate for its Plan filed on September

---

[1] The Objection is verified by the Declaration of David Goldwasser attached hereto as **Exhibit A**.  The Objection is further supported by the Declaration of Mark Podgainy attached hereto as **Exhibit B** (the "Podgainy Dec.").

[2] The Debtor is finalizing the August 2021 operating report which has taken longer than anticipated due to loss of business days as a result of the Jewish holidays.  The Debtor expects to report profits during such period.

[3] Engagements remain subject to Court approval.

744051918.1

20, 2021, and emergence from Chapter 11, while preserving the going concern value of the Hotel (which is significantly greater than in a forced liquidation).  The Debtor's Plan would greatly benefit not only the Debtor, but the mechanics and materialmen, general unsecured creditors and the mezzanine lender, who would otherwise likely be wiped out by a forced liquidation.  Under the Plan, all creditors will be paid in full, over time, with interest.

Notwithstanding the Debtor's current profitability and plan for emergence (the hearing on approval of the Debtor's disclosure statement has been set for November 5, 2021, with a proposed confirmation date of December 13, 2021), the UST curiously seeks to derail all of that by converting the Chapter 11 Case to a forced liquidation under Chapter 7 or dismissing the Chapter 11 Case.  Not only contrary to the interests of the Debtor, its estate and creditors, there is absolutely no basis for such extraordinary relief under well-established law.

A party moving for relief under § 1112(b) bears the burden of establishing cause by a preponderance of the evidence.  Here, the sole basis for cause cited by the UST is the purported "gross mismanagement" of the estate under § 1112(b)(4)(B).  As an initial matter, however, such allegation of gross mismanagement is belied by the fact that the Debtor is running a profitable hospitality business during a global pandemic while formulating the Plan to reorganize and emerge from Chapter 11 protection.  Further, and notwithstanding, in alleging mismanagement, the UST relies on discreet, technical discrepancies that have no effect on the estate or Chapter 11 Case, as well as a misunderstanding of the Debtor's cash management system – neither of which can support the extraordinary relief requested here.

_First_, the UST asserts that the through the Debtor's Local Rule Affidavit (defined below), it incorrectly stated that it has 80 employees when in reality, those employees are employed by the Debtor's Management Company (defined below).  While technically true, this discrepancy

was subsequently clarified by the Debtor before the Motion was filed (and has been disclosed

going back to the state court Foreclosure Action (defined below)), and in any case, has no

material impact on the Debtor's estate or Chapter 11 Case.  As described in detail below, while

the employees are employed by the Management Company, they are providing support for the

operations of the Hotel.

        _Second_, the UST asserts that the through the Local Rule Affidavit, the affiant, Mr. David

Goldwasser, indicated that he was the CRO but it is his company, G.C. Realty Advisors, L.L.C.,

that is the counterparty to the agreement retaining the CRO.  Like the issue raised above, any

alleged discrepancy as to the identity of the CRO was previously clarified and in any case, this

technical distinction has no effect on the estate or Chapter 11 Case.  As described further below,

Mr. Goldwasser is the CRO, appointed by the Debtor, and acting through his closely held, single

member limited liability company, G.C. Realty.  Indeed, Mr. Goldwasser has been highly visible

in this Chapter 11 Case from day one, executing the Chapter 11 Petition and Local Rule

Affidavit on behalf of the Debtor, signing each monthly operating report as the responsible party

and working to help prepare the Debtor's Plan.  As such, there is no question as to the identity of

the CRO or his critical involvement in the Chapter 11 Case.

        _Third_, the UST alleges that the Debtor is maintaining unauthorized non-debtor bank

accounts for the improper purpose of secreting millions of dollars beyond the scrutiny of the

Court.  To the contrary, as detailed further below, and in the attached affirmation of Mark

Podgainy (Ex. B), a managing director of Getzler Henrich, the Debtor's independent financial

advisors, as part of the Debtor's cash management system, it transfers funds to certain non-

debtor accounts maintained by its Management Company to pay expenses the Management

Company incurs in operating the Hotel.  Such cash management system has been in place since

744051918.1

well before the Petition Date and represents the ordinary course of business between the Debtor

and its Management Company.  Rather than try to shield such information from the Court and

other interested parties, the cash management system and transfers between the Debtor and

Management Company are detailed in the Debtor's recent Cash Management Motion (defined

below) and as confirmed by Mr. Podgainy, fully disclosed in the Debtor's previous monthly

operating reports.  As further described below, the maintenance of such system is critical to the

Debtor's profitable business and current efforts to reorganize and preserve value of the estate –

the antithesis of gross mismanagement.  That said, in the interests of addressing the UST's

concerns (and despite the expense and logistical disruption created by such), the Debtor has

discussed with the UST establishing additional debtor-in-possession bank accounts to replace the

dedicated Management Company accounts, which it is agreeable to implement if need be,

subject to working out logistics for such.[4]

For all of these reasons, explained in further detail below, the Motion should be denied

with prejudice.

## FACTUAL BACKGROUND

### A.    The Debtor's Chapter 11 Filing

1.    On February 23, 2021 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The

Debtor remains in possession of the Property as a debtor-in-possession pursuant to Bankruptcy

Code §§ 1107 and 1108.

---

[4] For example, establishing new payroll accounts would necessarily require that the Debtor procure its
own workers' compensation insurance coverage, with appropriate documentation and sign offs, as well as
sign offs from all employees.

744051918.1

2.      The Debtor owns the Property and Hotel, which includes a bar and restaurant and a separate, elevated and enclosed bar that sits above the pool referred to as the Water Tower Bar. The Hotel is fully operational after being severely curtailed during the initial stages of the COVID-19 pandemic.  The Chapter 11 filing was made to, among other things, provide a breathing spell to reorganize given the negative impact upon the business as a result of the COVID-19 pandemic, as well as an ongoing dispute with the Debtor's lender, Benefit Street Operating Partnership, L.P. (and now, its alleged assignee BSPRT 2018-FL3 Issuer, Ltd.) (the "Lender"), with respect to various asserted (and disputed) events of default under the subject loan documents and related claims and counterclaims.  Such disputes with the Lender led to the commencement of a foreclosure action by the Lender against the Debtor, among others, in New York County Supreme Court (the "Foreclosure Action").  The Foreclosure Action is currently stayed against the Debtor as a result of this Chapter 11 Case.

**B.      The Hotel Management Agreement**

3.      The Hotel is managed in the ordinary course of business by Williamsburg Hotel BK LLC (the "Management Company"), a non-debtor affiliate, pursuant to that certain Hotel Management and Services Agreement between the Debtor and the Management Company dated November 21, 2017 (the "Management Agreement").

4.      Retention of a hotel manager is common practice in the hospitality industry and this prepetition arrangement of the Debtor was described in the Debtor's Local Rule Statement [Dkt. 8] (the "Local Rule Affidavit" or "LRA") as follows:

> The Debtor's day to day operations are managed by a hotel manager which has managed the business through [the receiver's] appointment [in the Foreclosure Action], as directed by the Court in the Foreclosure Action.  The Debtor intends to maintain the status quo with no change in day-to-day management.

6

744051918.1

LRA ¶ 38.[5]

5.      On August 11, 2021, in order to clarify its relationship with the Management

Company, and in an abundance of caution, seek authority for certain transfers between the

Debtor and Management Company to fund Hotel expenses, the Debtor filed its Motion to

Authorize Intercompany Transfers, which specifically detailed the Debtor's cash management

system including Debtor and non-Debtor accounts and certain transfers between them [Dkt. 83]

(the "Cash Management Motion" or "CMM").

6.      As detailed in the Cash Management Motion, a majority of the Hotel operations

are performed by the Management Company under the Management Agreement including all

relationships with Hotel vendors and employees who are retained by the Management Company

to service the Hotel.  The Debtor in turn pays the Management Company for the costs of

operating the Hotel (pursuant to the Cash Management System described below).  CMM ¶¶ 7,

14.  In particular, the Management Company contracts directly with Hotel vendors for services

required and employs approximately 80 employees dedicated to servicing the Hotel and its

guests.  *Id*. ¶ 2.

7.      As further detailed in the Cash Management Motion, post-petition adherence to

the Management Agreement provides a "business as usual" atmosphere, facilitates the Debtor's

stabilization of its business operations and assists the Debtor in its efforts to reorganize and

preserve value.  *Id*. ¶ 12.  Conversely, aborting the Management Agreement and operating the

Hotel solely through the Debtor, would disrupt relationships with vendors and other key

counterparties, all of whom are accustomed to working with the Management Company.  *Id*.

---

[5] The Debtor's management arrangement was reiterated in the Debtor's Application to Use Cash
Collateral.  Dkt. 4, ¶ 37.

¶ 13.  In addition, ending the Management Agreement would expose the Debtor and its estate to a range of new liabilities, costs and general disruption related to the operation of the business, including executing new vendor and employment agreements as well as event and sales agreements.  *Id.*

8.      For all of these reasons, as described in the Local Rule Affidavit and further in the Cash Management Motion, it has always been the intent of the Debtor to continue operating under the Management Agreement in the ordinary course of business during this Chapter 11 Case.

**C.      The Debtor's Cash Management System Including the DIP Bank Accounts and Separate, Non-Debtor Accounts**

9.      Prior to the Petition Date, in the ordinary course of the Debtor's business, the Debtor and the Management Company employed a cash management system (the "Cash Management System") to implement the Management Agreement and collect, transfer and disburse funds generated by the Hotel and required to cover Hotel expenses paid by the Management Company.

10.      As the Debtor previously advised the UST at the initial debtor interview, the Debtor opened and presently maintains two DIP accounts at TD Bank, the last four digits of which are 0935 and 0927, respectively (the "DIP Accounts").  All revenue from the Debtor's operations is deposited into the main DIP Account (ending 0935) (the "Central DIP Account"). Podgainy Dec. ¶ 3.

11.      In order to pay the vendors and employees retained by the Management Company for services provided to the Hotel, as well as other Hotel expenditures handled by the Management Company, the Management Company maintains three separate non-Debtor accounts at TD Bank: (i) a general disbursement account, the last four digits of which are 1596

8

(the "<u>Disbursement Account</u>"); (ii) a payroll account, the last four digits of which are 1603 (the

"<u>Payroll Account</u>"); and (iii) a sales tax reserve account, the last four digits of which are 1611

(the "<u>Sales Tax Reserve Account</u>" and collectively with the Disbursement and Payroll Accounts,

the "<u>Non-Debtor Accounts</u>").  The Management Company opened the Non-Debtor Accounts

post-petition dedicated solely to post-petition disbursements made on behalf of the Hotel.  *Id.* ¶

4.

12.    As Mr. Podgainy confirmed, under the Cash Management System, the

Management Company reviews at least weekly with the Debtor all expenses due for services

provided to the Hotel.  The Debtor then transfers the amount needed to cover such expenses from

the Central DIP Account to the Non-Debtor Accounts and the Management Company then

disburses payments to the Hotel vendors and employees, among others.  The Debtor and

Management Company maintain current records of all transfers made and can readily ascertain,

trace and account for all such intercompany transactions.  *Id.* ¶ 6.

13.    In order to provide complete transparency into the Cash Management System and

the relationship between the Debtor and Management Company, relevant bank statements for the

DIP Accounts and Non-Debtor Accounts are attached as exhibits to the Debtor's monthly

operating reports.  For example, in the June MOR attached hereto as **Exhibit C**, the transfers

from the Central DIP Account to the Non-Debtor Accounts are highlighted on pages 16-32 in

blue.  The specific transfers into the Non-Debtor Accounts are highlighted in yellow. As further

confirmed per Mr. Podgainy's review,  each outgoing transfer from the Central DIP Account has

a corresponding incoming transfer into one of the Non-Debtor Accounts.  *Id.* ¶ 5.

14.    In addition to disclosure in the monthly operating reports, the Hotel expenses

covered by the intercompany transfers from the Debtor to the Management Company are also

744051918.1

guided by the Debtor's monthly budget attached to the cash collateral motion [Dkt. 8] and approved by this Court on an interim basis.  Dkt. 15, 21, 28, 52, 111.  Specifically, the budget incorporates the various Hotel expenditures contracted for and paid by the Management Company but funded by the Debtor, including, among other things: (i) salaries and wages; (ii) employee benefits; (iii) contract labor; (iv) equipment, supplies and services; and (v) marketing and promotion.  *See* Dkt. 8.

15.    Accordingly, the Debtor's current Cash Management System represents the ordinary course of business between the Debtor and Management Company and that system, along with all related accounts and accounts statements, have been fully disclosed by the Debtor through various filings and representations.

## D.    **The Debtor's Chief Restructuring Officer**

16.    Prior to the Petition Date, on February 22, 2021, the Debtor appointed Mr. David Goldwasser to act as chief restructuring officer ("CRO") for the Debtor.   LRA ¶ 1. Subsequently, that arrangement was formalized pursuant to that certain Bankruptcy Management Agreement dated April 5, 2021 (the "Bankruptcy Management Agreement") between the Debtor and Mr. Goldwasser's company, G.C. Realty Advisors L.L.C. ("G.C. Realty").

17.    G.C. Realty is a closely held, single member limited liability company, run by its sole member, Mr. Goldwasser.  In his capacity as the principal and sole member of G.C. Realty, Mr. Goldwasser serves as the CRO through G.C. Realty under the Bankruptcy Management Agreement.

18.    Mr. Goldwasser has been involved in this Chapter 11 Case since day one.  Mr. Goldwasser helped prepare and signed the Chapter 11 petition, submitted the Local Rule Affidavit, helped prepare and signed each monthly operating report as the responsible party and assisted with the filing of the Debtor's Plan.  Indeed, as CRO, Mr. Goldwasser has considerable

10

744051918.1

authority over the Debtor's post-petition operations and restructuring efforts.  Mr. Goldwasser

interacts frequently with the Management Company in its operations on behalf of the Hotel as

well as all estate professionals in overseeing the Chapter 11 Case and currently, in formulating

the Plan.

19.     While the Bankruptcy Management Agreement provides that the CRO shall

receive $15,000/month, to date, no such monthly payments have been made and the Debtor shall

seek Court approval of the same.

**E.     The Debtor's Profitability and Plan to Reorganize**

20.     Against the odds, the Hotel emerged from the early stages of the COVID-19

pandemic to become fully operational *and* profitable.  As detailed in the June 2021 and July

2021 operating reports, the Debtor's net operating profit for June was nearly $550,000 and it was

holding over $1.3 million in cash and in July 2021, the Debtor's net profit was over $671,000

and it held a cash balance of approximately $1.8 million.  Dkt. 72 at 14-15; Dkt. 91 at 12-13.

21.     In addition, the Debtor recently brought on a team of new advisors, including new

bankruptcy co-counsel and financial advisor Hilco Real Estate/Getzler Henrich to assist in

preparing for an exit from bankruptcy.  Specifically, the Debtor, through its advisors, has filed its

Plan, which includes the infusion of $8 million in new money (together with the over $2 million

in cash the Debtor anticipates as of the effective date of the its Plan, totals $10 million), forming

the predicate for emergence from Chapter 11, while preserving the going concern value of the

Hotel.  The Debtor's Plan would greatly benefit not only the Debtor, but the mechanics and

materialmen, general unsecured creditors and the mezzanine lender, who would otherwise be

wiped out by a forced liquidation.

744051918.1

## ARGUMENT

**A.    Standard Under Bankruptcy Code Section 1112(b)**

22.    Subject to certain exceptions that do not apply in the Chapter 11 Case,

Bankruptcy Code § 1121(b)(1) provides that a court shall dismiss a case under Chapter 11 or

convert the case to one under Chapter 7, whichever is in the best interests of the creditors and the

estate, if the movant establishes "cause." 11 U.S.C. § 1121(b)(1). The moving party bears the

burden of demonstrating such "cause" by a preponderance of the evidence. *In re BH S&B*

*Holdings, LLC*, 439 B.R. 342, 346 (S.D.N.Y. Bankr. 2010) (citing *In re Loco Realty Corp*., No.

09-11785 (AJG), 2009 WL 2883050, at *2, 2009 Bankr. LEXIS 1724, at *5 (S.D.N.Y. Bankr.

June 25, 2009)).

23.    Here, the UST relies exclusively on § 1121(b)(4)(B) – gross mismanagement of

the estate – as the basis for alleged "cause" to dismiss or convert this Chapter 11 Case. Mot. p.

4-5. Application of § 1121(b)(4)(B) is highly subjective and the standard for finding cause under

§ 1121(b)(4)(B) is flexible and subject to a court's substantial discretion. *See* 7 Collier on

Bankruptcy ¶ 1112.04[4] ("Some of the enumerated bases for cause . . . are more subjective than

others. For example, . . . [subsection] 1112(b)(4)(B), . . . give[s] the court implicit discretion. . ."

(citation omitted)); *see also*, *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y.

Aug. 13, 2007) ("a court is given wide latitude in determining whether the challenged conduct

rises to the level of 'cause'") (citation omitted). A court must only consider post-petition acts of

the present management of the Debtor under § 1121(b)(4)(B). 7 Collier on Bankruptcy ¶

1112.04[6][b]; *see also In re The 1031 Tax Grp., LLC*, 374 B.R. at 86.

**B.    The Debtor's Chapter 11 Plan Is in the Best Interests of the Estate and Its Creditors**

24.    At the outset, *and significantly*, the Debtor has emerged from the devastating

early impact of the COVID-19 pandemic and is now fully operational *and* profitable. As

12

evidenced in the most recent operating report for June, the Debtor had a net operating profit in

June of nearly $550,000 and holds a cash balance of over $1.3 million and in July 2021, the

Debtor's net profit was over $671,000 and it held a cash balance of over $1.8 million.  *See In re*

*Hyatt*, 479 B.R. 880, 888 (Bankr. D. N.M. Sept. 26, 2012) (finding no gross mismanagement

where, among other things, through the chapter 11 case the debtor "worked diligently to manage

the assets and grow the net value of the companies.").

25.     Further, under the guidance of its newly retained bankruptcy counsel and financial

advisor, the Debtor has filed its Plan, which includes the infusion of $8 million in cash (together

with the over $2 million in cash the Debtor anticipates as of the effective date of the its Plan,

totals $10 million), forming the predicate for its Plan and emergence from Chapter 11, while

preserving the going concern value of the Hotel (which is significantly greater than in a forced

liquidation).  The Debtor's Plan would greatly benefit not only the Debtor, but the mechanics

and materialmen, general unsecured creditors and the mezzanine lender, who would otherwise

likely be wiped out by a forced liquidation.  As such, the Plan would advance the very purpose of

Chapter 11 – to rehabilitate the Debtor while maximizing value of the estate for all interested

parties.  *Id.* at 895 ("Giving debtors the opportunity to reorganize in response to impending

financial distress is the purpose of chapter 11.") (citations omitted).

**C.      The UST Does Not Come Close to Establishing Gross Mismanagement or any other Basis for Cause Under § 1112(b)**

26.     Notwithstanding the Debtor's substantial efforts to reorganize and maximize

value for its creditors (which alone should weigh heavily against the UST's efforts to derail such

efforts at the expense of interested parties, *see id.*), in any case, the UST falls woefully short of

satisfying its burden of establishing cause under § 1112(b).  The UST's sole purported basis for

cause is gross mismanagement under 1112(b)(4)(B).  Specifically, the UST argues that "the

13

Debtor has failed to explain basic facts and actively misled the United States Trustee and this Court with Court filings." Mot. p. 5. In so arguing, however, the UST grossly overstates and/or mischaracterizes the factual record in this Chapter 11 Case and does not cite to a single authority supporting conversion or dismissal under the *actual* facts, as detailed below.

### 1. The Hotel Is Serviced by 80 Dedicated Employees

27.     The UST complains that in the Local Rule Affidavit, the Debtor stated that it has 80 employees, but in the Cash Management Motion stated that such employees were employed by the Management Company. Mot. p. 5. As detailed above, while these employees are in fact employed by the Management Company, they provide services to the Hotel through the Management Company. The Debtor pays these employees indirectly through the Cash Management System where the Management Company submits amounts due and receives direct transfers from the Debtor in the amount needed to cover such expenses. Such employee payroll expenses are included in the Debtor's budget and disclosed in the monthly operating reports as well. As such, the distinction raised by the UST here is a technical one that has no material effect on the estate. By stating in the Local Rule Affidavit that "the Debtor has approximately 80 employees," the intent was never to deceive or mislead either the UST or this Court; to the contrary, it was at most, a semantical issue, and the Local Rule Affidavit disclosed the (important) reality that the Debtor is serviced by 80 employees.

28.     Moreover, the Local Rule Affidavit was also clear that "the Debtor's day to day operations are managed by a hotel manager," which had managed the business prior to the Petition Date. LRA ¶ 38. While in hindsight the Local Rule Affidavit could possibly have been more clear about the specifics of the actual employment of Hotel employees by the Management Company versus the Debtor itself, as it later became apparent in discussions with the UST that there was some confusion on this point, the Debtor filed the Cash Management Motion to clear

14

this up, among other things.  As the UST concedes, the Cash Management Motion specifically

clarifies that the Hotel employees are employed through the Management Company.  Mot. p. 13.

As such, this fact was fully transparent and clarified before the Motion was filed and importantly

here, the UST provides no basis whatsoever as to why the Debtor would attempt to hide this fact

or what effect this technical distinction has on the Debtor's estate and Chapter 11 Case.  Indeed,

*it has none*, and this allegation cannot support cause under § 1112(b).  *In re Hyatt*, 479 B.R. at

888-89 (finding that "numerous accounting discrepancies in the [debtor's] records" did not

amount to gross mismanagement under § 1112(b)(4)(B) where there was no evidence of "any

fraud, any cover up, any other illegitimate activity" and that such "significant discrepancies were

all easily explained."); *see In re Walton Street Properties, LLC*, 2011 WL 7179642 at *3 (Bankr.

W.D. Ark. July 1, 2011) (finding that a degree of mismanagement does not mean there is gross

mismanagement: "[t]he 'gross mismanagement' standard implies 'that every bankruptcy

reorganization involves some degree of mismanagement.'") (citation omitted).

> **2.    Mr. Goldwasser Is the Debtor's CRO Through His Closely Held Company
> G.C. Realty**

29.    The UST next quibbles that in the Local Rule Affidavit, Mr. Goldwasser stated

that he was the CRO but it is his company, G.C. Realty, that is the counterparty to the

Bankruptcy Management Agreement.  Mot. p. 5.  In what similarly appears to be a belated (and

immaterial) game of "gotcha," the UST makes this allegation even though any confusion on this

point was cleared up months ago when the Bankruptcy Management Agreement was produced to

the UST in May, 2021 (Mot. p. 10), and the UST fails to explain how this technical distinction

has any effect whatsoever on the estate or this Chapter 11 Case – *again, it does not.  In re Hyatt*,

479 B.R. at 888 (finding no gross mismanagement and holding that "[a]t most an occasional lack

15

of expertise and some sloppiness appear to have been the culprits [of accounting discrepancies].").

30.     As detailed above (and previously explained to the UST), G.C. Realty is a closely held, single member limited liability company, run by its sole member Mr. Goldwasser.  In that capacity, Mr. Goldwasser serves as the CRO through G.C. Realty and signed the Chapter 11 petition, the Local Rule Affidavit and each monthly operating report on behalf of the Debtor and has appeared in this Chapter 11 Case from day one.  Simply put, Mr. Goldwasser *is* the CRO through his closely held company G.C. Realty.  Indeed, as the Motion makes clear, the Bankruptcy Management Agreement was not formalized until April 5, 2021, after the Local Rule Affidavit had been submitted.  In the February 25, 2021 Local Rule Affidavit, Mr. Goldwasser accurately stated that he was appointed CRO as of February 22, 2021.  As such, this gripe by UST is much ado about nothing.

31.     Further, the UST apparently asserts that the CRO has improperly left the day-to-day management of the Debtor to the Management Company.  Mot. p. 6.  As an initial matter, the UST does not, *and cannot*, explain how retention of a hotel manager somehow runs afoul of the Bankruptcy Code.  It does not.  It is standard practice in the hospitality industry to employ a management company to perform the tasks delegated here under the Management Agreement. Indeed, the Management Agreement has been in place in the ordinary course of the Debtor's business since November, 2017 and it was directed by the state court in the Foreclosure Action that the State Court Receiver continue to retain the Management Company.  LRA ¶ 38.  Further, as detailed herein, the Debtor – by its CRO – disclosed through the Local Rule Affidavit the existence of the Management Agreement and the Debtor's "inten[tion] to maintain the status quo with no change in day-to-day management."  *Id*.  It is curious that the UST would only now take

16

issue with this management arrangement, six months after it was first identified.  This is particularly true where the Hotel is operating at a profit and filed the Plan, which provides for preservation of the value of the Hotel for the benefit of all creditors.  *See In re Hyatt*, 479 B.R. at 888.

32.     Moreover, any suggestion by the UST that the CRO has somehow abdicated his duties to the third party Management Company is simply false.  As detailed above, the CRO has played and continues to plan an integral role in this Chapter 11 Case.  Mr. Goldwasser helped prepare and signed the Chapter 11 petition, submitted the Local Rule Affidavit, helped prepare and signed each monthly operating report as the responsible party and assisted with the preparation of the Plan.  Indeed, as CRO, Mr. Goldwasser has considerable authority over the Debtor's post-petition operations and restructuring efforts.  Mr. Goldwasser interacts frequently with the Management Company in its operations on behalf of the Hotel as well as all estate professionals in overseeing the Chapter 11 Case and currently, in formulating the Plan of reorganization.

33.     Finally, the UST states that "G.C. is being paid $15,000 a month post-petition and will receive certain success fees."  Mot. p. 5.  To be clear, G.C. Realty has not received any such management or success fee to date and the Debtor fully intends to seek Court approval before any such payments are made.

34.     Accordingly, similar to the issue described above, the Debtor has been fully transparent with respect to its retention of the CRO and any misunderstanding or discrepancy has no material effect on the estate or Chapter 11 Case and in any case, has now been clarified by the Debtor.  The UST provides no basis whatsoever that would support cause under §1112(b).  *In re Hyatt*, 479 B.R. at 888 (no gross mismanagement where "discrepancies were all easily

explained"); *see also In re Tosh*, 2012 WL 6629697 (Bankr. E.D.N.C. Dec. 19, 2012) (the court reconsidering its prior decision to convert under section 1112(b)(4)(B) where the debtor addressed and corrected instances of mismanagement including inaccuracies and reporting problems in its monthly operating).

### 3.    The Debtor Maintains Only Its Designated Debtor-In-Possession Accounts, Into Which All Debtor Revenue Is Deposited for the Benefit of Its Estate and Creditors

35.    The UST further argues (without any basis whatsoever) that "the Debtor is maintaining non-debtor bank accounts apart from the debtor in-possession account" (Mot. p. 5) and transferring millions of dollars to such accounts "beyond the scrutiny of the Court." Mot. p. 1. Such baseless allegations grossly misstate the *actual* facts here, which have been explained to the UST, most recently through the detailed Cash Management Motion, which was filed *before* the Motion, in part, to clear up this very issue.

36.    The Local Rule Affidavit first disclosed at the outset of this case that "[t]he Debtor's day to day operations are managed by a hotel manager which has managed the business throughout the [prepetition period]…" LRA ¶ 38. The Local Rule Affidavit further disclosed that "[t]he Debtor intends to maintain the status quo with no change in day-to-day management." *Id.* As detailed above, part of that status quo is the fact that the Management Company retains and pays the Hotel vendors and employees, as provided for in the Management Agreement. Prior to the Petition Date, the Debtor and Management Company employed the Cash Management System to implement their Management Agreement and to collect, transfer and disburse funds generated by the Hotel and required to cover such Hotel expenses paid by the Management Company.

37.    As detailed in the Cash Management Motion, the Cash Management System includes both the DIP Accounts, into which all revenue from the Debtor's operations is

18

deposited, and the Non-Debtor Accounts, which were established in order to pay creditors and employees of the Management Company for services provided to the Hotel, as well as other Hotel expenditures handled by the Management Company.  While these accounts mirror prepetition accounts of both the Debtor and Management Company, the Debtor established the DIP Accounts as of the Petition Date (as the UST was advised at the initial debtor interview) and the Management Company opened the Non-Debtor Accounts post-petition, dedicated solely to post-petition disbursements made on behalf of the Hotel.

38.     Through the integrated Cash Management System, the Management Company reviews at least weekly with the Debtor all Hotel operating costs that are due and as confirmed by Mr. Podgainy, the Debtor transfers the amount needed to cover such expenses from the Central DIP Account to the Non-Debtor Accounts.  Accordingly, the amounts transferred from the Central DIP Account to the Non-Debtor Accounts are only those amounts specifically needed to fund Hotel operations – in the amount of the payments to be made by the Management Company for such purpose.  Indeed, all such Hotel expenditures are included in the Debtor's monthly budget and to ensure complete transparency, bank statements for both the DIP Accounts and Non-Debtor Accounts evidencing this payment system – and all transfers between the DIP Accounts and Non-Debtor Accounts – are attached to the Debtor's monthly operating reports. *In re Hyatt*, 479 B.R. at 888 (no gross mismanagement where the debtor managed various companies' assets in a way to maximize the value including a number of intercompany transfers and finding "there was no evidence whatsoever of any attempt to conceal or mischaracterize any asset, debt or transaction at any time.").

39.     Indeed, these facts are not new to the UST.  Following multiple discussions with the UST regarding the same, the Debtor filed the Cash Management Motion to clear up any

confusion as to the maintenance of the DIP Accounts and Non-Debtor Accounts and in an abundance of caution to request that the Court authorize the Debtor's transfer of funds from the DIP Accounts to the Non-Debtor Accounts.  In any case, however, these accounts are maintained in the ordinary course of business with full transparency as to all transfers between accounts and the purpose of the same.  That said, as noted above, in the interest of addressing the UST's concerns (and despite the expense and logistical disruption created by such), the Debtor has discussed with the UST establishing additional debtor-in-possession bank accounts to replace the Non-Debtor Accounts, which it is agreeable to implement if need be, subject to working out logistics for such.

40.    Against this backdrop, the UST's allegations that the Debtor maintained unauthorized accounts for the nefarious purpose of shielding assets from scrutiny by this Court and interested parties, is entirely baseless (and disingenuous) and cannot support cause under § 1112(b).  *In re Northwest. Co., LLC*, 2020 WL 6927661 at *2 (Bankr. S.D.N.Y. Nov. 20, 2020) ("The possibility of a conversion based on gross mismanagement contemplates the presentation of actual proof of gross mismanagement, not merely a statement of suspicion or of a desire for future investigation.").

**4.    The Cases Cited By the UST Are Entirely Inapposite and Do Not Support a Finding of Cause Under § 1112(b)**

41.    The only two cases cited by the UST to support gross mismanagement under 1112(b)(4)(B) are entirely inapposite under the facts at issue here.

42.    First, the UST relies on *In re ARS Analytical, LLC*, 433 B.R. 848, 864 (Bankr. D. N.M. 2010), where the court found that several examples of mismanagement of the estate together constituted gross mismanagement, holding that "[e]ach individual [example] may not be significant, but, when taken together, they amount to a gross mismanagement.".  Mot. p. 5.  As

an initial matter, and as established above, most of the examples of mismanagement relied on in *ARS Analytical* do not exist here – *e.g.*, limited involvement of the debtor's officers in the daily operations of the debtor, the COO's delegation of the preparation of monthly operating reports and inability to confirm the accuracy of such reports, and the debtor's apparent lack of understanding of its assets and its financial affairs. *ARS Analytical,* 443 B.R. at 864. In addition, the court in *ARS Analytical* found cause under 1112(b)(4)(A) and found that the debtor showed no prospects of rehabilitation. *Id*. at 862, 865. Cleary inapposite here, as detailed above, the Debtor is profitable and formulated the Plan of reorganization and is clearly capable of successfully rehabilitating. Further, the records in *ARS Analytical* showed allegations far more serious than those made here – *e.g.*, unauthorized offsets that were allegedly preferential transfers, which would be best reviewed by a trustee. *Id*. at 864.

43. Second, the UST cites to, *Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 904-05 (N.D. Cal. 2016), which is clearly distinguishable where the court found it was unable to identify even the nature of the debtor's business or source of income and where the debtor failed to follow court orders. Mot. p. 5. To the contrary here, the Debtor has not failed to comply with any reporting requirement, let alone a court order, and has been entirely transparent by clarifying each issue raised by the UST both verbally and in subsequent Court filings and has fully disclosed all pertinent financial and business information through its monthly operating reports.

44. Neither case supports a finding of gross mismanagement here.

744051918.1

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court deny the

Motion in its entirety with prejudice and grant such other and further relief as the Court deems

just and proper.

Dated:  September 27, 2021
        New York, New York

Respectfully submitted,

By:  /s/ *Douglas  Spelfogel*
Douglas Spelfogel
Leah Eisenberg
Jason I. Kirschner
Dabin Chung
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 506-1910
Email: dspelfogel@mayerbrown.com
      leisenberg@mayerbrown.com
      jkirschner@mayerbrown.com
      dchung@mayerbrown.com

*Proposed Co-Counsel to the Debtor*
*and Debtor in* Possession

Mark Frankel
**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor and Debtor-in-*
*Possession*