KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
: 
In re:                                                       :   Chapter 11
                                                             :
96 WYTHE ACQUISITION LLC,                                    :   Case No. 21-22108 (RDD)
                                                             :
                    Debtor.                                  :
                                                             :
--------------------------------------------------------------- X

**LENDER'S JOINDER IN UNITED STATES TRUSTEE'S**
**MOTION TO CONVERT OR DISMISS CASE**

Benefit Street Partners Realty Operating Partnership, L.P.[1] ("**Benefit Street**") hereby joins the United States Trustee's (the "**UST**") motion to convert this case to chapter 7 or dismiss it [ECF No. 87] (the "**Motion to Convert**"). In support of this joinder Benefit Street respectfully represents as follows.

**PRELIMINARY STATEMENT[2]**

1.   For the first five and half months of this case, the Debtor represented to the Court and creditors that *it* operated the Williamsburg Hotel and *it* employed the Hotel staff. On this

---

[1] Benefit Street is a wholly-owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.

[2] Most of the statements in this Joinder have been set forth in prior pleadings filed by Benefit Street but, for ease sake, are summarized here again for the Court as relates to the Motion to Convert.

1

basis, it prepared schedules, engaged with its lender, and negotiated multiple cash collateral orders and budgets – which were used to fund the Hotel's operations.

2. Now, well into its extended exclusive period, and after repeated (and justified) criticism from the UST over its lack of transparency, the Debtor finally confesses that its representations were untrue, and that its affairs are managed and its staff employed by a non-debtor Hotel Manager controlled by the same principals that control the Debtor. In support of these assertions, a previously undisclosed, 18-page, single-spaced management agreement mysteriously appears which the Debtor claims governs the affiliates' relationship and assets (the "**Purported Management Agreement**"). The terms of this newly unveiled management agreement betray obvious self-dealing by the principals to the detriment of all estate creditors.

3. Understandably, this agreement came as a shock to the UST, especially because the Debtor never produced this agreement in response to the UST's many inquiries, nor did it disclose this unquestionably material agreement as an executory contract in its schedules. Such an omission cannot credibly be viewed as an oversight. The newly disclosed agreement came as a shock to Benefit Street for a different reason. The management agreement the Debtor now presents is dated November 21, 2017, just three weeks before the closing of Benefit Street's $68,000,000 loan. At the closing of that loan, the Debtor disclosed and assigned a drastically different management agreement to Benefit Street (one far less disadvantageous to the estate) as collateral for its loan (the "**Management Agreement**"). At the same time, the Debtor and the Hotel Manager (in documents signed by the same controlling insiders), as well as their counsel, expressly represented to Benefit Street that no other such management agreement existed.[3] For the Debtor to now present a detailed agreement (if authentic) signed while Benefit Street's loan

---

[3] Benefit Street reserves all rights and claims that it has against the non-debtor Hotel Manager for, among other things, breach of the representations made to Benefit Street.

2

was being negotiated suggests that these representations – made by exact same people – were not just false, but intentionally false.

4. As previously disclosed to the Court, equally troubling is the Hotel Manager's conduct in connection with the PPP loan. In violation of the state-court receiver order, the Hotel Manager applied for and received a $1,438,000 PPP loan, based upon the wages of the Hotel's staff. Although the application for the loan required the Hotel Manager to disclose its affiliates, it failed to identify the Debtor – *the owner of the Hotel*. Less than year later, the Hotel Manager applied for a second PPP loan – and again omitted any reference to the Debtor. Despite these efforts to hide the affiliation, the bank discovered the existence of the Debtor and this bankruptcy – and asked very pointed questions. Desperate to get the loan, in an exchange that occurred the day after the Petition Date in this case, the Hotel Manager's principals – again, who are also the Debtor's principals – claimed that the Hotel Manager was a standalone business and the Debtor merely owned the real property (in essence, that it was a "propco"). Ultimately, these maneuverings failed. The bank declined the loan because of the Hotel Manager's concealment of the Debtor.

5. There is also clear evidence that the Hotel Manager did not use the PPP loan proceeds to benefit the Hotel. When the PPP loan was funded, the Hotel Manager moved all $1,438 million of the loan proceeds out of the Hotel's master account and into an account whose holder the Debtor has never identified, all under the nose of a court-appointed receiver. Discovery to date suggests that only about $357,000 may have been returned to the Hotel and that payroll and utility expenses (the authorized purposes of the PPP loan) were instead funded from Hotel revenues. This apparent self-dealing and mismanagement had consequences. When revenues ran

short, the Debtor (under the control of Hotel Manager) could not pay almost $2 million in real estate taxes and hundreds of thousands of dollars in utility payments.

6. Benefit Street does not raise these concerns lightly. They are very relevant to the Motion to Convert and this Joinder because *the individuals managing the Debtor and the Hotel Manager (who are one and the same) have acted dishonestly and engaged in clear (and potentially unlawful) self-dealing*. Such apparent mismanagement and dishonesty mandates the appointment of a trustee (whether under Chapter 7 or Chapter 11). Not only will such an appointment ensure the honest administration of the estate, but it will also install an unconflicted fiduciary to investigate and potentially pursue claims against the Hotel Manager and the Debtor's insiders – claims that have never been properly investigated in these cases and, indeed, cannot be properly investigated until an independent fiduciary is appointed. This relief will not result in a "forced liquidation" as the Debtor hyperbolically and inaccurately claims. A trustee can easily continue the operation of the Hotel as a going concern. There is a well-developed market for third party hotel management services who can quickly be retained by a trustee. This would not only minimize disruption, but an experienced manager would likely improve operations. Benefit Street is prepared to work with a trustee to preserve the Hotel's ongoing business operations.

7. Finally, the recent filing of the Debtor's Chapter 11 plan provides no grounds to deny the motion. That plan is facially non-confirmable and seeks overreaching benefits to the same dishonest insiders at the expense of all creditors. There are viable alternatives, moreover, including a plan that Benefit Street would be prepared to proceed with that enhance the recovery for all the estate's creditors.[4]

---

[4] In fact, should the Court elect to appoint a Chapter 11 Trustee, Benefit Street is prepared to proceed with an alternative Chapter 11 plan with such trustee.

4

## FACTS

8.     The facts underlying this joinder are set forth in Benefit Street's Objections to (i) the Debtor's Cash Management Motion [ECF No. 106], ¶¶ 7-24 (facts related to Hotel Manager and Hotel Manager Agreement) and (ii) the Hotel Manager's Motion to Quash Rule 2004 Discovery [ECF No. 109], ¶¶ 6-26 (facts related to PPP loan). They will not be repeated here.

### THE COURT SHOULD CONVERT THE CASE OR, IN THE ALTERNATIVE, APPOINT A CHAPTER 11 TRUSTEE

9.     The UST has moved to convert or dismiss the case under Section 1112(b) of the Bankruptcy Code. Benefit Street hereby joins in that motion. In addition, to the extent that the Court is concerned about the impact of Chapter 7 on the management of the Hotel or the continued operation of its business, Benefit Street would support the appointment a Chapter 11 trustee under Section 1104 of the Bankruptcy Code and will immediately work with any trustee appointed (whether Chapter 7 or 11) to provide for the ongoing operation of the Hotel to minimize any disruption.

10.     Section 1112(b) of the Bankruptcy Code allows the Court to convert a chapter 11 case to chapter 7 if certain conditions are met. In pertinent part, that section provides,

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). Section 1112(b)(4) lists several examples of "cause" for the conversion to chapter 7, including "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). This list of factors, however, is not exhaustive, and "courts are free to consider other factors." *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citing *In re Ameribuild Constr. Mgmt., Inc.*, 339 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009)) ("The list contained in § 1112(b) is

5

not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.") (internal citation omitted). Courts use several factors to determine whether conversion to chapter 7 is appropriate, including whether a debtor "had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests." *In re BH S&B Holdings,* 439 B.R. at 346 (citing 7 Collier on Bankruptcy ¶ 1112.04[6]). The actions of the Debtor and the Hotel Manager both before and during this Chapter 11 case provide ample cause to convert this case.

11. Section 1112(b)(4)(B) provides for a conversion when the debtor has caused "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). Courts in this district have taken a somewhat expansive view of this language, and have converted chapter 11 cases where the Debtor has made false or incomplete disclosures of critical information. *See, e.g.*, *In re Halal 4 U LLC*, No. 08-15216 (MG), 2010 WL 3810860, at *5 (Bankr. S.D.N.Y. Sept. 24, 2010) (converting case under this section because circumstances surrounding filing and required disclosure were suspicious and the debtor had to file amended schedules for failure to list properties that were not initially disclosed). The *Halal 4 U* court also found that failure to make accurate and complete postposition disclosures qualified as gross mismanagement of the estate warranting conversion to chapter 7. For example, the debtor in that case had failed to accurately represent its interests in its properties. *Halal 4 U*, 2010 WL 3810860, at *4.

12. The UST correctly points out that from the first days of the case, the Debtor persistently obscured the nature and extent of the Hotel Manager's role in its operations. Although the Debtor's First Day Affidavit acknowledged the existence of the Hotel Manager in two sentences, ECF No. 8, ¶ 38, it provided no indication of the extent or terms of that relationship. What details it did provide, moreover, were misleading. The Debtor's First Day Affidavit and

6

cash collateral motions describe *the Debtor* as owning and operating the Hotel and *the Debtor* as having 80 employees. The basis on which the Debtor made these sworn statements is unclear given that, just two days before the Cash Collateral Motion was filed, the Debtor's principals were locked in a last-ditch effort *on behalf of the Hotel Manager* to obtain a second draw PPP loan after Live Oak Bank discovered their various misrepresentations. As part of this effort, they explained to Live Oak Bank that *the Hotel Manager* operated the Hotel, that *the Hotel Manager* employed 90-200 employees, and that the Debtor was only "the ownership entity for the building, 96 Wythe Acquisition LLC." *See* ECF No. 109, Ex. M at 1-2. Such a dramatic inconsistency cannot be overlooked.

13. Rather than correct its apparent misstatements, the Debtor continued to conceal the role and interests of the Hotel Manager. Although the Debtor now argues that its relationship with the Hotel Manager is governed by an 18-page formal agreement, the Debtor failed to disclose that unquestionably material agreement as an executory contract in its schedules, even though the Schedules were filed *more than ten weeks* after the Petition Date. *See* ECF No. 31, at 22. Nor did the Debtor disclose the Hotel Manager as holding claims against the estate, *see id.* at 10-21, even though it now claims *over $2 million* in fees were owed to it. Worse, over the first several months of the case, the Debtor presented Benefit Street – and the Court – with multiple cash collateral budgets and negotiated serial interim cash collateral orders which present the operating expenses of the Hotel as *the Debtor's* operating expenses, *not* the expenses of the Hotel Manager. At no point did the Debtor disclose that its cash was funding operating expenses of the non-debtor Hotel Manager or that the Hotel Manager was claiming a material fee.[5]

---

[5] Benefit Street reserves all rights with respect to the alleged accrual of any fee payable to the non-debtor Hotel Manager and the entitlement to payment of <u>any</u> such fee under its operative agreements with Benefit Street.

7

14. Aside from these material non-disclosures, there is ample evidence of mismanagement and self-dealing by the Debtor and its principals. As an initial matter, while committed in the name of the Hotel Manager, the misrepresentations and mismanagement described in Benefit Street's Objection to the Hotel Manager's Motion to Quash and Objection to the Debtor's Cash Management Motion [ECF Nos. 109, 106] were effected by or at the direction of Ms. Moskovits and Mr. Lichtenstein, who control the Debtor and are the operating fiduciaries in this case.[6] They knew but did not disclose the role of the Hotel. They knew but did not disclose that they had signed the Purported Management Agreement (if indeed it was signed at the time) and concealed it from Benefit Street, among others. They knew, but did not disclose to the Receiver, that the Hotel Manager had applied for and received a $1.438 million PPP loan. They almost certainly knew that the Hotel Manager had withdrawn those funds from the Hotel's Master Account and transferred them to an account they will not identify. They knew – despite what they affirmatively misrepresented – when they sought forgiveness of the PPP loan that all of the proceeds of the PPP loan had in fact not been used to fund payroll and utility expenses.[7] Finally, they knew that they had presented Live Oak Bank with tax returns asserting that the Debtor's Hotel revenues belonged to the Hotel Manager (a result which is inexplicable given the Hotel Manager's fee structure).

15. With respect to the PPP proceeds, bank statements recently received from Bank of America show that the Hotel Manager almost entirely depleted those proceeds by the end

---

[6] Mr. Lichtenstein is also CEO of Mint Development Corp., an entity which has received over $30,000 from the Debtor during this bankruptcy proceeding for undisclosed reasons, as reflected in the Debtor's monthly operating reports. *See* ECF No. 72 (June monthly operating report); ECF No. 91 (July).

[7] While Benefit Street understands that the Court prefers not to dwell on a second PPP loan that was not made, the facts surrounding the principals' attempt to obtain this loan are nonetheless extremely relevant to the dishonest conduct of the fiduciaries presently in sole control of this case. These are serious allegations that go to the integrity of how this case is being administered and the best interest of creditors.

8

of December 2020.[8] Many of the 2020 transfers could not plausibly be appropriate PPP expenditures and include $176,000 in payments to various law firms and $197,000 payments to construction services (subcontractors, architects, and engineers). Moreover, the statements reflect at least $468,000 to various payees, including payments to:

- GC Realty Advisors LLC (David Goldwasser's company);

- Downtown Capital Partners (an investor/lender in distressed assets);

- Heritage Equity Partners (the Debtor's parent company);

- 286 Rider Associates (a property in the Bronx owned by Ms. Moskovits);

- Payroll expenses for Northside Development (a company owned by Mr. Lichtenstein);

- What appears to be an insurance payment for Mint Development Corp. (a company owned by Mr. Lichtenstein); and

- More transfers to unknown accounts.

From these transfers alone, it appears the Hotel Manager used those funds – obtained expressly to pay Hotel expenses – for other businesses and purposes. The Hotel Manager then got the loan forgiven by misrepresenting that those proceeds were used for payroll. This is both dishonesty and mismanagement, which should be disqualifying for an estate fiduciary.

16.    Moreover, the Debtor itself has also committed independent acts of mismanagement. The Debtor affirmatively represented to Benefit Street at closing in both the Loan Agreement and the Management Agreement that no other management agreement existed with the Hotel Manager. It now argues that its relationship with the Hotel Manager is governed by an agreement dated a mere three weeks before the closing of Benefit Street's Loan – precisely

---

[8] The 2020 year-end balance for the 0102 Account was about $172,000.

9

the document it represented did not exist. Not only did the Debtor conceal this agreement (if indeed, it is authentic), but the agreement itself appears to be an intentional fraudulent conveyance, secretly conferring extraordinary benefits on an affiliate controlled by the Debtor's principals at the expense of the Debtor and its various creditors.

17. The actions of the Debtor, the Hotel Manager, and their principals may give rise to substantial claims on behalf of the estate. These claims include:

- an action to avoid the Purported Management Agreement; and

- an action against the Hotel Manager based upon its unauthorized application for the PPP loan, potential misappropriation of PPP loan proceeds, and failure to use those proceeds to pay Hotel expenses – consistent with the purposes of the CARES Act and PPP loan – and instead use revenues from the Debtor's Hotel to pay such expenses, thereby claiming forgiveness of the PPP loan. Had PPP proceeds been used consistent with their purposes, other operating revenues from the Hotel would have been available to pay, among other things, taxes and avoid the accrual of excess, interest-bearing tax claims against the Debtor.

18. Other facts demand an independent investigation of the Debtor and its principals and affiliates to identify additional estate claims against them.

19. If the Debtor's operating fiduciaries have misappropriated over $1 million in PPP loan proceeds, it is reasonable to suppose that there may be other acts of self-dealing that have depleted the estate and injured creditors.

20. The alleged tax returns the Hotel Manager provided to Live Oak Bank appear to assert that the Debtor's revenues belong to the Hotel Manager. An investigation is required to determine whether the Hotel Manager misappropriated Hotel revenues or any tax benefits that should have accrued to the Debtor.

21. The Debtor acknowledges that it had over $20 million in revenue in 2019. It paid no debt service during that year (although over $6 million was payable). Together, these

facts suggests that the Debtor should have had a substantial cash surplus at the beginning of 2020 when the Receiver was appointed. An investigation is required to determine whether the Debtor built excess cash in 2019 and, if so, what happened to that money.

22. The Debtor is obviously conflicted and cannot investigate or prosecute claims against itself, the Hotel Manager, or its controlling insiders or its affiliates. Nor can its retained professionals do so. In the absence of a creditors' committee in this case, it is essential that an independent estate fiduciary be appointed to investigate and pursue these claims on behalf of the estate. The appointment of a trustee – whether through conversion to Chapter 7 or the appointment of a Chapter 11 trustee – can perform this function.

23. Appointment of an independent fiduciary is also needed to provide basic transparency about the affairs of the prepetition Debtor and the estate after months of obfuscation and concealment. The Debtor failed to make basic disclosures about fundamental matters such as the management and workforce of the Hotel as well as the handling of its revenues and cash – so much so that the UST filed its motion. When Benefit Street has sought information, the Debtor has delayed and generally has provided only very limited information, if it responds at all. Until this month, when Benefit Street had been forced to seek discovery, the Debtor has not cooperated voluntarily. Instead, it has first objected to all requests *in toto*, forcing this Court repeatedly to rule on discovery issues. Even when the Court has ruled, moreover, the Debtor has done the bare minimum necessary to claim compliance, making minimal productions and forcing further hearings.

24. The discovery relating to the PPP loan provides a telling example. First, the Debtor refused to produce its bank statements during the full period of the Receivership. When the Court ordered the bank statements produced, the statements revealed two substantial transfers

11

that had been swiftly moved out of the operating account to an unidentified account. When the court ordered the Debtor to explain the transfers, it said only that they were government assistance loans. When Benefit Street found evidence that they were PPP and EIDL loans, the Court ordered the loan documents and applications to be produced. Even then, the Debtor produced only the PPP application document and not the payroll information on which it was based. When the Debtor claimed it did not have this information, the Court ordered Rule 2004 discovery of the Hotel Manager. The Hotel Manager then objected to that discovery *in toto.* Production was scheduled to occur September 27, almost two months after the original subpoenas were served. Yesterday, on the day its production of Rule 2004 discovery was due, the Hotel Manager filed a motion to reargue its motion to quash in yet another attempt to impede discovery. *See* ECF No. 123.

25. If the past is any guide, the Debtor will respond to these facts with *ad hominems*, claiming that Benefit Street is "overreaching" or a "bully." But the Debtor has responded in exactly the same manner to the UST – an arm of the Department of Justice – hardly a bully. As the UST's motion and supporting declaration illustrate, the Debtor repeatedly failed to respond accurately or completely to the UST's information requests and, over the course of months, withheld the extent of its relationship with the Hotel Manager as well as the Purported Management Agreement. When they finally were forced to comply, their disclosures raised serious issues about the conduct of the Debtor and the Hotel Manager, which have now prompted further discovery and further litigation. At bottom, the Debtor has demonstrated time and again that it will not make proactive or forthright disclosures about its operations but will try to stiff-arm or slow walk information requests about the estate no matter who makes them. Continuing down this path will aggravate the suspicions of stakeholders and generate a cycle of litigation that

12

squanders estate resources and benefits only the out-of-the-money equity holders who have failed to provide transparency. The time has come to replace them.

26.     Benefit Street notes that Section 1112 of the Bankruptcy Code allows the Court to deny conversion or dismissal if it concludes that the appointment of a Chapter 11 trustee is in the best interests of creditors and the estate. *See* 11 U.S.C. § 1112(b)(1). Such relief may be appropriate here where there is an operating business and the potential for a refinancing or other value maximizing transaction. Benefit Street notes that there is a well-developed market for hotel management services. Third party independent managers routinely provide such services to recognized hospitality chains, such as Marriott or Hilton, as well as to stand alone boutique hotels like the Williamsburg Hotel. These managers are far more experienced than the Hotel Manager, which has only three years of experience in a single hotel that could not pay debt service or property taxes. If appointed, a Chapter 11 trustee could readily retain such a third party manager, which promises not only to minimize any disruption from the trustee's appointment, but also to improve the operations of the Hotel.

## **CONCLUSION**

27.     For the foregoing reasons, the Court should grant the UST's motion to convert or dismiss the case or, in the alternative, appoint a Chapter 11 Trustee, and grant Benefit Street such other and further relief as may be just and proper.

Dated: September 28, 2021
      New York, New York

                                KRAMER LEVIN NAFTALIS &FRANKEL LLP

                                /s/ P. Bradley O'Neill
                                Adam C. Rogoff
                                P. Bradley O'Neill
                                Kramer Levin Naftalis & Frankel LLP
                                1177 Avenue of the Americas
                                New York, New York 10036
                                Telephone: (212) 715-9100
                                Facsimile:  (212) 715-8000
                                Email: arogoff@kramerlevin.com
                                            boneill@kramerlevin.com

                                *Attorneys for Benefit Street Partners Realty*
                                *Operating Partnership, L.P.*