| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | HEARING DATE: October 6, 2021<br>HEARING TIME: 2:00 p.m. |

-----------------------------------------------------------x
: Chapter 11
In re: :
: Case No. 21-22108 (RDD)
96 WYTHE ACQUISITION LLC, :
:
                       Debtor. :
-----------------------------------------------------------x

**REPLY TO DEBTOR'S OBJECTION TO THE UNITED STATES TRUSTEE'S
MOTION FOR AN ORDER TO CONVERT THIS CHAPTER 11 CASE TO A
CHAPTER 7 CASE OR, ALTERNATIVELY, TO DISMISS THIS CHAPTER 11 CASE**

TO: THE HONORABLE ROBERT D. DRAIN,
     UNITED STATES BANKRUPTCY JUDGE:

       This Reply is respectfully filed in support of the motion of William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee") for an order converting, or, alternatively, dismissing the Chapter 11 case of 96 Wythe Acquisition LLC (the "Debtor") pursuant to 11 U.S.C. § 1112(b) [Dkt. No. 87] (the "Motion") and to address certain representations made by the Debtor in its objection to the Motion [Dkt. No. 124] (the "Objection") and in its disclosure statement (the "Disclosure Statement") [Dkt. No. 116]. In support thereof, the United States Trustee respectfully represents and states as follows:

## I. INTRODUCTION

       A bankruptcy proceeding is not like other litigation. The Debtor voluntarily entered bankruptcy and must fully reveal its financial affairs, in exchange for bankruptcy's powerful protections. A policy of disclosing material facts grudgingly and under pressure may work outside of bankruptcy but violates the basic bankruptcy hallmark of transparency.

       As explained in the Motion, the Debtor failed to adequately explain the Debtor's business operations in a timely and forthright manner. These failures were in no sense trivial or "technical" (as described by the Debtor) and by themselves constitute grounds for the

appointment of a trustee or dismissal of this case.

Of immediate concern, however, are the continuing new revelations as reflected in the Objection and the Disclosure Statement, both filed by the Debtor after the Motion. Although the Debtor states that its arrangements with Williamsburg Hotel BK LLC, the Hotel's management company (the "Management Company"), have been "fully disclosed by the Debtor through various filings and representations,"[1] as discussed below, this simply is not true. In addition, the issue of the PPP loans was not addressed in the Objection, and the Disclosure Statement states merely that "the Management Company received $1,438,000.00, of which it reinvested approximately $400,000.00 into the hotel, and disbursed the remaining amount into other business activity."[2] The Debtor did not explain what it meant by "other business activity." The Debtor likewise did not explain why it has no cause of action against the Management Company for this apparent diversion of funds from Debtor coffers.

Further, as described in the Motion, at the Debtor's Initial Debtor Interview ("IDI"), the United States Trustee asked for an explanation of Mr. Goldwasser's role, and whether he entered into any written agreement as CRO with the Debtor. Mr. Goldwasser promised a response, but that response was not immediately forthcoming. The Debtor now explains in its Objection that it "formalized" the arrangement with Mr. Goldwasser well after the IDI. In its agreement between G.C. Realty Advisors LLC ("G.C.," Mr. Goldwasser's company, and not Mr. Goldwasser individually), G.C. is to receive a monthly fee and success fee. But the fact remains that Mr. Goldwasser did not volunteer at the IDI that the CRO was "G.C." and not him individually.[3]

---

[1] Objection, ¶ 15.
[2] Disclosure Statement at 17.
[3] The Debtor did not disclose the existence of the Management Agreement as an executory contract in its bankruptcy schedules of assets and liabilities, which were filed on May 5, 2021. See Schedule G [Dkt. No. 31].

Certainly, there is no hint of G.C.'s involvement in the Local Rule Affidavit. The United States Trustee has no confidence that the Debtor can conduct itself as a proper fiduciary.

## I. RELEVANT BACKGROUND

1. On February 23, 2021 (the "Petition Date"), the Debtor filed a voluntary petition under Title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"). [Dkt. No. 1].

2. The Debtor owns real property located in Brooklyn, New York, comprising a thirteen-story, 160-room hotel with a rooftop pool, a bar and restaurant and a separate, elevated and enclosed bar that sits above the pool referred to as the Water Tower Bar (the "Hotel"). According to the Local Rule Affidavit, "[t]he Debtor has approximately 80 employees." See Local Rule Affidavit [Dkt. No. 8], ¶ 2.

**The Motion to Convert or Dismiss**

3. On August 18, 2021, the United States Trustee filed the Motion, in which Benefit Street Partners Realty Operating Partnership, L.P.1 ("Benefit Street" or "Lender"), as the Debtor's secured creditor, joins. [Dkt. No. 127].[4] The United States Trustee has asserted that the Debtor has failed to provide basic documents explaining its relationship with a third-party management company. After stating at the beginning of the case (in at least two pleadings) that the Debtor has employees, the Debtor later disclosed that the employees are working for the third-party management company. The Debtor's chief restructuring officer has likewise failed to clarify the relationship of his company to the Debtor and these third parties. In the Motion, the United States Trustee observed that a chapter 11 debtor must provide forthright answers to

---

[4] The Lender makes certain additional allegations based on its own discovery which the United States Trustee has not confirmed but has no reason to doubt.

3

United States Trustee's questions. Because the Debtor has failed act in a transparent manner, the Court should convert the case to one under Chapter 7 or dismiss the case due to the Debtor's gross mismanagement of the estate.

### **The Debtor's Objection and Filing of Disclosure Statement and Plan**

5. On September 27, 2021, the Debtor filed its Objection to the Motion [Dkt. No. 116]. In it, the Debtor acknowledged that it had made several inconsistent statements in its filings, including the misstatement that the 80 employees were employed by the Debtor.[5] See Objection at 3. The Debtor also tried to address the concern over the CRO's retention by explaining that Mr. Goldwasser was working through his "closely held, single member limited liability company," Objection at 4; however, there was no disclosure of the existence of this company in the Local Rule Affidavit or the Schedules.

6. With respect to cash management motion, other than wanting to "clarify" transfers, "out of an abundance of caution," the Debtor did not address the reasons why transferring millions of dollars to third-party accounts, which may be subject to garnishment by creditors unrelated to the Debtor, is appropriate, especially because the Debtor acknowledges it can transfer these management accounts to debtor-in-possession accounts. Objection at ¶ 5.[6]

7. On September 20, 2021, a week before the filing of the Objection, the Debtor filed a Plan and Disclosure Statement. See Dkt. Nos. 115-116. In the Disclosure Statement, the Debtor disclosed the existence of certain Paycheck Protection Program ("PPP") loans received by the Management Company approximately one year prior to the Petition Date, in the

---

[5] In addition to statement in the Local Rule Affidavit, the Debtor again stated that it has 80 employees in its Cash Collateral Motion, and that payment of wages was one of the needs for the use of cash collateral. See Cash Collateral Motion [Dkt. No. 4], ¶ 2.

[6] The Debtor claims, without any supporting evidence, that the transfer of the accounts would be costly and inefficient.

4

amount of $1,438,000.00. See Disclosure Statement at 17. Of this amount, approximately $400,000 was reinvested into the Hotel, and the remaining amount disbursed "into other business activity." Id. The Debtor maintains that it has no rights or claims with respect to the PPP loans because the Management Company is the operating entity obligated to "pay the employees' salaries, as well as the other operating expenses for the Hotel[,]" and as such, the PPP loans "would necessarily be available only to the Management Company[.]" Id.

8. Notwithstanding the Debtor's assertion that it has no rights to the PPP loans and no claims against the Management Company, the Debtor further discloses that as part of its exit from this chapter 11, the Debtor and Management Company agreed to settle any and all purported claims relating to the PPP loans through a deferral of $2 million in claims for fees due to the Management Company through the Plan's Effective Date (until after allowed claims have been paid), an infusion of up to $8 million to the Debtor by the Plan Sponsor, with the agreed-to $1,438,000.00 PPP loan earmarked for return to the Debtor. See id.

9. According to the Debtor, the Plan will be implemented by and through a cash infusion in the amount of $8 million to be contributed from the Plan Sponsor[7] (of which $1.438 million will be allocated for the PPP diversions), as well as cash on hand (which the Debtor projects will aggregate approximately $2 million on the Effective Date), for a total available cash of approximately $10 million. See Plan § 5.4.

### III. LEGAL ARGUMENT

Under section 1112(b) of the Bankruptcy Code, on request of a party in interest, the Court shall dismiss a case under chapter 11 for "cause," which includes, *inter alia*, "gross mismanagement of the estate," unless the appointment of a trustee under § 1104(a) is in the best

---

[7] Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Plan.

interests of creditors and the estate. See 11 U.S.C. § 1112(b)(1), (4)(B). In other words, sections 1112(b)(1) and 1104(a) "require a court to consider three alternatives… whether to dismiss the case, convert the case to one under Chapter 7, or appoint a Chapter 11 trustee, whichever results in the best interest of creditors." In re McKenna, P.C., No. CA 10–472 ML, 2011 WL 2214763, at *2 (D.R.I. May 31, 2011) (internal citation and quotation marks omitted). See also In re Sillerman, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019) ("Section 1112(b) mandates conversion if "cause" is found under that provision, but authorizes the Court to exercise its discretion to instead appoint a trustee if it concludes it is in the best interest of creditors and the estate.").

Once the movant demonstrates "cause," the burden of proof shifts to the debtor to establish an exception under § 1112(b)(2). See In re MSR Hotels & Resorts, Inc., No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013); In re Vascular Access Centers, L.P., 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020) (citation and footnote omitted). "The Court has wide discretion in determining cause, and 'may consider other factors as they arise and use its powers to reach appropriate results in individual cases.'" In re McKenna, 580 B.R. 1, *10 (Bankr. D.R.I. 2017); see also In re The 1031 Tax Grp., LLC, 347 B.R. 78, 93 (Bankr. S.D.N.Y. 2007).

Here, there is ample cause to warrant dismissal or conversion of this chapter 11 case for gross mismanagement. As previously set forth in the Motion, the Debtor has made multiple misstatements with respect to its CRO, employees, and intercompany transactions with the Management Company, a non-debtor affiliate that is owned by the same insiders that control the Debtor and the Hotel.[8] The Debtor's response is a seemingly "what's the big deal" attitude—

---

[8] The Management Agreement (described below) is executed by Yechial Michael Lichtenstein on behalf of the Management Company. See Cash Management Motion, Ex. A.

6

contending that these are "technical discrepancies that have no effect on the estate or Chapter 11 Case." See Objection at 3.

Such a response is plainly unacceptable and frankly, misses the point. Collectively, the misrepresentations and delays in this case evince a theme of deliberate obscurity by the Debtor. By way of further example, save for a one-line reference to a "hotel manager" of the Debtor's day-to-day operations, the Local Rule Affidavit fails to specifically identify or describe the Management Company, its affiliated relationship to the Debtor, the nature and scope of the services provided by the Management Company, and the types and frequencies of the intercompany transfers between them. It was not until five and a half months after the Petition Date, that the Debtor filed its Cash Management Motion [Dkt. No. 83], attaching the Hotel Management and Services Agreement, dated November 21, 2017 (the "Management Agreement") between the Debtor and the Management Company—an agreement/arrangement that the Lender asserts is fraudulent[9]—disclosing the Debtor's transfers of funds (both pre- and post- petition) to a non-debtor affiliate, and seeking authority to continue with a cash management system that is apparently so customary that the Debtor had not previously felt the need to seek approval therefor. Indeed, the Debtor's Cash Management Motion itself leads to even more questions concerning the Debtor's operations. For example, the reconciliation detail

---

[9] See Cash Management Objection at 2, stating in part:

- At the closing of Benefit Street's loan, the Debtor actually assigned Benefit Street a materially different, one-page management agreement in December 2017 – one far less favorable to the Hotel Manager than the one purportedly entered into in November 2017 – and there is simply no credible comparison between the two documents[.]

- At the closing of Benefit Street's loan, which occurred roughly three weeks after the date of this previously concealed management agreement, both the Debtor and the Hotel Manager (again, acting through the same common, controlling principals) expressly represented to Benefit Street that no other management agreement existed – let alone this alternative version that reflects blatant self-dealing in favor of the insiders' separately held Hotel Manager business[.]

and bank statements attached to the Cash Management Motion shows multiple transfers to "Mint Development Corp.," a related affiliate of the Debtor that is also owned and controlled in part by Mr. Lichtenstein, without any explanations as to the nature of such transactions.[10]

The Debtor also contends in its Objection that dismissal of this case or conversion to a forced liquidation under chapter 7 would not benefit creditors, but rather wipe out their claims. See Objection at 3. That argument does not hold water because it ignores the fact that once converted, this Court may authorize the chapter 7 trustee "to operate the business of a debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. Thus, if the Hotel is operating profitably, as the Debtor claims, the Hotel need not be immediately liquidated in a fire sale, and can be operated for a long enough period to maximize the value of the asset, until the best liquidation strategy is devised, such as a going concern sale.

Moreover, as noted above, a motion under Section 1112(b) "provides the court with discretion to appoint a trustee rather than convert or dismiss a case under chapter 11, if the court determines that appointment of a trustee 'is in the best interests of creditors and the estate.'" In re NOA, LLC, 578 B.R. 534, 539 (E.D.N.C. 2017) (citing 11 U.S.C. § 1112(b)(1)). "The factors to be considered to determine the best interests are much the same as considered by the court in choosing among conversion, dismissal, or appointment of a trustee under Section 1104(a)." 7 Collier on Bankruptcy ¶ 1112.05 (16th ed. 2021); see also 11 U.S.C. § 1104(a)(1) ("on request of a party in interest of the United States Trustee… the court shall order the appointment of a trustee (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement…").

---

[10] These intercompany transfers to Mint Development Corp. are further confirmed through the Debtor's August Monthly Operating Report [Dkt. No. 130].

In addition to the misleading statements discussed in the Motion, the Debtor's disclosure of the PPP loans and PPP Settlement in the Plan and Disclosure Statement were belated.[11] Such disclosure of the PPP loans and PPP Settlement was undoubtedly spurred by the Benefit Street's Rule 2004 discovery requests and the revelation of the ostensible improper diversion of the Debtor's funds to the Management Company for use towards "other business activity" rather than benefitting the Hotel. See Dkt. Nos. 78-79.[12] Left to its own devices, and without vigilant scrutiny, the Debtor may not have negotiated the PPP Settlement in the Plan.

In the Disclosure Statement, the Debtor also discusses the receipt by the Hotel's Management Company of a certain Economic Injury Disaster Loan ("EIDL") loan in the amount of $149,000 during 2020. The Debtor quickly dismisses this loan as "having no connection to the Debtor." Disclosure Statement at 17, n.3. Since the Debtor has not provided the United States Trustee with any documents or other information concerning this EIDL loan, the United States Trustee cannot affirm the veracity or accuracy of the Debtor's statement.

Even if the Hotel is operating profitably now, and the Debtor has proposed a plan, the record of this case makes clear that the interests of creditors would be better served, at the very least, by the appointment of a trustee, whether under section 721 or section 1104 of the Bankruptcy Code, if not an outright dismissal. See, e.g., 7 Collier on Bankruptcy ¶ 1112.04

---

[11] As described in the Disclosure Statement and Plan, the PPP Settlement is to "settle any and all purported claims relating to the PPP loans through agreement by the Management Company to defer repayment of over $2 million in claims for fees due to the Management Company through the Plan's Effective Date until after all Allowed Claims (as defined in the Plan) have been paid, and the current equity holders, through the Plan Sponsor (as defined in the Plan), agreement to infuse up to $8 million (which, together with projected available cash on the Effective Date, equals approximately $10 million) into the Debtor, $1,438,000.00 of which is earmarked as a settlement payment[.]"

To the United States Trustee's knowledge, the Debtor has not explained the basis for the $2 million in fees due to the Management Company.

[12] Early in this case, the United States Trustee asked the Debtor, by counsel, if the Debtor received a PPP loan, and the Debtor's counsel answered "no" in an email. This is an example of an answer that may have been technically correct but is insufficient and misleading given what was subsequently ferreted out regarding the Debtor's business operations.

9

(16th ed. 2021) ("The court may choose the alternative of appointing a chapter 11 trustee upon a finding that the business of the debtor may operate profitably in a bankruptcy and thereby maximize payments to creditors."). A Trustee can run the sale process, and also investigate potential claims or causes of action the Debtor may have against the Management Company for the apparent diversion of PPP loans and other possibly improper inter-company transfers.

### IV.  CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court enter an order, pursuant to section 1112 of the Bankruptcy Code, dismissing or converting this case, or in the alternative, appoint a chapter 11 trustee as being in the best interest of the creditors; and granting such other further relief as may be deemed just and proper.

Dated: New York, New York
       October 4, 2021

                WILLIAM K. HARRINGTON
                UNITED STATES TRUSTEE

By:   /s/ Greg M. Zipes
      Greg M. Zipes
      Annie Wells
      Trial Attorneys
      201 Varick Street, Room 1006
      New York, New York 10014
      Tel. No. (212) 510-0500
      Fax. No. (212) 668-2255