KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
Priya K. Baranpuria
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners
Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
                                                            :

In re:                                           :    Chapter 11

96 WYTHE ACQUISITION LLC,           :    Case No. 21-22108 (RDD)

                        Debtor.            :

----------------------------------------------------------------X

**LENDER'S REPLY TO DEBTOR'S OBJECTION TO THE LENDER'S**
**MOTION TO APPOINT AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**

       Benefit Street Partners Realty Operating Partnership, L.P.[1] ("**Benefit Street**" or "**Lender**") submits this reply (the "**Reply**") in response to the Objection [Docket No. 151] (the "**Objection**") filed by 96 Wythe Acquisition (the "**Debtor**") to *Lender's Motion to Appoint an Examiner Pursuant to 11 U.S.C.* § *1104(c)* [Docket No. 147] (the "**Examiner Motion**").[2]

---

[1] Benefit Street is a wholly owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Examiner Motion.

1

KL2 3255633.10

1.  The central argument of Benefit Street's Examiner Motion is that the terms of the Debtor's proposed Plan require an investigation by an independent fiduciary. Under its Plan, the Debtor proposes to grant sweeping estate and third party releases to its controlling insiders, Ms. Moskovits, and Mr. Lichtenstein, and its affiliates from all claims. It would grant these releases to itself, which are obviously interested party transactions, even though no unconflicted fiduciary has conducted any independent investigation of the potential claims being released or the value of those potential claims. *The Debtor cannot investigate itself, and no official committee has been appointed*. On these facts, the appointment of an examiner is required to act on behalf of the estate and all its creditors to investigate the basis of the extraordinary benefit that the Debtor proposes to confer on itself, its affiliates and its obviously self-interested, controlling insiders.

2.  In 15 pages of opposition, the Debtor studiously ignores this argument and fundamental equitable principle. Unable to dispute that the terms of its own Plan (and the substantial benefits it provides to insiders) require the appointment of an independent fiduciary to investigate the claims being released, the Debtor retreats to bluster, invective and half-truths. None of its contentions, however, have merit.

3.  First, the Debtor argues that appointment of an examiner is unnecessary because Benefit Street has already had ample opportunity to investigate the Debtor. Objection ¶¶ 4, 7, 20. But Benefit Street has *never* been permitted to investigate the Debtor's prepetition or postpetition operations generally, the Debtor's transactions with its affiliates, or potential claims arising out of those transactions. Discovery in the state court foreclosure action was limited to narrow issues concerning the Debtor's default on Benefit Street's loan. Not only was the scope of this discovery necessarily limited to the litigation itself, but the Debtor's insiders did not even minimally cooperate with discovery. Indeed, Ms. Moskovits and Mr. Lichtenstein both separately walked

out of their depositions less than a minute after they began -- without answering a single question – and never returned. For them to now claim that the same state court discovery they openly flouted is an adequate substitute for an independent investigation is breathtaking in its hypocrisy..

4. Furthermore, contrary to the Debtor's assertions, the appointment of the Receiver did not result in an investigation of affiliate transactions. Objection ¶ 4. Rather, the Receiver appears to have done no more than rely on the affiliated Hotel Manager to tell him how much it had collected and which bills to pay. In fact, he was so incurious that he did not even discover the PPP loan or the misdirection of its proceeds, despite those monies passing through the Hotel's bank accounts during his receivership. Moreover, far from informing Benefit Street – his beneficiary – about the Debtor's activities, he forced Benefit Street to go to court repeatedly to get him to reveal *any* information about the Debtor at all. Even then, the Receiver provided only reports that the Debtor or its insiders had generated, not his own work product.

5. After this case filed, the Court did not grant Benefit Street's request for access to prepetition bank statements and financial information as part of the cash collateral process and severely restricted Benefit Street's discovery during the Receiver Motion. Mar. 15, 2021 Hr. Tr. 19:15 – 22:1. While the Debtor has provided cash collateral reporting, those reports do not purport to describe prepetition transactions or the basis for affiliate transactions (prepetition or postpetition). For the Debtor to suggest that these few, narrow, consistently-resisted efforts at discovery and ordinary course postpetition cash collateral reporting obviate an independent investigation of the broad releases it proposes to grant to its insiders and affiliates under the Plan — that was not negotiated with any independent fiduciary such as a creditors' committee — is preposterous.

6.      The Debtor is simply wrong when it asserts that there are not "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor[.]" Objection ¶ 11, 14, 26.  Although the terms of the Debtor's proposed Plan, standing alone, require the appointment of an examiner, even the very limited postpetition discovery has disclosed a thicket of red flags and improprieties concerning affiliate transactions that require investigation:[3]

- <u>The diversion of PPP proceeds</u>.  The Court has already expressed its rightful concern over the misuse of PPP proceeds based upon the Hotel's operations.  The insider's recent agreement to a "settlement," however, does not obviate the need for a proper investigation. Rather, it confirms that multi-million dollar misconduct did occur – and provides ample basis to investigate whether other such conduct may have occurred elsewhere in the Debtor's business.  "No harm, no foul" should not apply to sweeping Plan releases negotiated without oversight between and for the benefit of the controlling insiders.

- <u>The hidden management agreement</u>.  The insiders claimed they wrote and entered into an 18-page, single spaced management agreement at the very same time they represented it did not exist to induce Benefit Street it to make a $68 million loan.  The issue here is not whether management agreements are customary for hotel operations but, instead, whether this management agreement and the circumstances surrounding its mysterious appearance months into this bankruptcy case is appropriate. (This plainly material 18-page affiliated party contract was neither included in the Debtor's schedules nor disclosed during the section 341 examination).  Whatever merit there may be to the Court's observation that "debtors lie," not every debtor conspires with its affiliates and controlling insiders to execute a multi-million dollar fraud.  Nor does every debtor seek to release those insiders and affiliates of the consequences of their actions under a Plan — let alone a Plan not subject to any independent manager/director oversight or creditor committee negotiation.

- <u>The CRO Loan</u>.  The Debtor's CRO apparently made a $3 million prepetition loan to the Debtor, which he did not disclose until the Debtor's objection to the examiner motion was filed. Nor were any of Mr. Goldwasser's numerous other business transactions with Ms. Moskovits or Mr. Lichtenstein previously or timely disclosed.  While the Debtor attempts to dismiss the FIA Heritage loan as a claim against non-debtors, their schedules listed it as an undisputed unsecured claim against the Debtor in its full amount.  [Docket No. 31, at 13]

---

[3] It is notable that the United States Trustee, the only independent party to appear in this case, moved for the appointment of a trustee due to the Debtor's repeated lack of cooperation and transparency. [Docket No. 87].

4

- Further affiliate payments. During these cases, the Debtor has continued to make tens of thousands of dollars of payments to affiliates, such as Mint Development, which is owned by Mr. Lichtenstein. No independent has reviewed the basis or propriety of these transactions.

- The unexplained disappearance of millions of dollars in cash in 2019. The Debtor now claims that it made a 13% profit on $20 million in revenues in 2019. Together with the approximately $7 million in interest it did not pay to Benefit Street during the same year, there are material dollars unaccounted for from operations by the time the receiver was appointed in February 2020. What happened to that money, which could, at a minimum have been used to pay the millions of dollars in real property taxes that became senior liens on the Hotel (bearing 18% interest) during the next three years?

- Unexplained Tax Returns. As part of the PPP Discovery, Live Oak Bank produced tax returns provided by the insiders in which the Hotel Manager appears to have claimed the Debtor's revenues as its own. The basis for this position, if there is a credible one, needs to be explored, as it raises concerns over the submission of false tax returns by Debtor's control parties who, following sweeping releases, seek to maintain exclusive control over the business.

In short, there is already ample basis to believe that the Debtor engaged in undisclosed and/or improper transactions with insiders and affiliates. Before insiders and affiliates can be released, an independent investigation of such transaction is required.

7. Unable to explain away these clear red flags, the Debtor argues that an investigation of claims is unnecessary because it is allegedly "paying creditors in full" under its proposed Plan. Objection ¶ 17. First, its Plan does not propose to pay creditors in full in cash on the effective date. Instead, it will make payments to creditors — even secured creditors holding undisputed claims — over a period of *three to ten years*, while its (released) insiders enjoy the continued benefits of ownership of the Hotel and its operations, including the ability to collect post-confirmation management fees and have unrestricted access to the revenues and profits of the Hotel. Moreover, *the Debtor is not guaranteeing that unsecured creditors will be paid in full*. Rather, it is committing to fund a pot of only up to $2.5 million which it "estimates" will be sufficient to pay the maximum allowed amount of unsecured claims over a period of four years.

It offers no explanation of this "estimate," however, which is far lower than the over $20 million in scheduled and filed unsecured claims. In fact, it admits, because it must, that *if this unsupported "estimate" is too low, unsecured creditors will not be paid in full, even after waiting for four years.* It is simply wrong to suggest that creditors — who will wait years for payments — have no interest in the investigation or pursuit of potential insider claims of the controlling equity parties and their affiliates.

8. The same delay in payment of creditors belies the Debtor's stated concerns about "delay" in the Chapter 11 case resulting from a proper investigation of claims central to this case and the Plan. Objection¶ 16. The Debtor's Plan is structured around material delay. It would make a token payment to creditors on the effective date, and then stretch much larger payments over many years thereafter with attendant risk. Yet, Ms. Moskovits, Mr. Lichtenstein and their related entities would enjoy immediate releases negotiated by themselves and for their own benefit and control over the Hotel and its revenues. A short adjournment of confirmation to allow for an independent to understand the nature of the claims being released would not harm the creditors being forced to give those releases and to whom the Debtor's insiders owe a fiduciary duty.

9. The Debtor also pretends that appointment of an examiner would somehow interfere with its purportedly successful operations. Objection ¶¶ 6, 15(ii). But the principal example of "progress" it offers is the hiring of more and more advisors. Not only does this not evidence progress, but *the Debtor's advisors are not independent – they report to the Debtor and its insiders – and therefore cannot investigate the Debtor's transaction with these same insiders and affiliates*. Under Section 1107(a) and 1106(a) of the Bankruptcy Code, moreover, neither the Debtor, nor its professionals, are charged with investigating "the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of

6

the continuance of such business, and any other matter relevant to the case or to the formulation of a plan" or filing a report of that investigation. Thus, their retention cannot serve as a substitute for the appointment of an examiner. *See* 7 Collier on Bankruptcy P 1107.02 (16th 2021) ("Although, for obvious reasons, section 1107(a) exempts the debtor in possession from investigating and reporting on its own conduct and affairs, this does not mean that these matters will go unscrutinized. *Such an investigation may be conducted by an examiner* or by a creditors' or equity security holders' committee") (emphasis added).

10. Nor do the Debtor's operations reflect material progress. The Debtor pretends that the Hotel is flourishing; but while the Debtor may be building a small amount of cash, it is doing so by not paying all of its expenses, rather than because it is operating profitably. Objection ¶¶ 6-7. As the Court knows, the Debtor did not pay almost $600,000 in real estate taxes during the case. It is similarly not paying debt service which, if paid, would completely consume its supposed "profits". As importantly, the Debtor's current cash build does not somehow validate the insider's management. *Rather, the Hotel is a seasonal business, which is building cash because the summer high season has just concluded. As they do every year, revenues – and cash – are going to decline when the weather gets colder.* Benefit Street, in fact, raised this concern at the beginning of the case. [Docket No. 37 ¶ 3]. Nor was the Hotel's performance during the high season exceptionally good. Given its special features and amenities, like the rooftop bar and pool, the Hotel should be outperforming its competitors which it did not do.

11. The appointment of an examiner will not cripple the Debtor's operations. In fact, given the Debtor's contentious relationship with Benefit Street, appointment of a neutral to conduct an impartial investigation promises to sidestep the ill-will and eliminate unnecessary disputes, thereby allowing the Debtor to spend less time on litigation. In contrast, denying the

7

appointment, which the Debtor proposes, Objection ¶ 20, will force Benefit Street to try to conduct the investigation itself, and maintain the very "distraction" the Debtor claims that it wants to avoid.

12. Nor should the Court give weight to the Debtor's crocodile tears about its alleged mistreatment at the hands of Benefit Street or its claims that it is "committed to moving past the acrimony." Objection ¶ 5. The Debtor has not seriously disputed that its insiders misled Benefit Street into making an 18-month multi-million dollar loan, on which the Debtor has made no payment at all for the last three years. Now, "moving past the acrimony," it proposes to give Benefit Street a six year, interest-only note with up to a $90 million (if the disputed portion of the claim is allowed) balloon at the end, while its insiders retain total control over the Hotel and access to its revenues and are released from all potential claims – including claims under guarantees they gave Benefit Street at closing. These are not simply Plan issues for confirmation where the Debtor has refused to proceed with any Court-approved marketing process and yet seeks to release itself at the direct expense of creditors with absolutely no independent review.

13. The Debtor's attempts to distinguish Benefit Street's cases are unsuccessful. That the Debtor in *In re ProFlo Indus., LLC*, No. 17-33184 2018 WL 615122 (Bankr. N.D. Ohio Jan. 29, 2018) had not formulated a non-arm's length, collusive, "settlement," as the insiders have here, is irrelevant. Objection ¶ 23. Not only does that "settlement" obviously itself require independent review, there are both further transactions with affiliates, including the transfers to Mint Development, and other affiliate transactions that have not been independently examined. Similarly, the Debtor misses the point when it tries to distinguish *In re YC Atlanta Hotel, LLC,* 630 B.R. 348 (Bankr. N.D. Ga. 2021). Objection at ¶ 24. The Lender's concerns regarding the PPP Loan are not resolved by the releases embodied in the Plan and PPP Settlement, and just as in *In re YC Atlanta*, there remain significant questions regarding the relationship between the Debtor

8

and other affiliates and insiders. It is also irrelevant that *In re JNL Funding Corp.*, No. 10-73724 2010 WL 3448221, at *3-4 (Bankr. E.D.N.Y. Aug. 26, 2010) and *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) involved debtors that supported the appointment of an examiner. In neither case did the Court rely on the debtor's consent in appointing the examiner. Those cases, along with *In re Apex Oil Co.*, 101 B.R. 92 (Bankr. E.D. Mo. 1989) and *In re Tribune Co.*, Case No. 08-13141 (Bankr. D. Del. April 20, 2010) (Dkt. Nos. 4112 & 4120) appointed examiners based on allegations of insider and related-party transactions and did not turn on the Debtor's consent.

## CONCLUSION

For the reasons set herein, Benefit Street respectfully requests that the Court overrule the Objection and grant the Examiner Motion.

Dated: October 26, 2021
New York, New York

KRAMER LEVIN NAFTALIS &FRANKEL LLP

/s/ *P. Bradley O'Neill*
Adam C. Rogoff
P. Bradley O'Neill
Priya K. Baranpuria
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: arogoff@kramerlevin.com
        boneill@kramerlevin.com
        pbaranpuria@kramerlevin.com

*Attorneys for Benefit Street Partners Realty Operating Partnership, L.P.*

9

KL2 3255633.10