KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                                                  :
In re:                                                            :    Chapter 11
                                                                  :
96 WYTHE ACQUISITION LLC,                                         :    Case No. 21-22108 (RDD)
                                                                  :
                                          Debtor.                 :
                                                                  :
------------------------------------------------------------------ X


**LENDER'S OBJECTION TO CONFIRMATION OF DEBTOR'S**
**<u>SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION</u>**

## TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ................................................................ 1

FACTUAL BACKGROUND ..................................................................... 5

    A.    Organizational Structure of Debtor and Affiliates ................................ 5

    B.    The Debtor's Capital Structure ............................................. 6

    C.    Benefit Street's Loan and Pre-Petition Foreclosure Action.................... 7

    D.    The PPP Loan Settlement Under the Plan ............................... 8

    E.    The Fraudulent Management Agreement ............................... 10

    F.    The Plan's Classification and Treatment of Claims ........................ 12

    G.    Releases................................................................. 14

OBJECTION .......................................................................... 15

I.    The Plan Was Not Proposed in Good Faith ..................................... 15

II.    The Appointment of the Debtor's Insiders as Managers of the Reorganized Debtor Is Not in the Interest of Creditors or Public Policy........................... 20

III.    The Plan Does Not Satisfy the Best Interests Test ............................. 23

IV.    The Plan Is Not Feasible ....................................................... 24

V.    The Plan Does Not Satisfy the Requirements of Section 1129(b)................... 28

    A.    Legal Standard ........................................................... 28

    B.    The Plan Is Not Fair and Equitable Because Benefit Street Will Bear the Ultimate Risk of Reorganization ......................................... 31

        1.    The Plan Improperly Structures Payments to Shift Risk from the Debtor's Equity Holders and Junior Creditors to Benefit Street ............ 31

        2.    The Terms of the Proposed Note Do Not Remotely Compensate Benefit Street for the Substantial Risk It Is Bearing................... 34

            (a)    The Proposed Note's Interest Rate Is Too Low........................... 34

i

(b)    Six-Year Maturity Is Excessive ...................................................... 37

(c)    Loan-to-Value Ratio Is Too High .................................................. 37

(d)    Lack of Amortization Is Unfair...................................................... 38

VI.    The Debtor Has Not Satisfied the "New Value" Exception to the Absolute Priority
Rule ....................................................................................................................... 39

A.    The Characterization of the Purported "Equity Contribution" is Deceptive
and Is Not "New" Value .......................................................................... 39

B.    Debtor Has Not Demonstrated that the Insiders' "Contribution" Is
"Reasonably Equivalent" to What They Will Receive Under the Plan ................ 41

VII.    The Debtor Cannot Assume the Purported Management Agreement Under the
Plan ....................................................................................................................... 43

A.    The Purported Management Agreement Was Entered into in Bad Faith ............. 44

B.    The Debtor Cannot Demonstrate that the Purported Management
Agreement Is Entirely or Intrinsically Fair or That Its Terms Would Be
Required By Third Parties in the Marketplace ...................................................... 45

C.    The Debtor Is Estopped From Asserting the Purported Management
Agreement Is a Valid Contract .............................................................................. 48

CONCLUSION .................................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 20 Bayard Views*,
    445 B.R. 83 (Bankr. E.D.N.Y. 2011) ................................................................................. 35, 36

*In re 8315 Fourth Ave. Corp.*,
    172 B.R. 725 (Bankr. E.D.N.Y. 1994) ...................................................................................... 25

*In re AG Consultants Grain Div. Inc.*,
    77 B.R. 665 (Bankr. N.D. Ind. 1987) ........................................................................................ 42

*Alpert v. 28 Williams St. Corp.*,
    63 N.Y.2d 557 (1984) ....................................................................................................... 43, 45

*In re Angeron*,
    No. 18-10482, 2018 WL 6601130 (Bankr. E.D. La. Dec. 13, 2018) ........................................ 41

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A (In re Bd. of Dirs. of
    Telecom Argentina, S.A.)*,
    528 F.3d 162 (2d Cir. 2008) ...................................................................................................... 16

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) ........................................................................................................... 18, 42

*In re Bashas' Inc.*,
    437 B.R. 874 (Bankr. D. Ariz. 2010) ....................................................................................... 20

*In re Bergman*,
    585 F.2d 1171 (2d Cir. 1978) .................................................................................................... 24

*In re Biz As Usual, LLC*,
    627 B.R. 122 (Bankr. E.D. Pa. 2021) ................................................................................. 25, 26

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................................................ 15, 16

*BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners*,
    203 B.R. 527 (S.D.N.Y. 1996), *aff'd*, 138 F.3d 39 (2d Cir. 1998) ..................................... 39, 42

*C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*,
    419 F. Supp. 2d 419 (S.D.N.Y. 2005) ...................................................................................... 49

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010*)* ..................................................................................... 16

*In re Consul Restaurant Corp.*,
  146 B.R. 979 (Bankr. D. Minn. 1992) .................................................................31

*In re Crosscreek Apts., Ltd.*,
  213 B.R. 521 (Bankr. E.D. Tenn 1997) ..........................................................25, 39

*D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*,
  873 F. Supp. 786 (E.D.N.Y. 1995) ....................................................................48

*In re DeArakie*,
  199 B.R. 821 (Bankr. S.D.N.Y. 1996) ................................................................48

*In re DeTienne Assocs. Ltd. P'ship*,
  No. 04-63115-11, 2005 Bankr. LEXIS 3122 (Bankr. D. Mont. July 29, 2005) ....................37

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................................16

*Donnenfeld v. Petro, Inc.*,
  333 F. Supp. 3d 208 (E.D.N.Y. 2018) ................................................................48

*In re Drexel Burnham Lambert Grp.,Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)..................................................................24

*In re Eagle Creek Subdivision, LLC*,
  397 B.R. 758 (Bankr. E.D.N.C. 2008) ................................................................47

*In re Ellison Assocs.*,
  13 B.R. 661 (Bankr. S.D.N.Y. 1981), *aff'd*, 63 B.R. 756 (S.D.N.Y. 1983) ...........................48

*In re Excel Marine Carriers Ltd.*,
  Case No. 13-23060-rdd, 2013 Bankr. LEXIS 3920 (Bankr. S.D.N.Y. Sept. 13,
  2013) ............................................................................................18

*Feeley v. NHAOCG, LLC*,
  CA. No. 7304-VCL, 2012 WL 4859132 (Del. Ch. Oct. 12, 2012).........................................47

*In re Genco Shipping & Trading Ltd*,
  513 B.R. 233 (Bankr. S.D.N.Y.).........................................................................16

*In re Gramercy Twins Assocs.*,
  187 B.R. 112 (Bankr. S.D.N.Y. 1995) ............................................................38, 41

*In re Haskell Dawes, Inc.*,
  199 B.R. 867 (Bankr. E.D. Pa. 1996) ............................................................41, 42

*In re Innkeepers USA Tr.*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ............................................................43, 47

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)...................................................................................16

*In re Kellogg Square P'ship*,
    160 B.R. 343 (Bankr. D. Minn. 1993) ...................................................................37

*In re Kent Terminal Corp.*,
    166 B.R. 555 (Bankr. S.D.N.Y. 1994)...................................................................25

*In re Koelbl*,
    751 F.2d 137 (2d Cir. 1984)...................................................................................16

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...................................................................23

*In re LightSquared Inc.*,
    513 B.R. 56 (Bankr. S.D.N.Y. 2014)......................................................................18

*In re Lionel L.L.C.*,
    Case No. 04-17324 (BRL), 2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31,
    2008) .......................................................................................................................15

*In re Malkus, Inc.*,
    Case No. 03-07711-GLP, 2004 Bankr. LEXIS 2120 (Bankr. M.D. Fla. Nov.
    15, 2004) .................................................................................................................19

*In re Miami Ctr. Assocs., Ltd.*,
    144 B.R. 937 (Bankr. S.D. Fla. 1992)...........................................29, 30, 37, 39, 40

*In re Min Sik Kang*,
    No. 1:15-CV-00953 LMB/IDD, 2015 WL 5786692 (E.D. Va. Sept. 30, 2015) ....................47

*Momentive Performance Materials Inc. v. BOKF, NA (In re MPM Silicones,
    L.L.C.)*,
    874 F.3d 787 (2d Cir. 2017)............................................................................34, 35

*In re Montgomery Court Apts. of Ingham Cty., Ltd.*,
    141 B.R. 324 (Bank. S.D. Ohio 1992) .............................................................29, 30

*In re Multiut Corp.*,
    449 B.R. 323 (Bankr. N.D. Ill. 2011) ....................................................................19

*Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*,
    474 N.Y.S.2d 122 (2d Dep't 1984).........................................................................49

*In re One Times Square Assocs. Ltd. P'ship*,
    159 B.R. 695 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994),
    *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) ................40, 41

*Pepper v. Litton*,
308 U.S. 295 (1939)....................................................................................................43

*In re Polytherm Indus., Inc.*,
33 B.R. 823 (W.D. Wis. 1983) ...................................................................................20

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ...........................................................29, 30, 31

*In re Quigley Co.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ..........................................................16, 23, 25

*In re Reid Park Props., LLC*,
No. 4:11-BK-15267-EWH, 2012 WL 5462919 (Bankr. D. Ariz. Nov. 7, 2012) ...................32

*In re Rusty Jones, Inc.*,
110 B.R. 362 (Bankr. N.D. Ill. 1990) .........................................................................20

*In re RYYZ, LLC*,
490 B.R. 29 (Bankr. E.D.N.Y. 2013)....................................................................39, 41

*In re S.A.B.T.C. Townhouse Ass'n*,
152 B.R. 1005 (Bankr. M.D. Fla. 1993) .....................................................................39

*In re Sis Corp.*,
120 B.R. 93 (Bankr. N.D. Ohio 1990) ........................................................................26

*In re SM 104 Ltd.*,
160 B.R. 202 (Bankr. S.D. Fla. 1993).........................................................................20

*Springel v. Prosser (In re Prosser)*,
Case No. 06-30009, 2009 Bankr. LEXIS 3209 (Bankr. D.V.I. Oct. 9, 2009) .........................19

*In re Stader*,
90 B.R. 29 (Bankr. D. Conn. 1988) ............................................................................49

*In re Sunflower Racing, Inc.*,
219 B.R. 587 (Bankr. D. Kan. 1998), *aff'd*, 226 B.R. 673 (D. Kan. 1998)............................41

*In re T.A.T. Prop.*,
No. 05-47223(SMB), 2009 Bankr. LEXIS 739 (Bankr. S.D.N.Y. Feb. 20,
2009) ........................................................................................................................25

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ............................................................................29

*In re Texaco Inc.*,
84 B.R. 889 (Bankr. S.D.N.Y. 1988)..........................................................................15

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004)...................................................................................35

*In re Transcare Corp.*,
    Case No. 16-10407(SMB), 2020 WL 8021060 (Bankr S.D.N.Y. July 6, 2020) ....................43

*Vays v. 139 Emerson Place, LLC*,
    2010 N.Y. Misc. LEXIS 2405 (Sup. Ct. N.Y. Cnty. Feb. 19, 2010) ......................................47

*In re WCI Steel, Inc.*,
    Case No. 03-44662 (Bankr. N.D. Ohio Dec. 15, 2004).........................................................39

**Statutes**

11 U.S.C. § 1123.........................................................................................................15

11 U.S.C. § 1129.....................................................................................................15, 24

11 U.S.C. § 1129(a).................................................................................................15, 24

11 U.S.C. § 1129(a)(3)........................................................................................1, 15, 18

11 U.S.C. § 1129(a)(5)...........................................................................................15, 20

11 U.S.C. § 1129(a)(7)...........................................................................................15, 23

11 U.S.C. § 1129(a)(11).........................................................................................15, 24

11 U.S.C. § 1129(b)........................................................................................... *passim*

11 U.S.C. § 1129(b)(1)................................................................................................28

11 U.S.C. § 1129(b)(2)(A).....................................................................................28, 29

11 U.S.C. § 1129(b)(2)(A)(i)........................................................................................34

11 U.S.C. § 1129(b)(2)(B)...........................................................................................29

11 U.S.C. § 1129(b)(2)(B)(ii).......................................................................................39

New York City Admin. Code § 11-224h ......................................................................13

Benefit Street Partners Realty Operating Partnership, L.P.[1] (“**Benefit Street**” or “**Lender**”) submits this objection (the “**Objection**”)[2] to confirmation of the Debtor’s Second Amended Chapter 11 Plan of Reorganization (the “**Plan**”) [Dkt. No. 196].

## PRELIMINARY STATEMENT

1.      The Debtor has consistently run this case for the benefit of its dishonest, self-dealing insiders.  The proposed Plan – issued unilaterally rather than negotiated with key stakeholders – is the culmination of those efforts.  It allows the Insiders (defined below) to keep their ownership interests (and all potential upside) for a minimal, non-market-tested cash contribution while placing virtually all reorganization risk onto Benefit Street without anything approaching fair compensation or treatment.  Not surprisingly, this overreaching value-grab is unconfirmable for myriad, overlapping reasons:

2.      *First*, and permeating all other issues, is the fundamental lack of good faith underlying this Plan.  This is true in both senses contemplated by Bankruptcy Code section 1129(a)(3):  The Insiders running the Debtor have repeatedly acted in subjective bad faith, and the Plan cannot be viewed as a serious, good faith effort to effect a feasible reorganization.  Among other malfeasance, the Insiders:

- fraudulently induced the Benefit Street loan by concealing a grossly unfair, off-market, insider management agreement that purports to strip the Debtor of key assets;[3]

---

[1] Benefit Street is a wholly owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.  Franklin BSP Realty Trust is a publicly traded entity on the New York Stock Exchange under the ticker symbol FBRT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (as defined herein).

[3] The Insiders procured the Benefit Street loan by fraud if the purported management agreement disclosed months into this bankruptcy actually existed (but was concealed) when the loan was made. The only other factual possibility, which cannot be discounted until the Insiders produce documents with metadata showing when the agreement was drafted, is that it was created later and backdated, in which case the Insiders are attempting to defraud not just Benefit Street but also this Court.

1

- collected but apparently improperly diverted millions of dollars in hotel occupancy taxes, thereby permitting massive additional priority claims to accrue; and

- engaged in millions of dollars of other, as-yet-unexplained insider transactions (including diverting PPP funds) still being unraveled by the Examiner (whose investigation the insiders have tried to thwart).

3.     More generally, the entire Plan process was hobbled by the Debtor's singular focus on benefiting its Insiders.  It never seriously investigated a sale or refinancing of its key hotel asset, and it proposed a Plan that: permits the Insiders to retain their ownership for a minimal "capital contribution"; buys the votes of certain unsecured creditors by promising favorable treatment that it cannot deliver to all unsecured creditors; provides Benefit Street, which was deceived into making the loan in the first place, with a six-year, non-amortizing note with a coupon far *below* the original loan, even though it will effectively be behind $4 million (and potentially much more) in tax claims that will accrue interest at 18% and be amortized; and offers broad releases for the Insiders while seeking to block the Examiner's inquiries into "tens of millions of dollars" in suspect transactions.

4.     *Second*, the Plan would leave the Debtor's conflicted, dishonest, and inadequate Insiders in place as managers of the reorganized company – against the best interests of creditors and public policy.  The Insiders' appalling history would make it impossible in the real world for them to obtain the financing they hope to force upon Benefit Street.  Among other things, they:

- have never successfully managed a hotel (their sole experience being their failed, pre-pandemic stewardship of the Debtor) and have a shocking track record of other failed real estate ventures that have left them mired in litigation and other bankruptcy proceedings;

- failed to file tax returns or to pay millions of dollars in various City taxes;

- blatantly disregarded loan and governance documents to effectuate insider transactions, including perhaps running all of the estate's revenues through the non-Debtor management company, which actually appears to have claimed title to them;

2

- diverted tax revenues collected from hotel guests as well as other hotel revenues;

- stubbornly refused to explore alternative plan structures that could have preserved more value for creditors; and

- have sought to block the Examiner investigation at every turn, in gross violation of their fiduciary duty to preserve estate claims.

These are critical concerns to Benefit Street, and the Plan requires it to wait *six years* before seeing a penny of its $95-plus million with potentially the protection only of contractual and governance rights like those the insiders have repeatedly violated. The Insiders are not suitable borrowers on any loan, let alone a nonconsensual "loan" replacing one procured by fraud.

5.      *Third*, the Plan fails the Best Interests test because, under the Debtor's own valuation of the hotel property (but without applying an unjustified discount), Benefit Street would fare better in a liquidation than under the Plan.

6.      *Fourth*, the Plan is not feasible because the Debtor has not demonstrated that it will have the cash to pay unsecured creditors in full, as promised, within six months, and the Debtor's purported ability to satisfy its other obligations – including eventually paying Benefit Street (through an illusory refinancing) – is based on projected growth far greater than the Debtor has ever achieved. If the value of the hotel property proves inadequate to fully secure Benefit Street's loan, Benefit Street could have a substantial unsecured claim that would have to be paid in full, in cash, and that could also affect the vote in the unsecured class.

7.      *Fifth*, the Plan cannot be crammed down over Benefit Street's objection because it is not fair and equitable: It impermissibly shifts virtually all of the risks of reorganization onto Benefit Street by permitting the Insiders to keep their equity interests without any market test and unrealistically promising relatively quick, full, cash payment to certain unsecured creditors, while forcing Benefit Street to wait *six years* for an enormous balloon payment of all its principal that

3

may never be made if the business fails again.  The interest rate proposed to be paid on Benefit

Street's claim reflects only a tiny premium over the prime rate customarily reserved for a lender's

best customers and is wholly inadequate to compensate it for bearing the risks of this Plan.  This

is particularly troubling since the Plan includes *no* controls to prevent the Insiders from simply

distributing their capital contribution back to themselves as dividends or resuming their practice

of material unexplained transfers to affiliates.  Further, it is impossible to fully determine the Plan's

treatment of Benefit Street's claim because the Debtor has not provided a single document

concerning how its claim will be treated – only vague statements about modifying the terms of

Benefit Street's debt.  This is particularly unacceptable given that Benefit Street's is by far the

most material claim under the Plan.

8.      *Sixth*, the Plan fails to satisfy the "new value" exception to the absolute priority rule

because (i) the Insiders' purported $9 million equity contribution is (at best) really only $7.5

million, excluding the $1.5 million "settlement" of the PPP claims, without taking account of the

value of their releases or other diverted funds they will have to repay; and (ii) the infused capital

will mostly *not* be used to pay creditors but only to increase the value of the Insiders' equity stake,

with nothing to prevent them from "round housing" the money back out again.

9.      *Seventh*, the Plan would improperly permit the Debtor to assume a management

agreement that the Insiders concealed from Benefit Street, which, together with other misconduct,

fraudulently induced the very loan they are trying to force Benefit Street to extend.  The agreement

was neither negotiated nor re-evaluated in bankruptcy at arm's length and contains grossly off-

market terms that shift significant value away from the reorganized Debtor to the management

entity controlled by the Insiders.  This result is barred both by the Debtor's own operating

agreement and by the Debtor's inability to demonstrate the "entire fairness" of this interested

transaction.  In any event, the Debtor's representation to Benefit Street that no such management agreement existed estops it from seeking to enforce this lopsided agreement now, and the form of management agreement adopted at the closing of the Benefit Street loan should be viewed as a novation that wiped out any previous (undisclosed) agreements.

## **FACTUAL BACKGROUND**

10.    Benefit Street refers to and fully incorporates by reference its Motion to Appoint an Examiner Pursuant to 11 U.S.C. § 1104 [Dkt. No. 147] (the "**Examiner Motion**"), its objection to the Debtor's disclosure statement [Dkt. No. 162], and all other pleadings filed by Benefit Street in this case.  The following summarizes certain key facts relevant to the Objection.

### A.    **Organizational Structure of Debtor and Affiliates**

11.    On February 23, 2021 (the "**Petition Date**"), the Debtor filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

12.    The Debtor operates the 147-room Williamsburg Hotel in Brooklyn, New York (the "**Hotel**").  The Debtor is owned and controlled by Toby Moskovits and Michael Lichtenstein (together, the "**Insiders**") through a variety of intermediate entities.  *See* Local Rule Statement ¶ 1 [Dkt. No. 8].

13.    The Debtor is managed by Williamsburg Hotel BK LLC (the "**Management Company**"), a non-debtor management company also owned and controlled by the Insiders.  *See* Third Amended Disclosure Statement (the "**Disclosure Statement**") § II.2 [Dkt. No. 196].  The Management Company manages no other hotels and provides no corporate chain services, such as legal or human resources, to augment its property level staffing.

14.    The Insiders co-own and operate a series of other affiliated entities through which they attempt to develop real estate.  Five of these entities are currently in bankruptcy in the

5

Southern District of New York.[4]  Most of these cases involve material litigation with third parties (*e.g.*, other lenders).  *See* 232 Seigel Bankruptcy Case (involving secured lenders who filed motions for relief from the automatic stay and objections to the disclosure statement); My 2011 Grand Bankruptcy Case (same).  One has been converted to chapter 7.  232 Seigel Bankruptcy Case [Case No. 20-22844, Dkt. No. 160].  Both Insiders are personally subject to numerous orders and lawsuits.  *See* 286 Rider Bankruptcy Case [Case No. 21-11298, Dkt. No. 245] (order of protection barring Lichtenstein and Moskovits from contact with debtor's counsel); *Katsky Korins LLP v. Moskovits, et al.*, Case No. 657292/2019 (Sup. Ct. N.Y. Cty. Dec. 13, 2021); *Kopelowitz v. Moskovits, Lichtenstein, et al.*, Case No. 150418/2020 (Sup. Ct. N.Y. Cty. Aug. 4, 2021).

15.    On November 8, 2021, the Bankruptcy Court appointed an examiner (the "**Examiner**") to investigate estate claims against insiders and affiliates. *See* Order Directing Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) (the "**Examiner Order**") [Dkt. No. 178].  His report is currently due to be filed on January 28, 2022.

### B.    The Debtor's Capital Structure

16.    In December 2017, Benefit Street provided the Debtor with a $68 million construction completion loan (the "**Loan**") secured by the Hotel, the real property on which it stands, and all improvements, fixtures, personal property, leases, rents, proceeds, and agreements of the Hotel.  Calculated as of February 15, 2022, with unpaid contract and default interest, Benefit Street's total claim is just over $95 million.[5]

---

[4] *In re 286 Rider Ave Acquisition LLC*, Case No. 21-11298 (Bankr. S.D.N.Y. (the "**286 Rider Bankruptcy Case**")); *In re 232 Seigel Development LLC*, Case No. 20-22844 (Bankr. S.D.N.Y.) (jointly administered with *In re 232 Seigel Acquisition LLC*, Case No. 20-22845 (Bankr. S.D.N.Y.)) (together, the "**232 Seigel Bankruptcy Case**"); *In re My 2011 Grand LLC*, Case No. 19-23957 (Bankr. S.D.N.Y.) (jointly administered with *In re S&B Monsey LLC*, Case No. 19-23959 (Bankr. S.D.N.Y.)) (together, the "**My 2011 Grand Bankruptcy Case**").

[5] The claim amount listed on Benefit Street's ballot is as of November 5, 2021, as required by the ballot instructions. Benefit Street's claim continues to accrue interest, fees, expenses, and other charges and, thus, the amount listed in the ballot is not a waiver, restriction, or other limitation on the amount of Benefit Street's claim.

17.     In January 2020, before the onset of the COVID-19 pandemic, the Debtor ceased paying real property taxes on the Hotel.  As a result, senior tax claims totaling approximately $4 million have attached to the Hotel.  *See* N.Y.C. Dept. of Finance [Proof of Claim No. 10].  The Disclosure Statement also describes mechanic's and materialmen's liens on the property totaling $353,306.  Disclosure Statement § IV(6)(D).

18.     Scheduled and filed unsecured claims total over $40 million.  Disclosure Statement § IV; Claims Register, attached as Ex. A.  Of these, approximately $20 million relate to litigation claims for which the Debtor has filed claims objections.  *See* Dkt. Nos. 248, 258, 259.  The rest are trade claims.  The Debtor estimates that the total ultimately allowed unsecured claims will be $1,970,936 to $2,570,936.  Disclosure Statement § IV(6)(E).  It has not provided support for this estimate.

### C.     Benefit Street's Loan and Pre-Petition Foreclosure Action

19.     Benefit Street's Loan matured in June 2019 and was not repaid – eight months before the pandemic.  In the preceding months, the Debtor repeatedly defaulted by, among other things, failing to (i) pay any monthly interest since December 2018, (ii) discharge mechanic's liens that had attached to the property, (iii) complete construction of the Hotel in accordance with the parties' agreements and building plans, and (iv) reimburse Benefit Street's costs and expenses.

20.     After the Loan matured, in June 2019, Benefit Street filed a foreclosure action in the New York Supreme Court (the "**State Court Action**").  Upon filing the complaint, Benefit Street moved for appointment of a receiver, and, in February 2020, the state court appointed a receiver.  Pursuant to the order appointing a receiver (the "**Receiver Order**"), all defendants (which included Ms. Moskovits) were enjoined from entering any agreement that was not

---

terminable on 30 days' notice, absent Benefit Street's consent.  Benefit Street moved for summary judgment, and, on February 16, 2021, the Appellate Division, First Department, granted Benefit Street's summary judgment motion in full.  *See* Disclosure Statement § II.3.C.  The Debtor filed this bankruptcy case one week later.

### D.    The PPP Loan Settlement Under the Plan

21.    On April 14, 2020, the Management Company applied to Live Oak Bank for a PPP loan based upon the staff of the Hotel (the "**PPP Loan**").  Ms. Moskovits signed that application for the Management Company, as the Debtor's agent.  As part of the PPP Loan agreement (the "**PPP Loan Agreement**"), Ms. Moskovits certified that the proceeds of the loan would be used "to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  *See* Ex. F to Lender's Objection to the Motion to Quash ("**Lender Objection to Motion to Quash**"), at Ex. A § A [Dkt. No. 109].

22.    The application required the Management Company to list any business owned by, or under common management with, it or its owners, but it did not identify the Debtor, even though it was the owner of the Hotel.  *See* Ex. C to Lender Objection to Motion to Quash at 5.  Ms. Moskovits, who owns 50% of both entities, certified that the list of affiliates was "true and accurate in all material respects."  *Id.* at 2.[6]  On April 21, 2020, Live Oak Bank wired $1,438,000 in PPP Loan proceeds to an account denominated as the "Master Account" for "The Williamsburg Hotel BK LLC DBA The Williamsburg Hotel."  Two days later, the loan proceeds were transferred to a

---

[6] In February 2021, the Management Company applied for a second PPP loan.  The bank ran a new risk review and discovered an article about the filing of this bankruptcy case.  On February 25, 2021 – two days after the Petition Date – the bank declined to make the second loan, principally because of the Insider's failure to disclose the Debtor as an affiliate in both loan applications.  *See* Letter from Live Oak Bank to The Williamsburg Hotel BK LLC, dated Feb. 25, 2021, attached as Ex. B.

separate account in the name of the Management Company (the "**Special Purpose Account**").

Lender's Objection to Motion to Quash, Ex. H.

23.    The Special Purpose Account was created in April 2020 and, except for *de minimis*

amounts, funded exclusively with PPP Loan proceeds.  Less than a quarter of the proceeds – only

$357,624.53 – was thereafter transferred into the Hotel Payroll Account.  *See* Lender Objection to

Motion to Quash ¶ 15.  The Debtor has conceded that the Management Company transferred

$824,241.07 in PPP Loan proceeds out of the Special Purpose Account to other affiliated

businesses.  *See* Disclosure Statement § III.4.  It claims that the remaining $613,758.93 was spent

on expenses related to the Hotel.  *Id.*

24.    In October 2021, the Debtor and the Management Company entered a "settlement"

of the Debtor's claims against the Management Company arising from the PPP Loan (the "**PPP**

**Settlement**"), executed between Ms. Moskovits and Mr. Lichtenstein, signing on behalf of both

the Debtor and the Management Company.  No independent estate fiduciary was involved in the

PPP Settlement negotiations.  The proposed settlement gives the Insiders (who control both the

Debtor and the Management Company) the exclusive right to make a $9 million cash infusion –

$1,438,000 of which is earmarked as a "return" of the diverted PPP Loan proceeds – to retain their

equity interests in the Debtor.  *See* Plan § 1.37; *id.* § 3.2(g)(i).

25.    However, under a second non-arms'-length agreement (the "**PPP Stipulation**"),

the Management Company has agreed to backstop the return of only the $824,241.07 that it admits

was disbursed "into other business activity of the Hotel Manager," and not the remaining

$613,758.93, which the Insiders maintain was "invested" in the Debtor's operations.  *See* PPP

Stipulation and Settlement Agreement ¶¶ E, 3(a), attached as Ex. E to Plan; Disclosure Statement

§ III.4.  If the Plan does not go effective by March 1, 2022, the Management Company – which

will have no source of income – will be obligated to make equal monthly payments to the Debtor of $50,000 per month for one year, with a balloon payment of $274,241.07 due on the twelfth month. *Id.* ¶ 3(c).

26.     The Debtor and Management Company and all related parties will receive a full release from all claims related to the PPP Loan immediately upon approval of the settlement, before any deferred payments are made. *Id.* ¶ 6.[7]

                    **E.     The Fraudulent Management Agreement**

27.     In late October 2017, when negotiations began concerning Benefit Street's Loan, the Debtor informed Benefit Street that the Hotel was managed by the Management Company. Ms. Moskovits represented to Benefit Street, in writing, that no written management agreement existed. *See* 10.30.17 Email from Toby Moskovits, attached as Ex. C.   Benefit Street therefore required that a management agreement be prepared and assigned to it as collateral for the Loan. At the closing of the Loan, on December 13, 2017, both the Debtor and the Management Company signed an Assignment of Management Agreement and Subordination of Management Fees, dated as of the December closing ("**Assignment of Management Agreement**"), which attached a one-page Management Agreement ("**Management Agreement**"), signed by both Ms. Moskovits and Mr. Lichtenstein.  In Section 3 of the Assignment of Management Agreement, entitled "Estoppel," both the Debtor and the Management Company expressly represented that no other management agreement existed. *Id.* § 3.  In the Loan agreement (the "**Loan Agreement**"), the Debtor again expressly represented to Benefit Street that no other management agreement existed. *See* Loan

---

[7] Further facts regarding Benefit Street's discovery of the PPP Loan and related issues are set forth in the Lender Objection to Motion to Quash ¶¶ 6-26 [Dkt. No. 109].

Agreement at §§ 3.31(d), 1.1 (def. of "Major Contract"), & Exhibit I (schedule of Major Contracts), attached as Ex. D.

28.    At the outset of this case, the Management Company collected the Debtor's revenues in accounts held in the name of the Management Company.  At the insistence of the United States Trustee (the "**UST**"), it established DIP accounts in the name of the Debtor.  Also at the insistence of the UST, more than five months into the case, it filed a motion seeking authorization to continue using Management Company accounts to pay bills of the Debtor.

29.    In support of that request, the Debtor attached an 18-page, single-spaced, Management and Service Agreement, between the Management Company and the Debtor, dated as of November 21, 2017 ("**Purported Management Agreement**").  *See* Motion to Authorize Intercompany Transfers, Ex. A [Dkt. No. 83].  The Purported Management Agreement is also signed by both Ms. Moskovits and Mr. Lichtenstein.  This agreement was not previously disclosed to Benefit Street or other creditors, nor was it included in the Debtor's schedule of executory contracts or mentioned at the section 341 meeting.

30.    On its face, the Purported Management Agreement was signed three weeks before the closing of Benefit Street's Loan – which would render false the representations made in the Assignment of Management Agreement and the Loan Agreement.  The Debtor and Management Company have to date failed to produce any documents related to the Purported Management Agreement, including documents with metadata that would confirm when it was drafted.

31.    The Purported Management Agreement contains materially non-market terms and improperly transfers rights, assets, and authority to the non-debtor Management Company all to the detriment of the Debtor.  Among other things, the Purported Management Agreement provides: (i) all Hotel intellectual property belongs to the Management Company – not the Debtor; (ii) the

Management Company is entitled to an above-market "incentive fee"; (iii) the agreement may not

be terminated upon a sale; (iv) the Management Company can usurp corporate opportunities of the

Debtor and may compete with the Debtor; (v) the Management Company is not required to meet

any performance standards; (vi) the Management Company has sweeping authority to manage the

Hotel, to the exclusion of the Debtor; and (vii) operating accounts will be in the name of the

Management Company.

32.     Under the Plan, the Debtor will assume the Purported Management Agreement with

the Management Company (controlled by Insiders of the Debtor).  Plan § 5.7.  Once the Purported

Management Agreement is assumed, the Management Company will begin receiving management

fees, in excess of $5 million over six years according to the projections in the Plan.

**F.     The Plan's Classification and Treatment of Claims**

33.     The Plan gives the Debtor's controlling Insiders the exclusive right to make a $9

million "cash infusion" ($1,438,000 of which is merely a return of diverted PPP Loan proceeds)

and thereby exclusively retain their equity interests in the Debtor.

34.     The Plan includes seven classes of claims: Class 1 (Priority Claims); Class 2 (BSP

Claims); Class 3 (Secured Property Tax Claims); Class 4 (Secured M&M Claims); Class 5

(Unsecured Claims); Class 6 (Subordinated Claims); and Class 7 (Equity Interests).  Plan § 2.2.

All classes except for Class 1 are impaired.  *Id.*

35.     The Debtor proposes to pay Benefit Street, its largest secured creditor, over a span

of six years – *four times* the term of Benefit Street's original 18-month loan.  The Debtor disputes

a portion of Benefit Street's claim.  On account of the "BSP Undisputed Claim" (as defined in the

Plan) in the amount of $70.7 million, the Debtor proposes to provide Benefit Street with a new

note (the "**Note**") (on undisclosed terms), which will pay *interest only* for *six years*, with *all*

principal payable in a balloon at maturity — an amount Benefit Street asserts is in excess of $95

million due.  Plan § 3.2(b).  The Debtor proposes to pay interest on this principal at a rate of 4.5% for four years, increasing to 5% for two additional years.  *Id*.  In addition, Benefit Street will be second in priority to secured property tax claims (which are receiving 18% interest and are amortized).  On the effective date, the reorganized Debtor will contribute $3 million into an interest reserve account.  *Id.*

36.     With respect to the "BSP Disputed Claim" (the difference between Benefit Street's full claim and the BSP Undisputed Claim), upon a final order or written agreement between the parties, if amounts due to Benefit Street exceed the BSP Undisputed Claim amount, Benefit Street will be paid from the interest reserve so that it receives the interest payments otherwise payable on its Allowed Claim. The balance of any additional Allowed Claim amounts will be paid with the balance of the BSP Undisputed Claim – *i.e.*, six years post-effective date.[8]

37.     The Debtor's secured property tax claims, which are accruing interest at 18% pursuant to a payment plan (which agreement has never been presented to the Court for approval), the Debtor entered into with the relevant New York City taxing authority, will be paid through semi-annual installments of $443,201.41 over a period of ten years, with the first installment due January 1, 2022.  Disclosure Statement § V.6.C; Property Payment Plan at 1, attached as Ex. E; New York City Admin. Code § 11-224h (18% interest rate applies to nonpayment of real estate cases where annual tax on property is more than $2,750).  The Debtor executed the payment plan on June 23, 2021, agreeing to make the installment payments, a portion of which will be applied

---

[8] On January 6, 2022, after months of delay, the Debtor filed a 41-page adversary complaint against Benefit Street objecting to the full amount of Benefit Street's claim and asserting certain counterclaims.   The Complaint seeks to do precisely what the Debtor told the Court it would not do on the very first day of the case – relitigate the substance of the state foreclosure action.  The action is meritless for reasons that Benefit Street has repeatedly explained from the same day forward.

to interest (which rates may change as required by law). Property Payment Plan ¶ 2. The Debtor also agreed to pay all current real property taxes. *Id.* ¶ 3.

38.     Holders of unsecured claims are to receive payment of one-half of their allowed claim on the effective date and payment of the remainder, with interest, within six months thereafter. Plan § 3.2(d), (e). The Debtor estimates an aggregate amount of allowed unsecured claims in the range of $1,970,936 to $2,570,936, but has provided no support for that estimate. It has commenced proceedings to object to or estimate 17 out of 18 claims that were filed. *See* Dkt. Nos. 246, 247, 248, 249, 250, 251, 252, 253, 254, 258, 259, 273, 302, 303, 304, 305, 306 (claims objections and motions to estimate claims filed by Debtor). It has conceded that, if certain asserted litigation claims are allowed in full (and are not covered by insurance), it will require additional cash to pay these claims, which may not be available to the Debtor. Disclosure Statement § VI.4.B.

39.     The Plan places no restrictions on the reorganized Debtor's use of cash or the new equity holders' ability to collect dividends or otherwise receive cash from the reorganized Debtor.

### G.    Releases

40.     The Plan grants a release (the "**__Plan Release__**") of all estate and third party causes of actions against Ms. Moskovits and Mr. Lichtenstein and any other insiders and affiliates through the confirmation date. Plan § 5.10. This Plan Release extends not only to events in the Chapter 11 Case, but to pre-petition conduct, including avoidance actions against insiders and affiliates and third party guaranty claims against insiders. The Plan Release carves out holders of Claims that abstain or vote to reject the Debtor's Plan and opt out of the Plan Release. However, claims related to the PPP Loan are carved out of the Plan Release and are separately released, barring claimants from opting out. Plan § 5.10.

14

**OBJECTION**

41.    To confirm its Plan, the Debtor must demonstrate compliance with the provisions

of section 1129 of the Bankruptcy Code. *See In re Lionel L.L.C.*, Case No. 04-17324 (BRL), 2008

WL 905928, at *4 (Bankr. S.D.N.Y. Mar. 31, 2008) ("The Debtors, as proponents of the [Plan],

have the burden of proving the elements of sections 1129(a) and 1129(b) by a preponderance of

the evidence"); *In re Texaco Inc.*, 84 B.R. 889, 891 (Bankr. S.D.N.Y. 1988) (even absent objection,

debtor has burden of establishing full compliance with 11 U.S.C. § 1129.).  Section 1129 requires

compliance with applicable provisions of the Bankruptcy Code, such as 11 U.S.C. § 1123, which

sets forth the required contents of a plan of reorganization.  *In re Lionel*, 2008 WL 905928, at *4.

Under section 1129(b), the bankruptcy court can "confirm a plan over the rejection by a class of

claims or interests if 'the plan does not discriminate unfairly, and is fair and equitable, with respect

to each class of claims or interests that is impaired, and has not accepted, the plan.'"  *In re

Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018) (quoting 11 U.S.C. §

1129(b)(1)).

42.    The Debtor's Plan patently fails to meet multiple requirements of Section 1129(a),

including that it was not proposed in good faith, as required by section 1129(a)(3); it does not

propose post-confirmation management that serves the interests of creditors under section

1129(a)(5); it does not meet the best interests test in section 1129(a)(7); and it does not satisfy the

feasibility requirement of section 1129(a)(11).  In addition, the Plan does not satisfy section

1129(b)'s requirements for confirmation of a non-consensual plan because it is not "fair and

equitable."

**I.    The Plan Was Not Proposed in Good Faith**

43.    The party seeking confirmation must show that "[t]he plan has been proposed in

good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "Good faith" is not

defined in the Bankruptcy Code, but this Circuit requires that the plan be proposed "with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (internal quotations and citation omitted); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984). Courts in the Southern District also consider whether the plan "will achieve a result consistent with the standards prescribed under the Bankruptcy Code." *In re Ditech Holding Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019); *see also In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010*); In re Quigley Co.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010); *In re Genco Shipping & Trading Ltd*, 513 B.R. 233, 261 (Bankr. S.D.N.Y.); *In re Breitburn Energy Partners LP*, 582 B.R. at 352. Those policies include "preserving going concerns and maximizing property available to satisfy creditors . . . . [G]iving debtors a fresh start, discourag[ing] debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *In re Ditech Holding Corp.*, 606 B.R. at 578 (internal citation omitted).

44.     Here, the Debtor cannot show that it has proposed the Plan – or, indeed, conducted the entire case – in good faith. Rather than demonstrating "honesty and good intentions" and a serious intention to create a fair, workable Plan, the Insiders controlling the Plan process have diverted tax revenues, PPP funds, and possibly other funds from the Debtor to their other businesses; surfaced, months into the case, with a previously concealed, unscheduled management agreement that purportedly strips the Debtor of crucial assets, income, and control; and otherwise have acted to maintain control for themselves rather than to maximize the value of the estate for all stakeholders. Further, they have failed to cooperate with the court-appointed Examiner and

have impeded his investigation by withholding documents and tactically delaying access to materials necessary to conduct a thorough investigation. *See* Dkt. Nos. 199, 202, 214, 218 (letters from Examiner concerning Debtor's efforts to impede access to relevant information) and 243 (Examiner's motion to enforce order appointing examiner).

45.     At the outset, the entire process of developing the economic terms of the Plan was circumscribed by the Insiders' singular goal of keeping control at any cost. Despite repeated requests from Benefit Street, the Debtor appears never to have seriously investigated a sale or refinancing of the Hotel. In fact, it delayed for months before hiring a banker with hospitality experience. Then, without properly investigating alternatives or negotiating with any other fiduciary or creditor constituency, it proposed a Plan that plainly benefits the Insiders at the expense of creditors – allowing them to acquire exclusively all the equity in the reorganized Debtor without conducting *any* market test of the value of that interest, while at the same time fighting to maintain exclusivity.

46.     The lack of good faith is evident as well in the Debtor's willingness to make unrealistic promises to unsecured creditors to induce them to vote for the Plan, while litigating with numerous other unsecured creditors and putting most of the risk of Plan failure on Benefit Street. Initially, the Debtor proposed to pay all unsecured creditors their pro rata share of a $2.5 million cash pot, in annual installments over four years. When Benefit Street sought leave to propose a plan that would have provided a larger cash pot, the Debtor amended its Plan to purport to pay unsecured creditors in full in cash within six months of consummation. But the Debtor had conducted only a cursory review of filed and scheduled claims without even providing proper notice of the bar date to all creditors. As a result, there is now approximately $40 million in unsecured claims, far too much for the Debtor to pay or reserve for in full. It has therefore

scrambled to initiate expedited proceedings objecting to or seeking estimation of all of those claims.  Nonetheless, the Debtor's Plan requires payment in full of *all* Allowed unsecured claims (which would need to include claims allowed by this Court or on any appeal).

47.    Meanwhile, the Plan knowingly loads today all of the long-term risk of the reorganization onto Benefit Street.  Whereas junior creditors would receive payment in full within six months, Benefit Street will not receive a penny of principal on its $95-plus million claim – by orders of magnitude the largest claim in the case – for *six years*, and will receive only periodic interest at a well-below-market rate.  At the same time, the Plan imposes no limits on the Debtor's use of cash or the Insiders' ability to take distributions after the effective date and long before Benefit Street has seen any of its principal.   Given the apparently enormous inter-affiliate transactions that the Debtor has now admitted to as part of the Examination, this is no theoretical concern.  A plan that places virtually all reorganization risk on a single disfavored senior creditor is not proposed in good faith.  *See In re LightSquared Inc.*, 513 B.R. 56, 100 (Bankr. S.D.N.Y. 2014) (holding proposed plan discriminated unfairly – and was likely not proposed in good faith – where treatment of secured creditor put it "at the mercy of the rest of the proposed post-confirmation capital structure, including the equityholders below it"); *see also In re Excel Marine Carriers Ltd.*, Case No. 13-23060-rdd, 2013 Bankr. LEXIS 3920 (Bankr. S.D.N.Y. Sept. 13, 2013) (in case that involved a proposed new value plan, court observed that if debtor fails to negotiate with creditors to achieve broader plan support, plan may be unconfirmable under either section 1129(a)(3) or *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999)).

48.    The lack of good faith is also evident in the Debtor's attempt to secure blanket estate and third party releases for the Insiders and their affiliates without any apparent internal

18

investigation.  Because the Debtor was clearly unable to provide an unconflicted analysis of those claims, Benefit Street sought appointment of an examiner to act as an independent fiduciary. While initially promising prompt cooperation, the Debtor has fought tooth and nail to undermine the Examiner's work:  It resisted discovery on confidentiality grounds and, even after receiving assurances of confidentiality, still refused to produce bank statements for non-Debtor accounts that received multiple large transfers from Hotel accounts.  Then, when the Examiner subpoenaed the withheld records from third parties, the Debtor – which has no interest in the documents and a fiduciary duty to preserve estate claims – sought to *quash* the subpoenas and actually wrote to the subpoena recipients urging them not to comply.  Even after being threatened with contempt of Court, the Debtor apparently has still not fully complied with the Examiner's requests.

49.    Despite its efforts to obstruct the examination, the Debtor has been forced to admit – for the first time in ten months of bankruptcy – that the Insiders may have received millions of dollars in "repayment" of alleged "loans" from the Hotel prepetition, thereby confirming that the existence of significant transactions requiring investigation.  The Debtor's lack of cooperation with the court-appointed independent fiduciary charged with investigating the very claims its Plan will release demonstrates the Debtor's failure to propose the Plan in good faith.  *See In re Malkus, Inc.*, Case No. 03-07711-GLP, 2004 Bankr. LEXIS 2120, at *9-10 (Bankr. M.D. Fla. Nov. 15, 2004) (failure of debtor's president to investigate potential preference claims against himself or affiliates was example of conduct that supported lack of good faith); *see also Springel v. Prosser (In re Prosser)*, Case No. 06-30009, 2009 Bankr. LEXIS 3209, at *112–13 (Bankr. D.V.I. Oct. 9, 2009) (finding bad faith conduct of debtor where bad acts included failing to cooperate with and make appropriate disclosures to the court, the examiner or trustees); *cf. In re Multiut Corp.*, 449 B.R. 323, 343 (Bankr. N.D. Ill. 2011) (plan's failure to "adequately reserve claims and causes of action

the Debtor may have against third parties," accurately state value of unsecured claims and accurately disclose percentage distribution to unsecured creditors demonstrated lack of good faith).

## II. The Appointment of the Debtor's Insiders as Managers of the Reorganized Debtor Is Not in the Interest of Creditors or Public Policy

50.     Confirmation should further be denied because the Plan proposes to leave the fate of the reorganized company in the hands of conflicted, dishonest, and thoroughly unreliable managers – the Insiders.  Section 1129(a)(5) of the Bankruptcy Code requires that the plan disclose the directors of the reorganized debtor and provides that a plan "may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy." *In re Bashas' Inc.*, 437 B.R. 874, 912 (Bankr. D. Ariz. 2010).  "Continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." *In re Polytherm Indus., Inc.,* 33 B.R. 823, 829 (W.D. Wis. 1983).

51.     In particular, "[w]here the proposed officer or director has previously engaged in serious misconduct in managing the debtor or is unfit to manage the debtor, employment is improper under § 1129(a)(5)." *In re SM 104 Ltd.*, 160 B.R. 202, 245-46 (Bankr. S.D. Fla. 1993) (denying confirmation where proposed manager had intentionally diverted funds from a lock box, made misrepresentations regarding those diversions, and was responsible for misrepresentations in the debtor's loan application) (citing *Pepper v. Litton,* 308 U.S. 295 (1939) (insiders cannot manipulate bankruptcy process for own benefit), and *Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307, 323-24 (1939) (Bankruptcy Act) (refusing to allow majority shareholder to retain majority position because of "abuses of management")); *In re Rusty Jones, Inc.*, 110 B.R. 362,

365, 367 (Bankr. N.D. Ill. 1990) (denying confirmation of plan that would have reinstalled officers

who had sought "to obtain direct or indirect benefit[] from the [Debtor's] cash assets," including

by seeking assumption of expensive "management" contract with entity controlled by same

officers).

52.    Here, as in those cases, the record reflects ample evidence of misconduct and

inadequate management by the Insiders both pre- and post-petition, rendering it against the best

interest of creditors and public policy for them to remain in control of the reorganized Debtor:

- The Insiders and the Management Company concealed the existence of the Purported Management Agreement from Benefit Street, the Court, and creditors.  Not only did their deception fraudulently induce Benefit Street to make the Loan, but they also failed to disclose the "agreement" in their first day papers or schedules, or at the section 341 meeting, and in fact produced it only when compelled by the U.S. Trustee.

- The Management Company, acting through the Insiders, applied for a PPP Loan based on the Hotel's staff and operations in violation of the Receiver Order; concealed the existence of the Debtor in that application; and then misdirected over $800,000 of the PPP Loan proceeds to other entities they controlled unrelated to the business of the Hotel.  The Debtor's diversion of these proceeds forced real property taxes to go unpaid, a clear act of intentional mismanagement that allowed additional senior secured claims to accrue against the Debtor and the Hotel.

- The Examiner has explained in his filings that all the Hotel's revenues were received and held in Management Company accounts – in direct violation of the Debtor's operating agreement, which requires that all its assets be held in the name of the Debtor. *See* Fourth Amendment to Operating Agreement of 96 Wythe Acquisition LLC (the "**Operating Agreement**") § 3(c)(vii), Manager's Certificate with relevant Operating Agreement attached as Ex. F.  More alarmingly, the Management Company, which is a contractual agent paid a fee that is a small percentage of the Hotel's rents, repeatedly filed tax returns in which it claimed *all* of the Hotel's revenues and income – not merely the agent's fees – as revenues and income of the Management Company.  At the same time, it did *not* cause the Debtor to file any tax returns – yet another violation of the Operating Agreement – presumably because it claimed the Hotel's revenues and income were its own.  Whether these actions resulted from ineptitude or wrongdoing remains unclear pending the Examiner's report.

- It further appears that the Debtor failed to pay an additional $6.5 million in corporate, unincorporated business (UBT), and hotel occupancy taxes (for a total of more than

$10 million in unpaid taxes), according to proofs of claim filed by New York City taxing authorities.  According to a claim objection filed just last Friday, the Debtor now admits that it failed to pay more than $3.7 million (in taxes, interest and penalties) in hotel (guest occupancy) taxes – a lapse for which it blames *the Management Company*, which of course is controlled by the same Insiders.  *See* Debtor's (I) Objection to Claim No. 14 Filed by NYC Department of Finance and (II) Motion to Estimate Claim No. 14 Pursuant to Sections 105 and 502 of the Bankruptcy Code ¶ 13 [Dkt. No. 302]; Declaration of David Norensberg ¶¶ 4, 5 [Dkt. No. 302].  The claim objection leaves unexplained what happened to the taxes collected from hotel guests for the City but then apparently diverted by the Insiders.

- The Debtor has resisted cooperating with the Court-appointed Examiner in violation of its duty to preserve claims of the estate, seeking to suppress third-party bank statements that showed multiple large transfers from the Debtor – stymying the Examination and driving up costs.  The Debtor nevertheless has been forced to admit the existence of massive, unexplained transactions with the Insiders and their affiliates – including affiliates unrelated to the business of the Hotel.  Those transactions appear to directly violate the terms of Benefit Street's Loan and the Debtor's Operating Agreement.

- Against all this incompetence and malfeasance, there is no affirmative benefit in retaining the Management Company.  It has virtually none of the professional resources independent third party managers are paid to provide, but appears simply to be a shell for the on-site staff of the Hotel.  The Insiders and their Management Company have no depth of experience or success in managing hotels.  Under their leadership, the first and only time they have managed a hotel, the Debtor failed to complete construction of the Hotel, defaulted on its mortgage within one year, and failed to repay the balance of the Loan at maturity – long before the pandemic.

- And in case there is any remaining question as to the Insiders' suitability, they also have an astonishing track record of failure and conflict on their *other* real estate projects – everything they touch seems to end in bankruptcy and acrimonious litigation.  *See* above at ¶¶ 4, 14.

53.     These facts establish that the Insiders' continued management of the reorganized Debtor is inconsistent with creditors' interests and public policy, preventing confirmation of the Plan.  The Plan requires Benefit Street to wait years to receive even a penny of principal.  During that time, its only protections would be contractual rights under its loan documents (forms of which the Debtor has never provided) and governance limitations under the Debtor's Operating Agreement.  But the Insiders have repeatedly flouted similar restrictions in the past, removing

potentially millions of dollars of Benefit Street's collateral from the Hotel. At the same time, they have shirked such fundamental managerial obligations as the payment of taxes *for years*. Such "stewards" cannot properly continue in place.

## III. The Plan Does Not Satisfy the Best Interests Test

54.     Under the "best interests" test, the Debtor must prove that each holder in each impaired class will receive or retain on account of its claim or interest property of a value, as of the Plan effective date, that is at least what the holder would receive under a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7); *see In re Quigley Co., Inc.*, 437 B.R. at 143-44; *In re Leslie Fay Cos.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997).

55.     The Plan contemplates distributions to impaired classes that are entitled to vote, including Class 2 (Benefit Street's secured claim). Using the Debtor's own valuation, Benefit Street would be entitled to a greater recovery (with less risk) in a chapter 7 liquidation than it would receive under the Plan.

56.     Benefit Street's claim exceeds $95 million. The Debtor proposes to pay this claim with a six-year interest only note, at 4.5 to 5% annual interest. The Debtor asserts that this distribution satisfies the best interests test because the Debtor values Benefit Street's collateral – the Hotel – at $113 million on a going concern basis, but then discounts this amount by 30% to achieve what it labels a "liquidation value" for the Hotel. *See* Plan, Ex. B.

57.     The Debtor wants to have it both ways, asserting that the Hotel is worth $113 million for certain Plan purposes today, and somehow also could only be sold for $79 million today. That discount is wholly unwarranted. A chapter 7 trustee could simply reject the Purported Management Agreement and the enormous drag on value that it creates; install a reputable and competent third party manager; and conduct a robust marketing process to sell the Hotel as a going concern at full value. While this process might take more or less time than the 90- to 120-day

23

"forced liquidation" period cited by the Debtor as the reason for the discount, it would be consistent with the trustee's fiduciary duties and undoubtedly supported by creditors. The principal asset of the Debtor is the Hotel itself, not the components of the Hotel, like accounts receivable or inventory, which might be subject to a discount if, for example, a chapter 7 trustee were liquidating the business.  In fact, the only support the Debtor provides for this steep discount is a two-page document, within Exhibit F of the Disclosure Statement, in which the Debtor's advisors cite qualitative characteristics that should already have been considered by the appraiser as reasons for a further discount.  Similarly, although there may be different costs associated with the chapter 7 process and professionals, the Debtor has not demonstrated that they would differ materially from current expenses and, in any event, these costs are distinct from any "liquidation discount" to be applied to the asset.

58.    There is no reason to believe the Hotel could not be sold, even in chapter 7, for full value – which the Debtor estimates to be $113 million, enough to satisfy Benefit Street's claim in full, in cash.  That is a far better recovery than a long term, non-amortizing note at a below market interest rate, with no protections against the depredations of the insiders.  Indeed, the value-killing aspects of the Plan treatment leave Benefit Street worse off than in liquidation.

## IV.    The Plan Is Not Feasible

59.    The "feasibility test" of section 1129 requires the Debtor to establish that confirmation of the plan is not "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . under the plan."  11 U.S.C. § 1129(a)(11).  Under this test, the court "views the probability of actual performance of the provisions of the plan."  *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978) (citation omitted).

60.    Accordingly, the Debtor must demonstrate "the reasonable probability that the provisions of the [p]lan can be performed."  *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R.

723, 762 (Bankr. S.D.N.Y. 1992).  This showing requires "a probability of success, rather than a

mere possibility." *In re Kent Terminal Corp.*, 166 B.R. 555, 560 (Bankr. S.D.N.Y. 1994). "To

establish feasibility, the debtor must present proof through reasonable projections, which are not

speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and

maintain operations." *In re Quigley Co.*, 437 B.R. at 142 (citation omitted).

61.    A chapter 11 plan is not feasible where the debtor lacks funding to make the

payments proposed under the plan.  *See, e.g.*, *In re Biz As Usual, LLC*, 627 B.R. 122, 130-31

(Bankr. E.D. Pa. 2021) (confirmation denied where "Plan's success is dependent on highly

contested, undeveloped litigation," namely claims objections, and debtor had not established its

ability to sustain contemplated monthly payments if it did not succeed in litigation).  Further, if

the plan contains a balloon payment, the debtor must demonstrate that "the funds will be available

at the time the payment is due." *In re Crosscreek Apts., Ltd.*, 213 B.R. 521, 541 (Bankr. E.D.

Tenn. 1997); *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 734 (Bankr. E.D.N.Y. 1994) (plan not

feasible where debtor would likely not have sufficient capital to make balloon payment); *In re

T.A.T. Prop.*, No. 05-47223(SMB), 2009 Bankr. LEXIS 739, at *52 (Bankr. S.D.N.Y. Feb. 20,

2009) (finding plan not feasible where projections underestimated plan payments debtor would be

required to make or reserve for on effective date).

62.    The Debtor cannot demonstrate feasibility here for four reasons:

63.    *First*, it cannot demonstrate it has sufficient funds to pay claims under the Plan.

Under Section 3.2(e) of the Plan, the Debtor must pay general unsecured claims in full in cash,

half on the effective date and the rest six months later.  The Disclosure Statement provides no

support for its estimate that general unsecured claims will total a maximum of $2,570,936.  This

estimate, moreover, was made before the supplemental bar date, at which litigations and tax claims

25

totaling more than an additional $10 million were filed – pushing the unsecured claim total over $40 million.  The Debtor lacks the cash to pay or reserve for those claims and, thus, must either successfully object to them, or have them estimated at a lower amount – by a final order – and the Plan is not confirmable until this happens.  *See In re Sis Corp.*, 120 B.R. 93, 95 (Bankr. N.D. Ohio 1990) (plan "submitted on a conditional basis" is "infeasible"); *In re Biz As Usual, LLC*, 627 B.R. at 130-31 (denying confirmation where plan was not feasible as it was contingent on debtor succeeding in claims objection litigation).  Under the Plan, if an objection is filed, the claim will *not* be considered an Allowed Claim until adjudicated by Final Order, or settled by agreement with the Debtor.  Plan § 1.5.  A "Final Order" is "an order or judgment . . . [that] has not been reversed, stayed, modified, or amended and the time to appeal such order has expired."  Plan § 1.43.  Thus, Allowed Claims to be paid under the Plan include Disputed Claims that may be allowed on appeal, even if in an amount greater than the Bankruptcy Court may have allowed.  *Id.* § 4.1(a)(iii).  While the Debtor has filed approximately 16 separate claim objections/motions to estimate specific claims, and one adversary proceeding, none has been adjudicated. The Debtor concedes that if it does not prevail in these proceedings, it will require additional cash that it does not apparently have available.  *See* Disclosure Statement § VI.4.B.

64.    In addition, the parties will dispute the valuation of the Hotel at confirmation.  If the Court determines that the value of the Hotel is lower than the amount of Benefit Street's claim (in excess of $95 million as of mid-February 2022), Benefit Street it may have a large unsecured claim that will need to be paid in full in cash that the Debtor must pay or reserve for.  The Plan fails to account for this possibility.[9]

---

[9] Benefit Street reserves all rights with respect to any potential unsecured claim it may have if the Hotel is valued at less than its claim.

65.    The Debtor also has failed to demonstrate that it will have the funds required to pay the $95 million balloon in six years when Benefit Street's Note is due or to address any alternative methods to pay Benefit Street.  Presumably, it will either sell or refinance the Hotel but it includes no analysis of its ability to do so, including the likely proceeds associated with either of these actions necessary to feasibly implement the Plan.  Furthermore, the bogus Management Agreement it proposes to assume severely depresses the value of its assets to the point where no lender would refinance the note it proposes to provide Benefit Street.

66.    *Second*, the Debtor bases its claims to feasibility on a set of projections that reflect performance far exceeding anything the Debtor has ever achieved.  For example, in the twelve months ending in October 2021 ("**TTM Oct 2021**"), the Debtor earned revenues of $16.4 million.  Nevertheless, the first year of the Debtor's projections, attached as Ex. C to the Disclosure Statement, forecasts that it will have revenues of $24.8 million, roughly 25% higher than it earned in 2019 and 50% higher than TTM October 2021.[10]  The Debtor further projects that revenues will increase to $27.9 million and $31.6 million in the second and third years.  Although its business plan is not changing, the Debtor also forecasts that its NOI (less reserves) will skyrocket from $1.8 million in 2019 to $3.7 million in the first year and then continue to grow to $4.8 million and $6.2 million in the following years.  In short, the Debtor's projections are unsupported by anything in its prior history.   As discussed more fully below at paragraphs 81-82, this creates a serious risk that Benefit Street will not receive its promised balloon payment in six years – rendering the Plan not just infeasible but also unconfirmable on multiple other grounds.

---

[10] The Debtor reports $19.5 million in revenue in 2019, yet did not pay any debt service in 2019 and did not pay its real estate taxes in January 2020.  This begs the question – where did the money go?

67.     *Third*, the Plan projections assume that the Court will approve deferring all the principal of Benefit Street's claim with no amortization at a dramatically depressed interest rate. As explained below, this treatment plainly violates section 1129(b).   If the Court requires reasonable and customary amortization and an appropriate interest rate, the Debtor's cash balance is negative within the first two years of the Plan and never recovers.

68.     *Fourth*, if any material portion of the City's $6.5 million proof of claim for additional unpaid taxes is allowable against the Debtor as an additional administrative or priority claim, that may well render the Plan infeasible out of the box.

## V.      The Plan Does Not Satisfy the Requirements of Section 1129(b)

69.     The Plan fails as well because it unfairly shifts virtually all plan risk to Benefit Street – barring the Debtor from cramming down Benefit Street's class under Bankruptcy Code section 1129(b).

### A.      Legal Standard

70.     The Bankruptcy Code permits confirmation of a plan over the objection of a rejecting, impaired class of creditors only if all other confirmation requirements are satisfied and the plan "does not discriminate unfairly, and is fair and equitable."  11 U.S.C. § 1129(b)(1).  With respect to a dissenting class of *secured* creditors, such as Benefit Street, (1) the plan must preserve the secured creditor's lien and (2) where the plan proposes to pay a secured creditor in installments, the present value of the future stream of payments must equal the amount of the creditor's secured claim or the creditor must receive the "indubitable equivalent" of its claim.  11 U.S.C. § 1129(b)(2)(A).  And under the "absolute priority rule," junior classes of creditors and equity holders cannot receive property of a debtor unless all senior classes are paid in full or accept the plan.  11 U.S.C. § 1129(b)(2)(B).

28

71.     "Mere compliance with the specific treatment required by § 1129(b)(2)(A) and (B) does not assure that the plan is fair and equitable." *In re Montgomery Court Apts. of Ingham Cty., Ltd.,* 141 B.R. 324, 346 (Bank. S.D. Ohio 1992) (citation and internal quotations omitted).  To be confirmed, "a plan may not treat a dissenting class unfairly, and must not unduly shift the risk of reorganization." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 168 (Bankr. D.N.J. 2010); *see In re Prussia Assocs.*, 322 B.R. 572, 595 (Bankr. E.D. Pa. 2005) (denying confirmation of plan that shifted "risk of failure from the Debtor and insiders to" secured creditor); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992) (plan not fair and equitable where secured creditor "runs the ultimate risk of the project's failure with no upside potential").

72.     In determining whether a plan imposes "impermissible risk shifting upon the primary secured creditor, a court will consider: (i) the debtors' demonstration of feasibility; (ii) the protections and risks to the secured creditor, and (iii) the general reasonableness of the proposals in light of the circumstances." *In re TCI 2 Holdings, LLC*, 428 B.R. at 168; *In re Montgomery Court Apts. of Ingham Cty., Ltd.,* 141 B.R. at 346 (enumerating factors to consider when analyzing whether plan unduly shifts risk of reorganization, including "whether the primary risk of reorganization remains with the equity interests of the reorganized debtor").[11]

---

[11] The *Montgomery Court Apartments* court noted seven non-exhaustive factors relevant to the improper risk shifting analysis:

> (1) whether the statutory mandates of § 1129(b)(2)(A) or (B) have been met; (2) whether for a secured class, the valuation process has been fair; (3) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor; (4) whether any secured loan restructure, including default provisions and other covenants, is reasonable when compared to the parties' previous understandings and practices; (5) whether the length of time until proposed repayment is reasonable; (6) whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations; and (7) whether other particular inequities exist, including special prejudice to a dissenting class arising from its particular circumstances.

141 B.R. at 346.

73.    Thus, in *In re Miami Center Associates, Ltd.*, 144 B.R. 937 (Bankr. S.D. Fla. 1992), the debtor hotel proposed to pay the secured creditor's claim at an interest rate not to exceed 10%, payable over ten years, with principal paid based on a 30-year amortization and a balloon payment at the end of ten years.  *Id.* at 939.  Insiders would receive equity in the new debtor in exchange for investing $6 million in cash over three years, to be used to refurbish the hotel and pay administrative claims.  *Id.*  The court found that all the upside potential of the debtor's success went to equity or residual claimants, noting that approximately half of the secured creditor's claim would be made as a balloon payment in ten years. *Id.* at 942 ("[T]he secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable . . . .").

74.    Similarly, in *In re Prussia Associates*, 322 B.R. 572 (Bankr. E.D. Pa. 2005), the debtor proposed to pay the secured creditor interest only for the first year at a 6.5% interest rate and, thereafter, monthly principal and interest payments at the same rate, based on a 25-year amortization, with a balloon payment of outstanding principal and interest paid seven years after the effective date.  Pre-petition, the secured creditor's loan was payable in two years with a fluctuating interest rate of 8-16.97%.  *Id.* at 576.  In contrast, insiders would get a note at 6% interest, and receive interest only payments – but after the first two years, the notes could be paid in full at any time so long as the debtor was not in default under the plan.  *Id.* at 578.  The court found that the insiders would likely be paid in full "long before [the secured creditor] receives payment of its principal debt."  *Id.* at 595.  Accordingly, the plan shifted the risk of failure from the debtor and insiders to the secured creditor, which the court found "sufficiently inequitable" to deny confirmation.  *Id.*

75.     A plan that shifts the risk of the reorganization to a senior class while favoring junior classes is also not fair and equitable.  Thus, in *In re Consul Restaurant Corp.*, 146 B.R. 979 (Bankr. D. Minn. 1992), the court rejected a plan that proposed to distribute cash to a subordinated class while the senior class received a combination of cash, equity, and an accelerating unsecured note.  *Id.* at 983.  The court found the proposed distribution scheme not fair and equitable because it would pay to a subordinated class cash that, if given to the senior class, would pay that class in full.  *Id.* at 989.  "[T]he concept of fair and equitable involves more than an application of a mechanical calculation of absolute priority based on distribution of property valued abstractly." *Id.*  Rather, because "the proposed distribution would substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose, the plan is not fair and equitable to the dissenting class."  *Id.*

### B.     The Plan Is Not Fair and Equitable Because Benefit Street Will Bear the Ultimate Risk of Reorganization

#### 1.     The Plan Improperly Structures Payments to Shift Risk from the Debtor's Equity Holders and Junior Creditors to Benefit Street

76.     Under the Plan, the $95 million principal balance of Benefit Street's claim – the largest in the case by a factor of ten more – will remain fully outstanding and subject to the success of the reorganization for six years.  Neither the equity, nor any other creditor, will bear the same uncompensated risk or anything close to it.  This renders the Plan not "fair and equitable" and bars cram-down under section 1129(b).

77.     Insiders propose to acquire all of the equity in the reorganized Debtor in return for a payment of approximately $7.5 million.  While they claim the amount is actually $1.5 million larger, the difference is a settlement payment made to resolve claims based on the Insiders' admitted diversion of PPP funds and thus cannot be double-counted as a contribution in respect of

the equity. Not only is $7.5 million less than 8% of the amount of Benefit Street's claim, but the Insiders can begin to recover it virtually from consummation of the Plan. Furthermore, the Debtor will assume the disputed management contract with its affiliated Management Company, which shifts value dramatically from the Debtor to the Insiders. *See* Section VII, below. More critically, the Plan places no restrictions of any kind on the reorganized Debtor's use of cash or on the Insiders' ability to repay themselves through dividends or distributions – thereby minimizing or eliminating their exposure while Benefit Street's much larger exposure remains in place.

78.    At the same time, in a transparent effort to buy the support of general unsecured creditors, the Debtor proposes to pay them in full within six months of the effective date. In other words, creditors junior to Benefit Street will paid in full, in cash, twelve times faster than it is and their much, much smaller claims will accordingly have at least twelve times less exposure to the risk of the reorganization's failure.

79.    Furthermore, the only other claim that will remain outstanding as long as Benefit Street's – the City's real property tax claim created by the Insiders' mismanagement – will (i) be senior in priority to Benefit Street's, (ii) be paid 18% interest—or roughly four times more than Benefit Street, (iii) amortize over ten years, and (iv) be treatment to which the City has agreed.

80.    This is precisely the type of risk-shifting that renders a cram-down plan unconfirmable. *See In re Reid Park Props., LLC*, No. 4:11-BK-15267-EWH, 2012 WL 5462919, at *9-10 (Bankr. D. Ariz. Nov. 7, 2012) (plan improperly shifted risk to lender by allowing new equity holder to receive twice its capital contribution while during same period lender received "a payment stream which does not fully amortize its debt and leaves it with the risk of a balloon payment 13 years later"). The absence of any effective controls over operations and distributions, including on the use of cash by the reorganized Debtor, only heightens the risk. Given the Insiders'

32

demonstrated disregard for the Debtor's express obligations under contracts, court orders, and its own operating documents, their continued control of the Debtor amplifies this risk beyond reason.

81.     The risk that Benefit Street will receive *nothing* on the principal amount of its claim while the Insiders and unsecured creditors receive full value is not merely hypothetical.  The Debtor will emerge more highly leveraged than when Benefit Street made its loan in 2017.  There are potentially in excess of $99 million of secured claims being "kicked" under the Plan, in addition to priority and unsecured obligations to be paid on or following the effective date.  In contrast, when Benefit Street made its loan in 2017, it had only $68 million in principal and the Debtor was subject to only minimal additional junior claims.

82.     As discussed above at paragraph 66, the Debtor's projections forecast, without any adequate support, that it will generate revenues and profits that dramatically exceed its past performance.  But given the business track record of the Debtor's principals, there is no assurance that the reorganized Debtor will be profitable at all – or even operating – in six years' time.  Even if the Debtor somehow achieves its projected income, that would be insufficient to make the balloon payment – as the Court has already observed.  *See In re 96 Wythe Acquisition, LLC*, Disclosure Statement Hr'g Tr. 36:7-17 (Case No. 21-22108-rdd, Nov. 5, 2021), relevant portions attached as Ex. G (Court expressing concern about how balloon payment would be made: "you're left wondering as an Unsecured Creditor and as a Secured Creditor how that balloon gets paid . . . it doesn't appear to be payable from the cashflows – from the projections. . . . there's no provision for anything to pay it").  At the same time, the crudely lopsided terms of the non-arm's-length, non-market, fraudulent management agreement that the Debtor proposes to assume are all but certain to scuttle any effort at refinancing.  And if the Debtor *fails* to reach these inflated levels,

Benefit Street will certainly not be repaid or refinanced.[12]  This leaves Benefit Street with over $95-plus million of debt that may not be repaid, whereas the risk exposure for general unsecured creditors per the Debtor (for only six months) is approximately $2.5 million and equity holders are only risking $7.5 million (which they are free to transfer out of the company at will), and a related party management company will extract millions in fees while providing limited, if any, value to the Hotel.  Forcing Benefit Street to shoulder such substantial risk while junior creditors and equity holders risk minimal exposure is unfair and inequitable.

### 2. The Terms of the Proposed Note Do Not Remotely Compensate Benefit Street for the Substantial Risk It Is Bearing

83.    The terms of the new note that Benefit Street would receive under the Plan are woefully insufficient to compensate Benefit Street for the enormous risk it is being forced to bear and fail to satisfy the requirements of, *inter alia*, 11 U.S.C. § 1129(b)(2)(A)(i), which requires a dissenting creditor to receive the present value of its claim.  The disclosed terms of the Note are not even plausibly market and far worse than what Benefit Street originally bargained for.

### (a) The Proposed Note's Interest Rate Is Too Low

84.    Under the Plan, the six-year, interest only note provided to Benefit Street will bear interest at an annual rate of 4.5%, increasing to 5% in the last two years.  This interest rate is far too low to compensate Benefit Street for the inherent risk of the financing.  The Second Circuit has adopted a two-step approach to determining cramdown interest rate: if there is an efficient market, apply the market rate; and if not, use a prime-plus formula.  *Momentive Performance Materials Inc. v. BOKF, NA (In re MPM Silicones, L.L.C.),* 874 F.3d 787, 799–800 (2d Cir. 2017).  Courts have found "efficient markets" where "they offer a loan with a term, size, and collateral

---

[12] Only the NYC taxing authority shares long-term exposure to the success of the reorganization.  But it has voluntarily agreed to a payment plan with the Debtor and is being compensated with an interest rate of 18%, which is far more appropriate for the level of risk it is assuming.

comparable to the forced loan contemplated under the cramdown plan." *Id.* (quoting *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)).

85.    In determining whether an efficient market exists, courts will rely on "expert evidence and evidence of actual loan offers." *In re 20 Bayard Views*, 445 B.R. 83, 109 (Bankr. E.D.N.Y. 2011).  Absent an "efficient market," courts apply the "prime-plus formula," under which the national prime rate is adjusted "to reflect the amount of risk associated with the loan at issue." *Id.* at 111.  When applying the prime-plus formula, courts must adjust the rate by examining the circumstances of the estate, nature of security, duration and feasibility of the plan, as well as time-value of money, inflation, and risk of non-payment. *Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004).  Other risk factors include "debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors." *20 Bayard Views, LLC*, 445 B.R. at 111 (quoting *In re Griswold Bldg. LLC*, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009)).

86.    For example, in *20 Bayard Views, LLC*, the court denied confirmation of a plan that crammed down the largest secured lender and proposed to pay that claim over five years at an interest rate of 4.75% (which included a 1.5% risk adjustment).  The court found that the adjustment did not account for the risk borne by the secured lender, which included a 100% LTV ratio, the stigma of bankruptcy on the debtor's property, a lack of Fannie Mae financing for potential buyers, and a saturated market.  *Id.* at 112.  Other risks were a diminished recovery if the property was sold and the reorganization's failure if condominium units could not be sold as projected, since the debtor failed to identify any alternative source of funds to meet its obligations. *Id.* at 113.

87.    Here, the original Loan had a term of 18 months, with two potential six-month extensions, and paid interest at an annual rate of LIBOR plus 6.25%.  Loan Agreement at 14  With

LIBOR over 1% in December 2017, the Plan proposes a Note with an interest rate approximately 2.25 to 2.75% *lower* than the original loan at inception – absurd on its face given the materially riskier situation today.  This proposed interest rate is in stark contrast to the 18% rate that the NYC taxing authority is to receive (on money that is senior to Benefit Street).[13]  Such a rate patently fails to compensate Benefit Street for the risk it is being forced to take.  Of course, in the real world, senior lien creditors bear less risk and thus typically get paid a lower rate of interest than junior lien creditors.  That the Debtor proposes to do the opposite here represents another bad faith, discriminatory feature of its Plan.  In fact, it agreed to such an exorbitant payment plan with the City because its already unfeasible Plan could not pay the City's priority and administrative tax claim in full in cash at confirmation.

88.    Benefit Street will demonstrate at the confirmation hearing that no efficient market rate exists and that the prime-plus formula requires a significantly higher interest rate.  The current national prime rate of interest is 3.25%.  Thus, the proposed 4.5% to 5.0% interest rate on the Note includes only a 1.25% to 1.75% risk adjustment.  Such a minor adjustment is insufficient to account for the risk to be borne by Benefit Street.  *See 20 Bayard Views, LLC*, 445 B.R. at 112-13 (finding 1.5% risk adjustment insufficient given creditor's potential shortfall in a liquidation, lack of equity cushion and risk of nonpayment under plan and other noted ).

89.    Such a minimal risk adjustment is particularly inappropriate here, where existing management has failed once in hospitality and repeatedly elsewhere, and everywhere acted with dishonesty and disregard of contractual and other obligations.  *See supra* Section II.  It is far-fetched to suggest that these principals, with their history, could obtain a loan on such terms in the marketplace, when disclosure of just a small part of their dishonesty resulted in denial of even a

---

[13] It is also in contrast to the 15% interest rate earned by the Debtor's prepetition mezzanine lender, which had made a $13 million loan to the Debtor's parent.

second PPP loan, and they separately agreed to pay a roughly 300% higher rate of interest to the senior lienholder.

### (b)      Six-Year Maturity Is Excessive

90.      The Debtor proposes to quadruple the term of Benefit Street's original Loan, from 18 months to six years, beginning nearly three years after the Loan matured. This extension of time over which Benefit Street "will recover its principal unfairly imposes excessive risk on it." *In re Kellogg Square P'ship*, 160 B.R. 343, 367 (Bankr. D. Minn. 1993); *see In re DeTienne Assocs. Ltd. P'ship*, No. 04-63115-11, 2005 Bankr. LEXIS 3122, at *20–21 (Bankr. D. Mont. July 29, 2005) (finding extension of obligation nearly four-fold "smacks of inequity" and denying confirmation); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. at 940–41 (concluding 10 years for repayment on secured hotel loan was too long, noting only one year was left under original term).

91.      If forced to accept the new note, Benefit Street will be involved in this transaction for *ten years*, nearly seven times longer than the original (fraudulently induced) loan. The Debtor is unilaterally transforming what was a short-term bridge-like, construction completion loan into long-term permanent financing – but stripping out the amortization that accompanies permanent financing (see further below) and *decreasing* the interest rate. This unfairly gives the Insiders a one-way option to capture additional upside in a strong economy while putting all downside risk on Benefit Street, instead of selling the hotel (which could pay Benefit Street in full, in cash) or refinancing on market terms that appropriately allocate risk (assuming they reject their fraudulent, value-killing, insider management agreement). Tying Benefit Street to the reorganized Debtor for so much longer than initially contemplated radically heightens the unfairly imposed risk.

### (c)      Loan-to-Value Ratio Is Too High

92.      The Debtor asserts that the value of the Hotel is $113.1 million. *See* Disclosure Statement § VI.4.B. Even accepting this valuation, which Benefit Street does not, the amount of

Benefit Street's claim exceeds $95 million, implying a loan-to-value ("**LTV**") ratio of approximately 80%. If the Court does not accept that valuation, the LTV may exceed 100%. Not only is this LTV significantly higher than when the Loan was originally made, but as will be demonstrated in trial, it is far above the customary LTV for a senior secured mortgage, which, given the grossly inadequate interest rate proposed, imposes substantial risk on the Lender for which it is not being compensated. The Debtor must win both the valuation and claim litigations or the Note it offers Benefit Street will be hopelessly out of market for this additional reason.

### (d)    *Lack of Amortization Is Unfair*

93.    Further, Benefit Street is to receive a payment stream that does not amortize its $95-plus million debt at all for six years, while imposing no excess cash flow sweeps or any other controls on the use of cash. As a result, Benefit Street's exposure will not be reduced if the reorganized Debtor generates excess cash. The court in *In re Gramercy Twins Associates*, 187 B.R. 112 (Bankr. S.D.N.Y. 1995), found that similar terms justified denial of plan confirmation. There, the debtor's plan provided for a balloon payment at the end of five years with no amortization of principal during that time. *See id.* at 123. Thus, the lender would receive only interest payments for those five years, "while encountering much of the risk." *Id.* at 124. Other factors that the court found to increase the risk to the lender included the high loan to value ratio of 85% and the debtor's exclusive right to refinance or sell the property. *Id.* The lack of amortization here, combined with the other terms of the proposed new note, similarly fail to compensate Benefit Street and fall far short of satisfying the requirement for cram-down under section 1129(b).

## VI. The Debtor Has Not Satisfied the "New Value" Exception to the Absolute Priority Rule

94.     For a plan to be considered fair and equitable, it must satisfy the absolute priority rule found in 11 U.S.C. § 1129(b)(2)(B)(ii), under which junior classes may not receive property unless all senior classes are paid in full.  An exception to the absolute priority rule exists that allows old equity to retain their interests in the debtor if they contribute "new value."[14]

95.     The Second Circuit has defined the new value exception as requiring that old equity's capital contribution "be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the property that old equity is retaining or receiving."  *BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners*, 203 B.R. 527, 534 (S.D.N.Y. 1996), *aff'd*, 138 F.3d 39 (2d Cir. 1998) (citing *In re Fur Creations by Varriale, Ltd.,* 188 B.R. 754, 762 (Bankr. S.D.N.Y. 1995)); *see also In re RYYZ, LLC,* 490 B.R. 29, 44 (Bankr. E.D.N.Y. 2013). The debtor bears the burden of showing that the plan meets these requirements.  *See In re Crosscreek Apts., Ltd.*, 213 B.R. at 546.

### A.     The Characterization of the Purported "Equity Contribution" is Deceptive and Is Not "New" Value

96.     A "new" contribution must be something "that does not already belong to the debtor or to which the debtor is not already entitled."  *In re S.A.B.T.C. Townhouse Ass'n*, 152 B.R. 1005, 1010 (Bankr. M.D. Fla. 1993) (finding debtor's managers had not contributed new value because contributions were already owed to debtor).  And the funds must actually facilitate payments to creditors, not merely increase the equity value for the benefit of old equity holders.  *See, e.g.*, Opinion re: Confirmation of Proposed Competing Plans of Reorganization at 23, *In re WCI Steel,*

---

[14] Standing to raise absolute priority and the "new value" corollary is not limited to general unsecured creditors. *See In re Miami Ctr. Assocs., Ltd.*, 144 B.R. at 941-42 (finding plan violated absolute priority rule where new value exception was not satisfied and secured lender was being forced to run the ultimate risk of project's failure with no upside potential).

*Inc.*, Case No. 03-44662 (Bankr. N.D. Ohio Dec. 15, 2004), attached as Ex. H (cash contribution by existing equity, used to increase equity value of reorganized debtor instead of paying creditors, was "impermissible round housing" and did not constitute "new value"); *In re One Times Square Assocs. Ltd. P'ship,* 159 B.R. 695, 708 (Bankr. S.D.N.Y. 1993) (finding that proposed new value contribution did not satisfy absolute priority rule because primarily equity holder would benefit from use of funds), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994), *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994); *In re Miami Ctr. Assocs., Ltd,* 144 B.R. at 942 (finding plan not fair and equitable and violated absolute priority rule because new value to be used to refurbish and increase value of hotel to benefit debtor's principals and was essentially like "putting money in the bank").

97.    The proposed "new value" contribution here violates both rules.  While the Debtor trumpets a purported $9 million new "equity" contribution, it acknowledges that approximately $1.5 million of this amount is in fact a settlement payment to resolve claims arising out of the diversion of the PPP Loan proceeds.  That portion is therefore not a contribution for equity or something to which the Debtor was not otherwise entitled.   Accordingly, it cannot be counted as part of the Debtor's "new value" contribution.  The Examiner's pending report may reveal other estate claims against insiders, the value of which would further reduce the amount of the Insiders' (unmarketed) "investment."

98.    Furthermore, the great majority of the remaining $7.5 million contribution will not be used to pay creditors upon the effective date, but will instead remain in the reorganized Debtor, whose equity will be held by the Insiders.  As explained above, the Plan imposes no restrictions of any kind on the reorganized Debtor's use of that cash or on the equity holders' ability to extract it for themselves through distributions and third-party transfers to other entities they control.  Thus,

the portion of the "new value" contribution that does not go out to creditors on the effective date is effectively "round housed" and not a "new value" contribution at all.

### B.   Debtor Has Not Demonstrated that the Insiders' "Contribution" Is "Reasonably Equivalent" to What They Will Receive Under the Plan

99.   The "reasonably equivalent" prong is not satisfied where the new value contributed by the existing equity holders does not approximate the value of the debtor's equity or assets. *See In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. at 708 (finding equity's contribution of $2.4 million not reasonably equivalent where debtor's property had a value of $19 million). Courts have used the debtor's going concern or present value as the reference point for determining whether a contribution is reasonably equivalent. *See In re Angeron*, No. 18-10482, 2018 WL 6601130, at *4 (Bankr. E.D. La. Dec. 13, 2018) (finding, in individual chapter 11 case, that contribution of approximately 20% of value of scheduled property was not reasonably equivalent); *In re Sunflower Racing, Inc.*, 219 B.R. 587, 605 (Bankr. D. Kan. 1998), *aff'd*, 226 B.R. 673 (D. Kan. 1998); *In re Haskell Dawes, Inc.*, 199 B.R. 867, 878 (Bankr. E.D. Pa. 1996) (finding debtor had not carried its burden of showing that contribution of $25,600 was "reasonably equivalent" to retained interest where record was insufficient to determine debtor's going concern value).

100.   Other courts have compared the contribution to the debtor's hypothetical liquidation value, *see In re RYYZ*, 490 B.R. 29 (Bankr. E.D.N.Y. 2013) (finding new value exception not satisfied where, among other factors, proposed contribution of 5% of hypothetical liquidation value was too small), while others have not focused expressly on the debtor's value but rather on the benefits equity is to receive, *see In re Gramercy Twins Assocs.*, 187 B.R. at 127 (finding equity's new contribution of $250,000 not reasonably equivalent to 70% interest received where equity would receive $30,000 on account of pre-petition claims and accrue interest on its contribution at 8%).

41

101.    The Plan fails to discuss whether the amount the Insiders are purporting to contribute approximates the value of the equity that the Insiders will receive, together with the value of the claims against them that are being released.  The Debtor has therefore failed to satisfy its burden in establishing that the new value corollary applies.  *See, e.g.*, *In re Haskell Dawes, Inc.*, 199 B.R. at 879 (finding debtor failed to carry burden to establish new value requirements); *In re AG Consultants Grain Div. Inc.*, 77 B.R. 665, 678 (Bankr. N.D. Ind. 1987) (new value exception not satisfied where debtor presented no evidence of whether contribution was substantial or exceeded value of retained interest).  Even crediting the new value contribution at the full $9 million, that constitutes less than eight percent of the Hotel's going concern value and eleven percent of the Debtor's proffered liquidation value (only six percent and nine percent, respectively, using the $7.5 million true new contribution amount, which itself may be further reduced by the Examiner's discoveries).  The Insiders' true contribution must be further reduced by the as-yet-undetermined value of the releases they are receiving.  The actual net new contribution – even if treated as "true" new value – is clearly insufficient to satisfy the reasonably equivalent prong.

102.    Furthermore, the Supreme Court has mandated that any new value contribution be market-tested to demonstrate that the purported new value was necessary and reasonably equivalent, and was not merely an exclusive opportunity for old equity to gain advantages at the expense of creditors.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999); *see also Coltex Loop Cent. Three Partners*, 203 B.R. at 534.  Yet the Debtor has refused to perform any market test – failing to prepare materials or conduct any systematic process to assess interest in either the purchase or refinancing of the Hotel by third parties.  In short, the Plan allows Insiders to keep their equity interests in exchange for a minimal, non-market-tested cash contribution while placing virtually all reorganization risk onto Benefit Street.

**VII.    The Debtor Cannot Assume the Purported Management Agreement Under the Plan**

103.    The Plan is also defective because the Debtor cannot make the extraordinary showing needed to assume the Purported Management Agreement – an agreement between the Debtor and the Management Company, both of which are owned and controlled by the Insiders. The Purported Management Agreement is not an arms-length management agreement negotiated with a third-party hotel manager and thus, before it may be assumed, the Debtor must demonstrate both the good faith and "entire fairness" of the transaction. *See In re Innkeepers USA Tr.*, 442 B.R. 227, 231, 233 (Bankr. S.D.N.Y. 2010) (finding assumption of plan support agreement involving insiders failed to satisfy either heightened scrutiny or business judgment test); *In re Transcare Corp.*, Case No. 16-10407(SMB), 2020 WL 8021060, at *17–20 (Bankr S.D.N.Y. July 6, 2020) (concluding transaction was not fair where director stood on every side of transaction without any oversight by non-interested person, and did not seek financial advice or possible third-party purchasers); *see also Pepper v. Litton*, 308 U.S. 295, 306 (1939) (noting that controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder to not only prove the good faith of the transaction but also to show its inherent fairness."); *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570–71 (1984) (under New York law, "entire fairness" inquiry puts burden on proponent of contract to demonstrate both fair process and fair price).

104.    The Debtor's own Operating Agreement similarly bars it from entering into any contract with an affiliate unless it is on "terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties." Operating Agreement § 3(c)(xiv). The Debtor cannot make any of these showings, and the Purported Management Agreement is therefore ultra vires and void and cannot be assumed.

43

105.    In addition, the Debtor's concealment of the Purported Management Agreement and affirmative misrepresentations to Benefit Street concerning its existence estop it as a matter of law from arguing that the Purported Management Agreement is an enforceable contract. Alternatively, the parties' entry of the Management Agreement in connection with the closing of Benefit Street's Loan acted as a novation, completely replacing the Purported Management Agreement as a matter of contract law.

### A.    The Purported Management Agreement Was Entered into in Bad Faith

106.    The Debtor's own assertion of how and when the Purported Management Agreement was entered into defeat any attempt to demonstrate that it was entered into in good faith.  Although the agreement mysteriously surfaced months into the case, the Debtor maintains that it was entered into between affiliated entities both controlled by the Insiders three weeks before closing on the Benefit Street Loan – when the parties were actively engaged in negotiating the terms of the Loan.  It therefore is beyond dispute that the Debtor intentionally concealed it from Benefit Street, thereby misrepresenting its collateral and fraudulently inducing the Loan.

107.    As with other hospitality loans, Benefit Street sought in negotiating the Loan a collateral assignment of any hotel management agreement.  As discussed in more detail above at ¶¶ 27–32, despite allegedly having just entered into the Purported Management Agreement, Ms. Moskovits and Mr. Lichtenstein both represented to Benefit Street in writing that no management agreement existed.  Relying on that representation, Benefit Street accepted an Assignment of Management Agreement that attached a one-page management agreement, signed by both Ms. Moskovits and Mr. Lichtenstein.  The Debtor never disclosed the existence of the Purported Management Agreement – which would have revealed its representation to be false and dramatically compromised the value of its collateral – thus inducing Benefit Street to make a $68

44

million loan to the Debtor without knowledge that an agreement already existed with extreme, off-market terms favoring the Management Company.  In view of this intentional concealment, the Debtor cannot demonstrate that the Purported Management Agreement was entered into in good faith, one prerequisite for assumption of an affiliated party contract.[15]

### B.    The Debtor Cannot Demonstrate that the Purported Management Agreement Is Entirely or Intrinsically Fair or That Its Terms Would Be Required By Third Parties in the Marketplace

108.    The Debtor cannot demonstrate that the Purported Management Agreement satisfies the "entire fairness" standard or is "intrinsically fair" and contains market terms.  The Debtor bears the burden under the "entire fairness" standard to demonstrate both fair process and fair terms.  *See Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d at 570.  Thus, the Debtor needs to establish, first, fair process:  that the decision to ratify and seek assumption of the pre-bankruptcy contract was made by unconflicted fiduciaries with only the Debtor's best interests at heart.  This it cannot do, because *every* decision in this bankruptcy case has been made by the same conflicted fiduciaries who stand on both sides of the Purported Management Agreement.

109.    Nor can the Debtor demonstrate that the *substance* of that agreement is entirely fair to the estate or consistent with the terms that could be obtained in an arm's-length transaction.  To the contrary, the Purported Management Agreement is littered with non-market terms that disadvantage the estate and gratuitously benefit the insider-controlled Management Company:

- Hotel's Intellectual Property Granted to Manager.  All intellectual property of the Hotel belongs to the Management Company, including trademarks, trade names, customer lists, business plans, and reservations systems.  Purported Management Agreement § 13.01; *see also id.* §§ 2.01, 4.01.  If the Management Company is terminated, the Hotel must immediately cease using this intellectual property.  *See id.*  Of course, granting such rights to the Management Company effectively prevents any third party from operating the Hotel without the Management Company's consent, dramatically

---

[15] Benefit Street has direct claims against the Debtor and Insiders for fraudulent representations, which are not being released because Benefit Street opted out of the Plan Release on its ballot.

reducing the Hotel's value.    To give one particularly absurd example, if the Management Company were terminated, the Hotel would have to remove the name "Williamsburg Hotel" – even though it is built into eight stories of the brick façade of the building and carved into the headboard in every guestroom.

- <u>Management Company Fees Enhanced</u>.  The Management Company will be entitled not only to a fee equal to 3% of gross revenues, but also an "incentive fee" equal to 10% of net operating income.  *Id*. §§ 10.01, 10.03-04.  Given that the same parties agreed to a fee of only 3% of "gross rents" in the Management Agreement adopted in connection with the Loan closing, this provision is plainly above market.

- <u>Discretion to Manage</u>.  The Management Company is granted sweeping authority over the management of the Hotel, often to the exclusion of the Debtor.  In particular, the Debtor is barred from any role in the hiring or firing of Hotel staff.  The Management Company, in turn, is expressly insulated from liability as a result of the actions of the employees that it hires.  *See id.* §§ 3.02(a), 18.05(a).  It is decidedly not market to give the owner of the Hotel virtually no say in its operation.

- <u>Debtor Termination Rights Severely Limited</u>.  The Debtor is permitted to terminate the agreement based only on the Management Company's fraud or willful misconduct.  Also, the agreement does not terminate upon a sale of the Hotel (or presumably, a foreclosure), effectively requiring any purchaser to assume the contract.  *See id*. § 14.01.  This is a dramatic departure from market terms, which would permit termination for failure to meet specified performance criteria or upon a sale of the property.  This provision serves no purpose other than to entrench the Management Company, allowing it to remain in place even if the Hotel is failing and forcing any potential purchaser to take the Hotel subject to its management, even if incompetent.

- <u>Absence of Performance Standards</u>.  The Management Company may not be deemed in breach of the agreement based upon the failure of the Hotel to meet financial performance goals, the acts of Hotel personnel, or the filing of a lawsuit or entry of judgment against the Hotel or the Management Company.  *See id*. § 15.01.  This is plainly not market.

- <u>Bank Accounts in Name of Management Company</u>.  Hotel operating accounts are to be opened and held in the name of the Management Company (and not the Debtor).  *See id*. § 8.02.  Not only does this depart from market standards, in which the bank accounts are held in the name of the owner and administered by the management company "as agent," but it violates the terms of the Debtor's Operating Agreement, which requires assets to be held in its own name.  *See* Operating Agreement § 3(c)(vii).

110.    Each of these provisions, as well others that Benefit Street will address at trial, is

deeply disadvantageous to creditors and, in particular to Benefit Street, whose ability to realize on

its collateral would be severely impaired.  There is no evidence the Debtor market-tested this agreement or its provisions before entering into it or solicited competing management bids before proposing its Plan.  Nor is there evidence of any benefit to the Debtor from assuming this contract.  The Debtor therefore cannot demonstrate that the transaction is entirely fair.  *See In re Innkeepers USA Tr.*, 442 B.R. at 231 (plan support agreement failed heighted scrutiny where it was not entered into with "due care" and was not "shopped" in the market prior to signing).

111.    For the same reasons, the Purported Management Agreement violates the requirements of the Debtor's Operating Agreement that it be "intrinsically fair" and on terms comparable to those available in the market.  Indeed, the contract is so unfavorable to the Debtor that it arguably would fail even under the business judgment rule.  *See In re Innkeepers USA Tr.*, 442 B.R. at 234 (assumption of plan support agreement rejected even under business judgment rule where no real benefit to debtors demonstrated).  Because the Purported Management Agreement fails under any test, it cannot be assumed.

112.    Moreover, acts in violation of an LLC's operating agreement are considered null and void as a matter of law.  *See Feeley v. NHAOCG, LLC*, CA. No. 7304-VCL, 2012 WL 4859132, at *7 (Del. Ch. Oct. 12, 2012); *In re Min Sik Kang*, No. 1:15-CV-00953 LMB/IDD, 2015 WL 5786692, at *6 (E.D. Va. Sept. 30, 2015); *Vays v. 139 Emerson Place, LLC*, 2010 N.Y. Misc. LEXIS 2405, at *8 (Sup. Ct. N.Y. Cnty. Feb. 19, 2010) (citing *TIC Holdings, LLC v. HR Software Acquisitions Grp., Inc.*, 301 A.D.2d 414, 414-15 (1st Dep't 2003)).  The Debtor's inability to demonstrate that the Purported Management Agreement is intrinsically fair and contains market terms means that it violates the Operating Agreement, is void and, therefore, cannot be assumed.  *See In re Eagle Creek Subdivision, LLC*, 397 B.R. 758, 761 (Bankr. E.D.N.C. 2008) ("[A] debtor-

in-possession may not assume a contract that has already been terminated according to its terms under nonbankruptcy law.") (citing Collier on Bankruptcy ¶ 365.05[4]).

### C. The Debtor Is Estopped From Asserting the Purported Management Agreement Is a Valid Contract

113.    As already explained, the Debtor induced Benefit Street to loan it tens of millions of dollars by misrepresenting that the Purported Management Agreement did not exist.  Benefit Street plainly relied on that representation in making the Loan.  The Debtor therefore is estopped from asserting that the Purported Management Agreement is a valid contract that can be assumed.

114.    "The elements of equitable estoppel elements are (1) material misrepresentation, (2) reliance, and (3) damage."  *In re DeArakie*, 199 B.R. 821, 827 (Bankr. S.D.N.Y. 1996); *see also In re Ellison Assocs.*, 13 B.R. 661, 676 (Bankr. S.D.N.Y. 1981), *aff'd*, 63 B.R. 756 (S.D.N.Y. 1983).  In *Ellison Associates*, the court found the debtor was estopped from asserting title to property where it knew of a "secret, unrecorded deed" that defendants were unaware of and had no way of discovering.  *Id.*  Here, similarly, Benefit Street was unaware of any other management agreement, it relied on the express representations of the Debtor that no such agreement existed, and as a result entered into the Loan.  Accordingly, the Debtor is equitably estopped from asserting that the Purported Management Agreement is a valid contract.

115.    Alternatively, the management agreement delivered in connection with the closing of Benefit Street's Loan operated as a novation, replacing the Purported Management Agreement and rendering it of no further force and effect.  "Under New York law, 'a novation is a new contract replacing and extinguishing a prior contract.'"  *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 217 (E.D.N.Y. 2018) (citing *Gem Glob. Yield Fund, Ltd. v. Surgilight, Inc.*, No. 04-CV-4451 (KMK), 2006 WL 2389345, at *1 (S.D.N.Y. Aug. 17, 2006)).  "[I]t is well established that whether a novation exists depends on the parties' intentions."  *D.S. Am. (E.), Inc. v. Chromagrafx Imaging*

*Sys., Inc.*, 873 F. Supp. 786, 794 (E.D.N.Y. 1995); *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (2d Dep't 1984).  A novation need not be express but "may be implied or inferred from all surrounding circumstances."  *In re Stader*, 90 B.R. 29, 32 (Bankr. D. Conn. 1988) (citing *Nat'l Equip. Rental, Ltd. v. Sebert Mfg. Corp.*, 248 N.Y.S.2d 374, 376 (Sup. Ct. 1964)).  "A substitute agreement may be evidenced by language indicating that it supersedes and supplants the previous contract, completely replacing an old relationship with a new one."  *C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 434 (S.D.N.Y. 2005).  "[F]ormalized papers with unequivocal language tend to indicate a substitute agreement."  *Id.* (internal quotations and citation omitted).

116.    Here, the Assignment of Management Agreement is a substitute agreement that replaces the Purported Management Agreement.  The Assignment of Management Agreement involved the same parties as the Purported Management Agreement and contains the unequivocal language that the Hotel Management Agreement attached as Exhibit A to the Assignment of Management Agreement "is in full force and effect . . . and constitutes the entire agreement between the Manager and Borrower with respect to management of the Property."  Assignment of Management Agreement § 3.  This language expresses the parties' clear intent and agreement that no other management agreement be binding – thus replacing any prior agreements that might exist, including the Purported Management Agreement.[16]

## CONCLUSION

For the foregoing reasons, Benefit Street respectfully requests that the Court deny

---

[16] Benefit Street previously objected to the non-consensual releases for third parties contained in Section 5.10 of the Plan, which the Debtor modified to an opt-out release.  Benefit Street opted-out.  The Plan also has broad estate releases.  The appropriateness of these releases cannot be assessed until the Debtor complies with its discovery obligations and the Examiner issues his report on potential claims against the Insiders.  Benefit Street reserves its rights with respect to Plan releases and will file a supplemental objection following issuance of the Examiner's report.

confirmation of the Debtor's Plan.

Dated: January 17, 2022
      New York, New York

                    KRAMER LEVIN NAFTALIS &FRANKEL LLP

                    /s/ P. Bradley O'Neill
                    Adam C. Rogoff
                    P. Bradley O'Neill
                    Kramer Levin Naftalis & Frankel LLP
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Telephone: (212) 715-9100
                    Facsimile:  (212) 715-8000
                    Email: arogoff@kramerlevin.com
                          boneill@kramerlevin.com

                    *Attorneys for Benefit Street Partners Realty*
                    *Operating Partnership, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

       I certify that, on January 17, 2022, I caused a true and correct copy of the foregoing Objection to be served via email on the parties listed below.

                                       /s/ P. Bradley O'Neill
                                       P. Bradley O'Neill

To:     Douglas Spelfogel, Esq.
          Leah Eisenberg, Esq.
          Jason I. Kirschner, Esq.
          Dabin Chung, Esq.
          Mayer Brown LLP
          1221 Avenue of the Americas
          New York, NY 10020
          *Attorneys for the Debtor*

          Mark Frankel, Esq.
          Backenroth Frankel & Krinsky, LLP
          800 Third Avenue
          New York, New York 10022
          *Attorneys for the Debtor*

          Jason A. Nagi, Esq.
          Offit Kurman
          590 Madison Avenue, 6th floor
          New York, NY 10022
          *Attorneys for the Debtor*

          James B. Glucksman, Esq.
          Jonathan S. Pasternak, Esq.
          Robert L. Rattet, Esq.
          Davidoff Hutcher & Citron LLP
          120 Bloomingdale Road
          White Plains, New York 10605
          *Attorneys for The Williamsburg Hotel BK LLC*

          Douglas A. Kellner, Esq.
          Kellner Herlihy Getty & Friedman, LLP
          470 Park Avenue South, 7th Floor
          New York, NY 10016-6819
          *Attorneys for Constantino Sagonas*

          Greg Zipes, Esq.
          Office of the United States Trustee

201 Varick Street
New York, NY 10014

Barry D. Haberman, Esq.
Law Office of Barry D. Haberman
254 South Main Street, #404
New City, NY 10956
*Attorney for Grandfield Realty Corp.*

Edward J. LoBello
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 1420
New York, NY 10018-0026
*Attorneys for Town of Islip*

# EXHIBIT A

# Southern District of New York
# Claims Register

## 21-22108-rdd 96 Wythe Acquisition LLC

| | | | |
|---|---|---|---|
| **Judge:** Robert D. Drain | | **Chapter:** 11 | |
| **Office:** White Plains | | **Last Date to file claims:** 12/15/2021 | |
| **Trustee:** | | **Last Date to file (Govt):** | |

*Creditor:* (7823542)
Zurich American Insurance Co
PO Box 68549
Schaumburg, IL 60196

**Claim No: 1**
*Original Filed Date*: 03/17/2021
*Original Entered Date*: 03/17/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $1.00

*History:*

| Details | 1-1 | 03/17/2021 Claim #1 filed by Zurich American Insurance Co, Amount claimed: $1.00 (Admin.) |
|---|---|---|

*Description:*

*Remarks:* (1-1) Account Number (last 4 digits):8555

---

*Creditor:* (7827348)
NYC Water Board
Andrew Rettig
Assistant Counsel
59-17 Junction Blvd, 13th Floor
Elmhurst, NY 11137-5001

**Claim No: 2**
*Original Filed Date*: 03/30/2021
*Original Entered Date*: 03/30/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $100522.64
  Secured claimed: $100522.64

*History:*

| Details | 2-1 | 03/30/2021 Claim #2 filed by NYC Water Board, Amount claimed: $100522.64 (Admin.) |
|---|---|---|

*Description:*

*Remarks:* (2-1) Account Number (last 4 digits):5001

---

*Creditor:* (7840206)
Cohen & Gresser LLP
800 3rd Ave
21st Floor
21st Floor
New York, NY 10022

**Claim No: 3**
*Original Filed Date*: 05/06/2021
*Original Entered Date*: 05/06/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $798807.20

*History:*

| Details | 3-1 | 05/06/2021 Claim #3 filed by Cohen & Gresser LLP, Amount claimed: $798807.20 (Admin.) |
|---|---|---|

*Description:*

*Remarks:*

*Creditor:*        (7841408)
MPI Plumbing Corp / NBE Plumbing
C/O Bronstein, Gewirtz & Grossman
LLC
60 E 42nd St #4600
New York, NY 10165

**Claim No: 4**
*Original Filed Date*: 05/11/2021
*Original Entered Date*: 05/11/2021
*Last Amendment Filed*: 05/27/2021
*Last Amendment Entered*: 05/27/2021

*Status:*
*Filed by:* AT
*Entered by:* Edward N Gewirtz
*Modified:*

Amount  claimed: $103048.62

Secured  claimed: $103048.62

*History:*

| | | | |
|---|---|---|---|
| Details | 4-3 | 05/27/2021 | Amended Claim #4 filed by MPI Plumbing Corp / NBE Plumbing, Amount claimed: $103048.62 (Gewirtz, Edward) |
| Details | 4-2 | 05/27/2021 | Amended Claim #4 filed by MPI Plumbing Corp / NBE Plumbing, Amount claimed: $103048.62 (Gewirtz, Edward) |
| Details | 4-1 | 05/11/2021 | Claim #4 filed by MPI Plumbing Corp / NBE Plumbing, Amount claimed: $103048.62 (Gewirtz, Edward) |

*Description:*

*Remarks:*

---

*Creditor:*        (7843522)
Grandfield Realty Corp.
c/o Barry D. Haberman, Esq.
254 South Main Street, #404
NEW CITY, NY 10956

**Claim No: 5**
*Original Filed Date*: 05/20/2021
*Original Entered Date*: 05/20/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

Amount claimed: $7904641.28

*History:*

| | | | |
|---|---|---|---|
| Details | 5-1 | 05/20/2021 | Claim #5 filed by Grandfield Realty Corp., Amount claimed: $7904641.28 (Admin.) |

*Description:*

*Remarks:*

---

*Creditor:*        (7844257)
Gerson Mencia
Jordan Hecht
19 West 44th Street
Suite 1500
New York, NY 10036

**Claim No: 6**
*Original Filed Date*: 05/25/2021
*Original Entered Date*: 05/25/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

Amount claimed: $8000000.00

*History:*

| | | | |
|---|---|---|---|
| Details | 6-1 | 05/25/2021 | Claim #6 filed by Gerson Mencia, Amount claimed: $8000000.00 (Admin.) |

*Description:*

*Remarks:*

---

*Creditor:*        (7848183)
Philip Guarino
Harmon, Linder & Rogowsky, Esqs.
3 Park Avenue, Suite 2300
New York, NY 10016

**Claim No: 7**
*Original Filed Date*: 06/09/2021
*Original Entered Date*: 06/09/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

*No amounts claimed*

*History:*

| | | | |
|---|---|---|---|
| Details | 7-1 | 06/09/2021 | Claim #7 filed by Philip Guarino, Amount claimed: (Admin.) |

*Description:*

*Remarks:* (7-1) Filer Comment: personal injury claim

*Creditor:* (7856755)
Benefit Street Partners Realty Operating
Partnership, L.P.
c/o Micah Goodman
1345 Avenue of the Americas, Suite 32A
New York, NY 10105

**Claim No: 8**
*Original Filed Date:* 07/13/2021
*Original Entered Date:* 07/13/2021

*Status:*
*Filed by:* CR
*Entered by:* Adam C. Rogoff
*Modified:*

  Amount claimed: $0.00

  Secured claimed: $0.00

*History:*

| | | |
|---|---|---|
| Details | 8-1 | 07/13/2021 Claim #8 filed by Benefit Street Partners Realty Operating, Amount claimed: $0.00 (Rogoff, Adam) |

*Description:*

*Remarks:* (8-1) See Addendum for Claim Amount and Basis of Claim

---

*Creditor:* (7857080)
OES-Williamsburg Hotel LLC
c/o Eric J. Snyder, Esq.
Wilk Auslander LLP
825 Eighth Avenue, Suite 2900
New York, NY 10019

**Claim No: 9**
*Original Filed Date:* 07/15/2021
*Original Entered Date:* 07/15/2021

*Status:*
*Filed by:* AT
*Entered by:* Eric J. Snyder
*Modified:*

  Amount claimed: $4000000.00

*History:*

| | | |
|---|---|---|
| Details | 9-1 | 07/15/2021 Claim #9 filed by OES-Williamsburg Hotel LLC, Amount claimed: $4000000.00 (Snyder, Eric) |

*Description:* (9-1) Membership interest in 96 Wythe Holdings LLC
*Remarks:*

---

*Creditor:* (7859276)
NYC Dept. of Finance
Office of Legal Affairs-Collection Unit
375 Pearl Street-30th Floor
New York, NY 10038

**Claim No: 10**
*Original Filed Date:* 07/26/2021
*Original Entered Date:* 07/26/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $606749.04

  Secured claimed: $606749.04

*History:*

| | | |
|---|---|---|
| Details | 10-1 | 07/26/2021 Claim #10 filed by NYC Dept. of Finance, Amount claimed: $606749.04 (Admin.) |

*Description:*
*Remarks:*

---

*Creditor:* (7870195)
NYC Department of Finance
Legal Affairs
Collection Unit-Real Property Taxes
3 75 Pearl Street, 30th Fl.
New York, New York I 0038

**Claim No: 11**
*Original Filed Date:* 07/28/2021
*Original Entered Date:* 09/09/2021

*Status:*
*Filed by:* CR
*Entered by:* Narotam Rai
*Modified:*

  Amount claimed: $3378218.12

*History:*

| | | |
|---|---|---|
| Details | 11-1 | 07/28/2021 Claim #11 filed by NYC Department of Finance, Amount claimed: $3378218.12 (Rai, Narotam) |

*Description:*
*Remarks:*

*Creditor:* (7887638)
JUAN RAMIREZ
James Greenberg PC
240 Kent Avenue
Suite B-13
Brooklyn, NY 11249

**Claim No: 12**
*Original Filed Date:* 11/18/2021
*Original Entered Date:* 11/18/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:* 11/21/2021

  Amount claimed: $8000000.00

*History:*

| Details | 12-1 | 11/18/2021 Claim #12 filed by JUAN RAMIREZ, Amount claimed: $8000000.00 (Admin.) |

*Description:*
*Remarks:*

---

*Creditor:* (7888355)
Town of Islip
c/o MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 1420
New York, New York 10018-0026
Attn: Edward J. LoBello, Esq.

**Claim No: 13**
*Original Filed Date:* 11/23/2021
*Original Entered Date:* 11/23/2021

*Status:*
*Filed by:* CR
*Entered by:* Edward J. LoBello
*Modified:*

  Amount claimed: $4000000.00

*History:*

| Details | 13-1 | 11/23/2021 Claim #13 filed by Town of Islip, Amount claimed: $4000000.00 (LoBello, Edward) |

*Description:*
*Remarks:*

---

*Creditor:* (7891360)
NYC Dept of Finance
375 Pearl St
New York, NY 10038-1003

**Claim No: 14**
*Original Filed Date:* 12/09/2021
*Original Entered Date:* 12/09/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $6520449.01
  Priority  claimed: $6520449.01

*History:*

| Details | 14-1 | 12/09/2021 Claim #14 filed by NYC Dept of Finance, Amount claimed: $6520449.01 (Admin.) |

*Description:*
*Remarks:*

---

*Creditor:* (7891737)
CONSOLIDATED EDISON COMPANY
OF NEW YORK INC
4 IRVING PLACE
9th Floor
NEW YORK, NY 10003-1000

**Claim No: 15**
*Original Filed Date:* 12/13/2021
*Original Entered Date:* 12/13/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

  Amount claimed: $353429.44

*History:*

| Details | 15-1 | 12/13/2021 Claim #15 filed by CONSOLIDATED EDISON COMPANY OF NEW YORK INC, Amount claimed: $353429.44 (Admin.) |

*Description:*
*Remarks:* (15-1) Account Number (last 4 digits):# 8

*Creditor:* (7892076)
National Grid
300 Erie Boulevard West
Syracuse, NY 13202-1320

**Claim No:** 16
*Original Filed Date:* 12/14/2021
*Original Entered Date:* 12/14/2021

*Status:*
*Filed by:* CR
*Entered by:* Admin.
*Modified:*

Amount claimed: $46014.57

*History:*

| | | |
|---|---|---|
| Details | 16-1 | 12/14/2021 Claim #16 filed by National Grid, Amount claimed: $46014.57 (Admin.) |

*Description:*
*Remarks:*

*Creditor:* (7892508)
Fair Harbor Capital LLC as assignee of
Top Shelf S
PO box 237037
New York, NY 10023

**Claim No: 17**
*Original Filed Date:* 12/16/2021
*Original Entered Date:* 12/16/2021

*Status:*
*Filed by:* CR
*Entered by:* Victor Knox
*Modified:*

Amount claimed: $4477.75

*History:*

| | | |
|---|---|---|
| Details | 17-1 | 12/16/2021 Claim #17 filed by Fair Harbor Capital LLC as assignee of Top Shelf S, Amount claimed: $4477.75 (Knox, Victor) |

*Description:* (17-1) goods/services
*Remarks:*

*Creditor:* (7891360)
NYC Dept of Finance
375 Pearl St
New York, NY 10038-1003

**Claim No: 18**
*Original Filed Date:* 12/14/2021
*Original Entered Date:* 12/20/2021

*Status:*
*Filed by:* CR
*Entered by:* Kevin Su
*Modified:*

Priority claimed: $6520449.01

*History:*

| | | |
|---|---|---|
| Details | 18-1 | 12/14/2021 Claim #18 filed by NYC Dept of Finance, Amount claimed: (Su, Kevin) |

*Description:*
*Remarks:*

# Claims Register Summary

**Case Name:** 96 Wythe Acquisition LLC
**Case Number:** 21-22108-rdd
**Chapter:** 11
**Date Filed:** 02/23/2021
**Total Number Of Claims:** 18

| | |
|---|---|
| **Total Amount Claimed\*** | $43816358.67 |
| **Total Amount Allowed\*** | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $810320.30 | |
| **Priority** | $13040898.02 | |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">01/16/2022 17:12:41</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>KLresearch</td><td><strong>Client Code:</strong></td><td>074121-00002-18829</td></tr>
<tr><td><strong>Description:</strong></td><td>Claims Register</td><td><strong>Search Criteria:</strong></td><td>21-22108-rdd Filed or Entered From: 1/3/2020 Filed or Entered To: 1/18/2022</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>2</td><td><strong>Cost:</strong></td><td>0.20</td></tr>
</table>

# EXHIBIT B



February 25, 2021

**VIA Electronic Mail**

The Williamsburg Hotel BK LLC
Attn: Toby Moskovits: toby@heritage-equity.com

Re:    Proposed second draw PPP loan ("Proposed Loan") from Live Oak Banking Company ("Lender")
to The Williamsburg Hotel BK LLC (the "Borrower") in the amount of $2,000,000.00

Dear Ms. Moskovits:

I am writing on behalf of the Lender in connection with the Proposed Loan (as defined above).  It has come to our attention that the Borrower's beneficial owners – Toby Moskovits and Yechial Michael Lichtenstein – are also co-owners of 96 Wythe Acquisition, LLC, an entity that recently filed bankruptcy on February 23, 2021 in connection with the Williamsburg Hotel property.  This entity was not disclosed on the SBA Form 2483 or Live Oak Bank's Addendum A for the first draw PPP loan, nor was it disclosed on the application for the Proposed Loan.  Upon further investigation of the beneficial owners, there were significant outstanding liens and judgments indicated against Ms. Moskovits and Mr. Lichtenstein.

Based on the forgoing, this letter is to notify you that Lender declines to issue the Proposed Loan.  As you know, no proposal letter or commitment letter was ever issued regarding the Proposed Loan.

Please forward all future correspondence relating to this matter to my attention at the address stated herein.

Very truly yours,

Edward T. Shipley, III
SVP - Managing Counsel



1741 Tiburon Dr
Wilmington, NC 28403
liveoakbank.com

©2020 Live Oak Banking Company. All rights reserved. Member FDIC. Equal Housing Lender. ⌂

# EXHIBIT C

**From:** Toby Moskovits <toby@heritage-equity.com>
**Sent:** Monday, October 30, 2017 11:02 AM
**To:** Wainger, Margot J. <mwainger@stroock.com>
**Cc:** marion gross <marion@northsidedev.com>; Touhill, Peter <p.touhill@benefitstreetpartners.com>;
Balshem, Eugene P. <ebalshem@stroock.com>; northsideacquisition@gmail.com; Breinholt, Jacob
<j.breinholt@benefitstreetpartners.com>; Goodman, Micah <m.goodman@benefitstreetpartners.com>; Bays,
David <d.bays@benefitstreetpartners.com>; Fife, Sam <S.Fife@benefitstreetpartners.com>; Mollova, Tanya
<t.mollova@benefitstreetpartners.com>; Chorny, Allan <a.chorny@benefitstreetpartners.com>;
nycdevmanager@gmail.com Lichtenstein <nycdevmanager@gmail.com>; Nicholas J. Kaiser
<NKaiser@cohengresser.com>; Robert J. Gavigan <rgavigan@cohengresser.com>; Jeremy Rauch
<jeremy@heritage-equity.com>; Zangara, Michael R. <mzangara@stroock.com>
**Subject:** Re: BSP/Williamsburg Hotel - Management Agreement

We do not have a management agreement in place.

Toby Moskovits
Heritage Equity Partners
679 Driggs Avenue
Brooklyn, NY 11211
(347)-229-7527

On Oct 30, 2017, at 11:00 AM, Wainger, Margot J. <mwainger@stroock.com> wrote:

> Thanks Miriam.
> I believe on our call you mentioned that the management agreement was uploaded to the dropbox site. I
> can't seem to locate it. Could you please circulate a copy by email?
>
> **Margot Wainger**
> Associate
>
> **STROOCK**
> 200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
> T: 305.789.9314
>
> mwainger@stroock.com | vCard | www.stroock.com

> **From:** marion gross [mailto:marion@northsidedev.com]
> **Sent:** Monday, October 30, 2017 12:26 AM
> **To:** Wainger, Margot J.
> **Cc:** Touhill, Peter; Balshem, Eugene P.; Toby Moskovits; northsideacquisition@gmail.com;
> Breinholt, Jacob; Goodman, Micah; Bays, David; Fife, Sam; Mollova, Tanya; Chorny, Allan;
> nycdevmanager@gmail.com Lichtenstein; Nicholas J. Kaiser; Robert J. Gavigan; Jeremy Rauch;
> Zangara, Michael R.
> **Subject:** Re: BSP/Williamsburg Hotel - TCO
> See attached.

Miriam Gross

O: (718) 408-8849
C: (917) 652-9292

On Fri, Oct 27, 2017 at 6:04 PM, Wainger, Margot J. <mwainger@stroock.com> wrote:

The attached TCO that was posted to the data site is expired (expired 9/14). Do you have a copy of the renewal?

**Margot Wainger**
Associate

**STROOCK**
200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

**From:** Touhill, Peter [mailto:p.touhill@benefitstreetpartners.com]
**Sent:** Friday, October 27, 2017 11:11 AM
**To:** Wainger, Margot J.; Balshem, Eugene P.; 'Toby Moskovits';
'northsideacquisition@gmail.com'; 'Marion@northsidedev.com'; Breinholt, Jacob; Goodman,
Micah; Bays, David; Fife, Sam; Mollova, Tanya; Chorny, Allan; 'nycdevmanager@gmail.com
Lichtenstein'; 'Nicholas J. Kaiser'; 'Robert J. Gavigan'
**Cc:** Zangara, Michael R.
**Subject:** RE: BSP/Williamsburg Hotel - Checklist and kickoff materials

https://www.dropbox.com/sh/019wgha0lidsgmq/AACXA_xjGDj2y9YhE2naU1Bva?dl=0

**From:** Wainger, Margot J. [mailto:mwainger@stroock.com]
**Sent:** Friday, October 27, 2017 10:16 AM
**To:** Balshem, Eugene P. <ebalshem@stroock.com>; Touhill, Peter
<p.touhill@benefitstreetpartners.com>; 'Toby Moskovits' <toby@heritage-equity.com>;
'northsideacquisition@gmail.com' <northsideacquisition@gmail.com>;
'Marion@northsidedev.com' <Marion@northsidedev.com>; Breinholt, Jacob
<j.breinholt@benefitstreetpartners.com>; Goodman, Micah
<m.goodman@benefitstreetpartners.com>; Bays, David <d.bays@benefitstreetpartners.com>;
Fife, Sam <S.Fife@benefitstreetpartners.com>; Mollova, Tanya
<t.mollova@benefitstreetpartners.com>; Chorny, Allan <a.chorny@benefitstreetpartners.com>;
'nycdevmanager@gmail.com Lichtenstein' <nycdevmanager@gmail.com>; 'Nicholas J. Kaiser'
<NKaiser@CohenGresser.com>; 'Robert J. Gavigan' <rgavigan@cohengresser.com>
**Cc:** Zangara, Michael R. <mzangara@stroock.com>
**Subject:** RE: BSP/Williamsburg Hotel - Checklist and kickoff materials

Resending my email below with the attachments.


**Margot Wainger**
Associate

**STROOCK**

200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

---

**From:** Wainger, Margot J.
**Sent:** Friday, October 27, 2017 10:15 AM
**To:** Balshem, Eugene P.; 'Touhill, Peter'; 'Toby Moskovits'; 'northsideacquisition@gmail.com';
'Marion@northsidedev.com'; 'Breinholt, Jacob'; 'Goodman, Micah'; 'Bays, David'; 'Fife, Sam';
'Mollova, Tanya'; 'Chorny, Allan'; 'nycdevmanager@gmail.com Lichtenstein'; 'Nicholas J.
Kaiser'; 'Robert J. Gavigan'
**Cc:** Zangara, Michael R.
**Subject:** BSP/Williamsburg Hotel - Checklist and kickoff materials
**Importance:** High

Nicholas,

SSL will be serving as outside counsel to Benefit Street Partners ("BSP") in connection with the above-
referenced transaction, and will be working with BSP's internal personnel as they finalize the
underwriting, due diligence and credit approval process on the proposed loan. Please pass this email on to
anyone else who should receive it.

For your information, please find attached BSP's standard forms of (1) Survey requirements, (2) Title
requirements, (3) W-9 and (4) form legal opinion letter.


Also, for our mutual convenience and in anticipation of our kickoff call today, I have drafted a list of
items that, together with anything required by our client, will be necessary to close this transaction (which
list remains subject to change as the transaction progresses and more information becomes known). This
closing requirements list will serve as the legal closing checklist for the transaction, and we will
periodically update and circulate the list to keep everyone apprised of the status of legal closing
requirements.


The list is as follows:

    1) Loan documents – drafts sent by SSL on 10/26

    2) Identity of clearing account bank and confirmation of establishment of clearing account and
    cash management account – SSL coordinating with Wells Fargo

    3) Opinions(form attached)

        a. Due execution/authorization/local enforceability opinion

      b. NY enforceability opinion

      c. Delaware opinions

      d. Non-con opinion

4) Title commitment and underlying documents (requirements attached)

5) Survey (requirements attached)

6) Zoning report (to be ordered by Lender (survey required))

7) Temporary Certificate of Occupancy

8) Service Contracts and Equipment Leases

9) Construction Diligence - TBD

10) Search results (Lender will order, final organizational chart required)

11) Organizational chart – draft under review

12) Borrower formation documents

      a. Certificate of formation/articles of organization

      b. LLC Agreement

      c. Borrowing consents

      d. Certificate of good standing

      e. Certificate of foreign qualification, as applicable

      f. W-9

13) SPE Component Entity formation documents

      a. Certificate of Formation

      b. LLC Agreement

      c. Borrowing resolutions

      d. Certificate of good standing

14) Property management agreement

15) Estoppels/SNDAs (Borrower to confirm no commercial tenants)

16) Rate Cap confirmation (and counterparty signatures to Collateral Assignment)

4

17) Rate Cap counterparty opinion (Post Closing)

18) Form Lease (if applicable)

19) Mortgage Assignment

    a. Recorded originals of existing mortgages being assigned

    b. Originals of all prior notes

    c. Assignment of existing mortgages and allonge to the notes secured thereby

    d. Terminations of ALR/UCC3s

20) Payoff Statement(s)

Thanks and I look forward to working together.

**Margot Wainger**
Associate

**STROOCK**
200 South Biscayne Boulevard, Suite 3100, Miami, FL 33131
T: 305.789.9314

mwainger@stroock.com | vCard | www.stroock.com

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This message may contain information that is legally privileged or confidential. If you received this transmission in error, please notify the sender by reply email, and delete the message and any attachments. This transmission is believed to be defect free; however, no responsibility is accepted by the sender for damage arising from its receipt.

All email and instant messages (including attachments) sent to or from Franklin Templeton Investments (FTI) personnel may be retained, monitored and/or reviewed by FTI and its agents, or other authorized parties as disclosed in Franklin Templeton's Privacy Notice, without further notice or consent. Refer to our country/region specific Privacy & Cookies Notice, which you can read here http://www.franklintempletonglobal.com/privacy to learn more. Depending on your location, other privacy laws and regulations may also apply to you.

**EXHIBIT D**

**Execution Copy**

---

# LOAN AGREEMENT

dated as of December 13, 2017

between

## 96 WYTHE ACQUISITION LLC,

as Borrower

and

## BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.,
as Lender

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS; PRINCIPLES OF CONSTRUCTION ......................................1

Section 1.1        Definitions...............................................................................1
Section 1.2        Principles of Construction.....................................................27

ARTICLE 2        GENERAL TERMS...........................................................................28

Section 2.1        No Loan Commitment ...........................................................28
Section 2.2        The Loan................................................................................28
Section 2.3        Disbursement to Borrower ....................................................28
Section 2.4        The Note and the other Loan Documents ..............................28
Section 2.5        Interest Rate..........................................................................28
Section 2.6        Loan Payments......................................................................33
Section 2.7        Prepayments..........................................................................34
Section 2.8        Interest Rate Cap Agreement ................................................36
Section 2.9        Assignment of Security Instrument .......................................38
Section 2.10       Payment of Additional Interest..............................................38
Section 2.11       Extension of the Maturity Date.............................................39

ARTICLE 3        REPRESENTATIONS AND WARRANTIES.....................................41

Section 3.1        Existence and Authority.........................................................41
Section 3.2        Borrower's Principal Place of Business..................................41
Section 3.3        Validity of Documents...........................................................41
Section 3.4        Agreements ...........................................................................42
Section 3.5        Title; Permitted Encumbrances..............................................42
Section 3.6        Purchase Options ..................................................................42
Section 3.7        Condemnation .......................................................................43
Section 3.8        Separate Lots; Flood Zone; Wetlands....................................43
Section 3.9        Use of Property .....................................................................43
Section 3.10       Certain Additional Property Representations ...........................43
Section 3.11       Financial Condition...............................................................44
Section 3.12       Financial Information.............................................................45
Section 3.13       Fraudulent Conveyance .........................................................45
Section 3.14       Disclosure .............................................................................45
Section 3.15       No Plan Assets ......................................................................46
Section 3.16       Not a Foreign Person ............................................................46
Section 3.17       Business Purposes.................................................................46
Section 3.18       Litigation...............................................................................46
Section 3.19       Leases....................................................................................46
Section 3.20       Taxes.....................................................................................46
Section 3.21       Insurance...............................................................................47
Section 3.22       Management Agreement.........................................................47
Section 3.23       Illegal Activity/Forfeiture .....................................................47
Section 3.24       Special Purpose Entity ..........................................................47

i

Section 3.25    Federal Reserve Regulations.................................................48
Section 3.26    Investment Company Act .................................................48
Section 3.27    Embargoed Person ...........................................................48
Section 3.28    Organizational Chart.........................................................49
Section 3.29    Bank Holding Company ....................................................49
Section 3.30    No Other Financing; Other Obligations and Liabilities.......49
Section 3.31    Contracts..........................................................................49
Section 3.32    Property Document Representations....................................49
Section 3.33    No Change in Facts or Circumstances; Disclosure..............50
Section 3.34    Third Party Representations...............................................50
Section 3.35    Non-Consolidation Opinion Assumptions............................50
Section 3.36    Hotel Representations .......................................................50
Section 3.37    Business Plan Work ..........................................................51
Section 3.38    Construction.....................................................................51

ARTICLE 4        BORROWER COVENANTS.................................................52

Section 4.1     Existence..........................................................................52
Section 4.2     Change of Name, Identity or Structure ..............................52
Section 4.3     Business and Operations....................................................53
Section 4.4     Title to Property; Legal Requirements................................53
Section 4.5     Waste................................................................................53
Section 4.6     Maintenance and Use of Property......................................54
Section 4.7     Taxes and Other Charges ..................................................54
Section 4.8     Labor and Materials ..........................................................55
Section 4.9     Property Access ................................................................56
Section 4.10    Litigation..........................................................................56
Section 4.11    Performance by Borrower...................................................56
Section 4.12    Books and Records ...........................................................56
Section 4.13    Contracts..........................................................................59
Section 4.14    Cooperation in Proceedings ...............................................59
Section 4.15    Estoppel Certificates .........................................................59
Section 4.16    Leases and Rents ..............................................................59
Section 4.17    Notice of Default...............................................................61
Section 4.18    Other Agreements .............................................................61
Section 4.19    Alterations........................................................................61
Section 4.20    Management Agreement .....................................................61
Section 4.21    No Joint Assessment .........................................................63
Section 4.22    ERISA ..............................................................................63
Section 4.23    Special Purpose Entity ......................................................63
Section 4.24    Debt Cancellation..............................................................64
Section 4.25    Property Documents...........................................................64
Section 4.26    Embargoed Person .............................................................64
Section 4.27    Patriot Act ........................................................................65
Section 4.28    No Plan Assets; Illegal Activity/Forfeiture........................65
Section 4.29    Business Plan Work ...........................................................65
Section 4.30    Construction Costs and Expenses ......................................66
Section 4.31    Violation Work ..................................................................67

ii

Section 4.32    Parking Work ........................................................................67
Section 4.33    Post-Closing Execution of Collateral Assignment of Interest
                Rate Cap Agreement ............................................................67

ARTICLE 5    INSURANCE; CASUALTY; CONDEMNATION; RESTORATION.............67

Section 5.1    Insurance ..............................................................................67
Section 5.2    Casualty.................................................................................72
Section 5.3    Condemnation .......................................................................73
Section 5.4    Restoration ............................................................................73
Section 5.5    Business Interruption Proceeds.............................................78

ARTICLE 6    NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS ...................78

Section 6.1    No Sale/Encumbrance.............................................................78
Section 6.2    Intentionally Omitted.............................................................78
Section 6.3    Permitted Equity Transfers ....................................................78
Section 6.4    Replacement Guarantor .........................................................80
Section 6.5    Lender's Rights .....................................................................81
Section 6.6    Economic Sanctions, Anti-Money Laundering.........................82
Section 6.7    Costs and Expenses...............................................................82

ARTICLE 7    RESERVE FUNDS........................................................................82

Section 7.1    Sam Tell Funds .....................................................................82
Section 7.2    Tax and Insurance Funds.......................................................82
Section 7.3    FF&E Reserve Funds..............................................................83
Section 7.4    Intentionally Omitted.............................................................84
Section 7.5    Intentionally Omitted.............................................................84
Section 7.6    Excess Cash Flow Funds ........................................................84
Section 7.7    The Accounts Generally ........................................................85
Section 7.8    Business Plan Reserve Funds..................................................87
Section 7.9    Interest Reserve Funds ..........................................................89

ARTICLE 8    CASH MANAGEMENT .................................................................90

Section 8.1    Distribution of Cash Flow......................................................90
Section 8.2    Excess Operating Cash Flow Funds ........................................90
Section 8.3    Intentionally Omitted.............................................................91
Section 8.4    Cash Application Statement....................................................91
Section 8.5    Establishment of Certain Accounts.........................................91
Section 8.6    Deposits into and Maintenance of Clearing Account ...............91
Section 8.7    Events of Default...................................................................93
Section 8.8    Borrower Distributions; Acknowledgement .............................94

ARTICLE 9    SECONDARY MARKET .................................................................94

Section 9.1    Securitization ........................................................................94
Section 9.2    Disclosure and Indemnification ..............................................97
Section 9.3    Reserves/Escrows ................................................................100
Section 9.4    Servicer ..............................................................................100
Section 9.5    Intentionally Omitted...........................................................100

iii

Section 9.6      REMIC Savings Clause ...................................................................101
Section 9.7      Syndication; Registered Form.........................................................101

ARTICLE 10      EVENTS OF DEFAULT; REMEDIES ...........................................102

Section 10.1     Event of Default ............................................................................102
Section 10.2     Remedies .......................................................................................106

ARTICLE 11      INDEMNIFICATIONS ..................................................................108

Section 11.1     General Indemnification ................................................................108
Section 11.2     Mortgage and Intangible Tax Indemnification ...................................109
Section 11.3     ERISA Indemnification .................................................................109
Section 11.4     Duty to Defend, Legal Fees and Other Fees and Expenses .................109
Section 11.5     Survival .........................................................................................109

ARTICLE 12      EXCULPATION.............................................................................109

Section 12.1     Exculpation ...................................................................................109

ARTICLE 13      FURTHER ASSURANCES .............................................................112

Section 13.1     Replacement Documents ................................................................112
Section 13.2     Recording of Security Instrument, etc ..............................................112
Section 13.3     Further Acts, etc.............................................................................113
Section 13.4     Changes in Tax, Debt, Credit and Documentary Stamp Laws .............113

ARTICLE 14      WAIVERS .....................................................................................114

Section 14.1     Remedies Cumulative; Waivers.......................................................114
Section 14.2     Modification, Waiver in Writing ......................................................114
Section 14.3     Delay Not a Waiver ........................................................................114
Section 14.4     Waiver of Trial by Jury...................................................................115
Section 14.5     Waiver of Notice ............................................................................115
Section 14.6     Remedies of Borrower ....................................................................115
Section 14.7     Marshalling and Other Matters ........................................................115
Section 14.8     Waiver of Statute of Limitations......................................................115
Section 14.9     Waiver of Counterclaim ..................................................................115
Section 14.10    Sole Discretion of Lender ...............................................................116

ARTICLE 15      MISCELLANEOUS .......................................................................116

Section 15.1     Survival .........................................................................................116
Section 15.2     Expenses; Indemnity......................................................................116
Section 15.3     Brokers ..........................................................................................117
Section 15.4     Governing Law ...............................................................................118
Section 15.5     Notices ..........................................................................................119
Section 15.6     Headings ........................................................................................120
Section 15.7     Severability ....................................................................................120
Section 15.8     Preferences ....................................................................................120
Section 15.9     Cost of Enforcement .......................................................................120
Section 15.10    Exhibits Incorporated.....................................................................120
Section 15.11    Offsets, Counterclaims and Defenses ...............................................120

Section 15.12    No Joint Venture or Partnership; No Third Party Beneficiaries ...........121
Section 15.13    Publicity ...............................................................................................122
Section 15.14    Limitation of Liability .........................................................................122
Section 15.15    Conflict; Construction of Documents; Reliance ..................................122
Section 15.16    Entire Agreement .................................................................................123
Section 15.17    Liability ................................................................................................123
Section 15.18    Duplicate Originals; Counterparts .......................................................123
Section 15.19    Set-Off ..................................................................................................123
Section 15.20    Certain Additional Rights of Lender (VCOC) .....................................123

ARTICLE 16    INTENTIONALLY OMITTED .......................................................................124

ARTICLE 17    MEZZANINE LOAN. ....................................................................................124

Section 17.1    Mezzanine Loan Notice ........................................................................124
Section 17.2    Mezzanine Loan Estoppels ...................................................................125
Section 17.3    Mezzanine Intercreditor .......................................................................125
Section 17.4    Direction of Mezzanine Borrower ........................................................125
Section 17.5    Notices from Mezzanine Lender ...........................................................126
Section 17.6    Mezzanine Loan Prepayment ................................................................126

MIA 31354953v9

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of December 13, 2017 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**, a Delaware limited partnership, having an address at 142 West 57th Street, Suite 1201, New York, New York 10019 (together with its successors and/or assigns, "**Lender**") and **96 WYTHE ACQUISITION LLC**, a New York limited liability company, having its principal place of business at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and/or assigns, "**Borrower**").

### RECITALS:

**WHEREAS,** Borrower desires to obtain the Loan (defined below) from Lender; and

**WHEREAS,** Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of the Loan Documents (defined below).

**NOW, THEREFORE,** in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE 1

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean the Cash Management Account, the Clearing Account, the Casualty and Condemnation Account, the Reserve Accounts and any other account established by this Agreement or the other Loan Documents.

"**Additional Costs**" shall have the meaning set forth in Section 2.5(b)(vii) hereof.

"**Additional Interest**" shall mean an amount equal to one-half of one percent (0.50%) of the face amount of the Note.

"**Adjusted LIBOR Rate**" shall mean, with respect to the applicable Interest Period, the quotient of (i) LIBOR applicable to such Interest Period, divided by (ii) one (1) minus the Reserve Percentage:

$$\text{Adjusted LIBOR Rate} = \frac{\text{LIBOR}}{(1 - \text{Reserve Percentage})}$$

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or executive officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person.

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Guarantor, any SPE Component Entity (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alternate Index**" shall mean either (1) a floating rate index (a) that is commonly accepted by market participants in commercial or multifamily real estate loans, (b) that is publicly recognized by ISDA as an alternative to LIBOR and (c) for which ISDA has approved an amendment to hedge agreements, generally providing such floating rate index as a standard alternative to LIBOR or, at Lender's election, (2) a floating rate index then being used by any institutional warehouse or repurchase lender that is not an Affiliate of Lender providing financing backed in whole or in part by an interest in the Loan.

"**Alternate Rate**" shall mean the greater of (i) the sum of (A) a per annum rate of interest of the Alternate Index, determined on the related Determination Date and (B) Alternate Rate Spread ("**Original Alternate Rate**") and (ii) Alternate Rate Floor. Notwithstanding the foregoing, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the Alternate Rate shall be restored to the Original Alternate Rate. Any change in the Alternate Rate as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

"**Alternate Rate Floor**" shall mean six and seventy-five hundredths percent (6.75%).

"**Alternate Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Alternate Rate.

"**Alternate Rate Spread**" shall mean 5.75%

"**Alteration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan.

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith

estimate of anticipated Gross Rents, Operating Expenses and FF&E expenditures for the applicable Fiscal Year.

"**Approved Accounting Method**" shall mean GAAP, the Uniform System of Accounts, federal tax or cash basis accounting or such other method of accounting, in each case consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.12 hereof.

"**Approved Extraordinary Expense**" shall mean an operating expense of the Property not set forth on the Approved Annual Budget but approved by Lender in writing (which such approval shall not be unreasonably withheld, delayed or conditioned).

"**Approved Operating Expense**" shall mean an operating expense of the Property set forth on the Approved Annual Budget.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Listing Agreement**" shall mean that certain Assignment of Listing Agreement and Subordination of Leasing Commissions dated as of the date hereof among Lender, Borrower and Listing Agent, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated as of the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bank**" shall be deemed to refer to the bank or other institution maintaining the Clearing Account pursuant to the Clearing Account Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more of the following: (i) Borrower or any SPE Component Entity shall commence any case, proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets;

3

(ii) Borrower or any SPE Component Entity shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower or any SPE Component Entity under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower or any SPE Component Entity or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's or any SPE Component Entity's assets; (iv) Borrower or any SPE Component Entity files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any SPE Component Entity or any portion of the Property; (vi) Borrower or any SPE Component Entity makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Guarantor or its subsidiaries; (viii) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (vii) above; and (ix) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws, Guarantor or any of its Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, any SPE Component Entity, any Affiliated Manager and Guarantor.

"**Breakage Costs**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Broker**" shall have the meaning set forth in Section 15.3 hereof.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

"**Business Plan**" shall mean, collectively, Borrower's plan to pay for and complete all capital improvements at the Property, together with (and as more specifically set forth in) the budget relating thereto, as each of the foregoing are attached to the Borrower's Certification of even date herewith given by Borrower in favor of Lender, and together with the Plans and Specifications (as each of the same may hereafter be amended and/or supplemented, with Lender's prior written consent).

"**Business Plan Reserve Account**" shall have the meaning set forth in Section 7.8 hereof.

MIA 31354953v9

"**Business Plan Reserve Funds**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Reserve Funds Borrower Deposit**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Reserve Funds Future Disbursement Conditions**" shall mean that Lender has received evidence, in form and substance satisfactory to Lender, that Borrower has spent the entire amount of the Business Plan Reserve Funds Initial Disbursement for the Business Plan Work (such evidence to include, without limitation, copies of the receipts for any such purchases, as applicable).

"**Business Plan Reserve Funds Initial Disbursement**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Work**" shall mean all work and costs contemplated to be incurred pursuant to the Business Plan.

"**Carveout Guaranty**" shall mean that certain Guaranty of Recourse Obligations executed by Guarantor and dated as of the date hereof.

"**Cash Application Statement**" shall have the meaning set forth in Section 8.4 hereof.

"**Cash Management Account**" shall have the meaning set forth in Section 8.5 hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, executed by Borrower, Lender and Wells Fargo Bank, N.A., as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Sweep Period**" shall mean a period (i) commencing upon any of (A) the occurrence and continuance of an Event of Default, and (B) the Debt Service Coverage Ratio (Combined) being less than 1.25 to 1.00; and (ii) expiring upon (x) with regard to any Cash Sweep Period commenced in connection with clause (A) above, the cure (if applicable) of such Event of Default, and (y) with regard to any Cash Sweep Period commenced in connection with clause (B) above, the date that the Debt Service Coverage Ratio (Combined) is equal to or greater than 1.25 to 1.00 for six (6) consecutive months.  Notwithstanding the foregoing, a Cash Sweep Period shall not be deemed to expire in the event that a Cash Sweep Period then exists for any other reason. Borrower acknowledges that a Cash Sweep Period shall be deemed to exist as of the Closing Date on account of clause (i)(B) above.

"**Casualty**" shall have the meaning set forth in Section 5.2.

"**Casualty and Condemnation Account**" shall mean an Account into which any Net Proceeds collected after the occurrence of a Casualty or Condemnation, as required pursuant to Article 5 hereof, shall be deposited.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4 hereof.

MIA 31354953v9

"**Clearing Account**" shall have the meaning set forth in Section 8.5 hereof.

"**Clearing Account Agreement**" shall mean that certain Deposit Account Control Agreement by and among Borrower, Lender and Wells Fargo Bank, N.A. dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Co-Lender**" shall have the meaning set forth in Section 9.7 hereof.

"**Collateral Assignment of Interest Rate Cap Agreement**" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Completion**" shall mean the substantial completion of the Business Plan Work on or prior to the Completion Date substantially in accordance with all Plans and Specifications, the Business Plan, all Legal Requirements, and this Agreement such that the Property is ready for full occupancy, such compliance to be evidenced to the satisfaction of Lender; together with the delivery to Lender of one or more temporary certificate of occupancy (if subject to any conditions, such conditions being acceptable to Lender) for all Improvements and evidence that all other approvals from Governmental Authorities have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents.

"**Completion Date**" shall mean December 31, 2018.

"**Completion Guaranty**" shall mean that certain Guaranty of Completion executed by Guarantor and dated as of the date hereof.

"**Condemnation**" shall mean any permanent or temporary taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contract**" shall mean any contract or agreement with any architect, engineer, contractor, subcontractor, management agent, leasing agent, sales agent, service and maintenance agent, or any other third party, whether existing as of the Closing Date or thereafter arising, relating to the design, construction, ownership, condition, use, occupancy, possession, management, operation, space leasing, service, maintenance or repair of, or otherwise in respect of, the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (but the same shall not be deemed to include any Lease or the Management Agreement).

"**Control**" as to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person,

6

whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled" or "controlling" shall have a correlative meaning.

"**Counterparty**" shall mean the counterparty under any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, which counterparty shall satisfy the Minimum Counterparty Rating and otherwise be acceptable to Lender.

"**Covered Rating Agency Information**" shall mean any Provided Information furnished to the NRSROs in connection with issuing, monitoring and/or maintaining the Securities.

"**Credit Card Direction Notice**" shall have the meaning set forth in Section 8.2 hereof.

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Critical Hotel Features**" shall mean all guest rooms, the pool and related facilities, all food and beverage outlets (including the watertower bar and rooftop bar area) and all other Improvements necessary for the full use and operation of any of the foregoing.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including the Minimum Interest Payment, Additional Interest and Breakage Costs, if applicable) due to Lender in respect of the Loan under the Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder.

"**Debt Service (Combined)**" shall mean, with respect to any particular period of time, the sum of (A) Debt Service and (B) the Mezzanine Loan Monthly Debt Service and all other sums (including, without limitation, any accelerated principal balance) due under the Mezzanine Loan.

"**Debt Service Coverage Ratio (Combined)**" shall mean the ratio calculated by Lender of (i) the Underwritable Cash Flow to (ii) the aggregate amount of Debt Service (Combined) which would be due for the twelve (12) month period immediately succeeding the date of calculation; provided, that, the foregoing shall be calculated by Lender (A) assuming that each of the Loan and the Mezzanine Loan will be in place for the entirety of said period and (B) assuming Amortization Payments were due on each Monthly Payment Date for the entirety of said period.

"**Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which (i) the numerator is the Underwritable Cash Flow and (ii) the denominator is the then aggregate outstanding principal balance of the Loan.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that (i) no Event of Default shall have occurred and be continuing (either at the date of any notices

specified below or as of the effective date of any deemed approval), (ii) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Initial Notice**"), which such Initial Notice shall have been (A) accompanied by any and all required information and documentation relating thereto as may be reasonably required in order to approve or disapprove such matter (the "**Approval Information**") and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Initial Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; (iii) Lender shall have failed to respond to the Initial Notice within the aforesaid time frame; (iv) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Second Notice**"), which such Second Notice shall have been (A) accompanied by the Approval Information and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Second Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; and (v) Lender shall have failed to respond to the Second Notice within the aforesaid time frame.  For purposes of clarification, Lender requesting additional and/or clarified information, in addition to approving or denying any request (in whole or in part), shall be deemed a response by Lender for purposes of the foregoing.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate, and (ii) five percent (5%) above the Interest Rate.

"**Determination Date**" shall mean, with respect to any Interest Period, the date that is two (2) London Business Days prior to the first day of such Interest Period.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or NRSROs in connection with any public offering or private placement in connection with a Securitization, including, but not limited to, any preliminary or final offering circular, prospectus, prospectus supplement, free writing prospectus, private placement memorandum or other offering documents, marketing materials or information.

"**Eligible Account**" shall have the meaning set forth in the Cash Management Agreement.

"**Eligible Institution**" shall have the meaning set forth in the Cash Management Agreement.

"**Embargoed Person**" shall have the meaning set forth in Section 4.26 hereof.

MIA 31354953v9

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equipment Leases**" shall have the meaning set forth in Section 3.36 hereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 8.1(ix) hereof.

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Operating Cash Flow Funds**" shall have the meaning set forth in Section 8.2 hereof.

"**Exchange Act**" shall mean the Securities and Exchange Act of 1934, as amended.

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1 hereof.

"**Exculpated Parties**" shall have the meaning set forth in Section 12.1 hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.11 hereof.

"**Extension Fee**" shall mean, with respect to first Extension Option, one eighth of one percent (0.125%) of the outstanding principal amount of the Loan on the date the related Extension Period is commenced and, with respect to the second Extension Option, one eighth of one percent (0.125%) of the outstanding principal amount of the Loan on the date the related Extension Period is commenced.

"**Extension Option**" shall have the meaning set forth in Section 2.11 hereof.

"**Extension Period**" shall have the meaning set forth in Section 2.11 hereof.

"**FF&E**" shall mean furniture, fixtures and equipment at or in or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotel located on the Property and of the type customarily utilized in hotel properties such as the Property.

"**FF&E Reserve Account**" shall have the meaning set forth in Section 7.3 hereof.

"**FF&E Reserve Funds**" shall have the meaning set forth in Section 7.3 hereof.

"**FF&E Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.3 hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Floor Rate**" shall mean six and seventy-five hundredths percent (6.**75**%).

"**Foreign Taxes**" shall have the meaning set forth in Section 2.5(b) hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Lists**" shall have the meaning set forth in Section 3.27 hereof.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Rents**" shall mean an amount equal to the sum of (i) annual rental income reflected in a current rent roll for all Tenants paying rent and (ii) all income, computed in accordance with the Approved Accounting Method, derived from the ownership and operation of the Property from whatever source for the trailing twelve (12) month period, including, without limitation: (a) all income and proceeds received from rental of rooms, commercial space, meeting, conference and/or banquet space within the Property including net parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); (d) all Awards for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); and (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this clause (ii) if received in the ordinary course of the Property operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); but excluding, (1) Gross Rents and gross receipts received by lessees, licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (3) non-recurring or extraordinary income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (4) federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent

10

taxes; (5) Awards (except to the extent provided in clause (d) above) or insurance proceeds (except to the extent provided in clause (c) above); (6) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (7) gratuities collected by the Property employees; (8) the proceeds of any financing; (9) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; (10) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues; (11) rents from tenants that are included in any bankruptcy proceedings; and (12) any disbursements to Borrower from the Reserve Funds or any other escrow fund established by the Loan Documents or under the Management Agreement.  Gross Rents shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof. For purposes of clarity, income calculated under clause (ii) shall not include any income calculated under clause (i) above.

"**Guarantor**" shall mean, individually and collectively, Toby Moskovits and Yechiel Michael Lichtenstein, and any successor to and/or replacement of any of the foregoing (including, without limitation, following the occurrence of a Mezzanine Foreclosure, the applicable substitute for Guarantor provided by Mezzanine Lender in connection with such Mezzanine Foreclosure (subject to the applicable terms and conditions of the Mezzanine Intercreditor), in each case, pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

"**Guaranty**" shall mean, collectively, the Carveout Guaranty and the Completion Guaranty.

"**Hedge Losses**" shall mean all actual losses incurred by Lender or its affiliates in connection with the hedge positions taken by Lender or its affiliates with respect to the Interest Rate.  Borrower acknowledges that such hedging transactions may include the sale of U.S. Obligations or other securities and/or the execution of certain derivative transactions, which hedging transactions would have to be "unwound" if all or any portion of the Loan is paid down.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Indebtedness**" shall mean, for any Person, without duplication:  (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

MIA 31354953v9

"**Indemnified Parties**" shall mean (i) Lender, (ii) any successor owner or holder of the Loan or participations in the Loan, (iii) any Servicer or prior Servicer of the Loan, (iv) any Investor or any prior Investor in any Securities, (v) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (vi) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (vii) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (viii) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 15.2 hereof.

"**Insurance Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Insurance Payment Date**" shall mean, with respect to any applicable Policies, the date occurring 30 days prior to the date the applicable Insurance Premiums associated therewith are due and payable.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1 hereof.

"**Interest Bearing Accounts**" shall mean the FF&E Reserve Account.

"**Interest Period**" shall have the meaning set forth in Section 2.6.

"**Interest Rate**" shall mean the rate or rates at which the outstanding principal amount of the Loan bears interest from time to time as determined accordance with the provisions of Section 2.5 hereof.

"**Interest Rate Cap Agreement**" shall mean, as applicable, any interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance satisfactory to Lender between Borrower and Counterparty or any Replacement Interest Rate Cap Agreement, in each case which also satisfies the requirements set forth in Section 2.8.

"**Interest Reserve Account**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Deficiency**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Deficiency Amount**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Funds**" shall have the meaning set forth in Section 7.9 hereof.

"**Investor**" shall mean any investor or potential investor in the Loan (or any portion thereof or interest therein) in connection with any Secondary Market Transaction.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Labor and Materials Charge**" shall have the meaning set forth in Section 4.8 hereof.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Law Change**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transaction with respect to the Loan, Borrower, any Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"**Lender Affiliate**" shall mean the Affiliate of Lender that has filed a Registration Statement.

"**Lender Consultant**" shall mean such Person as Lender may designate and engage to assist Lender in reviewing all or any portions of the Business Plan, the required permits and approvals for the Business Plan Work, to inspect the Improvements and the Property as Business Plan Work progresses and to consult with and to provide advice to and to render reports to Lender and/or Servicer which, at Lender's option, may be either an officer or employee of Lender or a consulting architect, engineer or inspector appointed or engaged by Lender or Servicer at the sole cost and expense of Borrower.

"**Lender Group**" shall mean Lender, each of its directors, officers, employees, representatives, agents and affiliates (including, without limitation, those who have signed the applicable Registration Statement), and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act.

"**Liabilities**" shall have the meaning set forth in Section 9.2 hereof.

"**LIBOR**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, as necessary, to the next nearest 1/100th of 1%) equal to the rate reported for deposits in U.S. dollars, for a one-month period, that appears on Reuters Screen LIBOR01 Page (or the successor thereto) as of 11:00 a.m., London time, on the

related Determination Date; provided that, (i) if such rate does not appear on Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the principal London office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the amounts for a comparable loan at the time of such calculation and, if at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations; and (ii) if fewer than two such quotations in clause (i) are so provided, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the amounts for a comparable loan at the time of such calculation and, if at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. Lender's computation of LIBOR shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"**LIBOR Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the LIBOR Rate.

"**LIBOR Rate**" shall mean the greater of (i) the sum of (A) the Adjusted LIBOR Rate and (B) LIBOR Spread and (ii) Floor Rate ("**Original LIBOR Rate**"); provided, however, if the Operating Condition is not satisfied on or prior to May 31, 2018 ("**Rate Increase Event**"), the LIBOR Spread in clause (B) shall be increased to 6.25% and the Floor Rate in clause (ii) shall be increased to 7.25%. Notwithstanding the foregoing, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the LIBOR Rate shall be restored to the Original LIBOR Rate. Any change in the LIBOR Rate as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

"**LIBOR Spread**" shall mean five and seventy-five hundredths percent (5.75%).

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Collateral Assignment of Interest Rate Cap Agreement, the Carveout Guaranty, Completion Guaranty the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are not open for business.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and

unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**Major Contract**" shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $150,000.00 or which extend beyond one year (unless cancelable by Borrower on thirty (30) days or less notice without penalty)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"**Major Lease**" shall mean any Lease and any instrument guaranteeing or providing credit support for any Lease.

"**Management Agreement**" shall mean the "Management Agreement" as defined in the Assignment of Management Agreement and any other management agreement entered into by and between Borrower and Manager in accordance with the terms of this Agreement, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean Williamsburg Hotel BK LLC, a New York limited liability company, or such other entity selected as the manager of the Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean, with respect to any Person, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal, state, local or foreign law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or take any action to consolidate or merge such Person with or into any other Person, or take any action to dissolve or liquidate such Person, or make any assignment for the benefit of creditors of such Person, or sell all or substantially all of such Person's assets, or admit in writing such Person's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, any SPE Component Entity, any Guarantor or the Property, (ii) the ability of Borrower or any Guarantor to perform their respective obligations under any of the Loan Documents, (iii) the enforceability or validity of any of the Loan Documents, the perfection or priority of any lien created under any of the Loan Documents or the rights, interests or remedies of Lender under any of the Loan Documents, or (iv) the value, use operation of, or cash flows from, the Property.

MIA 31354953v9

"**Maturity Date**" shall mean June 9, 2019, as such date may be extended pursuant to and in accordance with Section 2.11 hereof, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean the "Borrower" as defined in the Mezzanine Loan Agreement.

"**Mezzanine Equity Collateral**" shall mean the 100% direct and/or indirect equity ownership interest held by Mezzanine Borrower in Borrower (other than any equity interest in Borrower held directly by any SPE Component Entity), including all of Mezzanine Borrower's equity ownership interests in any SPE Component Entity.

"**Mezzanine Foreclosure**" shall mean the transfer of the Mezzanine Equity Collateral to Mezzanine Lender in connection with the exercise of Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents, provided that such transfer is made in accordance with the applicable terms and conditions of the Mezzanine Intercreditor.

"**Mezzanine Intercreditor**" shall mean that certain intercreditor or other similar agreement by and among Lender and Mezzanine Lender relating to the Loan and the Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with its terms.

"**Mezzanine Lender**" shall mean WH Mezz Lender, LLC, in its capacity as mezzanine lender under the Mezzanine Loan, and its successors and/or assigns (to the extent permitted under the Mezzanine Intercreditor).

"**Mezzanine Loan**" shall mean that certain loan in the original principal amount of $12,500,000.00 made by Mezzanine Lender to Mezzanine Borrower.

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan Agreement dated as of even date herewith between Mezzanine Lender and Mezzanine Borrower in respect of the Mezzanine Loan.

"**Mezzanine Loan Documents**" shall mean the documents, certificates and instruments evidencing, securing or otherwise executed in connection with the Mezzanine Loan (as the same exist as of the date hereof and as the same may be amended, restated, replaced, supplemented or otherwise modified, in each case, in accordance with the express terms thereof and of the Mezzanine Intercreditor).

"**Mezzanine Loan Event of Default**" shall mean the occurrence of an "Event of Default" as such term is defined in the Mezzanine Loan Agreement.

MIA 31354953v9

"**Mezzanine Loan Monthly Debt Service**" shall mean, with respect to any particular period of time, regularly scheduled monthly principal (if applicable) and interest payments due under the Mezzanine Loan Documents.

"**Mezzanine Transfer**" shall mean each of (i) the pledge of the Mezzanine Equity Collateral by Mezzanine Borrower to Mezzanine Lender in connection with the Mezzanine Loan and (ii) any Mezzanine Foreclosure.

"**Minimum Counterparty Rating**" shall mean (a) a long term credit rating from S&P of at least "A+", which rating shall not include a "t" or otherwise reflect a termination risk, and (b) a long term credit rating from Moody's of at least "A1", which rating shall not include a "t" or otherwise reflect a termination risk (and, after a Securitization, the equivalent of the foregoing by the other Rating Agencies). After a Securitization of the Loan, only the ratings of those Rating Agencies rating the Securities shall apply.

"**Minimum Disbursement Amount**" shall mean Ten Thousand and No/100 Dollars ($10,000).

"**Minimum Interest**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Minimum Interest Payment**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Monthly Amortization Payment**" shall mean, with respect to each Monthly Amortization Payment Date, an amount equal to $55,000.00.

"**Monthly Amortization Payment Date**" shall mean the first Monthly Payment Date following the commencement of the second Extension Period and each Monthly Payment Date thereafter throughout the term of the Loan.

"**Monthly Debt Service Payment**" shall have the meaning set forth in Section 2.6 hereof.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Monthly Payment Date**" shall mean January 9, 2018 and the ninth (9th) day of every calendar month occurring thereafter during the term of the Loan.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Moody's**" shall mean Moody's Investor Service, Inc.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such Award.

17

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4 hereof.

"**New Non-Consolidation Opinion**" shall mean a substantive non-consolidation opinion provided by outside counsel acceptable to Lender (it being acknowledged and agreed that Cohen & Gresser LLP is acceptable to Lender) and the Rating Agencies and otherwise in form and substance acceptable to Lender and the Rating Agencies.

"**Non-Consolidation Opinion**" shall mean any substantive non-consolidation opinion delivered to Lender in connection with the Loan (including, without limitation, that certain substantive non-consolidation opinion delivered to Lender by Cohen & Gresser LLP in connection with the closing of the Loan).

"**Note**" shall mean that certain Consolidation, Extension and Restatement of Notes Agreement of even date herewith in the principal amount of up to $68,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

"**Obligations**" shall have the meaning set forth in the Security Instrument.

"**OFAC**" shall have the meaning set forth in Section 3.27 hereof.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by Responsible Officer of Borrower.

"**Open Period Start Date**" shall mean October 9, 2018.

"**Operating Condition**" shall mean (1) Completion of the Business Plan Work (for the avoidance of doubt, including all Critical Hotel Features) in accordance with the terms of this Agreement and (2) Critical Hotel Features are fully open for business and operating, in each case as determined by Lender.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Approved Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, (and without duplication) (a) utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, payroll and related taxes, computer processing charges, management fees (equal to the greater of (x) three percent (3.0%) of Gross Rents for the trailing twelve (12) month period or (y) actual management fees payable under the Management Agreement), operational equipment or other lease payments as approved by Lender, but specifically excluding (i) depreciation, (ii) Debt Service, (iii) non-recurring or extraordinary expenses, and (iv) deposits into the Reserve Funds; and (b) normalized FF&E expenditures equal to the greater of (x) four percent (4.0%) of Gross Rents for the trailing twelve (12) month period or (y) actual FF&E expenditures.

"**Organizational Chart**" shall have the meaning set forth in Section 3.28 hereof.

"**Original Alternate Rate**" shall have the meaning set forth in the definition of Alternate Rate Spread.

"**Original LIBOR Rate**" shall have the meaning set forth in the definition of LIBOR Rate.

"**Original Prime Rate Spread**" shall have the meaning set forth in the definition of Prime Rate Spread.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Parking Work**" shall have the meaning set forth in Section 4.32 hereof.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

"**Patriot Act Offense**" shall have the meaning set forth in Section 3.27 hereof.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) required under applicable Legal Requirements for the operation of the Property and the conduct of Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean collectively, (i) the lien and security interests created by this Agreement and the other Loan Documents, (ii) all liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent (other than liens securing a PACE Loan), (iv) any workers', mechanics' or similar liens on the Property provided any such lien is discharged or bonded in accordance with the terms and conditions of the Loan Documents, and (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Personal Property; provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the Property in the

19

ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Plans and Specifications**" shall mean all plans and specifications, shop drawings, architectural and engineering reports and designs, together with all architectural and engineering agreements, construction contracts and other material agreements entered into by Borrower, in connection with the Business Plan Work.

"**Policies**" shall have the meaning specified in Section 5.1 hereof.

"**Prepayment Notice**" shall have the meaning specified in Section 2.7(a) hereof.

"**Prime Rate**" shall mean rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate plus the Prime Rate Spread. Notwithstanding the foregoing, in no event shall the Prime Rate plus the Prime Rate Spread be less than the Floor Rate.

"**Prime Rate Spread**" shall mean the difference (expressed as the number of basis points) between (a) the LIBOR Rate on the Determination Date that LIBOR was last applicable to the Loan and (b) the Prime Rate on the Determination Date that LIBOR was last applicable to the Loan ("**Original Prime Rate Spread**"); provided, however, in no event shall such difference be a negative number. Notwithstanding the foregoing, following the occurrence of a Rate Increase Event, the Prime Rate Spread shall be increased by fifty (50) basis points and, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the Prime Rate Spread shall be restored to the Original Prime Rate Spread. Any change in the Prime Rate Spread as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

MIA 31354953v9

"**Prohibited Transfer**" shall mean (i) a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents), (ii) a Sale or Pledge of an interest in any Restricted Party and/or (iii) Borrower's acquisition of any real property in addition to the real property owned by Borrower as of the Closing Date.  A Prohibited Transfer shall include, but not be limited to, (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any (1) Leases or any Rents or (2) Property Documents; (C) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (D) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (E) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (F) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (G) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) or the engagement of a new Manager, in each case, other than in accordance with the terms and conditions of this Agreement; (H) if Borrower enters into, or the Property is subjected to, any PACE Loan; or (I) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower or by any other Person, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law) and/or any other action instituted by (or at the behest of) Borrower or its Affiliates or consented to or acquiesced in by Borrower or its Affiliates which results in a Property Document Event.

"**Property**" shall have the meaning set forth in the Security Instrument.

"**Property Document**" shall mean, individually and collectively, each REA.

"**Property Document Event**" shall mean any event which would, directly or indirectly, cause a termination right, right of first refusal, first offer or any other similar right, cause any termination fees to be due or would cause a Material Adverse Effect to occur under any Property Document (in each case, beyond any applicable notice and cure periods under the applicable Property Document); provided, however, any of the foregoing shall not be deemed a Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Property Document Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents related to, in each case,

any Property Document and/or other related matters (including, without limitation, Sections 3.32 and 4.25 of this Agreement).

"**Provided Information**" shall mean any information provided by or on behalf of any Borrower Party in connection with the Loan, the Property, such Borrower Party and/or any related matter or Person.

"**Qualified Carrier**" shall have the meaning set forth in Section 5.1 hereof.

"**Qualified Management Agreement**" shall mean a management agreement with a Qualified Manager with respect to the Property which is approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such management agreement and (ii) if such Qualified Manager is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non Consolidation Opinion with respect to such management agreement).

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such Person and (ii) if such Person is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such Person).

"**Rate Increase Event**" shall have the meaning set forth in the definition of LIBOR Rate.

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch, DBRS, Inc., Kroll Bond Ratings and Morningstar Credit Ratings, LLC and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing) in connection with and/or in anticipation of any Secondary Market Transaction.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities given by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion; provided, however, (i) if a Securitization has occurred and either (A) any Rating Agency fails to respond to any request for a Rating Agency Confirmation with respect to such event or otherwise elects (verbally or in writing) not to consider such event or (B) Lender (or Servicer) is not required to and has elected not to obtain (or cause to be obtained) a Rating Agency Confirmation with respect to such event, in each case, pursuant to and in compliance with the Securitization's pooling and servicing agreement (or similar agreement), then, notwithstanding anything contained in this Agreement to the contrary, Lender's written approval of such event shall be required in lieu of a Rating Agency Confirmation, in the case of clause (i)(A) above, from such Rating Agency or Rating Agencies (only) or, in the case of clause (i)(B) above, from each of the Rating Agencies or (ii) if a Securitization has not occurred, then, notwithstanding anything contained in this Agreement to the contrary, the term "Rating Agency Confirmation" shall be deemed instead to require Lender's written approval of such event.  In the event that either of clause (i) or (ii) of the

foregoing proviso applies, Lender's approval shall be based on Lender's good faith determination of applicable Rating Agency standards and criteria, unless Lender has an independent approval right in respect of such event pursuant to the other terms of this Agreement or the other Loan Documents, in which case the discretion afforded to Lender in connection with such independent approval right shall apply.

"**REA**" shall mean, individually and collectively, each agreement described on <u>Exhibit D</u> hereto (if any), any amendment, restatement, replacement or other modification thereof, any future reciprocal easement agreement, declaration of covenants, conditions and/or restrictions or other similar agreement affecting the Property entered into in accordance with the applicable terms and conditions hereof and any amendment, restatement, replacement or other modification thereof.

"**Register**" shall have the meaning set forth in Section 9.7 hereof.

"**Registrar**" shall have the meaning set forth in Section 9.7 hereof.

"**Registration Statement**" shall mean the registration statement relating to a Securitization.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Related Loan**" shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Securitization with the Loan (or any portion thereof or interest therein).

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

"**REMIC Opinion**" shall mean, as to any matter, an opinion as to the compliance of such matter with applicable REMIC Requirements (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies).

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the Loan (or the applicable portion thereof and/or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the IRS Code, the non-imposition of any tax on such REMIC Trust under the IRS Code (including, without limitation, taxes on "prohibited transactions and "contributions") and any other constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the Loan (or any portion thereof and/or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the IRS Code)).

"**REMIC Trust**" shall mean any "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code that holds any interest in all or any portion of the Loan.

"**Rents**" shall have the meaning set forth in the Security Instrument.

"**Replacement Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.8(c) hereof.

"**Required DSCR**" shall have the meaning set forth in Section 7.9 hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the FF&E Reserve Account, the Excess Cash Flow Account, the Interest Reserve Account, the Business Plan Reserve Account, the Sam Tell Account and any other escrow account established by this Agreement or the other Loan Documents (but specifically excluding the Cash Management Account and the Clearing Account).

"**Reserve Funds**" shall mean the Tax and Insurance Funds, the FF&E Reserve Funds, the Excess Cash Flow Funds, the Interest Reserve Funds, the Business Plan Reserve Funds, the Sam Tell Funds and any other escrow funds established by this Agreement or the other Loan Documents.

"**Reserve Percentage**" shall mean the rates (expressed as a decimal) of reserve requirements applicable to Lender on the applicable Determination Date (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of any Governmental Authority as now and from time to time hereafter in effect, dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors of the Federal Reserve System) (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against any category of extensions of credit or other assets which includes loans by a non United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits).  The determination of the Reserve Percentage shall be based on the assumption that Lender funded 100% of the Loan in the interbank Eurodollar market.  In the event of any change in the rate of such Reserve Percentage during an Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including, without limitation, the imposition of Reserve Percentages, or differing Reserve Percentages, on one or more but not all of the holders of the Loan or any participation therein, Lender may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining the rate of such Reserve Percentage which shall be used in the computation of the Reserve Percentage.  Lender's computation of the Reserve Percentage shall be determined conclusively by Lender and shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president of such Person or such other similar officer of such Person reasonably acceptable to Lender.

"**Restoration**" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restoration Retainage**" shall have the meaning set forth in Section 5.4 hereof.

"**Restoration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan.

"**Restricted Party**" shall mean Borrower, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Guarantor, any SPE Component Entity, any Affiliated Manager or any non-member manager.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"**Sam Tell**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell Account**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell Funds**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell UCC**" shall have the meaning set forth in Section 7.1 hereof.

"**Satisfactory Replacement Guarantor**" shall have the meaning set forth in Section 6.4.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization**" shall have the meaning set forth in Section 9.1 hereof.

"**Security Instrument**" shall mean that certain first priority Consolidation, Modification, Spreader and Extension Agreement dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 9.4 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.4 hereof.

MIA 31354953v9

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**SPE Component Entity**" shall have the meaning set forth on <u>Exhibit C</u> attached hereto.

"**Springing Member LLC**" shall mean a Delaware limited liability company properly structured in accordance with applicable Rating Agency criteria with at least one springing member that shall, upon the dissolution, withdrawal or disassociation of such limited liability company's last remaining member, immediately become the sole member of such limited liability company.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**State**" shall mean the state in which the Property or any part thereof is located.

"**State National**" shall have the meaning set forth in Section 5.1 hereof.

"**Strike Rate**" shall mean two percent (2.0%).

"**Substitution**" shall have the meaning set forth in Section 6.4.

"**Survey**" shall mean that certain survey of the Property certified and delivered to Lender in connection with the closing of the Loan.

"**Syndication**" shall have the meaning set forth in Section 9.7 hereof.

"**Tax Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Tax and Insurance Funds**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Title Insurance Policy**" shall mean, individually and collectively, each ALTA (or TLTA, as applicable) mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Security Instrument.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Underwritable Cash Flow**" shall mean an amount calculated by Lender on a monthly basis equal to the trailing twelve (12) months Gross Rents less the trailing twelve (12) months Operating Expenses, each of which shall be subject to Lender's application of the Underwriting Adjustments. Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Operating Expenses) shall be calculated by Lender in good faith based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall mean Lender Affiliate, any other placement agent or underwriter with respect to the applicable Securitization, each of their respective directors and each Person who controls the applicable Lender Affiliate or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act.

"**Underwriting Adjustments**" shall mean adjustments made by Lender in its calculation of Underwritable Cash Flow and the components thereof, in each case, based upon Lender and Rating Agency underwriting criteria, which such adjustments shall include, without limitation, adjustments (A) for (i) items of a non-recurring nature, (ii) intentionally omitted, and (iii) imminent liabilities and/or other expense increases (including, without limitation, imminent increases to Taxes and Insurance Premiums) and (B) to exclude rental income attributable to any Tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) not paying rent under its Lease or otherwise in default under its Lease for at least sixty (60) days beyond any applicable notice and cure periods, (3) that has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Lease, and (4) whose Lease is not in full force and effect.

"**Updated Information**" shall have the meaning set forth in Section 9.1 hereof.

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

"**Violation Work**" shall have the meaning set forth in Section 4.31 hereof.

**Section 1.2    Principles of Construction**.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2

## GENERAL TERMS

**Section 2.1    No Loan Commitment**.  Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make disbursements to Borrower.  Borrower hereby waives any right Borrower may have to make any claim to the contrary.

**Section 2.2    The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**Section 2.3    Disbursement to Borrower**.  Borrower may request and receive only one borrowing hereunder in respect of the Loan.  Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

**Section 2.4    The Note and the other Loan Documents**.  The Loan shall be evidenced by the Note and this Agreement and secured by this Agreement and the other Loan Documents.

**Section 2.5    Interest Rate**.

(a)    Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)    The following additional provisions shall apply and, subject to Section 2.5(c) hereof, the Interest Rate shall be determined in accordance with this Section 2.5(b):

(i)    The Interest Rate with respect to the Loan shall be:  (A) the LIBOR Rate with respect to the applicable Interest Period for a LIBOR Loan, (B) the Prime Rate plus the Prime Rate Spread for a Prime Rate Loan if the Loan is converted to a Prime Rate Loan pursuant to the provisions hereof or (C) the Alternate Rate plus the Alternate Rate Rate Spread for an Alternate Rate Loan if the Loan is converted to an Alternate Rate Loan pursuant to the provisions hereof. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to a Prime Rate Loan or an Alternate Rate Loan.

(ii)    Subject to the terms and conditions hereof, the Loan shall be a LIBOR Loan and Borrower shall pay interest on the outstanding principal amount of the Loan at the LIBOR Rate for the applicable Interest Period.  Any change in the rate of interest hereunder due to a change in the Interest Rate shall become effective as of the opening of business on the first day on which such change in the Interest Rate shall become effective.  Each determination by Lender of the Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(iii)    In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of

28

circumstances affecting the interbank Eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR and an Alternate Index has not been established pursuant to Section 2.5(b)(iv) below, then Lender shall forthwith give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding LIBOR Loan shall be converted, on the last day of the then current Interest Period, to a Prime Rate Loan.

(iv)    If, prior to the Loan being converted from a LIBOR Loan to a Prime Rate Loan in accordance with Section 2.5 hereof or following the Loan being converted from a Prime Rate Loan back to a LIBOR Loan in accordance with Section 2.5 hereof, Lender has determined in good faith that LIBOR has been succeeded by an Alternate Index, the Loan shall be converted from a LIBOR Loan to an Alternate Rate Loan, provided that the same does not violate applicable law. Lender may exercise the foregoing conversion right by giving notice of such determination in writing to Borrower at least one (1) day prior to the last day of the related Interest Period. If such notice is given, the Loan shall be converted, as of the first day of the next succeeding Interest Period, to an Alternate Rate Loan.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to an Alternate Rate Loan, or to convert an Alternate Rate Loan to a LIBOR Loan or a Prime Rate Loan.

(v)    If, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding Prime Rate Loan shall be converted to a LIBOR Loan on the last day of the then current Interest Period.

(vi)    All payments made by Borrower hereunder shall, provided that Lender complies with the requirements of Section 2.5(b)(ix) below, be made free and clear of, and without reduction for or on account of, any and all present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding income and franchise taxes of the United States of America imposed by the jurisdiction under the laws of which Lender is organized or any political subdivision or taxing authority thereof or therein or imposed by the jurisdiction of Lender's applicable lending office where Lender is resident or engaged in business or any political subdivision or taking authority thereof or therein (such non-excluded taxes being referred to collectively as "**Foreign Taxes**").  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign

29

Tax.  Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.  All amounts payable under this Section 2.5(b)(v) shall constitute additional interest hereunder and shall be secured by the Security Instrument and the other Loan Documents.  The provisions of this Section 2.5(b)(v) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument. Any reference under this Section 2.5(b)(v) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(vii)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR Loan as contemplated hereunder, then (A) the obligation of Lender hereunder to make a LIBOR Loan or to convert a Prime Rate Loan to a LIBOR Loan shall be canceled forthwith and (B) any outstanding LIBOR Loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as required by law.  Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any reasonable costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder.  Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(viii)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(A)    shall hereafter impose, modify or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of LIBOR hereunder;

(B)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(C)    shall hereafter impose on Lender any other condition, and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

30

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender (the "**Additional Costs**"). If, on or after the Open Period Start Date, Borrower is required to compensate Lender for Additional Costs pursuant to this clause (vii), then Borrower shall have a right to prepay the Loan within sixty (60) days after notification of such Additional Costs without payment of the Additional Interest, the Minimum Interest Payment or any prepayment premium or penalty, but otherwise in accordance with this Agreement. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(ix)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs as a consequence of (A) any default by Borrower in payment of the principal of or interest on a LIBOR Loan, including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder, (B) any prepayment (whether voluntary or mandatory) of the LIBOR Loan on a day that is not the last day of an Interest Period, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Loan hereunder and (C) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Interest Rate from the LIBOR Rate to the Prime Rate plus the Prime Rate Spread with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the LIBOR Rate on a date other than the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder (the amounts referred to in clauses (A), (B) and (C) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence. This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(x)    If Lender is a U.S. Person (other than the lender originally named herein), Lender shall deliver to Borrower, upon request, a Form W-9 (unless it establishes to the reasonable satisfaction of Borrower that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax). If Lender is not a U.S. Person, Lender shall deliver to Borrower, upon request, either (A) a Form W-8BEN which indicates a 0% rate of tax or (B) a Form W-8ECI. If Lender is not a U.S. Person, Lender further undertakes to deliver to Borrower additional Forms W-8, 1001, 4224 (or any successor forms) or other manner of certification, as the case may be, (x) on or before the date that any such form expires or becomes obsolete, (y) after the occurrence of any event

31

requiring a change in the most recent form previously delivered by it to Borrower, and (z) such extensions or renewals thereof as may reasonably be requested by Borrower, certifying that Lender is entitled to receive payments hereunder without deduction or withholding of any Loan Taxes. However, in the event that any change in law, rule, regulation, treaty or directive, or in the interpretation or application thereof (a "**Law Change**"), has occurred prior to the date on which any delivery pursuant to the preceding sentence would otherwise be required which renders such form inapplicable, or which would prevent Lender from duly completing and delivering any such form, or if such Law Change results in Lender being unable to deliver a Form W-9 (or other satisfactory evidence that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax), Lender shall not be obligated to deliver such forms but shall, promptly following such Law Change, but in any event prior to the time the next payment hereunder is due following such Law Change, advise Borrower in writing whether it is capable of receiving payments without any deduction or withholding of Loan Taxes. In the event of such Law Change, Borrower shall have the obligation to make Lender whole and to "gross-up" under Section 2.5(b)(v) hereof, despite the failure by Lender to deliver such forms. Any reference under this Section 2.5(b)(ix) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(c)    In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

(d)    Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (i) the actual number of days elapsed in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (iii) the outstanding principal balance of the Loan. The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Period immediately prior to such Monthly Payment Date. Borrower understands and acknowledges that such interest accrual requirement results in more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(e)    This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All

sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**Section 2.6    Loan Payments**.

(a)    Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through and including the next succeeding fourteenth (14th) day of a calendar month, whether such fourteenth (14th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the fifteenth (15th) day of a calendar month, in which case no such separate payment of interest shall be due).  Each interest accrual period (the "**Interest Period**") thereafter shall commence on the fifteenth (15th) day of each calendar month during the term of the Loan and shall end on and include the fourteenth (14th) day of the next occurring calendar month.  No Interest Period shall be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

(b)    Borrower shall make (i) on each Monthly Payment Date throughout the term of the Loan, a payment to Lender of interest accruing on the outstanding principal balance of the Loan during the Interest Period in which such Monthly Payment Date occurs, which payments shall be applied to accrued and unpaid interest, and (ii) on each Monthly Amortization Payment Date, a Monthly Amortization Payment to Lender, which payments shall be applied to principal (each such payment in (i) and (ii), a "**Monthly Debt Service Payment**").

(c)    Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

(d)    If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5%) of such unpaid sum and (ii) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Security Instrument and the other Loan Documents.

(e)    Additionally:

(i)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately preceding Business Day.

(iii)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

(iv)    Lender shall have the right from time to time, in its sole discretion, upon not less than thirty (30) days prior written notice to Borrower, to change the Monthly Payment Date to a different calendar day each month which is not more than five (5) days earlier nor more than ten (10) days later than the sixth (6th) day of each calendar month; provided, however, that (A) if Lender shall have elected to change the Monthly Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period correspondingly and (B) if Lender shall have elected to change the Monthly Payment Date as aforesaid to any calendar day earlier than the sixth (6th) day of each calendar month, Borrower shall have a grace period for any amounts due on a Monthly Payment Date through the sixth (6th) day of each such calendar month.

**Section 2.7    Prepayments**.

(a)    Except as otherwise provided in this Section 2.7, Borrower shall not have the right to prepay the Loan in whole or in part.  On or after the Open Period Start Date, Borrower may, provided no Event of Default has occurred and is continuing, at its option and upon not less than thirty (30) days prior notice (a "**Prepayment Notice**") to Lender (or such shorter period of time as may be permitted by Lender in its sole discretion), which notice must specify the date on which such prepayment is to be made, prepay the Debt in whole (but not in part) on any date (other than a date from, and including, the tenth (10th) day of a calendar month through, and including, the fourteenth (14th) day of a calendar month); provided that such prepayment is accompanied by payment of all interest accrued on the principal amount prepaid through and including the date of repayment, the Breakage Costs, the Additional Interest and the Minimum Interest Payment, in each case to the extent applicable.  Lender shall not be obligated to accept any prepayment unless it is accompanied by payment of all sums required to be paid in connection therewith.   As a condition to any voluntary prepayment, the Prepayment Notice may not be given to Lender more than ninety (90) days prior to the date upon which prepayment is to be made and Borrower hereby agrees that, in the event Borrower delivers a Prepayment Notice and fails to prepay the Loan in accordance with the Prepayment Notice and the terms of this Section 2.7, Borrower shall pay Lender all reasonable out-of-pocket costs and expenses incurred by Lender, including, without limitation, any Breakage Costs or similar expenses, as a result of such failure.  A Prepayment Notice may be revoked by Borrower if written notice of such revocation is delivered by Borrower to Lender on or before the date that is five (5) Business Days prior to the prepayment date set forth in the Prepayment Notice.  If Borrower delivers to Lender a Prepayment Notice and subsequently revokes such Prepayment Notice prior to prepayment, Borrower shall promptly reimburse Lender for all costs and expenses incurred by Lender (including any attorneys' fees) due to such revoked notice or otherwise in connection with the anticipated prepayment.

(b)        On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender is not required pursuant to the terms and conditions of this Agreement to (and does not otherwise elect to) make such Net Proceeds available to Borrower for Restoration, Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds.  Any prepayment received by Lender under this Section 2.7(b) shall be accompanied by (i) all interest accrued on the principal amount prepaid through and including the date of repayment, the applicable portion of the Additional Interest and any Breakage Costs, (ii) all other sums due and payable under the Loan Documents (including, without limitation, any amount due under Section 9.6 hereof) and (iii) all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such prepayment.  No prepayment premium or penalty (which shall not be deemed to include the Additional Interest or, if an Event of Default exists, the Minimum Interest Payment, each of which shall be owed as provided for in this Agreement, if applicable) shall be due in connection with any prepayment made pursuant to this Section 2.7(b).

(c)        If concurrently with or after an Event of Default, payment of all or any part of the principal of the Loan is tendered by or on behalf of Borrower (including, without limitation, by virtue of an application of Reserve Funds or any other cash collateral for the Loan by Lender pursuant to the terms and conditions of the Loan Documents), a purchaser at foreclosure or any other Person, (i) such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth herein and (ii) Borrower, such purchaser at foreclosure or other Person shall pay the Minimum Interest Payment, the Additional Interest and the Breakage Costs, in each case to the extent applicable, in addition to (A) the outstanding principal balance of the Loan, (B) all accrued and unpaid interest and other amounts payable under the Loan Documents and (C) if such prepayment occurs prior to the final sale of the Loan in a Secondary Market Transaction, Hedge Losses.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

(d)        Except as otherwise expressly set forth herein, in all events and under all circumstances Borrower shall be obligated to pay to Lender minimum interest in an amount equal to interest at the Interest Rate in effect as of the date of full repayment of the Debt (whether by virtue of a voluntary prepayment hereunder, acceleration, or otherwise) calculated on the face amount of the Note for a period of fifteen (15) months (the "**Minimum Interest**").  Upon prepayment or repayment in full of the Obligations or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender an amount (such amount, the "**Minimum Interest Payment**") equal to the positive difference, if any, between (i) the entire Minimum Interest, minus (ii) the aggregate total of all Monthly Debt Service Payments paid by Borrower during the term of the Loan (exclusive of any portions thereof constituting (A) interest accrued at the Default Rate in excess of the Interest Rate or (B) payments of principal).  In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (x) Lender shall have no obligation to accept any prepayment or repayment of the Loan unless and until Borrower shall have complied with this Section 2.7(d), and (y) Lender shall have no obligation to release or, if requested by Borrower, assign the Note and Security Instrument upon payment of the Obligations unless and until Lender shall have received the entire Minimum Interest Payment.  In the event that any Minimum Interest Payment is due hereunder, Lender shall deliver to Borrower a statement setting forth the amount and

determination of the Minimum Interest Payment, and, provided that Lender shall have in good faith applied the formula described above, Borrower shall not have the right to challenge the calculation or the method of calculation set forth in any such statement in the absence of manifest error, which calculation may be made by Lender on any day during the fifteen (15) day period preceding the date of such prepayment.  Lender shall not be obligated or required to have actually reinvested the prepaid principal balance at LIBOR or otherwise as a condition to receiving the Minimum Interest Payment.  Borrower expressly acknowledges and agrees that the Minimum Interest Payment shall constitute additional consideration for the Loan, and shall, upon payment, be the sole and exclusive property of Lender.

Section 2.8    **Interest Rate Cap Agreement**.

(a)    Prior to or contemporaneously with the Closing Date, Borrower shall enter into an Interest Rate Cap Agreement with a LIBOR strike rate equal to the Strike Rate.  The Interest Rate Cap Agreement (i) shall at all times be in a form and substance acceptable to Lender, (ii) shall at all times be with a Counterparty, (iii) shall at all times be for a period equal to the term of the Loan, and (iv) shall at all times have a notional amount equal to or greater than the principal balance of the Loan and shall at all times provide for the applicable LIBOR strike rate to be equal to the Strike Rate.  Borrower shall direct such Counterparty to deposit directly into the Cash Management Account (or, if the Cash Management Account is not then activated, into such other Account as Lender may designate) any amounts due Borrower under such Interest Rate Cap Agreement so long as any portion of the Debt is outstanding, provided that the Debt shall be deemed to be outstanding if the Property is transferred by judicial or non-judicial foreclosure or deed-in-lieu thereof.  Additionally, Borrower shall collaterally assign to Lender, pursuant to the Collateral Assignment of Interest Rate Cap Agreement, all of its right, title and interest in and to the Interest Rate Cap Agreement (and any replacements thereof), including, without limitation, its right to receive any and all payments under the Interest Rate Cap Agreement (and any replacements thereof), and Borrower shall, and shall cause Counterparty to, deliver to Lender a fully executed Interest Rate Cap Agreement (which shall, by its terms, authorize the assignment to Lender and require that payments be deposited directly into the Cash Management Account).

(b)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately into the Cash Management Account.  Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(c)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty by any Rating Agency below the Minimum Counterparty Rating, Borrower shall (i) replace the Interest Rate Cap Agreement not later than fifteen (15) Business Days following receipt of notice of such downgrade, withdrawal or qualification with an Interest Rate Cap Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 2.8) (a "**Replacement Interest Rate Cap Agreement**") from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating or (ii) if provided for in such Interest Rate Cap Agreement, cause the Counterparty to deliver

36

collateral to secure Borrower's exposure under the Interest Rate Cap Agreement in such amount and pursuant to such terms as are acceptable to the Rating Agencies.

(d)      In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or fails to maintain the Interest Rate Cap Agreement in accordance with the terms and provisions of this Agreement, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is reimbursed by Borrower to Lender.

(e)      Each Interest Rate Cap Agreement shall contain the following language or its equivalent:  "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, the Counterparty must, within ten (10) business days, either (x) post collateral on terms acceptable to each Rating Agency and Borrower, or (y) find a replacement Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency and Borrower; provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an "Additional Termination Event" as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the "Affected Party." In the event that a Counterparty is required pursuant to the terms of an Interest Rate Cap Agreement to (i) deliver collateral as specified in the applicable Interest Rate Cap Agreement, or (ii) find a replacement Counterparty, Borrower covenants and agrees that Borrower shall seek Lender's approval with respect thereto and shall not approve or consent to the foregoing unless and until Borrower receives Lender's prior written approval and shall approve or consent to the foregoing upon receipt of Lender's prior written approval.  Borrower's failure to comply with the requirements of this Section 2.8(e) shall constitute, at Lender's option, an immediate Event of Default.

(f)      Borrower shall obtain and deliver to Lender an opinion from counsel (which counsel may be in house counsel for the Counterparty) for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)      the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)      the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

37

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g)    Borrower shall deliver to Lender a new Collateral Assignment of Interest Rate Cap Agreement acceptable to Lender in connection with each Replacement Interest Rate Cap Agreement.

**Section 2.9    Assignment of Security Instrument**.    Upon payment in full of all principal and interest due on the Loan and all other amounts due and payable in accordance with the terms and provisions of the Loan Documents, and upon the written request and at the sole cost and expense of Borrower (including payment of Lender's reasonable legal fees and expenses and then customary administrative fee in connection therewith), Lender shall cooperate with Borrower to effect an assignment of the Note and the Security Instrument to a new lender by assigning the Note and the Security Instrument, each without recourse, covenant or warranty of any nature, express or implied, to such new lender designated by Borrower (other than Borrower or a nominee of Borrower) pursuant to documentation reasonably acceptable to Lender.

**Section 2.10    Payment of Additional Interest**.

(a)    Subject only to Section 2.10(d) below, Borrower shall be obligated to pay the Additional Interest to Lender as follows: (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof, in addition to all other amounts payable to Lender under Section 2.7 hereof, Borrower shall pay to Lender, on account of the Additional Interest, an amount equal to one-half of one percent (0.50%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or Net Proceeds to the Debt in accordance with the terms of this Agreement and the Security Instrument, one-half of one percent (0.50%) of the amount thereof shall be retained by Lender on account of the Additional Interest and the balance thereof shall be applied to the Debt; and (iii) upon repayment in full of the Debt or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender the entire Additional Interest which would be due on such date, less any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.10(a).

38

(b)    In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (i) Lender shall have no obligation to accept any prepayment of the Loan unless and until Borrower shall have complied with this Section 2.10, and (ii) Lender shall have no obligation to release or assign any Loan Document upon payment of the Debt unless and until Lender shall have received the Additional Interest then due and payable.

(c)    Borrower expressly acknowledges and agrees that the Additional Interest shall constitute additional consideration for the Loan.

(d)    Notwithstanding anything herein or in any other Loan Document to the contrary, upon any fixed rate refinancing of the Loan by the initially-named Lender hereunder, or an Affiliate thereof, the Additional Interest due and payable in connection therewith shall be waived (it being agreed, however, that in no event shall any refund be owed to Borrower on account of any amounts paid pursuant to Section 2.10(a) above).

**Section 2.11   Extension of the Maturity Date**.   Borrower shall have the option to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (the "**Extension Option**") of six (6) months each (each, an "**Extension Period**") to (i) December 9, 2019 if the first Extension Option is exercised and (ii) June 9, 2020 if the second Extension Option is exercised (each such date, the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions (in each case as determined by Lender):

(a)    no Event of Default shall have occurred and be continuing at the time an Extension Option is exercised and on the date that the applicable Extension Period is commenced;

(b)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than ninety (90) days and no later than thirty (30) days prior to the applicable Maturity Date; provided, however, that Borrower shall be permitted to revoke such notice at any time up to three (3) Business Days before the Maturity Date provided that Borrower pays to Lender all actual out-of-pocket costs incurred by Lender in connection with such notice, including, without limitation, any Breakage Costs;

(c)    Borrower shall obtain and deliver to Lender prior to exercise of such Extension Option, pursuant to the applicable terms and conditions of Section 2.8 hereof, a Replacement Interest Rate Cap Agreement, which Replacement Interest Rate Cap Agreement shall be effective commencing on the first day of the related Extension Period and shall have a maturity date not earlier than the last day of the related Extension Period;

(d)    Borrower shall have paid to Lender the Extension Fee on the date the related Extension Period is commenced;

(e)    intentionally omitted;

(f)    each Guarantor shall execute and deliver a reaffirmation, in form and substance satisfactory to Lender, of such Guarantor's obligations under each of the Loan Documents executed and delivered by such Guarantor;

(g)      Borrower shall deliver to Lender such other certificates, documents or instruments as Lender may reasonably require, including, without limitation, an Officer's Certificate stating that all representations and warranties of Borrower set forth in Article 3 hereof remain true and correct in all material respects, subject to any changes in facts or circumstances permitted to have occurred, or not prohibited from having occurred, pursuant to the terms of the Loan Documents (in which case such change of facts and circumstances shall be set forth in such Officer's Certificate with reference to the applicable representations and warranties) or setting forth any exceptions to such representations and warranties, which exceptions shall be satisfactory to Lender;

(h)      if required by Lender, Lender shall have received, at Borrower's expense, a title continuation from the title company that provided the Title Insurance Policy evidencing that there are no liens against the Property other than Permitted Encumbrances;

(i)      Borrower shall have completed all Business Plan Work in accordance with the terms and conditions of this Agreement;

(j)      intentionally omitted;

(k)      in connection with the second Extension Option, the Debt Yield shall not be less than 10.5% at the time such Extension Option is exercised and on the date that such Extension Period is commenced; provided, however, that if the foregoing condition is not satisfied, Borrower may prepay a portion of the outstanding principal balance of the Loan as may be necessary so that such condition is satisfied, provided that any such prepayment shall be subject to Borrower's obligation to pay the proportionate share of the Additional Interest applicable thereto pursuant to Section 2.10 hereof;

(l)      in connection with the second Extension Option, the Debt Service Coverage Ratio (Combined) shall be not less than 1.25 to 1.00 at the time the Extension Option is exercised; provided, however, that if the foregoing condition is not satisfied, Borrower may prepay a portion of the outstanding principal balance of the Loan as may be necessary so that such condition is satisfied, provided that any such prepayment shall be subject to Borrower's obligation to pay the proportionate share of the Additional Interest applicable thereto pursuant to Section 2.10 hereof;

(m)      in connection with the second Extension Option, a permanent certificate of occupancy covering all of the Improvements shall have been obtained; and

(n)      the maturity date of the Mezzanine Loan shall have been extended to the applicable Extended Maturity Date.

All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the applicable Extended Maturity Date in the event an Extension Option is exercised.

MIA 31354953v9

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the Closing Date that:

**Section 3.1    Existence and Authority**.    Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in the State; (c) except as set forth on Exhibit F hereto, has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property; and (d) has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents on Borrower's part to be performed.

**Section 3.2    Borrower's Principal Place of Business**.    Borrower's principal place of business and its chief executive office as of the date hereof is 1274 49th Street, Suite 184, Brooklyn, New York 11219.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.  Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 4253908.  Borrower's federal tax identification number is 45-5412160.  Borrower is not subject to back-up withholding taxes.

**Section 3.3    Validity of Documents**.    (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to operate the Property, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Security Instrument in appropriate land records in the State and except for Uniform Commercial Code filings relating to the security interest created hereby), (b) this Agreement, the Note, the Security Instrument and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor and (c) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general

41

principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

**Section 3.4     Agreements**.  Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents. Borrower is not a party to any agreement or instrument or subject to any restriction which would have a Material Adverse Effect. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound.  There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations hereunder or under the Note to an obligation owed to another party.

**Section 3.5     Title; Permitted Encumbrances**.  Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all liens whatsoever except the Permitted Encumbrances.  None of the Permitted Encumbrances, individually or in the aggregate, (a) materially interfere with the benefits of the security intended to be provided by the Loan Documents, (b) materially and adversely affect the value of the Property, (c) impair the use or operation of the Property, or (d) impair Borrower's ability to pay the Obligations in a timely manner.  The Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on Borrower's interest in the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances.  There are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may become liens prior to, or equal or coordinate with, the lien of the Security Instrument.

**Section 3.6     Purchase Options**.  Neither the Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties.

MIA 31354953v9

**Section 3.7    Condemnation**.    No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of the access to the Property.

**Section 3.8    Separate Lots; Flood Zone; Wetlands**.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.  Except as expressly disclosed on the Survey, no portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards.  No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

**Section 3.9    Use of Property**.  The Property is used exclusively as a hotel and for other appurtenant and related uses.

**Section 3.10    Certain Additional Property Representations**.

(a)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar Legal Requirements.

(b)    The Property is served by public water and sewer systems and sanitary sewer and storm drain facilities, in each case adequate to service the Property for its intended uses.  All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.  The Property is served by all utilities necessary or convenient for the full use and enjoyment of the Property, all of which (i) are provided by public utilities, (ii) either have been accepted by the Property or the Property is equipped to accept the same, (iii) are located in a public right of way abutting the Property and (iv) are connected so as to serve the Property without passing over other property absent a valid easement.

(c)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, dedicated to public use and accepted by all Governmental Authorities, are serviceable and all-weather and are physically and legally open for use by the public.  The Property has either direct access to such public roads or streets or access to such public roads or streets by virtue of a perpetual easement or similar agreement inuring in favor of Borrower and any subsequent owners of the Property.

(d)    Except as set forth on Exhibit F hereto, Borrower has obtained all Permits, all of which are in full force and effect as of the date hereof and not subject to forfeiture, revocation, suspension or modification.

(e)    The Property is free from damage caused by fire or other casualty.  The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair (excepting ordinary wear and

43

MIA 31354953v9

tear), except for any of the foregoing that will be completed as part of the Business Plan Work. There exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(f)    Except for the Business Plan Work, Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created by this Agreement, the Note, the Security Instrument and the other Loan Documents.

(g)    To Borrower's knowledge after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(h)    All the Improvements lie within the boundaries of the Land and any building restriction lines applicable to the Land.  All easements, cross easements, licenses, air rights and rights of way or other similar property interests, if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.

(i)    Except for the Business Plan Work, Borrower has not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been completed and paid for in full, (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full or (iii) attached any fixtures to the Property which have not been paid for in full.  There is no such construction, repairs, alterations or improvements ongoing at the Property as of the Closing Date. There are no outstanding or disputed claims for any Labor and Materials Charges and there are no outstanding liens or security interests in connection with any Labor and Materials Charges. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

**Section 3.11   Financial Condition**.

(a)    Borrower is solvent and Borrower has received reasonably equivalent value for the granting of the Security Instrument.  No proceeding under Creditors Rights Laws with respect to any Borrower Party has been initiated.

(b)    In the last ten (10) years, no (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

MIA 31354953v9

(c)    No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

(d)    Except as set forth on <u>Exhibit G</u> attached hereto, with respect to any loan or financing in which any Borrower Party or any Affiliate thereof has been directly or indirectly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety (including, without limitation and to the extent applicable, any loan which is being refinanced by the Loan), none of such loans or financings has ever been (i) more than 30 days in default or (ii) transferred to special servicing.

**Section 3.12    Financial Information**.  All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Guarantor and/or the Property (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, Guarantor or the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements and except as set forth on <u>Exhibit J</u> attached hereto.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or Guarantor from that set forth in said financial statements.

**Section 3.13    Fraudulent Conveyance**.  Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 3.14    Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 3.15   No Plan Assets**.

(a)     Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA;

(b)     Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA;

(c)     transactions by or with Borrower are not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans;

(d)     none of the assets of Borrower constitutes "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101; and

(e)     Neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA).

**Section 3.16   Not a Foreign Person**.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the IRS Code.

**Section 3.17   Business Purposes**.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

**Section 3.18   Litigation**.  Except as set forth on Exhibit H attached hereto, there is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower or Guarantor or against or affecting the Property.

**Section 3.19   Leases**.  The Property is not subject to any Leases.

**Section 3.20   Taxes**.

(a)     All Taxes and governmental assessments owing in respect of the Property have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(b)     Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(c)     All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection

with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement, the Security Instrument, the Note and the other Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid, and, under current Legal Requirements, the Security Instrument and the other Loan Documents are enforceable in accordance with their terms by Lender (or any subsequent holder thereof), except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 3.21   Insurance**.  Borrower has obtained and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**Section 3.22   Management Agreement**.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  As of the date hereof, no management fees under the Management Agreement are due and payable.

**Section 3.23   Illegal Activity/Forfeiture**.

(a)      No portion of the Property has been purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)      There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Security Instrument or the other Loan Documents.

**Section 3.24   Special Purpose Entity**.  Since Borrower's and any SPE Component Entity's creation and as of the date hereof, Borrower and each SPE Component Entity have complied with and are in compliance with the requirements set forth on <u>Exhibit C</u> attached hereto.  Additionally, Borrower represents and warrants to Lender that it and each SPE Component Entity:

(a)      is and always has been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business;

(b)      has no judgments or liens of any nature against it except for tax liens not yet due;

(c)      is in compliance with all laws, regulations, and orders applicable to it and has received all permits necessary for it to operate;

(d)      is not aware of any pending or threatened litigation against it;

(e)      is not involved in any dispute with any taxing authority;

(f)      has paid all taxes that it owes;

(g)      has never owned any property other than the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and personal property necessary or incidental to its ownership or operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and has never engaged in any business except the ownership and operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower);

(h)      is not now, nor has ever been, party to any lawsuit, arbitration, summons, or legal proceeding; and

(i)      has no material contingent or actual obligations not related to the Property.

**Section 3.25   Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Security Instrument, the Note or the other Loan Documents.

**Section 3.26   Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 3.27   Embargoed Person**.  Neither Borrower nor, to Borrower's knowledge, any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of the Office of Foreign Assets Control ("**OFAC**") or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity.  For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or (v) the Patriot Act.

48

"**Patriot Act Offense**" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "**Government Lists**" means (A) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (B) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (C) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

Section 3.28   **Organizational Chart**.  The organizational chart attached as <u>Exhibit A</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

Section 3.29   **Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

Section 3.30   **No Other Financing; Other Obligations and Liabilities**.  Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect.  Borrower has no known contingent liabilities other than pursuant to the Loan Documents.

Section 3.31   **Contracts**.

(a)     Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.

(b)     Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)     Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

(d)     Except for the Major Contracts set forth on <u>Exhibit I</u> attached hereto, no Major Contract has as a party an Affiliate of Borrower.  All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

Section 3.32   **Property Document Representations**.  With respect to each Property Document, Borrower hereby represents that (a) each Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Property Document by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of

49

time, the giving of notice, or both, would constitute a default under any Property Document, (c) all rents, additional rents and other sums due and payable under the Property Documents have been paid in full, (d) no party to any Property Document has commenced any action or given or received any notice for the purpose of terminating any Property Document and (e) the representations made in any estoppel or similar document delivered with respect to any Property Document in connection with the Loan are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

Section 3.33   **No Change in Facts or Circumstances; Disclosure**.  All information submitted by (or on behalf of) Borrower or Guarantor to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower and/or Guarantor in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects.    There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 3.34   **Third Party Representations**.   Each of the representations and the warranties made by Guarantor in the other Loan Documents (if any) are true, complete and correct in all material respects.

Section 3.35   **Non-Consolidation Opinion Assumptions**.  All of the assumptions made in any Non-Consolidation Opinion delivered in connection with the closing of the Loan (if any), including, but not limited to, any exhibits attached thereto and/or certificates delivered in connection therewith, are true, complete and correct.

Section 3.36   **Hotel Representations**.

(a)      Other than as set forth on Exhibit L hereof (such leases or agreements, the "**Equipment Leases**"), the Property is not subject to equipment leases or any other similar leases or agreements.

(b)      Except for any incentive compensation systems designed to promote increased customer use of the Property, there are no:  (i) collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; or (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower or the Property, or any portion thereof is a party, or by which either is or may be bound.  Borrower has no employees as of the date hereof. Borrower has not violated in any material respects any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate Governmental Authorities.

50

MIA 31354953v9

Section 3.37   **Business Plan Work**.  Borrower has delivered or caused to be delivered to Lender true, correct and complete copies of all Plans and Specifications in existence as of the Closing Date.

Section 3.38   **Construction**.

(i)      Construction Documents.

(A)      Borrower has delivered to Lender a list, certified by Borrower, of all contractors who have been or, to the extent identified by Borrower, will be supplying labor or materials in connection with the Business Plan Work.

(B)      Borrower has delivered to Lender the most recent completed and itemized Application and Certificate for Payment (AIA Document No. G702), containing the certification of the General Contractor to whom such payment is made, as applicable, and the Architect as to the accuracy of same, together with invoices relating to the costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Property to the date of the requisition.

(C)      Borrower has furnished to Lender true and complete sets of the Plans and Specifications which will comply with all applicable legal requirements, all governmental approvals, and all restrictions, covenants and easements affecting the Property, and which have been approved by General Contractor, the Architect, and the other design professionals (as applicable), and any governmental authority as is required for construction and renovation relating to the Business Plan Work.

(ii)      Zoning.

(A)      The land use and zoning regulations which are in effect for the Property permit the Business Plan Work to be completed and use of the Property as a one hundred forty-seven (147) room hotel on an as of right basis and no variance, conditional use permit, special use permit or other similar approval is required for the completion the Business Plan Work or the use of the Property as currently used and as contemplated by the Plans and Specifications that has not been obtained prior to the date hereof.

(b)      All government approvals necessary for the Business Plan Work as contemplated by the Plans and Specifications and the Business Plan, including, without limitation, a final and full building permit, have been obtained , any applicable appeal periods have expired and all necessary development rights for the Property have fully and irrevocably vested.  Borrower has complied with all legal requirements, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any applicable governmental authority and applicable to any construction at the Property, so as to permit construction to continue to progress and to permit the Business Plan Work to be completed in accordance with the terms of this Agreement.

51

(iii)    Budget.  The Business Plan accurately reflects all costs and expenses of the Business Plan Work, including all anticipated costs and expenses through completion of the Business Plan Work.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 3 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender. All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 4

## BORROWER COVENANTS

Borrower hereby covenants and agrees with Lender that, from the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents:

**Section 4.1    Existence**.  Borrower will continuously maintain (a) its existence, (b) its rights to do business in the State and (c) its franchises and trade names, if any.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPE Component Entity to (A) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which such SPE Component Entity would be dissolved, wound up or liquidated in whole or in part or (B) amend, modify, waive or terminate the organizational documents of such SPE Component Entity, in each case without obtaining the prior written consent of Lender.

**Section 4.2    Change of Name, Identity or Structure**.  Borrower shall not change (or permit to be changed) Borrower's or the SPE Component Entity's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth in this Agreement, or (d) corporate, partnership or other structure or state of formation, without, in each case, notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's or the SPE Component Entity's structure or state of formation, without first obtaining the prior written consent of Lender and, if required by Lender, a Rating Agency Confirmation with respect thereto.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or the SPE Component Entity intends to operate the Property, and representing and warranting that Borrower or the SPE Component Entity does business under no other trade name with respect to the Property.

52

**Section 4.3    Business and Operations**.    Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.    Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

**Section 4.4    Title to Property; Legal Requirements**.

(a)    Borrower shall warrant and defend the validity and priority of the liens of the Security Instrument and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to the Permitted Encumbrances.

(b)    Borrower shall promptly comply and shall cause the Property to comply with all Legal Requirements affecting the Property or the use thereof (which such covenant shall be deemed to (i) include Environmental Laws and (ii) require Borrower to keep all Permits in full force and effect).

(c)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements.

(d)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

(e)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of such Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.5    Waste**.    Borrower shall not intentionally commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially

increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the Loan. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 4.6    Maintenance and Use of Property**. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender or as otherwise permitted pursuant to Section 4.19 hereof. Borrower shall perform (or cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation or similar proceeding and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land. Borrower shall operate the Property for the same uses as the Property is currently operated and Borrower shall not, without the prior written consent of Lender, (i) change the use of the Property or (ii) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

**Section 4.7    Taxes and Other Charges**.

(a)    Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 7.2 hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof). Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal

Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Security Instrument being primed by any related lien.

**Section 4.8    Labor and Materials**.

(a)    Subject to Section 4.8(b) below, Borrower will promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a "**Labor and Materials Charge**") and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Security Instrument, except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Labor and Materials Charge, the applicability of any Labor and Materials Charge to Borrower or to the Property or any alleged non-payment of any Labor and Materials Charge and defer paying the same, provided that (i) no Event of Default has occurred and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay (or cause to be paid) any such contested Labor and Materials Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Labor and Materials Charge from the Property or Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Labor and Materials Charge, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to pay for such Labor and Materials Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Labor and Materials Charge is finally established or the Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

MIA 31354953v9

**Section 4.9    Property Access**.    Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants.

**Section 4.10    Litigation**.    Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which could reasonably be expected to have a Material Adverse Effect.

**Section 4.11    Performance by Borrower**.    Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

**Section 4.12    Books and Records**.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements set forth on Exhibit C hereof and the Approved Accounting Method, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.    Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make and retain such copies or extracts thereof as Lender shall desire, provided that, prior to the occurrence of an Event of Default, Borrower shall not be required to pay costs and expenses incurred by Lender.    After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender (it being acknowledged and agreed that Berdon LLP is acceptable to Lender) (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, the same shall, upon Lender's written request, be audited by such independent certified public accountant) in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower.    Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, operating expenses and occupancy statistics for the Property (including an average daily room rate).

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's

Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject quarter, (ii) an occupancy report for the Property (including an average daily room rate) and any franchise scores, franchise inspection reports or other similar information made available to Borrower during the subject quarter, (iii) FF&E expenditures, (iv) the most current Smith Travel Research Reports, in a form reasonably acceptable to Lender, then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property, (v) quarterly and year-to-date operating statements (including expenditures for FF&E) prepared for each calendar quarter, noting net operating income, gross income, and operating expenses (not including any contributions to the FF&E Reserve Funds) and (vi) an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses.  In addition, such certificate shall also be accompanied by an Officer's Certificate stating that Borrower is in compliance with the requirements set forth in Section 4.23 as of the date of such certificate.

(d)    Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject month, (ii) an occupancy report for the Property (including an average daily room rate) and any franchise scores, franchise inspection reports or other similar information made available to Borrower during the subject month, (iii) FF&E expenditures, (iv) the most current Smith Travel Research Reports, in a form reasonably acceptable to Lender, then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property, (v) monthly and year-to-date operating statements (including expenditures for FF&E) prepared for each calendar month, noting net operating income, gross income, and operating expenses (not including any contributions to the FF&E Reserve Funds) and (vi) upon request by Lender (not more frequently than two (2) times in any calendar year), an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month, and containing a comparison of budgeted income and expenses and the actual income and expenses.

(e)    For the partial year period commencing on the Closing Date, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than thirty (30) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's written approval (each such Annual Budget so approved by Lender, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower in accordance with this Section 4.12, Lender shall advise Borrower of such objections within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise

Borrower of any objections to such revised Annual Budget within seven (7) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget, (1) to the extent that an Approved Annual Budget does not exist for the immediately preceding calendar year, all operating expenses of the Property for the then current calendar year shall be deemed extraordinary expenses of the Property and shall be subject to Lender's prior written approval (not to be unreasonably withheld or delayed) and (2) to the extent that an Approved Annual Budget exists for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that such Approved Annual Budget shall be adjusted to reflect (A) actual increases in Taxes, Insurance Premiums and utilities expenses and (B) up to five percent (5%) increases in any budgeted line items provided such increases do not exceed a five percent (5%) increase in the Approved Annual Budget in the aggregate.

(f)        Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower and Guarantor as may be reasonably requested by Lender any of the aforementioned items in this Section 4.12 on a monthly basis).

(g)        Borrower shall furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease and same is received by Borrower after request therefor).

(h)        If Borrower shall consist of more than one Person, then the annual financial statements required to be delivered hereunder shall be in the form of an annual combined balance sheet of each Borrower (and no other Person), together with the related combined statements of operations, members' capital and cash flows with respect to each Borrower, including a combined balance sheet and a statement of income for the Property on a combined basis.

(i)        Borrower agrees that all financial information delivered to Lender pursuant to this Section 4.12 shall:  (i) be complete and correct in all material respects; (ii) present fairly the financial condition of the applicable Person; (iii) disclose all liabilities that are required to be reflected or reserved against; and (iv) be prepared (A) in the form required by Lender and certified by a Responsible Officer of Borrower (B) in hardcopy and electronic formats and (C) in accordance with the Approved Accounting Method.  Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower in a writing delivered to Lender.  Borrower agrees that all financial information delivered hereunder shall not contain any misrepresentation or omission of a material fact.

MIA 31354953v9

**Section 4.13   Contracts**.   Borrower may enter into any Contract without Lender's consent so long as such Contract (a) contains terms that are commercially reasonable and comparable to existing local market terms for similar contractual agreements with respect to commercial properties similar to the Property as would be available from unaffiliated third parties and (b) does not contain any terms which would have a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Borrower shall be required to obtain Lender's prior written approval of any and all Major Contracts affecting the Property (including any renewals or extensions thereof, or any amendments or modifications thereto), which approval shall not be unreasonably withheld, conditioned or delayed.   Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Contract to which it is a party, and do all things necessary to preserve and keep unimpaired its rights thereunder, (ii) promptly notify Lender of any notice of default given by any party under any Major Contract and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the material terms, covenants and conditions required to be performed and/or observed by the other party to each Contract and to which Borrower is a party in a commercially reasonable manner.

**Section 4.14   Cooperation in Proceedings**.   Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Security Instrument or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**Section 4.15   Estoppel Certificates**.

(a)     After request by Lender, Borrower, within ten (10) Business Days of such request, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the outstanding principal balance of the Note, (ii) the Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment and performance of the Obligations, and (v) any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations created and evidenced hereby and by the Security Instrument or the Property.

(b)     Intentionally omitted.

(c)     Borrower shall use commercially reasonable efforts to deliver to Lender, within twenty (20) Business Days of request, estoppel certificates from each party under any Property Document in form and substance reasonably acceptable to Lender.

(d)     In connection with any Secondary Market Transaction, within ten (10) Business days of Lender's request and at Borrower's expense, subject to Section 9.1(j) hereof, Borrower shall provide an estoppel certificate to any Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

**Section 4.16   Leases and Rents**.

(a)     All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on

59

commercially reasonable terms with unaffiliated, third parties (unless otherwise consented to by Lender), (iii) provide that such Lease is subordinate to the Security Instrument and (iv) not contain any terms which would have a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Borrower shall not, without the prior written approval of Lender (which approval shall not be unreasonably withheld or delayed), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any Major Lease.

(b)    Without limitation of subsection (a) above, Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate 4.16(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)    Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Borrower further agrees to provide Lender with written notice of any commercial Tenant (if any exist at the Property) "going dark" under such Tenant's Lease within five (5) Business Days after Borrower becomes aware of such Tenant "going dark" and Borrower's failure to provide such notice shall constitute an Event of Default.

(d)    Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any commercial Lease or any Major Lease, and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender). The foregoing consent right of Lender (including, without limitation, any reserve requirement) shall not be subject to any "cap" or similar limit on the amount of Reserve Funds held by Lender.

(e)    To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.16 and Lender

thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

**Section 4.17   Notice of Default**.   Borrower shall promptly advise Lender of any material adverse change in Borrower's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**Section 4.18   Other Agreements**.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto.

**Section 4.19   Alterations**.   Notwithstanding anything contained herein (including, without limitation, Article 7 hereof) to the contrary, Lender's prior approval shall be required in connection with any alterations to any Improvements (other than the Business Plan Work) (a) that may have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval, in the case of clauses (a) and (c), may be granted or withheld in Lender's sole discretion, and in the case of clause (b), shall not be unreasonably withheld.  If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (i) cash, (ii) U.S. Obligations, (iii) other security acceptable to Lender (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same).  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, taking into account any Reserve Funds on deposit and available pursuant to the terms and conditions of the Loan Documents to pay such costs.

**Section 4.20   Management Agreement**.

(a)       Borrower shall (i) cause Manager to manage the Property in accordance with the Management Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, estimate, report and each material notice received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any

MIA 31354953v9

sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

(b)      Borrower shall not, without the prior written consent of Lender (which consent may be conditioned, without limitation, on Lender's receipt of evidence that the same would not result in a breach or violation of any Property Document), (i) surrender, terminate, cancel, materially modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement); provided, that, so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may replace Manager with a Qualified Manager pursuant to a Qualified Management Agreement, (ii) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, (iv) permit or suffer any transfer of the ownership, management or Control of an Affiliated Manager to occur, or (v) waive or release any of its rights and remedies under the Management Agreement in any material respect.

(c)      In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall enter into a Qualified Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

(d)      Lender shall have the right to require Borrower to replace Manager with a Qualified Manager chosen by Borrower which is not an Affiliated Manager to manage the Property pursuant to a Qualified Management Agreement upon the occurrence of any one or more of the following events:  (i) at any time following the occurrence of an Event of Default, (ii) if, at any time after the first (1st) anniversary of the Closing Date, the Debt Service Coverage Ratio (Combined) falls below 1.00 to 1.00, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iv) if Manager shall become insolvent or a debtor in any involuntary bankruptcy or insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof, or any voluntary bankruptcy or insolvency proceeding, (v) if at any time Manager has engaged in gross negligence, fraud or willful misconduct, or (vi) if there is an increase or consent to any increase in the amount of any management or other fees under the Management Agreement. Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4.20(d) unless either (i) a monetary Event of Default (including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of this Agreement has occurred.

(e)      Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender.

(f)     If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute an Assignment of Management Agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**Section 4.21   No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**Section 4.22   ERISA**.

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Security Instrument, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

(B)     Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

(C)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)     Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan" (as each of the same is defined in Section 3.15 of this Agreement).

**Section 4.23   Special Purpose Entity**.  Borrower and each SPE Component Entity shall at all times comply with the requirements set forth on <u>Exhibit C</u> attached hereto and shall not

63

take or permit any action that would result in Borrower or any SPE Component Entity not being in compliance with the representations, warranties and covenants set forth in Section 3.24 and Exhibit C attached hereto.

**Section 4.24  Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**Section 4.25  Property Documents**.  Without limiting the other provisions of this Agreement and the other Loan Documents, Borrower shall (a) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Property Documents and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Property Documents of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Property Documents; (d) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Property Documents in a commercially reasonable manner; (e) cause the Property to be operated, in all material respects, in accordance with the Property Documents; and (f) not, without the prior written consent of Lender, (i) enter into any new Property Document or replace or execute modifications to any existing Property Documents or renew or extend the same (exclusive of, in each case, any automatic renewal or extension in accordance with its terms), (ii) surrender, terminate or cancel the Property Documents, (iii) reduce or consent to the reduction of the term of the Property Documents, (iv) increase or consent to the increase of the amount of any charges under the Property Documents, (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Property Documents in any material respect or (vi) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Property Documents.

**Section 4.26  Embargoed Person**.  At all times throughout the term of the Loan, including after giving effect to any transfers of all or any portion of the Property or any direct or indirect equity or beneficial interests in Borrower or any Guarantor that is not a natural person, (a) none of the funds or other assets of Borrower or any Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the Patriot Act and any Executive Orders or regulations promulgated thereunder, each as may be amended from time to time, with the result that the investment in Borrower or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "**Embargoed Person**"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or any Guarantor, as applicable, with the result that the investment in Borrower or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower or any Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower or any

Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**Section 4.27  Patriot Act**.  Borrower shall comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.

**Section 4.28  No Plan Assets; Illegal Activity/Forfeiture**.  Borrower shall take all necessary actions in order to remain in compliance with the representation contained in Sections 3.15 and 3.23 hereof at all times during the term of the Loan, and shall not take any actions that would cause Borrower to violate any of the same.  Borrower covenants and agrees not to commit, permit or suffer to exist any act or omission affording any right of forfeiture described in Section 3.23.

**Section 4.29  Business Plan Work**.

(a)      Borrower shall diligently pursue the Business Plan Work to Completion on or prior to the Completion Date in accordance with the Plans and Specifications and the Business Plan and in compliance with all restrictions, covenants and easements affecting the Property, all applicable Legal Requirements, and all approvals of any Governmental Authority, and with all terms and conditions of the Loan Documents, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith unless bonded and removed as a lien on the Property. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date. If any certificate of occupancy or other approval of any Governmental Authority is temporary in nature, Borrower shall diligently pursue procuring all final approvals from such Governmental Authorities. Borrower shall pay all costs and expenses incurred in connection with the Business Plan Work.

(b)      Borrower acknowledges that (i) Lender may retain a Lender Consultant at the sole expense of Borrower (not to exceed $10,000 after the date hereof, unless an Event of Default has occurred), to act as a consultant and only as a consultant to Lender in connection with the Business Plan Work and will have no duty to Borrower, (ii) the Lender Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or

65

report provided or not provided, by the Lender Consultant with respect thereto, (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Lender Consultant to Lender or any other person or party, and (v) Lender reserves the right to replace the Lender Consultant with another inspecting engineer or other appropriate Person at any time and without prior notice to or approval by Borrower. Lender hereby advises Borrower that it will advise the Lender Consultant retained by it of the restrictions contained in this Section.

(c)     Without in anyway limiting the scope of the Lender Consultant's engagement, the Lender Consultant may perform the following services on behalf of Lender:

(i)     To review and advise Lender or Servicer whether, in the opinion of the Lender Consultant, the Plans and Specifications are satisfactory;

(ii)     To review requests for disbursements from the Business Plan Reserve Account, and any requests for approval of changes to the Business Plan and to the Plans and Specifications; and

(iii)     To make periodic inspections (approximately at the date of each request for disbursements from the Business Plan Reserve Account) for the purpose of assuring that the Business Plan Work performed to date is in accordance with the Plans and Specifications and the Business Plan and to approve Borrower's then current funding request as being consistent with Borrower's obligations under this Agreement, including, among other things, an opinion as to Borrower's continued compliance with the requirement that the Business Plan Reserve Funds will be sufficient to cover all costs of Business Plan Work reasonably anticipated to be incurred.

(d)     The reasonable fees of the Lender Consultant shall be paid by Borrower within ten (10) days after Borrower's receipt of the billing therefor and expenses incurred by Lender shall be reimbursed to Lender within ten (10) days after such receipt or deemed receipt, but neither Lender nor the Lender Consultant shall have any liability to Borrower on account of (i) the services performed by the Lender Consultant, (ii) any neglect or failure on the part of the Lender Consultant to properly perform its services, except for its gross negligence and/or willful misconduct or (iii) any approval by the Lender Consultant of any Business Plan Work. Neither Lender nor the Lender Consultant assumes any obligation to Borrower or any other person concerning the quality of renovation of the Improvements or the absence therefrom of defects.

(e)     Borrower shall promptly correct all defects in the Improvements or any departure from the Plans and Specifications or the Business Plan not approved by Lender to the extent required hereunder. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

**Section 4.30   Construction Costs and Expenses**.  Borrower shall promptly pay when due all costs and expenses of any work (including the Business Plan Work).

MIA 31354953v9

**Section 4.31    Violation Work**.    Borrower shall, on or prior to the Completion Date, (i) cure, remediate and discharge of record all violations of law, pay all fees, costs, fines and penalties, and comply with all other requirements of Governmental Authorities that are set forth on or related to the matters attached hereto as Exhibit K (collectively, the "**Violation Work**") and (ii) provide Lender with satisfactory evidence of Borrower's compliance with clause (i).

**Section 4.32    Parking Work**.    If required by any Governmental Authority in order to comply with any applicable Legal Requirements or as a condition to the issuance of any temporary or permanent certificate of occupancy, Borrower will, at its sole cost and expense, reconfigure the parking at the Property in accordance with the parking plan depicted on Exhibit B hereto (the "**Parking Work**") in order to comply with such Legal Requirements or otherwise cause such compliance in a manner satisfactory to Lender within the time periods required for compliance.

**Section 4.33    Post-Closing Execution of Collateral Assignment of Interest Rate Cap Agreement**.    Notwithstanding anything to the contrary contained herein, Borrower shall deliver, within ten (10) Business Days after the date hereof, a fully executed Collateral Assignment of Interest Rate Cap Agreement, rate cap confirmation and customary legal opinion with respect thereto, each as reasonably satisfactory to Lender.

# ARTICLE 5

# INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

**Section 5.1    Insurance**.

(a)    Unless otherwise agreed to by Lender in its sole and absolute discretion, Borrower, at its sole cost and expense, shall obtain and maintain during the entire term of the Loan, or cause to be maintained, insurance policies for Borrower and the Property providing at least the following coverages:

(i)    property insurance against loss or damage by fire, wind (including named storms), lightning and such other perils as are included in a standard "all risk" or "special form" policy, including riot and civil commotion, vandalism, terrorist acts, malicious mischief, burglary and theft, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) waiving depreciation.    The Full Replacement Cost must be adjusted annually to reflect increased value due to inflation. If this is not provided, Inflation Guard Coverage shall be required; (B) written on a no co-insurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of $25,000.00 (except for deductibles for windstorm and earthquake coverage, which deductibles may be up to five percent (5%) of the total insurable value of the Property); and (D) containing "Ordinance or Law Coverage" if any of the Improvements or the use of the Property shall at any time constitute legal non conforming structures or uses, including coverage for Loss to the

Undamaged Portion, Demolition Costs and Increased Cost of Construction, all in amounts acceptable to Lender. In addition, Borrower shall obtain: (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended plus such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so called "occurrence" form and containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00), with a combined limit per policy year, excluding umbrella coverage, of not less than Two Million and No/100 Dollars ($2,000,000.00) applying "per location" if the policy covers more than one location; (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 11 hereof to the extent the same is available;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above, subsections (iv) (if applicable), subsection (vi), subsection (x) and Section 5.1(h) below; (C) containing an extended period of indemnity endorsement which provides the continued loss of income shall be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Rents from the Property for a period of eighteen (18) months from the date of the Casualty. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Rents from the Property for the succeeding eighteen (18) month period. Subject to Section 5.5(b), all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its Obligations to pay the Debt on the respective dates of payment provided

for in the Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability insurance coverage forms do not otherwise apply, coverage all in form and substance and with limits, terms and conditions acceptable to Lender including (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required in this Section 5.1(a); and (B) the insurance provided for in subsection (i) above written in a so called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsections (i), (iii), (vi), (x) and Section 5.1(h), (3) including permission to occupy the Property, (4) with an agreed amount endorsement waiving co-insurance provisions, (5) including coverage for 100% of the hard costs, and (6) including Soft Costs that are recurring costs as agreed to by Lender in its reasonable discretion.  Borrower shall cause design professionals, if any, including any architects and engineers, to obtain and maintain professional liability insurance during the period commencing on the date of the architect's or engineer's contract and expiring no earlier than the expiration of the applicable statute of repose after completion of services or Substantial Completion.  Such insurance shall have limits commensurate with the risk and acceptable to Lender.  Borrower shall further cause the General Contractor to obtain and maintain commercial general liability coverage, including, without limitation, products and completed operations to the extent available in the market expiring no earlier than the expiration of the applicable statute of repose after completion of services or Substantial Completion.  Such policy maintained by the General Contractor shall name Borrower and Lender as additional insureds by endorsement reasonably satisfactory to Lender and have limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate for the Project.  The General Contractor shall provide umbrella liability over the required policies with limits commensurate with the risk and acceptable to Lender.  The General Contractor shall maintain statutory Workers Compensation, Disability and Employers Liability insurance in force for all workers on the job as well as commercial auto liability for all owned, hired and non-owned vehicles with a combined single limit no less than $1,000,000.  Borrower may use an Owner Controlled Insurance Program (OCIP), also known as a "Wrap Up" policy, to satisfy the Borrower's and General Contractor's requirements herein, including commercial general liability and umbrella liability, workers compensation and auto liability, provided the coverages are in form and substance acceptable to Lender, contain a deductible acceptable to Lender, and otherwise meet the requirements as set forth herein.  Certificates of insurance and endorsements reasonably acceptable to Lender must be provided prior to any work being performed on the Property;

(v)    workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with limits which are required from time to time by Lender in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

MIA 31354953v9

(vi)     boiler and machinery/equipment breakdown insurance in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance Policy required under subsection (i) above (if applicable);

(vii)     umbrella liability insurance in addition to primary coverage in an amount not less than Fifty Million and No/100 Dollars ($50,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) and, if applicable, the Policies required in subsection (v) above and (viii) below;

(viii)     commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, with limits which are required from time to time by Lender (if applicable);

(ix)     if applicable, insurance against employee dishonesty in an amount not less than one month of Gross Rents from the Property and with a deductible not greater than Ten Thousand and No/100 Dollars ($10,000.00) (if applicable); and

(x)     upon sixty (60) days' notice, such other insurance and in such amounts as Lender from time to time may request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)     All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**") and shall be subject to the approval of Lender as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance and, if requested by Lender, other documentation, in each case acceptable to Lender, evidencing the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy shall be subject to Lender's approval and shall provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1(a).  Lender shall have determined based on a review of the schedule of locations and values that the amount of such coverage is sufficient in light of the other risks and properties insured under the blanket policy.

(d)     All Policies of insurance provided for or contemplated by Section 5.1(a) shall name Borrower as a named insured and, in the case of liability coverages (except for the Policies referenced in Sections 5.1(a)(v) and (viii)) shall name Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property insurance coverages, including but not limited to boiler and machinery, terrorism, flood and earthquake insurance, shall contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.  Additionally, if Borrower obtains property insurance coverage in addition to or in excess of that required by

70

Section 5.1(a)(i), then such insurance policies shall also contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All property insurance Policies provided for in Section 5.1(a) shall:

(i)    provide that no act or negligence of Borrower or any other insured under the Policy, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    provide that the Policy shall not be canceled without at least thirty (30) days' written notice to Lender, except ten (10) days' notice for non-payment of Insurance Premiums and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(iii)    not contain any provision that would make Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder, except that Lender is permitted to make payments to effect the contribution of such Policy upon notice of cancellation due to non-payment of Insurance Premiums pursuant to the mortgagee clause required herein.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, or Borrower shall fail to deliver certificates of insurance and, if requested by Lender, other documentation evidencing the Policies, evidence of payment and any other information required by Section 5.1(b), no less than ten (10) days prior to the expiration date of any Policies, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all Insurance Premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate. Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)    In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)    If any of the all risk/special form property, rental loss and/or business interruption, commercial general liability or umbrella liability Policies include any exclusions for loss, cost, damage or liability caused by "terrorism" or "terrorist acts", Borrower shall obtain and

MIA 31354953v9

maintain terrorism coverage to cover such exclusion(s) from a carrier which otherwise satisfies the rating criteria specified in Section 5.1(i) (a "**Qualified Carrier**") or, in the event that such terrorism coverage is not available from a Qualified Carrier, Borrower shall obtain such terrorism coverage from the highest rated insurance company providing such terrorism coverage.

(i)    All Policies required pursuant to Section 5.1(a): (i) shall be issued by companies authorized to do business in the State with a financial strength and claims paying ability rating of "A" or better by S&P; (ii) shall, with respect to the property, rental loss and/or business interruption, commercial general liability and umbrella liability Policies, contain a waiver of subrogation against Lender; (iii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under said Policies; and (iv) shall be satisfactory in form and substance to Lender and shall be approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. Complete copies of the Policies shall be delivered to Lender, at 142 West 57th Street, Suite 1201, New York, New York 10019, Attention:  Micah Goodman, General Counsel, on the date hereof with respect to the current Policies and within thirty (30) days after the effective date thereof with respect to all renewal Policies; provided, however, that if complete copies of the current Policies are not available on the date hereof, Borrower shall deliver to Lender on the date hereof documentation acceptable to Lender evidencing such Policies and shall deliver to Lender complete copies of such Policies within ten (10) days after such Policies are available.  Borrower shall pay the Insurance Premiums annually in advance as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided, however, that Borrower shall not be required to pay such Insurance Premiums nor furnish such evidence of payment to Lender in the event that the amounts required to pay such Insurance Premiums have been deposited into the Insurance Account pursuant to Section 7.2 hereof).  In addition to the insurance coverages described in Section 5.1(a) above, Borrower shall obtain such other insurance as may from time to time be reasonably required by Lender in order to protect its interests.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

**Section 5.2    Casualty**.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property and otherwise comply with the provisions of Section 5.4.  Borrower shall pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may settle and adjust such claim so long as no Event of Default has occurred and is continuing.  Any such adjustment must be carried out by Borrower in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender

shall have the opportunity to participate, at Borrower's cost, in any such adjustment; provided, however, if Borrower fails to settle and adjust such claim within one hundred twenty (120) days after the Casualty, Lender shall have the right to settle and adjust such claim at Borrower's cost and without Borrower's consent. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

Section 5.3    **Condemnation**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property of which Borrower has knowledge and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation. Any such settlement and compromise must be carried out in a commercially reasonable and timely manner. In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.4. Borrower shall pay all costs of Restoration whether or not such costs are covered by the Net Proceeds. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 5.4    **Restoration**. The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, then provided that no Event of Default has occurred and is continuing and the condition in Section 9.6 hereof has been satisfied, subject to Section 5.5 hereof, the Net Proceeds will be disbursed by Lender to Borrower upon receipt. Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of

73

this Agreement. If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held for the benefit of Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

(b)      If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration are equal to or greater than the Restoration Threshold, subject to Section 5.5 hereof, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 5.4(b).

(i)      The Net Proceeds shall be made available for Restoration provided that each of the following conditions are met:

(A)      no Event of Default shall have occurred and be continuing;

(B)      (1) in the event the Net Proceeds are insurance proceeds, less than thirty percent (30%) of each of (i) fair market value of the Property as reasonably determined by Lender, and (ii) rentable area of the Property has been damaged, destroyed or rendered unusable as a result of a Casualty or (2) in the event the Net Proceeds are condemnation proceeds, less than fifteen percent (15%) of each of (i) the fair market value of the Property as reasonably determined by Lender and (ii) rentable area of the Property is taken, such land is located along the perimeter or periphery of the Property, no portion of the Improvements is located on such land and such taking does not materially impair the existing access to the Property;

(C)      Leases demising in the aggregate a percentage amount equal to or greater than seventy-five percent (75%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty or taking, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all Tenants under Major Leases shall continue to operate their respective space at the Property after the completion of the Restoration;

(D)      Borrower shall commence (or shall cause the commencement of) the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after the issuance of a building permit with respect thereto) and shall diligently pursue the same to satisfactory completion in compliance with all applicable Legal Requirements, including, without limitation, all applicable Environmental Laws, and the applicable requirements of the Property Documents;

(E)      Lender shall be satisfied that any operating deficits which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking will be covered out of (1) the Net Proceeds, (2) the

insurance coverage referred to in Section 5.1(a)(iii) above, or (3) by other funds of Borrower;

(F)    Lender shall be satisfied that the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration;

(G)    Lender shall be satisfied that, upon the completion of the Restoration, the fair market value and cash flow of the Property will not be less than the fair market value and cash flow of the Property as the same existed immediately prior to the applicable Casualty or Condemnation;

(H)    Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) twelve (12) months after the occurrence of such fire or other casualty or taking, (3) the earliest date required for such completion under the terms of any Leases and the Property Documents, (4) such time as may be required under applicable Legal Requirements or (5) the expiration of the insurance coverage referred to in Section 5.1(a)(iii) above;

(I)    Borrower and Guarantor shall execute and deliver to Lender a completion guaranty in form and substance satisfactory to Lender and its counsel pursuant to the provisions of which Borrower and Guarantor shall jointly and severally guaranty to Lender the lien-free completion by Borrower of the Restoration in accordance with the provisions of this Subsection 5.4(b);

(J)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements and the Property Documents;

(K)    the Restoration shall be done and completed in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and the Property Documents;

(L)    the Property Documents will remain in full force and effect during and after the Restoration and a Property Document Event shall not occur as a result of the applicable Casualty, Condemnation and/or Restoration; and

(M)    Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements (including, without limitation, satisfaction of the condition in Section 9.6 hereof) and, in that regard, Lender may require Borrower to deliver a REMIC Opinion in connection therewith.

(ii)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 5.4(b), shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.  The Net Proceeds shall be disbursed by Lender to,

75

or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the related Restoration item have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration shall be subject to prior review and acceptance by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower. Borrower shall have the right to settle all claims under the Policies jointly with Lender, provided that (a) no Event of Default exists, (b) Borrower promptly and with commercially reasonable diligence negotiates a settlement of any such claims and (c) the insurer with respect to the Policy under which such claim is brought has not raised any act of the insured as a defense to the payment of such claim. If an Event of Default exists, Lender shall, at its election, have the exclusive right to settle or adjust any claims made under the Policies in the event of a Casualty.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Restoration Retainage. The term "**Restoration Retainage**" as used in this Subsection 5.4(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until such time as the Casualty Consultant certifies to Lender that Net Proceeds representing 50% of the required Restoration have been disbursed. There shall be no Restoration Retainage with respect to costs actually incurred by Borrower for work in place in completing the last 50% of the required Restoration. The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 5.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Restoration Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 5.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage, provided, however, that Lender will

release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of the Security Instrument.  If required by Lender, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.4(b) shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.

(vii)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under this Agreement, the Security Instrument, the Note or any of the other Loan Documents.

(c)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 5.4(b)(vii) shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper.  If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)    Notwithstanding the foregoing or anything to the contrary contained herein, to the extent that Borrower is entitled to a disbursement of Net Proceeds hereunder for any purpose other than Restoration, Borrower hereby authorizes and directs Lender to pay the same to

77

Mezzanine Lender to the extent that Mezzanine Lender is entitled to the same under the terms and conditions of the Mezzanine Loan Documents. Borrower further (i) agrees that Lender shall be entitled to conclusively rely on Mezzanine Lender's assertion that it is entitled to such Net Proceeds and (ii) hereby releases Lender and indemnifies Lender against any Losses that may be incurred by Lender as a result of any Person claiming that Lender improperly remitted such Net Proceeds to Mezzanine Lender.

**Section 5.5    Business Interruption Proceeds**.    Notwithstanding the foregoing provisions of this Article 5 to the contrary:

(a)    Subject to Section 5.5(b), payments received on account of the business interruption insurance specified in Section 5.1(a)(iii) above shall be deposited directly into the Casualty and Condemnation Account. Notwithstanding the last sentence of Section 5.1(a)(iii) above, and provided that no Event of Default shall have occurred and be continuing, proceeds received by Lender on account of business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) above shall be held by Lender and disbursed to Borrower (in installments relating o to the relevant period) to the extent such proceeds (or a portion thereof) reflect a replacement for lost Rents for the relevant period, as determined by Lender in good faith. All other such proceeds not reflecting a replacement for lost Rents shall be held by Lender and disbursed in accordance with Section 5.4 hereof.

(b)    Notwithstanding the foregoing provisions of Section 5.5(a), if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption Insurance Proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining Net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such Net Proceeds are to be applied repay the Loan in accordance with the terms hereof, that such remaining Net Proceeds will be sufficient to pay off the Loan in full.

## ARTICLE 6

## NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS

**Section 6.1    No Sale/Encumbrance**. It shall be an Event of Default hereunder if, without the prior written consent of Lender, a Prohibited Transfer occurs, other than (i) pursuant to Leases in accordance with the provisions of this Agreement and (ii) as expressly permitted pursuant to the terms of this Article 6.

**Section 6.2    Intentionally Omitted**.

**Section 6.3    Permitted Equity Transfers**.

(a)    Notwithstanding Section 6.1 hereof, the following equity transfers shall be permitted without Lender's consent:

78

(i)    the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock Exchange or another nationally recognized stock exchange; provided, that, the foregoing shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or to cause the compliance with) the other covenants set forth herein and in the other Loan Documents (including, without limitation, the covenants contained herein relating to ERISA matters).

(ii)    a transfer (but not a pledge) by devise or descent or by operation of law upon the death or declaration of incompetence of a Restricted Party or any member, partner or shareholder of a Restricted Party, so long as, in any case, each of the following conditions is satisfied:

(A)    no Event of Default has occurred and is continuing, or would occur as a result of such transfer;

(B)    Lender shall receive not less than thirty (30) days prior written notice of such transfers (except in the case of a transfer occurring upon the death or declaration of incompetence of any Person, in which case Lender shall receive written notice thereof not more than thirty (30) days after such transfer);

(C)    no such transfers shall result in a change in Control of Guarantor or Affiliated Manager;

(D)    after giving effect to such transfers, Guarantor shall (1) own at least a 51% direct or indirect equity ownership interest in each of Borrower and any SPE Component Entity; (2) Control Borrower and any SPE Component Entity and (3) control the day-to-day operation of the Property;

(E)    after giving effect to such transfers, the Property shall continue to be managed by Manager or a replacement Manager approved in accordance with the applicable terms and conditions hereof;

(F)    in the case of the transfer of any direct equity ownership interests in Borrower or in any SPE Component Entity, such transfers shall be conditioned upon continued compliance with the relevant provisions of Exhibit C hereof;

(G)    such transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question, (1) remake the representations contained herein relating to ERISA matters (and, upon Lender's request, Borrower shall deliver to Lender an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer) and (2) continue to comply with the covenants contained herein relating to ERISA matters;

(H)    such transfers shall be permitted pursuant to the terms of the Property Documents and the Mezzanine Loan Documents;

79

(I)    if after giving effect to any equity transfer set forth in Section 6.3(a)(ii), ten percent (10%) or more in the aggregate of the direct or indirect ownership interests in Borrower, any SPE Component Entity or any Guarantor that is not a natural person would be owned by a Person (together with its Affiliates) which did not own ten percent (10%) or more of the direct or indirect ownership interests in such Person on the Closing Date or as a result of other equity transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such equity transfer being permitted hereunder, Borrower shall deliver Lender credit searches (in form, scope and substance and from a provider, in each case, reasonably acceptable to Lender) with respect to such equity transfer; and

(J)    if after giving effect to any equity transfer set forth in Section 6.3(a)(ii), forty nine percent (49%) or more in the aggregate of the direct or indirect ownership interests in Borrower, any SPE Component Entity or any Guarantor that is not a natural person would be owned by a Person (together with its Affiliates), other than Guarantor, which did not own forty nine percent (49%) or more of the direct or indirect ownership interests in Borrower, any SPE Component Entity or such Guarantor, as applicable, on the Closing Date or as a result of other equity transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such equity transfer being permitted hereunder, Borrower shall deliver to Lender (1) a Rating Agency Confirmation and (2) if a Non-Consolidation Opinion has previously been delivered in connection with the Loan, a New Non-Consolidation Opinion.

(iii)    any Mezzanine Transfer.

(b)    Upon request from Lender, Borrower shall promptly provide Lender a revised version of the Organizational Chart reflecting any equity transfer consummated in accordance with this Section 6.3.

**Section 6.4    Replacement Guarantor**.  To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 6.4.  Borrower shall be permitted to substitute a replacement guarantor (a "**Substitution**") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied:  (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor; (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty and the Environmental Indemnity for events or conditions occurring prior to, as of and after the Substitution or (ii) executes and delivers to Lender a replacement guaranty and a replacement environmental indemnity in each case in form and

80

substance the same as the Guaranty and the Environmental Indemnity, respectively, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, each remaining Guarantor and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) Borrower delivers to Lender a Rating Agency Confirmation with respect to such Substitution; (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, (i) that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (ii) that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution; and (h) if required by Lender or the Rating Agencies and a Non-Consolidation Opinion has previously been delivered in connection with the Loan, Borrower delivers to Lender a New Non-Consolidation Opinion.  No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.  As used herein, the term "**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

    **Section 6.5    Lender's Rights**.  Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed Prohibited Transfer, (b) payment of a transfer fee of 1% of outstanding principal balance of the Loan and all of Lender's expenses incurred in connection with such Prohibited Transfer, (c) receipt of a Rating Agency Confirmation with respect to the Prohibited Transfer, (d) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Section 4.23, (e) receipt of a New Non-Consolidation Opinion with respect to the Prohibited Transfer (if at such time a Non-Consolidation Opinion has previously been issued to Lender in connection with the Loan) and/or (f) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender.  All expenses incurred by Lender shall be payable by Borrower whether or not Lender consents to the Prohibited Transfer.  Lender shall not be required to

demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent.  This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

**Section 6.6    Economic Sanctions, Anti-Money Laundering**.  Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Sections 3.27, 4.26 and 4.27 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 6 to be complied with at all times.  Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party.

**Section 6.7    Costs and Expenses**.  Borrower shall pay all costs and expenses of Lender in connection with any Transfer, assumption and/or replacement of any Guarantor, including, without limitation, the cost of any Rating Agency Confirmation and all reasonable fees and expenses of Lender's counsel, and the cost of any required counsel opinions, including, without limitation, any New Non-Consolidation Opinion.

# ARTICLE 7

# RESERVE FUNDS

**Section 7.1    Sam Tell Funds**.

(a)    On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Sam Tell Account**") an amount equal to $88,421.17 for amounts required to be paid in connection with the termination of a UCC-1 Financing Statement filed on May 25, 2016 by Sam Tell & Son, Inc. ("**Sam Tell**") against Manager and 96 W Development LLC with the New York Secretary of State as Filing Number 201605250244039 (the "**Sam Tell UCC**").  Amounts deposited pursuant to this Section 7.1 are referred to herein as the "**Sam Tell Funds**".

(b)    Lender shall disburse to Borrower the Sam Tell Funds upon Lender's receipt of evidence satisfactory to Lender that all amounts required to be paid to Sam Tell have been paid, including, without limitation, receipt of a filed UCC-3 Financing Statement Termination authorized by Sam Tell with respect to the Sam Tell UCC.  If Borrower has failed to deliver such evidence to Lender on or prior to March 31, 2018 (provided that such date shall be extended for any period that Borrower is contesting the Sam Tell UCC and any related charges in accordance with the terms of Section 4.8(b) hereof), Lender may, at its option, disburse the Sam Tell Funds to Sam Tell to satisfy and cause the termination of the Sam Tell UCC.

**Section 7.2    Tax and Insurance Funds**.

On the Closing Date, Borrower shall make an initial deposit with Lender with respect to Taxes and Insurance Premiums in an amount reasonably determined by Lender, to be held in

Eligible Accounts by Lender or Servicer and hereinafter respectively referred to as the "**Tax Account**" and the "**Insurance Account**".  In addition, Borrower shall pay (or cause to be paid) to Lender on each Monthly Payment Date (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months assuming that said Taxes are to be paid in full on the Tax Payment Date (the "**Monthly Tax Deposit**"), each of which such deposits shall be held in the Tax Account, and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies on the Insurance Payment Date (the "**Monthly Insurance Deposit**"), each of which such deposits shall be held in the Insurance Account (amounts held in the Tax Account and the Insurance Account are collectively herein referred to as the "**Tax and Insurance Funds**").  If, at any time, Lender determines that amounts on deposit or scheduled to be deposited in (i) the Tax Account will be insufficient to pay all applicable Taxes in full on the Tax Payment Date and/or (ii) the Insurance Account will be insufficient to pay all applicable Insurance Premiums in full on the Insurance Payment Date, Borrower shall make a payment into the applicable Reserve Account in an amount which will be sufficient to make up such insufficiency, as reasonably determined by Lender.  Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority.  Provided there are sufficient amounts in the Tax Account and Insurance Account, respectively, and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Tax and Insurance Funds to the payment of such Taxes and Insurance Premiums.  If the amount of the Tax and Insurance Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4.7 and 5.1 hereof, Lender shall either return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Funds (such election to be made by Lender in its discretion).

    **Section 7.3    FF&E Reserve Funds**.

    (a)    Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**FF&E Reserve Account**") on each Monthly Payment Date, for FF&E costs, an amount equal to 1/12th of (x) 2.0%, commencing with the first Monthly Payment Date following the first anniversary of the Closing Date and (y) 4.0%, following the commencement of the second Extension Period and thereafter, in each case, the greater of (i) gross revenues for the Property in the preceding calendar year or (ii) the projected gross revenues for the Property for the current calendar year according to the most recently submitted Annual Budget (the "**FF&E Reserve Monthly Deposit**").  Amounts deposited pursuant to this Section 7.3 are referred to herein as the "**FF&E Reserve Funds**".  Lender may reassess its estimate of the amount necessary for FF&E costs from time to time, and may require Borrower to increase the monthly deposits required pursuant to this Section 7.3 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

    (b)    Lender shall disburse FF&E Reserve Funds only for costs associated with FF&E reasonably approved by Lender.  Lender shall disburse to Borrower the FF&E Reserve Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests

such payment be made and specifies the FF&E to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are FF&E, (B) stating that all FF&E at the Property to be funded by the requested disbursement have been installed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the FF&E, (C) identifying each Person that supplied materials or labor in connection with the FF&E to be funded by the requested disbursement and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (iv) at Lender's option, in the case of any work, if the disbursement amount exceeds $100,000, Lender shall have received a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances other than Permitted Encumbrances; (v) at Lender's option, in the case of any work, if the disbursement exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the applicable work; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the FF&E at the Property to be funded by the requested disbursement has, as applicable, been completed and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to disburse FF&E Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of FF&E Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

(c)    Nothing in this Section 7.3 shall (i) make Lender responsible for any costs associated with any FF&E; (ii) require Lender to expend funds in addition to the FF&E Reserve Funds to pay for or complete, as applicable, any FF&E; (iii) obligate Lender to proceed with any FF&E work; or (iv) obligate Lender to demand from Borrower additional sums to pay for or complete, as applicable, any FF&E.

(d)    Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of any Tenants under their Leases) to inspect the progress of any FF&E work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such FF&E work.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

**Section 7.4    Intentionally Omitted**.

**Section 7.5    Intentionally Omitted.**

**Section 7.6    Excess Cash Flow Funds**.  On each Monthly Payment Date occurring after the occurrence and during the continuance of an Event of Default, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Lender or Servicer (the "**Excess Cash**

**Flow Account**") an amount equal to the Excess Cash Flow generated by the Property for the immediately preceding Interest Period (the amounts on deposit in the Excess Cash Flow Account being herein referred to as the "**Excess Cash Flow Funds**").  Provided no Event of Default has occurred and is continuing, any Excess Cash Flow Funds remaining in the Excess Cash Flow Account upon the expiration of all Cash Sweep Periods in accordance with the applicable terms and conditions hereof shall be disbursed to Borrower.

      **Section 7.7**    **The Accounts Generally**.

      (a)    Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security for the Debt.  The provisions of this Section 7.7 (together with the other related provisions of the other Loan Documents) are intended to give Lender and/or Servicer "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) Reserve Funds on account of the liabilities, costs, work and other matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

      (b)    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

      (c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security

85

interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)      The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)      Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Accounts, the sums deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)      Borrower and Lender (or Servicer on behalf of Lender) shall maintain each applicable Account as an Eligible Account, except as otherwise expressly agreed to in writing by Lender.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria.  Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding) with respect to any such transfers and the establishment of accounts with a successor institution.

(g)      Interest accrued on any Account other than an Interest Bearing Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.  Funds deposited in the Interest Bearing Accounts shall be invested in Permitted Investments as provided for in Section 7.7(h) hereof.  Interest accrued, if any, on sums on deposit in the Interest Bearing Accounts shall be remitted to and become part of the applicable Account. All such interest that so becomes part of the applicable Account shall be disbursed in accordance with the disbursement procedures contained herein applicable to such Account; provided, however, that Lender may, at its election, retain any such interest for its own account during the occurrence and continuance of an Event of Default.

(h)      Sums on deposit in the Interest Bearing Accounts shall, upon Borrower's written request, be invested in Permitted Investments selected by Lender or Servicer provided (i) such investments are then regularly offered by Lender (or Servicer on behalf of Lender) for accounts

of this size, category and type (Borrower acknowledges that the Servicer or Lender may only offer as an investment opportunity the right to place funds on deposit in the applicable Accounts in an interest bearing account (bearing interest at the money market rate)), (ii) such investments are permitted by applicable federal, State and local rules, regulations and laws, (iii) the maturity date of the Permitted Investment is not later than the date on which sums in the Interest Bearing Accounts are required to be disbursed pursuant to the terms hereof, and (iv) no Event of Default shall have occurred and be continuing.   All income earned from the aforementioned Permitted Investments shall be property of Borrower and Borrower hereby irrevocably authorizes and directs Lender (or Servicer on behalf of Lender) to hold any income earned from the aforementioned Permitted Investments as part of the applicable Interest Bearing Account. Borrower shall be responsible for payment of any federal, State or local income or other tax applicable to income earned from Permitted Investments.   No other investments of the sums on deposit in the Interest Bearing Accounts shall be permitted.   Lender shall not be liable for any loss sustained on the investment of any funds in the Interest Bearing Accounts.

(i)        Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

**Section 7.8        Business Plan Reserve Funds**.

(a)        On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Business Plan Reserve Account**") an amount equal to $1,651,000.00, which deposit shall be derived from capital contributions to Borrower and shall not come from Loan proceeds.   In addition to the foregoing, if Lender determines that the cost of completing the Business Plan Work (taking into account any amounts remaining in the contingency line item of the Business Plan) is likely to exceed the Business Plan Reserve Funds then on deposit, then (1) Borrower shall, within ten (10) Business Days of notice thereof, deposit with or on behalf of Lender into the Business Plan Reserve Account such amount as Lender determines will be necessary to complete such Business Plan Work (the "**Business Plan Reserve Funds Borrower Deposit**") and (2) notwithstanding anything to the contrary contained in Section 7.8(b) hereof, no Business Plan Reserve Funds (other than such funds consisting of the Business Plan Reserve Funds Borrower Deposit) shall be disbursed hereunder until the full amount of the Business Plan Reserve Funds Borrower Deposit has been disbursed pursuant to the terms and conditions of Section 7.8(b) hereof; provided, however, that if Lender determines, subsequent to Borrower making any Business Plan Reserve Funds Borrower Deposit, that the conditions set forth above which necessitated such Business Plan Reserve Funds Borrower Deposit no longer exist (for purposes of which any remaining portion of such Business Plan Reserve Funds Borrower Deposit shall not be counted), then Lender shall promptly disburse any remaining portion of such Business Plan Reserve Funds Borrower Deposit then on deposit in the Business Plan Reserve Funds Account to Borrower.   Amounts deposited pursuant to this Section 7.8 are referred to herein as the "**Business Plan Reserve Funds**".

MIA 31354953v9

(b)      On the Closing Date, Borrower shall deliver invoices to Lender for the cost of furniture in the amount of $174,424.32, and invoices for the construction of the pool at the Property in the amount of $150,000.00.  Lender shall disburse the amount of such invoices directly to the vendors and/or contractor, as applicable, from the Business Plan Reserve Funds from the Business Plan Reserve Account (the "**Business Plan Reserve Funds Initial Disbursement**").  Thereafter, following the satisfaction of the Business Plan Reserve Funds Future Disbursement Conditions and subject to Section 7.8(a) above and the final sentence of this Section 7.8(b), Lender shall disburse to Borrower the Business Plan Reserve Funds to pay the costs of Business Plan Work, pursuant to the terms and conditions of Section 7.3 hereof (as if such Business Plan Reserve Funds were FF&E Reserve Funds).  Lender shall not be required to disburse Business Plan Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Business Plan Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).  Notwithstanding the foregoing, (A) Lender shall not be obligated to make disbursements of Business Plan Reserve Funds to reimburse Borrower to the extent (1) there are amounts available to pay the relevant costs on deposit in the FF&E Reserve Account, (2) any requested disbursement does not, in Lender's reasonable determination, adhere to the Business Plan (including, without limitation, by virtue of the purpose or amount of such disbursement, or because the costs to be paid with the proceeds of such disbursement have been the subject of a previous disbursement of any Reserve Funds), (B) any disbursement of Business Plan Reserve Funds allocable to the contingency line item of the Business Plan shall be subject to Lender's reasonable discretion, and (C) each disbursement of Business Plan Reserve Funds to pay for Business Plan Work shall be subject to a retainage equal to the greater of (x) the actual retention required by the applicable contract and (y) (1) at such time as fifty percent (50%) or less of the contract in question is complete, ten percent (10%) retention or (2) at such time as more than fifty percent (50%) of the contract in question is complete, five percent (5%), which retainage shall only be disbursed by Lender (subject to the other terms and conditions of this Section 7.8) upon Lender's receipt of evidence in form and substance reasonably satisfactory to Lender that each applicable vendor has completed all work, or delivered all materials, being performed and/or delivered, as applicable, by such vendor with respect to the Property.

(c)      Nothing in this Section 7.8 shall (i) make Lender responsible for performing or completing any Business Plan Work; (ii) require Lender to expend funds in addition to the Business Plan Reserve Funds to complete any Business Plan Work; (iii) obligate Lender to proceed with any Business Plan Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any Business Plan Work.

(d)      Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Business Plan Work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Business Plan Work. Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

(e)    In addition to any insurance required under the Loan Documents, Borrower shall cause to be provided workmen's compensation insurance, builder's risk, public liability insurance and other insurance to the extent required under applicable law in connection with Business Plan Work.  All such policies shall be in form and amount satisfactory to Lender.

(f)    For purposes of clarity it is agreed that Borrower shall pay for all costs and expenses of Lender, any Lender Consultant and/or Servicer incurred in connection with any disbursements under this Section 7.8.

(g)    Upon the written request of Borrower following (i) Completion of all Business Plan Work in accordance with the terms of this Agreement, and (ii) Lender's receipt of a permanent certificate of occupancy covering all of the Improvements, any remaining Business Plan Reserve Funds on deposit in the Business Plan Reserve Account shall be (x) provided no Cash Sweep Period exists, disbursed to Borrower or (y) if a Cash Sweep Period exists, deposited into the Interest Reserve Account and held in accordance with the terms and conditions of Section 7.9 hereof.

Section 7.9    **Interest Reserve Funds**.  On the Closing Date, Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Interest Reserve Account**") the sum of $2,400,000.00, to be held as additional security for the Debt and all of the other Obligations.  Amounts deposited pursuant to this Section 7.9 are referred to herein as the "**Interest Reserve Funds**".  Until such time as the Required DSCR is first achieved, if at any time during the term of the Loan Lender determines that the remaining balance in the Interest Reserve Account is insufficient to pay Debt Service projected to be due and payable during the next ensuing two (2) month period (which Debt Service shall be calculated based on the Applicable Interest Rate) (the "**Interest Reserve Deficiency**"), Lender shall notify Borrower of such determination and Borrower shall, upon fifteen (15) days' notice, deposit an amount equal to the Interest Reserve Deficiency (the "**Interest Reserve Deficiency Amount**").  Provided no Event of Default has occurred and is continuing, on each Monthly Payment Date on which a shortfall exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account due on such Monthly Payment Date (as demonstrated to Lender's reasonable satisfaction including, without limitation, by virtue of an Officer's Certificate detailing the applicable shortfall and the amount(s) to be paid by the disbursement of Interest Reserve Funds and a Cash Application Statement covering the applicable period), Lender shall disburse an amount of available Interest Reserve Funds, up to the amount of such shortfall, in payment of such amount(s).  Provided no Event of Default exists, all funds on deposit in the Interest Reserve Account shall be disbursed to Borrower once the Debt Service Coverage Ratio (Combined) is equal to or greater than 1.25 to 1.00 for six (6) consecutive months ("**Required DSCR**").

# ARTICLE 8

# CASH MANAGEMENT

**Section 8.1    Distribution of Cash Flow**.

(a)    Borrower shall cause all Rents and other revenue derived from the Property and received by Borrower or Manager, as the case may be, to be applied on a monthly basis for the following purposes and in the following order of priority:

(i)    First, funds sufficient to pay the Monthly Tax Deposit due for the then applicable Monthly Payment Date, if any;

(ii)    Then, funds sufficient to pay the Monthly Insurance Deposit due for the then applicable Monthly Payment Date, if any;

(iii)    Then, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any;

(iv)    Then, funds sufficient to pay Debt Service due for then applicable Monthly Payment Date;

(v)    Then, funds to pay the FF&E Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any;

(vi)    Then, funds sufficient to pay any other amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents, if any;

(vii)    Then, funds sufficient to pay Approved Operating Expenses and Approved Extraordinary Expenses incurred by Borrower for the then applicable period;

(viii)    Then, unless an Event of Default exists, funds sufficient to pay the amount of the Mezzanine Loan Monthly Debt Service that is then due; and

(ix)    Lastly, all amounts remaining after the payment of items (i) through (viii) above (the "**Excess Cash Flow**") shall be (x) unless Event of Default exists, held and applied strictly in the manner set forth in Section 8.2 below and (y) if an Event of Default exists, deposited into the Excess Cash Flow Account.

(b)    In the event that available revenue derived from the Property and received by Borrower shall not be sufficient to enable Borrower to make any of the payments described in subparagraphs (i) through (vii) above (such amount being referred to herein as the "**Operating Deficiency**"), Borrower shall not be relieved of its obligations to make such payments.

**Section 8.2    Excess Operating Cash Flow Funds**.  All Excess Cash Flow shall be held in trust by Borrower for the benefit of Lender as additional collateral for the Loan. Amounts held by Borrower pursuant to this Section 8.2 are referred to herein as the "**Excess Operating Cash Flow Funds**".  Provided no Cash Sweep Period exists, Excess Operating Cash Flow Funds

90

may be used, enjoyed and distributed by Borrower. Upon the occurrence of an Event of Default, Borrower shall immediately deposit all Excess Operating Cash Flow Funds into the Excess Cash Flow Account.

**Section 8.3    Intentionally Omitted.**

**Section 8.4    Cash Application Statement**.  Until the Loan is paid in full, Borrower shall deliver to Lender monthly operating statements for the Property certified by an authorized representative of Borrower within twenty (20) days after the end of each month, which operating statements (each, a "**Cash Application Statement**") show in detail the net operating income, the amounts and sources of Rents and other revenue received by or on behalf of Borrower and the amounts and purposes of Approved Operating Expenses and Approved Extraordinary Expenses paid by or on behalf of Borrower with respect to the Property for the previous month and year-to-date (including, in each case, a comparison to the Approved Annual Budget), or the portion thereof, paid out of Rents or other revenue for such calendar month or year-to-date, as applicable; amounts funded into any reserves hereunder; amounts paid to Manager, if any; shortfalls that exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account; any Operating Deficiency; and the amount of any distributions made during such month (and year-to-date) pursuant to Section 8.1(a) above or from Excess Operating Cash Flow Funds, together with a certification of Borrower that Borrower has not made any distributions in violation of the terms of Section 8.1(a); such statements also to include delinquency reports, tenant and expenses payable and receivable reports, and occupancy statistics.  Each such monthly statement shall provide for comparisons with the same calendar month in the immediately preceding calendar year, including year-to-date information, to the extent Borrower is in possession of such information for the applicable month and/or year-to-date for the preceding calendar year.

**Section 8.5    Establishment of Certain Accounts**.

(a)    Borrower shall, upon the occurrence of an Event of Default, establish an Eligible Account (the "**Clearing Account**") pursuant to the Clearing Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property.  Pursuant to the Clearing Account Agreement, funds on deposit in the Clearing Account shall be transferred on each Business Day to the Cash Management Account.

(b)    Upon the occurrence of an Event of Default, Lender, on Borrower's behalf, shall establish an Eligible Account with Lender or Servicer, as applicable, in the name of Borrower for the sole and exclusive benefit of Lender (the "**Cash Management Account**").  All sums in the Cash Management Account shall be held as additional collateral for the Loan and shall be applied in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.6    Deposits into and Maintenance of Clearing Account**.

(a)    Borrower represents, warrants and covenants that, upon the occurrence of an Event of Default and thereafter for so long as the Debt remains outstanding, (i) Borrower shall,

91

or shall cause Manager to, immediately deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Clearing Account; (ii) Borrower shall instruct Manager to immediately deposit (A) all revenue derived from the Property collected by Manager, if any, pursuant to the Management Agreement (or otherwise) into the Clearing Account and (B) all funds otherwise payable to Borrower by Manager pursuant to the Management Agreement (or otherwise in connection with the Property) into the Clearing Account; (iii) Borrower shall send (1) a notice, in a form approved by Lender, to all Tenants now occupying space at the Property directing them to pay all rent and other sums due under the Lease to which they are a party into the Clearing Account (such notice, the "**Tenant Direction Notice**") and (2) a notice, in a form approved by Lender, to all credit card companies and credit card clearing banks with which Borrower or Manager has entered into agreements with respect to the Property directing them to pay all receipts payable with respect to the Property into the Clearing Account (such notice, the "**Credit Card Direction Notice**"), (B) (1) simultaneously with the execution of any Lease entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish each Tenant under each such Lease the Tenant Direction Notice and (2) simultaneously with the execution of any credit card company agreement, credit card bank agreement or similar agreement entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish the counterparty thereunder the Credit Card Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices and Credit Card Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property. From and after the occurrence of an Event of Default, until deposited into the Clearing Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower. Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.6 without Lender's prior written consent.

(b)     From and after the occurrence of an Event of Default, Borrower shall maintain the Clearing Account for the term of the Loan, which Clearing Account shall be under the sole dominion and control of Lender (subject to the terms hereof and of the Clearing Account Agreement). The Clearing Account shall have a title evidencing the foregoing in a manner reasonably acceptable to Lender. Borrower hereby grants to Lender a first-priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account. Borrower hereby authorizes Lender to file UCC Financing Statements and continuations thereof to perfect Lender's security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof. All costs and expenses for establishing and maintaining the Clearing Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt. Borrower shall pay all sums due under and otherwise comply with the Clearing Account Agreement. Borrower shall not alter or modify either the Clearing Account or the Clearing Account Agreement, in each case without the

prior written consent of Lender. The Clearing Account Agreement shall provide (and Borrower shall provide) Lender online access to bank and other financial statements relating to the Clearing Account (including, without limitation, a listing of the receipts being collected therein). In connection with any Secondary Market Transaction, Lender shall have the right to cause the Clearing Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Clearing Account. Lender shall provide Borrower with prompt written notice of any such renaming of the Clearing Account. Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. The Clearing Account (i) shall be an Eligible Account and (ii) shall not be commingled with other monies held by Borrower or Bank. Upon (A) Bank ceasing to be an Eligible Institution, (B) the Clearing Account ceasing to be an Eligible Account, (C) any resignation by Bank or termination of the Clearing Account Agreement by Bank or Lender and/or (D) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's request, (1) terminate the existing Clearing Account Agreement, (2) appoint a new Bank (which such Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (3) cause such Bank to open a new Clearing Account (which such account shall be an Eligible Account) and enter into a new Clearing Account Agreement with Lender on substantially the same terms and conditions as the previous Clearing Account Agreement and (4) send any new Credit Card Direction Notices, Tenant Direction Notices and other notices required pursuant to the terms hereof relating to such new Clearing Account Agreement and Clearing Account. Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section 8.6 in the name of Borrower in the event Borrower fails to do the same, provided that Lender will not exercise its rights herein granted unless an Event of Default exists. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(c)      Subject to the terms and conditions of the Clearing Account Agreement, all funds on deposit in the Clearing Account shall be transferred into the Cash Management Account.

**Section 8.7    Events of Default**.  Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (i) Borrower shall have no right to apply revenue derived from the Property for any purpose without Lender's prior written approval and (ii) Lender shall have all of the remedies available to it pursuant to this Agreement and pursuant to applicable law, including, without limitation, the institution of all of Lender's controls respecting deposits into and distributions from the Clearing Account and/or the Cash Management Account as more particularly set forth herein and in the Cash Management Agreement, and the exercise by Lender of the remedies specified in Article 8 and Article 10 hereof. Without limitation to the foregoing, upon the occurrence of an Event of Default, Lender shall have the continuing exclusive control of, right to withdraw and apply, the funds in the Clearing Account or the Cash Management Account to payment of any and all debts, liabilities and obligations of Borrower to Lender pursuant to or in connection with this Agreement, the Note, the Cash Management Agreement, the Clearing Account Agreement, the

Security Instrument and the other Loan Documents in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.8    Borrower Distributions; Acknowledgement**.    Any transfer of Borrower's funds to or for the benefit of the Mezzanine Lender or the Mezzanine Borrower pursuant to this Agreement or any of the other Loan Documents, is intended by the parties to constitute, and shall constitute, a distribution from the Borrower to the Mezzanine Borrower and shall be treated as such on the books and records of each party.    No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and the Mezzanine Lender.

## ARTICLE 9

## SECONDARY MARKET

**Section 9.1    Securitization**.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.    The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".    Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".    At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender in connection with any Secondary Market Transaction, Borrower shall assist Lender (at Borrower's sole cost and expense) in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the NRSROs in connection with such Secondary Market Transactions, including, without limitation, to:

(i)    provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, any SPE Component Entity and Manager including, without limitation, the information set forth on Exhibit E attached hereto, (B) updated budgets relating to the Property, (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

(ii)    provide new and/or updated opinions of counsel, which may be relied upon by Lender, the NRSROs and their respective counsel, agents and representatives, as may be customary in Secondary Market Transactions or required by the Rating Agencies, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)    provide updated (as of the closing date of the applicable Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require;

(iv)    execute such amendments to the Loan Documents, the Property Documents and Borrower's or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies to effect any Secondary Market Transaction, including, without limitation, (A) to amend and/or supplement the independent director provisions provided on Exhibit C attached hereto, in each case, in accordance with the applicable requirements of the Rating Agencies, (B) bifurcating the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) (any of the foregoing, a "**Loan Bifurcation**") and (C) to modify all operative dates (including but not limited to payment dates, interest period start dates and end dates, etc.) under the Loan Documents, by up to ten (10) days; provided, however, that Borrower shall not be required to so modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity (except as provided in subclause (C) above) or the amortization of principal set forth herein, except in connection with a Loan Bifurcation which may result in varying interest rates and, as applicable, amortization schedules, but which shall have the same initial weighted average coupon of the original Note; and

(v)    review any Disclosure Document or any interim draft thereof furnished by Lender to Borrower with respect to information contained therein that was furnished to Lender by or on behalf of Borrower specifically in connection with the preparation of such Disclosure Document and provide to Lender any revisions to such Disclosure Document or interim draft thereof necessary to insure that such reviewed information does not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements contained therein not misleading.

(c)    If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following information:

(i)    if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, net operating income for the Property

and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)    if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)    If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "**Exchange Act Filing**") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)    If requested by Lender, Borrower shall furnish to Lender financial data and/or financial statements for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of Affiliated tenants, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor.

(f)    The financial data and statements provided by Borrower under this Section 9.1 shall be furnished to Lender (A) with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender, and (B) with respect to ongoing information required under Section 9.1(d)

and (e) above, not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each fiscal year of Borrower.

(g)    All financial data and statements provided by Borrower under Sections 9.1(c), (d), (e) and (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation AB and other applicable legal requirements.  All financial statements referred to in such Sections shall be audited by independent accountants of Borrower acceptable to Lender (it being acknowledged and agreed that Berdon LLP is acceptable to Lender) in accordance with Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided.  All financial data and statements (audited or unaudited) provided by Borrower under this Section shall be accompanied by an Officer's Certificate, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this subsection (g).

(h)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by Lender.

(i)    In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or other legal requirements are other than as provided herein, then notwithstanding the provisions of this Section, Lender may request, and Borrower shall promptly provide, such other financial data and financial statements as Lender determines to be necessary or appropriate for such compliance.

(j)    All costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with this Section 9.1 (including, without limitation, the fees and expenses of the Rating Agencies) shall be paid by Borrower; provided that such costs and expenses shall not exceed $10,000 (and Lender shall reimburse Borrower for all reasonable third party costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with Borrower's compliance with this Section 9.1 (including, without limitation, the fees and expenses of the Rating Agencies) in excess of $10,000).

### Section 9.2    Disclosure and Indemnification.

(a)    Borrower (on its own behalf and on behalf of each other Borrower Party) understands that information provided to Lender by Borrower, any other Borrower Party and/or

their respective agents, counsel and representatives may be (i) included in (A) the Disclosure Documents and (B) filings under the Securities Act and/or the Exchange Act and (ii) made available to Investors, the NRSROs, investment banking firms, accounting firms, law firms and other third-party advisory and service providers, in each case, in connection with any Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)     Borrower agrees to indemnify Lender, the Lender Group and the Underwriter Group against any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender, the Lender Group or the Underwriter Group may become subject in connection with (x) any Disclosure Document and/or any Covered Rating Agency Information, in each case, insofar as such Liabilities arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or arise out of or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading and (y) after a Securitization, any indemnity obligations incurred by Lender or Servicer in connection with any Rating Agency Confirmation.

(c)     If requested by Lender, Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager, Guarantor and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender, the Lender Group and the Underwriter Group for any Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lender Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property.  The indemnification provided for in clauses (B) and (C) above shall be effective whether or not the indemnification agreement described above is provided.  The aforesaid indemnity will be in addition to any liability which Borrower may otherwise have.

(d)      In connection with filings under Exchange Act and/or the Securities Act, Borrower shall (i) indemnify Lender, the Lender Group and the Underwriter Group for Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Lender Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(e)      Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof (but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party).  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.   After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnifying party shall pay for any legal or other expenses subsequently incurred by such indemnifying party in connection with the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.

(f)      The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt. Failure by Borrower and/or any Borrower Party to comply with the provisions of Section 9.1 and/or Section 9.2 within the timeframes specified therein and/or as otherwise required by Lender shall, at Lender's option, constitute a breach of the terms thereof and/or an Event of Default.  Borrower (on its own behalf and on behalf of each Borrower Party) hereby expressly authorizes and appoints Lender its attorney-in-fact to take any actions required of any Borrower Party under Sections 9.1, 9.2 and/or 9.5 in the event any Borrower Party fails to do the same, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Notwithstanding anything to the contrary contained herein, (i) except as otherwise expressly provided to the contrary in this Article 9, each Borrower Party shall bear its own cost of compliance with this Article (including, without limitation, the costs of any ongoing financial reporting or similar provisions contained herein) and (ii) to the extent that the timeframes for compliance with such ongoing financial reporting and similar provisions are shorter than the

99

timeframes allowed for comparable reporting obligations under Section 4.12 hereof (if any), the timeframes under this Article 9 shall control.

**Section 9.3    Reserves/Escrows**.  In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement and the other Loan Documents shall be deposited in "eligible accounts" at "eligible institutions" and, to the extent applicable, invested in "permitted investments" as then defined and required by the Rating Agencies.

**Section 9.4    Servicer**.

(a)     At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, designees or nominees, collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under the Loan Documents to the Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for set-up fees of $1,500.00 and Borrower shall not be responsible for payment of scheduled monthly servicing fees due to Servicer under the Servicing Agreement.  In addition, Borrower shall pay (i) any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or any Guarantor, any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement and (ii) the costs of all property inspections and/or appraisals of the Property (or any updates to any existing inspection or appraisal) that a Servicer may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement); provided, however, that Borrower shall not be responsible for payment of any fees or expenses required to be borne by, and not reimbursable to, Servicer.  Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto pursuant to the terms of the Loan Documents.

(b)     Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and any Guarantor under the Loan Documents.

(c)     Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or any Guarantor deliver to Lender pursuant to the Loan Documents.  No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 9.4(c).

**Section 9.5    Intentionally Omitted.**

**Section 9.6    REMIC Savings Clause**.    Notwithstanding anything herein to the contrary, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the real property relating to the Property, the ratio of the unpaid principal balance of the Loan to the value of the remaining real property relating to the Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust and it being agreed and acknowledged that such loan-to-value determination shall be based on the value of only real property and shall exclude any personal property or going-concern value, if any), the principal balance of the Loan must be paid down by Borrower by an amount sufficient to satisfy REMIC Requirements, unless the Lender receives an opinion of counsel acceptable to Lender that the Loan will not fail to maintain its status as a "qualified mortgage" within the meaning of Section 860G(a)(3)(A) of the IRS Code as a result of the related release of lien.

**Section 9.7    Syndication; Registered Form**.

(a)    Borrower acknowledges that Lender and any Co-Lender may, at their option and without the consent of Borrower, sell with novation all or any part of their right, title and interest in and to the Loan (the "**Syndication**") to one or more additional lenders (each a "**Co-Lender**"). In connection therewith, Borrower will take all actions as Lender and any such Co-Lender may request to assist Lender and /or such Co-Lender in consummating any such Syndication including, without limitation: (i) facilitating the review of the Loan and the Property by any prospective Co-Lender; (ii) assisting and cooperating with Lender in the preparation of information offering materials in connection with any such Syndication (which assistance may include reviewing and commenting on drafts of such materials and drafting portions thereof); (iii) delivering updated financial information, operating statements and other information with respect to Borrower and the Property (including, without limitation, appraisals); (iv) making representatives of Borrower available at reasonable times and upon reasonable notice to meet with prospective Co-Lenders (for tours of the Property or otherwise); (v) facilitating direct contact between the senior management and advisors of Borrower and any prospective Co-Lender; (vi) providing Lender with all information reasonably deemed necessary by Lender to complete any such Syndication; and (vii) executing such modifications to the Loan Documents as may be required by Lender or any Co- Lender in connection with any such Syndication (provided that such modifications will not, change in the aggregate any economic terms or other material terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower from those contemplated in the Loan Documents. The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan.    Borrower acknowledges and agrees, with respect to any co-lending agreement (or similar agreement) among the Co-Lenders, that (A) any such agreement shall be solely for the benefit of the Co-Lenders, and that Borrower shall not be a third-party beneficiary (intended or otherwise) of any of the provisions therein, shall not have any rights thereunder, and shall not be entitled to rely on any of the provisions contained therein, (B) Borrower's obligations under the Loan Documents are and will be independent of any such agreement and shall remain unmodified by the terms and provisions thereof, (C) any such agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the

Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision, and (D) the Co-Lenders shall have no obligation to disclose to Borrower the contents of any such agreement.  All costs incurred in connection with any Syndication shall be paid by Borrower.

(b)      At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, a register (the "**Register**") for the recordation of the names and addresses of Lender and any other lender or Co-Lender, and the principal amounts (and stated interest) under the Loan Documents owing to Lender and each other lender or Co-Lender pursuant to the terms of the Loan Documents from time to time, in a manner that shall cause the Loan to be considered to be in registered form for purposes of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRS Code.  The entries in the Register shall be conclusive absent manifest error, and Borrower, Lender and other lenders and Co-Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower, Lender and any other lender of Co-Lender, at any reasonable time and from time to time upon reasonable prior notice.  Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents.  If the Registrar has not been appointed to maintain the Register, the transfer of the Note may be effected only by surrender of the Note and the reissuance by Borrower of the Note to the transferee.

(c)      All costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with this Section 9.7 (including, without limitation, the fees and expenses of the Rating Agencies) shall be paid by Borrower; provided that such costs and expenses shall not exceed $10,000 (and Lender shall reimburse Borrower for all reasonable third party costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with Borrower's compliance with this Section 9.7 (including, without limitation, the fees and expenses of the Rating Agencies) in excess of $10,000).

# ARTICLE 10

# EVENTS OF DEFAULT; REMEDIES

### Section 10.1   Event of Default.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)      if (i) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (ii) any deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid when due or (iii) any other portion of the Debt is not paid

when due and (in the case of this clause (iii)) such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(b)        if any of the Taxes or Other Charges are not paid prior to delinquency, except to the extent (i) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender failed to pay the Taxes or Other Charges in question when required hereunder, (ii) Lender's access to such sums was not restricted or constrained in any manner and (iii) no Event of Default was continuing;

(c)        if (i) the Policies are not kept in full force and effect, except to the extent (A) the failure to maintain such Policies resulted solely from failure to pay the applicable Insurance Premiums therefor, (B) sums sufficient to pay such Insurance Premiums had been reserved hereunder prior to the applicable due date for the express purpose of paying such Insurance Premiums and Lender failed to pay the same when required hereunder, (C) Lender's access to such sums was not restricted or constrained in any manner and (D) no Event of Default was continuing, or (ii) evidence of the Policies being in full force and effect is not delivered to Lender as and when required in Section 5.1 hereof and either (A) such failure continues for two (2) Business Days following written notice thereof to Borrower or (B) such failure continues beyond the date that is two (2) Business Days prior to the scheduled expiration date of such Policies;

(d)        if (i) any of the representations or covenants contained in Sections 3.24 or 4.23 hereof are breached or violated (provided, however, that, with respect to breaches or violations of any such covenants, as distinguished from representations or warranties, under the Loan Documents, such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation was inadvertent, non-recurring and immaterial and (B) within twenty (20) days of the earlier to occur of notice from Lender or Borrower's knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation, (y) provides Lender with written evidence of such cure and (z) if requested by Lender, delivers to Lender a New Non-Consolidation Opinion relating to such breach or violation), or (ii) any of the representations or covenants contained in Sections 3.32, 4.25 or Article 6 hereof or in the Property Document Provisions are breached or violated;

(e)        if any representation or warranty made herein, in the Guaranty or in the Environmental Indemnity or in any other guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made;

(f)        if (i) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against

103

Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; (iii) there shall be commenced against Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (iv) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; (v) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vi) any of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Guarantor or its subsidiaries; or (vii) a Bankruptcy Event occurs;

(g)     if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(h)     if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days;

(i)     if any federal tax lien is filed against Borrower, any SPE Component Entity, Guarantor or the Property and same is not discharged of record (by payment, bonding or otherwise) within forty-five (45) days after same is filed;

(j)     if Borrower shall fail to deliver to Lender any financial reporting item required by this Agreement (including without limitation any of the items required by Section 4.12 hereof), on the date the same is due, and such failure continues for ten (10) Business Days after written notice thereof from Lender;

(k)     if Borrower shall fail to comply with any of its obligations under Section 4.15 hereof and such failure continues for ten (10) days after written notice thereof from Lender;

(l)     if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable grace periods, if any;

MIA 31354953v9

(m)    if any of the assumptions contained in any Non-Consolidation Opinion, or in any New Non-Consolidation Opinion (including, without limitation, in any schedules thereto and/or certificates delivered in connection therewith) are untrue or shall become untrue in any material respect;

(n)    if Borrower defaults under the Management Agreement beyond the expiration of applicable notice and grace periods, if any, thereunder or if the Management Agreement is canceled, terminated or surrendered, expires pursuant to its terms or otherwise ceased to be in full force and effect, unless, in each such case, Borrower, contemporaneously with such cancellation, termination, surrender, expiration or cessation, enters into a Qualified Management Agreement with a Qualified Manager in accordance with the applicable terms and provisions hereof;

(o)    if Borrower fails to appoint a replacement Manager upon the request of Lender and/or fails to comply with any limitations on instructing the Manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement, the Assignment of Management Agreement and the Security Instrument;

(p)    if any representation and/or covenant herein relating to ERISA matters is breached;

(q)    if (i) any Interest Rate Cap Agreement is terminated for any reason by Borrower or Counterparty or (ii) Borrower shall fail to observe, perform or discharge any of Borrower's obligations, covenants, conditions or agreements under the Interest Rate Cap Agreement and otherwise comply with the covenants set forth in Section 2.8 hereof;

(r)    intentionally omitted;

(s)    if the Operating Condition is not satisfied on or prior to the Completion Date;

(t)    if (A) Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder, (B) Borrower defaults under the Property Documents beyond the expiration of applicable notice and grace periods, if any, thereunder, (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms, unless in such case Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof or (E) a Property Document Event occurs;

(u)    with respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through (t) above or not otherwise expressly specified as an Event of Default in this Agreement, if the same is not cured (i) within fifteen (15) days after notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after notice from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have

105

commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or

(v)    if any default shall exist under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2    Remedies**.

(a)    Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Security Instrument, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Security Instrument, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity. Upon any Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity, the Debt and all other obligations of Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Security Instrument, the Note and the other Loan Documents to the contrary notwithstanding.

(b)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Security Instrument, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Security Instrument, the Note or the other Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Security Instrument, the Note or the other Loan Documents.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to

106

Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

(c)        Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered. Notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by the Note and secured by the Security Instrument has been split or severed into multiple notes or components after the date hereof, Lender will not partially foreclose the Security Instrument with respect to any single indebtedness evidenced by any individual note or component separate and apart from the entire indebtedness secured by this Security Instrument (for the avoidance of doubt, except as expressly set forth in this clause, in no event shall the foregoing be construed to limit Lender's rights and remedies under  applicable law to conduct one or more sales or to institute proceedings in order to realize on any collateral for the Loan).

(d)        Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until ten (10) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(e)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Property or any other collateral for the Loan and/or

paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(f)      Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary.   Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.   All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.   All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

## ARTICLE 11

## INDEMNIFICATIONS

**Section 11.1   General Indemnification**.   Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease, management agreement or any Property Document; (f) the payment of any commission, charge or brokerage fee to anyone (other than a broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the Security Instrument; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts.   Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

**Section 11.2   Mortgage and Intangible Tax Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents.

**Section 11.3   ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.15 or 4.22 of this Agreement.

**Section 11.4   Duty to Defend, Legal Fees and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**Section 11.5   Survival**.  The obligations and liabilities of Borrower under this Article 11 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

## ARTICLE 12

## EXCULPATION

**Section 12.1   Exculpation**.

(a)      Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or Affiliate of Borrower or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other

109

Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.  The provisions of this Section shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (3) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan (including, without limitation, indemnities set forth in Article 11 hereof, Section 9.2 hereof, in the Guaranty and in the Environmental Indemnity) or any of the rights and remedies of Lender thereunder; (4) impair the right of Lender to obtain the appointment of a receiver or to enforce its rights and remedies provided in Articles 7 and 8 hereof; (5) impair the enforcement of any assignment of leases contained in the Security Instrument; (6) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (7) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Loss incurred by Lender (including attorneys' fees and expenses reasonably incurred) arising out of or in connection with the following:

(i)    fraud or material misrepresentation by any Borrower Party in connection with the Loan;

(ii)    the gross negligence or willful misconduct of any Borrower Party;

(iii)    any litigation or other legal proceeding related to the Debt filed by any Borrower Party or any other action of any Borrower Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents that is found by a court of competent jurisdiction to be frivolous, brought in bad faith, wholly without merit or wholly without basis in fact or law;

(iv)    physical waste to the Property caused by the intentional acts or intentional omissions of any Borrower Party and/or the removal or disposal of any portion of the Property after an Event of Default;

(v)    the misapplication, misappropriation or conversion by any Borrower Party of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property (or any portion thereof), (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, (C) any Rents, (D) any Tenant security deposits or Rents collected in advance, or (E) any other monetary

MIA 31354953v9

collateral for the Loan (including, without limitation, any Reserve Funds and/or any portion thereof disbursed to (or at the direction of) Borrower);

(vi)    failure to pay Taxes, charges for labor or materials or other charges that can create liens on any portion of the Property (except, in the case of Taxes, to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Taxes have been deposited with Lender hereunder in the Tax Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents);

(vii)    failure to pay Insurance Premiums (except to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Insurance Premiums have been deposited with Lender hereunder in the Insurance Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents), to maintain the Policies in full force and effect and/or to provide Lender evidence of the same, in each case, as expressly provided herein;

(viii)    any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(ix)    any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents or any transfer or similar taxes (whether due upon the making of the same or upon Lender's exercise of its remedies under the Loan Documents), but excluding any income, franchise or other similar taxes;

(x)    any forfeiture or seizure of the Property (or any portion thereof and/or interest therein) resulting from a violation or breach of any applicable law;

(xi)    any violation or breach of any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto;

(xii)    any violation or breach of any exclusivity (or similar) provision in any Major Lease that permits or could permit the Tenant thereunder the right to terminate such Major Lease or abate rent thereunder;

(xiii)    the failure to purchase or replace (as applicable) any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement (as applicable), in each case, as and when required by the terms hereof;

(xiv)    any violation or breach of the Property Document Provisions and/or any Property Document Event;

(xv)    Borrower's violation or breach of Section 4.32 hereof; and/or

111

(xvi)    if any temporary certificate of occupancy issued for the Property shall lapse or become invalid or be revoked.

(b)    Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents:

(i)    Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents;

(ii)    the Debt shall be fully recourse to Borrower in the event that: (1) the first Monthly Debt Service Payment is not paid when due, (2) any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto is violated or breached, and (A) a court of competent jurisdiction orders a substantive consolidation of Borrower based, in whole or in part, on such violation or breach or (B) the Property or any portion thereof or interest therein becomes an asset in a bankruptcy or insolvency proceeding as a result of (in whole or in part) or due to (in whole or in part) such violation or breach, (3) any representation, warranty or covenant contained in Article 6 hereof is violated or breached, or (4) a Bankruptcy Event occurs;

(iii)    Borrower shall pay, and shall be personally liable to Lender for the payment of, the Interest Reserve Deficiency Amount in accordance with Section 7.9 of this Agreement; and

(iv)    Borrower shall pay, and shall be personally liable to Lender for the payment of, any Operating Deficiency.

## ARTICLE 13

## FURTHER ASSURANCES

**Section 13.1  Replacement Documents**.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

**Section 13.2  Recording of Security Instrument, etc**.  Borrower forthwith upon the execution and delivery of the Security Instrument and thereafter, from time to time, will cause the Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes,

filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Security Instrument, this Agreement, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by applicable law so to do.

> **Section 13.3   Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Security Instrument, or for complying with all Legal Requirements including, without limitation, the execution and delivery of all such writings necessary to transfer any licenses with respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 13.3.

> **Section 13.4   Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)      If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable without prepayment premium or penalty.

(b)      Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Security Instrument or the Debt.  If such claim, credit or deduction shall be required by applicable law, Lender shall

have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable without prepayment premium or penalty.

(c)       If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

## ARTICLE 14

## WAIVERS

**Section 14.1   Remedies Cumulative; Waivers**.   The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 14.2   Modification, Waiver in Writing**.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Security Instrument, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 14.3   Delay Not a Waiver**.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Security Instrument, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Security Instrument, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

114

**Section 14.4  Waiver of Trial by Jury.**    BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 14.5   Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 14.6   Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 14.7   Marshalling and Other Matters**.  Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Security Instrument of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument and on behalf of all persons to the extent permitted by applicable Legal Requirements.

**Section 14.8   Waiver of Statute of Limitations**.  To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Security Instrument or other Loan Documents.

**Section 14.9   Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

115

**Section 14.10 Sole Discretion of Lender**.  Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

## ARTICLE 15

## MISCELLANEOUS

**Section 15.1   Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Security Instrument, the Note or the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 15.2   Expenses; Indemnity**.

(a)      Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) except to the extent otherwise expressly set forth in this Agreement or any of the other Loan Documents, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (ii) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the liens in favor of Lender pursuant to the Loan Documents; (iii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property or any other security given for the Loan; (iv) enforcing any Obligations of, or collecting any payments due from, Borrower or any Guarantor under the Loan Documents or with respect to the Property; (v) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; (vi) protecting Lender's interest in the Property or any other security given for the Loan; and (vii) Lender's participation (including, without limitation, responding to any service of process, subpoena, or other request) in any litigation or other proceeding involving or related to any Borrower Party, the Loan or the Loan Documents and/or Lender's response to any other service of process, subpoena, or other request from any Governmental Authority involving or related to any Borrower Party, the Loan or the Loan Documents (including, without limitation, in each case, any legal fees incurred in connection therewith); provided, however, that Borrower

116

shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non appealable judgment of a court of competent jurisdiction.  Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents; (ii) the use or intended use of the proceeds of the Loan; (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument, the Property or any interest therein, or receipt of any Rents; (v) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; and (vi) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties, as determined by a final non appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.  The provisions of Section 15.2(a) and this Section 15.2(b) shall (A) survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument and (B) apply equally in favor of the then-current Lender hereunder and any prior Lender hereunder (regardless of whether any such prior Lender has retained any obligations hereunder following the applicable assignment of the Loan, this Agreement and the other Loan Documents).

(c)     Borrower hereby agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees imposed, and costs and expenses incurred, by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

**Section 15.3  Brokers**.  Borrower agrees (i) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each a "**Broker**") hired or contracted by any

Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (ii) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person.  The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt.  Borrower hereby represents and warrants that no Broker has been engaged by any Borrower Party in connection with the transactions contemplated by this Agreement.  Lender hereby agrees to pay any and all fees imposed or charged by any Broker hired solely by Lender.  Borrower acknowledges and agrees that (a) any Broker is not an agent of Lender and has no power or authority to bind Lender, (b) Lender is not responsible for any recommendations or advice given to any Borrower Party by any Broker, (c) Lender and the Borrower Parties have dealt at arms-length with each other in connection with the Loan, (d) no fiduciary or other special relationship exists or shall be deemed or construed to exist among Lender and the Borrower Parties and (e) none of the Borrower Parties shall be entitled to rely on any assurances or waivers given, or statements made or actions taken, by any Broker which purport to bind Lender or modify or otherwise affect this Agreement or the Loan, unless Lender has, in its sole discretion, agreed in writing with any such Borrower Party to such assurances, waivers, statements, actions or modifications.  Borrower acknowledges and agrees that Lender may, in its sole discretion, pay fees or compensation to any Broker in connection with or arising out of the closing and funding of the Loan.  Such fees and compensation, if any, (i) shall be in addition to any fees which may be paid by any Borrower Party to such Broker and (ii) create a potential conflict of interest for Broker in its relationship with the Borrower Parties.  Such fees and compensation, if applicable, may include a direct, one-time payment, servicing fees and/or incentive payments based on volume and size of financings involving Lender and such Broker.

      **Section 15.4   Governing Law**.

      **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND DELIVERED TO LENDER BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING**

**UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5 1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

**Section 15.5   Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | 96 Wythe Acquisition LLC<br>1274 49th Street, Suite 184<br>Brooklyn, New York 11219<br>Attention: Toby Moskovits |
| With a copy to: | Cohen & Gresser LLP<br>800 Third Avenue<br>New York, New York 10022<br>Attention:  Nicholas J. Kaiser, Esq. |
| If to Lender: | Benefit Street Partners Realty Operating Partnership, L.P.<br>142 West 57th Street, Suite 1201<br>New York, New York 10019<br>Attention:  Micah Goodman, General Counsel |
| With a copy to: | Stroock & Stroock & Lavan LLP<br>200 Biscayne Boulevard, Suite 3100 |

MIA 31354953v9

Miami, Florida 33131
Attention: Eugene Balshem, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 15.6   Headings**.  The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 15.7   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 15.8   Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 15.9   Cost of Enforcement**.  In the event (a) that the Security Instrument is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement, the Security Instrument, the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

**Section 15.10 Exhibits  Incorporated**.   The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 15.11 Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Security Instrument, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no

120

such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 15.12  No Joint Venture or Partnership; No Third Party Beneficiaries.**

(a)    Borrower and Lender intend that the relationships created under this Agreement, the Security Instrument, the Note and the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement, the Security Instrument, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Security Instrument, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.   All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

(c)    The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.   Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.  Furthermore, each Borrower Party has obtained advice of counsel, accountants, and other professionals sufficient, in the judgment of such Borrower Party, to approve the Loan, the Loan Documents, and any transaction related to the closing of the Loan (including, without limitation, allocations of funds and the organizational structure of Borrower as each of the same relate to tax matters affecting such Borrower Party and the constituent direct and indirect owners of Borrower), and no Borrower Party is relying on Lender or any counsel or other professionals engaged by Lender with respect thereto.

(d)    Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases); or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property is subject.

(e)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Security Instrument, the Note

MIA 31354953v9

or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)     Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 3 of this Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Agreement, the Note, the Security Instrument and the other Loan Documents in the absence of the warranties and representations as set forth in Article 3 of this Agreement.

**Section 15.13 Publicity**.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to this Agreement, the Note, the Security Instrument or the other Loan Documents or the financing evidenced by this Agreement, the Note, the Security Instrument or the other Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld.

**Section 15.14 Limitation of Liability**.  No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**Section 15.15 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and the Security Instrument, the Note or any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Security Instrument and the other Loan Documents and this Agreement, the Note, the Security Instrument and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Security Instrument and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right

MIA 31354953v9

to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

**Section 15.16 Entire Agreement**. This Agreement, the Note, the Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents.

**Section 15.17 Liability**. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.18 Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 15.19 Set-Off**. In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided, however, Lender may only exercise such right during the continuance of an Event of Default. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided, that, the failure to give such notice shall not affect the validity of such set-off and application.

**Section 15.20 Certain Additional Rights of Lender (VCOC)**.

(a)    For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Borrower agrees that, in addition to the rights set forth in the Loan Documents and otherwise provided by applicable law, Lender shall have the following supplemental management rights:

(i)    the right to receive the information and reports described in the Loan Documents;

(ii)    the right to receive written notice of and attend as an observer meetings of the Borrower;

MIA 31354953v9

(iii)    upon a reasonable request and at reasonable times during normal business hours, inspect the books and records of the Borrower;

(iv)    upon reasonable request and at reasonable times during normal business hours, the right to visit and inspect any physical properties owned by the Borrower and pledged as collateral for the Loan; and

(v)    upon a reasonable request and at reasonable times during normal business hours, to meet and consult with management of the Borrower with respect to the significant business of the Borrower.

(b)    Borrower represents to Lender, as of the date hereof, that (i) at least 50% of Borrower's assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate, and (ii) Borrower has the right to, and actually does on a continuous basis, regularly and substantially participate directly in management and/or development activities with respect to such real estate. If any part of the foregoing sentence ceases to be true and correct in any respect after the date hereof, Borrower will promptly notify Lender of such change.

(c)    The aforementioned rights are intended to satisfy the requirement of "management rights" for purposes of qualifying the Loan as a "venture capital investment" for purposes of the DOL "plan assets" regulation, 29 C.F.R. § 2510.3-101., and in the event such rights are not satisfactory for such purpose, Borrower and Lender shall reasonably cooperate in good faith to agree upon mutually satisfactory management rights which satisfy such regulations.

(d)    The rights described herein shall apply and continue for so long as Lender continues to own any interest in the Loan, which shall be deemed to be so owned and to remain outstanding notwithstanding any conversion, exercise or exchange of such Loan for securities ("**Derivative Securities**"). The rights described herein shall terminate and be of no further force or effect as of the date upon which the Lender and their respective affiliates cease to maintain any interest in the Loan or any Derivative Securities.

## ARTICLE 16

## INTENTIONALLY OMITTED

## ARTICLE 17

## MEZZANINE LOAN.

### Section 17.1    Mezzanine Loan Notice.

(a)    Promptly after receipt (but no more than ten (10) Business Days after receipt), Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender a true, correct and complete copy of all material notices (including, without limitation, any notice of a Mezzanine Loan Event of Default or any other default under the Mezzanine Loan Documents), demands, requests or material correspondence (including electronically transmitted items) received from

124

Mezzanine Lender by Mezzanine Borrower or any guarantor under the Mezzanine Loan Documents.

(b)    Unless otherwise delivered to Lender pursuant to the provisions of Section 4.12 hereof, Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when due under the Mezzanine Loan Documents.

**Section 17.2   Mezzanine Loan Estoppels**.   After written request by Lender made no more than one time in any calendar year, Borrower shall (or shall cause Mezzanine Borrower to) from time to time, use reasonable efforts to obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.  In the event or to the extent that Mezzanine Lender is not legally obligated to deliver such estoppel certificates and is unwilling to deliver the same, or is legally obligated to deliver such estoppel certificates but breaches such obligation, then Borrower shall not be in breach of this provision so long as such Borrower furnishes to Lender estoppels executed by Mezzanine Borrower, each expressly representing to Lender the information requested by Lender regarding the status of the Mezzanine Loan and the compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents.  Borrower hereby indemnifies Lender from and against all Losses which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mezzanine Loan which was misrepresented in any material respect by Borrower in, or which warrants disclosure and was omitted from, such estoppel executed by Mezzanine Borrower.

**Section 17.3   Mezzanine Intercreditor**.   Borrower hereby acknowledges and agrees that the Mezzanine Intercreditor is solely for the benefit of Lender and Mezzanine Lender, and that neither Borrower nor Mezzanine Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein.  Lender and Mezzanine Lender have no obligation to disclose to Borrower or Mezzanine Borrower the contents of the Mezzanine Intercreditor. Borrower's obligations under the Loan Documents are and will be independent of the Mezzanine Intercreditor and shall remain unmodified by the terms and provisions thereof.

**Section 17.4   Direction of Mezzanine Borrower**.   Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any other Loan Documents to the effect that (a) Borrower shall cause, direct, permit or allow Mezzanine Borrower to act or to refrain from acting in any manner or (b) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mezzanine Borrower, or (c) other similar effect, such clause or provision, in each case, is intended to mean, and shall be construed as meaning, with respect to Borrower, and to the fullest extent permitted by applicable law, the power (whether direct or indirect) of Borrower to direct Mezzanine Borrower (through ownership of voting securities or partnership or limited liability company or other ownership interests), to bring about or effect a desired result.  Lender hereby specifically acknowledges that Borrower does not, directly or indirectly, hold or own any voting securities or partnership or limited liability company or other ownership interest in

125

Mezzanine Borrower, or have any other contractual relationship or agreement with Mezzanine Borrower, and therefore Borrower, cannot, through ownership of voting securities or partnership or limited liability company or other ownership interests, or other contract or agreement, direct Mezzanine Borrower to bring about or effect a desired result.

**Section 17.5   Notices from Mezzanine Lender**.    Borrower and Lender hereby acknowledge and agree that Lender may conclusively rely on any notice delivered by Mezzanine Lender without any inquiry into the validity thereof, including, without limitation, a notice from Mezzanine Lender that a Mezzanine Loan Event of Default has occurred or is continuing.

**Section 17.6   Mezzanine Loan Prepayment**.   Mezzanine Loan may not be prepaid in whole or in part unless the Loan shall have been (or shall simultaneously be) paid in full in accordance with the terms of this Agreement (including any Minimum Interest, Additional Interest and other amounts due and payable to Lender under the Loan Documents).

**[NO FURTHER TEXT ON THIS PAGE]**

126

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: Toby Moskovits
Title:   Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: _____
Name: Micah Goodman
Title:   Authorized Signatory

Loan Agreement

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: Toby Moskovits
Title: Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: _____
Name: Micah Goodman
Title: Authorized Signatory

Loan Agreement

**EXHIBIT A**

**ORGANIZATIONAL CHART**

**(attached hereto)**

A-1

# ORGANIZATION CHART[1]
## (as of December 13, 2017)



---

[1] Except as shown on this chart, no person or entity, individually or together with affiliates, owns directly or indirectly 20% or more interests in 96 Wythe Acquisition LLC or controls 96 Wythe Acquisition LLC.

1640006.2

**EXHIBIT B**

**PARKING WORK**

**(attached hereto)**

B-1

MIA 31354953v9



01 PARKING FLOOR PLAN (1ST FLOOR)

**EXHIBIT C**

**SPECIAL PURPOSE ENTITY REQUIREMENTS**

Borrower covenants and agrees that:

(a)    Borrower has not and will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases; provided, however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time (in the aggregate among all Borrowers, if more than one exist) three percent (3.0%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(iv)    commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)    use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)    fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(vii)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or

C-1

formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)    have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person (other than, with respect to any SPE Component Entity, in Borrower);

(xii)    fail to file its own tax returns (to the extent Borrower is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates). Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)    except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)    make any loans or advances to any Person;

C-2

MIA 31354953v9

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(xix)    fail to consider the interests of Borrower's creditors in connection with all company actions;

(xx)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Borrower or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Borrower or any SPE Component Entity  (provided, that, none of any member, shareholder or partner (as applicable) of Borrower or any SPE Component Entity or any board of directors or managers (as applicable) of Borrower or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xxii)    permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii) identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv) conduct its business and activities in such a way as to cause any of the assumptions made with respect to Borrower and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(b)    If Borrower is a partnership or limited liability company (other than a Springing Member LLC), each general partner (in the case of a partnership) and managing member (in the case of a limited liability company) of Borrower, as applicable, shall be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Borrower.  Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (a)(iv) - (xxiv) of this <u>Exhibit C</u> and, if such SPE Component Entity is a Springing Member LLC, clauses (c) and (d) of this <u>Exhibit C</u>, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will

C-3

not engage in any business or activity other than owning an interest in Borrower; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Borrower; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Borrower; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Borrower to comply with the provisions of this <u>Exhibit C</u>.

(c)        In the event Borrower or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Borrower or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Borrower or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Borrower or the SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or the SPE Component Entity (as applicable) automatically be admitted to Borrower or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Borrower or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Borrower or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of the SPE Component Entity or Borrower (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower or the SPE Component Entity (as applicable) upon the admission to Borrower or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Borrower or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Borrower or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Borrower or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Borrower or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Borrower or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Borrower or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or the SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Borrower or the SPE Component Entity (as applicable); <u>provided</u>, <u>however</u>, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the

C-4

admission to Borrower or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Borrower or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Borrower or the SPE Component Entity (as applicable).

(d)     The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable) agree in writing (A) to continue Borrower or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Borrower or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable).

(e)     The organizational documents of Borrower (to the extent Borrower is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two  duly appointed independent directors or managers of such entity (each, an "**Independent Director**") who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Borrower in connection with, in each case, an Acceptable ID Provider (defined below).

(f)     The organizational documents of each Borrower and the SPE Component Entity shall further provide that (I) the board of directors or managers of Borrower and the SPE

Component Entity and the constituent equity owners of such entities (constituent equity owners, the "**Constituent Members**") shall not take any action set forth in clause (a)(xx) of this Exhibit C or any other action which, under the terms of any organizational documents of Borrower or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Borrower's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Borrower or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Borrower and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Borrower or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Borrower or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Borrower, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(g)    Notwithstanding the foregoing, no Independent Director of Borrower or any SPE Component Entity may also serve as an independent director of Mezzanine Borrower or any special purpose component entity of Mezzanine Borrower.

"**Acceptable ID Provider**" shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

**EXHIBIT D**

**<u>REA</u>**

NONE

D-1

**EXHIBIT E**

**SECONDARY MARKET TRANSACTION INFORMATION**

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of Tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such Tenant, and the principal provisions of the leases with those Tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the  last three years prior to the date of filing.

(H)     Schedule of the lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

(1)     The number of Tenants whose leases will expire.

(2)     The total area in square feet covered by such leases.

(3)     The annual rental represented by such leases.

(4)     The percentage of gross annual rental represented by such leases.

MIA 31354953v9

**EXHIBIT F**

**<u>PERMITS</u>**

NONE

F-1

**EXHIBIT G**

**<u>FINANCINGS</u>**

NONE

**EXHIBIT H**

**LITIGATION**

1. Case no. 170702398 (Pennsylvania) filed July 24, 2017 by the City of Philadelphia against York Street Property Development, Michael Lichtenstein and Nahman Lichtenstein;

2. Case no. 504396/2017 (New York) filed March 6, 2017 by Grand Living II LLC, Toby Moskovits, My 2011 Grand LLC, S&B Monsey, LLC and Moshe Dov Schweidl against Yoel Goldman and All Year Management;

3. Case no. 161004907 (Pennsylvania) filed November 4, 2016 by Reed Smith LLP against 1718-41 York Street LP, YML Realty, Inc., York Street Property Development, 1718 York Street, LLC, Michael Lichtenstein, and Nahman Lichtenstein;

4. Case no. 090800820 (Pennsylvania) filed August 7, 2009 by Republic Bank against Michael Lichtenstein;

5. Case no. 5145900/2017 (New York) filed July 27, 2017 by Juan L. Ramirez and Carmen Nina Ramirez against Borrower and Manager;

6. Case No. 514248/2017 (New York) filed July 24, 2017 by Madwell, LLC against Borrower;

7. Case No. 513214/2016 (New York) filed August 1, 2016 by Gerson Mencia against Borrower and Dimyon Development Corp.;

8. Case No. 508700/2016 (New York) filed by Arones Milrod against Borrower, Dimyon Development Corp., Heritage Equity Holdings LLC and Heritage Equity Partners;

9. Case No. 507323/2014 (New York) filed August 11, 2014 by Grandfield Realty Corp. against Borrower, Toby Moskovits, 96 W Development LLC, 96 Wythe Holdings LLC, et al; and

10. Case No. 14609/2013 (New York) filed August 12, 2013 by Loeffler Realty LLC against Borrower, 96 W Development LLC, Economy Contracting Corp., et al.

H-1

**EXHIBIT I**

**MAJOR CONTRACTS**

NONE

I-1

## EXHIBIT J

## <u>CONTINGENT LIABILITIES AND LONG-TERM COMMITMENTS</u>

NONE

MIA 31354953v9

## **EXHIBIT K**

## **VIOLATIONS**

(See attached)

MIA 31354953v9

# NYC

## Buildings

☑ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

### NYC Department of Buildings
### Property Profile Overview

| 96 WYTHE AVENUE | | BROOKLYN 11249 | | BIN# 3425311 | |
|---|---|---|---|---|---|
| WYTHE AVENUE | 96 - 96 | Health Area | : 400 | Tax Block | : 2295 |
| | | Census Tract | : 557 | Tax Lot | : 21 |
| | | Community Board | : 301 | Condo | : NO |
| | | Buildings on Lot | : 1 | Vacant | : NO |

**View DCP Addresses...**    **Browse Block**

**View Zoning Documents**    **View Challenge Results**    **Pre - BIS PA**    **View Certificates of Occupancy**

| Cross Street(s): | NORTH 11 STREET, NORTH 10 STREET | | |
|---|---|---|---|
| DOB Special Place Name: | | | |
| DOB Building Remarks: | | | |
| Landmark Status: | | Special Status: | N/A |
| Local Law: | NO | Loft Law: | NO |
| SRO Restricted: | NO | TA Restricted: | NO |
| UB Restricted: | NO | | |
| Environmental Restrictions: | N/A | Grandfathered Sign: | NO |
| Legal Adult Use: | NO | City Owned: | NO |
| Additional BINs for Building: | 3061593 | | |

| Special District: | UNKNOWN |
|---|---|

This property is not located in an area that may be affected by Tidal Wetlands, Freshwater Wetlands, Coastal Erosion Hazard Area, or Special Flood Hazard Area. Click here for more information

**Department of Finance Building Classification:**    H2-HOTELS

Please Note: The Department of Finance's building classification information shows a building's tax status, which may not be the same as the legal use of the structure. To determine the legal use of a structure, research the records of the Department of Buildings.

| | Total | Open | |
|---|---|---|---|
| Complaints | 44 | 0 | Elevator Records |
| Violations-DOB | 9 | 3 | Electrical Applications |
| Violations-ECB (DOB) | 29 | 1 | Permits In-Process / Issued |
| Jobs/Filings | 46 | | Illuminated Signs Annual Permits |
| ARA / LAA Jobs | 0 | | Plumbing Inspections |
| Total Jobs | 46 | | Open Plumbing Jobs / Work Types |
| Actions | 19 | | Facades |

Elevator Records
Electrical Applications
Permits In-Process / Issued
Illuminated Signs Annual Permits
Plumbing Inspections
Open Plumbing Jobs / Work Types
Facades
Marquee Annual Permits
Boiler Records
DEP Boiler Information
Crane Information
After Hours Variance Permits

OR Enter Action Type: [_____]

OR Select from List: Select... ▼

AND [ Show Actions ]

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## DOB Violation Display for 040414CEX0101BT

Premises: 96 WYTHE AVENUE BROOKLYN

BIN: 3425311   Block: 2295   Lot: 21

| | | |
|---|---|---|
| Issue Date: | 04/04/2014 | Violation Category:   V – DOB VIOLATION - ACTIVE |
| Violation Type: | C - CONSTRUCTION | |
| Violation Number: | EX0101BT | Device No.: |
| ECB No.: | | |
| Infraction Codes: | | |
| Description: | | |

Disposition:
Code:                          Date:
Inspector:
Comments:

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## DOB Violation Display for 013017E9027/596990

Premises: 96 WYTHE AVENUE BROOKLYN        BIN: 3425311    Block: 2295    Lot: 21

| | | | |
|---|---|---|---|
| Issue Date: | 01/30/2017 | Violation Category: | V - DOB VIOLATION - ACTIVE |
| Violation Type: | E - ELEVATOR | | |
| Violation Number: | 9027/596990 | Device No.: | 3P14898 |
| ECB No.: | | | |
| Infraction Codes: | | | |
| Description: | | | |

Disposition:
Code:                      Date:
Inspector:
Comments:

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## DOB Violation Display for 013017E9027/596991

Premises: 96 WYTHE AVENUE BROOKLYN                           BIN: 3425311   Block: 2295   Lot: 21

| | | |
|---|---|---|
| Issue Date: | 01/30/2017 | Violation Category:   V - DOB VIOLATION - ACTIVE |
| Violation Type: | E - ELEVATOR | |
| Violation Number: | 9027/596991 | Device No.:   3P14890 |
| ECB No.: | | |
| Infraction Codes: | | |
| Description: | | |

Disposition:
Code:                          Date:
Inspector:
Comments:

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





# Buildings

NYC Department of Buildings
## ECB Violation Details

Premises: 96 WYTHE AVENUE BROOKLYN                     Filed at: 96 WYTHE AVENUE  BROOKLYN  NY 11249
BIN: 3425311   Block: 2295   Lot: 21                                              Community Board: 301

## ECB Violation Summary
ECB Violation Number: 3-184105N                                                  **VIOLATION OPEN**
Severity: CLASS - 2
Penalty Balance Due: $500.00                   Certification Status: NO COMPLIANCE RECORDED
                                               Hearing Status: STIPULATION/IN-VIO

## Respondent Information
Name                    96 WYTHE ADQUISITIONS LLC
Mailing Address:        1274 49 STREET / BK  NY  11219

## Violation Details
| Violation Date: | 12/09/2016 | Violation Type: | CONSTRUCTION |
| Served Date: | 12/09/2016 | Inspection Unit: | PRO CERT UNIT |

| Infraction Codes | Section of Law | Standard Description |
| --- | --- | --- |
| 762 | 28-105.12.2 | WRK DOESN'T CONFORM TO APPROV DOCS AND/OR APPROV AMENDMENTS |

Specific Violation Condition(s) and Remedy:
WORK DOES NOT CONFORM TO APPROVED CONSTRUCTION DOCUMENTS &/OR APPROVED AMENDMENTS. UNDER
ALT2 #321395184, INSPECTION DRAWING 0-23-16 AT TIME OF INSPECTION FOUND OR ENTER/EXIT DOOR NOT AS
PROPOSED ON PLAN. PLANS

Issuing Inspector ID:        2723                      DOB Violation Number: 120916CN01RAU2
Issued as Aggravated Level:  NO

## Dept. of Buildings Compliance History and Events
Certification Status:       NO COMPLIANCE RECORDED                      Compliance On:
Stipulated Compliance Due Date                       01/18/2017
A Certificate of Correction must be submitted to the Administrative Enforcement Unit (AEU) for All Violations. A violation that is not
corrected by ECB will continue to remain ACTIVE or "open" on DOB records until acceptable proof is submitted to the AEU. (even if the penalty has paid the penalty imposed by ECB.)

## ECB Hearing Information
Scheduled Hearing Date/Time:  01/30/2017  11:30         Hearing Status:   STIPULATION/IN-VIO

## ECB Penalty Information
| Penalty Imposed: | $600.00 | | |
| --- | --- | --- | --- |
| Adjustments: | 30.00 | Amount Paid: | $0.00 |
| Penalty Balance Due | $500.00 | Court Docket Date: | 08/11/2017 |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Customer Service Center by
dialing 311 or (212) NEW YORK outside of New York City.



**November 7, 2017**

*The Williamsburg Hotel*
*96 Wythe Avenue*
*Site Number 53668*

Per search of the City of NYC Fire Department records, there is an open fire code violation notice on file for this property under Notice of Violation numbers:

```
11565764P
11593835L
E459042
E467113S2
E503142
E503143
E503144
E503145
E503146
```

The City of NYC Fire Department considers these violations open and active.   The Fire Department does not consider the Notice of Violation to be closed, based on subsequent annual inspections that do not list or note the prior notice of violations items on the subsequent inspections and requires a follow up inspection to be requested and re-inspection fees to be paid to address the items listed in the notice of violation and close out the notice.

Contact providing this information:

**Richie Mann**
**Municipal Data Services**
**Staten Island, NY**
**718-815-0707**

Respectfully;
Ashlee D. Williams
Research Analyst



3555 N.W. 58th Street
Suite 400
Oklahoma City, OK  73112

Phone:       405.525.2998 ext 129
Fax:          405.528.4878
Email:        awatters@zoning-info.com



**MUNICIPAL DATA**
— **SERVICES** —

25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:**   11/03/2017

**County:**   KINGS

**Title/CoNo.:**   ZONE 53668

**Address:**   63 NORTH   10 STREET
A/K/A 96 / 102 WYTHE AVENUE

**Block:**   2295
**Lot:**   21

## FIRE DEPARTMENT VIOLATION SEARCH

In reply to your request concerning the above mentioned premises, please be advised that as of
**9 A.M. on 09/19/2017**   , the records show the following:

```
11565764P
11593835L
E459042
E467113S2
E503142
E503143
E503144
E503145
E503146
```

**Violations recorded above are of record in headquarters of the Division of Fire Prevention only, and may not include violations issued by local units.**
Municipal Data Services Inc. certifies that the records of the above municipal agency were examined on behalf of ZONING INFO, INC.
The information reported above is a true and accurate abstract of the information on file therein. This report is submitted for
information purposes only. There are no intended third party beneficiaries. No liability is assumed.

3136413        2825432

FDNY Building Information Profile                    11/06/17 10:33:14

Bin: 3061593
Total AKA Found: 2

| BLOCK | LOT | BIN | LHND | HHND | STREET NAME | BOROUGH |
|---|---|---|---|---|---|---|
| 02295 | 0021 | 3061593 | 63 | 63 | NORTH 10 STREET | BROOKLYN |
| 02295 | 0021 | 3061593 | 96 | 102 | WYTHE AVENUE | BROOKLYN |

Summary

Num Siam Sprinkler    :            Sprinkler Type :
Num Siam Standpipe    :            Sprinkler Type :
Last BISP Insp Date   : 05/22/2013    Last BISP Insp Status : Construction
Num of Violation Notices : 1          Num of Violation Order : 6
Has BISP Asbestos Abatement : No

Accounts

FPREV Permit Accounts

| Acct # | Owner Name | Do # | PFX | Last Insp Date | Last Insp Stat |
|---|---|---|---|---|---|
| 36286714 | 96 WYTHE ACQUISITION | 34 | N | 11/02/2016 | PASS |
| 35959819 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/02/2015 | NOV AND VIO(NOV NO HOLD) |
| 36372613 | 96 WYTHE ACQUISITION LLC | 34 | T | 08/10/2016 | NOV(FIELD) |
| 36406486 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/19/2016 | NOV(FIELD) |
| 36416642 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/29/2016 | NOV AND VIO(NOV NO HOLD) |
| 37203551 | 96 WYTHE ACQUISITION LLC | 98 | AA | 07/05/2017 | NOV AND VIO(NOV NO HOLD) |
| 36181329 | 96 WYTHE AQUISITION LL | 34 | N | 09/05/2017 | PASS |
| 33178955 | ALL ISLAND MASONRY & | 50 | S | 08/06/2014 | PASS |
| 37170289 | THE HARVEY | 45 | G | 05/31/2017 | PASS |
| 37073384 | THE WILLIAMSBURG HOEL | 36 | F | 03/07/2017 | PASS |
| 36172179 | THE WILLIAMSBURG HOTEL | 98 | AA | 09/15/2017 | NOV(FIELD) |
| 37073350 | THE WILLIAMSBURG HOTEL | 36 | B | 10/20/2017 | NOV(FIELD) |
| 37126091 | THE WILLIAMSBURG HOTEL | 45 | G | 04/19/2017 | PASS |
| 36397172 | WILLIAMSBURG HOTEL | 48 | AA | 12/08/2016 | NOT APP(VIO) |
| 37154614 | WILLIAMSBURG HOTEL | 48 | AA | 06/02/2017 | NOV(FIELD) |

NOV

FPREV Violation Notices

| Owner Name | NOV Num | Issue Date | Vio LawNum | Vio LawDesc | Vio Disposition | Disp Date |
|---|---|---|---|---|---|---|
| THE WILLIAMSBURG HOTEL | 11593835L | 03/07/2017 | RULE 17 | FAILED TO OBTAIN CERTIFICATE OF FITNESS | DEFAULT | 06/27/2017 |
| | | | RULE 20 | FAILED TO CONDUCT REQUIR TEST/INSPECTION | DEFAULT | 06/27/2017 |
| | | | RULE 5 | FAILED TO PRODUCE PERMIT AND/OR RECORD | DEFAULT | 06/27/2017 |

Page 1 of 2



FDNY Building Information Profile

Bin:  3061593

11/06/17 10:33:14

Vio Orders

FPREV Violation Orders

| Acct Owner | Acct# | Violation# | Vio Law Num | Vio Law Desc | Vio Type | Vio Date | Action |
|---|---|---|---|---|---|---|---|
| 96 WYTHE ACQUISITION LLC | 36372613 | E459042 | OTHER0001 | SEE FOLDER INFORMATION | FPREV | 08/10/2016 | HOLD BILLING |
| THE WILLIAMSBURG HOTEL | 37073350 | E503142 | HRU-23 | PROVIDE/MAINTAIN SMOKE DET REC. | FPREV | 03/07/2017 | HOLD BILLING |
| THE WILLIAMSBURG HOTEL | 37073350 | E503143 | HT-3 | NO FSD OR DFSD ON DUTY | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503144 | HRU-3 | PROVIDE LOA FOR ALARM SYSTEM | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503145 | HT-4 | PROVIDE FSP FOR APPROVAL-HOTEL | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503146 | HRU-13 | RESTORE FIRE ALARM SYSTEM | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |

Page 2 of 2

# *SUMMONS BY NUMBER*

| SUMNUM | E467113S2 | | SUMTYPE | | |
|---|---|---|---|---|---|

| ISSUE DATE | 03/08/17 | SUMCREATEDT | 03/09/17 | HEARINGDT | |
|---|---|---|---|---|---|

| DISPCD | A | | | AGCY CD | |
|---|---|---|---|---|---|

| SUMNAME | THE WILLIAMSBURG HOTEL | FINES OWED | |
|---|---|---|---|

| ADDRESS | 96  WYTHE AVE  112490000 |
|---|---|

| STBORO | 4 | BROOKLYN |
|---|---|---|

| HRU-8 | V.O. ENFORCED-SUMMONS ISSUED | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# *SUMMONS BY NUMBER*

| | | | | |
|---|---|---|---|---|
| SUMNUM | 11565764P | | SUMTYPE | E |
| ISSUE DATE | 09/23/17 | SUMCREATEDT | 10/03/17 | HEARINGDT |
| DISPCD | A | | | AGCY CD |
| SUMNAME | 96 WYTHE AQUISITION LLC | | | FINES OWED |
| ADDRESS | 96  WYTHE AVE  112490000 | | | |
| STBORO | 4 | BROOKLYN | | |

| | | | | | |
|---|---|---|---|---|---|
| RULE 19 | FAILED TO PROVIDE REQUIR AFFIDAVIT/PLANS | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## **EXHIBIT L**

## **EQUIPMENT LEASES**

NONE

MIA 31354953v9

# EXHIBIT E

PAGE 01

**THE CITY OF NEW YORK**
**Department of Finance**
**59 Maiden Lane**
**New York, NY 10038**

PROPERTY COLLECTION
INSTALLMENT AGREEMENT

**96 WYTHE ACQUISITION LLC**
**POA - YERACHMIEL ZOLDAN**
**1274 49TH ST**
**184**

**Property Address:**
96 WYTHE AVENUE 11249
**Borough :**          BROOKLYN
**Block:**             02295
**Lot:**               0021
**Building Class:**    H2

| | |
|---|---|
| **Agreement No:** | 114176 |
| **Agreeor Name:** | 96 WYTHE ACQUISITION LLC POA - YERACHMIEI |
| **Agreement Amount:** | $3,928,923.57 |
| **Percentage Down:** | |
| **Down Payment Amount:** | |
| **Agreement Begin Date:** | 06/23/2021 |
| **Term (in years):** | 10 |
| **Number of Semi-Annual Installments:** | 20 |
| **Amount of each Installment:** | $443,201.41 |
| **First Installment Date:** | 01/01/2022 |

**THE CITY OF NEW YORK**
**Department of Finance**
**59 Maiden Lane**
**New York, NY 10038**

PROPERTY COLLECTION
INSTALLMENT AGREEMENT

**BROOKLYN NY 11219**

As this agreement requires your signature, please read the agreement and ask any questions that you have before signing. The property listed above is, or may be, included in a list of properties on which there are tax liens that may be sold by the City of New York pursuant to the provisions of Chapter 3 of Title 11 of the administrative code of the City of New York.

You have advised the Department of Finance that you are interested in entering into a Payment Agreement to pay outstanding Real Estate Taxes, and/or Assessments and/or and other related charges. The amount of the required down payment and the number and amount of installments to be paid are listed above, and the remainder of the terms of the agreement are listed below.

1. I agree to make a payment in the amount of the down payment, if required. All payments are payable to New York City Department of Finance, starting with the first Semi-Annual payment. Failure to make the Semi-Annual payment will prevent the installment agreement from being listed as "Activated" in the Department's records and will subject you to any and all collection actions, including Tax Lien Sales. Payments may be mailed to the NYC DEPARTMENT OF FINANCE, P.O. BOX 680, NEWARK, N.J. 07101-0680, made via the website at NYC.GOV/FINANCE, or at one of Finance's business centers.

2. I agree to pay the payment agreement amount in Semi-Annual installments as indicated above. A portion of each installment payment will be applied to interest, which is compounded daily and continues to accrue on any unpaid balance. Interest rates may change periodically, as required by Law. There may be a balance due at the end of the installment agreement term which may be paid in additional installments if the balance due is greater than the original installment. There will be no penalty for prepaid installments.

3. I also agree and acknowledge that, in addition to the installment agreement amount, I will pay all current real property taxes and/or assessments and/or other related charges as they become due, or by the last day to pay before interest begins to accrue. As provided in paragraph 4 below, if I fail to do so, Finance may cancel this installment agreement. If the agreement is cancelled, all payments made shall remain credited to the account of the property and the city may immediately sell the right to collect the unpaid balances remaining open on the agreement in a future tax lien sale.

4. I understand that if any payment that I am required to make under this installment agreement is unpaid for six months, the agreement will be in default and may be cancelled and my property may be included in the next Tax Lien Sale conducted by the City of New York. The property may also become eligible for In-Rem foreclosure. I understand that if my installment agreement is cancelled, I cannot enter into another payment agreement with the Department of Finance for the property listed above for Five(5) years from the date of default. I understand that such consequences of default may be avoided if I pay all outstanding installments and current charges, including interest, prior to the date of the next tax lien sale following such default.

PAGE 03

**THE CITY OF NEW YORK**
**Department of Finance**
**59 Maiden Lane**
**New York, NY 10038**

PROPERTY COLLECTION
INSTALLMENT AGREEMENT

5. Please initial here to verify receipt of information regarding eligibility for Real Property Tax Exemption programs
_____

X 96 WYTHE ACQUISITION LLC

(Your Name)

X 1214 49 ST.

(Mailing Address) (No. and Street)

_____

(Name of Officer) (Title)

X BROOKLY NY 11219

(City, State, Zip Code)

X 81 415 2485

(Social Security No. or Federal ID No.)

X 718 412 856

(Daytime Telephone No.)

X

(Signature)

My relationship to the property is: (Check One)

___ Owner        ✓ Power of Attorney

Recommended for Approval ___M. Coloma___

Approved _____  Date 6/23/2021

The Federal privacy act of 1974 requires us to state the following if we ask for your Social Security Number.

PAGE 04

**THE CITY OF NEW YORK**
**Department of Finance**
**59 Maiden Lane**
**New York, NY 10038**

PROPERTY COLLECTION
INSTALLMENT AGREEMENT

You must list your taxpayer identification number (social security number or employer identification number) in order to enter into an installment agreement. We ask for this information in order to make sure that our real property tax records are accurate, and that you have paid all the city taxes that you owe.

Our legal right to require this information is contained in section 11-102.1 of the administrative code. This authorizes the department of finance to require any person to provide a taxpayer identification number so that we may administer and collect taxes.

X
Approved _____

X
Date _6/23/21_____

# EXHIBIT F

## 96 WYTHE HOLDINGS LLC

## MANAGERS' CERTIFICATE

The undersigned, as both of the Managers of 96 WYTHE HOLDINGS LLC, a New York limited liability company, (the "Company"), hereby certify to BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P., a Delaware limited partnership, its successors and/or assigns that:

1.    Attached hereto as <u>Exhibit A</u> are (i) true, correct and complete copies of the Articles of Organization of each of the Company, NORTHSIDE PARTNERS LLC, 96 W DEVELOPMENT LLC, and 96 WYTHE ACQUISITION LLC, and (ii) true, correct and complete copies of the Certificate of Formation of each of 96 WYTHE MEZZ DE LLC and 96 WYTHE BORROWER DE LLC (collectively, the "Certificate"), together with all amendments thereto filed through the date hereof, each as certified by the Secretary of State of the State of each such entity's formation on the date set forth on such Certification, each of which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

2.    Attached hereto as <u>Exhibit B</u> are true, correct and complete copies of the operating agreements, together with all amendments through the date hereof, of the Company, 96 W DEVELOPMENT LLC, 96 WYTHE MEZZ DE LLC, 96 WYTHE BORROWER DE LLC, and 96 WYTHE ACQUISITION LLC, together with all amendments through the date hereof, each of which has not been terminated, modified, further amended or rescinded and is in full force and effect on the date hereof;

3.    Attached hereto as <u>Exhibit C</u> are the Managers' Consents of the Company, and the same have not been amended or rescinded and are in full force and effect on the date hereof;

4.    Attached hereto as <u>Exhibit D</u> are true, correct and complete copies of each of the Company's, 96 W DEVELOPMENT LLC's, 96 WYTHE MEZZ DE LLC's, 96 WYTHE BORROWER DE LLC's, and 96 WYTHE ACQUISITION LLC's Certificates of Good Standing, as issued by the Secretary of State of the state of each such entity's formation on the date set forth thereon, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

5.    Attached hereto as <u>Exhibit E</u> is a true, correct and complete copy of the Authorization to Transact Business in the State of New York of 96 WYTHE BORROWER DE LLC, as issued by the Secretary of State of the State of New York on October 31, 2017, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

6.    The Managers of the Company and their specimen signatures are, and each such signature is certified to be such person's signature by the Managers signing below such specimen signature, as follows:

1655222.4

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Manager | |
| Yechiel Michael Lichtenstein | Manager | |

7.  The Authorized Signatories, each acting singly, of 96 WYTHE ACQUISITION LLC and their specimen signatures are, and each such signature is certified to be such person's signature by the Authorized Signatory signing below such specimen signature, as follows:

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Authorized Signatory | |
| Yechiel Michael Lichtenstein | Authorized Signatory | |

[Remainder of page intentionally left blank.  Signature page follows]

1655222.4

Signed and dated this <u>13th</u> day of December, 2017.

96 WYTHE HOLDINGS LLC, a New York limited
liability company, as manager of 96 W
DEVELOPMENT LLC, as sole member of 96
WYTHE MEZZ DE LLC, as sole member of 96
WYTHE BORROWER DE LLC, as managing
member of 96 WYTHE ACQUISITION LLC

By: _____
Toby Moskovits, Manager

By: _____
Yechiel Michael Lichtenstein, Manager

1655222.4

**FOURTH AMENDMENT TO**
**OPERATING AGREEMENT OF**
**<u>96 WYTHE ACQUISITION LLC</u>**

This Fourth Amendment (this "**Amendment**") to Operating Agreement of 96 Wythe Acquisition LLC, a New York limited liability company (the "**Company**"), dated as of December 13, 2017, is among the individuals/entities signing it below.

**WHEREAS**, the parties desire to amend that certain Operating Agreement of the Company dated as of June 20, 2012 (the "**Original Operating Agreement**"), as amended by the Amendment to the Limited Liability Company Operating Agreement dated June 26, 2012 (the "**First Amendment**"), the Second Amendment to the Limited Liability Company Operating Agreement dated March 26, 2014 (the "**Second Amendment**"), the Third Amendment to the Limited Liability Company Operating Agreement dated December, 2014 (the "**Third Amendment**," and together with the Original Operating Agreement as amended by the First Amendment and the Second Amendment, the "**Operating Agreement**"), which governs the Company, pursuant to the New York Limited Liability Company Law;

**WHEREAS**, this Amendment is a condition and an inducement for the Company and Benefit Street Partners Realty Operating Partnership, L.P., a Delaware limited liability company, and its successors and assigns ("**Lender**") to (a) enter into (i) that certain Loan Agreement by and between the Company and Lender, dated as of the date hereof (the "**Loan Agreement**") and (ii) the Loan Documents (as defined in the Loan Agreement), (b) perform its obligations under the Loan Documents, and (c) obtain the Loan (as defined in the Loan Agreement);

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Amendment below agree to amend the Operating Agreement as follows by (i) deleting the First Amendment, the Second Amendment and the Third Amendment in their entirety (including any "opt-in" provisions for the purposes of Article 8 of the Uniform Commercial Code set forth therein) and (ii) adding the following provisions to the Operating Agreement, which terms shall modify, amend and supersede any contrary terms of the Operating Agreement:

Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as the Loan by Lender to the Company remains outstanding (any undefined capitalized terms used in this Amendment not defined in the Operating Agreement shall have the meanings assigned to them in the Loan Agreement):

Section 1.    <u>Members</u>. The names, addresses and percentage interest of the Members is set forth below:

| Name& Address: | Percentage Interest |
|---|---|
| 96 Wythe MEZZ DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 99.5% |
| 96 Wythe Borrower DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 0.5% |

All references to "Member," the "Members" or the "sole member" in the Operating Agreement shall mean the members set forth above.

Section 2.    Management.  The business and affairs of the Company shall be managed by or under the direction of its managing member.  96 Wythe Borrower DE LLC, a Delaware limited liability company ("**Managing Member**") shall act as the managing member of the Company.

Section 3.    Single Purpose Entity Provisions.

(a)    The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    own, manage and operate the Property;

(ii)    to enter into and perform its obligations under the Loan Documents

(iii)    to transact any lawful business permitted to be transacted by limited liability companies organized under the laws of the State of New York that is related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(b)    The Company, the Member, or any Authorized Signatory on behalf of the Company, may enter into and perform the Loan Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, Director, Officer or other Person notwithstanding any other provision of this Agreement or any applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the Member or any Director or Officer to enter into other agreements on behalf of the Company.

(c)    Company has not and will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

1657062.3

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases; provided, however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3.0%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(iv)    commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)    use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)    fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(vii)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)     have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Company if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person;

(xii)   fail to file its own tax returns (to the extent Company is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)  fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Company's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Company's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Company and such Affiliates and to indicate that Company's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Company's own separate balance sheet.  Company has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)   enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)   except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)  make any loans or advances to any Person;

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(xix)   fail to consider the interests of Company's creditors in connection with all company actions;

1657062.3

(xx) without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Company or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Company or any SPE Component Entity (provided, that, none of any member, shareholder or partner (as applicable) of Company or any SPE Component Entity or any board of directors or managers (as applicable) of Company or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi) acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xxii) permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii) identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv) conduct its business and activities in such a way as to cause any of the assumptions made with respect to Company and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(d)     The Managing Member of Company will be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Company. Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (c)(iv) - (xxiv) of this Section 3 of this Amendment and, if such SPE Component Entity is a Springing Member LLC, clauses (e) and (f) of this Section 3 of this Amendment, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Company; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Company; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Company; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Company to comply with the provisions of this Section 3 of this Amendment.

(e)     In the event Company or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Company or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that

causes the last remaining member of Company or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Company or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Company or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Company or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Company or the SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Company or the SPE Component Entity (as applicable) automatically be admitted to Company or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Company or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Company or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Company or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of the SPE Component Entity or Company (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Company or the SPE Component Entity (as applicable) upon the admission to Company or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Company or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Company or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Company or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Company or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Company or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Company or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Company or the SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Company or the SPE Component Entity (as applicable); provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the admission to Company or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Company or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Company or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Company or the SPE Component Entity (as applicable).

(f)     The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Company or the SPE Component

1657062.3

Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable) agree in writing (A) to continue Company or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Company or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Company or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Company or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable).

(g)      The organizational documents of Company (to the extent Company is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two  duly appointed independent directors or managers of such entity (each, an **"Independent Director"**) who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Company in connection with, in each case, an Acceptable ID Provider (defined below).

(h)      The organizational documents of Company and the SPE Component Entity shall further provide that (I) the board of directors or managers of Company and the SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the **"Constituent Members"**) shall not take any action set forth in clause (c)(xx) of Section 3 of this Amendment or any other action which, under the terms of any organizational documents of Company or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise

consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Company's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Company or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Company and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Company or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Company or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Company, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(i)    Notwithstanding the foregoing, no Independent Director of Company or any SPE Component Entity may also serve as an independent director of Mezzanine Company or any special purpose component entity of Mezzanine Company.

For the purpose of Section 3 of this Amendment, "**Acceptable ID Provider**" shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

This Amendment may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

1657062.3

Section 4.    <u>Certificated Limited Liability Company Interests</u>.

(a)    Each limited company interest in the Company shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York (the "Uniform Commercial Code"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code. The Company shall maintain books for the purpose of registering the transfer of limited liability company interests, and, upon any transfer of limited liability company interests in the Company, the Company shall notify the registered owner of any applicable restrictions on the transfer of limited liability company interests.

(b)    The limited liability company interests in the Company shall be evidenced by certificates in the form of <u>Exhibit 1</u> hereto. Each such certificate shall be executed by manual or facsimile signature of an authorized person of the Company on behalf of the Company. The Company shall maintain books for purpose of registering the transfer of limited liability company interests. In connection with a transfer in accordance with this Agreement of any limited liability company interest in the Company, the certificate(s) evidencing the limited liability company interests shall be delivered to the Company for cancellation, and the Company shall thereupon issue a new certificate to the transferee evidencing the limited liability company interests that were transferred and, if applicable, the Company shall issue a new certificate to the transferor evidencing any limited liability company interests registered in the name of the transferor that were not transferred. Notwithstanding anything to the contrary set forth herein, in no event shall the Managing Member's limited liability company interests in the Company be evidenced by a certificate of limited liability company interests.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

**MEMBERS**:

96 WYTHE MEZZ DE LLC,
a Delaware limited liability company

By: _____
Name: Toby Moskovits
Title:   Authorized Person


96 WYTHE BORROWER DE LLC,
a Delaware limited liability company,

By: _____
Name: Toby Moskovits
Title:  Authorized Person

Exhibit 1

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
### 96 Wythe Acquisition LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS, CONDITIONS AND RESTRICTIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate Number _____                              99.5% Percentage Interest

96 Wythe Acquisition LLC, a New York limited liability company (the "Company"), hereby certifies that 96 Wythe MEZZ DE LLC, a Delaware limited liability company (the "Holder") is the registered owner of ninety-nine and one-half percent (99.5%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of such limited liability company interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 20, 2012, as amended by the Amendment to the Limited Liability Company Operating Agreement dated June 26, 2012, as further amended by the Second Amendment to the Limited Liability Company Operating Agreement dated March 26, 2014, as further amended by the Third Amendment to the Limited Liability Company Operating Agreement dated as of December, 2014, and as further amended by the Fourth Amendment to the Operating Agreement as of the date hereof, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of this Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and governed by Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York (the "Code") and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

[Intentionally Left Blank – Signature Page to Follow]

1657062.3

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: November ___, 2017

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: _____
Title: _____

(REVERSE SIDE OF CERTIFICATE)

ASSIGNMENT OF INTEREST

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (print or typewrite name of transferee), _____ (insert Social Security or other taxpayer identification number of transferee), the following specified percentage of limited liability company interests in the Company: _____ (identify the percentage interest being transferred) effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

**96 WYTHE MEZZ DE LLC,**
a Delaware limited liability company

Dated: _____     By: _____
                                              Name:
                                              Title:

                                              Address:

_____

APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of limited liability company interests in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the limited liability company interests in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.


Name of Transferee (Print)

1657062.3

Dated: _____    Signature: _____

                                                       (Transferee)

                                  Address:

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
               Name:
               Title:

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------X   Case No.  21-22108-rdd
IN RE:                          .   Chapter 11
                                .   300 Quarropas Street
96 WYTHE ACQUISITION, LLC,      .   White Plains, NY  10601
                                .
          Debtor.               .   November 5, 2021
-------------------------------X   11:33 a.m. - 1:03 p.m.
```

**21-22108-rdd      96 Wythe Acquisition LLC**      *Ch. 11*

Objection to Motion / Lender's Objection to Debtor's Motion for
Entry of an Order: (I) Approving the Disclosure Statement; (II)
Approving Solicitation and Notice Materials; (III) Approving
forms of Ballots; (IV) Establishing Solicitation and Voting
Procedures; (V) Establishing Procedures for Allowing Certain
Claims for Voting Purposes; (VI) Scheduling A Confirmation
Hearing; and (VII) Establishing Notice and Objection Procedures
(related document(s)117) filed by Paul B. O'Neill on behalf of
Benefit Street Partners Realty Operating Partnership, L.P..

   [*APPEARANCES AND DOCKET ENTRIES CONTINUED ON FOLLOWING PAGES*]

                 HONORABLE ROBERT D. DRAIN
              UNITED STATES BANKRUPTCY JUDGE

VIRTUAL APPEARANCES (VIDEO/ZOOM):

FOR THE DEBTOR:              MARK A. FRANKEL, ESQ.
                            Backenroff, Frankel & Krinsky, LLP
                            800 Third Avenue, 11th Floor
                            New York, New York  10022

                            DOUGLAS E. SPELFOGEL, ESQ.
                            Mayer Brown LLP
                            1221 Avenue of the Americas
                            New York, New York  10020-1001

FOR BENEFIT STREET          P. BRADLEY O'NEILL, ESQ.
PARTNERS REALTY             ADAM C. ROGOFF, ESQ.
OPERATING PARTNERSHIP       Kramer Levin Naftalis & Frankel LLP
L.P.:                       1177 Avenue of the Americas
                            New York, New York  10036

*Proceedings digitally recorded.*
*Transcript produced by:  Catherine M. Griffin*

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel.: (845) 452-3090 - Fax: (845) 452-6099*
americanlegaltranscription.com

1          THE COURT:  -- it just -- it -- it doesn't --

2          MR. SPELFOGEL:  I -- we -- we can clarify that, Your

3  Honor.  It's certainly not the intent; the intent is that they

4  would get the -- the -- they get the full -- the full amount,

5  whatever is allowed.

6          THE COURT:  And you have a really quick discussion of

7  feasibility.  I -- you're left wondering as an Unsecured

8  Creditor and as a Secured Creditor how that balloon gets paid

9  by the -- there's really no -- it doesn't appear to be payable

10  from the cashflows -- from the projections.

11          I mean, you're -- you're still gonna be left with a

12  large, you know, multimillion dollar claim at the end of that

13  period.  And there's -- there's no provision for anything to

14  pay it.  I'm assuming it would either be a refinancing or a

15  sale, but that does tie into the point that all three objectors

16  have made, which is what is -- is there actually -- an actual

17  appraisal yet of the -- of the hotel property?

18          MR. SPELFOGEL:  Yeah, so -- so the -- there is --

19  there is an appraisal; it's $113 million, Your Honor, number

20  one.  And the -- the intent, and -- and this is in consultation

21  with -- with Getzler Henrich and -- and -- and Hilco, is to --

22  to emerge from bankruptcy.

23          As the market stabilizes in terms of coming out of

24  the COVID, the COVID crisis and -- and the negative impact on

25  that, the goal would be to eventually to refinance out the --

# EXHIBIT H



**DEC 15 2004**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) CASE NO. 03-44662 |
| | ) |
| WCI STEEL, INC., *et al.*, | ) CHAPTER 11 |
| | ) |
| DEBTOR(S) | ) JUDGE MARILYN SHEA-STONUM |
| | ) |
| | ) |
| | ) OPINION RE: CONFIRMATION OF |
| | ) PROPOSED COMPETING PLANS OF |
| | ) REORGANIZATION |

This matter is before the Court on two proposed competing plans of reorganization, one filed by the Debtors (as hereinafter defined) and one filed by the Secured Noteholders (as hereinafter defined). The hearing to consider confirmation of both plans was held on July 21, 2004, August 30, 2004 through September 3, 2004 and September 10, 2004. Closing arguments were held on October 25 and 26, 2004. For the reasons set forth below, I conclude that, although the economic backdrop of this case provides every reason to believe that a plan can and should be confirmed in this case soon, neither of the two plans now under consideration can be confirmed.

## OVERVIEW

A confluence of unusual factors causes this case to present "quality problems." Among those factors are, on the one hand, (1) the determination of existing equity, Renco (as hereinafter defined), to continue its ownership of the debtor entities after reorganization, (2) the exposure of existing equity and affiliates to controlled group liability for unfunded pension

obligations should the existing pension plan for hourly workers be terminated and (3) the

resulting treatment of pension plan issues in the Debtors' proposed plan that has garnered that

plan the intense loyalty of both the USWA (as hereinafter defined) and the PBGC (as

hereinafter defined). On the other hand, a well-organized group of holders of notes secured

by the plant, property and equipment of the Debtors has proposed a competing plan under

which that group (1) proposes to take majority control of the reorganized debtor and (2) has

identified two individuals with significant experience in the steel industry for proposed roles

of chief executive officer and chief financial officer. The treatment of pension issues in the

Secured Noteholders' proposed plan would export the liability of those claims in methods that

are neither wholly predictable nor, in the view of the current workforce, as reliable as the

treatment of pension issues in the Debtors' proposed plan. That treatment creates the

possibility, though the proponents of the Secured Noteholders' proposed plan argue that it is

a *de minimis* one, that the PBGC might have to fund pension benefits of retirees. That

treatment raises the procedural question of whether all of the bases necessary for such an

approach have been touched and the policy question of whether, in a situation where such

treatment does not appear absolutely necessary, such an overburdened safety net should be

further stretched, even theoretically.

In the contest between competing plans of reorganization, the bankruptcy court must

examine all of these issues through the lens of appropriate distribution of value to holders of

claims, analyzing the priority, or lack thereof, of the classes of creditors as each plan

proponent has crafted such classes. The foundation for this examination is the value of the

enterprise of the reorganized debtor as of the effective date of the particular plan of

reorganization. This is always a moving target and must necessarily be something of an

approximation. Contributing to the "quality problems" in this case is the red hot seller's

-2-

market that has emerged in the worldwide steel commodities markets since the filing of these

cases nearly 15 months ago. Determination of enterprise value in a cyclical industry will

always present challenges, and those challenges are greater when reorganization plans provide

relatively fixed creditor treatment, while directing the balance of what could be a very large

upside to the parties who would emerge with equity under either plan.

In short, this company is a small but agile niche player in the U.S. steel industry as

evidenced by its relatively strong performance in the worst part of the cycle for the U.S. steel

industry and by these two determined suitors, as well as a third would-be plan proponent. In

an age when all too many chapter 11 cases appear to require the sale of substantially all of the

operating assets in sales pursuant to § 363(b),[1] this case has seen the filing of two competing

plans that were set for simultaneous confirmation hearings with a third one waiting in the

wings.

This is a company that can and will be reorganized. Over the course of my

involvement with this case,[2] I have held numerous case management conferences. At the end

of closing arguments, in two such conferences held pursuant to § 105(a), I shared with counsel

for the two competing plan proponents, as well as counsel for the Creditors Committee (as

hereinafter defined), the USWA, the PBGC and the United States Trustee, the serious

concerns of this Court regarding the failure of the Debtors' proposed plan to incorporate the

---

[1]     Unless otherwise specifically noted, all statutory section references in this Opinion shall be to
chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

[2]     This case was filed in Youngstown and assigned to Judge William Bodoh. Upon his retirement on
January 2, 2004, the so-called mega cases on his docket were assigned temporarily by lot to each
of the active judges on the bankruptcy court for the Northern District of Ohio. In July 2004 Judge
Kay Woods was named to the bankruptcy bench in Youngstown. All of the cases that had been
temporarily assigned during the period of vacancy on the bankruptcy bench in Youngstown
returned to her docket, including this one. However, since I had significant familiarity with the
competing plans in this case and she had an ample amount on her docket, she and I agreed that I
should continue to address the plan confirmation issues in this case through the confirmation of a
plan.

-3-

good news regarding the reorganized debtor's likely enterprise value. Permeating all of the

credible valuation evidence at the confirmation hearing were the increases in value stemming

from the worldwide steel market and the new operating conditions inherent in a newly

negotiated collective bargaining agreement between the Debtors and the USWA. I once again

sought to focus the Secured Noteholders' attention on the huge feasibility problems presented

by their plan with its absence of a collective bargaining agreement. Ironically, the Secured

Noteholders and the Debtors' union employees share the fact that they have each had a

glimpse of alternative futures: The Secured Noteholders when they reached an agreement in

principle with the USWA in the spring of 2004, only to see that agreement negated within

days by the pension-driven agreement that the USWA reached with the Debtors; and the

USWA members, currently employed by or retired from the Debtors, who have now seen a

future where retirement benefits that have been seriously shaved in so many other chapter 11

cases of steel makers can survive intact in this particular case.

    Simply put, the requirements necessary for confirmation have not been met by either

of the two plans that were considered in full at the confirmation hearing.[3] Thus, the decision

being documented here will come as no surprise to either of these plan proponents or their

professionals.   In the last of the Court's case management conferences, the Debtors'

professionals called the Court's attention to the guidance provided by the court in *In re Coram

Heathcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004).  They asked that this Court provide

---

[3]     A third plan, filed by D.E. Shaw Laminar Portfolios, L.L.C., an investment fund and holder of
$1,000,000 in secured notes, and MIC Capital, Inc., a financing affiliate of a supplier of raw
materials to the steel industry (collectively, "DE Shaw"), after the approval of the two disclosure
statements for the Debtors' proposed plan and the Secured Noteholders' proposed plan,
respectively, so closely mimics the inadequate enterprise valuation in the Debtors' proposed plan
and the Secured Noteholders' proposed plan with regard to absence of a collective bargaining
agreement that this Court will briefly consider it in this Opinion so as to spare the very limited
resources of this Court's chambers with respect to further consideration of that plan in its current
form.

-4-

similar guidance. This Court can do so only in the broadest strokes.

As discussed further below, with respect to the Debtors' proposed plan, among the

issues that would have to be addressed before that plan could obtain confirmation are:

- The Debtors' overly conservative reckoning of the enterprise value of the reorganized debtor and aggressive characterization of the new value being provided by existing equity;

- The Debtors' undervaluation of the Secured Noteholders' collateral i.e., plant, property and equipment;

- The Debtors' invocation of the "business judgment rule" to justify huge disparities in the percentage dividends being afforded various classes of holders of unsecured claims; it is true that even in a nonconsensual plan the business judgment rule may support the creation of a variety of classes of unsecured claims for the purpose of providing different payment features, but particularly in a "cramdown" case any such sorting of holders of general unsecured claims must be examined in light of principles of unfair discrimination; with the possible exception of a class of small claims that are paid promptly to ease administrative burdens, the business judgment rule cannot be used to justify substantial economic disparities in the present value amounts paid to holders of general unsecured claims; as presently drafted the Debtors' proposed plan relies on a gerrymandering of the claims pool, such that their contention of having accepting classes, a requirement to allow them to invoke § 1129(b), is at best a pyrrhic victory because the Debtors' proposed plan fails to survive the necessary scrutiny that must be given under that section with respect to unfair discrimination both as between Class 5 and Class 7 and possible unfair discrimination in the treatment of various holders of claims within Class 7; and

- The Debtors' obligation under § 1129(b) to show that the holder of existing equity is providing fair equivalent new value for the equity that it would receive under the Debtors' proposed plan; the termination of exclusivity does not satisfy the obligation; the Debtors' effort to assign the savings that the reorganized debtor will realize under the new collective bargaining agreement as a component of new value that should be credited to the existing equity holder ignores the record evidence that the Secured Noteholders had reached an agreement in principle with the USWA with substantially similar economic terms.

Because the Secured Noteholders' proposed plan assumes the ability of that group to

successfully negotiate a collective bargaining agreement with the USWA and further assumes

that the pension obligations of the Debtors can be laid at the doorstep of the PBGC through

-5-

one of a variety of possible outcomes over which those plan proponents have no control, this

Court finds that the Secured Noteholders have not met their burden of proof as to the central

issue of feasibility.

In short, the Debtors, allied with the existing equity holder whose commitment to fund

the great majority of pension and related benefits of existing retirees would spare the Debtors

a variety of big dollar claims in this case, a savings that can be translated into a component

of new value on the part of existing equity, have the inside track on proposing a confirmable

plan. If they fail to do so, the Secured Noteholders have given strong evidence of their

willingness to fill that void, should it continue.

## JURISDICTION

This proceeding arises in a case referred to this Court by the Standing Order of

Reference entered in this District on July 16, 1984. It is a core proceeding pursuant to 28

U.S.C. §157(b)(2)(L) over which this Court has jurisdiction pursuant to 28 U.S.C. §1334(b).

This opinion constitutes the Court's findings of fact and conclusions of law required by

Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND OF THIS CASE[4]

*The Bankruptcy Filing:*         On September 16, 2003, WCI Steel, Inc. ("WCI") and

certain of its affiliates,[5] each a debtor and debtor in possession in the above-captioned cases

(collectively, the "Debtors"), filed voluntary petitions for relief under the Bankruptcy Code

---

[4]    The parties in interest in this matter have filed various stipulations which are incorporated in this
Court's opinion as set forth below [docket ##653, 725, 754, 755, 756, 762, 764 and 769]. In
addition, the parties have submitted proposed findings of fact and conclusions of law [docket ##
675, 676, 677 and 678] and pre-hearing briefs [docket ## 682, 683, 684, 685 and 686] which this
Court has also found helpful in making the findings and conclusions set forth herein.

[5]    The affiliated debtor subsidiaries are WCI Steel Metallurgical Services, Inc., WCI Steel
Production Control Services, Inc., WCI Steel Sales L.P., Youngstown Sinter Company and Niles
Properties, Inc.

-6-

with this Court. By Order entered on September 17, 2003, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to §§ 1107 and 1108. [Stip. ¶7 - docket #653]. On September 24, 2003, the United States Trustee for Region 9 appointed the Official Committee of Unsecured Creditors (the "Creditors Committee").[6]

*Summary of the Debtors' Business*: WCI is the primary operating entity among the Debtors. It is a niche oriented integrated producer of value-added, custom steel products. WCI fills a market niche by offering specialized service to its customers, many of whom order in small quantities that might otherwise require them to deal with middlemen. WCI has supplied at least 135 kinds of steel and is willing to accept orders as small as 15 tons for specialty steels. It owns and operates a plant on approximately 1,100 acres in Warren, Ohio. The other Debtors are wholly-owned direct or indirect subsidiaries of WCI. [Stip. ¶3 - docket #653].

Together, the Debtors employ about 1,800 people, approximately 75% of whom are hourly employees and the remainder salaried employees. In addition, there are approximately 686 recipients of pension benefits, including retirees and surviving spouses. Most of the hourly employees are represented by the United Steelworkers of America, AFL-CIO, CLC (the "USWA"). WCI is a party to various collective bargaining agreements (individually a "CBA") with the USWA effective from September 1, 1999 through on or after November 1, 2004 (collectively the "Current CBA"). The Current CBA requires the establishment and

---

[6]     The Creditors Committee consisted of the following seven members: United States Steel Corporation, the USWA, Cleveland-Cliffs Inc., the PBGC, FirstEnergy Corporation, Ogelbay Norton Company and Carmeuse North America. On March 5, 2004, the United States Trustee reconstituted the Creditors Committee to include all the original committee members except for United States Steel Corporation. In light of subsequent assumptions of certain members' contracts, perhaps the United States Trustee should revisit the constitution of the Creditors Committee.

-7-

maintenance of the WCI, Inc.-USWA Defined Benefit Pension Plan (the "Current Pension Plan"). [Stip. ¶4 - docket #653].

The Renco Group, Inc. ("Renco") purchased the assets of the Debtors in 1988 out of the first LTV chapter 11 case for approximately $61 million plus the value of the inventory (resulting in a total purchase price of approximately $66 million). [Stip. ¶1 - docket #653].

On November 27, 1996, the Debtors issued $300 Million face amount of 10% Senior Secured Notes due 2004, Series A and Series B (the "Secured Notes"). The Secured Notes are secured by substantially all of the Debtors' real property, plant and equipment. [Stip. ¶2 - docket #653]. The "Secured Noteholders" consist of Wilmington Trust Company, as indenture trustee, together with holders of approximately $275 million principal face value amount of the Secured Notes. Harbert Distressed Investment Master Fund, Ltd. ("Harbert") is the single largest holder of the Secured Notes. [Stip. ¶¶2, 5 and 6 - docket #653].

WCI performed a reline of its blast furnace during the summer of 2004 which was completed in July 2004. [Stip. ¶9 - docket #653].

*The Plan Process*:    On December 4, 2003, the Debtors filed a motion to extend the exclusive periods provided by § 1121 for a debtor to file a plan and solicit votes in support thereof (the "Exclusive Periods"). The Secured Noteholders objected to granting such extension. On December 22, 2003, over the Secured Noteholders' objection, the Court granted to the Debtors an extension of the Exclusive Periods through and including May 14, 2004 and July 14, 2004, respectively. [Stip. ¶16 - docket #653].

On March 26, 2004, the Secured Noteholders filed a motion to terminate the Debtors' Exclusive Periods (the "Exclusivity Termination Motion"). The Secured Noteholders represented in the Exclusivity Termination Motion that they had formulated a proposed plan of reorganization. [Stip. ¶17 - docket #653].

-8-

On April 6, 2004, the Debtors filed a proposed disclosure statement (as amended from
time to time thereafter, the "WCI Disclosure Statement") describing and attaching their
proposed plan of reorganization ( as amended from time to time thereafter, the "Debtors'
Plan"). [Stip. ¶18 - docket #653].

The Court held a hearing in connection with the Exclusivity Termination Motion on
May 4, 2004. At the conclusion of the presentation of evidence, the Court continued the
hearing until May 11, 2004 to allow each party to make a closing argument. Prior to the
resumption of the hearing, the Debtors advised the Court and the parties that the Debtors were
prepared to consent to the termination of the Exclusive Periods. [Stip. ¶19 - docket #653].
Accordingly, the Court entered a Stipulated and Agreed Order terminating the Exclusive
Periods. [Stip. ¶20 - docket #653].

On May 11, 2004 the Secured Noteholders filed a proposed plan (as amended from
time to time thereafter, the "Secured Noteholders' Plan") and a Disclosure Statement in
support of that plan (as amended from time to time thereafter, the "Secured Noteholders'
Disclosure Statement"). [Stip. ¶21 - docket #653]

The Court entered an Order setting June 8, 2004 as the hearing date to consider
approval of the disclosure statements and fixing June 3, 2004 as the deadline for objecting to
either or both disclosure statements. [Stip. ¶22 - docket #653 ].

On or about June 3, 2004, the Debtors, Renco and the Creditors Committee filed
separate objections to the Secured Noteholders' Disclosure Statement and the Secured
Noteholders filed an objection to the WCI Disclosure Statement. [Stip. ¶¶23 and 24 - docket
#653].

The Court considered the adequacy of the disclosure in each of the disclosure
statements at a hearing held on June 8 and 9, 2004. On June 14, 2004, the Court entered an

-9-

Order approving both the Secured Noteholders' and the WCI Disclosure Statements. [Stip.

¶25 - docket #653].

Various objections to both the Debtors' Plan and the Secured Noteholders' Plan have

been filed with the Court.[7]

*Plan Summaries:*       The following is a summary comparison of the classification

and treatment of claims as set forth in the proposed plans of reorganization that have been

filed in this case.

| CLAIMS/INTERESTS | DEBTORS | SECURED NOTEHOLDERS | DE SHAW |
|---|---|---|---|
| **Secured Lender** | payment in full/payment pursuant to Exit Facility | payment in full/ payment pursuant to DIP Order | payment in full/ sale proceeds of property securing the allowed secured claim/ legal, equitable and contractual rights to remain unaltered |
| **Secured Noteholders** | $94 mil. principal NewCo. Notes, 9% interest per annum, maturity in 2014 | $100 mil. principal NewCo Notes, 9% interest per annum, maturity date in 2014 | $100 mil. principal notes, 9.5% interest per annum, maturity date of 2014 |

[7]       Objections were filed to the Secured Noteholders' Plan by MIC Capital, D. E. Shaw Laminar Portfolios, L.L.C. [ docket # 586]; WCI Steel, Inc. [docket # 584]; The BOC Group, Inc.[docket # 582]; the USWA [docket # 577]; the Creditors Committee [docket # 574]; Congress Financial Corporation [docket # 573]; the PBGC [docket # 572] and the Commonwealth of Pennsylvania, Department of Revenue [docket #539].

Objections were filed to the Debtors' Plan by MIC Capital, D. E. Shaw Laminar Portfolios, L.L.C. [docket #586]; the Secured Noteholders [docket # 583]; The BOC Group, Inc.[docket #579] and the Commonwealth of Pennsylvania, Department of Revenue [docket #377] .

The objections of Congress Financial, the Commonwealth of Pennsylvania and the BOC Group were resolved by agreement of the parties. Because of the Court's findings below regarding the non-confirmability of both plans, the Court does not address all of the issues raised in the remaining objections.

| CLAIMS/INTERESTS | DEBTORS | SECURED NOTEHOLDERS | DE SHAW |
|---|---|---|---|
| **Other Secured Claims** | | | |
| **Convenience Class** | 85% | 100% | 100% |
| **Continuing Vendor** | 50% payable in ten consecutive quarterly payments | N/A | 50% payable in ten consecutive quarterly payments |
| **Other Unsecured Creditors** | pro-rata share of $5 mil. <br> -offers option to sell claim to Renco for cash payment <br><br> -plus potential add'l distribution based on EBITDA in 2006 - 2014 | pro-rata share of $5 mil. (plus proceeds of any avoidance actions) | pro-rata share of $5 mil. |

*Plan Voting:*   The following is a summary of the results of the voting as to the

Debtors' Plan and the Secured Noteholders' Plan [Decl. of Laura DiBiase - docket # 589]:

| Plan Class | Passing | Ballots Accepted | % Count | Amount Accepted | % Amount |
|---|---|---|---|---|---|
| WCI Plan/ Class 2- Secured Noteholders | Fail | 17 | 20.48% | $1,792,266.66 | 21.4% |
| Noteholders Plan/Class 2 - Secured Noteholders | Pass | 79 | 96.34% | 184,849,666.65 | 99.63% |
| WCI Plan/Class 4 - Convenience Class | Pass | 273 | 96.47% | $793,560.31 | 97.00% |
| Noteholders' Plan/Class 4-Convenience Class | Fail | 85 | 36.17% | $193,730.78 | 28.50% |
| WCI Plan/Class 5 - Continuing Vendor Claims | Pass | 56 | 100.00% | $4,511,069.20 | 100.00 |
| Noteholders' Plan/Class 5 | N/A | N/A | N/A | N/A | N/A |
| WCI Plan/Class 7 - Other Unsecured Claims | Fail | 112 | 62.57% | $38,173,818.14 | 15.95% |
| Noteholders' Plan/Class 7 - Other Unsecured Claims | Fail | 89 | 43.00% | $119,112,676.43 | 83.37% |

## DISCUSSION

The requirements for confirmation are set forth in § 1129.  Each plan proponent bears

the burden of establishing the plan's compliance with each of the requirements set forth in §

1129(a).  If an impaired class does note vote to accept the plan, the plan proponent must also

prove that the plan meets the additional requirements of § 1129(b), including that the plan

does not unfairly discriminate against dissenting classes and the treatment of the dissenting

classes is fair and equitable. *In re Exide Technologies, et al.*, 303 B.R. 48, 58-59 (Bankr. D.

Del. 2003).  The Court will now discuss each proposed plan in turn and, in doing so, will

separately set forth findings of fact and conclusions of law as they relate to each plan.

## I.    THE DEBTORS' PLAN

The Court believes in the potential for the Debtors to propose a confirmable plan using

the basic structure proposed in its current plan.  However, the Debtors' valuation both of its

entire enterprise and of the Secured Noteholders' collateral is intellectually suspect and

generally unreliable and the plan unfairly discriminates against the Secured Noteholders.

### A.    *The Debtors' Plan Violates § 1129(b) because Renco is Retaining 100% of the Debtors' New Equity While Failing to Contribute New Value that is Worth the Reasonably Equivalent Value of Such Equity.*

Section 1129(b) provides, in pertinent part,

(1) ... the court shall confirm the plan ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements: ...

(B) With respect to a class of unsecured claims -
...

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Class 7 is impaired under the Debtors' Plan and has rejected the Debtors' Plan.  Thus,

the Debtors' Plan can only be confirmed if is "fair and equitable" with respect to Class 7, as

required by § 1129(b)(1) and if it also provides, as required by § 1129(b)(2)(B)(ii), that "the

holder of any claim or interest that is junior to claims of such class will not receive or retain

-12-

under the plan on account of such junior claim or interest any property." *Bank of America National Trust & Savings Associates v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 441-42 (1999).

The Court's determination of what the equity of the reorganized debtor is worth begins with an analysis of the enterprise value of the reorganized debtor as of the hypothetical effective date of the Debtors' Plan.

### 1.    Findings of Fact  Re:  Enterprise Value

**A1**.    The Debtors and the Secured Noteholders each offered their own experts to testify about WCI's enterprise value.  All of the experts used the same three methodologies for calculating such value: (1) comparable company analysis; (2) precedent transaction analysis (sometimes referred to as mergers and acquisitions);  and (3) discounted cash flow.  Those methodologies which rely on cash flow analysis are more persuasive to the Court in light of Renco's proposal to retain the Debtors' current equity.

### a).    Weighting

**A2**.    The Debtors presented the expert testimony and valuation analysis of Timothy O'Connor, a managing director of Jeffries & Company, Inc. ("Jeffries"), and Brett Levy, a senior research analyst, managing director and co-director of high yield research with Jeffries. [*See* Ex.  96].    Before joining Jeffries, Mr. Levy was a metals industry analyst with RBC Capital Markets ("RBC").  As a part of his work at RBC, he analyzed the Debtors and, based upon publicly available information and consideration of the Debtors in relation to the changing worldwide steel market, made forecasts as to the current and future value of the Debtors and their equity. [Trial Trans. - Levy at 466-67].

**A3**.    Although Mr. Levy now works for Jeffries and has testified in support of Jeffries' valuation opinion, the Court is more persuaded by the statements concerning the

-13-

Debtors' evolving value made by Mr. Levy in analyst reports he wrote while at RBC. When

Mr. Levy was at RBC, he was not associated with any of the current plan proponents and his

professional reputation depended upon offering "objective" analysis of the future prospects

of the steel companies that he followed. In this context he published two reports that directly

addressed the issue of the Debtors' value. In March 2004, Mr. Levy's report presented a

valuation analysis based almost entirely on comparable public companies, using EBITDA[x]

and production capacity multiples. [Ex. 102 - pp. 3-5]. Mr. Levy placed little emphasis on

general precedent transactions analysis because he felt that most of the transactions were not

good comparables for valuing the Debtors. [Trial Trans.- Levy at 595]. Mr. Levy's value

forecast in March 2004, *i.e.*, relatively early in the upturn of the steel commodity market,

placed a value of $250 million on the Debtors' enterprise. Mr. Levy testified that he does not

believe the value of the Debtors has decreased since March 2004.

    **A4**.    In contrast, Jeffries weighted each of the methodologies nearly evenly in its

analysis. Jeffries' calculations set forth in Exhibit 96 are summarized as follows:

| Methodology | Weight | Range (in Millions) | |
|---|---|---|---|
| | | Low | High |
| Comparable Company Analysis | 30% | $220 | $320 |
| Precedent Transaction Analysis | 35% | $160 | $205 |
| Discounted Cash Flow | 35% | $170 | $230 |
| Weighted Average | 100% | $181.5 | $248.3 |
| Concluded Enterprise Valuation Range | | $190 | $250 |

Jeffries ultimately opined that the total enterprise value was between $190 million and $250

million. [*See* Ex. 96 - p.11].

    **A5**.    The Secured Noteholders' presented the expert testimony and valuation

---

[x]    EBITDA connotes a calculation of earnings before interest, taxes, depreciation and amortization.

-14-

analysis of Richard Schmitt, the Chief Operating Officer and Executive Vice President of Accuval Associates, Inc. ("Accuval"), as to the value of the Secured Noteholders' security interest in the Debtors' real property, plant and equipment. Accuval approached the valuation of that collateral from the top down, *i.e.*, starting with the enterprise value derived from the income generated by WCI less working capital and amounts purporting to approximate the value of each category of intangible assets associated with that income stream. In doing so, Accuval also selected an even weight for each methodology. The values derived by Accuval for each method are: $344 million under a Comparable Company Analysis; $260 million under a Precedent Transaction Analysis and $245 million under a Discounted Cash Flow Analysis. Accuval's report reflects a total enterprise value of $285 million. [*See* Ex.112 - p. 52].

**A6**.    The Secured Noteholders also presented the expert testimony and valuation analysis of Steven Strom, a managing director in CIBC World Markets ("CIBC") Restructuring Group and Mark Henkels, a managing director and head of CIBC's Industrial Growth Group. [*See* Exhibit 50]. CIBC opined that the total enterprise value was between $300 million and $350 million. [*See* Ex. 50 - p. 7].

**A7**.    CIBC's ultimate calculations set forth in Exhibit 50 are summarized as follows:

| Methodology | Weight | Range (in Millions) | |
|---|---|---|---|
| | | Low | High |
| Comparable Company Analysis | 55% | $325 | $375 |
| Precedent Transaction Analysis | 10% | $215 | $270 |
| Discounted Cash Flow | 35% | $280 | $335 |
| Weighted Average | 100% | $298 | $351 |
| Concluded Enterprise Valuation Range | | $300 | $350 |

-15-

CIBC concluded that the precedent transaction analysis was not as reliable in this instance given the improvement to the steel industry since the time of the transactions and the lack of similarity in circumstances between the comparable companies and WCI, *i.e.*, auction sale v. plan of reorganization. [*See* Trial Trans. - Strom at 1066-69; Ex. 50 - p. 29]. Therefore, CIBC weighted the comparable company analysis more heavily.

### b).   Choice of Comparables

**A8**.   In addition to the differences in weight given to each methodology, the experts selected different comparable companies for the purpose of analyzing the value of WCI under the Precedent Transaction Analysis and Comparable Companies Analysis.

**A9**.   Jeffries chose five companies in its comparable company analysis: (1) International Steel Group; (2) Dofasco; (3) AK Steel Holdings, (4) Wheeling-Pitt and (5) Algoma Steel.   Mr. Levy testified that he believed these were appropriate comparable companies because they were domestic or North American steel companies. [Trial Trans. - Levy at 487-96].

**A10**.   With the exception of Algoma Steel, CIBC relied upon the same companies. CIBC also considered U.S. Steel, Arcelor, Corus Group, Steel Dynamics and Nucor in its analysis. [Ex. 50 - p. 10].   In its updated valuation analysis, CIBC included Algoma Steel, Inc. in its Comparable Company Analysis, but this inclusion did not change CIBC's expert opinion as to the valuation numbers. [*See* Ex. 111 - p. 2].

**A11**.   In its Precedent Transaction Analysis, Jeffries relied on the acquisitions of Weirton Steel, Republic Engineered Products, Rouge Industries, Bethlehem Steel and National Steel Corp.   Each acquisition took place in 2003 or 2004.   Mr. Levy indicated that Jeffries believed these transactions to be directly comparable to WCI's, in part due to the fact that many of these transactions occurred in a bankruptcy context. [*See* Trial Trans. - Levy at

-16-

491, 505-06]. That analysis did not distinguish between sales under § 363, often when

continued operating funds were in jeopardy, and sales pursuant to reorganization plans.

**A12**. In addition to these acquisitions, CIBC included some older transactions, such

as, Co-Steel, Birmingham Steel, RTI, LTV Corp. and Inland Steel. These older transactions

generally took place at higher multiples of revenue, EBITDA and tons capacity than the 2003

transactions focused on by Jeffries. Mr. O'Connor testified that the state of the steel market

in 2002 was more similar to present circumstances than the state of the steel market in 2003.

[Trial Trans. - O'Connor at 398-400]. Christopher Plummer of Metal Strategies, Inc., a well

respected expert in the steel industry, testified that he routinely uses transactions that took

place in 2002 in his presentations and calculations if the situations are otherwise factually

similar. [*See* Ex. 95 - p. 32; Trial Trans. - Plummer at 1012-13].

### c).    Projections

**A13**. Finally, the experts relied on different sets of projections to calculate enterprise

value.

**A14**. Jeffries relied upon the Projected Financials in Exhibit 3 of the WCI

Disclosure Statement and did not rely on or incorporate any subsequent financial information

which may have been available from WCI for the enterprise valuation. [Stip. ¶2 - docket

#754]. These projections are "conservative" and are not the most reasonable projections in

light of the current state of the steel market. [Trial Trans. - Plummer at 995] ("given the

magnitude and totally unexpected degree of change in the marketplace, I think it would be

obvious that the absolute dollar values of our forecasts were no longer valid.").

**A15**. In addition, Jeffries' financial projections are not based on a normalized fiscal

year. This failure to normalize the financial projections for the calendar year resulted in an

"apples to oranges" comparison. [Trial Trans. - Strom at 1053]. Using projections that have

not been normalized caused Jeffries' ultimate valuation numbers to be lower than those of CIBC. If Jeffries had used normalized projections, which it should have, its comparable company analysis would have yielded a higher valuation range.

**A16**.   A 13 Week Cash Flow was filed under seal with this Court on October 22, 2004. That document, which sets forth the Debtors' expected cash flow from October 1, 2004 to December 31, 2004, casts further doubt on the reliability of the projections used by Jeffries and lends more credence to the projections used by CIBC.

**A17**.   Based upon the evidence submitted at the confirmation hearing, the Court finds that the enterprise value of the reorganized debtor operating under the CBA that is part of the Debtors' Plan is likely to be not less than $300 million. Because confirmation is not occurring now, the question of enterprise valuation is one that must be determined in relation to the effective date of the plan, that issue may need to be revisited if revised competing plans are submitted in this case. Recognizing that value issues will be the subject of further discussion and, one hopes, negotiation among the key players in this case, it may be useful to recognize that the most relevant metric is discounted future cash flow. Focus on flexible instruments that would distribute cash flows that were not necessary to the continued economic health of the reorganized debtor's operations ought to result in those key players reaching agreement on a consensual chapter 11 plan.

### 2.   Findings of Fact Re: Debtors' Implied Equity Value

**A18**.   The value of equity in a company can be calculated by subtracting the total long term debt against the entity from the enterprise value. The debt to be subtracted from the enterprise value of the reorganized debtor includes the value of the new notes, the loan from the State of Ohio, the cure payments on executory contracts, and the balance on the revolving credit agreement.

-18-

**A19**. The Court finds that the reorganized debtor's long term debt, as of the effective date of a plan, would include, at a minimum, (1) approximately $100 million in new notes, with the terms and characteristics of the notes proposed under the Secured Noteholders' Plan, (2) a $5 million loan from the State of Ohio, (3) approximately $21 million earmarked for cure payments on executory contracts under the Debtors' Plan, (4) a $5 million distribution[9] to Class 7 claimants in the "out years," and (5) the approximately $35 million balance on the revolving credit agreement,[10] for a total of approximately $166 million.

**A20**. Assuming an enterprise value of, say, $320 million at the time of the effective date of a plan, the implied equity value of the reorganized debtor, prior to the infusion of new value by existing equity, would be approximately $154 million.

### 3. Findings of Fact re: Renco's Contribution

#### a). Cash

**A21**. The Debtors' Plan provides that Renco would pay, on the effective date of the plan, $35 million in exchange for all of the equity in the reorganized debtor. The Debtors' Plan proposes that the reorganized debtor will retain the $35 million rather than distribute any of that money to the Debtors' creditors.

**A22**. Because the cash is to be retained by the reorganized debtor, the cash contribution by Renco actually increases the equity value of the reorganized debtor. Therefore, the Court finds that to the extent the cash contribution is treated as new value, it

---

[9] The Debtors argue that the distribution in the out years is potentially much larger, growing to approximately $30 million. Even if the Debtors' calculations are correct, it does not change the Court's conclusion that Renco's contribution falls short of being the fair equivalent value of the equity of the reorganized debtors. Indeed since such payments are subject to a cap, it exacerbates it.

[10] The 13 Week Cash Flow projections show that the Debtors' assumption about the projected amount of the revolver was inflated. At the time of eventual confirmation the amount of the revolver will not be $60 million, but likely will be half of that number, or less.

-19-

directly increases the reorganized debtor's equity value.

### b). Labor Savings

**A23**.   The USWA has entered into a new CBA with WCI (the "Revised WCI CBA").

**A24**.   Thomas Gentile, the Debtors' Treasurer and acting Chief Financial Officer, testified that the labor savings achieved under the Revised WCI CBA are $42 million in the first year and approximately $149 million over the life of the agreement. Although Mr. Gentile's testimony is undisputed with respect to the amount of labor savings, the Court finds that the Debtors failed to prove that these labor savings should be attributed to Renco in determining the value of Renco's contribution. Rather, the record evidence shows that the USWA was ready to enter into a contract with similar benefits to the company with the Secured Noteholders, such terms having now become something of industry norms.[11] The source of the value of the labor savings, then, is from the workforce. This is not irrelevant to this analysis because it provides real consideration to support the contractual right of the USWA to block a sale of a reorganized debtor's assets or stock, particularly to the extent that such a sale would alter the controlled group for purposes of pension liability.

### c). Pension Savings

**A25**.   The Court finds that the appropriate measure of the value of the pension savings to the Debtors is the amount of pension liability to be assumed by Renco, for which Renco cannot seek reimbursement from the Debtors. According to an excerpt from the March 26, 2004 agreement between WCI, Renco and the USWA, which is attached to the WCI Disclosure Statement as Ex. 5, Renco will be obligated to contribute $54 million over the first three years and $12 million thereafter as the initial minimum contributions for the current Pension Plan for a total of $66 million (defined as the "Minimum Renco Contribution").

---

[11]   *See* Findings of Fact D3 - D6, *infra.*

-20-

**A26**.   The reorganized debtor can upstream payments to Renco under certain

circumstances in certain amounts. According to the excerpt, the reorganized debtor may

upstream payments to Renco in the following amounts:

c.     Provided such Upstreamed funds are directly contributed to the Old
       Pension Plan [as per Union's Pension Proposal] in any given year, the
       greater of (I)(A) the minimum contribution to the Old Pension Plan
       required under law [to be defined]; minus (B) the Minimum Renco
       Contribution (as defined below); minus (C) any Upstreaming that has
       occurred under d below since the Effective Date; and (ii) 20% of Net
       Income [to be defined]...

d.     Beginning in 2007, provided the Company has made capital
       expenditures of at least the amount indicated on Attachment C hereto,
       the lesser of (a) 50% of Net Income after deducting all Upstreaming
       payments made under a-c above including, in the case of Upstreaming
       payment made under c, above, all such payments made since the
       Effective Date; and (b) an amount which, after such Upstreaming,
       would leave the Company with total liquidity [to be defined] both
       immediately and on a projected basis over the succeeding twelve
       months, of at least \$75 Million.

**A27**.   The best that the Court can do is discuss this theoretically because, on the

evidence before the Court, there is no means of calculating an actual dollar figure. However,

based on the record before it, the Court finds that the value of Renco's new value

contributions under the Debtors' Plan totals significantly less than the value of the equity that

the existing equity holders would receive under the Debtors' Plan.

### 4.   Conclusions of Law

### a).   Absolute Priority and New Value

In order for old equity holders to retain the equity of a reorganized entity, a

contribution must be (1) in the form of money or money's worth; (2) necessary to the

reorganization and (3) reasonably equivalent to the value of the interest being purchased. *In

re Beaver Office Prods., Inc.*, 185 B.R. 537, 542 (Bankr. N.D. Ohio 1995)**.**     The Debtors

have the burden of proving that Renco is not receiving the reorganized debtor's equity "on

account of" its existing equity interest, but rather on account of new value in "money or money's worth" equal or equivalent to the value of the reorganized debtor. "This involves looking at the need for the contribution and whether [the equity holder] paid a fair price for its interest." *In re U.S. Truck*, 800 F.2d 581, 588 (6th Cir. 1986); *see also In re Economy Lodging Sys., Inc.* 205 B.R 862, 865 (Bankr. N.D. Ohio 1997) (recognizing the new value exception, but declining to confirm the proposed plan due to insufficiency of the proposed new value).

The Debtors argue that they have satisfied the requirements of the absolute priority rule and the new value corollary by terminating exclusivity and engaging in a so-called marketing process. Contrary to the Debtors' contention, the Supreme Court did not hold that either the termination of exclusivity or engaging in a "marketing process" automatically satisfy the absolute priority rule.[12]  The Supreme Court simply held that, as a matter of law, plans providing junior interest holders with exclusive opportunities free from competition and without the benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii). *203 North LaSalle*, at 458.  In other words a marketing process and the termination of exclusivity are necessary, but are not independently sufficient steps to prove compliance with § 1129(b)(2)(B)(ii).

In a case like this where the market was not or cannot be tested, plan confirmation centers on enterprise value.  As in *In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003), the market based approach should be rejected and other valuation methods embraced. *Id.* at 65-66.  The Debtors argue that *In re Union Financial Servs. Group, Inc.*, 303 B.R. 390 (Bankr. E.D. Mo. 2003) directs this Court to find § 1129(b) satisfied by virtue of the Debtors'

---

[12]    Furthermore, the marketing process in this instance does not constitute the type of process that could be considered to adequately test the market for the Debtors' assets and equity.

-22-

marketing process. *In re Union Financial Servs. Group, Inc.* is not controlling authority.
Further, it is not analogous factually. In *Union Financial*, the marketing process began prior
to the petition date and was an open and independent process. Further, the court in *Union
Financial* was not asked to confirm a plan over the objection of an impaired creditor, but
rather over the objection of a frustrated bidder. *Id.* at 425. Therefore, the Court finds *Union
Financial* inapposite to this case.

It is the burden of the Debtors to prove, by a preponderance of the evidence, that
Renco is paying "top dollar" for the reorganized debtor's equity. Renco argues that its
contributions should be viewed to included three main components - a cash contribution, all
of the projected savings under the Revised WCI CBA and the assumption of pension
liabilities.

### (1) Cash Contribution

A cash contribution clearly is money or money's worth. However, Renco's cash
contribution does not constitute new value because it is not being distributed to creditors. It
is being used to increase the equity value of the reorganized debtor. This is impermissible
round housing. *See In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695, 708
(Bankr. S.D. N.Y. 1993) (finding that proposed new value contribution did not satisfy the
absolute priority rule because only the new equity holder would benefit from such repairs);
*In re Miami Ctr. Assocs. Ltd.*, 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992); *cf. In re 8315
Fourth Ave. Corp.*, 172 B.R. 725, 739 (Bankr. E.D. N.Y. 1994).

### (2) Revised WCI CBA

The Debtors argues that the labor savings under the Revised WCI CBA should be
considered value contributed by Renco because Renco closed the final deal with the USWA.
The Debtors cite to *In re Union Financial* and *In re Treasure Bay Corp.*, 212 B.R. 520, 545

-23-

(Bankr. S.D. Miss. 1997) for the proposition that the value the court should consider is the

value to the estate, not a credit to the contributor. In *Treasure Bay Corp.*, the creditors argued

that the debtors failed to prove that the property contributed to the estate was worth

$4,500,000. The court disagreed. The court wrote,

> The evidence showed that Shoreline purchased the Budget Inn property on
> February 15, 1995 for $3,667,596.26. Given that over two years has passed,
> that real property values in Biloxi have been increasing because of gambling,
> and the particular advantages the Budget Inn property brings to the Treasure
> Bay Casino, the court finds that the contribution of the Budget Inn property is
> reasonably equivalent to a value of $4,500,000.

*Id.*

In contrast, the Secured Noteholders argue that new value must consist of money or

money's worth - meaning that it should be capable of exchange in any market for something

of value to creditors today. *In re Economy Lodging, Sys., Inc.*, 205 B.R. at 868. New value

contributions must be "balance sheet" assets that provide value to a reorganized debtor in the

event of a failed reorganization. *See Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908

F.2d 1351, 1362 (7th Cir. 1990). Further, the Secured Noteholders argue that the Revised WCI

CBA is a market rate contract and the contribution of a market rate contract does not

constitute new value. *See In re SunCruz Casino*, 298 B.R. at 841.

The Court finds that the full value of the labor savings under the Revised WCI CBA

are not attributable to Renco as new value.

### (3) Pension Liabilities

The Debtors argue that another component of the new value being contributed by

Renco is Renco's assumption of the Debtors' pension liabilities relative to the Current

Pension Plan. The Debtors argue that this has a value of $48 million to $86 million

attributable to Renco. The Secured Noteholders counter that Renco's assumption of liabilities

-24-

for which it was already responsible, albeit secondarily, does not constitute new value.

The Court believes that the value appropriately attributable to Renco is the amount of pension liability assumed by Renco for which the Debtors will no longer be primarily liable and for which Renco cannot seek reimbursement from the Debtors. It is arguable that the computation of new value should be limited to what this bankruptcy estate would pay on the claims that are entirely avoided because of this highly unusual treatment of the pension issues. Because this Court recognizes the importance of a highly motivated work force charged with every incentive to make the reorganized debtor successful, the Court concludes that on the facts and circumstances of this case it is appropriate to give dollar for dollar new value credit to the existing equity to the extent that it will pay such benefits without any ability to be reimbursed by the reorganized debtor.[13]

### b.)  Fair and Equitable

Separate and apart from satisfaction of the absolute priority rule, a plan must be fair and equitable. *In re Dow Corning*, 244 B.R. 678, 687-95 (Bankr. E.D. Mich. 1999) (discussing the breadth of the "fair and equitable" requirement of § 1129(b)); *203 North LaSalle*, 526 U.S. at 449-50.   Treatment of Class 7 is not fair and equitable in light of the retention of 100% of the equity by Renco in exchange for a contribution of $35 million plus the present value of the portion of future pension payments that equity is obligated to make without any ability to seek reimbursement.  The implied equity of the reorganized debtor under the Debtors' Plan is worth one or more multiples of the new value credit to which Renco is entitled.  This is further corroborated by the market evidence (even as dampened as it has been by the signals from Debtors' management and thus not a product of truly adequate market exposure) showing another buyer would pay the equivalent of $85 million.

---

[13]     *See* Finding of Fact A27, infra.

Viewed from yet another perspective, excluding the monies directed to Class 7 under

the Debtors' Plan, the reorganized debtor's long term debt, at the time of confirmation, would

include, at a minimum, (1) approximately $100 million (the amount provided in the Secured

Noteholders' Plan and therefore an appropriate place holder for the purpose of discussions)

in new notes, (2) a $5 million loan from State of Ohio, (3) approximately $21 million

earmarked for cure payments on executory contracts under the Debtors' Plan and (4) the

balance on the revolving credit agreement,[14] say for this discussion's sake, a total of

approximately $155 million. Assuming an enterprise value of, say, $310 million at the time

of the effective date of the plan, the question that all of the key players should address when

they (re)turn to negotiations is who would have what entitlement to implied remaining value

of, say, $155 million.

In addition, the enterprise value of the reorganized debtor depends on certain

intangibles. Thus, the enterprise value of the reorganized debtor will vary depending upon,

*inter alia*, the ownership structure. For instance, the Debtors' Plan, which seems to include

the preservation of workforce morale, would probably generate a reorganized debtor with a

higher enterprise value.

## B. The Debtor's Plan is Not Confirmable Because its Distribution of $94 Million in new 9% 10 year Notes Does not Comply with the Requirements of § 1129(b)(2)(A).

In order for the Debtors' Plan to be capable of confirmation, it must provide for

payment on the Secured Noteholders' Class 2 claims to the full extent of the value of their

collateral or provide treatment to which the Secured Noteholders have agreed. *See* §

1129(b)(2)(A).

---

[14]      *See* fn. 10, supra.

-26-

1.    **Findings Re: Value of Secured Noteholders's Collateral**

**B1**.    The Secured Noteholders' collateral includes substantially all of the Debtors' real property, plant and equipment (the "PP&E"). It does not include any other tangible or intangible assets or the Debtors' goodwill.

**B2**.    The Debtors' audited financial statements at the time these bankruptcy cases were filed listed the value of the PP&E as $185,433,000.

**B3**.    During the confirmation hearing, the Debtors presented the testimony and valuation analysis of John Connolly, an Executive Vice President and the Chief Operating Officer of Nationwide Consulting Company, Inc. ("NCC"). Mr. Connolly testified that he believed the value of the PP&E to be $94 million as of the petition date, September 16, 2004. Mr. Connolly also testified that he did not believe the value of the PP&E had changed significantly between the petition date and the time of his testimony.

**B4**.    The Court finds that Mr. Connolly's/NCC's appraisal is not entitled to any weight because neither NCC's report nor its workfile disclose the reasoning, basis, and support purportedly underlying Mr. Connolly's conclusions.    Mr. Connolly's testimony revealed several inexcusable departures from required documentation necessary to support a valid appraisal. Second, the values Mr. Connolly attributes to each category of the Secured Noteholders' collateral are inconsistent with the limited documentation that does exist in his workfile. In other words, the documentation that exists provides no basis for the slashing of asset values evident in Mr. Connolly's final report. Finally, Mr. Connolly testified that he used an overall depreciation factor, based on the LTV II transaction, to value the PP&E. The Court finds the testimony and analysis of Mr. Connolly wholly incredible and unreliable.

**B5**.    Accuval approached the valuation of the PP&E from the top down, *i.e.*, starting with the enterprise value derived from the income generated by WCI less working capital and

-27-

amounts purporting to approximate the value of each category of intangible assets associated with that income stream. Using this methodology and current projections and market data for steel companies, Accuval arrived at a value for the Secured Noteholders' collateral of the PP&E of $184 million as of October 1, 2004.

 **B6**. The Secured Noteholders's Plan offers new notes to Class 2 Claimants in the amount of $100 million.

 **B7**. The Court finds that currently the only possibly useful evidence of value of the PP&E is the valuation analysis by Accuval and the Secured Noteholders' Plan.

  **2.** **Conclusions of Law**

 The Debtors have the burden of proving, by a preponderance of the evidence, that the Debtors' Plan satisfies the requirements of § 1129(b)(2)(A) that the Secured Noteholders are being paid the value of their collateral. Valuation for the purposes of "cramming down" a proposed plan is to be determined as of the effective date of the plan. *See In re Kidd*, 315 F.3d 671, 676-77 (6th Cir. 2003); Collier on Bankruptcy ¶ 506.03[10]. In addition, the valuation is to be done in light of the purpose for the valuation. *See Assocs. Comm. Corp. v. Rash,* 520 U.S. 953, 963 (1997).

 In this circumstance, where the Debtors are proposing to retain the PP&E for future use in place, the Debtors argue the appropriate measure of value of a secured creditor's claim against specific assets is defined by the going concern value of its collateral and not by values the collateral may have when combined with other assets that are not secured by such creditor's claim. *In re TennOhio Transp. Co.*, 247 B.R. 715, 720 (Bankr. S.D. Ohio 2000). In contrast, the Secured Noteholders argue that, because the Secured Noteholders' collateral is used to generate income in the form of an integrated manufacturing facility, the appropriate valuation method must consider the income generated by the collateral. *In re Fiberglass*

-28-

*Indus., Inc.,* 74 B.R. 738, 742 (Bankr. N.D. N.Y. 1987). The Secured Noteholders cite to *In re LTV Steel*, 285 B.R. 259, 277 (Bankr. N.D. Ohio 2002) for the proposition that with respect to steel mills in particular, courts have valued property, plant and equipment based upon the income generated by the mill, minus the working capital needed to get it up and running. The Court recognizes the incentives, on each side, to either overvalue or undervalue Debtors' enterprise and their constituent assets. *In re Coram Healthcare, Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004) *citing In re Exide Technologies*, 303 B.R. 48, 61 (Bankr. D. Del. 2003). In addition, the Court recognizes that valuation is a mixture of art and science, and therefore, experts often disagree. Nonetheless, the Court does not credit the opinion of NCC and discounts the opinion of Accuval because of its top down approach.

As the record is now developed the only reliable evidence of value of the Secured Noteholders' collateral is measured by the value of what the Secured Noteholders themselves proposed to distribute on account of the old notes, *i.e.*, new notes in the amount of at least $100,000,000 with terms, conditions and restrictions so that they would trade at par. The Court understands that this treatment was in the context of a plan that directed all of the remaining enterprise value to holders of general unsecured claims. It is notable that one of the few matters on which the Debtors, the Secured Noteholders, the union and existing equity appeared to have a consensus was that the reorganized debtor should not have excessive fixed debt. While not a one to one relationship, the amount of debt that could be reliably serviced from the operation of the PP&E is relevant to its value in use by the reorganized debtor.

C.      **The Debtors' Plan Unfairly Discriminates Against the Secured Noteholders
        in Violation of § 1129(b).**

1.      **Findings of Fact**

a.)     **Class 4**

**C1**.    Class 4 is a convenience class that includes general unsecured creditors holding

claims of $5,000 or less, or those holding claims of more than $5,000 but agreeing to reduce

their claims and be treated under Class 4. Class 4 claimants will receive 85% of their allowed

claim in cash on the effective date. There are over 300 claims in Class 4. Class 4 voted to

accept the Debtors' Plan

b.)     **Class 5**

**C2**.    Class 5 claims are defined in the Debtors' Plan as follows:

Unsecured Claims for liabilities that were incurred by the Debtors prior to the
Filing Date for the purchase of products or services in the ordinary course of
business of the Debtors by creditors which (a) have been identified by the
Debtors as vendors which are to continue to provide Debtors with products or
services important to the Debtors' operations after the Confirmation Date, and
(b) have agreed to provide such products or services to the reorganized
Debtors on commercial terms approved as beneficial by the Debtors....

*See* Debtors' Plan, Definition of "Continuing Vendor Claims."

**C3**.    The Debtors' Plan proposes to pay Class 5 claimants 50% of their allowed

claims in ten consecutive quarterly cash installments, each in the amount of 5% of the allowed

claim beginning January 1, 2005.

**C4**.    The Debtors classified the claims of 74 trade creditors as Class 5 - Continuing

Vendor Claims. The trade creditors placed in Class 5 (the "Class 5 Vendors") consist of (1)

28 trucking companies and 1 railroad; (2) six "outside processors" and warehouses; and (3)

39 "suppliers," of which 11 "original equipment manufacturers" provide parts and services

to maintain and repair original equipment sold to WCI; eight provide professional consulting

-30-

services concerning environmental, actuarial and legal matters; eight supply commodities; one, the City of Warren, Ohio, provides water and sewer service; and 11 supply other goods and services. [Stip. ¶1 - docket #765].

**C5**.      In the first few weeks after the bankruptcy filing, the Debtors' strategy "was to do whatever [WCI] needed to do to continue to receive the material or service that was critical ..., to [the Debtors'] continued operation." [Stip. ¶12 - docket #765].

**C6**.      In the first few weeks after the bankruptcy filing, some vendors requested or required that WCI agree to tighter payment terms. WCI generally acquiesced to the new terms, in some instances after negotiating over the particular payment terms that would apply during its bankruptcy. [Stip. ¶13 - docket #765].

**C7**.      Of the vendors who requested and obtained tighter payment terms incident to WCI's bankruptcy, some 31 were later placed in Class 5. The other 43 vendors later placed in Class 5 never changed their payment terms. [Stip. ¶14 - docket #765].

**C8**.      Many vendors later placed in Class 4 (*i.e.*, "Convenience Claims") and Class 7 (*i.e.*, "Unsecured Claims") also requested and received tighter payment terms from WCI in the weeks immediately after the bankruptcy.   WCI agreed to tighter payment terms with substantially more than 31 Class 4 vendors (of the approximately 300 vendors in that Class) and substantially more than 31 Class 7 vendors (of the approximately 200 vendors in that Class). [Stip. ¶15 - docket #765].

**C9**.      After the "initial shock" of the bankruptcy filing had dissipated, WCI was "able to fend off" the tightening of payment terms requested by other vendors and rather kept vendors on their pre-petition payment terms. [Stip. ¶16 - docket #765].

**C10**.      WCI expected that almost all of its vendors would revert to their normal pre-petition payment terms following WCI's emergence from bankruptcy. None of the vendors

-31-

later placed in Class 5 had ever stated, prior to being notified of their placement in Class 5,
that they would refuse to do business with WCI postconfirmation unless their pre-petition
claims received preferential treatment in the bankruptcy proceeding. [Trial Trans. - Gentile
at 112, 117-18]. However, Carmeuse Lime, Inc. ("Carmeuse"), which had one of the largest
pre-petition claims of any trade creditor ($767,112.60) and an existing, but about to expire,
executory contract with WCI, unsuccessfully pressed WCI on its claim soon after the
bankruptcy filing. After Carmeuse's executory contract expired and was rejected, Carmeuse
was later placed in Class 5. [Stip. ¶¶17-18 - docket #765].

**C11.** All or substantially all of the Class 5 Vendors have long-standing business
relationships with WCI. [Trial Trans. - Gentile at 80-81]. Most of the supplier and outside
processor vendors later placed in Class 5 had (and still have) "blanket" purchase orders in
place with WCI. A "blanket" purchase order commits a vendor to supply its goods or services,
at a specified price, for a term of typically one year. In practice, regardless of whether a
vendor could do so as a legal matter, vendors with blanket purchase orders have not cancelled
such orders other than for reasons of non-payment or non-availability of product. [Stip. ¶¶19-
20 - docket #765].

**c.)   Class 7**

**C12.** The general unsecured claims not included in either Class 4 or 5 have been
placed in Class 7. The Class 7 claims include the deficiency claims of the Secured
Noteholders. Under the Debtors' Plan, Class 7 claimants will receive a pro rata share of $5
million plus accumulated interest on the fifth anniversary of the effective date of the plan.
Class 7 claimants may also receive the "Earnings Based Class 7 Distributions" as defined in
an amendment to the Debtors' Plan.

**C13.** Renco offered to purchase approximately $8 million in Class 7 claims held by

-32-

vendors for 15% of the face amount of the claims upon confirmation of the Debtors' Plan. Renco's offer to purchase the claims is contained in the WCI Disclosure Statement. A Class 7 vendor creditor agreed to sell its claim to Renco by checking a box on its ballot and voting for the Debtors' Plan.

## 2.    Conclusions of Law

Section 1122(a) governs the classification of claims.  This section does not demand that all similar claims be placed in the same class; however, a debtor may not classify similar claims differently solely to gerrymander an affirmative vote on a plan. *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 893 (Bankr. N.D. Ohio 2004).  A separate classification of similar claims can be justified if a debtor proves that there is a legitimate business reason supporting the classification. *Id.*  In *In re Snyders Drug Stores, Inc.* the debtors created a class ("class 10") made up of primarily but not exclusively trade creditors with whom the reorganized debtor hoped to do business after the reorganization.  The court found that the debtors separate classification was justified by a legitimate business reason: the intention to do business with those creditors in the future. *Id.* at 893-94.

Despite the ability of the debtors in *In re Snyders Drug Stores, Inc.* to meet the requirements of § 1122, the debtors were not able to show that the different treatment afforded to its class 10 claimants was anything other than unfair discrimination prohibited by § 1129(b).

As in the *Snyders Drug Store* case, the Debtors have proposed a separate class made up primarily of trade creditors with whom the reorganized debtor hopes to do business after the reorganization.  Even assuming the Debtors have a legitimate business reason for the

-33-

separate classification resulting in Class 5, the Debtors have not shown that the different

treatment granted to Class 5 claimants is anything other than unfair discrimination prohibited

by § 1129. Thus, the Debtors may have the acceptance of one or more impaired classes of

claims, but the Debtors have not met the burden of showing that the plan does not unfairly

discriminate between classes of creditors.

### a.)   Intra Class Discrimination

Section 1123(a)(4) provides that: (a) ... a plan shall - (4) provide the same treatment

for each claim or interest of a particular class, unless the holder of a particular claim or

interest agrees to a less favorable treatment of such particular claim or interest.  Thus, the

treatment intra class must be the same.   The Secured Noteholders argue that Renco's offer

to the creditors with Class 7 claims, excluding the Secured Noteholders, to purchase those

claims allows certain members of Class 7 to receive better treatment than that offered to the

Secured Noteholders with respect to their deficiency claim. *See In re Allegheny Int'l., Inc.*,

118 B.R. 282, 292-94, 316 (W.D. Pa. 1990) (condemning agreement negotiated by debtors

that permitted some, but not all, of the debtors' bank creditors to sell their claims to a third

party for cash instead of the stock distributed under the Plan); *In re P-R Holding Corp.*, 147

F.2d 895, 897 (2d Cir. 1945) (plan proponents discriminated between assenting and dissenting

bondholders by purchasing the dissenters' claims for cash, leaving the accepting bondholders

to receive stock under the plan).

The Debtors suggest that a third party offer providing for the use of non-estate funds

to purchase creditor claims as disclosed in their disclosure statement does not contravene the

requirements of § 1123. *See In re Cajun Electric Power Co-op, Inc.*, 150 F.3d 503, 507 (5th

-34-

Cir. 1998). The distributions approved in *Cajun Electric* were offers to reimburse the legal fees of certain creditors and were separate and apart from the proposed distributions to those creditors on their claims.

### b.) Inter Class Discrimination

The question is whether the discrimination is unfair within the meaning of § 1129(b)(1). Courts use a four-part test to determine if the discrimination is unfair: (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) how the class that is being discriminated against is treated. *In re Snyders Drug Stores, Inc.,* 307 B.R. 889, 894-95 (Bankr. N.D. Ohio 2004); *In re Graphic Communications, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996); *In re Creekstone Apartments Assoc., L.P.*, 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994).

With respect to the first factor, some courts have allowed a plan to discriminate if the proposed discrimination protects a relationship with specific creditors that the debtor needs to reorganize successfully. *Id.*

In this case, as in *Snyder Drugstore,*

> The testimony did not, however, go far enough to prove that the general propositions discussed above justify discrimination in this particular case. Several things weigh against the explanation provided for the proposed discrimination. First, class 10 is not solely made up of trade vendors. Instead, the class of nearly 2569 creditors includes: (1) trade vendors; (2) service providers; and (3) lessors of stores which the reorganized debtor will continue to operate. There was no evidence to support the preferential treatment afforded to the lessors included in class 10. Second, there was no evidence to prove that the trade and service creditors included in class 10 would refuse to deal with the reorganized debtor on acceptable terms going forward absent some preferential payment under the plan. Class 10 is not, therefore, reasonably tailored to foster only those relationships that are critical to the

-35-

> success of the reorganized debtor. [FN9 omitted] The plan proponents did not
> prove that there was a reasonable basis for the discrimination.

307 B.R. at 895. The Debtors have not met their burden of showing that the discrimination
is reasonably tailored or has a reasonable basis. The discrimination is unfair.\

With respect to Class 4, an impaired class that voted to accept the Debtors' Plan, the
Secured Noteholders argue that Class 4 is artificially impaired and, thus, cannot be used to
satisfy the requirements of § 1129(A)(10). Given the Court's findings and conclusions with
respect to Class 5 and unfair discrimination, the Court does not need to address this argument.

## II.    THE SECURED NOTEHOLDERS' PLAN

In addition to the previously mentioned confirmation requirements, a chapter 11 plan
must provide an "adequate means for the plan's implementation" and the plan proponent bears
the burden of proving by a preponderance of the evidence that, *inter alia*, "[c]onfirmation of
the plan is not likely to be followed by the liquidation, or the need for further financial
reorganization, of the debtor or any successor to the debtor under the plan. . . ." § 1123(a)(5);
§ 1129(a)(11). *See also* § 1129(a)(1) (which requires that, to be confirmed, the "[t]he plan
[must] compl[y] with the applicable provisions of this title"). Objections were raised
regarding the adequacy of implementation and feasibility of the Secured Noteholders' Plan
in relation to two specific issues: (1) a collective bargaining agreement (or lack thereof)
between the reorganized debtor and the USWA and (2) the pension plan that would be offered
to USWA workers by the reorganized debtor.[15]

---

[15]    Other objections to confirmation of the Secured Noteholders' Plan were also raised including one
by the USWA that confirmation of the Secured Noteholders' Plan would violate the successorship
clause in the Current CBA and the provisions of § 1113(f). Because of the Court's findings herein
regarding adequacy of implementation and feasibility of the Secured Noteholders' Plan, it need not
reach all the other issues raised in all pending objections.

-36-

*A.*     ***The Lack of a Collective Bargaining Agreement Between the USWA and the Reorganized Debtor under the Secured Noteholders' Plan Renders that Plan Unfeasible.***

**1.      Findings of Fact**

**D1**.     The USWA is the collective bargaining representative for over 1,300 employees of WCI and serves as the authorized representative pursuant to § 1114(c) of WCI's bargaining unit retirees and surviving spouses. The USWA has represented bargaining unit employees of WCI and its predecessor companies for many years. [Stip. ¶9 - docket #725].

**D2**.     The Current Pension Plan provides, among other benefits, normal retirement benefits, early retirement benefits and special shut down benefits in the event of a shutdown of WCI. [Joint Ex. 127].

**D3**.     The USWA has entered into many innovative collective bargaining agreements over the years, including the groundbreaking contract reached with International Steel Group in December 2002, which has served as the model for many recent contracts. [Stip. ¶5 - docket #725].

**D4**.     The USWA has also not hesitated to meet forcefully and effectively the challenge of major labor disputes, whether strikes or lockouts, including those with US Steel (1986), LTV I (1987), Ravenswood Aluminum Corp. (1990-92), Bridgestone/Firestone (1994-96), WCI Steel (1995), Wheeling-Pittsburgh Steel (1996-98), Georgetown Steel Corp. (1997-98), GST Steel Co. (Kansas City facility) (1997), Magnetic Specialties, Inc. (Marietta, Ohio) (1997-98), Rocky Mountain Steel (1997-2004), RMI Titanium Co. (Niles, Ohio)(1998-99; 2003-present), Southwire Co. (1998-99), Titan Tire Co. (Des Moines) (1998-2001), Titan Tire Co. of Natchez (Natchez, Miss.) (1998-2001), Kaiser Aluminum and Chemical Corp. (1998-

2000), Continental General Tire (1998-99), Rubatex Corp. (1999-2001), Newport News

Shipbuilding (1999) and AK Steel (Mansfield, Ohio) (1999-2002). [Stip. ¶6 - docket #725].

**D5**.     In 1995, an extremely acrimonious labor dispute occurred at WCI that had a

devastating impact on the company. Two principal issues in the dispute were pension benefits

and the successorship clause in the CBA. [Stip. ¶10 - docket #725].

**D6**.     Following the closing of LTV Steel in 2001, the USWA Basic Steel

Conference adopted a statement in 2002 that emphasized, *inter alia*, that the USWA would

bargain based on principles that included the following:

> Financial viability. The Company must have a financial structure that allows
> it to invest in its facilities and meet its obligations, even if it means financial
> restructuring, in or out of bankruptcy. . . .

> Protecting our pensions. A retirement with dignity means, among other
> things, a defined benefit pension, which provides us with guaranteed pension
> benefits. . . .

> Sharing in the company's success. If companies do well, it will be because of
> our efforts, so the benefits of any success should also belong to us.

> Strengthened corporate protections. We're not fixing our companies for
> somebody else's benefit. We need commitments to invest in our plants and
> restrictions on the ability of management and owners to line their pockets at
> our expense.

[Stip. ¶8 - docket #725].

**D7**.     Beginning on September 22, 2003, Lawrence M. Clark, Jr. of Harbert traveled

to Pittsburgh six times, along with counsel and financial advisors, to meet with Ron Bloom,

the USWA's Assistant to the President. [Stip. ¶11 - docket #653].

**D8**.     In January, February and March 2004, the Secured Noteholders were in

frequent and continuing contact with Ron Bloom and David McCall, the USWA District

Director for Ohio.  [Stip. ¶12 - docket #653].

**D9**.       On March 9, 2004, representatives of the USWA and the Secured Noteholders

reached an agreement in principle, subject to certain conditions, on both the material terms

of a plan of reorganization and the overall economic terms of a CBA.  On March 11, 2004,

the USWA and the Secured Noteholders reconfirmed their agreement in principle and began

discussing its implementation.  On March 26, 2004, the USWA and the Secured Noteholders

reached agreement in principle on documentation permitting the USWA to support the

Secured Noteholders' Exclusivity Termination Motion.  [Stip. ¶13 - docket #653].

**D10**.      The USWA at all times had reserved the right to continue collective bargaining

negotiations with the Debtors and Renco, in their respective capacities as employer of the

USWA's members and owner of the employer.  During the USWA's negotiations with the

Secured Noteholders, the union was also conducting competing negotiations with the Debtors

and Renco.  [Stip. ¶14 - docket #653].

**D11**.      On April 1, 2004, Ron Bloom informed Joseph O'Leary, the Secured

Noteholders' labor counsel, that the USWA had reached an agreement with the Debtors and

Renco that it considered to be better for the USWA's members and retirees than the

agreement it had reached with the Secured Noteholders.  [Stip. ¶15 - docket #653].

**D12**.      The USWA then entered into the Revised WCI CBA and strongly supports

confirmation of the Debtors' Plan.  The USWA has not entered into a CBA with the Secured

Noteholders and opposes confirmation of the Secured Noteholders' Plan.  The USWA reached

these decisions in good faith after many months of meetings with all relevant parties.  The

USWA has determined that the Debtors' Plan and the Revised WCI CBA best serve the

-39-

interests of the employees and retirees represented by the USWA. [Stip. ¶¶1-2 - docket #725].

**D13**. The leadership of the USWA and the USWA local union endorsed the Revised WCI CBA and recommended that the membership vote in favor of ratification. A ratification vote took place on July 15, 2004 and the tentative agreement has been ratified. The tentative agreement remains subject to confirmation of the Debtors' Plan. [Stip. ¶12 - docket #725].

**D14**. The Revised WCI CBA provides, *inter alia*, for continued investment in WCI through capital improvement commitments and limitations on dividends and other "upstream payments" by the reorganized debtor to its corporate affiliates, although it does permit upstream payments to Renco after five years, if approved by the board of the reorganized debtor, that purportedly will be controlled by independent directors, including a USWA nominee. [Stip. ¶14 - docket #725].

**D15**. The USWA has maintained contact with the Secured Noteholders' labor counsel subsequent to the rejection of the March 26, 2004 agreement in principle.

## 2. Treatment of the CBA Under the Secured Noteholders' Plan

**D16**. The Secured Noteholders' Plan sets forth the following with respect to a CBA between the USWA and the reorganized debtor:

## ARTICLE 1.
## WHAT YOU GET UNDER THE PLAN

**1.1** Summary of Plan.

* * *

    **(b)** **USWA.** NewCo *will* assume the Debtors' existing obligations in respect of retirees' medical and health benefits ( **"Retiree Medical Benefits",** as defined more fully in Article 8). NewCo *will not* assume the Debtors' existing obligations, under their existing pension plans, in respect of all pension benefits earned through the effective date of the Plan.

> The Debtors, and their controlling shareholder, Renco Group, Inc. (**"*Renco*"**), will remain liable for earned pension benefits.  With respect to pension benefits to be earned in the future, NewCo will provide such benefits through a new pension plan to be negotiated with the [USWA] pursuant to a new collective bargaining agreement.  The USWA has not entered into, and its members have not ratified a new collective bargaining agreement with NewCo and there is no assurance that the USWA will do so, but NewCo will offer employment to USWA members on terms and conditions set forth in a 230-page collective bargaining agreement that the Secured Noteholders fully negotiated with the Noteholders over three months ending March 26, 2004 (the **"March 26 Agreement"**).  NewCo intends to negotiate a final new collective bargaining agreement no less favorable to the USWA than the March 26 Agreement.

[Secured Noteholders' Plan, Art. 1 - docket #374].

**D17**.    Article 6 of the Secured Noteholders' Plan addresses "Conditions Precedent to Confirmation and to Consummation." [Secured Noteholders' Plan, Art. 6 - docket #374]. As none of those conditions requires the reorganized debtor to have entered into a CBA with the USWA, the Secured Noteholders propose that their plan of reorganization would become effective with or without a CBA in place.

**3.    Conclusions of Law**

The plan of reorganization proposed by the Secured Noteholders provides for the reorganized debtor to continue as an operating steel company which, *inter alia*, requires a skilled workforce to exist.  The Secured Noteholders clearly understand the need for a skilled workforce as evidenced by the time, energy and resources expended in attempting to negotiation a new CBA with the USWA.  The Secured Noteholders also clearly understand the possible repercussions should it be unable to ultimately negotiate a new CBA:

> It is possible that USWA members could refuse to work at NewCo without a final CBA, causing NewCo to cease operations temporarily, or in some instances, even permanently.  The Secured Noteholders believe this is unlikely, but no assurances can be given that such work stoppages and

-41-

cessation of operations will not occur.

[Secured Noteholders' Discl. Stmnt. at p. 40 - docket #512].  During a deposition of James

Wareham, who the Secured Noteholders propose to appoint as chief executive officer of the

reorganized debtor, he acknowledged that WCI could probably not successfully reorganize

without a new CBA:

> Q:    Have you done any formulation in your own mind or any thinking in
>       your own  mind as to what the business plan of this company should
>       be?
>
> * * *
>
> A:    I have given the subject some thought, yes.
>
> Q:    Okay.  What's your thinking on the subject?
>
> * * *
>
> A:    I think there are three or four areas that probably need specific
>       addresses.  One is the cost structure of this company.
>
> * * *
>
> Q:    Let's talk about the cost structure.  Is it fair to say in your mind the
>       most significant portion of cost structure is a revised USWA
>       agreement?
>
> A:    That's certainly a large one.  I don't know if it is – it's – certainly it's
>       not the only one.
>
> Q:    I didn't say that.
>
> A:    And I'm not even sure that I would say it is the major one.
>
> Q:    Do you believe this company can emerge from bankruptcy and
>       successfully reorganize without a new USWA collective bargaining
>       agreement?
>
> A:    No, I don't.

[Wareham Depo. at pp. 45-47 - docket #749].

As set forth in their plan, the Secured Noteholders intend to offer employment to USWA members on the same terms and conditions in the agreement reached with the USWA in March 2004. [*See* Secured Noteholders' Plan, Art.1 - docket #374]. In support of its contention that the lack of a pre-negotiated CBA does not render its plan unfeasible, the Secured Noteholders rely upon its history of negotiations with the USWA and the fact that the USWA would, if the Secured Noteholders' plan was confirmed, be obligated to negotiate in good faith with the reorganized debtor. The Secured Noteholders also rely upon *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986) for the proposition that the unresolved issue of a collective bargaining agreement does not render the Secured Noteholders' Plan unfeasible.

In its *U.S. Truck* decision, the Sixth Circuit was asked to review, *inter alia*, the trial court's finding that a proposed plan of reorganization was feasible despite the absence of a pre-negotiated labor agreement with the union. In determining that the trial court's factual finding was not clearly erroneous, the Sixth Circuit took specific note of the labor union's "sincere willingness" to cooperate with the reorganized debtor to reach a labor contract so as to ensure continued viability of the company. *In re U.S. Truck*, 800 F.2d. 581, 589 (6th Cir. 1986).

In this case, the USWA has not expressed a "sincere willingness" to enter into a new CBA with the Secured Noteholders because of the fact that is has successfully negotiated a new CBA with the Debtors. Although the USWA would be under a duty to negotiate in good faith with the Secured Noteholders if their plan was confirmed, this Court will not discredit

the statements of the USWA's counsel during the hearing in this matter that the Secured Noteholders would face an uphill battle with the union in such negotiations. Moreover, it is extremely doubtful that the union would be willing to negotiate a new CBA with the Secured Noteholders on the same (or even similar) terms as the parties' March 2004 agreement given (1) the change in the worldwide steel market; (2) the increase in WCI's operating profits and (3) the intervening Revised WCI CBA which, *inter alia,* preserves historic pension liabilities in favor of union employees.

The Court is also mindful of the fact that the USWA could (as it has in the past at this very plant) refuse to work until a new CBA is finalized and this potential work stoppage raises serious questions as to the feasibility of the Secured Noteholders' Plan. There was no evidence presented during the confirmation hearing that the reorganized debtor under the Secured Noteholders' Plan has a strategy (or strategies) to deal with the very real possibility that, upon confirmation, members of the USWA would refuse to work given the absence of a CBA.

The Secured Noteholders rely upon the similarities between the Revised WCI CBA and the agreement in principle that the Secured Noteholders reached with the USWA on March 26, 2004 as a basis for its argument that it would likely enter into a new CBA with the USWA. Although there do appear to be some similar provisions, one very real difference exists. Under the plan of reorganization proposed by the Debtors, existing pension benefits would not be materially changed while the Secured Noteholders' Plan specifically provides for the rejection of the Current Pension Plan. [Secured Noteholders' Plan, Art. 4, as amended - docket ##374, 550].

-44-

The reorganized debtor under the Secured Noteholders' Plan intends to offer pension benefits through participation in the Steelworkers Pension Trust (the "SPT"), a multi-employer pension plan. However, the Mulitemployer SPT Trust Agreement requires, in order for an employer to participate on behalf of bargaining unit employees, a CBA providing for such participation and a decision by the SPT as to what benefits would be provided. [*See* Joint Ex. 129 and Joint Ex. 130].       *See also* 29 U.S.C. § 186(c)(5) (which requires a written agreement for participation in a joint-board Mulitemployer pension plan).

The Secured Noteholders have also argued that they bear all the risk in the event that they are unable to reach a deal with the USWA subsequent to confirmation of their plan because all other classes of creditors under their plan will receive 100% of their allowed claims through distributions to be made on the effective date of the plan with no contingencies.     This argument ignores, however, the impact that potentially lengthy negotiations for a new CBA would have on the future viability of the reorganized debtor as an operating steel producer.   Should that viability be jeopardized, there exists a very real possibility that this reorganization would be followed in short order by another bankruptcy filing.

In order to prove feasibility, a plan proponent must demonstrate that its plan has a reasonable prospect of success and is workable. *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 539 (Bankr. E.D. Tenn. 1997). Although a plan proponent need not prove certainty, it cannot provide only speculation as to a key component of the proposed plan of reorganization, which in this case is a CBA with the USWA. *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 539 (Bankr. E.D. Tenn. 1997). This is especially so when, as here, the Court is presented

-45-

with a competing plan which provides for a new CBA and is strongly supported by the

USWA.

### B.   Treatment of the Current Pension Plan Under the Secured Noteholders' Plan Renders that Plan Unfeasible.

### 1.   Findings of Fact

**E1**.   WCI is the named sponsor of the Current Pension Plan, a single-employer defined benefit pension plan insured by the PBGC under ERISA.[16]

**E2**.   WCI is the administrator of the Current Pension Plan and named fiduciary as meant by 29 U.S.C. §§ 1002(1)(A), 1102(a) and, assuming the Secured Noteholders' Plan is confirmed, would continue to function as such, through its directors, officers and professionals hired for that purpose.   [Stip. ¶3 - docket #756].

**E3**.   Renco and WCI, together with certain other entities, are members of a "controlled group" as defined under ERISA, and rules and regulations adopted thereunder by the PBGC and the Internal Revenue Service.   [Stip. ¶2 - docket #764].]

**E4**.   As a member of a controlled group, Renco is jointly and severally liable for all unfunded pension liabilities of the Current Pension Plan.

**E5**.   The Current Pension Plan has approximately $100 million in assets under management. [Stip. ¶4 - docket #756].

**E6**.   The Current Pension Plan has approximately 1,300 active participants with approximately 600 retirees, disabled employees and surviving spouses receiving monthly

---

[16]   ERISA is the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1001-1461 (2000 & Supp. I 2001).  ERISA's fiduciary standards are codified at 29 U.S.C. §§ 1101-1114, and the pension insurance program, which it Title IV of ERISA, is codified at 29 U.S.C. §§ 1301-1461.

pensions.  [Stip. ¶1 - docket #756].

**E7**.     About 380 employees covered under the Current Pension Plan have enough service for an immediate unreduced "30 and Out" pension.

**E8**.     About 200 employees covered under the Current Pension Plan have enough age and service to qualify for an immediate unreduced pension ("70/80" or "Rule of 65") if they lose their jobs due to shutdown or layoff.

**E9**.     Approximately 250 active employees are expected to retire under a proposed headcount reduction if either the Debtors' Plan or the Secured Noteholders' Plan is confirmed. [Stip. ¶2 - docket #756].

**E10**.    The PBGC timely filed a proof of claim for, among other things, the unfunded benefit liabilities of the Current Pension Plan in the amount of \$197,300,000 (the "UBL Claim").  The UBL Claim is a contingent general unsecured claim.  The PBGC does not believe that any of its other claims are likely to become liquidated in any significant amount. [Stip. ¶5 - docket #756].

**E11**.    In the event of termination of the Current Pension Plan, the PBGC has statutory authority to pursue recovery of the UBL Claim against Renco, as well as certain other entities that are jointly and severally liable under 29 U.S.C. § 1362.  The UBL Claim would also become a liquidated general unsecured claim against WCI, which would be classified in Class 7 under the Secured Noteholders' Plan.  [Stip. ¶8 - docket #756]

### 2.     Pension Plan Treatment Under the Secured Noteholders' Plan

**E12**.    The Secured Noteholders' Plan sets forth the following with respect to the Current Pension Plan:

4.1 **Assumption and Rejection of Executory Contracts and Unexpired Leases.** Pursuant to Bankruptcy Code §§ 365 and 1123(b)(2), on the Effective Date, all executory contracts and unexpired leases to which the Debtors are parties shall be *assumed and assigned to NewCo*, except (i) all defined benefit pension plans . . . .

[Secured Noteholders' Plan, Art. 4, as amended - docket ##374, 550]. As to post-

confirmation administration of the rejected Current Pension Plan, the Secured Noteholders'

Plan provides the following:

5.8 **Post-Confirmation Administration of the WCI Steel-USWA Pension Plan.** The WCI Steel-USWA Pension Plan (the "Pension Plan") will continue to be sponsored and administered by WCI until such time as, (i) Renco assumes sponsorship of the Pension Plan, or (ii) the Pension Plan is terminated, pursuant to Section 4041 or 4042 of ERISA.

(a) Bank One Trust Company is, and will remain, trustee of the Pension Plan's assets. Subjection only to direction from WCI's board of directors or its designee, Bank One Trust Company has, and will continue post-confirmation to have, fiduciary responsibility for the maintenance and investment of all assets of the Pension Plan (the "Plan Trustee Functions"). Bank One Trust Company's fees and expenses are properly reimbursable our of the assets of the Pension Plan, and therefore do not require any ongoing payments by WCI.

(b) All administrative and actuarial functions with respect to the Pension Plan (the "Non-Plan Trustee Functions") will continue to be performed by or at the direction of WCI, under the supervision and ultimate responsibility of WCI's board of directors.

(c) The Secured Noteholders have consulted with Hewitt Associates ("Hewitt"), a nationally prominent firm that specializes in providing administrative and actuarial services to pension plan. Hewitt has provided the Secured Noteholders with an estimate of the maximum fees that would be payable to a third-party administrator if it became necessary to "outsource" all

-48-

> Non-Plan Trustee Functions with respect to the
> Pension Plan, including both implementation and
> ongoing administration fees for a full year following
> confirmation of the Secured Noteholders' Plan (the
> "Maximum Fee Estimate"). The Maximum Fee
> Estimate is $500,000. The Secured Noteholders will
> establish a cash reserve in the amount of $500,000
> upon confirmation of the Secured Noteholders' Plan
> (the "Pension Plan Administration Reserve") for use by
> WCI in the event that WCI does not have sufficient
> cash to pay for performance of the [N]on-Plan Trustee
> Functions following confirmation. This reserve will
> continue to be available to WCI (with drawdown
> subject to Court approval) to defray the cost of
> employing its own personnel to provide Non-Plan
> Trustee Functions or hiring a third-party administrator,
> until such time as (I) Renco assumes sponsorship of
> the Pension Plan, or (ii) the Pension Plan is terminated,
> pursuant to Section 4041 or 4042 of ERISA. ***The
> Secured Noteholders expect that one of these two
> eventualities will occur promptly following
> confirmation of the Secured Noteholders' Plan.***

[Secured Noteholders' Plan, Art. 5, as amended - docket ##374, 645] (emphasis added).

**E13**. The Secured Noteholders' Plan provides that "Equity Interests in each Debtor

shall not be cancelled but shall remain outstanding" and further provides the following as to

the continuance of WCI directors after confirmation

> (e) In the unlikely event that all directors of WCI resign or
> otherwise cease to serve following confirmation of the Secured
> Noteholders' Plan, the Secured Noteholders shall in that
> circumstance be empowered, pursuant to the Order confirming
> the Secured Noteholders' Plan, to appoint a director for WCI,
> in order to ensure the continued orderly administration of the
> Pension Plan through use of the Pension Plan Administration
> Reserve, until such time as (I) Renco assumes sponsorship of
> the Pension Plan, or (ii) the Pension Plan is terminated,
> pursuant to §4041 or 4042 of ERISA.

[Secured Noteholders' Plan, Art. 5.8, as amended - docket ##374, 645].

-49-

### 3.     Conclusions of Law

The Secured Noteholders' Plan explicitly proposes to decline assumption of the Current Pension Plan, which is one of WCI's largest liabilities.   Instead, the Secured Noteholders propose to leave the Current Pension Plan with a WCI corporate shell to pend its ultimate fate, which depends upon the actions of third parties over which the Secured Noteholders have no control.

Pursuant to their plan, the Secured Noteholders have identified two possible outcomes for the Current Pension Plan.  The first possible outcome is that WCI will remain the sponsor of the Current Pension Plan until Renco volunteers to become the plan's new sponsor.  The second possible outcome is that Renco refuses to assume sponsorship of the Current Pension Plan and it is ultimately terminated by the PBGC.  Because neither of these outcomes would immediately occur, the Secured Noteholders' Plan provides for the appointment of a third party to administer the Current Pension Plan while its fate is being decided.

Even if the Court were to assume that one of the two identified outcomes for the Current Pension Plan would eventually occur, the Secured Noteholders have failed to identify (and then address) the potential liabilities to the estate under each of the possible outcomes. Moreover, the Secured Noteholders have incorrectly assumed that the Current Pension Plan will be dealt with in a manner that leaves no negative impact upon the estate.

***First Possible Outcome:  WCI will remain as sponsor of the Current Pension Plan until Renco assumes sponsorship.***     The Secured Noteholders contend that this outcome is "virtually certain" to occur because (a) if the Current Pension Plan is terminated, the PBGC could seek to collect payment on the UBL Claim against Renco (as a member of the

-50-

controlled group) and (b) the UBL Claim is larger than Renco's obligation to fund the Current

Pension Plan. During the confirmation hearing, the only evidence presented by the Secured

Noteholders to support this contention was the expert report of William Daniels:

> Based upon my experiences in similar situations, the most likely outcome is
> that the plan sponsorship will be assumed by a member of the Renco
> controlled group of companies. This outcome occurs either directly because
> the controlled group realized that it is responsible or by inducement/agreement
> with the PBGC, which precipitates the action by threatening an involuntary
> plan termination that would cause the controlled group to incur higher cost
> than if they [sic] assumed the plan. For Renco, . . ., the Total Benefit Liability
> is \$230,714,000 for an assumed plan termination as of October 31, 2003. Plan
> assets as of that date equaled \$92,900,000 resulting in an immediate claim by
> the PBGC in the amount of \$137,814,000. This value is substantially greater
> than the costs of maintaining the plan.

[William Daniels Expert Rpt. at pp. 1-2 - docket #757]. Aside from a stipulation that Renco

"has cash substantially in excess of the . . . maximum termination liabilities [of the Current

Pension Plan] plus securities and other assets," there was no evidence presented regarding

Renco's other liabilities. [Stip. ¶5 - docket #764]. Nor was there any evidence presented to

support an assumption that Renco would necessarily act in what appears to be the most

economically reasonable manner.[17]

---

[17]     Renco is a New York corporation which is solely owned and/or controlled by Ira Rennert. That
corporation's balance sheet is not a matter of public record or the record in this case. When asked
in his deposition about specifics of that corporation's operations, Mr. Rennert was often times
unable to recall basic information.

>     Q:     You are the sole owner of the Renco Group?
>
>     A:     Myself and trusts for my children.
>
>     Q:     And do I understand there are five separate trusts that own
>            Renco?
>
>     A:     I don't know. I don't know.

Rennert Depo. at pg. 14.

>     Q:     Do you have any sort of identified committee that has any

Even if the Court were to accept that Renco would eventually assume sponsorship of the Current Pension Plan, there are state corporate law issues that arise given the Secured Noteholders' proposal to maintain WCI as a corporate shell pending Renco's decision. Through their plan, the Secured Noteholders provide that WCI's current board of directors would remain responsible for "[a]ll administrative and actuarial functions with respect to the

---

                         responsibility for decision-making at Renco?

A:       No.

Q:       Is there a board of directors?

A:       I believe so.

Q:       Who are the members of that board?

A:       I don't recall.

Q:       Would it be fair to say that you were the final decision-maker at Renco?

    * * *

A:       Yes, that would be fair to say.

Rennert Depo. at pg. 17.

Q:       What records, if any, are kept of corporate decisions made by Renco?

A:       I don't know.

Q:       Is there a minute book, as far as you know?

A:       I don't know.

Q:       Have you ever seen any corporate resolutions?

A:       Yes.

Q:       And where are corporate resolutions kept?

A:       I don't know.

Rennert Depo. at pg. 23.

-52-

[Current] Pension Plan." [Secured Noteholders' Plan, Art. 5.8, as amended - docket ##374, 645]. That plan further provides that "in the unlikely event" that WCI's directors resign, the Secured Noteholders would be entitled, pursuant to the confirmation order, to appoint a director for WCI "to ensure the continued orderly administration of the [Current] Pension Plan." [Secured Noteholders' Second Amend. to Plan, Art. 5.8, as amended - docket ##374, 645].

Ohio Revised Code § 1701.55 provides that the shareholders of the corporation are empowered to elect directors. The Secured Noteholders are not shareholders of WCI and they have set forth no authority to justify preemption of state corporate law by an order confirming a chapter 11 plan. "[F]or proponents to preempt state law . . . they will need to rely on more than just the general policy of Chapter 11 favoring reorganizations. They must show that enforcing such state law would be an 'obstacle to the accomplishment and execution of the full purposes of the bankruptcy law'." *In re Pacific Gas & Elec. Co.* , 273 B.R. 795, 813 (Bankr. N.D. Cal. 2002).

Although the Secured Noteholders' Plan establishes a $500,000 cash reserve to pay a third-party administrator, there has been no evidence of how long such funds would last nor do the Secured Noteholders address what would happen if those funds were depleted while the fate of the Current Pension Plan was still being decided. The Secured Noteholders have also not addressed whether an assumption of the Current Pension Plan by Renco could give rise to Renco then having a claim against the estate and, if such a claim could arise, how it would be treated under their proposed plan.

***Second Possible Outcome:  Renco does not assume sponsorship of the Current***

-53-

***Pension Plan and it is terminated by the PBGC.***      If the Current Pension Plan is ultimately

terminated by the PBGC, the UBL Claim would become a liquidated general unsecured claim

against WCI which would be classified in Class 7 of the Secured Noteholders' Plan and,

pursuant to the terms of that plan, not paid in full.   Additionally, the PBGC would have

statutory authority to pursue recovery of the UBL Claim against Renco.  As noted above, aside

from a stipulation that the Renco "has cash substantially in excess of the . . . maximum

termination liabilities [of the Current Pension Plan] plus securities and other assets," there is

no evidence before the Court as to Renco's other liabilities.  Even if Renco could pay the UBL

Claim in full, there is nothing to indicate that such claim would be paid immediately upon

demand by the PBGC so that the PBGC would not have to expend its limited resources[18] to

pursue Renco for such payment.

Additionally, if the Current Pension Plan were terminated, the PBGC would be

constrained by applicable policies and procedures to reduce the benefit payments to

guaranteed levels, at least until it has performed valuations of the plan and of its expected

recovery from liable parties.  The burden of such reduced payments would be borne by

participants of the Current Pension Plan who may be the least able to absorb such loss.

As noted, a plan proponent need not prove with "certainty" that its plan is workable

and would succeed.  *See In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 539 (Bankr. E.D.

---

[18]      The PBGC is the United States government agency created to administer the defined benefit
pension plan termination insurance program under Title IV of ERISA.  That agency receives no
funds from general tax revenues and is not backed by the full faith and credit of the government.
Operations are financed largely by insurance premiums paid by companies that sponsor PBGC-
insured pension plans and by PBGC's investment returns.  As of the end of fiscal year 2003, the
PBCG has a record deficit of $11.2 billion.  As the same time, the PBGC estimated that total
underfunding in single-employer pension plans exceeding $350 billion, and that underfunding in
plans sponsored by financially troubled companies exceeding $80 billion.

Tenn. 1997). However, in order to demonstrate that a plan is feasible, the plan proponent cannot simply leave the fate of one of the largest liabilities in the case to a third party over which the proponent has no control. Such speculation renders the Secured Noteholders' Plan unfeasible.

Finally, these uncertainties play against the backdrop of a competing plan that appears to avoid the need to call upon the PBGC's limited resources, including its presumably overworked legal staff, and further avoids contentious litigation in which it is unclear how this estate's interests would be represented. Thus, this Court is urging the Secured Noteholders to direct their energies toward the negotiation of a consensual plan that resolves all issues, rather than creating unresolved issues for which any reserves that are established would probably prove inadequate.

## CONCLUSION

None of the legal requirements discussed in this Opinion should come as any surprise to the sophisticated professionals advising the primary interested parties in this case. It is not unusual for chapter 11 plans that are consensual, *i.e.*, accepted by each class of claims holders entitled to vote, to depart from some of the § 1129 requirements. But absent such consensus, the Court must consider each of the confirmation requirements. In chambers conferences, this Court has reminded the competing plan proponents on innumerable occasions that defeating their opponent's plan would not result in the default confirmation of their own plan.

Since at least May of this year, while scheduling a variety of procedurally mandated hearings on these competing plans, this Court has noted the collision course that the Debtors with their plan funder and the Secured Noteholders have been pursuing. Often in such scenarios the Creditors Committee adopts a moderating role. In this case the opposite has

-55-

happened.  The Creditors Committee apparently unilaterally defined its constituency not to

include the holders of deficiency claims resulting from the undersecured status of the Secured

Notes.  The USWA, which has otherwise done a great deal to contribute to the potential

success of any operating entity that will emerge from this case, sought to cap the distribution

to holders of claims secured by the PP&E at $74 million, a number that totally ignores the

value of that collateral and therefore the legal rights of the Secured Noteholders.  Meanwhile

the majority of the Secured Noteholders have ignored the limits of their legal entitlement,

believing that they could leverage their property rights in the PP&E to the potential detriment

of retirees, both present and future.  And existing equity creates the impression that it views

chapter 11 as a form of hat trick, allowing it to pretend to comply with new value

requirements without any regard for the actual application of those concepts.  Yet the

attempted sleight of hand suffered as the $35 million of new value proposed in the Debtors'

Plan dangled without a clear application that inured to the benefit of any party other than the

equity holder.

The good news for all of these interested parties and indeed for all holders of claims

and interests in this case is that, despite the legal maneuvering that has been the hallmark of

this case since its filing, industry conditions still exist to allow for a successful plan of

reorganization.  Among those conditions are both worldwide demand and the correction in

domestic production capacity that has occurred over the last several years.  The *real* enterprise

value of the reorganized debtor as of the effective date of any confirmed plan will be much

more a function of these factors and the costs of raw materials, power and other goods and

services needed for production than any of the proxies for value on which valuation experts

necessarily focus.  While generally reorganization plans can take an almost endless variety

of forms, as the major parties begin to answer the question "what next?" in this case, there is

-56-

a clear anchor. Maintaining the current control for pension purposes is an obvious starting point. Providing dividends to holders of large general unsecured claims in the form of notes that have features allowing participation in future realization of the enterprise value is a way to get promptly to a confirmable plan; avoiding arbitrary caps on such participation would help to avoid future issues under *203 North LaSalle*.

Because the type of litigation that has marked this case for the last six months literally drains value that could be available for distribution to holders of non priority claims in this case, on its own motion, this Court is directing that, prior to January 17, 2005, no party shall file an amended plan or a new plan in this case, without prior court authorization, unless such plan has the support of the Debtors and their plan funder, the Secured Noteholders, the USWA, the Creditors Committee and the PBGC. On January 14, 2005 this Court will hold a § 105 status conference to consider whether cause exists to extend the moratorium on the filing of unilateral plans. The Court expects that representatives of each of those parties be available to work with maximum efficiency toward the development of a consensual plan. Although the parties are free to identify other approaches to plan development, the Court suggests that they first consider what amendments might be made to the Debtors' Third Amended Plan [docket #514] that could avoid the need for an additional round of balloting on such a plan. *See* § 1127.

The rulings being announced in this Opinion are interlocutory in nature. Thus, the only appeals that would be appropriate of the orders denying confirmation would be interlocutory appeals. The Court will refrain from entering orders or judgments consistent with this Opinion until, at the earliest January 17, 2005. It is the Court's explicit intention in refraining from the entry of judgment with respect to each of the plans considered hereunder to eliminate questions about the appeal period. Until judgments consistent with this Opinion

are entered, the appeal period has not begun.  In taking this step, the Court is seeking to

channel all of the resources available in this case to the development of a consensual plan.

The Court has scheduled a case management conference to coincide with the filing of this

decision for the purpose of discussing protocols that the parties believe may be effective in

the development of a consensual plan.

Marilyn Shea-Stonum
United States Bankruptcy Judge