UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                                :         Chapter 11

In re:                                     :

                                                :         Case No. 21-22108 (RDD)

96 WYTHE ACQUISITION LLC,       :

                                                :

                          Debtor.      :

---------------------------------------------------------x

### UNITED STATES TRUSTEE'S OBJECTION TO THE CONFIRMATION OF DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN

TO:     THE HONORABLE ROBERT D. DRAIN,
          UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), by and through his undersigned counsel, hereby submits his objection (the "Objection") to confirmation of the Debtor's Second Amended Chapter 11 Plan of Reorganization of the Debtor (the "Plan") attached to the Third Amended Disclosure Statement (the "Disclosure Statement"). Dkt. No. 196. In support of the Objection, the United States Trustee respectfully states:

### PRELIMINARY STATEMENT

The United States Trustee objects to confirmation of the Plan because the Plan impermissibly imposes third party releases on parties who have not affirmatively and unambiguously demonstrated their consent to grant such releases. The Plan and balloting procedures require an affirmative "opt-out" for classes that are entitled to vote. In addition, the releases will be imposed on creditor classes who **do not have any right to vote** because they are deemed to reject the Plan. The third-party releases in the Plan contravene established case law in this district and should be stricken.

1

But the Court should strike the releases for a separate, independent reason.  As described

below, an examiner has been appointed in this case to review prepetition transfers to the Debtor's

equity holders – Ms. Toby Moskovits and Mr. Michael Lichtenstein.  Yet, these equity holders

are within the definition of "released parties."  The examiner's report is not due until January 28,

2022.  Here, because the deadline to object to the Plan will pass before the examiner issues his

report, the United States Trustee objects to the releases to preserve his rights in the event the

examiner finds that the proposed released parties had engaged in improper conduct – assuming

the Court is inclined to grant any third-party releases at all.

The United States Trustee also objects to the scope of the Plan's exculpation language as

beyond the temporal scope of customary provisions, and also because the exculpations

provisions protect non-fiduciaries.  Further, the Plan must provide a valid and legal basis for

payments to the chief restructuring officer in this case.  As set forth below, the Debtor does not,

and cannot, provide a basis.  Finally, it appears that the Plan violates the absolute priority rule.

## FACTUAL BACKGROUND

1.      The Debtor owns real property located in Brooklyn, New York, comprising a

thirteen-story, 160-room hotel with a rooftop pool, a bar and restaurant and a separate, elevated

and enclosed bar that sits above the pool referred to as the Water Tower Bar.  *See* Local Rule

Affidavit ¶ 2 Dkt. No. 8.

2.      On February 23, 2021, the Debtor filed a voluntary petition (the "Petition") under

Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code").  *See*

Petition Dkt. No. 1.  The Petition was signed by David Goldwasser individually as "Chief

Restructuring Officer."  *Id*.

3.      On May 5, 2021, the Debtor filed its schedules of assets and liabilities (the "Schedules").  Dkt. No. 31.  The Schedules were signed by David Goldwasser individually as "Chief Restructuring Officer."  *Id.*  On Schedule E/F, the Debtor scheduled an unsecured creditor named FIA Heritage Holding LLC ("FIA Heritage") with a claim amount of approximately $3.08 million.  *Id.*

4.      On August 18, 2021, the United States Trustee filed a motion to convert this case to one under Chapter 7 or to dismiss this case (the "Motion to Convert").  *See* Motion to Convert Dkt. No. 87.

5.      In the Motion to Convert, the United States Trustee noted, *inter alia*, the existence of a management agreement between the Debtor and an entity controlled by Mr. Goldwasser.  As described in the Motion to Convert, on or about May 13, 2021, Mr. Goldwasser provided the United States Trustee with a "Bankruptcy Management Agreement" entered by the Debtor and G.C. Realty Advisors L.L.C. ("G.C." and the "G.C. Management Agreement").  The G.C. Management Agreement was dated April 5, 2021.  *See* Declaration of Madeleine Vescovacci in Support of Motion to Convert (the "Vescovacci Decl.") at ¶¶ 9-10; Ex. C.

6.      As further noted in the Motion to Convert, the G.C. Management Agreement seemed to demonstrate that in fact Mr. Goldwasser's firm is operating as the CRO in the case, and not Mr. Goldwasser individually.  The G.C. Management Agreement also provides for fees to Mr. Goldwasser's firm that have not been disclosed to the Court.  *Id.*  These fees include a monthly billing for work, in the amount of $15,000, and a success fee if the Debtor enters into a joint venture or obtains financing.  *Id.*; Ex. C ¶¶ 2-3.

7.    The Motion to Convert was opposed by the Debtor and ultimately was denied by the Court.  *See Reply to Motion to Convert* Dkt. No. 135; *Order Denying Motion to Convert* Dkt. No. 142.

8.    The Debtor no longer asserts that Mr. Goldwasser is acting in his individual capacity as CRO.  As explained in the Disclosure Statement, "G.C. Realty is a closely held, single-member limited liability company, run by its sole member, Mr. Goldwasser. In his capacity as the principal and sole member of G.C. Realty, Mr. Goldwasser serves as the CRO through G.C. Realty."  Disclosure Statement at 21.

9.    The Plan provides no reference to any payment obligations of the Debtor to Mr. Goldwasser or G.C.  However, the Disclosure Statement states as follows: "While the terms of Mr. Goldwasser's employment provides that the CRO shall receive compensation of $15,000.00 per month, to date, no such monthly payments have been made and the Debtor shall seek Bankruptcy Court approval of the same."  *See* Disclosure Statement at 22.

**B. Examiner's Investigation for potential avoidance actions**

10.    On October 15, 2021, Benefit Street Partners Realty Operating Partnership, L.P. ("Benefit Street") filed its *Motion to Appoint an Examiner Pursuant to 11 U.S.C. § 1104(c)* (the "Examiner Motion"), Dkt. No.147, which the Debtor opposed.  *See* Debtor's Objection to Examiner Motion, Dkt. No. 151.  In the Examiner Motion, Benefit Street expressed concerns over the release provision that would release claims against Toby Moskovits, Michael Lichtenstein, and The Williamsburg BK Hotel, LLC, the Hotel's management company (the "Management Company") from the beginning of time through the Confirmation Date, including estate claims based on pre-petition avoidable transfers.

4

11.    As previously noted, on Schedule E/F, the Debtor scheduled FIA Heritage as an unsecured creditor with a claim approximately $3.08 million.  *See* Dkt. No. 31.

12.    In the Examiner Motion, Benefit Street identified David Goldwasser as FIA Heritage's managing member.  *See* Motion to Appoint Examiner ¶ 2.[1]

13.    The Court granted the Examiner Motion on November 8, 2021 and entered the *Order Directing the United States Trustee to Appointment an Examiner Pursuant to 11 U.S.C. § 1104(c)* (the "Original Examiner Appointment Order").  Dkt. No. 178.

14.    On December 14, 2021, the Court entered the *Second Amended Examiner Appointment Order* ("Second Amended Examiner Order"). Dkt. No. 224.

15.    Pursuant to the Second Amended Examiner Order, the Examiner is authorized to investigate the "Examination Topics," which are "transactions . . . that might give rise to potential claims by the Debtor's estate, against Ms. Toby Moskovits, Mr. Michael Lichtenstein and/or the Debtor's other insiders, as such terms are defined in the Bankruptcy Code," subject to exclusions for claims based on the Hotel Manager's loans under the Paycheck Protection Program and related settlement and stipulation and potential claims belonging to individual creditors, including relating to the management agreement between the Debtor and Hotel Manager.  *See* Second Amended Examiner Order ¶ 2.

16.    The Examiner has encountered resistance and non-cooperation from the Debtor and its principals in document productions, which led to the Examiner's filing of *Motion to Enforce and Further Amend Second Amended Order Directing the Appointment of an Examiner* (the "Motion to Enforce"). Dkt. No. 243.

---

[1] On December 2, 2021 (the same day the Debtor filed the Disclosure Statement), the Debtor amended its Schedules (the "Amended Schedules") to list FIA Heritage's claim as zero. *See* Dkt. No. 205.  The Amended Schedules were signed by David Goldwasser individually as CRO.

17.    On January 12, 2022 the Court granted Examiner's Motion to Enforce (the "Order Extending Time"). Dkt. No. 288.  The Examiner's deadline to file his Report is extended to and including January 28, 2022, which deadline may be further extended by Order of the Court.

### C. Plan and Disclosure Statement

18.    On November 3, the Debtor filed the Second Amended Disclosure Statement with the Amended Chapter 11 Plan attached thereto. Dkt. No. 167.

19.    The Court held a hearing on November 5, 2021, during which time the Court directed its questions and comments to the Debtor and the Debtor made certain changes to the Second Amended Disclosure Statement. Dkt. No. 204.

20.    On November 25, 2021, the Debtor filed the Third Amended Disclosure Statement (the "Disclosure Statement") and the Second Amended Chapter 11 Plan (previously defined as the "Plan") attached to the Disclosure Statement. Dkt. No. 196.

21.    On December 1, 2021, the Court approved the Debtor's Disclosure Statement, Solicitation and Notice Materials, and forms of Ballots (the "First Scheduling Order"). Dkt. No. 204.

### 1.    Distributions and Voting Under Plan

22.    The Plan provides for, among others, (i) full payment in cash to Class 5 Unsecured Claims up to the allowed amount, (ii) no distribution to Class 6 Subordinated Claims (currently only has one claim: BSP's disputed claim), and (iii) the Plan Sponsor 100% equity interest in the Reorganized Debtor. *See* Dkt. No. 196, Ex. A, Plan 3.2.

23.    A summary of claims and their treatment follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Claims | No | No (deemed to accept) |
| Class 2 | BSP Claims | Yes | Yes |
| Class 3 | Secured Property Tax Claims | Yes | Yes |
| Class 4 | Secured M&M Claims | Yes | Yes |
| Class 5 | Unsecured Claims | Yes | Yes |
| Class 6 | Subordinated Claims | Yes | No (deemed to reject) |
| Class 7 | Equity Interests | Yes | No (deemed to reject) |

*See* Dkt. No. 196, Ex. A Plan 2.2.

24.    In the First Scheduling Order, ballots are required to be sent to holders of claims in Class 2 (BSP Claims), Class 3 (Secured Property Tax Claims), Class 4 (Secured M&M Claims), and Class 5 (Unsecured Claims), and are not required to be sent to holders of Class 1 (priority claims) and class 6 (subordinated claims) pursuant to sections 1124 and 1126 of the bankruptcy code.  Dkt. No. 204 ¶¶ E-G.

25.    According to the First Scheduling Order, each holder of a Claim in a Non-Voting Class (Class 1 and Class 6) shall receive either an Unimpaired Non-Voting Status Notice, or an Impaired Non-Voting Status Notice.  Neither notice contains an opt-in or opt-out form with respect to the third party releases.  *See* Dkt. No. 204, Exs. 3, 4.

## 2.    The Releases Under the Plan

26.    The Plan Sponsor is 96 Wythe New Acquisition LLC, an entity owned and control by Debtor's existing principals, Ms. Toby Moskovits and Mr. Michael Lichtenstein.  *See*

Dkt. No. 196, Ex. A. Plan §1.64; Plan §5.5.  These are the parties being reviewed by the

Examiner.

27.    The third-party release provision in the Plan states the following:

… any Persons and holders of any Claims or Interests that received actual or
constructive notice of this Plan shall be and are permanently enjoined and precluded
from asserting, commencing, or continuing in any manner any actions or *from
asserting any lien against* the ***Debtor, the Released Parties,*** and against any of
such parties' respective assets or properties, with respect to any debt, Claim, or
interest, ***including any guarantee by any of the Released Parties*** based upon any
document, instrument or act, omission, transaction, or other activity of ***any kind or
nature arising out of, based upon, or in any way related to, the conduct, actions,
and transactions of the Debtor or the Released Parties through the Confirmation
Date,*** except for any act or omission that constitutes fraud, gross negligence, or
willful misconduct as determined by a final order of a court of competent
jurisdiction (the "Release") ….

Plan §5.10 (emphasis added).

28.    The Plan defines Released Parties "[as] the Debtor and the Management

Company and each of their respective agents, managers, members, officers, directors,

shareholders, advisors, attorneys, and representatives. For the avoidance of doubt, BSP shall not

be a Released Party."  Plan §1.66.

29.    With respect to the parties bound by the Release, the Plan provides, "For the

avoidance of doubt, except as provided below [related to PPP loans], the Release shall not apply

to the Released Parties (other than the Debtor) with respect to a holder of a Claim that is entitled

to vote that elects to 'opt-out' of such Release on its timely and properly-submitted ballot."  Plan

§5.10.

### 3.    Exculpations Under the Plan

30.    The Exculpation in the Plan provides as follows:

Neither the Debtor nor any of the Released Parties shall have or incur any liability
to any holder of a Claim or Interest for any act or omission in connection with, or
arising out of, the Reorganization Case, the Confirmation of the Plan, the

Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan other than for conduct that constitutes gross negligence, willful misconduct, or a violation of the criminal, tax, environmental, and antitrust laws of the United States.

Plan § 5.12.[2]

# ARGUMENT

### A.    Debtor Has Failed to Procure Appropriate Consent from All Parties for Releases

A release of claims held by non-debtors against other non-debtors is "a dramatic measure to be used cautiously" and "is only proper in rare cases." *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 142-43 (2d Cir. 2005) (internal citation omitted).  "The plain admonition of the Second Circuit Court of Appeals is that third party releases are frequently a subject of abuse and that they are appropriate only in narrow and unusual circumstances." *In re Chassix Holdings, Inc.,* 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015) (citing *Metromedia*, 461 F 3d. at 143).

Among the rare circumstances in which the Second Circuit has recognized non-debtor releases as permissible is when "the affected creditors consent" to giving releases. *Metromedia,* 461 F 3d. at 142 (citing *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993)). However, ". . . a Bankruptcy Court should be [. . .] wary of approving voting procedures that effectively would impose [. . .] releases on creditors who have not affirmatively manifested their consent to them." *Chassix,* 533 B.R. at 79.

The *Chassix* Court has stated as follows:

As to creditors who might vote to reject the Plan: the Court noted that it was difficult to understand why any other action should be required to show that the creditor also objected to the proposed third party releases. If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and "consented" to third party

---

[2] As already stated, the Plan defines Released Parties "[as] the Debtor and the Management Company and each of their respective agents, managers, members, officers, directors, shareholders, advisors, attorneys, and representatives. For the avoidance of doubt, BSP shall not be a Released Party."  Plan §1.66.

> releases that are contained in that plan, then by that same logic a creditor who votes
> to reject a plan should also be presumed to have rejected the proposed third party
> releases that are set forth in the plan.

*In re Chassix Holdings, Inc.,* 533 B.R. at 79.

By contrast, the debtor in *Chassix* required the parties who have already voted against the Plan to take an additional action to check the opt-out box. Otherwise, they would be bound by the releases. The *Chassix* Court concluded that such additional requirement "would have been little more than a Court-endorsed trap for the careless or inattentive creditor." *Id.*

There is no rule that specifies an "opt out" mechanism or a "deemed consent" mechanism with respect to third party releases, nor is there a general "public policy" in favor of making third party releases applicable to as many creditors as possible … a Bankruptcy Court should be [] wary of approving voting procedures that effectively would impose those same releases on creditors who have not affirmatively manifested their consent to them." *Id.* at 78-79.

In addition to *Chassix*, courts in this district and other district have spoken precisely to this scenario. "Any third-party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases." *In SunEdison, Inc.*, 576 B.R. 453, 460 (Bankr. S.D.N.Y. 2017). "[T]he Court concludes that the opt out mechanism is not sufficient to support the third-party releases anyway … [and] that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases." *In re Washington Mut., Inc.,* 442 B.R. at 355. In *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019), the court agreed with objecting parties' position that consent cannot be inferred by the failure of a creditor or equity holder to return the Opt-Out Form. This

Court need not consider the most recent cases on the subject[3] as the third-party releases in the Plan do not pass muster even under *Chassix* and other less restrictive court rulings.

The Disclosure Statement and the Plan collectively explain how a holder will be bound by the Release. "For the avoidance of doubt, except as provided below [related to PPP loans], the Release shall not apply to the Released Parties (other than the Debtor) with respect to a holder of a Claim that is entitled to vote that elects to "opt-out" of such Release on its timely and properly-submitted ballot." Plan § 5.10

There are two problems with the Release as proposed. The first problem with the proposed releases is with respect to those who are entitled to vote, holders of claims in Classes 2, 3, 4, and 5. *See* Disclosure Statement at 55.

- If a holder of a Claim eligible to vote on the Plan votes to accept the Plan, such holder will be deemed to provide the Release. If such holder votes to accept the Plan, such holder cannot opt out of giving such Release.

- If a holder of a Claim eligible to vote on the Plan votes to reject the Plan and wishes to opt out of giving the Release, such holder must submit its Ballot to the Debtor by the Voting Deadline and check the opt out box in the Ballot.

- If a holder of a Claim eligible to vote on the Plan does not vote on the Plan, but wishes to opt out of giving the Release, such holder must submit its Ballot to the Debtor by the Voting Deadline, and check the opt out box in the Ballot.

- If a holder of a Claim eligible to vote on the Plan (i) does not submit a Ballot to the Debtor by the Voting Deadline, or (ii) submits its Ballot and fails to check the opt out box therein, regardless of whether such holder votes to accept or reject the Plan, such holder will be deemed to consent to giving the Release.

Disclosure Statement at 56-57.

---

[3] Recent cases in this and other Circuits that make clear that third-party non-consensual releases in chapter 11 reorganization plans are not permissible. *See, e.g.*, *In re Purdue Pharma L.P.*, No. 7:21-cv-08566-CM, ---B.R.---, 2021 WL 5979108, at *48 (S.D.N.Y Dec. 16, 2021) (The Bankruptcy Code does not allow "any court the power to approve the release of non-derivative third-party claims against non-debtors[.]"); *Patterson v. Mahwah Bergen Retail Grp. Inc.*, No. 3:21cv167 (DJN) --- B.R. ---, 2022 WL 135398, at *3 (E.D. Va. Jan. 13, 2022) [ECF No. 79] (noting that the "sheer breadth of the releases can only be described as shocking," and striking releases).

The second problem with the proposed releases is with respect to those who are NOT entitled to vote, holders of claims in Class 1 (priority claims excluding priority tax and administrative claims) and Class 6 (subordinated Claims). These class members will not receive the ballot that has the opt out box and therefore appear to lose the opportunity to opt out of the Release.

In summary, the Plan treats silence as consent, does not give certain parties the opportunity to opt out of the release and requires the parties who vote against the plan or do not want to vote to take additional action in order not to be bound by the Release. Even leaving aside the string of recent cases, this goes beyond established case law. *See SunEdison*, 576 B.R. at 460. Accordingly, the United States Trustee respectfully requests the Court strike down the releases and injunctions that are not consensual.

### B.    The Releases Apply to Parties Being Reviewed by the Examiner

Here, the Plan requires non-debtor releasing parties to grant broad, unconditional, and irrevocable releases to non-debtor Released Parties. *See* Plan 5.10. Moreover, as described, the Examiner is still investigating potential causes of action against the equity holders, and all objections to the Plan are due before the date of the issuance of the Examiner's report. If the Examiner finds impropriety, it would appear under the Plan that there would be no recourse, because the Released Parties are released from any conduct not just in the case, but "based upon any document, instrument or act, omission, transaction, or other activity of any kind or nature arising out of, based upon, or in any way related to, the conduct, actions, and transactions of the Debtor or the Released Parties through the Confirmation Date . . ." Plan §5.10. For this separate reason, the third-party releases should not be approved. For this same reason, the Debtor's rights

12

should be fully reserved as against the parties being reviewed by the Examiner until that examination is complete.

### C. The Exculpation Provision is Overly Broad

The Debtors' exculpation provision in the Plan is inappropriate because the definition of exculpated party is overly broad. A proper exculpation provision is a protection of court-supervised fiduciaries. *See In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers." *In re Washington Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean*, 599 B.R. at 721. "If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations." *Id.*

The "Released Parties" will be protected under the proposed exculpation clause. These include insiders and management who may be subject to liability based on the Examiner's report, as set forth above. These parties do not fall under the definition of fiduciaries. Further, the exculpation appears to fall outside the traditional areas relating to plan preparation and the like.

No statutory committee has been appointed in this case, and therefore only the Debtor and its professionals can be considered as fiduciaries to the estate. Further, the exculpations should largely track the language of Section 1125(e), protecting matters related to plan confirmation. Accordingly, the United States Trustee respectfully requests the Court curtail the

13

list of exculpated parties to Debtors and their professionals, and the scope of the exculpations to the activities surrounding the confirmation of a plan, as contemplated by 11 U.S.C. § 1125(e).

Furthermore, in addition to excepting actual fraud, willful misconduct or gross negligence, the exculpation should also except attorneys' violation of New York Rules of Professional Conduct ("NYRPC"). The Plan, as written, runs afoul of the NYRPC provision that restricts attorneys from making agreements limiting their liability to a client for malpractice. *See* N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

### D. The Plan Does Not Meet the Requirements of 11 U.S.C. § 1129(a)(4)

The Plan is silent as to how David Goldwasser or G.C. will be paid in this case. The Court should not approve a Plan that leaves an opportunity for the Debtor to pay the CRO without a specific statutory basis.

Section 1129(a)(4) of the Bankruptcy Code is a catch-all provision that allows for payment of "costs and expenses in or in connection with the case, or in connection with the plan and incident to the case . . ." This is mainly to address the payments that are not already covered by other provisions of the code (such as professional fees approved under 330) and preplan payments. *See* 7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2021).

But 11 U.S.C. § 1129(a)(4) cannot be used as a substitute for more specific provisions. *See Lehman Bros. Holdings*, 508 B.R. 283, 294 (S.D.N.Y. 2014) (denying attempt to circumvent Section 503(b) by using 1129(a)(4) to pay professionals and stating that committee members seeking repayment of legal fees must seek reimbursement under Sections 503(b)(3)(D) and 503(b)(4)). "[N]either the need for flexibility, the consensual nature of [such a payment], nor a bankruptcy court's approval of a payment as 'reasonable' can justify a plan provision that is merely a backdoor to administrative expenses [ . . . ] [T]he federal scheme cannot remain

14

comprehensive if interested parties [ . . . ] are free to tweak the law to fit their preferences".
*Lehman Bros.*, 508 B.R. at 289 (*citing RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132
S. Ct. 2065, 2071 (2012)).

The Disclosure Statement and Plan must provide a valid and legal basis for payments to
Mr. Goldwasser or G.C., and 11 U.S.C. § 1129(a)(4) does not provide this basis.  Generally,
debtors in possession may employ attorneys, accountants, appraisers, auctioneers, and other
professionals after obtaining court approval.  *See* 11 U.S.C. §§ 327(a), 1107.  Upon receipt of
such court approval, those professionals are entitled to reasonable compensation and
reimbursement for actual expenses on account of the services they provide after parties in
interest have received notice and have had an opportunity to be heard. *See* 11 U.S.C. § 330(a)(1).
CROs are sometimes retained under 11 U.S.C. § 363.

David Goldwasser signed the Petition as an officer of the Debtor.  His firm must
investigate claims against his own entity, FIA Heritage.  Mr. Goldwasser and his firm do not
meet the disinterestedness standards under 11 U.S.C. § 101(14).  They cannot be retained under
11 U.S.C. § 327 or 11 U.S.C. § 363, and in any event cannot meet the requirements for *nunc pro
tunc* approval of their retention.  The disclosure in the Disclosure Statement appears to be an
end-run around the statutory requirements.  The Disclosure Statement states that Mr. Goldwasser
(and not G.C.) will receive $15,000 a month at some unspecified time. *See* Disclosure Statement
at 22.  The Disclosure Statement does not mention the success fee, referred in the G.C.
Management Agreement.  *See* Vescovacci Decl. at ¶¶ 9-10; Ex. C.  None of these fee
arrangements have otherwise been approved by the Court and should not be approved absent
some statutory basis.

**E. The Plan Violates the Absolute Priority Rule as Required in 11 U.S.C. §1129(b)(2)(B)**

Section 1129(b)(2)(B) of the Bankruptcy Code provides that for a plan to be fair and

equitable, the plan must the meet the following requirement,

> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B)

Here, the holders of Class 6 (Subordinated Claims) will not receive any distribution under

the Plan, *see* Plan §3.2(f), while the Plan Sponsor will receive 100% new interest in the

Reorganized Debtor, *see* Plan §3.2(g).  The Plan Sponsor is 96 Wythe New Acquisition LLC, *see*

Plan 1.64, an entity owned and control by Debtor's existing principals, Ms. Toby Moskovits and

Mr. Michael Lichtenstein.  *See* Plan §5.5.  Although the Debtor asserts that BSP's disputed

portion of its claim is the only claim in this class and does not anticipate other claims to be in this

class, the Debtor should still contractually provide for full payment of the allowed claims in this

class if the Plan Sponsor, who is the existing equity holders, is to retain equity in the

Reorganized Debtor.

It is unclear whether the requirements of "new value exception" are met here, because

although the Plan Sponsor will make an equity investment of $7,562,000 into the Reorganized

Debtor, *see* Plan §3.2(g), there is no record showing the equity in the Reorganized Debtor has

been tested in the market or been valued by experts, nor has the Debtor given non-insider

investors the opportunity to bid for the equity.  Therefore, the Plan, as it is written, violated

section 1129(b)(2)(B).

## **CONCLUSION**

For the foregoing reasons, the United States Trustee respectfully requests that the Court

deny confirmation of the Plan absent modification to address the concerns raised herein, and grant

such other relief as is just and proper.

Dated: New York, New York
       January 19, 2022

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE

By:    /s/ Greg M. Zipes_____
       Greg M. Zipes
       Trial Attorney
       201 Varick Street, Room 1006
       New York, New York 10014
       Tel. No. (212) 510-0500
       Fax. No. (212) 668-2255