**Hearing Date and Time: March 8, 2022 @ 10:00 a.m. (ET)**

**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910
Email: dspelfogel@mayerbrown.com
       leisenberg@mayerbrown.com
       dchung@mayerbrown.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &
KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>              Debtor. | Chapter 11<br><br>Case No.: 21-22108 -(RDD) |

**DEBTOR'S RESPONSE TO THE LENDER'S OBJECTION TO
CONFIRMATION OF DEBTOR'S SECOND AMENDED
CHAPTER 11 PLAN OF REORGANIZATION**

745782561

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ........................................................................................................... 5

    A. The Plan was Proposed in Good Faith ............................................... 5

    B. The Plan Satisfies the Best Interests Test......................................... 9

    C. The Plan Is Feasible ........................................................................ 11

    D. The Terms of the Lender's Payment Are Permissible ................... 14

    E. The Absolute Priority Rule Is Satisfied.......................................... 19

    F. The Debtor's Management Should Remain In Place ..................... 23

CONCLUSION....................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC,*
    445 B.R. 83 (Bankr. E.D.N.Y. 2011) .....................................................................18

*In re Adelphia Bus. Sol., Inc.,*
    341 B.R. 415 (Bankr. S.D.N.Y. 2003) ..................................................................11

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................9

*In re Allegheny Int'l Inc.,*
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ...................................................................4

*In re Am. Trailer & Storage, Inc.,*
    419 B.R. 412 (Bankr. W.D. Mo. 2009) ...........................................................14, 17

*In re Angeron,*
    No. 18-10482, 2018 WL 6601130 (Bankr. E.D. La. Dec. 13, 2018) .....................21

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999) ..............................................................................................19

*BT/SAP Pool C Assocs. V. Coltex Loop Cent. Three Partners,*
    203 B.R. 527 (S.D.N.Y. 1996) ..............................................................................20

*In re Chemtura Corp.,*
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................................6

*Corestates Bank, N.A. v. United Chem. Techs., Inc.,*
    202 B.R. 33 (E.D. Pa. 1996) .................................................................................19

*In re Crane Automotive, Inc.,*
    88 B.R. 81 (Bankr. W.D. Pa. 1988) ......................................................................15

*In re Ditech Holding Corp.,*
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...................................................................6

*In re Dupell,*
    No. 99-10561DWS, 2000 WL 192972 (Bankr. E.D. Pa. Feb. 15, 2000) ..............17

*In re Eddington Thread Mfg. Co.,*
    181 B.R. 8236 (Bankr. E.D. Pa. 1995) .................................................................11

*i*

*In Matter of Excel Mar. Carriers Ltd.*,
  No. 13-23060-RDD, 2013 WL 5155040 (Bankr. S.D.N.Y. Sept. 13, 2013)............................8

*In re Fur Creations by Varriale, Ltd.*,
  188 B.R. 754 (Bankr. S.D.N.Y. 1995) ...........................................................................20

*In re Geijsel*,
  480 B.R. 238 (Bankr. N.D. Tex. 2012).....................................................................6, 9

*In re Gramercy Twins Assocs.*,
  187 B.R. 112 (Bankr. S.D.N.Y. 1995) ...........................................................................17

*In re Introgen Therapeutics, Inc.*,
  429 B.R. 570 (Bankr. W.D. Tex. 2010) ...................................................................20

*In re Johnston*,
  140 B.R. 526 (B.A.P. 9th Cir. 1992).............................................................................19

*In re Kadlubek Fam. Revocable Living Tr.*,
  545 B.R. 660 (Bankr. D.N.M. 2016) ...........................................................................7

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)...............................................................................6, 11

*In re Leslie Fay Companies, Inc.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997).........................................................................23

*In re LightSquared Inc.*,
  513 B.R. 56 (Bankr. S.D.N.Y. 2014) ...........................................................................8

*In re MacLeod Co.*,
  63 B.R. 654 (Bankr. S.D. Ohio 1986)...........................................................................3

*Matter of Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984) ...............................................................................2, 9

*In re Malkus, Inc.*,
  No. 03-07711-GLP, 2004 WL 3202212 (Bankr. M.D. Fla. Nov. 15, 2004) ............................8

*In re Mendoza*,
  No. 09-11678, 2010 WL 1610120 (Bankr. N.D. Cal. Apr. 20, 2010) ....................................17

*In re Miami Ctr. Assocs., Ltd.*,
  144 B.R. 937 (Bankr. S.D. Fla. 1992) ......................................................................18, 19

*In re New Midland Plaza Assocs.*,
  247 B.R. 877 (Bankr. S.D. Fla. 2000) ...........................................................................19

*In re Northbelt, LLC*,
    630 B.R. 228 (Bankr. S.D. Tex. 2020) ..................................................................7

*In re One Times Square Assocs. Ltd. P'ship*,
    159 B.R. 695 (Bankr. S.D.N.Y. 1993) ................................................................21

*In re Prosser*,
    No. 06-30009, 2009 WL 3270865 (Bankr. D.V.I. Oct. 9, 2009) ............................8

*In re Purdue Pharma L.P.*,
    633 B.R. 53 (Bankr. S.D.N.Y. 2021) ....................................................................6

*In re Reid Park Props.*,
    LLC, 2012 WL 5462919 (Bankr. D. Ariz. Nov. 7, 2012) ....................................19

*In re Riverbend Leasing LLC*,
    458 B.R. 520 (Bankr. S.D. Iowa 2011) ................................................................14

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................10

*In re Texas Grand Prairie Hotel Realty, L.L.C.*,
    710 F.3d 324 (5th Cir. 2013) ...............................................................................14

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004)....................................................................................... *passim*

*In re Valley View Shopping Ctr., L.P.*,
    260 B.R. 10 (Bankr. D. Kan. 2001) .......................................................................7

*Matter of Woodbrook Assocs.*,
    19 F.3d 312 (7th Cir. 1994) ...........................................................................21, 22

**Statutes**

11 U.S.C. § 1123(a)(5)(E)...........................................................................................15

11 U.S.C. § 1126(e) .......................................................................................................3

11 U.S.C. § 1129(a)(3)...........................................................................................5, 6, 8

11 U.S.C. § 1129(a)(5)(A) ..........................................................................................23

11 U.S.C. § 1129(a)(7)...................................................................................................9

11 U.S.C. § 1129(a)(11)...............................................................................................11

11 U.S.C. § 1129(b)......................................................................................................23

11 U.S.C. § 1129(b)(1) ............................................................................................................14

11 U.S.C. § 1129(b)(2)(A) ......................................................................................................14

11 U.S.C. § 1129(b)(2)(A)(i) ...................................................................................................10

11 U.S.C. § 1129(b)(2)(b)(i) ....................................................................................................20

11 U.S.C. § 1129(b)(2)(B)(ii) ............................................................................................19, 20

96 Wythe Acquisition LLC, the above-captioned debtor and debtor in possession (the "Debtor"), by its undersigned attorneys, Mayer Brown LLP and Backenroth Frankel & Krinsky, LLP, hereby files this response (the "Response") to *Lender's Objection to Confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization* [ECF No. 307] (the "Lender Objection") and in support thereof states as follows:

## PRELIMINARY STATEMENT

1.      The Debtor has succeeded in turning the Hotel around during some of the hospitality industry's darkest days, resulting from the COVID-19 pandemic.  It is operating profitably, with occupancy rates significantly higher than competitors across the city.  With no efficient or functioning market to refinance or sell, the Debtor proposes a restructuring plan, including an infusion of $10 million in new funds, that provides for the preservation of the Hotel as a going concern, retention of employees' jobs, and payment in full to all creditors with interest.[1]

2.      Debtor's proposed treatment of Lender complies with *Till* and its progeny.  The Debtor's experts confirm that the payment terms are consistent with the actual degree of risk borne by the Lender, which is minimal due to the success of the Hotel and the projected increase in value during the term of the Plan.  Debtor's appraisal is not challenged by a competing appraisal -- Lender fails to present a separate appraisal and it cannot competently controvert Debtor's evidence of current or stabilized market value over the plan period.

3.      Lender's efforts to block confirmation are nothing but a veiled plan to force a distressed sale of the Hotel under depressed market conditions with the effect, if not intent, of taking control of the Hotel through a credit bid, wiping out tens of millions of dollars in value,

---

[1] The Debtor is in the process of finalizing a further amended plan that, amongst other things, increases the cash infusion to $10 million.

destroying jobs, and prejudicing all stakeholders.  The Lender's position that the Hotel must be sold despite current market conditions, when a restructuring can pay creditors in full, is equivalent to arguing *no* chapter 11 plan may be confirmed over creditors' objections, which is plainly false.

4.     The Debtor has been operating successfully, overcoming the disastrous commercial effects of COVID-19.  Debtor's experts will testify that the Hotel has outperformed its competitors and is regularly ranked as a top hotel in Brooklyn and enjoys strong customer reviews.  In the last three quarters of 2021, the Hotel exceeded projections on all key metrics, generating net profits (and cash on hand) of more than $3,000,000, despite the absence of any DIP financing.  To further support the Plan and viability of the emerging entity, Debtor is receiving a cash infusion of $10,000,000 which will bring total cash on hand to $13,000,000.  Debtor's astounding progress and financial stability should not be destroyed by a recalcitrant lender with its own agenda, seeking only to enrich itself at the expense of all others.  For the reasons set forth herein, Lender's Objection should be overruled and the Plan should be confirmed.

## BACKGROUND

5.     On February 23, 2021, Debtor filed a voluntary chapter 11 petition initiating the present case.  Debtor owns the property located at 96 Wythe Avenue in Brooklyn, the 147-room Williamsburg Hotel including a restaurant and multiple bars (the "Hotel").  The Hotel is fully operational after being severely curtailed during the initial stages of the COVID-19 pandemic.  The Hotel is operated by Williamsburg Hotel BK LLC (the "Management Company"), a non-debtor affiliate of Debtor, under its November 21, 2017 contract  (the "Management Agreement").

6.     Debtor's principal creditor is Benefit Street Partners Realty Operating Partnership, L.P. (the "Lender"), which holds a mortgage on the Hotel to secure its claim against Debtor, which Debtor asserts should not exceed $70.7 million.  Debtor initially obtained a $68 million loan from the Lender in 2017 to consolidate existing debt and provide minimal additional funding for

2

completion of the Hotel's construction. The Lender asserts, with inflated interest and fees, that its claim exceeds $95 million. This is disputed, and subject to pending litigation.

7.      The longstanding dispute between Debtor and Lender is familiar to the Court. Suffice it to say -- Debtor's position is that Lender's willful misconduct throughout its relationship with Debtor evidences its intent to create distress and drive the Hotel into foreclosure so the Lender alone benefits by obtaining the now-completed, and highly rated, Hotel at a steep discount, presumably to capture the value for itself, perhaps selling it for a healthy profit. The Lender's scheming has continued throughout this bankruptcy case, in which it has repeatedly sought to take control of the Debtor and the Hotel, including through its fire sale proposal.

8.      Now, with Debtor on the verge of advancing its plan that maximizes value for all stakeholders, the Lender is making its last stand. Debtor's Second Amended Chapter 11 Plan of Reorganization [ECF No. 196 Ex. A] (the "Plan") presents the best possible resolution of this bankruptcy case. It pays all allowed unsecured claims in full. The Lender retains its lien and is paid in full over time. The Hotel's employees keep their jobs. Debtor continues to operate uninterrupted as a going concern. Meanwhile, the Lender's preferred alternative achieves none of these goals. Nevertheless, the Lender, taking its usual shotgun approach in opposing the Debtor, asserts a vast, and self-contradictory, array of arguments to obstruct Plan confirmation.

9.      The Lender Objection is merely its latest blatant attempt to thwart the Debtor's reorganization efforts in bad faith, and the Court should therefore disregard Lender's objection entirely. As Section 1126(e) allows the court to disregard votes of creditors who voted for an ulterior motive, such as to enrich their own business at the expense of the estate, *In re MacLeod Co.,* 63 B.R. 654, 655–56 (Bankr. S.D. Ohio 1986), Section 105(a) should be used to disregard the

3

Lender's objection.[2]  In addition, each of the Lender's objections is without merit.

10.    *First*, the Plan was proposed in good faith.  Debtor's formulation of the Plan reflects an honest effort to obtain numerous beneficial outcomes contemplated by the chapter 11 process and the Code.  These goals include (1) preservation of the Debtor as a going concern; (2) maximization of the value of the Debtor for the benefit of all stakeholders; (3) payment in full of Debtor's secured lender; and (4) payment in full of Debtor's other secured and unsecured creditors.

11.    *Second*, the terms of the Plan provide that the Lender and other creditors will receive more under the Plan than they would in a chapter 7 liquidation, especially given the distressed market that Lender acknowledges is not efficient or functioning.  Here, the full amount of the Lender's allowed secured claim will be paid in full over time, while being protected by a growing value of the Hotel, increasing the equity cushion.  In a chapter 7, an expedited sale process and the added transaction costs incident to a forced sale would be devastating, and result in the Lender being unable to recover the full value of its claim (and wiping out claims of other creditors in the process).  While the Lender would likely be partially paid up front in a chapter 7, rather than fully paid over time, the best interest test considers the amount and not the timing of the payment, and the Lender is being compensated for both delay and the (minimal) risk incident thereto while also preserving value for all other stakeholders.

12.    *Third*, the Plan is feasible.  The infusion of $10,000,000 provided by Debtor's principals, plus existing accumulated cash in excess of $3,000,000, is sufficient to satisfy

---

[2] Section 105(a) may be used "to prevent activities which would delay or thwart efforts to reorganize the debtor."  *In re Allegheny Int'l Inc.*, 118 B.R. 282, 303 (Bankr. W.D. Pa. 1990).  Furthermore, "[e]quitable relief under section 105 is also appropriate to prevent 'end runs' on the bankruptcy process." *Id.* (citation omitted).  Here, Lender is attempting an "end run" on the bankruptcy process by advancing frivolous arguments against a valid plan of reorganization with the goal of torpedoing the Debtor's reorganization efforts so that the Lender can instead seek a plan of liquidation, under which Lender would act as the stalking horse bidder and snatch up the property for less than market value.  The Debtor also reserves the right to seek to designate the Lender's vote at an appropriate time.

administrative claims and other claims to be paid at or shortly following the effectiveness of the Plan. The deferred payments under the Plan will be easily satisfied once the hospitality market in New York stabilizes following the devastating effects of COVID.

13.     *Fourth*, the Plan's treatment of the Lender is permissible. The Lender is being paid in full over time, with interest, with terms that are consistent with applicable bankruptcy law and typical market practices. Meanwhile, the Lender is not being subjected to meaningful risk of nonpayment given that it gets to retain its lien on the Hotel and the Hotel's value is only expected to increase as the time to pay the Lender its principal approaches.

14.     *Fifth*, the absolute priority rule, to the extent it even applies on account of the payment in full of all allowed claims, is easily satisfied by Debtor's insiders' substantial new value contribution towards equity in the reorganized Debtor, which is reasonably equivalent to the residual equity value of the reorganized Debtor after accounting for existing claims.

15.     *Finally*, despite claims to the contrary, Debtor's existing management, which developed and operates the Hotel, has a sustained track record of sound operational performance. The Hotel is significantly outperforming its competitors and is consistently ranked as one of the top hotels in the area, which could not have been achieved without the Hotel's management's understanding of the business, maintenance of the Hotel, and connections in the community.

16.     Accordingly, Debtor respectfully requests that the Lender's objections to confirmation of the Plan are overruled and the Plan is confirmed forthwith.

## **ARGUMENT**

### A.     **The Plan was Proposed in Good Faith**

17.     Section 1129(a)(3) of the Code requires that, as a condition for plan confirmation, the plan must have been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). To satisfy the "good faith" test, the plan must have been "proposed with

5

honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (cleaned up). The inquiry focuses primarily on "whether the proposal of the plan was in good faith, not on whether the plan generally is in good faith . . . [or on a] free ranging inquiry into fairness and equity." *See In re Purdue Pharma L.P.*, 633 B.R. 53, 74 (Bankr. S.D.N.Y. 2021). The good faith analysis "speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); *see In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012) (stating that good faith objection based on "aggregation of all things they say are wrong with the Plan" is "more properly addressed under the feasibility requirement").

18.    In evaluating compliance with section 1129(a)(3), courts also consider whether the plan "will achieve a result consistent with the standards prescribed under the Bankruptcy Code." *Purdue Pharma*, 633 B.R. at 74. Those objectives include preserving going concerns, maximizing distributions to creditors, giving debtors a fresh start, and expeditiously liquidating claims. *In re Ditech Holding Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019).

19.    The Plan easily meets these requirements. First, there is no question that, facing a matured mortgage loan held by an aggressive lender, and just beginning to come off of the worst of COVID, the Debtor is in need of a financial restructuring. *See Johns-Manville*, 843 F.2d at 649 (endorsing Bankruptcy Court's conclusion that good-faith requirement was met because "Johns-Manville was and remains 'a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future.'").

20.    Second, the Plan represents a solid effort by Debtor to pay all legitimate claims in full. Debtor could easily have justified short-changing its unsecured creditors and paying them a fraction of what is owed. Instead, Debtor formulated its plan to pay unsecured creditors *in full*

over a relatively short period of time -- a rarity in Chapter 11 cases, especially during COVID. *See, e.g.*, *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 28 (Bankr. D. Kan. 2001) (holding that plan that paid secured and unsecured claims in full while preserving equity interests was proposed in good faith); *In re Northbelt, LLC*, 630 B.R. 228, 278 (Bankr. S.D. Tex. 2020) (noting that "a single-asset debtor's desire to protect its equity can be a legitimate Chapter 11 objective"); *In re Kadlubek Fam. Revocable Living Tr.*, 545 B.R. 660, 667 n.7 (Bankr. D.N.M. 2016) ("In solvent estate . . . the debtor in possession/trustee must also take into account the interests of equity.").[3]

21.    While the Plan does not reflect a negotiated agreement with the Lender, the Plan is nevertheless the product of significant negotiations with stakeholders.  Debtor has been engaging continuously with unsecured creditors on claims allowance issues.  As a result, Debtor has agreed to stipulations with creditors (or otherwise obtained orders) to reduce the allowed amount of claims by more than $16 million.  Debtor has also negotiated a settlement with the City of New York to satisfy unpaid property taxes -- a first priority secured claim -- over time rather than up front, which resulting effect on cash flow benefits the Lender, among others.[4]

22.    Debtor is also continuing its efforts to reach a consensual solution with the Lender. While Debtor's efforts have been rebuffed, Debtor welcomes upcoming mediation with the Lender in the hopes that the parties can come to terms.  Debtor has also taken the Lender's input regarding certain Plan and Disclosure Statement provisions, and has even increased the amount of cash being

---

[3] The Debtor's principals are also not the only equityholders of the Debtor.  WH Mezz Lender, LLC (the "Mezz Lender"), a third-party, holds an indirect interest in the equity of the Debtor by virtue of a $14 million investment. Although the Mezz Lender is prohibited by an intercreditor agreement from interfering with the Lender's conduct in this case, its interest would be wiped out by the Lender's competing plan.

[4] The Debtor is in discussions with the City of New York to resolve certain additional claims filed, which are generally duplicative and/or erroneous.

infused into Debtor based on Lender's position that the earlier financing amount was inadequate.

23.    Cases cited by the Lender to support its good faith arguments are inapposite.  In *Malkus*, for example, the lack of good faith was found (with minimal discussion of applicable law) where the debtor's shareholders "retained all equity interests with no new investment, while unsecured creditors receive virtually nothing," and the debtor's president paid himself while secured creditors went unpaid.  *In re Malkus, Inc.*, No. 03-07711-GLP, 2004 WL 3202212, at *4 (Bankr. M.D. Fla. Nov. 15, 2004).  In addition to being contrary to the "good faith" standard discussed above, the facts in *Malkus* are distinguishable in that, here, creditors are paid in full and the Debtor's principals are making a substantial equity investment.

24.    This Court's suggestion in *Excel Marine* that the good faith requirement might be lacking if "the unsecured creditors are left with only a death trap provision" has no bearing on this case.  *In Matter of Excel Mar. Carriers Ltd.*, No. 13-23060-RDD, 2013 WL 5155040, at *4 (Bankr. S.D.N.Y. Sept. 13, 2013).  It was not the mere absence of creditor negotiations that determined whether the good faith requirement was met (as the Lender argues), but the fact that creditors were potentially facing a plan that coercively provided greater benefits to accepting creditors than to dissenting ones absent negotiations.  *Id.*  Here, unsecured creditors are being paid in full whether or not they vote to accept the Plan, so the analysis in *Excel Marine* is inapplicable.

25.    Likewise, the extremely limited discussion in *LightSquared* concerning good faith is purely dicta.  *In re LightSquared Inc.*, 513 B.R. 56, 100 (Bankr. S.D.N.Y. 2014) (denying confirmation on other grounds and making no findings as to section 1129(a)(3)).  And the *Prosser* case cited by the Lender does not even discuss confirmation at all.  *In re Prosser*, No. 06-30009, 2009 WL 3270865, at *33 (Bankr. D.V.I. Oct. 9, 2009) (denying Chapter 7 debtor's claims of exemptions where debtor was found, in bad faith, to have concealed assets).

8

26.    The Lender's separate arguments with respect to the conduct of Debtor and its principals before the bankruptcy case, or the merits of various substantive provisions of the Plan are irrelevant to the question of good faith.  As noted above, the good faith requirement addresses the formulation and solicitation of the plan itself; it does not touch upon whether, at some point in history, a debtor's insiders engaged in conduct that parties now take issue with.  *Matter of Madison Hotel Assocs.*, 749 F.2d 410, 424–25 (7th Cir. 1984) (holding that district court erred in considering pre-filing conduct); *Geijsel*, 480 B.R. at 255 ("Courts do not consider pre-petition actions when assessing the good faith of a proposed plan.").  Debtor's goal in the Plan was to provide for preservation of Debtor as a going concern for the benefit of the Debtor, its creditors, its equity holders, and the Williamsburg community while ensuring all parties receive at least their entitlement under the Code.  This Court should find that the Plan was proposed in good faith.

## B.    The Plan Satisfies the Best Interests Test

27.    The Lender's argument that the Plan does not satisfy the best interests test is seriously misguided.  Section 1129(a)(7) of the Code requires that impaired creditors "receive or retain under the plan . . . a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7).  The chapter 7 distribution scheme along with "the probable costs incident to such liquidation" must be accounted for.  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007).

28.    The Plan unambiguously satisfies the best interests test.  Under the Plan, the Lender retains its mortgage and is promised the full value of its allowed claim, with interest.  There is no doubt the Lender would rather the Hotel is sold for its own benefit (where it can credit bid to acquire it at a discount) .  Indeed, that is exactly what the Lender has been attempting for nearly

9

four years.  *See, e.g.*, Lender's Term Sheet [ECF No. 196 Ex. E] (proposing plan of liquidation as alternative to the Plan).  But nothing in the Code requires a creditor to get its way (especially to the detriment of all others) -- it only requires payment in full over time.  *See* 11 U.S.C. § 1129(b)(2)(A)(i); *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (declining to "substitute the judgment of the objecting creditors over the business judgment of the Debtor[.]").

29.    The Lender's argument that it would receive more in a Chapter 7 liquidation makes no sense.  As Debtor's hospitality experts confirm, a forced liquidation in the current climate, with the lingering effects of COVID-19, and the hospitality market in New York non-functional, such a sale would be disastrous, resulting in loss of at least 30% of the value of the Hotel, to $79 million, and a loss of the $10,000,000 cash infusion provided under the Plan.  The foregoing, after deducting transaction costs, and loss of the transfer tax safe harbor, would result in a significant loss to the Lender off its asserted claims of $95 million, and wipe out all other creditors and stakeholders.  In contrast, if the Lender is significantly over-secured -- as is indicated by Debtor's uncontroverted $113 million appraised valuation of the Hotel -- there is only speculative risk of nonpayment and the Lender will instead receive the full amount of its allowed claim.  This is especially true if, as Debtor's experts indicate, the value of the Hotel will increase between now and the final payment of Lender's claim, with the then-projected value in excess of $152,000,000.

30.    In addition, if the Court were to use the Lender's unfounded position on value, which is suspect given that Lender did not retain its own appraiser and offers no credible alternative valuation, the liquidation value would only be further reduced from Lender's lower "valuation." Moreover, Lender's hypothetical recovery in a Chapter 7 would have to be further reduced to account for trustee's and broker's fees and other costs of sale, as well as the significant price decrease in a liquidation sale (although, again, the Lender asserts without basis that such sale

10

would not materially affect the value of the Hotel). Moreover, a Chapter 7 trustee would be as motivated as Debtor, if not more so, to reduce the total allowable amount of Lender's claim on legal or equitable grounds relating to Lender's misconduct prior to the commencement of this bankruptcy case and for equitable grounds, in order to ensure distributions to unsecured creditors.

31.     Accordingly, the Lender's suggestion it would fare better in a Chapter 7 is entirely baseless and the best interests test is satisfied with respect to the Lender.

**C.     The Plan Is Feasible**

32.     Under Section 1129(a)(11) of the Code, a court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

33.     Success does not have to be a certainty to satisfy section 1129(a)(11). The statute just requires that the debtor demonstrate a "reasonable assurance" that plan consummation is unlikely to result in a further need for financial reorganization once the debtor emerges. *See Johns-Manville*, 843 F.2d at 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Adelphia Bus. Sol., Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) ("In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty or even a substantial probability that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success."); *In re Eddington Thread Mfg. Co.*, 181 B.R. 8236, 833 (Bankr. E.D. Pa. 1995) ("[T]here is a relatively low threshold of proof necessary to satisfy the feasibility requirement.").

34.     As an initial matter, Debtor's experts, Getzler Henrich and Hilco Realty have provided thorough analysis detailing projections over the life of the Plan, showing there will be

sufficient cash for effective-date payments and those shortly thereafter, plus sufficient free cash flow over the life of the Plan to cover deferred payments thereunder. In fact, Debtor is projecting it will have excess cash flow from operations of as much as $15 million by the end of the Plan's term, plus a hotel valued in excess of $152,000,000. Further, Debtor's experts conclude that the market will have stabilized by then and the Debtor will be able to refinance (or sell) the Hotel.

35.    With respect to the more than $40 million of asserted unsecured claims, there are overstated and not supportable. As to effective date payments, claims objections have been filed and are pending with respect to the vast majority (by dollar amount) of unsecured claims, and Debtor believes it will prevail or reach settlement on all such objections. Indeed, as of the date hereof, more than $16,000,000 in asserted unsecured claims have already been disallowed. To the extent the total amount of allowed unsecured claims is modestly higher than estimated, the Debtor's independently vetted projections establish there should be more than enough cash to satisfy such claims. Further, the disputed and unliquidated claims of Mencia and Grandfield are entirely baseless, and even if somehow allowed in part, which is contested, are likely otherwise covered and would be paid by insurers and/or co-defendants.[5] There is therefore no need for the Debtor to have cash on hand *today* to satisfy such disputed and unsupportable claims[6]; the Debtor's profits could instead be put toward those claims in due course if necessary.

36.    The proposed balloon payment to the Lender is also feasible. As is set forth in the Debtor's expert reports -- and as common sense suggests -- the stabilization of the New York

---

[5] Likewise, there are material legal and factual deficiencies in the recently filed unsecured claim of the New York City Department of Finance, in that the amounts asserted therein do not reflect actual claims against the Debtor. As noted above, the Debtor is in discussions to resolve such. Responses to Mencia and Grandfield plan objections are addressed in the Debtor's omnibus response, being filed concurrently.

[6] The Debtor has sought to estimate such claims at zero given the highly questionable basis for the claims, and that there are likely other pockets to pay such claims

hospitality market following COVID, and the stabilization of the Hotel following several years of normal operations, will result in the Hotel's value increasing significantly. Leitner Berman has valued the Hotel at $152,000,000 at the conclusion of the Plan period.  Both Hilco Realty and B. Riley have opined that, at such valuation, the Loan can be readily refinanced.  Accordingly, Debtor will demonstrate that it should have no difficulty paying the Lender in full through a refinancing or sale of the Hotel within the six-year period allotted under the Plan.

37.    In addition, the Lender's argument that the Plan is not feasible because the Court may not accept the proposed payment terms as provided for under the Plan, begs the question.[7] The treatment of the Lender is authorized under the Code, as discussed below. Accordingly, the Lender's objection argument regarding feasibility under a hypothetical different plan, is inapposite.  The interest-only payments to the Lender under the Plan actually under consideration herein are unquestionably feasible, particularly in light of the interest reserve being funded on the Effective Date.  While the Debtor submits that the treatment under the Plan is consistent with controlling precedent as discussed below, if the Court requires the Plan to enhance the terms beyond what it currently contains, any compensating adjustments to other Plan provisions can be addressed at such time.

38.    Lender's argument that Debtor's projections are unreasonably high is also without merit and rejected by Debtor's independent experts.  The Hotel was only fully completed in 2018, and has been under the cloud of foreclosure, COVID, and this bankruptcy case for nearly the entire period thereafter.  And even facing those existential challenges, the Hotel has still significantly outperformed its peers due to the strength of its management team, their understanding of the

---

[7] In particular, the Lender simply assumes that this Court will require partial amortization of the debt to the Lender prior to the balloon payment at the end of year six of the Plan.  As discussed below, however, the terms of the payment to the Lender are supported by applicable law and the particular circumstances of the Debtor's business.

market, and their community connections.  Debtor's witnesses will demonstrate that projections supporting the Plan are reasonable and the Lender offers no alternative beyond speculation.  There is ample evidence Debtor will fulfill all requirements of the Plan.

**D.    The Terms of the Lender's Payment Are Permissible**

39.    Lender asserts the Code's cramdown requirements are not met based on its position that the proposed payment terms to the Lender are improper and that the risk of success of the plan unfairly shifts from Debtor's equityholders to the Lender.  Both assertions are inaccurate and the proposed treatment of the Lender is in fact "fair and equitable."

40.    Section 1129(b)(1) of the Code provides that a plan of reorganization can be confirmed over the objection of a dissenting impaired class of creditors if the plan "is fair and equitable."  11 U.S.C. § 1129(b)(1).  The "fair and equitable" requirement means that objecting secured creditors must retain their liens on property of the estate and receive deferred cash payments in at least the amount of their claim plus interest, the property securing the creditors' claims must be sold, or the secured creditors must receive the "indubitable equivalent" of their claims. 11 U.S.C. § 1129(b)(2)(A).  Importantly, there are no *per se* rules as to what payment terms are permissible; non-amortizing, and even negative-amortizing terms are permitted under the right circumstances.  *In re Riverbend Leasing LLC*, 458 B.R. 520, 534 (Bankr. S.D. Iowa 2011).  Instead, a holistic assessment of the characteristics of the debtor, the plan, and the related risk factors is required.  *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 334 (5th Cir. 2013).

41.    While Debtor would like nothing more than to pay off the Lender and be done with it, there is not currently a functioning market such that Debtor could refinance the Lender's debt at a manageable interest rate.  *See In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 438 (Bankr. W.D. Mo. 2009) ("Telling debtors that the only way to pay creditors the present value of their

claim is to submit to vulture lenders, who lay in wait, charging sky high interest rates . . . is akin to holding that no Chapter 11 cramdown is feasible.").  Once the market has stabilized, and once the Hotel has been operating profitably for a longer period of time, the Debtor will be in position to do so.  In the meantime, the Debtor has proposed terms for payments to the Lender that provide a high probability of payment in full and compensation for the limited risk incurred.

The Plan Provides An Appropriate *Till* Rate

42.    The interest rate the Plan provides in connection to the Lender  is permissible. Section 1123(a)(5)(E) specifically allows for the "modification of any lien" in connection with confirming a chapter 11 plan. 11 U.S.C. § 1123(a)(5)(E).  Courts have held that Congress intended, through this section of the Code, to allow chapter 11 debtors to modify (among other things) the interest rate on secured claims in order to implement a plan of reorganization. *E.g.*, *In re Crane Automotive, Inc.*, 88 B.R. 81, 83 (Bankr. W.D. Pa. 1988).

43.    Here, Debtor and Lender agree that there is no efficient market for loans to provide financing as proposed by the Debtor under the Plan.[8]  Accordingly, the parties agree that the *Till* "prime-plus" or "formula" rate is applicable.  *Till v. SCS Credit Corp.*, 541 U.S. 465, 480-81 (2004).  Under *Till*'s formula rate approach, courts begin with the prime rate and add a risk adjustment to compensate the creditor being crammed down for the risk they are being forced to bear.  *Id.*  The Supreme Court in *Till* noted that "courts have generally approved adjustments of 1% to 3%" and that the rate should be "not so high as to doom the plan." *Id.* ("If the court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, the plan probably should not be confirmed.").

---

[8] In addition to the expert reports by B Riley, Getzler Henrich, and Hilco, the Debtor also filed a declaration of Mark Podgainy [ECF No. 160], which further details how the market is not functioning at this time.

44.    Where Debtor and Lender diverge is on the appropriate risk adjustment to apply. The Debtor contends that a risk adjustment of 1.25% above prime for the first four years of Plan payments and 1.75% above for the remaining two years, and it is appropriate based on both legal precedent and an objective computation of the risk factors actually the Lender.   The Lender Objection does not state what rate it believes is appropriate, but its consultants put forth a claim that their "*Till* rate" is 10.30% without much explanation, including an eye-popping risk adjustment of 7.05% for a fully secured senior mortgage lender with a lien on valuable, fully developed, fully operational real estate (that appreciates in value).   As will be demonstrated at confirmation, the Lender's proposed rate is arbitrary and excessive while the rate provided in the Plan is appropriate and consistent with the risk borne by the Lender and established precedent.

45.    The Lender argues that it is "absurd on its face given the materially riskier situation today" that the resulting rate under the Plan is materially lower than the contract rate of the loan. The Lender does not say what makes current circumstances risker (for hotel that is increasing in value) but it beggars belief that a mortgage on a half-constructed hotel is somehow safer than a mortgage on a hotel that is not only fully operational but is materially outperforming its peers. Moreover, it is nearly universally the case that the prime-plus approach will result in a lower interest rate than the contract rate, especially when contractual default interest is taken into consideration.  *Till* itself, for example, involved a contractual 21% interest rate reduced to 9.5% (the 8% prime rate plus a 1.5% risk adjustment) under the chapter 13 debtor's payment plan, and other similar examples abound.  Accordingly, a rate lower than the contract rate is justified.

The Other Terms of the Lender's Payments Are Appropriate

46.    The Lender also takes issue with the term, loan-to-value ratio, and lack of pre-maturity amortization of its allowed claim.   However, each of these terms is consistent with

applicable law and, as Debtor's experts will establish, comports with market practices with respect to real estate mortgage loans.  Indeed, the analysis regarding the terms of the restructuring note is governed under *Till*, and nothing therein (or in the Code) requires a shorter term, modified loan-to-value ratio, or that loan principal be amortized under cramdown plans.

47.     In *Mendoza*, the court was prepared to confirm a plan that provided for a mortgage lender to receive five years of monthly interest-only payments at 4.75% with a balloon payment at the end of the term, which closely tracks the Plan's treatment of the Lender.  *In re Mendoza*, No. 09-11678, 2010 WL 1610120, at *2 (Bankr. N.D. Cal. Apr. 20, 2010) (confirming revised plan with shorter term at lower rate).  Likewise, in *Gramercy Twins*, the court endorsed a five-year term of interest-only payments.  *In re Gramercy Twins Assocs.*, 187 B.R. 112, 124 (Bankr. S.D.N.Y. 1995); see also *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 432 (Bankr. W.D. Mo. 2009) (holding plan that provided for a balloon payment did not discriminate unfairly).  And in *Dupell*, the court approved conceptually of a minimally amortizing payment over five years.  *In re Dupell*, No. 99-10561DWS, 2000 WL 192972, at *1 (Bankr. E.D. Pa. Feb. 15, 2000) (denying confirmation where source of balloon payment was "bonuses from [debtor's] separate employment with 'his wife's company'").  Debtor's experts have also identified $26 billion of interest-only commercial loans in the lodging industry, and $122 billion overall, issued between 2014 and 2021, demonstrating that these are normal and common payment terms.

48.     There is also nothing improper about a six-year term for Lender's note, which is within the range of what other courts have approved.  While the Lender's loan began as a short-term construction loan, the Hotel is now fully complete, so it is not a meaningful comparison to look at the duration of other construction loans or the original term of the loan from Lender. And Lender's objections to the loan-to-value ratio of its debt (which is simply another factor in the *Till*

analysis) are based on an artificially deflated Hotel value and assumes Lender's claim will be fully allowed. Lender completely ignores the projected increase in the Hotel's value over time, which only further increases the equity cushion (and therefore the Lender's LTV).

49. Lender's cases do not offer any meaningful support for its opposition to its treatment under the Plan. For example, the court in *20 Bayard Views* found it most significant that there was "no equity cushion" behind the cramdown loan, the liquidation value was less than the secured lender's claim, and the success of the plan depended on future sales of condominium units. *In re 20 Bayard Views, LLC*, 445 B.R. 83, 112 (Bankr. E.D.N.Y. 2011). In this case, the Hotel has a significant and increasing equity cushion and the Plan's success is not tied to something as risky and uncertain as condo unit sales to third parties. In *Miami Center*, the court rejected the 10-year term of the cramdown loan not because of a comparison to the term remaining pre-bankruptcy but because there was no evidence that the market allowed for that length of loan on comparable properties. *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992). Here, Debtor's experts will testify a six-year term is well within the reasonable duration of comparable loans, as typical loans in the relevant market for hotel loans run longer.

The Plan Does Not Unfairly Shift Risk to the Lender

50. The Lender also asserts that the terms and structure of the Plan unfairly shift the risk of a successful reorganization from Debtor's junior classes of claims and interests, but this, too, is baseless. First, the Lender is simply mistaken as to the benefits that the Debtor's equityholders will receive under the Plan. Debtor's existing equity is being cancelled under the Plan and new equity will be issued in exchange for new value: a significant capital infusion that will be used to pay claims, including the Lender's and ensure sufficient working capital. Further under the Plan, cash will be allocated first to cover plan payments and operations, before equity in

18

reorganized Debtor will receive *any* distributions under the Plan.  Further, any distributions on

account of the Management Agreement arise from ongoing efforts to operate the hotel and not on

account of equity and, in any event, a third-party hotel operator would charge a similar, if not

greater, fee for managing the Hotel.

51.    The *Reid Park* case cited by Lender rejected a plan that actually required a 12%

return on the new money while the lender's balloon payment and unsecured dividends remained

outstanding.  *In re Reid Park Props.*, LLC, 2012 WL 5462919, at *9-10 (Bankr. D. Ariz. Nov. 7,

2012).[9]  There is no return of equity under the Plan and unsecured creditors are paid in full, so

equity's and Lender's interests are aligned to satisfy claims while ensuring the Hotel's viability.

**E.    The Absolute Priority Rule Is Satisfied**

52.    The Lender makes several arguments -- all incorrect -- that the absolute priority

rule bars confirmation of the Plan.  The absolute priority rule does not apply to the Lender.  The

Supreme Court has unequivocally stated that the source of the absolute priority rule is Section

1129(b)(2)(B)(ii), which deals only with unsecured creditors. *See Bank of Am. Nat. Tr. & Sav.*

*Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 4497 (1999) ("[T]the absolute priority rule now

on the books as subsection (b)(2)(B)(ii) may carry a new value corollary.").[10]  The rule is

inapplicable to a secured lender, and the Lender lacks standing to assert it on behalf of others. *See*

*In re New Midland Plaza Assocs.*, 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000) (holding that "fully

secured creditor" lacked "standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii)").

53.    Further, the absolute priority rule is inapplicable to unsecured creditors that are paid

---

[9] Likewise, the dictum in the *Miami Center* decision that a secured lender should have "upside potential" is suspect. There is no basis in the Code for requiring that a secured lender receive *more* than the amount of its claim plus interest.

[10] The fact that some cases have stretched *203 North LaSalle* and the absolute priority rule beyond their intended meanings does not mean this Court should add to the folly.  *See, Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 54 (E.D. Pa. 1996) (confirming that Section 1129(B)(2)(B)(ii) applies only to unsecured creditors).

in full.  *See In re Johnston*, 140 B.R. 526, 530 (B.A.P. 9th Cir. 1992) ("Thus, in our evaluation of

the absolute priority rule, we focus only on whether the plan provides that [the objecting unsecured

creditor] will be paid in full"); *In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 585 (Bankr. W.D.

Tex. 2010) (noting unsecured creditors paid in full are covered by § 1129(b)(2)(b)(i), rather than

§ 1129(B)(2)(b)(ii)—the source of the absolute priority rule).

54.     Even if the rule were implicated, the "new value corollary" permits the Plan's

structure.  The new value corollary allows existing equityholders to obtain the equity in the

reorganized debtor if they make a contribution that is new, substantial, money or money's worth,

necessary for a successful reorganization, and reasonably equivalent to the property received

therefor.  *BT/SAP Pool C Assocs. V. Coltex Loop Cent. Three Partners*, 203 B.R. 527, 534

(S.D.N.Y. 1996).  Each of these conditions is easily met.

55.     At least $8.5 million of the cash contribution into the reorganized Debtor  is new

money, and there is no question that it is a substantial sum of money, given that it is more than

double the amount of unsecured claims expected to be allowed in this case. *See In re Fur Creations

by Varriale, Ltd.*, 188 B.R. 754, 762 (Bankr. S.D.N.Y. 1995) (comparing equity contribution to

amount of unsecured claims against debtor).

56.     The investment is necessary to a successful reorganization, given Debtor lacks

sufficient free cash flow to make Plan payments to creditors, including Lender, on or shortly after

the effective date.  In other words, without this investment, the Plan will not be feasible and the

only alternative will be liquidation.  The Lender's argument that the cash contribution is being

used to enrich the investors rather than pay claims is factually unsupported.  The contribution will

(1) fund a $3 million interest reserve to protect the Lender's interest payment rights, (2) pay

administrative expense claims, (3) pay secured claims that will be paid either on the effective date

20

of the Plan or within 180 days thereafter, and (4) pay unsecured claims that are payable either on the effective date of the Plan or within 180 days thereafter. Any excess remaining, will be used to provide a cushion for subsequent payments to the Lender, late-allowed claims, or for other cash needs that help ensure viability for the Hotel, which is helpful for Plan feasibility.

57.    Finally, the amount of cash contribution is reasonably equivalent to the Hotel's equity on exit. Debtor's licensed appraiser values the Hotel at roughly $113 million. Subtracting anticipated administrative claims, the Lender's asserted $95 million claim, $3.5 million in other secured claims, and about $2.5 million in unsecured claims leaves equity of less than $10 million, strikingly close to the $8.5 million being paid for the equity in the reorganized Debtor.

58.    The fact that the price paid for *equity* is a small fraction of the value of Debtor's *assets* is irrelevant. The new value corollary requires that the new investment "is reasonably equivalent to the value of the new equity interests in the reorganized debtor" received on account of such investment. *Matter of Woodbrook Assocs.*, 19 F.3d 312, 319 (7th Cir. 1994) (citing *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121–22 (1939)). It does not require a comparison between the amount of the investment and the value of the assets owned by the reorganized debtor irrespective of the claims payable from those assets. In *Angeron*, cited by the Lender, the property at issue was unencumbered, so the equity and asset values were the same. *In re Angeron*, No. 18-10482, 2018 WL 6601130, at *4 (Bankr. E.D. La. Dec. 13, 2018). A comparison with asset values makes no sense here, as the equity received reflects residual value after accounting for claims.

59.    While *One Times Square* involves muddy analysis and unclear facts, it appears to have conflated the value of equity and the value of assets, and also noted that the equity investment was used to rehab the real estate rather than pay claims. *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 708 (Bankr. S.D.N.Y. 1993). Other cases cited by the Lender that imply the

value of equity should be ignored in favor of the value of encumbered assets should be disregarded as contradictory to applicable law and common sense. *See Woodbrook Assocs.*, 19 F.3d at 319.

60.     Further, Lender cannot have it both ways and simultaneously assert an inflated claim and argue for a depressed value of the Hotel while also claiming that the reorganized Debtor's equity is undervalued.  If, as Lender asserts, the Hotel's value is less than $100 million, the Debtor's principals are foolish for infusing $10 million, including spending at least $8.5 million to buy valueless equity (after accounting for the value of claims).  Likewise, the Lender's insistence that the Plan is doomed to fail, and therefore that the reorganized Debtor will be forced to liquidate, would similarly mean that the equity value of the reorganized Debtor is (or is likely to fall to) zero. The absolute priority rule does not prevent equityholders from spending lots of money on allegedly worthless equity.

61.     Either way, the new value corollary, and therefore the absolute priority rule, is satisfied.  Debtor's indirect equityholders are either severely overpaying for an interest in the reorganized Debtor, or they are paying roughly fair value for the equity, but under no circumstances are they receiving their interest for a significant discount.

62.     Finally, there is no need to "market test" the equity in the Debtor in order to satisfy the absolute priority rule or the new value corollary.  The clearest reason is that there is simply not a functioning market for boutique hotel asset or equity investments at this time such that a "market test" would provide any meaningful insight.  The Lender acknowledges as much in connection with its *Till* arguments, yet continues to insist that a market test remains the only way the Plan can be confirmed.  In any event, the Lender itself has satisfied any "market test" requirement by "offering" a competing plan proposal that includes the functional equivalent of an equity contribution of up to $10 million to backstop creditor recoveries.  *See* Lender's Term Sheet [ECF

No. 196 Ex. E]. In other words, no matter how one looks at the scope of the absolute priority rule, any applicable requirements of Section 1129(b) are satisfied.

**F.    The Debtor's Management Should Remain In Place.**

63.    The Lender makes a number of related arguments to the effect that the existing management of Debtor -- whether the officers and employees of Debtor who manage its affairs or the Management Company that handles Hotel operations -- should not be permitted to remain in control of the Hotel under the Plan. These arguments, too, are without merit.

64.    First, the Lender argues that the Plan should not be confirmed because the existing insiders of Debtor will, by virtue of their acquisition of equity in the reorganized Debtor, continue to manage Debtor. Section 1129(a)(5)(A) requires the plan proponent disclose the identity of directors and officers of the reorganized debtor and establish that employment of such individuals is "consistent with the interests of creditors and equity security holders and with public policy[.]" 11 U.S.C. § 1129(a)(5)(A). Absent evidence of significant wrongdoing justifying removal of existing management, a debtor's existing management is presumed to satisfy Code's requirements. *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) (citing *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr.S.D.N.Y.1984)). "There is a need to have the person continue the business where, without such person, what may be passed along for 'restructuring' is merely a corporate shell." *Id.* at 792.

65.    Moreover, as Debtor's experts will establish, the Management Company is well suited to operate the Hotel. Through the Management Company's oversight, the Hotel's occupancy has been steadily increasing to a market-leading position and the Hotel is consistently ranked as a top property in Brooklyn, including with respect to guest satisfaction. Further, success of an independent boutique hotel is typically driven by the owner-developer-manager's direct

involvement in operations, rather than a third-party that is less committed to the hotel's concept. The Hotel is a unique concept -- not a cookie-cutter operation -- conceived of and executed by Debtor's principals who are best positioned to continue its operations post-bankruptcy.[11]

66.     The Lender also puts forth a laundry list of arguments for why the Management Agreement should not be assumed under the Plan.  For example, the Lender argues, as it has done many times beforehand, that the Management Agreement was wrongfully concealed from the Lender at the time of the making of its prepetition loan to the Debtor.  But these arguments are irrelevant to the going-forward management of the Hotel.  Irrespective of whether the business judgment test or the entire fairness standard applies, the Management Agreement can be assumed. Though it takes issue with the form of the Management Agreement, the Lender acknowledges that there is a management agreement in place that provides materially the same terms for the Hotel to be managed by the Management Company and for a market-standard 3% fee.[12]  To the extent the terms deviate from market, *i.e.*, with respect to the incentive fee, the Plan precludes the enforcement of such conditions. Plan § 5.7.

67.     The Lender's position that the Management Agreement depresses the value of the Hotel in the event of a hypothetical future sale is without merit.  The Management Agreement is a contract between the Debtor and the Management Company.  It is not an encumbrance that runs with the real estate on which the Hotel was constructed.  If the Hotel were ultimately sold at some point in the future, any prospective purchaser could elect to agree to be bound by the Management Agreement, enter into a new agreement with the Hotel Manager, or employ a third-party operator

---

[11] The fact that the third-party receiver appointed to manage the Hotel prepetition retained the Management Company is further evidence of the value that the Management Company brings to the table.

[12] The Lockwood Development Partners letter of intent ("LOI") also requires that debt service and plan payments are fully paid before can equityholders can receive distributions.  LOI, ¶ 2.

following such sale.  And will be set forth in a forthcoming further amended plan, the Debtor and Management Company have agreed that in the event of the Debtor negotiates sale of the Hotel to a non-affiliated third party, the Management Agreement may be terminated upon such sale.

68.     The Lender's assumption that the Debtor owns the "Williamsburg Hotel" IP is also baseless.  As the Lender's own experts note, there is typically a distinction between (1) the owner of the real property on which a hotel operates, (2) the entity that operates the hotel, and (3) the owner of the franchise and branding (including IP) of a hotel.  The owner of the real property seldom, if ever, owns the intellectual property associated with a hotel and at no point was the intellectual property underlying the Hotel contributed to Debtor.  Accordingly, the Management Agreement merely recognizes that Debtor is not the owner of the Williamsburg Hotel IP—it does not purport to assign such rights from the Debtor to the Management Company.  Further, Debtor has obtained a license to use the intellectual property going forward provided there is no change of control, akin to chain hotel franchise agreements.  Finally, Debtor's experts will establish that the "Williamsburg Hotel" IP only has value if the Plan, and thus the Hotel, is successful. If the Hotel fails and must be sold, the name would likely be changed to avoid taint or reputational risk.

69.     In any event, it would be illogical if confirmability turned on the particular terms of the Management Agreement.  If the Court deems any terms of the Management Agreement objectionable, this can be addressed either in a Plan revision or the confirmation order.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

70.    The Debtor has devised and proposed its Plan with the goal of preserving Debtor as a going concern and maximizing distributions to creditors, including the Lender, despite the Lender's continuous efforts to obstruct the Debtor and seize the Hotel for its own benefit. Although the Lender has interposed every possible objection to the Plan, Debtor's proposals comport with the requirements of the Code, as will be demonstrated conclusively at confirmation.

**WHEREFORE**, the Debtor respectfully requests that this Court overrule the Lender Objection to confirmation of the Plan, enter an order confirming the Plan, and grant such other and further relief as this Court deems just and proper.

Dated:  February 14, 2022
       New York, New York

Respectfully submitted,

By: */s/ Douglas Spelfogel*
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
**MAYER BROWN LLP**
1221 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
Email: dspelfogel@mayerbrown.com
       leisenberg@mayerbrown.com
       dchung@mayerbrown.com

*-and-*

Mark Frankel
**BACKENROTH FRANKEL &
KRINSKY, LLP**
800 Third Avenue
New York, New York  10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor and Debtor in
Possession*