**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
Email: dspelfogel@mayerbrown.com
          leisenberg@mayerbrown.com
          dchung@mayerbrown.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>Debtor. | Chapter -11<br><br>Case No.: 21-22108 (RDD) |

**OMNIBUS (I) OBJECTION TO EXAMINER'S MOTION TO MODIFY**
**AGGREGATE CAP ON COMPENSATION AND REIMBURSEMENT OF**
**EXAMINER'S FEES AND EXPENSES; FIRST INTERIM APPLICATION**
**OF ERIC M. HUEBSCHER AND HUEBSCHER & CO. AS EXAMINER;**
**AND FIRST INTERIM APPLICATION OF LOCKE LORD LLP, AS**
**EXAMINER'S COUNSEL; AND (II) CROSS-MOTION TO ENFORCE**
**FEE CAP AND LIMIT EXAMINER FEES; AUTHORIZE LIMITED**
**DISCOVERY AGAINST EXAMINER; ENFORCE CONFIDENTIALITY;**
**AND FOR RELATED RELIEF**

96 Wythe Acquisition LLC, the above-captioned debtor and debtor in possession (the "Debtor") hereby files this omnibus objection (this "Objection") to the *Examiner's Motion to Modify Aggregate Cap on Compensation and Reimbursement of Examiner's Fees and Expenses* [ECF No. 400] (the "Motion to Increase"), the *First Interim Application of Eric M. Huebscher and Huebscher & Co., as Examiner, for Allowance of Compensation and for Reimbursement of Expenses for the Period from November 16, 2021 through December 31, 2021* [ECF No. 293] (the "Huebscher Fee Application"), and *First Interim Application of Locke Lord LLP, as Examiner's Counsel, for Allowance of Compensation and for Reimbursement of Expenses for the Period from November 16, 2021 through December 31, 2021* [ECF No. 294] (the "Locke Lord Fee Application" and, together with the Huebscher Fee Application, the "Fee Application") and, in support of this Objection, incorporates the *Declaration of Michael Lichtenstein* [ECF No. 354] (the "Lichtenstein Declaration") by reference; and *Cross-Motion to Enforce Fee Cap and Limit Examiner Fees; Authorize Limited Discovery Against the Examiner; Enforce Confidentiality; and for Related Relief* and respectfully represents as follows:[1]

### PRELIMINARY STATEMENT

1.     The Debtor seeks to enforce the fee cap imposed with respect to Examiner, limit and/or bar further expenditure of costs by the Examiner, opposes his fees, authorize limited discovery in connection with conflicts of interest, and mark parts of the Examiner's report confidential pending further review.

2.     As discussed below, the Examiner has improperly and unreasonably run up charges many times the fee cap herein, for unnecessary services, undertaken an examination in coordinated fashion with the Lender (as defined below), calling into question the independence of the

---

[1] Capitalized terms used but not defined in this Objection have the meanings given in the Motion to Increase.

Examiner, who was often times in daily contact with the Lender.  As addressed in the Debtor's Rebuttal (as defined below), the resulting Draft Report (as defined below) shows that the Examiner has been doing the Lender's bidding for it, and deliberately made false statements leading to misleading, compromised, and or fraudulent conclusions.

3.    By its Motion to Increase, the Examiner seeks to modify the $350,000 cap on his compensation to $850,000.  This outrageous request to de facto remove the fee cap is problematic on multiple fronts, as it defies the Court's prior comments on the need for a fee cap given the limited scope of the Examiner's review, and asks for a retroactive 3-fold increase for what is a patently false report.  The request is made after the Examiner ran up alleged fees that are almost 3-fold from the original cap of $250,000 – untethered to the reality of the case (which includes a plan in prospect that provides for the infusion of $10 million in new monies).  The request is simply unwarranted given the limited scope of examination, inequitable in light of the relative size of the Debtor's business and liability, and detrimental to the estate's resources.  Further, the Examiner's report is not only unhelpful but rife with false statements and its conclusions are contradicted by the facts (and the report itself).  It also deviates from the precedents of this District where the examiner was rewarded far less than the current (and generous) fee cap for an investigation similar in scope to what the Examiner was tasked to do here.

4.    For the reasons detailed below, the Debtor opposes any increase in the cap, cross moves to enforce the cap, and to limit any further work by the Examiner.  The Motion to Increase also brims with false accusations and mischaracterizations of facts, which were already rebutted by the Debtor.  Specifically, the Examiner falsely accuses the Debtor of sandbagging the investigation and then argues that the Debtor's conduct somehow warrants more than tripling of the Examiner's fees, when the facts (including those presented within the Fee Applications) belie

such accusations.  Instead, the facts clearly shows the Examiner, in cahoots with Benefit Street Partners Realty Operating Partnership, L.P. (the "Lender"), and potentially in violation of the confidentiality protocol the Examiner agreed on, has unreasonably ran up the cost of the examination, and provided a conflicted and fraudulent report.

5.      In addition, as discussed below (and in the Debtor's Rebuttal), the Debtor submits that the report issued by the Examiner creates a false narrative, and is replete with deliberate misstatements, false claims and conclusions, in spite and in the face of evidence and facts that have proven such claims to be false. As set forth in great detail in the Debtor's Rebuttal, the Debtor submits that the Examiner's report contains many statements that are false, scandalous and defamatory.

6.      Given the foregoing, and as described more fully below, the Debtor respectfully requests that the Court enter an order enforcing the cap, barring any further expenditure of estate resources on the flawed examination, deny the Motion to Increase and each of the Fee Applications and *sua sponte* consider other affirmative safeguards to ensure that the estate's resources are preserved and restore confidence in the examination process, substantially in the form of the proposed order submitted herewith as **Exhibit A**.  The Debtor also seeks permission to undertake limited discovery to determine the nature of communications with Lender, and that pending completion of such, the Examiner's report remain confidential and/or the flawed conclusions remain confidential, together with protecting information concerning employee salary information.

## BACKGROUND FACTS

7.      On February 23, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code commencing the Chapter 11 Case.  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code. The Debtor owns and operates the property located at 96 Wythe Avenue in Brooklyn, including the 147-room Williamsburg Hotel with a restaurant and multiple bars (the "Hotel"). The Hotel is fully operational after being severely curtailed during the initial stages of the COVID-19 pandemic.

8.      The Chapter 11 Case has provided the Debtor, among other things, a breathing spell to reorganize given the negative impact of the pandemic upon the hospitality industry and the Debtor's business, which had previously severely impaired the Debtor's ability to obtain replacement mortgage financing, and continues to do so. The Debtor is in the process of finalizing an amended plan (the plan of reorganization as may be revised, amended, or supplemented, the "Plan"), which provides for the infusion of $10 million of new monies by the principals, together with payment to all creditors in full with interest over time. *See* Amended Chapter 11 Plan, [ECF No. 196].[2] The Debtor estimates that the allowed claims in class 5 will be in the ballpark of $2.5-$3 million, notwithstanding the two contested tort litigation claimants who have each asserted about $8 millions of unliquidated claims.[3] The confirmation hearing for the Plan was adjourned in part to accommodate a Court ordered mediation between the Debtor and BSP, and is now scheduled for April 7, 2022.

9.      On November 8, 2021, the Court entered the *Order Directing Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 178], on November 23, 2021, entered the *Amended Order Directing Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 193], and on December 14, 2021, entered the *Second Amended Examiner Appointment Order*

---

[2] The Debtor is finalizing the terms for a further amended plan which includes enhanced terms, such as increasing the cash infusion to $10 million.

[3] The tort claims are subject to objections, which provide that the claims are overstated, and subject to payment from insurance and/or third parties.

[ECF No. 224] (the "Second Amended Examiner Order").  Under each of the orders, the Examiner

has been given limited authority to investigate the "Examination Topics", which are "transactions

. . . that might give rise to potential claims by the Debtor's estate, against Ms. Toby Moskovits,

Mr. Michael Lichtenstein and/or the Debtor's other insiders (as such terms is defined in the

Bankruptcy Code," subject to exclusions for claims based on the Hotel Manager's loans under the

Paycheck Protection Program and related settlement and stipulation and potential claims belonging

to individual creditors, including relating to the management agreement between the Debtor and

Hotel manager.  *See* Second Amended Examiner Order, ¶¶ 2-3.  The examination was also

supposed to take into account the practical realities of the instant case, which includes that there is

a plan in prospect that provides for a $10 million cash infusion and payment in full to all creditors

over time with interest.  Further, the Examiner, after Court intervention, agreed to keep

"information sought or obtained in the conduct of the [Examiner's investigation]" confidential

until the Examiner determines which documents or information he intends to use in his report.  *See*

ECF No. 214, Attachment A (the "Confidentiality Protocol").

10.    As the Court has made clear many times the focus of the Examiner's investigation

always has been intended to be on potentially avoidable transfers of the Debtor's property.  *See,*

*e.g.*, Oct. 29, 2021 Hrg. Tr. 31:22-24 ("[I]t probably does make sense to have an investigation of .

. . avoidable transfers.").  The Court further clarified more than once that the examination should

have a "monetary limit to it".  *See id.* at 47:12-20.

11.    On December 22, 2021, the Examiner filed its *Motion to Enforce and Further*

*Amend Second Amended Order Directing the Appointment of an Examiner* [ECF No. 243] (the

"Motion to Enforce"), to, among other things, request that the Court eliminate any cap on or limit

to his fees under his appointment, despite the Court's prior position on examination scope and

fees.  On January 12, 2022, the Court entered an *Order Granting Examiner's Motion to Enforce and Further Amend Second Amended Order Directing Appointment of an Examiner* [ECF No. 288], which modified the cap on the Examiner's fees from $250,000 to $350,000 but firmly denied the Examiner's request to remove the cap.

12.     On January 13, 2022, the Examiner filed the Huebscher Fee Application, seeking fees and expenses in the amount of $87,678.57 for the period between November 16 through December 31, 2021); on the same day, the Examiner's attorneys filed the Locke Lord Fee Application, seeking professional fees and expenses in the amount of $158,249.03 for the period between November 16 through December 31, 2021.  The aggregate amount accrued by the Examiner's firm and counsel for the first six weeks add up to $245,927.60.

13.     Following the Huebscher Fee Application and the Locke Lord Fee Application, the Examiner filed the Motion to Increase, which seeks an increase of cap on compensation from $350,000 to $850,000, placing the blame falsely on the Debtor for the surge in Examiner's fees. In doing so, the Examiner continues a misleading narrative that the Debtor has not complied with the Examiner's requests, without regard for the Examiner's litigious conduct, refusal to work out issues without Court intervention, lack of independence and coordination with the Lender, false statements, and the excessive and unproductive nature of the examination itself.  In fact, throughout the Examiner's appointment, the Debtor has complied with the Examiner's demands and, to that end, produced thousands of pages of documents to the Examiner (sometimes reproducing documents that the Debtor had produced before per the Examiner's demands) and made many individuals available for interviews with the Examiner for many hours and days.  To the extent that the Examiner objected to the production by non-Debtor third parties, the Debtor understands the non-Debtor parties cured the missing production just after the Court's ruling on

the Motion to Enforce, and have complied with the Court's order following the January 14th bench ruling.

### *Draft Examiner Report*

14.     The Examiner's misguided and biased approach to his examination became all the more apparent on February 17, 2022, when the Examiner sent a "draft" copy of his investigation report, dated February 14, 2022 (the "Draft Report") not only to the Debtor but to the Lender as well, notwithstanding the Examiner's prior agreement to give the Debtor the opportunity to review the report for confidentiality and privilege concerns prior to its distribution to other parties.

15.     As detailed at length in the Debtor's rebuttal to the Draft Report (the "Rebuttal"), filed substantially contemporaneously herewith, and attached as **Exhibit B**, the Draft Report includes a significant volume of false and misleading information and the conclusions presented therein are based on faulty premises.  The information presented in the Draft Report is misleading, and, at times, entirely fraudulent, in spite and in the face of facts that provide such claims to be false, such that the Debtor can only conclude that the Examiner has intentionally spun a false narrative in order to justify further examination and greater fees (as evidenced by the Motion to Increase).

16.     In order to create this false narrative, the Draft Report presents an incoherent and self-contradictory analysis wherein the Debtor and Hotel Manager are sometimes treated as one and the same, and at other times they are treated as wholly independent, depending on which approach creates the perception of outflows of Debtor funds under particular circumstances.  In other words, the Examiner wants to have it both ways; he wants to inflate the value of the purportedly suspect transactions by treating all of the Hotel manager's funds as Debtor's funds, but he also wants to ignore transfers made *to* the Debtor by entities that received funds from the Hotel Manager, despite purporting to net out transactions.

17. Specifically, as an initial matter, as detailed in the Rebuttal, nowhere in the Draft Report does the Examiner reference the more than $30 million infused into the Hotel, approximately $21 million in equity and $11 million in loans. The Examiner also claims revenues are somehow actionable transfers without taking into account the costs of operating the Hotel. The Examiner also goes so far to assert that while revenues from operations were insufficient to pay debt service (as a construction project, income had not normalized), he falsely claims there were purported transfers out of the business to insiders that were nearly three-fold any available cash. The Examiner also lists payments to Northside Acquisition, his biggest line item relating to transfers out of the Management Company, but fails to account for payments in excess of $7 million from Northside Acquisition to the Debtor.

18. In fact, as detailed in the Rebuttal, the transactions that the Examiner falsely asserts are suspect are in fact legitimate business transactions not avoidable under any provision of the Bankruptcy Code or applicable state law, which fall into the following categories: (a) payment of expenses incurred in operating the Hotel (or related to construction of the Hotel); (b) repayment of debts owed to non-insider third-parties; (c) reimbursement of business expenditures incurred by one of the Debtor's principals or affiliates on behalf of the Debtor or Hotel Manager; (d) repayment of documented short-term loans made by the Debtor's principals or affiliates[4]; or (e) fictitious transfers manufactured by ignoring the economic substance of transactions among the Debtor, the Hotel Manager, and Northside Acquisition.[5]

19. Importantly, the Examiner, in the course of his examination, already has been

---

[4] The Debtor has acknowledged repayments of approximately $4.5 million in loans. Even if such was subject to avoidance, the Debtor has obtained agreements from insiders to increase the cash infusion at confirmation to $10 million, more than double any repayments on account of such loans.

[5] Additionally, as discussed in the Rebuttal, the Examiner has already been informed that certain of the identified transfers involve PPP loan funds. Those funds already being returned to the Debtor in connection with the Debtor's proposed plan of reorganization, and which are outside the scope of the Examiner's investigation.

provided with more than enough information to establish the foregoing.  That the Examiner has

chosen to ignore such information in favor of a factually deficient narrative indicates that the

Examiner has violated his statutory duties and is instead pursuing an agenda to harm the Debtor

and enrich himself.[6]

## **ARGUMENT**

A.    **The Fee Cap should be Enforced; Further Work Limited; and the Examiner's Request to Increase Fee Cap Denied.**

20.    Courts may limit the budget and duration of the examiner's investigation where an

extensive examination would be an unnecessary drain on estate resources.  *See In re Parmalat*

*USA Corp.*, Case No. 04-11139 (Bankr. S.D.N.Y. May 17, 2004), ECF No. 383 (limiting the

examination to two weeks and $5,000 budget); *see In re Neiman Marcus Group Ltd.*, Case No. 20-

32519 (Bankr. S.D. Tex. May 29, 2020), ECF No. 827, Hr'g Tr. at 194:12-17 (conveying the

court's willingness to appoint an examiner only with a limited budget of $100,000 and duration of

three weeks); *In re Purdue Pharma L.P.*, 19-23649 (RDD) (Bankr. S.D.N.Y.), ECF No. 3048 at

¶¶ 2,5 (ordering a $200,000 cap for the examiner).  The facts and circumstances of each case,

including the relative costs and benefits to the debtor's estate, factor heavily in determining the

appropriate scope of an examiner's investigation.  *See, e.g.*, *In re Residential Capital, LLC*, 474

B.R. 112, 120-21 (Bankr. S.D.N.Y. 2012); *In re SRJ Enters., Inc.*, 151 B.R. 189, 195-96 (Bankr.

N.D. Ill. 1993).

21.    As an example, an examiner appointed in *Cenveo* was tasked to investigate a similar

scope of examination limited to transactions and/or transfer of value between the *Cenveo* debtors

---

[6] The Examiner's violation of his own agreement to share with the Debtor a draft of his Report *prior to* providing the report to other parties, so that the Debtor may ensure that its privileged information is not disclosed (and notwithstanding the Examiner's prior efforts to destroy the Debtor's attorney-client privilege) further demonstrates Examiner's bad faith.

and their insiders and any potential causes of action that the debtors may have, and the examiner and counsel had billed approximately $208,000. *See Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y.), ECF Nos. 203, 398, 488, 628, 629, 988; *see also In re Nat'l Events of Am., Inc.*, Case No. 17-11798 (JLG) (Bankr. S.D.N.Y.), ECF Nos. 37, 163 (appointing the examiner for the investigation of any claims or potential claims by or against any debtor involving any entity or person identified by the U.S. Trustee, who ended up accruing less than $46,000). The examiner in *Cenveo* had an oversight role supervising the creditor's committee and the debtors to ensure that the creditor's committee's investigation was thorough and conducted in good faith so potentially had responsibility more limited than the Examiner's. *See Cenveo, Inc.*, ECF No. 203. However, it is worth comparing the facts of the two cases and noting that the *Cenveo* examiner was able to efficiently investigate a mega chapter 11 case of thirty-something debtor entities, oversaw many interviews and depositions, reviewed 5,425 documents and 99,297 pages that were produced to him, meet and confer with key stakeholders throughout his appointment, and still managed to stay within the $200,000 fee cap. *See id.*, ECF No. 467.

22.    The Examiner's request to increase the cap to $850,000 and essentially eliminate the fee cap is nonsensical. As an initial matter, the Examiner waited until after exceeding the cap by nearly three-fold before seeking permission to raise the cap - - in effect defeating the very purpose of the cap. Here, the Examiner represents in the Fee Applications that he and his counsel together accrued fees and expenses in the amount of approximately $250,000 for the first six weeks of his appointment. *See* Huebscher Fee Application (showing accrual of $87, 678.57); *see* Locke Lord Fee Application (showing accrual of $158,249.03). The Examiner further represented that he and his counsel billed more than $500,000 in fees and expenses during the next seven weeks. *See* Motion to Increase at ¶ 36 ("The Examiner's fees and expenses incurred to [February 22, 2022]

total approximately $775,000."). Such excessive fee is unwarranted given the expressly limited investigation scope, deviates from the practice of this District, and is inequitable given the facts of this chapter 11 case, including the relatively modest size of the bankruptcy and costs and benefits to the estate whose Debtor already soliciting for a plan of reorganization that proposes to pay in full.

23.     Moreover, the Examiner in the Motion to Increase misstates the facts to try to place the blame for his ballooned fees to the Debtor. While such allegations are simply untrue and have been refuted by many court papers and declarations submitted by the Debtor, the Debtor will expand on such so-called "series of matters" the Examiner sets forth as justification for the de facto removal of the fee cap.

24.     *First*, the Examiner argues that the scope of investigation proved to be much more complex than initially anticipated. This is a false statement, and it happened only because the Examiner arbitrarily expanded his investigation to outside the Court-mandated investigation scope untethered to the realities of the case, and for the apparent purpose of increasing his fees with no benefit to the estate. Contrary to the Examiner's representations, the Examiner's task was not to check every bank transaction of the Debtor and the dozens of non-Debtors bank accounts untethered to reality. His job was to identify potential transactions that could be avoided under section 544, 547, and 548 of the Bankruptcy Code while making economical use of his fee cap, and ensuring that such made sense in the scheme of the case.. Instead, the Examiner has made unreasonably broad requests for information and records (including numerous non-Debtors') that provided no cognizable benefit to the estate.[7] The Examiner also analyzed the pre-petition

---

[7] The Examiner insists that his investigation reflects industry standards. While the Debtor has endeavored to meet the Examiner's ever-changing goalposts and demands, the Debtor fails to understand how the Examiner's demands are all even relevant to the investigation scope. *See* Lichtenstein Declaration at ¶¶ 10-20. Such Examiner's demands

relationship with the Lender, reviewed projections and the management agreement, and otherwise extended his work outside the scope of his appointment unilaterally, and without regard for the realities of the case.

25.    While the Court held that the Examiner may exercise his discretion to determine which information is required as a part of the investigation, the Examiner was still obligated to make an "assessment of the benefit to the Debtor's creditors of pursuing any such cause of action", which would mean that the Examiner should have done a cost-benefit analysis and would have tailored his review accordingly.  Second Amended Examiner Order at ¶ 2.

26.    Here, the Examiner's claims about the case being complicated are simply false, as the Debtor's detailed report of cash/transfers provided by the Debtor clearly and simply shows the flow of funds into the Debtor as the $11 million loan was utilized by the Debtor over the years of 2017 to 2020.[8]  Similarly, the Examiner repeatedly mentions that he was required review of about 50 bank account statements.  However, most of the 50 accounts have no connection to the Debtor, and the review of all these accounts was unnecessary and irrelevant to the Debtor.  This claim has been falsely and repeatedly stated to the Court by the Examiner as a means to claim that the examination must go on, to expand the scope of the exam and to increase his fees.  The fact is that funds flowed into the Debtor mainly through one account, held by Northside Acquisition, which is the main account that is relevant to the Debtor and Management Company.  It is one thing for the Examiner wants to challenge such transfers; however, the fact that funds were provided from or subsequently transferred to other entities is irrelevant, as such transfers have been always

_____

include his insistence that the Debtor procure written documentation confirming closing of certain bank accounts (which the Debtor nevertheless agreed to obtain verification from its bank), account statement for a personal account of a Hotel employee, and various reports from the Debtor close to the report deadline.  *See id.*

[8] The Debtor's analysis provides that approximately $4.5 million in loans were repaid.

acknowledged by the Debtor and in the reports provided by the Debtor that funds transferred to Northside Acquisition were transferred out of the Hotel.

27.    Instead, the Examiner has continued to make broad requests for information and records without showing how they are relevant to the Examination Topics or not duplicative of materials he has already received.  To further these broad requests, the Examiner and his counsel have made a series of filings with the Court that have increased his fees and expenses without materially advancing the objectives of his appointment.  Here, the Examiner accrued fees and costs that unchecked will soon approach $1 million, against an estate with general unsecured claims expected to be in the $2.5-3 million range  (which are in any case going to be paid in full over time under the plan of reorganization currently proposed by the Debtor).

28.    *Second*, the Examiner claims that he faced non-compliance by the Debtor and its principals during the investigation.  The Examiner misleadingly suggests that the Debtor hasn't complied with his requests, disregarding the substantial production to date, conflates the Debtor with non-debtor entities, and paints with a broad brush claiming that actions by non-debtor are acts by Debtor.  Of course, the non-debtors are not in bankruptcy.  The Examiner continues to move goal posts and expand the nature, scope, and timing of the examination, all of which translate to an unnecessary heavy cost burden to the estate to the detriment of all creditors (with the exception of the Lender).  Each of the non-Debtors and other third parties are separate entities, with separate corporate structures, and independent counsel.

29.    In addition, despite the Examiner's statements, the Debtor (and non-debtor third parties) have produced over ten thousand pages of documents and complied with his requests to produce all bank statements known and available to the Debtor, including about 35 bank accounts, from companies that are mostly unrelated to the Debtor or its operations. In addition,

the Debtor has provided a full and complete report of all transfers/loans/revenue of the Debtor, in a 500 page report with annotations detailing transfers, with full back up, and several supplemental productions.

30.     *Third*, the Examiner argues that the Debtor's so-called actions and inactions resulted in the Examiner's need to seek Court assistance, without describing what such actions and inactions he is referring to.  This is a false statement made by the Examiner as the Examiner has steadfastly refused to confer to work out any issues that may arise in the case, seeking or requiring Court intervention where disputes should have been resolved through discussion.  The Examiner also refused to engage with the Debtor or counsel to coordinate production of documents, using a shoot first ask questions later approach, resulting in the Examiner going down many unwarranted rabbit holes, that could have easily be avoided with a dialogue.

31.     For example, issues raised with the Court include follows:

- Initial protocol for confidentiality (whereupon after Examiner refused to enter into any confidentiality protocol, the Court directed that the Examiner keep documents confidential);

- Request to eliminate and/or raise the cap and to address the scope of the review.  The Court agreed to raise the cap by $100,000, but denied the request to eliminate the cap.  It also permitted Examiner to self-regulate in terms of scope, whereupon the Examiner clarified that he was not seeking documents from all employees.

- Deadlines.  The Examiner sought multiple extensions of deadlines to complete his report.  On almost all occasions the Debtor consented to such extensions and in many cases agreed to more time than requested.  With respect to the last extension request, the Debtor attempted to negotiate a shorter extension than sought, whereupon despite pending discussions to resolve scheduling issues, Examiner filed his motion, which was subsequently agreed to.

- Protocol for release of draft report.  The Examiner refused to provide a copy of the draft report to the Debtor in advance

> of release to Lender or agree to keep the report confidential pending review by the Debtor for privilege and confidentially issues.

32.    This record shows that the Examiner refused to coordinate, and chose to force the issue with the Court's intervention every time, and any such increase of cost should, accordingly, be borne by the Examiner.  The Debtor therefore opposes these expenses incurred by the Examiner for no reason and without any benefit to the estate.

33.    *Fourth*, the Examiner claims that he should have a right to attorney fees seeking *in camera* review of a document, which was produced to the Examiner expressly subject to attorney-client privilege.  The Court had provided that the document(s) at issue would need to be "evidence of a crime" relevant to the examination for the Examiner to be able to disclose the document publicly.  Hr'g Tr., January 27, 2022, 5:13-4.  Nevertheless, despite the Court's direction, the Examiner proceeded to waste the Debtor's time and money to seek to disclose the document(s) based on the Examiner's wild theories of a criminal conspiracy among the Debtor's counsel and its principals, which was denied by the Court.  The Debtor opposes payment of these expenses, given that they were incurred without basis and were completely unrelated to the Examiner's investigation of transactions involving the Debtor.

34.    As such, the Debtor should not have to bear the expense of the Examiner's failure to operate within the budget that the Court already increased in the Second Amended Examiner Order.  The Examiner had the obligation to make economical use of his fee cap and account for the relative cost and benefit of continuing his investigation.  Instead, the Examiner inappropriately maintained contact with the Lender's attorneys (as explained below) and conducted his investigation outside the limited scope of the investigation mandated by the Court.  Thus, the Examiner's request for an increased budget should be denied.

**B.      The Fee Applications Should Not Be Approved and the Examiner Barred from Incurring Any Additional Fees**

35.      It well established that applications for the awards of fees may be reduced for billing that are "excessive, redundant or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (cited by *Kovalesky v. Carpenter*, 1997 U.S. Dist. LEXIS 16731 at *16-17 (S.D.N.Y. 1997)).  A professional in a bankruptcy case hired to handle the preference action is required to consider the potential for recovery and balance the efforts required against the results that might be achieved.  *See In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995) (remanding lower courts' rulings approving the debtor's professional's fees under section 330 of the Bankruptcy Code) (quotation omitted).  Further, the court may exclude excessive hours counsel expended on the action because of unnecessary contentious conduct.  *See Luciano v. Olsten Corp.*, 109 F.3d 111, 116-17 (2d Cir. 1997) ("The [district court] agrees that this litigation was characterized by a notably high level of contentiousness and lack of cooperation that resulted in excessive requests for [c]ourt intervention and increased the number of hours spent on the case by the attorneys.").

36.      *First*, the Debtor submits that the Examiner's overreaching position and aggressive (and, in hindsight, conflicted) conduct were unreasonable and unnecessary and warrants disallowance of legal fees incurred in connection of such motion practice.  As outlined above, and as the Debtor has described to the Court previously, the Examiner has made, and continues to make, overbroad requests for information and records without showing how they are relevant to the Examination Topics or not duplicative of materials he has already received.  To advance these requests, the Examiner and his counsel have made a series of filings with the Court that have increased his fees and expenses without materially advancing the objectives of his appointment.

37.     Specifically, in connection with the Fee Applications, the Examiner's first request for Court assistance related to a dispute over confidentiality (despite widely accepted practice), at which point the Court directed that the Examiner maintain confidentiality related to the investigation.  [ECF No. 199].  The second request was related to questions about overbroad document production, which the Examiner sought Court assistance on without meet and confer with the Debtor.[9]  [ECF No. 218].  The third request was a formal motion – the Motion to Enforce – seeking clarification on the earlier question of scope of document production as well as seeking to lift the cap on examiner's fees and expenses, despite the Court's advising that the examination should be subject to a monetary cap.[10]

38.     *Second*, and more importantly, the Examiner does not appear to have acted independently in this case, interfacing with the Lender, often times daily, and may have violated its confidentiality protocol given such interactions and the report issued, warranting further investigation and objection to payment of any fees.

39.     The Locke Lord Fee Application reveals that the Examiner or his counsel was in constant, sometimes daily, contact with BSP's counsel and the Office of the U.S. Trustee throughout the time covered by the Fee Applications.  The Examiner's counsel, for example, in the limited fee period subject to the instant application, spent at least twelve hours in multiple calls with BSP's counsel on status of the investigation, which raises serious questions about whether

---

[9] As a result of the letter, the Examiner clarified some of its requests, and the Debtor attempted in good faith to work with the Examiner to supplement its production (which has been completed) and with the Debtor's members to produce non-Debtor account information relating to transfers to/from Hotel operations.

[10] To the extent that the Examiner or his counsel file another fee application for fees incurred in January 2022, the Debtor will submit that the Examiner failed his obligation to consider the potential recovery and balance the efforts required against the results that might be achieved.  *See Taxman*, 49 F.3d at 316; 11 U.S.C. § 330(3)(C).  Rather, he violated his duties as an officer of the court when he continued to pursue theories outside the scope of investigations after it was (or should have been abundantly) clear that his efforts could have not benefited the Debtor's estate.  *See Taxman*, 49 F.3d at 314-5.

the Examiner was truly operating impartially without an axe to grind and whether confidentiality was breached. *See* Locke Lord Fee Application, Exh. B., pp. 15-16. There are also a significant number of communications between the Examiner's counsel and Mr. Greg Zipes, of the Office of the United States Trustee, despite that the Examiner is presumed to maintain independence, which reflects the true power dynamics in the case.

40.   Notwithstanding the Debtor's concerns over confidentiality and neutrality, the Debtor submits that such time spent in such inappropriate communication was neither reasonable nor necessary to the furtherance of the examination, and at a minimum should not be approved by the Court today. Moreover, given the concerns regarding the staggering costs, conflicted investigation, and intentionally misleading report, the Debtor submits that the current monetary cap should be enforced, and that the Examiner should be not permitted to incur any additional fees in connection with the investigation. 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code, including . . .] taking any action necessary or appropriate to prevent an abuse of process.")

### C.   The Court Should Authorize Limited Discovery with Respect to the Examiner

41.   The Examiner's conduct since his appointment, through and including the improper distribution of the Draft Report, as well as the contents of the Draft Report which is full of false statements and factually impossible conclusions (as described in the Rebuttal), call into question the independence of the Examiner. As discussed above, the Examiner has taken an adversarial stance throughout this chapter 11 case and has repeatedly sought to expand the scope of his examination to generate additional fees for himself and his attorneys, while also harming the Debtor and harassing the Debtor's employees.

42.     The Examiner's apparent nature came to a head in connection with its attempt to destroy the attorney-client privilege that the Debtors holds with its attorneys.  As detailed in filings provided directly to this Court, the Examiner speciously accused the Debtor and Debtor's attorneys of engaging in a so-called criminal conspiracy with the Debtor's principals when, despite the vague and shifting allegations levied by the Examiner, he insisted on breaking privilege.  While such exercise was denied, the Debtor was forced to expend significant resources to respond to such request, and are also being asked to pay for the Examiner's costs in connection with such baseless actions.

43.     As reflected in the time records filed by the Examiner's attorneys, and as detailed above, representatives for the Examiner were in regular contact with the representatives of Lender, who has also doggedly fought to frustrate the Debtor's reorganization every step of the way.  The Examiner's close relationship with the Lender is apparent from the Draft Report, given that (as discussed in the Rebuttal) the Examiner went far beyond the scope of his Examination to opine, without justification or evidence, as to the Debtor's intentions when it obtained a loan from the Lender in 2017 and the Debtor's ability to make debt service payments going forward.  Likewise, the fact that the Examiner chose to send the Draft Report to the Lender at exactly the same time that he sent it to the Debtor, despite the Examiner's prior agreement that the Debtor would be able to review the report for confidentiality and privilege issues before its distribution to others, reinforces how the Examiner has been favoring the Lender all along.  Last but not least, the Draft Report is full of mischaracterizations, false statements, and outright defamatory and baseless conclusions.

44.     The Examiner through counsel has also been in at times daily contact with counsel for Lender. *See Generally, In re AFI Holding, Inc.*, 355 B.R. 139, 153 (B.A.P. 9th Cir. 2006), *aff'd*

*and adopted*, 530 F.3d 832 (9th Cir. 2008)(an appointed estate fiduciary like a trustee or examiner must be "free from any hint of bias." "Cause" therefore applies where an examiner has "some interest or relationship that 'would even faintly color the independence and impartial attitude required by the Code,'" discussing removal. *Id.* at 149 (citing *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 835 (7th Cir.1998)).

45.    The Examiner should have to answer for the numerous misleading statements and outright falsehoods included in the Draft Report and for his conduct since his appointment.  If it is the case that the Examiner merely lacks the ability to understand and analyze the Debtor's books and records, cause exists to object to his fees, and may justify removal for incompetence.  If, on the other hand, it is determined, as all appearances suggest, that the Examiner has been doing the Lender's bidding for it, then the Examiner may be subject to removal for bias and/or impropriety and, as discussed above, barred from receiving his requested fees and expenses.

46.    In light of the Examiner's apparent bias, as demonstrated by the often times daily communications with the Lender and the willful disregard of the objective facts provided to the Examiner, limited discovery concerning the Examiner's investigation is appropriate.[11]

47.    Examiners are not immune from discovery, unless the court orders to the contrary. *See In re Adelphia Commc'ns Corp.*, 348 B.R. 99, 107 (Bankr. S.D.N.Y. 2006) (discussing discovery requested of court-appointed fee committee by analogy discovery sought of an examiner); *see also In re LLS Am., LLC*, 2012 WL 2042503, at *7 (B.A.P. 9th Cir. June 5, 2012) (noting ability to depose court-appointed examiner).

48.    The Debtor requests discovery of the Examiner with respect to the following topics:

---

[11] Out of an abundance of caution, given the Examiner's unique position as a court-appointed investigator, the Debtor seeks this Court's leave under Rule 2004 of the Federal Rules of Bankruptcy Procedure to conduct limited discovery of the Examiner.  Arguably, the Examiner's various filings, including the Fee Applications, have triggered contested matters to which the ordinary discovery rules apply.

(a)    All drafts, supporting materials, and non-attorney work product, including investigation notes directly or indirectly connected or relating to any communications with Lender, generated by the Examiner or his staff throughout his investigation in this bankruptcy case;

(b)    All communications with the Lender in connection with this bankruptcy case or the Draft Report; and

(c)    All communications with the Office of the United States Trustee in connection with this bankruptcy case or the Draft Report.

49.    While some of the materials that would be sought may also be available from the Lender and its counsel or other sources, other materials, such as the Examiner's notes and supporting materials and communications with other parties relating to the Lender, would not be available from other sources.  Accordingly, limited discovery on the Examiner is the most efficient way to obtain all of the requested information.

**D.    The Examiner's Report and/or Flawed Conclusions, and Disclosure of Employee Salary Should Remain Confidential[12]**

50.    As discussed above and in the Rebuttal, the Examiner's Draft Report is replete with numerous factual falsehoods and baselessly draws incendiary conclusions without factual support in an apparent effort to aid the Lender's  campaign to undermine the Debtor's restructuring.  In addition, the Examiner's Draft Report includes confidential financial information concerning the salary for at least one employee, Marion Gross.

51.    Section 107 of the Bankruptcy Code requires the Court, upon a motion from any party in interest, to "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a" bankruptcy case.  11 U.S.C. § 107(b); *see also* Fed. R. Bankr. P. 9018 (same).[13]

---

[12] The Debtor is also contemporaneously providing the Examiner with the Rebuttal Report, and hopes to work to resolve and/or narrow any issues relating to confidentiality.  However, given the timing concerns, and that the Examiner may file the Report after close of business today, the Debtor is seeking the instant relief, and is requesting that the Report remain confidential pending hearing on the instant Cross-Motion.

[13] In addition to the false, defamatory, and scandalous materials included in the Draft Report as discussed below, the Draft Report needlessly includes the salary of an ordinary employee of the Debtor, Marion Gross.  This information should be redacted or omitted on personal privacy grounds.

Section 107 and Rule 9018 are generally considered to govern requests to seal some or all of an examiner's report. *See*, e.g., *In re FiberMark, Inc.*, 330 B.R. 480, 505 (Bankr. D. Vt. 2005).

52.    Material is "scandalous or defamatory," and therefore subject to sealing, if a reasonable person would likely alter their opinion of a party "based on the statements therein, taking those statements in the context in which they appear." *Id.* at 507 (quoting *In re Phar-Mor, Inc.*, 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995)).    Separately, information concerning the disclosure of the false conclusions and salary information is unnecessary to the Draft Report and should be kept confidential.

53.    Here, as discussed above, and in the Rebuttal, applying the standard articulated in *FiberMark* and *Phar-Mor*, the Debtor submits that report issued by the Examiner creates a false narrative, and is replete with deliberate misstatements, false claims and conclusions, in spite and in the face of evidence and facts that have proven such claims to be false. Given the foregoing, the Debtor submits that the Examiner's report contains many statements that are scandalous or defamatory.    Such issues are set forth in greater detail in the Debtor's Rebuttal.

54.    Given that the foregoing false, defamatory, and scandalous statements permeate the Draft Report, the Debtor submits that it is appropriate to delay release of the report and/or redact the conclusions, as well as the personal employee salary information as noted above, pending completion of limited discovery and further order of the Court.

## **CONCLUSION**

55.    The Debtor had repeatedly raised its concerns of the likely cost implications of allowing the Examiner to go on a fishing expedition against the Debtor, given the many false statements made by the Examiner long prior to issuing the Draft Report.    It gives the Debtor no pleasure to confirm its suspicions that the Examiner was not operating (and does not intend to operate) in good faith, and has improperly circumvented the fee cap and run up excessive and

unreasonable charges, untethered to the facts of the case.  Furthermore, the Draft Report is replete with false statements, and baseless conclusions that are contradicted by the facts. Given the foregoing, the Debtor submits it should not have to bear the expense of the Examiner's failure to operate within the budget that has been already increased by the Court, as none of the actions of the Examiner have caused any benefit to the estate.  Accordingly, the Debtor requests that the Court deny the Motion to Increase and the Fee Applications, enforce fee cap, direct that the Examiner not expend further services, authorize limited discovery, enforce confidentiality as provided above, and grant further relief as is just and proper.

   **WHEREFORE**, the Debtor respectfully requests that this Court deny the Motion and the Fee Applications, grant the Cross-Motion, and grant relief as is just and proper.

Dated:  February 28, 2022
   New York, New York

Respectfully submitted,

By: ___*/s/ Douglas E. Spelfogel*___
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
Email: dspelfogel@mayerbrown.com
   leisenberg@mayerbrown.com
   dchung@mayerbrown.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

Mark Frankel
**BACKENROTH FRANKEL & KRINSKY, LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor*
*and Debtor in* Possession

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-22108 (RDD) |

**ORDER DENYING EXAMINER'S MOTION TO INCREASE FEE CAP, DENYING IN
PART EXAMINER'S INTERIM FEE APPLICATIONS, GRANTING DEBTOR'S
CROSS-MOTION TO ENFORCE FEE CAP, LIMIT EXAMINER'S FEES, AUTHORIZE
LIMITED DISCOVERY AND ENFORCE CONFIDENTIALITY**

Upon (1) the *Examiner's Motion to Modify Aggregate Cap on Compensation and Reimbursement of Examiner's Fees and Expenses* [ECF No. 400] (the "Motion to Increase"), (2) the *First Interim Application of Eric M. Huebscher and Huebscher & Co., as Examiner, for Allowance of Compensation and for Reimbursement of Expenses for the Period from November 16, 2021 through December 31, 2021* [ECF No. 293] (the "Huebscher Fee Application"), (3) the *First Interim Application of Locke Lord LLP, as Examiner's Counsel, for Allowance of Compensation and for Reimbursement of Expenses for the Period from November 16, 2021 through December 31, 2021* [ECF No. 294] (the "Locke Lord Fee Application" and, together with the Huebscher Fee Application, the "Fee Applications"), and (4) the *Omnibus Objection to (I) Examiner's Motion to Modify Aggregate Cap on Compensation and Reimbursement of Examiner's Fees and Expenses, (II) First Interim Application of Eric M. Huebscher and Huebscher & Co. as Examiner, and (III) First Interim Application of Locke Lord LLP, as Examiner's Counsel; and Cross-Motion to Enforce Fee Cap and Limit Examiner Fees; Authorize Limited Discovery Against Examiner; Enforce Confidentiality; and for Related Relief* [ECF No. ___] (the "Cross-Motion")[1]

---

[1] Capitalized terms used but not defined in this Order shall have the meanings given to such terms in the Cross-Motion.

filed by 96 Wythe Acquisition LLC (the "Debtor"); and this Court having found that it has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that

venue of this proceeding and the Motion to Increase, Fee Applications, and Cross-Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Cross-Motion  is just and proper; and this Court having found that the Debtor

provided appropriate notice of the Cross-Motion as represented by that certain Affidavit of

Service, dated [_____] [ECF No. ___]; and this Court having reviewed the Motion to Increase,

Fee Applications, and Cross-Motion; and this Court having determined that the legal and factual

bases set forth in the Cross-Motion establish just cause for the relief granted herein; and upon all

of the proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY ORDERED THAT:

1.      The Motion to Increase is denied in its entirety.

2.      The Fee Applications are denied without prejudice.  The Examiner and his counsel

shall submit final fee applications no later than _____, seeking no more than $350,000 in

compensation and reimbursement of expenses.

3.      The Cross-Motion is granted to the extent set forth herein.

4.      The Examiner shall not perform any further work in this bankruptcy case or incur

any additional fees or expenses without further authorization from this Court.

5.      The Debtor is authorized to conduct discovery upon the Examiner only with respect

to the topics set forth in the Cross-Motion and other matters directly related thereto.  The Examiner

shall promptly comply with all such discovery requests from the Debtor.

6.    The Examiner may not file any version of his report, except under seal, pending further order of this Court.

7.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.    The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Cross-Motion.

9.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated:  March __, 2022
        White Plains, New York


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Rebuttal**

# *Filed Under Seal*

746412347