**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

96 WYTHE ACQUISITION LLC,

                Debtor.

Chapter 11

Case No. 21-22108 (RDD)

# REPORT OF EXAMINER, ERIC M. HUEBSCHER

## February 28, 2022

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ..............................................................................................1

II.     BACKGROUND ...........................................................................................................4

    A.    Case Background ..........................................................................................4
    B.    BSP Loan .....................................................................................................5
    C.    Manager's Control Over the Debtor's Finances ..........................................7

III.    EXAMINATION STRUCTURE AND INVESTIGATIVE FINDINGS ...........................9

    A.    Examination Structure ..................................................................................9
    B.    Investigative Findings .................................................................................11

        (1)    Debtor/Manager Banking Transactions ....................................11

        (2)    Funds Flows for the Debtor and the Manager .........................12

            (a)    Debtor's Funds Flow ...................................................12

            (b)    Manager's Funds Flow ................................................14

            (c)    Round Trip Transfers of Funds Between Debtor and
                  Manager ......................................................................16

        (3)    Mark Podgainy (Getzler Henrich & Associates LLC) Declaration ..........18

IV.     CAUSES OF ACTION ...............................................................................................20

    A.    Pre-Petition Transfers ................................................................................21
    B.    Post-Petition Transfers...............................................................................24

V.      CONCLUSION............................................................................................................24

    Appendix:  Examiner's Chronology of the Investigation

    Exhibit A: Organizational Structure
    Exhibit B: Loan Closing Document
    Exhibit C: November Agreement
    Exhibit D: Assignment
    Exhibit E: November 21, 2021 Document and Information Requests
    Exhibit F: Examiner's Identification of Outstanding Requests
    Exhibit G: Bank Account Matrix

## I.    Executive Summary

The Examiner's mandate was to investigate and assess potential bankruptcy causes of action of 96 Wythe Acquisition LLC (the "Debtor").   In the course of the investigation, the Examiner reviewed banking records for 50 bank accounts, conducted 11 interviews and reviewed over 10,000 of pages in documents, including bank statements, transfer reports prepared by the Debtor, emails, and other relevant and supporting documentation.   The Examiner reviewed over 48,000 banking transactions from, to, and among the Debtor, the Debtor's management company (the Williamsburg Hotel BK, LLC) (the "Manager") and other bank accounts linked to accounts in the name of the Debtor or the Manager.   These transactions took place over an approximately four-year period.[1]

The Debtor owns a 147-room boutique hotel in Williamsburg, New York. According to numerous sources, the Manager has no business operations other than the management of the hotel. All of the hotel's revenues are deposited into the Manager's bank accounts. Because of the intertwined finances of the Debtor and the Manager, this report examines transactions of the Manager as well as the Debtor.

The investigation uncovered significant potentially avoidable transfers. More specifically, the investigation uncovered evidence of a complex scheme to divert and siphon substantial amounts of money from the Debtor, through a labyrinth of banking relationships between the Debtor and the Manager, and other entities under common ownership and control of Michael Lichtenstein ("Lichtenstein") and Toby Moskovits ("Moskovits," and, together with Lichtenstein, the "Principals"). Entities owned directly or indirectly by the Principals which received and sent transfers to the Debtor and/or the Manager include, but may not be limited to, 232 Seigel

---

[1]        The investigation focused on transactions four years before February 23, 2021 (the "Petition Date"), although the look back period for transfers prior to April 6, 2020 is up to six years under New York law. This was done to streamline the investigation by limiting it to the time periods of the most financial activity.  As further discussed below, the investigation also led to discovery of potentially avoidable post-petition transactions, although the post-petition period was not the primary focus of the investigation. While the Examiner's mandate is to address causes of action of the Debtor, as noted above, the investigation revealed that all of the Debtor's revenue is directly paid to the Manager, and that the Manager's sole business activity is management of the Debtor.  The Manager is the initial transferee of funds from the Debtor, and an examination of all subsequent transfers from the Manager was necessary. See 11 U.S.C. § 550(a).

1

Acquisition, LLC, 232, Seigel Development, LLC, Mint Development Corporation, 564 St. Johns Acquisition LLC, 564 St. Johns Holdings LLC, Northside Development Holdings, LLC, Northside Acquisition Partners LLC, 215 Moore Street Acquisition LLC, 215 Moore Street Development LLC, 875 4th Avenue Acquisition LLC, 286 Rider Ave Acquisition, LLC, Heritage GC Walton Acquisition LLC, Brooklyn Bread Lab, Building Development Corp, 96 W Development, LLC, and FIA Capital Partners (an entity owned directly or indirectly by the Debtor's Chief Restructuring Officer (the "CRO")).[2] Significant transfers were also sent to and received from Lichtenstein, Moskovits, and Marion (Miriam) Gross (an employee of the Debtor). In total, the Examiner has identified at least an aggregate net amount of $12.5 million sent from the Manager to many of the above entities.

In addition to these transactions, which may be subject to potential claw-back actions, there are several other areas of significant concern that will be identified in this report for possible legal action.

Despite the fact that approximately $24.5 million was deposited into (and approximately $25.5 million was withdrawn from) the Debtor's bank accounts during the period 2017 – 2020, the Debtor did not file tax returns for years 2017, 2018 or 2019.[3] Similarly, while approximately $68.2 million was deposited into (and approximately $68.7 million was withdrawn from) the Manager's bank accounts during the period 2017 – 2020,[4] with the possible exception the year 2019, these deposits and withdrawals by the Manager have not been reported to any taxing authority. Lichtenstein informed the Examiner that, other than the 2020 Federal tax return for the Debtor and the 2019 Federal tax return for the Manager, tax returns were not filed because the entities did not make a "profit".

---

[2]        Lichtenstein refused to explain the nature of these transactions.

[3]        The Examiner was provided with one unsigned Federal tax return (2020) for the Debtor, which showed zero revenue or expense.

[4]        The Examiner was provided with one unsigned Federal tax return (2019) for the Manager.

The Principals obstructed the Examiner's investigation, by actions and inactions, including significant delays in document production, interference with third party subpoenas, and refusal to answer questions regarding thousands of financial transactions.

While the Principals' obstructive efforts are discussed in further detail in this report, (*see* Appendix), the following are two examples of efforts to hide certain transactions. On January 5, 2022, the Examiner learned that two accounts (BOA 4400 and 3162), which he had discovered based on their link to other accounts in the name of either the Debtor or the Manager, and which the Debtor represented to have no relationship with the Debtor or the Manager, were, in fact, in the name of the Manager and received significant post-petition transfers that had not been disclosed:

- Through BOA 3162, in July of 2021, 5 months after the Debtor's bankruptcy filing, the Manager received an economic disaster impact funds ("EIDL") grant in the amount of $350,000. The grant was obtained in the name of the Williamsburg Hotel.[5] This amount was transferred on August 3, 2021 from the Manager to Northside Acquisition Partners, LLC.[6] The application for the EIDL grant was not disclosed in any of the bankruptcy filings, and neither its receipt nor its disbursement was disclosed in the Debtor's monthly operating reports.[7]

- Additionally, $252,100 was transferred from BOA 4400, to Northside Management, LLC,[8] two days after the Petition Date and was not reported on the Debtor's monthly operating report or the Debtor's schedules of statement of financial affairs.

As a result of the Principals' actions to delay and obstruct the examination, coupled with the short time period during which the investigation was conducted, the Examiner believes there may be

---

[5]   This was identified on the corresponding bank statement.

[6]   Northside Acquisition Partners, LLC is an entity owned, directly or indirectly, by Lichtenstein.

[7]   Lichtenstein refused to provide the Examiner with a copy of the application for the EIDL grant.

[8]   Unlike other transfers to Northside entities, this transaction was sent via wire transfer.

additional valuable causes of action that he has not yet uncovered, and further investigation is warranted.

## II.    **Background**

### A.    **Case Background**

On February 23, 2021 (the "Petition Date"), the Debtor commenced this Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtor owns a 147-room boutique hotel in Williamsburg, New York. The organizational structure of the Debtor and its related entities is shown on **Exhibit A**. Moskovits and Lichtenstein are the indirect owners of the Debtor and the Manager, as well as a number of other entities identified in this report. In Court filings, the Debtor has identified Lichtenstein as its managing member.

The initial order directing the appointment of an examiner in this case was entered on November 8, 2021 (DI 178). On November 16, 2021, Eric M. Huebscher was appointed as Examiner (DI 184). The order directing the appointment of an examiner was amended on November 23, 2021 (DI 193) and on December 14, 2021 (DI 224). The order directing the appointment of an Examiner states that the Examiner is authorized to investigate the following matters:

> those transactions, as determined by the Examiner in the Examiner's sole discretion, that might give rise to potential claims by the Debtor's estate, including, without limitation, actions under sections 544, 547, 548 of the Bankruptcy Code, against Ms. Toby Moskovits, Mr. Michael Lichtenstein and/or the Debtor's other insiders (as such terms is defined in the Bankruptcy Code) (collectively, the "Examination Topics"[9]); provided, that the Examiner shall exercise discretion to narrow or limit the foregoing examination based on the Examiner's assessment of the benefit to the Debtors' creditors of pursuing any such cause of action. The Examiner shall be permitted to interview any party in interest, including, but not limited to, the Debtor, the Hotel Manager, Ms. Toby Moskovits, Mr. Michael Lichtenstein, and Benefit Street, and any of their advisors or professionals, to the extent the Examiner reasonably believes such persons have information relevant to the Examination Topics. Such persons shall make themselves available to the

---

[9]    The Examination Topics expressly exclude "(a) Potential Claims belonging to the Debtor's estate based on the loans received by Williamsburg Hotel BK LLC . . . pursuant to the Paycheck Protection Program, and related settlement and stipulation; and (b) Potential Claims belonging to individual creditors, including as they may pertain to the management agreement between the Debtor and the Hotel Manager." (DI 224), ¶ 3.

Examiner at such times and places as the Examiner may reasonably request and
upon reasonable notice.

The December 14, 2021 order permitted the issuance of third-party subpoenas, pursuant to Federal
Rule of Civil Procedure 45 (made applicable by Bankruptcy Rule 9016). (DI 224), ¶ 6.

**B.    BSP Loan**

In order to develop an appropriate investigative structure and protocol, it was necessary to have
an understanding of the Debtor's single secured debt obligation: the loan from Benefit Street
Partners Realty Operating Partnership, L.P. ("BSP").

The BSP loan arises out of a mortgage loan consolidation (the "Loan"), which closed on
December 13, 2017 and was executed by the Principals on behalf of the Debtor. The Debtor
scheduled the Loan in the principal amount of $68,000,000.00 as of the Petition Date.  The
detailed Loan closing document is attached as **Exhibit B**. As the closing document shows, in
addition to BSP and Hutton, the Principals contributed $425,000 from 564 St. John's Partners
LLC[10] to the Debtor. In late 2018 BSP declared the Loan in default.  Shortly thereafter, on June
11, 2019, after the Loan matured, BSP commenced foreclosure proceedings. As part of the
foreclosure proceedings in State court, a receiver was appointed to oversee the property and its
finances.

Given the extremely short time between the Loan closing and default, the investigation considered
whether the Debtor could have ever supported the underlying debt service on the Loan (as

---

[10]    The Examiner believes that 564 St. John's Partners LLC is owned indirectly by the Principals. The $425,000
contribution from 564 St. John's Partners LLC is identified as "equity" on the closing document. The Loan closing
document (Exhibit B) provided to the Examiner by the Debtor did not include the name of 564 St. John's Partners
LLC, which, as it turned out, had been whited out. When the Examiner received the same document from BSP, and
later, the CRO, the Examiner realized the actual document contained a reference to 564 St. John's Partners LLC,
unlike the "document" provided by the Debtor which had been altered to conceal the name of 564 St. John's Partners
LLC as "equity". Unlike the blacked-out redactions in documents mentioned elsewhere in this report, the removal of
a name by white out is less obvious, and the alteration would not have been discovered had the Examiner not sought
and obtained the document from sources other than the Debtor.  The amount of the $425,000 contribution by 564 St.
John's Partners LLC was in excess of the amount required to close the Loan. This over contribution resulted in a net
amount being paid to the Debtor.

discussed below). In that regard, it was important to understand not only the financial projections used in support of the Loan underwriting, but also to review the post-closing operating results.

The Examiner reviewed the pro forma information provided to BSP by the Debtor in connection with the closing of the Loan.[11] The pro forma income statements show the Debtor in the period just prior to the Loan with an EBITDA (earnings before interest taxes depreciation and amortization) of 25.7%. The same pro forma shows the Debtor's EBIDTA percentage increasing to 32.4% in year 1 after the Loan, and to 36.2% in year 5 after the Loan. These percentages and resulting funds (if ever achieved) would have been sufficient to support the debt service under the Loan.

The Debtor's financial statement for the year (2018), immediately following obtaining the Loan, shows a net operating profit of 10% or approximately $1.5 million. The Debtor's 2019 operating profit, based on the Debtor's financial statement, was 16% or $3.2 million. The 2020 financial statements showed a loss, due principally to the outbreak of the COVID-19 pandemic. None of these operating results would have been sufficient to support the debt service contemplated by the Loan.

The Examiner also reviewed the financial stability of the Debtor subsequent to the Petition Date. The March 2021 monthly operating report ("MOR") showed a loss. The September 2021 MOR showed a net operating profit of 25.3% or $592,000. The December 2021 MOR showed a net operating profit of 13.2% or $257,000. None of these operating results would be sufficient to support the debt service contemplated by the Loan.

It does not appear that the Debtor's operation will ever approach, or could have ever been expected to reach, the projections provided to BSP. Investigation as to the Principals' actions, decisions, and representations in connection with the Debtor's incurrence of the Loan may be appropriate.

---

[11]     These projections, "Williamsburg Hotel Budget – Stabilized Year – F&B Updates" were sent in an email from Jeremy Rauch (Director of Finance of the Debtor) to BSP in an email dated November 29, 2017.

### C.    Manager's Control Over the Debtor's Finances

Understanding the relationship between the Debtor and the Manager is critical to analyzing the transactions at issue and potential causes of action of the Debtor.  The Examiner was advised that the relationship between the Debtor and the Manager was governed by a management agreement.

Shortly after his appointment, the Examiner was provided with a Hotel Management and Services Agreement (the "November Agreement") dated November 13, 2017 (**Exhibit C**). The November Agreement is signed by Moskovits for the Debtor and Lichtenstein for the Manager. Several months into the chapter 11 case, and despite the fact that it was not disclosed on the schedule of the Debtor's executory contracts, the Debtor presented the November Agreement as its current management agreement.  However, the November Agreement appears to have been superseded. On December 13, 2017, the Debtor, Manager and BSP entered into an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees (the "Assignment") (**Exhibit D**), which attached a management agreement (the "December Agreement") which is different from the November Agreement.  The Assignment includes a representation that the December Agreement constitutes the entire agreement between the Debtor and the Manager governing management of the hotel. *See* Assignment, Section 3. The Assignment was signed by Moskovits for the Debtor and Lichtenstein for the Manager.[12]

Based on the above, the December Agreement appears to be the operative management agreement as of December 13, 2017.  However, in view of the Debtor's position regarding the November Agreement, the Examiner has analyzed the payment obligations between the Debtor and the Examiner under both the November Agreement and the December Agreement.

Section 8.02 of the November Agreement states that the Manager may open bank accounts linked to the Debtor bank accounts. This linkage, the November Agreement further states, is to assist in the payment of certain expenses e.g., Payroll and Travel commissions. The November Agreement does not permit or require *all amounts* earned by the Debtor to be deposited into Manager bank accounts.  In other words, even if the November Agreement were operative (and the Examiner believes that, in light of the Assignment, it is not), the November Agreement permits the Manager

---

[12]    The Assignment was also signed by a representative of BSP.

to operate accounts for maintenance and operation of the hotel, not to appropriate all of the Debtor's money and use it for purposes other than the specific uses permitted by Section 8.02 of the November Agreement.  The November Agreement also contemplates payment of certain fees to the Manager (*see* November Agreement, Art. X), but does not contemplate payment of 100% of the hotel revenue to the Manager.

The December Agreement states that the Debtor will pay the Manager 3% of gross rents, starting on January 1, 2018 and every month thereafter. Given the language in either the November Agreement, the Assignment, or the December Agreement, and regardless of which agreement was applicable, the Examiner anticipated that the review would consist of a fairly well-defined payment stream between the Debtor and Manager. As this report demonstrates, the financial relationship between the Debtor and Manager did not follow this anticipated construct in any form or substance.

During the course of his investigation, and confirmed by Jeremy Rauch (Director of Finance for the Debtor), the Examiner learned that 100% of all revenue earned by the Debtor was deposited into the Manager's bank accounts. Additionally, multiple sources confirmed that operation of the hotel is the Manager's only business.  The Examiner discovered that not only were the Debtor's and the Manager's bank accounts linked, [13]numerous other Principal-controlled entities' accounts were linked to the Manager accounts. These linkages (online banking connections) allowed for seamless funds flow between the Manager and Debtor as well several unaffiliated business entities owned by the Principals, and, in some instances, individuals. Indeed, the Examiner reviewed records for 50 bank accounts and over 48,000 banking transactions from, to, and among the Debtor, the Manager and other bank accounts linked to accounts in the name of the Debtor or the Manager. At times, hundreds of banking transactions occurred in a single day. The movement of funds is so substantial that a schedule detailing the transactions exceeds 1000 pages.[14] The

---

[13]     Linkage of bank accounts allows funds to be moved readily and immediately from one account to another. In this regard the Debtor and Manager utilized online banking functions within both Chase and Bank of America. Online banking transactions do not show full account number information, thus eliminating the transparency of the transaction from the reader of the respective bank statements. Conversely, wire transfers show full and complete account information.

[14]     The Examiner has prepared this schedule, which has not been attached due to its volume, but will be provided upon request.

Examiner has been informed that the Principals effectuated virtually all of the transactions between the Manager, Debtor and unaffiliated principal owned entities. Revenue generated by the Debtor was never deposited into the Debtor's bank accounts, but instead, was deposited into the Manager's bank accounts.

The funds flow used by the Manager and the Debtor is both unconventional and inconsistent with commercial accounting principles. Basic accounting principles state that the expenses of an entity must be matched against the entity that generated the income. The banking structure implemented by the Manager prevented this from happening. The Manager collected all the money, while the Debtor incurred all the expenses. This made it difficult to determine the exact expenses of the Debtor and to match it to the related income. The banking system shows that significant sums were transferred in and out of the Debtor and Manager accounts to and from business enterprises that do not relate to the Debtor's business.

In summary, the Principals controlled both sides of the accounting ledger, preventing open disclosure of financial and accounting transactions, and allowing for the siphoning of funds (from the Debtor and through the Manager) to unrelated investments of the Principals and possibly other transferees. Further, some of the Principals' other business enterprises are in bankruptcy e.g., Chapter 11 and 7. Given the intermingled finances with this Debtor/Manager and these other cases, consideration should be given to a further investigation of transactions among the related entities, including the other related debtors.

## III.    Examination Structure and Investigative Findings

### A.    Examination Structure

Shortly after the Examiner's appointment, upon review of available information from the Office of the United Trustee (the "OUST") and BSP, the Examiner believed that the examination would involve a review of financial transactions among and between the Debtor and Manager. Therefore, the Examiner's preliminary investigative plan was to review books and records of the Debtor and the Manager, including banking records, and to conduct interviews of key personnel. Given the relatively small size of the Debtor's operations and the simplicity of the financial transactions contemplated by the November Agreement, the Examiner anticipated the review consisting of no

more than three[15] bank accounts for the Debtor and fewer for the Manager. Considering the timing of the Loan closing and the Petition Date, the Examiner's investigation focused on the 4-year period subsequent to the closing and up to the Petition Date.[16] This permitted identification of potential causes of action for the periods 90 days,[17] 1 year,[18] 2 years,[19] and 4 years[20] prior to the Petition Date.

Based on the above limited understanding, the Examiner believed that the review would be relatively straightforward. As this report details, the Examiner soon learned that 50 bank accounts and more than 48,000 banking transactions required review and, from the date of his initial document request, he was met with extreme resistance to the investigation by the Principals.

Rather than cooperate, the Debtor's principals actively obstructed the investigation, including by providing heavily redacted bank statements to the Examiner,[21] refusing to provide records resulting in the issuance of third party subpoenas, subsequently interfering with the very subpoenas the Principals caused to be issued to third parties,[22] failing to produce requested

---

[15]    Ordinarily, for an operation the size of the Debtor, it would be expected to have one bank account for operations and one for payroll related expenses. The Manager would have been expected to have a similar or smaller banking structure. The Manager's singular business activity is to manage the Debtor.

[16]    Several unauthorized post-petition transfers have been identified in this report. Further investigation of all other post-petition activities is warranted.

[17]    *See* 11 U.S.C. § 547(b)(4)(A).

[18]    *See* 11 U.S.C. §547(b)(4)(B).

[19]    *See* 11 U.S.C. §548 (a)(1).

[20]    *See* NY UVTA §§ 273-274, 278 (Under the New York Uniform Law Commission's Uniform Voidable Transactions Act (UVTA) (effective as of April 4, 2020) a claim for relief based on fraudulent intent is extinguished the later of four years after the transfer or one year after the transfer was or could have been discovered by the claimant and a claim based on a lack of fair consideration is extinguished four years after the transfer); 11 U.S.C. § 544(b) ("[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . . .").

[21]    The Court subsequently directed the Debtor to turn over unredacted banking documents. The Court informed the Debtor that they did not have the right to redact banking records or withhold such information from the Examiner. The redaction of bank statements by the Debtor slowed the examination by at least two weeks.

[22]    Debtor's counsel sent letters to the third parties instructing them not to comply with the subpoenas, pending the outcome of a motion to quash filed by the Debtor. Debtor's counsel ultimately lost their challenge to the issuance

documents, delaying production of other documents, and even altering certain of the documents produced. These events, and others like them, led to an extraordinary increase in legal proceedings, and associated time and expense in an effort to compel the Debtor, Manager and others to cooperate with the examination. The Examiner's fees and costs have exceeded the cap despite his and his counsel's efforts handle the case efficiently. This is directly attributable to the extreme resistance of the Debtor and the Principals, including the Debtor's attempts to relitigate the scope of the investigation.[23] The chronology of these efforts to frustrate the investigation is described in the Appendix to this report.

### B.   Investigative Findings

Based on the Examiner's review of available banking records, the Examiner found the following regarding the banking transactions among and between the Debtor and the Manager and certain related and unrelated entities:

### (1)   *Debtor/Manager Banking Transactions*

The review of the Manager's bank records revealed that between 2017 and 2020, the Manager had received at least $49 million from the operations of the Debtor (the Examiner believes that this amount may have been understated by as much as $4 million) and approximately $19 million from other sources, for a total of approximately $68.2 million. None of these receipts remained in the Manager's bank accounts. The average balances for the Manager bank accounts, between 2017 and 2020, ranged between $50,000 and $733,000[24]. The Manager received 100% of all revenue generated by the Debtor.

The review of the Debtor's banking records revealed that the Debtor had received approximately $24 million from various sources between 2017 and 2020, none of which were from the operations

---

of the subpoenas. However, the Debtor's counsel's letters caused the third parties (banks) to put the subpoenas on hold, which delayed their responses by weeks.

[23]     In addition, the Examiner received a document over which the Debtor asserted privilege, but the Examiner did not believe to be privileged and which the Examiner believes is relevant to the Principal's conduct and intent. Resolution of the privilege dispute required significant time and expenses by the Examiner's counsel.

[24]     This $733,000 balance results from the Manager's receipt of PPP funds in the amount of $1,438,000. Without the PPP funds, the Manager's average bank balances would have been close to zero or even overdrawn.

of the hotel, approximately $4.9 million of which was from the Manager. The Debtor disbursed approximately $25 million during the same period, approximately $4.9 million of which went back to the Manager. The average balances of the Debtor bank accounts between 2017 and 2020 were between $10,000 and $480,000. As was the case with the Manager, the Debtor funds never remained in the Debtor's accounts. Quickly following deposit of funds, those same funds were wired, transferred, or spent.

Between 2017 and 2020, the Debtor and the Manager received and disbursed over $92 million. The Manager reported that 53 percent of this amount came from the operations of the hotel. A large number (thousands) of transactions with the Debtor's Principals' other business activities accounted for the remaining amounts. The Debtor and Manager confirmed that the only business conducted by the Manager was managing the Debtor. None of these amounts ($92 million), with the possible exception of the Manager tax return of 2019 ($20 million in revenue), were ever reported to the Internal Revenue Service, State or City tax authorities.

(2)    *Funds Flows for the Debtor and the Manager*

(a)    **Debtor's Funds Flow**

The following chart shows the significant inflows and outflows by and to the Debtor:



96 Wythe Acquisition: Analysis of Bank Transactions 2017-2020

**Certain Entities Controlled
by the Debtor's Principals**

| | |
|---|---|
| **Northside Acquisition** | ($3,522,364) |
| | $10,885,915 |
| $7,363,551 | |
| **96 W Development** | ($4,570,356) |
| | $114,525 |
| ($4,455,831) | |
| **Mint Development** | ($719,461) |
| | $400 |
| ($715,061) | |
| **564 St Johns** | ($93,050) |
| | $419,605 |
| $326,555 | |
| **Brooklyn Bread Lab** | ($3,700) |
| | $0 |
| ($3,700) | |
| **232 Seigel** | ($16,500) |
| | $0 |
| ($16,500) | |
| **215 Moore St.** | ($7,418) |
| | $0 |
| ($7,418) | |

($8,932,850)

$11,436,945

Net
$2,504,095

**96 Wythe Acquisition
(Debtor)**

Average Bank Balances

| | |
|---|---|
| 2017 | $480,929 |
| 2018 | $29,958 |
| 2019 | $10,515 |
| 2020 | $30,213 |

**Inflow Cash from Other Sources**
*(Total Deposits minus Deposits from Certain Entities
Controlled by the Debtor's Principals*

**$13,019,301**

| | |
|---|---|
| The Williamsburg Hotel | $4,915,787 |
| Clemons Properties Partners | $4,000,000 |
| FIA Capital Partners | $1,844,562 |
| Bordeaux Capital | $1,117,667 |
| Unknown | $118,312 |
| Other | $1,022,973 |

**Outflow Cash to Other Uses**
*(Total Withdrawals minus Transfers/Wires from
Certain Entities Controlled by the Debtor's
Principals)*

**($16,536,582)**

| | |
|---|---|
| The Williamsburg Hotel | ($4,897,172) |
| Checks | ($4,718,256) |
| Situs Asset Management | ($2,744,156) |
| Other | ($4,176,999) |

**Deposits**

| | |
|---|---|
| Deposits from Entities Controlled by the Debtor's Principals | $11,436,945 |
| Inflow Cash from Other Sources | $13,019,301 |
| **Total Deposits** | **$24,456,246** |

**Withdrawals**

| | |
|---|---|
| Transfers/Wires from Entities Controlled by the Debtor's Principals | ($8,932,850) |
| Cash to Other Uses | ($16,536,582) |
| **Total Withdrawals** | **($25,469,432)** |
| | |
| **Total Deposits minus Total Withdrawals** | **($1,013,186)** |

13

The above chart reflects the fact that (1) none of the funds from the operation of the hotel came directly into the Debtor (as noted previously, these funds were deposited directly into Manager bank accounts); and (2) any funds received by the Debtor were not retained by the Debtor. This is evidenced by the de minimis banking balances between 2017 and 2020. The funds flow also shows at least two transactions (funds inflows from FIA Capital Partners and Bordeaux Capital) in the aggregate amount of $2,962,299, which the Debtor has characterized as loans,[25] despite that no loan or other supporting documentation has been provided to the Examiner. The Examiner asked for and was refused access to any such loan documents.

The Debtor transacted with seven entities owned, directly or indirectly, by the Principals. These transactions (shown on the left side of the above chart) should be further evaluated, since many of the sources of these funds came into the Debtor from a related source only to be sent back out to another unrelated entity. Due to the significant number of transactions, and the inability to obtain credible opening balance or source information, all of these transactions need to be considered in the aggregate. None of these transactions appear on any tax return provided to the Examiner.

Since the Petition Date, the Debtor's funds flow looks significantly different.  The Debtor has accumulated significant cash reserves ($3.8 million as of December 31, 2021). At no point during the pre-bankruptcy period addressed in this report did either the Debtor or Manager retain any money in the respective bank accounts. As noted, review of bank statements for the pre-petition period shows that as soon as money came into a bank account, it was immediately wired, transferred or otherwise spent. The ability of the Debtor to achieve this level of cash reserve reflects that the Manager's pre-bankruptcy practice of sweeping the Debtor's funds was constrained during the chapter 11 case.

### (b)   **Manager's Funds Flow**

The following chart shows the significant inflows and outflows by and to the Manager:

---

[25]     The Debtor was not authorized to obligate itself to any further borrowings after the loan consolidation with BSP on December 13, 2017.



**The Williamsburg Hotel: Analysis of Bank Transactions 2017-2020**

<u>Certain Entities Controlled</u>
<u>by the Debtor's Principals</u>

Northside Acquisition
($18,124,955)
$5,889,502
($12,235,453)

564 St Johns
($131,155)
$98,580
($32,575)

286 Rider
($155,675)
$50,000
($105,675)

875 4th
($25,000)
$25,000
($0)

19 Kent Acquisition
$0
$5,000
$5,000

Mint Development
($159,704)
$4,797
($154,907)

Brooklyn Bread Lab
($1,994)
$10,184
$8,190

96 W Development
($2,236)
$2,236
($0)

215 Moore St
($99)
$0
($99)

($18,600,817)
$6,085,299
Net
($12,515,518)

**Inflow Cash from Operations**

Per the Debtor    **$49,022,269**
Possible Additional    **$3,998,309**
**$53,020,578**

The Williamsburg Hotel
*(Management Company)*

<u>Average Bank Balances</u>
2017    $50,576
2018    $31,952
2019    $95,255
2020    $723,445*

*impacted by PPP Loan in April 2020

**Net Income**
*(Per the Debtor)*

**$4,266,832**

**Inflow Cash from Other Sources**
*(Total Deposits minus Revenue from Operations and Deposits from Certain Entities Controlled by the Debtor's Principals, excluding the Debtor)*

**$9,140,006**

96 Wythe Acquisition    $4,897,172
Unknown    $2,063,313
Live Oak Bank PPP Loan    $1,438,000
Other    $741,521

**Outflow Cash to Other Uses**
*(Total Withdrawals minus Transfers/Wires from Certain Entities Controlled  by the Debtor's Principals, excluding the Debtor)*

**($50,189,511)**

PAYCHEX    ($20,439,303)
Checks    ($10,738,093)
96 Wythe Acquisition    ($4,915,787)
Other    ($14,096,327)

**Deposits**
Inflow Cash from Operations    $53,020,578
Deposits from Entities Controlled by the Debtor's Principals    $6,085,299
Inflow Cash from Other Sources    $9,140,006
**Total Deposits**    **$68,245,883**

**Withdrawals**
Transfers/Wires from Entities Controlled by the Debtor's Principals    ($18,598,725)
Outflow Cash to Other Uses    ($50,154,056)
**Total Withdrawals**    **($68,740,328)**

**Total Deposits minus Total Withdrawals**    **($494,445)**

15

Because the Manager's only business is managing the hotel, all transfers from the Manager have been analyzed in the chart above. Funds were used to pay ordinary course expenses, and approximately $12.5 million net was transferred to other entities controlled by the Principals.  The $12.5 million net aggregate amount shown in the above chart as having been transferred to Northside,[26] 564 St. John's,[27] and Mint Development Corporation may be subject to potential avoidance.

The Examiner asked Lichtenstein for any agreements (loan or service) between the Manager and the recipients of funds from the Manager, but none were provided. Lichtenstein refused to answer any questions regarding these transactions. There is no evidence that any of these entities had any bona fide business relationship with the Manager or Debtor. Virtually none of these transactions were reported to taxing authorities.

Based upon a review of the financial statements provided to the Examiner by Rauch, the Manager received approximately $49 million in revenue generated by the Debtor between 2017 and 2020. The Examiner's review of the books and records indicates that this amount may have been understated by as much as $4 million. The bank balances during this period, similar to those in the Debtor's bank accounts, were de minimis.

### (c)      Round Trip Transfers of Funds Between Debtor and Manager

The following chart shows the funds inflows and outflows between the Manager and Debtor:

---

[26]      Except as otherwise expressly noted in this report, references to "Northside" in this report refer to Northside Development Holdings, LLC, Northside Management NY, LLC and Northside Acquisition Partners LLC, collectively.

[27]      Except as otherwise expressly noted in this report, references to "564 St. John's" in this report refer to 564 St. John's Acquisition, LLC and 564 St. John's Holdings, LLC, collectively.

**96 Wythe Acquisition and The Williamsburg Hotel: Bank Transactions 2017-2020**



Over the course of the four year period prior to the Petition Date, the Principals transferred and received a substantially identical amount of money from the Manager to the Debtor and from the Debtor to the Manager. The difference between the transactions was approximately $18,000. Nothing indicates that the fee arrangement contemplated by the November Agreement or the December Agreement was ever implemented. Instead, the Manager simply obtained all of the hotel's revenues and determined their disposition.

(3)   *Mark Podgainy (Getzler Henrich & Associates LLC) Declaration*

The Debtor filed an objection to the Examiner's motion to enforce and further amend the second amended order directing the appointment of the Examiner (DI 243) (the "Examiner's Motion"), which included a redacted[28] declaration from Mark Podgainy ("Podgainy") of Getzler Henrich & Associates LLC ("Getzler"). The declaration stated that millions of dollars were advanced to the Debtor in the form of either capital or loans by the owners (Lichtenstein and Moskovits) through loan accounts at Northside Acquisition. Podgainy states, under penalty of perjury, that the members (Lichtenstein and Moskovits) "loaned nearly $10.92 million to the Debtor since inception, approximately $4.5 million of which was repaid, for a loans due to the members of approximately $6.38M." The declaration was accompanied by three documents: (1) Owners Loans Transfer Reports, (2) Transfers from Hotel Operations to Northside and (3) Transfers from Northside to 96 Wythe. This declaration, and the schedules upon which its conclusions rest, were provided in an attempt to demonstrate that funds flowing between the Debtor and/or Manager were loans, and that the net result was amounts due to the Principals.

While the Podgainy declaration and the related documents were provided under the guise of assisting the Examiner, they impeded the Examiner's analysis because they contained numerous inconsistencies, and were neither accurate nor complete. During the Examiner's interview, Podgainy confirmed that he never looked at, and was not provided with, any loan documents or any supporting evidence that would characterize any of the amounts referenced in his declaration as loans. Podgainy simply stated that he compared the amounts on the schedules provided to him

---

[28]   The declaration was redacted, despite the fact that no motion to seal was filed or granted. It is not clear why the Debtor redacted the declaration, which purported to contain information that would have required disclosure in the chapter 11 case.

18

to amounts on bank statements provided by the Debtor. In fact, Podgainy told the Examiner that he just took the Debtor's word that the referenced amounts were, in fact, loans.

During the Examiner's interview with Lichtenstein, the Examiner not only asked to go over these schedules, but also inquired as to the existence of any supporting loan documents. Lichtenstein refused to answer any questions regarding the purported loans, the Podgainy declaration, or the accompanying schedules. Rauch, who prepared these schedules at the direction of Lichtenstein, told the Examiner that he had never seen any loan documents for the referenced transactions. The Debtor refused to supply documentation evidencing the source of the underlying cash infusions to effectuate the purported loans, failed to produce any loan documents evidencing the alleged loans referenced in the schedules, and refused to answer any questions about these transactions and schedules.

The schedules prepared by Rauch at the direction of Lichtenstein failed to show the exact sequencing of the purported loans. From the Examiner's review of the schedules, he determined them to be flawed for several reasons, including, but not limited to, the fact that the schedules provided did not consistently apply the "loans." The bank accounts identified in the schedule "Transfers from Hotel Operations to Northside" include bank accounts in the name of the Manager and Northside. However, the bank accounts identified in the schedule labeled "Transfers from Northside to 96 Wythe" are not the same accounts. Instead, the bank accounts in the schedule labeled "Transfers from Northside to 96 Wythe" references bank accounts in the name of 96 W Development and the Debtor, *not* the Manager. An analysis of the banking with the entity 96 W Development raised more questions as to the source and uses of funds coming into and out of these accounts.[29] Neither the Podgainy declaration nor the related schedules distinguished the Debtor from 96 W Development.

---

[29]     Between 2017 and 2020, 96 W Development received $11.8 million, the most significant sources were 96 Wythe Acquisition LLC ($4 million), Northside Acquisition Partners, LLC ($3.4 million) and 564 St. John's Partners LLC (entity owned, directly or indirectly, by Moskovits and Lichtenstein – the timing of this deposit appeared to be around the same time as a loan from BSP to 564 St. John's Partners LLC) $2.7 million. During the same period, 96 W Development disbursed funds in the amount of $11.9 million, the most significant were checks (still to be investigated) in the amount of $6.1 million, Situs Asset Management of $1.2 million, Northside Acquisition $1

The Examiner found other issues with these schedules, including, but not limited to, amounts not supported in the corresponding bank statements and inconsistent time periods.[30] The schedules should have contained beginning balances, and an amount or amounts available within the Northside entities that would be available for loans. The schedules did not address this critical component of loan sequencing. The schedules were simply transferred amounts shown on a bank statement documented in an excel schedule. Rauch, at Lichtenstein's direction, determined which of these amounts were "loans." Lichtenstein never demonstrated the source of the funds allegedly loaned.[31] No documentation was presented as to the source of the funds allegedly loaned.

The Podgainy declaration and supporting schedules do not show any evidence of loans. They are simply numbers on a piece of paper, created by Rauch at the direction of Lichtenstein, in an attempt to persuade the Examiner that all of the transactions were bona fide transactions. Given Podgainy's extremely limited review of this information, Lichtenstein's adamant refusal to discuss this information and provide any supporting documentation, and the inconsistent application of banking transactions within the schedules, the Examiner considers the Podgainy declaration and the related schedules to be unreliable, and, if they have any probative value at all, it would be to support the conclusion that the Principals intended to misdirect the investigation.

## IV.    <u>Causes of Action</u>

The investigation revealed a number of potential causes of action, and, in particular, potential constructive fraudulent conveyance claims arising from funds transferred by the Debtor or by the Manager (the initial transferee of funds).

---

million and Mint Development (an entity owned, directly or indirectly, by Michael Lichtenstein) in the amount of $561,000. There are numerous other payments that appear to be of a non-business nature.

[30]    As an example, the schedule included amounts prior to 2017.

[31]    A preliminary review of the Northside Acquisition, LLC bank accounts associated with these purported loan schedules revealed tens of thousands of dollars paid directly to both Moskovits and Lichtenstein. Additionally, the bank statements showed the same pattern of numerous transfers among and between both the Debtor and Manager, as well as numerous other Principal unrelated entities e.g., 564 St. John's Partners, LLC, 232 Siegel, LLC and others. There also appeared to be evidence of other "loans", the sourcing of which may have originated with the Debtor and/or Manager. Moskovits is an authorized signer on the Northside bank accounts.

Due to the extreme resistance on the part of the Principals, and other obstacles encountered by the Examiner, at the time of the submission of this report, the Examiner does not have all the information needed to completely evaluate all possible causes of action, including claims against the Manager or other insiders on theories such as breach of contract, conversion, or breach of fiduciary duty.  While a prima facie case can be made to avoid many of the transactions described in this report, others transactions warrant further review and investigation.

### A.   Pre-Petition Transfers

The below chart details transferees that received funds from the Debtor and/or the Manager within four years prior to the Petition Date for which no bases or documentation has been provided. These transfers are potentially avoidable as unsupported by consideration.

| Transferor | Transferee | Date[32] | Amount[33] |
|---|---|---|---|
| Manager | Northside | Numerous | $12,235,453 |
| Manager | 564 St. John's Partners, LLC | Numerous | $32,575 |
| Manager | 286 Rider Ave Acquisition, LLC | Numerous | $105,675 |
| Manager | Mint Development Corporation | Numerous | $154,907 |
| Debtor | Moshe D. Schweid | Numerous | $65,000 |
| Manager/Debtor | Toby Moskovits | Numerous | $689,372 |
| Manager/Debtor | Downtown Capital Partners | Numerous | $33,000 |

---

[32]    The time periods analyzed in this table go back as far as four years prior to the petition date and therefore cover actions avoidable under New York state law (NY UVTA §§ 273, 274, 278), fraudulent conveyance actions under the Bankruptcy Code which are subject to a two year lookback period (11 U.S.C. § 548), and may include preference claims to non-insiders and to insiders (11 U.S.C. § 547).

[33]    All amounts displayed in this table are net amounts.  Given the sheer volume of transactions moving funds in and out of the relevant bank accounts on a daily basis, and the lack of supporting documentation evidencing the purpose of these transfers, the Examiner has been unable to tie specific transfers to amounts received incoming. Therefore, this table takes the most conservative approach by using net numbers.  In other words, the tables assumes that incoming funds from an individual transferee were received in exchange for the funds transferred by the transferor.  In actuality, the amounts subject to potential avoidance actions may be materially higher than those set forth in this table.

| | | | |
|---|---|---|---|
| Manager | Michael Lichtenstein | Numerous | $204,024 |
| Debtor | Moishe C. Schwartzman | 12/27/2017 | $50,000 |
| Debtor | Miriam Gross | Numerous | $300,250 |
| Debtor | Pessie Schweid | 1/27/2017 | $250,000 |
| Debtor | Spectrum Origination LLC | Numerous | $215,000 |
| Debtor | A&E Funding | Numerous | $260,000 |

The above-described transfers may be avoidable under the Bankruptcy Code as fraudulent conveyances (11 U.S.C. § 548),[34] or, under New York state's law governing avoidable transfers in reliance upon the Bankruptcy Code Section 544(b), which provides that a trustee may avoid a transfer "that is voidable under applicable law by a creditor holding an unsecured claim."   11 U.S.C. § 544(b).

An analysis of the Debtor's solvency[35] will be necessary to assert constructive fraudulent transfers made by the Debtor in the time leading up to the Debtor's bankruptcy filing and the equivalent action under New York law.[36]  While conducting a valuation of the Debtor was outside the scope

---

[34]    Pursuant to 11 U.S.C. § 548, a transfer of the Debtor's property or an interest therein made or incurred within 2 years prior to the bankruptcy filing date may be avoided if the debtor "(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer. . . (II) was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548.

[35]    Whether a debtor was insolvent at the time of a transfer affects the avoidability of that transfer as either a preference or a fraudulent transfer under the Bankruptcy Code.  *See* 11 U.S.C. §§ 547(b)(3); 548(a)(1)(B)(ii)(I).  The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . ." 11 U.S.C. § 32(A).

[36]    New York enacted the UVTA, effective as of April 4, 2020.  For transfers that occur on or after the effective date of the NY UVTA, the UVTA recognizes two types of avoidable fraudulent conveyances (1) claims voidable as to present and future creditors (Section 273), which includes both (a) transfers made with fraudulent intent or (b) transfers made without reasonably equivalent value when the debtor had or was about to have unreasonably small capital in relation to its business or should have believed that the debtor would incur debts beyond its ability to pay as they came due; and (2) claims voidable only as to present creditors (Section 274) which includes transfers made without fair consideration and transfers made to insiders under certain circumstances.  Under New York's Uniform

of the examination, the Debtor's financial condition and defaults under the Loan make it reasonable to believe that the Debtor was likely insolvent for some or most of the four year period prior to the Petition Date.   Further, the banking records show that the Debtor regularly had unreasonably small capital and incurred debts beyond its ability to pay.

While this analysis focuses largely on constructive fraudulent conveyances under the Bankruptcy Code and the equivalent under New York law, the Examiner notes that these same transfers may be subject to challenge as intentional fraudulent conveyances.   Due to the limitations and obstruction that the Examiner faced in connection with the investigation, the Examiner was unable to access the level of information necessary to establish the intent element necessary to assert an intentional fraudulent conveyance claim. Additionally, it is possible that a further analysis of these transfers on a transaction-by-transaction basis may result in additional causes of action, such as breach of fiduciary duty or avoidable preference.

Because the Examiner prioritized the investigation of large, insider transactions prior to the chapter 11 filing, and due to the constraints place on the investigation as described in this report, the Examiner did not separately assess potential preference actions under 11 U.S.C. § 547(b).[37] The Debtor's statement of financial affairs, in questions 3 and 4, states there were no payments made to creditors in the 90 days (and 1 year in the case of insiders) prior to the chapter 11 filing.

---

Fraudulent Conveyance Act of 1918 (the "UFCA"), the predecessor to the NY UVTA, there is a six year lookback period for claims for constructive fraudulent conveyance and a two year lookback period to bring claim from discovery of actual fraud. Under NY's UFCA, transfers were fraudulent under section 273(a) unless they were made for "fair consideration", which was defined by § 272 as having been provided when "in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or. . . [w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." As with the UVTA and the Bankruptcy Code, even if fair consideration were received under the UFCA, a transfer may still be fraudulent if made "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors," NY UFCA §276.

[37]     Pursuant to 11 U.S.C. § 547(b), a trustee may avoid a transfer of an interest of the Debtor "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made – (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b).

The Examiner was unable to verify this and or to determine the existence of potential preference claims.

### B.    Post-Petition Transfers

The Examiner's investigation identified unauthorized and undisclosed post-petition transfers, including (i) the receipt of the $350,000 EIDL grant in the name of the Williamsburg Hotel in July of 2021, which amount was transferred on August 3, 2021 from the Manager to Northside Acquisition Partners, LLC and (ii) the transfer of $252,100 from Manager account BOA 4400 to Northside Management NY, LLC, two days after the Petition Date.  These transfers may be subject to avoidance under 11 U.S.C. § 549.

## V.    Conclusion

The Principals entered into the BSP Loan, which the Principals knew or should have known could never be performed. In essence, the Loan was in default at the time of closing. The Principals then engaged in a scheme to siphon off any monies generated by the Debtor's hotel operations, through the illegitimate control of the Manager, to unrelated entities owned by the Principals.  This scheme diverted millions of dollars from the Debtor.

In addition to the discovery of significant potential causes of action by the estate, the investigation raises significant areas of concern surrounding the conduct of the Principals, both in their roles in the multitude of challengeable transactions identified in this report, but also in their fiduciary roles in administering the bankruptcy estate, including their lack of independence.

*[Signature page follows]*

Eric Huebscher
Examiner Pursuant to 11 U.S.C. § 1104(c)
96 Wythe Acquisition, LLC

**Appendix:  Examiner's Chronology of the Investigation**

On November 21, 2021, the Examiner sent his first formal document and information requests (**Exhibit E**) to Debtor's counsel. Among other items requested, the Examiner sought banking documents identified in Item 8, (i.e., listing of all bank account names, account numbers, bank physical addresses held in the name of or related to the Debtor and affiliated management company or any affiliate of the Debtor or management company that either received and/or disbursed funds directly or indirectly for and on behalf of the Debtor). Following this request, Debtor's counsel (Leah Eisenberg) stated that the Examiner would be receiving a drop box on November 24, 2021, with the requested documents.

Late in the day of November 23, 2021 the Examiner received an email from Debtor's counsel (Douglas Spelfogel) that stated that there were certain confidentiality issues that needed to be resolved prior to the Debtor turning over any documents or information. Mr. Spelfogel refused to provide any information unless the Examiner signed a confidentiality agreement that would materially limit the Examiner's investigation process, including the ability to interview witnesses. Ultimately, the Court's[38] intervention led to a workable confidentiality protocol that resolved the Examiner's concerns.

On or about December 3, 2021 (more than two weeks after the Examiner's appointment), the Examiner received the first production of documents from the Debtor (through Debtor's counsel), comprised of only 13 bank statements and assorted credit card statements. From the review of these statements the Examiner became aware of the existence of dozens of other accounts that were linked to the Debtor and Manager accounts via online banking transfers. Tens of thousands of online banking transfers occurred among and between the Debtor, Manager and other linked bank accounts.[39] The Examiner requested from Debtor's counsel, in over a dozen separate emails, the bank statements for the linked accounts identified. The number of previously unidentified

---

[38]     Even after the hearing, the Debtor attempted to impose additional limitations beyond what was directed by the Court.

[39]     This is in addition to hundreds of wire transfers, Zelle payments, checks and other banking transactions.

accounts and related statements continued to expand as the Examiner reviewed additional bank statements.

While the Examiner subsequently received additional documents from the Debtor, the bulk of the information requested was still missing, including a significant number of bank account statements, as well as other banking records and information previously requested from the Debtor.

On December 14, 2021, the Debtor produced three new bank statements, two new credit card statements and a 2020 federal tax return.

In light of the Debtor's refusal to comply with the Examiner's requests, counsel to the Examiner (i) on December 16-17, 2021, issued third party subpoenas (a) requesting documents from banks holding records of accounts in the name of the Debtor, the Manager or accounts linked to the Debtor or Manager accounts and (b) seeking tax returns prepared or filed on behalf of the Debtor, the Manager, 96 W Development LLC or Northside and (ii) on December 22, 2021, filed the Examiner's Motion to both enforce and further amend the second order directing the appointment of the Examiner.  The Examiner's Motion sought, among other things, to enforce the order and require the Debtor to turnover banking information. At substantially the same time, the Debtor filed a motion seeking to limit the Examiner's access to these records and to quash the third party subpoenas (DI 238) (the "Debtor's Motion").

On January 5, 2022, seven weeks after the Examiner's appointment, the Examiner received the first production since December 14, 2021, despite regular and repeated inquiries for the missing information.  The January 5, 2022 production did not contain all of the requested statements, and the statements that were included were heavily redacted, such that they could not be reviewed. After the receipt of the redacted bank statements, the Examiner continued to seek immediate turnover of all of the remaining documents.

On January 10, 2022, the Court held a hearing to consider the Examiner's Motion and the Debtor's Motion.  The Court denied the Debtor's Motion, granted the Examiner's Motion, and directed the Debtor to turn over the requested documents and information, including tax returns by January 14, 2022.

27

On January 14, 2022, at approximately 5:00 P.M., the Debtor sent (i) the bank statements for *some* of the related entities, (ii) unredacted copies of those statements that had been provided in redacted form on January 5, 2022, and (iii) one tax return for the Manager (2019).[40] Even after this submission by Debtor's counsel, there remained numerous missing bank account statements and tax returns. Subsequent to the January 14 production, the Examiner identified continued areas of non-compliance to the Debtor's counsel, as shown in **(Exhibit F)**. Debtor's counsel never provided any further documents or information relevant to this request.[41]As of the date of this report, the Examiner still has not received certain bank statements for some accounts that are linked to Debtor and/or Manager accounts.

Receipt of banking records directly from the banks has proved critical to the Examiner's investigation in light of the incomplete records provided by the Debtor.  For example, from the Examiner's review of documents from Bank of America, the Examiner became aware of two previously unknown and undisclosed Manager bank accounts (BOA 4400 and 3162).  These accounts should have been disclosed by the Debtor in response to the Examiner's November 21, 2021 request. It was not until December 29, 2021 that the Examiner first became aware of the existence of these two Manager accounts, and not until January 14, 2022 that the Examiner was able to review any bank statements for these two accounts. The Bank of America production revealed the existence of a previously undisclosed $350,000 EIDL Small Business Administration grant in the name of the Williamsburg Hotel (in BOA 3162). BOA 4400 revealed another undisclosed and unauthorized post-petition transfer in the amount of $252,100 from the Manager to Northside Management NY, LLC. Notable are the sustained efforts on the part of the Debtor to conceal these particular accounts and bank statements from the Examiner.

Through review of bank statements, the Examiner identified numerous other bank accounts that were not previously known, disclosed or identified. The Examiner saw thousands of transactions conducted between these newly discovered accounts (unknown entities) via online banking

---

[40] Both the Debtor 2020 and Manager 2019 returns were unsigned. The accountant was subpoenaed for the same documents and did not respond. The Examiner's counsel filed a notice of non-compliance with the Court.

[41] Debtor's counsel sent emails stating that he (Douglas Spelfogel) had sent these requests to the Debtor and Management for further follow up.

transfers. Between Bank of America and Chase Bank, the Debtor utilized 6 accounts; the Manager 10 accounts. The number of other unknown and undisclosed accounts, linked to these accounts was 34. The Debtor and Manager, combined, executed 48,454 transactions over 50 bank accounts.

The identification of these newly discovered bank accounts and related transactions raised a significant number of questions as to what relationships the Debtor and/or Manager had with the underlying entities. The Debtor and Manager exhibited extraordinary resistance to providing any information about the identity of the accounts and their relationship with the Debtor and/or Manager. Initially, the Debtor refused to supply any related banking records, and ultimately provided records only after the Court's direction.

The Debtor was not willing to explain the financial transactions among and between the Debtor, Manager and related entities.[42] Those related entities include 232 Seigel Acquisition, LLC, 232 Seigel Development, LLC, Mint Development Corporation, 564 St. Johns Acquisition LLC, 564 St. Johns Holdings LLC, Northside Development Holdings, LLC, Northside Acquisition Partners LLC, 215 Moore Street Acquisition LLC, 215 Moore Street Development LLC, 875 4th Avenue Acquisition LLC, 286 Rider Ave Acquisition, LLC, Heritage GC Walton Acquisition LLC, Brooklyn Bread Lab, Building Development Corp, 96 W Development, LLC and FIA Capital Partners. Significant transfers were also sent to and received from Lichtenstein, Moskovits, and Marion (Miriam) Gross (an employee of the Debtor). The efforts that were required by the Examiner to obtain documents, data and information were extraordinary. The Examiner concluded from the actions of the Debtor and its Principals to conceal and withhold information that relevant and material information was and is still being withheld from the Examiner.

**Exhibit G** is a matrix of the Chase Bank and Bank of America accounts. During the course of the examination, this matrix was regularly and repeatedly sent to Debtor's counsel as additional accounts were identified.   The matrix was sent to Debtor's counsel (Douglas Spelfogel) on December, 3, 4, 5, 6, 10, 14, 16, 17 and 20 and January 6, 11, 18, 19, 21, 22 and 24. In each of

---

[42]      The Debtor provided a declaration from Mark Podgainy, of Getzler, with the Debtor's objection to the Examiner's Motion. This declaration was supported by schedules prepared by the Debtor. This declaration and the unreliability of these schedules are discussed in this report.

these emails the Examiner inquired as to when he would be receiving the missing bank statements.[43] In virtually all instances the response the Examiner received was vague. In addition to the statements, the Examiner also asked for verification as to when certain accounts were either opened or closed. The Debtor had previously represented to the Examiner that a transition from Chase to Bank of America had occurred.[44] The Debtor failed to turn over bank statements and information for approximately 34 bank accounts. The document attached as Exhibit F (Examiner's Identification of Outstanding Requests) was sent to Debtor's counsel on January 21, 22, 24, 25, 26 and February 1, 2022. The Debtor and/or Debtor's counsel never provided responses to these continued deficiencies. For reference, those accounts identified by an X were those obtained from either the OUST, the case docket or BSP. Those identified by an S were those provided by Debtor's counsel (Douglas Spelfogel). Those identified by a C came from Chase Bank; those with a B came from Bank of America.

In addition to his review of bank statements and documents received from the Debtor, the Chief Restructuring Officer, and through the third-party subpoenas issued, the Examiner conducted a series of interviews.

The Examiner interviewed **Jeremy Rauch** ("Rauch"), Director Finance for the Debtor,[45] on three separate occasions. The purpose of these interviews was to gain an understanding of how funds flowed between the Debtor and Manager and understand the reasons behind the expansive network of unrelated transactions. During the first two interviews, Rauch was represented by Leah

---

[43]    Missing statements could be identified by empty cells on the matrix. Debtor's counsel would repeatedly state that the accounts were either opened with the first statement provided or closed after the last statement provided. Many of the account statements did not support this explanation, as they were either the first statement in a sequence had an opening balance of the last statement had a closing balance. This pattern led to the Examiner's insistence that the Debtor provide third party evidence of account opening and closing. This third party evidence was first provided on January 20, 2022, 9 weeks after the Examiner's appointment and seven weeks after first requesting this information from Debtor's counsel. The information provided on January 20, 2022 was incomplete and inconclusive.

[44]    Six weeks after inquiring of the Debtor to provide evidence of account opening and closing, the Examiner was informed that the Debtor did not make a written request for this information. The Examiner was informed that the Debtor simply made a phone call inquiry. Subsequently, the Debtor did provide communication from the banks on account opening and closing. However, this communication only included information on less than 25% of the accounts.

[45]    Jeremy Rauch's LinkedIn page indicates that he is the Director Finance for Heritage Equity Partners (Heritage). Heritage is an entity owned by Moskovits and Lichtenstein. Rauch is shown as the Director of Finance of Heritage on the Heritage website.

Eisenberg, counsel for the Debtor. During the second interview the Examiner found him to be guarded, but less so than in the first interview. During the third interview, Mr. Rauch was not represented by counsel, and he was much more forthcoming. Rauch provided some of the information requested. However, he would often defer his ability to answer questions to "ownership". As an example, when the Examiner inquired why there were thousands of transactions between the Debtor and Manager and unrelated entities, he stated that the Examiner needed to speak with "ownership". When the Examiner asked him why there were millions of dollars transacted between the Debtor, Manager and Northside, Rauch referred the question to Lichtenstein.

The Examiner interviewed **Toby Moskovits** once during the investigation. The purpose of this interview was to understand the organizational structure of the Debtor and Manager. Douglas Spelfogel and Leah Eisenberg were both present during the interview. The Examiner was represented by Stephanie Wickouski. The Examiner found Moskovits to be combative, hostile and uncooperative. Given her behavior, the Examiner decided it would not be a good use of time to consider a second interview.

The Examiner interviewed **Miriam Gross** ("Gross")[46] once during the investigation. She is an employee of the Debtor. The purpose of this interview was to understand the background regarding alleged loans provided by Gross to the Debtor/Manager. Gross stated she was not represented by counsel. She stated that her role with the Debtor was in Human Resources ("HR") and only included matters associated with insurance claims, insurance coverage and related policies. Gross stated during the interview that she loaned monies to the Debtor, but refused to supply detailed information regarding amounts, timing and repayments. At times during the interview, she was vague or inconsistent in her recollection of the amounts that she allegedly loaned the Debtor. Gross refused to turn over bank statements for accounts in her name which were linked to the Debtor's accounts and which reflected significant online transfers. Ms. Gross's partial banking information showed large (hundreds of thousands of dollars) of unexplained

---

[46]     Miriam Gross is shown as the Director of Operations on the Heritage Equity Partners (Heritage) website. Heritage is an entity owned, directly or indirectly, by the Principals.

beginning balances. The Debtor's records indicated that $298,000 was sent from Gross to the Debtor and/or Manager.

Following the interview, Gross sent Judge Drain (and the Examiner) a letter with links to certain banking information. This banking information was not complete and raised more questions Subsequent to the interview, the Examiner learned that Gross's role included not only HR but preparation of financial schedules and MORs. The Examiner requested a second interview with Gross, which she refused.

The Examiner interviewed **David Goldwasser** ("Goldwasser") on four different occasions. The purpose of these interviews was to understand what efforts Goldwasser had undertaken to restructure the Debtor and what information he may have relevant to financial transfers and/or transactions. Goldwasser was represented by counsel in the last three interviews. During the first interview, on November 23, 2021, the Examiner asked Goldwasser to provide documentation regarding his role as CRO. He refused to supply this information and stated that this was beyond the scope of the examination. During the second, third, and fourth interviews (January 19, 25 and February 8, 2022), Goldwasser was represented by counsel (Bonnie Pollack). These interviews were more productive than the initial interview. Prior to the third interview, Goldwasser's counsel sent thousands of pages of documents responding to requests from November 23, 2021. These documents contained both court pleadings, declarations (drafts and finals) and numerous emails among and between Goldwasser, Moskovits, Lichtenstein, Gross, Rauch, Spelfogel, Eisenberg and others. Many of these have been claimed as privileged and therefore their content is not discussed in this report.

During the fourth interview, Goldwasser reported that Gross was part of the team that created the bankruptcy schedules, statement of financial affairs and monthly operating reports. Goldwasser stated that he did not create one single document of work product related to his role as CRO, other than the emails that he produced to the Examiner. In addition, through the Examiner's interviews of Goldwasser, the Examiner learned that FIA Capital Partners, which was a recipient of significant transfers from the Debtor/Manager is owned, directly or indirectly, by Goldwasser. Goldwasser caused to be formed another entity FIA Heritage Holdings LLC ("HH"). HH procured loans for the benefit of the Debtor and/or Manager. Goldwasser subsequently divested himself of

32

his interest/involvement with HH. Additionally, Goldwasser made personal loans to the Debtor and/or Manager in the amount of approximately $250,000.

The Examiner interviewed **Mark Podgainy** ("Podgainy") telephonically on January 13 and 14, 2022. Podgainy is a Managing Director for Getzler.  Getzler is a middle market turnaround and restructuring firm founded in 1968. Getzler was retained in the case as financial advisor ("Advisor") to the Debtor. The purpose of this interview was to discuss his role as Advisor as well as efforts related to a declaration he signed on January 4, 2022 under penalty of perjury, in connection with the Debtor's objection to the Examiner's Motion. The declaration referenced several documents prepared by Rauch, at the direction of Lichtenstein. Those documents were intended to advance a theory that the monies that flowed between the Debtor/Manager and unrelated entities (e.g., Northside) were loans.[47] The Examiner asked Podgainy what efforts he undertook to verify the accuracy of the schedules. Podgainy told the Examiner that he was supplied with bank statements by the Debtor in a drop box and he compared amounts on the schedules to amounts on the bank statements. Podgainy confirmed that he did not ask for, and was not supplied with, any loan documents related to these schedules. The Examiner also inquired of him whether he verified that the entity that supplied the alleged loan had the liquidity or financial capacity to provide the loan. Podgainy confirmed that he did not verify any aspect of the lender's ability to make the loans. The Examiner found Podgainy to both cooperative and transparent. However, the Examiner questions the reliability of this declaration and supporting documents. The absence of any third-party verification to the existence of loans should have been the cornerstone of the declaration. Podgainy told the Examiner that "…if you (Huebscher) and I did this we would be doing it differently…" The implications of the Podgainy declaration are discussed further in this report.

The Examiner interviewed and met with **Michael Lichtenstein** once during the investigation, at the hotel on February 1, 2022. Lichtenstein was unprofessional and hostile. Several times during the interview he told the Examiner that the Examiner was both "stupid" and a "liar". He also used profanity on several occasions. Lichtenstein refused to answer questions regarding the November Agreement, taxes, tax returns, the existence of loan documents and/or schedules, the location of

---

[47]        Rauch told me that Lichtenstein instructed him to construct these schedules in mid/late-December 2021.

any loan documents and/or schedules, the ownership of entities that either received or sent monies to the Debtor and/or Manager. Virtually all of Lichtenstein's answers were vague, incomplete and non-responsive. The Examiner specifically asked Lichtenstein why there were thousands of financial transactions between and among the Debtor, Manager and numerous unrelated entities. Lichtenstein stated that this was not part of the examination, and he would not answer the question.

During the interviews with Gross, Lichtenstein and Moskovits there appeared to be a common theme and response to identical questions.  All three were less than forthcoming.  This lack of cooperation increased the time needed to conduct the investigation and associated costs, and raises concerns regarding the honesty and transparency of the Principals.