**MAYER BROWN LLP**
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL &**
**KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter -11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

## DEBTOR'S COUNTER REPORT AND RESPONSE TO EXAMINER REPORT

      **PLEASE TAKE FURTHER NOTICE** that the above-captioned debtor and debtor in possession (the "Debtor") hereby files the attached *Counter Report (the "Counter Report") and Response To Examiner's Report* filed on even date, which *Counter Report* is attached hereto as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that on February 28, 2022, the Debtor filed the *Omnibus (I) Objection to Examiner's Motion to Modify Aggregate Cap on Compensation and Reimbursement of Examiner's Fees and Expenses; First Interim Application of Eric M. Huebscher And Huebscher & Co. As Examiner; and First Interim Application of Locke Lord LLP, As Examiner's Counsel; and (II) Cross-Motion To Enforce Fee Cap and Limit Examiner Fees; Authorize Limited Discovery Against Examiner; Enforce Confidentiality; and for Related Relief* [Docket No. 417] (the "Omnibus Objection").

**PLEASE TAKE FURTHER NOTICE** that the Debtor **filed under seal** the Exhibit B to the Omnibus Objection titled *Counter Report and Response To Examiner's Preliminary Draft Report* , which report is now unsealed.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion may be obtained by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: February 28, 2022
      New York, New York

**MAYER BROWN LLP**

*/s/ Douglas Spelfogel*
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**BACKENROTH FRANKEL & KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

*Co-Counsel to the Debtor
and Debtor in Possession*

## <u>EXHIBIT 1</u>

**Counter Report and Response To Examiner's Preliminary Draft Report**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                           Chapter 11

96 WYTHE ACQUISITION LLC,                          Case No.- 21-22108 (RDD)

                         Debtor.

## COUNTER REPORT AND RESPONSE TO
## EXAMINER'S PRELIMINARY DRAFT REPORT[1]

1.      My name is Michael Lichtenstein, I am a managing member of 96 Wythe
Acquisition LLC (the "Debtor"), in the above-captioned chapter 11 case (the "Chapter 11
Case").  I am over the age of 18 and authorized to submit this Declaration on behalf of the
Debtor.

2.      I work with the David Goldwasser, the Chief Restructuring Officer for the Debtor,
and the Hotel's management team in connection with the within case.  I have reviewed and am
generally familiar with the Debtor's operations, including its operation of the Williamsburg
Hotel (the "Hotel"), and the Debtor's related financial records, agreements and other related
documents.  Except as otherwise indicated herein, all facts set forth in this Declaration are based
upon my personal knowledge of the Debtor's operations and finances, information learned from
my review of relevant documents, information supplied to me by members of the Hotel's
management team and other professional advisors, or my view based upon my experience and
knowledge of the Debtor and its operations and financial condition.

---

[1] The within counter report and response relates to the preliminary draft report of examiner, Eric Huebscher, dated
February 14, 2022.  The Debtor previously filed at least two declarations [Doc. # 268 and 354]  addressing Mr.
Huebscher's examination, which are incorporated herein by reference.  This counter report and response is focused
on Mr. Huebscher's findings, without prejudice.  The Debtor reserve its right to supplement the within response.

3.      I have reviewed Mr. Huebscher's report of examiner (the "Report"), preliminary draft dated February 14, 2022 and file this counter report and response to address false and misleading statements and conclusions that misstate the facts and appear compromised.

## SUMMARY OF RESPONSE

4.      Mr. Huebscher has misused his position as court-ordered examiner, and has instead acted as a passionate advocate for the Benefit Street Partners' ("Benefit Street") claims and positions.  In fact, a review of the fee applications recently filed by Mr. Huebscher and his counsel, reveal in many cases, almost daily contact between Mr. Huebscher's counsel and the lawyers for Benefit Street.  The report issued by Mr. Huebscher creates a false narrative, and is replete with  deliberate misstatements, false claims and conclusions, in spite and in the face of evidence and facts that have proven such claims to be false.

5.      The court order called for a neutral and true examination of the Debtor's books and records.  Instead, Mr. Huebscher engaged in a three-month vilification campaign, claiming falsely that in order to do a review he needed to review more and more unrelated accounts and to continually expand the scope of his work, and thereby keep increasing the fees for himself too. This three-month campaign culminated in the report issued by Mr. Huebscher, which falsely claims that the $12.2 million was taken from the Hotel by the Debtor's principals, which as discussed below is practically impossible, and makes many other false and unsubstantiated claims.  While the Debtor has worked with the CRO to enhance the Plan (which is being amended to increase the cash infusion upon confirmation to $10 million), the Report creates a toxic environment of misinformation that is severely prejudicial to the reorganization.

6.      The false narrative Mr. Huebscher presents is not surprising given his false and misleading narrative throughout the examiner process.  During the course of his examination, Mr. Huebscher has conflated the Debtor and other related entities, has raised unfounded

allegations against the Debtor and management (and even counsel), while claiming to have run up fees more than three (3) times the cap established by the court in this matter, mostly on extraneous work. At the same time, Mr. Huebscher through counsel has been in often times daily contact with counsel for Benefit Street as well as frequently talking to Mr. Zipes regarding motion practice.

7.    As an initial matter, nowhere in Mr. Huebscher's report does he reference the more than $30 million infused into the Hotel, approximately $21 million in equity and $11 million in loans. Mr. Huebscher also claims revenues are somehow actionable transfers without taking into account the costs of operating the Hotel.

8.    In fact, Mr. Huebscher goes so far to assert that while revenues from operations were insufficient to pay debt service (as a construction project, income had not normalized), noting excess cash of approximately $4.2MM-$4.7MM, he claims that over $12 million of non-existent monies was somehow transferred out of the business to insiders. As Mr. Huebscher stated in his report, during the years 2017-2020, the hotel generated a cumulative available cash of $4.2MM-$4.7MM. That was all the funds available. It is therefore a practical impossibility for Mr. Huebscher to claim transfers out of over $12 million.

9.    Mr. Huebscher also lists payments to Northside Acquisition, his biggest line item relating to transfers out of the Management Company, but fails to account for payments from Northside Acquisition to the Debtor, in the amount of $7.2MM.[2]  Mr. Huebscher also fails to account for the fact that the other payments made from the Management Company and Debtor were to cover construction related expenses and operating costs. Again, after accounting for

---

[2] While the Debtor questions several of the specific numbers Mr. Huebscher lists in terms of transfers into and out of the business, for ease of reference, the within response uses Mr. Huebscher's numbers. The Debtor reserves its right to supplement the within response.

such, the net transfers from the Hotel was approximately $4.5MM, which is what the analysis provided by the Debtor showed.

10.    Mr. Huebscher also criticizes the Debtor providing a detailed transfer analysis. However, Mr. Huebscher's claims that the fact that the Debtor provided a detailed report of use of cash transfers (backed up by bank statements) is somehow obstruction, is nonsensical. It further evidences that Mr. Huebscher is driven by an agenda, and does not wish to be provided with a true detailed report that simply ties in all transfers into and out of the Debtor and Management Company. While Getzler Henrich did not review underlying loan documentation, that was not their task. They simply reviewed and confirmed that the transfers into and out of the Debtor and Management Company accounts conformed with the amounts provided in the Debtor's analysis. The reports and bank statements show inflows of approximately $11 million, with repayments of $4.5MM leaving a net loan due of approximately $6.5MM (excluding equity/capital contribution of $21MM).

11.    Mr. Huebscher also reviewed operating reports during the bankruptcy case selectively and misleadingly, failing to take into account that since the lifting of the COVID-19 restrictions, the Hotel has operated profitably and is on track to meet its projections under the plan. In fact, the Hotel has achieved occupancy rates well in excess of the NY City average, and is highly rated.

12.    Mr. Huebscher complains about tax returns not being filed. However, the Debtor filed the required return for the post-petition period 2020, (2021 is not due yet), and have brought all federal pre-petition tax filings for the Debtor (and Management Company) up-to-date. As the filed returns show, and as the Debtor previously indicated to the Examiner, the Debtor had no taxable income in the pre-bankruptcy period.

13.   Mr. Huebscher also seeks to suggest the business structure is overly complex, noting that he reviewed some 50 bank accounts, but this is a red hearing.  During construction and pre-stabilization, when cash flow was tight, the principals funded cash shortfalls -- the bulk of which was funded through the bank accounts at Northside Acquisition, and all of which was fully documented.  The funds that were transferred into and out of the Hotel are acknowledged -- the fact that funds may have subsequently been transferred from Northside Acquisition to another related entity is irrelevant, given that such transfers were overwhelmingly transferred back into Debtor accounts, and the remainder reflect payment of legitimate expenses and repayment of loans.[3]  However, by ignoring large inflows of monies into the Debtor, double counting transfers, and failing to properly account for operating costs, the Examiner's analysis is fatally flawed, and his conclusions contradicted by his own analysis.

## RESPONSE

14.   The false and baseless claims made in Mr. Huebscher's report fall into broad categories and are constantly repeated in the Examiners report in different contexts. They broadly fall under the following seventeen false categories as follows:

15.   **First false statement** -- Mr. Huebscher claims falsely that somehow $12.5 million was taken from the Management Company's cash. This is a patently false claim.[4]

16.   Regarding the largest component of such, $12.2 million the Examiner says was transferred from the Management Company to Northside Acquisition, even Mr. Huebscher

---

[3] In addition, as to the amounts used to repay loans, these amounts are acknowledged, accordingly, whether the funds were transferred further beyond Northside is irrelevant.

[4] The $150,000 of cash Mr Huebscher claims was transferred to Mint Development was for contract labor hotel expenses, which was proven with bank statements and payroll records, but Mr. Huebscher still states falsely that it was somehow taken improperly. The $105,000 transferred to 286 Rider was from the PPP money and is outside the scope of this examination.  The $32,000 the Examiner says was transferred to 564 St Johns is a false statement and a net amount of $139,600 was transferred from 564 St Johns into the Manager.

himself states in different places in the report that $7.3 million was transferred from Northside Acquisition into the Debtor. Even according to Mr. Huebscher's report, if you net out these two numbers, only $4.9 million was transferred from the Management Company to Northside and not back into the Debtor. In addition, approximately $800,000 of the amounts transferred to Northside were for Debtor or Management Company payroll expenses which were handled through Northside. That leaves only $4.1 million that was transferred from the manager to Northside and not back into the Debtor.[5] Yet , the Examiner falsely and misleadingly ignores the $7.3 million of inflows into the Debtor when concluding that the entire $12.2 million is an avoidable transfer.

17.    Additionally, as the detailed report provided to the Examiner by the Debtor demonstrates, and as backed up by bank statements and confirmed thought Getzler Henrich, a review of the flow of funds shows inflows into the Hotel (Debtor and Management Company) from the Debtor's insiders of approximately $11 million. There were repayments of the $11million loan of only about $4.5 million. Any cash transferred from the Debtor's income went towards paying expenses and payroll of the Debtor, or such loan repayments, as is clearly shown in the detailed reports and bank statements provided by the Debtor as well as the underlying books and records reviewed by the Examiner.[6]

18.    **Second False Statement** -- On page 12 of his Report, the Examiner states that, "Between 2017 and 2020 the Debtor and the Management Company received and disbursed over $92 million. However, Mr. Huebscher is double-counting. Rather, only $49 million came into

---

[5] The $4.45 million transferred to 96 W Development were used for expenses of the Debtor.

[6] The Debtor has provided a detailed 500-page report, with backup, bank statements, and the review of Getzler Henrich. Mr. Huebscher asserts that the report is flawed because Mr. Podgainy didn't review loan documents or the source of the funds loaned. However, Mr. Podgainy's charge was not to undertake a legal review of the loan documents, but rather to confirm that the calculations in the report are correct.

the management company from operations of Hotel which is acknowledged in the Report.  Of this amount, the costs of operating the hotel were deducted, leaving (as Mr. Huebscher acknowledges) only cash available during the relevant period of $4.2MM-$4.7MM.[7]  In other words, there wasn't millions in unaccounted for revenues, as the only net amounts generated that could possibly have been transferred out is the $4.2-$4.7MM million in net available income, as this was the only excess funds generated from operations.[8]

19.    Regarding the other numbers, as noted above, Mr. Huebscher refers to $92 million  as a gross amount of funds received and disbursed.  However, this double-counts transfers that were made from Management Company to Northside Acquisition into Debtor, which is the same money. Mr. Huebscher is double and triple counting every stop of the funds in the Management Company, Northside transfer account and Debtor, rather than netting out multi-step transactions.

20.    One example of this is that the Mr. Huebscher says that around $5 million was transferred from the Debtor to the Management Company and $5 million was transferred from the Management Company to the Debtor.  By including both transfers in his calculation, this necessarily means that the $92 million is double counting $10 million. Additionally, the Manager transferred what the Examiner claims to be $12.2 million to Northside Acquisition and the Debtor transferred what the Examiner claims to be $7.3 million from Northside Acquisition to the Debtor. This means the $92 million is double counting at least $7.3 million. This false and inflammatory statement made by Mr. Huebscher, as if there were $92 million, is made with the clear intent of creating a misleading narrative that there are tens of millions of dollars that need

---

[7] Mr. Huebscher notes profits of $4.7 million.  The Debtor's records reflect profits of $4.2 million during such period.
[8] Mr. Huebscher lists profit at $4.7 (2018: $1.5 million; 2019: $3.2 million; 2020 loss). Report, p. 6.  Debtor provided net income was $4.2MM net income.  Report, chart p 14.

to be further investigated.  There are also other instances of funds being double counted to get to the $92 million since there were other revenues transferred out of the Manager and back into the Debtor.

21.    **Third False Statement** -- Mr. Huebscher spends a significant amount of his report repeating Benefit Street's false claims that the Debtor cannot support the debt service of the loan going forward. The examiner takes it a step further in his passionate advocacy for Benefit Street, falsely referring only to the months of March, September and December income, claiming that the average income is low.  However, in the hotel industry, March and December are among the weakest months of the year in terms of income for all hotels in NYC. Mr. Huebscher falsely uses the lowest income months of the cyclical hotel industry, to try to prove Benefit Street's point. Mr. Huebscher fails to mention the months of April, May, June, July and August, which are typically the busiest months in the local hotel industry.

22.    In fact, putting aside that the review of the current operations and projections was not part of Mr. Huebscher's charge, the Debtor has far exceeded the performance metrics set forth in the budget as provided for as part of the Debtor's consensual use of cash collateral, with net profits from April 2021 through December 2021 around $3,000,000, with approximately $3,200,000 cash in the bank.  The Debtor's projections are based upon an analysis of historic performance, as well as adjustments regarding anticipated growth as the hospitality industry continues to emerge from the devastating impact of COVID-19.[9] Needless to say, a fair and honest review of the projections shows that the income is sufficient to cover the debt service and

---

[9] Similarly, as detailed in the second amended Disclosure Statement, the Hotel outperformed the performance metrics set forth in the cash collateral budgets for the April 5, 2021 to September 26, 2021 period, as provided below:
- Gross revenue exceeded budget by 30.0%
- Gross operating income exceeded budget by 51.4%
- Gross operating profit exceeded budget by 413.0%

some more. This is confirmed by the Debtor's expert reports, and Mr. Huebscher's claims to the contrary are misleading at best.

23. **Fourth false statement** -- Mr. Huebscher claims falsely that since the Debtor could not cover debt service when the loan was originally issued by Benefit Street, therefore the Debtor was in default from the start of the loan. This is a patently false claim, however, as the Debtor had not even fully opened the Hotel when the loan was taken from Benefit Street, and construction was still ongoing in parts of the Hotel and in many of its hotel rooms, when Benefit Street provided the loan. In fact, part of the loan with Benefit Street had a construction reserve of $1.7 million to cover agreed upon construction costs.. Benefit Street knew that the Debtor could not initially cover debt service and the interest reserve of about $3 million was set up for this exact purpose, as the Debtor could not cover interest payments.10

24. There was never any claim made that the Debtor was stabilized and could cover interest payments, as Mr. Huebscher falsely states. Benefit Street provided a bridge loan, for an asset that was not completed and still needed millions of dollars of construction work, based on projections. Mr. Huebscher's assertion that the Debtor was somehow in default "from day one" is entirely baseless. This shows once again how Mr. Huebscher is simply parroting the Benefit Street claims, whether they are based in fact or just falsehoods. Nor does Mr. Huebscher mention (or even note) that there is a pending adversary proceeding against Benefit Street which, in part, challenges Benefit Street's conduct, and the defaults. Here, Benefit Street is a sophisticated lender, which provided a bridge loan for an asset that was far from stabilized, and

---

[10] The loan was always intended as a bridge loan, which would ultimately lead to stabilization. The Hotel started in Jan 2017 with only one floor, and no restaurant. Restaurant was opened sometime in mid 2017. By the time we closed with BSP in December 2017 -- we only had 3 guest room floors operational and two were not done construction. By June of 2018 the floors were substantially done. Rooftop was completed in June of 2018, as well as the water tower, as enumerated in the adverse proceeding.

in hindsight, it is now clear that Benefit Street indeed was a "loan to own" lender, who intended to call defaults and attempt to take control of the property.

25.    In any event, an analysis of the Debtor's ability to make its debt service payments, whether in 2017 or going forward, falls far outside the scope of the Examiner's mandate, and the fact that the Examiner has undertaken this analysis at all further demonstrates that he has been working at Benefit Street's behest and not as a neutral investigator.

26.    **Fifth False statement** – Mr. Huebscher makes repeated statements about the flow of funds of the management, claiming that the flow of funds is not what anyone expected. Despite the false intimation, the flow of funds through the Management Company has been in place since the start of 2017, when the Hotel opened.  This flow was in place prior to Benefit Street providing the loan.  In this regard, until the Filing Date, revenues were deposited with the Management Company, who in turn paid the expenses of operating the Hotel.  Additional cash infusions were provided to facilitate payments pursuant to a line of credit the Debtor had to cover cash shortfalls while the Hotel worked toward stabilization.  The advances were provided to assist with cash flow given the Debtor was not fully operational, nor stabilized.

27.    **Sixth false statement** -- Mr. Huebscher claims in his report that "the management company collected all the money, while the Debtor incurred all the expense.  This made it difficult to determine the exact expenses of the Debtor, and to match it to the related income". Page 8 of the report.  However, this is a false statement, as the Management Company paid all the Hotel's operating expenses on behalf of the Debtor.  All revenue from the Hotel income, such as rooms sales revenue, restaurant and bar revenue, and all other revenues, were deposited into the Management Company account.  Then all bills, such as payroll, vendor bills such as food and beverage suppliers, linen and room goods, cleaning, and all daily operating bills were paid from

Management Company accounts.  Therefore, the operating expenses can easily be matched to the operating revenue and the accounting of operating revenue and expenses is very clear.

28.     The Debtor likewise has provided reports, including its post-petition monthly operating reports, showing the revenues and expenses attributable to different segments of the Debtor's business, and the Debtor's books and records support these figures.[11]

29.     **Seventh false statement** -- Mr. Huebscher claims falsely that he somehow discovered on his own two bank accounts that the Debtor had hidden from his review – this is baseless.  Following the Court's order to provide more information to Mr Huebscher by January 14, 2022, the accounts were provided to Mr. Huebscher.  Mr Huebscher did not discover these accounts.  These accounts information were provided to Mr Huebscher by the Management Company, and Mr. Huebscher's claims that these accounts have been hidden is patently false as the record clearly shows.

30.     **Eighth false statement** -- Mr. Huebscher's claims about the EIDL funds are false.  The examiner states that the EIDL loan is a grant—it is not, it is a loan, and EIDL loans are generally not forgivable (unlike PPP loans).  The EIDL loan was issued to the Management Company, who is responsible for to paying it back.  Since it is a loan to the Management Company, the Debtor has no connection to these funds—the Debtor neither owns the funds nor is responsible for paying them back.  Accordingly, the transfer of the EDIL loan proceeds does not constitute a post-petition transfer of property of the Debtor's bankruptcy estate.

31.     **Ninth false statement** -- Mr. Huebscher claims falsely that all parties, including the Debtor and Management Company have acknowledged that the sole business of the Management Company is managing the Debtor.  Neither the Debtor nor the Management

---

[11] Post-petition, Hotel revenues are deposited into the debtor-in-possession account, with funds transferred to the Management Company accounts to cover operating expenses as fully documented in the operating reports.

Company have ever said as much and, in fact, they both repeatedly asserted that the Debtor and Management Company are separate entities with separate business interests. In fact, this is directly contradicted by the fact that another hotel using the same brand of The Williamsburg Hotel has been under construction since 2017 in another part of Brooklyn, which will be operated by the Management Company, and another hotel under the same branding and operations has been planned in Miami.

32.    **Tenth false statement** -- Mr. Huebscher falsely claims that an employee, Miriam Gross received $300,000 improperly. This false claim is made in spite of clear proof provided to Mr. Huebscher, which showed that Ms. Gross provided loans to the Debtor in the amount of approximately $300,000.

33.    These loans were made over a period of 8 months in 2018, when Ms. Gross assisted the Debtor because of the Debtor's limited operating cash flows and Benefit Street's improper refusal to release the Debtor's funds from its construction reserves. Despite very clearly explaining these loans to the Examiner, with backup from bank statements, and demonstrating how the loans were repaid by the Debtor, the Examiner has failed to address the documentation provided and instead repeated the false statement that Miriam Gross received money without any reason, and that no explanation was provided.[12]

34.    **Eleventh false statement** -- Mr. Huebscher claims that the Debtor understated cash by $4 million on page 11 of the report. That is a false statement. The Examiner is confusing revenue and cash receipts. While the Hotel generated approximately $49 million in revenue between 2017 and 2020, total receipts exceeded that amount on account of sales taxes collected, employee gratuities, returned checks, and other non-revenue cash receipts. The

---

[12] Additionally, the Examiner decries "unexplained balances" in Ms. Gross's personal bank accounts as a reason for his continued review. Ms. Gross's personal finances are far outside the scope of the Examiner's mandate, and the employees personal finances are generally not within the purview of this court. .

Examiner's inability to distinguish between revenue items like room charges and foodservice and non-revenue items like restaurant servers' tips suggests that he is either unqualified to assess financial records or is willfully misconstruing them.

35.    **Twelfth False Statement** -- Mr. Huebscher states that Toby Moskovits received from the Debtor and Management Company the net amount of $689,372 and I received from the Debtor and Management Company the net amount of $204,024.  This is a false statement.

36.    As Mr. Huebscher knows, the Debtor and the Management Company have corporate credit cards that are in my name and the name of Toby Moskovits.  These amounts were paid over the years by the Debtor to cover credit card bills of the corporate credit cards used by the Debtor and Management Company.  Any time that something needed to be paid on a credit card, the Debtor and Management Company had corporate credit cards, and these credit cards were used, for any needs of the Debtor, and for expenses of the Management Company on behalf of the Debtor.  Such corporate credit cards merely have Toby Moskovits and Michael Lichtenstein identified as the card holders of these corporate cards of the Debtor and Management Company, which such corporate credit cards are used on behalf and for the purpose of managing and making payments for the Hotel.  Mr. Huebscher was provided with all these corporate credit card statements, and according to his own statements he has reviewed all these accounts in detail.  His statements about these funds being taken by myself and Ms. Moskovits is false and deliberately deceiving.

37.    **Thirteenth False Statement** -- Mr. Huebscher refers to another nine transfers, which despite being explained to Mr. Huebscher (and given the relatively small amounts involved), he nonetheless claims that they need to be examined as he has not been given clear explanation.  A review of each of them reveals Mr. Huebscher's claims to be false.

564 St. John's Partners, LLC – Mr. Huebscher claims there was a transfer of $32,575. However, the record clearly shows that 564 St Johns made net loans to the Manager in the amount of $139,600. Mr. Huebscher's claim is false.

286 Rider Ave Acquisition, LLC – 105,675, and Downtown Capital Partners $25,000 – these were both funds from the PPP loan, which were both provided numerous times and Mr. Huebscher has these records, while falsely claiming he needs to investigate these. Separately, the court order clearly excluded the PPP loan from Mr. Huebscher's investigation  given that it has already been disclosed and is subject to a separate settlement.

M. Schweid - $65,000, and P. Schweid - $250,000 – these were both repayments of a loan provided in 2016, prior to the Benefit Street loan. This was explained to Mr. Huebscher but he falsely claims this needs to be investigated.

Spectrum origination - $240,000 – This amount reflects a nonrefundable deposit and advance for legal fees that were paid to Spectrum Origination in connection with a $70 million loan that the Debtor was contemplating obtaining from Spectrum. However, the Debtor ultimately decided not to move forward with that loan. This was explained to Mr. Huebscher, despite his false claims to the contrary.

A&E Funding - $260,000 – is part of the mezzanine lending group, and these are payments towards the mezzanine loan. This was told to Mr. Huebscher repeatedly, despite Mr. Huebscher's claims to the contrary.

Moishe C. Schwartzman - $50,000 – this is a repayment of a loan, as was explained to Mr. Huebscher.

38.     **Fourteenth false statement** – Mr. Huebscher refers repeatedly to a "labyrinthian and complex scheme" to get funds into the Hotel, which is a patently false statement. Another false statement made by the examiner is that there is "intermingling of the Debtor's funds with other entities." These are all false statements made by the Examiner, that are not supported by the facts and a clear attempt to extend the examination and run up fees, all of which are detrimental to the confirmation process.

39.     It is actually very simple.  The Debtor was short on money constantly from 2017 to 2020, between various challenges it faced (including Benefit Street's predatory behavior), and the Debtor's principals constantly lent the Debtor funds, per a loan agreement, in order to keep the Debtor's operations going, to the tune of about $11 million dollars between 2017 and 2020 – on top of the $21 million of equity invested prior to 2017.  These funds came from various accounts and were lent to the Debtor and Management Company.

40.     In summary, the Examiner's claims about it being complicated are simply false, as the Debtor's detailed report of cash/transfers provided by the Debtor clearly – and simply shows the flow of funds into the Debtor as the $11 million loan was utilized by the Debtor over the years of 2017 to 2020.  The report shows that it is very simple, and was reviewed by Getzler Henrich. Mr. Huebscher in order to further the Benefit Street's agenda, is attempting to turn a very clear and simple matter into a "complicated and labyrinthian scheme" – falsely casting claims of improprieties.

41.     **Fifteenth false statement** -- Mr. Huebscher repeatedly mentions in the report that the report required review of about 50 bank account statements.  However, most of the 50 accounts have no connection to the Debtor, and the review of all these accounts is absolutely unnecessary and irrelevant to the Debtor.  This claim has been falsely and repeatedly been stated by Mr. Huebscher as a means to claim that the exam must go on, to expand the scope of the exam and to increase his fees.  The fact is that funds flowed into the Debtor mainly through one account, held by Northside Acquisition, which is the main account that is relevant to the Debtor and Management Company.

42.     Most of the 50 accounts are merely accounts belonging to the principals of the Debtors, and most of these accounts were either entirely not relevant or were merely sources of

funds from which the Debtor's principals provided the $11 million of funds to Northside Acquisition account. The Northside Acquisition account is the main account which had direct loans and transfers and provided the $11 million loan to the Debtor and Management Company. Mr. Huebscher misstates repeatedly claiming that all these 50 accounts took money from the Debtor, and repeatedly claimed that the source of the funds in these unrelated accounts needed to be investigated – both claims which are false, as there are no direct transfers to the majority of these 50 accounts, as the documents reveal, and the accounts related to completely other businesses that have no relation to the Debtor.

43.     Instead nearly all of the transfers occurred through the Northside account. If Mr. Huebscher wants to challenge such transfers that is one thing, however, the fact that funds were provided from or subsequently transferred to other entities is irrelevant as it is acknowledged by the Debtor and in the reports provided by the Debtor that some of the funds transferred to Northside were transferred out of the Hotel as a repayment of the loans. Therefore, the claims repeatedly made by Mr. Huebscher as if the court order required him to review 50 bank accounts is misstated.

44.     **Sixteenth false statement** -- the conclusion of Mr Huebscher on page 22 is false and completely contradictory. Mr Huebscher states as follows:

> "The principals entered into a loan that the principals knew or should have known could never be performed. In essence, the loan was in default at the time of the closing. The principles then engaged in a scheme to siphon off any monies generated by the Debtor's hotel operations… This scheme diverted millions of dollars from the Debtor."

45.     However, these two statements are in one paragraph, but are completely contradictory. If indeed there was $12.5 million dollars that was diverted according to Mr. Huebscher's claims, then the loan could have performed and debt service covered. If the loan

could not have performed, as there wasn't' enough income, then there could not have been $12.5 million to divert; as if there was indeed so much money to divert, then by definition the loan could have performed.  In other words, Mr. Huebscher says in the same paragraph that the loan was in default because the Hotel could not have made enough money to cover its debt obligations of about $5 million annually; but in the same breath he claims that despite the fact that the hotel could not make $5 million to cover its debt service, he asserts a diversion of $12.5 million from the Debtor.  These two statements are completely contradictory, cannot co-exist, and are emblematic of the entire report.

46.     **Seventeenth False Statement** - As a final point, Mr. Huebscher quoted me that I called him a "liar" and "stupid". As usual Mr. Huebscher intermingles truth and lies and attributes quotes to me that are simply false. The single quote from me in the entire Examiner report that is true - is that I told Eric Huebscher numerous times in my interview with him that he is a liar. All other quotes attributed to me in this report are indeed erroneous. I filed declarations publicly in court stating that Eric Huebscher is a liar and continuously makes false statements, long prior to the filing of this report, and explained in detail his lies.13

47.     In conclusion, the analysis that the Debtor undertook, supported by the books and records and other information provided to the Examiner, shows very clearly that the Debtor's principals have invested about $21 million of equity, and lent about $11 million to the Debtor, for a total of over $30 million injected by the Debtor's principals.  Only about $4.5 million of the $11 million loan was ever repaid, and there is still almost $6 million owed to the principals, plus

---

13 Regarding the balance of Mr. Huebscher's characterizations, it is not true that I called Mr. Huebscher stupid - that is another false misquote and a classic Huebscher distortion of what I said. What I did say to him is that he was deliberately asking stupid questions in an attempt to entrap people, but again Mr. Huebscher deliberately and falsely misquoted me. I never said he is stupid, because I think that Mr. Huebscher is a smart advocate for the lender, masquerading as an examiner, who will stop at nothing, including making numerous false statements and announcing conclusions that are impossibilities, in furtherance of his agenda to assist Benefit Street and increase his own pay day.

about $21 million of equity invested by the principals.14  The many statements made by Mr. Huebscher are false, the basis of all of Mr. Huebscher's conclusions are premised on baseless and false claims, and don't take into account the full facts (or misstate the facts) of this case. The Report is clearly based on the Benefit Street claims, and in fact parrots its experts' reports' language in many places, in Mr. Huebscher's determination to advocate for Benefit Street in his report at all costs.  As such the report issued by Mr. Huebscher should be disregarded as biased and misleading.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on the 28th day
 of February, 2022.

_____
Michael Lichtenstein

---

14 While noting the equity investment, the Debtor's analysis focused on loan advances and repayments, most relevant herein.