**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
|  |  |
| :--- | :--- |
| In re: | : |
|  | : Chapter 11 |
| 96 WYTHE ACQUISITION LLC, | : |
|  | : Case No. 21-22108 (RDD) |
| Debtor. | : |
|  | : |

--------------------------------------------------------- X

## LENDER'S SUPPLEMENTAL OBJECTION TO CONFIRMATION OF DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOLLOWING EXAMINER'S REPORT

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

      A.     Appointment of the Examiner and the Scope of His Examination ......................... 4

      B.     Examiner's Report ................................................................................................. 5

The Findings of the Examiner's Report Bar Confirmation of the Plan ...................................... 13

I.     The Examiner's Report Confirms That the Plan Was Not Proposed in Good Faith ........ 13

II.    The Insiders' Continued Control of the Debtor Cannot Satisfy Section 1129(a)(5) ........ 15

      A.     The Plan Is Not Confirmable Because the Debtor Cannot Justify the Estate
            Releases ............................................................................................................. 16

      B.     The Gratuitous Release of Millions of Dollars in Claims Against the
            Insiders Negates their Purported Equity Contribution .......................................... 19

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................18

*Arfa v. Zamir*,
    No. 603602/05, 2008 N.Y. Misc. LEXIS 10110 (Sup. Ct. Apr. 29, 2008),
    *modified on other grounds*, 55 A.D.3d 508 (N.Y. App Div. 2008) .........................11

*Arfa v. Zamir*,
    No. 603602/05, 2008 WL 4302790 (N.Y. Sup. Ct. Sept. 8, 2008), *aff'd* 75
    A.D.3d 443 (N.Y. App. Div. 2010) .........................................................................12

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
    68 F.3d 914 (5th Cir. 1995) ....................................................................................18

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...................................................................17

*HSBC Bank USA, NA. v. Fane (In re MF Glob. Inc.)*,
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) ...................................................................17

*JPMorgan Chase Bank, NA. v. Charter Commc'ns Operating, LLC (In re Charter
    Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................................................................17

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006) ...................................................................................12

*In re Lupton Consulting LLC*,
    633 B.R. 844 (Bankr. E.D. Wis. 2021) ..................................................................14

*In re Matco Elecs. Grp., Inc.*,
    287 B.R. 68 (Bankr. N.D.N.Y. 2002) .....................................................................18

*McKinnon Doxsee Agency, Inc. v. Gallina*,
    187 A.D.3d 733 (N.Y. App. Div. 2020) ................................................................12

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
    LLC)*,
    478 F.3d 452 (2d Cir. 2007) ..............................................................................4, 16

*Mullin v. WL Ross & Co. LLC*,
    173 A.D.3d 520 (N.Y. App. Div. 2019) ................................................................12

ii

*In re Multiut Corp.*,
   449 B.R. 323 (Bankr. N.D. Ill. 2011) ...............................................................14

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*,
   421 B.R. 626 (Bankr. S.D.N.Y. 2009) ..............................................................8

*In re Present Co.*,
   141 B.R. 18 (Bankr. W.D.N.Y. 1992) ...............................................................18

*In re Rusty Jones, Inc.*,
   110 B.R. 362 (Bankr. N.D. Ill. 1990) ...............................................................16

*In re SM 104 Ltd.*,
   160 B.R. 202 (Bankr. S.D. Fla. 1993)...............................................................16

*Weinstein v. CohnReznick, LLP*,
   144 A.D.3d 1140 (N.Y. App. Div. 2016) ...........................................................12

**Statutes**

11 U.S.C. § 544(b) .................................................................................................7

11 U.S.C. § 548.......................................................................................................7

11 U.S.C. § 550.......................................................................................................8


11 U.S.C. § 1129(a)(2)..........................................................................................14

11 U.S.C. § 1129(a)(3)..........................................................................................14

11 U.S.C. § 1129(a)(5)....................................................................................3, 15, 16

N.Y. Ltd. Liab. Co. Law § 417(a)(1) ....................................................................12

Benefit Street Partners Realty Operating Partnership, L.P.[1] ("**Benefit Street**" or "**Lender**") submits this supplemental objection to confirmation of the Debtor's Second Amended Chapter 11 Plan of Reorganization ("**Plan**") [ECF No. 196] following the filing of the report of Examiner Eric M. Huebscher ("**Examiner**"), dated February 28, 2022 ("**Report**") [ECF No. 418].[2]

## PRELIMINARY STATEMENT

1.      Confirming concerns voiced by various parties over the past year, the Examiner's Report, based on months of investigation by a Court-appointed independent fiduciary, sets out a series of damning findings that confirm why the Debtor's Plan should not be confirmed.  The Report details a multi-year pattern of wrongdoing and self-dealing by the Debtor's principals, Toby Moskovits ("**Moskovits**") and Michael Lichtenstein ("**Lichtenstein**"; together with Moskovits, the "**Insiders**" or the "**Principals**"), as well the Debtor's affiliated management company, The Williamsburg Hotel BK LLC ("**Management Company**"), which the Insiders control.

2.      At the highest level, the Examiner found that "the Principals . . . engaged in a scheme to siphon off any monies generated by the Debtor's hotel operations, through illegitimate control of the [Management Company], to unrelated entities owned by the Principals."  Report at 24.  This scheme resulted in net transfers of Debtor revenues to the Insiders' affiliates exceeding $12.5 million.  *Id.* at 2, 16.  The Examiner identified multi-million dollar claims against the Insiders and affiliates in avoidable transactions and potentially other valuable claims as well.  *Id.* at 20-23.

---

[1] Benefit Street is a wholly owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton. Franklin BSP Realty Trust is a publicly traded entity on the New York Stock Exchange under the ticker symbol FBRT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lender's Objection to Confirmation of the Plan [ECF No. 307] ("**Lender Confirmation Objection**" or "**Lender Obj.**"), Lender's Reply in Support of its Objection to Confirmation of the Plan [ECF No. 425] ("**Sur-Reply**"), and the Plan, as applicable.

3.      During the four-year period from 2017 through 2020, the Examiner found that:

- The Debtor collected none of the revenues of the Hotel.  *Id*. at 8.  Instead, 100% of the Debtor's revenues were received in Management Company accounts.  *Id*.  These revenues totaled as much as $53 million.  *Id*. at 11, 16.

- The Management Company maintained eight bank accounts, which were electronically linked to one another and to another 40-plus accounts held in the name of the Debtor, the Insiders' affiliates, and others.  *Id*. at 8.  The Insiders exploited this linkage to make "over 48,000 banking transactions" between these 50 linked accounts.  *Id*. at 8.  The Insiders, moreover, made "virtually all" of these transfers themselves.  *Id*. at 8-9.

- Notwithstanding the provisions of the Debtor's operating agreement that required it to hold its assets in its own name and barred the commingling of assets with other entities, the Insiders daily swept all but a minimal amount of funds out of the Debtor's and the Management Company's accounts and into those of the Insiders' affiliates.  *Id*. at 11-12, 14-16.

- The Management Company's sole business is the management of the Debtor's Hotel.  *Id*. at 8, 10, 12, 16.  Nevertheless, the Management Company made net transfers to seven affiliates of the Insiders totaling over $12.5 million.  *Id*. at 16.  Lichtenstein refused to document any business relationship between these affiliates and the Hotel or to answer questions about the transactions.  *Id*.

- Both the Debtor and the Management Company filed no tax returns for many years.  *Id.* at 2.

- Based on these findings, the Examiner concluded that the estate likely holds substantial avoidance actions against the Management Company and the Insiders' affiliates.  Because of the Debtor's failure to cooperate with his investigation, the Examiner expressly did not reach other claims, but noted the possibility of claims for breach of fiduciary duty, conversion or breach of contract.  *See id.* at 21, 23, 24.

4.      These damning findings make clear why the Insiders sought releases and weigh heavily against confirmation of the Debtor's Plan – proposed by and for the benefit of the Insiders – for four reasons.  *First*, the Examiner's findings confirm that the Debtor did not propose its Plan – which gratuitously releases claims against Insiders and their affiliates – in good faith.  The Debtor's Insiders were clearly aware of the facts underlying the Examiner's findings; they *personally* executed tens of thousands of bank transfers totaling tens of millions of dollars.  Nevertheless, the Debtor did not disclose these transactions to creditors or conduct *any* investigation into the potential claims that might arise from them.  Although plan sponsors with

2

nothing to hide might be expected to welcome an independent investigation, the Debtor not only resisted the appointment of an Examiner, but, when the Examiner was appointed, refused to cooperate and answer his questions or provide basic documents; in fact, it actively obstructed his efforts to obtain information elsewhere.  As the Examiner prepared to file his final report, the Debtor sought delays to "comment" on privilege or other issues, but never delivered any such "comments."  Instead, it used the delay to prepare a self-serving "counter report" impugning the Examiner's competence and integrity while making baseless factual arguments that it chose not to make during the investigation.  Such bald-faced blame-shifting and character assassination do not establish "good faith."  This multi-year pattern of pre- and post-petition misconduct demonstrates that the Debtor's Plan is anything but an "honest effort" at reorganization.

5.      *Second*, not only did the Examiner identify claims that the estate may hold against the Management Company, the Insiders, and their affiliates, but the pattern of misconduct he uncovered clearly supports *additional claims*, including for flagrant violations of the Debtor's operating agreement.  These violations, occurring thousands of times over a period of four years or more, as well as the Insiders' attempts to obstruct the Examiner's investigation, demonstrate conclusively that the Insiders have no respect for the Debtor's legal, contractual, and governance obligations (under the Plan or otherwise) and that they will readily violate those obligations post-confirmation to enrich themselves at the expense of the Debtor's estate and creditors.  Allowing the architects of this scheme to remain in control of the reorganized debtor is manifestly not in the interests of creditors and contrary to public policy.[3]  If such managers do not run afoul of the requirements of Section 1129(a)(5), it is unclear what managerial candidates would.  To approve their appointment would effectively be to read that section out of the Bankruptcy Code.

---

[3] The Report also establishes the need for significant additional investigation, which if undertaken is likely to uncover even more evidence of malfeasance by the Insiders and their affiliates.

6.      *Third*, the Plan cannot be confirmed because the Debtor cannot justify the sweeping release of claims the Debtor's Plan proposes to grant Insiders, the Management Company, and related parties *without consideration*.  After an incomplete, obstructed investigation, the Examiner concluded that the estate may hold more than $12.5 million of avoidance claims against those parties.  The facts the Examiner describes, moreover, implicate numerous additional claims that must be properly investigated.  The hopelessly conflicted Debtor has never investigated or disclosed any of these claims and never made more than a token attempt to demonstrate that the proposed release of them meets the *Iridium* standards – which it plainly does not.

7.      *Fourth*, the potential claims the Examiner identified, together with those he did not reach, demonstrate that the Insiders' purported $10 million "equity" contribution (even if made by the Insiders, not Lockwood) is a sham.  For that contribution, the Insiders are not merely exclusively receiving the unmarket-tested equity; they are receiving a release of millions of dollars in potential claims for which they are providing zero consideration.  The value of these gratuitous releases may completely offset, or even exceed, the Debtor's proposed "equity" contribution, resulting in a net loss of value from the estate.  In these circumstances, the Insiders' exclusive opportunity to acquire that "equity" plainly violates the absolute priority rule.

## BACKGROUND

### A.      Appointment of the Examiner and the Scope of His Examination

8.      In November 2021, the Court appointed an examiner to investigate and file a report on transactions, which might give rise to potential estate claims, including claims against Moskovits, Lichtenstein, and others.  [ECF Nos. 178, 184].  The order directing the appointment of an examiner was amended on November 23, 2021 and again on December 14, 2021.  [ECF Nos. 193, 224].  The Examiner's investigation excluded potential estate claims based on the PPP loan,

as well as claims belonging to individual creditors and not the estate. *Id.* ¶ 3. On February 28,

2022, the Examiner filed his Report. Over three months of investigation, he reviewed records

from 50 bank accounts, conducted 11 interviews, and reviewed over 10,000 pages of documents.

**B.    Examiner's Report**

9.    <u>The Examiner's Findings of Substantive Wrongdoing.</u> The Examiner "uncovered

evidence of ***a complex scheme to divert and siphon substantial amounts of money from the***

***Debtor***, through a labyrinth of banking relationships between the Debtor and the [Management

Company], and other entities under common ownership and control of Michael Lichtenstein . . .

and Toby Moskovits." Report at 1 (emphasis added). In particular, from 2017 through 2020, the

Examiner found that:

- The Debtor collected none of the revenues of the Hotel. *Id*. at 8. Instead, all of the Debtor's revenues were received in Management Company accounts. *Id.* These revenues totaled "at least" $49 million, and potentially $53 million. *Id*. at 11, 16.

- Of approximately 50 bank accounts the Examiner reviewed, eight were held in the name of the Management Company, a total which the Examiner found unusual and excessive. *Id*. at 2, 8-9, Ex. G. These accounts were electronically linked to one another and to the remaining forty-plus accounts, which were held in the name of the Debtor, various affiliates of the Insiders not related to the Hotel, and certain individuals. *Id*. at 8. This linkage "allow[ed] funds to be moved readily and immediately from one account to another." *Id.* at 8 n.13.

- The bank records reflected over 48,000 transfers between these 50 linked accounts, an average of 48 transactions each business day. *Id*. at 8. The Insiders personally effected "virtually all" of these transfers. *Id*. at 8-9.

- Other than the single account holding the PPP loan proceeds, money was swept out of both Management Company and Debtor bank accounts on a daily basis. From 2017 to 2019, the average balance in the Management Company's accounts varied from about $32,000 to about $95,000. *Id*. at 15. In 2020, other than the PPP account, the average bank balance of the Management Company was "close to zero or even overdrawn." *Id*. at 11 n.24. "As was the case with the [Management Company], the Debtor funds never remained in the Debtor's accounts. Quickly following deposit of funds, those same funds were wired, transferred, or spent." *Id*. at 12.

- The Management Company's sole business is managing the Debtor's Hotel. *Id.* at 8, 10, 12, 16. Nevertheless, the Management Company made net transfers to seven

5

affiliates of the Insiders totaling over $12.5 million. *Id.* at 16. Lichtenstein refused to provide documentation of any business relationship between these affiliates and the Hotel or to answer questions about the transactions. *Id.*

- The Debtor did not file tax returns for years 2017, 2018, or 2019, even though "approximately $24.5 million was deposited into (and approximately $25.5 million was withdrawn from) the Debtor's bank accounts during the period 2017 – 2020." *Id.* at 2.[4] The Examiner received one unsigned federal tax return for the Debtor for the year 2020 which reported zero revenue or expense (contradicting the Debtor's schedules listing $7 million in revenue). *Id.* at 2 n.3. "Lichtenstein informed the Examiner that, other than the 2020 Federal tax return for the Debtor and the 2019 Federal tax return for the [Management Company], tax returns were not filed because the entities did not make a 'profit.'" *Id.* at 2.

10. <u>The Debtor and Its Insiders Obstructed the Investigation.</u> Despite the Court's order that the Debtor and its Insiders "fully cooperate" with the Examiner, the Examiner found that the Debtor and its Insiders "actively obstructed the investigation" and attempted to mislead him. *Id.* at 10. Specifically, the Examiner found that:

- "[T]the Debtor's principals actively obstructed the investigation, including by providing heavily redacted bank statements to the Examiner, refusing to provide records resulting in the issuance of third-party subpoenas, subsequently interfering with the very subpoenas the Principals caused to be issued to third parties, failing to produce requested documents, delaying production of other documents, and even altering certain of the documents produced." *Id.* at 10-11.

- During his investigation, the Debtor represented to the Examiner that two bank accounts had no relationship with either the Debtor or the Management Company. Yet, after the Debtor's attempts to quash the Examiner's subpoenas were denied, the Debtor produced account statements, reflecting that they were owned by the Management Company. *Id.* at 3. The Examiner thereafter found that these Management Company-owned bank accounts were used for two improper post-petition transfers totaling over $500,000 that had never been disclosed to the Court or to creditors. *Id.* at 3.

- The Debtor produced a loan closing statement to the Examiner that identified a $425,000 contribution as "equity." When the Examiner obtained copies of the document from other sources, it appeared that the Debtor had covertly whited out

---

[4] Although the Debtor collected hotel occupancy taxes from guests, these funds were apparently diverted to Insiders and were never paid to New York City. *See* ECF No. 367 ¶¶ 2-3, 19.

the name of the contributing entity, which turned out to be an affiliate of the Insiders. *Id.* at 5 n.10.

- Of its own accord, the Debtor filed a declaration with the Court from one of its retained advisors asserting that approximately $4.5 million in transfers from the Management Company to Northside Acquisition were repayments of "loans" made by the Insiders to the Debtor. *Id.* at 18. Questioned by the Examiner, the advisor admitted that he had (i) relied on the Debtor's representations that the transactions were "loans," (ii) never seen any documentation supporting that characterization, and (iii) simply cross-checked the declaration's schedules against bank account statements. *Id.* at 18-19. The employee who prepared the schedules at Lichtenstein's direction also had never seen any loan documents. *Id.* at 19. The Debtor refused to provide documents demonstrating the transactions were "loans," to identify the sources of funding of the "loans" or to answer any questions about them. *Id.* Lichtenstein refused to answer questions about any of these topics. *Id.* In addition, the Examiner found that the schedules attached to the declaration contained errors and inconsistencies and did not reconcile with the available bank statements. Ultimately, the Examiner concluded that if this declaration had "any probative value at all, it would be to support the conclusion that ***the Principals intended to misdirect the investigation.***" *Id.* at 20 (emphasis added).

- The Insiders did not cooperate with his investigation. Moskovits was so "combative, hostile[,] and uncooperative" that he concluded "it would not be a good use of time to consider a second interview." *Id.* at 31. Lichtenstein (i) was "unprofessional and hostile," (ii) told the Examiner that he was both "stupid" and a "liar," (iii) used profanity on several occasions, (iii) "refused to answer questions regarding the November Agreement, taxes, tax returns, the existence of loan documents and/or schedules, the location of any loan documents and/or schedules, the ownership of entities that either received or sent monies to the Debtor and/or [Management Company]," and (iv) provided answers that were "vague, incomplete[,] and non-responsive." *Id.* at 33-34. According to the Examiner, this behavior "raises concerns regarding the honesty and transparency of the Principals." *Id.* at 34.

11. <u>Potential Causes of Action Identified by the Examiner.</u> The Examiner concluded that the more than $12.5 million in net transfers to affiliates and others potentially supported fraudulent conveyance claims under 11 U.S.C. § 548 and under New York law as incorporated under the strong arm provisions of Section 544(b). *Id.* at 21-23. In particular, he identified "potential constructive fraudulent conveyance claims arising from funds transferred by the Debtor

or by the [Management Company] (the initial transferee of funds)." *Id.* at 20. These include millions of dollars in improper pre-petition transfers (*see id.* at 21-23) as well as over $500,000 in previously undisclosed *post-petition transfers* (*see id.* at 24). These potential causes of action reach not only the initial recipients of the fraudulent conveyances, like the Management Company, but also subsequent transferees under Section 550 of the Bankruptcy Code. Given that the subsequent transferees were also controlled by the Insiders, they would have no "good faith defense."

12. Even though he did not conduct a solvency analysis, the Examiner nonetheless identified several facts that indicated that the Debtor was insolvent "for some or most of the four year period prior to the Petition Date." *Id.* at 23. Comparing the projections used in connection with the Benefit Street loan to the Debtor's post-closing operating results, he concluded that the operating results were never sufficient to support the debt service on that loan and "could [not] have ever been expected to reach, the projections provided to BSP." *Id.* at 6. The Debtor's bank records, moreover, "show that the Debtor regularly had unreasonably small capital and incurred debts beyond its ability to pay." *Id.* at 23. Of course, the Debtor was not paying taxes over the entire period and was in default of Benefit Street's loan for much of it.

13. The Examiner also noted that the estate might also hold intentional fraudulent conveyance claims, but the Insiders' obstruction prevented him from developing all the evidence necessary to support such claims. *Id.* In fact, although the Examiner did not go through them, the facts he developed appear to support many of the "badges of fraud" under which intentional fraudulent conveyances are analyzed. *See Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009) (listing badges of fraud for purposes of fraudulent conveyance claim). The transfers he identifies (i) were made to the Insiders or their affiliates (*see*

Report at 11-12, 14-16), (ii) were concealed by the Insiders, (iii) were unsupported by consideration (*see id.* at 21), and (iv) were made when the Debtor was likely insolvent or had unreasonably small capital (*see id.* at 23).

14.    The Examiner concluded that "the investigation raises significant areas of concern surrounding the conduct of the Principals, both in their roles in the multitude of challengeable transactions identified in this report, ***but also in their fiduciary roles in administering the bankruptcy estate, including their lack of independence***." *Id.* at 24 (emphasis added).

15.    <u>Additional Causes of Action Supported by the Examiner's Findings.</u> "Due to the extreme resistance on the part of the Principals" and other obstacles, the Examiner was unable to gather the "information needed to completely evaluate all possible causes of action, including claims against the [Management Company] or other insiders on theories such as breach of contract, conversion, or breach of fiduciary duty." *Id.* at 21.  As a result, he did not analyze such claims, but he recommended additional investigation.  Nevertheless, his factual findings support many additional causes of action by the estate against the Insiders, the Management Company, and their affiliates.

16.    The Debtor is a New York LLC.  [ECF No. 116]  Lichtenstein is its managing member, and one of its ultimate owners "who control[s] the Debtor by and through the Debtor's parent entities."  [ECF Nos. 8, 354 ¶ 1, 397 at 14 ¶ 1.]  Moskovits is also an ultimate owner of the Debtor "who control[s] the Debtor by and through the Debtor's parent entities."  [ECF No. 8.]

17.    The powers and limitations of the Debtor's LLC are set forth in the Debtor's Fourth Amended Operating Agreement (the "Operating Agreement").  *See* Ex. A (Manager's Certificate with Operating Agreement Excerpt).  Section 3 of the Operating Agreement contains a series of "Single Purpose Entity Provisions," which are intended to segregate the Debtor's operations and

prevent the consolidation of the Debtor or its assets with any of its affiliates.  The adoption of the Operating Agreement was a condition precedent to the making of Benefit Street's loan.  *See id.* at 4.  Section 3(c)(vii)(C) of the Operating Agreement requires the Debtor to "hold its assets and conduct its business solely in its own name."  Similarly, Section 3(c)(iv) bars the Debtor from commingling its assets with any other entity.  Relatedly, Section 3(c)(xvii) requires the Debtor to be adequately capitalized, while  Section 3(c)(xix) requires the Debtor to consider the interests of its creditors "in connection with all company actions."  Finally, Section 3(c)(xiii) requires the Debtor to file its own tax returns.

18.    The facts found by the Examiner demonstrate that the Debtor violated each of these provisions *repeatedly*.  The Debtor allowed *all* its revenues to be received and held in accounts in the name of the Hotel Management Company.  The Management Company, which had no business other than operating the Hotel, participated in tens of thousands of transfers to various of the Insiders' affiliates and individuals, a portion of which were then transferred back, in a multi-year whirl of inter-affiliate transactions that effectively commingled the Debtor's assets with those of both the Management Company and the affiliates.  The outcome of these thousands of transfers was a net transfer of $12.5 million in Hotel revenues to various affiliates with which the Hotel had no business relationship.  The routine sweeping of Debtor and Management Company accounts, moreover, left the Debtor patently undercapitalized and unable to pay its taxes (real property, trust fund and otherwise), Benefit Street's loan or its other obligations when due.  *See* Report at 23.  All of these transactions were directly implemented by the Insiders, who acted in their own self-interest at the expense of the interests of the Debtor's creditors.

19.    While the Examiner found no evidence to support the Debtor's assertion that any of these transfers were "loan" repayments, any "loans" from Insiders also blatantly violated the

Operating Agreement, which prohibited debt other than Benefit Street's loan, trade debt incurred in the ordinary course, and equipment leases. *See* Ex. A at § 3(c)(iii). Similarly, the Debtor filed no occupancy tax returns at all and only one federal income tax. It also failed to pay millions in corporate and real property taxes – burdening the estate with senior liens accruing interest at 18%, compounding daily. [ECF No. 302 ¶ 13].

20.     The Debtor's estate holds significant additional claims based on these facts. In New York, a limited liability company has standing to sue its members for a breach of its operating agreement. *See Arfa v. Zamir*, No. 603602/05, 2008 N.Y. Misc. LEXIS 10110, at *5-6 (Sup. Ct. Apr. 29, 2008) ("an LLC is bound by, and can enforce, its own operating agreement"), *modified on other grounds*, 55 A.D.3d 508 (N.Y. App Div. 2008). Such claims would lie not only against its corporate parents, who are members of the Debtor, but also against Lichtenstein as managing member. These claims would seek damages of at least the net $12.5 million in Hotel revenues that were transferred to affiliates having no documented commercial relationship with the Hotel or otherwise commingling assets, but might seek damages of as much as $53 million, representing the amount of Hotel revenue the Insiders permitted to be held in the name of the Management Company, rather than in the Debtor's own accounts. Parallel claims would seek to recover millions of dollars in interest and penalties incurred by the estate as a result of the failure to file tax returns.

21.     In addition, the estate can assert that the Management Company, Lichtenstein, and the affiliates who received these improper transfers tortiously interfered with the Debtor's Operating Agreement by participating in these transactions and are thus also liable to the estate for the damages.[5] Similar claims would lie against the Management Company and Lichtenstein for causing the Debtor not to file occupancy or income tax returns for a period of years.

---

[5] "Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional

22.     The Debtor's managers – including its managing members, non-member managers, and de facto managers – also owed fiduciary duties to it. *See McKinnon Doxsee Agency, Inc. v. Gallina*, 187 A.D.3d 733, 736 (N.Y. App. Div. 2020); *see also Arfa v. Zamir*, No. 603602/05, 2008 WL 4302790, at *3 (N.Y. Sup. Ct. Sept. 8, 2008) (individual could be considered a direct fiduciary of an LLC even though she effected her role as manager "through the intermediation of another entity"), *aff'd* 75 A.D.3d 443 (N.Y. App. Div. 2010); *Mullin v. WL Ross & Co. LLC*, 173 A.D.3d 520, 384 (N.Y. App. Div. 2019) ("the principle that a fiduciary of a fiduciary is a fiduciary is equally applicable to the limited liability corporation form").  The facts outlined by the Examiner demonstrate not only that they violated these duties, but that they did so intentionally, through a multi-year pattern of tens of thousands of inter-affiliate transactions.  Thus, even if the Operating Agreement purported to limit manager's fiduciary duties – and it does not – that limitation would not apply as a matter of law.  *See* N.Y. Ltd. Liab. Co. Law § 417(a)(1) (liability of fiduciaries cannot be limited where "his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled").  In addition, because the Insiders' conduct was intentional, the Management Company and the other affiliates would have scienter and therefore be liable for aiding and abetting the Insiders' breaches of fiduciary duty.[6]

23.     Similarly, the Management Company's only business was the operation of the Hotel.  Despite this, it transferred millions in Hotel revenues to affiliates that did no business with the Hotel.  It did so at the direction of the Insiders, who were on both sides of the transactions and

---

procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citation omitted).

[6] "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Weinstein v. CohnReznick, LLP*, 144 A.D.3d 1140, 1141 (N.Y. App. Div. 2016).

knew of their impropriety. Even under the PMA, this conduct would constitute intentional or willful mismanagement, rendering the Management Company liable to the Debtor for the monies transferred. The Insiders would, in turn, be liable for tortiously procuring that breach.

24. Numerous other claims would lie against the Management Company and Insiders as well, including conversion of the Hotel's revenues by the Management Company, aiding and abetting conversion by the Insiders, and negligence (including failure to report and pay trust fund Hotel taxes *for years*). Additional defendants may be added as parties to a civil conspiracy.

### The Findings of the Examiner's Report Bar Confirmation of the Plan

### I. The Examiner's Report Confirms That the Plan Was Not Proposed in Good Faith

25. The Examiner's "investigation uncovered evidence of *a complex scheme to divert and siphon substantial amounts of money from the Debtor*, through a labyrinth of banking relationships between the Debtor and the [Management Company], and other entities under common ownership and control of Michael Lichtenstein . . . and Toby Moskovits." Report at 1 (emphasis added). This scheme led to a net transfer of over $12.5 million in Hotel assets to the Insiders' affiliates with which the Debtor had no commercial relationship. *Id.* at 2, 16, 21-24. The Insiders not only knew about this scheme, they personally implemented the transactions that underlay it for the direct benefit of themselves and affiliates they own and control. *Id.* at 8-9, 16.

26. The Debtor's Plan purports to grant the Insiders, the Management Company, and related parties broad releases. It grants these releases without consideration, even though the Debtor appears never to have investigated whether the claims it was releasing existed or had value (and never engaged an independent fiduciary to review them). Although the Insiders control the Debtor – and unquestionably knew the facts underlying this "scheme" – neither they nor the Debtor disclosed those facts to creditors, much less explained that the estate might have claims relating to them that would be released by the Plan.

27.    Nor were the Debtor and its Insiders guilty only of omissions; they actively obstructed as well.  Both the Debtor and its Insiders resisted the Examiner at every turn, withholding documents, altering documents they did produce, apparently misrepresenting that certain Management Company accounts did not relate to the Management Company, forcing the Examiner to subpoena banks for records that were in the Debtor's possession and then seeking to quash those subpoenas.  The Insiders, as the managing members of the Debtor, were belligerent, abusive, and uniformly uncooperative.  They refused to answer the Examiner's questions or provide documents concerning the topics of the investigation – even about matters like the purported Insider "loans" that they had raised voluntarily but thereafter declined to substantiate. Then, once the Examiner's Report was issued, the Debtor leapt to accuse him, an estate fiduciary, of "bias" and to offer an array of arguments questioning his conclusions that it did not offer during the examination or during the two-week review period thereafter.  Such transparent efforts to distract the Court and creditors from their obvious culpability represent bad faith, not its opposite.[7]

28.    All of this conduct demonstrates that the Debtor has not formulated, proposed, or prosecuted the Plan in good faith as required by Section 1129(a)(3).  *See In re Lupton Consulting LLC*, 633 B.R. 844, 869 (Bankr. E.D. Wis. 2021) (finding plan was not filed in good faith, where lack of good faith was evidenced by *inter alia* "initially undisclosed insider transactions."); *In re Multiut Corp.*, 449 B.R. 323, 343 (Bankr. N.D. Ill. 2011) (plan's failure to "adequately reserve claims and causes of action the Debtor may have against" insider third parties, accurately state value of unsecured claims, and accurately disclose percentage distribution to unsecured creditors demonstrated lack of good faith).[8]

---

[7] In addition, the Examiner identified two separate post-petition transfers from the Management Company to affiliates totaling over $500,000.  Such transfers appear to reflect a misuse of estate cash during the case by which the Insiders, as Plan sponsors, may have violated Section 1129(a)(2) as well.

[8] Additional authorities are set forth in Benefit Street's Sur-Reply.  [ECF No. 425 ¶¶ 6-11.]

## II.    The Insiders' Continued Control of the Debtor Cannot Satisfy Section 1129(a)(5)

29.     In earlier briefs, Benefit Street outlined multiple instances of the Insiders' mismanagement, deception and self-dealing that demonstrated that the continuation of the Insiders in control of the Hotel was not in the interests of creditors.  *See* Lender Obj. ¶¶ 52-53; Sur-Reply ¶¶ 12-14.  The Examiner's Report adds another dimension of misconduct that conclusively establishes that the Insiders' control of the reorganized debtor is not in the interests of creditors.

30.     According to the Examiner, the Insiders constructed a 50-account system of linked bank accounts with no apparent commercial value to the Hotel and then *personally* used it to effect tens of thousands of cash transfers to and from affiliates that had no business relationship with the Hotel, all in stark violation of the Debtor's governing documents.  In a pattern of transactions more appropriate for a money-laundering operation than a Hotel, they swept cash out of the Debtor and the Management Company accounts into multiple different accounts on a daily basis, returning some of it from the same or different accounts hours or days later to cover expenses.  Over a period of four years, these transfers "siphoned" a net of over $12.5 million out of the Hotel's revenues into unrelated businesses and away from the Debtor's estate and its creditors.  In short, the Insiders used their control of the Debtor and the Management Company to loot the Debtor's revenues and enrich their other enterprises, all at the expense of the Debtor and its creditors. With full knowledge of what they had done, the Debtor and the Insiders opposed the appointment of an Examiner and, when they lost, set about obstructing the Examiner's investigation whenever they could.

31.     The Insiders' malfeasance would be significant in any case, but is particularly critical here given the structure of the Debtor's Plan.  The central economic pillar of the Debtor's Plan is stretching out Benefit Street's $95 million claim for six years without any principal paydown at all.  Benefit Street is thus forced to bear the full risk of the reorganization for six years, during which it will be entirely dependent on the competence and integrity of the same

management of the post-reorganization debtor to recover a penny of the principal amount of its claims. *See, e.g.*, *In re SM 104 Ltd.*, 160 B.R. 202, 245-46 (Bankr. S.D. Fla. 1993) (denying confirmation for failure to satisfy Section 1129(a)(5) where proposed manager had intentionally diverted funds from a lock box, made misrepresentations about those diversions, and was responsible for misrepresentations in the debtor's loan application); *In re Rusty Jones, Inc.*, 110 B.R. 362, 365, 367 (Bankr. N.D. Ill. 1990) (denying confirmation for failure to satisfy Section 1129(a)(5) where plan that would have reinstalled officers who had sought "to obtain direct or indirect benefit from the [Debtor's] cash assets").

32.    In these circumstances, to reinstall Insiders who have (i)  failed at basic management tasks such as the payment of taxes, (ii) executed a multiyear strategy to remove assets from the estate to benefit their affiliated business and to the detriment of Debtor's creditors in blatant violation of  their governance and contractual agreements, (iii) given themselves sweeping releases without consideration, and (iv) flouted a Court-ordered investigation by hiding, altering, or withholding relevant documents, refusing to answer questions, and interfering with an independent fiduciaries efforts to obtain information elsewhere is obviously not in the interest of creditors and cannot be approved under Section 1129(a)(5) of the Bankruptcy Code.

**A.    The Plan Is Not Confirmable Because the Debtor Cannot Justify the Estate Releases**

33.    In evaluating proposed settlements in bankruptcy, courts in the Second Circuit apply a multi-factor test requiring consideration of all facts and circumstances. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citing *In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  Courts consider:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each

affected class's relative benefits 'and the degree to which creditors either do not
object to or affirmatively support the proposed settlement'; (4) whether other
parties in interest support the settlement; (5) the 'competency and experience of
counsel supporting, and '[t]he experience and knowledge of the bankruptcy court
judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be
obtained by officers and directors'; and (7) 'the extent to which the settlement is
the product of arm's length bargaining.'

*Id.* at 462.  The proponent of the proposed settlement bears the burden of proof that the standard

for approval is met.  *HSBC Bank USA, NA. v. Fane (In re MF Glob. Inc.)*, 466 B.R. 244, 248

(Bankr. S.D.N.Y. 2012).  Settlements involving insiders are subject to heightened scrutiny.  *See,*

*e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991);

*JPMorgan Chase Bank, NA. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,

419 B.R. 221, 240 (Bankr. S.D.N.Y. 2009) (plan settlement with controlling shareholder subject

to "heightened scrutiny"; noting importance of review and approval of independent directors).

34.     Under these standards, the Debtor has not justified the releases of the Insiders, the

Management Company, and related parties under the Plan.  First, neither the Disclosure Statement

nor the Debtor's brief so much as identify any claims against the Insiders, much less provide a

candid analysis of the strengths and weaknesses of those claims.  Instead, the Debtor asserts only

that it "does not have material causes of action against any of the Released Parties that would

justify the risk, expense, and delay of pursuing any such causes of action."  Debtor's Omnibus

Response to Objs. [ECF No. 384] ¶ 23.  It offers no analysis or evidence to support this conclusion.

35.     Second, the Debtor does not identify any consideration that the estate will receive

from settling those claims or explain why the merits of the claims render gratuitous releases in the

interest of creditors.  Instead, it suggests that the release was necessary to obtain the Insider's $10

million equity contribution.  *Id.*  But the Insiders are making that contribution to obtain the

(unmarketed) equity of the reorganized debtor, not to obtain a release of claims. If it is instead payment for the release, then the Insiders have not provided sufficient value for the equity.

36.     Third, the Debtor makes no attempt to demonstrate the releases have creditor support or are consistent with creditor interests. Indeed, given the absence of disclosure about the claims in the Disclosure Statement, creditors could not have made an informed decision about the potential release of claims against the Insiders in any event.

37.     Fourth, the Debtor cannot offer any evidence that this "settlement" was negotiated at arm's length between independent, disinterested fiduciaries who were well-informed about the subject matter – because it obviously was not. The Debtor failed to investigate the claims at all, so it is not clear how the negotiation could have been "informed." As importantly, any purported "settlement" was negotiated by and among its conflicted, controlling Insiders and therefore manifestly not conducted at arm's length. Arm's length negotiations are critical to assure the court comfort that the settlement "was the result of a vigorously negotiated process." *In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 246 (Bankr. S.D.N.Y. 2007). Settlements negotiated between insiders and not at arm's length are routinely rejected. *See In re Matco Elecs. Grp., Inc.*, 287 B.R. 68, 76-79 (Bankr. N.D.N.Y. 2002) (individual signing on behalf of debtors was a shareholder of settlement counterparty); *In re Present Co.*, 141 B.R. 18, 23-25 (Bankr. W.D.N.Y. 1992) (rejecting settlement of estate claims against insiders where only "negotiations" were among insiders and their counsel, no investigation by a disinterested party, no non-insider supported the settlement, and insufficient disclosure to unsecured creditors relating to underlying transactions).

38.     Even if there were evidence of an analysis of claims or an independent investigation, the Debtor cannot reliably negotiate with itself and controlling insiders to determine a settlement amount. *See Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg.*

*Corp.*), 68 F.3d 914, 916 (5th Cir. 1995) (vacating settlement releasing debtor claims against parent where bankruptcy court ignored the familial relationship between the parties and creditors opposed settlement).  For each of these reasons, the releases contained in the Plan cannot be approved.

**B.      The Gratuitous Release of Millions of Dollars in Claims Against the Insiders Negates their Purported Equity Contribution**

39.      As already explained, the Plan does not call for the Insiders to furnish any consideration for the broad estate releases they and other related parties will receive.  The potential claims outlined by the Examiner, as well as the additional claims the facts he found support, may total $12.5 million, and potentially much more.  The release of these claims delivers substantial value to the Insiders that must be offset against their purported "new value" contribution.

40.      As explained in the Lender Confirmation Objection, while the Debtor initially proposed to make a $9 million contribution (since upped to $10 million) that number included the approximately $1.5 million settlement payment in respect of the PPP loan proceeds wrongfully diverted by the Insiders to their other businesses.  Lender Obj. ¶ 97.  Because that settlement payment is not a contribution in return for the equity, but an amount to which the estate is entitled as a result of the Insiders' misconduct, it cannot be counted as an "equity contribution" by the Insiders.  For the same reason, the value of the release that the Insiders are receiving but not paying for under the Plan represents amounts they owe the estate in respect of the potential claims against them, not consideration for the reorganized equity, and cannot support their "new value" plan.  Indeed, it is entirely possible that the value of the potential claims exceeds the entire $8.5 million net contribution the Debtor asserts the Insiders are making to secure the reorganized equity.  Until the Debtor demonstrates that the value of the Insiders' contributions exceeds the value of the claims that the Plan releases, it cannot demonstrate that it is making any "new value" contribution

at all, let alone one substantial enough to meet the requirements of the exception or reasonably equivalent to the value of the equity they are receiving under the Plan. *See id.* ¶¶ 94-102.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in the Lender Confirmation Objection and Sur-Reply, Lender respectfully requests that the Court deny confirmation of the Debtor's Plan.

Dated: March 3, 2022
      New York, New York

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

/s/ P. Bradley O'Neill
Adam C. Rogoff
P. Bradley O'Neill
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000
Email: arogoff@kramerlevin.com
            boneill@kramerlevin.com

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

*Co-counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

# EXHIBIT A

**96 WYTHE HOLDINGS LLC**

**MANAGERS' CERTIFICATE**

The undersigned, as both of the Managers of 96 WYTHE HOLDINGS LLC, a New York limited liability company, (the "Company"), hereby certify to BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P., a Delaware limited partnership, its successors and/or assigns that:

1.      Attached hereto as <u>Exhibit A</u> are (i) true, correct and complete copies of the Articles of Organization of each of the Company, NORTHSIDE PARTNERS LLC, 96 W DEVELOPMENT LLC, and 96 WYTHE ACQUISITION LLC, and (ii) true, correct and complete copies of the Certificate of Formation of each of 96 WYTHE MEZZ DE LLC and 96 WYTHE BORROWER DE LLC (collectively, the "Certificate"), together with all amendments thereto filed through the date hereof, each as certified by the Secretary of State of the State of each such entity's formation on the date set forth on such Certification, each of which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

2.      Attached hereto as <u>Exhibit B</u> are true, correct and complete copies of the operating agreements, together with all amendments through the date hereof, of the Company, 96 W DEVELOPMENT LLC, 96 WYTHE MEZZ DE LLC, 96 WYTHE BORROWER DE LLC, and 96 WYTHE ACQUISITION LLC, together with all amendments through the date hereof, each of which has not been terminated, modified, further amended or rescinded and is in full force and effect on the date hereof;

3.      Attached hereto as <u>Exhibit C</u> are the Managers' Consents of the Company, and the same have not been amended or rescinded and are in full force and effect on the date hereof;

4.      Attached hereto as <u>Exhibit D</u> are true, correct and complete copies of each of the Company's, 96 W DEVELOPMENT LLC's, 96 WYTHE MEZZ DE LLC's, 96 WYTHE BORROWER DE LLC's, and 96 WYTHE ACQUISITION LLC's Certificates of Good Standing, as issued by the Secretary of State of the state of each such entity's formation on the date set forth thereon, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

5.      Attached hereto as <u>Exhibit E</u> is a true, correct and complete copy of the Authorization to Transact Business in the State of New York of 96 WYTHE BORROWER DE LLC, as issued by the Secretary of State of the State of New York on October 31, 2017, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

6.      The Managers of the Company and their specimen signatures are, and each such signature is certified to be such person's signature by the Managers signing below such specimen signature, as follows:

1655222.4

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Manager | |
| Yechiel Michael Lichtenstein | Manager | |

7.    The Authorized Signatories, each acting singly, of 96 WYTHE ACQUISITION LLC and their specimen signatures are, and each such signature is certified to be such person's signature by the Authorized Signatory signing below such specimen signature, as follows:

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Authorized Signatory | |
| Yechiel Michael Lichtenstein | Authorized Signatory | |

[Remainder of page intentionally left blank.  Signature page follows]

Signed and dated this <u>13th</u> day of December, 2017.

96 WYTHE HOLDINGS LLC, a New York limited
liability company, as manager of 96 W
DEVELOPMENT LLC, as sole member of 96
WYTHE MEZZ DE LLC, as sole member of 96
WYTHE BORROWER DE LLC, as managing
member of 96 WYTHE ACQUISITION LLC

By: _____
     Toby Moskovits, Manager

By: _____
     Yechiel Michael Lichtenstein, Manager

**FOURTH AMENDMENT TO**
**OPERATING AGREEMENT OF**
**96 WYTHE ACQUISITION LLC**

This Fourth Amendment (this "**Amendment**") to Operating Agreement of 96 Wythe Acquisition LLC, a New York limited liability company (the "**Company**"), dated as of December 13, 2017, is among the individuals/entities signing it below.

**WHEREAS**, the parties desire to amend that certain Operating Agreement of the Company dated as of June 20, 2012 (the "**Original Operating Agreement**"), as amended by the Amendment to the Limited Liability Company Operating Agreement dated June 26, 2012 (the "**First Amendment**"), the Second Amendment to the Limited Liability Company Operating Agreement dated March 26, 2014 (the "**Second Amendment**"), the Third Amendment to the Limited Liability Company Operating Agreement dated December, 2014 (the "**Third Amendment**," and together with the Original Operating Agreement as amended by the First Amendment and the Second Amendment, the "**Operating Agreement**"), which governs the Company, pursuant to the New York Limited Liability Company Law;

**WHEREAS**, this Amendment is a condition and an inducement for the Company and Benefit Street Partners Realty Operating Partnership, L.P., a Delaware limited liability company, and its successors and assigns ("**Lender**") to (a) enter into (i) that certain Loan Agreement by and between the Company and Lender, dated as of the date hereof (the "**Loan Agreement**") and (ii) the Loan Documents (as defined in the Loan Agreement), (b) perform its obligations under the Loan Documents, and (c) obtain the Loan (as defined in the Loan Agreement);

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Amendment below agree to amend the Operating Agreement as follows by (i) deleting the First Amendment, the Second Amendment and the Third Amendment in their entirety (including any "opt-in" provisions for the purposes of Article 8 of the Uniform Commercial Code set forth therein) and (ii) adding the following provisions to the Operating Agreement, which terms shall modify, amend and supersede any contrary terms of the Operating Agreement:

Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as the Loan by Lender to the Company remains outstanding (any undefined capitalized terms used in this Amendment not defined in the Operating Agreement shall have the meanings assigned to them in the Loan Agreement):

Section 1.      <u>Members</u>.  The names, addresses and percentage interest of the Members is set forth below:

| Name& Address: | Percentage Interest |
|---|---|
| 96 Wythe MEZZ DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 99.5% |
| 96 Wythe Borrower DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 0.5% |

All references to "Member," the "Members" or the "sole member" in the Operating Agreement shall mean the members set forth above.

Section 2.    Management.  The business and affairs of the Company shall be managed by or under the direction of its managing member.  96 Wythe Borrower DE LLC, a Delaware limited liability company ("**Managing Member**") shall act as the managing member of the Company.

Section 3.    Single Purpose Entity Provisions.

(a)    The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    own, manage and operate the Property;

(ii)    to enter into and perform its obligations under the Loan Documents

(iii)    to transact any lawful business permitted to be transacted by limited liability companies organized under the laws of the State of New York that is related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(b)    The Company, the Member, or any Authorized Signatory on behalf of the Company, may enter into and perform the Loan Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, Director, Officer or other Person notwithstanding any other provision of this Agreement or any applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the Member or any Director or Officer to enter into other agreements on behalf of the Company.

(c)    Company has not and will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

1657062.3

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases; provided, however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3.0%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(iv)    commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)    use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)    fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(vii)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)     have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Company if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)     own any subsidiary, or make any investment in, any Person;

(xii)     fail to file its own tax returns (to the extent Company is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)     fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Company's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Company's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Company and such Affiliates and to indicate that Company's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Company's own separate balance sheet.  Company has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)     enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)     assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)     except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)     make any loans or advances to any Person;

(xviii)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(xix)     fail to consider the interests of Company's creditors in connection with all company actions;

1657062.3

(xx)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Company or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Company or any SPE Component Entity (provided, that, none of any member, shareholder or partner (as applicable) of Company or any SPE Component Entity or any board of directors or managers (as applicable) of Company or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xxii)    permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii)    identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv)    conduct its business and activities in such a way as to cause any of the assumptions made with respect to Company and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(d)    The Managing Member of Company will be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Company. Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (c)(iv) - (xxiv) of this Section 3 of this Amendment and, if such SPE Component Entity is a Springing Member LLC, clauses (e) and (f) of this Section 3 of this Amendment, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Company; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Company; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Company; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Company to comply with the provisions of this Section 3 of this Amendment.

(e)    In the event Company or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Company or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that

causes the last remaining member of Company or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Company or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Company or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Company or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Company or the SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Company or the SPE Component Entity (as applicable) automatically be admitted to Company or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Company or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Company or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Company or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of the SPE Component Entity or Company (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Company or the SPE Component Entity (as applicable) upon the admission to Company or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Company or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Company or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Company or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Company or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Company or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Company or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Company or the SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Company or the SPE Component Entity (as applicable); provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the admission to Company or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Company or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Company or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Company or the SPE Component Entity (as applicable).

(f)     The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Company or the SPE Component

1657062.3

Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable) agree in writing (A) to continue Company or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Company or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Company or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Company or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable).

(g)      The organizational documents of Company (to the extent Company is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two  duly appointed independent directors or managers of such entity (each, an **"Independent Director"**) who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Company in connection with, in each case, an Acceptable ID Provider (defined below).

(h)      The organizational documents of Company and the SPE Component Entity shall further provide that (I) the board of directors or managers of Company and the SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the **"Constituent Members"**) shall not take any action set forth in clause (c)(xx) of Section 3 of this Amendment or any other action which, under the terms of any organizational documents of Company or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise

consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Company's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Company or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Company and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Company or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Company or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Company, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(i)     Notwithstanding the foregoing, no Independent Director of Company or any SPE Component Entity may also serve as an independent director of Mezzanine Company or any special purpose component entity of Mezzanine Company.

For the purpose of Section 3 of this Amendment, "**Acceptable ID Provider**" shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

This Amendment may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

1657062.3

Section 4.    Certificated Limited Liability Company Interests.

(a)    Each limited company interest in the Company shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York (the "Uniform Commercial Code"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code. The Company shall maintain books for the purpose of registering the transfer of limited liability company interests, and, upon any transfer of limited liability company interests in the Company, the Company shall notify the registered owner of any applicable restrictions on the transfer of limited liability company interests.

(b)    The limited liability company interests in the Company shall be evidenced by certificates in the form of Exhibit 1 hereto. Each such certificate shall be executed by manual or facsimile signature of an authorized person of the Company on behalf of the Company. The Company shall maintain books for the purpose of registering the transfer of limited liability company interests. In connection with a transfer in accordance with this Agreement of any limited liability company interest in the Company, the certificate(s) evidencing the limited liability company interests shall be delivered to the Company for cancellation, and the Company shall thereupon issue a new certificate to the transferee evidencing the limited liability company interests that were transferred and, if applicable, the Company shall issue a new certificate to the transferor evidencing any limited liability company interests registered in the name of the transferor that were not transferred. Notwithstanding anything to the contrary set forth herein, in no event shall the Managing Member's limited liability company interests in the Company be evidenced by a certificate of limited liability company interests.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

**MEMBERS**:

96 WYTHE MEZZ DE LLC,
a Delaware limited liability company

By: _____
Name: Toby Moskovits
Title:   Authorized Person

96 WYTHE BORROWER DE LLC,
a Delaware limited liability company,

By: _____
Name: Toby Moskovits
Title:  Authorized Person

1657062.3