**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

96 WYTHE ACQUISITION LLC,

Debtor.

Chapter 11

Case No. 21-22108 (RDD)

**SUPPLEMENTAL REPORT AND REBUTTAL**
**OF EXAMINER, ERIC M. HUEBSCHER**

**March 21, 2022**

## INTRODUCTION

The Examiner submits this supplemental and rebuttal report in order to respond to the Debtor's allegations of "flaws" in the Examiner's report filed on February 28, 2022 [ECF # 418] (the "Report"). Certain alleged "flaws" were raised for the first time in a "Counter Report and Response to Examiner's Preliminary Draft Report" authored by Michael Lichtenstein [ECF # 420] (the "Counter-Report")[1] and reiterated in the *Debtor's Response to the Lender's Supplemental Objection to Confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization* [ECF # 464] (the "Debtor's Response") filed on March 17, 2022.

None of the alleged flaws were raised with the Examiner directly at any time, much less within the timeframe set by the Court for comments. The draft report was provided to the Debtor on February 17, 2022, and the Examiner requested comments be provided as soon as possible. Because the Debtor would not commit to providing comments by a date certain to allow the Examiner to consider the comments and thereafter file the final report, the Examiner requested the Court set a deadline for the Debtor to provide comments. The Court directed that the Debtor provide the Examiner comments raising any errors or omissions by February 28, 2022 at 5:00 pm. [ECF # 415]. The Debtor provided no comments by this deadline, and provided only one comment (raising a confidentiality concern, not a factual error) after the deadline. The Examiner made the requested change prior to the filing of the Report. Instead of providing the Examiner comments, the Debtor filed the Counter-Report, criticizing the Examiner's methodology and conclusions in broad terms.

---

[1] The Counter-Report was filed at 8:26 pm on February 28, 2022, a few hours after the Report.

The Debtor baldly states the Report contains "elementary accounting errors", Debtor's Response ¶ 3, but fails to provide any specific basis for such charge. Notably, the Debtor's accusations are not supported by the declarations of any accountant (much less a qualified forensic accountant).

In fact, neither the Counter-Report nor the Debtor's Response are accompanied by any supporting documentation or evidence.[2] While the Debtor alludes to evidence and documentation (such as alleged insider loan documents), but there is reason to question their existence – especially alleged documentation that is being proffered now, for the first time, over a year into the case and weeks after the Report was filed.

At no point during the course of the examination did the Debtor or counsel to the Debtor provide any unsolicited[3] documents or information to the Examiner, either as to assist with the examination or to refute any aspect of the Report. At no time during the course of this investigation did any member of Debtor management, counsel to the Debtor, or any person familiar with the Debtor's finance and operations voluntarily offer information or documents. Rather than freely offer information, when the Examiner requested information, he was met with relentless resistance

---

[2] The Report, on the other hand, is supported by over 10,000 pages of bank records and hundreds of pages of other documents, as well as numerous pages of financial analysis prepared by the Examiner. The latter has been requested by several other parties in the case, but not by the Debtor. The fact that the Debtor attacks the methodology of the Report without any review whatsoever of the Report's detailed analysis, in itself demonstrates that the Counter-Report and Debtor's Response are not credible.

[3] The only documents that the Debtor supplied, through counsel to the Debtor, were those from the initial document request of November 21, 2021. All other documents were only obtained as a result of litigation, court conferences and hearings. As reflected in the Report, there was a concerted effort designed to thwart the investigation and conceal critical information.

2

by the Debtor's Principals.[4] A detailed account of the obstruction encountered by the Examiner during the course of the investigation is recounted in the Report and need not be repeated here.

## REFUTATION OF ALLEGED FLAWS

**Alleged Flaw #1**: The Report's conclusion that $12.2 million was diverted from the Manager to Northside overlooks transfers of $7.3 million back to the Debtor and $800,000 in payroll, so the net diversion was only $4.9 million.

**Examiner's Response**: This is incorrect, and misrepresents what the Report actually says. The chart on page 15 of the Report shows the funds flow of the Manager. With regard the Northside transfers, the chart shows that $18,124,955 was transferred from the Manager to Northside. The chart also shows that $5,889,502 was transferred back to the Manager, leaving a <u>net</u> transfer out of $12,235,453. This amount of money left the Manager's bank accounts and went to Northside.

At no time during the investigation did the Examiner receive from the Debtor any evidence or documents that support the alleged $800,000 advance by Northside for payroll expenses. All payroll was paid by the Manager through Paycheck, a payroll vendor. The chart on page 15 of the Report shows $20,429,303 in "Paycheck" expenses. The Examiner asked for and was provided with all of the Debtor W-2's for years 2017, 2018, 2019 and 2020. The amounts on these documents were reconciled back to the funds flow chart. All of these amounts and any others within the Report were taken directly from the third-party banking records. These records were obtained in large part from serving subpoenas on both Chase and Bank of America.

---

[4] Capitalized terms not otherwise defined have the meaning ascribed in the Report.

**Alleged Flaw #2**: The $92 million in funds received and disbursed by the Debtor and its Manager reflects double counting.

**Examiner's Response**: There is no double counting of funds in the $92 million number. Pages 13 and 15 of the Report show the funds flow for each of the Debtor and Manager. These are two separate and distinct streams of funds from separate bank accounts.

The total funds flow show on page 13 is $24,456,246 (labeled as total deposits). The total funds flow shown on page 15 is $68,245,883 (labeled as deposits). The total of these two numbers is $92,702,129. The amounts shown on pages 13 and 15 are mutually exclusive amounts and derived from different sources. The Report referred to the aggregate of the Manager and Debtor funds flow in order to demonstrate the overall level of funds which circled through the hotel and its Manager during the pre-bankruptcy period, especially given the absence of any tax reporting for most of this time period.

**Alleged Flaw # 3**: The Examiner ignored that the millions in transfers to the Debtor's insiders were all repayment of loans, some of which are still outstanding.

**Examiner's Response**: The Examiner did not ignore any document or fact presented to him. There is no credible evidence of the alleged $30 million in loans from insiders. The existence of insider loans was not previously disclosed in the case, either in the bankruptcy schedules, the plan or the disclosure statement, nor was a proof of claim filed in connection with such alleged loans. As detailed in the Report, the Debtor did not provide any documents substantiating loan arrangements between and among the Debtor, Manager and affiliated companies. Not only were loan documents not provided, but there was no other evidence that would support the characterization of these transfers as repayment of loans.  In the Examiner's interview, Mark Podgainy stated that he was not provided with any loan documents and he did not look behind the

data in the schedules provided to him. Further, Jeremy Rauch, who prepared the schedules for Podgainy to review, stated twice that he had never seen any loan documents. In fact, when the Examiner asked Rauch about the loan classification of the amounts shown on the Podgainy schedules, his reply was that Lichtenstein instructed him to classify the amounts as loans. The amounts on the Podgainy schedules were not shown as loans on the books and records of the Debtor.

The Debtor's Response, for the first time, states that loan documents exist and were given to Benefit Street, suggesting that the Examiner was remiss in not reviewing them.[5]  Upon inquiry, the Examiner learned that putative loan documents recently materialized for the first time and were given to Benefit Street <u>more than a week after</u> the Report was filed. The Examiner has never been provided with a copy of these purported loan documents (or, for that matter, any supporting banking information, or books and records of the Debtor and/or Manager that might support the existence of loans). The only reasonable inference that can be drawn is that loan documents did not exist prior to or during the investigation period.

The totality of the record in the case weighs against the existence of bona fide loans from Northside, including (1) the absence of any disclosure of these alleged loan obligations in the Debtor's schedules; (2) the absence of any mention of these alleged loan obligations in the Debtor's plan or disclosure statement; (3) the absence of any proof of claim filed in connection with such alleged claims; (4) the failure to produce any loan documents to the Examiner; (5) the absence of any mention of loan documentation in the Counter-Report; despite assertions of

---

[5] "The Examiner complains that he did see not loan documents (which were provided to Benefit Street)." Debtor's Response, p. 4. The Debtor deceptively implies that Benefit Street had these documents all along - which it did not, since the documents proffered by the Debtor only materialized a few days ago.

millions in alleged loans; and (6) the extremely belated production of putative loan documents to a creditor (not to the Examiner) after the filing of the Report.

**Alleged Flaw # 4**: The Report ignored the hotel's operating expenses,

**Examiner's Response**: The Report explicitly recognized and credits operating expenses. See Report, p 15. In fact, the Examiner gave the benefit of the doubt with respect to any transfers that on their face appeared to be payments to vendors or that might be an operating expense.

**Alleged Flaw # 5**: The Examiner falsely claims that certain bank accounts were hidden from him.

**Examiner's Response**: The record reflects the extraordinary efforts on the part of the Debtor to conceal certain accounts, particularly two accounts that reflected unauthorized post-petition transfers totaling over $600,000.

## CONCLUSION

The Report is the result of a careful review and precise analysis of tens of thousands of financial transactions, based on documents obtained directly from the Debtor's banks. The Debtor's Response's characterization of the Report as "fatally flawed" shows either a misunderstanding or mischaracterization of the work that was performed, or both. While the Report raises significant concerns about the lack of independence by the Principals, the promulgation of Counter-Report and Debtor's Response significantly amplifies these concerns.

As described in the Report, the investigation uncovered evidence that tens of millions of dollars circled among several commonly controlled entities (including the Debtor), often without

any apparent business purpose, as well as a chronic failure to file tax returns.[6] This may point to a large-scale tax evasion scheme perpetrated by the Debtor's Principals. There are also large, unexplained and undocumented deposits[7] into the Manager and Debtor bank accounts that mandate further investigation. The findings in the Report also disclosed possible fraud in connection with its mortgage loan originations and related financial transactions.

Further, the Debtor's Response ignores two large, unauthorized, and undisclosed post-petition transactions, which on their face raise possible bankruptcy criminal issues. First, the issue of the unrecorded EIDL loan/grant in the amount of $350,000 that was diverted to Northside (5 months into the bankruptcy). Second, the transfer of over $250,000 from the Manager to Northside, three days after the bankruptcy filing. Neither of these two transactions, totaling over $600,000 were ever reported to the Court or included in the monthly operating reports.[8] Neither the Counter-Report nor the Debtor's Response address these issues, except by deflection or broad-brush denials.

The Debtor goes to extreme lengths to suggest that the Examiner's work was biased to inure to the benefit of the lender, and that all of this work was simply to enrich the Examiner. While the Court has indicated that these accusations are not a productive path for the Debtor, the Examiner nevertheless feels compelled to directly deny them, as they are untrue. The Examiner works at the behest of the Court, and only the Court. The Examiner's work was conducted in a

---

[6] The Report noted that the Debtor's outside accountant (Daniel Norensberg; Norensberg & Associates, Inc.) ignored a subpoena for the production of tax returns and related records and failed to respond to any inquiry by the Examiner and his counsel.

[7] The Examiner discovered large "counter deposits", some in the hundreds of thousands of dollars that were unexplained by the Debtor. The origin of these counter deposits is unknown and warrants further investigation.

[8] This is in addition to significant issues identified regarding a PPP loan transaction, which was not investigated by the Examiner as it was outside the investigation scope.

21-22108-rdd    Doc 465    Filed 03/21/22    Entered 03/21/22 10:35:14    Main Document
Pg 9 of 9

professional and independent manner. The work of the Examiner was significantly constrained by the litigious conduct undertaken on behalf of the Principals.

If anything, the Debtor's Principal's disinformation campaign (reflected in the Counter-Report, Debtor's Response and other pleadings) reflects an effort to divert attention away from the enormity of the transgressions uncovered. Overwhelming evidence exists to support continuation of the investigation by the Examiner or others.

Respectfully Submitted,

Dated: New York, New York
March 21, 2022

By: _____
Eric M. Huebscher
Examiner Pursuant to 11 U.S.C. § 1104(c)
96 Wythe Acquisition LLC