**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- x
                                                                  :
*In re:*                                                          :
                                                                  :    Chapter 11
96 WYTHE ACQUISITION LLC,                                         :
                                                                  :    Case No. 21-22108 (RDD)
                                        Debtor.                   :
                                                                  :
---------------------------------------------------------------- x

**LENDER'S SUR-REPLY IN SUPPORT OF ITS SUPPLEMENTAL OBJECTION
TO CONFIRMATION OF DEBTOR'S SECOND AMENDED
<u>CHAPTER 11 PLAN OF REORGANIZATION</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

ARGUMENT .......................................................................................................................... 5

I.     Despite the Debtor's Attempts to Distract and Confuse, the Examiner's Report Remains Devastating ............................................................................................. 5

     A.    The Debtor's Attempt to Impugn the Integrity and Independence of the Examiner is Utterly Baseless ............................................................ 5

     B.    Just the Undisputed Portions of the Examiner's Report Show Significant, Disqualifying Misconduct by the Insiders.................................... 8

II.    The Debtor's "Counter Report" is Entitled to Zero Weight ...................................... 13

III.   The Debtor's Plan Remains Unconfirmable ............................................................. 14

     A.    The Plan Was Not Proposed in Good Faith ..................................................... 14

     B.    The Carve-Out of Certain Claims Does Not Satisfy the Standard for Plan Releases or the New Value Exception to the Absolute Priority Rule ...................................................................................................... 15

     C.    Current Management Cannot be Permitted to Remain in Control ................. 16

CONCLUSION ...................................................................................................................... 19

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re FiberMark, Inc.*,
339 B.R. 321 (Bankr. D. Vt. 2006) ..................................................................6, 7

*Grogan v. Garner*,
498 U. S. 279 (1991) ............................................................................................18

*In re Lupton Consulting LLC*,
633 B.R. 844 (Bankr. E.D. Wis. 2021) ..............................................................14

*In re Multiut Corp.*,
449 B.R. 323 (Bankr. N.D. Ill. 2011) .................................................................15

*In re Rusty Jones, Inc.*,
110 B.R. 362 (Bankr. N.D. Ill. 1990) .................................................................16

*In re SemCrude, L.P.*,
399 B.R. 388 (Bankr. D. Del. 2009) ...................................................................11

*In re SM 104 Ltd.*,
160 B.R. 202 (Bankr. S.D. Fla. 1993) ................................................................16

*In re Weiss*,
235 B.R. 349 (Bankr. S.D.N.Y. 1999) ...............................................................18

**Statutes**

11 U.S.C. § 553(a) ....................................................................................................11

Benefit Street Partners Realty Operating Partnership, L.P. ("**Benefit Street**" or "**Lender**")

submits this sur-reply in support of its Supplemental Objection to Confirmation [ECF No. 428]

("**Supplemental Objection**") of the Debtor's Second Amended Chapter 11 Plan of Reorganization

[ECF No. 196] ("**Plan**").[1]  This sur-reply responds to the Debtor's Response to the Supplemental

Objection [ECF No. 464] ("**Response**").

## **PRELIMINARY STATEMENT**

1.      The Examiner's report (the "**Report**") and the Supplemental Report (as defined

below) provide independent, expert corroboration that the Insiders have treated the Debtor as their

personal piggy bank, improperly diverting *all* of the Debtor's revenues – plus dedicated trust fund

tax receipts – to a web of other bank accounts (most completely unrelated to the Debtor's business);

shuffling money around for their own purposes in thousands of individual transactions, with a net

unexplained outflow from the Management Company of more than $12 million; and engaging in

a range of other misconduct—including willfully failing to pay taxes or even file tax returns in a

manner that suggests a large-scale tax evasion scheme, and improperly diverting funds post-

petition in a manner that suggests possible bankruptcy crimes.

2.      As part of its stonewalling of the Examiner's investigation, the Debtor submitted a

response (the "**Counter Report**") from Michael Lichtenstein, an insider and managing member

of the Debtor *whose very conduct is itself the subject of the Examiner's investigation and findings*.

Seeking to divert attention from his egregious misconduct, Mr. Lichtenstein leads with a

regrettable and entirely unfounded attack on the Examiner's integrity, independence, and

competence.  Although he is not even an accountant, let alone a forensic accountant, Mr.

---

[1] Capitalized terms used but not defined below have the meanings ascribed to them in the Supplemental Objection and/or Plan.

Lichtenstein alleges a series of errors in the Report, but provides zero evidence to support his allegations – and the Response itself relies entirely on Mr. Lichtenstein's *ipse dixit* and self-serving assertions, similarly substituting conclusory bluster for facts.

3.    The Examiner has filed a supplemental report and rebuttal responding to Mr. Lichtenstein's allegations of error contained in the Counter Report and Response [ECF No. 465] ("**Supplemental Report**").  But even the undisputed facts revealed in the Report paint a damning picture that disqualifies the Insiders from any further role in the Debtor's affairs and bars confirmation of their self-serving Plan.  The Debtor does not contest that the Insiders maintained a web of 50 separate bank accounts, through which they moved funds in literally dozens of individual transactions every day; that the Debtor's revenues were diverted to the Management Company in violation of the Debtor's own operating agreement; or that the Debtor failed to file tax returns and to pay millions of dollars in state and city taxes, including trust fund taxes for which personal liability exists.

4.    For example, it is undisputed that, *two days* after the Petition Date, the Insiders swept from the Debtor's account $252,100 in hotel occupancy taxes required to be held in trust and transferred the funds into the account of Northside Management, LLC, a non-debtor affiliate of the Insiders, with no documentation, assurance of repayment, or disclosure in the Debtor's monthly operating report.  Toby Moskovits Deposition Transcript ("**Moskovits Deposition**"), p. 258:2-19 (███████████████████████), relevant portions attached as Exhibit A; Jeremy Rauch Deposition Transcript ("**Rauch Deposition**"), pp. 130:22-131:24, 132:21-140:7 (████████████████████████████████████████████████████████████████ ████████████████████████████████████████████), relevant portions attached as

2

Exhibit B.  This post-petition misconduct exemplifies how the Insiders abused the Debtor and will continue to do so while in control.

5.      Scrambling to come up with an explanation for the Examiner's uncovering of unexplained net payments *out* of the Management Company (which took *all* of the Debtor's revenues) totaling approximately $12.5 million (Report at 2, 16), the Debtor tries multiple gambits. It first argues that, despite the Examiner's careful vetting of the affiliates' bank accounts, the math must be wrong because Hotel revenues less expenses left *only* approximately $4 million in cash for the Insiders to misappropriate.  Response ¶ 13.  But the Examiner's Report itself shows inflows of at least several million dollars from other sources.   Report at 13, 15.   Moreover, the Insiders now also claim to have infused more than $30 million into the Hotel, including approximately $11 million in previously undisclosed "loans."

6.      And, indeed, the Insiders now seek to characterize the $4 million-plus net unexplained payments that they *do* now acknowledge taking as partial repayment of their alleged loans to the Debtor.  Counter Report ¶ 17.  The genesis of any such purported loan obligation is murky at best.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████.  Rauch Deposition, pp. 102:5-103:8, 105:3-114:15; *see also* David Goldwasser Deposition Transcript ("**Goldwasser Deposition**"), pp. 62:16-71:24, relevant portions attached as Exhibit C.  The Examiner has concluded—based on the sudden, belated appearance of "loans" that were not scheduled as debts, not the subject of proofs of claim, and never disclosed (even in the Debtor's own Disclosure Statement) or documented to the Examiner—that the Insiders are perpetrating a fraud on the Court:  "The only reasonable inference that can be drawn is that the

loan documents did not exist prior to or during the investigation period." Supplemental Report at 5.

7.     Similar to the miraculously late-discovered Purported Hotel Management Agreement (as defined in the Lender's sur-reply in support of confirmation objection), if the proffered line of credit agreement was not created in 2022 and backdated to 2016 to defraud the Court, but actually existed in 2016, it simply provides further evidence that the Lender was defrauded in 2017 when it made the Loan, since the Insiders then represented that the Hotel had no other material debt.  The Debtor admits that these purported loans violate the Debtor's Operating Agreement (Response ¶ 17), and they were never scheduled as debts because ███ ████████████████████████████████████████████████████████ (Goldwasser Deposition, pp. 90:3-91:24) – all reasons why any purported loan "repayment," if actually made, was improper.

8.     The Debtor's arguments as to why the Plan somehow could be confirmed in the face of the Examiner's Report border on the ludicrous.  The concealment of apparently voidable transactions, failure to investigate claims against insiders, and stonewalling and vilification of a court-appointed Examiner are all powerful evidence that this Plan has not been promulgated and prosecuted in good faith.  The suggestion that any unexplained transfers be excused so long as they (according to the Debtor) are less than the $10 million in "new money" being contributed by the Insiders (Response ¶ 28) is offensively cavalier and ignores that the same funds cannot be double counted to pay damages to the estate and justify the exclusive retention of control and equity.

9.     Most absurdly, the argument that passing through estate fraud claims to a reorganized debtor *controlled by the very same wrongdoers* somehow protects creditors (Response ¶¶ 18-20) is disingenuous and offensive.  The Court appointed an Examiner because *insiders don't*

*investigate themselves*, and claims against insiders must be prosecuted by an independent fiduciary because insider-targets don't sue themselves.

10.     The Examiner's Report and Supplemental Report confirm what the record already has made clear:  These Insiders make it up as they go along and operate under their own rules, disregarding obligations to creditors, taxing authorities, and even this Court through their interference with and attacks upon the Examiner.  They cannot be permitted to remain in control of this Debtor, and the Plan, under which they would be permitted to continue their financial misdeeds while imposing massive delay and risk on the Debtor's largest creditor, cannot be confirmed.

## ARGUMENT

### I.     Despite the Debtor's Attempts to Distract and Confuse, the Examiner's Report Remains Devastating

11.     The Examiner has responded to the Debtor's baseless attacks on his Report.  We address below, however, the Debtor's deplorable attempt to impugn the Examiner's integrity and competence in an effort to distract, and note that even limited to the uncontestable facts uncovered, the Examiner's Report presents a damning picture of the Insiders' numerous bad acts and conduct.

#### A.     The Debtor's Attempt to Impugn the Integrity and Independence of the Examiner is Utterly Baseless

12.     Having no facts to support its baseless allegations, the Debtor continues to resort to scurrilous attacks on the Examiner's competence and neutrality.  *See* Response ¶ 5 (Examiner was not "competent to investigate the Debtor's finances" and was a "conflicted party working to support Benefit Street's agenda and his own inflated fees"); Counter Report ¶¶ 4, 46 (Examiner "acted as a passionate advocate for [Benefit Street]" through "deliberate misstatements, false claims and conclusions" and is a "liar").

13.     Such attacks are unfounded and wholly improper.  The Examiner is a disinterested third party, selected by the U.S. Trustee and appointed by the Court.  *See* Order Approving Appointment of Examiner [ECF No. 186].  The Examiner has no prior ties to the parties; has more than 20 years of experience in the bankruptcy field; and is a qualified forensic accountant having served as a litigation trustee, plan administrator, and financial advisor to debtors and official committees, as well as being appointed as a subchapter V trustee.  *See* Declaration of Disinterestedness of Eric M. Huebscher in Connection with Application Approving Appointment of Examiner ¶ 4 [ECF No. 185].

14.     In carrying out his duties, the Examiner consulted with both sides and, notwithstanding the Debtor's obfuscation, repeatedly sought facts, input, and explanations from the Debtor and its principals.  As a result of his investigation, he independently concluded that there was massive irregularity in the Debtor's financial operations and significant potential estate claims.

15.     There is absolutely no basis to question the Examiner's independence, integrity, or competence.  That independence is precisely why examiners are appointed—to give parties and the court objective factual input.  *See In re FiberMark, Inc.*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006) (stating independent examiner "will act as an objective nonadversarial party who will review the pertinent transactions and documents").  An examiner's report "is a resource containing information and observations of an independent expert." *Id.*

16.     Ironically, the Court appointed the Examiner precisely to *avoid* this very dispute. *See* October 29, 2021 Hr'g Tr. ("**10/29/21 Hr'g Tr.**") 34:6-18 [ECF No. 176] (Court explaining its view that parties would be more accepting of the conclusions of an unconflicted examiner, stating "I think it's far more likely for an examiner to understand that than . . . at least in the current

6

posture the case is in -- Benefit Street will"); *see also* January 10, 2022 Hr'g Tr. 34:6-9 (in response

to Mr. Lichtenstein stating there were no direct transfers from the Debtor or Management

Company to other residential projects of the principals, the Court stated: "[The Examiner] just

can't take your word for it; it's that simple. That's why I appointed him. I wasn't gonna take your

word for it and I wasn't gonna take Benefit Street's word for the contrary; that's why I appointed

an examiner.") (relevant portions attached as Exhibit D).    The Debtor and Benefit Street had

opposing views on the existence of potential estate claims—an examiner was appointed to provide

an independent determination as to whether any such claims existed.    The parties were to live by

the Examiner's conclusions.    *See* 10/29/21 Hr'g Tr. 34:15-18 (Court stating: "So if after an

examiner issues a report either side spends an unusual amount of time challenging it, I'll take that

into account as far as their credibility is concerned; and that's on either side.").[2]

17.    While the Court has expressed the view that the Examiner's Report is not, in and

of itself, "evidence" (March 8, 2022 Hr'g Tr. ("**3/8/22 Hr'g Tr.**") at 37, relevant portions attached

as Exhibit E), the Examiner's conclusions—based on objective accounting records—can be

admitted as expert opinion.    *See In re FiberMark, Inc.*, 339 B.R. at 326-27.    In any event, the

Report is a huge red flag in the confirmation process; and will provide a roadmap, if necessary, for

facts that *will* be proven at confirmation demonstrating the significant misconduct of the Debtor's

principals.    As discussed below, even the undisputed facts uncovered by the Examiner compel

denial of confirmation on multiple grounds.

---

[2] The Debtor and its Insiders have spent substantial time and effort seeking to discredit the Examiner and the Report. After receiving a draft of the Report, the Debtor sought to block it from being publicly filed.  It filed a motion to establish a protocol for its release to delay release, ECF No. 397, which this Court denied, ECF No. 415.  Then, after the Report was publicly filed, it promptly filed the Counter Report, and also objected to the Examiner's request to raise its fee cap, based on allegations that the Report contained "misstatements, false claims and conclusions."  ECF No. 417.  These are actions of a Debtor desperate to prevent the Examiner's conclusions from being publicly revealed and support a negative inference as to the Debtor's credibility.

### B. **Just the Undisputed Portions of the Examiner's Report Show Significant, Disqualifying Misconduct by the Insiders**

18.     Even leaving aside the facts disputed by the Debtor, the Examiner's Report confirms the existence of significant estate claims and other misconduct barring Plan confirmation.

19.     The Debtor fails to explain why its business — the operation of a single Hotel — required the Insiders to engage in over 48,000 inter-affiliate banking transactions in just four years, virtually all of which were effected personally by the principals.  Nor does it explain why it was necessary for the Management Company to maintain eight bank accounts, electronically linked to one another and to another 40-plus accounts held in the name of the Debtor, the Insiders' affiliates, and others.  The Examiner aptly concluded that this complex web of accounts was used to "divert and siphon substantial amounts of money from the Debtor" (Report at 1), and the Debtor fails to offer evidence to explain this inherently suspicious (and commercially unnecessary) activity.  *See* Rauch  Deposition  163:8-164:4  (███████████████████████████████); *see also* Supplemental Report at 7 ("This may point to a large-scale tax evasion scheme perpetrated by the Debtor's principals.").

20.     ***Transfers to Insiders***.  The Examiner identified at least $12.5 million in potentially avoidable net transfers out of the Management Company, which itself took all of the Debtor's revenues.  Even assuming the Debtor is correct that the net amount of unexplained transfers is closer to $4.5 million (Response ¶ 11)—and it offers no evidence to support this assertion—that still represents millions of dollars in potentially avoidable transfers not previously identified.  While the Debtor now claims that this amount represents repayment of alleged loans made to the Debtor (*see* Response ¶ 11; Counter Report ¶¶ 10, 17), it refused to provide the Examiner with any explanation for these transfers or any documentation of such loans, and the Insiders refused to

cooperate with and generally stonewalled the investigation at every opportunity.  Report at 2 n.2, 3, 16, 19.[3]

21.    Only after the report was issued did the Debtor surface *just one week ago* with purported loan documentation supposedly executed in 2016 and 2017 that ███████████ ████████████████████████████.  *See supra* ¶ 6.  There is a distinct possibility that this documentation was created and backdated[4] in an attempt to create a justification for the net cash outflow uncovered by the Examiner (in which case, as the Examiner has concluded, the Insiders are attempting to perpetrate a fraud on this Court).  But even if this documentation is genuine, it proves only that the Insiders defrauded the Lender in connection with entering into the Benefit Street's original loan.  In the loan agreement with Benefit Street, the Debtor represented that it had no other material financial obligations.  Loan Agreement §§ 3.4, 3.24, and Section (a)(iii) of Exhibit C thereto, attached as Exhibit F.  *See* Supplemental Objection ¶¶ 19-20 (explaining that incurrence of loans would give rise to estate claim against Debtor's corporate parents and Mr. Lichtenstein as managing member).  Thus, as with the late-produced Purported Hotel Management Agreement, the only two possibilities are that the Insiders defrauded Benefit Street in 2017 or that they are attempting to defraud the Court now.

22.    Moreover, as the Debtor admits (Response ¶ 17), the alleged loans would be a blatant violation of the Debtor's operating agreement, which prohibits debt other than Benefit Street's loan and trade debt incurred in the ordinary course.  *See* Third Amended Operating Agreement § 2(d) (in effect after December 2014), Manager's Certificate with Operating

---

[3]  The Examiner was entitled to draw inferences from this lack of cooperation.  *See* 3/8/22 Hr'g Tr. 18:12-13 ("[The Examiner is] certainly entitled to draw inferences if information wasn't provided.").

[4] The Debtor has steadfastly refused to provide metadata to the Lender during discovery and has denied that it has any emails whatsoever that related to the creation of these documents.

Agreement Excerpts attached as Exhibit G.  Loans from insiders are also a violation of the operating agreement, rendering them ultra vires and unenforceable.  *See id.* § 2(e).  As a result, the hypothesized loan repayment, even if genuine, would be unauthorized.  Further, given that the Debtor's own CRO testified that ████████████████████████████████████████ ████████████████████████████████████[5]████████████████, *see* Goldwasser Deposition, pp. 90:3-91:24, it was even more clearly improper to repay them even in part—█████████████ ████████████████████████████████████████████████████████████████████ ██████████████████, *see* Moskovits Deposition, pp. 258:2-259:3, while leaving many other claims outstanding (e.g., debt service, real estate taxes, corporate taxes, hotel occupancy taxes).

23.    While we otherwise leave defense of the Examiner's work to the Examiner himself, we note that the way the Debtor attempts to reduce the unexplained net transfer amount from more than $12 million to approximately the amount of the supposed loan repayment is wholly illegitimate.  Focusing on the largest net intercompany amount—the $12.2 million net paid by the Management Company to Northside Acquisition (Report at 15)—the Debtor attempts to reduce that amount by offsetting the $7.3 million net *inflow* from Northside Acquisition LLC to the Debtor itself.  Response ¶ 10; Counter Report ¶ 9.  But these two snapshots do not tell the whole story. The Insiders moved money constantly in and out of the linked accounts, and while $7.3 million may have flowed into the Debtor from that one entity, funds then went out to other affiliates.  *See* Report at 13.  In arriving at the $12.5 million of potentially avoidable transfers, the Examiner states he used net amounts and offset incoming funds from individual transferees against funds transferred by the transferor—a conservative approach necessitated by the sheer volume of

---

[5] The fact that these "loans" — if valid — would have been one of the largest unsecured claims in the case and *were not initially scheduled nor ever listed in an amendment*, plus the fact that the Insiders *never filed a proof of claim for this alleged debt* — reflects that they didn't actually exist until the Examiner caught the missing money.

transactions and lack of documentation as to the purpose of individual transfers. Thus, the Examiner cautioned that the amounts subject to potential avoidance actions may be materially *higher* than $12.5 million. Report at 21 n.33. In such circumstances, simply offsetting the net amount transferred from account A to account B against the net amount transferred from account B to account C says nothing about the true net amount of avoidable transfers.

24.    Nor would such a set-off be enforceable as a matter of contract law. Debts subject to setoff must be owed by and between the same two parties and in the same capacity. *See In re SemCrude, L.P.*, 399 B.R. 388, 393-94 (Bankr. D. Del. 2009) (creditor not permitted to set off debt it owed to one subsidiary against claim it held against other subsidiaries); *see also* 11 U.S.C. § 553(a). Northside Acquisition LLC's net transfers to the Debtor cannot be offset against the net transfers to Northside from Management Company—a different party acting in a different capacity. For purposes of analyzing potential estate avoidable transfer claims, the only "net" number that matters is the global net amount *out* of the Management Company, which received and disbursed all of the Debtor's revenues.[6]

25.    Having thus artificially reduced the unaccounted for transfers to something under $5 million, the Debtor asserts that the remaining transfers were used for the loan repayment to the principals, plus a small amount of expenditures incurred on the Debtor's behalf. Response ¶ 11. But the Debtor provides no evidence to support these claims. *See* Rauch Deposition, pp. 105:3-22 (█████████████████████████████████████████████████████).

26.    ***Revenues in Management Company Accounts.*** The Debtor concedes that all revenues from Hotel income were deposited into the Management Company account. Counter

---

[6] The effort to conflate the millions of dollars flying in and out of various bank accounts with the purported loans from Ms. Moskovits and Mr. Lichtenstein to the Debtor is fundamentally flawed for the same reasons as proper accounting requires mutuality between the parties.

Report ¶ 27.  This violates the Debtor's operating agreement, which requires the Debtor to hold

assets in its own name and bars commingling of assets.  Fourth Amended Operating Agreement §

3(c)(vii)(C), 3(c)(iv).  The Debtor's cavalier attitude towards breaching governance documents,

contracts and statutes hardly reflects a suitable steward now or in the future.  Response ¶¶ 16-17

(discussing breaches and covenant defaults).

27.    ***Improper Post-Petition Transfers.***  In addition to the $252,100 in hotel occupancy

trust funds improperly swept from the Debtor's account (*see* above ¶ 4), the Examiner notes an

unrecorded EIDL loan in the amount of $350,000 that was diverted to Northside five months into

the bankruptcy—for a total of more than $600,000 in unexplained, presumptively improper post-

petition transfers.  Supplemental Report at 7.  The Examiner suggests that these undisclosed post-

petition transaction "raise possible bankruptcy criminal issues." *Id*.  Indeed, even despite repeated

requests, the Debtor and Insiders have refused to disclose the documents governing the EIDL loan

to both Benefit Street and the Examiner.

28.    ***Failure to File or Pay Taxes.***  The Response is silent on the Debtor's failure to pay

hotel occupancy and real estate taxes.  In the Counter Report, the Debtor simply states that it filed

its tax return for 2020 (the Examiner was provided with only an unsigned federal tax return for

that year) and that it had no taxable income pre-petition.  Counter Report ¶ 12.  But lack of taxable

income does not obviate the requirement to file a tax return.  Moreover, the failure to pay hotel

occupancy taxes is particularly egregious, given that the Debtor collected the taxes from guests

but apparently diverted the funds to its Insiders.  Further, in the Supplemental Report, the Examiner

suggests that the Insiders "circling" of tens of millions of dollars "often without any apparent

business purpose," coupled with the "chronic failure to file tax returns . . . . may point to a large-

scale tax evasion scheme perpetrated by the Debtor's Principals."  Supplemental Report at 6-7.

29.     These examples of misconduct, which are not disputed by the Debtor, are clear violations of law and the Debtor's own governing documents.  The Debtor summarily asserts the potential claims in the Report and the Supplemental Objection lack merit because "it would be impossible to show any damages."  Response ¶ 15.  But of course the diversion of funds to entities controlled by the Insiders damaged the estate: millions of dollars that could have been used to pay Benefit Street and other creditors went instead to insider entities with which the Hotel had no business relationship.  The amount diverted is likely $12.5 million or more, but even on the Debtor's theory that it was "only" $4.5 million and used to pay insider loans, those payments were improperly leapfrogged ahead of other creditors and overdue taxes.  The resulting injury is real, substantial, and bars confirmation of the Plan.

## II.     **The Debtor's "Counter Report" is Entitled to Zero Weight**

30.     While the Counter Report purports to identify "false statements" in the Examiner's Report, it offers no evidence to support its allegations and, contrary to the Examiner's Report, it does not rely on findings of any investigation (let alone an independent investigation).  It is based entirely on naked assertions made by Mr. Lichtenstein, who is (1) not an accountant and thus unqualified to assess the work of a forensic accountant, and (2) an obviously biased interested party who was *himself the subject of the investigation*.  The Counter Report represents a frustrated outburst reflecting the principals' displeasure at being unable to thwart the Examiner from conducting an effective investigation and releasing a damning report.  The Counter Report's assertions are accompanied by no support or evidence—it proves nothing and is entitled to no weight.[7]

---

[7] Despite having had ample opportunity to identify any "errors or omissions" in the Examiner's report before it was publicly filed, the Debtor did not do so, preferring instead to wait until it was issued and then immediately launch a wholesale attack on both the Report and the Examiner individually.  *See* Supplemental Report at 1.

31.     The Response, which relies on the Counter Report, likewise includes numerous unsupported assertions.  For example, the Debtor provides no evidence that payments to the principals related "exclusively to reimbursement of Hotel business expenses."  Response ¶ 12. The Response parrots Mr. Lichtenstein's conclusory assertion that the Examiner's Report contains accounting errors, Response ¶ 13, but these assertions appear to be just willful misinterpretations of the Examiner's Report.  For example, the Report is clear that there were $92 million in payments shifted back and forth between affiliates, as distinct from the $49 million in Hotel revenue.  Noting the totality of the transfers among insiders is not double counting.  *See* Supplemental Report at 4.

32.     The Debtor advances these criticisms without even having requested access to the 10,000 pages of bank records and other documents on which the Examiner's analysis is based. "The fact that the Debtor attacks the methodology of the Report without any review whatsoever of the Report's detailed analysis, in itself demonstrates that the Counter-Report and Debtor's Response are not credible."  Supplemental Report at 2 n.2.

III.    **The Debtor's Plan Remains Unconfirmable**

        A.    **The Plan Was Not Proposed in Good Faith**

33.     The Debtor ignores the Insiders' misconduct that speaks directly to the Debtor's failure to propose the plan in good faith:  the Insiders were clearly aware of the facts underlying the Examiner's findings yet did not disclose the transactions to creditors or conduct any investigation into the potential claims.  Supplemental Objection ¶¶ 25-28.  They then fought against appointment of an Examiner and sought at every turn to stymie his investigation.  This misconduct relates directly to the plan proposal and amply establishes a lack of good faith, even leaving aside the bad faith baked in to the structure of the Plan and its treatment of Benefit Street.

34.     The Debtor says *In re Lupton Consulting LLC*, 633 B.R. 844 (Bankr. E.D. Wis. 2021), is inapposite because the undisclosed transactions at issue there were required to be

disclosed on the debtor's SOFA (Response ¶ 25), but the Debtor here engaged in the same misconduct—failing to schedule or otherwise disclose more than $6 million in purported outstanding insider loans that would have been one of the largest unsecured claims in the bankruptcy.  It also omitted the Purported Hotel Management Agreement.

### B. The Carve-Out of Certain Claims Does Not Satisfy the Standard for Plan Releases or the New Value Exception to the Absolute Priority Rule

35.    The Debtor contends that the Plan is confirmable without addressing the avoidance claims identified by the Examiner because the Plan does not release claims arising from fraud, gross negligence, or willful misconduct, and article six of the Plan preserves avoidance actions owned by the Debtor.  Response ¶¶18-19.[8]  This argument strains — if not offends — credulity. Under the Plan, the insiders will retain control of the reorganized Debtor, and they will never bring claims against themselves.  Thus, creditors will be deprived of the value of those claims.  *In re Multiut Corp.*, 449 B.R. 323 (Bankr. N.D. Ill. 2011), remains applicable because the carve-out supposedly preserving claims here is in fact illusory.  *See* Supplemental Objection ¶ 28.  Nor is it relevant that individual creditors like Benefit Street may opt out of releasing their *own* direct claims.  Response ¶ 20.  The issue here is claims of the *estate*, which must be pursued on behalf of *all* creditors.

36.    The value of the estate claims being released must be used to reduce dollar for dollar the purported "new money" capital contribution.  Supplemental Objection ¶¶ 39-40.  The Examiner's Report supports at least $12.5 million in claims ($2.5 million in excess of the new equity, even leaving aside the portion already attributable to repaying diverted PPP proceeds).  The Debtor has not disclosed any analysis of the value of claims or the likelihood of recovery and

---

[8] The Plan does include broad releases of negligence and other claims that would not require as heightened a showing of wrongdoing as the claims subject to the carve-out.

presents no evidence to support a lower potential claim value. The Debtor obviously cannot argue that any potential claims are covered by the $10 million in new equity while simultaneously claiming that entire amount is "new" money sufficient to satisfy the exception to the absolute priority rule.

37.    Also, the purported waiver of management fees as consideration for the releases (Response ¶ 22) is meaningless because such fees are already subordinate to the Lender[9] and the Management Company failed to file a proof of claim for such fees.

38.    Finally, the Debtor cannot rely on the business judgment rule for approval of the plan releases (Response ¶ 21), because through the releases it seeks to settle claims against itself. Supplemental Objection ¶ 33.

### C.    <u>Current Management Cannot be Permitted to Remain in Control</u>

39.    The egregious misconduct revealed in the Examiner's report makes clearer than ever that the Plan cannot be confirmed if it permits the corrupt Insiders to remain in control of the reorganized Debtor, which they will then be free to plunder as in the past to the detriment of all creditors that have not been paid in full—mainly Benefit Street, on which the Plan places nearly all the risks of the reorganization. As the Examiner notes, there were already "significant concerns" about the Insiders' conduct—but the Debtor's reckless and unfounded response to the Report "significantly amplifies these concerns." Supplemental Report at 6.

40.    The Debtor's spurious attempts to distinguish *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993), and *In re Rusty Jones, Inc.*, 110 B.R. 362 (Bankr. N.D. Ill. 1990) are to no avail. While the debtor in *SM 104 Ltd.* violated a court order, here the debtor violated its duty under New York City law by failing to hold in trust and remit the money collected for the payment

---

[9] Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees, dated December 13, 2017 ¶ 2, attached as Exhibit H (Management Company agreeing to subordinate any fees it is owed to Lender).

of occupancy taxes, including transferring $252,100 in segregated trust fund taxes post-petition.

*See* Supplemental Objection n.4.  Also, the Insiders violated the state court receivership order by

obtaining the PPP loan using the Hotel's revenues.  *See* Order Appointing a Receiver in a Non-

Residential Mortgage Foreclosure Action at 5, *BSPRT 2018-FL3 Issuer, Ltd. v. 96 Wythe

Acquisition LLC, et al.*, Index No. 653396/2019 (N.Y. Sup. Ct. Feb. 21, 2020) (enjoining

defendants from entering any agreement that was not terminable on 30 days' notice, absent Benefit

Street's consent), attached as Exhibit I.  While the Debtor argues that the Insiders' real estate

experience distinguishes this case from *Rusty Jones*, the irrefutable fact is that the Insiders

mismanaged the Hotel—including by failing to pay real estate or occupancy taxes or even to file

tax returns.  *See* Supplemental Objection at 9.[10]

41.    Finally, the Debtor preposterously argues that Benefit Street is protected from the

Insiders' future mismanagement and corruption by the existence of a $3 million interest reserve.

Response ¶ 32.[11]  Benefit Street is forced to wait *six years* for repayment of any principal on its

claim, during which time it is entirely dependent on management's competence and integrity —

none of which has manifested to date.  This is the same management who by their own admission

breached the Debtor's operating agreement and the Lender's loan documents by making (and

partially repaying) unauthorized and undisclosed loans to the Debtor, failing to pay occupancy and

real estate taxes, among other improprieties—and who the Examiner has found engaged in a

scheme to siphon millions of dollars away from the Debtor.  No Plan — and certainly not one that

---

[10] Additionally, five of the other real estate projects managed or owned by Mr. Lichtenstein or Ms. Moskowitz are currently in bankruptcy in the Southern District of New York.

[11] To the contrary.  This inadequate interest reserve (assuming it is even used as proffered) merely allows the Debtor to protect itself from triggering a post-confirmation monetary default to the Lender, thereby giving the Insiders free reign to continue to misrun the Hotel with little to no recourse for the Lender.

stretches out claim repayment for six years with no amortization and a massive balloon — can be confirmed with the Insiders still at the helm.

42.     The Debtor invokes the Bankruptcy Code's "fresh start" policy (Response ¶ 5), but that second chance is intended only for "the honest but unfortunate debtor." *Grogan v. Garner*, 498 U. S. 279, 286-87 (1991); *see also In re Weiss*, 235 B.R. 349, 360 (Bankr. S.D.N.Y. 1999) (concluding debtor was not the "type of 'honest debtor' that the Code's dischargeability provisions were designed to protect" where state court judgment had found debt resulted from debtor's fraud and breach of fiduciary duties).  The Debtor itself here may deserve a fresh start for the benefit of all stakeholders, but that second chance does not extend to its dishonest and destructive principals.

## CONCLUSION

For these reasons, Benefit Street respectfully requests that the Court deny confirmation of the Debtor's Plan.

Dated: March 21, 2022
New York, New York

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

*/s/ Adam C. Rogoff*
Adam C. Rogoff
P. Bradley O'Neill
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000
Email: arogoff@kramerlevin.com
        boneill@kramerlevin.com

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

*Co-counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

# EXHIBIT A

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4  --------------------x

   IN RE:

5                          Chapter 11

   96 WYTHE ACQUISITION,

6  LLC,                   Case No. 21-22108(RDD)

    Debtor.

7  --------------------x

8

9              9:00 a.m.

               March 4, 2021

10

11

12        VIDEOTAPED VIRTUAL DEPOSITION of TOBY

13  MOSKOVITS, a Witness in the above entitled matter,

14  pursuant to Rule 30(b)(6) and in her individual

15  capacity, before Stephen J. Moore, a Registered

16  Professional Reporter, Certified Realtime Reporter

17  and Notary Public of the State of New York.

18

19

20

21

22

23

24

25

**REDACTED**

# EXHIBIT B

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4   ----------------------------x

    IN RE:

5                                    Chapter 11

    96 WYTHE ACQUISITION, LLC

6                                    Case No. 21-22108(RDD)

            Debtor.

7   ----------------------------x

8

9            12:00 p.m.

            March 14, 2022

10

11

12       VIDEOTAPED VIRTUAL DEPOSITION of JEREMY

13   RAUCH, a Witness in the above entitled matter,

14   pursuant to Rule 30(b)(6) and in his individual

15   capacity, before Stephen J. Moore, a Registered

16   Professional Reporter, Certified Realtime Reporter

17   and Notary Public of the State of New York.

18

19

20

21

22

23

24

25

**REDACTED**

# EXHIBIT C

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    --------------------x

     IN RE:

5                             Chapter 11

     96 WYTHE ACQUISITION,

6    LLC,                     Case No. 21-22108(RDD)

      Debtor.

7    --------------------x

8

9                   12:00 p.m.

                    March 15, 2022

10

11

12          VIDEOTAPED VIRTUAL DEPOSITION of DAVID

13   GOLDWASSER, a Witness in the above entitled

14   matter, pursuant to Rule (30(b)(6) and in his

15   individual capacity, before Stephen J. Moore, a

16   Registered Professional Reporter, Certified

17   Realtime Reporter and Notary Public of the State

18   of New York

19

20

21

22

23

24

25

**REDACTED**

# EXHIBIT D

                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------X   Case No.  21-22108-rdd
IN RE:                         .   Chapter 11
                               .   300 Quarropas Street
96 WYTHE ACQUISITION, LLC,     .   White Plains, NY  10601
                               .
          Debtor.              .   January 10, 2022
-------------------------------X   10:57 a.m. - 12:00 p.m.
```

**21-22108-rdd**   **96 Wythe Acquisition LLC**   *Ch. 11*

Conference with Parties - re: Letter dated January 7, 2022 to
Judge Drain Requesting Telephonic Discovery Conference Filed by
Paul B. O'Neill on behalf of Benefit Street Partners Realty
Operating Partnership, L.P. (ECF #274)

Notice of Hearing on Motion of Debtors Motion to Clarify and
Amend Second Amended Order Directing Appointment of an Examiner
Pursuant to 11 U.S.C. 1104(c); Limit and/or Quash Subpoenas
that Exceed Scope of Examination, and Related Relief (related
document(s)238)(ECF #255)

 [*DOCKET MATTERS AND APPEARANCES CONTINUED ON SUCCEEDING PAGES*]

                    HONORABLE ROBERT D. DRAIN
                 UNITED STATES BANKRUPTCY JUDGE

VIRTUAL APPEARANCES (VIDEO/ZOOM):

FOR THE DEBTOR:             MARK A. FRANKEL, ESQ.
                            Backenroff, Frankel & Krinsky, LLP
                            800 Third Avenue, 11th Floor
                            New York, New York  10022

FOR THE DEBTOR AND          DOUGLAS E. SPELFOGEL, ESQ.
DEBTOR IN POSSESSION:       Mayer Brown LLP
                            1221 Avenue of the Americas
                            New York, New York  10020-1001

FOR THE EXAMINER,           STEPHANIE WICKOUSKI, ESQ.
ERIC M. HUEBSCHER:          Locke Lord LLP
                            Brookfield Place
                            200 Vesey Street, 20th Floor
                            New York, New York  10281

*Proceedings digitally recorded.*
*Transcript produced by:  Catherine M. Griffin*

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel.: (845) 452-3090 - Fax: (845) 452-6099*
americanlegaltranscription.com

1      THE COURT:  Sure.  Can you state your --

2      MR. LICHTENSTEIN:  This is Michael --

3      THE COURT:  -- name for the record.

4      MR. LICHTENSTEIN:  Michael Lichtenstein.

5      THE COURT:  Okay.  The only redactions that were made

6  were in accounts where most of the monies -- the payroll

7  accounts where most of the funds that passed through those

8  accounts were completely unrelated to the hotel and (inaudible)

9  other projects; meaning, it's a payroll account that covers

10  payroll for construction projects that happens to cover four

11  employees, which is basically less than 20 percent of the funds

12  that flow through those accounts.

13      THE COURT:  I -- I --

14      MR. LICHTENSTEIN:  -- therefore --

15      THE COURT:  -- I'm assuming that if that's true, the

16  Examiner will be able to verify that easily, but he needs to be

17  able to verify it.  And again, that information -- because it's

18  to the Examiner, and not to someone else -- is confidential.

19  So it doesn't need --

20      MR. LICHTENSTEIN:  Okay.

21      THE COURT:  -- to be blacked out.

22      MR. LICHTENSTEIN:  Understood.  Understood.  Can I

23  just make one sec -- a second comment?

24      THE COURT:  Um, okay.

25      MR. LICHTENSTEIN:  Fifty percent of the accounts that

1    the Examiner subpoenaed are for other residential projects or

2    office projects that have no connection to (inaudible) and the

3    -- there are no direct transfers from the Debtor or from the

4    hotel management company to them.

5          THE COURT:  Again, this is something -- he -- he

6    needs to verify that.  He just can't take your word for it;

7    it's that simple.  That's why I appointed him.  I wasn't gonna

8    take your word for it and I wasn't gonna take Benefit Street's

9    word for the contrary; that's why I appointed an Examiner.

10         MR. LICHTENSTEIN:  Okay.

11         MR. O'NEILL:  Your Honor, there -- there are a couple

12   of dates in the confirmation schedule that you're off of the

13   delivery of the Examiner's reports, so those will need to be

14   adjusted.

15         THE COURT:  Okay.  I'm not sure what those are, but

16   if that's the case --

17         MR. O'NEILL:  Yeah.  They're dates for responses,

18   basically or -- or -- additional objections based on the

19   content of the report.

20         THE COURT:  Okay.

21         MS. WICKOUSKI:  Your Honor, Stephanie Wickouski

22   again.  I'm hesitant to ask this question, but do we have a

23   deadline for when the Debtor needs to produce the documents?

24   The reason I'm hesitant to ask that is I think we already had a

25   deadline.  But just to be clear, since we have a deadline to --

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------X   Case No.  21-22108-rdd
IN RE:                         .   Chapter 11
                               .   300 Quarropas Street
96 WYTHE ACQUISITION, LLC,     .   White Plains, NY  10601
                               .
          Debtor.              .   March 8, 2022
-------------------------------X   10:12 a.m. – 11:30 a.m.
```

**21-22108-rdd**     **96 Wythe Acquisition LLC**     *Ch. 11*

Notice of Agenda for March 8, 2022 Hearing (related document(s) 367, 4, 336, 422, 439, 432, 351, 302, 247, 406, 295, 417, 310, 441, 398, 389, 370, 371, 136, 369, 374, 328, 353, 376, 293, 431, 429, 393, 343, 305, 424, 320, 400, 253, 327, 324, 377, 390, 423, 375, 294, 433, 254, 333, 436, 430, 248, 435, 306, 382, 388, 325)

 [*DOCKET MATTERS AND APPEARANCES CONTINUED ON SUCCEEDING PAGES*]

HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

VIRTUAL APPEARANCES (VIDEO/ZOOM):

```
FOR THE DEBTOR AND          DOUGLAS E. SPELFOGEL, ESQ.
DEBTOR IN POSSESSION:       Mayer Brown LLP
                            1221 Avenue of the Americas
                            New York, New York  10020-1001

FOR CITY OF NEW YORK:       HUGH H. SHULL, III, ESQ.
                            New York City Law Department
                            100 Church Street
                            New York, New York  10007

FOR CREDITOR, BENEFIT       P. BRADLEY O'NEILL, ESQ.
STREET PARTNERS REALTY      ADAM C. ROGOFF, ESQ.
OPERATING PARTNERSHIP       Kramer Levin Naftalis & Frankel LLP
L.P.:                       1177 Avenue of the Americas
                            New York, New York  10036

U.S. TRUSTEE:               GREG M. ZIPES, ESQ.
                            Office of the U.S. Trustee
                            201 Varick Street, Suite 1006
                            New York, New York  10014
```

*Proceedings digitally recorded.*
*Transcript produced by:  Catherine M. Griffin*

1    The -- the last path -- and I don't know whether this

2    is of any practical use to anybody -- but if the Court wanted

3    the Examiner to complete the report, then we would need a

4    resolution of the motion to quash.  And I don't know whether

5    that's feasible at this point.  We are -- the Examiner will do

6    whatever the Court directs us to do in that regard.

7        RULING ON MIRIAM GROSS'S MOTION AND AMENDED MOTION TO QUASH

8    THE COURT:  Okay.  All right.  Well, I -- I view the

9    Examiner's report as complete.  I recognize, as I believe he

10   did, that at some point there's a balance between getting all

11   the information that he wanted and filing the report so it

12   could be used.  And he did that.  And he's certainly entitled

13   to draw inferences if information wasn't provided.

14       But I -- I think at this point you should be on hold.

15   I -- I don't believe there is a basis frankly from what I've

16   read to quash the subpoena.  But on the other hand, the

17   information to be obtained is obtained for a purpose.  And at

18   this point given that the report has been filed, I don't see a

19   crying need for that purpose.

20       So I think this matter should be just be carried for

21   now.  It's fully briefed; I've given you my view on the merits.

22   I think the Examiner was within his rights to issue the

23   subpoena given the payments by and to Ms. Gross, who is an

24   employee of the Debtor.  But I think they have been identified,

25   and I don't see a need to go further at this point.

1        She had two opinions on it, and they're both good

2   ones, where it addresses –– where they address the evidentiary

3   nature of the report, and made what should be an obvious point

4   –– but is not necessarily one that, as Judge Brown recognizes

5   –– the press and public understand, which is that an Examiner's

6   report is ultimately an opinion.  It's not evidence, and it's

7   not a determination that's binding.  It –– it does have an

8   important role in a case.  But parties in interest, including

9   those dealt with unfavorably in the report, have the

10  opportunity to respond.  See In re FiberMark, Inc., 339 B.R.

11  321 (Bankr. D. Vt. 2005 [*sic*]), citing In re Rickel &

12  Associates, Inc., 272 B.R. 74, and 87-88 (Bankr. S.D.N.Y. 20 ––

13  sorry –– 2002); and In re FiberMark, Inc., 330 B.R. 480 (Bankr.

14  D. Vt. 2005).

15       So I –– I see this issue coming up in the future, so

16  we should probably address it now at least in terms of some

17  preliminary guidance.  The Debtor in its omnibus objection has

18  stated that it wants to seek certain discovery from the

19  Examiner related to I guess the report, and perhaps to an

20  objection to the motion that we're gonna be carrying, as well

21  as the –– the interim fee applications.

22       Most of the case law pertaining to the

23  discoverability of Examiner work papers, anything really

24  prepared by or for the Examiner –– other than the Examiner's

25  report –– comes up mostly in the context of the press seeking

# EXHIBIT F

**Execution Copy**

**LOAN AGREEMENT**

dated as of December 13, 2017

between

**96 WYTHE ACQUISITION LLC**,

as Borrower

and

**BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**,
as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS; PRINCIPLES OF CONSTRUCTION ......................................1

Section 1.1        Definitions.................................................................................1
Section 1.2        Principles of Construction.........................................................27

ARTICLE 2        GENERAL TERMS.................................................................................28

Section 2.1        No Loan Commitment ...............................................................28
Section 2.2        The Loan.....................................................................................28
Section 2.3        Disbursement to Borrower .........................................................28
Section 2.4        The Note and the other Loan Documents ...................................28
Section 2.5        Interest Rate ...............................................................................28
Section 2.6        Loan Payments............................................................................33
Section 2.7        Prepayments................................................................................34
Section 2.8        Interest Rate Cap Agreement .....................................................36
Section 2.9        Assignment of Security Instrument ............................................38
Section 2.10        Payment of Additional Interest..................................................38
Section 2.11        Extension of the Maturity Date...................................................39

ARTICLE 3        REPRESENTATIONS AND WARRANTIES..........................................41

Section 3.1        Existence and Authority.............................................................41
Section 3.2        Borrower's Principal Place of Business......................................41
Section 3.3        Validity of Documents................................................................41
Section 3.4        Agreements ................................................................................42
Section 3.5        Title; Permitted Encumbrances...................................................42
Section 3.6        Purchase Options ......................................................................42
Section 3.7        Condemnation.............................................................................43
Section 3.8        Separate Lots; Flood Zone; Wetlands........................................43
Section 3.9        Use of Property ..........................................................................43
Section 3.10        Certain Additional Property Representations...............................43
Section 3.11        Financial Condition....................................................................44
Section 3.12        Financial Information..................................................................45
Section 3.13        Fraudulent Conveyance ..............................................................45
Section 3.14        Disclosure ..................................................................................45
Section 3.15        No Plan Assets............................................................................46
Section 3.16        Not a Foreign Person .................................................................46
Section 3.17        Business Purposes......................................................................46
Section 3.18        Litigation....................................................................................46
Section 3.19        Leases.........................................................................................46
Section 3.20        Taxes..........................................................................................46
Section 3.21        Insurance....................................................................................47
Section 3.22        Management Agreement..............................................................47
Section 3.23        Illegal Activity/Forfeiture ..........................................................47
Section 3.24        Special Purpose Entity ...............................................................47

i

Section 3.25     Federal Reserve Regulations.................................................48
Section 3.26     Investment Company Act ....................................................48
Section 3.27     Embargoed Person .............................................................48
Section 3.28     Organizational Chart..........................................................49
Section 3.29     Bank Holding Company .....................................................49
Section 3.30     No Other Financing; Other Obligations and Liabilities.......49
Section 3.31     Contracts.............................................................................49
Section 3.32     Property Document Representations.....................................49
Section 3.33     No Change in Facts or Circumstances; Disclosure...............50
Section 3.34     Third Party Representations.................................................50
Section 3.35     Non-Consolidation Opinion Assumptions ...........................50
Section 3.36     Hotel Representations .........................................................50
Section 3.37     Business Plan Work ............................................................51
Section 3.38     Construction.......................................................................51

ARTICLE 4       BORROWER COVENANTS................................................52

Section 4.1      Existence.............................................................................52
Section 4.2      Change of Name, Identity or Structure ...............................52
Section 4.3      Business and Operations.....................................................53
Section 4.4      Title to Property; Legal Requirements.................................53
Section 4.5      Waste..................................................................................53
Section 4.6      Maintenance and Use of Property........................................54
Section 4.7      Taxes and Other Charges ....................................................54
Section 4.8      Labor and Materials ...........................................................55
Section 4.9      Property Access ..................................................................56
Section 4.10     Litigation............................................................................56
Section 4.11     Performance by Borrower....................................................56
Section 4.12     Books and Records .............................................................56
Section 4.13     Contracts.............................................................................59
Section 4.14     Cooperation in Proceedings ................................................59
Section 4.15     Estoppel Certificates ..........................................................59
Section 4.16     Leases and Rents ................................................................59
Section 4.17     Notice of Default................................................................61
Section 4.18     Other Agreements ..............................................................61
Section 4.19     Alterations..........................................................................61
Section 4.20     Management Agreement......................................................61
Section 4.21     No Joint Assessment ..........................................................63
Section 4.22     ERISA.................................................................................63
Section 4.23     Special Purpose Entity .......................................................63
Section 4.24     Debt Cancellation...............................................................64
Section 4.25     Property Documents............................................................64
Section 4.26     Embargoed Person ..............................................................64
Section 4.27     Patriot Act ..........................................................................65
Section 4.28     No Plan Assets; Illegal Activity/Forfeiture.........................65
Section 4.29     Business Plan Work ............................................................65
Section 4.30     Construction Costs and Expenses .......................................66
Section 4.31     Violation Work ...................................................................67

ii

Section 4.32    Parking Work ........................................................................67
Section 4.33    Post-Closing Execution of Collateral Assignment of Interest
                Rate Cap Agreement ............................................................67

ARTICLE 5    INSURANCE; CASUALTY; CONDEMNATION; RESTORATION..............67

Section 5.1    Insurance ...............................................................................67
Section 5.2    Casualty ..................................................................................72
Section 5.3    Condemnation ........................................................................73
Section 5.4    Restoration .............................................................................73
Section 5.5    Business Interruption Proceeds ..............................................78

ARTICLE 6    NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS ...................78

Section 6.1    No Sale/Encumbrance .............................................................78
Section 6.2    Intentionally Omitted .............................................................78
Section 6.3    Permitted Equity Transfers .....................................................78
Section 6.4    Replacement Guarantor ..........................................................80
Section 6.5    Lender's Rights ......................................................................81
Section 6.6    Economic Sanctions, Anti-Money Laundering ........................82
Section 6.7    Costs and Expenses ................................................................82

ARTICLE 7    RESERVE FUNDS ..................................................................82

Section 7.1    Sam Tell Funds ......................................................................82
Section 7.2    Tax and Insurance Funds ........................................................82
Section 7.3    FF&E Reserve Funds ..............................................................83
Section 7.4    Intentionally Omitted .............................................................84
Section 7.5    Intentionally Omitted .............................................................84
Section 7.6    Excess Cash Flow Funds ........................................................84
Section 7.7    The Accounts Generally .........................................................85
Section 7.8    Business Plan Reserve Funds ..................................................87
Section 7.9    Interest Reserve Funds ...........................................................89

ARTICLE 8    CASH MANAGEMENT .............................................................90

Section 8.1    Distribution of Cash Flow ......................................................90
Section 8.2    Excess Operating Cash Flow Funds ........................................90
Section 8.3    Intentionally Omitted .............................................................91
Section 8.4    Cash Application Statement ....................................................91
Section 8.5    Establishment of Certain Accounts .........................................91
Section 8.6    Deposits into and Maintenance of Clearing Account .............91
Section 8.7    Events of Default ...................................................................93
Section 8.8    Borrower Distributions; Acknowledgement ...........................94

ARTICLE 9    SECONDARY MARKET .............................................................94

Section 9.1    Securitization .........................................................................94
Section 9.2    Disclosure and Indemnification ..............................................97
Section 9.3    Reserves/Escrows ................................................................100
Section 9.4    Servicer ...............................................................................100
Section 9.5    Intentionally Omitted ...........................................................100

iii

Section 9.6        REMIC Savings Clause .............................................................101
Section 9.7        Syndication; Registered Form....................................................101

ARTICLE 10        EVENTS OF DEFAULT; REMEDIES ..........................................102

Section 10.1        Event of Default ......................................................................102
Section 10.2        Remedies .................................................................................106

ARTICLE 11        INDEMNIFICATIONS .................................................................108

Section 11.1        General Indemnification ...........................................................108
Section 11.2        Mortgage and Intangible Tax Indemnification .....................109
Section 11.3        ERISA Indemnification ...........................................................109
Section 11.4        Duty to Defend, Legal Fees and Other Fees and Expenses .................109
Section 11.5        Survival ...................................................................................109

ARTICLE 12        EXCULPATION..........................................................................109

Section 12.1        Exculpation ..............................................................................109

ARTICLE 13        FURTHER ASSURANCES ..........................................................112

Section 13.1        Replacement Documents ..........................................................112
Section 13.2        Recording of Security Instrument, etc ...................................112
Section 13.3        Further Acts, etc.......................................................................113
Section 13.4        Changes in Tax, Debt, Credit and Documentary Stamp Laws .............113

ARTICLE 14        WAIVERS .....................................................................................114

Section 14.1        Remedies Cumulative; Waivers................................................114
Section 14.2        Modification, Waiver in Writing ..............................................114
Section 14.3        Delay Not a Waiver ..................................................................114
Section 14.4        Waiver of Trial by Jury............................................................115
Section 14.5        Waiver of Notice......................................................................115
Section 14.6        Remedies of Borrower..............................................................115
Section 14.7        Marshalling and Other Matters ................................................115
Section 14.8        Waiver of Statute of Limitations..............................................115
Section 14.9        Waiver of Counterclaim............................................................115
Section 14.10       Sole Discretion of Lender ........................................................116

ARTICLE 15        MISCELLANEOUS .....................................................................116

Section 15.1        Survival....................................................................................116
Section 15.2        Expenses; Indemnity................................................................116
Section 15.3        Brokers.....................................................................................117
Section 15.4        Governing Law .........................................................................118
Section 15.5        Notices .....................................................................................119
Section 15.6        Headings ..................................................................................120
Section 15.7        Severability ..............................................................................120
Section 15.8        Preferences...............................................................................120
Section 15.9        Cost of Enforcement ................................................................120
Section 15.10       Exhibits Incorporated...............................................................120
Section 15.11       Offsets, Counterclaims and Defenses .....................................120

iv

Section 15.12    No Joint Venture or Partnership; No Third Party Beneficiaries ...........121
Section 15.13    Publicity ...............................................................................................122
Section 15.14    Limitation of Liability.........................................................................122
Section 15.15    Conflict; Construction of Documents; Reliance ..................................122
Section 15.16    Entire Agreement .................................................................................123
Section 15.17    Liability.................................................................................................123
Section 15.18    Duplicate Originals; Counterparts .......................................................123
Section 15.19    Set-Off...................................................................................................123
Section 15.20    Certain Additional Rights of Lender (VCOC)....................................123

ARTICLE 16    INTENTIONALLY OMITTED ........................................................................124

ARTICLE 17    MEZZANINE LOAN. .......................................................................................124

Section 17.1    Mezzanine Loan Notice .........................................................................124
Section 17.2    Mezzanine Loan Estoppels ....................................................................125
Section 17.3    Mezzanine Intercreditor ........................................................................125
Section 17.4    Direction of Mezzanine Borrower .........................................................125
Section 17.5    Notices from Mezzanine Lender............................................................126
Section 17.6    Mezzanine Loan Prepayment.................................................................126

v

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of December 13, 2017 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**, a Delaware limited partnership, having an address at 142 West 57th Street, Suite 1201, New York, New York 10019 (together with its successors and/or assigns, "**Lender**") and **96 WYTHE ACQUISITION LLC**, a New York limited liability company, having its principal place of business at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and/or assigns, "**Borrower**").

### RECITALS:

**WHEREAS,** Borrower desires to obtain the Loan (defined below) from Lender; and

**WHEREAS,** Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of the Loan Documents (defined below).

**NOW, THEREFORE,** in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### ARTICLE 1

### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean the Cash Management Account, the Clearing Account, the Casualty and Condemnation Account, the Reserve Accounts and any other account established by this Agreement or the other Loan Documents.

"**Additional Costs**" shall have the meaning set forth in Section 2.5(b)(vii) hereof.

"**Additional Interest**" shall mean an amount equal to one-half of one percent (0.50%) of the face amount of the Note.

"**Adjusted LIBOR Rate**" shall mean, with respect to the applicable Interest Period, the quotient of (i) LIBOR applicable to such Interest Period, divided by (ii) one (1) minus the Reserve Percentage:

$$\text{Adjusted LIBOR Rate} \quad = \quad \frac{\text{LIBOR}}{(1 - \text{Reserve Percentage})}$$

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or executive officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person.

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Guarantor, any SPE Component Entity (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alternate Index**" shall mean either (1) a floating rate index (a) that is commonly accepted by market participants in commercial or multifamily real estate loans, (b) that is publicly recognized by ISDA as an alternative to LIBOR and (c) for which ISDA has approved an amendment to hedge agreements, generally providing such floating rate index as a standard alternative to LIBOR or, at Lender's election, (2) a floating rate index then being used by any institutional warehouse or repurchase lender that is not an Affiliate of Lender providing financing backed in whole or in part by an interest in the Loan.

"**Alternate Rate**" shall mean the greater of (i) the sum of (A) a per annum rate of interest of the Alternate Index, determined on the related Determination Date and (B) Alternate Rate Spread ("**Original Alternate Rate**") and (ii) Alternate Rate Floor. Notwithstanding the foregoing, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the Alternate Rate shall be restored to the Original Alternate Rate. Any change in the Alternate Rate as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

"**Alternate Rate Floor**" shall mean six and seventy-five hundredths percent (6.75%).

"**Alternate Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Alternate Rate.

"**Alternate Rate Spread**" shall mean 5.75%

"**Alteration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan.

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith

MIA 31354953v9

estimate of anticipated Gross Rents, Operating Expenses and FF&E expenditures for the applicable Fiscal Year.

"**Approved Accounting Method**" shall mean GAAP, the Uniform System of Accounts, federal tax or cash basis accounting or such other method of accounting, in each case consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.12 hereof.

"**Approved Extraordinary Expense**" shall mean an operating expense of the Property not set forth on the Approved Annual Budget but approved by Lender in writing (which such approval shall not be unreasonably withheld, delayed or conditioned).

"**Approved Operating Expense**" shall mean an operating expense of the Property set forth on the Approved Annual Budget.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Listing Agreement**" shall mean that certain Assignment of Listing Agreement and Subordination of Leasing Commissions dated as of the date hereof among Lender, Borrower and Listing Agent, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated as of the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bank**" shall be deemed to refer to the bank or other institution maintaining the Clearing Account pursuant to the Clearing Account Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more of the following: (i) Borrower or any SPE Component Entity shall commence any case, proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets;

MIA 31354953v9

(ii) Borrower or any SPE Component Entity shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower or any SPE Component Entity under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower or any SPE Component Entity or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's or any SPE Component Entity's assets; (iv) Borrower or any SPE Component Entity files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any SPE Component Entity or any portion of the Property; (vi) Borrower or any SPE Component Entity makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Guarantor or its subsidiaries; (viii) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (vii) above; and (ix) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws, Guarantor or any of its Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, any SPE Component Entity, any Affiliated Manager and Guarantor.

"**Breakage Costs**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Broker**" shall have the meaning set forth in Section 15.3 hereof.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

"**Business Plan**" shall mean, collectively, Borrower's plan to pay for and complete all capital improvements at the Property, together with (and as more specifically set forth in) the budget relating thereto, as each of the foregoing are attached to the Borrower's Certification of even date herewith given by Borrower in favor of Lender, and together with the Plans and Specifications (as each of the same may hereafter be amended and/or supplemented, with Lender's prior written consent).

"**Business Plan Reserve Account**" shall have the meaning set forth in Section 7.8 hereof.

MIA 31354953v9

"**Business Plan Reserve Funds**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Reserve Funds Borrower Deposit**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Reserve Funds Future Disbursement Conditions**" shall mean that Lender has received evidence, in form and substance satisfactory to Lender, that Borrower has spent the entire amount of the Business Plan Reserve Funds Initial Disbursement for the Business Plan Work (such evidence to include, without limitation, copies of the receipts for any such purchases, as applicable).

"**Business Plan Reserve Funds Initial Disbursement**" shall have the meaning set forth in Section 7.8 hereof.

"**Business Plan Work**" shall mean all work and costs contemplated to be incurred pursuant to the Business Plan.

"**Carveout Guaranty**" shall mean that certain Guaranty of Recourse Obligations executed by Guarantor and dated as of the date hereof.

"**Cash Application Statement**" shall have the meaning set forth in Section 8.4 hereof.

"**Cash Management Account**" shall have the meaning set forth in Section 8.5 hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, executed by Borrower, Lender and Wells Fargo Bank, N.A., as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Sweep Period**" shall mean a period (i) commencing upon any of (A) the occurrence and continuance of an Event of Default, and (B) the Debt Service Coverage Ratio (Combined) being less than 1.25 to 1.00; and (ii) expiring upon (x) with regard to any Cash Sweep Period commenced in connection with clause (A) above, the cure (if applicable) of such Event of Default, and (y) with regard to any Cash Sweep Period commenced in connection with clause (B) above, the date that the Debt Service Coverage Ratio (Combined) is equal to or greater than 1.25 to 1.00 for six (6) consecutive months.  Notwithstanding the foregoing, a Cash Sweep Period shall not be deemed to expire in the event that a Cash Sweep Period then exists for any other reason. Borrower acknowledges that a Cash Sweep Period shall be deemed to exist as of the Closing Date on account of clause (i)(B) above.

"**Casualty**" shall have the meaning set forth in Section 5.2.

"**Casualty and Condemnation Account**" shall mean an Account into which any Net Proceeds collected after the occurrence of a Casualty or Condemnation, as required pursuant to Article 5 hereof, shall be deposited.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4 hereof.

"**Clearing Account**" shall have the meaning set forth in Section 8.5 hereof.

"**Clearing Account Agreement**" shall mean that certain Deposit Account Control Agreement by and among Borrower, Lender and Wells Fargo Bank, N.A. dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Co-Lender**" shall have the meaning set forth in Section 9.7 hereof.

"**Collateral Assignment of Interest Rate Cap Agreement**" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Completion**" shall mean the substantial completion of the Business Plan Work on or prior to the Completion Date substantially in accordance with all Plans and Specifications, the Business Plan, all Legal Requirements, and this Agreement such that the Property is ready for full occupancy, such compliance to be evidenced to the satisfaction of Lender; together with the delivery to Lender of one or more temporary certificate of occupancy (if subject to any conditions, such conditions being acceptable to Lender) for all Improvements and evidence that all other approvals from Governmental Authorities have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents.

"**Completion Date**" shall mean December 31, 2018.

"**Completion Guaranty**" shall mean that certain Guaranty of Completion executed by Guarantor and dated as of the date hereof.

"**Condemnation**" shall mean any permanent or temporary taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contract**" shall mean any contract or agreement with any architect, engineer, contractor, subcontractor, management agent, leasing agent, sales agent, service and maintenance agent, or any other third party, whether existing as of the Closing Date or thereafter arising, relating to the design, construction, ownership, condition, use, occupancy, possession, management, operation, space leasing, service, maintenance or repair of, or otherwise in respect of, the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (but the same shall not be deemed to include any Lease or the Management Agreement).

"**Control**" as to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person,

whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled" or "controlling" shall have a correlative meaning.

"**Counterparty**" shall mean the counterparty under any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, which counterparty shall satisfy the Minimum Counterparty Rating and otherwise be acceptable to Lender.

"**Covered Rating Agency Information**" shall mean any Provided Information furnished to the NRSROs in connection with issuing, monitoring and/or maintaining the Securities.

"**Credit Card Direction Notice**" shall have the meaning set forth in Section 8.2 hereof.

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Critical Hotel Features**" shall mean all guest rooms, the pool and related facilities, all food and beverage outlets (including the watertower bar and rooftop bar area) and all other Improvements necessary for the full use and operation of any of the foregoing.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including the Minimum Interest Payment, Additional Interest and Breakage Costs, if applicable) due to Lender in respect of the Loan under the Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder.

"**Debt Service (Combined)**" shall mean, with respect to any particular period of time, the sum of (A) Debt Service and (B) the Mezzanine Loan Monthly Debt Service and all other sums (including, without limitation, any accelerated principal balance) due under the Mezzanine Loan.

"**Debt Service Coverage Ratio (Combined)**" shall mean the ratio calculated by Lender of (i) the Underwritable Cash Flow to (ii) the aggregate amount of Debt Service (Combined) which would be due for the twelve (12) month period immediately succeeding the date of calculation; provided, that, the foregoing shall be calculated by Lender (A) assuming that each of the Loan and the Mezzanine Loan will be in place for the entirety of said period and (B) assuming Amortization Payments were due on each Monthly Payment Date for the entirety of said period.

"**Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which (i) the numerator is the Underwritable Cash Flow and (ii) the denominator is the then aggregate outstanding principal balance of the Loan.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that (i) no Event of Default shall have occurred and be continuing (either at the date of any notices

7

specified below or as of the effective date of any deemed approval), (ii) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Initial Notice**"), which such Initial Notice shall have been (A) accompanied by any and all required information and documentation relating thereto as may be reasonably required in order to approve or disapprove such matter (the "**Approval Information**") and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Initial Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; (iii) Lender shall have failed to respond to the Initial Notice within the aforesaid time frame; (iv) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Second Notice**"), which such Second Notice shall have been (A) accompanied by the Approval Information and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Second Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; and (v) Lender shall have failed to respond to the Second Notice within the aforesaid time frame.  For purposes of clarification, Lender requesting additional and/or clarified information, in addition to approving or denying any request (in whole or in part), shall be deemed a response by Lender for purposes of the foregoing.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate, and (ii) five percent (5%) above the Interest Rate.

"**Determination Date**" shall mean, with respect to any Interest Period, the date that is two (2) London Business Days prior to the first day of such Interest Period.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or NRSROs in connection with any public offering or private placement in connection with a Securitization, including, but not limited to, any preliminary or final offering circular, prospectus, prospectus supplement, free writing prospectus, private placement memorandum or other offering documents, marketing materials or information.

"**Eligible Account**" shall have the meaning set forth in the Cash Management Agreement.

"**Eligible Institution**" shall have the meaning set forth in the Cash Management Agreement.

"**Embargoed Person**" shall have the meaning set forth in Section 4.26 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equipment Leases**" shall have the meaning set forth in Section 3.36 hereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 8.1(ix) hereof.

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Operating Cash Flow Funds**" shall have the meaning set forth in Section 8.2 hereof.

"**Exchange Act**" shall mean the Securities and Exchange Act of 1934, as amended.

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1 hereof.

"**Exculpated Parties**" shall have the meaning set forth in Section 12.1 hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.11 hereof.

"**Extension Fee**" shall mean, with respect to first Extension Option, one eighth of one percent (0.125%) of the outstanding principal amount of the Loan on the date the related Extension Period is commenced and, with respect to the second Extension Option, one eighth of one percent (0.125%) of the outstanding principal amount of the Loan on the date the related Extension Period is commenced.

"**Extension Option**" shall have the meaning set forth in Section 2.11 hereof.

"**Extension Period**" shall have the meaning set forth in Section 2.11 hereof.

"**FF&E**" shall mean furniture, fixtures and equipment at or in or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotel located on the Property and of the type customarily utilized in hotel properties such as the Property.

"**FF&E Reserve Account**" shall have the meaning set forth in Section 7.3 hereof.

"**FF&E Reserve Funds**" shall have the meaning set forth in Section 7.3 hereof.

9

"**FF&E Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.3 hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Floor Rate**" shall mean six and seventy-five hundredths percent (6.**75**%).

"**Foreign Taxes**" shall have the meaning set forth in Section 2.5(b) hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Lists**" shall have the meaning set forth in Section 3.27 hereof.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Rents**" shall mean an amount equal to the sum of (i) annual rental income reflected in a current rent roll for all Tenants paying rent and (ii) all income, computed in accordance with the Approved Accounting Method, derived from the ownership and operation of the Property from whatever source for the trailing twelve (12) month period, including, without limitation: (a) all income and proceeds received from rental of rooms, commercial space, meeting, conference and/or banquet space within the Property including net parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); (d) all Awards for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); and (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this clause (ii) if received in the ordinary course of the Property operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); but excluding, (1) Gross Rents and gross receipts received by lessees, licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (3) non-recurring or extraordinary income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (4) federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent

10

taxes; (5) Awards (except to the extent provided in clause (d) above) or insurance proceeds (except to the extent provided in clause (c) above); (6) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (7) gratuities collected by the Property employees; (8) the proceeds of any financing; (9) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; (10) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues; (11) rents from tenants that are included in any bankruptcy proceedings; and (12) any disbursements to Borrower from the Reserve Funds or any other escrow fund established by the Loan Documents or under the Management Agreement.  Gross Rents shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof. For purposes of clarity, income calculated under clause (ii) shall not include any income calculated under clause (i) above.

"**Guarantor**" shall mean, individually and collectively, Toby Moskovits and Yechiel Michael Lichtenstein, and any successor to and/or replacement of any of the foregoing (including, without limitation, following the occurrence of a Mezzanine Foreclosure, the applicable substitute for Guarantor provided by Mezzanine Lender in connection with such Mezzanine Foreclosure (subject to the applicable terms and conditions of the Mezzanine Intercreditor), in each case, pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

"**Guaranty**" shall mean, collectively, the Carveout Guaranty and the Completion Guaranty.

"**Hedge Losses**" shall mean all actual losses incurred by Lender or its affiliates in connection with the hedge positions taken by Lender or its affiliates with respect to the Interest Rate.  Borrower acknowledges that such hedging transactions may include the sale of U.S. Obligations or other securities and/or the execution of certain derivative transactions, which hedging transactions would have to be "unwound" if all or any portion of the Loan is paid down.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Indebtedness**" shall mean, for any Person, without duplication:  (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

11

"**Indemnified Parties**" shall mean (i) Lender, (ii) any successor owner or holder of the Loan or participations in the Loan, (iii) any Servicer or prior Servicer of the Loan, (iv) any Investor or any prior Investor in any Securities, (v) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (vi) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (vii) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (viii) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 15.2 hereof.

"**Insurance Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Insurance Payment Date**" shall mean, with respect to any applicable Policies, the date occurring 30 days prior to the date the applicable Insurance Premiums associated therewith are due and payable.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1 hereof.

"**Interest Bearing Accounts**" shall mean the FF&E Reserve Account.

"**Interest Period**" shall have the meaning set forth in Section 2.6.

"**Interest Rate**" shall mean the rate or rates at which the outstanding principal amount of the Loan bears interest from time to time as determined accordance with the provisions of Section 2.5 hereof.

"**Interest Rate Cap Agreement**" shall mean, as applicable, any interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance satisfactory to Lender between Borrower and Counterparty or any Replacement Interest Rate Cap Agreement, in each case which also satisfies the requirements set forth in Section 2.8.

"**Interest Reserve Account**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Deficiency**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Deficiency Amount**" shall have the meaning set forth in Section 7.9 hereof.

"**Interest Reserve Funds**" shall have the meaning set forth in Section 7.9 hereof.

"**Investor**" shall mean any investor or potential investor in the Loan (or any portion thereof or interest therein) in connection with any Secondary Market Transaction.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Labor and Materials Charge**" shall have the meaning set forth in Section 4.8 hereof.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Law Change**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transaction with respect to the Loan, Borrower, any Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"**Lender Affiliate**" shall mean the Affiliate of Lender that has filed a Registration Statement.

"**Lender Consultant**" shall mean such Person as Lender may designate and engage to assist Lender in reviewing all or any portions of the Business Plan, the required permits and approvals for the Business Plan Work, to inspect the Improvements and the Property as Business Plan Work progresses and to consult with and to provide advice to and to render reports to Lender and/or Servicer which, at Lender's option, may be either an officer or employee of Lender or a consulting architect, engineer or inspector appointed or engaged by Lender or Servicer at the sole cost and expense of Borrower.

"**Lender Group**" shall mean Lender, each of its directors, officers, employees, representatives, agents and affiliates (including, without limitation, those who have signed the applicable Registration Statement), and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act.

"**Liabilities**" shall have the meaning set forth in Section 9.2 hereof.

"**LIBOR**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, as necessary, to the next nearest 1/100th of 1%) equal to the rate reported for deposits in U.S. dollars, for a one-month period, that appears on Reuters Screen LIBOR01 Page (or the successor thereto) as of 11:00 a.m., London time, on the

related Determination Date; provided that, (i) if such rate does not appear on Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the principal London office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the amounts for a comparable loan at the time of such calculation and, if at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations; and (ii) if fewer than two such quotations in clause (i) are so provided, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the amounts for a comparable loan at the time of such calculation and, if at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. Lender's computation of LIBOR shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"**LIBOR Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the LIBOR Rate.

"**LIBOR Rate**"  shall mean the greater of (i) the sum of (A) the Adjusted LIBOR Rate and (B) LIBOR Spread and (ii) Floor Rate ("**Original LIBOR Rate**"); provided, however, if the Operating Condition is not satisfied on or prior to May 31, 2018 ("**Rate Increase Event**"), the LIBOR Spread in clause (B) shall be increased to 6.25% and the Floor Rate in clause (ii) shall be increased to 7.25%. Notwithstanding the foregoing, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the LIBOR Rate shall be restored to the Original LIBOR Rate. Any change in the LIBOR Rate as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

"**LIBOR Spread**" shall mean five and seventy-five hundredths percent (5.75%).

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Collateral Assignment of Interest Rate Cap Agreement, the Carveout Guaranty, Completion Guaranty the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are not open for business.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and

14

unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**Major Contract**" shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $150,000.00 or which extend beyond one year (unless cancelable by Borrower on thirty (30) days or less notice without penalty)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"**Major Lease**" shall mean any Lease and any instrument guaranteeing or providing credit support for any Lease.

"**Management Agreement**" shall mean the "Management Agreement" as defined in the Assignment of Management Agreement and any other management agreement entered into by and between Borrower and Manager in accordance with the terms of this Agreement, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean Williamsburg Hotel BK LLC, a New York limited liability company, or such other entity selected as the manager of the Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean, with respect to any Person, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal, state, local or foreign law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or take any action to consolidate or merge such Person with or into any other Person, or take any action to dissolve or liquidate such Person, or make any assignment for the benefit of creditors of such Person, or sell all or substantially all of such Person's assets, or admit in writing such Person's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, any SPE Component Entity, any Guarantor or the Property, (ii) the ability of Borrower or any Guarantor to perform their respective obligations under any of the Loan Documents, (iii) the enforceability or validity of any of the Loan Documents, the perfection or priority of any lien created under any of the Loan Documents or the rights, interests or remedies of Lender under any of the Loan Documents, or (iv) the value, use operation of, or cash flows from, the Property.

"**Maturity Date**" shall mean June 9, 2019, as such date may be extended pursuant to and in accordance with Section 2.11 hereof, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean the "Borrower" as defined in the Mezzanine Loan Agreement.

"**Mezzanine Equity Collateral**" shall mean the 100% direct and/or indirect equity ownership interest held by Mezzanine Borrower in Borrower (other than any equity interest in Borrower held directly by any SPE Component Entity), including all of Mezzanine Borrower's equity ownership interests in any SPE Component Entity.

"**Mezzanine Foreclosure**" shall mean the transfer of the Mezzanine Equity Collateral to Mezzanine Lender in connection with the exercise of Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents, provided that such transfer is made in accordance with the applicable terms and conditions of the Mezzanine Intercreditor.

"**Mezzanine Intercreditor**" shall mean that certain intercreditor or other similar agreement by and among Lender and Mezzanine Lender relating to the Loan and the Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with its terms.

"**Mezzanine Lender**" shall mean WH Mezz Lender, LLC, in its capacity as mezzanine lender under the Mezzanine Loan, and its successors and/or assigns (to the extent permitted under the Mezzanine Intercreditor).

"**Mezzanine Loan**" shall mean that certain loan in the original principal amount of $12,500,000.00 made by Mezzanine Lender to Mezzanine Borrower.

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan Agreement dated as of even date herewith between Mezzanine Lender and Mezzanine Borrower in respect of the Mezzanine Loan.

"**Mezzanine Loan Documents**" shall mean the documents, certificates and instruments evidencing, securing or otherwise executed in connection with the Mezzanine Loan (as the same exist as of the date hereof and as the same may be amended, restated, replaced, supplemented or otherwise modified, in each case, in accordance with the express terms thereof and of the Mezzanine Intercreditor).

"**Mezzanine Loan Event of Default**" shall mean the occurrence of an "Event of Default" as such term is defined in the Mezzanine Loan Agreement.

16

"**Mezzanine Loan Monthly Debt Service**" shall mean, with respect to any particular period of time, regularly scheduled monthly principal (if applicable) and interest payments due under the Mezzanine Loan Documents.

"**Mezzanine Transfer**" shall mean each of (i) the pledge of the Mezzanine Equity Collateral by Mezzanine Borrower to Mezzanine Lender in connection with the Mezzanine Loan and (ii) any Mezzanine Foreclosure.

"**Minimum Counterparty Rating**" shall mean (a) a long term credit rating from S&P of at least "A+", which rating shall not include a "t" or otherwise reflect a termination risk, and (b) a long term credit rating from Moody's of at least "A1", which rating shall not include a "t" or otherwise reflect a termination risk (and, after a Securitization, the equivalent of the foregoing by the other Rating Agencies).  After a Securitization of the Loan, only the ratings of those Rating Agencies rating the Securities shall apply.

"**Minimum Disbursement Amount**" shall mean Ten Thousand and No/100 Dollars ($10,000).

"**Minimum Interest**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Minimum Interest Payment**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Monthly Amortization Payment**" shall mean, with respect to each Monthly Amortization Payment Date, an amount equal to $55,000.00.

"**Monthly Amortization Payment Date**" shall mean the first Monthly Payment Date following the commencement of the second Extension Period and each Monthly Payment Date thereafter throughout the term of the Loan.

"**Monthly Debt Service Payment**" shall have the meaning set forth in Section 2.6 hereof.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Monthly Payment Date**" shall mean January 9, 2018 and the ninth (9th) day of every calendar month occurring thereafter during the term of the Loan.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Moody's**" shall mean Moody's Investor Service, Inc.

"**Net Proceeds**" shall mean:  (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such Award.

17

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4 hereof.

"**New Non-Consolidation Opinion**" shall mean a substantive non-consolidation opinion provided by outside counsel acceptable to Lender (it being acknowledged and agreed that Cohen & Gresser LLP is acceptable to Lender) and the Rating Agencies and otherwise in form and substance acceptable to Lender and the Rating Agencies.

"**Non-Consolidation Opinion**" shall mean any substantive non-consolidation opinion delivered to Lender in connection with the Loan (including, without limitation, that certain substantive non-consolidation opinion delivered to Lender by Cohen & Gresser LLP in connection with the closing of the Loan).

"**Note**" shall mean that certain Consolidation, Extension and Restatement of Notes Agreement of even date herewith in the principal amount of up to $68,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

"**Obligations**" shall have the meaning set forth in the Security Instrument.

"**OFAC**" shall have the meaning set forth in Section 3.27 hereof.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by Responsible Officer of Borrower.

"**Open Period Start Date**" shall mean October 9, 2018.

"**Operating Condition**" shall mean (1) Completion of the Business Plan Work (for the avoidance of doubt, including all Critical Hotel Features) in accordance with the terms of this Agreement and (2) Critical Hotel Features are fully open for business and operating, in each case as determined by Lender.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Approved Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, (and without duplication) (a) utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, payroll and related taxes, computer processing charges, management fees (equal to the greater of (x) three percent (3.0%) of Gross Rents for the trailing twelve (12) month period or (y) actual management fees payable under the Management Agreement), operational equipment or other lease payments as approved by Lender, but specifically excluding (i) depreciation, (ii) Debt Service, (iii) non-recurring or extraordinary expenses, and (iv) deposits into the Reserve Funds; and (b) normalized FF&E expenditures equal to the greater of (x) four percent (4.0%) of Gross Rents for the trailing twelve (12) month period or (y) actual FF&E expenditures.

18

"**Organizational Chart**" shall have the meaning set forth in Section 3.28 hereof.

"**Original Alternate Rate**" shall have the meaning set forth in the definition of Alternate Rate Spread.

"**Original LIBOR Rate**" shall have the meaning set forth in the definition of LIBOR Rate.

"**Original Prime Rate Spread**" shall have the meaning set forth in the definition of Prime Rate Spread.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Parking Work**" shall have the meaning set forth in Section 4.32 hereof.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

"**Patriot Act Offense**" shall have the meaning set forth in Section 3.27 hereof.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) required under applicable Legal Requirements for the operation of the Property and the conduct of Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean collectively, (i) the lien and security interests created by this Agreement and the other Loan Documents, (ii) all liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent (other than liens securing a PACE Loan), (iv) any workers', mechanics' or similar liens on the Property provided any such lien is discharged or bonded in accordance with the terms and conditions of the Loan Documents, and (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Personal Property; provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the Property in the

19

ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Plans and Specifications**" shall mean all plans and specifications, shop drawings, architectural and engineering reports and designs, together with all architectural and engineering agreements, construction contracts and other material agreements entered into by Borrower, in connection with the Business Plan Work.

"**Policies**" shall have the meaning specified in Section 5.1 hereof.

"**Prepayment Notice**" shall have the meaning specified in Section 2.7(a) hereof.

"**Prime Rate**" shall mean rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate plus the Prime Rate Spread. Notwithstanding the foregoing, in no event shall the Prime Rate plus the Prime Rate Spread be less than the Floor Rate.

"**Prime Rate Spread**" shall mean the difference (expressed as the number of basis points) between (a) the LIBOR Rate on the Determination Date that LIBOR was last applicable to the Loan and (b) the Prime Rate on the Determination Date that LIBOR was last applicable to the Loan ("**Original Prime Rate Spread**"); provided, however, in no event shall such difference be a negative number. Notwithstanding the foregoing, following the occurrence of a Rate Increase Event, the Prime Rate Spread shall be increased by fifty (50) basis points and, if the Operating Condition is satisfied after the occurrence of a Rate Increase Event, the Prime Rate Spread shall be restored to the Original Prime Rate Spread. Any change in the Prime Rate Spread as hereinabove set forth shall become effective commencing with the immediately succeeding Interest Period.

MIA 31354953v9

"**Prohibited Transfer**" shall mean (i) a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents), (ii) a Sale or Pledge of an interest in any Restricted Party and/or (iii) Borrower's acquisition of any real property in addition to the real property owned by Borrower as of the Closing Date. A Prohibited Transfer shall include, but not be limited to, (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any (1) Leases or any Rents or (2) Property Documents; (C) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (D) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (E) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (F) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (G) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) or the engagement of a new Manager, in each case, other than in accordance with the terms and conditions of this Agreement; (H) if Borrower enters into, or the Property is subjected to, any PACE Loan; or (I) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower or by any other Person, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law) and/or any other action instituted by (or at the behest of) Borrower or its Affiliates or consented to or acquiesced in by Borrower or its Affiliates which results in a Property Document Event.

"**Property**" shall have the meaning set forth in the Security Instrument.

"**Property Document**" shall mean, individually and collectively, each REA.

"**Property Document Event**" shall mean any event which would, directly or indirectly, cause a termination right, right of first refusal, first offer or any other similar right, cause any termination fees to be due or would cause a Material Adverse Effect to occur under any Property Document (in each case, beyond any applicable notice and cure periods under the applicable Property Document); provided, however, any of the foregoing shall not be deemed a Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Property Document Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents related to, in each case,

any Property Document and/or other related matters (including, without limitation, Sections 3.32 and 4.25 of this Agreement).

"**Provided Information**" shall mean any information provided by or on behalf of any Borrower Party in connection with the Loan, the Property, such Borrower Party and/or any related matter or Person.

"**Qualified Carrier**" shall have the meaning set forth in Section 5.1 hereof.

"**Qualified Management Agreement**" shall mean a management agreement with a Qualified Manager with respect to the Property which is approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such management agreement and (ii) if such Qualified Manager is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such management agreement).

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such Person and (ii) if such Person is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such Person).

"**Rate Increase Event**" shall have the meaning set forth in the definition of LIBOR Rate.

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch, DBRS, Inc., Kroll Bond Ratings and Morningstar Credit Ratings, LLC and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing) in connection with and/or in anticipation of any Secondary Market Transaction.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities given by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion; provided, however, (i) if a Securitization has occurred and either (A) any Rating Agency fails to respond to any request for a Rating Agency Confirmation with respect to such event or otherwise elects (verbally or in writing) not to consider such event or (B) Lender (or Servicer) is not required to and has elected not to obtain (or cause to be obtained) a Rating Agency Confirmation with respect to such event, in each case, pursuant to and in compliance with the Securitization's pooling and servicing agreement (or similar agreement), then, notwithstanding anything contained in this Agreement to the contrary, Lender's written approval of such event shall be required in lieu of a Rating Agency Confirmation, in the case of clause (i)(A) above, from such Rating Agency or Rating Agencies (only) or, in the case of clause (i)(B) above, from each of the Rating Agencies or (ii) if a Securitization has not occurred, then, notwithstanding anything contained in this Agreement to the contrary, the term "Rating Agency Confirmation" shall be deemed instead to require Lender's written approval of such event.  In the event that either of clause (i) or (ii) of the

22

foregoing proviso applies, Lender's approval shall be based on Lender's good faith determination of applicable Rating Agency standards and criteria, unless Lender has an independent approval right in respect of such event pursuant to the other terms of this Agreement or the other Loan Documents, in which case the discretion afforded to Lender in connection with such independent approval right shall apply.

"**REA**" shall mean, individually and collectively, each agreement described on <u>Exhibit D</u> hereto (if any), any amendment, restatement, replacement or other modification thereof, any future reciprocal easement agreement, declaration of covenants, conditions and/or restrictions or other similar agreement affecting the Property entered into in accordance with the applicable terms and conditions hereof and any amendment, restatement, replacement or other modification thereof.

"**Register**" shall have the meaning set forth in Section 9.7 hereof.

"**Registrar**" shall have the meaning set forth in Section 9.7 hereof.

"**Registration Statement**" shall mean the registration statement relating to a Securitization.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Related Loan**" shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Securitization with the Loan (or any portion thereof or interest therein).

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

"**REMIC Opinion**" shall mean, as to any matter, an opinion as to the compliance of such matter with applicable REMIC Requirements (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies).

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the Loan (or the applicable portion thereof and/or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the IRS Code, the non-imposition of any tax on such REMIC Trust under the IRS Code (including, without limitation, taxes on "prohibited transactions and "contributions") and any other constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the Loan (or any portion thereof and/or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the IRS Code)).

23

"**REMIC Trust**" shall mean any "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code that holds any interest in all or any portion of the Loan.

"**Rents**" shall have the meaning set forth in the Security Instrument.

"**Replacement Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.8(c) hereof.

"**Required DSCR**" shall have the meaning set forth in Section 7.9 hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the FF&E Reserve Account, the Excess Cash Flow Account, the Interest Reserve Account, the Business Plan Reserve Account, the Sam Tell Account and any other escrow account established by this Agreement or the other Loan Documents (but specifically excluding the Cash Management Account and the Clearing Account).

"**Reserve Funds**" shall mean the Tax and Insurance Funds, the FF&E Reserve Funds, the Excess Cash Flow Funds, the Interest Reserve Funds, the Business Plan Reserve Funds, the Sam Tell Funds and any other escrow funds established by this Agreement or the other Loan Documents.

"**Reserve Percentage**" shall mean the rates (expressed as a decimal) of reserve requirements applicable to Lender on the applicable Determination Date (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of any Governmental Authority as now and from time to time hereafter in effect, dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors of the Federal Reserve System) (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against any category of extensions of credit or other assets which includes loans by a non United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits).  The determination of the Reserve Percentage shall be based on the assumption that Lender funded 100% of the Loan in the interbank Eurodollar market.  In the event of any change in the rate of such Reserve Percentage during an Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including, without limitation, the imposition of Reserve Percentages, or differing Reserve Percentages, on one or more but not all of the holders of the Loan or any participation therein, Lender may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining the rate of such Reserve Percentage which shall be used in the computation of the Reserve Percentage.  Lender's computation of the Reserve Percentage shall be determined conclusively by Lender and shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president of such Person or such other similar officer of such Person reasonably acceptable to Lender.

"**Restoration**" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restoration Retainage**" shall have the meaning set forth in Section 5.4 hereof.

"**Restoration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan.

"**Restricted Party**" shall mean Borrower, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Guarantor, any SPE Component Entity, any Affiliated Manager or any non-member manager.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"**Sam Tell**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell Account**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell Funds**" shall have the meaning set forth in Section 7.1 hereof.

"**Sam Tell UCC**" shall have the meaning set forth in Section 7.1 hereof.

"**Satisfactory Replacement Guarantor**" shall have the meaning set forth in Section 6.4.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization**" shall have the meaning set forth in Section 9.1 hereof.

"**Security Instrument**" shall mean that certain first priority Consolidation, Modification, Spreader and Extension Agreement dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 9.4 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.4 hereof.

25

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**SPE Component Entity**" shall have the meaning set forth on <u>Exhibit C</u> attached hereto.

"**Springing Member LLC**" shall mean a Delaware limited liability company properly structured in accordance with applicable Rating Agency criteria with at least one springing member that shall, upon the dissolution, withdrawal or disassociation of such limited liability company's last remaining member, immediately become the sole member of such limited liability company.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**State**" shall mean the state in which the Property or any part thereof is located.

"**State National**" shall have the meaning set forth in Section 5.1 hereof.

"**Strike Rate**" shall mean two percent (2.0%).

"**Substitution**" shall have the meaning set forth in Section 6.4.

"**Survey**" shall mean that certain survey of the Property certified and delivered to Lender in connection with the closing of the Loan.

"**Syndication**" shall have the meaning set forth in Section 9.7 hereof.

"**Tax Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Tax and Insurance Funds**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Title Insurance Policy**" shall mean, individually and collectively, each ALTA (or TLTA, as applicable) mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Security Instrument.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

26

"**Underwritable Cash Flow**" shall mean an amount calculated by Lender on a monthly basis equal to the trailing twelve (12) months Gross Rents less the trailing twelve (12) months Operating Expenses, each of which shall be subject to Lender's application of the Underwriting Adjustments.  Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Operating Expenses) shall be calculated by Lender in good faith based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall mean Lender Affiliate, any other placement agent or underwriter with respect to the applicable Securitization, each of their respective directors and each Person who controls the applicable Lender Affiliate or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act.

"**Underwriting Adjustments**" shall mean adjustments made by Lender in its calculation of Underwritable Cash Flow and the components thereof, in each case, based upon Lender and Rating Agency underwriting criteria, which such adjustments shall include, without limitation, adjustments (A) for (i) items of a non-recurring nature, (ii) intentionally omitted, and (iii) imminent liabilities and/or other expense increases (including, without limitation, imminent increases to Taxes and Insurance Premiums) and (B) to exclude rental income attributable to any Tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) not paying rent under its Lease or otherwise in default under its Lease for at least sixty (60) days beyond any applicable notice and cure periods, (3) that has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Lease, and (4) whose Lease is not in full force and effect.

"**Updated Information**" shall have the meaning set forth in Section 9.1 hereof.

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

"**Violation Work**" shall have the meaning set forth in Section 4.31 hereof.

## Section 1.2    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

27

# ARTICLE 2

# GENERAL TERMS

**Section 2.1    No Loan Commitment**.  Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make disbursements to Borrower.  Borrower hereby waives any right Borrower may have to make any claim to the contrary.

**Section 2.2    The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**Section 2.3    Disbursement to Borrower**.  Borrower may request and receive only one borrowing hereunder in respect of the Loan.  Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

**Section 2.4    The Note and the other Loan Documents**.  The Loan shall be evidenced by the Note and this Agreement and secured by this Agreement and the other Loan Documents.

**Section 2.5    Interest Rate**.

(a)    Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)    The following additional provisions shall apply and, subject to Section 2.5(c) hereof, the Interest Rate shall be determined in accordance with this Section 2.5(b):

(i)    The Interest Rate with respect to the Loan shall be:  (A) the LIBOR Rate with respect to the applicable Interest Period for a LIBOR Loan, (B) the Prime Rate plus the Prime Rate Spread for a Prime Rate Loan if the Loan is converted to a Prime Rate Loan pursuant to the provisions hereof or (C) the Alternate Rate plus the Alternate Rate Rate Spread for an Alternate Rate Loan if the Loan is converted to an Alternate Rate Loan pursuant to the provisions hereof. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to a Prime Rate Loan or an Alternate Rate Loan.

(ii)    Subject to the terms and conditions hereof, the Loan shall be a LIBOR Loan and Borrower shall pay interest on the outstanding principal amount of the Loan at the LIBOR Rate for the applicable Interest Period.  Any change in the rate of interest hereunder due to a change in the Interest Rate shall become effective as of the opening of business on the first day on which such change in the Interest Rate shall become effective.  Each determination by Lender of the Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(iii)    In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of

28

circumstances affecting the interbank Eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR and an Alternate Index has not been established pursuant to Section 2.5(b)(iv) below, then Lender shall forthwith give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding LIBOR Loan shall be converted, on the last day of the then current Interest Period, to a Prime Rate Loan.

(iv)    If, prior to the Loan being converted from a LIBOR Loan to a Prime Rate Loan in accordance with Section 2.5 hereof or following the Loan being converted from a Prime Rate Loan back to a LIBOR Loan in accordance with Section 2.5 hereof, Lender has determined in good faith that LIBOR has been succeeded by an Alternate Index, the Loan shall be converted from a LIBOR Loan to an Alternate Rate Loan, provided that the same does not violate applicable law. Lender may exercise the foregoing conversion right by giving notice of such determination in writing to Borrower at least one (1) day prior to the last day of the related Interest Period. If such notice is given, the Loan shall be converted, as of the first day of the next succeeding Interest Period, to an Alternate Rate Loan.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to an Alternate Rate Loan, or to convert an Alternate Rate Loan to a LIBOR Loan or a Prime Rate Loan.

(v)    If, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding Prime Rate Loan shall be converted to a LIBOR Loan on the last day of the then current Interest Period.

(vi)    All payments made by Borrower hereunder shall, provided that Lender complies with the requirements of Section 2.5(b)(ix) below, be made free and clear of, and without reduction for or on account of, any and all present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding income and franchise taxes of the United States of America imposed by the jurisdiction under the laws of which Lender is organized or any political subdivision or taxing authority thereof or therein or imposed by the jurisdiction of Lender's applicable lending office where Lender is resident or engaged in business or any political subdivision or taking authority thereof or therein (such non-excluded taxes being referred to collectively as "**Foreign Taxes**").  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign

29

Tax.  Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.  All amounts payable under this Section 2.5(b)(v) shall constitute additional interest hereunder and shall be secured by the Security Instrument and the other Loan Documents.  The provisions of this Section 2.5(b)(v) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.  Any reference under this Section 2.5(b)(v) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(vii)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR Loan as contemplated hereunder, then (A) the obligation of Lender hereunder to make a LIBOR Loan or to convert a Prime Rate Loan to a LIBOR Loan shall be canceled forthwith and (B) any outstanding LIBOR Loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as required by law.  Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any reasonable costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder.  Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(viii)   In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(A)    shall hereafter impose, modify or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of LIBOR hereunder;

(B)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(C)    shall hereafter impose on Lender any other condition, and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

30

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender (the "**Additional Costs**"). If, on or after the Open Period Start Date, Borrower is required to compensate Lender for Additional Costs pursuant to this clause (vii), then Borrower shall have a right to prepay the Loan within sixty (60) days after notification of such Additional Costs without payment of the Additional Interest, the Minimum Interest Payment or any prepayment premium or penalty, but otherwise in accordance with this Agreement. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(ix)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs as a consequence of (A) any default by Borrower in payment of the principal of or interest on a LIBOR Loan, including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder, (B) any prepayment (whether voluntary or mandatory) of the LIBOR Loan on a day that is not the last day of an Interest Period, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Loan hereunder and (C) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Interest Rate from the LIBOR Rate to the Prime Rate plus the Prime Rate Spread with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the LIBOR Rate on a date other than the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder (the amounts referred to in clauses (A), (B) and (C) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence. This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(x)    If Lender is a U.S. Person (other than the lender originally named herein), Lender shall deliver to Borrower, upon request, a Form W-9 (unless it establishes to the reasonable satisfaction of Borrower that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax). If Lender is not a U.S. Person, Lender shall deliver to Borrower, upon request, either (A) a Form W-8BEN which indicates a 0% rate of tax or (B) a Form W-8ECI. If Lender is not a U.S. Person, Lender further undertakes to deliver to Borrower additional Forms W-8, 1001, 4224 (or any successor forms) or other manner of certification, as the case may be, (x) on or before the date that any such form expires or becomes obsolete, (y) after the occurrence of any event

requiring a change in the most recent form previously delivered by it to Borrower, and (z) such extensions or renewals thereof as may reasonably be requested by Borrower, certifying that Lender is entitled to receive payments hereunder without deduction or withholding of any Loan Taxes.  However, in the event that any change in law, rule, regulation, treaty or directive, or in the interpretation or application thereof (a "**Law Change**"), has occurred prior to the date on which any delivery pursuant to the preceding sentence would otherwise be required which renders such form inapplicable, or which would prevent Lender from duly completing and delivering any such form, or if such Law Change results in Lender being unable to deliver a Form W-9 (or other satisfactory evidence that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax), Lender shall not be obligated to deliver such forms but shall, promptly following such Law Change, but in any event prior to the time the next payment hereunder is due following such Law Change, advise Borrower in writing whether it is capable of receiving payments without any deduction or withholding of Loan Taxes.  In the event of such Law Change, Borrower shall have the obligation to make Lender whole and to "gross-up" under Section 2.5(b)(v) hereof, despite the failure by Lender to deliver such forms.  Any reference under this Section 2.5(b)(ix) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(c)     In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

(d)     Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (i) the actual number of days elapsed in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (iii) the outstanding principal balance of the Loan.  The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Period immediately prior to such Monthly Payment Date.  Borrower understands and acknowledges that such interest accrual requirement results in more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(e)     This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All

32

sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.6    Loan Payments.

(a)     Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through and including the next succeeding fourteenth (14th) day of a calendar month, whether such fourteenth (14th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the fifteenth (15th) day of a calendar month, in which case no such separate payment of interest shall be due). Each interest accrual period (the "**Interest Period**") thereafter shall commence on the fifteenth (15th) day of each calendar month during the term of the Loan and shall end on and include the fourteenth (14th) day of the next occurring calendar month. No Interest Period shall be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

(b)     Borrower shall make (i) on each Monthly Payment Date throughout the term of the Loan, a payment to Lender of interest accruing on the outstanding principal balance of the Loan during the Interest Period in which such Monthly Payment Date occurs, which payments shall be applied to accrued and unpaid interest, and (ii) on each Monthly Amortization Payment Date, a Monthly Amortization Payment to Lender, which payments shall be applied to principal (each such payment in (i) and (ii), a "**Monthly Debt Service Payment**").

(c)     Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

(d)     If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5%) of such unpaid sum and (ii) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents.

(e)     Additionally:

(i)     Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

33

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately preceding Business Day.

(iii)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

(iv)    Lender shall have the right from time to time, in its sole discretion, upon not less than thirty (30) days prior written notice to Borrower, to change the Monthly Payment Date to a different calendar day each month which is not more than five (5) days earlier nor more than ten (10) days later than the sixth (6th) day of each calendar month; provided, however, that (A) if Lender shall have elected to change the Monthly Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period correspondingly and (B) if Lender shall have elected to change the Monthly Payment Date as aforesaid to any calendar day earlier than the sixth (6th) day of each calendar month, Borrower shall have a grace period for any amounts due on a Monthly Payment Date through the sixth (6th) day of each such calendar month.

### Section 2.7    Prepayments.

(a)    Except as otherwise provided in this Section 2.7, Borrower shall not have the right to prepay the Loan in whole or in part.  On or after the Open Period Start Date, Borrower may, provided no Event of Default has occurred and is continuing, at its option and upon not less than thirty (30) days prior notice (a "**Prepayment Notice**") to Lender (or such shorter period of time as may be permitted by Lender in its sole discretion), which notice must specify the date on which such prepayment is to be made, prepay the Debt in whole (but not in part) on any date (other than a date from, and including, the tenth (10th) day of a calendar month through, and including, the fourteenth (14th) day of a calendar month); provided that such prepayment is accompanied by payment of all interest accrued on the principal amount prepaid through and including the date of repayment, the Breakage Costs, the Additional Interest and the Minimum Interest Payment, in each case to the extent applicable.  Lender shall not be obligated to accept any prepayment unless it is accompanied by payment of all sums required to be paid in connection therewith.   As a condition to any voluntary prepayment, the Prepayment Notice may not be given to Lender more than ninety (90) days prior to the date upon which prepayment is to be made and Borrower hereby agrees that, in the event Borrower delivers a Prepayment Notice and fails to prepay the Loan in accordance with the Prepayment Notice and the terms of this Section 2.7, Borrower shall pay Lender all reasonable out-of-pocket costs and expenses incurred by Lender, including, without limitation, any Breakage Costs or similar expenses, as a result of such failure.  A Prepayment Notice may be revoked by Borrower if written notice of such revocation is delivered by Borrower to Lender on or before the date that is five (5) Business Days prior to the prepayment date set forth in the Prepayment Notice.  If Borrower delivers to Lender a Prepayment Notice and subsequently revokes such Prepayment Notice prior to prepayment, Borrower shall promptly reimburse Lender for all costs and expenses incurred by Lender (including any attorneys' fees) due to such revoked notice or otherwise in connection with the anticipated prepayment.

34

(b)    On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender is not required pursuant to the terms and conditions of this Agreement to (and does not otherwise elect to) make such Net Proceeds available to Borrower for Restoration, Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds.  Any prepayment received by Lender under this Section 2.7(b) shall be accompanied by (i) all interest accrued on the principal amount prepaid through and including the date of repayment, the applicable portion of the Additional Interest and any Breakage Costs, (ii) all other sums due and payable under the Loan Documents (including, without limitation, any amount due under Section 9.6 hereof) and (iii) all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such prepayment.  No prepayment premium or penalty (which shall not be deemed to include the Additional Interest or, if an Event of Default exists, the Minimum Interest Payment, each of which shall be owed as provided for in this Agreement, if applicable) shall be due in connection with any prepayment made pursuant to this Section 2.7(b).

(c)    If concurrently with or after an Event of Default, payment of all or any part of the principal of the Loan is tendered by or on behalf of Borrower (including, without limitation, by virtue of an application of Reserve Funds or any other cash collateral for the Loan by Lender pursuant to the terms and conditions of the Loan Documents), a purchaser at foreclosure or any other Person, (i) such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth herein and (ii) Borrower, such purchaser at foreclosure or other Person shall pay the Minimum Interest Payment, the Additional Interest and the Breakage Costs, in each case to the extent applicable, in addition to (A) the outstanding principal balance of the Loan, (B) all accrued and unpaid interest and other amounts payable under the Loan Documents and (C) if such prepayment occurs prior to the final sale of the Loan in a Secondary Market Transaction, Hedge Losses.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

(d)    Except as otherwise expressly set forth herein, in all events and under all circumstances Borrower shall be obligated to pay to Lender minimum interest in an amount equal to interest at the Interest Rate in effect as of the date of full repayment of the Debt (whether by virtue of a voluntary prepayment hereunder, acceleration, or otherwise) calculated on the face amount of the Note for a period of fifteen (15) months (the "**Minimum Interest**").  Upon prepayment or repayment in full of the Obligations or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender an amount (such amount, the "**Minimum Interest Payment**") equal to the positive difference, if any, between (i) the entire Minimum Interest, minus (ii) the aggregate total of all Monthly Debt Service Payments paid by Borrower during the term of the Loan (exclusive of any portions thereof constituting (A) interest accrued at the Default Rate in excess of the Interest Rate or (B) payments of principal).  In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (x) Lender shall have no obligation to accept any prepayment or repayment of the Loan unless and until Borrower shall have complied with this Section 2.7(d), and (y) Lender shall have no obligation to release or, if requested by Borrower, assign the Note and Security Instrument upon payment of the Obligations unless and until Lender shall have received the entire Minimum Interest Payment.  In the event that any Minimum Interest Payment is due hereunder, Lender shall deliver to Borrower a statement setting forth the amount and

35

determination of the Minimum Interest Payment, and, provided that Lender shall have in good faith applied the formula described above, Borrower shall not have the right to challenge the calculation or the method of calculation set forth in any such statement in the absence of manifest error, which calculation may be made by Lender on any day during the fifteen (15) day period preceding the date of such prepayment.  Lender shall not be obligated or required to have actually reinvested the prepaid principal balance at LIBOR or otherwise as a condition to receiving the Minimum Interest Payment.  Borrower expressly acknowledges and agrees that the Minimum Interest Payment shall constitute additional consideration for the Loan, and shall, upon payment, be the sole and exclusive property of Lender.

### Section 2.8    Interest Rate Cap Agreement.

(a)    Prior to or contemporaneously with the Closing Date, Borrower shall enter into an Interest Rate Cap Agreement with a LIBOR strike rate equal to the Strike Rate.  The Interest Rate Cap Agreement (i) shall at all times be in a form and substance acceptable to Lender, (ii) shall at all times be with a Counterparty, (iii) shall at all times be for a period equal to the term of the Loan, and (iv) shall at all times have a notional amount equal to or greater than the principal balance of the Loan and shall at all times provide for the applicable LIBOR strike rate to be equal to the Strike Rate.  Borrower shall direct such Counterparty to deposit directly into the Cash Management Account (or, if the Cash Management Account is not then activated, into such other Account as Lender may designate) any amounts due Borrower under such Interest Rate Cap Agreement so long as any portion of the Debt is outstanding, provided that the Debt shall be deemed to be outstanding if the Property is transferred by judicial or non-judicial foreclosure or deed-in-lieu thereof.  Additionally, Borrower shall collaterally assign to Lender, pursuant to the Collateral Assignment of Interest Rate Cap Agreement, all of its right, title and interest in and to the Interest Rate Cap Agreement (and any replacements thereof), including, without limitation, its right to receive any and all payments under the Interest Rate Cap Agreement (and any replacements thereof), and Borrower shall, and shall cause Counterparty to, deliver to Lender a fully executed Interest Rate Cap Agreement (which shall, by its terms, authorize the assignment to Lender and require that payments be deposited directly into the Cash Management Account).

(b)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately into the Cash Management Account.  Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(c)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty by any Rating Agency below the Minimum Counterparty Rating, Borrower shall (i) replace the Interest Rate Cap Agreement not later than fifteen (15) Business Days following receipt of notice of such downgrade, withdrawal or qualification with an Interest Rate Cap Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 2.8) (a "**Replacement Interest Rate Cap Agreement**") from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating or (ii) if provided for in such Interest Rate Cap Agreement, cause the Counterparty to deliver

collateral to secure Borrower's exposure under the Interest Rate Cap Agreement in such amount and pursuant to such terms as are acceptable to the Rating Agencies.

(d)     In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or fails to maintain the Interest Rate Cap Agreement in accordance with the terms and provisions of this Agreement, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is reimbursed by Borrower to Lender.

(e)     Each Interest Rate Cap Agreement shall contain the following language or its equivalent:  "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, the Counterparty must, within ten (10) business days, either (x) post collateral on terms acceptable to each Rating Agency and Borrower, or (y) find a replacement Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency and Borrower; provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an "Additional Termination Event" as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the "Affected Party." In the event that a Counterparty is required pursuant to the terms of an Interest Rate Cap Agreement to (i) deliver collateral as specified in the applicable Interest Rate Cap Agreement, or (ii) find a replacement Counterparty, Borrower covenants and agrees that Borrower shall seek Lender's approval with respect thereto and shall not approve or consent to the foregoing unless and until Borrower receives Lender's prior written approval and shall approve or consent to the foregoing upon receipt of Lender's prior written approval.  Borrower's failure to comply with the requirements of this Section 2.8(e) shall constitute, at Lender's option, an immediate Event of Default.

(f)     Borrower shall obtain and deliver to Lender an opinion from counsel (which counsel may be in house counsel for the Counterparty) for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)     the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)     the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

37

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g)    Borrower shall deliver to Lender a new Collateral Assignment of Interest Rate Cap Agreement acceptable to Lender in connection with each Replacement Interest Rate Cap Agreement.

**Section 2.9    Assignment of Security Instrument**.    Upon payment in full of all principal and interest due on the Loan and all other amounts due and payable in accordance with the terms and provisions of the Loan Documents, and upon the written request and at the sole cost and expense of Borrower (including payment of Lender's reasonable legal fees and expenses and then customary administrative fee in connection therewith), Lender shall cooperate with Borrower to effect an assignment of the Note and the Security Instrument to a new lender by assigning the Note and the Security Instrument, each without recourse, covenant or warranty of any nature, express or implied, to such new lender designated by Borrower (other than Borrower or a nominee of Borrower) pursuant to documentation reasonably acceptable to Lender.

**Section 2.10    Payment of Additional Interest**.

(a)    Subject only to Section 2.10(d) below, Borrower shall be obligated to pay the Additional Interest to Lender as follows: (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof, in addition to all other amounts payable to Lender under Section 2.7 hereof, Borrower shall pay to Lender, on account of the Additional Interest, an amount equal to one-half of one percent (0.50%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or Net Proceeds to the Debt in accordance with the terms of this Agreement and the Security Instrument, one-half of one percent (0.50%) of the amount thereof shall be retained by Lender on account of the Additional Interest and the balance thereof shall be applied to the Debt; and (iii) upon repayment in full of the Debt or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender the entire Additional Interest which would be due on such date, less any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.10(a).

MIA 31354953v9

(b)　　In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (i) Lender shall have no obligation to accept any prepayment of the Loan unless and until Borrower shall have complied with this Section 2.10, and (ii) Lender shall have no obligation to release or assign any Loan Document upon payment of the Debt unless and until Lender shall have received the Additional Interest then due and payable.

(c)　　Borrower expressly acknowledges and agrees that the Additional Interest shall constitute additional consideration for the Loan.

(d)　　Notwithstanding anything herein or in any other Loan Document to the contrary, upon any fixed rate refinancing of the Loan by the initially-named Lender hereunder, or an Affiliate thereof, the Additional Interest due and payable in connection therewith shall be waived (it being agreed, however, that in no event shall any refund be owed to Borrower on account of any amounts paid pursuant to Section 2.10(a) above).

**Section 2.11   Extension of the Maturity Date**.   Borrower shall have the option to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (the "**Extension Option**") of six (6) months each (each, an "**Extension Period**") to (i) December 9, 2019 if the first Extension Option is exercised and (ii) June 9, 2020 if the second Extension Option is exercised (each such date, the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions (in each case as determined by Lender):

(a)　　no Event of Default shall have occurred and be continuing at the time an Extension Option is exercised and on the date that the applicable Extension Period is commenced;

(b)　　Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than ninety (90) days and no later than thirty (30) days prior to the applicable Maturity Date; provided, however, that Borrower shall be permitted to revoke such notice at any time up to three (3) Business Days before the Maturity Date provided that Borrower pays to Lender all actual out-of-pocket costs incurred by Lender in connection with such notice, including, without limitation, any Breakage Costs;

(c)　　Borrower shall obtain and deliver to Lender prior to exercise of such Extension Option, pursuant to the applicable terms and conditions of Section 2.8 hereof, a Replacement Interest Rate Cap Agreement, which Replacement Interest Rate Cap Agreement shall be effective commencing on the first day of the related Extension Period and shall have a maturity date not earlier than the last day of the related Extension Period;

(d)　　Borrower shall have paid to Lender the Extension Fee on the date the related Extension Period is commenced;

(e)　　intentionally omitted;

(f)　　each Guarantor shall execute and deliver a reaffirmation, in form and substance satisfactory to Lender, of such Guarantor's obligations under each of the Loan Documents executed and delivered by such Guarantor;

MIA 31354953v9

(g)       Borrower shall deliver to Lender such other certificates, documents or instruments as Lender may reasonably require, including, without limitation, an Officer's Certificate stating that all representations and warranties of Borrower set forth in Article 3 hereof remain true and correct in all material respects, subject to any changes in facts or circumstances permitted to have occurred, or not prohibited from having occurred, pursuant to the terms of the Loan Documents (in which case such change of facts and circumstances shall be set forth in such Officer's Certificate with reference to the applicable representations and warranties) or setting forth any exceptions to such representations and warranties, which exceptions shall be satisfactory to Lender;

(h)       if required by Lender, Lender shall have received, at Borrower's expense, a title continuation from the title company that provided the Title Insurance Policy evidencing that there are no liens against the Property other than Permitted Encumbrances;

(i)       Borrower shall have completed all Business Plan Work in accordance with the terms and conditions of this Agreement;

(j)       intentionally omitted;

(k)       in connection with the second Extension Option, the Debt Yield shall not be less than 10.5% at the time such Extension Option is exercised and on the date that such Extension Period is commenced; provided, however, that if the foregoing condition is not satisfied, Borrower may prepay a portion of the outstanding principal balance of the Loan as may be necessary so that such condition is satisfied, provided that any such prepayment shall be subject to Borrower's obligation to pay the proportionate share of the Additional Interest applicable thereto pursuant to Section 2.10 hereof;

(l)       in connection with the second Extension Option, the Debt Service Coverage Ratio (Combined) shall be not less than 1.25 to 1.00 at the time the Extension Option is exercised; provided, however, that if the foregoing condition is not satisfied, Borrower may prepay a portion of the outstanding principal balance of the Loan as may be necessary so that such condition is satisfied, provided that any such prepayment shall be subject to Borrower's obligation to pay the proportionate share of the Additional Interest applicable thereto pursuant to Section 2.10 hereof;

(m)       in connection with the second Extension Option, a permanent certificate of occupancy covering all of the Improvements shall have been obtained; and

(n)       the maturity date of the Mezzanine Loan shall have been extended to the applicable Extended Maturity Date.

All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the applicable Extended Maturity Date in the event an Extension Option is exercised.

MIA 31354953v9

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the Closing Date that:

**Section 3.1    Existence and Authority**.    Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in the State; (c) except as set forth on Exhibit F hereto, has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property; and (d) has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents on Borrower's part to be performed.

**Section 3.2    Borrower's Principal Place of Business**.    Borrower's principal place of business and its chief executive office as of the date hereof is 1274 49th Street, Suite 184, Brooklyn, New York 11219.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.  Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 4253908.  Borrower's federal tax identification number is 45-5412160.  Borrower is not subject to back-up withholding taxes.

**Section 3.3    Validity of Documents**.    (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to operate the Property, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Security Instrument in appropriate land records in the State and except for Uniform Commercial Code filings relating to the security interest created hereby), (b) this Agreement, the Note, the Security Instrument and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor and (c) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general

41

principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

**Section 3.4    Agreements**.  Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents. Borrower is not a party to any agreement or instrument or subject to any restriction which would have a Material Adverse Effect. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations hereunder or under the Note to an obligation owed to another party.

**Section 3.5    Title; Permitted Encumbrances**.  Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all liens whatsoever except the Permitted Encumbrances. None of the Permitted Encumbrances, individually or in the aggregate, (a) materially interfere with the benefits of the security intended to be provided by the Loan Documents, (b) materially and adversely affect the value of the Property, (c) impair the use or operation of the Property, or (d) impair Borrower's ability to pay the Obligations in a timely manner. The Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on Borrower's interest in the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances. There are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may become liens prior to, or equal or coordinate with, the lien of the Security Instrument.

**Section 3.6    Purchase Options**.  Neither the Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties.

42

**Section 3.7    Condemnation**.    No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of the access to the Property.

**Section 3.8    Separate Lots; Flood Zone; Wetlands**.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.  Except as expressly disclosed on the Survey, no portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards.  No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

**Section 3.9    Use of Property**.  The Property is used exclusively as a hotel and for other appurtenant and related uses.

**Section 3.10    Certain Additional Property Representations**.

(a)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar Legal Requirements.

(b)    The Property is served by public water and sewer systems and sanitary sewer and storm drain facilities, in each case adequate to service the Property for its intended uses.  All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.  The Property is served by all utilities necessary or convenient for the full use and enjoyment of the Property, all of which (i) are provided by public utilities, (ii) either have been accepted by the Property or the Property is equipped to accept the same, (iii) are located in a public right of way abutting the Property and (iv) are connected so as to serve the Property without passing over other property absent a valid easement.

(c)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, dedicated to public use and accepted by all Governmental Authorities, are serviceable and all-weather and are physically and legally open for use by the public.  The Property has either direct access to such public roads or streets or access to such public roads or streets by virtue of a perpetual easement or similar agreement inuring in favor of Borrower and any subsequent owners of the Property.

(d)    Except as set forth on <u>Exhibit F</u> hereto, Borrower has obtained all Permits, all of which are in full force and effect as of the date hereof and not subject to forfeiture, revocation, suspension or modification.

(e)    The Property is free from damage caused by fire or other casualty.  The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair (excepting ordinary wear and

43

tear), except for any of the foregoing that will be completed as part of the Business Plan Work. There exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(f)       Except for the Business Plan Work, Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created by this Agreement, the Note, the Security Instrument and the other Loan Documents.

(g)       To Borrower's knowledge after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(h)       All the Improvements lie within the boundaries of the Land and any building restriction lines applicable to the Land.  All easements, cross easements, licenses, air rights and rights of way or other similar property interests, if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.

(i)       Except for the Business Plan Work, Borrower has not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been completed and paid for in full, (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full or (iii) attached any fixtures to the Property which have not been paid for in full.  There is no such construction, repairs, alterations or improvements ongoing at the Property as of the Closing Date. There are no outstanding or disputed claims for any Labor and Materials Charges and there are no outstanding liens or security interests in connection with any Labor and Materials Charges. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

**Section 3.11   Financial Condition**.

(a)       Borrower is solvent and Borrower has received reasonably equivalent value for the granting of the Security Instrument.  No proceeding under Creditors Rights Laws with respect to any Borrower Party has been initiated.

(b)       In the last ten (10) years, no (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

44

(c)    No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

(d)    Except as set forth on <u>Exhibit G</u> attached hereto, with respect to any loan or financing in which any Borrower Party or any Affiliate thereof has been directly or indirectly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety (including, without limitation and to the extent applicable, any loan which is being refinanced by the Loan), none of such loans or financings has ever been (i) more than 30 days in default or (ii) transferred to special servicing.

**Section 3.12    Financial Information**.  All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Guarantor and/or the Property (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, Guarantor or the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements and except as set forth on <u>Exhibit J</u> attached hereto.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or Guarantor from that set forth in said financial statements.

**Section 3.13    Fraudulent Conveyance**.  Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 3.14    Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

MIA 31354953v9

**Section 3.15   No Plan Assets**.

(a)      Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA;

(b)      Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA;

(c)      transactions by or with Borrower are not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans;

(d)      none of the assets of Borrower constitutes "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101; and

(e)      Neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA).

**Section 3.16   Not a Foreign Person**.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the IRS Code.

**Section 3.17   Business Purposes**.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

**Section 3.18   Litigation**.  Except as set forth on Exhibit H attached hereto, there is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower or Guarantor or against or affecting the Property.

**Section 3.19   Leases**.  The Property is not subject to any Leases.

**Section 3.20   Taxes**.

(a)      All Taxes and governmental assessments owing in respect of the Property have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(b)      Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(c)      All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection

46

with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement, the Security Instrument, the Note and the other Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid, and, under current Legal Requirements, the Security Instrument and the other Loan Documents are enforceable in accordance with their terms by Lender (or any subsequent holder thereof), except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 3.21   Insurance**.  Borrower has obtained and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**Section 3.22   Management Agreement**.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  As of the date hereof, no management fees under the Management Agreement are due and payable.

**Section 3.23   Illegal Activity/Forfeiture**.

(a)      No portion of the Property has been purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)      There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Security Instrument or the other Loan Documents.

**Section 3.24   Special Purpose Entity**.  Since Borrower's and any SPE Component Entity's creation and as of the date hereof, Borrower and each SPE Component Entity have complied with and are in compliance with the requirements set forth on <u>Exhibit C</u> attached hereto.  Additionally, Borrower represents and warrants to Lender that it and each SPE Component Entity:

(a)      is and always has been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business;

(b)      has no judgments or liens of any nature against it except for tax liens not yet due;

(c)      is in compliance with all laws, regulations, and orders applicable to it and has received all permits necessary for it to operate;

47

(d)       is not aware of any pending or threatened litigation against it;

(e)       is not involved in any dispute with any taxing authority;

(f)       has paid all taxes that it owes;

(g)       has never owned any property other than the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and personal property necessary or incidental to its ownership or operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and has never engaged in any business except the ownership and operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower);

(h)       is not now, nor has ever been, party to any lawsuit, arbitration, summons, or legal proceeding; and

(i)       has no material contingent or actual obligations not related to the Property.

**Section 3.25   Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Security Instrument, the Note or the other Loan Documents.

**Section 3.26   Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 3.27   Embargoed Person**.  Neither Borrower nor, to Borrower's knowledge, any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of the Office of Foreign Assets Control ("**OFAC**") or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity.  For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or (v) the Patriot Act.

48

"**Patriot Act Offense**" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "**Government Lists**" means (A) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (B) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (C) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

Section 3.28   **Organizational Chart**.  The organizational chart attached as <u>Exhibit A</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

Section 3.29   **Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

Section 3.30   **No Other Financing; Other Obligations and Liabilities**.  Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect.  Borrower has no known contingent liabilities other than pursuant to the Loan Documents.

Section 3.31   **Contracts**.

(a)      Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.

(b)      Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)      Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

(d)      Except for the Major Contracts set forth on <u>Exhibit I</u> attached hereto, no Major Contract has as a party an Affiliate of Borrower.  All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

Section 3.32   **Property Document Representations**.  With respect to each Property Document, Borrower hereby represents that (a) each Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Property Document by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of

49

time, the giving of notice, or both, would constitute a default under any Property Document, (c) all rents, additional rents and other sums due and payable under the Property Documents have been paid in full, (d) no party to any Property Document has commenced any action or given or received any notice for the purpose of terminating any Property Document and (e) the representations made in any estoppel or similar document delivered with respect to any Property Document in connection with the Loan are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

Section 3.33   **No Change in Facts or Circumstances; Disclosure**.   All information submitted by (or on behalf of) Borrower or Guarantor to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower and/or Guarantor in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects.    There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect.   Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 3.34   **Third Party Representations**.    Each of the representations and the warranties made by Guarantor in the other Loan Documents (if any) are true, complete and correct in all material respects.

Section 3.35   **Non-Consolidation Opinion Assumptions**.   All of the assumptions made in any Non-Consolidation Opinion delivered in connection with the closing of the Loan (if any), including, but not limited to, any exhibits attached thereto and/or certificates delivered in connection therewith, are true, complete and correct.

Section 3.36   **Hotel Representations**.

(a)     Other than as set forth on Exhibit L hereof (such leases or agreements, the "**Equipment Leases**"), the Property is not subject to equipment leases or any other similar leases or agreements.

(b)     Except for any incentive compensation systems designed to promote increased customer use of the Property, there are no:  (i) collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; or (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower or the Property, or any portion thereof is a party, or by which either is or may be bound.  Borrower has no employees as of the date hereof. Borrower has not violated in any material respects any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate Governmental Authorities.

50

**Section 3.37   Business Plan Work**.  Borrower has delivered or caused to be delivered to Lender true, correct and complete copies of all Plans and Specifications in existence as of the Closing Date.

**Section 3.38   Construction**.

(i)        Construction Documents.

(A)        Borrower has delivered to Lender a list, certified by Borrower, of all contractors who have been or, to the extent identified by Borrower, will be supplying labor or materials in connection with the Business Plan Work.

(B)        Borrower has delivered to Lender the most recent completed and itemized Application and Certificate for Payment (AIA Document No. G702), containing the certification of the General Contractor to whom such payment is made, as applicable, and the Architect as to the accuracy of same, together with invoices relating to the costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Property to the date of the requisition.

(C)        Borrower has furnished to Lender true and complete sets of the Plans and Specifications which will comply with all applicable legal requirements, all governmental approvals, and all restrictions, covenants and easements affecting the Property, and which have been approved by General Contractor, the Architect, and the other design professionals (as applicable), and any governmental authority as is required for construction and renovation relating to the Business Plan Work.

(ii)        Zoning.

(A)        The land use and zoning regulations which are in effect for the Property permit the Business Plan Work to be completed and use of the Property as a one hundred forty-seven (147) room hotel on an as of right basis and no variance, conditional use permit, special use permit or other similar approval is required for the completion the Business Plan Work or the use of the Property as currently used and as contemplated by the Plans and Specifications that has not been obtained prior to the date hereof.

(b)        All government approvals necessary for the Business Plan Work as contemplated by the Plans and Specifications and the Business Plan, including, without limitation, a final and full building permit, have been obtained , any applicable appeal periods have expired and all necessary development rights for the Property have fully and irrevocably vested.  Borrower has complied with all legal requirements, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any applicable governmental authority and applicable to any construction at the Property, so as to permit construction to continue to progress and to permit the Business Plan Work to be completed in accordance with the terms of this Agreement.

51

(iii)    Budget.  The Business Plan accurately reflects all costs and expenses of the Business Plan Work, including all anticipated costs and expenses through completion of the Business Plan Work.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 3 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender. All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 4

## BORROWER COVENANTS

Borrower hereby covenants and agrees with Lender that, from the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents:

**Section 4.1    Existence**.  Borrower will continuously maintain (a) its existence, (b) its rights to do business in the State and (c) its franchises and trade names, if any.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPE Component Entity to (A) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which such SPE Component Entity would be dissolved, wound up or liquidated in whole or in part or (B) amend, modify, waive or terminate the organizational documents of such SPE Component Entity, in each case without obtaining the prior written consent of Lender.

**Section 4.2    Change of Name, Identity or Structure**.  Borrower shall not change (or permit to be changed) Borrower's or the SPE Component Entity's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth in this Agreement, or (d) corporate, partnership or other structure or state of formation, without, in each case, notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's or the SPE Component Entity's structure or state of formation, without first obtaining the prior written consent of Lender and, if required by Lender, a Rating Agency Confirmation with respect thereto.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or the SPE Component Entity intends to operate the Property, and representing and warranting that Borrower or the SPE Component Entity does business under no other trade name with respect to the Property.

**Section 4.3    Business and Operations**.    Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.    Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

**Section 4.4    Title to Property; Legal Requirements**.

(a)    Borrower shall warrant and defend the validity and priority of the liens of the Security Instrument and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to the Permitted Encumbrances.

(b)    Borrower shall promptly comply and shall cause the Property to comply with all Legal Requirements affecting the Property or the use thereof (which such covenant shall be deemed to (i) include Environmental Laws and (ii) require Borrower to keep all Permits in full force and effect).

(c)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements.

(d)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

(e)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of such Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.5    Waste**.    Borrower shall not intentionally commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially

53

increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the Loan.  Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

Section 4.6    **Maintenance and Use of Property**.  Borrower shall cause the Property to be maintained in a good and safe condition and repair.  The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender or as otherwise permitted pursuant to Section 4.19 hereof.  Borrower shall perform (or cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation or similar proceeding and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land.  Borrower shall operate the Property for the same uses as the Property is currently operated and Borrower shall not, without the prior written consent of Lender, (i) change the use of the Property or (ii) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

Section 4.7    **Taxes and Other Charges**.

(a)    Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 7.2 hereof.  Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof).  Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal

54

Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Security Instrument being primed by any related lien.

**Section 4.8    Labor and Materials**.

(a)    Subject to Section 4.8(b) below, Borrower will promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a "**Labor and Materials Charge**") and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Security Instrument, except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Labor and Materials Charge, the applicability of any Labor and Materials Charge to Borrower or to the Property or any alleged non-payment of any Labor and Materials Charge and defer paying the same, provided that (i) no Event of Default has occurred and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay (or cause to be paid) any such contested Labor and Materials Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Labor and Materials Charge from the Property or Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Labor and Materials Charge, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to pay for such Labor and Materials Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Labor and Materials Charge is finally established or the Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

55

**Section 4.9    Property Access**.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants.

**Section 4.10    Litigation**.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which could reasonably be expected to have a Material Adverse Effect.

**Section 4.11    Performance by Borrower**.  Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

**Section 4.12    Books and Records**.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements set forth on Exhibit C hereof and the Approved Accounting Method, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make and retain such copies or extracts thereof as Lender shall desire, provided that, prior to the occurrence of an Event of Default, Borrower shall not be required to pay costs and expenses incurred by Lender.  After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender (it being acknowledged and agreed that Berdon LLP is acceptable to Lender) (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, the same shall, upon Lender's written request, be audited by such independent certified public accountant) in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, operating expenses and occupancy statistics for the Property (including an average daily room rate).

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's

Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject quarter, (ii) an occupancy report for the Property (including an average daily room rate) and any franchise scores, franchise inspection reports or other similar information made available to Borrower during the subject quarter, (iii) FF&E expenditures, (iv) the most current Smith Travel Research Reports, in a form reasonably acceptable to Lender, then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property, (v) quarterly and year-to-date operating statements (including expenditures for FF&E) prepared for each calendar quarter, noting net operating income, gross income, and operating expenses (not including any contributions to the FF&E Reserve Funds) and (vi) an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses.  In addition, such certificate shall also be accompanied by an Officer's Certificate stating that Borrower is in compliance with the requirements set forth in Section 4.23 as of the date of such certificate.

(d)     Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject month, (ii) an occupancy report for the Property (including an average daily room rate) and any franchise scores, franchise inspection reports or other similar information made available to Borrower during the subject month, (iii) FF&E expenditures, (iv) the most current Smith Travel Research Reports, in a form reasonably acceptable to Lender, then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property, (v) monthly and year-to-date operating statements (including expenditures for FF&E) prepared for each calendar month, noting net operating income, gross income, and operating expenses (not including any contributions to the FF&E Reserve Funds) and (vi) upon request by Lender (not more frequently than two (2) times in any calendar year), an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month, and containing a comparison of budgeted income and expenses and the actual income and expenses.

(e)     For the partial year period commencing on the Closing Date, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than thirty (30) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's written approval (each such Annual Budget so approved by Lender, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower in accordance with this Section 4.12, Lender shall advise Borrower of such objections within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise

57

Borrower of any objections to such revised Annual Budget within seven (7) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget, (1) to the extent that an Approved Annual Budget does not exist for the immediately preceding calendar year, all operating expenses of the Property for the then current calendar year shall be deemed extraordinary expenses of the Property and shall be subject to Lender's prior written approval (not to be unreasonably withheld or delayed) and (2) to the extent that an Approved Annual Budget exists for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that such Approved Annual Budget shall be adjusted to reflect (A) actual increases in Taxes, Insurance Premiums and utilities expenses and (B) up to five percent (5%) increases in any budgeted line items provided such increases do not exceed a five percent (5%) increase in the Approved Annual Budget in the aggregate.

(f)      Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower and Guarantor as may be reasonably requested by Lender any of the aforementioned items in this Section 4.12 on a monthly basis).

(g)      Borrower shall furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease and same is received by Borrower after request therefor).

(h)      If Borrower shall consist of more than one Person, then the annual financial statements required to be delivered hereunder shall be in the form of an annual combined balance sheet of each Borrower (and no other Person), together with the related combined statements of operations, members' capital and cash flows with respect to each Borrower, including a combined balance sheet and a statement of income for the Property on a combined basis.

(i)      Borrower agrees that all financial information delivered to Lender pursuant to this Section 4.12 shall:  (i) be complete and correct in all material respects; (ii) present fairly the financial condition of the applicable Person; (iii) disclose all liabilities that are required to be reflected or reserved against; and (iv) be prepared (A) in the form required by Lender and certified by a Responsible Officer of Borrower (B) in hardcopy and electronic formats and (C) in accordance with the Approved Accounting Method.  Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower in a writing delivered to Lender.  Borrower agrees that all financial information delivered hereunder shall not contain any misrepresentation or omission of a material fact.

58

**Section 4.13   Contracts**.   Borrower may enter into any Contract without Lender's consent so long as such Contract (a) contains terms that are commercially reasonable and comparable to existing local market terms for similar contractual agreements with respect to commercial properties similar to the Property as would be available from unaffiliated third parties and (b) does not contain any terms which would have a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Borrower shall be required to obtain Lender's prior written approval of any and all Major Contracts affecting the Property (including any renewals or extensions thereof, or any amendments or modifications thereto), which approval shall not be unreasonably withheld, conditioned or delayed.   Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Contract to which it is a party, and do all things necessary to preserve and keep unimpaired its rights thereunder, (ii) promptly notify Lender of any notice of default given by any party under any Major Contract and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the material terms, covenants and conditions required to be performed and/or observed by the other party to each Contract and to which Borrower is a party in a commercially reasonable manner.

**Section 4.14   Cooperation in Proceedings**.   Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Security Instrument or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**Section 4.15   Estoppel Certificates**.

(a)      After request by Lender, Borrower, within ten (10) Business Days of such request, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the outstanding principal balance of the Note, (ii) the Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment and performance of the Obligations, and (v) any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations created and evidenced hereby and by the Security Instrument or the Property.

(b)      Intentionally omitted.

(c)      Borrower shall use commercially reasonable efforts to deliver to Lender, within twenty (20) Business Days of request, estoppel certificates from each party under any Property Document in form and substance reasonably acceptable to Lender.

(d)      In connection with any Secondary Market Transaction, within ten (10) Business days of Lender's request and at Borrower's expense, subject to Section 9.1(j) hereof, Borrower shall provide an estoppel certificate to any Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

**Section 4.16   Leases and Rents**.

(a)      All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on

59

commercially reasonable terms with unaffiliated, third parties (unless otherwise consented to by Lender), (iii) provide that such Lease is subordinate to the Security Instrument and (iv) not contain any terms which would have a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Borrower shall not, without the prior written approval of Lender (which approval shall not be unreasonably withheld or delayed), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any Major Lease.

(b)     Without limitation of subsection (a) above, Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate 4.16(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)     Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Borrower further agrees to provide Lender with written notice of any commercial Tenant (if any exist at the Property) "going dark" under such Tenant's Lease within five (5) Business Days after Borrower becomes aware of such Tenant "going dark" and Borrower's failure to provide such notice shall constitute an Event of Default.

(d)     Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any commercial Lease or any Major Lease, and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender). The foregoing consent right of Lender (including, without limitation, any reserve requirement) shall not be subject to any "cap" or similar limit on the amount of Reserve Funds held by Lender.

(e)     To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.16 and Lender

thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

Section 4.17    Notice of Default.    Borrower shall promptly advise Lender of any material adverse change in Borrower's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

Section 4.18    Other Agreements.    Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto.

Section 4.19    Alterations.    Notwithstanding anything contained herein (including, without limitation, Article 7 hereof) to the contrary, Lender's prior approval shall be required in connection with any alterations to any Improvements (other than the Business Plan Work) (a) that may have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval, in the case of clauses (a) and (c), may be granted or withheld in Lender's sole discretion, and in the case of clause (b), shall not be unreasonably withheld.  If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (i) cash, (ii) U.S. Obligations, (iii) other security acceptable to Lender (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same).  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, taking into account any Reserve Funds on deposit and available pursuant to the terms and conditions of the Loan Documents to pay such costs.

Section 4.20    Management Agreement.

(a)    Borrower shall (i) cause Manager to manage the Property in accordance with the Management Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, estimate, report and each material notice received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any

61

sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

(b)  Borrower shall not, without the prior written consent of Lender (which consent may be conditioned, without limitation, on Lender's receipt of evidence that the same would not result in a breach or violation of any Property Document), (i) surrender, terminate, cancel, materially modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement); provided, that, so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may replace Manager with a Qualified Manager pursuant to a Qualified Management Agreement, (ii) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, (iv) permit or suffer any transfer of the ownership, management or Control of an Affiliated Manager to occur, or (v) waive or release any of its rights and remedies under the Management Agreement in any material respect.

(c)  In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall enter into a Qualified Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

(d)  Lender shall have the right to require Borrower to replace Manager with a Qualified Manager chosen by Borrower which is not an Affiliated Manager to manage the Property pursuant to a Qualified Management Agreement upon the occurrence of any one or more of the following events:  (i) at any time following the occurrence of an Event of Default, (ii) if, at any time after the first (1st) anniversary of the Closing Date, the Debt Service Coverage Ratio (Combined) falls below 1.00 to 1.00, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iv) if Manager shall become insolvent or a debtor in any involuntary bankruptcy or insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof, or any voluntary bankruptcy or insolvency proceeding, (v) if at any time Manager has engaged in gross negligence, fraud or willful misconduct, or (vi) if there is an increase or consent to any increase in the amount of any management or other fees under the Management Agreement. Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4.20(d) unless either (i) a monetary Event of Default (including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of this Agreement has occurred.

(e)  Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender.

MIA 31354953v9

(f)    If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute an Assignment of Management Agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**Section 4.21  No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**Section 4.22  ERISA**.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Security Instrument, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

(B)    Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan" (as each of the same is defined in Section 3.15 of this Agreement).

**Section 4.23  Special Purpose Entity**.  Borrower and each SPE Component Entity shall at all times comply with the requirements set forth on Exhibit C attached hereto and shall not

take or permit any action that would result in Borrower or any SPE Component Entity not being in compliance with the representations, warranties and covenants set forth in Section 3.24 and Exhibit C attached hereto.

**Section 4.24  Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**Section 4.25  Property Documents**.  Without limiting the other provisions of this Agreement and the other Loan Documents, Borrower shall (a) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Property Documents and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Property Documents of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Property Documents; (d) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Property Documents in a commercially reasonable manner; (e) cause the Property to be operated, in all material respects, in accordance with the Property Documents; and (f) not, without the prior written consent of Lender, (i) enter into any new Property Document or replace or execute modifications to any existing Property Documents or renew or extend the same (exclusive of, in each case, any automatic renewal or extension in accordance with its terms), (ii) surrender, terminate or cancel the Property Documents, (iii) reduce or consent to the reduction of the term of the Property Documents, (iv) increase or consent to the increase of the amount of any charges under the Property Documents, (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Property Documents in any material respect or (vi) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Property Documents.

**Section 4.26  Embargoed Person**.  At all times throughout the term of the Loan, including after giving effect to any transfers of all or any portion of the Property or any direct or indirect equity or beneficial interests in Borrower or any Guarantor that is not a natural person, (a) none of the funds or other assets of Borrower or any Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the Patriot Act and any Executive Orders or regulations promulgated thereunder, each as may be amended from time to time, with the result that the investment in Borrower or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "**Embargoed Person**"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or any Guarantor, as applicable, with the result that the investment in Borrower or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower or any Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower or any

Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**Section 4.27  Patriot Act**.    Borrower shall comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.

**Section 4.28  No Plan Assets; Illegal Activity/Forfeiture**.  Borrower shall take all necessary actions in order to remain in compliance with the representation contained in Sections 3.15 and 3.23 hereof at all times during the term of the Loan, and shall not take any actions that would cause Borrower to violate any of the same.  Borrower covenants and agrees not to commit, permit or suffer to exist any act or omission affording any right of forfeiture described in Section 3.23.

**Section 4.29  Business Plan Work**.

(a)    Borrower shall diligently pursue the Business Plan Work to Completion on or prior to the Completion Date in accordance with the Plans and Specifications and the Business Plan and in compliance with all restrictions, covenants and easements affecting the Property, all applicable Legal Requirements, and all approvals of any Governmental Authority, and with all terms and conditions of the Loan Documents, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith unless bonded and removed as a lien on the Property. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date. If any certificate of occupancy or other approval of any Governmental Authority is temporary in nature, Borrower shall diligently pursue procuring all final approvals from such Governmental Authorities. Borrower shall pay all costs and expenses incurred in connection with the Business Plan Work.

(b)    Borrower acknowledges that (i) Lender may retain a Lender Consultant at the sole expense of Borrower (not to exceed $10,000 after the date hereof, unless an Event of Default has occurred), to act as a consultant and only as a consultant to Lender in connection with the Business Plan Work and will have no duty to Borrower, (ii) the Lender Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or

report provided or not provided, by the Lender Consultant with respect thereto, (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Lender Consultant to Lender or any other person or party, and (v) Lender reserves the right to replace the Lender Consultant with another inspecting engineer or other appropriate Person at any time and without prior notice to or approval by Borrower. Lender hereby advises Borrower that it will advise the Lender Consultant retained by it of the restrictions contained in this Section.

(c)      Without in anyway limiting the scope of the Lender Consultant's engagement, the Lender Consultant may perform the following services on behalf of Lender:

(i)      To review and advise Lender or Servicer whether, in the opinion of the Lender Consultant, the Plans and Specifications are satisfactory;

(ii)      To review requests for disbursements from the Business Plan Reserve Account, and any requests for approval of changes to the Business Plan and to the Plans and Specifications; and

(iii)      To make periodic inspections (approximately at the date of each request for disbursements from the Business Plan Reserve Account) for the purpose of assuring that the Business Plan Work performed to date is in accordance with the Plans and Specifications and the Business Plan and to approve Borrower's then current funding request as being consistent with Borrower's obligations under this Agreement, including, among other things, an opinion as to Borrower's continued compliance with the requirement that the Business Plan Reserve Funds will be sufficient to cover all costs of Business Plan Work reasonably anticipated to be incurred.

(d)      The reasonable fees of the Lender Consultant shall be paid by Borrower within ten (10) days after Borrower's receipt of the billing therefor and expenses incurred by Lender shall be reimbursed to Lender within ten (10) days after such receipt or deemed receipt, but neither Lender nor the Lender Consultant shall have any liability to Borrower on account of (i) the services performed by the Lender Consultant, (ii) any neglect or failure on the part of the Lender Consultant to properly perform its services, except for its gross negligence and/or willful misconduct or (iii) any approval by the Lender Consultant of any Business Plan Work. Neither Lender nor the Lender Consultant assumes any obligation to Borrower or any other person concerning the quality of renovation of the Improvements or the absence therefrom of defects.

(e)      Borrower shall promptly correct all defects in the Improvements or any departure from the Plans and Specifications or the Business Plan not approved by Lender to the extent required hereunder. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

**Section 4.30   Construction Costs and Expenses**.  Borrower shall promptly pay when due all costs and expenses of any work (including the Business Plan Work).

MIA 31354953v9

**Section 4.31    Violation Work**.    Borrower shall, on or prior to the Completion Date, (i) cure, remediate and discharge of record all violations of law, pay all fees, costs, fines and penalties, and comply with all other requirements of Governmental Authorities that are set forth on or related to the matters attached hereto as Exhibit K (collectively, the "**Violation Work**") and (ii) provide Lender with satisfactory evidence of Borrower's compliance with clause (i).

**Section 4.32    Parking Work**.    If required by any Governmental Authority in order to comply with any applicable Legal Requirements or as a condition to the issuance of any temporary or permanent certificate of occupancy, Borrower will, at its sole cost and expense, reconfigure the parking at the Property in accordance with the parking plan depicted on Exhibit B hereto (the "**Parking Work**") in order to comply with such Legal Requirements or otherwise cause such compliance in a manner satisfactory to Lender within the time periods required for compliance.

**Section 4.33    Post-Closing Execution of Collateral Assignment of Interest Rate Cap Agreement**.    Notwithstanding anything to the contrary contained herein, Borrower shall deliver, within ten (10) Business Days after the date hereof, a fully executed Collateral Assignment of Interest Rate Cap Agreement, rate cap confirmation and customary legal opinion with respect thereto, each as reasonably satisfactory to Lender.

## ARTICLE 5

## INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

**Section 5.1    Insurance**.

(a)    Unless otherwise agreed to by Lender in its sole and absolute discretion, Borrower, at its sole cost and expense, shall obtain and maintain during the entire term of the Loan, or cause to be maintained, insurance policies for Borrower and the Property providing at least the following coverages:

(i)    property insurance against loss or damage by fire, wind (including named storms), lightning and such other perils as are included in a standard "all risk" or "special form" policy, including riot and civil commotion, vandalism, terrorist acts, malicious mischief, burglary and theft, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) waiving depreciation.    The Full Replacement Cost must be adjusted annually to reflect increased value due to inflation. If this is not provided, Inflation Guard Coverage shall be required; (B) written on a no co-insurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of $25,000.00 (except for deductibles for windstorm and earthquake coverage, which deductibles may be up to five percent (5%) of the total insurable value of the Property); and (D) containing "Ordinance or Law Coverage" if any of the Improvements or the use of the Property shall at any time constitute legal non conforming structures or uses, including coverage for Loss to the

67

Undamaged Portion, Demolition Costs and Increased Cost of Construction, all in amounts acceptable to Lender.  In addition, Borrower shall obtain:  (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended plus such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so called "occurrence" form and containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00), with a combined limit per policy year, excluding umbrella coverage, of not less than Two Million and No/100 Dollars ($2,000,000.00) applying "per location" if the policy covers more than one location; (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:  (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 11 hereof to the extent the same is available;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above, subsections (iv) (if applicable), subsection (vi), subsection (x) and Section 5.1(h) below; (C) containing an extended period of indemnity endorsement which provides the continued loss of income shall be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Rents from the Property for a period of eighteen (18) months from the date of the Casualty.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Rents from the Property for the succeeding eighteen (18) month period.  Subject to Section 5.5(b), all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its Obligations to pay the Debt on the respective dates of payment provided

MIA 31354953v9

for in the Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability insurance coverage forms do not otherwise apply, coverage all in form and substance and with limits, terms and conditions acceptable to Lender including (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required in this Section 5.1(a); and (B) the insurance provided for in subsection (i) above written in a so called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsections (i), (iii), (vi), (x) and Section 5.1(h), (3) including permission to occupy the Property, (4) with an agreed amount endorsement waiving co-insurance provisions, (5) including coverage for 100% of the hard costs, and (6) including Soft Costs that are recurring costs as agreed to by Lender in its reasonable discretion.  Borrower shall cause design professionals, if any, including any architects and engineers, to obtain and maintain professional liability insurance during the period commencing on the date of the architect's or engineer's contract and expiring no earlier than the expiration of the applicable statute of repose after completion of services or Substantial Completion.  Such insurance shall have limits commensurate with the risk and acceptable to Lender.  Borrower shall further cause the General Contractor to obtain and maintain commercial general liability coverage, including, without limitation, products and completed operations to the extent available in the market expiring no earlier than the expiration of the applicable statute of repose after completion of services or Substantial Completion.  Such policy maintained by the General Contractor shall name Borrower and Lender as additional insureds by endorsement reasonably satisfactory to Lender and have limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate for the Project. The General Contractor shall provide umbrella liability over the required policies with limits commensurate with the risk and acceptable to Lender.  The General Contractor shall maintain statutory Workers Compensation, Disability and Employers Liability insurance in force for all workers on the job as well as commercial auto liability for all owned, hired and non-owned vehicles with a combined single limit no less than $1,000,000.  Borrower may use an Owner Controlled Insurance Program (OCIP), also known as a "Wrap Up" policy, to satisfy the Borrower's and General Contractor's requirements herein, including commercial general liability and umbrella liability, workers compensation and auto liability, provided the coverages are in form and substance acceptable to Lender, contain a deductible acceptable to Lender, and otherwise meet the requirements as set forth herein.  Certificates of insurance and endorsements reasonably acceptable to Lender must be provided prior to any work being performed on the Property;

(v)     workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with limits which are required from time to time by Lender in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

69

(vi)     boiler and machinery/equipment breakdown insurance in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance Policy required under subsection (i) above (if applicable);

(vii)    umbrella liability insurance in addition to primary coverage in an amount not less than Fifty Million and No/100 Dollars ($50,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) and, if applicable, the Policies required in subsection (v) above and (viii) below;

(viii)   commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, with limits which are required from time to time by Lender (if applicable);

(ix)     if applicable, insurance against employee dishonesty in an amount not less than one month of Gross Rents from the Property and with a deductible not greater than Ten Thousand and No/100 Dollars ($10,000.00) (if applicable); and

(x)      upon sixty (60) days' notice, such other insurance and in such amounts as Lender from time to time may request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**") and shall be subject to the approval of Lender as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance and, if requested by Lender, other documentation, in each case acceptable to Lender, evidencing the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)      Any blanket insurance Policy shall be subject to Lender's approval and shall provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1(a).  Lender shall have determined based on a review of the schedule of locations and values that the amount of such coverage is sufficient in light of the other risks and properties insured under the blanket policy.

(d)      All Policies of insurance provided for or contemplated by Section 5.1(a) shall name Borrower as a named insured and, in the case of liability coverages (except for the Policies referenced in Sections 5.1(a)(v) and (viii)) shall name Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property insurance coverages, including but not limited to boiler and machinery, terrorism, flood and earthquake insurance, shall contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.  Additionally, if Borrower obtains property insurance coverage in addition to or in excess of that required by

70

Section 5.1(a)(i), then such insurance policies shall also contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All property insurance Policies provided for in Section 5.1(a) shall:

(i)    provide that no act or negligence of Borrower or any other insured under the Policy, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    provide that the Policy shall not be canceled without at least thirty (30) days' written notice to Lender, except ten (10) days' notice for non-payment of Insurance Premiums and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(iii)    not contain any provision that would make Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder, except that Lender is permitted to make payments to effect the contribution of such Policy upon notice of cancellation due to non-payment of Insurance Premiums pursuant to the mortgagee clause required herein.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, or Borrower shall fail to deliver certificates of insurance and, if requested by Lender, other documentation evidencing the Policies, evidence of payment and any other information required by Section 5.1(b), no less than ten (10) days prior to the expiration date of any Policies, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all Insurance Premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate. Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)    In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)    If any of the all risk/special form property, rental loss and/or business interruption, commercial general liability or umbrella liability Policies include any exclusions for loss, cost, damage or liability caused by "terrorism" or "terrorist acts", Borrower shall obtain and

71

maintain terrorism coverage to cover such exclusion(s) from a carrier which otherwise satisfies the rating criteria specified in Section 5.1(i) (a "**Qualified Carrier**") or, in the event that such terrorism coverage is not available from a Qualified Carrier, Borrower shall obtain such terrorism coverage from the highest rated insurance company providing such terrorism coverage.

(i)     All Policies required pursuant to Section 5.1(a): (i) shall be issued by companies authorized to do business in the State with a financial strength and claims paying ability rating of "A" or better by S&P; (ii) shall, with respect to the property, rental loss and/or business interruption, commercial general liability and umbrella liability Policies, contain a waiver of subrogation against Lender; (iii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under said Policies; and (iv) shall be satisfactory in form and substance to Lender and shall be approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Complete copies of the Policies shall be delivered to Lender, at 142 West 57th Street, Suite 1201, New York, New York 10019, Attention:  Micah Goodman, General Counsel, on the date hereof with respect to the current Policies and within thirty (30) days after the effective date thereof with respect to all renewal Policies; provided, however, that if complete copies of the current Policies are not available on the date hereof, Borrower shall deliver to Lender on the date hereof documentation acceptable to Lender evidencing such Policies and shall deliver to Lender complete copies of such Policies within ten (10) days after such Policies are available.  Borrower shall pay the Insurance Premiums annually in advance as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided, however, that Borrower shall not be required to pay such Insurance Premiums nor furnish such evidence of payment to Lender in the event that the amounts required to pay such Insurance Premiums have been deposited into the Insurance Account pursuant to Section 7.2 hereof).  In addition to the insurance coverages described in Section 5.1(a) above, Borrower shall obtain such other insurance as may from time to time be reasonably required by Lender in order to protect its interests.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

**Section 5.2     Casualty**.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property and otherwise comply with the provisions of Section 5.4.  Borrower shall pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may settle and adjust such claim so long as no Event of Default has occurred and is continuing.  Any such adjustment must be carried out by Borrower in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender

72

shall have the opportunity to participate, at Borrower's cost, in any such adjustment; provided, however, if Borrower fails to settle and adjust such claim within one hundred twenty (120) days after the Casualty, Lender shall have the right to settle and adjust such claim at Borrower's cost and without Borrower's consent. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

**Section 5.3   Condemnation**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property of which Borrower has knowledge and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation. Any such settlement and compromise must be carried out in a commercially reasonable and timely manner. In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.4. Borrower shall pay all costs of Restoration whether or not such costs are covered by the Net Proceeds. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

**Section 5.4   Restoration**. The following provisions shall apply in connection with the Restoration of the Property:

(a)     If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, then provided that no Event of Default has occurred and is continuing and the condition in Section 9.6 hereof has been satisfied, subject to Section 5.5 hereof, the Net Proceeds will be disbursed by Lender to Borrower upon receipt. Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of

this Agreement.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held for the benefit of Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

(b)    If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration are equal to or greater than the Restoration Threshold, subject to Section 5.5 hereof, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 5.4(b).

(i)    The Net Proceeds shall be made available for Restoration provided that each of the following conditions are met:

(A)    no Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are insurance proceeds, less than thirty percent (30%) of each of (i) fair market value of the Property as reasonably determined by Lender, and (ii) rentable area of the Property has been damaged, destroyed or rendered unusable as a result of a Casualty or (2) in the event the Net Proceeds are condemnation proceeds, less than fifteen percent (15%) of each of (i) the fair market value of the Property as reasonably determined by Lender and (ii) rentable area of the Property is taken, such land is located along the perimeter or periphery of the Property, no portion of the Improvements is located on such land and such taking does not materially impair the existing access to the Property;

(C)    Leases demising in the aggregate a percentage amount equal to or greater than seventy-five percent (75%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty or taking, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all Tenants under Major Leases shall continue to operate their respective space at the Property after the completion of the Restoration;

(D)    Borrower shall commence (or shall cause the commencement of) the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after the issuance of a building permit with respect thereto) and shall diligently pursue the same to satisfactory completion in compliance with all applicable Legal Requirements, including, without limitation, all applicable Environmental Laws, and the applicable requirements of the Property Documents;

(E)    Lender shall be satisfied that any operating deficits which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking will be covered out of (1) the Net Proceeds, (2) the

insurance coverage referred to in Section 5.1(a)(iii) above, or (3) by other funds of Borrower;

(F)     Lender shall be satisfied that the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration;

(G)     Lender shall be satisfied that, upon the completion of the Restoration, the fair market value and cash flow of the Property will not be less than the fair market value and cash flow of the Property as the same existed immediately prior to the applicable Casualty or Condemnation;

(H)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) twelve (12) months after the occurrence of such fire or other casualty or taking, (3) the earliest date required for such completion under the terms of any Leases and the Property Documents, (4) such time as may be required under applicable Legal Requirements or (5) the expiration of the insurance coverage referred to in Section 5.1(a)(iii) above;

(I)     Borrower and Guarantor shall execute and deliver to Lender a completion guaranty in form and substance satisfactory to Lender and its counsel pursuant to the provisions of which Borrower and Guarantor shall jointly and severally guaranty to Lender the lien-free completion by Borrower of the Restoration in accordance with the provisions of this Subsection 5.4(b);

(J)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements and the Property Documents;

(K)     the Restoration shall be done and completed in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and the Property Documents;

(L)     the Property Documents will remain in full force and effect during and after the Restoration and a Property Document Event shall not occur as a result of the applicable Casualty, Condemnation and/or Restoration; and

(M)     Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements (including, without limitation, satisfaction of the condition in Section 9.6 hereof) and, in that regard, Lender may require Borrower to deliver a REMIC Opinion in connection therewith.

(ii)     The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 5.4(b), shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents. The Net Proceeds shall be disbursed by Lender to,

or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the related Restoration item have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)      All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.  Borrower shall have the right to settle all claims under the Policies jointly with Lender, provided that (a) no Event of Default exists, (b) Borrower promptly and with commercially reasonable diligence negotiates a settlement of any such claims and (c) the insurer with respect to the Policy under which such claim is brought has not raised any act of the insured as a defense to the payment of such claim.  If an Event of Default exists, Lender shall, at its election, have the exclusive right to settle or adjust any claims made under the Policies in the event of a Casualty.

(iv)      In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Restoration Retainage.  The term "**Restoration Retainage**" as used in this Subsection 5.4(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until such time as the Casualty Consultant certifies to Lender that Net Proceeds representing 50% of the required Restoration have been disbursed.  There shall be no Restoration Retainage with respect to costs actually incurred by Borrower for work in place in completing the last 50% of the required Restoration.  The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 5.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Restoration Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 5.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage, provided, however, that Lender will

76

release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of the Security Instrument.  If required by Lender, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.4(b) shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under this Agreement, the Security Instrument, the Note or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 5.4(b)(vii) shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper.  If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)     Notwithstanding the foregoing or anything to the contrary contained herein, to the extent that Borrower is entitled to a disbursement of Net Proceeds hereunder for any purpose other than Restoration, Borrower hereby authorizes and directs Lender to pay the same to

MIA 31354953v9

Mezzanine Lender to the extent that Mezzanine Lender is entitled to the same under the terms and conditions of the Mezzanine Loan Documents. Borrower further (i) agrees that Lender shall be entitled to conclusively rely on Mezzanine Lender's assertion that it is entitled to such Net Proceeds and (ii) hereby releases Lender and indemnifies Lender against any Losses that may be incurred by Lender as a result of any Person claiming that Lender improperly remitted such Net Proceeds to Mezzanine Lender.

**Section 5.5    Business Interruption Proceeds**.    Notwithstanding the foregoing provisions of this Article 5 to the contrary:

(a)    Subject to Section 5.5(b), payments received on account of the business interruption insurance specified in Section 5.1(a)(iii) above shall be deposited directly into the Casualty and Condemnation Account. Notwithstanding the last sentence of Section 5.1(a)(iii) above, and provided that no Event of Default shall have occurred and be continuing, proceeds received by Lender on account of business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) above shall be held by Lender and disbursed to Borrower (in installments relating o to the relevant period) to the extent such proceeds (or a portion thereof) reflect a replacement for lost Rents for the relevant period, as determined by Lender in good faith. All other such proceeds not reflecting a replacement for lost Rents shall be held by Lender and disbursed in accordance with Section 5.4 hereof.

(b)    Notwithstanding the foregoing provisions of Section 5.5(a), if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption Insurance Proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining Net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such Net Proceeds are to be applied repay the Loan in accordance with the terms hereof, that such remaining Net Proceeds will be sufficient to pay off the Loan in full.

## ARTICLE 6

## NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS

**Section 6.1    No Sale/Encumbrance**. It shall be an Event of Default hereunder if, without the prior written consent of Lender, a Prohibited Transfer occurs, other than (i) pursuant to Leases in accordance with the provisions of this Agreement and (ii) as expressly permitted pursuant to the terms of this Article 6.

**Section 6.2    Intentionally Omitted**.

**Section 6.3    Permitted Equity Transfers**.

(a)    Notwithstanding Section 6.1 hereof, the following equity transfers shall be permitted without Lender's consent:

MIA 31354953v9

(i)    the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock Exchange or another nationally recognized stock exchange; provided, that, the foregoing shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or to cause the compliance with) the other covenants set forth herein and in the other Loan Documents (including, without limitation, the covenants contained herein relating to ERISA matters).

(ii)    a transfer (but not a pledge) by devise or descent or by operation of law upon the death or declaration of incompetence of a Restricted Party or any member, partner or shareholder of a Restricted Party, so long as, in any case, each of the following conditions is satisfied:

(A)    no Event of Default has occurred and is continuing, or would occur as a result of such transfer;

(B)    Lender shall receive not less than thirty (30) days prior written notice of such transfers (except in the case of a transfer occurring upon the death or declaration of incompetence of any Person, in which case Lender shall receive written notice thereof not more than thirty (30) days after such transfer);

(C)    no such transfers shall result in a change in Control of Guarantor or Affiliated Manager;

(D)    after giving effect to such transfers, Guarantor shall (1) own at least a 51% direct or indirect equity ownership interest in each of Borrower and any SPE Component Entity; (2) Control Borrower and any SPE Component Entity and (3) control the day-to-day operation of the Property;

(E)    after giving effect to such transfers, the Property shall continue to be managed by Manager or a replacement Manager approved in accordance with the applicable terms and conditions hereof;

(F)    in the case of the transfer of any direct equity ownership interests in Borrower or in any SPE Component Entity, such transfers shall be conditioned upon continued compliance with the relevant provisions of Exhibit C hereof;

(G)    such transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question, (1) remake the representations contained herein relating to ERISA matters (and, upon Lender's request, Borrower shall deliver to Lender an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer) and (2) continue to comply with the covenants contained herein relating to ERISA matters;

(H)    such transfers shall be permitted pursuant to the terms of the Property Documents and the Mezzanine Loan Documents;

(I)      if after giving effect to any equity transfer set forth in Section 6.3(a)(ii), ten percent (10%) or more in the aggregate of the direct or indirect ownership interests in Borrower, any SPE Component Entity or any Guarantor that is not a natural person would be owned by a Person (together with its Affiliates) which did not own ten percent (10%) or more of the direct or indirect ownership interests in such Person on the Closing Date or as a result of other equity transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such equity transfer being permitted hereunder, Borrower shall deliver Lender credit searches (in form, scope and substance and from a provider, in each case, reasonably acceptable to Lender) with respect to such equity transfer; and

(J)      if after giving effect to any equity transfer set forth in Section 6.3(a)(ii), forty nine percent (49%) or more in the aggregate of the direct or indirect ownership interests in Borrower, any SPE Component Entity or any Guarantor that is not a natural person would be owned by a Person (together with its Affiliates), other than Guarantor, which did not own forty nine percent (49%) or more of the direct or indirect ownership interests in Borrower, any SPE Component Entity or such Guarantor, as applicable, on the Closing Date or as a result of other equity transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such equity transfer being permitted hereunder, Borrower shall deliver to Lender (1) a Rating Agency Confirmation and (2) if a Non-Consolidation Opinion has previously been delivered in connection with the Loan, a New Non-Consolidation Opinion.

(iii)      any Mezzanine Transfer.

(b)      Upon request from Lender, Borrower shall promptly provide Lender a revised version of the Organizational Chart reflecting any equity transfer consummated in accordance with this Section 6.3.

**Section 6.4    Replacement Guarantor**.  To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 6.4.  Borrower shall be permitted to substitute a replacement guarantor (a "**Substitution**") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied:  (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor; (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty and the Environmental Indemnity for events or conditions occurring prior to, as of and after the Substitution or (ii) executes and delivers to Lender a replacement guaranty and a replacement environmental indemnity in each case in form and

80

substance the same as the Guaranty and the Environmental Indemnity, respectively, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, each remaining Guarantor and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) Borrower delivers to Lender a Rating Agency Confirmation with respect to such Substitution; (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, (i) that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (ii) that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution; and (h) if required by Lender or the Rating Agencies and a Non-Consolidation Opinion has previously been delivered in connection with the Loan, Borrower delivers to Lender a New Non-Consolidation Opinion.  No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.  As used herein, the term "**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

    **Section 6.5    Lender's Rights**.  Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed Prohibited Transfer, (b) payment of a transfer fee of 1% of outstanding principal balance of the Loan and all of Lender's expenses incurred in connection with such Prohibited Transfer, (c) receipt of a Rating Agency Confirmation with respect to the Prohibited Transfer, (d) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Section 4.23, (e) receipt of a New Non-Consolidation Opinion with respect to the Prohibited Transfer (if at such time a Non-Consolidation Opinion has previously been issued to Lender in connection with the Loan) and/or (f) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender.  All expenses incurred by Lender shall be payable by Borrower whether or not Lender consents to the Prohibited Transfer.  Lender shall not be required to

demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent.  This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

Section 6.6    **Economic Sanctions, Anti-Money Laundering**.  Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Sections 3.27, 4.26 and 4.27 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 6 to be complied with at all times.  Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party.

Section 6.7    **Costs and Expenses**.  Borrower shall pay all costs and expenses of Lender in connection with any Transfer, assumption and/or replacement of any Guarantor, including, without limitation, the cost of any Rating Agency Confirmation and all reasonable fees and expenses of Lender's counsel, and the cost of any required counsel opinions, including, without limitation, any New Non-Consolidation Opinion.

## ARTICLE 7

## RESERVE FUNDS

Section 7.1    **Sam Tell Funds**.

(a)    On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Sam Tell Account**") an amount equal to $88,421.17 for amounts required to be paid in connection with the termination of a UCC-1 Financing Statement filed on May 25, 2016 by Sam Tell & Son, Inc. ("**Sam Tell**") against Manager and 96 W Development LLC with the New York Secretary of State as Filing Number 201605250244039 (the "**Sam Tell UCC**").  Amounts deposited pursuant to this Section 7.1 are referred to herein as the "**Sam Tell Funds**".

(b)    Lender shall disburse to Borrower the Sam Tell Funds upon Lender's receipt of evidence satisfactory to Lender that all amounts required to be paid to Sam Tell have been paid, including, without limitation, receipt of a filed UCC-3 Financing Statement Termination authorized by Sam Tell with respect to the Sam Tell UCC.  If Borrower has failed to deliver such evidence to Lender on or prior to March 31, 2018 (provided that such date shall be extended for any period that Borrower is contesting the Sam Tell UCC and any related charges in accordance with the terms of Section 4.8(b) hereof), Lender may, at its option, disburse the Sam Tell Funds to Sam Tell to satisfy and cause the termination of the Sam Tell UCC.

Section 7.2    **Tax and Insurance Funds**.

On the Closing Date, Borrower shall make an initial deposit with Lender with respect to Taxes and Insurance Premiums in an amount reasonably determined by Lender, to be held in

Eligible Accounts by Lender or Servicer and hereinafter respectively referred to as the "**Tax Account**" and the "**Insurance Account**".  In addition, Borrower shall pay (or cause to be paid) to Lender on each Monthly Payment Date (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months assuming that said Taxes are to be paid in full on the Tax Payment Date (the "**Monthly Tax Deposit**"), each of which such deposits shall be held in the Tax Account, and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies on the Insurance Payment Date (the "**Monthly Insurance Deposit**"), each of which such deposits shall be held in the Insurance Account (amounts held in the Tax Account and the Insurance Account are collectively herein referred to as the "**Tax and Insurance Funds**").  If, at any time, Lender determines that amounts on deposit or scheduled to be deposited in (i) the Tax Account will be insufficient to pay all applicable Taxes in full on the Tax Payment Date and/or (ii) the Insurance Account will be insufficient to pay all applicable Insurance Premiums in full on the Insurance Payment Date, Borrower shall make a payment into the applicable Reserve Account in an amount which will be sufficient to make up such insufficiency, as reasonably determined by Lender.  Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority.  Provided there are sufficient amounts in the Tax Account and Insurance Account, respectively, and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Tax and Insurance Funds to the payment of such Taxes and Insurance Premiums.  If the amount of the Tax and Insurance Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4.7 and 5.1 hereof, Lender shall either return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Funds (such election to be made by Lender in its discretion).

   **Section 7.3    FF&E Reserve Funds**.

   (a)    Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**FF&E Reserve Account**") on each Monthly Payment Date, for FF&E costs, an amount equal to 1/12th of (x) 2.0%, commencing with the first Monthly Payment Date following the first anniversary of the Closing Date and (y) 4.0%, following the commencement of the second Extension Period and thereafter, in each case, the greater of (i) gross revenues for the Property in the preceding calendar year or (ii) the projected gross revenues for the Property for the current calendar year according to the most recently submitted Annual Budget (the "**FF&E Reserve Monthly Deposit**").  Amounts deposited pursuant to this Section 7.3 are referred to herein as the "**FF&E Reserve Funds**".  Lender may reassess its estimate of the amount necessary for FF&E costs from time to time, and may require Borrower to increase the monthly deposits required pursuant to this Section 7.3 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

   (b)    Lender shall disburse FF&E Reserve Funds only for costs associated with FF&E reasonably approved by Lender.  Lender shall disburse to Borrower the FF&E Reserve Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests

such payment be made and specifies the FF&E to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are FF&E, (B) stating that all FF&E at the Property to be funded by the requested disbursement have been installed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the FF&E, (C) identifying each Person that supplied materials or labor in connection with the FF&E to be funded by the requested disbursement and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (iv) at Lender's option, in the case of any work, if the disbursement amount exceeds $100,000, Lender shall have received a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances other than Permitted Encumbrances; (v) at Lender's option, in the case of any work, if the disbursement exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the applicable work; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the FF&E at the Property to be funded by the requested disbursement has, as applicable, been completed and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to disburse FF&E Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of FF&E Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

(c)    Nothing in this Section 7.3 shall (i) make Lender responsible for any costs associated with any FF&E; (ii) require Lender to expend funds in addition to the FF&E Reserve Funds to pay for or complete, as applicable, any FF&E; (iii) obligate Lender to proceed with any FF&E work; or (iv) obligate Lender to demand from Borrower additional sums to pay for or complete, as applicable, any FF&E.

(d)    Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of any Tenants under their Leases) to inspect the progress of any FF&E work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such FF&E work.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

**Section 7.4    Intentionally Omitted**.

**Section 7.5    Intentionally Omitted.**

**Section 7.6    Excess Cash Flow Funds**.  On each Monthly Payment Date occurring after the occurrence and during the continuance of an Event of Default, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Lender or Servicer (the "**Excess Cash**

Flow Account") an amount equal to the Excess Cash Flow generated by the Property for the immediately preceding Interest Period (the amounts on deposit in the Excess Cash Flow Account being herein referred to as the "**Excess Cash Flow Funds**").  Provided no Event of Default has occurred and is continuing, any Excess Cash Flow Funds remaining in the Excess Cash Flow Account upon the expiration of all Cash Sweep Periods in accordance with the applicable terms and conditions hereof shall be disbursed to Borrower.

### Section 7.7    The Accounts Generally.

(a)      Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security for the Debt.  The provisions of this Section 7.7 (together with the other related provisions of the other Loan Documents) are intended to give Lender and/or Servicer "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) Reserve Funds on account of the liabilities, costs, work and other matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

(b)      Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

(c)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security

85

interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)    The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Accounts, the sums deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)    Borrower and Lender (or Servicer on behalf of Lender) shall maintain each applicable Account as an Eligible Account, except as otherwise expressly agreed to in writing by Lender.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria.  Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding) with respect to any such transfers and the establishment of accounts with a successor institution.

(g)    Interest accrued on any Account other than an Interest Bearing Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.  Funds deposited in the Interest Bearing Accounts shall be invested in Permitted Investments as provided for in Section 7.7(h) hereof.  Interest accrued, if any, on sums on deposit in the Interest Bearing Accounts shall be remitted to and become part of the applicable Account. All such interest that so becomes part of the applicable Account shall be disbursed in accordance with the disbursement procedures contained herein applicable to such Account; provided, however, that Lender may, at its election, retain any such interest for its own account during the occurrence and continuance of an Event of Default.

(h)    Sums on deposit in the Interest Bearing Accounts shall, upon Borrower's written request, be invested in Permitted Investments selected by Lender or Servicer provided (i) such investments are then regularly offered by Lender (or Servicer on behalf of Lender) for accounts

86

of this size, category and type (Borrower acknowledges that the Servicer or Lender may only offer as an investment opportunity the right to place funds on deposit in the applicable Accounts in an interest bearing account (bearing interest at the money market rate)), (ii) such investments are permitted by applicable federal, State and local rules, regulations and laws, (iii) the maturity date of the Permitted Investment is not later than the date on which sums in the Interest Bearing Accounts are required to be disbursed pursuant to the terms hereof, and (iv) no Event of Default shall have occurred and be continuing.  All income earned from the aforementioned Permitted Investments shall be property of Borrower and Borrower hereby irrevocably authorizes and directs Lender (or Servicer on behalf of Lender) to hold any income earned from the aforementioned Permitted Investments as part of the applicable Interest Bearing Account. Borrower shall be responsible for payment of any federal, State or local income or other tax applicable to income earned from Permitted Investments.  No other investments of the sums on deposit in the Interest Bearing Accounts shall be permitted.  Lender shall not be liable for any loss sustained on the investment of any funds in the Interest Bearing Accounts.

(i)      Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

**Section 7.8     Business Plan Reserve Funds**.

(a)      On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Business Plan Reserve Account**") an amount equal to $1,651,000.00, which deposit shall be derived from capital contributions to Borrower and shall not come from Loan proceeds.  In addition to the foregoing, if Lender determines that the cost of completing the Business Plan Work (taking into account any amounts remaining in the contingency line item of the Business Plan) is likely to exceed the Business Plan Reserve Funds then on deposit, then (1) Borrower shall, within ten (10) Business Days of notice thereof, deposit with or on behalf of Lender into the Business Plan Reserve Account such amount as Lender determines will be necessary to complete such Business Plan Work (the "**Business Plan Reserve Funds Borrower Deposit**") and (2) notwithstanding anything to the contrary contained in Section 7.8(b) hereof, no Business Plan Reserve Funds (other than such funds consisting of the Business Plan Reserve Funds Borrower Deposit) shall be disbursed hereunder until the full amount of the Business Plan Reserve Funds Borrower Deposit has been disbursed pursuant to the terms and conditions of Section 7.8(b) hereof; provided, however, that if Lender determines, subsequent to Borrower making any Business Plan Reserve Funds Borrower Deposit, that the conditions set forth above which necessitated such Business Plan Reserve Funds Borrower Deposit no longer exist (for purposes of which any remaining portion of such Business Plan Reserve Funds Borrower Deposit shall not be counted), then Lender shall promptly disburse any remaining portion of such Business Plan Reserve Funds Borrower Deposit then on deposit in the Business Plan Reserve Funds Account to Borrower.  Amounts deposited pursuant to this Section 7.8 are referred to herein as the "**Business Plan Reserve Funds**".

MIA 31354953v9

(b)    On the Closing Date, Borrower shall deliver invoices to Lender for the cost of furniture in the amount of $174,424.32, and invoices for the construction of the pool at the Property in the amount of $150,000.00.  Lender shall disburse the amount of such invoices directly to the vendors and/or contractor, as applicable, from the Business Plan Reserve Funds from the Business Plan Reserve Account (the "**Business Plan Reserve Funds Initial Disbursement**").  Thereafter, following the satisfaction of the Business Plan Reserve Funds Future Disbursement Conditions and subject to Section 7.8(a) above and the final sentence of this Section 7.8(b), Lender shall disburse to Borrower the Business Plan Reserve Funds to pay the costs of Business Plan Work, pursuant to the terms and conditions of Section 7.3 hereof (as if such Business Plan Reserve Funds were FF&E Reserve Funds).  Lender shall not be required to disburse Business Plan Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Business Plan Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).  Notwithstanding the foregoing, (A) Lender shall not be obligated to make disbursements of Business Plan Reserve Funds to reimburse Borrower to the extent (1) there are amounts available to pay the relevant costs on deposit in the FF&E Reserve Account, (2) any requested disbursement does not, in Lender's reasonable determination, adhere to the Business Plan (including, without limitation, by virtue of the purpose or amount of such disbursement, or because the costs to be paid with the proceeds of such disbursement have been the subject of a previous disbursement of any Reserve Funds), (B) any disbursement of Business Plan Reserve Funds allocable to the contingency line item of the Business Plan shall be subject to Lender's reasonable discretion, and (C) each disbursement of Business Plan Reserve Funds to pay for Business Plan Work shall be subject to a retainage equal to the greater of (x) the actual retention required by the applicable contract and (y) (1) at such time as fifty percent (50%) or less of the contract in question is complete, ten percent (10%) retention or (2) at such time as more than fifty percent (50%) of the contract in question is complete, five percent (5%), which retainage shall only be disbursed by Lender (subject to the other terms and conditions of this Section 7.8) upon Lender's receipt of evidence in form and substance reasonably satisfactory to Lender that each applicable vendor has completed all work, or delivered all materials, being performed and/or delivered, as applicable, by such vendor with respect to the Property.

(c)    Nothing in this Section 7.8 shall (i) make Lender responsible for performing or completing any Business Plan Work; (ii) require Lender to expend funds in addition to the Business Plan Reserve Funds to complete any Business Plan Work; (iii) obligate Lender to proceed with any Business Plan Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any Business Plan Work.

(d)    Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Business Plan Work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Business Plan Work. Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

MIA 31354953v9

(e)      In addition to any insurance required under the Loan Documents, Borrower shall cause to be provided workmen's compensation insurance, builder's risk, public liability insurance and other insurance to the extent required under applicable law in connection with Business Plan Work.  All such policies shall be in form and amount satisfactory to Lender.

(f)      For purposes of clarity it is agreed that Borrower shall pay for all costs and expenses of Lender, any Lender Consultant and/or Servicer incurred in connection with any disbursements under this Section 7.8.

(g)      Upon the written request of Borrower following (i) Completion of all Business Plan Work in accordance with the terms of this Agreement, and (ii) Lender's receipt of a permanent certificate of occupancy covering all of the Improvements, any remaining Business Plan Reserve Funds on deposit in the Business Plan Reserve Account shall be (x) provided no Cash Sweep Period exists, disbursed to Borrower or (y) if a Cash Sweep Period exists, deposited into the Interest Reserve Account and held in accordance with the terms and conditions of Section 7.9 hereof.

Section 7.9    **Interest Reserve Funds**.  On the Closing Date, Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Interest Reserve Account**") the sum of $2,400,000.00, to be held as additional security for the Debt and all of the other Obligations.   Amounts deposited pursuant to this Section 7.9 are referred to herein as the "**Interest Reserve Funds**".   Until such time as the Required DSCR is first achieved, if at any time during the term of the Loan Lender determines that the remaining balance in the Interest Reserve Account is insufficient to pay Debt Service projected to be due and payable during the next ensuing two (2) month period (which Debt Service shall be calculated based on the Applicable Interest Rate) (the "**Interest Reserve Deficiency**"), Lender shall notify Borrower of such determination and Borrower shall, upon fifteen (15) days' notice, deposit an amount equal to the Interest Reserve Deficiency (the "**Interest Reserve Deficiency Amount**").   Provided no Event of Default has occurred and is continuing, on each Monthly Payment Date on which a shortfall exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account due on such Monthly Payment Date (as demonstrated to Lender's reasonable satisfaction including, without limitation, by virtue of an Officer's Certificate detailing the applicable shortfall and the amount(s) to be paid by the disbursement of Interest Reserve Funds and a Cash Application Statement covering the applicable period), Lender shall disburse an amount of available Interest Reserve Funds, up to the amount of such shortfall, in payment of such amount(s).   Provided no Event of Default exists, all funds on deposit in the Interest Reserve Account shall be disbursed to Borrower once the Debt Service Coverage Ratio (Combined) is equal to or greater than 1.25 to 1.00 for six (6) consecutive months ("**Required DSCR**").

89

## ARTICLE 8

## CASH MANAGEMENT

**Section 8.1     Distribution of Cash Flow**.

(a)     Borrower shall cause all Rents and other revenue derived from the Property and received by Borrower or Manager, as the case may be, to be applied on a monthly basis for the following purposes and in the following order of priority:

(i)     First, funds sufficient to pay the Monthly Tax Deposit due for the then applicable Monthly Payment Date, if any;

(ii)     Then, funds sufficient to pay the Monthly Insurance Deposit due for the then applicable Monthly Payment Date, if any;

(iii)     Then, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any;

(iv)     Then, funds sufficient to pay Debt Service due for then applicable Monthly Payment Date;

(v)     Then, funds to pay the FF&E Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any;

(vi)     Then, funds sufficient to pay any other amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents, if any;

(vii)     Then, funds sufficient to pay Approved Operating Expenses and Approved Extraordinary Expenses incurred by Borrower for the then applicable period;

(viii)     Then, unless an Event of Default exists, funds sufficient to pay the amount of the Mezzanine Loan Monthly Debt Service that is then due; and

(ix)     Lastly, all amounts remaining after the payment of items (i) through (viii) above (the "**Excess Cash Flow**") shall be (x) unless Event of Default exists, held and applied strictly in the manner set forth in Section 8.2 below and (y) if an Event of Default exists, deposited into the Excess Cash Flow Account.

(b)     In the event that available revenue derived from the Property and received by Borrower shall not be sufficient to enable Borrower to make any of the payments described in subparagraphs (i) through (vii) above (such amount being referred to herein as the "**Operating Deficiency**"), Borrower shall not be relieved of its obligations to make such payments.

**Section 8.2     Excess Operating Cash Flow Funds**.  All Excess Cash Flow shall be held in trust by Borrower for the benefit of Lender as additional collateral for the Loan. Amounts held by Borrower pursuant to this Section 8.2 are referred to herein as the "**Excess Operating Cash Flow Funds**".  Provided no Cash Sweep Period exists, Excess Operating Cash Flow Funds

90

may be used, enjoyed and distributed by Borrower. Upon the occurrence of an Event of Default, Borrower shall immediately deposit all Excess Operating Cash Flow Funds into the Excess Cash Flow Account.

**Section 8.3    Intentionally Omitted.**

**Section 8.4    Cash Application Statement**.  Until the Loan is paid in full, Borrower shall deliver to Lender monthly operating statements for the Property certified by an authorized representative of Borrower within twenty (20) days after the end of each month, which operating statements (each, a "**Cash Application Statement**") show in detail the net operating income, the amounts and sources of Rents and other revenue received by or on behalf of Borrower and the amounts and purposes of Approved Operating Expenses and Approved Extraordinary Expenses paid by or on behalf of Borrower with respect to the Property for the previous month and year-to-date (including, in each case, a comparison to the Approved Annual Budget), or the portion thereof, paid out of Rents or other revenue for such calendar month or year-to-date, as applicable; amounts funded into any reserves hereunder; amounts paid to Manager, if any; shortfalls that exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment and/or required deposits into the Tax Account and/or the Insurance Account; any Operating Deficiency; and the amount of any distributions made during such month (and year-to-date) pursuant to Section 8.1(a) above or from Excess Operating Cash Flow Funds, together with a certification of Borrower that Borrower has not made any distributions in violation of the terms of Section 8.1(a); such statements also to include delinquency reports, tenant and expenses payable and receivable reports, and occupancy statistics.  Each such monthly statement shall provide for comparisons with the same calendar month in the immediately preceding calendar year, including year-to-date information, to the extent Borrower is in possession of such information for the applicable month and/or year-to-date for the preceding calendar year.

**Section 8.5    Establishment of Certain Accounts**.

(a)    Borrower shall, upon the occurrence of an Event of Default, establish an Eligible Account (the "**Clearing Account**") pursuant to the Clearing Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property.  Pursuant to the Clearing Account Agreement, funds on deposit in the Clearing Account shall be transferred on each Business Day to the Cash Management Account.

(b)    Upon the occurrence of an Event of Default, Lender, on Borrower's behalf, shall establish an Eligible Account with Lender or Servicer, as applicable, in the name of Borrower for the sole and exclusive benefit of Lender (the "**Cash Management Account**").  All sums in the Cash Management Account shall be held as additional collateral for the Loan and shall be applied in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.6    Deposits into and Maintenance of Clearing Account**.

(a)    Borrower represents, warrants and covenants that, upon the occurrence of an Event of Default and thereafter for so long as the Debt remains outstanding, (i) Borrower shall,

or shall cause Manager to, immediately deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Clearing Account; (ii) Borrower shall instruct Manager to immediately deposit (A) all revenue derived from the Property collected by Manager, if any, pursuant to the Management Agreement (or otherwise) into the Clearing Account and (B) all funds otherwise payable to Borrower by Manager pursuant to the Management Agreement (or otherwise in connection with the Property) into the Clearing Account; (iii) Borrower shall send (1) a notice, in a form approved by Lender, to all Tenants now occupying space at the Property directing them to pay all rent and other sums due under the Lease to which they are a party into the Clearing Account (such notice, the "**Tenant Direction Notice**") and (2) a notice, in a form approved by Lender, to all credit card companies and credit card clearing banks with which Borrower or Manager has entered into agreements with respect to the Property directing them to pay all receipts payable with respect to the Property into the Clearing Account (such notice, the "**Credit Card Direction Notice**"), (B) (1) simultaneously with the execution of any Lease entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish each Tenant under each such Lease the Tenant Direction Notice and (2) simultaneously with the execution of any credit card company agreement, credit card bank agreement or similar agreement entered into on or after the occurrence of an Event of Default in accordance with the applicable terms and conditions hereof, Borrower shall furnish the counterparty thereunder the Credit Card Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices and Credit Card Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property.  From and after the occurrence of an Event of Default, until deposited into the Clearing Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower.  Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.6 without Lender's prior written consent.

(b)      From and after the occurrence of an Event of Default, Borrower shall maintain the Clearing Account for the term of the Loan, which Clearing Account shall be under the sole dominion and control of Lender (subject to the terms hereof and of the Clearing Account Agreement).  The Clearing Account shall have a title evidencing the foregoing in a manner reasonably acceptable to Lender.  Borrower hereby grants to Lender a first-priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account.  Borrower hereby authorizes Lender to file UCC Financing Statements and continuations thereof to perfect Lender's security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof.  All costs and expenses for establishing and maintaining the Clearing Account (or any successor thereto) shall be paid by Borrower.  All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt.  Borrower shall pay all sums due under and otherwise comply with the Clearing Account Agreement. Borrower shall not alter or modify either the Clearing Account or the Clearing Account Agreement, in each case without the

92

prior written consent of Lender. The Clearing Account Agreement shall provide (and Borrower shall provide) Lender online access to bank and other financial statements relating to the Clearing Account (including, without limitation, a listing of the receipts being collected therein). In connection with any Secondary Market Transaction, Lender shall have the right to cause the Clearing Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Clearing Account. Lender shall provide Borrower with prompt written notice of any such renaming of the Clearing Account. Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. The Clearing Account (i) shall be an Eligible Account and (ii) shall not be commingled with other monies held by Borrower or Bank. Upon (A) Bank ceasing to be an Eligible Institution, (B) the Clearing Account ceasing to be an Eligible Account, (C) any resignation by Bank or termination of the Clearing Account Agreement by Bank or Lender and/or (D) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's request, (1) terminate the existing Clearing Account Agreement, (2) appoint a new Bank (which such Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (3) cause such Bank to open a new Clearing Account (which such account shall be an Eligible Account) and enter into a new Clearing Account Agreement with Lender on substantially the same terms and conditions as the previous Clearing Account Agreement and (4) send any new Credit Card Direction Notices, Tenant Direction Notices and other notices required pursuant to the terms hereof relating to such new Clearing Account Agreement and Clearing Account. Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section 8.6 in the name of Borrower in the event Borrower fails to do the same, provided that Lender will not exercise its rights herein granted unless an Event of Default exists. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(c)    Subject to the terms and conditions of the Clearing Account Agreement, all funds on deposit in the Clearing Account shall be transferred into the Cash Management Account.

**Section 8.7    Events of Default**. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (i) Borrower shall have no right to apply revenue derived from the Property for any purpose without Lender's prior written approval and (ii) Lender shall have all of the remedies available to it pursuant to this Agreement and pursuant to applicable law, including, without limitation, the institution of all of Lender's controls respecting deposits into and distributions from the Clearing Account and/or the Cash Management Account as more particularly set forth herein and in the Cash Management Agreement, and the exercise by Lender of the remedies specified in Article 8 and Article 10 hereof. Without limitation to the foregoing, upon the occurrence of an Event of Default, Lender shall have the continuing exclusive control of, right to withdraw and apply, the funds in the Clearing Account or the Cash Management Account to payment of any and all debts, liabilities and obligations of Borrower to Lender pursuant to or in connection with this Agreement, the Note, the Cash Management Agreement, the Clearing Account Agreement, the

Security Instrument and the other Loan Documents in such order, proportion and priority as Lender may determine in its sole discretion.

**Section 8.8    Borrower Distributions; Acknowledgement**.    Any transfer of Borrower's funds to or for the benefit of the Mezzanine Lender or the Mezzanine Borrower pursuant to this Agreement or any of the other Loan Documents, is intended by the parties to constitute, and shall constitute, a distribution from the Borrower to the Mezzanine Borrower and shall be treated as such on the books and records of each party.   No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and the Mezzanine Lender.

## ARTICLE 9

## SECONDARY MARKET

**Section 9.1    Securitization**.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.  The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".   Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".    At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender in connection with any Secondary Market Transaction, Borrower shall assist Lender (at Borrower's sole cost and expense) in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the NRSROs in connection with such Secondary Market Transactions, including, without limitation, to:

(i)    provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, any SPE Component Entity and Manager including, without limitation, the information set forth on Exhibit E attached hereto, (B) updated budgets relating to the Property, (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

MIA 31354953v9

(ii)     provide new and/or updated opinions of counsel, which may be relied upon by Lender, the NRSROs and their respective counsel, agents and representatives, as may be customary in Secondary Market Transactions or required by the Rating Agencies, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)     provide updated (as of the closing date of the applicable Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require;

(iv)     execute such amendments to the Loan Documents, the Property Documents and Borrower's or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies to effect any Secondary Market Transaction, including, without limitation, (A) to amend and/or supplement the independent director provisions provided on Exhibit C attached hereto, in each case, in accordance with the applicable requirements of the Rating Agencies, (B) bifurcating the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) (any of the foregoing, a "**Loan Bifurcation**") and (C) to modify all operative dates (including but not limited to payment dates, interest period start dates and end dates, etc.) under the Loan Documents, by up to ten (10) days; provided, however, that Borrower shall not be required to so modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity (except as provided in subclause (C) above) or the amortization of principal set forth herein, except in connection with a Loan Bifurcation which may result in varying interest rates and, as applicable, amortization schedules, but which shall have the same initial weighted average coupon of the original Note; and

(v)     review any Disclosure Document or any interim draft thereof furnished by Lender to Borrower with respect to information contained therein that was furnished to Lender by or on behalf of Borrower specifically in connection with the preparation of such Disclosure Document and provide to Lender any revisions to such Disclosure Document or interim draft thereof necessary to insure that such reviewed information does not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements contained therein not misleading.

(c)     If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following information:

(i)     if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, net operating income for the Property

and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)      if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)      If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "**Exchange Act Filing**") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)      If requested by Lender, Borrower shall furnish to Lender financial data and/or financial statements for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of Affiliated tenants, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor.

(f)      The financial data and statements provided by Borrower under this Section 9.1 shall be furnished to Lender (A) with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender, and (B) with respect to ongoing information required under Section 9.1(d)

and (e) above, not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each fiscal year of Borrower.

(g)     All financial data and statements provided by Borrower under Sections 9.1(c), (d), (e) and (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation AB and other applicable legal requirements.  All financial statements referred to in such Sections shall be audited by independent accountants of Borrower acceptable to Lender (it being acknowledged and agreed that Berdon LLP is acceptable to Lender) in accordance with Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided.  All financial data and statements (audited or unaudited) provided by Borrower under this Section shall be accompanied by an Officer's Certificate, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this subsection (g).

(h)     If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by Lender.

(i)     In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or other legal requirements are other than as provided herein, then notwithstanding the provisions of this Section, Lender may request, and Borrower shall promptly provide, such other financial data and financial statements as Lender determines to be necessary or appropriate for such compliance.

(j)     All costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with this Section 9.1 (including, without limitation, the fees and expenses of the Rating Agencies) shall be paid by Borrower; provided that such costs and expenses shall not exceed $10,000 (and Lender shall reimburse Borrower for all reasonable third party costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with Borrower's compliance with this Section 9.1 (including, without limitation, the fees and expenses of the Rating Agencies) in excess of $10,000).

### Section 9.2     Disclosure and Indemnification.

(a)     Borrower (on its own behalf and on behalf of each other Borrower Party) understands that information provided to Lender by Borrower, any other Borrower Party and/or

their respective agents, counsel and representatives may be (i) included in (A) the Disclosure Documents and (B) filings under the Securities Act and/or the Exchange Act and (ii) made available to Investors, the NRSROs, investment banking firms, accounting firms, law firms and other third-party advisory and service providers, in each case, in connection with any Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)    Borrower agrees to indemnify Lender, the Lender Group and the Underwriter Group against any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender, the Lender Group or the Underwriter Group may become subject in connection with (x) any Disclosure Document and/or any Covered Rating Agency Information, in each case, insofar as such Liabilities arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or arise out of or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading and (y) after a Securitization, any indemnity obligations incurred by Lender or Servicer in connection with any Rating Agency Confirmation.

(c)    If requested by Lender, Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager, Guarantor and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender, the Lender Group and the Underwriter Group for any Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lender Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property.  The indemnification provided for in clauses (B) and (C) above shall be effective whether or not the indemnification agreement described above is provided.  The aforesaid indemnity will be in addition to any liability which Borrower may otherwise have.

98

(d)     In connection with filings under Exchange Act and/or the Securities Act, Borrower shall (i) indemnify Lender, the Lender Group and the Underwriter Group for Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Lender Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(e)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof (but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party).  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.   After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnifying party shall pay for any legal or other expenses subsequently incurred by such indemnifying party in connection with the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt. Failure by Borrower and/or any Borrower Party to comply with the provisions of Section 9.1 and/or Section 9.2 within the timeframes specified therein and/or as otherwise required by Lender shall, at Lender's option, constitute a breach of the terms thereof and/or an Event of Default.  Borrower (on its own behalf and on behalf of each Borrower Party) hereby expressly authorizes and appoints Lender its attorney-in-fact to take any actions required of any Borrower Party under Sections 9.1, 9.2 and/or 9.5 in the event any Borrower Party fails to do the same, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Notwithstanding anything to the contrary contained herein, (i) except as otherwise expressly provided to the contrary in this Article 9, each Borrower Party shall bear its own cost of compliance with this Article (including, without limitation, the costs of any ongoing financial reporting or similar provisions contained herein) and (ii) to the extent that the timeframes for compliance with such ongoing financial reporting and similar provisions are shorter than the

timeframes allowed for comparable reporting obligations under Section 4.12 hereof (if any), the timeframes under this Article 9 shall control.

**Section 9.3    Reserves/Escrows**.  In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement and the other Loan Documents shall be deposited in "eligible accounts" at "eligible institutions" and, to the extent applicable, invested in "permitted investments" as then defined and required by the Rating Agencies.

**Section 9.4    Servicer**.

(a)    At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, designees or nominees, collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under the Loan Documents to the Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for set-up fees of $1,500.00 and Borrower shall not be responsible for payment of scheduled monthly servicing fees due to Servicer under the Servicing Agreement.  In addition, Borrower shall pay (i) any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or any Guarantor, any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement and (ii) the costs of all property inspections and/or appraisals of the Property (or any updates to any existing inspection or appraisal) that a Servicer may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement); provided, however, that Borrower shall not be responsible for payment of any fees or expenses required to be borne by, and not reimbursable to, Servicer.  Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto pursuant to the terms of the Loan Documents.

(b)    Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and any Guarantor under the Loan Documents.

(c)    Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or any Guarantor deliver to Lender pursuant to the Loan Documents.  No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 9.4(c).

**Section 9.5    Intentionally Omitted.**

**Section 9.6    REMIC Savings Clause**.   Notwithstanding anything herein to the contrary, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the real property relating to the Property, the ratio of the unpaid principal balance of the Loan to the value of the remaining real property relating to the Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust and it being agreed and acknowledged that such loan-to-value determination shall be based on the value of only real property and shall exclude any personal property or going-concern value, if any), the principal balance of the Loan must be paid down by Borrower by an amount sufficient to satisfy REMIC Requirements, unless the Lender receives an opinion of counsel acceptable to Lender that the Loan will not fail to maintain its status as a "qualified mortgage" within the meaning of Section 860G(a)(3)(A) of the IRS Code as a result of the related release of lien.

**Section 9.7    Syndication; Registered Form**.

(a)    Borrower acknowledges that Lender and any Co-Lender may, at their option and without the consent of Borrower, sell with novation all or any part of their right, title and interest in and to the Loan (the "**Syndication**") to one or more additional lenders (each a "**Co-Lender**"). In connection therewith, Borrower will take all actions as Lender and any such Co-Lender may request to assist Lender and /or such Co-Lender in consummating any such Syndication including, without limitation: (i) facilitating the review of the Loan and the Property by any prospective Co-Lender; (ii) assisting and cooperating with Lender in the preparation of information offering materials in connection with any such Syndication (which assistance may include reviewing and commenting on drafts of such materials and drafting portions thereof); (iii) delivering updated financial information, operating statements and other information with respect to Borrower and the Property (including, without limitation, appraisals); (iv) making representatives of Borrower available at reasonable times and upon reasonable notice to meet with prospective Co-Lenders (for tours of the Property or otherwise); (v) facilitating direct contact between the senior management and advisors of Borrower and any prospective Co-Lender; (vi) providing Lender with all information reasonably deemed necessary by Lender to complete any such Syndication; and (vii) executing such modifications to the Loan Documents as may be required by Lender or any Co- Lender in connection with any such Syndication (provided that such modifications will not, change in the aggregate any economic terms or other material terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower from those contemplated in the Loan Documents. The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan.   Borrower acknowledges and agrees, with respect to any co-lending agreement (or similar agreement) among the Co-Lenders, that (A) any such agreement shall be solely for the benefit of the Co-Lenders, and that Borrower shall not be a third-party beneficiary (intended or otherwise) of any of the provisions therein, shall not have any rights thereunder, and shall not be entitled to rely on any of the provisions contained therein, (B) Borrower's obligations under the Loan Documents are and will be independent of any such agreement and shall remain unmodified by the terms and provisions thereof, (C) any such agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the

Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision, and (D) the Co-Lenders shall have no obligation to disclose to Borrower the contents of any such agreement.  All costs incurred in connection with any Syndication shall be paid by Borrower.

(b)     At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, a register (the "**Register**") for the recordation of the names and addresses of Lender and any other lender or Co-Lender, and the principal amounts (and stated interest) under the Loan Documents owing to Lender and each other lender or Co-Lender pursuant to the terms of the Loan Documents from time to time, in a manner that shall cause the Loan to be considered to be in registered form for purposes of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRS Code.  The entries in the Register shall be conclusive absent manifest error, and Borrower, Lender and other lenders and Co-Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower, Lender and any other lender of Co-Lender, at any reasonable time and from time to time upon reasonable prior notice.  Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents.  If the Registrar has not been appointed to maintain the Register, the transfer of the Note may be effected only by surrender of the Note and the reissuance by Borrower of the Note to the transferee.

(c)     All costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with this Section 9.7 (including, without limitation, the fees and expenses of the Rating Agencies) shall be paid by Borrower; provided that such costs and expenses shall not exceed $10,000 (and Lender shall reimburse Borrower for all reasonable third party costs and expenses incurred by Borrower, Guarantor, Manager and their respective Affiliates in connection with Borrower's compliance with this Section 9.7 (including, without limitation, the fees and expenses of the Rating Agencies) in excess of $10,000).

## ARTICLE 10

## EVENTS OF DEFAULT; REMEDIES

### Section 10.1   Event of Default.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)     if (i) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (ii) any deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid when due or (iii) any other portion of the Debt is not paid

when due and (in the case of this clause (iii)) such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(b)      if any of the Taxes or Other Charges are not paid prior to delinquency, except to the extent (i) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender failed to pay the Taxes or Other Charges in question when required hereunder, (ii) Lender's access to such sums was not restricted or constrained in any manner and (iii) no Event of Default was continuing;

(c)      if (i) the Policies are not kept in full force and effect, except to the extent (A) the failure to maintain such Policies resulted solely from failure to pay the applicable Insurance Premiums therefor, (B) sums sufficient to pay such Insurance Premiums had been reserved hereunder prior to the applicable due date for the express purpose of paying such Insurance Premiums and Lender failed to pay the same when required hereunder, (C) Lender's access to such sums was not restricted or constrained in any manner and (D) no Event of Default was continuing, or (ii) evidence of the Policies being in full force and effect is not delivered to Lender as and when required in Section 5.1 hereof and either (A) such failure continues for two (2) Business Days following written notice thereof to Borrower or (B) such failure continues beyond the date that is two (2) Business Days prior to the scheduled expiration date of such Policies;

(d)      if (i) any of the representations or covenants contained in Sections 3.24 or 4.23 hereof are breached or violated (provided, however, that, with respect to breaches or violations of any such covenants, as distinguished from representations or warranties, under the Loan Documents, such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation was inadvertent, non-recurring and immaterial and (B) within twenty (20) days of the earlier to occur of notice from Lender or Borrower's knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation, (y) provides Lender with written evidence of such cure and (z) if requested by Lender, delivers to Lender a New Non-Consolidation Opinion relating to such breach or violation), or (ii) any of the representations or covenants contained in Sections 3.32, 4.25 or Article 6 hereof or in the Property Document Provisions are breached or violated;

(e)      if any representation or warranty made herein, in the Guaranty or in the Environmental Indemnity or in any other guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made;

(f)      if (i) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against

Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; (iii) there shall be commenced against Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (iv) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; (v) Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vi) any of Borrower, any SPE Component Entity, any Affiliated Manager or Guarantor is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Guarantor or its subsidiaries; or (vii) a Bankruptcy Event occurs;

(g)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(h)    if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days;

(i)    if any federal tax lien is filed against Borrower, any SPE Component Entity, Guarantor or the Property and same is not discharged of record (by payment, bonding or otherwise) within forty-five (45) days after same is filed;

(j)    if Borrower shall fail to deliver to Lender any financial reporting item required by this Agreement (including without limitation any of the items required by Section 4.12 hereof), on the date the same is due, and such failure continues for ten (10) Business Days after written notice thereof from Lender;

(k)    if Borrower shall fail to comply with any of its obligations under Section 4.15 hereof and such failure continues for ten (10) days after written notice thereof from Lender;

(l)    if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable grace periods, if any;

(m)    if any of the assumptions contained in any Non-Consolidation Opinion, or in any New Non-Consolidation Opinion (including, without limitation, in any schedules thereto and/or certificates delivered in connection therewith) are untrue or shall become untrue in any material respect;

(n)    if Borrower defaults under the Management Agreement beyond the expiration of applicable notice and grace periods, if any, thereunder or if the Management Agreement is canceled, terminated or surrendered, expires pursuant to its terms or otherwise ceased to be in full force and effect, unless, in each such case, Borrower, contemporaneously with such cancellation, termination, surrender, expiration or cessation, enters into a Qualified Management Agreement with a Qualified Manager in accordance with the applicable terms and provisions hereof;

(o)    if Borrower fails to appoint a replacement Manager upon the request of Lender and/or fails to comply with any limitations on instructing the Manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement, the Assignment of Management Agreement and the Security Instrument;

(p)    if any representation and/or covenant herein relating to ERISA matters is breached;

(q)    if (i) any Interest Rate Cap Agreement is terminated for any reason by Borrower or Counterparty or (ii) Borrower shall fail to observe, perform or discharge any of Borrower's obligations, covenants, conditions or agreements under the Interest Rate Cap Agreement and otherwise comply with the covenants set forth in Section 2.8 hereof;

(r)    intentionally omitted;

(s)    if the Operating Condition is not satisfied on or prior to the Completion Date;

(t)    if (A) Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder, (B) Borrower defaults under the Property Documents beyond the expiration of applicable notice and grace periods, if any, thereunder, (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms, unless in such case Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof or (E) a Property Document Event occurs;

(u)    with respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through (t) above or not otherwise expressly specified as an Event of Default in this Agreement, if the same is not cured (i) within fifteen (15) days after notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after notice from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have

105

commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or

(v)      if any default shall exist under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2    Remedies**.

(a)      Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Security Instrument, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Security Instrument, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity. Upon any Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity, the Debt and all other obligations of Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Security Instrument, the Note and the other Loan Documents to the contrary notwithstanding.

(b)      Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Security Instrument, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Security Instrument, the Note or the other Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Security Instrument, the Note or the other Loan Documents.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to

106

Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

(c)  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered. Notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by the Note and secured by the Security Instrument has been split or severed into multiple notes or components after the date hereof, Lender will not partially foreclose the Security Instrument with respect to any single indebtedness evidenced by any individual note or component separate and apart from the entire indebtedness secured by this Security Instrument (for the avoidance of doubt, except as expressly set forth in this clause, in no event shall the foregoing be construed to limit Lender's rights and remedies under  applicable law to conduct one or more sales or to institute proceedings in order to realize on any collateral for the Loan).

(d)  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until ten (10) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(e)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Property or any other collateral for the Loan and/or

107

paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(f)     Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary.   Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.   All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.   All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

## ARTICLE 11

## INDEMNIFICATIONS

**Section 11.1   General Indemnification**.   Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease, management agreement or any Property Document; (f) the payment of any commission, charge or brokerage fee to anyone (other than a broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the Security Instrument; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts.   Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

**Section 11.2   Mortgage and Intangible Tax Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents.

**Section 11.3   ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.15 or 4.22 of this Agreement.

**Section 11.4   Duty to Defend, Legal Fees and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**Section 11.5   Survival**.  The obligations and liabilities of Borrower under this Article 11 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

## ARTICLE 12

## EXCULPATION

**Section 12.1   Exculpation**.

(a)    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or Affiliate of Borrower or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other

MIA 31354953v9

Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.  The provisions of this Section shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (3) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan (including, without limitation, indemnities set forth in Article 11 hereof, Section 9.2 hereof, in the Guaranty and in the Environmental Indemnity) or any of the rights and remedies of Lender thereunder; (4) impair the right of Lender to obtain the appointment of a receiver or to enforce its rights and remedies provided in Articles 7 and 8 hereof; (5) impair the enforcement of any assignment of leases contained in the Security Instrument; (6) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (7) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Loss incurred by Lender (including attorneys' fees and expenses reasonably incurred) arising out of or in connection with the following:

(i)     fraud or material misrepresentation by any Borrower Party in connection with the Loan;

(ii)     the gross negligence or willful misconduct of any Borrower Party;

(iii)     any litigation or other legal proceeding related to the Debt filed by any Borrower Party or any other action of any Borrower Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents that is found by a court of competent jurisdiction to be frivolous, brought in bad faith, wholly without merit or wholly without basis in fact or law;

(iv)     physical waste to the Property caused by the intentional acts or intentional omissions of any Borrower Party and/or the removal or disposal of any portion of the Property after an Event of Default;

(v)     the misapplication, misappropriation or conversion by any Borrower Party of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property (or any portion thereof), (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, (C) any Rents, (D) any Tenant security deposits or Rents collected in advance, or (E) any other monetary

MIA 31354953v9

collateral for the Loan (including, without limitation, any Reserve Funds and/or any portion thereof disbursed to (or at the direction of) Borrower);

(vi)     failure to pay Taxes, charges for labor or materials or other charges that can create liens on any portion of the Property (except, in the case of Taxes, to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Taxes have been deposited with Lender hereunder in the Tax Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents);

(vii)     failure to pay Insurance Premiums (except to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Insurance Premiums have been deposited with Lender hereunder in the Insurance Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents), to maintain the Policies in full force and effect and/or to provide Lender evidence of the same, in each case, as expressly provided herein;

(viii)     any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(ix)     any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents or any transfer or similar taxes (whether due upon the making of the same or upon Lender's exercise of its remedies under the Loan Documents), but excluding any income, franchise or other similar taxes;

(x)     any forfeiture or seizure of the Property (or any portion thereof and/or interest therein) resulting from a violation or breach of any applicable law;

(xi)     any violation or breach of any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or <u>Exhibit C</u> attached hereto;

(xii)     any violation or breach of any exclusivity (or similar) provision in any Major Lease that permits or could permit the Tenant thereunder the right to terminate such Major Lease or abate rent thereunder;

(xiii)     the failure to purchase or replace (as applicable) any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement (as applicable), in each case, as and when required by the terms hereof;

(xiv)     any violation or breach of the Property Document Provisions and/or any Property Document Event;

(xv)     Borrower's violation or breach of Section 4.32 hereof; and/or

111

(xvi)   if any temporary certificate of occupancy issued for the Property shall lapse or become invalid or be revoked.

(b)      Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents:

(i)      Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents;

(ii)     the Debt shall be fully recourse to Borrower in the event that: (1) the first Monthly Debt Service Payment is not paid when due, (2) any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto is violated or breached, and (A) a court of competent jurisdiction orders a substantive consolidation of Borrower based, in whole or in part, on such violation or breach or (B) the Property or any portion thereof or interest therein becomes an asset in a bankruptcy or insolvency proceeding as a result of (in whole or in part) or due to (in whole or in part) such violation or breach, (3) any representation, warranty or covenant contained in Article 6 hereof is violated or breached, or (4) a Bankruptcy Event occurs;

(iii)    Borrower shall pay, and shall be personally liable to Lender for the payment of, the Interest Reserve Deficiency Amount in accordance with Section 7.9 of this Agreement; and

(iv)     Borrower shall pay, and shall be personally liable to Lender for the payment of, any Operating Deficiency.

## ARTICLE 13

## FURTHER ASSURANCES

**Section 13.1   Replacement Documents**.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

**Section 13.2   Recording of Security Instrument, etc**.  Borrower forthwith upon the execution and delivery of the Security Instrument and thereafter, from time to time, will cause the Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes,

112

filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Security Instrument, this Agreement, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by applicable law so to do.

Section 13.3  **Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Security Instrument, or for complying with all Legal Requirements including, without limitation, the execution and delivery of all such writings necessary to transfer any licenses with respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 13.3.

Section 13.4   **Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)      If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable without prepayment premium or penalty.

(b)      Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Security Instrument or the Debt.  If such claim, credit or deduction shall be required by applicable law, Lender shall

have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable without prepayment premium or penalty.

(c)      If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

## ARTICLE 14

## WAIVERS

**Section 14.1   Remedies Cumulative; Waivers**.   The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 14.2   Modification, Waiver in Writing**.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Security Instrument, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 14.3   Delay Not a Waiver**.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Security Instrument, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Security Instrument, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

MIA 31354953v9

**Section 14.4   Waiver of Trial by Jury.**   BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 14.5   Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 14.6   Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 14.7   Marshalling and Other Matters**.  Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Security Instrument of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument and on behalf of all persons to the extent permitted by applicable Legal Requirements.

**Section 14.8   Waiver of Statute of Limitations**.  To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Security Instrument or other Loan Documents.

**Section 14.9   Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

MIA 31354953v9

**Section 14.10 Sole Discretion of Lender**.  Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

## ARTICLE 15

## MISCELLANEOUS

**Section 15.1   Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Security Instrument, the Note or the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 15.2   Expenses; Indemnity**.

(a)      Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) except to the extent otherwise expressly set forth in this Agreement or any of the other Loan Documents, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (ii) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the liens in favor of Lender pursuant to the Loan Documents; (iii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property or any other security given for the Loan; (iv) enforcing any Obligations of, or collecting any payments due from, Borrower or any Guarantor under the Loan Documents or with respect to the Property; (v) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; (vi) protecting Lender's interest in the Property or any other security given for the Loan; and (vii) Lender's participation (including, without limitation, responding to any service of process, subpoena, or other request) in any litigation or other proceeding involving or related to any Borrower Party, the Loan or the Loan Documents and/or Lender's response to any other service of process, subpoena, or other request from any Governmental Authority involving or related to any Borrower Party, the Loan or the Loan Documents (including, without limitation, in each case, any legal fees incurred in connection therewith); provided, however, that Borrower

116

shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non appealable judgment of a court of competent jurisdiction.  Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account.

(b)        Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents; (ii) the use or intended use of the proceeds of the Loan; (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument, the Property or any interest therein, or receipt of any Rents; (v) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; and (vi) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties, as determined by a final non appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.  The provisions of Section 15.2(a) and this Section 15.2(b) shall (A) survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument and (B) apply equally in favor of the then-current Lender hereunder and any prior Lender hereunder (regardless of whether any such prior Lender has retained any obligations hereunder following the applicable assignment of the Loan, this Agreement and the other Loan Documents).

(c)        Borrower hereby agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees imposed, and costs and expenses incurred, by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

**Section 15.3   Brokers**.  Borrower agrees (i) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each a "**Broker**") hired or contracted by any

Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (ii) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person. The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt. Borrower hereby represents and warrants that no Broker has been engaged by any Borrower Party in connection with the transactions contemplated by this Agreement. Lender hereby agrees to pay any and all fees imposed or charged by any Broker hired solely by Lender. Borrower acknowledges and agrees that (a) any Broker is not an agent of Lender and has no power or authority to bind Lender, (b) Lender is not responsible for any recommendations or advice given to any Borrower Party by any Broker, (c) Lender and the Borrower Parties have dealt at arms-length with each other in connection with the Loan, (d) no fiduciary or other special relationship exists or shall be deemed or construed to exist among Lender and the Borrower Parties and (e) none of the Borrower Parties shall be entitled to rely on any assurances or waivers given, or statements made or actions taken, by any Broker which purport to bind Lender or modify or otherwise affect this Agreement or the Loan, unless Lender has, in its sole discretion, agreed in writing with any such Borrower Party to such assurances, waivers, statements, actions or modifications. Borrower acknowledges and agrees that Lender may, in its sole discretion, pay fees or compensation to any Broker in connection with or arising out of the closing and funding of the Loan. Such fees and compensation, if any, (i) shall be in addition to any fees which may be paid by any Borrower Party to such Broker and (ii) create a potential conflict of interest for Broker in its relationship with the Borrower Parties. Such fees and compensation, if applicable, may include a direct, one-time payment, servicing fees and/or incentive payments based on volume and size of financings involving Lender and such Broker.

**Section 15.4   Governing Law**.

**THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND DELIVERED TO LENDER BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING**

**UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5 1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

      **Section 15.5   Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | 96 Wythe Acquisition LLC<br>1274 49th Street, Suite 184<br>Brooklyn, New York 11219<br>Attention: Toby Moskovits |
| With a copy to: | Cohen & Gresser LLP<br>800 Third Avenue<br>New York, New York 10022<br>Attention:  Nicholas J. Kaiser, Esq. |
| If to Lender: | Benefit Street Partners Realty Operating Partnership, L.P.<br>142 West 57th Street, Suite 1201<br>New York, New York 10019<br>Attention:  Micah Goodman, General Counsel |
| With a copy to: | Stroock & Stroock & Lavan LLP<br>200 Biscayne Boulevard, Suite 3100 |

119

Miami, Florida 33131
Attention: Eugene Balshem, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 15.6   Headings**.   The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 15.7   Severability**.   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 15.8   Preferences**.   Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 15.9   Cost of Enforcement**.   In the event (a) that the Security Instrument is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement, the Security Instrument, the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

**Section 15.10  Exhibits  Incorporated**.   The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 15.11  Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Security Instrument, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no

120

such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 15.12  No Joint Venture or Partnership; No Third Party Beneficiaries.**

(a)     Borrower and Lender intend that the relationships created under this Agreement, the Security Instrument, the Note and the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement, the Security Instrument, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Security Instrument, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.   All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

(c)     The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.   Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.  Furthermore, each Borrower Party has obtained advice of counsel, accountants, and other professionals sufficient, in the judgment of such Borrower Party, to approve the Loan, the Loan Documents, and any transaction related to the closing of the Loan (including, without limitation, allocations of funds and the organizational structure of Borrower as each of the same relate to tax matters affecting such Borrower Party and the constituent direct and indirect owners of Borrower), and no Borrower Party is relying on Lender or any counsel or other professionals engaged by Lender with respect thereto.

(d)     Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases); or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property is subject.

(e)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Security Instrument, the Note

121

or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)     Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 3 of this Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Agreement, the Note, the Security Instrument and the other Loan Documents in the absence of the warranties and representations as set forth in Article 3 of this Agreement.

**Section 15.13 Publicity**.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to this Agreement, the Note, the Security Instrument or the other Loan Documents or the financing evidenced by this Agreement, the Note, the Security Instrument or the other Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld.

**Section 15.14 Limitation of Liability**.  No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**Section 15.15 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and the Security Instrument, the Note or any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Security Instrument and the other Loan Documents and this Agreement, the Note, the Security Instrument and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Security Instrument and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right

to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

**Section 15.16 Entire Agreement**.  This Agreement, the Note, the Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents.

**Section 15.17 Liability**.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.18 Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 15.19 Set-Off**.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided, however, Lender may only exercise such right during the continuance of an Event of Default.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided, that, the failure to give such notice shall not affect the validity of such set-off and application.

**Section 15.20 Certain Additional Rights of Lender (VCOC)**.

(a)      For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Borrower agrees that, in addition to the rights set forth in the Loan Documents and otherwise provided by applicable law, Lender shall have the following supplemental management rights:

(i)      the right to receive the information and reports described in the Loan Documents;

(ii)      the right to receive written notice of and attend as an observer meetings of the Borrower;

MIA 31354953v9

(iii)    upon a reasonable request and at reasonable times during normal business hours, inspect the books and records of the Borrower;

(iv)    upon reasonable request and at reasonable times during normal business hours, the right to visit and inspect any physical properties owned by the Borrower and pledged as collateral for the Loan; and

(v)    upon a reasonable request and at reasonable times during normal business hours, to meet and consult with management of the Borrower with respect to the significant business of the Borrower.

(b)    Borrower represents to Lender, as of the date hereof, that (i) at least 50% of Borrower's assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate, and (ii) Borrower has the right to, and actually does on a continuous basis, regularly and substantially participate directly in management and/or development activities with respect to such real estate. If any part of the foregoing sentence ceases to be true and correct in any respect after the date hereof, Borrower will promptly notify Lender of such change.

(c)    The aforementioned rights are intended to satisfy the requirement of "management rights" for purposes of qualifying the Loan as a "venture capital investment" for purposes of the DOL "plan assets" regulation, 29 C.F.R. § 2510.3-101., and in the event such rights are not satisfactory for such purpose, Borrower and Lender shall reasonably cooperate in good faith to agree upon mutually satisfactory management rights which satisfy such regulations.

(d)    The rights described herein shall apply and continue for so long as Lender continues to own any interest in the Loan, which shall be deemed to be so owned and to remain outstanding notwithstanding any conversion, exercise or exchange of such Loan for securities ("**Derivative Securities**"). The rights described herein shall terminate and be of no further force or effect as of the date upon which the Lender and their respective affiliates cease to maintain any interest in the Loan or any Derivative Securities.

## ARTICLE 16

## INTENTIONALLY OMITTED

## ARTICLE 17

## MEZZANINE LOAN.

### Section 17.1   Mezzanine Loan Notice.

(a)    Promptly after receipt (but no more than ten (10) Business Days after receipt), Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender a true, correct and complete copy of all material notices (including, without limitation, any notice of a Mezzanine Loan Event of Default or any other default under the Mezzanine Loan Documents), demands, requests or material correspondence (including electronically transmitted items) received from

124

Mezzanine Lender by Mezzanine Borrower or any guarantor under the Mezzanine Loan Documents.

(b)    Unless otherwise delivered to Lender pursuant to the provisions of Section 4.12 hereof, Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when due under the Mezzanine Loan Documents.

**Section 17.2    Mezzanine Loan Estoppels**.    After written request by Lender made no more than one time in any calendar year, Borrower shall (or shall cause Mezzanine Borrower to) from time to time, use reasonable efforts to obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.  In the event or to the extent that Mezzanine Lender is not legally obligated to deliver such estoppel certificates and is unwilling to deliver the same, or is legally obligated to deliver such estoppel certificates but breaches such obligation, then Borrower shall not be in breach of this provision so long as such Borrower furnishes to Lender estoppels executed by Mezzanine Borrower, each expressly representing to Lender the information requested by Lender regarding the status of the Mezzanine Loan and the compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents.  Borrower hereby indemnifies Lender from and against all Losses which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mezzanine Loan which was misrepresented in any material respect by Borrower in, or which warrants disclosure and was omitted from, such estoppel executed by Mezzanine Borrower.

**Section 17.3    Mezzanine Intercreditor**.    Borrower hereby acknowledges and agrees that the Mezzanine Intercreditor is solely for the benefit of Lender and Mezzanine Lender, and that neither Borrower nor Mezzanine Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein.  Lender and Mezzanine Lender have no obligation to disclose to Borrower or Mezzanine Borrower the contents of the Mezzanine Intercreditor. Borrower's obligations under the Loan Documents are and will be independent of the Mezzanine Intercreditor and shall remain unmodified by the terms and provisions thereof.

**Section 17.4    Direction of Mezzanine Borrower**.    Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any other Loan Documents to the effect that (a) Borrower shall cause, direct, permit or allow Mezzanine Borrower to act or to refrain from acting in any manner or (b) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mezzanine Borrower, or (c) other similar effect, such clause or provision, in each case, is intended to mean, and shall be construed as meaning, with respect to Borrower, and to the fullest extent permitted by applicable law, the power (whether direct or indirect) of Borrower to direct Mezzanine Borrower (through ownership of voting securities or partnership or limited liability company or other ownership interests), to bring about or effect a desired result.  Lender hereby specifically acknowledges that Borrower does not, directly or indirectly, hold or own any voting securities or partnership or limited liability company or other ownership interest in

125

Mezzanine Borrower, or have any other contractual relationship or agreement with Mezzanine Borrower, and therefore Borrower, cannot, through ownership of voting securities or partnership or limited liability company or other ownership interests, or other contract or agreement, direct Mezzanine Borrower to bring about or effect a desired result.

**Section 17.5  Notices from Mezzanine Lender**.    Borrower and Lender hereby acknowledge and agree that Lender may conclusively rely on any notice delivered by Mezzanine Lender without any inquiry into the validity thereof, including, without limitation, a notice from Mezzanine Lender that a Mezzanine Loan Event of Default has occurred or is continuing.

**Section 17.6  Mezzanine Loan Prepayment**.  Mezzanine Loan may not be prepaid in whole or in part unless the Loan shall have been (or shall simultaneously be) paid in full in accordance with the terms of this Agreement (including any Minimum Interest, Additional Interest and other amounts due and payable to Lender under the Loan Documents).

**[NO FURTHER TEXT ON THIS PAGE]**

126

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name:  Toby Moskovits
Title:   Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By:     _____
Name:  Micah Goodman
Title:   Authorized Signatory

**Loan Agreement**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: Toby Moskovits
Title:  Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: _____
Name: Micah Goodman
Title:  Authorized Signatory

**Loan Agreement**

**EXHIBIT A**

**ORGANIZATIONAL CHART**

**(attached hereto)**

MIA 31354953v9

# ORGANIZATION CHART[1]
## (as of December 13, 2017)



---

[1] Except as shown on this chart, no person or entity, individually or together with affiliates, owns directly or indirectly 20% or more interests in 96 Wythe Acquisition LLC or controls 96 Wythe Acquisition LLC.

1640006.2

**EXHIBIT B**

**PARKING WORK**

**(attached hereto)**

B-1



01  PARKING FLOOR PLAN (1ST FLOOR)

**EXHIBIT C**

**SPECIAL PURPOSE ENTITY REQUIREMENTS**

Borrower covenants and agrees that:

(a)      Borrower has not and will not:

(i)      engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)      acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)      incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases; provided, however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time (in the aggregate among all Borrowers, if more than one exist) three percent (3.0%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(iv)      commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)      use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)      fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(vii)      fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)      fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or

C-1

formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (<u>provided</u>, <u>that</u>, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)    have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person (other than, with respect to any SPE Component Entity, in Borrower);

(xii)    fail to file its own tax returns (to the extent Borrower is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates). Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; <u>provided</u>, <u>however</u>, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)    except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)    make any loans or advances to any Person;

C-2

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(xix)    fail to consider the interests of Borrower's creditors in connection with all company actions;

(xx)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Borrower or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Borrower or any SPE Component Entity  (provided, that, none of any member, shareholder or partner (as applicable) of Borrower or any SPE Component Entity or any board of directors or managers (as applicable) of Borrower or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xxii)    permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii) identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv) conduct its business and activities in such a way as to cause any of the assumptions made with respect to Borrower and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(b)    If Borrower is a partnership or limited liability company (other than a Springing Member LLC), each general partner (in the case of a partnership) and managing member (in the case of a limited liability company) of Borrower, as applicable, shall be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Borrower.  Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (a)(iv) - (xxiv) of this Exhibit C and, if such SPE Component Entity is a Springing Member LLC, clauses (c) and (d) of this Exhibit C, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will

C-3

not engage in any business or activity other than owning an interest in Borrower; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Borrower; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Borrower; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Borrower to comply with the provisions of this <u>Exhibit C</u>.

(c)        In the event Borrower or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Borrower or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Borrower or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Borrower or the SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or the SPE Component Entity (as applicable) automatically be admitted to Borrower or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Borrower or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Borrower or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of the SPE Component Entity or Borrower (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower or the SPE Component Entity (as applicable) upon the admission to Borrower or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Borrower or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Borrower or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Borrower or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Borrower or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Borrower or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Borrower or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or the SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Borrower or the SPE Component Entity (as applicable); <u>provided</u>, <u>however</u>, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the

C-4

admission to Borrower or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Borrower or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Borrower or the SPE Component Entity (as applicable).

(d)    The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable) agree in writing (A) to continue Borrower or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Borrower or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable).

(e)    The organizational documents of Borrower (to the extent Borrower is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two  duly appointed independent directors or managers of such entity (each, an "**Independent Director**") who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Borrower in connection with, in each case, an Acceptable ID Provider (defined below).

(f)    The organizational documents of each Borrower and the SPE Component Entity shall further provide that (I) the board of directors or managers of Borrower and the SPE

C-5

Component Entity and the constituent equity owners of such entities (constituent equity owners, the "**Constituent Members**") shall not take any action set forth in clause (a)(xx) of this Exhibit C or any other action which, under the terms of any organizational documents of Borrower or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Borrower's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Borrower or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Borrower and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Borrower or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Borrower or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Borrower, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(g)     Notwithstanding the foregoing, no Independent Director of Borrower or any SPE Component Entity may also serve as an independent director of Mezzanine Borrower or any special purpose component entity of Mezzanine Borrower.

"**Acceptable ID Provider**" shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

MIA 31354953v9

**EXHIBIT D**

**REA**

NONE

**EXHIBIT E**

**SECONDARY MARKET TRANSACTION INFORMATION**

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of Tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such Tenant, and the principal provisions of the leases with those Tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the  last three years prior to the date of filing.

(H)     Schedule of the lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

(1)     The number of Tenants whose leases will expire.

(2)     The total area in square feet covered by such leases.

(3)     The annual rental represented by such leases.

(4)     The percentage of gross annual rental represented by such leases.

E-1

**EXHIBIT F**

**<u>PERMITS</u>**

NONE

F-1

**EXHIBIT G**

**<u>FINANCINGS</u>**

NONE

G-1

## EXHIBIT H

## LITIGATION

1. Case no. 170702398 (Pennsylvania) filed July 24, 2017 by the City of Philadelphia against York Street Property Development, Michael Lichtenstein and Nahman Lichtenstein;

2. Case no. 504396/2017 (New York) filed March 6, 2017 by Grand Living II LLC, Toby Moskovits, My 2011 Grand LLC, S&B Monsey, LLC and Moshe Dov Schweidl against Yoel Goldman and All Year Management;

3. Case no. 161004907 (Pennsylvania) filed November 4, 2016 by Reed Smith LLP against 1718-41 York Street LP, YML Realty, Inc., York Street Property Development, 1718 York Street, LLC, Michael Lichtenstein, and Nahman Lichtenstein;

4. Case no. 090800820 (Pennsylvania) filed August 7, 2009 by Republic Bank against Michael Lichtenstein;

5. Case no. 5145900/2017 (New York) filed July 27, 2017 by Juan L. Ramirez and Carmen Nina Ramirez against Borrower and Manager;

6. Case No. 514248/2017 (New York) filed July 24, 2017 by Madwell, LLC against Borrower;

7. Case No. 513214/2016 (New York) filed August 1, 2016 by Gerson Mencia against Borrower and Dimyon Development Corp.;

8. Case No. 508700/2016 (New York) filed by Arones Milrod against Borrower, Dimyon Development Corp., Heritage Equity Holdings LLC and Heritage Equity Partners;

9. Case No. 507323/2014 (New York) filed August 11, 2014 by Grandfield Realty Corp. against Borrower, Toby Moskovits, 96 W Development LLC, 96 Wythe Holdings LLC, et al; and

10. Case No. 14609/2013 (New York) filed August 12, 2013 by Loeffler Realty LLC against Borrower, 96 W Development LLC, Economy Contracting Corp., et al.

H-1

**EXHIBIT I**

**<u>MAJOR CONTRACTS</u>**

NONE

MIA 31354953v9

# EXHIBIT J

## CONTINGENT LIABILITIES AND LONG-TERM COMMITMENTS

NONE

MIA 31354953v9

# **EXHIBIT K**

# **VIOLATIONS**

(See attached)

K-1

# NYC

## Buildings

✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

**Property Profile Overview**

| | | | | | |
|---|---|---|---|---|---|
| **96 WYTHE AVENUE** | | **BROOKLYN 11249** | | **BIN# 3425311** | |
| WYTHE AVENUE | 96 - 96 | **Health Area** | : 400 | **Tax Block** | : 2295 |
| | | **Census Tract** | : 557 | **Tax Lot** | : 21 |
| | | **Community Board** | : 301 | **Condo** | : NO |
| | | **Buildings on Lot** | : 1 | **Vacant** | : NO |

**View DCP Addresses...**    **Browse Block**

**View Zoning Documents**    **View Challenge Results**    **Pre - BIS PA**    **View Certificates of Occupancy**

| | |
|---|---|
| **Cross Street(s):** | NORTH 11 STREET, NORTH 10 STREET |
| **DOB Special Place Name:** | |
| **DOB Building Remarks:** | |

| | | | |
|---|---|---|---|
| **Landmark Status:** | | **Special Status:** | N/A |
| **Local Law:** | NO | **Loft Law:** | NO |
| **SRO Restricted:** | NO | **TA Restricted:** | NO |
| **UB Restricted:** | NO | | |
| **Environmental Restrictions:** | N/A | **Grandfathered Sign:** | NO |
| **Legal Adult Use:** | NO | **City Owned:** | NO |
| **Additional BINs for Building:** | 3061593 | | |

**Special District:**     UNKNOWN

This property is not located in an area that may be affected by Tidal Wetlands, Freshwater Wetlands, Coastal Erosion Hazard Area, or Special Flood Hazard Area. Click here for more information

**Department of Finance Building Classification:**    H2-HOTELS

Please Note: The Department of Finance's building classification information shows a building's tax status, which may not be the same as the legal use of the structure. To determine the legal use of a structure, research the records of the Department of Buildings.

| | Total | Open | |
|---|---|---|---|
| **Complaints** | 44 | 0 | **Elevator Records** |
| **Violations-DOB** | 9 | 3 | **Electrical Applications** |
| **Violations-ECB (DOB)** | 29 | 1 | **Permits In-Process / Issued** |
| **Jobs/Filings** | 46 | | **Illuminated Signs Annual Permits** |
| **ARA / LAA Jobs** | 0 | | **Plumbing Inspections** |
| **Total Jobs** | 46 | | **Open Plumbing Jobs / Work Types** |
| **Actions** | 19 | | **Facades** |
| | | | **Marquee Annual Permits** |
| | | | **Boiler Records** |
| **OR Enter Action Type:** | | | **DEP Boiler Information** |
| **OR Select from List:** Select... ▼ | | | **Crane Information** |
| **AND** Show Actions | | | **After Hours Variance Permits** |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## DOB Violation Display for 040414CEX0101BT

**Premises: 96 WYTHE AVENUE BROOKLYN**

BIN: 3425311    Block: 2295    Lot: 21

| | | | |
|---|---|---|---|
| **Issue Date:** | 04/04/2014 | **Violation Category:** | V - DOB VIOLATION - ACTIVE |
| **Violation Type:** | C - CONSTRUCTION | | |
| **Violation Number:** | EX0101BT | **Device No.:** | |
| **ECB No.:** | | | |
| **Infraction Codes:** | | | |
| **Description:** | | | |

**Disposition:**

**Code:**                    **Date:**

**Inspector:**

**Comments:**

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**
**DOB Violation Display for 013017E9027/596990**

**Premises: 96 WYTHE AVENUE BROOKLYN**                    BIN: <u>3425311</u>    **Block:** 2295    **Lot:** 21

| | | | |
|---|---|---|---|
| **Issue Date:** | 01/30/2017 | **Violation Category:** | V - DOB VIOLATION - ACTIVE |
| **Violation Type:** | E - ELEVATOR | | |
| **Violation Number:** | 9027/596990 | **Device No.:** | <u>3P14898</u> |

**ECB No.:**
**Infraction Codes:**
**Description:**

**Disposition:**
**Code:**                         **Date:**
**Inspector:**
**Comments:**

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

**DOB Violation Display for 013017E9027/596991**

Premises: **96 WYTHE AVENUE BROOKLYN**                          BIN: <u>3425311</u>   Block: **2295**   Lot: **21**

| | | |
|---|---|---|
| **Issue Date:** | 01/30/2017 | **Violation Category:**   V - DOB VIOLATION - ACTIVE |
| **Violation Type:** | E - ELEVATOR | |
| **Violation Number:** | 9027/596991 | **Device No.:**   <u>3P14899</u> |
| **ECB No.:** | | |
| **Infraction Codes:** | | |
| **Description:** | | |

**Disposition:**

**Code:**                          **Date:**

**Inspector:**

**Comments:**

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

### NYC Department of Buildings
### ECB Violation Details

**Premises: 96 WYTHE AVENUE BROOKLYN**

BIN: <u>3425311</u>   **Block: 2295   Lot: 21**

**Filed At: 96 WYTHE AVENUE , BROOKLYN , NY 11249**

Community Board: 301

## ECB Violation Summary

ECB Violation Number: 35184105N

**VIOLATION OPEN**

Severity: **CLASS - 2**

Penalty Balance Due: $500.00

Certification Status: NO COMPLIANCE RECORDED

Hearing Status: STIPULATION/IN-VIO

## Respondent Information

**Name:**          96 WYTHE ADQUISITIONS LLC

**Mailing Address:**   1274 49 STREET , BK , NY 11219

## Violation Details

| | | | |
|---|---|---|---|
| **Violation Date:** | 12/09/2016 | **Violation Type:** | CONSTRUCTION |
| **Served Date:** | 12/09/2016 | **Inspection Unit:** | PRO CERT UNIT |

| Infraction Codes | Section of Law | Standard Description |
|---|---|---|
| 282 | 28-105.12.2 | WRK DOESN'T CONFORM TO APPROV DOCS AND/OR APPROV AMENDMENTS |

**Specific Violation Condition(s) and Remedy:**

WORK DOES NOT CONFORM TO APPROVED CONSTRUCTION DOCUMENTS &/OR APPROVEDAMENDMENTS. UNDER ALT2 #321298154. INSPECTION DRAWING 8-23-16 AT TIMEOF INSPECTION FOUND OF ENTER/EXIT DOOR NOT AS PROPOSED ON PLAN. PLANS

**Issuing Inspector ID:**    2723

**Issued as Aggravated Level:**   NO

**DOB Violation Number:** 120916CN01RA02

## Dept. of Buildings Compliance History and Events

**Certification Status:**       NO COMPLIANCE RECORDED

**Compliance On:**

**Stipulated Compliance Due Date:**        04/15/2017

A Certificate of Correction must be submitted to the Administrative Enforcement Unit (AEU) for all violations. A violation that is not dismissed by ECB will continue to remain ACTIVE or "open" on DOB records until acceptable proof is submitted to the AEU, even if you have paid the penalty imposed by ECB.

## ECB Hearing Information

**Scheduled Hearing Date/Time:** 01/30/2017 8:30

**Hearing Status:**    STIPULATION/IN-VIO

## ECB Penalty Information

| | | | |
|---|---|---|---|
| **Penalty Imposed:** | $500.00 | | |
| **Adjustments:** | $0.00 | **Amount Paid:** | $0.00 |
| **Penalty Balance Due:** | $500.00 | **Court Docket Date:** | 08/31/2017 |

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.



**November 7, 2017**

*The Williamsburg Hotel*
*96 Wythe Avenue*
*Site Number 53668*

Per search of the City of NYC Fire Department records, there is an open fire code violation notice on file for this property under Notice of Violation numbers:

```
11565764P
11593835L
E459042
E467113S2
E503142
E503143
E503144
E503145
E503146
```

The City of NYC Fire Department considers these violations open and active.   The Fire Department does not consider the Notice of Violation to be closed, based on subsequent annual inspections that do not list or note the prior notice of violations items on the subsequent inspections and requires a follow up inspection to be requested and re-inspection fees to be paid to address the items listed in the notice of violation and close out the notice.

Contact providing this information:

**Richie Mann**
**Municipal Data Services**
**Staten Island, NY**
**718-815-0707**

Respectfully;
Ashlee D. Williams
Research Analyst



3555 N.W. 58th Street
Suite 400
Oklahoma City, OK  73112

Phone:       405.525.2998 ext 129
Fax:          405.528.4878
Email:        awatters@zoning-info.com



## MUNICIPAL DATA
### SERVICES

25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:** 11/03/2017

**County:** KINGS

**Title/CoNo.:** ZONE 53668

**Address:** 63 NORTH  10 STREET
A/K/A 96 / 102 WYTHE AVENUE

**Block:** 2295
**Lot:** 21

## FIRE DEPARTMENT VIOLATION SEARCH

In reply to your request concerning the above mentioned premises, please be advised that as of
**9 A.M. on 09/19/2017**   , the records show the following:

```
11565764P
11593835L
E459042
E467113S2
E503142
E503143
E503144
E503145
E503146
```

**Violations recorded above are of record in headquarters of the Division of Fire Prevention only, and may not include violations issued by local units.**

Municipal Data Services Inc. certifies that the records of the above municipal agency were examined on behalf of ZONING INFO, INC.
The information reported above is a true and accurate abstract of the information on file therein. This report is submitted for
information purposes only. There are no intended third party beneficiaries. No liability is assumed.

3136413         2825432

# FDNY Building Information Profile

11/06/17 10:33:14

Bin: 3061593

Total AKA Found: 2

| BLOCK | LOT | BIN | LHND | HHND | STREET NAME | BOROUGH |
|---|---|---|---|---|---|---|
| 02295 | 0021 | 3061593 | 63 | 63 | NORTH 10 STREET | BROOKLYN |
| 02295 | 0021 | 3061593 | 96 | 102 | WYTHE AVENUE | BROOKLYN |

## Summary

Num Siam Sprinkler          :          Sprinkler Type          :
Num Siam Standpipe          :          Sprinkler Type          :
Last BISP Insp Date         : 05/22/2013     Last BISP Insp Status     : Construction
Num of Violation Notices    : 1             Num of Violation Order     : 6
Has BISP Asbestos Abatement : No

## Accounts

FPREV Permit Accounts

| Acct # | Owner Name | Do # | PFX | Last Insp Date | Last Insp Stat |
|---|---|---|---|---|---|
| 36286714 | 96 WYTHE ACQUISITION | 34 | N | 11/02/2016 | PASS |
| 35359819 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/02/2015 | NOV AND VIO(NOV NO HOLD) |
| 36372613 | 96 WYTHE ACQUISITION LLC | 34 | T | 08/10/2016 | NOV(FIELD) |
| 36406486 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/19/2016 | NOV(FIELD) |
| 36416642 | 96 WYTHE ACQUISITION LLC | 98 | AA | 12/29/2016 | NOV AND VIO(NOV NO HOLD) |
| 37203551 | 96 WYTHE ACQUISITION LLC | 98 | AA | 07/05/2017 | NOV AND VIO(NOV NO HOLD) |
| 36181329 | 96 WYTHE AQUISITION LL | 34 | N | 09/05/2017 | PASS |
| 33178955 | ALL ISLAND MASONRY & | 50 | S | 08/06/2014 | PASS |
| 37170289 | THE HARVEY | 45 | G | 05/31/2017 | PASS |
| 37073384 | THE WILLIAMSBURG HOEL | 36 | F | 03/07/2017 | PASS |
| 36172179 | THE WILLIAMSBURG HOTEL | 98 | AA | 09/15/2017 | NOV(FIELD) |
| 37073350 | THE WILLIAMSBURG HOTEL | 36 | B | 10/20/2017 | NOV(FIELD) |
| 37126091 | THE WILLIAMSBURG HOTEL | 45 | G | 04/19/2017 | PASS |
| 36397172 | WILLIAMSBURG HOTEL | 48 | AA | 12/08/2016 | NOT APP (VIO) |
| 37154614 | WILLIAMSBURG HOTEL | 48 | AA | 06/02/2017 | NOV(FIELD) |

## NOV

FPREV Violation Notices

| Owner Name | NOV Num | Issue Date | Vio LawNum | Vio LawDesc | Vio Disposition | Disp Date |
|---|---|---|---|---|---|---|
| THE WILLIAMSBURG HOTEL | 11593835L | 03/07/2017 | RULE 17 | FAILED TO OBTAIN CERTIFICATE OF FITNESS | DEFAULT | 06/27/2017 |
|  |  |  | RULE 20 | FAILED TO CONDUCT REQUIR TEST/INSPECTION | DEFAULT | 06/27/2017 |
|  |  |  | RULE 5 | FAILED TO PRODUCE PERMIT AND/OR RECORD | DEFAULT | 06/27/2017 |

Page 1 of 2



FDNY Building Information Profile

11/06/17 10:33:14

Bin:  3061593

Vio Orders

FPREV Violation Orders

| Acct Owner | Acct# | Violation# | Vio Law Num | Vio Law Desc | Vio Type | Vio Date | Action |
|---|---|---|---|---|---|---|---|
| 96 WYTHE ACQUISITION LLC | 36372613 | E459042 | OTHER0001 | SEE FOLDER INFORMATION | FPREV | 08/10/2016 | HOLD BILLING |
| THE WILLIAMSBURG HOTEL | 37073350 | E503142 | HRU-23 | PROVIDE/MAINTAIN SMOKE DET REC. | FPREV | 03/07/2017 | HOLD BILLING |
| THE WILLIAMSBURG HOTEL | 37073350 | E503143 | HT-3 | NO FSD OR DFSD ON DUTY | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503144 | HRU-3 | PROVIDE LOA FOR ALARM SYSTEM | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503145 | HT-4 | PROVIDE FSP FOR APPROVAL-HOTEL | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |
| THE WILLIAMSBURG HOTEL | 37073350 | E503146 | HRU-13 | RESTORE FIRE ALARM SYSTEM | FPREV | 03/07/2017 | ADD & DELE TO A HELD ACCOUNT |

Page 2 of 2

# *SUMMONS BY NUMBER*

| SUMNUM | E467113S2 | SUMTYPE | |
|---|---|---|---|

| ISSUE DATE | 03/08/17 | SUMCREATEDT | 03/09/17 | HEARINGDT | |
|---|---|---|---|---|---|

| DISPCD | A | | | AGCY CD | |
|---|---|---|---|---|---|

| SUMNAME | THE WILLIAMSBURG HOTEL | FINES OWED | |
|---|---|---|---|

| ADDRESS | 96  WYTHE AVE  112490000 |
|---|---|

| STBORO | 4 | BROOKLYN |
|---|---|---|

| HRU-8 | V.O. ENFORCED-SUMMONS ISSUED | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# *SUMMONS BY NUMBER*

| | | |
|---|---|---|
| SUMNUM 11565764P | SUMTYPE E | |
| ISSUE DATE 09/23/17 | SUMCREATEDT 10/03/17 | HEARINGDT |
| DISPCD A | | AGCY CD |
| SUMNAME 96 WYTHE AQUISITION LLC | | FINES OWED |
| ADDRESS 96 WYTHE AVE 112490000 | | |
| STBORO 4 BROOKLYN | | |

| | | | | |
|---|---|---|---|---|
| RULE 19 | FAILED TO PROVIDE REQUIR AFFIDAVIT/PLANS | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# **EXHIBIT L**

## **EQUIPMENT LEASES**

NONE

MIA 31354953v9

# EXHIBIT G

## 96 WYTHE HOLDINGS LLC

## MANAGERS' CERTIFICATE

The undersigned, as both of the Managers of 96 WYTHE HOLDINGS LLC, a New York limited liability company, (the "Company"), hereby certify to BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P., a Delaware limited partnership, its successors and/or assigns that:

1.      Attached hereto as Exhibit A are (i) true, correct and complete copies of the Articles of Organization of each of the Company, NORTHSIDE PARTNERS LLC, 96 W DEVELOPMENT LLC, and 96 WYTHE ACQUISITION LLC, and (ii) true, correct and complete copies of the Certificate of Formation of each of 96 WYTHE MEZZ DE LLC and 96 WYTHE BORROWER DE LLC (collectively, the "Certificate"), together with all amendments thereto filed through the date hereof, each as certified by the Secretary of State of the State of each such entity's formation on the date set forth on such Certification, each of which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

2.      Attached hereto as Exhibit B are true, correct and complete copies of the operating agreements, together with all amendments through the date hereof, of the Company, 96 W DEVELOPMENT LLC, 96 WYTHE MEZZ DE LLC, 96 WYTHE BORROWER DE LLC, and 96 WYTHE ACQUISITION LLC, together with all amendments through the date hereof, each of which has not been terminated, modified, further amended or rescinded and is in full force and effect on the date hereof;

3.      Attached hereto as Exhibit C are the Managers' Consents of the Company, and the same have not been amended or rescinded and are in full force and effect on the date hereof;

4.      Attached hereto as Exhibit D are true, correct and complete copies of each of the Company's, 96 W DEVELOPMENT LLC's, 96 WYTHE MEZZ DE LLC's, 96 WYTHE BORROWER DE LLC's, and 96 WYTHE ACQUISITION LLC's Certificates of Good Standing, as issued by the Secretary of State of the state of each such entity's formation on the date set forth thereon, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

5.      Attached hereto as Exhibit E is a true, correct and complete copy of the Authorization to Transact Business in the State of New York of 96 WYTHE BORROWER DE LLC, as issued by the Secretary of State of the State of New York on October 31, 2017, which has not been terminated, modified, amended or rescinded and is in full force and effect on the date hereof;

6.      The Managers of the Company and their specimen signatures are, and each such signature is certified to be such person's signature by the Managers signing below such specimen signature, as follows:

1655222.4

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Manager | |
| Yechiel Michael Lichtenstein | Manager | |

      7.     The Authorized Signatories, each acting singly, of 96 WYTHE ACQUISITION LLC and their specimen signatures are, and each such signature is certified to be such person's signature by the Authorized Signatory signing below such specimen signature, as follows:

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Toby Moskovits | Authorized Signatory | |
| Yechiel Michael Lichtenstein | Authorized Signatory | |

[Remainder of page intentionally left blank.  Signature page follows]

Signed and dated this <u>13th</u> day of December, 2017.

> 96 WYTHE HOLDINGS LLC, a New York limited
> liability company, as manager of 96 W
> DEVELOPMENT LLC, as sole member of 96
> WYTHE MEZZ DE LLC, as sole member of 96
> WYTHE BORROWER DE LLC, as managing
> member of 96 WYTHE ACQUISITION LLC

By: _____
    Toby Moskovits, Manager

By: _____
    Yechiel Michael Lichtenstein, Manager

## THIRD AMENDMENT TO
## THE LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR
## 96 WYTHE ACQUISITION LLC

This Third Amendment (this "Amendment"), dated as of December ___, 2014, is among the individuals/entities signing it below.

WHEREAS, the individuals/entities signing this Amendment desire to amend that certain Limited Liability Company Operating Agreement dated as of June 20, 2012, which formed a limited liability company known as 96 WYTHE ACQUISITION LLC (the "Company"), pursuant to the New York Limited Liability Company Law, as amended by that certain First Amendment to the Limited Liability Company Operating Agreement for the Company, dated as of June 26, 2012, as further amended by that certain Second Amendment to the Limited Liability Company Operating Agreement for the Company, dated as of March 26, 2014 (collectively, the "Operating Agreement");

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the individuals/entities signing this Amendment below agree that the following shall be inserted at the end of the Operating Agreement:

1.    Definitions.

(a)    Capitalized terms used in this Amendment and not otherwise defined shall have the meanings ascribed to them in the Operating Agreement.

(b)    For the purposes of this Amendment, the following terms shall have the following meanings:

(i)    "Assignment of Contracts" shall mean the Assignment of Contracts, Permits, Warranties and General Intangibles (Acquisition Loan), dated as of the date hereof, by and between the Company and G4 18141 and the Assignment of Contracts Permits, Warranties and General Intangibles (Project Loan and Building Loan), dated as of the date hereof, by and between the Company and G4 18142, collectively.

(ii)    "Assignment of Rents and Leases" shall mean the Assignment of Rents and Leases (Acquisition Loan), dated as of the date hereof, from the Company to G4 18141; the Assignment of Rents and Leases (Project Loan), dated as of the date hereof, from the Company to G4 18142; the Assignment of Rents and Leases (Building Loan), from the Company to G4 18142, collectively.

(iii)    "Building Loan Agreement" shall mean the Building Loan Agreement, dated as of the date hereof, by and between the Company and G4 18142.

(iv)    "Environmental Indemnity Agreements" shall mean the Environmental Indemnity Agreement (Acquisition Loan), dated as of the date hereof, by the Company, Toby Moskovits and Yoel Goldman, to and for the benefit of G4 18141, the Environmental Indemnity Agreement (Project Loan), dated as of the date hereof, by the Company, Toby Moskovits and Yoel Goldman, to and for the benefit of G4 18142, the Environmental Indemnity Agreement (Building Loan), dated as of the date hereof, by the

Company, Toby Moskovits and Yoel Goldman, to and for the benefit of G4 18142, collectively.

(v)    "G4 18141" shall mean G4 18141, LLC, a New York limited liability company, having its principal place of business at 14 Skillman Street, Roslyn, New York 11576.

(vi)    "G4 18142" shall mean G4 18142, LLC, a New York limited liability company, having its principal place of business at 14 Skillman Street, Roslyn, New York 11576.

(vii)    "Goldman" shall mean Yoel Goldman, an individual, having an address at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

(viii)    "Guarantor" shall mean Moskovits and Goldman, jointly and severally.

(ix)    "Guaranties" shall mean those certain Guaranties, dated as of the date hereof, by Guarantor in favor of G4 18141 and G4 18142.

(x)    "Loan Documents" shall mean, collectively, the Assignment of Contracts, the Assignment of Rents and Leases, the Building Loan Agreement, the Pledge Agreement, the Mortgages, the Guaranties, the Environmental Indemnity Agreements, the Project Loan Agreement, the Notes and all other documents and instruments executed and/or delivered on the date hereof in connection therewith.

(xi)    "Mortgages" shall mean, collectively, (i) the Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, from the Company to G4 18141, (ii) the Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, from the Company to G4 18142, and (iii) the Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, from the Company to G4 18142, collectively.

(xii)    "Moskovits" shall mean Toby Moskovits, an individual, having an address at c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022.

(xiii)    "Notes" shall mean, collectively, (i) the Consolidated, Amended and Restated Promissory Note, dated as of the date hereof, in the principal amount of $24,250,000, by the Company in favor of G4 18141, (ii) the Building Loan Note, dated as of the date hereof, in the principal amount of $13,670,555 by the Company in favor of G4 18142, and (iii) the Project Loan Note, dated as of the date hereof, in the principal amount of $2,329,445, by the Company in favor of G4 18142.

(xiv)    "Obligations" shall mean the indebtedness, liabilities and obligations of the Company or the Member under or in connection with the Loan Documents or any related document in effect as of any date of determination.

2

(xv)    "Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

(xvi)    "Pledge Agreement" shall mean that certain Pledge Agreement, dated as of the date hereof, by and between 96 W DEVELOPMENT LLC, a New York limited liability company having an address at c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("96 W Development" or the "Member") in favor of G4 18141.

(xvii)    "Project Loan Agreement" shall mean that certain Project Loan Agreement, dated the date hereof, by and between the Company and G4 18142.

(xviii)    "Property" shall mean 96 Wythe, 61 N. 10th Street & 59 N. 10th Street, Brooklyn, New York 11211 (Kings County, Block 2295, Lot 21, 28 & 29).

2.    Single Purpose Entity/Separateness Covenants.  Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as (x) that certain loan arrangement in the principal sum of $24,250,000 (the "Acquisition Loan") by G4 18141 to the Company is outstanding, (y) that certain loan arrangement in the principal sum of $13,670,555 (the "Building Loan") by G4 18142 to the Company is outstanding, or (z) that certain loan arrangement in the principal sum of $2,329,445 (the "Project Loan," and together with the Acquisition Loan and the Building Loan, the "Loans") by G4 18142 to the Company is outstanding:

(a)    The Company will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

(b)    The Company will not engage in any business other than the ownership, management and operation of the Property and the Company will conduct and operate its business as presently conducted and operated.

(c)    The Company will not enter into any contract or agreement with any Guarantor or any party which is directly or indirectly controlling, controlled by or under common control with the Company or any Guarantor (an "Affiliate"), except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms–length basis with third parties other than any Guarantor or any Affiliate.

(d)    The Company will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (i) the Obligations, and (ii) trade and operational debt incurred in the ordinary course of business with trade creditors and in amounts as are normal and reasonable under the circumstances. No indebtedness other than the Obligations may be secured (subordinate or *pari passu*) by the Property.

(e)    The Company will not make any loans or advances to any third party, nor to any Guarantor, any Affiliate or any Member.

3

(f)     The Company will remain solvent and the Company will pay its debts from its assets as the same shall become due; provided, however, that notwithstanding the foregoing, a failure of the Company to remain solvent due solely to a decrease in the fair market value of the Property that does not result from any actions or omissions of the Company shall not constitute a breach of this clause (f).

(g)     The Company will do all things necessary to preserve its existence and the Company will not amend, modify or otherwise change the formation certificate or the Operating Agreement in a manner which would adversely affect the Company's existence as a single-purpose entity.

(h)     The Company will maintain books and records and bank accounts separate from those of its Affiliates and any Member, and the Company will file its own tax returns.

(i)     The Company will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate, any Member or any Guarantor).

(j)     The Company will preserve and keep in full force and effect its existence, good standing and qualification to do business in the state in which the Property is located.

(k)     The Company will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light or its contemplated business operations.

(l)     No Member will seek the dissolution or winding up, in whole or in part, of the Company, or the merger with or consolidation of the Company into any other entity.

(m)     The Company will not commingle the funds and other assets of the Company with those of any Affiliate, any Guarantor, any Member or any other Person.

(n)     The Company will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Member, any Affiliate, any Guarantor or any other Person.

(o)     The Company will not hold itself out to be responsible for the debts or obligations of any other Person (provided that the foregoing shall not prevent the Company from being and holding itself responsible for expenses incurred or obligations undertaken by the property manager of the Property in respect of its duties regarding the Property).

(p)     The Company shall obtain and maintain in full force and effect, and abide by and satisfy the material terms and conditions of, all material permits, licenses, registrations and other authorizations with or granted by any governmental authorities that may be required from time to time with respect to the performance of the Obligations.

(q)     The Company shall not, without the prior written consent of G4 18141, terminate, fail to comply with the provisions of, amend or modify the Operating Agreement or this Amendment or any organizational documents to which it is a party.

4

3.    Pledge Agreement.

(a)    The Company recognizes and acknowledges that the Member has entered into the Pledge Agreement with G4 18141. Notwithstanding anything in this Amendment to the contrary, the following provision shall apply for the benefit of, and with respect to, G4 18141 and its successors and assigns under the Pledge Agreement: G4 18141 (or its designee) may, upon foreclosure pursuant to the Pledge Agreement, (i) become a substitute Member with respect to the Membership Interests subject to such Pledge Agreement, (ii) exercise any and all voting rights allowed to the holder of any Membership Interests subject to such Pledge Agreement, and/or (iii) succeed to all other rights or interests associated with the Membership Interests subject to the Pledge Agreement, or any part thereof, as may be provided in the Pledge Agreement.

(b)    Each limited liability company interest in the Company (a "Membership Interest") shall constitute and shall remain a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Notwithstanding any provision of this Amendment to the contrary, to the extent that any provision of this Amendment is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of New York (6 Del C. § 8-101, et. seq.) (the "UCC"), such provision of Article 8 of the UCC shall be controlling.

(c)    Upon the issuance of Membership Interests in the Company to any Person in accordance with the provisions of this Amendment, without any further act, vote or approval of any Member or manager, director or officer of the Company, or any Person, the Company, and the Member on behalf of the Company, shall issue one or more non-negotiable certificates in the name of such Person substantially in the form of Schedule A hereto (a "Membership Interest Certificate"), which evidences the ownership of the Membership Interests in the Company of such Person. Each such Membership Interest Certificate shall be denominated in terms of the number of the Membership Interests in the Company evidenced by such Membership Interest Certificate and shall be signed by the Member on behalf of the Company.

(d)    Without any further act, vote or approval of any Member, director or officer of the Company or any Person, the Company shall issue a new Membership Interest Certificate in place of any Membership Interest Certificate previously issued if the holder of the Membership Interests in the Company represented by such Membership Interest Certificate, as reflected on the books and records of the Company:

(i)    makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Membership Interest Certificate has been lost, stolen or destroyed; and

(ii)    requests the issuance of a new Membership Interest Certificate before the Company has notice that such previously issued Membership Interest Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim.

5

(e)    Upon a Member's transfer in accordance with the provisions of this Amendment of any or all Membership Interests in the Company represented by a Membership Interest Certificate, the transferee of such Membership Interests in the Company shall deliver such Membership Interest Certificate to the Company for cancellation (executed by such transferee on the reverse side thereof), and the Company shall thereupon issue a new Membership Interest Certificate to such transferee for the percentage of Membership Interests in the Company being Transferred and, if applicable, cause to be issued to such Member a new Membership Interest Certificate for that percentage of Membership Interests in the Company that were represented by the canceled Membership Interest Certificate and that are not being transferred.

(f)    The Company shall maintain books for the purpose of registering the transfer of Membership Interests. Notwithstanding any provision of this Amendment to the contrary, a transfer of Membership Interests requires delivery of an endorsed Membership Interest Certificate and shall be effective upon registration of such transfer in the books of the Company.

4.    Certain Understandings of Parties; Registration of Pledge; Control of Pledged Collateral, Etc.

(a)    The parties acknowledge and agree that the Pledged Interests (as defined in the Pledge Agreement) constitute "investment property" (as defined in Section 9-102(a)(49) of the UCC. The Member therefore covenants and agrees that (A) the Pledged Interests shall at all times be certificated and evidenced by certificates in a form acceptable to G4 18141, (B) the terms of the Pledged Interests provide that they are securities governed by Article 8 of the UCC, (C) G4 18141 may perfect its security interest in the Pledged Interests by taking delivery under Section 8-301 of the UCC of the certificates evidencing the Pledged Interests; and (D) the Company's Formation Agreements shall not be amended to uncertificate the Pledged Interests until such time as the Loans are paid in full.

(b)    Notwithstanding the foregoing, to better assure the perfection of the security interest of G4 18141 in the Pledged Interests concurrently with the execution and delivery of this Amendment, the Member shall send written instructions in the form of Exhibit B hereto to the Company, and shall cause the Company to, and the Company shall, deliver to G4 18141 the Confirmation Statement and Instruction Agreement in the form of Exhibit C hereto pursuant to which the Company will confirm that it has registered the pledge effected by this Amendment on its books and agrees to comply with the instructions of G4 18141 in respect of the Pledged Interests without further consent of the Member or any other Person. Notwithstanding anything in this paragraph, neither the written instructions nor the Confirmation Statement and Instruction Agreement shall be construed as expanding the rights of G4 18141 to give instructions with respect to the Collateral beyond such rights set forth in this Amendment.

(c)    Solely with respect to Article 8 Matters (as hereinafter defined), the Member hereby irrevocably grants and appoints G4 18141, from the date of this Amendment until the termination of the Pledge Agreement in accordance with its terms, as the Member's true and lawful proxy, for and in the Member's name, place and stead to vote the Pledged Interest in the Company by the Member, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters. The proxy granted and appointed in this Section 4(c) shall include the right to sign the Member's name (as a member of the Company) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Interests that applicable

6

law may permit or require, to cause the Pledged Interest to be voted in accordance with the preceding sentence. The Member hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter and the Pledged Interest that the Member may have granted or appointed. The Member will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect. As used herein, "Article 8 Matter" shall mean any action, decision, determination or election by the Company or its member(s) that its membership interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

(d)    The proxies and powers granted by the Member pursuant to this Amendment (and the Pledge Agreement) are coupled with an interest and are given to secure the performance of the Member's obligations.

5.    No Amendment. The Company shall not, without the prior written consent of G4 18141, terminate, fail to comply with the provisions of, amend or modify the Operating Agreement or this Amendment or any organizational documents to which it is a party.

[SIGNATURE PAGE TO FOLLOW]

7

IN WITNESS WHEREOF, the individuals/entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

**MEMBER:**

96 W DEVELOPMENT LLC

By 96 Wythe Holdings LLC, Its Manager

By: _____

Name: Toby Moskovits
Title:  Manager

Schedule A

Form of Membership Interest Certificate

**CERTIFICATE FOR LIMITED MEMBERSHIP INTERESTS IN
96 WYTHE ACQUISITION LLC**

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate Number 001                                    100% Percentage Interest

96 Wythe Acquisition LLC, a New York limited liability company (the "Company"), hereby certifies that 96 W Development LLC, a New York limited liability company (together with any assignee of this Certificate, the "Holder"), is the registered owner of one hundred percent (100%) of the membership interests in the Company. The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company are set forth in, and this Certificate and the membership interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 20, 2012, as the same maybe further amended or restated from time to time (the "Limited Liability Company Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the membership interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Limited Liability Company Agreement. The Company will furnish a copy of the Limited Liability Company Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the membership interests in the Company evidenced by this Certificate is subject to certain restrictions in the Limited Liability Company Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed , by and on behalf of the transferee in such Transfer.

Each membership interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each membership interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code). Notwithstanding any provision of this Certificate to the contrary, to the extent that any provision of this Certificate is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of New York (NY CLS UCC § 8-101, et. seq.), such provision of Article 8 of the Uniform Commercial Code shall be controlling.

This Certificate and the membership interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

96 WYTHE ACQUISITION LLC,
a New York limited liability company

By:   96 W Development LLC, its sole member

By: 96 Wythe Holdings LLC, its Manager

By: _____
Name:  Toby Moskovits
Title:  Manager

Dated: _____, 2014

Schedule B

Form of Instructions to the Company

**INSTRUCTION TO REGISTER PLEDGE**

_____ ___, 2014

To:     96 Wythe Acquisition LLC

In accordance with the requirements of that certain Pledge Agreement dated as the date hereof (as amended, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), between G4 18141, LLC, a New York limited liability company, having an address at 14 Skillman Street, Roslyn, New York 11576 (together with its successor and assigns, "***Lender***") and 96 W Development LLC, a New York limited liability company ("***Pledgor***") (capitalized but undefined terms used herein shall have the meanings set forth in the Pledge Agreement as therein defined), you are hereby instructed to register the pledge of the following interests as follows:

All right, title and interest now owned or hereafter acquired by Pledgor in the following:

(i)     all limited liability company membership interests, partnership interests, capital stock or other equity interests of and all other right, title and interest now owned or hereafter acquired by Pledgor in and to Issuer (as defined in the Pledge Agreement), together with (a) all additional membership interests, partnership interests, capital stock or other equity interests in Issuer and options, warrants, and other rights now or hereafter acquired by Pledgor in respect of such membership interests, partnership interests, capital stock or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Issuer or otherwise) and all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests, partnership interests, capital stock or other equity interests; (b) all certificates, instruments, or other writings representing or evidencing interests in Issuer, and all accounts and general intangibles arising out of, or in connection with, the interests in Issuer; (c) any and all moneys or property due and to become due to Pledgor now or in the future in respect of the interests in Issuer, or to which Pledgor may now or in the future be entitled in its capacity as a member, partner, shareholder or other equity holder of Issuer, whether by way of a dividend, distribution, return of capital or otherwise; (d) all other claims which Pledgor now has or may in the future acquire in its capacity as a member, partner, shareholder or other equity holder of Issuer against Issuer and its property; and (e) all rights of Pledgor under the applicable Issuer Formation Agreement applicable to Issuer (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of the interests in Issuer), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the interests in Issuer (collectively, the "***Pledged Interests***");

(ii)    all  "accounts",  "general  intangibles",  "payment  intangibles", "instruments" and "investment property" (in each case as defined in the Code) constituting or relating to the foregoing; and

(iii)    to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

You are hereby further authorized and instructed to execute and deliver to Lender a Confirmation Statement and Instruction Agreement, substantially in the form of Exhibit C to the Pledge Agreement and, to the extent provided more fully therein, to comply with the instructions of Lender in respect of the Collateral without further consent of, or notice to, Pledgor. Notwithstanding anything in this paragraph, this instruction shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement. These instructions may be executed and delivered in counterparts.

**PLEDGOR:**

96 WYTHE ACQUISITION LLC,
a New York limited liability company

By:   96 W Development LLC, its sole member

By: 96 Wythe Holdings LLC, its Manager

By: _____
        Name:  Toby Moskovits
        Title:  Manager

**LENDER:**

G4 18141, LLC

By: _____
Name:
Title:

Schedule C

Form of Confirmation Statement and Instruction Agreement

**CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT**

_____ ___, 2014

To:  G4 18141, LLC
     14 Skillman Street
     Roslyn, New York 11576

Pursuant to the requirements of that certain Pledge Agreement dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), between G4 [_____], LLC, a New York limited liability company, having an address at 14 Skillman Street, Roslyn, New York 11576 (together with its successor and assigns, "***Lender***") and 96 W Development LLC, a New York limited liability company ("***Pledgor***") (capitalized but undefined terms used herein as therein defined), this Confirmation Statement and Instruction Agreement relates to those ownership interests (the "***Pledged Interests***"), as further described in the Pledge Agreement, issued by 96 Wythe Acquisition LLC, a New York limited liability company ("***Issuer***").

Issuer acknowledges and agrees that the Pledged Interests constitute "investment property" (as defined in Section 9-102(a)(49) of the Code). Issuer therefore covenants and agrees that (A) the Pledged Interests shall at all times be certificated and evidenced by certificates in a form acceptable to Lender, (B) the terms of the Pledged Interests shall at all times provide that the Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code, (C) the Pledged Interests are investment company securities within the meaning of Section 8-103 of the Code, and (D) the Issuer Formation Agreements applicable to Issuer shall not be amended to uncertificate the Pledged Interests or to cause the Pledged Interests to cease to be "investment property" (as defined in Section 9-102(a)(49) of the Code) and securities under Article 8 of the Code until such time as the Obligations is paid in full. Accordingly, for purposes of perfecting the security interest of Lender therein, Lender and Issuer each agree as follows:

On the date hereof, the registered owner of one hundred percent (100%) of the ownership interests in Issuer and the Pledged Interests is Pledgor.

The registered pledgee of the Pledged Interests is:

G4 18141, LLC

There are no liens of Issuer on the Pledged Interests or any adverse claims thereto for which Issuer has a duty under Section 8-403 of the Code. Issuer has by book-entry registered the Pledged Interests in the name of the registered pledgee on or before the date hereof. No other

pledge is currently registered on the books and records of Issuer with respect to the Pledged Interests.

Issuer hereby acknowledges receipt of a copy of the Pledge Agreement and agrees that Pledgor is bound thereby. Until the Debt is paid in full (exclusive of provisions which shall survive full payment), Issuer agrees to: (i) comply with the instructions of Lender sent in accordance with the Pledge Agreement, without any further consent from Pledgor or any other Person, in respect of the Collateral; and (ii) disregard any request made by Pledgor or any other person which contravenes the instructions of Lender with respect to the Collateral. Notwithstanding anything in this paragraph, this Confirmation Statement and Instruction Agreement shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

**PLEDGOR:**

96 W DEVELOPMENT LLC

By:   96 Wythe Holdings LLC, its Manager

By:   _____
      Name:  Toby Moskovits
      Title:  Manager

Acknowledged and Agreed:

**LENDER:**

G4 18141, LLC

By: _____
Name:
Title:

## FOURTH AMENDMENT TO
## OPERATING AGREEMENT OF
## 96 WYTHE ACQUISITION LLC

This Fourth Amendment (this "**Amendment**") to Operating Agreement of 96 Wythe Acquisition LLC, a New York limited liability company (the "**Company**"), dated as of December 13, 2017, is among the individuals/entities signing it below.

**WHEREAS**, the parties desire to amend that certain Operating Agreement of the Company dated as of June 20, 2012 (the "**Original Operating Agreement**"), as amended by the Amendment to the Limited Liability Company Operating Agreement dated June 26, 2012 (the "**First Amendment**"), the Second Amendment to the Limited Liability Company Operating Agreement dated March 26, 2014 (the "**Second Amendment**"), the Third Amendment to the Limited Liability Company Operating Agreement dated December, 2014 (the "**Third Amendment**," and together with the Original Operating Agreement as amended by the First Amendment and the Second Amendment, the "**Operating Agreement**"), which governs the Company, pursuant to the New York Limited Liability Company Law;

**WHEREAS**, this Amendment is a condition and an inducement for the Company and Benefit Street Partners Realty Operating Partnership, L.P., a Delaware limited liability company, and its successors and assigns ("**Lender**") to (a) enter into (i) that certain Loan Agreement by and between the Company and Lender, dated as of the date hereof (the "**Loan Agreement**") and (ii) the Loan Documents (as defined in the Loan Agreement), (b) perform its obligations under the Loan Documents, and (c) obtain the Loan (as defined in the Loan Agreement);

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Amendment below agree to amend the Operating Agreement as follows by (i) deleting the First Amendment, the Second Amendment and the Third Amendment in their entirety (including any "opt-in" provisions for the purposes of Article 8 of the Uniform Commercial Code set forth therein) and (ii) adding the following provisions to the Operating Agreement, which terms shall modify, amend and supersede any contrary terms of the Operating Agreement:

Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as the Loan by Lender to the Company remains outstanding (any undefined capitalized terms used in this Amendment not defined in the Operating Agreement shall have the meanings assigned to them in the Loan Agreement):

Section 1.        <u>Members</u>.  The names, addresses and percentage interest of the Members is set forth below:

| Name& Address: | Percentage Interest |
|---|---|
| 96 Wythe MEZZ DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 99.5% |
| 96 Wythe Borrower DE LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211 | 0.5% |

All references to "Member," the "Members" or the "sole member" in the Operating Agreement shall mean the members set forth above.

Section 2.    Management.  The business and affairs of the Company shall be managed by or under the direction of its managing member.  96 Wythe Borrower DE LLC, a Delaware limited liability company ("**Managing Member**") shall act as the managing member of the Company.

Section 3.    Single Purpose Entity Provisions.

(a)    The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    own, manage and operate the Property;

(ii)    to enter into and perform its obligations under the Loan Documents

(iii)    to transact any lawful business permitted to be transacted by limited liability companies organized under the laws of the State of New York that is related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

(b)    The Company, the Member, or any Authorized Signatory on behalf of the Company, may enter into and perform the Loan Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, Director, Officer or other Person notwithstanding any other provision of this Agreement or any applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the Member or any Director or Officer to enter into other agreements on behalf of the Company.

(c)    Company has not and will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

1657062.3

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases; provided, however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3.0%) of the outstanding principal amount of the Debt. No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property;

(iv)    commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)    use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)    fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(vii)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)    have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Company if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person;

(xii)    fail to file its own tax returns (to the extent Company is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Company's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Company's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Company and such Affiliates and to indicate that Company's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Company's own separate balance sheet.  Company has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)    except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)    make any loans or advances to any Person;

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company);

(xix)    fail to consider the interests of Company's creditors in connection with all company actions;

1657062.3

(xx)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Company or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Company or any SPE Component Entity (provided, that, none of any member, shareholder or partner (as applicable) of Company or any SPE Component Entity or any board of directors or managers (as applicable) of Company or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xxii)    permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii) identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv) conduct its business and activities in such a way as to cause any of the assumptions made with respect to Company and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(d)    The Managing Member of Company will be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Company. Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (c)(iv) - (xxiv) of this Section 3 of this Amendment and, if such SPE Component Entity is a Springing Member LLC, clauses (e) and (f) of this Section 3 of this Amendment, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Company; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Company; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Company; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Company to comply with the provisions of this Section 3 of this Amendment.

(e)    In the event Company or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Company or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that

causes the last remaining member of Company or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Company or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Company or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Company or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Company or the SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Company or the SPE Component Entity (as applicable) automatically be admitted to Company or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Company or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Company or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Company or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of the SPE Component Entity or Company (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Company or the SPE Component Entity (as applicable) upon the admission to Company or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Company or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Company or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Company or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Company or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Company or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Company or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Company or the SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Company or the SPE Component Entity (as applicable); provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the admission to Company or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Company or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Company or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Company or the SPE Component Entity (as applicable).

(f)     The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Company or the SPE Component

1657062.3

Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable) agree in writing (A) to continue Company or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Company or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Company or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Company or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Company or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Company or the SPE Component Entity (as applicable).

(g)    The organizational documents of Company (to the extent Company is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two  duly appointed independent directors or managers of such entity (each, an **"Independent Director"**) who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Company or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Company in connection with, in each case, an Acceptable ID Provider (defined below).

(h)    The organizational documents of Company and the SPE Component Entity shall further provide that (I) the board of directors or managers of Company and the SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the **"Constituent Members"**) shall not take any action set forth in clause (c)(xx) of Section 3 of this Amendment or any other action which, under the terms of any organizational documents of Company or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise

consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Company's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Company and any SPE Component Entity (including Company's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Company or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Company and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Company or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Company or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Company, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(i)    Notwithstanding the foregoing, no Independent Director of Company or any SPE Component Entity may also serve as an independent director of Mezzanine Company or any special purpose component entity of Mezzanine Company.

For the purpose of Section 3 of this Amendment, "**Acceptable ID Provider**" shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

This Amendment may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

1657062.3

Section 4.    Certificated Limited Liability Company Interests.

(a)    Each limited company interest in the Company shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York (the "Uniform Commercial Code"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.    The Company shall maintain books for the purpose of registering the transfer of limited liability company interests, and, upon any transfer of limited liability company interests in the Company, the Company shall notify the registered owner of any applicable restrictions on the transfer of limited liability company interests.

(b)    The limited liability company interests in the Company shall be evidenced by certificates in the form of Exhibit 1 hereto. Each such certificate shall be executed by manual or facsimile signature of an authorized person of the Company on behalf of the Company.    The Company shall maintain books for the purpose of registering the transfer of limited liability company interests.    In connection with a transfer in accordance with this Agreement of any limited liability company interest in the Company, the certificate(s) evidencing the limited liability company interests shall be delivered to the Company for cancellation, and the Company shall thereupon issue a new certificate to the transferee evidencing the limited liability company interests that were transferred and, if applicable, the Company shall issue a new certificate to the transferor evidencing any limited liability company interests registered in the name of the transferor that were not transferred.    Notwithstanding anything to the contrary set forth herein, in no event shall the Managing Member's limited liability company interests in the Company be evidenced by a certificate of limited liability company interests.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

**MEMBERS**:

96 WYTHE MEZZ DE LLC,
a Delaware limited liability company

By: _____
Name: Toby Moskovits
Title:   Authorized Person


96 WYTHE BORROWER DE LLC,
a Delaware limited liability company,

By: _____
Name: Toby Moskovits
Title:  Authorized Person

<u>Exhibit 1</u>

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
96 Wythe Acquisition LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OR BLUE SKY LAWS OF ANY STATE.    THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.    ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS, CONDITIONS AND RESTRICTIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate Number _____                                         99.5% Percentage Interest

96 Wythe Acquisition LLC, a New York limited liability company (the "<u>Company</u>"), hereby certifies that 96 Wythe MEZZ DE LLC, a Delaware limited liability company (the "<u>Holder</u>") is the registered owner of ninety-nine and one-half percent (99.5%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of such limited liability company interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 20, 2012, as amended by the Amendment to the Limited Liability Company Operating Agreement dated June 26, 2012, as further amended by the Second Amendment to the Limited Liability Company Operating Agreement dated March 26, 2014, as further amended by the Third Amendment to the Limited Liability Company Operating Agreement dated as of December, 2014, and as further amended by the Fourth Amendment to the Operating Agreement as of the date hereof, as the same may be further amended or restated from time to time (the "<u>Operating Agreement</u>"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of this Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and governed by Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York (the "Code") and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

[Intentionally Left Blank – Signature Page to Follow]

1657062.3

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: November __, 2017

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By:     _____

Name:  _____

Title:    _____

(REVERSE SIDE OF CERTIFICATE)

ASSIGNMENT OF INTEREST

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (print or typewrite name of transferee), _____ (insert Social Security or other taxpayer identification number of transferee), the following specified percentage of limited liability company interests in the Company: _____ (identify the percentage interest being transferred) effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

**96 WYTHE MEZZ DE LLC,**
a Delaware limited liability company

Dated: _____    By: _____
                                     Name:
                                     Title:

                                     Address:

---

APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of limited liability company interests in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the limited liability company interests in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee (Print)

1657062.3

Dated: _____    Signature: _____
                                                    (Transferee)

                          Address:

                          _____

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
        Name:
        Title:

# EXHIBIT H

## ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES

THIS **ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Assignment**") is made as of the 13th day of December, 2017, by **96 WYTHE ACQUISITION LLC**, a New York limited liability company, having an address at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Borrower**"), to **BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**, a Delaware limited partnership, having an address at 142 West 57th Street, Suite 1201, New York, New York 10019 (together with its successors and assigns, "**Lender**"), and is consented and agreed to by **WILLIAMSBURG HOTEL BK LLC**, a New York limited liability company, having its principal place of business at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Manager**").

## RECITALS:

A.      Borrower, by its Consolidation, Extension and Restatement of Notes Agreement of even date herewith given to Lender (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"), is indebted to Lender in the principal sum of up to $68,000,000.00 advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Loan Agreement and the Note (the indebtedness evidenced by the Loan Agreement and the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Loan Agreement and the Note.  Initially capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement.

B.      The Loan is secured by, among other things, the Security Instrument, which grants Lender a first lien on the Property.

C.      Borrower and Manager have agreed that Manager will manage the Property on terms set forth on Exhibit A attached hereto (the "**Hotel Management Agreement**") and Manager is entitled to certain hotel management fees (the "**Hotel Management Fees**") thereunder.

D.      Lender requires as a condition to the making of the Loan that Borrower assign the Hotel Management Agreement to Lender and that Manager subordinate its interest in the Hotel Management Fees in lien and payment to the Security Instrument as set forth below.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Assignment of Hotel Management Agreement.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Hotel Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default under the Loan Agreement or any of the other Loan Documents and the failure of Borrower to cure such default within any applicable grace period.

2.    Subordination of Hotel Management Agreement.  Manager hereby agrees that the Hotel Management Agreement, the Hotel Management Fees and any and all liens, rights, privileges and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property pursuant to the Hotel Management Agreement or otherwise, are and shall be in all respects subordinate and inferior in lien, payment and terms to the lien, payment and terms of the Security Instrument, the Note, the Loan Agreement and the other Loan Documents, and to any renewals, extensions, modifications, assignments, replacements or consolidations thereof, and to the rights, privileges and powers of Lender thereunder.

3.    Estoppel.  Each of Borrower and Manager represents and warrants that (a) the Hotel Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and constitutes the entire agreement between Manager and Borrower with respect to management of the Property, (b) neither Manager nor Borrower is in default under any of the terms, covenants or provisions of the Hotel Management Agreement and neither Borrower or Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default by either Borrower or Manager under the Hotel Management Agreement, (c) neither Manager nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Hotel Management Agreement, (d) the Hotel Management Fees and all other sums due and payable to Manager under the Hotel Management Agreement have been paid in full, as of the date hereof, and (e) Manager is aware that the Leases and the Rents relating to the Property have been assigned to Lender pursuant to the Loan Documents.

4.    Agreement by Borrower and Manager.  Borrower and Manager hereby agree (a) not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without Lender's prior written consent which will not be unreasonably withheld, delayed or conditioned and (b) that in the event of a default (continuing beyond any applicable grace or cure period) under the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents (each, an "**Event of Default**") during the term of this Assignment or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Hotel Management Agreement in accordance with the Loan Agreement, Lender may require Borrower to terminate the Hotel Management Agreement and require Manager to transfer its responsibility for the management of the Property to a Qualified Manager in accordance with the terms of the Loan Agreement, effective as of the date set forth in Lender's notice to Manager.  In such event, Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4 or Section 5 hereinbelow unless either (i) a monetary Event of Default

2

(including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of the Loan Agreement has occurred.

5.     Lender's Right to Replace Manager.  In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Assignment, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar in location, size, class, use, operation and value as the Property, Lender may deliver written notice thereof to Borrower and Manager, which notice shall specify with particularity the grounds for Lender's determination.  If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Manager within thirty (30) days from receipt of such notice or that Borrower or Manager have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate Manager as manager of the Property and terminate the Hotel Management Agreement and to replace Manager with a Qualified Manager in accordance with the terms of the Loan Agreement, in which event Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.

6.     Hotel Management Fees.

(a)     Borrower and Manager hereby agree that Manager shall not be entitled to receive any Hotel Management Fees or other fee, commission or other amount payable to Manager under the Hotel Management Agreement from and after the occurrence of an Event of Default; provided, however, that notwithstanding anything to the contrary contained herein, Manager shall not be obligated to return or refund to Lender any Hotel Management Fees or other fee, commission or other amount received by Manager prior to the occurrence of the Event of Default, and to which Manager was entitled under the Hotel Management Agreement and this Assignment.

(b)     Neither Manager nor any other Person shall be entitled to a termination fee, liquidated damages or any other fees or payments as a result of the replacement of Manager pursuant to the terms of this Assignment or the Loan Agreement.

(c)     Manager agrees that, notwithstanding anything to the contrary contained in the Hotel Management Agreement, Manager shall not be entitled to receive compensation for its services conducted in connection with the Property in excess of three percent (3.0%) of gross rent collected from the Property.

7.     Consent and Agreement by Manager.  Manager hereby acknowledges and consents to the terms and provisions of this Assignment and Article 8 and Section 4.20 of the Loan Agreement.  Manager agrees that it will act in conformity with the provisions of this Assignment, such provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Hotel Management Agreement.  In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof or otherwise, Manager shall fully cooperate in transferring its responsibility to a new

MIA 31354908v7

management company and effectuate such transfer no later than thirty (30) days from the date the Hotel Management Agreement is terminated.  Further, Manager shall (a) not contest or impede the exercise by Lender of any right it has under or in connection with this Assignment and (b) give at least thirty (30) days prior written notice to Lender of its intention to terminate the Hotel Management Agreement or otherwise discontinue its management of the Property.  After exercise of Lender's rights under Section 1 of this Assignment, (i) Manager shall, subject to the terms and conditions contained herein, continue to provide management services in accordance with, and to the extent provided for in, the Hotel Management Agreement (and, if applicable, shall continue to maintain the liquor licenses at the Property for and on behalf of Lender and shall cooperate with Lender in any application by Lender to obtain new liquor licenses) and shall take no further instruction from Borrower or any Person (other than Lender) in connection therewith and (ii) neither Lender nor any successor owner of the Property shall be responsible or liable for any representation or warranty made by Borrower under the Hotel Management Agreement or for any act, omission or default by Borrower under the Hotel Management Agreement which occurred prior to exercise of Lender's rights under Section 1.

8.      <u>Termination</u>.  At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Hotel Management Agreement shall terminate.

9.      <u>Notices</u>.  All notices or other communications hereunder shall be in writing and shall be given in accordance with Section 15.5 of the Loan Agreement.  Any notice or other communication to Manager shall be addressed as follows (or at such other address and Person as shall be designated by Manager from time to time):

If to Manager:          Williamsburg Hotel BK, LLC
                        1274 49th Street, Suite 184,
                        Brooklyn, New York 11219

10.     <u>No Verbal Change</u>.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated verbally or by any act or failure to act on the part of Borrower, Lender or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11.     <u>Liability</u>.  This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever.  Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment.  Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

12.     <u>Inapplicable Provisions</u>.  If any provision of this Assignment is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Assignment, such provision shall be fully severable and this Assignment shall be construed and

4

enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

13.    <u>Governing Law; Submission to Jurisdiction</u>.   The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Manager substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Manager hereunder. Borrower and Manager hereby certify that they have received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).   In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 13, this Section 13 shall control.

14.    <u>Headings, etc</u>.   The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15.    **<u>Waiver Of Trial By Jury</u>.   BORROWER, MANAGER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, MANAGER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER**.

16.    <u>Duplicate Originals, Counterparts</u>.   This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.   This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.    <u>Number and Gender</u>.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.    <u>Secondary Market</u>.   Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in

the secondary mortgage market and, in connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19.    <u>Lender's Reliance on Representations</u>.  Manager has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

20.    <u>Management</u>. Borrower and Manager hereby agree that Manager will perform the management services for the Property set forth in the Hotel Management Agreement.

21.    <u>Manager Not Entitled to Gross Revenues</u>. At all times during the term of the Loan, all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by Manager, if any, shall be handled and applied in accordance with Article 8 of the Loan Agreement. Manager acknowledges and agrees that all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by it shall be solely in it is capacity as the agent for the Borrower, such monies are the sole property of the Borrower, encumbered by the lien of the Security Instrument and other Loan Documents in favor of Lender and Manager has no right to, or title in, such monies except as provided in the Management Agreement, or at law or equity. In any bankruptcy, insolvency or similar proceeding the Manager, or any trustee acting on behalf of the Manager, waives any claim to such monies other than pursuant to the terms and conditions of the Management Agreement or at law or equity.

22.    <u>Miscellaneous</u>.

(a)    Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)    Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender.

(c)    If more than one Person has executed this Assignment as "Borrower" or as "Manager," the obligations of all such Persons hereunder shall be joint and several.

MIA 31354908v7

23.    <u>Inconsistencies</u>.    In the event of any inconsistency between the terms and conditions of this Assignment and the terms and conditions of the Hotel Management Agreement, the terms and conditions set forth in this Assignment shall govern.

**[NO FURTHER TEXT ON THIS PAGE]**

7

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

BORROWER:

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: _____
Name: Toby Moskovits
Title:   Authorized Signatory


LENDER:

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership


By: _____
Name: Micah Goodman
Title:   Authorized Signatory


MANAGER:

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company


By: _____
Name: _____
Title: _____

Assignment of Management Agreement

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By:     _____
Name: Toby Moskovits
Title:   Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY
OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By:     _____
Name: Micah Goodman
Title:   Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company

By:     _____
Name: _____
Title:  _____

Assignment of Management Agreement

## EXHIBIT A

## HOTEL MANAGEMENT AGREEMENT

Manager a real estate development and management firm, shall perform all work in connection with the on-site management of Property, including F&B operations.  Manager will employ at its expense all personnel and facilities necessary and appropriate to enable it to perform the services required of it hereunder.

All accounting duties, including the keeping of proper and complete books of account for the Borrower shall be kept by or under the supervision of the Borrower.  The Manager shall assist in providing any information in its possession necessary or helpful for the accounting function.

Manager shall receive a management fee in the amount of 3.0% of the gross rents as of January 1 of each year, payable on the first day of each month throughout the calendar year.

The term of the management services required hereunder shall be for one year, and shall automatically renew for an additional one-year term unless notice of termination is given by Borrower or Manager at least thirty (30) days prior to the expiration of the then current term. Thereafter, for successive one-year terms unless such notice of termination is given as provided above.

# EXHIBIT I

FILED: NEW YORK COUNTY CLERK 02/21/2020 12:38 PM     INDEX NO. 653396/2019

NYSCEF DOC. NO. 155                                 RECEIVED NYSCEF: 02/21/2020

21-22728-shl Doc 46-9 Filed 06/24/22 Entered 06/24/22 21:30:42 Main Document
Order appointing Rec Pg 250 of 259     Pg 1 of 10

At the Commercial Division Part 61 of the
Supreme Court of the State of New York in and
for the County of New York, located at 60 Centre
Street, New York, New York, on the 21st day of
February, 2020

PRESENT:

    Hon. Barry R. Ostrager,
        Justice.

---------------------------------- x
                        :

BSPRT 2018-FL3 ISSUER, LTD.,        :   Index No. 653396/2019

            Plaintiff,    :

    - against -          :   ORDER APPOINTING A RECEIVER
                         IN A NON-RESIDENTIAL
96 WYTHE ACQUISITION LLC, TOBY   :   MORTGAGE FORECLOSURE
MOSKOVITS, YECHIEL MICHAEL      ACTION
LICHTENSTEIN, RENT A UNIT NY INC., :
ADVANCED PLUMBING MECHANICAL &  :   Motion Seq. # 1
SPRINKLERS CORP., MA2 FLAGS     :
CONTRACTING CORP., ROCK GROUP NY :
CORP., CRIMINAL COURT OF THE CITY OF :
NEW YORK, NEW YORK STATE
DEPARTMENT OF TAXATION AND FINANCE, :
ENVIRONMENTAL CONTROL BOARD OF THE:
CITY OF NEW YORK, and JOHN DOE #1   :
THROUGH JOHN DOE #50,         :
                        :
            Defendants.   :
---------------------------------- x

    Upon the Summons, Verified Foreclosure Complaint, and Order to Show Cause

(Motion Seq. #1) filed in New York County and signed June 17, 2019, and the Notice of

Pendency of Action filed in Kings County, the reading and filing of the Affidavit of Micah

Goodman, an authorized signatory at BSPRT 2018-FL3 ISSUER, LTD. and officer of Plaintiff

USA\601525393.2

Benefit Street Partners Operating Partnership, L.P.'s, as successor in interest to BSPRT 2018-FL3 Issuer, Ltd. ("Plaintiff"), sworn to the 11th day of June 2019 with Exhibits, the Affidavit in Opposition to Application For Appointment of a Temporary Receiver of Toby Moskovits, sworn to June 24, 2019 with Exhibits (Doc. # 15); the Affidavit in Opposition to Application For Appointment of A Temporary Receiver of Robert Schecter sworn to June 26, 2019 (Doc. # 19); the Court Notice dated June 27, 2019 (Doc. # 21), the Reply Affidavit in Further Support of Application for Appointment of a Temporary Receiver in A Mortgage Foreclosure Action of Steven Fischler, sworn to July 11, 2019 (Doc. # 23), the Memorandum of Law in Further Support of its Application for Appointment of a Temporary Receiver (Doc. # 24), the Letter to the Court of Katsky Korins LLP, former counsel for 96 Wythe Acquisition LLC ("Borrower"), dated July 15, 2019 (Doc. #25), the Letter to the Court from Plaintiff's counsel, dated July 15, 2019 in opposition to Defendants' request for leave to file a sur-reply (Doc. # 26), Plaintiff's Response to Defendants' Statement of Material Facts (Doc. # 56), Plaintiff's Proposed Findings of Fact in Support of its Application for the Appointment of a Temporary Receiver (Doc. # 57), the Rebuttal Affidavit of Tanya Mollova, sworn to October 16, 2019 (Doc. # 58), the Rebuttal Affidavit of Steven Fischler, sworn to October 16, 2019 (Doc # 59), Defendants' Statement of Material Facts (Doc. # 60), Defendants' Response to Plaintiff's Proposed Findings of Fact (Doc. # 61), the Notice of Rejection of Plaintiff's Rebuttal Affidavits (Doc. # 62) together with its exhibits (Doc. #s 63-65), the Letter to the Court from counsel for Defendants, dated October 17, 2019 (Doc. # 66), the decision and order dated October 18, 2019 granting plaintiff's motion to appoint a Temporary Receiver (Doc. # 69), the Affidavit if Plaintiff filed October 29, 2018 with proposed order (Docs. #70 and 71), the Affidavit of Defendants with exhibits filed October 31, 2019 (Docs. No. 72 -74); the letter from Defendants' counsel filed November 21, 2019 with

exhibit (Docs. # 77 and 78), the Letters to the Court from Plaintiff's counsel dated November 22,

2019 (with attachments) (Docs. # 79-81), and the Letters in response to the Court from

Defendants' counsel dated November 22, 2019 and November 25, 2019 (Docs # 82 and 83), the

order dated November 27, 2019 and transcript of proceedings held November 26, 2019, the

proceedings held on December 17, 2019; and upon all pleadings and proceedings heretofore had

herein;

       And the Court having heard testimony and oral argument on July 18, 2019, it is

hereby

       **ORDERED**, that Constantino Sagonas, 240-51 68th Avenue, Douglaston, New

York 11362, Fiduciary # 560967, be and hereby is appointed Temporary Receiver with the usual

powers and directions, for the benefit of Plaintiff, as its interests may appear, of all the rents and

profits now due and unpaid or to become due during the pendency of the Temporary Receiver's

appointment and issuing out of the mortgaged premises, more fully described in the Verified

Complaint and commonly known as The Williamsburg Hotel, 96 Wythe Avenue, Brooklyn, New

York 11249 (the "Premises"); and it is further

       **ORDERED**, that before entering upon his/her duties, the Temporary Receiver

shall execute to the People of the State of New York and file with the Clerk of this Court an

undertaking in the sum of $ 4,500,000.00, conditioned on the faithful discharge of his/her duties

as such Temporary Receiver; and it is further

       **ORDERED**, that upon the execution of such undertaking, the Temporary

Receiver is authorized forthwith to take charge and enter into possession of the Premises; and it

is further

USA\601525393.2

3

**ORDERED**, that the Temporary Receiver be and hereby is directed to demand,

collect and receive from all occupants, tenants, licensees or other persons in possession of the

Premises, or other persons liable therefore, inclusive of the mortgagor, all revenue and other

income of the Premises, cash collateral (whether consisting of cash on hand, cash in any and all

bank accounts or other accounts and all other cash equivalents), all the rents and fees, food and

beverage revenue, credit card transactions, reservation deposits, capital reserves and any

accounts utilized by hotel personnel including desk clerks, credit card receipts, demand deposits,

reimbursement rights, bank deposits, security deposits and all other forms of accounts, accounts

receivable, payment rights, cash and cash equivalents thereof now due and unpaid or hereafter to

become fixed or due; and that the Temporary Receiver be and hereby is authorized to compel the

hotel manager(s) and occupants to attorn to the Temporary Receiver or his/her designee; and it is

further directed that the Temporary Receiver may institute and prosecute suits for the collection

of rents, license fees, and other charges now due or hereafter to become due or fixed and

summary proceedings for the removal of any manager, tenant or licensee or any other persons

therefrom, and to employ counsel, provided however that the terms and conditions of said

retention are approved by further order of this Court upon notice to all parties that have appeared

in this action; and it is further

**ORDERED**, that all occupants, tenants, licensees or other persons in possession

of the Premises, or other persons liable therefore, inclusive of the mortgagor, attorn to the

Temporary Receiver and pay over to the Temporary Receiver all revenue and other income of

the Premises, cash collateral (whether consisting of cash on hand, cash in any and all bank

accounts or other accounts and all other cash equivalents), rents, guest charges and fees, license

fees, food and beverage revenue, and other charges or fees generated at or in connection in with

4

USA\601525393.2

Premises now due and unpaid, or that may hereafter become due ("Premise Revenue"); and after

entry of this Order that all Defendants and those acting through them be enjoined and restrained

from (i) collecting such Premise Revenue, (ii) entering into any management, brokerage or

leasing agreement, franchise agreement or any other contract or agreement (other than to pay off

the mortgage loan that is the subject of this action), whether written or oral, that is not terminable

on thirty days' notice, absent consent of the Plaintiff, and (iii) transferring, removing or in any

way disturbing any of the occupants, tenants, patrons, licensees, guests, or employees; and that

all occupants, tenants, patrons, licensees, guests, or employees of the Premises and other persons

liable for Premise Revenue be and hereby are enjoined and restrained from paying any Premise

Revenue to Defendants, their agent or servant; and it is further

     **ORDERED**, that no provision of this Order shall be construed to prevent the

Borrower from entering into any agreements made in connection with a full payoff to Plaintiff, in

an amount determined by the Court, including a refinancing of the mortgage loan that is the

subject of this foreclosure action; and

     **ORDERED**, that the Temporary Receiver shall, promptly after the end of each

month, provide a report to counsel for the parties, as to the occupancy rate, and the hotel and

food and beverage revenues and expenses and other pertinent management issues in standard

hotel history format with appropriate backup for the preceding month period and shall provide a

quarterly report to the Court under seal setting forth such information; and it is further

     **ORDERED**, that pursuant to the provisions of General Obligations Law § 7-105,

any defendant or agent of any defendant holding any deposits or advances of rental as security

under any lease or license agreement affecting space at the Premises shall turn same over to the

Temporary Receiver within five (5) days after the Temporary Receiver shall have qualified; and

5

USA\601525393.2

thereupon the Temporary Receiver shall hold such security subject to such disposition thereof as shall be provided in an order of this Court to be made and entered in this action; and it is further

**ORDERED**, that anybody in possession of same shall turn over to the Temporary Receiver (i) all books and records concerning any revenue and other income of the Premises, cash collateral (whether consisting of cash on hand, cash in any and all bank accounts or other accounts and all other cash equivalents); (ii) all deposits, tax escrow deposits, keys, books, records, checkbooks, ledgers, accounts payable records, accounts receivable records, leases, rent rolls, passwords, combinations, insurance policies and certificates, any and all contracts and or agreements, plans, specifications and drawings, a current list of the guests and tenants, if any, including the complete tenant ledgers, tenant files and tenant histories, all records pertaining to occupancy (including all guest ledgers, reservation reports, credit card billings, and cash receipts journals); (iii) all books, records and accounts reflecting all of the financial affairs related to the Premises and all items of income and expense in connection with the operation of the Premises; (iv) all financial statements related to the Premises or operation of the Premises, including any statements of profit and loss, any balance sheet, any record concerning the financial condition and the results of operations for the Premises; (v) all books and records concerning the annual net operating income, net cash flow, gross income, operating expenses and occupancy statistics for the Premises (including an average daily room rate); (vi) all guest or occupant ledgers; (vii) all books and records concerning rent rolls, occupancy reports, or expenditures for furniture, fixtures and equipment ("FF&E") at, or in, or used in connection with the use, occupancy, operation and maintenance of all or any part of, the Premises; (viii) all Smith Travel Research Reports; (ix) all operating statements (including expenditures for FF&E); (x) all ARGUS (or similar) cash flow projections models; (xi) all budgets related to the Premises,

6

including any Annual Budget; all bank statements and records relating to any accounts

associated with the Premises; (xii) all operating statements and records relating to any operating

accounts associated with the Premises; (xiii) all records relating to pending or current litigation

(excluding the captioned action); (xiv) all payroll records, employee files, applications and other

materials relevant to those persons employed at the Premises; (xv) all books, records, or

documents related to the management or operation of the Premises; and (xvi) all other documents

whatsoever related to the Premises, its management or operation or that are reasonably requested

by Temporary Receiver; and it is further

      **ORDERED**, that the Temporary Receiver be and hereby is authorized to deliver

to Plaintiff the (i) materials required to be provided in accordance with Section 4.12 of the Loan

Agreement, dated as of December 13, 2017 by and between Borrower and Plaintiff (the "Loan

Agreement"); and (ii) materials on which the findings and conclusions of any Receiver report or

recommendation are based, including the quarterly report to the Court; and (iii) such other

materials as agreed by the parties or directed by the Court upon application of any party or the

Receiver.

      **ORDERED**, that the Temporary Receiver be and hereby is authorized to make

any reasonable and necessary ordinary repairs to the Premises, subject, however, to the

qualification that the Temporary Receiver shall not expend in excess of $5,000 for any repair

without the written consent of Plaintiff or the prior approval of this Court; and it is further

      **ORDERED**, that the Temporary Receiver shall forthwith deposit all monies

received by him as Temporary Receiver, at the time he receives the same, into an account at any

federally insured banking institution or savings association with offices in the state of New York

(the "Temporary Receiver Account"), and no withdrawals shall be made therefrom except to pay

the hotel payroll and current valid third-party vendor invoices and other ordinary and necessary operating expenses of the Premises pursuant to a quarterly budget approved in advance by the parties or as directed by the Court; payments may be made by wire initiated by the Temporary Receiver or on a draft or check signed by the Temporary Receiver or the hotel manager or management hereafter appointed, upon instruction of the Temporary Receiver; the Temporary Receiver shall furnish the parties' attorneys with monthly statements of the receipts and expenditures of the Receivership and the Premises, together with a copy of the monthly statement received from the Temporary Receiver Account; and it is further

**ORDERED**, that the Temporary Receiver be and hereby is authorized to keep the Premises insured against loss or damage by fire or other causes and against liability; to pay the taxes, assessments, water rates, sewer rents, vault rents, salaries and benefits of employees, supplies and other charges; to comply with all lawful requirements of any municipal department or other governmental authority having jurisdiction; and to procure such fire, plate glass, liability and other insurance as may be reasonably necessary; and it is further

**ORDERED**, that if it is necessary to the fulfillment of the Temporary Receiver's duties, Plaintiff may, but shall not be required to, advance funds to the Temporary Receiver for the payment of repairs, maintenance, insurance, taxes, the curing of violations or any other expenses which may be reasonably necessary for the preservation and protection of the Premises by the Temporary Receiver and to the extent that the rents, issue and profits collected by the Temporary Receiver and remaining in the Temporary Receiver's account are insufficient to reimburse the advancing party for such advances, all such advances made by said party shall be secured by its mortgages and shall be added to and included in the debt thereupon due and in the Judgment of Foreclosure and Sale; and it is further

8

**ORDERED**, that all persons now or hereafter in possession of the Premises, or any part thereof, and not holding such possession under valid and existing leases or tenancies do forthwith surrender such possession to the Temporary Receiver, subject to emergency laws, if any; and it is further

**ORDERED**, that except as directed by the Court and after paying the expenses for care of the Premises as above provided, the Temporary Receiver shall retain the balance of the monies that may come into his hands in the Temporary Receiver Account until the sale of the Premises under the Judgment to be entered in this action and/or until further Order of the Court, and such amounts shall be deemed held in trust for the benefit of the parties as their interests may appear; and it is further

**ORDERED**, that the Temporary Receiver or any party hereto may at any time, upon notice to all parties who may have appeared in this action, apply to this Court for further or other instructions or powers necessary to enable the Temporary Receiver properly to fulfill their duties, and it is further

**ORDERED,** that upon request by Borrower's counsel, the Temporary Receiver shall provide to Borrower's counsel all of the information, reports and categories of documents previously identified in this order and thereafter created in connection with the Receivership; and it is further

**ORDERED,** that any information or documents created by the Temporary Receiver and provided to Plaintiff shall be concurrently provided to Borrower; and it is further

**ORDERED,** that Borrower shall cooperate with the Temporary Receiver and execute any and all documentation required by the New York State Liquor Authority to add the

9

USA\601525393.2

Temporary Receiver appointed herein to the existing liquor license for the Premises; and it is
further

**ORDERED,** that the appointee named as Temporary Receiver shall comply with
the provisions of NYCRR Part 36, Section 35-a of the Judiciary Law, Sections 6401-6405 of the
Civil Practice Law and Rules, and Article 13 of the Real Property Actions and Proceedings Law.

ENTER:

_____
J. S. C.

**BARRY R. OSTRAGER**
**JSC**