# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 21-22108 (RDD) |

**REPORT OF EXAMINER, ERIC M. HUEBSCHER**

**February 28, 2022**

**TABLE OF CONTENTS**

**I.** EXECUTIVE SUMMARY ....... 1

**II.** BACKGROUND ....... 4

- **A.** Case Background ....... 4
- **B.** BSP Loan ....... 5
- **C.** Manager's Control Over the Debtor's Finances ....... 7

**III.** EXAMINATION STRUCTURE AND INVESTIGATIVE FINDINGS ....... 9

- **A.** Examination Structure ....... 9
- **B.** Investigative Findings ....... 11
  - (1) Debtor/Manager Banking Transactions ....... 11
  - (2) Funds Flows for the Debtor and the Manager ....... 12
    - **(a)** Debtor's Funds Flow ....... 12
    - **(b)** Manager's Funds Flow ....... 14
    - **(c)** Round Trip Transfers of Funds Between Debtor and Manager ....... 16
  - (3) Mark Podgainy (Getzler Henrich & Associates LLC) Declaration ....... 18

**IV.** CAUSES OF ACTION ....... 20

- **A.** Pre-Petition Transfers ....... 21
- **B.** Post-Petition Transfers ....... 24

**V.** CONCLUSION ....... 24

Appendix: Examiner's Chronology of the Investigation

Exhibit A: Organizational Structure
Exhibit B: Loan Closing Document
Exhibit C: November Agreement
Exhibit D: Assignment
Exhibit E: November 21, 2021 Document and Information Requests
Exhibit F: Examiner's Identification of Outstanding Requests
Exhibit G: Bank Account Matrix

# I. Executive Summary

The Examiner's mandate was to investigate and assess potential bankruptcy causes of action of 96 Wythe Acquisition LLC (the "Debtor"). In the course of the investigation, the Examiner reviewed banking records for 50 bank accounts, conducted 11 interviews and reviewed over 10,000 of pages in documents, including bank statements, transfer reports prepared by the Debtor, emails, and other relevant and supporting documentation. The Examiner reviewed over 48,000 banking transactions from, to, and among the Debtor, the Debtor's management company (the Williamsburg Hotel BK, LLC) (the "Manager") and other bank accounts linked to accounts in the name of the Debtor or the Manager. These transactions took place over an approximately four-year period.[1]

The Debtor owns a 147-room boutique hotel in Williamsburg, New York. According to numerous sources, the Manager has no business operations other than the management of the hotel. All of the hotel's revenues are deposited into the Manager's bank accounts. Because of the intertwined finances of the Debtor and the Manager, this report examines transactions of the Manager as well as the Debtor.

The investigation uncovered significant potentially avoidable transfers. More specifically, the investigation uncovered evidence of a complex scheme to divert and siphon substantial amounts of money from the Debtor, through a labyrinth of banking relationships between the Debtor and the Manager, and other entities under common ownership and control of Michael Lichtenstein ("Lichtenstein") and Toby Moskovits ("Moskovits," and, together with Lichtenstein, the "Principals"). Entities owned directly or indirectly by the Principals which received and sent transfers to the Debtor and/or the Manager include, but may not be limited to, 232 Seigel

[1] The investigation focused on transactions four years before February 23, 2021 (the "Petition Date"), although the look back period for transfers prior to April 6, 2020 is up to six years under New York law. This was done to streamline the investigation by limiting it to the time periods of the most financial activity. As further discussed below, the investigation also led to discovery of potentially avoidable post-petition transactions, although the post-petition period was not the primary focus of the investigation. While the Examiner's mandate is to address causes of action of the Debtor, as noted above, the investigation revealed that all of the Debtor's revenue is directly paid to the Manager, and that the Manager's sole business activity is management of the Debtor. The Manager is the initial transferee of funds from the Debtor, and an examination of all subsequent transfers from the Manager was necessary. *See* 11 U.S.C. § 550(a).

Acquisition, LLC, 232, Seigel Development, LLC, Mint Development Corporation, 564 St. Johns Acquisition LLC, 564 St. Johns Holdings LLC, Northside Development Holdings, LLC, Northside Acquisition Partners LLC, 215 Moore Street Acquisition LLC, 215 Moore Street Development LLC, 875 4th Avenue Acquisition LLC, 286 Rider Ave Acquisition, LLC, Heritage GC Walton Acquisition LLC, Brooklyn Bread Lab, Building Development Corp, 96 W Development, LLC, and FIA Capital Partners (an entity owned directly or indirectly by the Debtor's Chief Restructuring Officer (the "CRO")).[2] Significant transfers were also sent to and received from Lichtenstein, Moskovits, and Marion (Miriam) Gross (an employee of the Debtor). In total, the Examiner has identified at least an aggregate net amount of $12.5 million sent from the Manager to many of the above entities.

In addition to these transactions, which may be subject to potential claw-back actions, there are several other areas of significant concern that will be identified in this report for possible legal action.

Despite the fact that approximately $24.5 million was deposited into (and approximately $25.5 million was withdrawn from) the Debtor's bank accounts during the period 2017 – 2020, the Debtor did not file tax returns for years 2017, 2018 or 2019.[3] Similarly, while approximately $68.2 million was deposited into (and approximately $68.7 million was withdrawn from) the Manager's bank accounts during the period 2017 – 2020,[4] with the possible exception the year 2019, these deposits and withdrawals by the Manager have not been reported to any taxing authority. Lichtenstein informed the Examiner that, other than the 2020 Federal tax return for the Debtor and the 2019 Federal tax return for the Manager, tax returns were not filed because the entities did not make a "profit".

[2] Lichtenstein refused to explain the nature of these transactions.

[3] The Examiner was provided with one unsigned Federal tax return (2020) for the Debtor, which showed zero revenue or expense.

[4] The Examiner was provided with one unsigned Federal tax return (2019) for the Manager.

The Principals obstructed the Examiner's investigation, by actions and inactions, including significant delays in document production, interference with third party subpoenas, and refusal to answer questions regarding thousands of financial transactions.

While the Principals' obstructive efforts are discussed in further detail in this report, (*see* Appendix), the following are two examples of efforts to hide certain transactions. On January 5, 2022, the Examiner learned that two accounts (BOA 4400 and 3162), which he had discovered based on their link to other accounts in the name of either the Debtor or the Manager, and which the Debtor represented to have no relationship with the Debtor or the Manager, were, in fact, in the name of the Manager and received significant post-petition transfers that had not been disclosed:

- Through BOA 3162, in July of 2021, 5 months after the Debtor's bankruptcy filing, the Manager received an economic disaster impact funds ("EIDL") grant in the amount of $350,000. The grant was obtained in the name of the Williamsburg Hotel.[5] This amount was transferred on August 3, 2021 from the Manager to Northside Acquisition Partners, LLC.[6] The application for the EIDL grant was not disclosed in any of the bankruptcy filings, and neither its receipt nor its disbursement was disclosed in the Debtor's monthly operating reports.[7]

- Additionally, $252,100 was transferred from BOA 4400, to Northside Management, LLC,[8] two days after the Petition Date and was not reported on the Debtor's monthly operating report or the Debtor's schedules of statement of financial affairs.

As a result of the Principals' actions to delay and obstruct the examination, coupled with the short time period during which the investigation was conducted, the Examiner believes there may be

---

5 This was identified on the corresponding bank statement.

6 Northside Acquisition Partners, LLC is an entity owned, directly or indirectly, by Lichtenstein.

7 Lichtenstein refused to provide the Examiner with a copy of the application for the EIDL grant.

8 Unlike other transfers to Northside entities, this transaction was sent via wire transfer.

additional valuable causes of action that he has not yet uncovered, and further investigation is warranted.

## II. Background

### A. Case Background

On February 23, 2021 (the "Petition Date"), the Debtor commenced this Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtor owns a 147-room boutique hotel in Williamsburg, New York. The organizational structure of the Debtor and its related entities is shown on **Exhibit A**. Moskovits and Lichtenstein are the indirect owners of the Debtor and the Manager, as well as a number of other entities identified in this report. In Court filings, the Debtor has identified Lichtenstein as its managing member.

The initial order directing the appointment of an examiner in this case was entered on November 8, 2021 (DI 178). On November 16, 2021, Eric M. Huebscher was appointed as Examiner (DI 184). The order directing the appointment of an examiner was amended on November 23, 2021 (DI 193) and on December 14, 2021 (DI 224). The order directing the appointment of an Examiner states that the Examiner is authorized to investigate the following matters:

> those transactions, as determined by the Examiner in the Examiner's sole discretion, that might give rise to potential claims by the Debtor's estate, including, without limitation, actions under sections 544, 547, 548 of the Bankruptcy Code, against Ms. Toby Moskovits, Mr. Michael Lichtenstein and/or the Debtor's other insiders (as such terms is defined in the Bankruptcy Code) (collectively, the "Examination Topics"[9]); provided, that the Examiner shall exercise discretion to narrow or limit the foregoing examination based on the Examiner's assessment of the benefit to the Debtors' creditors of pursuing any such cause of action. The Examiner shall be permitted to interview any party in interest, including, but not limited to, the Debtor, the Hotel Manager, Ms. Toby Moskovits, Mr. Michael Lichtenstein, and Benefit Street, and any of their advisors or professionals, to the extent the Examiner reasonably believes such persons have information relevant to the Examination Topics. Such persons shall make themselves available to the

[9] The Examination Topics expressly exclude "(a) Potential Claims belonging to the Debtor's estate based on the loans received by Williamsburg Hotel BK LLC . . . pursuant to the Paycheck Protection Program, and related settlement and stipulation; and (b) Potential Claims belonging to individual creditors, including as they may pertain to the management agreement between the Debtor and the Hotel Manager." (DI 224), ¶ 3.

21-22108-rdd Doc 418 Filed 12/21/21 Entered 12/21/21 14:45:23 Main Document
Pg 7 of 36

Examiner at such times and places as the Examiner may reasonably request and upon reasonable notice.

The December 14, 2021 order permitted the issuance of third-party subpoenas, pursuant to Federal Rule of Civil Procedure 45 (made applicable by Bankruptcy Rule 9016). (DI 224), ¶ 6.

**B. BSP Loan**

In order to develop an appropriate investigative structure and protocol, it was necessary to have an understanding of the Debtor's single secured debt obligation: the loan from Benefit Street Partners Realty Operating Partnership, L.P. ("BSP").

The BSP loan arises out of a mortgage loan consolidation (the "Loan"), which closed on December 13, 2017 and was executed by the Principals on behalf of the Debtor. The Debtor scheduled the Loan in the principal amount of $68,000,000.00 as of the Petition Date. The detailed Loan closing document is attached as **Exhibit B**. As the closing document shows, in addition to BSP and Hutton, the Principals contributed $425,000 from 564 St. John's Partners LLC[10] to the Debtor. In late 2018 BSP declared the Loan in default. Shortly thereafter, on June 11, 2019, after the Loan matured, BSP commenced foreclosure proceedings. As part of the foreclosure proceedings in State court, a receiver was appointed to oversee the property and its finances.

Given the extremely short time between the Loan closing and default, the investigation considered whether the Debtor could have ever supported the underlying debt service on the Loan (as

---

[10] The Examiner believes that 564 St. John's Partners LLC is owned indirectly by the Principals. The $425,000 contribution from 564 St. John's Partners LLC is identified as "equity" on the closing document. The Loan closing document (Exhibit B) provided to the Examiner by the Debtor did not include the name of 564 St. John's Partners LLC, which, as it turned out, had been whited out. When the Examiner received the same document from BSP, and later, the CRO, the Examiner realized the actual document contained a reference to 564 St. John's Partners LLC, unlike the "document" provided by the Debtor which had been altered to conceal the name of 564 St. John's Partners LLC as "equity". Unlike the blacked-out redactions in documents mentioned elsewhere in this report, the removal of a name by white out is less obvious, and the alteration would not have been discovered had the Examiner not sought and obtained the document from sources other than the Debtor. The amount of the $425,000 contribution by 564 St. John's Partners LLC was in excess of the amount required to close the Loan. This over contribution resulted in a net amount being paid to the Debtor.

discussed below). In that regard, it was important to understand not only the financial projections used in support of the Loan underwriting, but also to review the post-closing operating results.

The Examiner reviewed the pro forma information provided to BSP by the Debtor in connection with the closing of the Loan.[11] The pro forma income statements show the Debtor in the period just prior to the Loan with an EBITDA (earnings before interest taxes depreciation and amortization) of 25.7%. The same pro forma shows the Debtor's EBIDTA percentage increasing to 32.4% in year 1 after the Loan, and to 36.2% in year 5 after the Loan. These percentages and resulting funds (if ever achieved) would have been sufficient to support the debt service under the Loan.

The Debtor's financial statement for the year (2018), immediately following obtaining the Loan, shows a net operating profit of 10% or approximately $1.5 million. The Debtor's 2019 operating profit, based on the Debtor's financial statement, was 16% or $3.2 million. The 2020 financial statements showed a loss, due principally to the outbreak of the COVID-19 pandemic. None of these operating results would have been sufficient to support the debt service contemplated by the Loan.

The Examiner also reviewed the financial stability of the Debtor subsequent to the Petition Date. The March 2021 monthly operating report ("MOR") showed a loss. The September 2021 MOR showed a net operating profit of 25.3% or $592,000. The December 2021 MOR showed a net operating profit of 13.2% or $257,000. None of these operating results would be sufficient to support the debt service contemplated by the Loan.

It does not appear that the Debtor's operation will ever approach, or could have ever been expected to reach, the projections provided to BSP. Investigation as to the Principals' actions, decisions, and representations in connection with the Debtor's incurrence of the Loan may be appropriate.

---

[11]     These projections, "Williamsburg Hotel Budget – Stabilized Year – F&B Updates" were sent in an email from Jeremy Rauch (Director of Finance of the Debtor) to BSP in an email dated November 29, 2017.

21-22108-rdd Doc 41-8 Filed 02/05/21 Entered 02/05/21 17:44:53 Main Document
Pg 9 of 36

## C. Manager's Control Over the Debtor's Finances

Understanding the relationship between the Debtor and the Manager is critical to analyzing the transactions at issue and potential causes of action of the Debtor. The Examiner was advised that the relationship between the Debtor and the Manager was governed by a management agreement.

Shortly after his appointment, the Examiner was provided with a Hotel Management and Services Agreement (the "November Agreement") dated November 13, 2017 (**Exhibit C**). The November Agreement is signed by Moskovits for the Debtor and Lichtenstein for the Manager. Several months into the chapter 11 case, and despite the fact that it was not disclosed on the schedule of the Debtor's executory contracts, the Debtor presented the November Agreement as its current management agreement. However, the November Agreement appears to have been superseded. On December 13, 2017, the Debtor, Manager and BSP entered into an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees (the "Assignment") (**Exhibit D**), which attached a management agreement (the "December Agreement") which is different from the November Agreement. The Assignment includes a representation that the December Agreement constitutes the entire agreement between the Debtor and the Manager governing management of the hotel. *See* Assignment, Section 3. The Assignment was signed by Moskovits for the Debtor and Lichtenstein for the Manager.[12]

Based on the above, the December Agreement appears to be the operative management agreement as of December 13, 2017. However, in view of the Debtor's position regarding the November Agreement, the Examiner has analyzed the payment obligations between the Debtor and the Examiner under both the November Agreement and the December Agreement.

Section 8.02 of the November Agreement states that the Manager may open bank accounts linked to the Debtor bank accounts. This linkage, the November Agreement further states, is to assist in the payment of certain expenses e.g., Payroll and Travel commissions. The November Agreement does not permit or require *all amounts* earned by the Debtor to be deposited into Manager bank accounts. In other words, even if the November Agreement were operative (and the Examiner believes that, in light of the Assignment, it is not), the November Agreement permits the Manager

---

12 The Assignment was also signed by a representative of BSP.

to operate accounts for maintenance and operation of the hotel, not to appropriate all of the Debtor's money and use it for purposes other than the specific uses permitted by Section 8.02 of the November Agreement. The November Agreement also contemplates payment of certain fees to the Manager (*see* November Agreement, Art. X), but does not contemplate payment of 100% of the hotel revenue to the Manager.

The December Agreement states that the Debtor will pay the Manager 3% of gross rents, starting on January 1, 2018 and every month thereafter. Given the language in either the November Agreement, the Assignment, or the December Agreement, and regardless of which agreement was applicable, the Examiner anticipated that the review would consist of a fairly well-defined payment stream between the Debtor and Manager. As this report demonstrates, the financial relationship between the Debtor and Manager did not follow this anticipated construct in any form or substance.

During the course of his investigation, and confirmed by Jeremy Rauch (Director of Finance for the Debtor), the Examiner learned that 100% of all revenue earned by the Debtor was deposited into the Manager's bank accounts. Additionally, multiple sources confirmed that operation of the hotel is the Manager's only business. The Examiner discovered that not only were the Debtor's and the Manager's bank accounts linked, [13]numerous other Principal-controlled entities' accounts were linked to the Manager accounts. These linkages (online banking connections) allowed for seamless funds flow between the Manager and Debtor as well several unaffiliated business entities owned by the Principals, and, in some instances, individuals. Indeed, the Examiner reviewed records for 50 bank accounts and over 48,000 banking transactions from, to, and among the Debtor, the Manager and other bank accounts linked to accounts in the name of the Debtor or the Manager. At times, hundreds of banking transactions occurred in a single day. The movement of funds is so substantial that a schedule detailing the transactions exceeds 1000 pages.[14] The

[13] Linkage of bank accounts allows funds to be moved readily and immediately from one account to another. In this regard the Debtor and Manager utilized online banking functions within both Chase and Bank of America. Online banking transactions do not show full account number information, thus eliminating the transparency of the transaction from the reader of the respective bank statements. Conversely, wire transfers show full and complete account information.

[14] The Examiner has prepared this schedule, which has not been attached due to its volume, but will be provided upon request.

Examiner has been informed that the Principals effectuated virtually all of the transactions between the Manager, Debtor and unaffiliated principal owned entities. Revenue generated by the Debtor was never deposited into the Debtor's bank accounts, but instead, was deposited into the Manager's bank accounts.

The funds flow used by the Manager and the Debtor is both unconventional and inconsistent with commercial accounting principles. Basic accounting principles state that the expenses of an entity must be matched against the entity that generated the income. The banking structure implemented by the Manager prevented this from happening. The Manager collected all the money, while the Debtor incurred all the expenses. This made it difficult to determine the exact expenses of the Debtor and to match it to the related income. The banking system shows that significant sums were transferred in and out of the Debtor and Manager accounts to and from business enterprises that do not relate to the Debtor's business.

In summary, the Principals controlled both sides of the accounting ledger, preventing open disclosure of financial and accounting transactions, and allowing for the siphoning of funds (from the Debtor and through the Manager) to unrelated investments of the Principals and possibly other transferees. Further, some of the Principals' other business enterprises are in bankruptcy e.g., Chapter 11 and 7. Given the intermingled finances with this Debtor/Manager and these other cases, consideration should be given to a further investigation of transactions among the related entities, including the other related debtors.

## III.    Examination Structure and Investigative Findings

### A.    Examination Structure

Shortly after the Examiner's appointment, upon review of available information from the Office of the United Trustee (the "OUST") and BSP, the Examiner believed that the examination would involve a review of financial transactions among and between the Debtor and Manager. Therefore, the Examiner's preliminary investigative plan was to review books and records of the Debtor and the Manager, including banking records, and to conduct interviews of key personnel. Given the relatively small size of the Debtor's operations and the simplicity of the financial transactions contemplated by the November Agreement, the Examiner anticipated the review consisting of no

more than three[15] bank accounts for the Debtor and fewer for the Manager. Considering the timing of the Loan closing and the Petition Date, the Examiner's investigation focused on the 4-year period subsequent to the closing and up to the Petition Date.[16] This permitted identification of potential causes of action for the periods 90 days,[17] 1 year,[18] 2 years,[19] and 4 years[20] prior to the Petition Date.

Based on the above limited understanding, the Examiner believed that the review would be relatively straightforward. As this report details, the Examiner soon learned that 50 bank accounts and more than 48,000 banking transactions required review and, from the date of his initial document request, he was met with extreme resistance to the investigation by the Principals.

Rather than cooperate, the Debtor's principals actively obstructed the investigation, including by providing heavily redacted bank statements to the Examiner,[21] refusing to provide records resulting in the issuance of third party subpoenas, subsequently interfering with the very subpoenas the Principals caused to be issued to third parties,[22] failing to produce requested

---

15 Ordinarily, for an operation the size of the Debtor, it would be expected to have one bank account for operations and one for payroll related expenses. The Manager would have been expected to have a similar or smaller banking structure. The Manager's singular business activity is to manage the Debtor.

16 Several unauthorized post-petition transfers have been identified in this report. Further investigation of all other post-petition activities is warranted.

17 *See* 11 U.S.C. § 547(b)(4)(A).

18 *See* 11 U.S.C. §547(b)(4)(B).

19 *See* 11 U.S.C. §548 (a)(1).

20 *See* NY UVTA §§ 273-274, 278 (Under the New York Uniform Law Commission's Uniform Voidable Transactions Act (UVTA) (effective as of April 4, 2020) a claim for relief based on fraudulent intent is extinguished the later of four years after the transfer or one year after the transfer was or could have been discovered by the claimant and a claim based on a lack of fair consideration is extinguished four years after the transfer); 11 U.S.C. § 544(b) ("[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . . .").

21 The Court subsequently directed the Debtor to turn over unredacted banking documents. The Court informed the Debtor that they did not have the right to redact banking records or withhold such information from the Examiner. The redaction of bank statements by the Debtor slowed the examination by at least two weeks.

22 Debtor's counsel sent letters to the third parties instructing them not to comply with the subpoenas, pending the outcome of a motion to quash filed by the Debtor. Debtor's counsel ultimately lost their challenge to the issuance

documents, delaying production of other documents, and even altering certain of the documents produced. These events, and others like them, led to an extraordinary increase in legal proceedings, and associated time and expense in an effort to compel the Debtor, Manager and others to cooperate with the examination. The Examiner's fees and costs have exceeded the cap despite his and his counsel's efforts handle the case efficiently. This is directly attributable to the extreme resistance of the Debtor and the Principals, including the Debtor's attempts to relitigate the scope of the investigation.[23] The chronology of these efforts to frustrate the investigation is described in the Appendix to this report.

**B. <u>Investigative Findings</u>**

Based on the Examiner's review of available banking records, the Examiner found the following regarding the banking transactions among and between the Debtor and the Manager and certain related and unrelated entities:

(1) *Debtor/Manager Banking Transactions*

The review of the Manager's bank records revealed that between 2017 and 2020, the Manager had received at least $49 million from the operations of the Debtor (the Examiner believes that this amount may have been understated by as much as $4 million) and approximately $19 million from other sources, for a total of approximately $68.2 million. None of these receipts remained in the Manager's bank accounts. The average balances for the Manager bank accounts, between 2017 and 2020, ranged between $50,000 and $733,000[24]. The Manager received 100% of all revenue generated by the Debtor.

The review of the Debtor's banking records revealed that the Debtor had received approximately $24 million from various sources between 2017 and 2020, none of which were from the operations

---

of the subpoenas. However, the Debtor's counsel's letters caused the third parties (banks) to put the subpoenas on hold, which delayed their responses by weeks.

[23] In addition, the Examiner received a document over which the Debtor asserted privilege, but the Examiner did not believe to be privileged and which the Examiner believes is relevant to the Principal's conduct and intent. Resolution of the privilege dispute required significant time and expenses by the Examiner's counsel.

[24] This $733,000 balance results from the Manager's receipt of PPP funds in the amount of $1,438,000. Without the PPP funds, the Manager's average bank balances would have been close to zero or even overdrawn.

of the hotel, approximately $4.9 million of which was from the Manager. The Debtor disbursed approximately $25 million during the same period, approximately $4.9 million of which went back to the Manager. The average balances of the Debtor bank accounts between 2017 and 2020 were between $10,000 and $480,000. As was the case with the Manager, the Debtor funds never remained in the Debtor's accounts. Quickly following deposit of funds, those same funds were wired, transferred, or spent.

Between 2017 and 2020, the Debtor and the Manager received and disbursed over $92 million. The Manager reported that 53 percent of this amount came from the operations of the hotel. A large number (thousands) of transactions with the Debtor's Principals' other business activities accounted for the remaining amounts. The Debtor and Manager confirmed that the only business conducted by the Manager was managing the Debtor. None of these amounts ($92 million), with the possible exception of the Manager tax return of 2019 ($20 million in revenue), were ever reported to the Internal Revenue Service, State or City tax authorities.

(2) *Funds Flows for the Debtor and the Manager*

**(a) <u>Debtor's Funds Flow</u>**

The following chart shows the significant inflows and outflows by and to the Debtor:

96 Wythe Acquisition: Analysis of Bank Transactions 2017-2020
Certain Entities Controlled by the Debtor's Principals
Northside Acquisition
($3,522,364)
$10,885,915
$7,363,551
96 W Development
($4,570,356)
$114,525
($4,455,831)
Mint Development
($719,461)
$400
($715,061)
564 St Johns
($93,050)
$419,605
$326,555
Brooklyn Bread Lab
($3,700)
$0
($3,700)
232 Seigel
($16,500)
$0
($16,500)
215 Moore St.
($7,418)
$0
($7,418)
($8,932,850)
$11,436,945
Net
$2,504,095
96 Wythe Acquisition
(Debtor)
Average Bank Balances
2017 $480,929
2018 $29,958
2019 $10,515
2020 $30,213
Inflow Cash from Other Sources
(Total Deposits minus Deposits from Certain Entities Controlled by the Debtor's Principals
$13,019,301
The Williamsburg Hotel $4,915,787
Clemons Properties Partners $4,000,000
FIA Capital Partners $1,844,562
Bordeaux Capital $1,117,667
Unknown $118,312
Other $1,022,973
Outflow Cash to Other Uses
(Total Withdrawals minus Transfers/Wires from Certain Entities Controlled by the Debtor's Principals)
($16,536,582)
The Williamsburg Hotel ($4,897,172)
Checks ($4,718,256)
Situs Asset Management ($2,744,156)
Other ($4,176,999)

| | |
|---|---|
| **Deposits** | |
| Deposits from Entities Controlled by the Debtor's Principals | $11,436,945 |
| Inflow Cash from Other Sources | $13,019,301 |
| **Total Deposits** | **$24,456,246** |
| | |
| **Withdrawals** | |
| Transfers/Wires from Entities Controlled by the Debtor's Principals | ($8,932,850) |
| Cash to Other Uses | ($16,536,582) |
| **Total Withdrawals** | **($25,469,432)** |
| | |
| **Total Deposits minus Total Withdrawals** | **($1,013,186)** |

The above chart reflects the fact that (1) none of the funds from the operation of the hotel came directly into the Debtor (as noted previously, these funds were deposited directly into Manager bank accounts); and (2) any funds received by the Debtor were not retained by the Debtor. This is evidenced by the de minimis banking balances between 2017 and 2020. The funds flow also shows at least two transactions (funds inflows from FIA Capital Partners and Bordeaux Capital) in the aggregate amount of $2,962,299, which the Debtor has characterized as loans,[25] despite that no loan or other supporting documentation has been provided to the Examiner. The Examiner asked for and was refused access to any such loan documents.

The Debtor transacted with seven entities owned, directly or indirectly, by the Principals. These transactions (shown on the left side of the above chart) should be further evaluated, since many of the sources of these funds came into the Debtor from a related source only to be sent back out to another unrelated entity. Due to the significant number of transactions, and the inability to obtain credible opening balance or source information, all of these transactions need to be considered in the aggregate. None of these transactions appear on any tax return provided to the Examiner.

Since the Petition Date, the Debtor's funds flow looks significantly different. The Debtor has accumulated significant cash reserves ($3.8 million as of December 31, 2021). At no point during the pre-bankruptcy period addressed in this report did either the Debtor or Manager retain any money in the respective bank accounts. As noted, review of bank statements for the pre-petition period shows that as soon as money came into a bank account, it was immediately wired, transferred or otherwise spent. The ability of the Debtor to achieve this level of cash reserve reflects that the Manager's pre-bankruptcy practice of sweeping the Debtor's funds was constrained during the chapter 11 case.

**(b) Manager's Funds Flow**

The following chart shows the significant inflows and outflows by and to the Manager:

---

[25] The Debtor was not authorized to obligate itself to any further borrowings after the loan consolidation with BSP on December 13, 2017.



The Williamsburg Hotel: Analysis of Bank Transactions 2017-2020
Certain Entities Controlled by the Debtor's Principals
Northside Acquisition
($18,124,955)
$5,889,502
($12,235,453)
564 St Johns
($131,155)
$98,580
($32,575)
286 Rider
($155,675)
$50,000
($105,675)
875 4th
($25,000)
$25,000
($0)
19 Kent Acquisition
$0
$5,000
$5,000
Mint Development
($159,704)
$4,797
($154,907)
Brooklyn Bread Lab
($1,994)
$10,184
$8,190
96 W Development
($2,236)
$2,236
($0)
215 Moore St
($99)
$0
($99)
($18,600,817)
$6,085,299
Net
($12,515,518)
Inflow Cash from Operations
Per the Debtor $49,022,269
Possible Additional $3,998,309
$53,020,578
The Williamsburg Hotel
(Management Company)
Average Bank Balances
2017 $50,576
2018 $31,952
2019 $95,255
2020 $723,445*
*impacted by PPP Loan in April 2020
Net Income
(Per the Debtor)
$4,266,832
Inflow Cash from Other Sources
(Total Deposits minus Revenue from Operations and Deposits from Certain Entities Controlled by the Debtor's Principals, excluding the Debtor)
$9,140,006
96 Wythe Acquisition $4,897,172
Unknown $2,063,313
Live Oak Bank PPP Loan $1,438,000
Other $741,521
Outflow Cash to Other Uses
(Total Withdrawals minus Transfers/Wires from Certain Entities Controlled by the Debtor's Principals, excluding the Debtor)
($50,189,511)
PAYCHEX ($20,439,303)
Checks ($10,738,093)
96 Wythe Acquisition ($4,915,787)
Other ($14,096,327)

| | |
|---|---|
| **Deposits** | |
| Inflow Cash from Operations | $53,020,578 |
| Deposits from Entities Controlled by the Debtor's Principals | $6,085,299 |
| Inflow Cash from Other Sources | $9,140,006 |
| **Total Deposits** | **$68,245,883** |
| **Withdrawals** | |
| Transfers/Wires from Entities Controlled by the Debtor's Principals | ($18,598,725) |
| Outflow Cash to Other Uses | ($50,154,056) |
| **Total Withdrawals** | **($68,740,328)** |
| **Total Deposits minus Total Withdrawals** | **($494,445)** |

15

Because the Manager's only business is managing the hotel, all transfers from the Manager have been analyzed in the chart above. Funds were used to pay ordinary course expenses, and approximately $12.5 million net was transferred to other entities controlled by the Principals. The $12.5 million net aggregate amount shown in the above chart as having been transferred to Northside,[26] 564 St. John's,[27] and Mint Development Corporation may be subject to potential avoidance.

The Examiner asked Lichtenstein for any agreements (loan or service) between the Manager and the recipients of funds from the Manager, but none were provided. Lichtenstein refused to answer any questions regarding these transactions. There is no evidence that any of these entities had any bona fide business relationship with the Manager or Debtor. Virtually none of these transactions were reported to taxing authorities.

Based upon a review of the financial statements provided to the Examiner by Rauch, the Manager received approximately $49 million in revenue generated by the Debtor between 2017 and 2020. The Examiner's review of the books and records indicates that this amount may have been understated by as much as $4 million. The bank balances during this period, similar to those in the Debtor's bank accounts, were de minimis.

**(c) <u>Round Trip Transfers of Funds Between Debtor and Manager</u>**

The following chart shows the funds inflows and outflows between the Manager and Debtor:

---

[26] Except as otherwise expressly noted in this report, references to "Northside" in this report refer to Northside Development Holdings, LLC, Northside Management NY, LLC and Northside Acquisition Partners LLC, collectively.

[27] Except as otherwise expressly noted in this report, references to "564 St. John's" in this report refer to 564 St. John's Acquisition, LLC and 564 St. John's Holdings, LLC, collectively.

96 Wythe Acquisition and The Williamsburg Hotel: Bank Transactions 2017-2020
$4,915,787
96 Wythe Acquisition
(Debtor)
The Williamsburg Hotel
(Management Company)
$18,615
($18,615)
$4,897,172



Over the course of the four year period prior to the Petition Date, the Principals transferred and received a substantially identical amount of money from the Manager to the Debtor and from the Debtor to the Manager. The difference between the transactions was approximately $18,000. Nothing indicates that the fee arrangement contemplated by the November Agreement or the December Agreement was ever implemented. Instead, the Manager simply obtained all of the hotel's revenues and determined their disposition.

(3) *Mark Podgainy (Getzler Henrich & Associates LLC) Declaration*

The Debtor filed an objection to the Examiner's motion to enforce and further amend the second amended order directing the appointment of the Examiner (DI 243) (the "Examiner's Motion"), which included a redacted[28] declaration from Mark Podgainy ("Podgainy") of Getzler Henrich & Associates LLC ("Getzler"). The declaration stated that millions of dollars were advanced to the Debtor in the form of either capital or loans by the owners (Lichtenstein and Moskovits) through loan accounts at Northside Acquisition. Podgainy states, under penalty of perjury, that the members (Lichtenstein and Moskovits) "loaned nearly $10.92 million to the Debtor since inception, approximately $4.5 million of which was repaid, for a loans due to the members of approximately $6.38M." The declaration was accompanied by three documents: (1) Owners Loans Transfer Reports, (2) Transfers from Hotel Operations to Northside and (3) Transfers from Northside to 96 Wythe. This declaration, and the schedules upon which its conclusions rest, were provided in an attempt to demonstrate that funds flowing between the Debtor and/or Manager were loans, and that the net result was amounts due to the Principals.

While the Podgainy declaration and the related documents were provided under the guise of assisting the Examiner, they impeded the Examiner's analysis because they contained numerous inconsistencies, and were neither accurate nor complete. During the Examiner's interview, Podgainy confirmed that he never looked at, and was not provided with, any loan documents or any supporting evidence that would characterize any of the amounts referenced in his declaration as loans. Podgainy simply stated that he compared the amounts on the schedules provided to him

[28] The declaration was redacted, despite the fact that no motion to seal was filed or granted. It is not clear why the Debtor redacted the declaration, which purported to contain information that would have required disclosure in the chapter 11 case.

to amounts on bank statements provided by the Debtor. In fact, Podgainy told the Examiner that he just took the Debtor's word that the referenced amounts were, in fact, loans.

During the Examiner's interview with Lichtenstein, the Examiner not only asked to go over these schedules, but also inquired as to the existence of any supporting loan documents. Lichtenstein refused to answer any questions regarding the purported loans, the Podgainy declaration, or the accompanying schedules. Rauch, who prepared these schedules at the direction of Lichtenstein, told the Examiner that he had never seen any loan documents for the referenced transactions. The Debtor refused to supply documentation evidencing the source of the underlying cash infusions to effectuate the purported loans, failed to produce any loan documents evidencing the alleged loans referenced in the schedules, and refused to answer any questions about these transactions and schedules.

The schedules prepared by Rauch at the direction of Lichtenstein failed to show the exact sequencing of the purported loans. From the Examiner's review of the schedules, he determined them to be flawed for several reasons, including, but not limited to, the fact that the schedules provided did not consistently apply the "loans." The bank accounts identified in the schedule "Transfers from Hotel Operations to Northside" include bank accounts in the name of the Manager and Northside. However, the bank accounts identified in the schedule labeled "Transfers from Northside to 96 Wythe" are not the same accounts. Instead, the bank accounts in the schedule labeled "Transfers from Northside to 96 Wythe" references bank accounts in the name of 96 W Development and the Debtor, *not* the Manager. An analysis of the banking with the entity 96 W Development raised more questions as to the source and uses of funds coming into and out of these accounts.[29] Neither the Podgainy declaration nor the related schedules distinguished the Debtor from 96 W Development.

[29] Between 2017 and 2020, 96 W Development received $11.8 million, the most significant sources were 96 Wythe Acquisition LLC ($4 million), Northside Acquisition Partners, LLC ($3.4 million) and 564 St. John's Partners LLC (entity owned, directly or indirectly, by Moskovits and Lichtenstein – the timing of this deposit appeared to be around the same time as a loan from BSP to 564 St. John's Partners LLC) $2.7 million. During the same period, 96 W Development disbursed funds in the amount of $11.9 million, the most significant were checks (still to be investigated) in the amount of $6.1 million, Situs Asset Management of $1.2 million, Northside Acquisition $1

The Examiner found other issues with these schedules, including, but not limited to, amounts not supported in the corresponding bank statements and inconsistent time periods.[30] The schedules should have contained beginning balances, and an amount or amounts available within the Northside entities that would be available for loans. The schedules did not address this critical component of loan sequencing. The schedules were simply transferred amounts shown on a bank statement documented in an excel schedule. Rauch, at Lichtenstein's direction, determined which of these amounts were "loans." Lichtenstein never demonstrated the source of the funds allegedly loaned.[31] No documentation was presented as to the source of the funds allegedly loaned.

The Podgainy declaration and supporting schedules do not show any evidence of loans. They are simply numbers on a piece of paper, created by Rauch at the direction of Lichtenstein, in an attempt to persuade the Examiner that all of the transactions were bona fide transactions. Given Podgainy's extremely limited review of this information, Lichtenstein's adamant refusal to discuss this information and provide any supporting documentation, and the inconsistent application of banking transactions within the schedules, the Examiner considers the Podgainy declaration and the related schedules to be unreliable, and, if they have any probative value at all, it would be to support the conclusion that the Principals intended to misdirect the investigation.

## IV. Causes of Action

The investigation revealed a number of potential causes of action, and, in particular, potential constructive fraudulent conveyance claims arising from funds transferred by the Debtor or by the Manager (the initial transferee of funds).

---

million and Mint Development (an entity owned, directly or indirectly, by Michael Lichtenstein) in the amount of $561,000. There are numerous other payments that appear to be of a non-business nature.

30 As an example, the schedule included amounts prior to 2017.

31 A preliminary review of the Northside Acquisition, LLC bank accounts associated with these purported loan schedules revealed tens of thousands of dollars paid directly to both Moskovits and Lichtenstein. Additionally, the bank statements showed the same pattern of numerous transfers among and between both the Debtor and Manager, as well as numerous other Principal unrelated entities e.g., 564 St. John's Partners, LLC, 232 Siegel, LLC and others. There also appeared to be evidence of other "loans", the sourcing of which may have originated with the Debtor and/or Manager. Moskovits is an authorized signer on the Northside bank accounts.

21-22108-rdd Doc 418 Filed 02/28/22 Entered 02/28/22 12:46:23 Main Document Pg 23 of 39

Due to the extreme resistance on the part of the Principals, and other obstacles encountered by the Examiner, at the time of the submission of this report, the Examiner does not have all the information needed to completely evaluate all possible causes of action, including claims against the Manager or other insiders on theories such as breach of contract, conversion, or breach of fiduciary duty. While a prima facie case can be made to avoid many of the transactions described in this report, others transactions warrant further review and investigation.

### A. Pre-Petition Transfers

The below chart details transferees that received funds from the Debtor and/or the Manager within four years prior to the Petition Date for which no bases or documentation has been provided. These transfers are potentially avoidable as unsupported by consideration.

| Transferor | Transferee | Date[32] | Amount[33] |
|---|---|---|---|
| Manager | Northside | Numerous | $12,235,453 |
| Manager | 564 St. John's Partners, LLC | Numerous | $32,575 |
| Manager | 286 Rider Ave Acquisition, LLC | Numerous | $105,675 |
| Manager | Mint Development Corporation | Numerous | $154,907 |
| Debtor | Moshe D. Schweid | Numerous | $65,000 |
| Manager/Debtor | Toby Moskovits | Numerous | $689,372 |
| Manager/Debtor | Downtown Capital Partners | Numerous | $33,000 |

[32] The time periods analyzed in this table go back as far as four years prior to the petition date and therefore cover actions avoidable under New York state law (NY UVTA §§ 273, 274, 278), fraudulent conveyance actions under the Bankruptcy Code which are subject to a two year lookback period (11 U.S.C. § 548), and may include preference claims to non-insiders and to insiders (11 U.S.C. § 547).

[33] All amounts displayed in this table are net amounts. Given the sheer volume of transactions moving funds in and out of the relevant bank accounts on a daily basis, and the lack of supporting documentation evidencing the purpose of these transfers, the Examiner has been unable to tie specific transfers to amounts received incoming. Therefore, this table takes the most conservative approach by using net numbers. In other words, the tables assumes that incoming funds from an individual transferee were received in exchange for the funds transferred by the transferor. In actuality, the amounts subject to potential avoidance actions may be materially higher than those set forth in this table.

| | | | |
|---|---|---|---|
| Manager | Michael Lichtenstein | Numerous | $204,024 |
| Debtor | Moishe C. Schwartzman | 12/27/2017 | $50,000 |
| Debtor | Miriam Gross | Numerous | $300,250 |
| Debtor | Pessie Schweid | 1/27/2017 | $250,000 |
| Debtor | Spectrum Origination LLC | Numerous | $215,000 |
| Debtor | A&E Funding | Numerous | $260,000 |

The above-described transfers may be avoidable under the Bankruptcy Code as fraudulent conveyances (11 U.S.C. § 548),[34] or, under New York state's law governing avoidable transfers in reliance upon the Bankruptcy Code Section 544(b), which provides that a trustee may avoid a transfer "that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b).

An analysis of the Debtor's solvency[35] will be necessary to assert constructive fraudulent transfers made by the Debtor in the time leading up to the Debtor's bankruptcy filing and the equivalent action under New York law.[36] While conducting a valuation of the Debtor was outside the scope

[34] Pursuant to 11 U.S.C. § 548, a transfer of the Debtor's property or an interest therein made or incurred within 2 years prior to the bankruptcy filing date may be avoided if the debtor "(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer. . . (II) was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548.

[35] Whether a debtor was insolvent at the time of a transfer affects the avoidability of that transfer as either a preference or a fraudulent transfer under the Bankruptcy Code. *See* 11 U.S.C. §§ 547(b)(3); 548(a)(1)(B)(ii)(I). The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . ." 11 U.S.C. § 32(A).

[36] New York enacted the UVTA, effective as of April 4, 2020. For transfers that occur on or after the effective date of the NY UVTA, the UVTA recognizes two types of avoidable fraudulent conveyances (1) claims voidable as to present and future creditors (Section 273), which includes both (a) transfers made with fraudulent intent or (b) transfers made without reasonably equivalent value when the debtor had or was about to have unreasonably small capital in relation to its business or should have believed that the debtor would incur debts beyond its ability to pay as they came due; and (2) claims voidable only as to present creditors (Section 274) which includes transfers made without fair consideration and transfers made to insiders under certain circumstances. Under New York's Uniform

of the examination, the Debtor's financial condition and defaults under the Loan make it reasonable to believe that the Debtor was likely insolvent for some or most of the four year period prior to the Petition Date.  Further, the banking records show that the Debtor regularly had unreasonably small capital and incurred debts beyond its ability to pay.

While this analysis focuses largely on constructive fraudulent conveyances under the Bankruptcy Code and the equivalent under New York law, the Examiner notes that these same transfers may be subject to challenge as intentional fraudulent conveyances.   Due to the limitations and obstruction that the Examiner faced in connection with the investigation, the Examiner was unable to access the level of information necessary to establish the intent element necessary to assert an intentional fraudulent conveyance claim. Additionally, it is possible that a further analysis of these transfers on a transaction-by-transaction basis may result in additional causes of action, such as breach of fiduciary duty or avoidable preference.

Because the Examiner prioritized the investigation of large, insider transactions prior to the chapter 11 filing, and due to the constraints place on the investigation as described in this report, the Examiner did not separately assess potential preference actions under 11 U.S.C. § 547(b).[37] The Debtor's statement of financial affairs, in questions 3 and 4, states there were no payments made to creditors in the 90 days (and 1 year in the case of insiders) prior to the chapter 11 filing.

---

Fraudulent Conveyance Act of 1918 (the "UFCA"), the predecessor to the NY UVTA, there is a six year lookback period for claims for constructive fraudulent conveyance and a two year lookback period to bring claim from discovery of actual fraud.  Under NY's UFCA, transfers were fraudulent under section 273(a) unless they were made for "fair consideration", which was defined by § 272 as having been provided when "in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or. . . [w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." As with the UVTA and the Bankruptcy Code, even if fair consideration were received under the UFCA, a transfer may still be fraudulent if made "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors," NY UFCA §276.

[37]     Pursuant to 11 U.S.C. § 547(b), a trustee may avoid a transfer of an interest of the Debtor "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made – (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b).

The Examiner was unable to verify this and or to determine the existence of potential preference claims.

### B. Post-Petition Transfers

The Examiner's investigation identified unauthorized and undisclosed post-petition transfers, including (i) the receipt of the $350,000 EIDL grant in the name of the Williamsburg Hotel in July of 2021, which amount was transferred on August 3, 2021 from the Manager to Northside Acquisition Partners, LLC and (ii) the transfer of $252,100 from Manager account BOA 4400 to Northside Management NY, LLC, two days after the Petition Date. These transfers may be subject to avoidance under 11 U.S.C. § 549.

## V. Conclusion

The Principals entered into the BSP Loan, which the Principals knew or should have known could never be performed. In essence, the Loan was in default at the time of closing. The Principals then engaged in a scheme to siphon off any monies generated by the Debtor's hotel operations, through the illegitimate control of the Manager, to unrelated entities owned by the Principals. This scheme diverted millions of dollars from the Debtor.

In addition to the discovery of significant potential causes of action by the estate, the investigation raises significant areas of concern surrounding the conduct of the Principals, both in their roles in the multitude of challengeable transactions identified in this report, but also in their fiduciary roles in administering the bankruptcy estate, including their lack of independence.

[*Signature page follows*]

Eric Huebscher
Examiner Pursuant to 11 U.S.C. § 1104(c)
96 Wythe Acquisition, LLC

**Appendix: Examiner's Chronology of the Investigation**

On November 21, 2021, the Examiner sent his first formal document and information requests (**Exhibit E)** to Debtor's counsel. Among other items requested, the Examiner sought banking documents identified in Item 8, (i.e., listing of all bank account names, account numbers, bank physical addresses held in the name of or related to the Debtor and affiliated management company or any affiliate of the Debtor or management company that either received and/or disbursed funds directly or indirectly for and on behalf of the Debtor). Following this request, Debtor's counsel (Leah Eisenberg) stated that the Examiner would be receiving a drop box on November 24, 2021, with the requested documents.

Late in the day of November 23, 2021 the Examiner received an email from Debtor's counsel (Douglas Spelfogel) that stated that there were certain confidentiality issues that needed to be resolved prior to the Debtor turning over any documents or information. Mr. Spelfogel refused to provide any information unless the Examiner signed a confidentiality agreement that would materially limit the Examiner's investigation process, including the ability to interview witnesses. Ultimately, the Court's[38] intervention led to a workable confidentiality protocol that resolved the Examiner's concerns.

On or about December 3, 2021 (more than two weeks after the Examiner's appointment), the Examiner received the first production of documents from the Debtor (through Debtor's counsel), comprised of only 13 bank statements and assorted credit card statements. From the review of these statements the Examiner became aware of the existence of dozens of other accounts that were linked to the Debtor and Manager accounts via online banking transfers. Tens of thousands of online banking transfers occurred among and between the Debtor, Manager and other linked bank accounts.[39] The Examiner requested from Debtor's counsel, in over a dozen separate emails, the bank statements for the linked accounts identified. The number of previously unidentified

---

[38] Even after the hearing, the Debtor attempted to impose additional limitations beyond what was directed by the Court.

[39] This is in addition to hundreds of wire transfers, Zelle payments, checks and other banking transactions.

accounts and related statements continued to expand as the Examiner reviewed additional bank statements.

While the Examiner subsequently received additional documents from the Debtor, the bulk of the information requested was still missing, including a significant number of bank account statements, as well as other banking records and information previously requested from the Debtor.

On December 14, 2021, the Debtor produced three new bank statements, two new credit card statements and a 2020 federal tax return.

In light of the Debtor's refusal to comply with the Examiner's requests, counsel to the Examiner (i) on December 16-17, 2021, issued third party subpoenas (a) requesting documents from banks holding records of accounts in the name of the Debtor, the Manager or accounts linked to the Debtor or Manager accounts and (b) seeking tax returns prepared or filed on behalf of the Debtor, the Manager, 96 W Development LLC or Northside and (ii) on December 22, 2021, filed the Examiner's Motion to both enforce and further amend the second order directing the appointment of the Examiner. The Examiner's Motion sought, among other things, to enforce the order and require the Debtor to turnover banking information. At substantially the same time, the Debtor filed a motion seeking to limit the Examiner's access to these records and to quash the third party subpoenas (DI 238) (the "Debtor's Motion").

On January 5, 2022, seven weeks after the Examiner's appointment, the Examiner received the first production since December 14, 2021, despite regular and repeated inquiries for the missing information. The January 5, 2022 production did not contain all of the requested statements, and the statements that were included were heavily redacted, such that they could not be reviewed. After the receipt of the redacted bank statements, the Examiner continued to seek immediate turnover of all of the remaining documents.

On January 10, 2022, the Court held a hearing to consider the Examiner's Motion and the Debtor's Motion. The Court denied the Debtor's Motion, granted the Examiner's Motion, and directed the Debtor to turn over the requested documents and information, including tax returns by January 14, 2022.

On January 14, 2022, at approximately 5:00 P.M., the Debtor sent (i) the bank statements for *some* of the related entities, (ii) unredacted copies of those statements that had been provided in redacted form on January 5, 2022, and (iii) one tax return for the Manager (2019).[40] Even after this submission by Debtor's counsel, there remained numerous missing bank account statements and tax returns. Subsequent to the January 14 production, the Examiner identified continued areas of non-compliance to the Debtor's counsel, as shown in **(Exhibit F)**. Debtor's counsel never provided any further documents or information relevant to this request.[41]As of the date of this report, the Examiner still has not received certain bank statements for some accounts that are linked to Debtor and/or Manager accounts.

Receipt of banking records directly from the banks has proved critical to the Examiner's investigation in light of the incomplete records provided by the Debtor. For example, from the Examiner's review of documents from Bank of America, the Examiner became aware of two previously unknown and undisclosed Manager bank accounts (BOA 4400 and 3162). These accounts should have been disclosed by the Debtor in response to the Examiner's November 21, 2021 request. It was not until December 29, 2021 that the Examiner first became aware of the existence of these two Manager accounts, and not until January 14, 2022 that the Examiner was able to review any bank statements for these two accounts. The Bank of America production revealed the existence of a previously undisclosed $350,000 EIDL Small Business Administration grant in the name of the Williamsburg Hotel (in BOA 3162). BOA 4400 revealed another undisclosed and unauthorized post-petition transfer in the amount of $252,100 from the Manager to Northside Management NY, LLC. Notable are the sustained efforts on the part of the Debtor to conceal these particular accounts and bank statements from the Examiner.

Through review of bank statements, the Examiner identified numerous other bank accounts that were not previously known, disclosed or identified. The Examiner saw thousands of transactions conducted between these newly discovered accounts (unknown entities) via online banking

---

40 Both the Debtor 2020 and Manager 2019 returns were unsigned. The accountant was subpoenaed for the same documents and did not respond. The Examiner's counsel filed a notice of non-compliance with the Court.

41 Debtor's counsel sent emails stating that he (Douglas Spelfogel) had sent these requests to the Debtor and Management for further follow up.

transfers. Between Bank of America and Chase Bank, the Debtor utilized 6 accounts; the Manager 10 accounts. The number of other unknown and undisclosed accounts, linked to these accounts was 34. The Debtor and Manager, combined, executed 48,454 transactions over 50 bank accounts.

The identification of these newly discovered bank accounts and related transactions raised a significant number of questions as to what relationships the Debtor and/or Manager had with the underlying entities. The Debtor and Manager exhibited extraordinary resistance to providing any information about the identity of the accounts and their relationship with the Debtor and/or Manager. Initially, the Debtor refused to supply any related banking records, and ultimately provided records only after the Court's direction.

The Debtor was not willing to explain the financial transactions among and between the Debtor, Manager and related entities.[42] Those related entities include 232 Seigel Acquisition, LLC, 232 Seigel Development, LLC, Mint Development Corporation, 564 St. Johns Acquisition LLC, 564 St. Johns Holdings LLC, Northside Development Holdings, LLC, Northside Acquisition Partners LLC, 215 Moore Street Acquisition LLC, 215 Moore Street Development LLC, 875 4th Avenue Acquisition LLC, 286 Rider Ave Acquisition, LLC, Heritage GC Walton Acquisition LLC, Brooklyn Bread Lab, Building Development Corp, 96 W Development, LLC and FIA Capital Partners. Significant transfers were also sent to and received from Lichtenstein, Moskovits, and Marion (Miriam) Gross (an employee of the Debtor). The efforts that were required by the Examiner to obtain documents, data and information were extraordinary. The Examiner concluded from the actions of the Debtor and its Principals to conceal and withhold information that relevant and material information was and is still being withheld from the Examiner.

**Exhibit G** is a matrix of the Chase Bank and Bank of America accounts. During the course of the examination, this matrix was regularly and repeatedly sent to Debtor's counsel as additional accounts were identified. The matrix was sent to Debtor's counsel (Douglas Spelfogel) on December, 3, 4, 5, 6, 10, 14, 16, 17 and 20 and January 6, 11, 18, 19, 21, 22 and 24. In each of

[42] The Debtor provided a declaration from Mark Podgainy, of Getzler, with the Debtor's objection to the Examiner's Motion. This declaration was supported by schedules prepared by the Debtor. This declaration and the unreliability of these schedules are discussed in this report.

21-22108-rdd Doc 418 Filed 02/15/22 Entered 02/15/22 11:21:53 Main Document Pg 32 of 39

these emails the Examiner inquired as to when he would be receiving the missing bank statements.[43] In virtually all instances the response the Examiner received was vague. In addition to the statements, the Examiner also asked for verification as to when certain accounts were either opened or closed. The Debtor had previously represented to the Examiner that a transition from Chase to Bank of America had occurred.[44] The Debtor failed to turn over bank statements and information for approximately 34 bank accounts. The document attached as Exhibit F (Examiner's Identification of Outstanding Requests) was sent to Debtor's counsel on January 21, 22, 24, 25, 26 and February 1, 2022. The Debtor and/or Debtor's counsel never provided responses to these continued deficiencies. For reference, those accounts identified by an X were those obtained from either the OUST, the case docket or BSP. Those identified by an S were those provided by Debtor's counsel (Douglas Spelfogel). Those identified by a C came from Chase Bank; those with a B came from Bank of America.

In addition to his review of bank statements and documents received from the Debtor, the Chief Restructuring Officer, and through the third-party subpoenas issued, the Examiner conducted a series of interviews.

The Examiner interviewed **Jeremy Rauch** ("Rauch"), Director Finance for the Debtor,[45] on three separate occasions. The purpose of these interviews was to gain an understanding of how funds flowed between the Debtor and Manager and understand the reasons behind the expansive network of unrelated transactions. During the first two interviews, Rauch was represented by Leah

---

43 Missing statements could be identified by empty cells on the matrix. Debtor's counsel would repeatedly state that the accounts were either opened with the first statement provided or closed after the last statement provided. Many of the account statements did not support this explanation, as they were either the first statement in a sequence had an opening balance of the last statement had a closing balance. This pattern led to the Examiner's insistence that the Debtor provide third party evidence of account opening and closing. This third party evidence was first provided on January 20, 2022, 9 weeks after the Examiner's appointment and seven weeks after first requesting this information from Debtor's counsel. The information provided on January 20, 2022 was incomplete and inconclusive.

44 Six weeks after inquiring of the Debtor to provide evidence of account opening and closing, the Examiner was informed that the Debtor did not make a written request for this information. The Examiner was informed that the Debtor simply made a phone call inquiry. Subsequently, the Debtor did provide communication from the banks on account opening and closing. However, this communication only included information on less than 25% of the accounts.

45 Jeremy Rauch's LinkedIn page indicates that he is the Director Finance for Heritage Equity Partners (Heritage). Heritage is an entity owned by Moskovits and Lichtenstein. Rauch is shown as the Director of Finance of Heritage on the Heritage website.

Eisenberg, counsel for the Debtor. During the second interview the Examiner found him to be guarded, but less so than in the first interview. During the third interview, Mr. Rauch was not represented by counsel, and he was much more forthcoming. Rauch provided some of the information requested. However, he would often defer his ability to answer questions to “ownership”. As an example, when the Examiner inquired why there were thousands of transactions between the Debtor and Manager and unrelated entities, he stated that the Examiner needed to speak with “ownership”. When the Examiner asked him why there were millions of dollars transacted between the Debtor, Manager and Northside, Rauch referred the question to Lichtenstein.

The Examiner interviewed **Toby Moskovits** once during the investigation. The purpose of this interview was to understand the organizational structure of the Debtor and Manager. Douglas Spelfogel and Leah Eisenberg were both present during the interview. The Examiner was represented by Stephanie Wickouski. The Examiner found Moskovits to be combative, hostile and uncooperative. Given her behavior, the Examiner decided it would not be a good use of time to consider a second interview.

The Examiner interviewed **Miriam Gross** (“Gross”)[46] once during the investigation. She is an employee of the Debtor. The purpose of this interview was to understand the background regarding alleged loans provided by Gross to the Debtor/Manager. Gross stated she was not represented by counsel. She stated that her role with the Debtor was in Human Resources (“HR”) and only included matters associated with insurance claims, insurance coverage and related policies. Gross stated during the interview that she loaned monies to the Debtor, but refused to supply detailed information regarding amounts, timing and repayments. At times during the interview, she was vague or inconsistent in her recollection of the amounts that she allegedly loaned the Debtor. Gross refused to turn over bank statements for accounts in her name which were linked to the Debtor’s accounts and which reflected significant online transfers. Ms. Gross’s partial banking information showed large (hundreds of thousands of dollars) of unexplained

[46] Miriam Gross is shown as the Director of Operations on the Heritage Equity Partners (Heritage) website. Heritage is an entity owned, directly or indirectly, by the Principals.

beginning balances. The Debtor's records indicated that $298,000 was sent from Gross to the Debtor and/or Manager.

Following the interview, Gross sent Judge Drain (and the Examiner) a letter with links to certain banking information. This banking information was not complete and raised more questions Subsequent to the interview, the Examiner learned that Gross's role included not only HR but preparation of financial schedules and MORs. The Examiner requested a second interview with Gross, which she refused.

The Examiner interviewed **David Goldwasser** ("Goldwasser") on four different occasions. The purpose of these interviews was to understand what efforts Goldwasser had undertaken to restructure the Debtor and what information he may have relevant to financial transfers and/or transactions. Goldwasser was represented by counsel in the last three interviews. During the first interview, on November 23, 2021, the Examiner asked Goldwasser to provide documentation regarding his role as CRO. He refused to supply this information and stated that this was beyond the scope of the examination. During the second, third, and fourth interviews (January 19, 25 and February 8, 2022), Goldwasser was represented by counsel (Bonnie Pollack). These interviews were more productive than the initial interview. Prior to the third interview, Goldwasser's counsel sent thousands of pages of documents responding to requests from November 23, 2021. These documents contained both court pleadings, declarations (drafts and finals) and numerous emails among and between Goldwasser, Moskovits, Lichtenstein, Gross, Rauch, Spelfogel, Eisenberg and others. Many of these have been claimed as privileged and therefore their content is not discussed in this report.

During the fourth interview, Goldwasser reported that Gross was part of the team that created the bankruptcy schedules, statement of financial affairs and monthly operating reports. Goldwasser stated that he did not create one single document of work product related to his role as CRO, other than the emails that he produced to the Examiner. In addition, through the Examiner's interviews of Goldwasser, the Examiner learned that FIA Capital Partners, which was a recipient of significant transfers from the Debtor/Manager is owned, directly or indirectly, by Goldwasser. Goldwasser caused to be formed another entity FIA Heritage Holdings LLC ("HH"). HH procured loans for the benefit of the Debtor and/or Manager. Goldwasser subsequently divested himself of

his interest/involvement with HH. Additionally, Goldwasser made personal loans to the Debtor and/or Manager in the amount of approximately $250,000.

The Examiner interviewed **Mark Podgainy** ("Podgainy") telephonically on January 13 and 14, 2022. Podgainy is a Managing Director for Getzler. Getzler is a middle market turnaround and restructuring firm founded in 1968. Getzler was retained in the case as financial advisor ("Advisor") to the Debtor. The purpose of this interview was to discuss his role as Advisor as well as efforts related to a declaration he signed on January 4, 2022 under penalty of perjury, in connection with the Debtor's objection to the Examiner's Motion. The declaration referenced several documents prepared by Rauch, at the direction of Lichtenstein. Those documents were intended to advance a theory that the monies that flowed between the Debtor/Manager and unrelated entities (e.g., Northside) were loans.[47] The Examiner asked Podgainy what efforts he undertook to verify the accuracy of the schedules. Podgainy told the Examiner that he was supplied with bank statements by the Debtor in a drop box and he compared amounts on the schedules to amounts on the bank statements. Podgainy confirmed that he did not ask for, and was not supplied with, any loan documents related to these schedules. The Examiner also inquired of him whether he verified that the entity that supplied the alleged loan had the liquidity or financial capacity to provide the loan. Podgainy confirmed that he did not verify any aspect of the lender's ability to make the loans. The Examiner found Podgainy to both cooperative and transparent. However, the Examiner questions the reliability of this declaration and supporting documents. The absence of any third-party verification to the existence of loans should have been the cornerstone of the declaration. Podgainy told the Examiner that "…if you (Huebscher) and I did this we would be doing it differently…" The implications of the Podgainy declaration are discussed further in this report.

The Examiner interviewed and met with **Michael Lichtenstein** once during the investigation, at the hotel on February 1, 2022. Lichtenstein was unprofessional and hostile. Several times during the interview he told the Examiner that the Examiner was both "stupid" and a "liar". He also used profanity on several occasions. Lichtenstein refused to answer questions regarding the November Agreement, taxes, tax returns, the existence of loan documents and/or schedules, the location of

---

47 Rauch told me that Lichtenstein instructed him to construct these schedules in mid/late-December 2021.

any loan documents and/or schedules, the ownership of entities that either received or sent monies to the Debtor and/or Manager. Virtually all of Lichtenstein's answers were vague, incomplete and non-responsive. The Examiner specifically asked Lichtenstein why there were thousands of financial transactions between and among the Debtor, Manager and numerous unrelated entities. Lichtenstein stated that this was not part of the examination, and he would not answer the question.

During the interviews with Gross, Lichtenstein and Moskovits there appeared to be a common theme and response to identical questions.  All three were less than forthcoming.  This lack of cooperation increased the time needed to conduct the investigation and associated costs, and raises concerns regarding the honesty and transparency of the Principals.

# Exhibit A:  Organizational Structure

# ORGANIZATION CHART[1]

**(as of December 13, 2017)**

[1] Except as shown on this chart, no person or entity, individually or together with affiliates, owns directly or indirectly 20% or more interests in 96 Wythe Acquisition LLC or controls 96 Wythe Acquisition LLC.

1640006.2

# Exhibit B:  Loan Closing Document



220 East 42nd Street, Suite 3105
New York, NY 10017
Phone: (212) 499-0100 Fax: (212) 499-0600

## DISBURSEMENT STATEMENT

File # FN-13625-NY
Borrower(s) 96 Wythe Acquisition LLC
Premises 96 Wythe Avenue, Brooklyn NY
Closing Date December 13, 2017

| | DESCRIPTION | | Amount | Notes | Fed Reference Numbers |
|---|---|---|---|---|---|
| 1 | **FUNDS WIRED INTO ESCROW** | | | | |
| 2 | Net Loan Proceeds from Lender | | $ 67,364,412.71 | | |
| 3 | Equity - 564 St. Johns Partners LLC | | $ 425,000.00 | received | |
| 4 | Equity | | $ 11,658,613.08 | | |
| 5 | | **Total Funds Wired into Escrow** | $ 79,448,025.79 | | |
| 6 | | | | | |
| 7 | Settlement Fees | First Nationwide Title Agency LLC | $ 3,000.00 | check | |
| 8 | Share of Premium | First Nationwide Title Agency LLC | $ 65,970.27 | $ 68,970.27 | |
| 9 | Title Insurance Fees to | Riverside Abstract | $ 1,579,581.56 | wire | |
| 10 | Property Specific Escrow | Situs Asset Management | $ 3,936,874.04 | wire | |
| 11 | Appraisal Fee to | LW Hospitality Advisors | $ 9,550.00 | wire | |
| 12 | Property Condition/Environmental Reports to | CBRE, Inc. | $ 4,100.00 | wire | |
| 13 | Credit Search Fees to | Financial Risk Mitigation | $ 3,900.00 | wire | |
| 14 | Insurance Consultant Fee to | Harbor Group Consulting LLC | $ 5,575.00 | wire | |
| 15 | Zoning Report Fee to | Zoning-Info, Inc. | $ 800.00 | wire | |
| 16 | Lender's Legal Fees to | Stroock & Stroock & Lavan LLP | $ 135,000.00 | wire | |
| 17 | Environmental Counsel Fees to | Schulte Zabel & Roth | $ 1,691.00 | wire | |
| 18 | Construction Review Fees to | CBRE, Inc. | $ 4,445.00 | wire | |
| 19 | Search Fees to | United Corporate Services | $ 5,916.25 | check | |
| 20 | Account Setup Fee to | Wells Fargo | $ 2,500.00 | wire | |
| 21 | Borrower's Legal Fees to | Cohen & Gresser | $ 100,000.00 | wire | |
| 22 | Rate Cap Fee to | SMBC Capital Markets, Inc. | $ 142,000.00 | wire | |
| 23 | Transaction Management Services | Chatham Hedging Advisors | $ 11,220.00 | wire | |
| 24 | Due Diligence Fee to | Sterling Project Development Group LLC | $ 12,500.00 | wire | |
| 25 | Independent Manager Services to | Stewart Management Company | $ 2,430.00 | wire | |
| 26 | Legal Fees | Richard Layton & Finger | $ 7,500.00 | wire | |
| 27 | Legal Fees | Mavrides Moyal Packman & Sadkin LLP | $ 15,000.00 | | |
| 28 | Fees to | JIS Contract Furniture Inc. | $ 120,478.58 | check | |
| 29 | Escrow for JIS Contract Furniture Inc. | Riverside Abstract | $ 53,945.74 | hold | |
| 30 | Fees to | Steelways Inc. | $ 150,000.00 | check | |
| 31 | Existing Payoff to | Hutton Ventures LLC | $ 10,419,616.67 | wire | |
| 32 | Existing Payoff to | G4 Capital Bridge, LLC | $ 62,467,971.97 | wire | |
| 33 | Cost Reimbursement | SRF Ventures | $ 875.00 | wire | |
| 34 | Consulting Services | Angelo Riemma, CPA | $ 1,000.00 | check | |
| 35 | Professional Fees | Caldwalader Wickersham & Taft LLP | $ 30,000.00 | wire | |
| 36 | Underwriting Fees to | Apicii LLC | $ 17,000.00 | wire | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | **SUB-TOTAL DEBITS & CREDITS** | | $ 79,310,441.08 | | |
| 49 | **FUNDS DUE TO/(FROM) 96 Wythe Acquisition LLC** | | $ 137,584.71 | | |
| 50 | | | | | |
| 51 | **TOTALS** | | $ 79,448,025.79 | | |

This statement was prepared using information provided by the parties named above. First Nationwide Title Agency LLC makes no representation as to the accuracy of this information.

**First Nationwide Title**
An AmTrust Financial Company

220 East 42nd Street, Suite 3105
New York, New York 10017
Phone: (212) 499-0100 Fax: (212) 499-0600

**SIGNATURE PAGE**

| BORROWER | FILE/ESCROW NO.: | FN-13625-NY |
|---|---|---|
| 96 Wythe Acquisition LLC | CLOSING OFFICER: | Timothy Bolles |
| | CLOSING DATE: | December 13, 2017 |
| LENDER: Benefit Street Partners | PROPERTY DESCRIPTION: | 96 Wythe Avenue Brooklyn NY |

The undersigned hereby authorizes First Nationwide Title Agency LLC to receive funds and disburse them in accordance with the attached settlement and disbursement statements.

Agreed and Signed to by:
Borrower(s):
96 Wythe Acquisition LLC

By: [signature]
Name: Toby Moskovits
Title: Authorized Signatory

Escrow Agent:
First Nationwide Title Agency LLC

By: [signature]
Name:
Title: **Timothy A. Bolles**
**Vice President & Senior Underwriter**

# Exhibit C: November Agreement

**HOTEL MANAGEMENT AND SERVICES AGREEMENT**

**between**

**96 Wythe Acquisition LLC**
**("Owner")**

**and**

**The Williamsburg Hotel BK LLC**
**("Manager")**

**November 21, 2017**

This **HOTEL MANAGEMENT AND SERVICES AGREEMENT** is executed as of November 21, 2017 ("Effective Date"), by and between 96 Wythe Acquisition, a New York limited liability company ("Owner"), and The Williamsburg Hotel BK, LLC, a New York limited liability company ("Manager").

**RECITALS:**

A. Owner is the owner of a property located at 96 Wythe Avenue, Brooklyn, New York (the "Property"), and has developed a new building on the Property, including 147 guest rooms, lobby, restaurant, bars, rooftop, and other amenities (the "Hotel");

B. Manager has overseen design, branding, programming, furnishing, promoting, managing and operating the property during the pre-development and development phase; and

C. Owner desires to use the Williamsburg Hotel brand and to retain Manager to brand, manage and operate the Hotel in accordance with this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions, agreements and obligations hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged by the parties hereto, Owner and Manager agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01 Definitions. As used herein, the following terms shall have the indicated meanings:

Affiliate means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person. For purposes of this definition, the term "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement means this Hotel Management Agreement and all amendments, modifications, supplements, consolidations, extensions and revisions to this Hotel Management Agreement from time to time approved in writing by Owner and Manager.

Books and Records means the books and records of account maintained by the Manager necessary to prepare customary accounting records and financial reports in connection with the operation of the Hotel, but expressly excluding any and all sales and marketing files, guest lists and profiles (including Manager Owned Customer Lists), guest histories, detailed employee records and all standard Manager's materials.

Brand Name means The Williamsburg Hotel.

Budget means a proposed budget for the Hotel setting forth all anticipated income and expenditures to be received or incurred for any Fiscal Year and the marketing and operating plan for any Fiscal Year.

Competitor means a Person engaged, directly or indirectly through an Affiliate, in the business of owning, operating, licensing (as licensor), franchising (as franchisor), or managing a hotel brand or lodging system of hotels that is competitive with Manager or its Affiliates.

Emergency Repairs means, without limitation, repairs which, in Manager's good faith reasonable judgment are necessary to prevent (a) imminent personal injury, (b) imminent damage to the property of third parties, (c) imminent damage to the Hotel, (d) imminent loss or diminution of any material licenses or right to operate the Hotel for its intended purposes, (e) imminent loss or material diminution of any parking, ingress, egress or access relating to the Hotel or (f) a violation of any material Legal Requirements.

FF&E means all furniture, furnishings, wall coverings, fixtures, equipment and systems (except equipment and fixtures attached to and forming a part of the Improvements) located at the Hotel and required for the operation of the Improvements as a hotel, including (a) office furnishings and equipment, (b) specialized hotel equipment necessary for the operation of any portion of the Improvements as a hotel, including equipment for kitchens, laundries, dry cleaning facilities, bars, restaurants, dining rooms, public rooms, commercial spaces, and recreational facilities, including Operating Equipment, and all artwork, (c) all other furnishings and equipment (except equipment and fixtures attached to and forming a part of the Improvements) as necessary or desirable in the operation of the Hotel in accordance with the terms and conditions set forth in this Agreement.

Fiscal Year means (i) the period commencing on the first date that the Hotel generates any Gross Revenues and ending on December 31 of the calendar year in which such date occurs, and (ii) any successive yearly period (beginning January 1 and ending December 31) thereafter.

Force Majeure Event means (a) strikes, labor lock-outs, other industrial disputes, accidents, need to remove Hazardous Substances, inability to procure materials, loss of permitting or licensing, recession, governmental action or restriction, regulation or control, failure of power, water, fuel, electricity or other utilities, riots, insurrection, civil commotion, enemy or terrorist action or threat, war, acts of God (including inordinately severe weather conditions), fire or other casualty and (b) any other matter, cause or circumstances which is beyond the reasonable control of Manager in each case to the extent the same has not arisen by reason of any breach by Manager of any of Manager's obligations under this Agreement.

Gross Revenues means any and all income and proceeds of sales received for the use, occupancy or enjoyment of the Hotel or for the sale of any goods, services or other items sold on, or provided from, the Hotel including all proceeds from insurance and all income received from tenants, transient guests, licensees, concessionaires, lessees of retail space, spa and food and beverage service operations at the Hotel excluding the following: (i) any excise, sales or use taxes or similar government charges collected directly from patrons or guests, or as a part of the sales price of any goods, services or displays, such as gross receipts, value added, admission, cabaret or similar or (ii) any security deposits of Hotel tenants, subtenants, or concessionaires (unless and until applied) and any payments by such tenants, subtenants or concessionaires for taxes; (iii) proceeds of collection of accounts receivable; (iv) consideration received at the Hotel for hotel accommodations, goods and services to be provided at other hotels arranged by, for or on behalf of Manager; and (v) discounts, allowances and refunds or credits to patrons or guests.

Improvements means all buildings, structures, improvements and betterments now located or hereafter constructed on the Property and all fixtures and equipment attached to and forming a part of such buildings, structures and improvements (including heating, lighting, plumbing, sanitary sewer, air-conditioning, laundry, refrigeration, kitchen, elevators and similar items).

Independent Accountant means a third party independent certified public accounting firm jointly selected by Owner and Manager.

Legal Requirements means all present and future laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements pertaining to the Hotel and its operation including any applicable insurance, environmental, human health and safety, zoning or building, laws or regulations, Americans with Disabilities Act, fire and fire safety system laws, land use laws, ordinances, rules or regulations and all covenants, restrictions and conditions now or hereafter of record which may be applicable to the Hotel or any portion thereof, or to the use, occupancy, possession, operation, maintenance, alteration, construction or repair of any of the Improvements, including any rules, regulations and requirements of competent authorities relating to permits, consents, licenses and the like which are required for the use, occupancy, possession, operation, maintenance, alteration, construction or repair of any of the Hotel and/or Improvements.

Manager Directed Customers means customers of the Manager or its Affiliates, whether or not such customers have at any point in time stayed at the Hotel, hosted an event or was a guest at a food and beverage venue, or who were introduced to the Hotel by Manager or its Affiliates or through their historical relationship with Manager or its Affiliates, during the term of this agreement.

Manager Owned Customer Lists means the customer and guest information, preference and history relating to Manager Directed Customers.

Manager's Expenses means the out-of-pocket expenses and disbursements which are included in the Budget and are reasonably and necessarily incurred by Manager in the performance of its obligations under this Agreement, provided, however, that the same cost shall not be included in more than one category of expense. Manager's Expenses may include the following expenses: travel, business entertainment costs, telephone, air express and other incidental expenses. This shall include: (i) reasonable and customary out-of-pocket expenses properly incurred by Manager on behalf of the Hotel or Owner in order to facilitate the performance of Manager's duties under this Agreement; (ii) other reasonable and customary direct expenses incurred by the Manager in connection with the management or operation of the Hotel; (iii) all costs and expenses incurred by Manager on behalf of the Hotel or Owner, including out-of-pocket expenses related to the time spent by, and travel of, specifically to and from the Hotel in order to facilitate the transition of services in connection with the termination of this Agreement, and (iv) third party contracts with providers in the name of Manager or its Affiliates for the benefit of the Hotel (such as Google search terms, PMX and Synxis) that may be done on a group or individual basis, which amounts shall be included in the Budget (the "Third Party Contract Expenses").

Manager's Fees means, collectively, the Base Management Fee, the Incentive Fee, and any other fees payable to the Manager.

Operating Account means the bank account(s) opened and maintained in Owner's or Manager's name, with a banking institution selected by Manager and reasonably approved by Owner, into which all income, receipts and proceeds included in the definition of Gross Revenues (without exclusion of any of the items excluded from the definition of such term) shall be deposited and from which disbursements shall be made.

Operating Equipment means linens, chinaware, glassware, uniforms, utensils and other items of similar nature.

Person means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a limited liability company, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

Personnel means all individuals performing services for the benefit of the Hotel as employees of Manager or an Affiliate of Manager.

Personnel Costs means all costs associated with the hiring, employment or termination of Personnel (x) located at and providing services directly and exclusively to the Hotel, on behalf of the Manager, (y) who provide services to the Hotel, and other hotels under developed or operated by Manager and its Affiliates, on a non-exclusive basis, or (z) who are shared employees of any current or future hotels owned and/or operated by Manager or an Affiliate of Manager, including, in each case, compensation (i.e., salaries and bonuses) and benefits, employment taxes, social security contributions, training and severance payments, costs in connection with litigation or consultation and, subject to the Approved Budget, recruitment expenses and the costs of moving executive level Personnel, their families and their belongings to the area in which the Hotel is located at the commencement of their employment.

Working Capital means funds reasonably necessary for the day-to-day operation of the Hotel.

ARTICLE II

TERM OF AGREEMENT

Section 2.01 Term. The initial term of this Agreement (the "Initial Term") shall begin on the Effective Date and, subject to the termination rights expressly set forth herein, will terminate on the last day of the tenth (10th) full Fiscal Year. Thereafter, the Term shall automatically be extended for two successive terms of five (5) years each (each, a "Renewal Term") on the same terms and conditions as set forth in this Agreement unless Manager notifies Owner of its election not to renew at least six (6) months before the end of the Initial Term, or then current Renewal Term. The Initial Term and each Renewal Term are collectively, the "Term." In the event that the Owner is required to terminate this agreement due to lender covenants, immediately upon restoration of the Owner's rights to control the Property, this Agreement shall be immediately reinstated. At any time that the Manager is not in full control of the Property, use of all brand collateral, trademarks, digital and design assets, online presence including website and social media accounts in the name of The Williamsburg Hotel, shall ceased to be associated with the property in any manner and control and ownership of all brand collateral and online and social media accounts shall remain with the Manager.

ARTICLE III

OPERATION OF THE HOTEL

Section 3.01 Operation of the Hotel. Owner hereby retains Manager to manage and operate the Hotel commencing on the Effective Date in a professional manner in accordance with and subject to the terms of this Agreement, and to provide or cause to be provided all amenities in connection with the Hotel which are reasonable and customary for such an operation.

Section 3.02 Manager's Control and Discretion. Subject to the terms of this Agreement and the Budget, Manager shall manage and operate the Hotel. Without limiting the generality of the foregoing but subject to the other provisions of this Agreement, Manager's control and discretion shall include, and Manager shall be responsible for, the operation of the Hotel for all customary purposes, and, without limitation thereof, at its discretion to do the following:

(a) Hire, directly or through an Affiliate, the general manager, the financial controller and other managerial and hourly staff of the Hotel who shall work solely and exclusively for the Manager; provided, that Owner shall have a reasonable opportunity to meet with the general manager before Manager shall hire such person; provided, further, however, that Owner shall have no approval right with respect to any such hiring. Manager shall also have the right to hire, supervise, promote and discharge all employees performing services in or about the Hotel, all of whom shall be employees of Manager or an Affiliate of Manager. Owner shall have no right to hire, supervise, promote or discharge any employees of the Hotel, and Owner agrees not to attempt to do so and, not in limitation of the foregoing, in no event shall Owner cause, suffer or permit any Affiliate of Owner, or any person holding, directly or indirectly, a beneficial interest in Owner (other than Manager or an Affiliate of Manager), to participate in or interfere with such supervision. On reasonable advance notice from Owner to Manager, senior executives of Manager's corporate office (as designated by Manager) shall meet with Owner, either in person or by telephone (at Manager's discretion), to review with Owner the financial performance the Hotel.

(b) Retain such specialists and consultants as Manager may from time to time reasonably determine to be necessary for the successful operation of the Hotel.

(c) Determine and implement all labor policies, including with respect to wage and salary rates and terms, fringe benefits, pension, retirement, vacation, bonus and employee benefit plans, all consistent with industry practice.

          (d) Supervise and maintain accurate Books and Records, including the books of account and accounting procedures of the Hotel.

(e) Negotiate, enter into, and modify, leases, subleases, licenses and concession agreements for stores, restaurants, bars and other facilities, and services at the Hotel.

(f) Make or cause to be made all necessary repairs, replacements and/or additions to the Hotel so that it shall be adequately maintained and furnished at a level of a luxury boutique hotel

(g) Negotiate and enter into service contracts and software licenses in Owner's or Manager's name required in the ordinary course of business in operating the Hotel, including contracts for electricity, gas, telephone, detective agency protection, information technology, cleaning, trash removal, extermination and other services which Manager deems advisable.

(h) Select and obtain Consumable Supplies, Operating Equipment and FF&E for the operation of the Hotel in the normal course of business.

(i) Determine all terms for admittance, charges and rate schedules for guest rooms, function rooms, commercial space privileges, entertainment and food and beverages.

(j) Determine all credit policies with respect to the operation of the Hotel, including entering into customary credit card and barter agreements.

(k) Establish food and beverage policies (including pricing) with respect to the Hotel, including the right to conduct catering operations outside the Hotel but for the account of the Hotel.

(l) Establish and implement all advertising, public relations and promotional policies with respect to the Hotel including exercising the sole and exclusive control over all public statements, whether written or oral and no matter how disseminated, advertising, press releases and conferences;.

(m) Retain attorneys and other professionals as Manager may reasonably deem necessary to provide advice with respect to operating the Hotel, including with respect to zoning, environmental, employment and litigation matters, and institute any and all legal actions or proceedings as shall be reasonably necessary in the Manager's judgment to collect charges, rent or other income of the Hotel.

(n) Appear in, defend against and/or settle all legal actions or proceedings brought against Manager or Owner or both in connection with the operation of the Hotel.

(o) Establish any other policy or perform any other act or function which in the reasonable discretion of Manager is necessary or desirable to operate the Hotel on a day-to-day basis in accordance with the Operating Standard and the terms of this Agreement and perform all other acts within the scope of Manager's duties hereunder.

Section 3.03 Manager Affiliate Services. In fulfilling its obligations under this Agreement, Manager is hereby authorized to use the services of Manager's Affiliates provided that such services and fees therefor shall be furnished on terms and conditions which are not less favorable to Owner than those obtained in the competitive, open market.

## ARTICLE IV

## MANAGER STATUS; EMPLOYEES

Section 4.01 Manager Status. Nothing herein shall constitute or be construed to be or create a partnership, joint venture or any other similar type of association between Owner and Manager. Owner covenants that Manager's engagement under this Services Agreement hereunder and right to occupy and manage the Hotel shall be exclusive and undisturbed, subject only to the limitations of this Management

and Services Agreement. Owner further covenants that all intellectual property, including brand name, trademarks issued and filed, customer lists, website, social media accounts and all content including photos of the property are the sole property of the Manager. The Manager retains unlimited rights to any content including photos of the property utilized in the any media including all social media accounts of the Williamsburg Hotel, included but not limited to Instagram and Facebook.

Section 4.02 Employees.

(a) All Personnel shall be employees of Manager or an Affiliate of Manager; provided, however, that Owner shall be obligated to reimburse Manager for all Personnel Costs for such Personnel in accordance with the terms of this Agreement. Reimbursement for Personnel Costs includes any costs incurred as a result of the termination of any Personnel including if such termination is as a result of the termination or sooner expiration of this Agreement. Manager shall have the right to transfer the Personnel to an Affiliate or cause an Affiliate to hire the Personnel, and notwithstanding the foregoing, Manager and its Affiliates shall, in their sole discretion, have any and all rights regarding such Personnel provided hereunder, and in relation thereto. Owner shall not give orders or instructions to any Personnel, including with respect to the operation of the Hotel. In furtherance of the foregoing, Owner and Manager hereby agree that the Manager shall determine, in its sole discretion, the number of employees required to operate the Hotel, the working conditions at the Hotel, the organizational concept and any necessary reorganization and the like in order to properly perform the duties of the Manager under this Agreement.

Section 4.03 Reimbursement of Employee Expenses. All Personnel Costs shall be billed by Manager to, and be reimbursed by, Owner as an operating expense under this Management services agreement. Manager may assign employees of Manager or any of Manager's Affiliates to perform services for the Hotel and Owner shall reimburse Manager for Personnel Costs associated with such employees as an Operating Expense. Employees of Manager other than those regularly employed at the Hotel or otherwise in the New York City metropolitan area shall be entitled to free room and board at such times as they visit the Hotel in connection with the management of the Hotel or are assigned temporarily to the Hotel to perform services for the Hotel. Owner shall reimburse Manager for all reasonable travel expenses to and from the Hotel for such employees. Not in limitation of the provisions of the foregoing, Owner authorizes Manager to make available to employees of Manager and its Affiliates certain benefits in the form of discounted room use at the Hotel as determined in accordance with Manager's then-effective employee discount policy, not to exceed 200 room nights per any calendar year. Owner hereby approves such benefits and acknowledges that it has no claim against Manager with respect thereto, to the extent such discounts do not materially exceed those customary to the hotel industry in the geographic region where the Hotel is located.

## ARTICLE V

## INDEMNIFICATION

Section 5.01 Indemnification by Owner.

(a) Owner shall indemnify, defend, and hold Manager and its Affiliates and their respective directors, members, trustees, officers, employees, agents and assigns (collectively, "Manager Indemnified Parties") harmless from and against any and all claims, demands, damages, cost, expense, actions (including enforcement proceedings initiated by any government agency), penalties, suits, and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and costs and any other amounts that Manager is required to pay to third parties in connection with such matters) which they or any of them may have alleged against them, incur, become responsible for, or pay out for any reason related to the design, management, operation or maintenance of the Hotel or the performance by Manager of the responsibilities and obligations provided in this Agreement, provided, however, that in no event shall Owner's indemnification obligations cover or extend to conduct of Manager or any of Manager's Affiliates that constitutes gross negligence, willful misconduct or fraud. In case of any action, suit or proceeding

brought against Manager arising from or relating to matters covered by the indemnity Manager will notify Owner of such action, suit or proceeding, and Manager may, at Owner's expense, by notice to Owner, elect to defend such action, suit or proceeding or cause the same to be defended. Any compromise, settlement or offer of settlement of any claim, action or proceeding that Owner shall be obligated to indemnify Manager Indemnified Parties pursuant to the terms of this Agreement shall require the prior written consent of Manager; provided that no such consent shall be required for any such compromise, settlement or offer which provides for a full release of Manager and its Affiliates.

Section 5.02 Indemnification by Manager. Manager shall indemnify, defend and hold Owner and its Affiliates and their respective directors, members, officers, employees, agents and assigns (collectively, "Owner Indemnified Parties") harmless from and against any and all claims, demands, damages, cost, expense, actions (including enforcement proceedings initiated by any government agency), penalties, suits, and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and costs and any other amounts the Owner is required to pay to third parties in connection with such matters, but excluding consequential damages sustained by Owner), which they or any of them may have alleged against them, incur, become responsible for, or pay out for any reason, to the extent such matters are caused by conduct of Manager's or Manager's Affiliates corporate personnel that constitutes gross negligence, willful misconduct or fraud. In case of any action, suit or proceeding brought against Owner arising from or relating to matters covered by the indemnity, Owner will notify Manager of such action, suit, or proceeding, and Manager may, at Manager's expense, by notice to Owner, defend such action, suit, or proceeding, or cause the same to be defended. Any compromise, settlement or offer of settlement of any claim, action or proceeding that Manager shall be obligated to indemnify pursuant to the terms of this Agreement shall require the prior written consent of Owner; provided that no such consent shall be required for any such compromise, settlement or offer which provides for a full release of Owner and its Affiliates.

Section 5.03 Survival of Indemnity. The obligations set forth shall survive any termination or assignment of this Agreement. In no event shall the settlement by either party in good faith of any claim brought by a third party (including Personnel) in connection with the ownership or operation of the Hotel be deemed to create any presumption of the validity of the claim. Notwithstanding any contrary provisions, Owner and Manager mutually agree for the benefit of each other to look first to the appropriate insurance coverages in effect in the event any claim or liability occurs as a result of injury to person or damage to property, regardless of the cause of such claim or liability.

## ARTICLE VI

## BUDGETS

Section 6.01 Budget. Not later than sixty (60) days prior to the commencement of each Fiscal Year, Manager shall submit the Budget to Owner for Owner's review and approval. The Budget shall contain (i) an estimated profit and loss statement on a monthly basis, (ii) a budget of receipts and expenditures required for the operation of the Hotel pursuant to the terms of this Agreement, (iii) a description of proposed capital improvements to be made and itemized capital expenses, (iv) a statement of cash flow, including a schedule of Working Capital which may be maintained in a sub-account of the Operating Account and (v) any anticipated requirements for funding by Owner. Owner shall give its written approval or disapproval of the proposed Budget not later than thirty (30) days after receipt thereof. If Owner does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within such thirty (30) day period, and Manager gives notice (the "Reminder Notice") to Owner of such failure by Owner, then, if Owner still does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within thirty (30) days after receipt of the Reminder Notice, Owner shall be deemed to have approved such proposed Budget as submitted by Manager. Owner acknowledges that the projections contained in each proposed Budget and the Approved Budget are estimates and are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Manager's reasonable control, and the giving of such

projections shall not be construed as a guarantee or warranty by Manager to Owner of any matter or in any way whatsoever.

Section 6.02 Adherence to Budget.

(a) If the usage of all or any portion of an income-producing facility of the Hotel or the guest occupancy related to such facility, in any period exceeds the usage or occupancy for such facility projected in the Approved Budget for such period, the expense categories in the Approved Budget for such period directly related to servicing such increase in usage or occupancy shall automatically be deemed increased by such reasonable amount as is necessary to accommodate such increased usage or occupancy. Subject to the foregoing sentence and the next following sentence, Manager shall, in the performance of its duties hereunder, (i) adhere to the Budget with respect to expense items set forth in such Budget (it being agreed that Manager shall have no liability for cost overruns beyond its reasonable control) and (ii) use its reasonable good faith efforts to adhere to or exceed the Budget with respect to income items set forth in such Budget.

(b) If at any time during any Fiscal Year Manager shall, in the performance of its duties hereunder, determine that the Budget relating to such Fiscal Year is no longer appropriate because of unforeseen changes, Manager shall submit to Owner for Owner's review, a revised budget (the "Revised Budget") for the remainder of such Fiscal Year. Owner shall give its written approval or disapproval of the proposed Revised Budget not later than thirty (30) days after receipt thereof. If Owner does not give its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within such thirty (30) day period, and Manager gives the Reminder Notice to Owner, then, if Owner still does not provide its written approval or disapproval (and in the case of disapproval, specifying in reasonable detail its objections) within thirty (30) days after receipt of the Reminder Notice, Owner shall be deemed to have approved such proposed Revised Budget as submitted by Manager

## ARTICLE VII

## OPERATING EXPENSES

Section 7.01 Payment of Operating Expenses. In performing its authorized duties hereunder, Manager shall promptly pay all Operating Expenses to the extent of available Working Capital. All Operating Expenses incurred by Manager in performing its authorized duties in accordance with the terms of this Agreement shall be reimbursed or borne by Owner. To the extent the funds necessary therefor are not generated by the operation of the Hotel, they shall be supplied by Owner to Manager in the manner provided in Article VIII. Manager shall in no event be required to advance any of its own funds for Operating Expenses.

## ARTICLE VIII

## WORKING CAPITAL AND BANK ACCOUNTS

Section 8.01 Working Capital.

(a) Owner shall provide the initial funds necessary to supply the Hotel with Working Capital in accordance with the Budget. Thereafter, subject to the Budget, upon request of Manager, Owner shall promptly provide any additional funds necessary to maintain Working Capital at levels reasonably determined by Manager to be necessary to satisfy the needs of the Hotel as its management and operation may from time to time require. Working Capital so provided shall remain the property of Owner throughout the Term, subject to expenditure for Operating Expenses. Upon termination of this Agreement, Owner shall retain any unused Working Capital.

(b) If Owner does not provide the additional funds required pursuant to Section 8.01(a) or as otherwise required hereunder within five (5) business days after the request is made therefor by

Manager, Manager may elect, but shall have no obligation, to provide such additional funds, and shall be promptly reimbursed therefor by Owner with interest thereon at a rate equal to the prime commercial lending rate (the "Prime Rate") plus six percent (6%) per annum, or the highest legal rate, whichever is lower, compounded monthly, such interest accruing from the date the Manager provides such additional funds through and including the date of reimbursement. If Manager is not reimbursed by Owner within five (5) days after Manager so provides such additional funds, Manager may reimburse itself (with interest as set forth above) out of the Operating Account. The aforementioned right of reimbursement shall be in addition to any other rights which Manager may have with respect to any provision of this Agreement or otherwise.

Section 8.02 Bank Accounts. All funds to be made available to Manager by Owner for the maintenance and operation of the Hotel shall be deposited in the Operating Account Manager may open separate accounts which are linked to the Operating Account for certain operational purposes, such as by way of example, payment of payroll expenses and travel agent commissions. Such bank accounts shall be opened and maintained in Manager's name, at the same bank as the Operating Account and provisions in this Agreement regarding the Operating Account shall apply to those accounts. Manager shall pay all Operating Expenses (including Manager's Expenses and Manager's Fees) and all other amounts as required in connection with the maintenance and operation of the Hotel in accordance with the provisions of this Agreement out of the Operating Accounts.

Section 8.03 Authorized Signatures. The Operating Account shall be in Owner's or Manager's name and Manager shall be authorized signatory. Checks or other documents of withdrawal shall be signed by duly authorized individual representatives of Manager; Upon expiration or termination of this Agreement, as provided in this Agreement, all remaining amounts in the referenced accounts shall be made available to Owner, subject to the obligation to pay all amounts due to Manager hereunder.

Section 8.04 Disbursements to Owner. Contemporaneously with furnishing each Monthly Statement and commencing after the first Fiscal Year, Manager shall disburse to Owner, in the manner directed by Owner, any funds remaining in the Operating Account at the end of such immediately preceding calendar month after: (i) payment of all Operating Expenses to be paid by Manager under this Agreement, Manager's Fees, Centralized Expenses, Manager's Expenses, and any other amounts Manager is permitted or required to make pursuant to this Agreement, (ii) retention of amounts in the Operating Account necessary to fund Working Capital if any and any other reserves reasonably established by Manager (such as a reserve for litigation costs) and (iii) payment or retention of such other amounts as may be agreed to in writing from time to time by Owner and Manager. Prior to the expiration of the first Fiscal Year, in order to allow the Hotel to stabilize, Manager shall not be required to make the foregoing monthly disbursements to Owner but shall use commercially reasonable efforts to disburse excess funds to Owner in Manager's discretion. Manager's willingness to defer payment of Management Fees shall not constitute a waiver of monies due to the Manager.

## ARTICLE IX

## BOOKS, RECORDS AND STATEMENTS

Section 9.01 Books and Records. Manager shall keep full and adequate Books and Records reflecting the results of operation of the Hotel on an accrual basis,, with such exceptions as may be required by the provisions of this Agreement. All Books and Records, wherever kept, shall be available to Owner and its representatives at all reasonable times for examination. Upon any termination of this Agreement, a copy of all of such Books and Records forthwith shall be turned over to Owner so as to insure the orderly continuance of the operation of the Hotel, but the original Books and Records, shall be retained by Manager.

ARTICLE X

MANAGER'S FEES

Section 10.01 Base Management Fee. On the tenth (10th) day of each month during each Fiscal Year, , Owner shall pay to Manager a base management fee (the "Base Management Fee") equal to three percent (3.0%) of Gross Revenues in the first Fiscal Year and for all remaining Fiscal Years in the Term. The Base Management Fee shall be based on the actual monthly Gross Revenues as shown on the monthly Statement for the prior month.

Section 10.02 Reimbursement of Expenses. From time to time as incurred, Owner shall promptly reimburse Manager for any Manager's Expenses to the extent such Manager's Expenses are incurred by Manager in accordance with the provisions of this Agreement.

Section 10.03 Incentive Fee. Within ten (10) days after receipt of the Certified Financial Statements, Owner shall pay Manager an annual incentive management fee in an amount equal to ten percent (10%) of net operating income (the "Incentive Fee").

Section 10.04 Disbursement of Fees. Manager is authorized to disburse to itself from the Operating Account the amounts owing as the Manager's Fees and for reimbursements provided for in the Budget or otherwise expressly permitted by this Agreement, all at the times and in the amounts provided for in this Agreement, but, if insufficient funds are available to do so, such amounts shall accrue with interest thereon at the Prime Rate plus six percent (6%) per annum, or the highest legal rate, whichever is lower, compounded monthly, from the date such payment is due through and including the date of payment, and Owner shall pay same to Manager within ten (10) days after demand by Manager.

ARTICLE XI

REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

Section 11.01 Repairs and Maintenance.

(a) Manager shall from time to time make such expenditures for repairs and maintenance to the Hotel, and repairs, maintenance, replacements, renewals and additions to the FF&E, and minor capital improvements (collectively, "Repairs") as are set forth in the Budget. Notwithstanding the foregoing, Manager shall not require the consent of Owner for, and shall be authorized to undertake, Emergency Repairs whether or not the cost of performing such repairs are in the Budget, and Manager may deviate from the Budget and incur additional expenses for Repairs.

ARTICLE XII

REAL AND PERSONAL PROPERTY TAXES,
LOCAL TAXES, LEVIES AND OTHER ASSESSMENTS

Section 12.01 Payment of Real Estate Taxes. Manager shall pay from the Operating Account prior to the dates the same become delinquent all real estate and personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. If Owner shall pay the real estate taxes, Owner shall furnish Manager proof of payments thereof upon request from Manager.

Section 12.02 Owner's Right to Contest. Notwithstanding the foregoing, Owner may, as an Operating Expense, contest the validity or the amount of any such tax or assessment. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided that Manager is satisfied that the facts set forth in such documents or pleadings are accurate and that such execution or cooperation does not impose any unreasonable obligations on Manager, and Owner agrees to reimburse Manager as an Operating Expense for all expenses occasioned to Manager for any such cooperation.

ARTICLE XIII

TRADEMARKS AND HOTEL NAME

Section 13.01 Primary Name; Other Marks. During the term of this Agreement, the Hotel shall at all times be known and designated by the name The Williamsburg Hotel (the "Hotel Brand"). Owner acknowledges that the Brand Name is the property of the Manager.

(a) Manager's Tradename. Owner and Manager agree that if the Manager utilizes any tradenames, trademarks, service marks, logos or designs owned, created or licensed by Manager or any Affiliate thereof (collectively, "Manager's Tradename") in connection with the management, operation and marketing of the Hotel, such Manager Tradenames shall remain within the sole control and ownership of the Manager. Manager shall have the right to cease using such agreed-upon Primary Name and any other Manager's Tradename with respect to the Hotel if at any time this Agreement is terminated or Owner prevents Manager from operating the Hotel at a level consistent with the Approved Budget and the Operating Standard. Owner hereby acknowledges that it has no right, title or interest in and to Manager's Tradename and covenants (i) not to claim any such interest and (ii) to take such steps as are necessary, in the negotiation, execution and delivery of agreements with third parties, and in any other circumstances which might otherwise suggest erroneously that Manager's Tradename is the property of Owner, to represent that Manager's Tradename is the property of Manager. Except as otherwise expressly provided herein, Owner shall have no right, at any time, to use Manager's Tradename, or any derivation thereof, or the name of any other hotel managed or operated by Manager or its Affiliates, or any derivation thereof, for any reason or purpose whatsoever, without obtaining the prior written consent of Manager, which consent may be withheld in Manager's sole discretion. As between Owner and Manager, all right, title and interest in Manager's Tradename shall, at all times, remain with Manager. Upon the termination of this Agreement for any reason or upon termination of the license agreement governing the use of Manager's Tradenames between Owner and Manager, Manager shall have the right to promptly remove Manager's Tradename from the Hotel and all items (including, by way of example and not by limitation, the Hotel building, all facilities, FF&E, advertising and marketing materials and Consumable Supplies) used at, in connection with or in reference to the Hotel.

(b) Manager's Materials and Manager's Design Work. Owner acknowledges that in the design, operation and management of the Hotel, Manager will make use of confidential information regarding Manager's business, operations, clients, investors and business partners and/or information not generally known by Owner in the form in which it is used by Manager, and which gives Owner a competitive advantage over other companies which do not have access to this information, including secret, confidential, or valuable proprietary information, trade secrets or work product of Manager and its Affiliates, conveyed orally or reduced to a tangible form in any medium, including but not limited to information concerning the operations, business plans, financial data and financial plans, architectural plans and designs, marketing plans, techniques and arrangements, manuals and form contracts, Personnel information and files, pricing policies, proprietary databases, internal communication and correspondence, including with Personnel, mailing lists, guest profiles and records, technology, research, future plans, business models, strategies, business methods and employees of Manager and its Affiliates, as well as information about Manager's and its Affiliates' customers, clients and business partners and its operations (collectively, the "Manager's Materials"). During the Term, in the event Owner has access to any Manager's Materials, its use of such Manager's Materials shall not (a) violate the terms of this Agreement, any applicable law or any privacy policies of Manager or any of its Affiliates, (b) interfere with, or be detrimental to, the use and exclusive operation of the Hotel by Manager, and (c) interfere with, or be detrimental to, the financial performance of the Hotel. Owner also acknowledges that in the design, operation and management of the Hotel, Manager may create logos and/or designs and commission artwork, photographs, website design, images of the Hotel, or other decorative specialty items (collectively, the "Manager's Design Work") to be used in connection with Manager's operation of the Hotel. Owner hereby acknowledges that it has no right,

title or interest in and to Manager's Materials or Manager's Design Work and covenants (i) not to claim any such interest, (ii) not to disclose or distribute, or contract to disclose or distribute, Manager's Materials or Manager's Design Work to any person without Manager's express written consent except as otherwise expressly provided herein or to the extent required by law, (iii) not to use Manager's Materials or Manager's Design Work in any manner except with the prior consent of Manager which may be withdrawn at any time, and (iv) upon termination of this Agreement for any reason, to cease all use of Manager's Materials (or any part thereof) and Manager's Design Work (or any part thereof) and return to Manager all copies and/or originals of Manager's Material and Manager's Design Work in its possession. When using Manager's Materials or Manager's Design Work with Manager's consent, the same shall be used only for the purpose of furthering the business of the Hotel and not for any other reason. All right, title and interest in and to Manager's Materials and Manager's Design Work, including all copyrights, trademarks and trade secret rights, shall always remain with Manager and may be removed from the Hotel by Manager at any time, including upon a termination or expiration of the Agreement, and Owner shall have no rights with respect thereto.

(c) Solicitation. Owner shall not, and shall ensure that its Affiliates do not, directly, or indirectly, for itself or on behalf of any other person, firm or corporation, solicit, hire, retain as a consultant, or use the services of, any person who is, or was in the previous eighteen (18) months (other than a person whose services were terminated by Manager), either an employee (including Personnel) of Manager or an Affiliate of Manager, without Manager's express prior written approval. This provision of shall survive for eighteen (18) months after the termination or expiration of this Agreement.

(d) Sales of Merchandise. Owner acknowledges that Manager's Materials, Manager's Design Work and Manager's Tradename are of great commercial value and that, without the covenants contained herein with respect thereto and with respect to Manager's employees set forth above, Manager would not enter into this Agreement. Nothing herein shall prohibit Manager from placing in rooms and other places at and around the Hotel items, such as picture books, identifying other hotels managed or operated by Manager and its Affiliates. In addition, Manager shall have the right to sell merchandise in the rooms in an unobtrusive manner or in the gift shop, at the front desk or in other appropriate locations at the Hotel, provided that the proceeds from such sales shall constitute Gross Revenues and Manager shall provide such merchandise to Owner at a price no less favorable to Owner than that which Manager provides such merchandise to any other hotel operated by Manager or its Affiliates.

ARTICLE XIV

ASSIGNMENTS; SALE OF HOTEL

Section 14.01 Assignment by Owner. Owner shall have no right to transfer or assign any of Owner's interest in this Agreement without the prior written consent of Manager (which consent of Manager may be withheld by Manager in Manager's sole and absolute discretion), except that in connection with a sale of the Hotel or a permitted lease Owner shall, on thirty (30) days' prior written notice to Manager, cause this Agreement to be assigned to, and assumed by, the purchaser of the Hotel. For the avoidance of doubt, if Owner shall sell, assign, transfer or convey the Hotel or a controlling interest therein (including by transfer of ownership interest, merger or other disposition, in one or a series of related transactions) at any time during the Term, Owner shall have no right to terminate this Agreement as a result thereof, and, subject to Manager's right to terminate, this Agreement shall continue in full force and effect and bind Manager and Owner's successors and assigns.

Section 14.02 Assignment by Manager. Manager is not entitled to assign this Agreement to a third party without the written consent of the Owner, except in connection with a merger or transfer of substantially all of the assets of its parent entity to any corporation, limited liability company, partnership or other business entity, provided that (i) the assignee will assume the obligations of Manager under this

Agreement, and (ii) the Hotel will continue to be operated under the Hotel Brand, in substantially the same manner as it was operated prior to such transfer.

ARTICLE XV

TERMINATION

Section 15.01 Termination By Owner.

(a) Owner shall have the right to terminate this Agreement, without the payment of any fee or penalty, other than Manager's Expenses and accrued and unpaid Manager's Fees payable pursuant to this Agreement and the return of all monies advanced by the Manager, for the following reason only (each, following the provision of notice and the lapse of any applicable cure periods, an "Event of Default"): the commission by Manager of fraud or willful misconduct in the performance of the duties of Manager under this Agreement

(b) Owner shall have no right to terminate this Agreement unless Owner shall have given notice of any such event to Manager and such event shall continue unremedied for a period of ninety (90) days after notice, or if the breach is not susceptible of cure within ninety (90) days, such additional period as may be necessary to effect such cure provided that Manager commences such cure promptly within such sixty (60) day period and diligently prosecutes such cure to completion. In addition, but not in limitation of the foregoing, Owner shall have no right to terminate this Agreement unless Owner shall have given notice to Manager of the occurrence of the event which Owner claims is the basis for such termination, such notice to be given within 180 days after the date Owner first obtains actual knowledge of such occurrence or, if such occurrence is ongoing, the date on which Owner first obtains actual knowledge that such occurrence has ceased. Failure by Owner to give such notice within said 180-day period will constitute a waiver of the rights of Owner to terminate this Agreement by reason of the particular occurrence which would have been the basis for such termination, but not, for the avoidance of doubt, with respect to any other occurrence, and shall not limit Owner's other rights and remedies, if any, arising out of such occurrence.

(c) IN NO EVENT SHALL MANAGER BE DEEMED IN BREACH OF ITS DUTIES HEREUNDER, OR OTHERWISE AT LAW OR IN EQUITY, SOLELY BY REASON OF (I) THE FAILURE OF THE FINANCIAL PERFORMANCE OF THE HOTEL TO MEET OWNER EXPECTATIONS OR INCOME PROJECTIONS OR OTHER MATTERS INCLUDED IN THE OPERATING PLAN, (II) THE ACTS OF HOTEL PERSONNEL, (III) THE INSTITUTION OF LITIGATION OR THE ENTRY OF JUDGMENTS AGAINST OWNER, MANAGER OR THE HOTEL WITH RESPECT TO HOTEL OPERATIONS, OR (IV) ANY OTHER ACTS OR OMISSIONS NOT OTHERWISE CONSTITUTING A BREACH OF THIS AGREEMENT, IT BEING THE INTENTION AND AGREEMENT OF THE PARTIES THAT MANAGER'S SOLE OBLIGATION HEREUNDER SHALL BE TO ACT IN CONFORMITY WITH THE STANDARD OF SKILL, CARE AND DILIGENCE REQUIRED BY THE OPERATING STANDARD, AND OTHERWISE IN CONFORMITY WITH THE EXPRESS TERMS OF THIS AGREEMENT.

Section 15.02 Termination by Manager.

(a) Manager shall have the right to terminate this Agreement for the following reasons (each, following the provision of notice and the lapse of any applicable cure periods, an "Event of Default"): (i) a monetary or a material non-monetary breach of obligations by Owner under the terms of this Agreement; (ii) the event of any suspension for a period in excess of thirty (30) days or withdrawal or revocation of any material license or permit required for the Manager's performance under this Agreement or the operation of the Hotel in accordance with the terms hereof, but only if such suspension, withdrawal or revocation is due to circumstances beyond Manager's control or any Force Majeure Event; (iii) Manager is materially limited in operating and maintaining the Hotel in accordance with the requirements of this

Agreement because of (x) governmental laws, rules or regulations hereafter enacted of which Manager so notifies Owner in writing, and/or (y) Owner's failure to fund any amounts as required pursuant to the terms of this Agreement; (v) Manager makes a reasonable determination that continued operation of the Hotel will result in an imminent danger to public health or safety; (vi) a failure by Owner to deposit in the Operating Account funds requested by Manager in accordance with the terms hereof; (vii) Owner contests in any court or proceeding Manager's ownership of any of the Manager's Materials, Manager's Design Work and Manager's Tradename; (viii) Owner conceals revenue, maintains false books and records of accounts, submits false reports or information to Manager or otherwise attempts to defraud Manager.

Section 15.03 Transition Procedures. Upon the expiration or termination of this Agreement, Owner and Manager shall have the following rights and cause the following to occur each of which shall be a covenant of the party obligated hereunder:

(a) Licenses and Permits. Manager shall execute all documents and instruments reasonably necessary to transfer (if transferable) to Owner all governmental permits and licenses held by Manager necessary to operate the Hotel.

(b) Leases and Concessions. Manager shall assign to Owner or its nominee, and Owner and its nominee, if any, shall assume, all leases and concession agreements in effect with respect to the Hotel in Manager's name.

(c) Books and Records. A copy of all Books and Records for the Hotel kept by Manager shall be turned over to Owner, so as to ensure the orderly continuance of the operation of the Hotel, but the original Books and Records, may be kept by Manager.

(d) Bookings. Manager shall provide to Owner a complete list of all future bookings together with the pertinent information relevant to such bookings, (i) to be used by Owner solely to honor and complete such bookings and for no other purpose (including marketing) and (ii) subject to Owner's written agreement to Manager's then-current data protection terms, including its privacy, security, access, correction, deletion, data transfer, and incident notification and response requirements. Manager may remove from the Hotel any information (whether in electronic or hard copy format) pertaining to the Manager Owned Customer Lists and/or Manager Directed Customers and Owner shall have no right to retain any originals or copies of the same. In addition, Manager may retain a copy of and utilize, any other customer and guest information, preference and history relating to customers of the Hotel other than Manager Directed Customers without charge. Owner shall have no rights whatsoever to Manager's guest loyalty programs, lists or the information contained therein, or any lists of followers, guests, held in any program utilized by Manager to manage the property, as well as social media platform included but not limited to Instagram and Facebook.

Owner shall pay to Manager all accrued Manager's Fees and Manager's Expenses due through the date of termination of this Agreement as a condition to effective termination. Any and all costs incurred by the Manager and/or its Affiliates, including costs related to the time of, and costs incurred by Personnel, in connection with facilitating the foregoing transition procedures, shall be borne solely by Owner. Manager shall be entitled to take reasonable measures, including restricting access to computer servers or hard copies of files, in order to protect and prevent dissemination of any of the foregoing items set or otherwise that are the property of Manager.

Section 15.04 Termination Procedure. Upon an election of a non-defaulting party to exercise their right to terminate this Agreement under, the non-defaulting party may, at its option, give to the defaulting party notice of intention to terminate this Agreement, which termination shall be effective after the expiration of a period of ninety (90) days following the date of such termination notice and, upon the expiration of such period, the Term shall expire on the date specified in the notice. Such termination shall be without prejudice to any right to any and all other remedies available at law or in equity subject to the terms of this Agreement.

ARTICLE XVI

NOTICES

Section 16.01 Notices.

(a) Any notice, statement or demand required to be given under this Agreement shall be in writing and shall be deemed given or rendered if (i) delivered by hand (against a signed receipt), (ii) sent by certified or registered mail, postage prepaid, return receipt requested, (iii) sent by express or overnight courier, such as by FedEx or UPS, or (iii) sent by facsimile or email transmission, with a confirmation copy sent in a manner provided in one of subclauses (i)-(iii) above, addressed to the parties hereto at their respective addresses listed on Exhibit A.

(b) All notices, statements, demands and requests shall be effective upon receipt or refusal of delivery. By giving to the other party at least thirty (30) days written notice thereof, either party shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses for notices, statements, demands and requests, provided such new address shall be within the United States of America. Any consent required to be given under this Agreement in writing shall be delivered in accordance with the terms of this Section 18.01.

ARTICLE XVII

ADJUDICATON BY JURY

Section 17.04 Adjudication. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by a Court of Law in New York, NY, before a judge and jury.

ARTICLE XVIII

MISCELLANEOUS

Section 18.01 Representations.

(a) Owner, as an inducement to Manager to enter into this Agreement, hereby represents and warrants and covenants as follows: (a) this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof; (b) there is no claim, litigation, proceeding or governmental investigation pending (or, to Owner's knowledge, threatened) against Owner, the properties or business of Owner or the

Section 18.02 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Owner, its successors and/or permitted assigns, shall be binding upon and inure to the benefit of Manager, its successors and/or permitted assigns.

Section 18.03 Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

Section 18.04 Confidentiality. Except disclosure to obtain the advice of professionals or consultants, in connection with the financing of the Hotel from a potential lender, to investors or potential investors in the Hotel, Owner, Manager or any of their respective Affiliates, in furtherance of a permitted assignment of this Agreement, or as may be required by law or by the order of any government or tribunal, Manager, Owner, the direct and indirect beneficial owners of Owner and their respective Affiliates shall each ensure that the terms of this Agreement are not disclosed to the press or to any other third party or entity without the prior consent of Owner and Manager. In addition, the parties agree to keep confidential

all information of a proprietary or confidential nature about or belonging to Owner or Manager to which such Person gains or has access by virtue of the relationship between Owner and Manager. Furthermore, Manager may not disclose any specific information regarding financial performance of the Hotel to any third party, except (i) to obtain the advice of professionals or consultants, (ii) as provided in this Agreement, (iii) on a confidential basis to potential partners and/or investors in the Manager or its Affiliates or to potential new owners of Standard branded properties, or (iv) to a professional data reporting agency in accordance with standard industry practice. The obligations set forth shall survive any termination of this Agreement for a period of two (2) years following such termination. The parties shall coordinate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement, or the performance by either Owner or Manager of their respective obligations hereunder. Neither party shall have any liability under this Section if such Person uses commercially reasonable efforts to maintain the confidentiality required hereby.

Section 18.05    Standard of Liability; Fiduciary Duties; Irrevocability of Contract; Competition.

(a)    Standard of Liability. Anything contained in any other provision of this Agreement to the contrary notwithstanding, Manager shall not be liable to Owner in any respect, whether during the Term or after any expiration or termination thereof, for the actions or activities of any employees, contractors, consultants or advisors employed or retained by the Hotel, whether or not recommended by Manager or employed by Manager or Manager's Affiliates other than for the gross negligence, fraud or willful misconduct on the part of Manager's corporate personnel in the performance of its duties hereunder. In addition, if an Event of Default by Manager shall have occurred and be continuing hereunder, Owner may seek compensation for actual damages sustained by Owner by reason of such breach, provided, however, that Owner shall not have the right to seek such damages from Manager for Manager's negligent (but not, for the avoidance of doubt, grossly negligent) conduct of its supervisory duties and in no event shall Manager be liable for punitive, exemplary, statutory or treble damages or any incidental or consequential damages with respect to any breach of a material obligation under this Agreement.

(b)    Competition and Corporate Opportunities. Except as provided in subsection (d) below, none of Manager, its Affiliates, nor any of their respective partners, principals, directors, officers, members, managers and employees, shall have any duty to refrain from engaging, directly or indirectly, in (i) the same or similar business activities or lines of business as the Owner or (ii) the business of managing hotels other than the Hotel. In the event that Manager, its Affiliate or any of their respective partners, principals, directors, officers, members, managers and employees, acquire knowledge of a potential transaction or matter which may be a corporate opportunity for any of Owner or Owner's Affiliates (i) neither Owner nor any Affiliate of Owner shall have any expectancy in such corporate opportunity, (ii) such Persons shall not have any duty to communicate or offer such corporate opportunity to Owner or any Affiliate of Owner and (C) such Persons may pursue or acquire such corporate opportunity or direct such corporate opportunity to another Person, including to Manager or any Affiliate of Manager.

Section 18.06    Entire Agreement. This Agreement constitutes the entire Agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written. Owner and Manager hereby represent each to the other, that in entering into this Agreement neither has relied on any projection of earnings, statements as to possibility of future success or other similar matters.

Section 18.07    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile or electronic mail (via portable document format (pdf)) which, upon transmission to the other Party, shall have the same force and effect as delivery of the original signed counterpart.

Section 18.08 Force Majeure. A party will not be liable to the other party for its inability or failure to perform, or delay in performing, any of its obligations under this Agreement caused by a Force Majeure Event provided that the party affected takes all reasonable steps to reduce the effect of such Force Majeure Event. If a party is unable to perform, in whole or in part, its obligations under this Agreement by reason of a Force Majeure Event, then such party shall be relieved of those obligations to the extent such party is so unable to perform them and such inability to perform so caused shall not make such party liable to the other.

*[Signature page follows]*

IN WITNESS WHEREOF, Owner and Manager have executed this Management and Services Agreement as of the day and year first above written.

**OWNER:**

**96 WYTHE ACQUISITION LLC**

By: 96 W Development LLC, its sole member

By: 96 Wythe Holdings LLC, its Manager

By:________________________
Name: Toby Moskovits
Title: Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC**

By:________________________
Name: Yechial Michael Lichtenstein,
Title: Authorized Signatory

# Exhibit A

96 Wythe Acquisition LLC,
96 Wythe Avenue
Brooklyn, New York 11249
Attn: Toby Moskovits

The Williamsburg Hotel BK, LLC
1274 49TH Street, Suite 184
Brooklyn, New York 11219
Attn: Yechial Michael Lichtenstein

# Exhibit D: Assignment

**Execution Copy**

## ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES

**THIS ASSIGNMENT OF HOTEL MANAGEMENT AGREEMENT AND SUBORDINATION OF HOTEL MANAGEMENT FEES** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Assignment**") is made as of the 13th day of December, 2017, by **96 WYTHE ACQUISITION LLC**, a New York limited liability company, having an address at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Borrower**"), to **BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.**, a Delaware limited partnership, having an address at 142 West 57th Street, Suite 1201, New York, New York 10019 (together with its successors and assigns, "**Lender**"), and is consented and agreed to by **WILLIAMSBURG HOTEL BK LLC**, a New York limited liability company, having its principal place of business at 1274 49th Street, Suite 184, Brooklyn, New York 11219 (together with its successors and permitted assigns, "**Manager**").

### RECITALS:

A. Borrower, by its Consolidation, Extension and Restatement of Notes Agreement of even date herewith given to Lender (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"), is indebted to Lender in the principal sum of up to $68,000,000.00 advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Loan Agreement and the Note (the indebtedness evidenced by the Loan Agreement and the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Loan Agreement and the Note. Initially capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement.

B. The Loan is secured by, among other things, the Security Instrument, which grants Lender a first lien on the Property.

C. Borrower and Manager have agreed that Manager will manage the Property on terms set forth on Exhibit A attached hereto (the "**Hotel Management Agreement**") and Manager is entitled to certain hotel management fees (the "**Hotel Management Fees**") thereunder.

D. Lender requires as a condition to the making of the Loan that Borrower assign the Hotel Management Agreement to Lender and that Manager subordinate its interest in the Hotel Management Fees in lien and payment to the Security Instrument as set forth below.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Assignment of Hotel Management Agreement. As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Hotel Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default under the Loan Agreement or any of the other Loan Documents and the failure of Borrower to cure such default within any applicable grace period.

2. Subordination of Hotel Management Agreement. Manager hereby agrees that the Hotel Management Agreement, the Hotel Management Fees and any and all liens, rights, privileges and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property pursuant to the Hotel Management Agreement or otherwise, are and shall be in all respects subordinate and inferior in lien, payment and terms to the lien, payment and terms of the Security Instrument, the Note, the Loan Agreement and the other Loan Documents, and to any renewals, extensions, modifications, assignments, replacements or consolidations thereof, and to the rights, privileges and powers of Lender thereunder.

3. Estoppel. Each of Borrower and Manager represents and warrants that (a) the Hotel Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and constitutes the entire agreement between Manager and Borrower with respect to management of the Property, (b) neither Manager nor Borrower is in default under any of the terms, covenants or provisions of the Hotel Management Agreement and neither Borrower or Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default by either Borrower or Manager under the Hotel Management Agreement, (c) neither Manager nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Hotel Management Agreement, (d) the Hotel Management Fees and all other sums due and payable to Manager under the Hotel Management Agreement have been paid in full, as of the date hereof, and (e) Manager is aware that the Leases and the Rents relating to the Property have been assigned to Lender pursuant to the Loan Documents.

4. Agreement by Borrower and Manager. Borrower and Manager hereby agree (a) not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without Lender's prior written consent which will not be unreasonably withheld, delayed or conditioned and (b) that in the event of a default (continuing beyond any applicable grace or cure period) under the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents (each, an "**Event of Default**") during the term of this Assignment or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Hotel Management Agreement in accordance with the Loan Agreement, Lender may require Borrower to terminate the Hotel Management Agreement and require Manager to transfer its responsibility for the management of the Property to a Qualified Manager in accordance with the terms of the Loan Agreement, effective as of the date set forth in Lender's notice to Manager. In such event, Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager. Notwithstanding anything to the contrary contained herein or in any other Loan Document, so long as Manager is the initial Manager named herein, Lender shall not exercise its rights under this Section 4 or Section 5 hereinbelow unless either (i) a monetary Event of Default

(including failure to repay the Debt on the Maturity Date) has occurred and is continuing or (ii) a Default or an Event of Default attributable or relating to, or arising from, any acts, omissions, circumstances, conditions or events giving rise to liability under Article 12 of the Loan Agreement has occurred.

5. Lender's Right to Replace Manager. In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Assignment, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar in location, size, class, use, operation and value as the Property, Lender may deliver written notice thereof to Borrower and Manager, which notice shall specify with particularity the grounds for Lender's determination. If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Manager within thirty (30) days from receipt of such notice or that Borrower or Manager have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate Manager as manager of the Property and terminate the Hotel Management Agreement and to replace Manager with a Qualified Manager in accordance with the terms of the Loan Agreement, in which event Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.

6. Hotel Management Fees.

(a) Borrower and Manager hereby agree that Manager shall not be entitled to receive any Hotel Management Fees or other fee, commission or other amount payable to Manager under the Hotel Management Agreement from and after the occurrence of an Event of Default; provided, however, that notwithstanding anything to the contrary contained herein, Manager shall not be obligated to return or refund to Lender any Hotel Management Fees or other fee, commission or other amount received by Manager prior to the occurrence of the Event of Default, and to which Manager was entitled under the Hotel Management Agreement and this Assignment.

(b) Neither Manager nor any other Person shall be entitled to a termination fee, liquidated damages or any other fees or payments as a result of the replacement of Manager pursuant to the terms of this Assignment or the Loan Agreement.

(c) Manager agrees that, notwithstanding anything to the contrary contained in the Hotel Management Agreement, Manager shall not be entitled to receive compensation for its services conducted in connection with the Property in excess of three percent (3.0%) of gross rent collected from the Property.

7. Consent and Agreement by Manager. Manager hereby acknowledges and consents to the terms and provisions of this Assignment and Article 8 and Section 4.20 of the Loan Agreement. Manager agrees that it will act in conformity with the provisions of this Assignment, such provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Hotel Management Agreement. In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof or otherwise, Manager shall fully cooperate in transferring its responsibility to a new

management company and effectuate such transfer no later than thirty (30) days from the date the Hotel Management Agreement is terminated. Further, Manager shall (a) not contest or impede the exercise by Lender of any right it has under or in connection with this Assignment and (b) give at least thirty (30) days prior written notice to Lender of its intention to terminate the Hotel Management Agreement or otherwise discontinue its management of the Property. After exercise of Lender's rights under Section 1 of this Assignment, (i) Manager shall, subject to the terms and conditions contained herein, continue to provide management services in accordance with, and to the extent provided for in, the Hotel Management Agreement (and, if applicable, shall continue to maintain the liquor licenses at the Property for and on behalf of Lender and shall cooperate with Lender in any application by Lender to obtain new liquor licenses) and shall take no further instruction from Borrower or any Person (other than Lender) in connection therewith and (ii) neither Lender nor any successor owner of the Property shall be responsible or liable for any representation or warranty made by Borrower under the Hotel Management Agreement or for any act, omission or default by Borrower under the Hotel Management Agreement which occurred prior to exercise of Lender's rights under Section 1.

8. Termination. At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Hotel Management Agreement shall terminate.

9. Notices. All notices or other communications hereunder shall be in writing and shall be given in accordance with Section 15.5 of the Loan Agreement. Any notice or other communication to Manager shall be addressed as follows (or at such other address and Person as shall be designated by Manager from time to time):

If to Manager: Williamsburg Hotel BK, LLC<br>1274 49th Street, Suite 184,<br>Brooklyn, New York 11219

10. No Verbal Change. This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated verbally or by any act or failure to act on the part of Borrower, Lender or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11. Liability. This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever. Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment. Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

12. Inapplicable Provisions. If any provision of this Assignment is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Assignment, such provision shall be fully severable and this Assignment shall be construed and

enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

13. Governing Law; Submission to Jurisdiction. The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Manager substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Manager hereunder. Borrower and Manager hereby certify that they have received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof). In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 13, this Section 13 shall control.

14. Headings, etc. The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15. **Waiver Of Trial By Jury. BORROWER, MANAGER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, MANAGER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

16. Duplicate Originals, Counterparts. This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17. Number and Gender. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18. Secondary Market. Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in

the secondary mortgage market and, in connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19. Lender's Reliance on Representations. Manager has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

20. Management. Borrower and Manager hereby agree that Manager will perform the management services for the Property set forth in the Hotel Management Agreement.

21. Manager Not Entitled to Gross Revenues. At all times during the term of the Loan, all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by Manager, if any, shall be handled and applied in accordance with Article 8 of the Loan Agreement. Manager acknowledges and agrees that all portions of the Rents, security deposits, issues, proceeds, profits and other revenues of the Property collected by it shall be solely in it is capacity as the agent for the Borrower, such monies are the sole property of the Borrower, encumbered by the lien of the Security Instrument and other Loan Documents in favor of Lender and Manager has no right to, or title in, such monies except as provided in the Management Agreement, or at law or equity. In any bankruptcy, insolvency or similar proceeding the Manager, or any trustee acting on behalf of the Manager, waives any claim to such monies other than pursuant to the terms and conditions of the Management Agreement or at law or equity.

22. Miscellaneous.

(a) Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b) Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender.

(c) If more than one Person has executed this Assignment as "Borrower" or as "Manager," the obligations of all such Persons hereunder shall be joint and several.

21-22108-rdd Doc 418-4 Filed 02/18/22 Entered 02/18/22 17:48:17 Exhibit F: Assignment Pg 8 of 11

23. Inconsistencies. In the event of any inconsistency between the terms and conditions of this Assignment and the terms and conditions of the Hotel Management Agreement, the terms and conditions set forth in this Assignment shall govern.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: ______________________
Name: Toby Moskovits
Title: Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: ______________________
Name: Micah Goodman
Title: Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company

By: ______________________
Name: Michael Lichtenstein
Title: Authorized Signatory

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

**BORROWER:**

**96 WYTHE ACQUISITION LLC,**
a New York limited liability company

By: ______________________
Name: Toby Moskovits
Title: Authorized Signatory

**LENDER:**

**BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.,**
a Delaware limited partnership

By: ______________________
Name: Micah Goodman
Title: Authorized Signatory

**MANAGER:**

**WILLIAMSBURG HOTEL BK LLC,**
a New York limited liability company

By: ______________________
Name: ______________________
Title: ______________________

21-22108-rdd Doc 548-6 Filed 05/28/22 Entered 05/28/22 16:48:17 Exhibit F: Examiner Report Pg 74 of 82

**EXHIBIT A**

**HOTEL MANAGEMENT AGREEMENT**

Manager a real estate development and management firm, shall perform all work in connection with the on-site management of Property, including F&B operations. Manager will employ at its expense all personnel and facilities necessary and appropriate to enable it to perform the services required of it hereunder.

All accounting duties, including the keeping of proper and complete books of account for the Borrower shall be kept by or under the supervision of the Borrower. The Manager shall assist in providing any information in its possession necessary or helpful for the accounting function.

Manager shall receive a management fee in the amount of 3.0% of the gross rents as of January 1 of each year, payable on the first day of each month throughout the calendar year.

The term of the management services required hereunder shall be for one year, and shall automatically renew for an additional one-year term unless notice of termination is given by Borrower or Manager at least thirty (30) days prior to the expiration of the then current term. Thereafter, for successive one-year terms unless such notice of termination is given as provided above.

Examiner Report Pg 75 of 82

# Exhibit E: November 21, 2021 Document and Information Requests

# 96 Wythe Acquisition, LLC
# Case No. 21-22108
# Examiner Document/Information/Interview Request

***(Debtor and affiliated Hotel Management Company – Hereinafter referred to as the "Debtor")***

**Interview days/times for (NLT 12/1/21):**

Ms. Toby Moskovits
Mr. Michael Lichtenstein
Mr. Jeremy Rauch
Mr. David Goldwasser
Mr. Mark Kirschner
Mr. Moshe Schepansky
Ms. Miriam Gross
Ms. Daniella Lisker
Mr Evan Cohen
Mr. Jonathan Tsirlin

**Information request (For the period November 2017 to Present):**

1. Where are the books and records of the Debtor held? The exact address/location.
2. Does the Debtor maintain the books and records on a cloud or other operating system?
   a. Name of system
   b. Who has access to the system?
      i. Name
      ii. Title
      iii. Access rights
3. Who is responsible for the financial matters of the Debtor?
   a. Is there a Controller – What is their exact name and physical work address
   b. Is there a Chief Financial Officer – What is their exact name and physical work address
   c. Exact name and physical address of any person or persons with knowledge, oversight and/or control of the books and records of the Debtor
4. Who has check signing authority over the Debtor? Exact name and physical address
5. Name, address of any outside accountant that assisted in or prepared any external financial documents e.g., Tax returns
6. Other than the Debtor and affiliated Hotel Management Company, are there any other corporate or other entities that have any direct or indirect control and/or oversight of the Debtor
   a. Name
   b. Physical address
   c. Nature of business
7. Name, address, % ownership of the Debtor and affiliated management company
8. Listing of all bank account names, account numbers, bank physical addresses held in the name of or related to the Debtor and affiliated management company or any

affiliate of the Debtor or management company that either received and/or disbursed funds directly or indirectly for and on behalf of the Debtor.

9. Location of any safe deposit boxes
   a. Physical address
   b. Name of those with access
10. Identification of any banking and/or financial relationships outside the United States
   a. Institution name
   b. Account number
   c. Authorized signors

**<u>Document Request (For the period November 2017 to Present</u>**

1. Copies of all bank statements and cancelled checks for all banking and/or financial institution transactions
2. Copies of all credit card statements, showing detailed transactions
   a. For the Debtor
   b. For any principle and/or employee of the Debtor or affiliated management company
3. Copies of all Federal and State tax returns, filed with Federal and Statue taxing authorities
4. Ensure access to and availability to all invoices and such other documents related to any transactions contained in the bank and/or financial institution statements noted in 1 above
   a. Exact physical address
   b. Name of custodian of records
   c. Hours available for access

# Exhibit F: Examiner's Identification of Outstanding Requests

96 Wythe Acquistion, LLC
Bank Statement Account Status
and
Bank Account Statements
Status
**1/21/2022**

**Chase**

| Last 4 | Missing and/or Incomplete Documents/Information |
|---|---|
| 3906 | December, 2016;Janunary 2017; proof of account opening |
| 8317 | December, 2016;Janunary 2017; proof of account opening |
| 8662 | December, 2016;Janunary 2017; proof of account opening |
| 9637 | December, 2016;Janunary 2017; proof of account opening |
| 7255 | ,December, 16;Janunary 2017; proof of account opening;February 21 - Present |
| 7387 | December 16; January 2017; proof of account opening;February 21 - present |
| 8878 | December 16;January 2017; proof of account opening;February 21 - present |
| 2699 | February 21 - Present |
| 2128 | December, 16; January 17; proof of account opening |
| 7071 | February 21 - Present |
| 8898 | December 16; January 17; proof of account opening;Feb 21 - present |
| 1798 | December 16; January 17; proof of account opening;Feb 21 - present |
| 3138 | February 21 - Present |
| 3509 | December16; January 17; proof of account opening;Feb 21 - present |
| 1379 | December 16; January 17; proof of account opening; Nov and Dec 18; Jan 19 |
| 0988 | December 16; January 17; proof of account opening; Feb 21 to present |
| 9022 | December 16;January and February 17; proof of account opening |

**BOA**

| Last 4 | Missing and/or Incomplete Documents/Information |
|---|---|
| 9206 | February 21 - Present |
| 7358 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 4831 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 4400 | February 21 - Present |
| 3162 | February 21 - Present |
| 2703 | December 16; July 18; proof of account opening; June 21 - present |
| 2855 | December 16 - July 18; proof of account opening' June 21 - present |
| 0102 | September 21 - Present |
| 9398 | Decenber 17 - July 18; proof of account opening; Feb 21 to present |
| 0696 | February 21 - Present |
| 5758 | February 21 - Present |
| 4662 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 9625 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 9641 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 5246 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 4102 | December 16 - July 18; proof of account opening; Sept 21 - present |
| 4076 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 0588 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 3283 | December 16 - July 18; proof of account opening; Feb 21 - present |
| 9138 | Feb 21 to present |
| 4483 | Feb 21 to present; proof of account opening and closing; December 16 - July 18 |
| 4470 | Feb 21 to present; proof of account opening and closing; December 16 - July 18 |
| 2536 | Feb 21 to present; proof of account closing |
| 6729 | Feb 21 to present; proof of account closing |

# Exhibit G:  Bank Account Matrix

96 WYTHE ACQUISITION LLC
CASE NUMBER - 21-22108
BANK STATEMENT LIST

JP Morgan Chase NA - Known

| | 96 Wythe Acquisition LLC Ending 2297 | 96 Wythe Acquisition LLC Ending 3906 | The Williamsburg Hotel BK LLC Ending in 8317 | The Williamsburg Hotel BK LLC Ending in 8662 | The Williamsburg Hotel BK LLC Ending in 9637 | Northside Development Holdings LLC Ending in 7255 | Northside Acquisition Partners LLC Ending in 7387 | Northside Acquisition Partners LLC Ending in 8878 | Northside Management LLC Ending in 2699 | Mint Development Corp Ending in 2128 | 564 St John's Partners LLC Ending in 7071 | 564 St John's Partners LLC Ending in 8898 | 564 St John's Partners LLC Ending in 1798 | 564 St. Johns Partner LLC Chase Ending in 3138 | 562 St. John's Partner's LLC Chase Ending in 0092 | Brooklyn Bread Lab Ending in 3509 | Building Development Corp Chase Ending in 1379 | Miriam Gross Chase Ending in 3556 | FAI Capital Partners LLC Chase Ending in 1195 | 215 Moore St Acquisition LLC Ending in 0988 | 96 W Development LLC Ending 9022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016** | | | | | | | | | | | | | | | | | | | | | |
| January | | | | | | | | | | | | | | | | | | | | | |
| February | | | | | | | | | | | | | | | | | | | | | |
| March | | | | | | | | | | | | | | | | | | | | | |
| April | | | | | | | | | | | | | | | | | | | | | |
| May | | | | | | | | | | | | | | | | | | | | | |
| June | | | | | | | | | | | | | | | | | | | | | |
| July | | | | | | | | | | | | | | | | | | | | | SR |
| August | | | | | | | | | | | | | | | | | | | | | |
| September | | | | | | | | | | | | | | | | | | | | | |
| October | | | | | | | | | | | | | | | | | | | | | |
| November | | | | | | | | | | | | | | | | | | | | | |
| December | | | | | | | | | | | | | | | | | | | | | |
| **2017** | | | | | | | | | | | | | | | | | | | | | |
| January | | C | C | C | C | C | | C | | | | | | | | | | | | | C |
| February | | C | C | C | C | C | C | C | | S | | S | S | | | S | S | | | S | C |
| March | | C | C | C | C | C | C | C | C | S | | S | S | | | S | S | | | S | C |
| April | | C | C | C | C | C | C | C | C | S | | S | S | | | S | S | | | S | C |
| May | | C | C | C | C | C | C | C | C | S | | S | S | | | S | S | | | S | C |
| June | | C | C | C | C | C | C | C | C | S | | S | S | | | S | S | | | S | C |
| July | | C | C | C | C | C | C | C | C | S | | S | S | | | S | S | | | S | C |
| August | | C | C | C | C | C | C | C | C | S | 9/26/2017 | S | S | 9/28/2017 | | S | S | | | S | C |
| September | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| October | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| November | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| December | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| **2018** | | | | | | | | | | | | | | | | | | | | | |
| January | | C | C | C | C | C | C | C | S | S | S | S | S | S | | S | S | | | S | C |
| February | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| March | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| April | | C | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| May | 5/5/2018 | 4/23/2018 | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| June | C | - | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| July | C | | C | C | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | C |
| August | C | | C | C | C | C | C | C | S | S | S | S | S | S | | S | S | | | S | C |
| September | C | | C | S | C | C | C | C | C | S | S | S | S | S | | S | S | | | S | S |
| October | C | | 9/28/2018 | 9/19/2018 | 9/28/2018 | C | C | C | C | S | S | S | S | S | | S | S | | | S | 9/28/2018 |
| November | C | | - | - | 0 | C | C | C | C | S | S | S | S | S | | S | 1/2/2019 | | | S | 0 |
| December | C | | | | | C | C | C | C | S | S | S | S | S | | S | 6.90 | | | S | |
| **2019** | | | | | | | | | | | | | | | | | | | | | |
| Jan | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| Feb | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| March | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| April | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| May | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| June | C | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| July | 6/7/2019 | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| Aug | - | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| Sept | | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| Oct | | | | | | C | C | C | C | S | S | S | S | S | | S | | | | S | |
| Nov | | | | | | C | C | C | C | 9/2/2020 | S | S | S | S | | S | | | | S | |
| Dec | | | | | | C | C | C | C | 119.95 | S | S | S | S | | S | | | | S | |
| **2020** | | | | | | | | | | | | | | | | | | | | | |
| Jan | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Feb | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| March | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| April | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| May | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| June | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| July | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Aug | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Sept | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Oct | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Nov | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Dec | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| **2021** | | | | | | | | | | | | | | | | | | | | | |
| Jan | | | | | | C | C | C | C | | S | S | S | S | | S | | | | S | |
| Feb | | | | | | C | C | C | C | | | | | | | | | | | | |
| March | | | | | | C | C | C | C | | 4.62 | 2.75 | 2.42 | 1.02 | | 3,739.38 | | | | 3.41 | |
| April | | | | | | C | C | C | C | | | | | | | | | | | | |
| May | | | | | | C | C | C | C | | | | | | | | | | | | |
| June | | | | | | C | C | C | C | | | | | | | | | | | | |
| July | | | | | | C | C | C | C | | | | | | | | | | | | |
| Aug | | | | | | C | | C | C | | | | | | | | | | | | |
| Sept | | | | | | C | | C | C | | | | | | | | | | | | |
| Oct | | | | | | C | | C | C | | | | | | | | | | | | |
| November | | | | | | C | | C | C | | | | | | | | | | | | |
| December | | | | | | C | | C | C | | | | | | | | | | | | |

**96 WYTHE ACQUISITION LLC**
**CASE NUMBER - 21-22108**
**BANK STATEMENT LIST**

**BANK OF AMERICA (B of A) - Known**

| | 96 Wythe Acquisition LLC Ending in 9206 | 96 Wythe Acquisition LLC Ending in 7358 | The Williamsburg Hotel BK LLC Ending in 4831 | The Williamsburg Hotel BK LLC Title Ending in 4400 | The Williamsburg Hotel BK LLC Title Ending in 3162 | The Williamsburg Hotel BK LLC Payroll Account Ending in 2703 | The Williamsburg Hotel BK LLC Master Account Ending in 2855 | The Williamsburg Hotel BK LLC Ending in 0102 | 96 W Development LLC Ending in 9398 | 232 Seigel Acquisition LLC Ending in 5051 | 232 Seigel Development LLC Ending in 4421 | Mint Development Corp in 0696 | Mint Development Corp Ending in 5758 | 564 St Johns Acquisition LLC Ending in 4662 | 564 St Johns Holdings LLC Ending in 9625 | 564 St Johns St Holdings LLC Ending in 9641 | Northside Development Holdings LLC Ending in 5246 | Northside Acquisition Partners LLC Ending in 4102 | Northside Acquisition Partners LLC Ending in 4076 | 215 Moore St Acquisition LLC Ending in 0588 | 215 Moore St Development LLC Ending in 3283 | 215 Moore St Acquisition LLC Ending in 9138 | 875 4th Ave Acquisition LLC Ending in 4483 | 875 4th Avenue Acquisition LLC Ending in 4470 | 286 Rider Ave Acquisition LLC Ending in 2536 | Heritage GC Walton Acquisition LLC Ending in 6729 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2017** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| January | | | | | | | | | | | | | | | | | | | | | | | | | | |
| February | | | | | | | | | | | | | | | | | | | | | | | | | | |
| March | | | | | | | | | | | | | | | | | | | | | | | | | | |
| April | | | | | | | | | | | | | | | | | | | | | | | | | | |
| May | | | | | | | | | | | | | | | | | | | | | | | | | | |
| June | | | | | | | | | | | | | | | | | | | | | | | | | | |
| July | | | | | | | | | | | | | | | | | | | | | | | | | | |
| August | | | | | | | | | | | | | | | | | | | | | | | | | | |
| September | | | | | | | | | | | | | | | | | | | | | | | | | | |
| October | | | | | | | | | | | | | | | | | | | | | | | | | | |
| November | | | | | | | | | | | | | | | | | | | | | | | | | | |
| December | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **2018** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| January | | | | | | | | | | | | | | | | | | | | | | | | | | |
| February | | | | | | | | | | | | | | | | | | | | | | | | | | |
| March | | | | | | | | | | | | | | | | | | | | | | | | | | |
| April | | | | | | | | | | | | | | | | | | | | | | | | | | |
| May | | | | | | | | | | | | | | | | | | | | | | | | | | |
| June | | | | | | | | | | | | | | | | | | | | | | | | | | |
| July | | 8/10/2018 | 8/9/2018 | | | 8/9/2018 | 8/9/2018 | | 8/10/2018 | | | | | 8/9/2018 | 8/10/2018 | 8/10/2018 | 8/13/2018 | 8/10/2018 | 8/10/2018 | 8/1/2018 | 8/13/2018 | | 8/13/2018 | 8/13/2018 | | |
| August | | B | B | | | B | B | | B | | | | | B | B | B | B | B | B | B | B | | B | B | | |
| September | | B | B | | | B | B | | B | • | | | | B | B | B | B | B | B | B | B | | B | B | | |
| October | | B | B | | | B | B | | B | 11/16/2018 | 11/6/2018 | | | B | B | B | B | B | B | B | B | | B | B | | |
| November | | B | B | | | B | B | | B | B | B | | 12/11/2018 | B | B | B | B | B | B | B | B | | B | B | | |
| December | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | | B | B | | |
| **2019** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| January | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | 2/1/2019 | B | B | 2/11/2019 | |
| February | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | |
| March | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | |
| April | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | 5/29/2019 |
| May | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| June | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| July | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| August | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| September | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| October | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| November | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| December | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| **2020** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| January | | B | B | | | B | B | | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| February | 3/11/2020 | B | B | | | B | B | | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| March | X | B | B | | | B | B | 4/23/2020 | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| April | X | B | B | | | X | X | X | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| May | X | B | B | | | X | X | X | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| June | X | B | B | | | X | X | X | B | B | B | | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| July | X | B | B | | | X | X | X | B | B | B | 8/4/2020 | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| August | X | B | B | 9/2/2020 | | X | X | X | B | 8/7/2020 | B | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| September | X | B | B | B | | X | X | X | B | 0 | 8/11/2020 | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| October | X | B | B | B | | X | X | X | B | | 0 | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| November | X | B | B | B | | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| December | X | B | B | B | | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| **2021** | | | | B | 1/25/2021 | | | | | | | | | | | | | | | | | | | | | |
| January | S | B | X | B | B | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| February | B | B | B | B | B | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| March | B | B | B | B | B | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| April | B | B | 3/1/2021 | B | B | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| May | 3/19/2021 | 3/17/2021 | | B | B | X | X | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | B |
| June | 85,018.90 | | | B | B | B | B | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | OPEN |
| July | Went to TD | | | B | B | B | B | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | 0 |
| August | | | | B | B | B | B | X | B | | | B | B | B | B | B | B | X | B | B | B | B | B | B | B | |
| September | | | | B | B | B | B | B | B | | | B | B | B | B | B | B | B | B | B | B | B | B | B | B | |
| October | | | | B | B | B | B | B | B | | | B | B | B | B | B | B | B | B | B | B | B | B | B | B | |
| November | | | | B | B | B | B | B | B | | | B | B | B | B | B | B | B | B | B | B | B | B | B | B | |
| December | | | | B | 11/30/2021 | OPEN | OPEN | 11/30/2021 | OPEN | | | OPEN | OPEN | 11/30/2021 | OPEN | OPEN | 11/30/2021 | OPEN | 11/30/2021 | OPEN | OPEN | OPEN | OPEN | 11/30/2021 | OPEN | |
| | | | | 12/24/2021 | SBA - $350,000 | (1,358.05) | (455.92) | 60.00 | 34.05 | | | 1,520.00 | 34.61 | 1.96 | 0.05 | 7.88 | 9,970.78 | 1,489.13 | 22,743.00 | 13,497.73 | 12,098.48 | 100.00 | 47,429.88 | 102,144.49 | 654.24 | |
| | | | | X-fer to NS | X-fer to NS | | | | | | | | | | | | | | | | | | | | | |
| | | | | $252,100 | $350,000 | | | | | | | | | | | | | | | | | | | | | |
| | | | | 2/25/2021 | 8/3/2021 | | | | | | | | | | | | | | | | | | | | | |