**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                                   :
In re:                                                             :
                                                                   :
                                                                   :   Chapter 11
96 WYTHE ACQUISITION LLC,                                          :
                                                                   :   Case No. 21-22108 (RDD)
                                        Debtor.                    :
                                                                   :
------------------------------------------------------------------- X

## DECLARATION OF MICHAEL A. COMPARATO

I, Michael A. Comparato, hereby declare as follows under penalty of perjury pursuant to

28 U.S.C. § 1746:

1.      I submit this declaration in lieu of direct testimony in support of *Lender's Renewed*

*Motion for the Appointment of a Chapter 11 Trustee Based On Continuing Malfeasance* filed by

1

Benefit Street Partners Realty Operating Partnership, L.P. ("Benefit Street" or "Lender") on March 28, 2022 [Docket No. 476], *Lender's Supplement to Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on April 29, 2022 [Docket No. 533], and any supplemental briefs and replies in support thereof (collectively, the "Trustee Motion").

2. I am a Managing Director and Head of Real Estate of Benefit Street Partners L.L.C. ("BSP"). BSP manages Franklin BSP Realty Trust, Inc., a multi-billion-dollar real estate investment trust ("BSP REIT") that is publicly traded on the New York Stock Exchange (NYSE: FBRT), which is the ultimate holder of 100% of the equity interest in Benefit Street. BSP is a wholly owned subsidiary of Franklin Resources, Inc. (Franklin Templeton), which is one of the world's largest independent investment managers with $1.5 trillion in total assets under management.

3. I am over the age of 18, am competent to testify as to the matters contained herein, and make this declaration upon my personal knowledge. As part of my job responsibilities with Benefit Street, I was a member of the credit committee that approved the Loan (defined below).

**I.  In the Fall of 2017, Benefit Street made a $68 million first priority mortgage loan to the Debtor to finance the completion of construction of the Williamsburg Hotel.**

4. In the Fall of 2017, Toby Moskovits approached Benefit Street to provide a loan on the Williamsburg Hotel (the "Hotel"). At the time, the Hotel was largely constructed, but certain areas still required completion, including guest rooms on the upper floors, the event space and kitchen and the rooftop area and bar.

5. From late October through December 2017, the parties negotiated the terms of a $68 million construction completion loan (the "Loan"). On December 13, 2017, the parties closed the loan and Benefit Street funded the principal balance.

2

6. At closing, the Debtor and Benefit Street executed and delivered a variety of closing documents. Among these were a loan agreement (the "<u>Loan Agreement</u>"), a consolidation, modification, spread and extension agreement (the "<u>Mortgage</u>"), and an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees (the "<u>Assignment of Management Agreement</u>").

7. The Loan Agreement, the Mortgage, the Assignment of Management Agreement are Joint Exhibits 8, 10, 11 exhibits in this proceeding. Each of these documents was dated as of December 13, 2017.

8. The Loan Agreement provided for an 18-month term, together with two six-month extensions available upon the satisfaction of specified conditions. The Loan bore interest at the rate of LIBOR + 6.25% and limited amortization during any appropriately exercised extension option. The Loan Agreement was intended to provide a short-term bridge loan to allow for the completion of the construction of the Hotel building and facilities.

9. Benefit Street's loan matured in accordance with its terms in June 2019. As of July 14, 2021, the effective date of Benefit Street's Proof of Claim (Claim No. 8-2), the total amount of Benefit Street's claim (the "<u>Claim</u>") was $89,543,755.49, with interest and fees continuing to accrue thereafter as permitted under the Loan Documents.

10. Benefit Street commenced a foreclosure action in New York Supreme Court promptly after the Loan matured. In February 2021, shortly before this chapter 11 case was filed, the Appellate Division, First Department entered a decision reversing an order of the lower court in the foreclosure action and granting summary judgment in favor of Benefit Street. A copy of the decision is Benefit Street Ex. 43.

**II. Benefit Street approved the Loan based upon a one-page Hotel Management Agreement appended to and incorporated within the Assignment of Management**

**Agreement signed by the Debtor, the Management Company and Benefit Street and delivered at closing.**

11.     As part of its standard loan documents and customary industry practice, if a property is managed by a separate management company, Benefit Street requires an assignment and subordination of the management agreement between the hotel owner and the management company.  Among other things, Benefit Street requires such an agreement to subordinate the payment of any management fees over a certain negotiated percentage of hotel revenues to Benefit Street's loan, in order to protect against the management company siphoning out an unreasonable amount of liquidity from the property, and to allow Benefit Street to replace the management company if the subject property underperforms.

12.     As part of its loan underwriting process, Benefit Street's standard practice is to review any in place or proposed management agreement for a property management company that would manage the subject property after closing.

13.     At the outset of negotiations regarding the Loan, Benefit Street understood that the Hotel would be managed directly by Toby Moskovits and Michael Lichtenstein, who are the individual principals of the Debtor (collectively, the "<u>Insiders</u>").  Shortly thereafter, Benefit Street became aware of Williamsburg Hotel BK LLC (the "<u>Management Company</u>"), an entity also owned and controlled by the Insiders and affiliated with the Debtor, that was managing the Hotel.

14.     Because Benefit Street learned, via email from Debtor's Loan transaction counsel on October 30, 2017, that the Management Company was managing the Hotel without a written agreement, Benefit Street required the Debtor to put in place a management agreement to establish the terms of the business deal between the Management Company and Debtor, and so that Benefit Street could subordinate certain compensation of the Management Company and terminate the Management Company in terms consistent with Benefit Street's standard program. That

4

management agreement (the "Management Agreement") is attached to the Assignment of Management Agreement as Exhibit "A" thereto and incorporated therein by reference, *see* Joint Exhibit 11, which was signed by the Debtor, Management Company and Benefit Street and was delivered to Benefit Street at closing of the Loan.

15. Recital C of the Assignment of Management Agreement provides that: "Borrower and Manager have agreed that the [Management Company] will manage the property on the terms set forth on Exhibit A attached hereto (the "**Hotel Management Agreement**") and [Management Company] is entitled to certain hotel management fees (the "**Hotel Management Fees**") thereunder."

16. The Management Agreement assigned to Benefit Street was brief and concise. It provided that:

- The Management Company would "perform all work in connection with the on-site management of the Property."

- The Management Company would "employ at its expense all personnel and facilities necessary and appropriate to enable it to perform the services required of it hereunder."

- "All accounting duties, including the keeping of proper and complete books of account for the [Debtor] shall be kept by or under the supervision of the [Debtor.] The [Management Company] shall assist in providing any information in its possession necessary or helpful for the accounting function."

- "Management Company shall receive a management fee in the amount of 3.0% of gross rents as of January 1 of each year, payable on the first day of each month throughout the calendar year."

17. Moreover, in Section 3 of the Assignment of Management Agreement, entitled "Estoppel," both the Debtor and the Management Company expressly represented that no other management agreements existed:

> *The Hotel Management Agreement* is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and *constitutes the entire agreement between [the* Management Company*] and [the Debtor] with respect to management of the Property.*

5

*Id.* § 3 (emphasis added).

18. Section 4 of the Assignment of Management Agreement barred any subsequent amendment, termination or replacement of the Hotel Management Agreement without Benefit Street's express written consent:

> The [Debtor and Management Company] hereby agree . . . not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without [Benefit Street's] prior written consent which will not be unreasonably withheld delayed or conditioned.[1]

*Id.* § 4.

19. The Management Company not only signed the Assignment of Management Agreement, but also expressly acknowledged that Benefit Street was relying on the Management Company's representations and agreements in making the Loan to the Debtor:

> [Management Company] has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

*See* Assignment of Management Agreement. § 19.

20. In the Loan Agreement, the Debtor expressly represented to Benefit Street that no other management agreement existed. In Section 3.31(d) and Exhibit I to the Loan Agreement, the Debtor represented to Benefit Street that it was not party to any "Major Contracts" with affiliates, which the Loan Agreement defined to include "any management (other than the Management Agreement [attached to the Assignment of Management Agreement]), brokerage or leasing agreement." *See* Loan Agreement, Joint Exhibit 8, at pp. 15 and 49 and Exhibit I.

---

[1] The Management Company further acknowledged, consented to and agreed to act in conformity with Section 4.20 of the Loan Agreement, which contained similar prohibitions on the termination or amendment of the Management Agreement without the prior written consent of Benefit Street. *See* Joint Exhibit 11, § 7 and Joint Exhibit 8, § 4.20(b).

6

21.     The Management Company agreed in Section 21 of the Assignment of Management Agreement that all amounts it collected were the sole property of the Debtor, and that it was collecting such funds solely as agent for the Debtor and subject to Benefit Street's liens. *See* Assignment of Management Agreement, Joint Exhibit 11, § 21.

22.     Article 8 of the Loan Agreement lays out detailed cash management requirements for the Debtor. Among these is the requirement that, upon an event of default under the Loan, the Debtor must establish a Clearing Account and a Cash Management Account *in the name of the Debtor* and deposit all revenues of the property received by the Debtor or the Management Company into those accounts, including all amounts collected under the Management Agreement. *See* Loan Agreement, Joint Exhibit 8, §§ 8.5, 8.6.

23.     Because the Insiders had no prior experience operating a hotel, Benefit Street's rights under its Loan Documents relating to the Management Agreement and Management Company, including the right to terminate the Management Company, were of exceptional importance to the approval of the Loan. In fact, during due diligence, I walked the Hotel with Leslie Ng, who is an expert hotel operator, to get comfortable that, if the Hotel underperformed due to poor management, Benefit Street could immediately replace the Management Company with competent management to remedy the situation and preserve the Hotel, and Benefit Street's collateral, as a going concern.

24.     Ultimately, Benefit Street became comfortable with the Management Agreement and Management Company, given the terms of the Management Agreement and the Assignment of Management Agreement and other Loan Documents, which included, among other things, Benefit Street's right to replace the Management Company if Benefit Street determined the Hotel

was not being managed in accordance with generally accepted management practices for similar properties.  *See* Assignment of Management Agreement, Joint Exhibit 11, § 5.

**III.    The terms of the Purported Management Agreement presented by the Debtor in this case differ materially from the terms of the Management Agreement approved by Benefit Street.**

25.    In August of 2021, more than five months into this Bankruptcy Case and almost four years after the Debtor delivered the Assignment of Management Agreement to Benefit Street at closing, the Debtor filed a motion attaching a different form of management agreement, dated as of November 21, 2017 (the "Purported Management Agreement").  Neither I, nor, to the best of my knowledge, anyone else at Benefit Street, had ever seen the Purported Management Agreement nor was its existence ever disclosed to me or, to the best of my knowledge, anyone else at Benefit Street.

26.    The Purported Management Agreement bears a date that is three weeks before the closing of the Loan Agreement.

27.    Had I been aware of the existence of the Purported Management Agreement, I would not have accepted the representations of Ms. Moskovits and Mr. Lichtenstein in the Assignment of Management Agreement that no other management agreement existed.

28.    Had I been aware of the existence of the Purported Management Agreement, I would never have voted to approve the Loan or allowed Benefit Street to close or fund under the Loan Agreement.

29.    Not only would the existence of the Purported Management Agreement have contradicted express representations from a prospective borrower necessitating additional due diligence by Benefit Street, but certain terms of the Purported Management Agreement are destructive to the value of Benefit Street's collateral.  Among these provisions are:

8

- The lengthy term of the agreement (10) years, with two five (5) year extension options for the Management Company;

- That the Purported Management Agreement does not terminate upon a sale of the Hotel, preventing a potential buyer from replacing the Management Company and severely damaging value;

- The above-market compensation, which includes an "incentive fee" given by the Debtor's principals to the same principals of the Management Company, in the amount of 10% of net operating income;

- That the trademarks, hotel name, reservation system and other intellectual property is owned by the Management Company and not the Debtor;

- That the Management Agreement is not assigned to Benefit Street and subordinated to the Loan.

30. To be clear: Benefit Street would not have closed the Loan on the terms of the Purported Management Agreement if it in fact existed at the time of closing and governed the terms of the relationship between the Debtor and the Management Company.

31. In an approximately 27 year professional career in commercial real estate, over the course of which I have negotiated and closed billions of dollars of hospitality loans, the Purported Management Agreement contains the most egregious and self-serving terms that most wildly deviate from the terms of a standard and arms' length management agreement that would have been customarily negotiated between a hotel owner and third party management company and accepted by the mortgage lender.

32. I understand that certain of the Debtor's experts have suggested that the November Management Agreement was created after Benefit Street's loan closed and served to expand the

9

Management Agreement. This also is untrue. To my knowledge, the Debtor did not present Benefit Street with the Purported Management Agreement at any time after the closing of Benefit Street's Loan, and Benefit Street never provided its written consent to the November Management Agreement, as was required by the Assignment of Management Agreement. Indeed, if it had done so, and even if the Purported Management Agreement had been approved (which it would not have been upon its existing terms), Benefit Street would have required it be appended to a new assignment and subordination of management agreement, signed and delivered by the Debtor and Management Company to Benefit Street, in accordance with Benefit Street's standard policies, procedures and loan program. However, I never would have granted such consent, given that the provisions of the Purported Management Agreement materially disadvantage the Debtor and Benefit Street's collateral, rights, economics and position.

**IV.    Benefit Street had no knowledge of the purported insider loans or alleged loan documents until after the Bankruptcy Case and would never have closed the Loan if it had known about them.**

33.    During discovery in this proceeding, the Debtor produced, on March 10, 2022 and for the first time, two documents to Benefit Street, a "Line of Credit Agreement and Note" dated June 8, 2016 in the maximum principal amount of $5 million, and a First Amendment to the Line of Credit Agreement and Note dated November 8, 2017, upsizing this purported line of credit to $15 million (collectively, the "<u>Purported Insider Loan Agreement</u>"). I understand that the Debtor asserts that over $4 million of the amounts allegedly advanced under the Purported Insider Loan Agreements was repaid before this case was filed and that over $6 million in such alleged advances remain outstanding (such alleged advances, collectively, the "<u>Purported Insider Loans</u>").

34.    At the outset, if this is true, it is shocking to me that the Debtor's Insiders claim to have caused the Debtor to repay themselves over $4 million of alleged debt without any disclosure

to Benefit Street at the very same time that, on the Insiders' watch, the Debtor was not paying its real estate taxes, occupancy taxes or debt service to Benefit Street. That type of behavior instantly disqualifies a person or entity from borrowing money under our program at Benefit Street and, frankly, any other prudent, institutional lender.

35. As part of its standard lending due diligence, Benefit Street seeks to determine whether its prospective borrower is subject to any other financial obligations. In Section 3.30 of the Loan Agreement, the Debtor expressly represented to Benefit Street that "Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan." *See* Loan Agreement, Joint Exhibit 8, at § 3.30.

36. As part of its standard lending procedures, Benefit Street requires its borrowers to conform to certain "special purpose entity" restrictions. These restrictions are intended, among other things, to assure that the Debtor's assets (which are often Benefit Street's collateral) are not improperly exposed to the claims of other entities or otherwise improperly transferred to affiliated entities. These restrictions are set forth in Exhibit C to the Loan Agreement (the "SPE Restrictions"). Joint Exhibit 8, Ex. C. In addition, Benefit Street requires its borrowers that are limited liability companies, like the Debtor, to include the SPE Restrictions in their organizational operating agreements, so that any act not in conformity with the SPE Restrictions would be taken without requisite corporate authority. The Debtor's Fourth Amendment to Operating Agreement of 96 Wythe Acquisition LLC dated December 13, 2017 (the "Operating Agreement") is Benefit Street Ex. 22 in this proceeding. The SPE Restrictions are contained in Section 3(c) of the Operating Agreement. *See* Benefit Street Ex. 22, § 3(c).

37. In Section 3.24 of the Loan Agreement, the Debtor represented to Benefit Street that "[s]ince . . . [its] creation and as of the date hereof," it had "complied with" and was "in

compliance with" the SPE Restrictions.  Joint Exhibit 8, § 3.24.  Section 4.23 obligated the Debtor to comply with the SPE Restrictions after the entry of the Loan.  *Id*. § 4.23.

38.  Section (a)(iii) of the SPE Restrictions and Section 3(c)(iii) of the Debtor's Operating Agreement provides that the Debtor "has not and will not:"

> incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than ninety (90) days past due, and/or (C) Permitted Equipment Leases . . . .

39.  Section (a)(iv) of the SPE Restrictions and Section 3(c)(iv) of the Debtor's Operating Agreement provide that the Debtor "has not and will not…commingle its funds or assets with the funds or assets of any other Person [including any 'corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association [or] any other entity…[]'"  *See* Loan Agreement, Joint Exhibit 8, p. 19 defining the term "Person".

40.  Included among the documents required by Benefit Street as inducement to closing the Loan was an opinion of Cohen & Gresser LLP, transaction counsel to the Debtor, dated December 13, 2017, which opined, among other things, that if various persons or entities, including Mr. Lichtenstein or Ms. Moskovits, were to become a debtor in a bankruptcy case, the assets of the Debtor would not be substantively consolidated into the bankruptcy estate of Mr. Lichtenstein, Ms. Moskovits or the other paired entities (the "Non-Con Opinion").  A true and correct copy of the Non-Con Opinion is Benefit Street Exhibit 15 in this case.

41.  In the Non-Con Opinion, the Debtor's transaction counsel made various factual assumptions, including that the Borrower had always operated in conformance with SPE Restrictions and would always so operate, the truth of which was certified by Ms. Moskovits, as

agent of the Debtor. *See* Recycled Entity Certificate attached to Non-Con Opinion, Benefit Street Exhibit 15, at § 12. These SPE Restrictions included, among other things, the prohibition on the Debtor from borrowing under material insider loans, such as the Purported Insider Loans. In connection with such certification, Ms. Moskovits acknowledged "that Cohen & Gresser LLP will rely on the representations contained in this Certificate in issuing its legal opinion to Lender, and that Lender will rely on the representations contained in this Certificate in making the Loan." *Id.*

42. Neither I, nor to the best of my knowledge, anyone else at Benefit Street, had ever seen the Purported Insider Loan Agreement, nor was its existence ever disclosed to me or, to the best of my knowledge, anyone else at Benefit Street, prior to its disclosure in this case. Moreover, I understand that the Purported Insider Loan Agreement was not disclosed in any of Debtor's bankruptcy filings. Further, I understand that the first time that anyone at Benefit Street or its bankruptcy or transaction counsel had ever seen the Purported Insider Loan Agreement was less than an hour before to the start of Michael Lichtenstein's deposition on March 10, 2022.

43. At no time before the signing of the Loan Agreement did the Debtor ever disclose to me or to Benefit Street the existence of the Purported Insider Loan Agreement, nor did it disclose the existence of any Purported Insider Loans.

44. Had it done so, Benefit Street would not have signed the Loan Agreement or funded the Loan absent additional underwriting and documentation, including, but not limited to subordination and standstill agreements with the Insiders subordinating the Purported Insider Loans to Benefit Street's Loan and prohibiting them from receiving any repayment thereof or exercising any remedies thereunder until Benefit Street's Loan was repaid, inclusion of the Purported Insider Loans into the Non-Con Opinion, and revision of the SPE Restrictions to

accommodate the Purported Insider Loans, among other things, if not wholly recharacterized as equity contributions.

45.     It is crucial to Benefit Street's business that its borrowers, including the Debtor, adhere to the SPE Restrictions. With respect to short term bridge loans such as the Loan, Benefit Street's business model is to leverage such loans via securitizing them through Collateralized Loan Obligations ("CLO's") or pledging them via Master Repurchase Agreements to major financial institutions, including national banks. This practice is standard in the industry in which Benefit Street operates. In my approximately 27 year career in commercial real estate, I have been involved with the securitization into CLO's and pledging via Master Repurchase Agreements thousands of individual loans.

46.     The Loan was itself placed in a CLO. Benefit Street is required to make representations and warranties with respect to each asset securitized into a CLO or pledged via a Master Repurchase Agreement, which include that its borrowers (including the Debtor) are "special purpose/single purpose entities" and subject to special purpose restrictions such as the SPE Restrictions. If Benefit Street is in breach of or is unable to make these representations and warranties, it could be obligated to repurchase the asset (loan), thereby depriving Benefit Street of the leverage it forecasted when it underwrote and closed the loan, and the deal it struck with its borrower. Moreover, if Benefit Street were to seek to securitize or pledge a loan for which the borrower was not a "special purpose/single purpose entity," Benefit Street would likely be unable to do so, and even if it were, the advance rate and pricing would likely be very poor.

47.     If the Purported Insider Loans and Purported Insider Loan Agreement existed at the time that Benefit Street closed the Loan, then the Debtor would have been in breach of the SPE Restrictions under the Loan Agreement and acted beyond its corporate authority permitted in its

organizational documents.  Moreover, the Debtor, through the Insiders, lied to and mislead Benefit Street regarding the Debtor's qualification as a "special purpose/single purpose entity," which was a material representation upon which Benefit Street relied in extending the Loan.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed:    New York, New York
                May 12, 2022

                                            /s/ Michael A. Comparato
                                            Michael A. Comparato