**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------X
                                                      :
In re:                                                :
                                                      :   Chapter 11
96 WYTHE ACQUISITION LLC,                             :
                                                      :   Case No. 21-22108 (RDD)
                    Debtor.                           :
                                                      :
----------------------------------------------------------------- X
```

## <u>DECLARATION OF LUIS O. RIVERA, CPA</u>

I, Luis O. Rivera, CPA, hereby declare as follows under penalty of perjury pursuant to 28

U.S.C. § 1746:

1.      I submit this declaration regarding *Lender's Renewed Motion for the Appointment*

*of a Chapter 11 Trustee Based On Continuing Malfeasance* filed by Benefit Street Partners Realty

Operating Partnership, L.P. ("Benefit Street" or "Lender") on March 28, 2022 [Docket No. 476], *Lender's Supplement to Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on April 29, 2022 [Docket No. 533], and any supplemental briefs and replies in support thereof (collectively, the "Trustee Motion").

2.      I have been retained by Benefit Street to render my expert opinion on the pre- and post-petition financial conduct of the Debtor, with a primary focus on the payment, or avoidance, of taxes, as more fully set forth in my Expert Report attached hereto.

3.      I am over the age of 18, am competent to testify as to the matters contained herein, and make this declaration upon my expert knowledge.  My curriculum vitae is attached hereto as Exhibit A.

4.      I have rendered the expert opinion attached hereto as Exhibit B.  I rendered a supplement to the expert report, attached hereto as Exhibit C, after attending the deposition of Daniel Norensberg on May 10, 2022 (collectively with the supplement, the "Expert Report").  The Expert Report contains my conclusions as they relate to the Trustee Motion.  If called to testify I would testify in accordance with my conclusions rendered in that Expert Report.

[SIGNATURE ON FOLLOWING PAGE]

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed:       Miami, Florida
                May 12, 2022

_____
Luis O. Rivera, CPA

**<u>Exhibit A</u>**

**Curriculum Vitae of Luis O. Rivera, CPA**

# Curriculum Vitae for Luis O. Rivera, CPA

## Luis O. Rivera, Managing Partner

Luis O. Rivera is currently a Partner at the MRW Consulting Group® specializing in white collar crime litigation support, international and domestic investigative services, civil and criminal tax controversy, anti-

money laundering and bank secrecy act services, financial fraud investigations and law enforcement training and reviews. At the MRW Consulting Group®, Luis has serviced numerous clients in the areas of voluntary disclosures, civil fraud matters, tax controversy issues, and forensic support on criminal and civil tax and fraud cases to include mortgage fraud, contract disputes cases, and business consulting. Prior to the MRW Consulting Group®, Luis worked in a Public Accounting firm in South Florida in the Advisory Services Division. At the firm, Luis worked on tax related matters including matrimonial cases, tax audits, litigation support and collection and criminal tax matters. Luis also worked on contract dispute cases providing forensic expertise. In addition, Luis expanded the Firm's practice to include work on Money laundering/forensic accounting matters internationally. Luis has developed criminal cases for trial and testified in various forums including US District court and administrative hearings. Luis brings 28 years of experience with the IRS Criminal Investigation Division and the Inspector general's Office of the Agency for International Development (USAID) Luis served as Special Agent, Foreign Service officer, Supervisory Special Agent, and task force Deputy Director finally retiring as the Assistant Special Agent in Charge (ASAC) of the Miami Field Office. As ASAC in IRS Criminal Investigations, Luis provided leadership directing field operations of the field office (Miami) with over 160 employees. He provided guidance and stewardship over program implementation, and plan execution. He had investigative, administrative and approval authority over complex, multi-jurisdictional tax, money laundering (Bank Secrecy Act) and financial fraud cases covering South Florida, Puerto Rico and the US Virgin Islands. Additionally, he was responsible for implementing the IRS criminal Investigations business plan, conducting operational reviews, approving and overseeing tax fraud, white collar crime, and money laundering investigations, including undercover operations.

## Expertise

- Forensic Accounting
- Financial Investigative Techniques
- Trial Support & Preparation
- Money Laundering
- Tax Fraud Investigations
- Black Market Peso Exchange
- Voluntary Disclosures
- White-Collar Crimes
- International Investigations
- Foreign Diplomacy
- Witness Interview Preparation
- Law Enforcement Management Consulting

## Accreditations

- Certified Public Accountant
- Certified Fraud Examiner

- Certified Financial Forensic
- Private Investigator

## Education

- Bachelor of Arts, Accounting - Rutgers University

## Affiliations

- American Institute of Certified Public Accountants
- Association of Certified Fraud Examiners
- Association of Former Special Agents
- Puerto Rico College of Certified Public Accountants
- Florida Institute of Certified Public Accountants
- Member of the Clara Barton Society of the American Red Cross (2011)

## Seminars & Lectures

- Association of Certified Anti-Money Laundering Specialists
- Florida Institute of CPAs
- Columbia Bankers Association
- Cuban-American CPA Association
- Florida International University
- Guatemala Central Bank
- Organization of American States
- Pan-American Money Laundering Conference
- Planned Giving Counsel of WB
- Quito Bankers Association

## **Exhibit B**

**Expert Report of Luis O. Rivera, CPA**

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

## In re:

## 96 WYTHE ACQUISITION LLC,

### Debtor

### Case No. 21-22108 (RDD)

### Chapter 11

May 9, 2022

MRW Consulting Group, LLP
950 S Pine Island Road
Plantation, FL 33324



*Strategies from Numbers* ®

## MRW Consulting Group, LLP
### 950 S Pine Island Road, Suite A 150
### Plantation, FL 33324

## INDEX

I.    INTRODUCTION:

II.    SCOPE OF WORK:

III.    RECORDS AND DOCUMENTS EXAMINED:

     ATTACHMENT A IS AN INTEGRAL PART OF THIS REPORT.

IV.    SUMMARY OF OPINION:

V.    CASE BACKGROUND:

VI.    FINDINGS:

    A. REVIEW OF DEBTOR'S TAX RETURNS 2017-2020 AND AMENDED RETURN 2020

        1.  Debtor's 2017 Tax Return
        2.  Debtor's 2018 Tax Return
        3.  Debtor's 2019 Tax Return
        4.  Debtor's 2020 Tax Return
        5.  Debtor's 2020 Amended Tax Return and 2021 Extension

    B. REVIEW OF HOTEL'S TAX RETURNS 2017-2020

        1.  Hotel 2017 through 2020 Tax Returns and 2021 Extension

    C. AGREEMENT BETWEEN DEBTOR AND HOTEL

    D. ASSIGNMENT OF INCOME

    E. EXAMINER FINDINGS

VII.    RELEVANT STATUTES:

    a. 26 U.S.C. § 7201 - Attempt to evade or defeat tax U.S. Code

    b. 26 U.S.C. § 7203 - Willful Failure to File

    c. 26 U.S.C. § 7206 - Fraud and False Statements

**d. 26 U.S.C. § 7206(1) (False or Fraudulent Return, Statement, or Other Document Made Under Penalty of Perjury) – Elements of the Offense**

**e. 26 U.S.C. § 7206(2) (Aid or Assistance in Preparation or Presentation of False or Fraudulent Return, Affidavit, Claim or Other)**

**VIII.    WILLFULNESS AND INTENT:**

**a.  Items of Intent**

**IX.    CONCLUSIONS – OPINION**

**MRW Consulting Group, LLP**
**950 S Pine Island Road, Suite A 150**
**Plantation, FL 33324**

## Report

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**In re:**
**96 WYTHE ACQUISITION LLC,**
**Debtor**
**Case No. 21-22108 (RDD)**
**Chapter 11**

### I.  INTRODUCTION:

In connection with the above referenced matter, MRW Consulting Group, LLP ("MRW") was retained by Nelson Mullins Riley & Scarborough, LLP ("NMRS") on behalf of secured creditor Benefit Street Partners Realty Operating Partnership, LP.  MRW was engaged to review: records (including tax returns), the report and supplemental report of the Examiner appointed in the matter, supporting analysis and schedules, and bank account statements and other related documents.

### II.   SCOPE OF WORK:

The scope of work for this matter includes the review of documentation, for the purpose of providing an expert opinion, relating to the flow of funds and the accrual, payment and filing of taxes for 96 Wythe Acquisition, LLC (the "Debtor") and Williamsburg Hotel BK, LLC (the affiliated "Hotel Manager"), as the foregoing are material to the reporting, payment and non-payment of taxes and the Debtor and Hotel Manager's compliance with applicable tax statutes and regulations.

MRW will also assist as necessary in preparing attorneys for deposition of the CPA firm retained by the Debtor and Hotel Manager and will attend depositions as a consulting expert.

### III.   RECORDS AND DOCUMENTS EXAMINED:

**Please refer to Attachment A, "List of Documents Examined"-**
**<span style="color:red">ATTACHMENT A IS AN INTEGRAL PART OF THIS REPORT.</span>**

## IV.    SUMMARY OF OPINION

The totality of the facts and circumstances surrounding the tax returns of the Debtor and Hotel Manager lead to the conclusion that there is a strong likelihood that tax offenses have been committed.

The tax returns and other documentary evidence reviewed in this matter, lead to a conclusion that the income assignment between the Debtor and the Hotel Manager has no tax economic substance or support in tax law, or IRS provisions and/or Treasury regulations.

The Debtor's and Hotel Manager's Principals' (defined below) lack of sound explanations for the multiple transfers and other irregularities detailed in this report and the Examiner's report are evidence of willful misconduct in the context of a criminal tax investigation. The totality of the serious omissions and irregularities on the tax returns of both the Debtor and the Hotel Manager coupled with the testimony from witnesses deposed in this bankruptcy matter would form the basis for establishing knowledge and intent (willfulness) to commit tax fraud (tax evasion).

All of the explanations provided by the Principals in their respective depositions about why the returns were filed late if, in fact, filed at all, and about the income assignment and multiple transfers between accounts are incongruent, and misleading and are not acceptable reasons for failing to file a return, nor assigning income or transferring funds in the manner in which the Debtor's and the Hotel Manager's Company's funds were transferred. Thus, with regard to all of the Debtor's and Hotel Manager's tax returns prepared for the years 2017 through 2020, including the amended 2020 tax return for the Debtor, are, in my opinion, worthless for purposes of filing obligations with the Internal Revenue Service ("IRS").

## V.    CASE BACKGROUND:

On February 23, 2021 (the "Petition Date"), the Debtor commenced this Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Debtor owns a 147-room boutique hotel in Williamsburg, New York. The organizational structure of the Debtor and its related entities is shown on Exhibit **A**. Michael Lichtenstein ("Lichtenstein") and Toby Moskovits ("Moskovits", together with Lichtenstein, the "Principals") are the indirect owners of the Debtor, direct owners of the Hotel Manager as well as an owner of a number of other entities identified in the Examiner's report. In Court filings, the Debtor has identified Lichtenstein as its managing member.

The initial order directing the appointment of an Examiner in this case was entered on November 8, 2021 (DE 178). On November 16, 2021, Eric M. Huebscher was appointed as Examiner (DE 184). The order directing the appointment of an Examiner was amended on November 23, 2021 (DE 193) and on December 14, 2021 (DE 224). The order directing the appointment of an Examiner states that the Examiner is authorized to investigate matters related to the Debtor and matters related to the Bankruptcy proceedings.

In the course of the Examiner's investigation, according to his report, 50 bank accounts, were reviewed/examined, 11 interviews were conducted and over 10,000 of pages in documents, including bank statements, transfer reports prepared by the Debtor, emails, and other relevant and supporting documentation were reviewed/examined.

Furthermore, according to the Examiner's report, over 48,000 banking transactions from, to, and among the Debtor, the Hotel Manager and other bank accounts linked to accounts in the name of the Debtor, or the Hotel Manager, were also reviewed. According to the Examiner's report, these transactions took place over an approximately four-year period.

The Examiner's investigation uncovered significant potentially avoidable transfers. More specifically, the Examiner's investigation uncovered evidence of a complex scheme to divert and siphon substantial amounts of money belonging to the Debtor, through a labyrinth of banking relationships between the Debtor and the Hotel Manager, and other entities under common ownership and control of Lichtenstein and Moskovits.

Entities owned directly or indirectly by the Principals which received and sent transfers to the Debtor and/or the Hotel Manager include, but may not be limited to, 232 Seigel, Acquisition, LLC, 232, Seigel Development, LLC, Mint Development Corporation, 564 St. Johns Acquisition LLC, 564 St. Johns Holdings LLC, Northside Development Holdings, LLC, Northside Acquisition Partners LLC, 215 Moore Street Acquisition LLC, 215 Moore Street Development LLC, 875 4th Avenue Acquisition LLC, 286 Rider Ave Acquisition, LLC, Heritage GC Walton Acquisition LLC, Brooklyn Bread Lab, Building Development Corp, 96 W Development, LLC, and FIA Capital Partners (an entity owned directly or indirectly by the Debtor's Chief Restructuring Officer (the "CRO"))[1].

---

[1] Examiners Report

Significant transfers were also sent to and received from Lichtenstein, Moskovits, and Marion (Miriam) Gross (an employee of the Hotel Manager). In total, the Examiner has identified at least an aggregate net amount of $12.5 million sent from the Hotel Manager to many of the above entities.

In addition to these transactions, which may be subject to potential claw-back actions, there are several other areas of significant concern that will be identified in this report for possible legal action.

Despite the fact that approximately $24.5 million was deposited into (and approximately $25.5 million was withdrawn from) the Debtor's bank accounts during the period of 2017 – 2020, such that they may represent income and expenses, the Debtor had failed to file tax returns timely for 2017, 2018, 2019 and 2020.  Similarly, while approximately $68.2 million was deposited into (and approximately $68.7 million was withdrawn from) the Hotel Manager's bank accounts during the period of 2017 – 2020, these deposits and withdrawals, to the extent that they may represent income and expenses of the Hotel Manager, were not reported on a timely filed tax return to the IRS.

Lichtenstein informed the Examiner that, other than the 2020 Federal tax return for the Debtor and the 2019 Federal tax return for the Hotel Manager, tax returns were not filed because the entities did not make a "profit".  During their depositions taken after the Examiner published his report, both Lichtenstein and Moskovits testified that the Debtor failed to file tax returns because the Hotel had not yet been stabilized.

We note that as of the date of this report, evidence that the Debtor's or Hotel Manger's return were actually filed has not been made available.  An account transcript from the IRS could provide evidence of filing.  If the returns were filed electronically, the tax program used could provide evidence of filing and acceptance by the IRS.

In addition, a review of the Debtor's tax returns for 2017-2020, and amended 2020, does not show the income and expenses on the Hotel Manager tax returns for that period when, in fact, the income and expenses should have been reported by the Debtor.  This is strong indicia that the Debtor is attempting to manufacture a situation to show that it has no income.

## VI.    FINDINGS:

As part of this engagement, the tax returns for the Debtor and the Hotel Manager were reviewed and analyzed. More specifically, the Debtor filed Form 1065, partnership returns, for the years 2017 through 2020, including an

amended tax return for 2020, and the Hotel Manager allegedly filed Form 1065, partnership returns, for the years 2018 through 2020.

The referenced tax returns list Daniel Norensberg of Norensberg & Associates Inc. as the return preparer. The tax returns for the Debtor and Hotel Manager have various prepared dates.  The below chart details the preparation dates for all the tax returns.   All of the returns were due by the 15th of March of the year following the year for which the return is prepared, absent an extension being filed. A valid extension would extend the filing date to September 15th. There was no information provided reflecting any extensions being filed for either the Debtor or the Hotel Manager, except for tax year 2021 (appropriately filed in 2022). However, even if extension had been filed for years prior to tax year 2021, (though proof of filed extensions have not been provided), because the returns were not allegedly filed until 2022, the returns are all considered late (delinquent).

The dates reflected on the Debtor's and Hotel Manager's returns are as follows:

| Summary of Dates on Tax Returns -2017-2020 | | | | |
|---|---|---|---|---|
| Type of Returns | Year | | Debtor | Hotel Manager |
| | | | Date of Return | Date of Return |
| original | 2017 | | 2/24/2022 | 2/24/2022 |
| | | | | |
| original | 2018 | | 2/24/2022 | 2/24/2021 |
| Second return | 2018 | | | 2/24/2022 |
| | | | | |
| original | 2019 | | 2/24/2022 | 2/24/2021 |
| Second return | 2019 | | | 5/4/2021 |
| | | | | |
| original | 2020 | | 9/13/2021 | 2/28/2022 |
| Amended | 2020 | | 2/24/2022 | |
| | | | | |

Several explanations for the returns being filed late were offered by both Ms. Moskovits and Mr. Lichtenstein in their respective depositions. Ms. Moskovits testified (at Pg. 133 Ln. 25 and Pg. 534, Ln. 2) that: "*it was our practice to file tax returns when the property started to cash flow*". Further on (on pg. 534, Ln. 17) she states, "*I did what my accountant told me to do*". Ms. Moskovits also testified (pg. 534, Ln. 23-25) "*...actually 20 that year was the year we started stabilizing and we stated pulling together getting all of our records in order*".

Regarding the late filing of the tax returns, and specifically regarding the 2017 tax return for the Debtor, Mr. Lichtenstein (pg. 231, Ln. 25 and Pg. 232, Ln. 2) testified that the tax return was filed late; "*because it didn't need to be filed until stabilization*". Furthermore, he added, (on Pg. 232, Ln. 3,4) "*...the asset will be stabilized, so we filed the returns*".

In addition, in response to the question (on pg.232, Ln. 21-23) asked by Attorney Gary Freedman, "*so someone told you back in 2018 that the debtor was not required to file its 2017 US return until the hotel was stabilized*", Mr. Lichtenstein (pg. 232, Ln. 25) testified that, "*You could say that*". The implication here being that he relied on someone's (unidentified) advice for not filing the Debtor's tax return for 2018 timely.

The explanation offered by the Principals, that they were simply following the advice of their accountant or "someone" about filing tax returns, in part, points to what is known as a reliance defense which is used at times to shift responsibility to someone else for failing to act to file tax returns. Other explanations found in the Moskovits and Lichtenstein depositions (Moskovits at Pg. 540, Ln. 3) is that, :*...there were no taxes due*".

The explanations regarding stabilization of assets, that there were no taxes due until "*...the property started to cash flow....*", are not rooted in any tax statute, Revenue Procedure ("Rev. Proc"), or Treasury regulations for excusing filing a late return. As to the testimony that there were no taxes due, both the Debtor and Hotel Manager are entities known as flow-through entities meaning that the income or losses flow to the personal tax returns of its owners. Therefore, these entities do not have an income tax. If "*no taxes due*" was a valid reason for not filing a tax return, none of the flow-through entities in the U.S would ever file a tax return. The explanation simply makes no sense.

Further analysis of the tax returns revealed a number of significant discrepancies, and omissions in the tax returns of both the Debtor and Hotel Manager.

It is noted that all the Debtor's and the Hotel Manager 's tax returns show that the preparer was Daniel Norensberg of Norensberg & Associates Inc. As of the date of this report it is unknown whether the tax returns were actually filed. However, we note that given the omission of information from the returns, including failing to check information boxes on pages 2 and 3 of each return, and based on my experience preparing returns using professional tax software, I can state unequivocally that it is improbable and unlikely that the returns, if filed, were filed electronically.

If the tax returns were filed via certified, return receipt, mail, then proof of mailing would be available for production. No such proof of mailing has been made available. Alternatively, obtaining an account transcript from the IRS would likewise provide proof of filing. But no such transcript has been provided.

As of the date of this report, because Mr. Norensberg had not been deposed (scheduled for May 10, 2022), it is unknown what tax software he may have used to prepare these returns or whether the software used would allow electronic filing of incomplete returns. Therefore, if additional information becomes known and or available regarding the filing of the tax returns, the undersigned reserves the right to amend this opinion and or the conclusions in this report to reflect any new information.

## A. REVIEW OF DEBTOR'S TAX RETURNS 2017-2020 AND AMENDED RETURN 2020

First, we note that in each of the returns (2017-2020) for the Debtor, the information just below the address, sections G and H were not marked. Section G, would among other things, alert the IRS to whether the tax return is an initial tax return and Section H would disclose to the IRS whether the taxpayer has a cash or accrual basis of accounting. For the year 2017, while the lack of a beginning balance on the balance sheets (Schedule L) would tend to indicate that this is a first-year return, the IRS still needs that information specifically noted. This information is not optional on the tax returns and failure to provide it renders the tax return incomplete.

### 1. Debtor's 2017 tax Return

The 2017 Debtor's tax return shows no income on line 1a, and line 2 shows no Cost of Goods Sold (CGS). The first number found on the 2017 return is $180,000 on line 7, "other income". A closer review of this tax return reveals that the income is attributed to "property fees" from (Williamsburg) Hotel.

For 2017, the Debtor's tax return crossed-referenced the Hotel Manager 's tax return. The undersigned's review showed that among other things (discussed later in this report) the Debtor's tax return showed an income of $180,000 on line 7 and the Hotel Manager's tax return showed a deduction of $180,000 as a "property fee" expense paid to the Debtor. As part of our work, we reviewed a service agreement between the Debtor and the Hotel Manager, (described below, the "Service Agreement"). However, that Service Agreement does not reflect a "property fee" being owed to the Debtor. To the contrary, it reflects a fee owed by the Debtor to the Hotel Manager.

We note that, according to Eric M. Huebscher Examiner's report, a service agreement, dated November 17, 2017, was not disclosed on the schedule of the Debtor's executory contracts. According to his report, it was *"Several months into the chapter 11 case …the Debtor presented a service agreement… as its current management agreement"*.[2] I reviewed the relevant documentation and corroborated these findings.

Regarding the Debtor's tax return, we note that at this time, it is unknown how long Mr. Norensberg has been the Debtor's or the Hotel Manager's external accountant. However, we observed that on the signature block of the return he clicked the box "NO" where it asks: *"May the IRS discuss this return with the Preparer shown below."* Because as of the date of this report Mr. Norsenberg had not been deposed, the reason(s) for checking "NO" are unknown at this time. Considering that in his deposition Mr. Lichtenstein deferred questions about the preparation of the tax return to his accountant, it seems odd that the same accountant would check "NO" on this box.

As discussed below, checking "NO" on this box was consistent on the tax returns I reviewed, except for one (amended 2020). This, in and of itself, is a red flag when viewed in the context of the Principals' deposition testimony referring most if not all of the questions about the preparation of the returns to the accountant.

We also note that the preparer's electronic signature is not on the return. This is another indication that the return, if filed, was not filed electronically.

With respect to other required information on the tax return, we note that on page 2 Schedule B item 1, there was no entity type checked. Although, this may seem to be perfunctory, this information is crucial for the IRS to know because the "type" of entity signals to the IRS the tax treatment for that entity and what additional forms may be necessary to file with the tax return. This information is not optional on the tax return. Failure to provide this information constitutes an incomplete tax return.

Furthermore, on page 2 item 3a the preparer checked the box for "NO" on the question of whether a corporation owns 50% of more of the interest of the entity filing the return. A B-1 schedule was required to be filed if the answer was "YES" and although clearly there is one partner with more than 50% ownership interest, the Schedule B-1 was not part of the tax return provided. In this case, the K-1s for the return shows that the Debtor is owned 99.5% by another corporation, 96 Wythe Mezz De LLC.

---

[2] Examiner's Report

Likewise, the remaining items 7 through 10 on page 2 were not completed. On page 3, none of the items 11 through 22 were completed. Finally, the designation of a tax matter partner section was left blank. This section tells the IRS with whom it should communicate if the return is audited or examined. The lack of this information makes this return not only incomplete but also interferes with the IRS' functions as they now have to "fish" for that information.

## 2. Debtor's 2018 Tax Return

The Debtor's 2018 tax return shows many of the same omissions and discrepancies that the 2017 return showed. For example, there was no income on line 1a, or Cost of Goods Sold(CGS) on line 2. The first number found on the 2018 return is $1,450,000 on line 7, "other income". A closer review of this return revealed that the income is attributed to "property fee" from (Williamsburg) Hotel Manager.

The Debtor's 2018 tax return cross-referenced the Hotel Manager's tax return to determine whether the corresponding expenses for "property fees" was taken as an expense by the Hotel Manager. We note that we received two 2018 tax returns for the Hotel Manager. Neither tax return was marked as amended.  One 2018 tax return, without a salaries' deduction, showed a deduction of $1,450,000 corresponding to the Debtor's reported income on its 2018 tax return. By contrast, the Hotel Manager 's other 2018 return, with a deduction for salaries, did not have the deduction of $1,450,000 corresponding to the Debtor's reported income on its 2018 return. There is additional information regarding the Hotel Manager 's tax returns discussed later in this report.

However, because one of the Hotel Manager 's tax returns has the deduction for fees paid to the Debtor and the other one does not, the inconsistency brings into question which return was intended to be filed as the accurate tax return. Regardless of which tax return was filed, if in fact the tax returns were filed, both tax returns are incomplete as to material facts and information.

Unlike the 2017 tax return for the Debtor, Mr. Norensberg on the signature block clicked the box "YES" where it asks: "*May the IRS discuss this return with the Preparer shown below".* Because as of the date of this report Mr. Norsenberg had not been deposed the reason(s) for checking the box "NO" in the prior year are unknown at this time.  It is unknown what changed in the relationship between the Principals and the tax return preparer to check the box "YES" for 2018.

We also note that the preparer's electronic signature is not on the tax return nor is the firm's Employer Identification Number (EIN). This is another indication that the tax return, if filed, was not filed electronically.

With respect to other required information on the return, we also note that on page 2 Schedule B item 1, there was no entity type checked. As noted earlier in this report, this information is not perfunctory. The type of partnership information is crucial for the IRS to know because the "type" of entity signals to the IRS the tax treatment for that entity and what forms may be required to filed with the tax return. This information is not optional on the tax return. Failure to provide this information constitutes an incomplete tax return.

Furthermore, on page 2 item 2a the preparer checked the "NO" box on the question of whether a corporation owns 50% of more of the interest of the entity filing the return. A schedule B-1 schedule was required to be filed if the answer was "YES" and although clearly there is one partner with more than 50% ownership interest, the Schedule B-1 was not part of the tax return provided. For 2018, the K-1s for the return shows that the Debtor is owned 99.5% by another corporation, 96 Wythe Mezz De LLC.

Likewise, the remaining items 5 through 10 on page 2 items were not completed. On page 3, none of the items 11 through 25 except for line 25 were completed. Finally, the designation of a Partnership Representative[3] section was left blank. This particular section tells the IRS with whom they should communicate if the return is audited or examined. The lack of this information makes this return not only incomplete but also interferes with the IRS' functions as they now have to "fish" for that information.

A review of the 2018 balance sheet for the Debtor's return shows that the partner loans (line 19a) increased by $5,122,314 (from $4,482,723 to $9,605,037). There was also a small increase to the mortgage (line 19b).

In addition, we note that there is an interest expenses totaling $6,473,058 taken on the tax returns. It is unknown how this interest was calculated.

### 3. Debtor's 2019 Tax Return

The Debtor's 2019 tax return shows many of the same omissions and discrepancies that the 2017 and 2018 tax returns showed. For example, there was no income on line 1a, or Cost of Goods Sold (CGS) on line 2. The first number found on the 2019 tax return is $500,000 on line 7, "other income".

---

[3] The designation from tax matter partner to Partnership Representative changed in 2018.

A review of this return revealed that the income is attributed to a "*Property fee from Williamsburg Hotel BK LLC*"[4].

The Debtor's, 2019 tax return was cross-referenced with the Hotel Manager's tax return to determine whether or not the corresponding expenses for "property fee" was taken as an expense by the Hotel Manager. There were no corresponding expenses that could be obviously matched with the fees being paid to the Hotel Manager. Therefore, the fee expense, not taken by the Hotel Manager, brings into question the accuracy of the Hotel Manager's tax return and raises the question of why these expenses, if legitimate, would not be taken on the Hotel Manager's tax return. Furthermore, as mentioned above, there was no documentation in the Service Agreement providing for such fees.

Unlike on the 2017 tax return, on the 2019 tax return for the Debtor, Mr. Norensberg did not click the box "NO" on the signature block of the 2019 tax return where it asks: "*May the IRS discuss this return with the Preparer shown below*". The vacillation between the various returns dated February 24, 2022 and this one is odd.  It is unknown, as of the date of this report, what changed, if anything, in the relationship between the Debtor and Mr. Norsenberg to allow him to discuss the return with the IRS.

We also note that neither the preparer's electronic signature nor the firm's Employer Identification Number (EIN) are included on the tax return. This is another indication that the return, if filed, was not filed electronically.

With respect to other required information on the return we also note that like the 2017 and 2018 tax returns, on this return on page 2, Schedule B item 1, there was no entity type checked. As noted earlier on this report, this information is not perfunctory.  The type of partnership information is crucial for the IRS to know because the "type" of entity signals to the IRS the tax treatment for that entity and what forms may be necessary to have filed with the tax return. This information is not optional on the tax return.  Failure to provide this information constitutes an incomplete tax return and, in my experience, professional tax preparation software will not allow an incomplete tax return to be filed electronically.

Furthermore, for the 2019, on page 2 item 2a the preparer checked the box for "YES" on the question of whether a corporation owns 50% of more of the interest of the entity filing the return.  A schedule B-1 scheduled was required to be filed and was included with the 2019 return. For 2019, the K-1s for the tax return shows that the Debtor is owned 99.5% by another corporation, 96

---

[4] Debtor's Tax Returns 2017,2018,2019.

Wythe Mezz De LLC.  In prior years (2017 and 2018) the same box was checked "NO".

Likewise, the remaining items 5 through 10 on page 2 items were not completed. On page 3, none of the items 11 through 25 except for lines 22 and 25 were completed. Finally, the designation of a Partnership Representative on this return shows that 96 Wythe Borrower De LLC is the designated Partnership Representative and Yechiel Lichtenstein as the individual for the Partnership Representative. It is noted that Mr. Lichtenstein's name Michael was not used. It is unknow as of the date of this report why on this 2019 return the preparer changed his prior pattern and listed a tax representative for the partnership. I am also aware that the Debtor's operating agreement actually identifies Ms. Moskovits as the Partnership Representative/Tax Matters Partner.

With regard to the signature on the tax returns we note that for 2017 and 2018, Ms. Moskovits signed the tax returns, but for the years 2019 and amended 2020 Mr. Lichtenstein signed the tax returns—one as Michael and one as Yechiel.  The first 2020 tax return was not signed at all.

A review of the 2019 balance sheet for the Debtor's tax return shows that the partner loans (line 19a) decreased by $3,221,109 (from $9,605,037 to $6,383,928). There was also a small increase to the mortgage (line 19b).

In addition, we note that there is an interest expenses totaling $ 2,186,159 taken on the tax returns. It is unknown how this interest was calculated.

### 4.  Debtor's 2020 Tax Return

The 2020 Debtor's tax return was allegedly amended. The date of the tax return is reflected as September 13, 2021. It is unknown if this tax return was actually filed. The explanation on the subsequent tax return for amending this tax return was simply: "*WAS MISSING BALANCE SHEET INFORMATION.*" However, in his deposition referring to the Debtor's amended 2020 return, Mr. Lichtenstein testifies (at Pg. 269, Ln. 22-24) that; *"this return was filed in a rush. It had many errors. That's why it was amended.  It's missing a lot of information and had many errors."*

The review of both of the Debtor's tax returns for 2020 shows that the only significant change from the original tax return to the amended was the numbers at the beginning of the balance sheet (schedule L).  The first page of the original return did not have any numbers on lines 1a through line 30, including a reference to shareholder loans. It was also missing the beginning of the tax year balances. As for the end of the tax year numbers there was

only a $2 difference between the two tax returns. The explanations provided by Mr. Lichtenstein about the reason for amending the tax returns is incongruent with what is actually on the tax returns.

### 5. Debtor's 2020 Amended Tax Return

The Debtor's 2020 tax return shows many of the same omissions and discrepancies that the 2017, 2018 and 2019 tax returns showed. For example, there was no income on line 1a, or Cost of Goods Sold (CGS) on line 2. Unlike the prior returns, the 2020 return shows $0 income on line 7, "other income".

Neither the 2020 tax return dated September 13, 2021, or the amended tax return dated February 24, 2022, has an interest deduction on page 1 of the respective tax returns.  In prior years, (2017-2019) the Debtor's tax returns showed a deduction for interest expense.

It is unknown as of the date of this report why there is no interest expense on the 2020 tax returns for the partner loans that were reflected in the 2020 amended return dated February 24, 2021.  The outstanding amounts per tax return on the partner loans remained relatively the same from 2019 to 2020. The lack of interest brings into question whether the loan transactions are, in fact, at arm's length between the Debtor and the Principals.  This absence of interest payments is a matter that deserves further investigation. The lack of documentation to show that interest payments had been suspended on the partner loans brings into question the legitimacy of these insider loans and the tax accuracy of the tax return.

Like on the 2017 and 2019 tax returns for the Debtor, Mr. Norensberg on the signature block of both 2020 returns clicked the box "NO" where it asks: "*May the IRS discuss this return with the Preparer shown below*". As stated earlier the vacillation between these the returns is odd.  Considering that in his deposition Mr. Lichtenstein deferred questions about the tax return to his accountant, it seems odd that he would check "NO" on this box.

We also note that the preparer's electronic signature is on the tax return but not the firm's Employer Identification Number (EIN). It is unknow as of the date of this report why the preparer signed this form in the 2020 amended tax return. This is another indication that the tax return, if filed, was not filed electronically.

With respect to other required information on the tax return we also note that like all other prior years, the 2020 Debtor's tax return on page 2, Schedule B item 1, there is not a "box' checked for entity type. As noted earlier on this report, this information is not perfunctory. The type of partnership

information is crucial for the IRS to know because the "type" of entity signals to the IRS the tax treatment for that entity and what forms may be necessary to have filed with the tax return. This information is not optional on the tax return. Failure to provide this information constitutes an incomplete tax return.

Furthermore, on page 2 item 2a the preparer checked the box for "YES" on the question of whether a corporation owns 50% of more of the interest of the entity filing the return. A schedule B-1 scheduled was required to be filed and was included with the 2020 return. Clearly there is one partner with more than 50% ownership interest. For 2020, the K-1s for the return shows that the Debtor is owned 99.5% by another corporation, 96 Wythe Mezz De LLC. It is unknown as of the date of this report the reason(s), if any, as to why on this return the box was actually checked "YES", unlike prior returns.

Like the other tax returns for prior years, the remaining items 5 through 10 on page 2 items were not completed. On page 3, none of the items 11 through 25 except for lines 22 and 25 were completed. Finally, the designation of a Partnership Representative on this return shows that 96 Wythe Borrower De LLC is the designated Partnership Representative and Yechiel Lichtenstein as the individual for the Partnership Representative. But, again, the Debtor's operating agreement identifies Ms. Moskovits as the tax matter partner. We note that Mr. Lichtenstein is listed with his first name Yechiel as opposed to Michael. His explanation (at Pg. 264, Ln 2-3) that, "*Actually, the electronic ones, the program spits out the signatory name*", is not true. This line item is a manual input in the tax return. The tax return preparer selects the name and inputs it.

A review of the 2020 balance sheet for the Debtor's tax return shows that the partner loans (line 19a) decreased by $3,221,109 (from $9,605,037 to $6,383,928), at a time when the debtor had no mortgage interest expense. There was also a small increase to the mortgage (line 19b).

We note that the Debtor's 2017 and 2018 tax returns were signed by Ms. Moskovits. In 2019 and 2020 Michael signed tax returns, although he used different first names. This seemed odd because all of the Debtor's tax returns, except for the original 2020 tax return, bear the same preparation date of February 24, 2022.

## SUMMARY OF DEBTOR'S TAX RETURNS

In summary, regarding the Debtor's 2017 through 2020 tax returns, including the amended tax return for 2020, I find that the totality of the numerous omissions of required information on the tax returns on page 2 and 3 of each tax return, and in sections G and H, and the lack of interest

payments on the Principals' loans in 2020 along with all the other material items that are incomplete on the tax returns, make these tax returns materially incomplete and inaccurate.

Moreover, I find that all of the explanations provided by the Principals in their respective depositions about why the tax returns were filed late (if in fact filed) are incongruent, inconsistent, misleading, and completely devoid of anything rooted in the Internal Revenue Code, Revenue Procedures or Treasury regulations.

The same is true for all of the explanations, in all of the depositions (made available to the undersigned), provided by the Principals, regarding the reasons why the income or revenue was reported on the Hotel Manager's tax returns, even though it belonged on the Debtor's tax return.  None of the explanations provided make sense or are rooted in tax practice. In fact, the explanations provided by the Principals are incongruent, misleading, and completely  devoid of anything found in the Internal Revenue Code, Revenue Procedures or Treasury regulations.

The testimony provided by Ms. Moskovits and Mr. Lichtenstein in their depositions actually show that they had knowledge that tax returns needed to be filed.  In fact, the 2020 original tax return for the Debtor, the Hotel Manager's original 2018 and 2019 tax returns, as well as the second tax return for the Hotel Manager for 2019 show dates in 2021. The incongruent, inconsistent, and misleading, explanations provided by the Principals as to the basis for failing to file the tax returns show a further pattern of activity that appears to be willful, and therefore, could give rise to potential false tax returns in violation of Section 7206(1).  The relevant statutes are discussed later in this report.

### B. REVIEW OF HOTEL MANAGER 'S TAX RETURNS 2017-2020

As part of this engagement, the tax returns for the Hotel Manager were reviewed and analyzed. More specifically, the Hotel Manager allegedly filed Form 1065, partnership tax returns for the years 2017 through and including 2020.  It is noted that as part of the document production in this matter, two tax returns for the year 2018 were provided.

The referenced tax returns list Daniel Norensberg of Norensberg & Associates Inc. as the tax return preparer.  The tax returns are all dated February 24, 2022, except for the original 2018 return which is dated February 24, 2021 and the 2019 tax returns which are dated February 24, 2021, and May 5, 2021.  These tax returns were due by the 15th of March of the year following the year for which the tax return is prepared, absent of an extension being filed.

There was no information provided reflecting any extensions being filed for the Debtor or the Hotel Manager, except for tax year 2021 (appropriately filed in 2022). However, even if an extension had been filed for years prior to tax year 2021, because the tax returns were not allegedly filed until 2022, the tax returns are all considered late (delinquent).

Further analysis of the tax returns revealed a number of significant discrepancies, and omissions in each set of tax returns for the Hotel Manager.

It is noted that as of the date of this report it is unknown whether the tax returns were filed. However, we note that given the omissions of information from the tax returns to include not checking information boxes on pages 2 and 3 of each tax return, it is unlikely that these tax returns, if filed, were filed electronically.

However, because as of the date of this report Mr. Norensberg had not yet been deposed, and it is unknown what testimony he would provide regarding the preparation of these tax returns, including the tax software he may have used to prepare these tax returns or whether the software used would allow electronic filing of the tax returns even with incomplete information. However, based on my experience preparing tax returns using professional tax software I can state unequivocally that it is improvable and unlikely that the tax returns, if filed, were filed electronically.

However, as part of the bankruptcy proceedings, the tax returns reviewed for this matter were represented as the tax returns filed by the Hotel Manager.

## 1. Hotel Manager's 2017 through 2020 Tax Returns

The 2017 through 2020 tax returns of the Hotel Manager show income on line 1a, totaling $48,797,899 or $49,022,270 depending on which 2018 tax return is used. For Cost of Goods Sold (CGS) on line 2 only the 2019 and one of the 2018 tax returns show amounts for CGS. The 2017, 2020 and one of the 2018 tax returns do not have any figures in CGS.

Regarding the Hotel Manager's tax returns, these tax returns were cross-referenced to the Debtor's tax returns for 2017 through 2020. The comparison showed that income reported by the Debtor on its tax returns for 2017 and 2020 was not always reported as an expense for the Hotel Manager. In its tax returns, the Hotel Manager shows an expense for the "fee" paid to the Debtor in 2017 ($180,000) and on one of the 2018 tax returns ($1,450,000) but not on the second 2018 tax return or the 2020 tax return. For 2019 the list of expenses was not included in the tax return provided to MRW and therefore we could not determine if the income to the Debtor was reported as expenses

for the Hotel Manager.  As noted above, the Service Agreement does not provide for a fee to be paid to the Debtor.

In this regard, we note that on the signature block of the return the preparer checked the box "NO" where it asks: "*May the IRS discuss this return with the Preparer shown below,*" for the 2017 and 2020 tax returns.  By contrast, for the tax returns 2018 and the 2019 tax return dated 2/21/2021, the preparer checked the box "YES".  Because as of the date of this report Mr. Norsenberg had not been deposed the reason(s) for the inconsistency in checking the box are unknown.

We also note that the preparer's electronic signature is not on the tax returns for 2017, 2018 (both copies) and 2019. However, the electronic signature is present in the 2020 tax return. The reason(s) for this inconsistent application of electronic signatures is unknown as of the date of this report.

Furthermore, to add to the inconsistencies on the tax returns, for 2020 there were two form 941, Employer's Quarterly Federal Tax Return, for the 3rd and 4th quarter of 2020 showing wages paid and taxes withheld. Moreover, the amount reported on line 2 of the 941s show $2,129,371.41 in wages line 3 shows $172,339.97 in federal taxes withheld. In addition, the forms show $325,793.83 of social Security and Medicare taxes withheld.  All of the taxes withheld should have been remitted to the IRS, because they are taxes withheld from employees and as such create a fiduciary responsibility to remit to the IRS the employment and income taxes withheld from their employees. It is unknown whether these taxes were remitted.

We also note that on the 2018 Hotel Manager tax return (dated 2/24/2021) showing $15,117,101 of gross income, has 2 "*Qualified Business Income Deduction*" attachment to the tax return shows wages amounting to $5,197,348 and on Line 9 of the tax return the same amount appears as a wage deduction.  Since wages are being deducted it would follow that 941 Quarterly tax returns would have been filed and taxes withheld from employees would have been remitted to the IRS, if the 941s were even filed. It is unknown as of the date of this report whether forms 941 were filed or whether employment and income taxes were withheld and or remitted to the IRS.

The Second 2018 Hotel Manager return (dated 2/24/2022) does not report any wages. In fact, on that tax return line 9 for wages is blank.  It seems inconceivable that a Hotel Manager operator, particularly one generating over $48 million in gross receipts, would have no employees, specially where the prior tax return allegedly filed the prior year reported almost $5.2 million in wages.

This discrepancy is yet another items of inaccuracies on the Hotel Manager's tax return for 2018 and is another badge of fraud.

One other item of interest is the repairs and maintenance expenses. None of the Hotel Manager's tax returns (2017-2020) show an expense for repairs and maintenance on line 11 and neither does the Debtor.  Unless these expenses are included in line item 20 (other deductions) it seems inconceivable that a Hotel Manager operating with revenues of over $48 million would not have repairs and maintenance expenses. A review of the expenses detailed in the Federal supporting statement did not reveal expenses that could reasonably be associated with repairs and maintenance. Repairs and maintenance would be properly reported on line 11 of the tax return because this is one of those deductions that can attract attention from the IRS and leaving these expenses off the tax returns (if indeed incurred) or hiding it in line 20 (other deductions) can be construed as an attempt to avoid IRS scrutiny.

Along with other discrepancies on the tax return for the Hotel Manager, the discrepancy in wages reported is one item that can be used to establish that the tax return for 2020 may be a false tax return or at a minimum inaccurate.

One of the tax returns for the 2018, does show a deduction for wages in line 9 of page 1.  However, MWR did not receive forms 941 for 2018 and as of the writing of this report it is unknown whether or not such tax returns were ever filed or whether required withholding of taxes was ever made and paid to the IRS.

These finding are material because both the Internal Revenue Code (IRC) and Treasury regulations require the collection and payment of these taxes for employers paying wages.  The findings set forth in this report demonstrate a pattern of activity which is consistent with tax evasion and other violations of the IRC, namely Sections 7201, 7206(1) and (2) and 7202[5].

In his deposition, on the question about the gross receipts of 15,117,101[6], Jeremy Rauch testified that *"the accountant and Michael are responsible for them"* (at page 103 Ln. 6, 7).  Mr. Rauch's deposition is replete with references to the "Michael" being responsible for the tax returns, payments and other financial matters related to the Debtor. Given the length of Mr. Rauch's

---

[5] The failure "to collect, account for, and pay over" these taxes is a felony. I.R.C. § 7202. FICA imposes a tax on "employees" that the employer is directed to deduct from "wages." See I.R.C. § 3102(a)." In a similar vein, an "employer" paying "wages" must collect income tax from her employees. I.R.C. § 3402(a). The employer is required to make periodic deposits of the amounts collected, and to file quarterly returns on Form 941 reporting the wages paid and taxes collected. See Treas. Reg. § 31.6302-1(a) (imposing deposit requirement); see also Treas. Reg. § 31.6011(a)-4(a)(1) (imposing obligation to file quarterly returns). The returns are due "on or before the last day of the first calendar month following the period for which it is made." Treas. Reg. § 31.6071(a)-1(a).

[6] The 15,117,101 number is found in one of the 2 Williamsburg tax returns for 2018.

deposition, the above refence serves as one example to illustrate that Mr. Lichtenstein bears responsibility for the tax returns.   In his deposition, Mr. Lichtenstein continuously deferred questions about the tax returns to the return preparer.  It is unknown until his deposition (scheduled for May 10, 2022) what the return preparer will testify about the preparation of the tax returns.

An element of the tax statute is willfulness and thus any violation must show willfulness. A discussion on willfulness is contained further in this report.

In addition to the omissions, inconsistencies and discrepancies noted above, the Hotel Manager's tax return shows a number of items that were not completed.

For example, on page 2, Schedule B item 1, of the Hotel Manger's tax returns there was no entity type checked for any of the tax returns 2017 through 2020. This is not an insignificant item. The type of partnership information asked for in this part of the return is crucial for the IRS to know because the "type" of entity signals to the IRS the tax treatment for that entity and what forms may be necessary to have filed with the tax return. This information is not optional on the tax return. Failure to provide this information constitutes an incomplete tax return.

Furthermore, on page 2 item 3b the preparer checked the box for "NO" on the question of whether an individual owns 50% of more of the interest of the entity filing the return. If the answer is "YES," then a B-1 Schedule was required to be filed with the tax return.  In this case, the box was checked "NO" for each return 2017 through 2019 and a Schedule B-1 was not included with the production provided to MRW.  For 2020 the box was checked "YES" and a schedule B1 was included with the return.  This inconsistent treatment of similar items on the Hotel Manager's tax returns bring to question the completeness of these tax returns.

For all returns the K-1 shows that Ms. Moskovits and Mr. Lichtenstein were 50% partners and thus the box should have been checked "YES".

We note that the tax returns for 2017 through 2019 show both Ms. Moskovits and Mr. Lichtenstein as 50% owners. For 2020 that percentage is changed to 51% Ms. Moskovits and 49% Mr. Lichtenstein. It is unknown whether or not the change in ownership was reported to the IRS or what consideration Mr. Lichtenstein received for his 1% transfer or whether that was reported on his personal tax return form 1040.

Likewise, the remaining boxes, 5 through 10 on page 2 (items 7 through 10 in 2017) were not completed. On page 3, none of the boxes 11 through 25

were not checked except for boxes 22 and 25 on the 2019 and 2020 tax returns and box 25 on the 2018 returns.

A review of the Services Agreement shows that as part of the Service Agreement between the Debtor and the Hotel Manager includes, "*furnishings, wall coverings, fixtures, equipment, and systems (except equipment and fixtures attached to and forming a part of the Improvements associated with the Hotel Manager*"[7]. A review of the tax returns shows that these items are being expensed rather than depreciated. This is an incorrect treatment of these items because they are depreciable items not items to be expensed. Expensing of the items, as opposed to depreciating, provides a higher amount for deductions and potentially decreases net income below what it would be if depreciation was taken. Consequently, the flow through to the member's (Principals) personal tax return would be less, reducing taxable income to the members.

The depreciation expenses are yet another item which seems questionable with a Hotel Manager operation. According to the Examiner's report, the Debtor owns a 147-room boutique Hotel Manager in Williamsburg, New York. Given the size of the Hotel Manager operation it stands to reason that a Hotel Manager would have furniture, linens and many other associated items that are subject to depreciation. However, in 2017 the depreciation expense reported on the tax return of the Hotel Manager was only $22,172 and it was taken on page 1 of the tax return and on the M-1 Schedule of the balance sheet. It is unknow what items are being depreciated for tax purposes because the form 4562 was not included with the documentation provided.

In one of the 2018 tax returns (dated 2/24/2022) there is a depreciation expense of $67,527. Like the 2017 tax return, the depreciation is being taken on page 1 of the tax return and on the M-1 schedule of the balance sheet for tax purposes. It is unknow what items are being depreciated for tax purposes because the form 4562 was not included with the documentation provided.

The other 2018 tax return (dated 2/24/2021) does not have depreciation on the form. Likewise, for 2019 there is no depreciation expenses on the tax return. For 2020, the depreciation taken on the tax return amounts to $310,171. The depreciation is being taken on page 1 of the tax return and on the M-1 schedule of the balance sheet for tax purposes. Because form 4562 was not included with any of the tax returns provided for review, at this time we cannot determine what is actually being depreciated or whether the items being depreciated are consistent with a Hotel Manager's operation.

---

[7] Services Agreement

The treatment of depreciable items is yet another indication that these tax returns are inaccurate, are potentially false and require further scrutiny.

## C. AGREEMENT BETWEEN DEBTOR AND HOTEL MANAGER

A review of the Services Agreement indicates that there is a fee owed by the Debtor to the Hotel Manager and in the section "definitions" it states that *"Manager 's Fees means, collectively, the Base Management Fee, the Incentive Fee, and any other fees payable to the Manager."*[8]

However, a review of the tax returns for the Hotel Manager and the Debtor show that it is the Hotel Manager that pays the Debtor a "property" fee which in some instances is not even expensed by the Hotel Manager as discussed earlier in this report.

Under Article III, Section 3.01, of the Service Agreement, it states that; *"Owner* (Debtor) *hereby retains Manager to manage and operate the Hotel commencing…"* This seems to suggest that the Debtor will be paying a fee for services provided to the Hotel Manager.  However, the reality is just the opposite.  The Debtor's returns for 2017, 2018 and 2019, show an expense for *"property Fee from the Williamsburg Hotel BK LLC"*[9].

According to the Examiner's report, during the course of his investigation and confirmed by Jeremy Rauch (Director of Finance for the Hotel Manager), the Examiner learned that 100% of all revenue earned by the Debtor was deposited into the Hotel Manager's bank accounts.  The revenue and expenses belonged properly on the Debtor's tax returns not the Hotel Manager's.  Hiding or transferring income with relatives or related entities is another badge of fraud that is present in the tax returns examined.

## D. ASSIGNMENT OF INCOME

Given that, 100% of all revenues earned by the Debtor were deposited into the Hotel Manager's bank accounts, and reported on the Hotel Manager's tax returns, this bring up the question; What is "Assignment of Income" under the Tax Law?

Gross income is taxed to the individual who earns the income or to owner of the property that generates the income.  The assignment of income doctrine is rooted in case law. The United States Supreme Court created the assignment of income doctrine in the *Lucas v. Earl*[10] decision.

---

[8] Service Agreement, Definitions, Manager's Fee.
[9] 2017 through 2019 Debtor's tax returns.
[10] Lucas v. Earl, 281 U.S. 111 (1930).

The progressive tax rate structure of the Code taxes income at a higher rate as a taxpayer's income increases. Hence, it stands to reason that if income assignment were permitted, higher income individuals would shift income to taxpayers in lower brackets. Although the Debtor and the Hotel Manager are both flow-through entities, in an assignment of income scenario the flow-through could shift taxable income or create losses (through the K-1) to individual in lower tax brackets, particularly in related or commonly control entities. Moreover, by manipulating the reporting of income and expenses, the Debtor and Management Company can actually affect reportable taxable income. It is my opinion that is what Ms. Moskovits and Mr. Lichtenstien did here.

Section 61 of the Internal Revenue Code provides that, except as otherwise provided by law, gross income means all income from whatever source derived. Nothing in the definition of what is taxable income supports the assignment of income. Under the "assignment of income doctrine," a taxpayer may not avoid tax by assigning the right to income to another taxpayer.

In this case, by reporting the income of another entity (which is also controlled by Ms. Moskovits and Mr. Lichtenstein) the flow through of income is effectively shifted from one entity to another. On this issue, there are no disclosures on any of the Debtor's or Hotel Manager's tax returns alerting the IRS that income has been shifted from the Debtor to the Hotel Manager. Hiding or transferring income with relatives or related entities is a badge of fraud which cannot be ignored.

Moreover, all of the explanations, in all of the depositions (made available to the undersigned) provided by the Principals, regarding the reasons why the income or revenue was reported on the Hotel Manager's tax returns, is not consistent with known tax laws. In fact, all the explanations provided by the Principals are incongruent, misleading, and complete devoid of anything found in the Internal Revenue Code, Revenue Procedures or Treasury regulations. Absent any explanation rooted in tax law, or any justification based on IRS or Treasury regulations, there is no justifiable reason for the assignment of income from the Debtor to the Hotel Manager. In fact, shifting the revenue as mentioned above is a red flag of fraud and makes these tax return false. The Service Agreement between the Debtor and the Hotel Manager does not change or control how income is to be reported. The tax laws do.

The testimony provided by Ms. Moskovits and Mr. Lichtenstein in their depositions actually shows that they had knowledge that tax returns needed to be filed. In fact, the 2020 original tax returns for the Debtor, the Hotel

Manager's original 2018 and 2019 tax returns, plus the second tax return for the Hotel Manager for 2019, show dates in 2021. The incongruent, inconsistent, misleading, and incompletely explanations provided by the Principals furthermore show a pattern of activity that can, if shown to be willful, give raise to potential false tax returns in violation of Section 7206(1). The relevant statutes are discussed later in this report.

In taxation, gross income is taxed to the individual who earns it or to the owner of property that generates the income. Simply stated, a taxpayer may not avoid taxes by assigning the income to another.

The assignment of income doctrine is frequently applied to assignments to creditors, controlled entities, family trusts and charities. Also, for tax purposes, a taxpayer cannot assign income that has already accrued from property the taxpayer owns. This aspect of the assignment of income doctrine is often applied to interest, dividends, rents, royalties, and trust income.

Section 451(a) of the IRC provides that items of gross income shall be included in gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Section 1.451-1(a) of the Income Tax Regulations provides that under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy (the "all-events test"). All events that fix the right to receive income occur when (1) the required performance takes place, (2) payment is due, or (3) payment is made, whichever happens first. See Schlude v. Commissioner, 372 U.S. 128 (1963).

Thus, despite whatever agreement exists between the Hotel Manager and the Debtor, the assignment of income for tax purposes is guided by the IRC and case law not by any agreement between parties that have potentially other interest in mind when assigning the income.

### E. EXAMINER FINDINGS

In his examination, the Examiner discovered that; *"multiple sources confirmed that operation of the Hotel Manager is the Hotel Manager's only business. The Examiner discovered that not only were the Debtor's and the Hotel Manager's bank accounts linked, 13 numerous other Principal-controlled entities' accounts were linked to the Hotel Manager accounts. These linkages (online banking connections) allowed for seamless funds flow between the Hotel Manager and Debtor as well several unaffiliated business entities owned by the principals, and, in some instances, individuals. Indeed, the Examiner reviewed records*

*for 50 bank accounts and over 48,000 banking transactions from, to, and among the Debtor, the Hotel Manager and other bank accounts linked to accounts in the name of the Debtor or the Hotel Manager. At times, hundreds of banking transactions occurred in a single day".*

In one of the procedures applied in this engagement, the undersigned reviewed the bank statements of the Debtor and the Hotel Manager as well as an excel spreadsheet labeled "Master" which detailed transfers between the hotel operations and other companies.  This procedure was applied in order to independently determine and verify transfer activity between entities and to corroborate the assertions regarding the multiple transfers between entities articulated in the Examiner's report. I understand that the "Master" spreadsheet provided to Benefit Street, was created by the Examiner to summarize the transfers that he examined.

We traced approximately 190 transactions from the multiple bank accounts (source documents) from the "Master" excel spreadsheets detailing the transfers between various entity accounts.  There were no exceptions in the results of the tracing.  All of the transactions examined by the undersigned (movement of funds) represented in the "Master" excel spreadsheets were verified (corroborated) by the bank account statements.  Based upon my review of the underlying bank account statements, the "Master" excel spreadsheet appears to be accurate.

The movement of funds between accounts as detailed in the Examiner's report seems inconsistent with the relationship established by the Service Agreement between the Hotel Manager and the Debtor.  Nothing in the Service Agreement makes refence or specifically allows for conducting business by having so many transfers between accounts.   In addition, to the movement of funds between accounts to which the Examiner refers in his report and summarized in a document titled "*96 Wythe Acquisition: Analysis of Bank Transactions 2017-2020*"[11], there are other indications that the transactions between the Hotel Manager and the Principal's affiliated entities are not necessarily at arm's-length or have a legitimate tax purpose.

In my experience, the banking activities and movement of funds described in the Examiner's report when combined with the lack economic substance and individuals attempting to hide the nature and source of the fund at issue are typically illustrative of activity that I have observed in tax evasion schemes, Ponzi Schemes and other frauds, and are another badge of financial activity designed to hide, confuse and obstruct in tax fraud schemes.

---

[11] Examiner's Report

As stated by the Examiner; "*In this regard the Debtor and Hotel Manager utilized online banking functions within both Chase and Bank of America. Online banking transactions do not show full account number information, thus eliminating the transparency of the transaction from the reader of the respective bank statements.*"

It is the lack of transparency that allows for transactions that lack economic substance to be easily detected.   This pattern of activity is consistent with fraud schemes and is a red flag of fraud.   For example, in a tax fraud investigation the activity cited by the Examiner would be considered acts that would tend to show intent to defraud (items of intent /willfulness are discussed later in this repot) because of, among other things, the lack of transparency.   The refusal of the Principals to provide this transparency when asked directly at depositions reinforces the belief that this lack of transparency is not just happenstance but that it is deliberate and intentional on their part.   Otherwise, it raises the question of if simple explanations or sound business purposes existed for this activity, why were they not provided?

Another item mentioned in the Examiner's report is that; *"Revenue generated by the Debtor was never deposited into the Debtor's bank accounts, but instead, was deposited into the Hotel Manager 's bank accounts."*   In my experience having investigated numerous fraud schemes including, tax fraud schemes, using other party's accounts in this manner is another red flag that is consistent with fraudulent activity.

Based on the facts uncovered by the Examiner, and as mentioned in his report, "*the funds flow used by the Hotel Manager and the Debtor is both unconventional and inconsistent with commercial accounting principles."*   I concur with the Examiner's conclusions.

According to the Examiner, the banking structure implemented by the Hotel Manager prevented proper disclosure.   The Hotel Manager collected all the money, while the Debtor incurred all the expense*.   "This made it difficult to determine the exact expenses of the Debtor and to match it to the related income. The banking system shows that significant sums were transferred in and out of the Debtor and Hotel Manager accounts to and from business enterprises that do not relate to the Debtor's business.".*   I also concur with this conclusion by the Examiner.

The Examiner states in his report that, "B*asic accounting principles state that the expenses of an entity must be matched against the entity that generated the income".*   This accounting principal, also known as the matching principal is also found in taxation.

In taxation, the concept of matching revenue with expenses is basic to the preparation of a tax return. So much so that the IRS has broadened tax matching beyond the traditional matching of revenue and expenses to include payer/payee matches. The matching principal seeks to match transactions that one taxpayer can record as a deduction, to what another taxpayer must report a similar amount of income in the same period. This, therefore, results in income and expenses being matched, but for different taxpayers. A simple example is when an employer takes a deduction for wages paid and the recipient (employee) of the wages reports them as income.

In his deposition (Pg 121, Ln 1-25 and Pg. 122, Ln 1-25) Mr. Lichtenstein was unable to provide any logical explanations or sound economic reasons for the multiple transfers detailed in the Examiner's report. The reading of Mr. Lichtenstein's transcripts shows a variety of explanation none which can be attributed to established business or economic reasons. The lack of congruent explanations, where they exist, is yet another indication of an attempt to hide information. In my experience hiding information which would tend to be exculpatory or explain an activity is an indication that fraud may be present.

Thus, the Examiner's findings regarding the handling of subject bank accounts and transactions established (and the Examiner obtained information) that the Principals (Ms. Moskovits and Mr. Lichtenstein) effectuated virtually all of the transactions between the Hotel Manager, Debtor and unaffiliated principal owned entities. The Examiner's report states that *"Revenue generated by the Debtor was never deposited into the Debtor's bank accounts, but instead, was deposited into the Hotel Manager 's bank accounts."* That being the case, this activity is consistent with tax evasion schemes that are in essence designed to hide or shelter income and evade taxes.

The transactions and activity cited by the Examiner do not appear to have economic substance or the transparency required for the proper reporting of income and expenses on a tax return. If, indeed, logical explanations as to the reasons for the transfers are available, as a financial investigator my question is, why were they not provided?

This unusual activity may explain why in 2019 and 2020, the "fees" being paid by the Debtor were not expensed by the Hotel Manager. However, as of the date of this report, the tax return preparer had not been deposed and any explanation from the tax return preparer, if any, for this activity are not available.

In this matter based on the examination of the Hotel Manager and the Debtor's numerous bank accounts, the Examiner concluded that, *"The Hotel Manager collected all the money, while the Debtor incurred all the expenses."* This activity apparently made it difficult for the Examiner *"to determine the exact expenses of the Debtor and to match it to the related income."* If the Examiner encountered so much difficulty in being able to match income and expenses for each of the Debtor and Hotel Manager, it stands to reason that without a tax audit, the IRS would not necessarily be able to know that this activity was taking place either. Accordingly, this activity is consistent with the red flags of tax fraud.

In the undersigned's experience in investigating, and approving, tax fraud and other fraud investigations, the movement of funds as characterized by the Examiner, and the use of multiple accounts without economic purpose, is conduct typically associated with Ponzi schemes and or fraudulent activity.

As stated by the Examiner, the fact of *"the principals"* being in control of both sides of the accounting ledger, prevents open disclosure of financial and accounting transactions, and allows for the siphoning of funds (from the Debtor and through the Hotel Manager) to unrelated entities controlled by Principals and possibly other transferees.

This conclusion by the Examiner, along with all of the irregularities, omissions, and misstatements on the tax returns of the Hotel Manager and the Debtor referenced above, when taken as a whole indicates activity that can be used to establish willfulness (intent) on the part of the principals in a tax fraud investigation. Likewise, the same activity can be used to establish willfulness (intent) for the tax preparer in a tax investigation seeking to establish a violation under section 7206(2).

In addition, the Examiner's report states that *"The Principals obstructed the Examiner's investigation, by actions and inactions, including significant delays in document production, interference with third party subpoenas, and refusal to answer questions regarding thousands of financial transactions"*.

In a tax investigation seeking to establish tax fraud (tax evasion), the activity described above would be considered factors that can be used to establish willfulness (intent). Acts that have the effect of misleading or concealing materials facts from the Government are affirmative act of evasion[12].

---

[12] Spies v. United States, 317 U.S. 492, 499 (1943).

## VII. RELEVANT STATUTES:

The conduct and acts discussed in the Examiner's report along with all of the observations and findings contained in this report regarding the tax returns of the Debtor and Hotel Manager, are matters that would fall under the prevue of the IRS and related statutes including:

### a. 26 U.S.C § 7201 - Attempt to evade or defeat tax[13]

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

Elements of the Offense[14].

1. an additional tax due and owing

2. an affirmative attempt in any manner to evade or defeat any tax, or the payment thereof willfulness

3. A defendant may be found guilty of tax evasion for failure to file a tax return or pay a tax due if the element of willfulness is present with an affirmative act, such as concealment by the taxpayer. For example, requesting to be paid in cash in order to conceal taxable income.

### b. 26 U.S.C. § 7203 - Willful Failure to File

The crime of willfully failing to file a return has three elements: First, the taxpayer:

1. willful failure to make any type of required return
2. a willful failure to pay any estimated tax or tax
3. a willful failure to keep records
4. a willful failure to supply information

---

[13] The landmark case which established that the term "willfully" requires specific subjective intent is Cheek v. United States, 498 U.S. 192 (1991). Petitioner Cheek was charged with six counts of willfully failing to file a federal income tax return in violation of § 7203 of the Internal Revenue Code and three counts of willfully attempting to evade his income taxes in violation of § 7201.

[14] IRS manual part 9, section 9.1.3.3.2.2

Elements of the Offense[15]

Part 9, Section 9.1.3.3.4.1.3 defines willfulness as:

Willfulness means the voluntary, intentional, violation of a known legal duty.

The government must establish that the failure to file the return was willful. However, as distinguished from willfulness in a tax evasion investigation, the government need not prove a tax evasion motive. In this context, "willful" means voluntary, purposeful, deliberate, and intentional, as distinguished from accidental, inadvertent, or negligent.

### c. 26 U.S.C. §7206 - Fraud and False Statements[16]

The offenses proscribed by 26 U.S.C. § 7206 include:

1. willfully making a false declaration under penalties of perjury

2. willfully assisting in the preparation of a false tax document

3. executing fraudulent bonds, permits and entries

4. removing or concealing taxable goods with intent to defraud

5. willfully concealing property or withholding/falsifying documents in connection with any compromise or closing agreement

Under 26 U.S.C. § 7206, a violation of the statute is punishable by a maximum fine of $100,000 ($500,000 in the case of a corporation), or imprisonment of not more than three years, or both, together with the costs of prosecution. However, the criminal fine provisions under 18 U.S.C. § 3571 increase the maximum permissible fines for a violation of 26 U.S.C. § 7206 to not more than $250,000 for individuals and $500,000 for corporations. Alternatively, if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.

---

[15] IRS manual Part 9, section 9.1.3.3.4
[16] IRM part 9, section 9.1.3.3.7

### d. 26 U.S.C. § 7206(1) (False or Fraudulent Return, Statement, or Other Document Made Under Penalty of Perjury) – Elements of the Offense[17]

In general, a person who willfully makes and subscribes, under penalty of perjury, any return, statement, or other document, which he/she does not believe to be true and correct as to every material matter, has committed a criminal offense under 26 U.S.C. § 7206(1).

The elements of this offense are:

the making and signing of a return, statement or other document containing a written declaration that it was signed under the penalties of perjury the inclusion in the document of information that was false as to a material matter the defendant's lack of belief that the document was true and correct as to every material matter

willfulness (see IRM, part 9, subsection 9.1.3.3.2.2.3)

This code section may apply regardless of whether the defendant's purpose was to evade or defeat the payment of taxes. For example, prosecution for this offense may be appropriate when the government is able to prove the falsity of a partnership return, even if the government is not able to prove a resulting tax deficiency.

A matter is material if:

it must be reported for a correct computation of tax it tends to influence or is capable of influencing the ability of the Service to audit or verify the accuracy of the return or a related return It is not necessary that the false statement actually affect the Service or that the Service actually rely on the statement.

Although the offense is complete upon signing the statement or document, prosecutions under this section should involve only false returns or statements presented to or filed with the IRS. This sanction is appropriate when it is possible to prove the falsity of a return, but it is difficult to establish a tax deficiency, or when the falsification results in a relatively small amount of tax evaded when compared to the total tax liability.

If an individual files a false and fraudulent return, it is possible for him/her to incur criminal liability both for attempting to defeat and evade the payment of tax and for making a false and fraudulent statement under penalty of perjury.

---

[17] IRM part 9, section 9.1.3.3.7.1

### e. 26 U.S.C. § 7206(2) (Aid or Assistance in Preparation or Presentation of False or Fraudulent Return, Affidavit, Claim or Other)

Section 72016(2) is not outlined in this report at this time because as of the date of this report, the return preparer, Mr. Norensberg, had not been deposed. Although there are acts discussed in this report which can be attributable to the conduct under § 7206(2), the undersigned believes that it is more appropriate to postpone the discussion of this statute until after Mr. Noresberg has had the opportunity to provide a statement with regard to the preparation of the returns he prepared. The undersigned reserves the right to amend this report as is appropriate.

### VIII. WILLFULNESS AND INTENT:

As can be read from the statues presented above, the element of willfulness is an element of each of the criminal offenses reference herein. The Internal Revenue Manual, Part 9, serves as a guide for IRS Special Agents in the investigation of tax crime and related offenses. The reference to willfulness in this report is made in the context of potential violation of the Internal Revenue Code, and the Criminal Investigation Division which has sole authority for the investigation of these offenses. Therefore, it is relevant to the conclusions in this report.

### a. Items of Intent[18]

The conduct and acts discussed in the Examiner's report, including the acts of obstruction and concealment of information discussed herein and as further evidenced in the deposition transcripts of Ms. Moskovits and Mr. Lichtenstein, along with the observations and findings contained in this report regarding the tax returns of the Debtor and Hotel Manager, are matters that would fall under the preview of the IRS.

The affirmative acts by Ms. Moskovits and Mr. Lichtenstein can be construed as willful conduct giving rise to tax evasion under the foregoing provisions.

---

[18] Black's law dictionary defines intent for purposes of criminal law and the law of evidence as a "formulated design; a resolve to do or forbear a particular act; aim; determination". According to the dictionary's definition "Intent" expresses mental action at its most advanced point, or as it actually accompanies an outward, corporal act which has been determined on- Intent shows the presence of will in the act which consummates a crime. It is 'the exercise of intelligent will, the mind being fully aware of the nature and consequences of the act, which is about to be done, and with such knowledge, and with full liberty of action, willing and electing to do it. Burrill, Circ. Ev. 284. and notes.

During the conduct of numerous investigations over a 40-year career in criminal investigations, tax and other frauds, the undersigned has written numerous reports wherein the following factors have been used to document willfulness and intent.

1. Subscribing to tax returns which on their face appear to be incomplete, inaccurate, omit required information and are inconsistent with revenue reporting requirement (assignment of income) and accounting standards.

2. Maintaining inadequate records or destroying record.

3. Providing implausible or inconsistent explanations during bankruptcy proceedings and or failing to provide information.

4. Filing false tax returns

5. Intentionally underreporting or omitting income (Assignment of income)

6. Hiding or transferring income with relatives or related entities

7. Arranging affairs that lack economic substance

## IX.    CONCLUSIONS – OPINION

The evidence examined in this matter includes depositions of the Principals and employees of the Hotel Manager with knowledge of the financial affairs of the Debtor, the Examiner's report, Bank account statements, summaries of transactions and transfers between accounts, tax returns for the Debtor and the Hotel Manager and other documentation served as support for reaching the conclusion that the conduct of the Debtor's and the Hotel Manager's tax affairs are inconsistent with established tax statutes and IRS and Treasury regulations.

After a careful examination and analysis of all of the evidence available to the undersign in this matter, and after a careful review of source documentation (bank accounts) and tracing transactions detailed in "Master" excel spreadsheets provided with the Examiner's report to the undersigned it seems clear that for example the multiple transfers between the accounts of the Debtor, the Hotel Manager and other entities controlled by the Principals, lack economic substance from a tax perspective.  Indeed, in deposition testimony neither of the Principals were able to explain an economically valid reason(s)

for the transfers between the Debtor and Hotel Manager. Based on my experience investigating fraud and tax frauds, in particular, the manner in which transfers were effectuated with significant transfers of funds to and from entities in one day or sequential days, in the same amounts are indicative of activity associated with tax fraud (tax evasion) and Ponzi schemes.

Moreover, the examination (review) of the Debtor's and the Hotel Manager's delinquent tax returns for the years 2017 through 2020 including amended tax returns shows that income was improperly assigned from the Debtor to the Hotel Manager without any justification rooted in the tax code, or IRS and Treasury regulations. In fact, the Principals, in their depositions provided incongruent explanations as to why the income had been assigned from the Debtor to the Hotel Manager. This practice of transferring funds through multiple accounts without an economic purpose can bring unnecessary exposure to a tax audit exposing the Debtor to potential tax liability, penalties, and interest if tax deficiencies are found. On the criminal side, this activity would be used to established attempts to evade taxes.

In her deposition Ms. Moskovits testified that "*it was our practice to file tax returns when the property started to cash flow*". She also stated that, "*I did what my accountant told me to do*". Under questioning, she testified in her deposition that there was no need to file tax returns, "*because it didn't need to be filed until stabilization*".

Similarly, Mr. Lichtenstein testified at his depositions that, "*so someone told you back in 2018 that the debtor was not required to file its 2017 US return until the hotel was stabilized*". The alleged source of this advice is unspecified. He also testified that *there were no taxes due*" as a reason for not filing timely returns if, in fact, the returns were filed.

All of the explanations provided by the Principals in their respective depositions as to why the returns were filed late if, in fact, filed are incongruent, inconsistent, misleading and none of the explanations provided are acceptable reasons for not filing a return.

The explanation about the late filings along with the Principals' inability to provide sounds and logical business explanations about numerous aspects of the conduct of business by the Debtor and the Hotel Manager coupled with the lack of cooperation as detailed in the Examiner's report, are clear indications of a pattern of obstruction and an effort to cover up indicia of tax evasion (tax fraud).

Furthermore, the explanations provided by the Principals regarding the assignment of income, are inconsistent and incongruent and are completely devoid of anything rooted in the Internal Revenue Code, Revenue Procedures or Treasury regulations.

In addition, all of the Debtor's and the Hotel Manager's tax returns show serious irregularities in the form of omissions, incompleteness and inaccuracies that further add to the flag of fraud found in tax fraud investigations.

Moreover, based on the prevalence of missing critical and required information on the Debtor's and Hotel Manager's tax returns, including the lack of a preparer signature and in addition the Debtor's failure to provide any proof or either electronic or mail-in filing strongly indicates that the subject tax returns may not have been filed at all.   Based on my experience preparing tax returns using professional tax software I can state unequivocally that it is improvable and unlikely that the returns, if filed, were filed electronically.

An account transcript from the IRS or electronic proof of filing generated by the preparer's tax software would provide positive confirmation that the tax returns were in fact filed.   No such proof has been made available to the undersigned.

Thus, objectively, and considering the totality of the information and facts available, it is my opinion, that there are numerous red flags of tax fraud present in the conduct of the Principals relating to the Debtor and the Management Company.

Further, it is my opinion based on my experience and based upon my analysis and supported by the findings in the Examiner's report that sufficient prima facie evidence exists reflecting that there is a likelihood that the Principals have committed tax offenses with respect to the affairs of the Debtor and Management Company.

Luis O. Rivera, CPA
MRW Consulting Group, LLP
May 9, 2022

# LIST OF DOCUMENTS EXAMINED
## ATTACHMENT A

1  In re 96Wythe - DE 31 - Schedules
2  In re 96Wythe - DE 205 - Schedules - Amended
3  In re 96Wythe - DE 411 - Schedules - Amended D
4  Transcript - KIRSCHNER Tax- highlighted
5  Transcript - LICHTENSTEIN - VOL I Tax - highlighted
6  Transcript - LICHTENSTEIN - VOL II Tax - highlighted
7  Transcript - LICHTENSTEIN - VOL III Tax - highlighted
8  Transcript - MOSKOVITS - VOL I Tax- highlighted
9  Transcript - MOSKOVITS - VOL II TAX- highlighted
10 Transcript - RAUCH Tax- highlighted
11 96 Wythe Acq - All transactions - 2017 - 2020 - 022722
12 2017 - Tax Returns - IRS - 96 Wythe Acquisition
13 2018 - Tax Returns - IRS - 96 Wythe Acquisition
14 2018 Purported Form 1065 - The Williamsburg Hotel Manager BK LLC
15 2019 - IRS, NYS, NYC- The Williamsburg Hotel BK
16 2019 - Tax Returns - IRS - 96 Wythe Acquisition
17 2019 Purported Form 1065 - The Williamsburg Hotel BK LLC
18 2020 - IRS, NYS, NYC- The Williamsburg Hotel BK
19 2020 - Tax Returns - IRS - 96 Wythe Acquisition - amended
20 2020 - Tax Returns - IRS - 96 Wythe Acquisition-
21 2020-Q3_Employer_s_Quarterly_Federal_Tax_Return - TWH
22 2020-Q4_Employer_s_Quarterly_Federal_Tax_Return - TWH
23 DE 418 - Examiner Report - Huebscher
24 DE 420 - Counter Report and Response to Examiner Report
25 DE 465 - Examiner Report - Huebscher - supplement
26 Funds flow chart - 022722 - FINAL
27 In re 96 Wythe - Williamsburg Matter - Related Documents
28 MASTER 03112022
29 TWH - Hotel Manager - Funds Flow Detail - 022722
30 96 Wythe - Equity & Loans Report
31 LOC 6.8.16
32 LOC Amendment 11.8.17
33 Owner's Loans Transfers Report
34 Transfers from Hotel Operations to Northside
35 Transfers from Northside to 96 Wythe
36 0102 The Williamsburg Hotel LLC - BoA Statements 2020 through 2021
37 0588 215 Moore St Acquisition LLC - BoA Statements 2018 through 2021
38 0696 Mint Development Corp - BoA Statements 2020 through 2021
39 2536 286 Rider Ave Acquisition LLC - BoA Statements 2019 through 2021
40 2703 The Williamsburg Hotel BK LLC Payroll - BoA Statements 2018 through 2021

41 2855 The Williamsburg Hotel BK LLC Master - BoA Statements 2018 through 2021

42 3162 The Williamsburg Hotel BK LLC - BoA Statements 2021

43 3283 215 Moore St Development LLC - BoA Statements 2018 through 2021

44 4076 Northside Acquisition Partners LLC - BoA Statements 2018 through 2021

45 4102 Northside Acquisition Partners LLC - BoA Statements 2018 through 2021

46 4400 The Williamsburg Hotel (1) - BoA Statements 2020 through 2021

47 4421 232 Seigel Development LLC - BoA Statements 2020 through 2021

48 4470 875 4th Ave Acquisition LLC - BoA Statements 2018 through 2021

49 4483 875 4th Ave Acquisition LLC - BoA Statements 2018 through 2021

50 4662 564 St Johns Acquisition LLC - BoA Statements 2018 through 2021

51 4831 The Williamsburg Hotel BK LLC - BoA Statements 2018 through 2021

52 5051 232 Seigel Acquisition LLC - BoA Statements 2018 through 2020

53 5246 Northside Development - BoA Statements 2018 through 2021

54 5758 Mint Development Corp - BoA Statements 2018 through 2021

55 6729 Heritage GC Walton Acquisition LLC - BoA Statements 2019 through 2021

56 7358 96 Wythe Acquisition LLC - BoA Statements 2018 through 2021

57 9138 215 Moore St Acquisition LLC - BoA Statements 2019 through 2021

58 9206 96 Wythe Acquisition LLC - BoA Statements 2020 through 2021

59 9398 96 W Development LLC - BoA Statements 2018 through 2021

60 9625 564 St Johns Holdings LLC - BoA Statements 2018 through 2021

61 9641 564 St Johns Holdings LLC - BoA Statements 2018 through 2021

62 0988 215 Moore St Acquisition LLC - Chase Bank Statements 2017 through 2021

63  1379 Building Development Corp - Chase Bank Statements 2017 through 2018

64 1798 564 St Johns Partners LLC - Chase Bank Statements 2017 through 2021

65 2128 Mint Development Corp - Chase Bank Statements 2017 through 2019

66 2297 96 Wythe Acquisition LLC - Chase Bank Statements 2018 through 2019

67 2699 Northside Management LLC - Chase Bank Statements 2017 through 2021

68 3138 564 St Johns Partners LLC - Chase Bank Statements 2017 through 2021

69 3509 Brooklyn Bread Lab - Chase Bank Statements 2017 through 2021

70 3906 96 Wythe Acquisition LLC - Chase Bank Statements 2017 through 2018

71 7071 564 St Johns Partners LLC - Chase Bank Statements 2017 through 2021

72 7255 Northside Development Holdings LLC - Chase Bank Statements 2017 through 2021

73 7387 Northside Acquisition Partners LLC - Chase Bank Statements 2017 through 2021

74 8317 The Williamsburg Hotel BK LLC - Chase Bank Statements 2017 through 2018

75 8662 The Williamsburg Hotel BK LLC - Chase Bank Statements 2017 through 2018

76 8878 Northside Acquisition Partners LLC - Chase Bank Statements 2017 through 2021

77 8898 564 St Johns Partners LLC - Chase Bank Statements 2017 through 2021

78 9022 96 W Development LLC - Chase Bank Statements 2017 through 2018

79 9637 The Williamsburg Hotel BK LLC - Chase Bank Statements 2018

80 0927 DIP 96 Wythe Acquisition LLC - TD Bank Statements 2021

81 0935 DIP 96 Wythe Acquisition LLC DIP - TD Bank Statements 2021

82 1596 The Williamsburg Hotel BK LLC - TD Bank Statements 2021

83 1603 The Williamsburg Hotel BK LLC Payroll - TD Bank Statements 2021

84 1611 The Williamsburg Hotel BK LLC - TD Bank Statements 2021

85 96 WYTHE ACQUISITION LLC DBA THE WILLIAMSBURG HOTEL - MOR Report Nov. 2021

86 96 WYTHE ACQUISITION LLC DBA THE WILLIAMSBURG HOTEL - TD Bank Statement Jan. 2022

## **Exhibit C**

**Supplement to Expert Report of Luis O. Rivera, CPA**

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

**In re:**

## 96 WYTHE ACQUISITION LLC,

Debtor

**Case No. 21-22108 (RDD)**

**Chapter 11**

## SUPPLEMENTAL REPORT

May 11, 2022



*Strategies from Numbers* ®

MRW Consulting Group, LLP
950 S Pine Island Road
Plantation, FL 33324

**MRW Consulting Group, LLP**
**950 S Pine Island Road, Suite A 150**
**Plantation, FL 33324**

## INDEX

I.     **INTRODUCTION:**

II.     **RECORDS AND DOCUMENTS EXAMINED:**

   Deposition of Daniel Norensberg of Norensberg and Associates

   ATX Error Report

III.     **SUPPLEMENTAL INFORMATION AND CHANGES TO REPORT DATED MAY 9, 2022:**

IV.     **CHANGES TO THE ORIGINAL REPORT:**

V.     **ADDITIONAL PROCEDURES APPLIED:**

VI.     **CONCLUSIONS – OPINION:**

**MRW Consulting Group, LLP**

**950 S Pine Island Road, Suite A 150**
**Plantation, FL 33324**

## Supplemental Report

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**In re:**
**96 WYTHE ACQUISITION LLC,**
**Debtor**
**Case No. 21-22108 (RDD)**
**Chapter 11**

### I.  INTRODUCTION:

In connection with the above referenced matter, the undersigned attended the deposition of Daniel Norensberg of Norensberg and Associates.  At the deposition, Mr. Norensberg provided additional information about the preparation of the tax returns for both the Debtor and the Hotel Manager including the tax software used to prepare the tax returns.

On the basis of the new information obtained at the deposition, this supplemental report makes certain changes to the report published on May 9, 2022 ("original report").

### II.    RECORDS AND DOCUMENTS EXAMINED:

Deposition of Daniel Norensberg of Norensberg and Associates

### III.    SUPPLEMANTAL INFORMATION AND CHANGES TO REPORT DATED MAY 9, 2022:

This supplemental report incorporates by reference all of the views, findings and opinions expressed in the ("original report"), except for the information being revised by this supplemental report.

The changes in this supplemental report are primarily to the views, findings and opinions expressed throughout the original report regarding the filing of electronic returns by the preparer.  This supplemental report makes changes to the original report based on the deposition testimony of Mr. Norensberg

taken on May 10, 2022, as well as other procedures (described below) applied to the matter.

### IV.    CHANGES TO THE ORIGINAL REPORT:

The sections of the original report that are revised by this supplemental are as follows.

Under the heading "Findings" page 8 and 9 of the original report, there is a section addressing the filing of returns electronically.   The original report states on page 8, last paragraph that,

> "*based on my experience preparing returns using professional tax software, I can state unequivocally that it is improbable and unlikely that the returns, if filed, were filed electronically.*"

The software I was referring to in that statement was the ATX professional tax software that I use to prepare returns.  The ATX software does not allow for electronic filing of tax returns if certain fields on the tax returns are not completed.  For example, the fields on page 2 and 3 of the tax returns for years 2019 through 2020 for the Debtor and the Hotel Manager, including the amended 2020 for the Debtor, contained fields (questions) with unchecked boxes.   The ATX software requires those boxes to be completed before a return for filing is created and the return is filed.

Further, on page 9 of the original report, paragraph 2, it states that,

> "*As of the date of this report, because Mr. Norensberg had not been deposed (scheduled for May 10, 2022), it is unknown what tax software he may have used to prepare these returns or whether the software used would allow electronic filing of incomplete returns.   Therefore, if additional information becomes known and or available regarding the filing of the tax returns, the undersigned reserves the right to amend this opinion and or the conclusions in this report to reflect any new information.*"

In addition, to the above, other sections of the original report expressing views and opinions addressing the filing the electronic tax returns are found on page 10, 4th paragraph, page 12, 1st paragraph, page 13, 3rd paragraph, page 15, 6th paragraph, and page 36 2nd paragraph.

## V.    ADDITIONAL PROCEDURES APPLIED:

During Mr. Norensberg deposition on May 10, 2022, which I attended, I learned for the first time, that Mr. Norensberg used the "Drake" tax software to prepare the Debtor's and Hotel Manager's tax returns for the years 2017 through 2020 including the 2020 amended Debtor's return.

As a test, I created two "dummy tax returns" on my ATX tax preparation software. One for the Debtor's 2020 amended tax return and one for the Hotel Manager's 2019 tax return. I then performed the "check return" function of the ATX software program on these returns. The ATX program created an error report[1] for each return (Debtor's 2020 amended tax return and Hotel Manager's 2019 tax return) identifying boxes on the returns that "must be checked". Other returns were not tested because the results expected would be the same.

As an additional step, I also called the support line for "Drake" and inquired about the programs capabilities and whether the program would allow for filing of tax returns with the incomplete fields identified in my original report for the Debtor's and Hotel Manager's tax returns. The hotline representative (not identified) related that their software (Drake) would allow for the filing of returns with incomplete fields. The representative stated that the IRS would have to review the filed returns and contact the taxpayer if the returns were subsequently rejected or deemed incomplete by the IRS. This finding is in contrast to the ATX software that I use.

## VI.    CONCLUSIONS – OPINION

Therefore, in consideration of the test perform on the ATX software, the information obtained from the Drake support line and the information obtained from Mr. Norensberg about the software he used, I am revising my views, findings and opinions on the original report regarding electronic filing of the Debtor's and Hotel Manager's tax returns as follows.

Based on the new information, it appears that the Debtor's incomplete tax returns for the years 2019 and 2020 (both original and amended returns) could have been filed electronically.

Further, it appears that the Hotel Manager's incomplete tax returns for the year, 2019 (return dated 05-04-2021), and the 2020 return could have been filed electronically.

---

[1] See attached reports

The returns for both entities for 2017 and 2018 were not filed electronically as confirmed by Mr. Norensberg during his deposition. I am also aware that the IRS will accept electronic returns only for the last three years (on a rolling basis). Thus, in 2022, only 2019 returns and forward can be filed electronically. Accordingly, given the dates of preparation for the 2017 and 2018 returns for both entities, the only way to file them would have been through the postal service. Mr. Norensberg had no knowledge as to whether these returns were ever actually filed and stated that, if filed, it would have been done directly by his clients.

All other views, findings and opinions expressed in the original report remain unchanged.

Luis O. Rivera, CPA
MRW Consulting Group, LLP
May 11, 2022