**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
In re:                                              :
                                                    :   Chapter 11
96 WYTHE ACQUISITION LLC,                           :
                                                    :   Case No. 21-22108 (RDD)
                          Debtor.                   :
                                                    :
--------------------------------------------------------------- X

## DECLARATION OF PETER TOUHILL

I, Peter Touhill, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I submit this declaration in lieu of direct testimony in support of *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based On Continuing Malfeasance* filed by

Benefit Street Partners Realty Operating Partnership, L.P. ("Benefit Street" or "Lender") on March 28, 2022 [Docket No. 476], *Lender's Supplement to Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on April 29, 2022 [Docket No. 533], and any supplemental briefs and replies in support thereof (collectively, the "Trustee Motion").

2. I am an originator in the commercial real estate group at Benefit Street Partners L.L.C. ("BSP"). BSP manages Franklin BSP Realty Trust, Inc., a multi-billion-dollar real estate investment trust ("BSP REIT") that is publicly traded on the New York Stock Exchange (NYSE: FBRT), which is the ultimate holder of 100% of the equity interest in Benefit Street. BSP is a wholly owned subsidiary of Franklin Resources, Inc. (Franklin Templeton), which is one of the world's largest independent investment managers with $1.5 trillion in total assets under management.

3. I am over the age of 18, am competent to testify as to the matters contained herein, and make this declaration upon my personal knowledge. I joined Benefit Street in approximately June of 2014. Currently, I am an originator at Benefit Street, which means that I identify opportunities to negotiate and close loans that Benefit Street's credit committee will approve. My current title is Managing Director. I originated the Loan (defined below) to the Debtor.

4. As an originator, my responsibilities included reviewing certain information submitted to Benefit Street by the Debtor and its owners during due diligence and aid in negotiating the terms of the loan based on such information received and feedback from the applicable credit committee as to the acceptable terms of the proposed transaction. I reviewed pertinent information received from or on behalf of the Debtor and its principals, Toby Moskovits and Michael Lichtenstein, during due diligence in connection with such negotiations, including, without

limitation, information regarding the management of the Debtor's hotel and the assets and liabilities of the Debtor.

**I.    In the Fall of 2017, Benefit Street made a $68 million first priority mortgage loan to the Debtor to finance the completion of construction of the Williamsburg Hotel.**

5.    In the Fall of 2017, Toby Moskovits approached Benefit Street to provide a loan on the Williamsburg Hotel (the "Hotel").  At the time, the Hotel was largely constructed, but certain areas still required completion, including guest rooms on the upper floors, the event space and kitchen and the rooftop area and bar.

6.    From late October through December 2017, the parties negotiated the terms of a $68 million construction completion loan (the "Loan").  On December 13, 2017, the parties closed the loan and Benefit Street funded the principal balance.

7.    At closing, the Debtor and Benefit Street executed and delivered a variety of closing documents.  Among these were a loan agreement (the "Loan Agreement"), a consolidation, modification, spread and extension agreement (the "Mortgage"), and an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees (the "Assignment of Management Agreement").

8.    The Loan Agreement, the Mortgage, the Assignment of Management Agreement are Joint Exhibits 8, 10, 11 exhibits in this proceeding.  Each of these documents was dated as of December 13, 2017.

9.    The Loan Agreement provided for an 18-month term, together with two six-month extensions available upon the satisfaction of specified conditions.  The Loan bore interest at the rate of LIBOR + 6.25% and limited amortization during any appropriately exercised extension option.  The Loan Agreement was intended to provide a short-term bridge loan to allow for the completion of the construction of the Hotel building and facilities.

**II.    The Debtor did not deliver the Purported Management Agreement to Benefit Street during due diligence.**

10.    The Debtor did not deliver the Purported Insider Loan Agreement or Purported Management Agreement to Benefit Street during due diligence or at any time prior to the closing of the Loan.

11.    At the outset of negotiations regarding the Loan, Benefit Street understood that the Hotel would be managed directly by Toby Moskovits and Michael Lichtenstein, who are the individual principals of the Debtor (collectively, the "Insiders").  Shortly thereafter, Benefit Street became aware of Williamsburg Hotel BK LLC (the "Management Company"), an entity also owned and controlled by the Insiders and affiliated with the Debtor, that was managing the Hotel.

12.    On October 30, 2017, Toby Moskovits sent an email to me and others in connection with the due diligence process leading up to the closing of the Loan, in which she states, in response to an inquiry from Benefit Street's external counsel, Margot Wainger, "We do not have a Management Agreement in place."  *See* Benefit Street Exhibit 6.

13.    Upon learning of the existence of the Management Company and the non-existence of any written management agreement, Benefit Street required that the Debtor and Management Company sign a single page management agreement memorializing the basic economic terms of the hotel management relationship between the Debtor and Management Company (the "Management Agreement"), and assigning and subordinating it to Benefit Street, as is consistent with our program.

14.    In my capacity as the originator, I reviewed the documents delivered by the Debtor to Benefit Street in the course of due diligence and negotiation of the Loan.  The only hotel management agreement of which I am aware is the Management Agreement.  At closing, the Debtor, Management Company and Benefit Street signed an Assignment of Hotel Management

Agreement and Subordination of Hotel Management Fees (the "Assignment of Management Agreement"), to which the Management Agreement is attached as Exhibit "A"

15. I understand that, in August of 2021, more than five months into this Bankruptcy Case and almost four years after the Loan closed, the Debtors filed a motion attaching a management agreement, purportedly dated as of November 21, 2017 (the "Purported Management Agreement"), which they claim now governs and has, since closing of the Loan, always governed, the hotel management relationship between the Debtor and Management Company.

16. Neither I, nor, to the best of my knowledge, anyone else at Benefit Street, had ever seen the Purported Management Agreement, nor was its existence ever disclosed to me or, to the best of my knowledge, anyone else at Benefit Street, prior to its filing on the docket in this Case in August of 2021.

17. Had I been aware of the Purported Management Agreement, as the originator I would have brought it to the attention of the Benefit Street's credit committee in connection with their review and approval of the Loan. Based on my knowledge of Benefit Street's standards for approving loans, I do not believe that Benefit Street would have approved the Loan if it had known that the Purported Management Agreement was in place and governed the hotel management relationship between the Debtor and Management Company, because I believe that the terms of the Purported Management Agreement are not market terms and would be unacceptable to Benefit Street's credit committee.

18. I understand that it is the Debtor's position, through testimony of Ms. Moskovits, that the Purported Management Agreement was uploaded by the Debtor to Benefit Street during due diligence via a "dropbox" site. I further understand it is the Debtor's position, through testimony of Ms. Moskovits, that the link to this "dropbox" has expired, so she cannot verify that

the Purported Management Agreement was actually delivered. Conversely, Benefit Street has located a link provided by Dropbox through which the Debtor transmitted documents during due diligence (the "Dropbox"). The Dropbox is still functional. The Dropbox provides access to 3.47 GB of files transmitted to Benefit Street by the Debtor during due diligence of the Loan. The Dropbox's online properties state that it has not been modified since 2:57 PM on November 6, 2017, which is 15 days prior to November 21, 2017, the date that the Purported Management Agreement was allegedly signed. I have reviewed the files contained in the Dropbox, and the Purported Management Agreement is not among them.

**II.    The Debtor did not deliver the Purported Insider Loan Agreement or disclose the Purported Insider Loans to Benefit Street during due diligence.**

19. The Debtor did not deliver the Purported Insider Loan Agreement or disclose the existence of the Purported Insider Loans to Benefit Street during due diligence or at any time prior to closing the Loan.

20. Benefit Street's lending program requires that its borrowers be "special purpose/single purpose" entities subject to certain single purpose restrictions provided in the loan documents governing the loan and organizational documents governing its borrowers. The Loan Agreement and Debtor's Operating Agreement contain the SPE Restrictions, which are consistent with the single purpose restrictions that Benefit Street typically requires.

21. As the originator of this Loan, in conjunction with counsel and the underwriter, it was my responsibility to, among other things, ensure there were no violations of the SPE Restrictions based upon the documents and information delivered in diligence. Never during due diligence did the Debtor, including through its agents, Ms. Moskovits or Mr. Lichtenstein, disclose to me or, to my knowledge, anyone else at Benefit Street, the existence of the Purported Insider

Loans or Purported Insider Loan Agreement. Among other things, the Purported Insider Loan Documents are not included in the Dropbox referenced above.

22. If they had disclosed the Purported Insider Loans or Purported Insider Loan Documents, I would have followed my standard practice of alerting Benefit Street's outside loan closing counsel and credit committee in order that the risks and legal issues associated with insider debt could be underwritten and accommodated in the Loan Documents, if allowed at all.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed:  New York, New York
May 12, 2022

_____
Peter Touhill