**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                                               :
In re:                                                         :
                                                               :    Chapter 11
96 WYTHE ACQUISITION LLC,                                      :
                                                               :    Case No. 21-22108 (RDD)
                                        Debtor.                :
                                                               :
---------------------------------------------------------------X

## DECLARATION OF MARGOT J. WAINGER

I, Margot J. Wainger, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in lieu of direct testimony with respect to *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based On Continuing Malfeasance*

1

filed by Benefit Street Partners Realty Operating Partnership, L.P. ("Benefit Street" or "Lender") on March 28, 2022 [Docket No. 476], *Lender's Supplement to Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on April 29, 2022 [Docket No. 533], and any supplemental briefs and replies in support thereof (collectively, the "Trustee Motion").

2. I am an attorney at the law firm Bryan Cave Leighton Paisner LLP ("Bryan Cave"). Prior to my employment with Bryan Cave, I was an attorney at the law firm Stroock & Stroock & Lavan LLP ("Stroock"). When I was an attorney at Stroock, I represented Benefit Street in the legal due diligence, negotiation, documentation and closing of the Loan (defined below) made by Benefit Street to the Debtor.

3. I am over the age of 18, am competent to testify as to the matters contained herein, and make this declaration upon my personal knowledge.

**I.  In the Fall of 2017, Benefit Street made a $68 million first priority mortgage loan to the Debtor to finance the completion of construction of the Williamsburg Hotel.**

4. In the Fall of 2017, Benefit Street retained Stroock to conduct the legal due diligence, negotiation, documentation and closing of a first lien mortgage loan secured by the Williamsburg Hotel (the "Hotel").

5. From late October through December 2017, the parties negotiated and documented the terms of a $68 million loan (the "Loan"). On December 13, 2017, the parties closed the Loan.

6. At closing, the Debtor and Benefit Street executed and delivered a variety of closing documents. Among these were a loan agreement (the "Loan Agreement"), a consolidation, modification, spread and extension agreement (the "Mortgage"), and an Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees (the "Assignment of Management Agreement").

2

7. The Loan Agreement, the Mortgage, the Assignment of Management Agreement are Joint Exhibits 8, 10, 11 exhibits in this proceeding. Each of these documents was dated as of December 13, 2017.

**II. Benefit Street approved closing the Loan based upon a one-page Hotel Management Agreement appended to and incorporated within the Assignment of Management Agreement signed by the Debtor, the Management Company and Benefit Street and delivered at closing.**

8. On October 30, 2017, Ms. Moskovits sent an email to me and others involved in negotiating the Loan and stated, "We do not have a management Agreement in place." A true and correct copy of the foregoing email correspondence is Benefit Street Ex. 6 in this proceeding.

9. The next day, November 1, 2017, Nicholas Kaiser at the Cohen Gresser firm, loan closing counsel for the Debtor, sent an email to me and others at Stroock stating the following:

> Toby and Michael do not intend to enter into a written management agreement at this time. BSP can insert reasonable covenants to insure that [the Management Company] supplies sufficient personnel and transfers all revenues to the required accounts. The Borrower will enter into an assignment of management agreement if it engages a third party unaffiliated management company.

A true and correct copy of the foregoing email correspondence is Benefit Street Ex. 6 in this proceeding.

10. Mr. Kaiser's suggestion was not acceptable to Benefit Street. On December 5, 2017, I emailed Mr. Kaiser with "a revised draft of the Assignment and Subordination of Management Agreement along with a redline marked to the last draft circulated," which included as Exhibit A, a single page draft hotel management agreement (the "Draft Management Agreement") revised to show 3.0% of gross rents as the Management Company's management fee. A true and correct copy of the foregoing email correspondence and incorporated Draft Management Agreement is Benefit Street Ex. 12 in this proceeding.

11. This Draft Management Agreement was necessary to document any agreement between Management Company and Debtor and to provide Benefit Street with certain rights more specifically set forth in the Assignment of Management Agreement.

12. Approximately 2 and ½ hours later, Mr. Kaiser responded, stating, "Thanks-subject to client's final approval, this document is fine." A true and correct copy of the foregoing email correspondence is Benefit Street Ex. 13 in this proceeding. Thereafter, Mr. Kaiser never expressed that the revised Assignment of Management Agreement along with the Exhibit A, Hotel Management Agreement, required any further revisions, nor did he mention any other form of hotel management agreement, during this communication on December 5, 2017, or at any other time either before or after.

13. On December 12, 2017, I exchanged the final signed loan documents with Loan closing counsel for the Debtor. Included among those final signed loan documents was the Assignment of Management Agreement, which is Joint Exhibit 11 in this case. Attached to the Assignment of Management Agreement, which is signed by the Debtor, Benefit Street and Management Company, is a single page document entitled "Hotel Management Agreement" (the "<u>Management Agreement</u>").

14. The Draft Management Agreement approved by the Debtor's Loan closing counsel, and Management Agreement attached to the Assignment of Management Agreement signed by the Debtor, Management Company and Benefit Street and delivered at closing, are the same document. In fact, the Draft Management Agreement and Assignment of Management Agreement, to which the Management Agreement is attached as Exhibit "A" and which was included as Tab 10 of the closing binder, are all part of the same document, as they all bear document identification

4

number MIA 31354908, with the December 5 draft bearing version 6 and the final, signed draft bearing version 7.

15. I understand that the Debtor has suggested that the Management Agreement was not included in the Assignment of Management Agreement when it was signed at closing. This is incorrect. As noted above, the Management Agreement was included as part of the same word processing document as the Assignment of Management Agreement document and bears the same document identification number, and then was included at Tab 10 of the closing binder.

16. The Loan closed on December 13, 2017 with the documents exchanged on December 12, 2017.

17. I prepared a closing binder containing all the final, signed loan documents agreed to by the parties, and transmitted that closing binder to Loan closing counsel for the Debtor on April 5, 2018. A copy of the transmittal letter and closing binder is Benefit Street Ex. 24 in this case. The closing binder contained the Assignment of Management Agreement, to which the Management Agreement was attached. As of today, I have received no communication from the Debtor, the Insiders or their agents, including their attorney, stating that any document in the closing binder is or was the incorrect version of any such document.

18. Recital C of the Assignment of Management Agreement provides that: "Borrower and Manager have agreed that the [Management Company] will manage the property on the terms set forth on Exhibit A attached hereto (the "**Hotel Management Agreement**") and [Management Company] is entitled to certain hotel management fees (the "**Hotel Management Fees**") thereunder."

19. Moreover, in Section 3 of the Assignment of Management Agreement, entitled "Estoppel," both the Debtor and the Management Company expressly represented that no other management agreements existed:

> *The Hotel Management Agreement* is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and *constitutes the entire agreement between [the Management Company] and [the Debtor] with respect to management of the Property.*

*Id.* § 3 (emphasis added).

20. Section 4 of the Assignment of Management Agreement barred any subsequent amendment, termination or replacement of the Hotel Management Agreement without Benefit Street's express written consent:

> The [Debtor and Management Company] hereby agree . . . not to materially amend, modify, replace, substitute, cancel or terminate the Hotel Management Agreement without [Benefit Street's] prior written consent which will not be unreasonably withheld delayed or conditioned.[1]

*Id.* § 4.

21. The Management Company not only signed the Assignment of Management Agreement, but also expressly acknowledged that Benefit Street was relying on the Management Company's representations and agreements in making the Loan to the Debtor:

> [Management Company] has executed this Agreement in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

*See* Assignment of Management Agreement. § 19.

---

[1] The Management Company further acknowledged, consented to and agreed to act in conformity with Section 4.20 of the Loan Agreement, which contained similar prohibitions on the termination or amendment of the Management Agreement without the prior written consent of Benefit Street. *See* Joint Exhibit 11, § 7 and Joint Exhibit 8, § 4.20(b).

6

22. In the Loan Agreement, the Debtor expressly represented to Benefit Street that no other management agreement existed. In Section 3.31(d) and Exhibit I to the Loan Agreement, the Debtor represented to Benefit Street that it was not party to any "Major Contracts" with affiliates, which the Loan Agreement defined to include "any management (other than the Management Agreement [attached to the Assignment of Management Agreement]), brokerage or leasing agreement." *See* Loan Agreement, Joint Exhibit 8, at pp. 15 and 49 and Exhibit I.

23. The Management Company agreed in Section 21 of the Assignment of Management Agreement that all amounts it collected were the sole property of the Debtor, and that it was collecting such funds solely as agent for the Debtor and subject to Benefit Street's liens. *See* Assignment of Management Agreement, Joint Exhibit 11, § 21.

24. Prior to closing, once I confirmed receipt and compilation of all fully signed loan documents, including the Assignment of Management Agreement with the Management Agreement attached, I communicated to Benefit Street that we had all documents necessary to close.[2] I would not have sent the foregoing communication to Benefit Street if I had been aware of the existence of any management agreement between the Debtor and Management Company other than the Management Agreement attached to the Subordination of Management Agreement signed by all parties and included in the Loan closing binder.

**III.    I had no knowledge of the Purported Management Agreement prior to closing of the Loan and would have disclosed it to Benefit Street prior to closing if I had such knowledge.**

25. I understand that, in August of 2021, the Debtor filed a motion in this case attaching a form of management agreement dated as of November 21, 2017 (the "Purported Management

---

[2] The foregoing was a statement of fact made by me to Benefit Street to satisfy a condition precedent to closing the Loan. It was not a dispensation of legal advice, and its disclosure herein does not and should not be construed as a waiver of the attorney-client privilege.

7

Agreement") that differs from the Management Agreement included within the final signed closing documents or closing binder that I prepared, reviewed and transmitted in connection with the closing of the Loan. A copy of the Purported Management Agreement is marked as Joint Ex. 7 in this proceeding.

26. I have reviewed the Purported Management Agreement. I have reviewed my files still in my possession relating to the Loan, and the negotiations and closing thereof. Prior to the closing of the Loan, neither I, nor, to the best of my knowledge, anyone at Benefit Street, had seen the Purported Management Agreement, nor was its existence disclosed to me or, to the best of my knowledge, anyone at Benefit Street. During the negotiations and exchange of draft documents with Mr. Kaiser, he never mentioned the existence of the Purported Management Agreement or any other hotel management agreement other than the one-page Management Agreement attached as Exhibit "A" to the Assignment of Management Agreement, which I exchanged with the Debtor's Loan closing counsel in connection with closing and included in the Loan closing binder. Nor did anyone express that the one-page Management Agreement attached as Exhibit "A" to the Assignment of Management Agreement was to serve as a placeholder.

27. The Purported Management Agreement bears a date that is three weeks before the closing of the Loan. Had I been aware of the existence of the Purported Management Agreement, I would have informed Benefit Street of its existence.

28. After the Loan closed, I never received any form of management agreement between the Debtor and Management Company to replace the Management Agreement, including, but not limited to, the Purported Management Agreement.

8

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed:    Miami, Florida
May 12, 2022

_____
Margot J. Wainger