**KRAMER LEVIN NAFTALIS & FRANKEL LLP**          Hearing Date: May 17, 2022
Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners Realty*
*Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 Wythe Acquisition, LLC<br><br>                    Debtor. | Chapter 11<br>Case No. 21-22108-RDD |

**REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR THE APPOINTMENT OF**
**A CHAPTER 11 TRUSTEE BASED ON CONTINUING MALFEASANCE**

Benefit Street Partners Realty Operating Partnership, L.P. ("BSP") hereby files this Reply Brief (the "Brief") in support of BSP's *Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on March 28, 2022 [Docket No. 476] and *Supplement to Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* filed on April 29, 2022 [Docket No. 533] (collectively, the "Motion").[1]

## I.    Introduction

The Debtor's Opposition to the Motion is an ongoing drill of excuses for misdeeds that the Debtor now largely *admits* were perpetrated by the Insiders,[2] including: (i) the pre-petition and post-petition misappropriation of trust fund occupancy taxes, (ii) that the Insiders and their affiliated entities received approximately $18.3 million in prepetition transfers from the Debtor (which is substantially more than calculated by the Examiner), and (iii) misappropriating the proceeds of the PPP and EIDL programs made available for the benefit of the Debtor's hotel.

In response, the Debtor doubles down on its excuses using fraudulently prepared documents and fabricated storylines, introduced to cover up the Insiders' misdeeds. For example, there was no disclosure anywhere (in this case or otherwise) of the existence of purported Insider loans until the Examiner began his investigation, at which point the Insiders needed to justify their receipt of $12.5 million of potentially avoidable transfers. Suddenly, documents began appearing, such as amended tax returns for the first time noting a loan account, and loan documents delivered

---

[1] On March 31, 2022, the United States Trustee (the "UST") filed its *Memorandum of Law in Support of United State's Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 491], as modified by the UST's *Notice of Withdrawal of Certain Requested Relief in Trustee Motion* (collectively, the "UST Motion", and together with the Motion, the "Trustee Motions"). On May 6, 2022, the Debtor opposed the Motion and UST Motion by filing the *Debtor's Omnibus Objection to Lender's and United States Trustee' Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539] (the "Opposition").

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the Motion.

1

for the first time literally minutes prior to Mr. Lichtenstein's deposition. None of this was previously disclosed anywhere in this case, including in the bankruptcy schedules.

The Debtor (under the control of its conflicted Insiders) has fabricated so much that it cannot keep track of even its own lies. By one example only, the Debtor argues that occupancy taxes are *Management Company liabilities*, while also asserting that *the Debtor* set off segregated trust fund occupancy taxes (allegedly owed only by the *Management Company*) against an ICAP abatement *held by the Debtor*.

Then, caught with the post-petition misappropriation of over $250,000 of segregated trust fund occupancy taxes, the Debtor implausibly pleas ministerial error and offers that the Insiders will return the money. And then, only if the Debtor's hotly contested and thinly supported proposed plan is confirmed. This all ignores the Debtor's multi-year history of failing to pay a dime of collected occupancy taxes, rendering the assertion of a one-time and ministerial error yet another lie made to this Court. Notably, the Debtor only admits this error after New York City filed a claim for unpaid taxes and the Examiner inquired about a bank account that the Debtor refused to disclose, which the Debtor claimed was unrelated to the Hotel. The Examiner thereafter obtained account statements from the relevant bank and determined that the funds were indeed Debtor funds. Ultimately, BSP determined that the funds in this account – which the Debtor refused to disclose – were segregated occupancy taxes misappropriated by the Debtor post-petition during depositions of the Hotel's staff.

The Debtor also argues that the alleged Insider loans and Alleged Management Agreement were in place all along, but it ignores that, if this is true, the Insiders now admit to having defrauded BSP at closing.

Under the Insiders' tutelage, the Debtor repeatedly violates laws, and when third parties expose the violations, the Insiders cause the Debtor to paper over them with fraudulent documents and weak and inconsistent excuses – or worse, simply settle with themselves with no independent investigation or oversight. This dishonest, negligent and fraudulent behavior is clearly orchestrated by the conflicted motives of the Insiders, who cannot act as proper independent fiduciaries for the Debtor's estate.  The governing case law provides that this behavior constitutes cause to appoint a Chapter 11 trustee under Section 1104(a)(1), as the Insiders have engaged in, among other things, "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor…"

## II.    Legal Standard

### A.    The Court is required to appoint a Chapter 11 trustee under Section 1104(a)(1).

In the Motion, BSP sets forth the legal standards under Section 1104(a)(1), which requires that courts "shall" appoint a Chapter 11 trustee for "cause," which is broad in scope.[3]  The standard is not controversial and the Debtor's efforts to distinguish the applicable cases fail.

For example, the Debtor discusses *In re Sundale, Ltd.*, 400 B.R. 890 (Bankr. S.D. Fla. 2009) for the proposition that bad acts do not give rise to cause to appoint a Chapter 11 trustee.  In *Sundale*, the Court stated that the factors "used to determine gross mismanagement vary depending on the facts of the case, but often include elements that hint at fraud, in addition to negligence." *Id.* at 907-8.  The court ultimately found that the debtor's infirmities arose from poor management rather than "gross mismanagement" and denied the trustee request.  *Id.* at 907-8.

However, the Debtor omits the whole *Sundale* story.  The *Sundale* debtor failed under its confirmed plan, and the case converted to Chapter 7.  *See* Order Converting Case Under Chapter 11 to Case Under Chapter 7, *In re Sundale, Ltd., et al.*, Case No. 07-21016 (Bankr. S.D. Fla. July

---

[3] *See* Motion, pp. 8-10.

3

14, 2011), ECF No. 1875.  This case is much more egregious than in *Sundale*.  Here, real evidence

exists of falsified documents, fraud on the Court and BSP, tax fraud and crimes, post-petition

conversion of trust fund taxes, usurpation of corporate opportunities, approximately $12.5 million

of avoidable Insider transfers, and a systematic and intentional pattern of opaqueness to obstruct

discovery by the Court-appointed Examiner (and BSP).  As discussed below, ample cause exists

to appoint a trustee under Section 1104(a)(1).

**B.      The pendency of the Debtor's proposed plan is irrelevant to the Trustee Motions.**

The Debtor spills much ink in effort to defeat the Trustee Motions by singing the praises

of its proposed plan.  Not only is the proposed plan unconfirmable (even as amended), *see, e.g.,*

Docket Nos. 307, 428, 467, but neither of the Trustee Motions seeks relief under Section

1104(a)(2).  Section 1104(a)(1) and (a)(2) are written in the disjunctive and are "two distinct and

independent provisions," and courts are "not required to consider both provisions together."  *In re*

*Sillerman*, 605 B.R. at 641.  *See also In re Sundale*, 400 B.R. at 908-913 (analyzing cause under

Section 1104(a)(2) and (a)(1) separately).

As the Trustee Motions are based on Section 1104(a)(1),[4] the pending plan is simply

irrelevant (and hotly contested).  The Debtor would render Section 1104(a)(1) and its mandatory

grounds superfluous with its misplaced focus on its Insider-sponsored plan.  The Court does not

render decisions in a vacuum, but the Debtor's outsized emphasis on its pending plan is misplaced.

Notably, this case has a claims base of approximately $111 million (subject to disputed

claims). Of those claims, only approximately $2.4 million of creditors (consisting of smaller claims

being paid off) voted to accept the plan – just 2.1%.  The rest of the Debtor's creditors – BSP and

---

[4] The UST withdrew its request under Section 1104(a)(2).  *See Notice of Withdrawal of Certain Requested Relief in Trustee Motion* filed by the UST on May 7, 2022 [Docket No. 540].

4

the New York City Department of Finance – who will bear the vast majority of the economic

consequences of the plan, **all voted to reject.**

It is no wonder.  The plan drags out payments to these creditors over many years and shifts

upon them the risk of ongoing wrongdoing by the Insiders, who would remain in control.  The

same Insiders who refused to pay their taxes, hide or fabricate documents, misappropriate the

Debtor's opportunities for their personal gain, and blatantly refuse to be transparent in the face of

bankruptcy law requirements designed to grant the "honest debtor" a fresh start.  Simply, the hotly

contested status of the proposed plan is not defense to the appointment of a Chapter 11 trustee

under Section 1104(a)(1).

### III.    Reply in Support of Motion

**A.    The Debtor's attempts to explain away the Insiders' bad acts in the Opposition fail.**

The evidence demonstrates the Insiders' systematic and habitual practice of violating laws,

getting caught, attempting to mitigate the damage, and then seeking to deflect their bad behavior.

"Better to ask forgiveness" is not a tenet of bankruptcy law.  Because of their obstructive behavior

in discovery and overall lack of transparency, *see generally Lender's Supplement to Renewed*

*Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket

No. 533], the depths of the Insiders' harmful rule-breaking and conflicts cannot be known.

#### 1.    The Debtor fails to rebut that the Alleged Insider Loans are fabricated.

The Debtor fails to rebut that the Alleged Insider Loans are fabricated.  In its Opposition,

the Debtor argues that the Insiders were so committed to the Hotel that they injected $21 million

in equity and $11 million in insider loans.  *See* Opposition, ¶ 19.  However, the Debtor has not

provided a shred of evidence – other than purported loan documents produced for the first-time

minutes before Mr. Lichtenstein's deposition (and never given to the Examiner) – that these

transfers can be characterized as loans.  While the first declaration of Mark Podgainy filed at

Docket No. 268-2 (the "First Podgainy Declaration") purportedly corroborates Mr. Lichtenstein's

"math," Mr. Lichtenstein concedes that the First Podgainy Declaration was never intended to opine

that these transactions were loans.  He says:

> While Getzler Henrich did not review underlying loan documentation, that was not
> their task.  They simply reviewed and confirmed that the transfers into and out of
> the Debtor and Management Company accounts confirmed with the amounts
> provided in the Debtor's analysis.  The reports and bank statements show inflows
> of approximately $11 million, with repayments of $4.5MM leaving a net loan due
> of approximately $6.5MM (excluding equity/capital contribution).

*See Debtor's Counter Report and Response to Examiner's Report* filed February 28, 2022

[Docket No. 420] (the "Counter Report"), at ⁋ 10.  Indeed, this statement is consistent with Mr.

Podgainy's interview with Mr. Huebscher, who stated in his *Report of Examiner, Eric M.*

*Huebscher* filed on February 28, 2022 [Docket No. 418] (the "Examiner's Report"), pp. 18-19:

> Podgainy confirmed that he never looked at, and was not provided with, any loan
> documents or supporting evidence that would characterize any of the amounts
> referenced in his declaration as loans.  Podgainy simply stated that he compared the
> amounts on the scheduled provided to him to amounts on bank statements provided
> by the Debtor.  In fact, Podgainy told the Examiner that *he just took the Debtor's*
> word that the referenced amounts were, in fact, loans.

Then, on May 9, 2022, the Debtor produced *yet another* Declaration of Mark Podgainy (the

"Second Podgainy Declaration"), purporting to do the same thing, but this time including *more*

*transfers*, and now alleges that the Debtor received **$19,075,321** of insider loans (and contends

that approximately **$18,264,261** million remains unpaid) – almost twice the $11 million alleged

by Mr. Licthenstein in his Counter Report. *See* Second Podgainy Declaration, at p. 5.

Indeed, the Second Podgainy Declaration appears to advance another theory: now, not only

are the transactions between the Insiders and Debtor characterized as "loans," but so are all the

other transactions between the Insiders' affiliated entities.  This new theory, emerging only days

6

ago, and after a months' long investigation by the Examiner, and over thirty hours of deposition of three corporate representatives of the Debtor and Management Company, and the Management Company's head of finance and controller, is not supported by any documents.  It is preposterous.

The Second Podgainy Declaration suffers from the same infirmities as the first.  Mr. Podgainy merely reviewed bank statements, canceled check images and, where he could not categorize transactions, requested clarification from Mr. Rauch. *See* Second Podgainy Declaration, pp. 1-2.  But, Mr. Rauch admitted in deposition that he had only recently been told that certain transactions were loans by Mr. Lichtenstein and had not seen loan documents until the *week before* his deposition.  *See* Motion, pp. 25-26.  None of this is an analysis of a "loan" versus any other type of transfer.  The Debtor's argument that these transfers are "loans" relies on nothing other than the unsupported and uncorroborated statements of Mr. Lichtenstein, first emerging only to give the Insiders a justification for receipt of $12.5 million of net transfers cited in the Examiner's Report and to excuse themselves from potential estate claims.

Advancing these lies under oath constitutes its own cause for appointment of a trustee under Section 1104(a)(1), and advancing them through fabrication of records and falsified bankruptcy disclosures implicates bankruptcy crimes.  If, against all evidence, the alleged Insider loans are legitimate, then the Debtor, via the Insiders, defrauded BSP at closing.  And that also constitutes cause to appoint a trustee under Section 1104(a)(1).

### 2.    The Debtor admits to misappropriating $252,100 of New York City trust fund taxes without any valid justification.

The Debtor now admits to the post-petition misappropriation of $252,100 of hotel occupancy taxes, which are segregated trust fund taxes due to the City of New York.  *See* Opposition, ¶ 60.  To excuse this, the Debtor advances a *mea culpa*: "[I]t was an inadvertent and isolated one-time error which occurred within the first forty-eight (48) hours of the bankruptcy

7

case while the Hotel Manager was still in the process of instituting financial controls…" *Id.*   Far from isolated, this misappropriation continues years of misconduct.

According to the New York City Department of Revenue (the "DOF"), the Debtor *never* paid any hotel occupancy taxes pre-petition.  *See* Claim No. 14 and *NYC Department of Finance's Statement in Support of Motions to Appoint a Chapter 11 Trustee* [Doc. No. 545] ("DOF Statement"), ⁋ 6.  The DOF estimates the Debtor's pre-petition tax liability at $6,520,449.01, comprised of corporation taxes and unincorporated business taxes, and hotel occupancy taxes. DOF Statement, ⁋ 4.  The occupancy tax portion is estimated at $2,667,547.75. *Id.,* ⁋ 6.

The Debtor makes various excuses for why this amount is overblown, including COVID-19 accommodations and payments allegedly made by third party booking sites.  Opposition, ⁋ 58. However, these excuses go only to amount; they do not cure the Debtor's utter failure to ever pay a dime of occupancy tax it collected or file any occupancy tax returns until the DOF filed Claim No. 14.  DOF Statement, ⁋ 7.  Moreover, one of the few forthright and direct answers given by Ms. Moskovits in her deposition was an admission that the Debtor misappropriated the segregated occupancy taxes to use for hotel operations.  *See* Motion, pp. 15-16.  This decision, of course, caused the Debtor to incur penalties, interest and a multi-million priority claim against the estate.

That the Debtor would ask the Court to believe that its post-petition misappropriation of $252,100 in occupancy taxes is a one-time, inadvertent and isolated incident in the face of a multi-year history of a systematic and habitual refusal to pay collected occupancy taxes regardless of the repercussions is offensive (qualifies as dishonesty, gross mismanagement and innumerable other grounds constituting "cause" under Section 1104(a)(1)).

The Debtor's new argument, advanced for the first time during Ms. Moskovits' deposition on March 4, 2022, that it misappropriated occupancy taxes as part of a unilateral setoff following

8

the failure to obtain an ICAP abatement is another fallacy.  *See* Opposition, ⁋ 59.  Due to the

Insiders' gross mismanagement and negligence, the Debtor applied late for the ICAP abatement

and were denied, and further lost on appeal in state court.  *See In the Matter of 96 Wythe*

*Acquisition, LLC, Appellant, v. Jacques Jiha, Etc., Respondent*, Supreme Court of the State of New

York, Appellate Division: Second Judicial Department, Index No. 17750/14, May 21, 2018.  Nor

was the ICAP abatement included in the Debtor's projections submitted to BSP in connection with

closing of the Loan or listed on the Debtor's schedules.  *See* Docket Nos. 31 and 205.

Moreover, the Debtor cannot offset segregated funds it holds in trust for New York City

against a claimed ICAP abatement that the Second Department found the Debtor was not entitled

to on appeal.  Further, the Debtor internally inconsistent, as on the one hand, the Debtor argues

that the occupancy tax obligation is the liability of the Management Company, *see* Opposition, ⁋

57, while on the other hand arguing that the ICAP abatement was an asset of the Debtor, *id.*, ⁋ 53.

The Debtor clearly cannot set off the Management Company's obligation to pay occupancy taxes

with an asset the Debtor claims is its own.

The ICAP abatement – which appears to have been lost be due to the Insiders' own

negligence (and for which estate claims may exist) – cannot justify a setoff and failure to pay trust

fund taxes.  The Debtor's ICAP argument is just another contrived *post hoc* justification that the

Insiders have concocted to paper over their wrongdoing for failure to pay taxes and misappropriate

trust funds.

### 3.    The Debtor fails to rebut fabrication of the Alleged Management Agreement.

The Debtor fails to rebut BSP's allegation that the Alleged Management Agreement was

fabricated.  Divorced from reality, Debtor argues that the Alleged Management Agreement was

always intended to be a "placeholder" summary of terms.  But, the parties' negotiations –

9

evidenced by written communications and testimony of witnesses that will be tendered into evidence – are clear that the single page Management Agreement attached to the Assignment of Management Agreement was always the governing document. The Assignment of Management Agreement itself, which is contained in the closing binder together with the single page Management Agreement, is signed by the Debtor, BSP and the Management Company. It contains a representation that the single page Management Agreement attached thereto is the *only* management agreement in force as of closing, which was December 13, 2017. By contrast, the Alleged Management Agreement is dated November 21, 2017. So, either the Alleged Management Agreement did not exist at closing, and the Debtor has defrauded the Court, or it did exist at closing, and the Debtor defrauded BSP.

The Debtor argues that the Management Agreement was only intended to be a placeholder agreement. Opposition, ¶¶ 28-30. However, despite best efforts to contort the parties' clear written communications, not a shred of evidence supports that. BSP proposed the single page Management Agreement to Debtor's counsel, Debtor's counsel approved it, the parties included it with the signed Assignment of Management Agreement, closed on it and placed it in the closing binder.

Neither the originator, underwriter nor head of real estate for BSP ever saw the Alleged Management Agreement prior to this case. BSP's closing counsel, who also compiled the closing binder, testified that she never saw the Alleged Management Agreement. The only testimony of its existence is of the Insiders, who allege it was placed in a Dropbox account they cannot locate. By contrast, Benefit Street has located and examined the Dropbox account delivered at closing and confirmed *the Alleged Management Agreement is not there*. Nor was this (non-existent) material contract scheduled in this case or discussed at the Section 341 meeting.

The Debtor dishonestly suggests that BSP failed to identify the Insiders' motives for fabricating the Alleged Management Agreement. Opposition, ¶ 34. Simply, when it became clear that Debtor funds were in the non-Debtor accounts held by the Management Company, and that the Court expressed concern over the usurpation of the Debtor's corporate opportunity associated with misappropriation of the PPP loan proceeds granted upon the Hotel's operations, the Debtor created the Management Agreement to paper over those defects. Just as with the Alleged Insider Loans: The UST and BSP identified a problem, and the Insiders invented papers in effort to cure those problems and swear to their veracity, perpetrating a fraud on the Court.

The Debtor further argues that the Alleged Management Agreement, if indeed fake, is "of no commercial moment," so it should be immaterial. But that argument ignores its many egregious terms, which, among others, are defects that *no commercial lender would ever accept of a property manager* and harm to the value of the estate's assets for the conflicting benefit of the Insiders[5]:

- The lengthy term of the agreement (10) years, with two five (5) year extension options for the Management Company;

- That the Alleged Management Agreement does not terminate upon a sale of the Hotel, preventing a potential buyer from replacing the Management Company and severely damaging value;

- The above-market compensation, which includes an "incentive fee" given by the Debtor's principals to the same principals of the Management Company, in the amount of 10% of net operating income;

- That the trademarks, hotel name, reservation system and other intellectual property is owned by the Management Company and not the Debtor;

- That the Management Agreement is not assigned to Benefit Street and subordinated to the Loan under a signed Assignment of Management Agreement.

---

[5] All rights are reserved with respect to claims against the Insiders and their purported rights under the Alleged Management Agreement, which should be properly investigated by a Chapter 11 trustee.

11

The Alleged Management Agreement is, without question, of great "commercial moment" in its imposition of commercially unreasonable and unacceptable terms, beyond the fact that it appears wholly contrived by the Debtor under control of the Insiders post-petition to remedy their cash management issues, misappropriation of PPP loan proceeds and exercise of unfettered control rights over the Hotel's operations to the detriment of the Debtor's estate and creditors. As a result, while the Debtor attempts to remediate the infirmities of the Alleged Management Agreement by amending it, whether they have succeeded in mitigating the damage does not matter. (And they have not.) The post-petition invention of a material contract to fundamentally alter the relationship between the Debtor, its creditors and the Insiders, to paper over wrongdoing clearly constitutes cause to appoint a trustee under Section 1104(a)(1).

However, as with the Alleged Insider Loans, under the Debtor's view that the Alleged Management Agreement was signed before closing and is the operative document between the Debtor and Management Company, then the Debtor has admitted to **defrauding** BSP (once again). And that is independent grounds to appoint a trustee under Section 1104(a)(1).

4.      **The Insiders usurped the Debtor's opportunity to benefit from the proceeds of the PPP and EIDL programs tied directly to the Hotel.**

The conflicted Insiders have also usurped the Debtor's opportunity to benefit from the PPP and EIDL programs. They applied for funds under these programs based upon the Hotel's operations. The proceeds of these programs were offered and backed by the United States Government to benefit *the Hotel*. That notwithstanding, the Insiders utilized the bulk of the funds for non-Debtor (and non-Hotel) purposes *and freely admit to it*.

In the Opposition at ¶¶ 69-70, they try to band-aid over this usurpation of opportunity by advancing arguments that the Insiders will return the money through their proposed plan and that the EIDL obligations are obligations of the Management Company and Ms. Moskovits. While

12

these proposed resolutions fail to remedy the harm (because the Debtor's Hotel did not have access to the funds when it needed them), the quality and merit of the resolutions is irrelevant. Instead, while the Debtor failed to pay real estate taxes, corporate taxes, occupancy taxes, a host of other trade creditors and laborers (now asserting materialmen's liens against the Hotel) – let alone BSP's debt service, the Insiders applied for, and received, over $2 million of PPP and EIDL proceeds based upon the operations of the Hotel, and diverted them away from the Debtor and Hotel. And, the only reason the Insiders are willing to remedy this damage is because they were caught red-handed in this Chapter 11 case.[6] Regardless of the fix, the fact of the misappropriation of these funds and usurpation of the Debtor's access to them is further evidence that a trustee is necessary.

**B.     BSP's expert concluded that there exist numerous red flags of tax fraud and prima facie evidence of tax offenses.**

In its Opposition, the Debtor attempts to downplay and distract from clear irregularities in its federal tax returns over the past five years. The Debtor and Management Company filed no tax return that Benefit Street is aware of for the tax year of 2016. For the tax years 2017, 2018, and 2019 the Debtor and Management Company dated their tax returns (collectively, the "Tax Returns") for the eve of, or immediately after, the February 23, 2021 petition date for this Chapter 11 case (the "Petition Date"). Of these, various Tax Returns appear to have been amended or refiled post-petition, or at least were dated post-petition.

Debtor argues in its Opposition that it is "not uncommon" for new businesses to forego filing tax returns "until their business has stabilized…" Opposition, ¶ 50. This assertion is false and has never been supported by any authority. In fact, just the opposite is true: new businesses are required to file returns just the same as "stabilized" businesses, and, indeed, they are often

---

[6] In addition, the Insiders' false written statements (via an email) to Live Oak Bank on the use of the first PPP loan proceeds so as to induce another PPP loan (which was denied) further evidences dishonesty and other misconduct constituting "cause" under Section 1104(a)(1). *See* Benefit Street Exhibit 47.

13

incentivized to do so to record and preserve losses serving as a tax benefit going forward. And, while it is true that often times debtors approach bankruptcy without having filed tax returns, the failure to file returns – combined with the infirmities and deficiencies of the returns produced by the Debtor – further combined with the suspicious timing of amendments containing new information regarding alleged loan accounts to corroborate litigation positions taken by the Debtor in this case – further combined with the lack of economic justification for intercompany transfers and the manner of reporting income and expenses – indicate a likelihood of tax fraud and crimes in the opinion of BSP's expert.

BSP retained Luis O. Rivera, CPA ("Mr. Rivera") to analyze the Tax Returns and the flow of funds as described in the Examiner's report. As reflected in his expert report, Mr. Rivera found that the Debtor and Management Company likely have substantial exposure for criminal and civil misconduct.

Mr. Rivera identified various clear deficiencies. Among other things, the Tax Returns reflect that the Hotel's income is listed on the Management Company's Tax Return, rather than the Debtor's, which is improper and for which the Debtor has never provided any legal or economic justification. They further show that Hotel management fees were paid *from* the Management Company *to* the Debtor, which is backwards and wholly unsupported by any documentation. Moreover, the original Tax Returns were unsigned by the Debtor and Management Company's tax preparer.

The Debtor's organizational documents designate Ms. Moskovits as the Debtor's tax matters partner. When BSP asked Ms. Moskovits questions regarding tax returns at deposition, she deferred to Mr. Lichtenstein. At his deposition, Mr. Lichtenstein refused to discuss tax returns without the Debtor's accountant. However, by and large, the preparer of the Tax Returns for the

14

Debtor – Daniel Norensberg – checked a box on the returns indicating that he should *not* be contacted regarding the returns. The Insiders have effectively created a dead end: Moskovits pointed to Lichtenstein who pointed to Norensberg, who indicated he should not be contacted.

However, BSP deposed Mr. Norensberg (who is <u>not</u> a CPA), and he essentially testified that he did no independent investigation of the numbers on the Debtor's tax returns. He testified as follows:

> Q: How would you gain comfort when all you are giving is a balance show the [profit] and loss statement, how do you know that those numbers are true and correct?
>
> A: So I never know if the numbers are true and correct, but when people give me numbers, I'm not the best at reading people, but when you give me numbers and you may or may not seem confident about it I might ask you what's going on, but if you give me a set of numbers and these are the numbers you are going with, it's not my job to go and audit those numbers, that is not my job. I ask the questions, are these the correct numbers, that's it, that's not my job to audit them.

Deposition of Mr. Norsenberg, May 10, 2022 ("<u>Norensberg Tr.</u>"), Pg. 88: 8-23.

When preparing certain of the Debtor's Tax Returns, Mr. Norsenberg listed loans to the Debtor from Insiders, but in doing so was given none of the alleged loan documents and in fact did not ask for any documentation:

> Q: [And] did you ask anyone at the Debtor whether there was an underlying loan agreement or loan agreements with respect to the loans from partners?
> A: I did not.
> Q: And no one volunteered that information to you either, correct?
> A: That's correct.

Norsenberg Tr., p. 120: 16-23.

Moreover, the Debtor appears to have amended the original Tax Returns provided to BSP and the Court to align with its litigation position regarding the alleged insider loans. The original returns, dated as of the eve of, or immediate after, the Petition Date, indicated that there were no

15

insider loan transfers. Yet, one year later, and apparently reacting to a draft of the Examiner's report delivered to the Debtor about ten days prior, certain of those same Tax Returns were amended (or simply re-dated) to suddenly report alleged insider transactions. (Notably, these alleged insider loans were not listed in the Debtor's bankruptcy schedules or disclosure statement, nor is there any proof of claim on file for them). This appears to be just another *post-petition fabrication* of documents to support the newly-advanced theory that the Insiders are owed money under loans allegedly made to the Debtor in attempt to justify the $12.5 million of pre-petition transfers identified by the Examiner for which the Insiders have legal exposure.

Mr. Rivera has over twenty-eight years of experience with the IRS Criminal Investigation Division and the Inspector General's Office of the Agency for International Development. More specifically, Mr. Rivera served as Special Agent, Foreign Service Officer, Supervisory Special Agent, Task Force Deputy Director, and Assistant Special Agent in Charge of the Miami Field Office. From this extensive career, Mr. Rivera has investigated money laundering, tax fraud, and white-collar crime, among other things. Additionally, Mr. Rivera is a certified public accountant ("CPA") (as opposed to Mr. Norensberg, who is not) as well as certified fraud examiner.

Mr. Rivera also reviewed the Examiner's report and analyzed the flow of funds, nature of transfers, and opaque business practices that were outlined in the Examiner's report. Mr. Rivera reviewed the explanations given at deposition by the Insiders for the Examiner-exposed irregularities, as well as the Insider's excuses for the manner in which Hotel income was shared. From this information, Mr. Rivera concluded there is no legitimate economic justification for the movement of funds or way in which income and expenses are being reported on the Tax Returns. Rather, he concluded that the Debtor is reporting in this matter to unlawfully misreport taxable income off the Hotel's revenue.

16

Drawing on his over 40-year career as an IRS agent and tax consultant, Mr. Rivera ultimately opined that the Debtor and Management Company bore substantial potential liability for tax fraud and other tax offenses.  Evidence of the above-described criminal and civil tax exposure will be presented at trial.

### C.      The Debtor's professionals and employees have performed practically no diligence to evaluate the Insiders' characterizations of the Debtor's transactions.

The Debtor's professionals have performed practically no diligence to evaluate the accuracy of the Insiders' characterizations of the Debtor's transactions.[7]  Discovery has elicited a pattern of the Debtor's experts and employees' repeated failure to investigate the claims of the Insiders.  Almost without exception, they take Mr. Lichtenstein's word for the characterization of transactions when opining on the Debtor's finances (Podgainy), preparing tax returns (Norensberg, discussed below) and characterizing transactions on books and records (Rauch).

Specifically, as discussed above, the Debtor relies upon Mr. Podgainy in support of the Debtor's characterization of millions of dollars of prepetition transactions to the Insiders (and, now, their affiliates) as loans. However, Mr. Podgainy testifies that he relied solely upon the representations of Michael Lichtenstein and review of internally prepared documents and bank statements in concluding that such transactions were "loans."  He never saw any loan documents or real indicia of debt.  In essence, he summed up the bank transfers that Mr. Lichtenstein told him were loans, and reported them as loans.

Mr. Norensberg, the Debtor's tax preparer, also conducted no independent analysis of the numbers he reported on the Debtor's tax return or the characterizations of those numbers.  Instead,

---

[7] As the Court is aware, no independent fiduciary with governance authority over the Debtor exists (e.g., no independent manager on the board of managers, and no independent member).  All governance roads lead singularly to Ms. Moskovits and Mr. Lichtenstein, who, by definition, have multiple interests in conflict with the Debtor.

Mr. Norensberg simply copied numbers given to him by Mr. Lichtenstein onto the Debtor and Management Company's Tax Returns without requiring further information.

Mr. Rauch, the Management Company's director of finance who is responsible for the Hotel's finances, recorded insider loans on the Debtor's internal books and records without any backup documentation. His characterization of those transactions as loans was simply based on Mr. Lichtenstein's instruction.

The Debtor spills much ink seeking to justify, among other things, the defects in its tax returns and the Insiders' liability for receipt of prepetition transfers by having multiple spokespeople testify as to the legitimacy of the Debtor's actions. But, when closely reviewed, it becomes clear that these spokespeople – Podgainy, Norensberg, Rauch, and likely others – did not do any independent diligence, nor did they report to any independent authority. They are simply parroting Mr. Lichtenstein's instruction, and Mr. Lichtenstein's instructions are a conflicted sham.

**D.     There is no risk of harm to the estate associated with any potential change in management arising from appointment of a Chapter 11 trustee.**

In its Objection, the Debtor argues that change in the management of the Hotel will severely disrupt the operations of the Hotel, which will harm the estate.[8] The assumption underpinning this belief is apparently that only the Insiders, and the Insiders alone, can successfully the Hotel. However, once subjected to expert scrutiny and the prism of reality, this incredulous (and egotistical) argument wilts.

BSP retained Gary Isenberg ("Mr. Isenberg") of LW Hospitality Advisors (d/b/a: LWHA Asset Management Group) (hereinafter, "LWHA") to opine on the impact of a change in Hotel management. Mr. Isenberg has an over thirty-five (35) year career in hospitality real estate,

---

[8] Although this proposition is disputed, it is also not relevant under Section 1104(a)(1) in the face of the Insiders' dishonesty and other grounds for "cause."

18

specifically in hotel management, development, finance, and asset management.  Included within

in that extensive experience is Mr. Isenberg's active involvement in the transition of the

management for over fifty (50) hotels.

Mr. Isenberg is familiar with the Hotel.  The sister company of LWHA prepared an

appraisal for the Hotel.  Mr. Isenberg understands the Hotel, its positioning in the market as a

boutique, luxury, lifestyle hotel, and its focus on food, beverage, and event revenue.  In his expert

review, Mr. Isenberg analyzed the Debtor and Management Company's STR Reports for January

and February of 2022, as well as the Debtor's most recent monthly operating reports.

Having finished his review, as reflected in his expert report, Mr. Isenberg concluded that

the present management of the Hotel is **simply mediocre** when compared to its competitive set.

He concluded that the Hotel is increasingly falling behind its competition as the hospitality market

recovers from COVID-19.  Specifically, Mr. Isenberg concluded that occupancy at the Hotel is

driven by a low daily occupancy rate.  While the Hotel's competition has raised room rates, the

Debtor has been unable to keep pace.  While the Debtor is penetrating its fair share of the market

based on its RevPAR numbers, it is doing so by charging dramatically below average room rates

(represented by its low ADR numbers), which is a combination that make the Hotel less profitable

on a room-by-room basis. Indeed, once placed into proper context, it is hard to imagine how one

of the many third-party hotel managers adept at managing boutique, luxury lifestyle hotels, could

do any worse with this asset.

To that end, Mr. Isenberg observes that, in light of the success of luxury hotel national

brands such as Starwood's W Hotels, Marriott's Edition, and IHG's Kimpton Hotels, to name a

few, third-party national firms have proven adept at developing and growing luxury lifestyle

brands such as the Hotel.  To meet this growing market segment, third-party management

companies such as Aimbridge's Evolution Group, Davidson Hotels, Coury Hospitality, and Aparium Hotels have developed an expertise in successfully operating luxury lifestyle hotels by emphasizing hiring of general managers steeped in and integrated with the local community. **The Debtor's claim that an independent management company cannot effectively operate the Hotel is wholly false.**

Further, Mr. Isenberg points out that, were the management of the Hotel to change, those changes would occur largely in the back-office of the Hotel. Absent good reason, guest-facing services would all remain in place. It is a total farce for the Debtor to assert that guests and employees would somehow be harmed if the Insiders no longer operate the Hotel. If anything, a change in management of the Hotel will improve the quality of the asset, as Hotel business increases and revenues rise to match the competition.

Therefore, while the costs and benefits to the estate is largely a consideration under Section 1104(a)(2), which is *not* the statutory basis for the Trustee Motions, to the extent relevant to the Court's Section 1104(a)(1) analysis, the estate would not be harmed by appointment of a Chapter 11 trustee and change in management.

### IV.    Conclusion

The foregoing facts and argument will be supported by evidence adduced at trial. The conflicted Insiders have proven themselves willing to commit fraud and dishonest acts while incompetently and grossly mismanaging the Debtor, all in furtherance of their own interests. The foregoing constitutes cause to appoint a Chapter 11 trustee under Section 1104(a)(1).

4889-2216-6559 v.3

Respectfully submitted, this 13th day of May, 2022.

NELSON MULLINS RILEY &
SCARBOROUGH, LLP

_/s/ Lee B. Hart_
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

_Co-Counsel for Benefit Street Partners_
_Realty Operating Partnership, L.P._

21