**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners Realty*
*Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 96 Wythe Acquisition, LLC | Case No. 21-22108-RDD |
| Debtor. | |

_____/

## LENDER'S NOTICE OF FILING HIGHLIGHTED TRANSCRIPT DESIGNATIONS

Benefit Street Partners Realty Operating Partnership, L.P. ("Lender"),[1] in

preparation for the evidentiary hearing scheduled for May 17, 2022 at 10:00 a.m. on

*Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on*

*Continuing Malfeasance* [ECF No. 476 & 477] and the Supplement thereto [ECF No. 533]

---

[1] Benefit Street is a wholly owned subsidiary of Franklin Resources, Inc. that, together with various subsidiaries, operates as Franklin Templeton.

(collectively, the "Lender's Trustee Motion") provides this notice of filing the attached

roadmap containing highlighted transcript designations and video excerpt references to

videotaped deposition testimony for use at the hearing to aid the Court and the parties

with following Lender's presentation of the evidence during the hearing on Lender's

Trustee Motion.[2]

Dated: May 16, 2022                         Respectfully submitted,

                                            NELSON MULLINS RILEY & SCARBOROUGH, LLP

                                            /s/ *Gary M. Freedman*
                                            Gary M. Freedman
                                            2 South Biscayne Blvd., 21st Floor
                                            Miami, Florida 33131
                                            Telephone: (305) 373-9400
                                            Facsimile: (305) 373-9443
                                            Gary.Freedman@nelsonmullins.com

                                            Lee B. Hart
                                            201 17th Street, Suite 1700
                                            Atlanta, Georgia 30363
                                            Telephone: (404) 322-6000
                                            Facsimile: (404) 322-6050
                                            Lee.Hart@nelsonmullins.com

                                            and

                                            KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                            Adam C. Rogoff, Esq.
                                            P. Bradley O'Neill, Esq.
                                            1177 Avenue of the Americas
                                            New York, New York 10036
                                            Telephone: (212) 715-9100
                                            Facsimile: (212) 715-8000
                                            arogoff@kramerlevin.com
                                            boneill@kramerlevin.com

                                            *Co-Counsel for Benefit Street Partners*
                                            *Realty Operating Partnership, L.P.*

---

[2] Please note that Lender reserves the right to vary its presentation from that reflected int his roadmap.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on

this 16th day of May, 2022:

Via e-mail upon *Co-Counsel for the Debtor and Debtor in Possession*

| | |
|---|---|
| Douglas E. Spelfogel, Esq. | Mark A. Frankel, Esq. |
| MAYER BROWN LLP | BACKENROTH GRANKEL & KRINSKY, LLP |
| 1211 Avenue of the Americas | 800 Third Avenue, 11th Floor |
| New York, New York  10020 | New York, NY  10022 |
| Telephone: (212) 506-2265 | Telephone: (212) 593-1100 |
| dspelfogel@mayerbrown.com | mfrankel@bfklaw.com |

*/s/ Gary M. Freedman*

Gary M. Freedman

## TABLE OF CONTENTS

I.    **General Background** ............................................................................................. 1

    a.  Exhibits (None) .................................................................................................. 1

    b.  Testimony ......................................................................................................... 1

        1.  Transcript of the Videotaped Virtual Deposition of Michael Lichtenstein, pursuant to Rule 30(b)(6) on behalf of the Debtor and in his individual capacity, taken on March 10, 2022 (Vol. I), and continued on March 23, 2022 (Vol. II) ("**Lichtenstein**"): .................................................................. 1

        −  Lichtenstein, p. 6, l. 20 through p. 7, l. 2 (video - p. 6, l. 20 through p. 7, l. 2 only) .......................................................................................................... 1

        −  Lichtenstein, p. 23, l. 10 through p. 25, l. 4 (video - p. 23, l. 10 through p. 24, l. 2 only) ................................................................................................. 3

        2.  Transcript of the Videotaped Virtual Deposition of Toby Moskovits, pursuant to Rule 30(b)(6) on behalf of the Debtor and in her individual capacity, taken on March 4, 2022 (Vol. I), and continued on April 1, 2022 (Vol. II) ("**Moskovits**"): ............................................................................. 6

        −  Moskovits, p. 8, l. 18 through p. 9, l. 5 (no video) ...................................... 6

        −  Moskovits, p. 32, ll. 9-15 (video) ................................................................ 8

        3.  Transcript of the Videotaped Virtual Deposition of David Goldwasser, pursuant to Rule 30(b)(6) on behalf of the Debtor and in his individual capacity, taken on March 15, 2022 ("**Goldwasser**"): ................................. 9

        −  Goldwasser, p. 7, ll. 10-13 (video) ............................................................ 9

        −  Goldwasser, p. 40, l. 11 through p. 41, l. 19 (video) ................................ 10

        −  Goldwasser, p. 43, l. 12 through p. 45, l. 20 (video - p. 44, l. 24 through p. 45, l. 20 only) ......................................................................................... 12

        −  Goldwasser, p. 52, l. 14 through p. 53, l. 20 (video - p. 52, l. 14 through p. 52, l. 19 and p. 53, l. 1 through p. 53, l. 20 only) ...................................... 15

        −  Goldwasser, p. 74, l. 19 through p. 75, l. 9 (no video) ............................. 17

        4.  Transcript of the Videotaped Virtual Deposition of Michael Lichtenstein, pursuant to Rule 30(b)(6) on behalf of The Williamsburg Hotel BK LLC and in his individual capacity, taken on March 29, 2022 ("**Lichtenstein MC**"): ............................................................................................................. 19

−    Lichtenstein MC, p. 8, ll. 20-23 (video).................................................... 19

−    Lichtenstein MC, p. 10, ll. 20-24 (video).................................................. 20

−    Lichtenstein MC, p. 13, l. 19 through p. 14, l. 14 (video).......................... 21

−    Lichtenstein MC, p. 15, ll. 6-9 (video) ..................................................... 23

−    Lichtenstein MC, p. 17, ll. 12–20 (video).................................................. 24

−    Lichtenstein MC, p. 18, l. 3 through p. 20, l. 11 (no video)....................... 25

II.    **Debtor's Lack of Transparency and Discovery Obstruction** ....................... **29**

a.    Exhibits (None) .......................................................................................... 29

b.    Testimony .................................................................................................. 29

1.    Lichtenstein.......................................................................................... 29

−    Lichtenstein, p. 42, ll. 16-25 (video) ....................................................... 29

−    Lichtenstein, p. 239, l. 20 through p. 241, l. 13 (video - p. 240, ll. 10-14 only)
..................................................................................................... 30

−    Lichtenstein, p. 155, ll. 4-8 (no video) .................................................... 33

−    Lichtenstein, p. 159, ll. 11-23 (no video) ................................................. 34

−    Lichtenstein, p. 242, l. 13-19 (video)....................................................... 35

−    Lichtenstein, p. 245, l. 18-19 (no video)................................................... 36

−    Lichtenstein, p. 248, ll. 17-24 (no video) ................................................. 37

−    Lichtenstein, p. 253, l. 25 through p. 254, l. 8 (no video) ........................ 38

−    Lichtenstein, p. 255, l. 16 through p. 256, l. 2 (no video) ........................ 40

−    Lichtenstein, p. 258, l. 16 through p. 259, l. 9 (no video) ........................ 42

−    Lichtenstein, p. 282, l. 6 through p. 283, l. 21 (video - p. 282, ll. 6-22 and  p.
283, l. 12-21 only) .................................................................................... 44

−    Lichtenstein, p. 293, l. 20 through p. 294, l. 6 (no video) ........................ 46

−    Lichtenstein, p. 296, l. 15 through p. 297, l. 6 (video) ............................. 48

–     Lichtenstein, p. 112, l. 24 through p. 113, l. 10 (video) ............................ 50

2.     Moskovits ............................................................................................ 52

–     Moskovits, p. 493, l. 2 through p. 494, l. 25 (video - p. 493, l. 4 through p. 494, l. 25 only) ....................................................................................... 52

–     Moskovits, p. 10, l. 3 through p. 11, l. 9 (no video) .................................. 54

–     Moskovits, p. 14, l. 23 through p. 17, l. 25 (no video) ............................. 56

–     Moskovits, p. 56, ll. 13-22 (video) .......................................................... 60

–     Moskovits, p. 99, l. 25 through p. 100, l. 10 (no video) ........................... 61

–     Moskovits, p. 106, ll. 14-24 (no video) .................................................... 63

–     Moskovits, p. 123, l. 6 through p. 126, l. 20 (no video) ........................... 64

–     Moskovits, p. 169, l. 18 through p. 172, l. 11 (no video)........................... 68

–     Moskovits, p. 173, l. 5 through p. 174, l. 11 (no video) ............................ 72

–     Moskovits, p. 182, ll. 5-18 (no video) ...................................................... 74

–     Moskovits, p. 342, l. 21 through p. 343, l. 8 (no video) ........................... 75

–     Moskovits, p. 344, ll. 9-25 (no video) ...................................................... 77

–     Moskovits, p. 346, l. 9 through p. 347, l. 4 (no video) ............................. 78

–     Moskovits, p. 348, l. 3 through p. 349, l. 18 (no video) ........................... 80

–     Moskovits, p. 359, l. 20 through 361, l. 14 (no video) ............................. 82

–     Moskovits, p. 361, l. 21 through p. 362, l. 16 (no video)........................... 85

–     Moskovits, p. 404, ll. 3-12 (no video) ...................................................... 87

–     Moskovits, p. 410, ll. 11-25 (no video) .................................................... 88

–     Moskovits, p. 462, ll. 11-24 (no video) .................................................... 89

–     Moskovits, p. 464, ll. 17-21 (video) ......................................................... 90

–     Moskovits, p. 465, ll. 17-22 (video) ......................................................... 91

–     Moskovits, p. 466, ll. 10-12 (video) ......................................................... 92

–     Moskovits, p. 473, ll. 3-18 (no video) ........................................................ 93

–     Moskovits, p. 474, ll. 7-24 (video) ........................................................... 94

–     Moskovits, p. 495, l. 11 through 496, l. 5 (no video) ................................. 95

–     Moskovits, p. 532, ll. 2-18 (video) ........................................................... 97

3.     Lichtenstein MC .................................................................................... 98

–     Lichtenstein MC, p. 23, l. 9 through p. 24, l. 9 (video) .............................. 98

–     Lichtenstein MC, p. 24, l. 22 through p. 25, l. 17 (video - p. 25, l. 11-17 only) ................................................................................................... 100

–     Lichtenstein MC, p. 26, l. 4 through p. 27, l. 9 (video - p. 26, ll. 4-15 and p. 27, ll. 6-9 only) ................................................................................. 102

–     Lichtenstein MC, p. 31, l. 16 through p. 32, l. 18 (video - p. 32, ll. 11-18 only) ................................................................................................... 104

–     Lichtenstein MC, p. 45, l. 24 through p. 47, l. 2 (video - p. 46, l. 15 through p. 47, l. 2 only) ................................................................................... 106

–     Lichtenstein MC, p. 52, l. 3 through p. 53, l. 11 (no video).................... 109

–     Lichtenstein MC, p. 53, ll. 18-25 (no video)........................................... 111

–     Lichtenstein MC, p. 55, ll. 14-20 (video)................................................ 112

–     Lichtenstein MC, p. 56, ll. 9-18 (video).................................................. 113

–     Lichtenstein MC, p. 57, ll. 4-12 (video).................................................. 114

–     Lichtenstein MC, p. 58, l. 20 through p. 59, l. 6 (no video).................... 115

–     Lichtenstein MC, p. 97, l. 20 through p. 98, l. 13 (no video).................. 117

4.     Goldwasser.......................................................................................... 119

–     Goldwasser, p. 106, ll. 5-12 (no video) .................................................. 119

–     Goldwasser, p. 111, l. 5 through p. 115, l. 18 (no video) ....................... 120

III.     **Omissions on Schedules and Disclosure Statement ................................. 125**

a.    Exhibits.................................................................................................... 125

➢ BSP EXHIBIT 56 - Schedules of Assets and Liabilities and Statement of Financial Affairs - Reporting Period 04/01/2021 - 04/30/2021 [ECF No. 31] 125

➢ JOINT EXHIBIT 30 - Amended Schedule E/F: Creditors Who Have Unsecured Claims [ECF No. 205] ............................................................. 125

➢ BSP EXHIBIT 117 - Amended Schedule D: Creditors Who Have Claims Secured by Property [ECF No. 411] ............................................................. 125

➢ JOINT EXHIBIT 1 – Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower 125

➢ JOINT EXHIBIT 6 – First Amendment to Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower .......................................................................... 125

➢ JOINT EXHIBIT 7 - Hotel Management and Services Agreement between 96 Wythe Acquisition LLC and The Williamsburg Hotel BK LLC. 125

➢ DEBTOR'S EXHIBIT 22 (former 42) – Equity and Loans Report (also found in BSP Exhibit 129 - Goldwasser Transcript as Deposition Exhibit 6) 125

b. Testimony ........................................................................................ 126

1. Goldwasser .............................................................................. 126

– Goldwasser p. 62, l. 11 through p. 64, l. 24 (video - p. 62, l. 16 through p. 63, l. 8 and p. 63, l. 22 through p. 64, l. 24 only).................................... 126

– Goldwasser, p. 69, l. 11 through p. 70, l. 10 (video) .............................. 129

– Goldwasser, p. 70, ll. 16-21 (video) ........................................................ 131

– Goldwasser, p. 72, l. 5 through p. 73, l. 7 (video) .................................. 132

– Goldwasser, p. 73, l. 8 through p. 74, l. 18 (video) ................................ 134

– Goldwasser, p. 75, l. 10 through p. 77, l. 9 (video - p. 75, ll. 10-15; p. 75, l. 20 through p. 77, l. 9 only) ...................................................................... 136

– Goldwasser, p. 79, ll. 3-18 (video) .......................................................... 139

– Goldwasser, p. 83, l. 16 through p. 87, l. 14 (video – p. 83, l. 25 through p. 84, l. 16 and 85, l. 3 through p. 87, l. 13 only)........................................ 140

– Goldwasser, p. 89, l. 19 through p. 90, l. 16 (video) .............................. 145

**IV.    Tax Evasion**.................................................................................................**147**

   a.  Exhibits ............................................................................................ 147

       ➢    BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418] 147

       ➢    BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465] 147

       ➢    JOINT EXHIBIT 39 – Debtor IRS Form 1065 – 2017 dated 2/24/2022 147

       ➢    JOINT EXHIBIT 45 – Debtor IRS Form 1065 – 2018 dated 2/24/2022 147

       ➢    JOINT EXHIBIT 48 – Debtor IRS Form 1065 – 2019 dated 2/24/2022 147

       ➢    JOINT EXHIBIT 22 – Debtor IRS Form 1065 – 2020 dated 9/13/2021 147

       ➢    JOINT EXHIBIT 49 – Debtor IRS Form 1065 – 2020 (amended) dated 2/24/2022 ................................................................... 147

       ➢    JOINT EXHIBIT 42 – TWH IRS Form 1065 – 2017 dated 2/24/2022 147

       ➢    BSP EXHIBIT 45 – TWH IRS Form 1065 – 2018 dated 2/24/2021 ... 147

       ➢    JOINT EXHIBIT 51 – TWH IRS Form 1065 – 2018 dated 2/24/2022 147

       ➢    BSP EXHIBIT 46 – TWH IRS Form 1065 – 2019 dated 2/24/2021 ... 147

       ➢    BSP EXHIBIT 55 – TWH IRS Form 1065 - 2019 dated 5/4/2021 ...... 147

       ➢    JOINT EXHIBIT 50 – TWH IRS Form 1065 – 2020 dated 2/24/2022 147

       ➢    BSP EXHIBIT 56 – BKC Schedules ECF 31 ..................................... 147

       ➢    BSP EXHIBIT 29 - Notice of Filing Amended Disclosure Statement (Third Amended Disclosure Statement and Plan) [ECF No. 196] ........................ 147

       ➢    BSP EXHIBIT 61 - Proof of Claim #10-1 filed by NYC Department of Finance................................................................................................ 147

       ➢    BSP EXHIBIT 62 - Proof of Claim #11-1 filed by NYC Department of Finance (Administrative)................................................................................. 147

       ➢    BSP EXHIBIT 84 - Proof of Claim #14-1 filed by NYC Department of Finance................................................................................................ 147

       ➢    BSP EXHIBIT 85 - Proof of Claim #18-1 filed by NYC Department of Finance................................................................................................ 147

➢    BSP EXHIBIT 97 - NYC Department of Finance's Response in Opposition to Debtor's Objection to Proofs of Claim Nos. 10 and 11 [ECF No. 328] 148

➢    BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022........................................... 148

➢    BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022........................................... 148

➢    BSP EXHIBIT 74 – Transcript - Deposition Via Zoom of Michael Lichtenstein, Esq. taken on 10/1/2021 ...................................................... 148

➢    BSP EXHIBIT 125 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/10/2022 .... 148

➢    BSP EXHIBIT 132 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/23/2022 .... 148

➢    BSP EXHIBIT 135 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/29//2022 ... 148

b.    Testimony ........................................................................................... 149

1.    Lichtenstein............................................................................... 149

–    Lichtenstein p. 231, l. 22 through p. 237, l. 16 (video - p. 231, l. 22 through p. 232, l. 4; p. 232, ll. 21-25; p. 235, ll. 22-24 and p. 236, l. 4 through p. 237, l. 16 only) ............................................................................... 149

–    Lichtenstein p. 239, l. 1 through p. 245, l. 22 (video - p. 239, l. 20 through p. 241, l. 3 and p. 243, l. 16 through p. 245, l. 19 only)............................. 156

–    Lichtenstein p. 246, l. 17 through p. 248, l. 25 (video - p. 246, l. 17 and p. 247, l. 9 through p. 248, l. 24 only) ....................................................... 163

–    Lichtenstein p. 250, ll. 11-24 (video) .................................................... 166

–    Lichtenstein p. 252, l. 13 through p. 256, l. 11 (video – p. 25, ll. 7-23 and p. 256, ll. 6-11 only) .................................................................................. 167

–    Lichtenstein p. 257, l. 3 through 270, l. 3 (video - 257, l. 24 through p. 259, l. 14; p. 259, l. 20 through p. 261, l. 13; p. 263, ll. 11-13 and p. 263, l. 16 through p. 267, l. 17 and p. 268, ll. 2-12 and p. 268, l. 25 through p. 270, l. 3; only) ................................................................................................... 172

2.    Moskovits ................................................................................. 186

–    Moskovits, p. 80, l. 14 through p. 81, l. 16 (no video) ............................ 186

–    Moskovits, p. 133, l. 10 through p. 141, l. 22 (video - p. 134, l. 10 through p. 136, l. 3; p. 137, l. 4 through p. 138, l. 9 and p. 139, l. 24 through p. 140, l. 24 only) ............................................................................................... 188

–    Moskovits, p. 533, l. 19 through p. 540, l. 19 (video – p. 533, l. 19 through p. 538, l. 14 only) ................................................................................... 197

3.    Lichtenstein – MC ..................................................................... 205

–    Lichtenstein MC, p. 21, l. 12 through p. 25, l. 17 (no video).................. 205

–    Lichtenstein MC, p. 42, l. 6 through p. 43, l. 11 (no video).................... 210

–    Lichtenstein MC, p. 44, l. 12 through p. 55, l. 20 (video – p. 44, l. 12 through p. 47, l. 13; p. 47, l. 22 through p. 48, l. 2; p. 48, l. 13 through p. 49, l. 10; p. 50, l. 17 through p. 51, l. 11; p. 51, l. 22 through p. 54, l. 2; p. 55, ll. 3-13 only) ............................................................................................... 212

–    Lichtenstein MC, p. 56, l. 9 through p. 62, l. 13 (video – p. 56, l. 20 through p. 59, l. 13; p. 59, l. 19 through p. 60, l. 9; p. 62, ll. 4-13 only) .............. 224

–    Lichtenstein MC, p. 68, l. 9 through p. 70, l. 25 (video – p. 68, l. 9 though p. 70, l. 11 only) ..................................................................................... 231

–    Lichtenstein MC, p. 92, l. 6 through p. 94, l. 3 (no video)...................... 234

–    Lichtenstein MC, p. 121, l. 2 through p. 130, l. 11 (video – p. 125, l. 17 through p. 129, l. 24 only ) ................................................................... 237

V.    **Post-Petition Conversion of Hotel Occupancy Taxes ................................ 247**

a.    Exhibits ......................................................................................... 247

➢    BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418] 247

➢    BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465] 247

➢    JOINT EXHIBIT No. 2 – Chase Statement - X9022 dated 7/30/2016 247

➢    JOINT EXHIBIT No. 3 – Chase Statement - X9022 dated 1/31/2017 247

➢    JOINT EXHIBIT No. 4 – Chase Statement – X8662 dated 1/31/2017 247

➢    BSP EXHIBIT No. 26 – Bank of America Statement - X4102 dated 2/29/2020 ............................................................................................... 247

➢  BSP EXHIBIT No. 31 – Bank of America Statement – X2855 dated 4/30/2020 ........................................................................................... 247

➢  JOINT EXHIBIT No. 14 – Bank of America Statement – X0102 dated 4/30/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 33 – Bank of America Statement – X0102 dated 5/31/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 36 – Bank of America Statement – X0102 dated 6/30/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 38 – Bank of America Statement – X0102 dated 7/31/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 39 – Bank of America Statement – X0102 dated 8/31/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 40 – Bank of America Statement – X0102 dated 9/30/2020 ........................................................................................... 247

➢  BSP EXHIBIT No. 41 – Bank of America Statement – X0102 dated 10/31/2020 .......................................................................................... 247

➢  BSP EXHIBIT No. 42 – Bank of America Statement – X0102 dated 11/30/2020 .......................................................................................... 247

➢  BSP EXHIBIT No. 167 – Chase Bank Statements (produced by bank through Subpoena) ...................................................................... 247

➢  BSP EXHIBIT No. 168 – Bank of America Statement (produced by bank through subpoena) ....................................................................... 248

➢  BSP EXHIBIT No. 179 – Bank of America Statements – X4400 for the period 2020-2021 .................................................................... 248

➢  BSP EXHIBIT No. 180 – Bank of America Statements – X4662 for the period 2018-2021 .................................................................... 248

b.  Testimony ......................................................................................... 249

1.    Lichtenstein ................................................................................ 249

–    Lichtenstein p. 104, l. 9 through p. 113, l. 17 (video - p. 104, ll. 9-22; p. 108, l. 3-19 p. 111, ll. 5-10 only) ................................................... 249

–    Lichtenstein p. 115, p. 17 through p. 117, l. 8 (video - p. 115, l. 17 through p. 117, l. 4 only) ................................................................... 259

2.    Moskovits ................................................................................... 262

–    Moskovits, p. 105, l. 25 through p. 107, l. 6 (video) .............................. 262

−  Moskovits, p. 107, ll. 13-18 (video) ........................................................ 265

3.  Lichtenstein MC ...................................................................... 266

−  Lichtenstein p. 39, l. 15 through p. 41, l. 7 (video) ................................. 266

**VI.  Prepetition Use of Hotel Occupancy Taxes.................................................. 269**

a.  Exhibits ............................................................................................... 269

➢  JOINT EXHIBIT 27 - NYC-HTX Hotel Room Occupancy Tax Return - The Williamsburg Hotel BK LLC for the periods: 12/01/2016-02/28/2017; 03/01/2017-05/31/2017;   06/01/2017-08/31/2017;   09/01/2017-11/30/2017; 2/01/2017-02/28/2018;   03/01/2018-05/31/2018;   06/01/2018-08/31/2018; 09/01/2018-11/30/2018;   12/01/2018-02/28/2019;   03/01/2019-05/31/2019; 06/01/2019-08/31/2019;   09/01/2019-11/30/2019;   12/01/2019-02/28/2020; 03/01/2020-05/31/2020;   06/01/2020-08/31/02020;   09/01/2020-11/30/2020; 12/01/2020-02/28/2021;   03/01/2021-05/31/021;   06/01/2021-08/31/2021; 09/01/2021-11/30/2021 ........................................................................ 269

➢  JOINT EXHIBIT 33 – Checks drawn to TD Bank Account for the Williamsburg Hotel to the New York City Department of Finance............. 269

➢  JOINT EXHIBIT 58 - NYC-HTX Hotel Room Occupancy Tax Return - The Williamsburg Hotel BK LLC for the period: 12/01/2021 - 2/28/2022 ... 269

➢  BSP Exhibit 84 – Proof of Claim #14-1 filed by NYC Department of Finance................................................................................................ 269

➢  BSP Exhibit 85 – Proof of Claim #18-1 filed by NYC Department of Finance................................................................................................ 269

➢  BSP Exhibit 92 – Debtor Objection to Proof of Claim #14-1 [ECF No. 302] 269

➢  BSP Exhibit 97 – NYC Department of Finance Response [ECF No. 367] 269

➢  BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418] 269

➢  BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465] 269

➢  JOINT EXHIBIT No. 2 – Chase Statement - X9022 dated 7/30/2016 269

➢  JOINT EXHIBIT No. 3 – Chase Statement - X9022 dated 1/31/2017 269

➢  JOINT EXHIBIT No. 4 – Chase Statement – X8662 dated 1/31/2017 269

➢ BSP EXHIBIT No. 26 – Bank of America Statement - X4102 dated 2/29/2020 ................................................................................ 269

➢ BSP EXHIBIT No. 31 – Bank of America Statement – X2855 dated 4/30/2020 ................................................................................ 270

➢ JOINT EXHIBIT No. 14 – Bank of America Statement – X0102 dated 4/30/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 33 – Bank of America Statement – X0102 dated 5/31/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 36 – Bank of America Statement – X0102 dated 6/30/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 38 – Bank of America Statement – X0102 dated 7/31/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 39 – Bank of America Statement – X0102 dated 8/31/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 40 – Bank of America Statement – X0102 dated 9/30/2020 ................................................................................ 270

➢ BSP EXHIBIT No. 41 – Bank of America Statement – X0102 dated 10/31/2020 .............................................................................. 270

➢ BSP EXHIBIT No. 42 – Bank of America Statement – X0102 dated 11/30/2020 .............................................................................. 270

➢ BSP EXHIBIT No. 167 – Chase Bank Statements (produced by bank through Subpoena)................................................................... 270

➢ BSP EXHIBIT No. 168 – Bank of America Statement (produced by bank through subpoena) .................................................................. 270

➢ BSP EXHIBIT No. 179 – Bank of America Statements – X4400 for the period 2020-2021 ................................................................... 270

➢ BSP EXHIBIT No. 180 – Bank of America Statements – X4662 for the period 2018-2021 ................................................................... 270

b.  Testimony ...................................................................... 271

1.    Moskovits.................................................................... 271

–    Moskovits, p. 238, l. 18 through p. 259, l. 3 (video p. 238, l. 18 through p. 242, l. 24; p. 247, l. 13 through p. 248, l. 8; p. 249, l. 14 through p. 251, l. 6; p. 258, l. 2 through p. 258, l. 19 only) ................................................... 271

–    Moskovits, p. 517, l. 5-21 (video) .......................................... 293

–    Moskovits, p. 524, l. 20 through p. 530, l. 11 (video p. 526, l. 23 through p. 528, l. 11 only) ................................................................................... 294

2.    Lichtenstein MC ..................................................................................... 301

–    Lichtenstein MC, p. 95, l. 2 through p. 98, l. 22 (no video).................... 301

**VII.   Fabricated November 2017 Management Agreement ................................. 305**

a.  Exhibits ................................................................................................... 305

➢    JOINT EXHIBIT 11 - Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees w/ Hotel Management Agreement 305

➢    BSP EXHIBIT 64 - Motion to Authorize Intercompany Transfers [ECF No. 83]  305

➢    BSP EXHIBIT 22 - Fourth Amendment to Operating Agreement of 96 Wythe Acquisition LLC ................................................................................. 305

➢    JOINT EXHIBIT 8 - Loan Agreement between 96 Wythe Acquisition and Benefit Street Partners Realty Operating Partnership, L.P........................ 305

➢    BSP EXHIBIT 24 – Loan Closing Binder with FedEx delivery confirmation 305

➢    BSP EXHIBIT 7 – Email chain from M. Wainger to T. Moskovits re: BSP/ Williamsburg Hotel - Management Agreement dated 10/30/2017 (Moskovits deposition exhibit TM-0010) ....................................................................... 305

➢    BSP EXHIBIT 8 - Email chain from M. Wainger to N. Kaiser and E. Balshem re: BSP doc comments - Management Agreement dated 11/2/2017 (Moskovits deposition exhibit TM-0011) .................................................... 305

➢    BSP EXHIBIT 12 - Email from M. Wainger to N. Kaiser re: BSP/Williamsburg - Assignment of Management Agreement with attached draft Agreement dated 12/5/2017 (Moskovits deposition exhibit TM-0012) 305

➢    BSP EXHIBIT 13 - Email chain from N. Kaiser to M. Wainger re: BSP/Williamsburg - Assignment of Management Agreement dated 12/5/2017 (Moskovits deposition exhibit TM-0013) .................................................... 305

➢    BSP EXHIBIT 14 - Email chain from M. Wainger to N. Kaiser, M. Lichtenstein, and T. Bolles re BSP/Williamsburg – Mortgage Loan Documents with attached executed copies of mortgage loan documents dated 12/12/2017 305

➢    BSP EXHIBIT 9 - BSP Drop Box screenshot reflecting last date documents provided .................................................................................... 305

➢   BSP EXHIBIT 56 - Schedules of Assets and Liabilities and Statement of Financial Affairs - Reporting Period 04/01/2021 - 04/30/2021 [ECF No. 31] 305

➢   JOINT EXHIBIT 30 - Amended Schedule E/F: Creditors Who Have Unsecured Claims [ECF No. 205] ............................................................. 306

➢   BSP EXHIBIT 117 - Amended Schedule D: Creditors Who Have Claims Secured by Property [ECF No. 411] ......................................................... 306

➢   BSP EXHIBIT 51 – Transcript of 341 Meeting of Creditors .............. 306

➢   BSP EXHIBIT 129 – Transcript and Video of Videotaped Virtual Deposition of David Goldwasser taken on 3/15/2022 ............................... 306

➢   BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022 ........................................... 306

➢   BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022 .......................................... 306

b.  Testimony ....................................................................................... 307

1.   Lichtenstein ............................................................................ 307

−   Lichtenstein p. 162, l. 17 through p. 168, l. 5 (video p. 162, l. 17; p. 162, l. 24 through p. 164, l. 14; p. 164, ll. 22-25; p. 165, l. 19 through p. 166, l. 25 and p. 167, ll. 21-24 only) .................................................................... 307

−   Lichtenstein p. 168, l. 15 through p. 172, l. 19 (video p. 168, ll. 15-18; p. 169, l. 13 through p. 170, l. 14 and p. 172, ll. 13-19 only) ...................... 314

−   Lichtenstein p. 173, l. 3 through p. 178, l. 9 (video p. 173, l. 19 through p. 174, l. 10; p. 175, ll. 7-12; p. 177, ll. 6-25 only) ...................................... 319

−   Lichtenstein p. 178, l. 15 through p. 179, l. 17 (no video) ...................... 325

−   Lichtenstein p. 180, l. 24 through p. 183, l. 9 (no video) ........................ 327

−   Lichtenstein p. 184, l. 3 through p. 188, l. 16 (no video) ........................ 331

−   Lichtenstein p. 188, l. 21 through p. 194, l. 15 (no video) ...................... 336

−   Lichtenstein p. 194, l. 25 through p. 206, l. 7 (no video) ........................ 343

−   Lichtenstein p. 206, l. 4 through p. 216, l. 4 (video p. 206, l. 4-7; p. 206, l. 11 through p. 207, l. 10; p. 208, l. 3 through p. 209, l. 19 and p. 210, l. 17 through p. 212, l. 9 only) ........................................................................ 356

−   Lichtenstein p. 223, ll. 9–10 (no video) ................................................. 367

–    Lichtenstein p. 224, l. 4 through p. 225, l. 15 (no video) ........................ 368

–    Lichtenstein p. 225, l. 24 through p. 229, l. 13 (no video) ...................... 370

2.    Moskovits ............................................................................................. 375

–    Moskovits, p. 326, l. 15 through p. 329, l. 17 (no video)......................... 375

–    Moskovits, p. 363, l. 7 through p. 367, l. 2 (video – p. 363, ll. 7-13; p. 365, l. 8 though p. 367, l. 2 only) ....................................................................... 379

–    Moskovits, p. 367, l. 16 through p. 369, l. 8 (video p. 367, l. 6 through p. 369, l. 8 only) ......................................................................................... 384

–    Moskovits, p. 370, l. 3 through p. 371, l. 23 (video p. 370, l. 25 through p. 371, l. 23 only) ....................................................................................... 389

–    Moskovits, p. 372, ll. 5-20 (video) ......................................................... 391

–    Moskovits, p. 388, l. 2 through p. 389, l. 16 (no video) .......................... 392

–    Moskovits, p. 390, l. 25 through p. 394, l. 18 (no video)......................... 394

–    Moskovits, p. 395, l. 13 through p. 398, l. 23 (no video)......................... 399

–    Moskovits, p. 399, l. 8 through p. 400, l. 12 (video) .............................. 403

–    Moskovits, p. 400, l. 19 through p. 401, l. 23 (video) ............................ 405

–    Moskovits, p. 431, l. 8 through p. 432, l. 12 (video) .............................. 407

–    Moskovits, p. 432, l. 24 through p. 433, l. 24 (no video)......................... 409

–    Moskovits, p. 434, ll. 11-19 (no video) ................................................. 411

–    Moskovits, p. 435, l. 2 through p. 436, l. 9 (no video) ........................... 412

–    Moskovits, p. 439, ll. 5-21 (video) ........................................................ 414

–    Moskovits, p. 441, l. 19 through p. 450, l. 25 (video - p. 441, l. 19 through p. 445 l. 15 only) ....................................................................................... 415

–    Moskovits, p. 454, ll. 2-11 (video p. 454, ll. 4-11 only) .......................... 425

–    Moskovits, p. 455, l. 24 through p. 461, l. 14 (video p. 456, l. 9 through p. 458, l. 17 and p. 459, l. 18 through p. 460, l. 6 only).............................. 426

–    Moskovits, p. 465, l. 17 through p. 466, l. 12 (no video)......................... 433

−    Moskovits, p. 470, l. 5 through p. 472, l. 7 (video p. 471, l. 17 through p. 472, l. 7 only) ...................................................................................... 435

3.    Goldwasser ................................................................................ 438

−    Goldwasser, p. 70, l. 16 through p. 74, l. 18 (no video) .......................... 438

−    Goldwasser, p. 98, l. 23 through p. 101, l. 4 (video – p. 98, l. 23 through p. 99, l. 20 only) ...................................................................................... 443

4.    Transcript of 341 Meeting of Creditors held on March 18, 2021 ("**341 Transcript**") ............................................................................................ 447

−    341 Transcript p. 14, l. 19 – p. 16, l. 13 ................................................. 447

−    341 Transcript p. 16, l. 21 through p. 17, l. 2 ......................................... 450

**VIII.    Fabricated Line of Credit Agreement and Amendment ............................... 452**

a.    Exhibits .......................................................................................... 452

➢    JOINT EXHIBIT 1 – Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower 452

➢    JOINT EXHIBIT 6 – First Amendment to Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower ........................................................................ 452

➢    BSP EXHIBIT 24 – Loan Closing Binder with FedEx delivery confirmation 452

➢    JOINT EXHIBIT 8 - Loan Agreement between 96 Wythe Acquisition and Benefit Street Partners Realty Operating Partnership, L.P. ........................ 452

➢    BSP EXHIBIT 22 - Fourth Amendment to Operating Agreement of 96 Wythe Acquisition LLC ................................................................................ 452

➢    BSP EXHIBIT 56 - Schedules of Assets and Liabilities and Statement of Financial Affairs - Reporting Period 04/01/2021 - 04/30/2021 [ECF No. 31] 452

➢    JOINT EXHIBIT 30 - Amended Schedule E/F: Creditors Who Have Unsecured Claims [ECF No. 205] ............................................................. 452

➢    BSP EXHIBIT 117 - Amended Schedule D: Creditors Who Have Claims Secured by Property [ECF No. 411] .......................................................... 452

➢    BSP EXHIBIT 64 - Motion to Authorize Intercompany Transfers [ECF No. 83]    452

&#10148;   JOINT EXHIBIT 29 – Notice of Filing Amended Disclosure Statement (Third Amended Disclosure Statement and Plan) [ECF No. 196].............. 452

&#10148;   BSP EXHIBIT 51 – Transcript of 341 Meeting of Creditors .............. 452

&#10148;   BSP EXHIBIT 129 – Transcript and Video of Videotaped Virtual Deposition of David Goldwasser taken on 3/15/2022 ............................... 452

&#10148;   BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418] 452

&#10148;   BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465] 452

b.  Testimony ..................................................................................... 453

1.   Lichtenstein.............................................................................. 453

–   Lichtenstein p. 46, l. 6 through p. 48, l. 5 (video – p. 46, l. 6 through p. 47, l. 22 only) ...................................................................................... 453

–   Lichtenstein p. 79, l. 2 through p. 80, 17 (video) ................................. 456

–   Lichtenstein p. 125, l. 4 through p. 126, l. 24 (video – p. 125, l. 4 through p. 126, l. 22 only) ...................................................................... 458

–   Lichtenstein p. 127, l. 2 through p. 130, l. 25 (video – p. 127, l. 4 through p. 129, l. 5 only) ....................................................................... 460

–   Lichtenstein p. 135, l. 2 through p. 136, l. 25 (video – p. 135, l. 15 through p. 136, l. 25 only) ................................................................... 464

–   Lichtenstein p. 138, l. 19 through p. 142, l. 21 (video – p. 138, l. 19 through p. 139, p. 12; p. 140 ll. 13-20 and p. 141, l. 15 through p. 142, l. 21 only) .................................................................................................. 466

–   Lichtenstein p. 146, l. 8 through p. 147, l. 21 (video) ............................ 471

–   Lichtenstein p. 148, l. 7 through p. 152, l. 22 (video – p. 149, ll. 15-18 and p. 150, l. 8 through p. 152, l. 11 only) ................................................... 473

–   Lichtenstein p. 153, l. 7 through p. 159, l. 4 (video – p. 156, ll. 10-14 only) .................................................................................................. 478

–   Lichtenstein p. 159, ll. 11-23 (no video) ................................................. 485

–   Lichtenstein p. 161, l. 14 through p. 162, l. 13 (video – p. 161, ll. 14-18 only) .................................................................................................. 486

–   Lichtenstein p. 266, l. 10 through p. 270, l. 6 (no video) ........................ 488

2. Moskovits ............................................................. 493

– Moskovits, p. 342, l. 4 through p. 348, l. 15 (no video) .......................... 493

– Moskovits, p. 350, l. 2 through p. 353, l. 24 (no video) ......................... 500

– Moskovits, p. 354, l. 3 through p. 355, l. 8 (no video) .......................... 504

– Moskovits, p. 473, l. 23 through p. 481, l. 23 (video – p. 473, l. 23 through p. 474, l. 6 and p. 474, l. 25 through p. 480, l. 11 only) ........................... 506

– Moskovits, p. 483, l. 10 through p. 489, l. 4 (video – p. 483, l. 10 through p. 487, l. 8 only) ......................................................... 515

– Moskovits, p. 491, ll. 6-10 (video – p. 491, ll. 6-10 only) ....................... 522

– Moskovits, p. 492, l. 16 through p. 498, l. 17 (video – p. 496, l. 9 through 497, l. 24 only) .................................................... 523

– Moskovits, p. 499, l. 6 through p. 501, l. 11 (video – p. 500, l. 23 through p. 501, l. 11 only) ..................................................... 525

3. Goldwasser ............................................................ 528

– Goldwasser, p. 68, l. 10 through p. 70, l. 10 (no video) .......................... 528

– Goldwasser, p. 74, l. 19 through p. 79, l. 21 (no video) .......................... 531

– Goldwasser, p. 80, l. 25 through p. 85, l. 17 (video – p. 80, l. 25 through p. 82, l. 5 only) ......................................................... 537

– Goldwasser, p. 85, l. 23 through p. 87, l. 14 (no video) .......................... 543

– Goldwasser, p. 89, l. 19 through p. 91, l. 24 (no video) .......................... 546

– Goldwasser, p. 98, l. 23 through p. 100, l. 7 (no video) .......................... 549

4. 341 Transcript ......................................................... 552

– 341 Transcript p. 14, l. 19 through p. 16, l. 13 ................................ 552

– 341 Transcript p. 16, l. 21 through p. 17, l. 2 ................................. 555

IX. **Misappropriated EIDL Loans Totaling $500,000** ........................................ 557

a. Exhibits ................................................................. 557

➢ JOINT EXHIBIT 15 – EIDL Loan Documents .................................... 557

➢ JOINT EXHIBIT 19 – EIDL Loan Documents - Amended Loan Authorization and Agreement (signed) ...................................................... 557

➢ BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418] 557

➢ BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465] 557

➢ JOINT EXHIBIT No. 2 – Chase Statement - X9022 dated 7/30/2016 (also found under BSP Exhibit ............................................................ 557

➢ JOINT EXHIBIT No. 3 – Chase Statement - X9022 dated 1/31/2017 557

➢ JOINT EXHIBIT No. 4 – Chase Statement – X8662 dated 1/31/2017 557

➢ BSP EXHIBIT No. 26 – Bank of America Statement - X4102 dated 2/29/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 31 – Bank of America Statement – X2855 dated 4/30/2020 .................................................................................... 557

➢ JOINT EXHIBIT No. 14 – Bank of America Statement – X0102 dated 4/30/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 33 – Bank of America Statement – X0102 dated 5/31/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 36 – Bank of America Statement – X0102 dated 6/30/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 38 – Bank of America Statement – X0102 dated 7/31/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 39 – Bank of America Statement – X0102 dated 8/31/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 40 – Bank of America Statement – X0102 dated 9/30/2020 .................................................................................... 557

➢ BSP EXHIBIT No. 41 – Bank of America Statement – X0102 dated 10/31/2020 ................................................................................... 557

➢ BSP EXHIBIT No. 42 – Bank of America Statement – X0102 dated 11/30/2020 ................................................................................... 558

➢ BSP EXHIBIT No. 167 – Chase Bank Statements (produced by bank through Subpoena) .................................................................... 558

➢ BSP EXHIBIT No. 168 – Bank of America Statement (produced by bank through subpoena) .................................................................... 558

➢ BSP EXHIBIT No. 179 – Bank of America Statements – X4400 for the period 2020-2021 .................................................................... 558

➢ BSP EXHIBIT No. 180 – Bank of America Statements – X4662 for the period 2018-2021 ...................................................................................... 558

➢ BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022 .............................................. 558

➢ BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022 ............................................ 558

➢ BSP EXHIBIT 135 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/29/2022 .... 558

b. Testimony ............................................................................................. 559

1. Moskovits .................................................................................... 559

– Moskovits, p. 94, l. 14 through p. 102, l. 10 (video – p. 94, l. 14 through p. 100, l. 20 only ) .............................................................................. 559

– Moskovits, p. 107, ll. 7-12 (video) ............................................. 568

2. Lichtenstein MC .......................................................................... 569

– Lichtenstein p. 25, l. 18 through p. 36, l. 25 (video - p. 25, l. 18 through p. 27, l. 16; p. 27, l. 24 through p. 28, l. 23; p. 29, l. 13 through p. 34, l. 6 and p. 34, l. 20 through p. 35, l. 6 only) ......................................................... 569

– Lichtenstein p. 37, l. 24 through p. 39, l. 4 (video – p. 37, l. 24 through p. 38, l. 15 only) ............................................................................... 581

**X.    Misappropriated PPP Loan Proceeds ............................................................ 584**

a. Exhibits ................................................................................................ 584

➢ BSP EXHIBIT 28 – PPP Application dated 4/14/2020 ...................... 584

➢ BSP EXHIBIT 29 – PPP Loan Agreement dated 4/18/2020 .............. 584

➢ BSP EXHIBIT 30 – PPP Note dated 4/18/2020 ................................ 584

➢ BSP EXHIBIT 47 - Email chain from M. Lichtenstein to M. Peeler, T. Moskovits re: PPP Loan Clarification dated 2/204/2021 ............................ 584

➢ BSP EXHIBIT 29 - Notice of Filing Amended Disclosure Statement (Third Amended Disclosure Statement and Plan) [ECF No. 196] ........................ 584

➢ BSP EXHIBIT 77 - Motion of Debtor Pursuant to 11 U.S.C. §105 and Federal Rule of Bankruptcy Procedure 9019 Authorizing and Approving a Settlement Between the Debtor and Williamsburg Hotel BK LLC [ECF No. 153] 584

➢    BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022 ............................................. 584

➢    BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022 ............................................. 584

➢    BSP EXHIBIT 74 – Transcript - Deposition Via Zoom of Michael Lichtenstein, Esq. taken on 10/1/2021 ...................................................... 584

➢    BSP EXHIBIT 125 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/10/2022 .... 584

➢    BSP EXHIBIT 132 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/23/2022 .... 584

➢    BSP EXHIBIT 135 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/29/2022 .... 584

b.  Testimony ......................................................................................... 585

1.  Transcript of the Rule 2004 Examination of The Williamsburg Hotel BK LLC, taken on October 1, 2021 ("Lichtenstein PPP") ...................................... 585

–    Lichtenstein PPP, p. 17 , l. 16 through p. 18, l. 10 ................................. 585

–    Lichtenstein PPP, p. 25, l. 1 through p. 25, l. 18 .................................... 587

–    Lichtenstein PPP, p. 26, ll. 12-17 ............................................................ 588

–    Lichtenstein PPP, p. 27, ll. 10-21 ............................................................ 589

–    Lichtenstein PPP, p. 28, ll. 10–14 ........................................................... 590

–    Lichtenstein PPP, p. 35, ll. 8:13 .............................................................. 591

–    Lichtenstein PPP, p. 44, ll. 3-20 .............................................................. 592

–    Lichtenstein PPP, p. 45, l. 11 through p. 53, l. 23 .................................. 593

–    Lichtenstein PPP, p. 55, l. 16 through p. 56, l. 25 .................................. 602

–    Lichtenstein PPP, p. 58, l. 6 through p. 59, l. 20 .................................... 604

–    Lichtenstein PPP, p. 62, l. 2 through p. 63, l. 4 ...................................... 606

–    Lichtenstein PPP, p. 63, ll. 11–25 ........................................................... 608

–    Lichtenstein PPP, p. 64, l. 9 through p. 65, l. 22 .................................... 609

–    Lichtenstein PPP, p. 66, l. 17 through p. 68, l. 13 .................................. 611

–   Lichtenstein PPP, p. 69, l. 25 through p. 70, l. 24 .................................. 614

–   Lichtenstein PPP, p. 71, ll. 2:15 ............................................................ 616

–   Lichtenstein PPP, p. 74, l. 12 through p. 78, l. 17 .................................. 617

–   Lichtenstein PPP, p. 79, l. 2 through p. 82, p. 13 ................................... 622

–   Lichtenstein PPP, p. 84, l. 17 through p. 88, l. 6 .................................... 626

–   Lichtenstein PPP, p. 88, l. 11 through p. 89, l. 10 .................................. 631

–   Lichtenstein PPP, p. 93, ll. 2–25 ........................................................... 633

–   Lichtenstein PPP, p. 96, l. 19 through p. 97, l. 12 .................................. 634

–   Lichtenstein PPP, p. 98, ll. 7–20 ........................................................... 636

–   Lichtenstein PPP, p. 101, ll. 4–12 ......................................................... 637

–   Lichtenstein PPP, p. 101, l. 17 through p. 102, l. 19 .............................. 638

–   Lichtenstein PPP, p. 105, l. 19 through p. 106, l. 8 ................................ 640

–   Lichtenstein PPP, p. 106, l. 21 through p. 108, l. 2 ................................ 642

–   Lichtenstein PPP, p. 109, l. 18 through p. 110, l. 5 ................................ 645

–   Lichtenstein PPP, p. 111, ll. 2–25 ......................................................... 647

–   Lichtenstein PPP, p. 112, l. 11 through p. 113, l. 8 ................................ 648

–   Lichtenstein PPP, p. 115, l. 3 through p. 123, l. 11 ................................ 650

–   Lichtenstein PPP, p. 123, l. 17 through p. 124, l. 12 .............................. 659

–   Lichtenstein PPP, p. 125, l. 4 through p. 126, l. 6 .................................. 661

–   Lichtenstein PPP, p. 126, l. 21 through p. 129, l. 19 .............................. 663

–   Lichtenstein PPP, p. 131, l. 12 through p. 133, l. 5 ................................ 667

–   Lichtenstein PPP, p. 134, ll. 13-20 ........................................................ 670

–   Lichtenstein PPP, p. 135, l. 9 through p. 136, l. 18 ................................ 671

–   Lichtenstein PPP, p. 137, l. 10 through p. 138, l. 16 .............................. 673

–   Lichtenstein PPP, p. 139, l. 2 through p. 140, l. 20 ................................. 675

–   Lichtenstein PPP, p. 141, l. 4 through p. 142, l. 21 ................................. 677

–   Lichtenstein PPP, p. 142, l. 24 through p. 143, l. 13 .............................. 679

–   Lichtenstein PPP, p. 143, l. 18 through p. 145, l. 12 .............................. 681

–   Lichtenstein PPP, p. 145, l. 19 through p. 149, l. 7 ................................ 684

–   Lichtenstein PPP, p. 151, l. 22 through p. 154, l. 18 .............................. 689

–   Lichtenstein PPP, p. 154, l. 24 through p. 159, l. 25 .............................. 693

–   Lichtenstein PPP, p. 160, l. 23 through p. 167, l. 20 .............................. 699

2.   Moskovits ............................................................................. 707

–   Moskovits, p. 501, ll. 2-11 (no video) ...................................... 707

–   Moskovits, p. 501, l. 17 through p. 504, l. 7 (video) .............................. 708

–   Moskovits, p. 506, l. 10 through p. 514, l. 7 (video – p. 506, l. 10 through p. 511, l. 11; p. 511, l. 21 through p. 512, l. 13 and p. 513, l. 19 through p. 513, l. 24 only) ............................................................................. 712

3.   Lichtenstein .......................................................................... 721

–   Lichtenstein p. 292, l. 6 through p. 295, l. 25 (video – p. 292, l. 6 through p. 295, l. 21 only) ...................................................................... 721

4.   Lichtenstein MC ..................................................................... 725

–   Lichtenstein - MC p. 96, l. 24 through p. 98, l. 22 (video – p. 96, l. 24 through p . 97, l. 15 and p. 98, ll. 9-22 only)...................................................... 725

**XI.   Failure to Pay Millions of Dollars of Real Estate Taxes ............................. 728**

a. Exhibit.......................................................................................... 728

➤   BSP EXHIBIT 157 - NYC Department of Finance - Property Address Search - February 2022 ........................................................ 728

➤   BSP EXHIBIT 158 - NYC Department of Finance - Property Address Search – May 2022 ............................................................ 728

b. Testimony ..................................................................................... 729

1.   Moskovits ............................................................................. 729

– Moskovits, p. 229, ll. 3-12 (no video) .................................................... 729

– Moskovits, p. 331, l. 2 through p. 332, l. 11 (no video) ......................... 730

I.    **General Background**

    a.    **Exhibits (None)**

    b.    **Testimony**

        1.    *Transcript of the Videotaped Virtual Deposition of Michael Lichtenstein, pursuant to Rule 30(b)(6) on behalf of the Debtor and in his individual capacity, taken on March 10, 2022 (Vol. I), and continued on March 23, 2022 (Vol. II) ("**Lichtenstein**"):*

        –    Lichtenstein, p. 6, l. 20 through p. 7, l. 2 (video - p. 6, l. 20 through p. 7, l. 2 only)

---

Page 6

```
 1                    LICHTENSTEIN
 2            MR. KELLEY:  Typically, for a
 3       deposition, all attendees are supposed to
 4       be noted on the record.  So I think
 5       Melissa appreciates that.  I see her
 6       nodding.
 7            MR. HART:  This is Lee Hart, with
 8       Nelson Mullins, for the lender as well.
 9            THE VIDEOGRAPHER:  Thank you,
10       Counsel.
11            At this time, I would ask
12       Ms. Gilmore to please administer the oath
13       and we can proceed.
14  M I C H A E L   L I C H T E N S T E I N,
15       called as a witness, having been duly
16       placed under oath by a Notary Public, was
17       examined and testified as follows:
18  EXAMINATION BY
19  MR. FREEDMAN:
20       Q.    Please state your name.
21       A.    Yechial Michael Lichtenstein.
22       Q.    Can you spell your first name for
23  us?
24       A.    Y-E-C-H-I-A-L.
25       Q.    And do you typically go by Michael?
```

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

Page 7

LICHTENSTEIN

1

2          A.    Yes.

3          Q.    And what is your home address,

4    Mr. Lichtenstein?

5          A.    929 East 5 Street, Brooklyn, New

6    York.

7          Q.    And do you have a business address,

8    sir?

9          A.    Yes.

10         Q.    What is that, please?

11         A.    679 Driggs Avenue, Brooklyn, New

12   York 11211.

13               (Reporter clarification.)

14         A.    679 Driggs, D-R-I-G-G-S, Avenue,

15   Brooklyn, New York 11211.

16         Q.    And what business is located at 679

17   Driggs Avenue?

18         A.    My office.

19         Q.    What's the name of the business or

20   businesses that are located at that address?

21         A.    My office is located there.

22         Q.    I understand that, sir.  Office for

23   what business or businesses?

24         A.    For my office and my files.

25               MR. KELLEY:  Your question, what

– Lichtenstein, p. 23, l. 10 through p. 25, l. 4 (video - p. 23, l. 10 through p. 24, l. 2 only)

---

Page 23

```
1                    LICHTENSTEIN
2              Do you understand that?
3        A.    Yes.
4        Q.    And you understand that you are
5   giving testimony today as the same as you would
6   give testimony in bankruptcy court before Judge
7   Drain.
8              Do you understand that?
9        A.    Yes.
10       Q.    And do you understand that you are a
11  proponent of the debtor's plan of
12  reorganization?
13       A.    Yes.
14       Q.    And do you understand that you are a
15  plan sponsor of the debtor's plan of
16  reorganization?
17       A.    Yes.
18       Q.    And would you agree with me that
19  it's important for you to provide forthright
20  testimony in respect to matters relating to the
21  debtor and the debtor's plan of reorganization?
22       A.    Yes.
23       Q.    What percentage ownership do you
24  presently have of the debtor, either directly
25  or indirectly, sir?
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

---

```
                                            Page 24

                    LICHTENSTEIN
 1
 2      A.      About 50 percent.
 3      Q.      You need to speak up.
 4              MR. KELLEY:  Michael, could you move
 5      just a hair closer to your microphone?
 6      Your volume -- thank you.  Your volume is
 7      falling down.
 8              Excuse me, Gary.  I'm sorry.
 9              MR. FREEDMAN:  Thank you.  I had the
10      same concern.
11      A.      I said about 50 percent.
12      Q.      Are you not sure of the exact
13  ownership interest that you have in the debtor,
14  sir?
15      A.      What is that beeping?
16      Q.      I can't hear you, sir.
17              MR. KELLEY:  For some reason your
18      microphone is having trouble picking you
19      up, Michael.  If there's any way you can
20      move a tad closer to your microphone, that
21      would be helpful.  Thank you.
22      A.      I said about 50 percent.
23      Q.      I understand, but why do you believe
24  it's about?  Why can't you give me an exact
25  ownership interest that you have in the debtor?
```

Page 25

1                    **LICHTENSTEIN**

2        **A.     Because we are -- you can call it --**

3   **for purposes of this conversation, we'll say**

4   **50 percent.**

5        Q.     And what interest -- strike that.

6               What ownership interest will you

7   have in the debtor post confirmation?

8        A.     We're still negotiating that.

9        Q.     You're negotiating that with whom?

10       A.     With the preferred equity provider.

11       Q.     Is that Lockwood?

12       A.     Yes.

13       Q.     Who are the individuals that are

14  involved in that negotiation?

15       A.     Toby Moskovits and myself.

16       Q.     And who on the Lockwood side, sir?

17       A.     The Lockwood team, Charles.

18       Q.     Charles.  Does Charles have a last

19  name, sir?

20       A.     Charles Everhardt.

21       Q.     And what is the status of those

22  negotiations?

23       A.     I don't think I need to provide

24  information on my negotiations.

25       Q.     Are you refusing to answer the

    2.     _Transcript of the Videotaped Virtual Deposition of Toby Moskovits, pursuant to Rule 30(b)(6) on behalf of the Debtor and in her individual capacity, taken on March 4, 2022 (Vol. I), and continued on April 1, 2022 (Vol. II) (_**_"Moskovits"_**_):_

    –  Moskovits, p. 8, l. 18 through p. 9, l. 5 (no video)

```
                                              Page 8
 1                    TOBY MOSKOVITS
 2   EXAMINATION BY
 3   MR. FREEDMAN:
 4
 5        Q      Good morning, Ms. Moskovits, I
 6   am Gary Freedman.
 7               As you know, I represent Benefit
 8   Street Partners.
 9               How are you today?
10        A      I am okay, thank you.
11        Q      You feel okay?
12        A      I guess it depends how this
13   proceeding goes.
14               If you are going to be polite
15   and pleasant, at least a new firm has shown up
16   over here, your predecessors weren't so nice,
17   but we will see what happens; I'm optimistic.
18        Q      I'll make a deal with you right
19   off the bat, if you're polite and civil, I will
20   do the same; how is that?
21        A      Okay.
22               You do know that your firm fired
23   my previous lawyer, but that's another
24   conversation for another day, but I'll give you
25   the benefit of the doubt.
```

Page 9

TOBY MOSKOVITS

1

2          Q       Well, I'm not sure why you are

3   bringing that up, but anyway, please state your

4   name for the record?

5          A       Toby Moskovits.

6          Q       And what is your home address,

7   Ms. Moskovits?

8          A       It's 137-55 71st Avenue, and

9   that's in Flushing, in Queens, in New York.

10         Q       And what is your business

11  address?

12         A       It's 679 Driggs Avenue, that's

13  in Brooklyn, New York.

14         Q       And what business is located at

15  679 Driggs Avenue?

16         A       My company.

17         Q       What company is that?

18         A       It's Heritage Equity Partners.

19         Q       Any other companies or

20  businesses located at that address that you are

21  affiliated with?

22         A       I am a real estate developer, so

23  it's a mailing address used for various

24  entities.

25         Q       Where are you physically located

–   Moskovits, p. 32, ll. 9-15 (video)

```
                                              Page 32
1                        TOBY MOSKOVITS
2            A       Yes, I understand that to be the
3    case.
4            Q       And you understand that you are
5    here to provide testimony on behalf of or with
6    respect to issues relating to the Debtor and
7    the Debtor's planning, correct?
8            A       Yes.
9            Q       And you individually indirectly
10   are a 50 percent owner of the Debtor, correct?
11           A       Yes.
12           Q       And Mr. Lichtenstein is the
13   other 50 percent holder or owner of the Debtor,
14   correct?
15           A       Yes.
16               MR. FREEDMAN:  Let us show what
17           we are marking as Exhibit number 2.
18           This is the organization chart that was
19           provided to us.
20           Q       Do you recognize this?
21               (The above described document was
22           marked Exhibit 2 for identification as of
23           this date.)
24           A       This is the organization -- as
25   you present it, I believe this is the
```

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

3.   *Transcript of the Videotaped Virtual Deposition of David Goldwasser, pursuant to Rule 30(b)(6) on behalf of the Debtor and in his individual capacity, taken on March 15, 2022 ("**Goldwasser**"):*

– Goldwasser, p. 7, ll. 10-13 (video)



```
                                        Page 7
 1                    DAVID GOLDWASSER
 2          called as a witness, having first duly
 3          affirmed before the Notary Public, under
 4          penalty of perjury, and was examined and
 5          testified as follows:
 6
 7   EXAMINATION BY
 8   MR. FREEDMAN:
 9
10          Q       Please state your name and your
11   home address.
12          A       David Goldwasser, 7028 Valencia
13   Drive, Boca Raton, Florida, 33433.
14          Q       And do you have a business
15   address, Mr. Goldwasser?
16          A       I do have a business address in
17   Hollywood, Florida, I do not know it off the
18   top of my head.
19          Q       Do you know what street it's on?
20          A       It's on a side street, I think
21   it's 34th Court or something.  I could look it
22   up if you would like, but I don't know it off
23   the top of my head.
24          Q       Where are you physically located
25   right now?
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

– Goldwasser, p. 40, l. 11 through p. 41, l. 19 (video)

Page 40

1                              DAVID GOLDWASSER

2    '19.

3              Q        Are there documents reflecting

4    that relinquishment of that interest?

5              A        I believe so, sir, yes.

6              Q        And were documents filed in the

7    corporate records of that entity reflecting

8    your relinquishment of interest?

9              A        I believe so.

10                      MS. PARLOVECCHIO:  Objection.

11             Q        How did you get involved in this

12   case?

13             A        How did I get involved in this

14   case?

15             Q        Yes, sir.

16             A        I was asked by Mr. Moskovits --

17   Mrs. Moskovits Moskovits and Mr. Lichtenstein

18   to work with them on the filing and come in as

19   a CRO to help them navigate this.

20             Q        And in that regard, what have

21   been your responsibilities?

22             A        We helped, myself and the people

23   in my office helped get all of the information

24   together, working with legal counsel, at that

25   time it was Backenroth Frankel & Krinsky,

Page 41

1                     DAVID GOLDWASSER
2    solely, who filed the case.
3                    Making sure we assembled all of
4    the information for the schedules, coordinating
5    to get them -- obviously it's a large amount of
6    information for an operating entity such as
7    this.
8                    And worked with counsel to put
9    together, assisted in helping putting the
10   petition together.
11                   Working on the 341 meetings,
12   working on communications with the creditors to
13   try to have a semblance of order, attending all
14   of the court hearings, reviewing all of the
15   filings.
16                   Working on plan proposals and,
17   you know, working through some of the
18   litigation or proposed litigation items
19   throughout the case.
20        Q        Who did you interface with --
21                 MR. FREEDMAN:   Strike that.
22        Q        You said there were others in
23   your office that were involved in this process.
24   Who were those people?
25        A        I have two people in my office,

– Goldwasser, p. 43, l. 12 through p. 45, l. 20 (video - p. 44, l. 24 through p. 45, l. 20 only)

Page 43

DAVID GOLDWASSER

1

2    A    Through a different -- I'm not
3  sure which entity each of them gets a check
4  from.

5              But they work -- they are under
6  my direction.

7    Q    Where are they physically
8  located?

9    A    Mr. Taub is in the Hollywood
10 address, and Ms. Chikasheva works out of her
11 apartment in New York City.

12    Q    And tell me about the effort to
13 compile the information and documents for the
14 bankruptcy filing and schedules, explain what
15 was undertaken and who you interfaced with.

16              MS. PARLOVECCHIO:   Objection.

17    A    You know, we have a list when we
18 enter into any potential preparation for a
19 bankruptcy, we send out the list to whoever is
20 designated on the team of the ownership and/or
21 management.

22              I don't have an e-mail in front
23 of me to tell you who was on that list, but we
24 send out the list, we copy the attorneys, we
25 copy the people on our team, we copy all of the

Page 44

DAVID GOLDWASSER

1

2  parties on the other side, and we create a

3  general, I would assume here, but we generally

4  create a checklist as the stuff comes in.

5            We organize the folders and we

6  make sure that counsel who is preparing for the

7  filing has access to all of the folders.

8            So that, you know, and the

9  information so that they can properly prepare

10 the filings and make sure that things are not

11 missing.

12           When things are missing,

13 generally Elena from my office follows up with

14 the appropriate parties.

15           In some cases there are many

16 people, in some cases there are a few.

17           In this case I think there were

18 a few different people and then follows up to

19 make sure we have everything that we can get.

20           And then continues to follow up

21 on the things that are missing and/or needed,

22 get found along the way, and then need to be

23 amended.

24      Q       And who on the Debtor's side did

25 you and your team interface with in respect to

Page 45

DAVID GOLDWASSER

1
2  this task?
3          A       Like I just said earlier, I
4  don't have an e-mail in front of me giving the
5  list.
6                  I believe definitely Ms.
7  Moskovits, Mr. Lichtenstein, Ms. Gross, I
8  believe, I'm not sure if Jeremy Rauch was
9  original, the original e-mail.  He definitely
10 was involved at some point.
11                 And there is I think another one
12 person from my team whose name is escaping me
13 at the moment.
14         Q       Would that be Mr. Kirschner?
15         A       Yes, Mark Kirschner, correct.
16                 I think those were the main
17 people.  There might have been others, but I
18 think those are the main three people that we
19 generally have dealt with in regards to the
20 information flow.
21         Q       Who is Ms. Gross?
22         A       Miriam or Marian Gross.
23         Q       Who is she?
24         A       I'm sorry?
25         Q       Who is she?

– Goldwasser, p. 52, l. 14 through p. 53, l. 20 (video - p. 52, l. 14 through p. 52, l. 19 and p. 53, l. 1 through p. 53, l. 20 only)

Page 52

1                        DAVID GOLDWASSER

2       application for fees.

3              Q       So, have you been paid?

4              A       I have not been paid.

5                      The lender has not allowed me to

6       get paid.

7              Q       Has the payment obligation been

8       guaranteed by any third party?

9              A       It has not.

10             Q       Has any third party verbally

11      guaranteed the payment obligation to you as

12      CRO?

13             A       Sadly for me, no.

14             Q       So, you helped prepare and sign

15      the Chapter 11 Petition, sir?

16             A       Yes.

17             Q       And you helped prepare and you

18      signed the bankruptcy schedules?

19             A       I did, sir.

20             Q       And you did that after you went

21      through the process that you described a couple

22      of moments ago about preparing a checklist and

23      having documents pulled and reviewed by you

24      prior to that, is that fair?

25             A       That is fair, sir, yes.

Page 53

1                      DAVID GOLDWASSER

2              Q        And you were satisfied with the

3    responsiveness of the Debtor in providing you

4    the information that was requested and on that

5    checklist?

6              A        I believe so.   I mean, in every

7    case there is always some frustrating stuff

8    that happens, and nothing is perfect.

9                       For the most part, I believe we

10   had a pretty fluid process.

11             Q        Do you remember or recall any

12   frustrations that you experienced in this case

13   in that regard?

14             A        I don't think so.   I think this

15   specific case had pretty much everything

16   available.   We did have to amend schedules a

17   couple of times, but that's not uncommon for

18   any case.

19                      I mean, in a case with moving

20   parts, I apologize.

21             Q        As CRO, did you have

22   considerable authority over the Debtor's

23   postpetition operations?

24             A        Authority, I wouldn't say I had

25   authority.

– Goldwasser, p. 74, l. 19 through p. 75, l. 9 (no video)

```
                                              Page 74
1                    DAVID GOLDWASSER
2    then what I asked or didn't ask at that point
3    in time.
4               But it's a very good point that
5    it's not on here, and it should have been here.
6         Q     And the bankruptcy schedules
7    have never been amended to include the
8    management agreement, correct?
9         A     I think that's been a bone of
10   contention between the lender and the Debtor
11   and the management company for a period of
12   time, of which they are claiming that's not a
13   valid management agreement, and there has been
14   a dispute over this agreement.
15        Q     Do you still have my question in
16   mind, which was simply --
17        A     I don't believe that we amended
18   it, that's correct.
19        Q     And who designated you as the
20   representative of the Debtor to appear on its
21   behalf at the meeting of creditors on March 18,
22   2021?
23        A     Who designated -- I think in the
24   original resolution that was filed that was
25   signed by Mr. Lichtenstein and Ms. Moskovits,
```

Page 75

1                    DAVID GOLDWASSER

2    they designated me to act on their behalf in

3    the capacity of CRO, which I have appeared at

4    many 341 meetings for this capacity.

5                    I don't -- it's been a general

6    practice that I go to the 341 meetings.  As of

7    late, we have been changing that, but that's a

8    general practice, especially in a larger case

9    where there is a lot of moving parts.

10           Q       Going back to Exhibit 3, the

11   bankruptcy schedules.

12           A       Yes, sir.

13           Q       If you look at, let's start on

14   page 24 of 33.

15           A       Okay.

16           Q       Let me know when you are there.

17           A       I'm not used to this system,

18   hold on.

19                   Yes, sir.

20           Q       If you look at the bottom of

21   page item 4.

22           A       Um-hum.

23           Q       Payments or other transfers of

24   property made within one year before filing

25   this case that benefited any insider.

4.   *Transcript of the Videotaped Virtual Deposition of Michael Lichtenstein, pursuant to Rule 30(b)(6) on behalf of The Williamsburg Hotel BK LLC and in his individual capacity, taken on March 29, 2022 ("**Lichtenstein MC**"):*

– Lichtenstein MC, p. 8, ll. 20-23 (video)

---

Page 8

```
1                    MICHAEL LICHTENSTEIN
2          fully understand, thank you for
3          clarifying.
4                    MR. ROGOFF:  Thank you.
5                    MR. FREEDMAN:  Can I proceed now,
6          Charles?
7                    MR. KELLEY:  Sure, Gary.  I
8          apologize for interrupting.
9          Q      I know time is valuable, so good
10   morning, Mr. Lichtenstein.  How are you today?
11         A      I am good.
12         Q      So, this is the third time we
13   have met for a deposition.  Do you remember the
14   rules of the road?
15         A      Yes.
16         Q      Good.
17                So, by the way, where are you
18   physically located today?
19         A      In the hotel.
20         Q      And I should ask you to state
21   your name and your home address for the record.
22         A      Michael Lichtenstein, 929 East
23   5th Street, Brooklyn, New York 11230.
24         Q      And where in the hotel are you
25   physically located?
```

– Lichtenstein MC, p. 10, ll. 20-24 (video)

Page 10

```
 1                MICHAEL LICHTENSTEIN
 2        record while he does that.  I don't want
 3        to use up valuable time while the
 4        witness tries to navigate the exhibit on
 5        the record.
 6              (Discussion off the record.)
 7              THE WITNESS:  I see it.  I've got
 8        it.
 9              MR. FREEDMAN:  Let's go back on
10        the record, then.
11              THE WITNESS:  Are we back on the
12        record?
13        Q        So you have Exhibit 1, sir?
14        A        Yes.
15        Q        Do you recognize this as the
16  notice of today's deposition?
17        A        Okay.
18        Q        Is that a yes?
19        A        That's a yes.
20        Q        And you understand that you're
21  being deposed today in your individual capacity
22  and as the corporate representative of the
23  Williamsburg Hotel BK LLC, correct?
24        A        Yes.
25        Q        And you've been designated by
```

– Lichtenstein MC, p. 13, l. 19 through p. 14, l. 14 (video)

Page 13

```
1                    MICHAEL LICHTENSTEIN
2           talking about a lot of companies that
3           are not under subpoena today.
4                    MR. FREEDMAN:  Okay.  First of
5           all, Mr. Glucksman, I'm going to ask you
6           to comply with the appropriate rules,
7           which requires you to object to form,
8           not make narrative objections.
9                    When you object to form, if I have
10          an issue and I want to challenge your
11          objection, I will do so.
12                   But I have a limited amount of time
13          and I'm not going to get into narrative
14          debates with you.
15                   So I would ask that you confine
16          yourself and comply with the appropriate
17          rules.
18                   Thank you.
19          Q       My question was going to be, is
20   now, what is your position with the management
21   company, Mr. Lichtenstein?
22          A       I am the owner.
23          Q       Along with Ms. Moskovits,
24   correct?
25          A       Yes.
```

Page 14

MICHAEL LICHTENSTEIN

1

2      Q      And what is your ownership

3   interest in the management company?

4      A      I don't remember, I don't

5   remember now, I think it's 50 percent.

6      Q      And Ms. Moskovits would be the

7   other 50 percent owner?

8      A      I think so.  I don't remember

9   now the details.

10     Q      Who else would be an owner of

11  the management company, other than Ms.

12  Moskovits and yourself?

13     A      I think it's the two of us right

14  now.

15            You are asking overly broad

16  questions, so let me be clear, when I said

17  before that I don't remember about any

18  agreements between the management company and

19  any of the numerous companies that you threw

20  out at me, I am not saying that there is no

21  agreement between the management company and

22  any of those companies, that was done in the

23  last six years, I'm saying I don't remember

24  now.

25            And when you ask me about

– Lichtenstein MC, p. 15, ll. 6-9 (video)

Page 15

```
 1                  MICHAEL LICHTENSTEIN
 2    partnership, ownership of the management
 3    company, I remember it being me and Toby, it
 4    could be that Toby is more than me, I don't
 5    remember the exact percentages.
 6              Q         And as I understand it, neither
 7    you nor Ms. Moskovits have ever been an
 8    employee of the management company, correct?
 9              A         I don't remember now.
10              Q         Are you presently an employee of
11    the management company, sir?
12              A         I am not getting a paycheck from
13    the management company now.
14              Q         Well, I didn't ask you whether
15    or not you are getting a paycheck, are.
16                       You presently an employee of the
17    management company?
18              A         The answer is I am not getting a
19    paycheck now from the management company.
20              Q         I want an answer to my question,
21    please, if you could.
22                       Are you an employee of the
23    management company?
24              A         I do not remember now if I was
25    an employee during the last seven, eight years
```

– Lichtenstein MC, p. 17, ll. 12–20 (video)

Page 17

```
 1                    MICHAEL LICHTENSTEIN
 2            30(b)(6) capacity.
 3                    I will take the lead on presenting,
 4            but Mr. Glucksman may have particular
 5            objections he may want to interpose.
 6                    I will be lead presenter of the
 7            witness, but he's entitled to make his
 8            record.
 9                    MR. GLUCKSMAN:  That's right.
10                    MR. FREEDMAN:  I'm going to
11            object to that, but we will proceed.
12            Q       What are your specific
13    responsibilities as an owner of the management
14    company?
15                    In other words, what are your
16    duties and responsibilities?
17            A       I'm not going to respond as to
18    duties.  My actions, what I do is I manage the
19    Williamsburg Hotel, and I manage whatever other
20    hotels the management company was working on.
21            Q       What other hotels has the
22    management company been working on?
23            A       The hotel -- the management has
24    been working on the Williamsburg Hotel in
25    Bushwick, and the management company has been
```

– Lichtenstein MC, p. 18, l. 3 through p. 20, l. 11 (no video)

Page 18

| | |
|---|---|
| 1 | MICHAEL LICHTENSTEIN |
| 2 | working on a hotel in Miami. |
| 3 | Q      What is the name of the |
| 4 | development company in respect to the Bushwick |
| 5 | hotel? |
| 6 | A      Excuse me? |
| 7 | Q      What is the name of the |
| 8 | development company in respect to the Bushwick |
| 9 | hotel project? |
| 10 | A      I'm not understanding your |
| 11 | question.  What is the name of who? |
| 12 | Q      The development company, who is |
| 13 | developing the Bushwick hotel? |
| 14 | A      I don't remember the exact name, |
| 15 | it's 233 Siegel Acquisition LLC, if I remember |
| 16 | correctly. |
| 17 | Q      And 233 -- that property was |
| 18 | just recently sold out of bankruptcy, right? |
| 19 | A      That property was just sold to |
| 20 | the original buyer, who was lining up to buy it |
| 21 | prior to COVID. |
| 22 | Q      Out of bankruptcy, correct? |
| 23 | A      Through bankruptcy |
| 24 | reorganization; yes. |
| 25 | Q      Did 232 Siegel ever have a |

Page 18

MICHAEL LICHTENSTEIN

1

2    working on a hotel in Miami.

3         Q       What is the name of the

4    development company in respect to the Bushwick

5    hotel?

6         A       Excuse me?

7         Q       What is the name of the

8    development company in respect to the Bushwick

9    hotel project?

10        A       I'm not understanding your

11   question.  What is the name of who?

12        Q       The development company, who is

13   developing the Bushwick hotel?

14        A       I don't remember the exact name,

15   it's 233 Siegel Acquisition LLC, if I remember

16   correctly.

17        Q       And 233 -- that property was

18   just recently sold out of bankruptcy, right?

19        A       That property was just sold to

20   the original buyer, who was lining up to buy it

21   prior to COVID.

22        Q       Out of bankruptcy, correct?

23        A       Through bankruptcy

24   reorganization; yes.

25        Q       Did 232 Siegel ever have a

Page 19

1                      MICHAEL LICHTENSTEIN

2      contract or agreement with the management

3      company?

4               A        Very possible.

5               Q        Do you recall it as you sit here

6      today?

7               A        I said it's very possible.

8               Q        That's not my question.

9                        Do you recall there being a

10     contract or agreement between 232 Siegel and

11     the management company as you sit here today?

12              A        There was definitely discussion

13     about it, and in various formats, both with if

14     we were going to build it, and both if someone

15     else was going to build it.

16                       And I would have to check my

17     records.

18              Q        And what's the name of the

19     development company that's doing the Miami

20     project?

21              A        The development company, I don't

22     remember the name now.

23              Q        You have no idea?

24              A        No, I said I don't remember the

25     name of the development company right now.

Page 20

MICHAEL LICHTENSTEIN

1

2      Q      Is there a written contract or

3  agreement between that company and the

4  management company?

5      A      I have to check my records.

6      Q      Do you have a recollection as

7  you sit here today of there being one?

8      A      There might very well have been

9  one.  I have to check my records over the past

10 four years to see if there was ever executed or

11 signed.

12              MR. GLUCKSMAN:  You have asked

13         him.  Objection, you've asked him again

14         and again to speculate.

15              MR. FREEDMAN:  Counsel, object to

16         form.  I'm not going to do this with

17         you.

18              I'll bring this before the judge

19         and I will seek sanctions if you keep it

20         up.

21              Do you understand me, sir?

22              MR. GLUCKSMAN:  I heard your

23         words, yes.

24              MR. FREEDMAN:  Good, thank you.

25      Q      The management company did not

## II.  **Debtor's Lack of Transparency and Discovery Obstruction**

### a.  **Exhibits (None)**

### b.  **Testimony**

#### 1.  *Lichtenstein*

– Lichtenstein, p. 42, ll. 16-25 (video)

```
                                        Page 42
 1                   LICHTENSTEIN
 2   $10 million of loans to the debtor to assist
 3   with operations, to assist with shortfalls, to
 4   assist with completion of construction and any
 5   and all necessary costs, of which we got paid
 6   back less than 50 percent and we are still owed
 7   about $6 million.
 8        Q.    Who is "we"?
 9        A.    Toby Moskovits and myself.
10        Q.    Of the approximately $10 million,
11   how much of that amount did you fund?
12        A.    Did you finish the question?
13        Q.    Yes, sir.
14              (Reporter clarification.)
15        A.    Both of us funded the loan.
16        Q.    What was the source of funds for the
17   loan?
18        A.    I don't think it's any of your
19   business.
20        Q.    You're refusing to answer the
21   question, sir?
22        A.    I am not responding as to the
23   sources of where the $10 million loan came
24   from.  It is simply not a matter for your
25   deposition.
```

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

– Lichtenstein, p. 239, l. 20 through p. 241, l. 13 (video - p. 240, ll. 10-14 only)

Page 239

```
 1                    M. LICHTENSTEIN
 2        A.    I don't know which line you're reading
 3   from.
 4        Q.    It's 1A.
 5        A.    Okay.
 6        Q.    Do you agree with me it shows zero
 7   receipts there?
 8        A.    Seems to show zero, yes.
 9        Q.    So is it your testimony that the debtor
10   had zero receipts in 2017?
11        A.    No.  It is my testimony that the tax
12   return is prepared in the way the -- the way a tax
13   return is done, and this is what it shows here in
14   this line item.
15        Q.    I don't know what that means.
16              If an entity has receipts, it's
17   supposed to be reflected on the return, no?
18        A.    Yes, and everything is reflected on this
19   return.  You're asking me about one line item.
20        Q.    Right.  And if you look at -- just look
21   at the income section, 1 through 8.  The only income
22   or receipts reflected on this 2017 return is
23   $180,000, correct?
24        A.    Yes.
25        Q.    Okay.  So that was the total amount of
```

Veritext Legal Solutions
212-267-6868                     www.veritext.com                     516-608-2400

30

Page 240

M. LICHTENSTEIN

2  receipt or income that the debtor had in 2017,

3  correct?

4       A.    No.   I think you don't know how to read a

5  tax return.

6       Q.    Well, teach me, then.   Where is the

7  reflection of --

8       A.    I don't think this deposition is a lesson

9  on how to read tax returns.

10       Q.    Show me, sir, where on this return it

11  reflects that the debtor had other income or

12  receipts in 2017 other than the $180,000.

13       A.    I'm not going to spend time now teaching

14  you how to read tax returns.

15       Q.    You're refusing to answer the question?

16            MR. KELLEY:  He's asking you to flip

17       through the document and direct him where you

18       need to direct him, if you would.

19       A.    You can look at Schedule L.   You can look

20  at any other pages other than the first page.

21       Q.    Take me to those pages that you think

22  reflect income or receipt of funds for the debtor in

23  2017 other than the first page where it reflects

24  only $180,000.

25       A.    The tax return consists of about 20

Page 241

M. LICHTENSTEIN

2    pages, so feel free to flip through it and go
3    through it.
4        Q.    I did, sir.   I couldn't find anything
5    else.   That's why I'm asking you.
6        A.    Okay.   So maybe you should ask an
7    accountant to review with you the tax return.
8        Q.    I have, and their conclusion was no
9    different than mine.
10       A.    Okay.
11       Q.    So as a debtor's representative --
12       A.    You can have your tax expert reach out to
13   my accountant to review.
14       Q.    Are you refusing to answer the question,
15   sir?   This is a problem.   You are here as the
16   debtor's representative.   This is a very important
17   issue with respect to confirmation.
18            If you don't want to engage in these
19   very direct questions, that's your prerogative;
20   we'll deal with it at the appropriate time.   I
21   just want to give you fair warning that we will be
22   dealing with this and we will be opposing
23   confirmation because of your reluctance and
24   failure to answer very straightforward questions
25   which relate to income and reporting of income by

– Lichtenstein, p. 155, ll. 4-8 (no video)

Page 155

```
1                    M. LICHTENSTEIN
2    we didn't provide this $10 million to the debtor
3    when the bank statements all show this money
4    actually coming in?  I mean, that is what Mr.
5    Huebscher is lying about in his reports.  And I
6    understand that probably you or one of your
7    colleagues probably drafted the report for Mr.
8    Huebscher, but --
9               MR. KELLEY:  Mr. Lichtenstein, just --
10       A.    -- the facts -- I'm finishing a response.
11   The facts are that these $10 million were provided
12   to the debtor.  There are bank statements that come
13   from JPMorgan and Bank of America.  There are
14   numerous bank statements.  They're there, so I don't
15   know what you guys are trying to do with this line
16   of questioning and disputing this stuff that is
17   actual facts.
18               MR. FREEDMAN:  Move to strike as
19       unresponsive.
20       Q.    My question -- well, let me ask a
21   different question.
22               When you were telling Mr. Huebscher
23   about these loans between you and and Ms.
24   Moskovits and the debtor, did you provide him a
25   copy of Exhibits 3 and 4?
```

– Lichtenstein, p. 159, ll. 11-23 (no video)

Page 159

```
 1                    M. LICHTENSTEIN
 2   Judge Drain?
 3        A.    Well, he's generally made it a practice
 4   to lie.
 5               (Reporter clarification.)
 6               MR. KELLEY:  For some reason, your
 7          voice is not coming through your microphone
 8          very clear, Mr. Lichtenstein.
 9        A.    Can you hear me now?
10               MR. KELLEY:  Yes.
11        A.    I said Mr. Huebscher has made it a
12   practice to lie and just say whatever Benefit Street
13   wants or needs him to say, so I wouldn't give
14   credence to anything that he says.
15        Q.    If he testified under oath that the
16   debtor never provided him or you and Ms. Moskovits
17   never provided him copies of Exhibits 3 and 4, would
18   he be lying to Judge Drain?
19        A.    We provided Mr. Huebscher a 500-page
20   detailed report.  He has all the bank statements
21   showing the money coming in.  So whether we provided
22   him the specific exhibits that you're referring to,
23   it doesn't matter.  He's still a liar.
24               MR. FREEDMAN:  And I don't like to make
25          narrative speeches on the record, but we are
```

– Lichtenstein, p. 242, l. 13-19 (video)

```
                                              Page 242

1                      M. LICHTENSTEIN

2      the debtor.

3                MR. KELLEY:  I'm going to object to the

4           sidebar.

5                But, Mr. Lichtenstein, how are you

6           feeling?  Are you tired?  Do you need to take

7           a break?  Or do you want to proceed with

8           answering this question?  How would you

9           like --

10               THE WITNESS:  We can take a break if

11          the parties want.

12               MR. KELLEY:  I'm fine.  It's up to you.

13               THE WITNESS:  I am merely saying that I

14          will not spend the next half hour reviewing a

15          tax return with Mr. Freedman.  That is not

16          the purpose of this deposition.

17          A.     If you want tax advice, then go and ask

18      some -- an accountant, and we can have conversations

19      with accountants by the tax returns.

20               MR. KELLEY:  Mr. Lichtenstein, let's --

21          I'm just going to do this once on the record

22          and then we can take a break and talk about

23          it.

24               It's Mr. Freedman's time.  He can waste

25          it any way he wants.  If he wants to ask you
```

– Lichtenstein, p. 245, l. 18-19 (no video)

```
                                           Page 245

 1                  M. LICHTENSTEIN

 2      A.     Yes.

 3      Q.     And at the end of year, the loan from

 4  partners is $4,482,723?

 5      A.     Yes.

 6      Q.     And when we looked at it earlier, we saw

 7  the line of credit agreement was dated June of 2016.

 8          So did you and Ms. Moskovits not have

 9  any outstanding loans to the debtor going into

10  2017?

11      A.    Who says we didn't?  I don't understand

12  your question.  How does this 2017 return show that

13  there were no loans before?

14      Q.     Because they would be fronted -- if there

15  were outstanding loans as of January 1, 2017, they

16  would be reflected as beginning of the year loans.

17  That's how.

18      A.     I will not respond to how tax returns

19  were prepared without my accountant.

20          (Whereupon, a 2018 Tax Return was

21      marked as Lichtenstein Exhibit 14 for

22      identification, as of this date.)

23          MR. FREEDMAN:  By the way, Mr. Kelley,

24      I've tried to be cordial and professional

25      with you.  When you call my questioning a
```

– Lichtenstein, p. 248, ll. 17-24 (no video)

```
                                              Page 248

 1                     M. LICHTENSTEIN

 2   there was no income.

 3        Q.    I never used the word "income," sir.  I

 4   said the return shows no gross receipts or sales,

 5   correct?

 6        A.    That line is empty.  That's all it says.

 7   Doesn't say the hotel didn't have gross receipts or

 8   sales.

 9        Q.    It doesn't reflect a number in there,

10   right?

11        A.    So the incomes and sales are reflected in

12   other places in the tax return.

13        Q.    Sir, 1A doesn't have a number in it,

14   right?

15        A.    1A doesn't have a number in it.  That's a

16   fact.

17        Q.    And the only income reflected on this tax

18   return is $1,450,000 on line 7, correct?  Other

19   income.

20        A.    I will not answer to that question.

21        Q.    What is that other income from?

22        A.    As I said, I will not be having a

23   discussion with you about tax returns and how they

24   were prepared.

25                THE WITNESS:  I have to wash my hands.
```

– Lichtenstein, p. 253, l. 25 through p. 254, l. 8 (no video)

```
                                              Page 253

 1                      M. LICHTENSTEIN
 2        Q.    Line item 19A, correct?
 3        A.    Yes.
 4        Q.    The next actual entry below that is
 5   Partners' capital accounts, line item 21.
 6              Do you see that?
 7        A.    Uh-huh.
 8        Q.    Is that a yes, sir?
 9        A.    That's a yes.
10        Q.    And the capital account went down from
11   twenty-one thousand, two hundred and seventy-four
12   thousand, three hundred thirty-six dollars to
13   $11,409,750.
14              Do you see that?
15              MR. KELLEY:  I think you may have
16        misspoke.  You said 21,000 when you meant 21
17        million.
18              MR. FREEDMAN:  Thanks.  When I said it,
19        it actually dawned on me that's the way it
20        came out, so let me try again.
21        Q.    $21,274,336.  And it went down to, at the
22   end of 2018, $11,459,750.
23              Do you see that?
24        A.    Yes.
25        Q.    How did the partners' capital accounts
```

Page 254

M. LICHTENSTEIN

1

2   drop over $10 million from the beginning of 2018 to

3   the end of 2018?

4        A.      So as I said, I will not be responding on

5   behalf of my accountant in detail.  But overall, it

6   could have been simply depreciation or other

7   accounting reasons or mechanisms why the capital

8   account is shown as going down by this much.

9        Q.      Did any of that capital account get

10  rolled into the loans?  In other words, did any of

11  that capital account get recharacterized to a loan

12  during 2018?

13       A.      No.

14       Q.      You're sure of that?

15       A.      Yes, I'm sure.

16       Q.      And your only explanation, as you sit

17  here today, for the reduction of the capital account

18  is perhaps depreciation, correct?

19       A.      I said that there might be a myriad of

20  explanations for how the tax returns are structured,

21  one of them which might be depreciation and other

22  explanations.

23              I will not be responding on behalf of

24  my -- of the accountant, as I said already.

25       Q.      Would you flip to the last page.

– Lichtenstein, p. 255, l. 16 through p. 256, l. 2 (no video)

Page 255

| | |
|---|---|
| 1 | M. LICHTENSTEIN |
| 2 | MR. KELLEY:  Page 17 of 17?  Sorry. |
| 3 | Just to make sure we're clear. |
| 4 | MR. FREEDMAN:  8187 Bates stamp. |
| 5 | MR. KELLEY:  Thank you. |
| 6 | A.    Okay. |
| 7 | Q.    You'll see in the middle description |
| 8 | Property Fee from the Williamsburg Hotel BK, LLC, of |
| 9 | $1,450,000. |
| 10 | What is that, sir? |
| 11 | (Technical interruption.) |
| 12 | Q.    Williamsburg BK, LLC. |
| 13 | What is that, sir? |
| 14 | A.    That is the income that was left after |
| 15 | expenses that came from the management company. |
| 16 | Q.    Why does the description called -- calls |
| 17 | it a property fee? |
| 18 | A.    You can ask the accountant if you want. |
| 19 | If Benefit Street insists, they can rename it to a |
| 20 | different name. |
| 21 | Q.    Do you know, sir? |
| 22 | A.    It's just a random description.  Just a |
| 23 | random description. |
| 24 | Q.    To the IRS. |
| 25 | A.    As I said, if Benefit Street, the lender, |

Page 256

M. LICHTENSTEIN

 1
 2  insists, we can name it a different way.

 3          (Whereupon, the 2019 Tax Return was

 4      marked as Lichtenstein Exhibit 15 for

 5      identification, as of this date.)

 6      Q.     Exhibit 15 is the 2019 return for the

 7  debtor.  Let me know when you have it up, please.

 8      A.     Yup, I have it.

 9      Q.     This starts with Bates stamp 3199.  Is

10  that a true copy of the debtor's 2019 return?

11      A.     Seems like it.

12      Q.     Okay.  And you see the first page?  This

13  is actually Acknowledgment and General Information

14  for Entities That File Returns Electronically, and

15  it has a return number.

16          Do you see that, sir?

17      A.     Yes.

18      Q.     Do you have a document like that for the

19  2018 return?

20      A.     Well, we just looked at it together.  I

21  don't think I saw it there.

22      Q.     I meant does the debtor have a document

23  like that in its possession, the 2018 return?

24      A.     I don't know.  I can check.  We already

25  agreed we'll send you the proof of filing or proof

– Lichtenstein, p. 258, l. 16 through p. 259, l. 9 (no video)

Page 258

1                        M. LICHTENSTEIN

2              Do you see that?

3      A.     Which page?

4      Q.     Same page, line item 15.

5      A.     Okay.

6      Q.     Who was that interest paid to?

7      A.     Well, if it was 2019, then probably

8   Benefit Street.

9      Q.     Do you know that for a fact?

10     A.     I don't know that, no.  As we're sitting

11  here, I don't know.

12     Q.     If you flip to page 3124 --

13     A.     Which page on the return?

14     Q.     5.

15     A.     Okay.

16     Q.     So you see that same line item 19A, Loans

17  from Partners?  At the beginning of the year, the

18  loan account was $9,605,000.37 and it went down at

19  the end of year to $6,383,928, correct?

20     A.     Yes.

21     Q.     And the capital account went from

22  $11,400- million down to $8,800,000?

23     A.     Yes.

24     Q.     Do you know why the capital account went

25  down?

Page 259

M. LICHTENSTEIN

1
2      A.    I will -- again, I will not get into
3  CPA-level analysis of the tax return.
4      Q.    My question is:  Do you know why it went
5  down?  If you don't, you don't.
6      A.    I said I will not be responding on behalf
7  of my CPA.  I can tell you that some of it is
8  depreciation.  There's other accounting principles
9  that can be involved, and that is it.
10     Q.    If you flip to Bates stamp 3137.
11     A.    Yeah.
12     Q.    You see description property fee from the
13  Williamsburg Hotel BK, LLC, $500,000?
14     A.    Yes.
15     Q.    Is that the income --
16     A.    It's freezing up.  One minute.  3145?
17  Which page are you talking about now?
18     Q.    3137, sir.
19     A.    Okay.  What's your question?
20     Q.    So I'm assuming, based upon your prior
21  testimony, that that's the income generated at the
22  hotel for 2019?
23     A.    That's what's left.  The income is filed
24  under -- income and expenses are filed under the
25  management company and this is what's left at the

– Lichtenstein, p. 282, l. 6 through p. 283, l. 21 (video - p. 282, ll. 6-22 and
p. 283, l. 12-21 only)

```
                                                    Page 282

1                        M. LICHTENSTEIN

2    question?

3        Q.    Mayer Brown has already been paid.  Tell

4    me about that.

5        A.    You can discuss with Mayer Brown.

6        Q.    I'm asking you, sir, as the debtor's

7    representative, how has Mayer Brown been paid?

8        A.    I don't think it's part of the deposition

9    topics not to discuss how much or how Mayer Brown

10   has been paid.

11       Q.    It's absolutely germane, sir.

12       A.    Well, I disagree.

13       Q.    How much has Mayer Brown been paid?

14       A.    I'm not going to answer that now.

15       Q.    Has there been a court order approving

16   the debtor's payment of Mayer Brown's fees?

17       A.    I will not be answering any questions

18   about his relationship with Mayer Brown.

19       Q.    Has the debtor paid Mayer Brown without

20   an appropriate court order in place?

21       A.    I will not be answering any questions

22   about our relationship with Mayer Brown.

23            MR. KELLEY:  I think what Mr.

24       Lichtenstein is -- Mr. Lichtenstein, I think

25       what Mr. Freedman is asking is are you aware
```

Page 283

M. LICHTENSTEIN

2  of any payments that have been made without

3  any existing orders to the law firm.

4          MR. FREEDMAN:  No, that's not my

5  question.  I want to know about any payments

6  made to Mayer Brown with respect to its

7  representation of debtor.

8          MR. KELLEY:  Okay.  Just trying to get

9  you an answer.

10      A.      I will not be responding to any questions

11  about Mayer Brown.

12      Q.      And you do realize that payment of a law

13  firm that is not approved by the bankruptcy court

14  could be a basis for the appointment of Chapter 11

15  trustee?

16          Do you understand that, sir?

17      A.      You do realize payment could be made in

18  various different entities and that Mayer Brown is a

19  much more prestigious firm than your own and

20  whatever they're doing is done 100 percent on the up

21  and up.

22          MR. FREEDMAN:  Move to strike once

23  again as unresponsive.

24      Q.      Anything else you want to add to this?

25  Because it is going to be germane to the appointment

– Lichtenstein, p. 293, l. 20 through p. 294, l. 6 (no video)

Page 293

```
1                    M. LICHTENSTEIN

2   behalf of the debtor -- not the lawyers.

3              Who on behalf of the debtor negotiated

4   and agreed to that settlement?

5        A.    The principals together.

6        Q.    You and Toby, correct?

7        A.    Yeah.

8        Q.    And who did you negotiate that with on

9   behalf of the management company?

10       A.    I don't understand the question.

11       Q.    Well, you just testified that you and

12  Toby negotiated on behalf of the debtor.

13             Who did you negotiate that on behalf of

14  --

15             MR. FREEDMAN:  Strike that.

16       Q.    Who did you negotiate that with on behalf

17  of the management company?  Who was on the other

18  side of that negotiation?

19       A.    Negotiated with ourselves.

20       Q.    And what due diligence did the debtor do

21  to determine the financial wherewithal or ability

22  for the management company to pay the 4824,000 over

23  a year if the debtor's plan is not confirmed?

24       A.    First of all, I don't believe I have to

25  provide you any information on that.  The
```

Page 294

M. LICHTENSTEIN

1

2  wherewithal the management company pays is none of

3  your business, number one.  Number two, the basic

4  response is the same people who provided $30 million

5  to the debtor can definitely provide that amount of

6  money if necessary.

7       Q.    Are you and Toby going to guarantee the

8  payment of the $824,000 to the debtor?

9            MR. KELLEY:  Objection.  Form.

10      A.    We're not going to provide anything more

11  than what was provided already.

12      Q.    I'm just understanding -- trying to

13  understand, sir, as a fiduciary on behalf of the

14  debtor, how did you make or what determination did

15  you make in respect to the ability of the management

16  company to pay that $824,000 over a year if the plan

17  is not confirmed?  Is there anything more you can

18  tell me?

19      A.    There's a track record of $10 million

20  being provided over five years.  So that should

21  definitely not be an issue, to answer your question.

22      Q.    That was provided by you and Toby?

23      A.    And the management company is owned by me

24  and Toby.

25      Q.    Are you going to guarantee the management

– Lichtenstein, p. 296, l. 15 through p. 297, l. 6 (video)

Page 296

1              M. LICHTENSTEIN

2      Q.    Over the past four years, how many

3    bankruptcy proceedings other than this one have you

4    and/or Ms. Moskovits been involved in, either

5    directly or through one of your affiliated

6    companies?

7      A.    We were involved in two more

8    bankruptcies, and one is out of bankruptcy already,

9    almost.

10     Q.    One would be 232 Seigel?

11     A.    232 Seigel is already out, so two, I

12   guess, are out already.

13     Q.    Not my question.  I didn't ask you what's

14   in and out.

15           I asked you:  In the past four years,

16   how many bankruptcies have you been involved in?

17     A.    And I responded.  We've been involved in

18   two more bankruptcies, and one is out already.  In

19   fact, there was a closing already yesterday.  And

20   the other one is almost resolved, too.

21     Q.    The one that closed yesterday is in re:

22   232 Seigel?

23     A.    Closed yesterday already, yes.

24     Q.    And that one, you're fighting with a

25   lender as well, right?

Page 297

M. LICHTENSTEIN

1     A.    That one is Fortress -- I guess Fortress

2 and Benefit Street are in a competition on who is

3 the biggest asshole lender in New York City.  So I

4 think Benefit Street might even take -- might win

5 that one, but we'll see.

6         MR. KELLEY:  Let's just stay with the

7    question.  The extra comments are -- while I

8    understand the anger, let's just stick to the

9    question.

10    Q.    So my question was, before you started

11 using profanity, sir, was you are in litigation with

12 a lender with respect to the 232 Seigel project,

13 correct?

14    A.    I am in litigation with two lenders,

15 Benefit Street and Fortress, and I have very fine

16 relationships with multiple other lenders where I'm

17 building projects and everything is going fine.

18         There are two lenders only, Benefit

19 Street and Fortress, who are -- and I will look

20 for a different description -- who are -- let's

21 call it jerks or bad predatory lenders who we are

22 resolving our issues with.

23         One has already been almost resolved

24 and the other one will be resolved on April 7th.

– Lichtenstein, p. 112, l. 24 through p. 113, l. 10 (video)

```
                                                    Page 112

 1                     M. LICHTENSTEIN

 2    this amount on average.  This is a business

 3    running between 20 and 25 million a year in

 4    revenue, so 250,000 is not a huge amount that I

 5    will remember from a year ago who said what to

 6    who.

 7              I would assume responsibility as the

 8    owner and manager of the management company and

 9    the owner of the debtor for whatever transfers

10    were made.  Yes.

11         Q.    So you said two or three times the money

12    was transferred to cover payroll?

13         A.    I did not --

14         Q.    You didn't say that?

15         A.    I said expenses.  I did not say payroll.

16    I said that you're obsessing about an amount of

17    $250,000 when that is only a payroll weekly average

18    cost.  The weekly average expenses are -- run

19    between 300 and 350,000 a week.

20              This obsession with $250,000, if that

21    is the only thing that you have, then we are

22    absolutely in great shape and it just shows what

23    an amazing operation we're running.

24         Q.    Sir, you're being extremely

25    argumentative, and I would appreciate, again, if you
```

Page 113

M. LICHTENSTEIN

1

2   stopped and just answered the question.

3       A.     I'm going to stop you right there.

4   Please do not say false statements.  I'm responding

5   to your questions and I'm responding and providing

6   information.

7              You don't like the answers, and you

8   will not like most of my answers, actually,

9   because you are representing a lying, thieving

10  entity who is trying to steal my building away

11  from me.

12             So you will not like most of my

13  answers, and I will continue answering with the

14  truth, which you will not like.

15      Q.     So --

16      A.     Please do not say I'm not responding to

17  your questions.

18             MR. KELLEY:  I appreciate that response

19        from both of you all, but I'm going to say

20        Gary, please, I will instruct my witness.  If

21        you have an objection, you're familiar with

22        the protocols.  Please assert it or exercise

23        it, but please proceed with the questions.

24        But please do not give instruction to my

25        witness.

2. _Moskovits_

– Moskovits, p. 493, l. 2 through p. 494, l. 25 (video - p. 493, l. 4 through
p. 494, l. 25 only)

---

Page 493

TOBY MOSKOVITS VOL. II

1
2          A.  The documentation seems to speak for
3     itself.
4          Q.  And, ma'am, you would agree with me
5     that the borrower under this loan agreement is
6     the Debtor, correct?
7          A.  That's a legal conclusion.
8          Q.  Who do you think was a borrower in
9     the loan transaction between my client and the
10    Debtor?
11         A.  I'm not a lawyer.  I can't -- I'm not
12    answering that.  It's a legal conclusion.
13         Q.  You have no idea who entered into the
14    loan transaction with my client; is that your
15    testimony?
16         A.  You're asking a legal question.  I'm
17    not --
18         Q.  No, it's -- no.  You're the --
19         A.  You're asking a legal question.
20         Q.  You're the Debtor's representative
21    here today.
22              You can't even tell me who entered
23    into the loan transaction with my client?
24         A.  If you want to ask about a specific
25    document, maybe show it to me and ask a very

---

Page 494

TOBY MOSKOVITS VOL. II

2    specific question.

3         Q.  No, I'm not going to waste time.  If

4    you can't answer a simple question as who was the

5    borrower --

6         A.  I don't know what the question is.  I

7    don't know what the question is.  What's the

8    question?

9         Q.  You're interrupting, ma'am.  Please

10   stop.

11            Who was the borrower in the loan

12   transaction with Benefit Street that is the

13   subject of all the controversy in this bankruptcy

14   case?  Who was the borrower?

15        A.  Are you asking for the name of the

16   entity?

17        Q.  Sure.  Let's start there.

18        A.  So why don't you show me the

19   signature block so I can remember the exact name

20   of the entity.

21        Q.  You can't tell me it was the Debtor,

22   as we sit here?

23        A.  You're asking me if the Debtor was

24   the borrower in the -- did the Debtor borrow

25   money from Benefit Street, yes.

– Moskovits, p. 10, l. 3 through p. 11, l. 9 (no video)



Page 10

TOBY MOSKOVITS

1

2  today?

3          A         I am in South Florida.

4          Q         What's the address where you are

5  currently located?

6          A         Is this relevant?

7                    THE WITNESS:  Gina, my attorney,

8          is it relevant where I'm physically

9          located?

10                   MS. PARLOVECCHIO:  I think --

11         A         I'm in South Florida, in a

12  private home.

13         Q         What is the address of the

14  private home that you are located?

15         A         I'm not sure why it's relevant.

16  I'm not comfortable sharing that.

17         Q         So, you are refusing to answer

18  the question?

19         A         I have confirmed that I am in a

20  private home in South Florida.  I am here by

21  myself.

22                   I am not giving any more

23  information about where I am in a public

24  proceeding.

25         Q         Well, your attorney has a right

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 11

**TOBY MOSKOVITS**

2  to designate information that you provide as

3  confidential and there is a confidentiality

4  stipulation in place.

5                  So, if you're concerned about

6  the information becoming public -- let me

7  finish, please ma'am?

8          A       I'm not telling you where I am.

9  I told you I'm in South Florida.  I've given

10  you my home address, my business address,

11  you're speaking to me representing a firm that

12  has not only published confidential

13  information, but lied in the process, so I'm

14  not comfortable sharing where I am right now.

15                  Okay, let's move on.

16          Q       How long have you been at that

17  location?

18                  Who was speaking?

19          A       I arrived last night, somebody

20  just mumbled something, I didn't hear that.

21          Q       You arrived last night, did you

22  say?

23          A       Yes.

24          Q       How long are you staying there?

25          A       Over the weekend.

– Moskovits, p. 14, l. 23 through p. 17, l. 25 (no video)

Page 14

```
 1                        TOBY MOSKOVITS
 2            A       Yes.
 3            Q       If you answer the question, I'm
 4   going to assume that you understood it; is that
 5   fair?
 6            A       I will make it clear if I need
 7   any more clarification.
 8            Q       So is my direction fair to you?
 9            A       Yes.
10            Q       It's important for you to allow
11   me to finish asking the question before you
12   answer it so our court reporter can take it
13   down.
14                    We have already talked over each
15   other a couple of times, and I want to try not
16   to do that; is that fair?
17            A       Yes.
18            Q       If at any time you need a break,
19   as long as there is no question pending, just
20   let us know, and we will accommodate you, is
21   that fair?
22            A       Yes.
23            Q       You understand that you are here
24   in your individual capacity?
25            A       I'm not sure what that means.
```

Page 15

1                    TOBY MOSKOVITS

2   Is that a statement, a question?

3          Q        Do you understand that you're

4   here to give testimony in your individual

5   capacity?

6          A        So I would defer to my lawyer.

7   Am I testifying on behalf of an entity, myself

8   or both, I'm not sure.

9                   If you're making a statement,

10  then I will accept it.  It was not important to

11  the scheduling of the proceeding.

12         Q        It was a question, ma'am.

13                  Do you understand that you are

14  appearing today to give testimony in your

15  individual capacity?

16                  That's a question mark at the

17  end?

18         A        I am deferring to my attorney

19  because I don't know that to be the case, I do

20  not understand as to who, on whose behalf I am

21  testifying.

22                  Can I ask my attorney to please

23  clarify?

24         Q        No, no, I'm asking the

25  questions.

Page 16

1                    TOBY MOSKOVITS
2                    So, ma'am, is it fair to say
3    that you have no -- idea in what capacity --
4          A        If you are --
5          Q        Let me finish asking the
6    question, ma'am that was the direction I gave
7    you and we agreed to.
8                    You have no idea as you sit here
9    today in what capacity you are to provide
10   testimony.
11                   Is that accurate?
12         A        My response is I am prepared to
13   provide testimony in an individual capacity or
14   on behalf of an entity as advised by my
15   attorney.
16                   I haven't finished my response,
17   and you're being overly combative on what
18   should be an administrative discussion in a
19   very simple administrative question I was
20   answering.
21                   So, I don't even begin to
22   understand why you are hot in the collar.
23                   The answer is I am here as an
24   individual, and I know that there has been some
25   discussion as to which, between myself and

Page 17

TOBY MOSKOVITS

Mr. Lichtenstein, who is going to be testifying

on behalf of which entities.

    So I think it's reasonable and

legitimate to defer that question to my

attorney.

    With regard to -- I'm here in an

individual capacity, I can tell you that to the

best of my knowledge yes.

    If you're telling me that I'm

not testifying on behalf of any other entities,

then I will take it at face value.

    I repeated --

    Q    I just want to know as you sit

here today what is your understanding in the

capacity or capacities in which you are to

provide testimony?  That's all I'm asking.

    A    The answer is I don't know.

    Q    Okay.

    A    I know there is discussion as to

who is testifying on behalf of which entity.

    I am here as an individual and I

have asked a legitimate question, an

administrative scheduling question of my

attorney and I don't understand.

– Moskovits, p. 56, ll. 13-22 (video)

```
                                              Page 56

1                    TOBY MOSKOVITS

2          A       The FIA, that's an entity that's

3    a name that I'm familiar with from my dealings

4    with him.

5          Q       David Goldwasser?

6          A       Yes.

7          Q       Actually, FIA Heritage Holdings

8    LLC is listed as a creditor on the bankruptcy

9    schedules filed in this case; are you aware of

10   that?

11         A       If that's what the document

12   says, then that's what the document says.

13         Q       And the document provides that

14   FIA Heritage Holdings LLC has a claim against

15   the Debtor for $3 million.

16                 Are you aware of that?

17         A       The document speaks for itself.

18         Q       Are you aware, is my question,

19   ma'am.

20         A       The document, I would have to

21   see the document, the document speaks for

22   itself.

23         Q       And are you aware that the claim

24   is listed as undisputed, are you aware of that?

25         A       I would have to see the
```

– Moskovits, p. 99, l. 25 through p. 100, l. 10 (no video)

Page 99

1                    TOBY MOSKOVITS
2    but keep going, I am responding again that the
3    EIDL loan is a loan that would need to be
4    repaid, that as per my attorney was addressed
5    in other capacities and was outside the scope
6    of Mr. Huebscher's examination.
7            Q      It's not outside the scope of my
8    deposition, ma'am, so that's why I am asking
9    it.
10           A      I responded to you, it is a loan
11   that will need to be repaid, not by the Debtor,
12   it will need to be repaid by us individually,
13   period.
14           Q      Was the loan applied for in the
15   name of the management company; yes or no?
16           A      I don't have the documents in
17   front of me.
18           Q      You have no recollection as you
19   sit here today, that's your testimony?
20           A      I don't have the documents in
21   front of me.  If you show me very specific
22   documents, I can answer.
23                  The EIDL money is a loan, it is
24   a loan that will need to be repaid.
25           Q      Is it your testimony, ma'am,

Page 100

TOBY MOSKOVITS

1

2     that you can't remember in what name in July

3     2021 this $350,000 loan was taken out under, is

4     that your testimony?

5           A        My testimony is --

6                    MS. PARLOVECCHIO:   Objection.

7           A        My testimony is that the EIDL

8     money is a loan.  If you ask me for anything

9     more specific, I would need to go check the

10    records.

11                   So please don't put words in my

12    mouth, okay?

13                   I would need to check the

14    record.  You are asking me about voluminous

15    information, employee records, documents that

16    were signed over the course of seven or eight

17    years.

18                   No, I do not have all that

19    information in my head, I would have to check

20    the records.

21          Q        This was just six months ago,

22    right?

23                   MS. PARLOVECCHIO:   Gary, I'm

24          assuming you have this in front of you.

25                   MR. FREEDMAN:   I don't.  If you

– Moskovits, p. 106, ll. 14-24 (no video)

Page 106

1                    TOBY MOSKOVITS

2   point on page 5 of 36, what is Northside

3   Management LLC?

4           A       That's an entity through which

5   Michael Lichtenstein and I do business.

6           Q       And what business does Northside

7   Management LLC do?

8           A       It's in the related real estate

9   management industry.

10          Q       And what properties?

11          A       Northside is an LLC, I'm not

12  sure if it has actual -- if it has an actual

13  operating business, I would have to confirm.

14          Q       And why did the management

15  company wire $252,100 to Northside Management

16  LLC on February 25, 2021?

17          A       I don't have that information in

18  front of me, so I can't tell you.  I would have

19  to go check the record.

20          Q       And in February 2021 was

21  Northside Management LLC involved in any actual

22  business enterprise?

23          A       I would have to check the

24  records.

25          Q       You have no recollection as you

– Moskovits, p. 123, l. 6 through p. 126, l. 20 (no video)

Page 123

1                    TOBY MOSKOVITS

2          Q        I thought --

3          A        I read the actual substance of

4    his report, I don't recall looking at every

5    exhibit.

6          Q        Okay, so when you saw the items

7    that we went through on page 5 of 36, did you

8    or have anyone do any due diligence to see if

9    the statement set forth in those two bullet

10   points were true and correct?

11                  MS. PARLOVECCHIO:  Objection,

12         calls for legal deliberations.

13         A        You are asking a lot.  I will

14   respond as follows, even though whatever I say

15   you claim is not responsive.

16                  Mr. Huebscher, who is so

17   confident in his skill, he refers to himself in

18   the third person, as has a series of addendums

19   after his name, seems to be incapable of doing

20   basic math or understanding basic accounting,

21   and is a very comprehensive response that was

22   prepared line by line to each of his false

23   statements.

24                  So, I'm not sure what that has

25   to do with this particular exhibit, which I

Page 124

TOBY MOSKOVITS

1
2   don't recall seeing.

3                   I didn't go through every single

4   exhibit and there are other people that

5   participated in the review of the document,

6   including Michael Lichtenstein, but this

7   particular exhibit I don't recall seeing.

8                   So what is the question about

9   this exhibit?

10          Q       Ma'am, I'm going to ask you once

11  again if you could just please, please, just

12  listen to my question and try to answer my

13  question.

14                  My simple question is --

15          A       I believe that I am answering

16  your questions.

17          Q       You are not, but that's okay we

18  will get through this, you and I, together.

19                  The two bullet points on page 5

20  of 36, the discussion of the $350,000 EIDL loan

21  and the discussion about the $252,100

22  transferred to the management company, to

23  Northside Management LLC, did anyone on behalf

24  of the Debtor do any investigation to see if

25  those statements were true and correct?

Page 125

TOBY MOSKOVITS

1

2                    MS. PARLOVECCHIO:   Objection.

3          A     It's a very comprehensive

4    response with regard to Mr. Huebscher's false,

5    deliberately false reports, and I would

6    encourage you to read them.

7          Q     Ma'am, ma'am, I'm sorry, I'm

8    sorry, stop.

9                    The question was did anyone on

10   behalf of the Debtor do any investigation with

11   respect to the validity of those two

12   statements?

13                   It's yes or no.

14         A     As far as I'm aware --

15                   MS. PARLOVECCHIO:   Objection to

16       form.

17                   THE WITNESS:   Gina, please repeat

18       what you said, because I couldn't hear

19       it.

20                   MS. PARLOVECCHIO:   Objection to

21       form.   I can't even follow this question

22       I'm sorry.

23                   MR. FREEDMAN:   Then, Gina, you

24       tell -- stop stop.

25         A     You are jumping between two

Page 126

TOBY MOSKOVITS

1

2   things.   I don't even understand the connection

3   between the equity contribution and these two

4   lines.

5              If you are deliberately trying

6   to confuse me, I don't know what you're doing,

7   I'm repeating again.

8              There is a very detailed,

9   comprehensive response to Mr. Huebscher.

10             Mr. Huebscher's report is an

11  attempt to falsely portray transactions that he

12  has, I don't know if he's 70 or 75 years old,

13  but based on what he put in his report, it's

14  like those cops where after they get caught for

15  taking bribes they go back and review every

16  single case they were involved in; every single

17  report he's ever issued should be reviewed.

18             He's deliberately ignored basic

19  accounting rules, he's deliberately ignored

20  basic information he was provided.

21             I cannot tell you, on a specific

22  line item he has 50 bank statements over seven

23  years and tens of thousands of pieces of paper

24  so.

25             So I did not review every

– Moskovits, p. 169, l. 18 through p. 172, l. 11 (no video)

Page 169

TOBY MOSKOVITS

2  MS. PARLOVECCHIO:  We can discuss
3  it off the record.
4  THE WITNESS:  I said clearly that
5  you put words in my mouth that I didn't
6  say.  You asked me to respond.
7  Q  Did you listen to Mr. Leitner's
8  deposition yesterday?
9  A  No.
10  Q  So you don't know how he
11  testified in respect to the effect of the COVID
12  regulations being withdrawn and done away with,
13  right?
14  A  I've seen -- I read his
15  appraisal, I did not listen to or read
16  anything, any transcript as relates to his
17  testimony yesterday.
18  Q  Between the foreclosure action
19  and the bankruptcy filing, so that would be
20  June of 2019 through February of 2021, what
21  efforts did the Debtor undertake to refinance
22  the BSP or the Benefit Street debt?
23  A  Just so I understand, could you
24  clarify again, you are asking about from June
25  of 2019 until February of 2021?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

68

Page 170

**TOBY MOSKOVITS**

1

2          Q        Yes, ma'am.

3          A        So, I think it was in December

4    of 2018 we had --

5          Q        Stop, I specifically asked

6    you --

7          A        In order to respond to that I

8    need to share a piece of information.

9                   So I don't know why that's to

10   your detriment to listen to me for a second.

11                  I am asking for you to be

12   respectful for a second, maybe it will be

13   faster.

14                  In the three minutes you didn't

15   let me speak, I would have finished what I was

16   saying.

17                  In December of 2018 after an

18   extensive amount of work on my part, okay, I

19   had a loan a term sheet from Natixis Bank that

20   would have paid off Benefit Street in full.

21                  Why I secured it was because we

22   were feeling very deeply abused by their

23   behavior on St. John's, and then were terrified

24   as to what they were going to do to us on the

25   Williamsburg Hotel, having gotten all kinds of

Page 171

### TOBY MOSKOVITS

1

2      crazy offers from Mike Comperator to buy the

3      offer from us which I believe is in the record.

4                        Once Benefit Street called a

5      default, hours after I sent a request for a

6      payoff letter to Michael Goodman, with a copy

7      of a fully executed term sheet, everybody in

8      the market knew we were in default, they

9      refused to cure the default even though they

10     were paid interest.

11                       So, our ability in June of 2019

12     when they filed foreclosure to find a lender

13     was severely hampered and was severely hampered

14     going back to December of 2018 when

15     unexplainably, even though we continued to get

16     the interest paid, which your client has

17     stipulated to in open court, they refused to

18     put the loan back into compliance.

19          Q       Move to strike, I move to -- I

20     move to strike your answer as unresponsive,

21     ma'am.

22          A       The answer was very responsive,

23     it's extremely difficult to refinance a loan in

24     default.

25          Q       The simple question is what

Page 172

TOBY MOSKOVITS

```
 1
 2   efforts did the Debtor undertake between June
 3   2019 and the filing of this bankruptcy case to
 4   refinance the Benefit Street debt?
 5           A       My response is I gave you
 6   background that is critical to --
 7           Q       I don't need the background, I
 8   want to know what efforts between that time
 9   frame, if any?
10           A       It is extremely difficult to
11   refinance a loan on a property in default.
12           Q       Is the answer none, is the
13   answer none?
14           A       The answer is I spent a year, I
15   I spent six months looking for debt in the last
16   two quarters of 2018.
17           Q       Is the answer none, ma'am?
18           A       The answer is --
19           Q       None?
20           A       The answer is my efforts to
21   refinance started in May of 2018.
22                   The efforts to refinance this
23   loan started in May of 2018, and were severely
24   hampered by a default, a technical default that
25   was unexplainable, that the lender refused to
```

– Moskovits, p. 173, l. 5 through p. 174, l. 11 (no video)

Page 173

TOBY MOSKOVITS

1

2  cure.

3              The efforts to refinance lead

4  back to December.

5        Q       What efforts specifically

6  between June 2019 and February 2021, that's my

7  question, ma'am.

8              For the third time I'm trying to

9  get an answer to that question, not yours.

10       A       With an active default, the

11 outreach we were making to find lenders was

12 unsuccessful.

13       Q       Tell me about the outreach

14 between those dates, tell me about the outreach

15 between those dates; who did you contact?

16       A       I don't recall specific, the

17 specific lenders, I would have to go back and

18 check my records.

19       Q       Can you tell me a single lender

20 that you reached out to between those two dates

21 to try to refinance the Benefit Street debt?

22              A single one?

23       A       Alliance Bernstein.

24       Q       Who is that?

25       A       Alliance Bernstein.  I recall

Page 174

TOBY MOSKOVITS

1
2    meeting with Alliance Bernstein.
3           Q        When was that contact?
4           A        What do you mean, what was that
5    contact?
6           Q        When?
7           A        It was after the foreclosure the
8    start of the foreclosure.
9           Q        Any other inquiries?
10          A        I would have to check my
11   records.
12                   But the feedback -- I'm trying
13   to respond.
14          Q        No, ma'am.  There is no question
15   pending.  Stop, stop.
16                   MS. PARLOVECCHIO:  She's not
17           saying anything.
18          Q        By the way, the Natixis term
19   sheet had contingencies, right?
20          A        I don't have the document in
21   front of me, I can't tell you.  It goes back to
22   2018.
23          Q        You can't recall?
24          A        The contingencies are irrelevant
25   because within an hour or two of getting the

– Moskovits, p. 182, ll. 5-18 (no video)

Page 182

1                    TOBY MOSKOVITS

2   the inquiry of Alliance Bernstein?

3          A        They issued a term sheet, which

4   they ultimately withdrew.

5          Q        Did the debt reflected in the

6   term sheet, would that have been sufficient to

7   take out my client's debt?

8          A        I need to go back and check, but

9   I recall that that would have been sufficient

10  to take out the debt.

11         Q        Did that term sheet contain

12  contingencies?

13         A        I don't have the document in

14  front of me.

15         Q        Who were you dealing with at

16  Alliance Bernstein?

17         A        I don't recall the individual's

18  name, I have to go back and check my records.

19         Q        Were you the principal person on

20  behalf of the Debtor that was dealing with

21  Alliance Bernstein?

22         A        Yes.

23         Q        Did the folks or the person that

24  you were dealing with at Alliance Bernstein

25  tell you why the term sheet was withdrawn?

– Moskovits, p. 342, l. 21 through p. 343, l. 8 (no video)

Page 342

TOBY MOSKOVITS

2   apple, I apologize.
3        Q        Do you have it now?
4        A        I have Exhibit 8, but it's
5   lender's objection to confirmation, is that
6   what it is?
7        Q        Go to page 250, please.
8        A        One second, that's all the way
9   down, hold on.
10       A        So I am looking at the numbers
11  on top, so it's 250 of 326, is that where you
12  want me to go to?
13       Q        Yes, ma'am.
14       Q        You will let me know when you
15  are there, please?
16       A        I have to scroll all the way
17  down, yes.
18                It's in the exhibits, right?  I
19  am almost there, hold on.
20                Okay, I have it.
21       Q        Do you see the top it's entitled
22  fourth amendment to operating agreement of 96
23  Wythe Acquisition LLC?
24       A        Yes.
25       Q        And you see on page 259 that you

Page 343

TOBY MOSKOVITS

1

2 signed this fourth amendment to operating

3 agreement of 96 Wythe Acquisition LLC on behalf

4 of the two members?

5          A       Yes, that appears -- that

6 appears to be my signature.  I'm going to take

7 it that this is what you say it is, which is

8 the amendment to the operating agreement.

9          Q       And you recall that this fourth

10 amendment to operating agreement of 96 Wythe

11 Acquisition LLC was required by Benefit Street

12 as part of the closing of its loan to the

13 Debtor?

14          A       I have to read it because --

15 give me a second.

16          Q       Of course.

17          A       I see it, but I'm not sure I

18 understand exactly what 100 percent the purpose

19 of it was.

20                  I have to refer back to the org

21 chart, why don't you go ahead and ask the

22 question and then I could answer to the best of

23 my ability.

24          Q       You do recall that the date of

25 this document, December 13, 2017, coincided

– Moskovits, p. 344, ll. 9-25 (no video)

Page 344

TOBY MOSKOVITS

1

2    with the closing of the loan from Benefit

3    Street to the Debtor, correct?

4            A       Yeah, I mean I don't know

5    exactly, but it's somewhere in December, so if

6    you tell me the closing date was the 13th, then

7    that's fine, that's somewhere in that time

8    frame.

9            Q       And if you flip to the second

10   page, which is 251?

11           A       Yeah.

12           Q       Do you see on the bottom it

13   says, "Company has not and will not," do you

14   see that?

15           A       Yes.

16           Q       So, you would agree with me that

17   the items following C here are matters for

18   which the Debtor agreed that it has not and

19   will not do in the future, correct?

20           A       Yeah, but I'm looking at this,

21   I'm not 100 percent clear on the relationship

22   between this and the Debtor, so I would need to

23   consult with my attorney to have someone

24   explain to me the relationship between this

25   entity and the Debtor.

– Moskovits, p. 346, l. 9 through p. 347, l. 4 (no video)

Page 346

TOBY MOSKOVITS

1

2        Q       I don't know, ma'am, I'm not

3   going to answer questions, I'm just trying --

4        A       I guess I'm not understanding.

5   I'm not sure that I understand the relationship

6   between this entity and the Debtor, but maybe

7   ask your question and then maybe it will be

8   more clear.

9        Q       You do agree with me, 96 Wythe

10  Acquisition LLC is the Debtor, correct?

11       A       That is correct.

12       Q       And that this document says,

13  "This fourth amendment to operating agreement

14  of 96 Wythe Acquisition LLC, a New York limited

15  liability company, dated as of December 13,

16  2017, is among the individual entities signing

17  it below," so you would agree with me that this

18  is the fourth amendment to the operating

19  agreement for the Debtor?

20       A       Yeah, but what I'm telling you

21  is I'm not familiar with this exact document

22  and I don't have the org chart in front of me.

23               So I would need to consult with

24  my lawyer to have them explain to me the

25  relationship between this and my ownership and

Page 347

TOBY MOSKOVITS

1

2    the actual Debtor, and I don't understand

3    that -- I don't understand that just from

4    looking at this.

5              Q        Putting that aside, you would

6    agree with me that subsection C or starting at

7    section 3 says, "single purpose entity

8    provisions," right?

9              A        Where are you up to on which

10   page is that?

11             Q        251.

12                      Do you see that section 3,

13   single purpose entity provision?

14             A        I see that.

15             Q        Then C says, "Company has not

16   and will not," do you see that?

17             A        Yes.

18             Q        And then after that it lists 24

19   separate paragraphs of items that the Debtor

20   has not and will not do, correct?

21             A        I mean in the last four seconds

22   I can't read all of them, but I note that there

23   is -- there is many items over there in the

24   bottom.

25                      I get to 24, yes I count to 24.

– Moskovits, p. 348, l. 3 through p. 349, l. 18 (no video)

Page 348

1              TOBY MOSKOVITS

2        Q        Okay.

3                 One the items that the Debtor

4    committed not to do under this operating

5    agreement was, Incur any indebtedness, secured

6    or unsecured, direct or contingent, other than

7    the debt that's referring to the debt from

8    Benefit Street, unsecured trade payables, I am

9    paraphrasing just to get through this, that

10   should not be more than 90 days past due,

11   permitted equipment leases.

12                So you would agree with me that

13   the Debtor did not comply with this provision,

14   right?

15       A        I put on the record I don't

16   understand the relationship between this entity

17   and the Debtor and any monies taken -- any

18   obligations taken on by the Debtor were solely

19   to support the business and/or to pay interest

20   to the Benefit Street Partners as a lender, so

21   I'm not sure what specifically you are

22   referring to.

23       Q        I'm really trying to get through

24   this.

25                So you've already testified that

Page 349

TOBY MOSKOVITS

2  the Debtor's principals made loans of $11 to

3  $12 million to the Debtor, right?

4          A       Yes.

5          Q       And you've testified about

6  another, I forget who it was, but another $2.5

7  million loan made to the Debtor?

8          A       Yes.

9          Q       So it's fair that the Debtor did

10  not comply with section C here, correct?

11          A       I repeat again that I don't

12  understand the connection between this document

13  and the Debtor, and I will add, as well, that

14  any monies that were provided were in support

15  of the business and in the furtherance of the

16  business plan, and to pay interest to Benefit

17  Street when they refused to release funds from

18  the escrow.

19          Q       And sub 4, "Comingle its funds

20  or assets with the funds or assets of any other

21  person, or maintain its assets in such a manner

22  that it will be costly or difficult to

23  segregate, ascertain or identify its individual

24  assets from those of any other person."

25                  So it's fair to say that the

– Moskovits, p. 359, l. 20 through 361, l. 14 (no video)

Page 359

1                    TOBY MOSKOVITS

2                    What are you referring to

3    specifically?

4          Q     I am just asking you as the

5    Debtor's representative here today, did the

6    Debtor comply with (xiv) of the operating

7    agreement?

8                    MS. PARLOVECCHIO:  Objection.

9          A     You need to give me a time

10   frame, I'm not even familiar -- I'm not even

11   sure I understand exactly the relationship

12   between this document and our ownership in the

13   entity, I ask for a more specific question.

14         Q     December 13, 2017 forward, and

15   I'm really focusing on affiliate, okay, with

16   respect to any agreements with any affiliates

17   of the Debtor,

18         A     To the best of my knowledge we

19   complied with this.

20         Q     Looking at page 254, did the

21   Debtor comply with (xxii) that it wouldn't

22   permit any affiliate independent access to its

23   bank accounts?

24         A     I'm not aware of anyone who was

25   provided access to the bank accounts other than

Page 360

TOBY MOSKOVITS

1
2      the Receiver; and then subsequently --

3             Q       Did the management company have

4      access to the Debtor's bank accounts?

5             A        The management company was

6      basically collecting -- the management company

7      on its own was collecting monies and paying

8      bills.

9             Q       My question is --

10            A       It didn't have control.

11            Q       Did the management company have

12     access to the Debtor's bank accounts?

13                    MS. PARLOVECCHIO:  Objection,

14            vague.

15            A        The management company had its

16     own accounts and the Debtor had its own

17     accounts.

18            Q       My question is did the

19     management company have access to the Debtor's

20     bank accounts?

21            A        What does the word access mean?

22     You mean did they have the right to send money

23     to the Debtor's bank accounts, is that the

24     question?

25            Q       Did they have the ability to

Page 361

TOBY MOSKOVITS

1
2    move money in or out of the Debtor's bank
3    accounts is the question.
4            A        Anybody can move money in, you
5    can send a wire or a transfer.
6                     The management company did not
7    have control over the management company's bank
8    accounts.
9            Q        Did it have the ability to move
10   money out of the Debtor's bank accounts?
11           A        Like I said previously, the
12   Debtor controlled its own bank accounts and the
13   management company controlled its own bank
14   accounts.
15           Q        I'm not asking control.
16           A        The access is no.
17           Q        The word is access, did it have
18   access?
19                    MS. PARLOVECCHIO:   Objection.
20           A        Sorry?
21           Q        Did it have access?   Did the
22   management company have access to the Debtor's
23   bank accounts?
24                    MS. PARLOVECCHIO:   Objection.
25           A        You asked me previously if the

– Moskovits, p. 361, l. 21 through p. 362, l. 16 (no video)

Page 361

1                         TOBY MOSKOVITS

2      move money in or out of the Debtor's bank

3      accounts is the question.

4              A        Anybody can move money in, you

5      can send a wire or a transfer.

6                      The management company did not

7      have control over the management company's bank

8      accounts.

9              Q        Did it have the ability to move

10     money out of the Debtor's bank accounts?

11             A        Like I said previously, the

12     Debtor controlled its own bank accounts and the

13     management company controlled its own bank

14     accounts.

15             Q        I'm not asking control.

16             A        The access is no.

17             Q        The word is access, did it have

18     access?

19                      MS. PARLOVECCHIO:  Objection.

20             A        Sorry?

21             Q        Did it have access?  Did the

22     management company have access to the Debtor's

23     bank accounts?

24                      MS. PARLOVECCHIO:  Objection.

25             A        You asked me previously if the

Page 362

TOBY MOSKOVITS

2  management company could move money in and out,

3  and I responded to that.

4                    I would need to check if the

5  management company also had view access, I

6  don't know.

7                    But the management company did

8  not have control, it could not move money out,

9  I don't know what access.

10                    You are using a generic word,

11  what does access mean?

12                    You want to clarify?

13          Q        Yeah, it's the language used in

14  your own operating agreement, ma'am.

15          A        Which I tell you I don't know

16  exactly how this relates to the actual Debtor.

17                    So you want to show me which

18  clause are you referring to?

19          Q        I am going to move on, I will

20  mark as the next exhibit which will be 9.

21                    (The above described document was

22          marked Exhibit 9 for identification as of

23          this date.)

24          A        I don't see anything there yet,

25  did you upload it?

– Moskovits, p. 404, ll. 3-12 (no video)

Page 404

TOBY MOSKOVITS

1

2  think you want to hear my answer.

3       A       As you like to say, the document

4  speaks for itself.

5               It's a document identified as a

6  hotel management agreement as unsigned, it

7  speaks for itself.

8       Q       I never say that.

9       A       I'll say that the document

10 speaks for itself.  It's unsigned and the

11 version that was supposedly sent to my attorney

12 had signature blocks on it.

13              MR. FREEDMAN:  Gina, can you have

14      her stop?

15              There is no question pending.

16      There is no question pending.

17      A       No problem.

18      Q       Do you have a copy of an

19 assignment of hotel management agreement that

20 talks about compensation to the hotel manager

21 consistent with what we have marked as Exhibit

22 9?

23              In other words, rather than 3

24 percent of gross rent, the assignment says 3

25 percent of all revenue, and then 10 percent of

– Moskovits, p. 410, ll. 11-25 (no video)

```
                                                    Page 410

1                       TOBY MOSKOVITS

2    with the Debtor in writing?

3                   MS. PARLOVECCHIO:  Objection.

4          A        No, that was clear in the

5    e-mails, and that's why my attorney kept trying

6    to limit the documents and he kept asking to

7    include the clauses that were of concern for

8    the attorneys at Stroock & Stroock & Lavan to

9    put that into the loan agreement, and they

10   clearly were not interested in doing that.

11         Q        Did the management company ever

12   have a technical services agreement, a

13   development agreement with the Debtor?

14                  MS. PARLOVECCHIO:  Objection to

15         form.

16         A        I need to check my records, I

17   don't remember.

18         Q        You don't recall it as you sit

19   here, right?

20         A        I don't recall.  I would have to

21   go back and check my records if it was

22   formalized in an agreement, there wasn't a

23   management agreement, so it may not have been,

24   but I don't know for certain, I would have to

25   go back and check my records.
```

– Moskovits, p. 462, ll. 11-24 (no video)

Page 462

1                    TOBY MOSKOVITS VOL. II

2              A.   I -- yes.

3              Q.   And you and Mr. Lichtenstein own

4    50 percent of the Debtor, correct?

5              A.   I answered that question last time.

6    I gave you a little more nuance on the --

7              Q.   Okay.  But, generally, that's

8    correct, right, ma'am?

9              A.   I gave you a very specific answer to

10   that question last time.

11             Q.   Either you -- either you or your

12   trust own 50 percent of the Debtor, correct?

13             A.   I answered that question already.

14             Q.   Well, I'm asking again, ma'am.  Just

15   answer the question so I can move on.

16             A.   I answered the question.  I went

17   through ery specifically who owns what.  I had

18   the org chart in front of me.  I'm not responding

19   to that without the org chart.  But you have the

20   answer in your record.

21                  So if you'd move to the next question

22   cause I answered this.  I said this has been

23   responded to with specificity off of an org

24   chart.  I don't have it in front of me right now.

25             Q.   Can you help me understand then what

– Moskovits, p. 464, ll. 17-21 (video)

```
                                                    Page 464
 1                    TOBY MOSKOVITS VOL. II
 2          Q.  The attorneys at Stroock required the
 3     17-page excessive term management agreement; is
 4     that your testimony?
 5              MS. PARLOVECCHIO:  Objection,
 6     mischaracterizes the testimony.
 7          Q.  They --
 8          A.  We were asked -- we were asked to
 9     prepare a management agreement and we did.  That
10     is my response.
11          Q.  They gave you a one-page form
12     management agreement, right, not a 17-page
13     management agreement?
14          A.  That e-mail that you showed me was
15     never -- I was not included on and I do not
16     recall Mr. Kaiser sending that to me.
17          Q.  And tell me why do you need an
18     incentive fee in a management agreement when the
19     owners of the hotel are the owners of the
20     management company?
21          A.  The document speaks for itself.
22          Q.  No, the document doesn't answer this
23     question.
24              Why do the owners of the hotel and
25     the owners of the management agreement require an
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

– Moskovits, p. 465, ll. 17-22 (video)

Page 465

1   TOBY MOSKOVITS VOL. II

2   incentive fee in the management agreement?

3   What's the purpose of that?

4         A.   Because as you're aware, there are

5   other parties who are in the ownership of the

6   hotel that were not involved in the management.

7   But beyond that, the document speaks for itself.

8         Q.   You testified a moment ago that --

9         A.   No, I actually didn't testify to

10  that.   So maybe you should be more careful with

11  your questions and your record.

12        Q.   Ma'am, stop yelling at me and stop

13  lecturing please.

14        A.   I don't yell.   I don't yell.   I speak

15  in a very calm voice.   I don't yell.   The only

16  yelling is coming from you.

17        Q.   Can you tell -- can you tell me any

18  other reason why you and Michael required the

19  hotel to provide -- the hotel, generally, owned

20  by you and Michael to provide an incentive fee to

21  you and Michael?

22        A.   The document speaks for itself.

23             MS. PARLOVECCHIO:   Objection to form.

24        Q.   Can you add anything more than "the

25  document speaks for itself"?

– Moskovits, p. 466, ll. 10-12 (video)

```
                                              Page 466
1                  TOBY MOSKOVITS VOL. II
2            A.   No.   There is a lot -- as you
3      mentioned, there are lot of pages here.   So I
4      think -- so, as you read it and you'll
5      understand.   The document speaks for itself.
6            Q.   Anything else you can add, ma'am, so
7      I can move on?
8            A.   Is there an open -- is there a
9      pending question?
10           Q.   Any other reason why you and Michael
11     included an incentive fee to you and Michael?
12           A.   The document speaks for itself.
13                MR. FREEDMAN:   Let's bring up the
14     loan document.
15           A.   Are you asking me a question or
16     trying to pull something up?
17           Q.   So, ma'am, approximately, 39 minutes
18     before I took Mr. Lichtenstein's first
19     deposition, the Debtor provided an alleged loan
20     agreement and an amendment to that loan agreement
21     representing a line of credit facility between
22     you and Michael as lender and the Debtor as the
23     borrower.
24                Are you familiar with that loan?
25                MS. PARLOVECCHIO:   Objection to form.
```

– Moskovits, p. 473, ll. 3-18 (no video)

Page 473

1                    TOBY MOSKOVITS VOL. II

2     What's the question?

3            Q.  This loan agreement is between you

4     and Michael Lichtenstein as lender and the Debtor

5     as borrower, correct?

6            A.  That's what the signature block seems

7     to show, yes.

8            Q.  Do you have any doubt that that's

9     what this agreement is?

10           A.  I think the document speaks for

11    itself.

12           Q.  Documents don't speak, ma'am.

13               Do you have any --

14           A.  -- the word in the doc -- I'm sorry.

15           Q.  Do you understand this document or

16    don't you?

17               MS. PARLOVECCHIO:  Objection.

18           A.  The document speaks for itself.

19           Q.  Are you refusing to answer the

20    question?

21           A.  What is the question?

22               MS. PARLOVECCHIO:  Objection.

23           Q.  Is this the loan agreement between

24    you and Michael as lender and the Debtor as

25    borrower?

– Moskovits, p. 474, ll. 7-24 (video)

Page 474

TOBY MOSKOVITS VOL. II

2    A.   This is the third time you're asking

3    me that and my response is I'm looking at the

4    signature blocks and that's what it says.  Yes,

5    it is a loan agreement between borrower 96 Wyeth

6    Acquisition and Michael and myself as lender.

7         Q.   And the maximum amount of the line of

8    credit under Exhibit 15 is $5 million, correct?

9         A.   The document speaks for itself.

10        Q.   Ma'am, please just answer the

11   question.  There is --

12        A.   The document speaks for itself.

13        Q.   I'm asking is that your

14   understanding, ma'am?

15        A.   The document speaks for itself.

16        Q.   You're refusing to answer the

17   question?

18        A.   I answered the question.

19        Q.   No, you haven't.

20             And the Debtor --

21        A.   The document speaks for itself.  It's

22   a line of credit agreement and it says, line of

23   credit limit $5 million.  The document speaks for

24   itself.

25        Q.   And the line -- this line of credit

– Moskovits, p. 495, l. 11 through 496, l. 5 (no video)

```
                                               Page 495

 1                    TOBY MOSKOVITS VOL. II

 2               You have to ask specific questions.

 3          Q.   And the borrower's --

 4          A.   I'm not sure what your question is.

 5     I'm sorry.  I'm not trying to be disrespectful.

 6          Q.   Okay.

 7               MR. FREEDMAN:  Then let's show her

 8     4.23.

 9          Q.   Let me know when you have that.

10          A.   I see that, yes.

11          Q.   Okay.  Section 4.23, "Special Purpose

12     Entity.  Borrower and each SPE component entity"

13     shall not at all times -- sorry, "shall at all

14     times comply with the requirements set forth on

15     Exhibit C attached hereto and shall not take or

16     permit any action that would result in borrower

17     or any SPE component entity not being in

18     compliance with the representations, warranties

19     and covenants set forth in Section 3.24 and

20     Exhibit C attached hereto."

21               Did I read that correctly?

22          A.   The document speaks for itself.

23          Q.   I just asked you if I read it

24     correctly, ma'am?

25          A.   So, like I said before, I actually
```

Page 496

TOBY MOSKOVITS VOL. II

1
2    have issues reading the screen.  So it's very big
3    strain for my eyes.  If you're representing that
4    you're reading it, then the document speaks for
5    itself.
6            Q.   Okay.  So let's go to Exhibit C now.
7                 You see Exhibit C, ma'am?
8            A.   Yes.
9            Q.   Okay.  Exhibit C, "Special Purpose
10   Entity requirements.  Borrower covenants and
11   agrees that (A) borrower has not and will not" --
12   and I'm going down to Romanette (iii) -- "incur
13   any indebtedness secured or unsecured, direct or
14   contingent (including guaranteeing any
15   obligation) other than (A) the debt," which is
16   the debt between the Debtor and Benefit Street,
17   "(B), unsecured trade payables and operational
18   debt not evidenced by a note and incurred in the
19   ordinary course of business with trade creditors
20   provided any indebtedness incurred pursuant to
21   subclause B shall not be more than 90 days," and
22   finally, "permitted equipment leases."
23                Okay.  So, at the time that the
24   Debtor executed the loan agreement, there existed
25   the line of credit agreement and the amendment to

– Moskovits, p. 532, ll. 2-18 (video)

Page 532

TOBY MOSKOVITS VOL. II

1

2    Q.   Ms. Moskovits, the Debtor recently

3    filed tax returns for 2017, '18, '19 and '20,

4    correct?

5    A.   Yes.

6    Q.   Okay.  If I ask you any questions

7    about that tax returns that the Debtor filed, are

8    you competent to testify to them?

9    A.   I'm not an accountant.  I would have

10   to consult with my account apartment.

11   Q.   Right.  And I just want to waste

12   time.  If I asked you questions about the tax

13   returns, would you just generally tell me that

14   you would need to consult with your accountant

15   and you'd be unable to answer questions?

16   A.   I can't answer -- I need -- I would

17   have to consult with my accountant.  That is

18   correct.

19   Q.   You've been jotting down notes --

20   A.   Actually, no.  I've been scribbling.

21   I have no notes; scribbling.  (Indicating.)

22   Q.   Did you bring any writing in with you

23   today?

24   A.   No, no.

25   Q.   A couple of the tax returns you

*3.*    *Lichtenstein MC*

–    Lichtenstein MC, p. 23, l. 9 through p. 24, l. 9 (video)

```
                                        Page 23

 1                  MICHAEL LICHTENSTEIN

 2    ago what hotel deals are you referring to?

 3          A      Well, we just discussed, it was

 4    a hotel deal in Brooklyn, there was a hotel

 5    deal in Miami.

 6                  I don't remember now all the

 7    deals that were discussed in the last five

 8    years.

 9          Q      And you said something like the

10    Eidolon.

11                  What was that?

12          A      You know very well what the

13    Eidolon is, because you asked me about it.

14          Q      I don't know, sir, so what is

15    it?

16          A      I would appreciate if you don't

17    lie, since you very well know what it is,

18    because you asked me about it.

19                  So the Eidolon was a source of

20    funds of the management company.

21          Q      What is the Eidolon, sir?  I

22    don't know, and this is your deposition, so I

23    need an answer to the question so I can move

24    on.

25          A      I would appreciate again if you
```

Page 24

MICHAEL LICHTENSTEIN

2    stop lying.  You know very well what the

3    Eidolon is, it is a loan provided by the SBA to

4    the management company.

5          Q       The EIDL loan, that's what you

6    are referring to?

7          A       I really don't appreciate your

8    playing dumb and lying to me three times as if

9    you didn't know what I'm talking about.

10          Q       All right.

11                 Does the management company have

12    a specific bank account associated with the

13    Miami project?

14          A       Not that I remember now.

15          Q       Does the management company have

16    a specific bank account associated with the

17    Bushwick project?

18          A       I don't remember now which

19    accounts were associated with what, and frankly

20    it's none of your business if it's not related

21    to the Debtor.

22          Q       Did the management company ever

23    receive a fee for any work it did on the

24    Bushwick project?

25          A       I will not answer that question

– Lichtenstein MC, p. 24, l. 22 through p. 25, l. 17 (video - p. 25, l. 11-17 only)

---

Page 24

```
 1              MICHAEL LICHTENSTEIN
 2    stop lying.  You know very well what the
 3    Eidolon is, it is a loan provided by the SBA to
 4    the management company.
 5         Q      The EIDL loan, that's what you
 6    are referring to?
 7         A      I really don't appreciate your
 8    playing dumb and lying to me three times as if
 9    you didn't know what I'm talking about.
10         Q      All right.
11                Does the management company have
12    a specific bank account associated with the
13    Miami project?
14         A      Not that I remember now.
15         Q      Does the management company have
16    a specific bank account associated with the
17    Bushwick project?
18         A      I don't remember now which
19    accounts were associated with what, and frankly
20    it's none of your business if it's not related
21    to the Debtor.
22         Q      Did the management company ever
23    receive a fee for any work it did on the
24    Bushwick project?
25         A      I will not answer that question
```

Page 25

MICHAEL LICHTENSTEIN

1
2  now, A, because I don't remember these, if
3  anything was incurred in the last few years.
4              B, sources of income of the
5  management company that are unrelated to the
6  Debtor are none of your business.
7      Q      Did the management company ever
8  receive a fee in respect to the Miami project?
9      A      Same answer applies to this,
10 too.
11     Q      You are refusing to answer the
12 question, sir?
13     A      I am answering the question,
14 that it's none of your business if the
15 management company had sources of funds from
16 other places that are not related to the
17 Debtor.
18     Q      Well, sir, since you brought up
19 the EIDL loan, do I have it correct that there
20 was a $350,000 loan that was made under the
21 EIDL, E-I-D-L, program to the management
22 company in July 2021, correct?
23     A      Yes.
24     Q      And the funds for that loan were
25 received into a management company account,

– Lichtenstein MC, p. 26, l. 4 through p. 27, l. 9 (video - p. 26, ll. 4-15 and p. 27, ll. 6-9 only)

```
                                                    Page 26

1                    MICHAEL LICHTENSTEIN

2     correct?

3          A         Yes.

4          Q         And thereafter the funds were

5     transferred to an account in the name of

6     Northside Acquisition Partners LLC, correct?

7          A         It is none of your business what

8     happened with the funds that were the

9     management company's funds that had no

10    connection to the Debtor.

11         Q         You are refusing to answer?

12         A         I am not going to respond to any

13    information asked about the use of the EIDL

14    funds, because it's unrelated to the Debtor and

15    it's not the Debtor's money.

16         Q         That was going to be my next

17    question, so I need to ask it.

18                   What did you or Northside

19    Acquisition Partners LLC do with the $350,000

20    that was received in respect to the EIDL loan

21    made in July 2021?

22         A         The answer is this is not the

23    Debtor's funds and it's none of your business.

24         Q         At the time that the management

25    company acquired that $350,000 EIDL loan, did
```

Page 27

```
 1                    MICHAEL LICHTENSTEIN
 2    it have any contracts or agreements to manage
 3    any other projects other than the Williamsburg
 4    Hotel?
 5                    MR. KELLEY:  Objection.
 6            A       The answer is that it's not
 7    anyone's business what other contracts the
 8    management company had with other hotels, and
 9    I'm not going to answer your question.
10            Q       What was the collateral that the
11    management company provided in respect to the
12    $350,000 EIDL loan to the government?
13            A       There was no collateral
14    required.
15                    MR. FREEDMAN:  Let's mark the
16            next exhibit as Exhibit number 2.
17                    (The above described document was
18            marked Exhibit 2 for identification as of
19            this date.)
20            Q       You should have it up in front
21    of you in a moment, sir.
22                    Let me know when you have it.
23            A       I have it.
24            Q       Okay, so I'm going to refer to
25    the Bates numbers on the bottom.  You see the
```

– Lichtenstein MC, p. 31, l. 16 through p. 32, l. 18 (video - p. 32, ll. 11-18
only)

Page 31

```
 1                    MICHAEL LICHTENSTEIN
 2           Q        Was the receiver that was in
 3    place over the Williamsburg Hotel informed of
 4    the application for this $150,000 EIDL loan?
 5                    MR. KELLEY:  Was the receiver
 6             informed, was that what the question
 7             was?  Objection to form.
 8           Q        It was --
 9                    MR. KELLEY:  Go ahead, Michael.
10             You can answer it if you can.
11           A        I don't remember now if he was
12    informed two years ago.
13                    It wouldn't have mattered, it
14    wasn't the Debtor's funds, it was the
15    management company's money.
16           Q        And has the management company
17    started making payments in respect to this
18    $150,000 EIDL loan?
19           A        As I said, I don't think it's
20    any of the Debtor's or the lender's business
21    the details of the EIDL loan, whether we are
22    making payments or not.
23           Q        And if you are making payments,
24    what's the source of funds for the payments
25    being made to the SBA in respect to this
```

Page 32

MICHAEL LICHTENSTEIN

1

2      $150,000 loan?

3              A       If there are payments made, then

4      the source of the payments are the management

5      company's own money and it has nothing to do

6      with the Debtor.

7              Q       What is the source of the

8      management company's own money?

9              A       I do not have to answer that

10     question about the management company to you.

11             Q       Does the management company

12     presently have any source of funds that are not

13     directly related to operating the Williamsburg

14     Hotel?

15             A       I will not be answering any

16     questions about an entity that is not the

17     Debtor and about the monies that are not the

18     Debtor's.

19             Q       So if you flip to --

20                     MR. KELLEY:   Sorry to interrupt,

21             Gary, I didn't want to interrupt the

22             witness or you, but I will object to the

23             form of the prior question.

24                     Sorry, go ahead.

25             Q       If you flip to 8210, this is the

– Lichtenstein MC, p. 45, l. 24 through p. 47, l. 2 (video - p. 46, l. 15 through p. 47, l. 2 only)

Page 45

```
 1                    MICHAEL LICHTENSTEIN
 2          Q       Line 1A, gross receipts of sales
 3     says $15,117,101.  Do you see that?
 4          A       Yes.
 5          Q       And to the best of your
 6     recollection, all or most of that would have
 7     come from the Williamsburg Hotel?
 8          A       Most of it, yeah, all or most of
 9     it would come from the Williamsburg Hotel.
10          Q       What contract or agreement
11     provides for the management company to make a
12     claim of ownership of the gross receipts of
13     sales generated at the Williamsburg Hotel?
14          A       First of all, this is not a
15     claim of ownership, necessarily.
16                  But the money flows through the
17     Williamsburg Hotel, and as such the accountants
18     decided to book it this way.
19          Q       It flows through as a
20     pass-through entity, correct?
21          A       I don't want to get into
22     accounting terms, and I don't want to take
23     responsibility for accounting terms now.
24          Q       Does the management company have
25     an ownership interest in any of the funds that
```

Page 46

MICHAEL LICHTENSTEIN

1

2   flow through its accounts that are generated at

3   the Williamsburg Hotel?

4           MR. KELLEY:   Objection to form.

5       Go ahead, you can answer.

6       A       As I said, there might be some

7   funds in some years that are not sourced by the

8   Debtor.

9               As to the Debtor's funds that

10  are flowing through the management company, I

11  will not respond as to classifications for tax

12  purposes without an accountant.

13      Q       I'm asking a different question,

14  sir.

15              I'm asking you based upon a

16  representative of the management company here

17  today, what is your understanding of the

18  management company's ownership interest in any

19  funds flowing through its accounts that are

20  generated at the Williamsburg Hotel?

21          MR. KELLEY:   Objection to form.

22      A       And I'm answering as a

23  representative of the management company that I

24  will not respond as to classifications of

25  funding or funds flowing through as it refers

Page 47

MICHAEL LICHTENSTEIN

1

2  to tax returns and such without an accountant.

3       Q     On line 22, ordinary business

4  income, $54,460, do you see that?

5       A     Okay.

6       Q     Is that ordinary business income

7  generated by anything other than the management

8  company's relationship with the Williamsburg

9  Hotel?

10      A     I already responded that I am

11  not sure if there was other income in 2018,

12  therefore I cannot answer this question right

13  now with certainty.

14      Q     You are familiar with the

15  bankruptcy schedules filed in this case, sir?

16      A     Not really that familiar.

17      Q     You reviewed them, we talked

18  about them last time we took your deposition,

19  right?

20      A     We talked about them.  I don't

21  remember reviewing them.

22      Q     I will show you Exhibit 4 and

23  ask you to flip to page 24 of 33.

24            (The above described document was

25       marked Exhibit 4 for identification as of

– Lichtenstein MC, p. 52, l. 3 through p. 53, l. 11 (no video)

Page 52

1                    MICHAEL LICHTENSTEIN

2          A       Yes.

3          Q       Who was the management company

4   paying interest to in 2018?

5          A       I don't remember at all.  It

6   could have been to Benefit Street, mezz loan, I

7   don't even know.

8                  I don't know, you have to check

9   with the accountant.

10         Q       Did the Williamsburg Hotel BK

11  LLC have a lending relationship with Benefit

12  Street?

13         A       No.

14         Q       Did the management company have

15  a lending relationship with the mezz company,

16  the mezz lender?

17         A       No; but it could have made a

18  payment on behalf of the Debtor.

19                 I don't know what it is, I have

20  no clue, I have to check with the accountant.

21         Q       So assuming all of the revenue

22  reflected on this 2018 return related directly

23  to the operations at the Williamsburg Hotel,

24  how did the management company earn $54,460 in

25  business income?

Page 53

MICHAEL LICHTENSTEIN

1

2      A      As I said, I will not be

3  answering such questions without an accountant.

4      Q      Where was that business income

5  deposited?

6              MR. KELLEY:  Objection to form.

7      A      Either in the management

8  company's account or back to the Debtor.

9      Q      Do you know as you sit here?

10     A      Nope, I have no clue, I don't

11 remember now.

12     Q      If you flip to page 5 of the

13 2018 return, sir --

14     A      Yes.

15     Q      -- the balance sheet, schedule

16 A, the cash, $92, 887.

17     A      Did you say page 5?

18     Q      5 of the return, balance sheet,

19 schedule L, cash, beginning of the year,

20 $92,887, at the end of the year, $93,562.

21              What was the source of that cash

22 other than operations at the Williamsburg

23 Hotel?

24     A      I can't answer you right now

25 about 2018 sources of cash.

– Lichtenstein MC, p. 53, ll. 18-25 (no video)

```
                                               Page 53

1                    MICHAEL LICHTENSTEIN

2          A      As I said, I will not be

3   answering such questions without an accountant.

4          Q      Where was that business income

5   deposited?

6                  MR. KELLEY:   Objection to form.

7          A      Either in the management

8   company's account or back to the Debtor.

9          Q      Do you know as you sit here?

10         A      Nope, I have no clue, I don't

11  remember now.

12         Q      If you flip to page 5 of the

13  2018 return, sir --

14         A      Yes.

15         Q      -- the balance sheet, schedule

16  A, the cash, $92, 887.

17         A      Did you say page 5?

18         Q      5 of the return, balance sheet,

19  schedule L, cash, beginning of the year,

20  $92,887, at the end of the year, $93,562.

21                What was the source of that cash

22  other than operations at the Williamsburg

23  Hotel?

24         A      I can't answer you right now

25  about 2018 sources of cash.
```

– Lichtenstein MC, p. 55, ll. 14-20 (video)

Page 55

```
 1                    MICHAEL LICHTENSTEIN
 2    statements.   Thank you.
 3            Q       12A, intangible assets, $8,750
 4    at the beginning of the year, $10,500 at the
 5    end of the year.
 6                    What are those assets?
 7            A       You said $2,500.   It says
 8    $10,500.
 9            Q       I said $10,500, but if I said it
10    incorrectly, I will say it again.   $10,500.
11            A       And the answer is that I'm not
12    going to answer such questions without my
13    accountant.
14            Q       Is it fair to say you're not
15    going to answer any questions with respect to
16    the management company's tax returns?
17            A       That is not fair to say at all.
18                    I said I won't answer any of
19    these questions right now in this deposition
20    without discussing with my accountant.
21                    MR. GLUCKSMAN:   Mr. Freedman,
22            this is argumentative.   You are not
23            during -- this is not a cage match.
24                    MR. FREEDMAN:   I didn't hear
25            anything you just said, Mr. Glucksman.
```

– Lichtenstein MC, p. 56, ll. 9-18 (video)

Page 56

1              MICHAEL LICHTENSTEIN

2                  MR. GLUCKSMAN:  Mr. Glucksman

3          said this is not a cage match, and I

4          would appreciate if you wouldn't badger

5          my witness.

6                  MR. FREEDMAN:  I'm not going to

7          even dignify that with a response, sir.

8                  MR. KELLEY:  Let's proceed.

9          Q       By the way, why did the

10    management company wait until February 2022 to

11    file its 2018 return?

12         A       As I said, I will not be

13    responding on any questions about the

14    management company that are not related to the

15    Debtor.

16                  And I will not be responding on

17    any questions on the tax returns without my

18    accountant.

19         Q       We have just marked Exhibit 5,

20    which is the Debtor's 20 -- Exhibit 5 is the

21    management company's tax return for 2019.

22                  Is it a true and correct copy,

23    sir?

24                  (The above described document was

25          marked Exhibit 5 for identification as of

– Lichtenstein MC, p. 57, ll. 4-12 (video)

Page 57

```
 1              MICHAEL LICHTENSTEIN
 2         this date.)
 3         A      It seems like it is.
 4         Q      And again, if I ask you any
 5   questions about this return, you are not going
 6   to answer them, is that correct?
 7         A      I will not be answering specific
 8   questions about these tax returns that are not
 9   related to the Debtor or that I -- or that are
10   related to tax matters of classifications or
11   such matters where I would rely on my
12   accountant.
13                You can ask the question and
14   either I'll answer or I won't answer.
15         Q      Here is a question.
16                Line item 1A on the second page
17   shows gross receipts of $20,034,954, and if you
18   flip back to the bankruptcy schedules, for
19   2019, the Debtor reflects gross revenues of the
20   same exact amount.
21                How is that -- how can that be,
22   sir?
23         A      As I said, these are two
24   different forms, two different questions.
25                So I'm not really understanding
```

–   Lichtenstein MC, p. 58, l. 20 through p. 59, l. 6 (no video)

Page 58

```
 1              MICHAEL LICHTENSTEIN
 2   your question and I will not respond any
 3   further on this.
 4        Q      If the management company is a
 5   pass-through entity, receiving the -- taking in
 6   the receipts from the hotel and paying
 7   expenses, how is the management company
 8   claiming ordinary business income of $94,698
 9   for 2019?
10        A      The management company is not
11   claiming generally any income from the hotel
12   revenues and, if anything, it is transferring
13   that to the Debtor, which is on the last page,
14   which we went through last time, where we chose
15   I think for this year $1.5 million, or I don't
16   know, some large sum that was transferred to
17   the Debtor.
18              We went through this actually in
19   the last deposition, so --
20        Q      My question is, though, sir, how
21   is the management company claiming that it had
22   income of $94,698 in 2019?
23              MR. KELLEY:  If you know.  I
24        don't think he's asking you to formulate
25        a legal conclusion, but if you know, go
```

Page 59

MICHAEL LICHTENSTEIN

1
2          ahead and answer.

3          A        I think that the question the

4     way it's asked is not a correct question, and I

5     will not respond on tax matters and tax

6     classifications without my accountant.

7          Q        And this return is dated May 4,

8     2021, and the first page shows it was filed on

9     May 26, 2021.

10              Do you see that, sir?

11         A        Could be.

12         Q        Do you see it, sir?

13         A        Okay, I'm not --

14         Q        So why did the management

15    company file its 2019 return in May 2021, but

16    filed its 2018 return in February of 2022?

17         A        I don't remember now the timing

18    when the tax returns were filed.

19         Q        You will have up in a moment

20    Exhibit 6.  Let me know when you have it.

21              (The above described document was

22         marked Exhibit 6 for identification as of

23         this date.)

24         A        Exhibit number 6?

25         Q        Yes, sir.

– Lichtenstein MC, p. 97, l. 20 through p. 98, l. 13 (no video)

Page 97

```
 1                    MICHAEL LICHTENSTEIN
 2   of funds for the management company to pay back
 3   the $824,000 under the settlement on the PPP
 4   loan if the Debtor's plan is not confirmed?
 5                MR. GLUCKSMAN:  Objection.
 6                THE WITNESS:  Go ahead, James.
 7                MR. GLUCKSMAN:  I object on the
 8        ground it's a hypothetical question.
 9                MR. FREEDMAN:  No, it not
10        hypothetical.  It's in the plan, sir.
11        Q       Please answer the question,
12   Mr. Lichtenstein.
13        A       I already responded to that
14   question.  We had that conversation already in
15   the previous deposition.
16        Q       Are you refusing to answer it
17   now?
18        A       I said I already responded at
19   length about this matter, and in summary --
20        Q       If you can just respond to it
21   now so I can move on?
22        A       Yes, if you would stop
23   interrupting my answer I would be able to
24   answer it.
25        Q       Please stop yelling at me, sir.
```

Page 98

MICHAEL LICHTENSTEIN

1

2     A     And I did not yell at you, for

3  the record.

4     Q     Yes, you did.  You're raising

5  our voice.

6     A     If you stop interrupting my

7  answers I can finish my answers without

8  interrupting.

9     Q     Sir, what's the source of funds,

10  sir?

11    A     And I responded already that

12  it's an irrelevant question because our plan is

13  going to be confirmed.

14    Q     If it's not confirmed what's the

15  source of funds?

16    A     We already dealt with that

17  question at length in the last deposition.

18    Q     You are refusing to answer the

19  question, then?

20    A     No, I am not refusing to answer

21  the question.  I already answered that question

22  at length in the previous deposition.

23    Q     How long have you been a

24  developer?

25    A     I don't know, about 20 years.

4. _Goldwasser_

– Goldwasser, p. 106, ll. 5-12 (no video)

```
                                              Page 106

1                      DAVID GOLDWASSER

2           A        Counsel.

3           Q        Just you and counsel?

4           A        Yes, sir.

5           Q        You never had a discussion with

6    the Debtor about the PPP stipulation?

7                    MS. PARLOVECCHIO:   Objection.

8           A        Who are you saying the Debtor

9    is, who is the Debtor?

10          Q        96 Wythe Acquisition LLC.

11          A        I did not have a conversation

12   with a piece of paper, no.

13          Q        I don't understand your answer.

14   A piece of paper, what are you talking about,

15   sir?

16          A        96 Wythe Acquisition LLC is a

17   name on a piece of paper.

18          Q        It is also owned by two people,

19   right?

20          A        I asked you who.  You said the

21   Debtor.  You didn't say the equity holders.

22          Q        Really?  That's the game we are

23   going to play, you are going to tell me you

24   didn't have a conversation with a piece of

25   paper and you don't think that's a flippant
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

– Goldwasser, p. 111, l. 5 through p. 115, l. 18 (no video)

Page 111

```
 1                 DAVID GOLDWASSER
 2   the decision to move forward with the PPP
 3   matter, both in resolution and in stipulation.
 4                 Nothing more, nothing less.
 5          Q         How did you decide to accept
 6   $1,438,000 approximately from the management
 7   company, if the plan is confirmed, but only
 8   $824,000 from the management company if the
 9   plan is not confirmed?
10                 MS. PARLOVECCHIO:  Objection, to
11             the extent it calls for conversations
12             with counsel.
13          A         There were many conversations
14   with counsel.  If you ask my belief, this is
15   all a sham and a side show.  The PPP had
16   nothing to do with the hotel.
17                 I can give you my subjective
18   analysis.  It was calculations made with
19   counsel on for or against confirmation and why
20   those numbers came about.
21                 I am not going to disclose them
22   on the record here.
23          Q         To your knowledge, did the
24   management company have any other business
25   other than managing the hotel?
```

Page 112

DAVID GOLDWASSER

1

2    A        I think you are going to have to

3    ask them.

4        Q        I'm asking you what your

5    knowledge is, sir.

6        A        I don't integrate with the

7    management company on a day-to-day basis, on

8    anything other than this hotel.

9            I cannot give you an opinion on

10    what I think.

11        Q        I am asking you what your

12    understanding is.  Can you at least tell me

13    what your understanding is?

14        A        I understand I deal with them on

15    this hotel and only on this hotel.  I have no

16    other dealings with them.

17        Q        So, you haven't answered my

18    question.

19            How did you determine that

20    payment by the management company of $1,438,000

21    is fair under the PPP stipulation if the plan

22    is confirmed, but only $824,000 if the plan is

23    not confirmed?

24            MS. PARLOVECCHIO:  Objection,

25    Gary, he's testified that these

Page 113

DAVID GOLDWASSER

1
2    conversations happened with counsel, so
3    now your question is calling for
4    communications with counsel.
5           MR. FREEDMAN:   No, I am asking
6    him how he determined as a fiduciary and
7    the CRO of the Debtor, who is advancing
8    these settlements, that's who I'm
9    asking, counsel.
10          Are you telling me I'm not entitled
11   to know that?
12          MS. PARLOVECCHIO:   I'm objecting
13   to the extent it involves conversations
14   with counsel, which he testified it did.
15          MR. FREEDMAN:   He also had --
16          MS. PARLOVECCHIO:   The
17   conversations that did not happen with
18   counsel, then he can answer, but I am
19   entitled to make my record.
20          MR. FREEDMAN:   I didn't ask for
21   conversations, I'm asking what he -- how
22   he determined that a $600,000 discount
23   was appropriate if the plan isn't
24   confirmed.
25   Q       So, sir, the question is

Page 114

DAVID GOLDWASSER

1

2    pending.

3        A        I had discussions with counsel

4    based upon items within, as was stated,

5    privilege, based upon where we thought the case

6    would be going or not be going.

7                And I do not believe there

8    should have been any settlement, there was no

9    harm to anybody, there was no nothing, it's a

10   side show, and I think this is all one big

11   piece of baloney.

12               So I think the fact that we

13   agreed to give some money or demand money back

14   if the case was not confirmed was a gift to the

15   estate and not a burden on the estate.

16               So, that's my testimony.

17       Q        So, when you are required to

18   give testimony at confirmation with respect to

19   the four prongs to ask Judge Drain to approve

20   this settlement, you are not going to testify

21   to anything more than you just testified to?

22               You are not going to give any

23   other reasons?

24               MS. PARLOVECCHIO:   Objection.

25       A        You will see what happens at the

```
                                                    Page 115

                        DAVID GOLDWASSER
 1
 2   confirmation.
 3          Q      Well, I am entitled to know now,
 4   sir.  You can't hide behind the attorney-client
 5   privilege today and then give fulsome testimony
 6   as the basis for this settlement at
 7   confirmation.
 8                  So, this isn't hide and seek.  I
 9   want to know now why you determined that that
10   was an appropriate settlement at confirmation,
11   an appropriate settlement if the plan isn't
12   confirmed?
13                  MS. PARLOVECCHIO:  Objection.
14          Q      Are you thinking, or you are
15   just not going to respond?  I just want to know
16   so I can move on.
17          A      You can move on.  I'm not
18   responding.
19          Q      Okay.
20                  And just for the record, if you
21   try to give testimony on this issue at
22   confirmation we are going to strike your
23   testimony.
24                  What due diligence did you do to
25   determine that the management company would
```

III.    **Omissions on Schedules and Disclosure Statement**

    a.    **Exhibits**

> ➤    BSP EXHIBIT 56 - Schedules of Assets and Liabilities and Statement of Financial Affairs - Reporting Period 04/01/2021 - 04/30/2021 [ECF No. 31]

> ➤    JOINT EXHIBIT 30 - Amended Schedule E/F: Creditors Who Have Unsecured Claims [ECF No. 205]

> ➤    BSP EXHIBIT 117 - Amended Schedule D: Creditors Who Have Claims Secured by Property [ECF No. 411]

> ➤    JOINT EXHIBIT 1 – Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower

> ➤    JOINT EXHIBIT 6 – First Amendment to Line of Credit Agreement and Note - Toby Moskovits and Y. Michael Lichtenstein, Lenders; 96 Wythe Acquisition, LLC, Borrower

> ➤    JOINT EXHIBIT 7 - Hotel Management and Services Agreement between 96 Wythe Acquisition LLC and The Williamsburg Hotel BK LLC

> ➤    DEBTOR'S EXHIBIT 22 (former 42) – Equity and Loans Report (also found in BSP Exhibit 129 - Goldwasser Transcript as Deposition Exhibit 6)

b.    **Testimony**

1.    _Goldwasser_

−    Goldwasser p. 62, l. 11 through p. 64, l. 24 (video - p. 62, l. 16 through p. 63, l. 8 and p. 63, l. 22 through p. 64, l. 24 only)

---

Page 62

1                    DAVID GOLDWASSER

2    responsibilities at the management company; we

3    do interact with him from time to time, but

4    more generally, Mr. Rauch.

5             Q        You should have before you

6    Exhibit number 3, which is a set of the

7    Debtor's bankruptcy schedules and statement of

8    financial affairs.

9                    Let me know when you have it,

10    please.

11                    (The above described document was

12             marked Exhibit 3 for identification as of

13             this date.)

14             A        Yes.

15                    I have it in front of me, sir.

16             Q        Do you recognize this document?

17    And for the record, it bears docket entry 31.

18             A        It does look familiar, yes.

19             Q        Would you agree with me that

20    these are the bankruptcy schedules and

21    statement of financial affairs filed on behalf

22    of the Debtor in this case?

23             A        Looks as such, yes, sir.

24             Q        And if you look, and I'm looking

25    at the numbers on the top, page 32 of 33, it

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

---

Page 63

DAVID GOLDWASSER

1

2  indicates that you signed exhibit number 3 on

3  May 5, 2021?

4      A        Yes, I see the conformed

5  signature, yes.

6      Q        And did you actually physically

7  sign the original copy of these schedules?

8      A        I believe I did, yes.

9      Q        And do you know where that wet

10  signature document is today?

11      A        I'm sorry?

12      Q        Do you know where that wet

13  signature document is today?

14      A        I generally e-sign my documents,

15  and then we send them over to counsel and they

16  file conforming signatures.

17      Q        So you may not have actually

18  signed it, it may just be an electronic

19  signature?

20              MS. PARLOVECCHIO:   Objection.

21      A        I sign on the screen, but yes.

22      Q        And you understood that when you

23  were signing these schedules, that you were

24  verifying that the information was true and

25  correct?

Page 64

DAVID GOLDWASSER

1
2    A         I verified the information was
3    true and correct to the best of my knowledge,
4    and these statements many times get amended
5    because information is not always perfect.
6              The gathering of information is
7    not always perfect, and especially when it is
8    not coming directly from you, you know,
9    sometimes people do not give you everything or
10   give you too much or give you the wrong thing.
11             So you always have the ability
12   to amend schedules when things are not exactly
13   perfect.
14        Q      And in fact, you've had to amend
15   these schedules twice, is that right?
16        A      I believe so, yes.
17        Q      To add creditors, correct?
18        A      To add, I think we took off one.
19        Q      And the schedules as amended
20   today, to the best of your knowledge, are they
21   true and correct?
22        A      I believe that that's the true
23   and correct copy as we have gone through
24   everything over the period of time, yes.
25        Q      If you flip to page 13 of 33,

– Goldwasser, p. 69, l. 11 through p. 70, l. 10 (video)

```
                                                    Page 69

1                    DAVID GOLDWASSER

2     highlights of question within the examiner

3     report, but they never felt of putting a claim,

4     per se, against the -- against the entity that

5     owned the hotel.

6                    They definitely have made

7     statements that they lent money to the hotel or

8     they, you know, in order to keep it afloat.

9                    But never that they wanted to

10    put a claim on their own hotel.

11         Q         When you were gathering this

12    information pursuant to the checklist that you

13    provided --

14         A         Um-hum.

15         Q         -- were you ever provided any

16    documentation that evidenced loans that Ms.

17    Moskovits and Mr. Lichtenstein made to the

18    Debtor?

19         A         That was not a focus that we

20    had.

21                   Could there be something?  There

22    could.

23         Q         The question simply was did they

24    provide you anything?

25         A         I don't know, sitting here right
```

Page 70

DAVID GOLDWASSER

1

2    now I don't know.

3         Q        Do you recall seeing anything?

4         A        I do not recall seeing anything,

5    but that doesn't mean there wasn't.

6         Q        Do you recall Ms. Moskovits and

7    Mr. Lichtenstein ever providing you a copy of

8    any loan agreement between them and the Debtor?

9         A        I do not recall seeing that,

10   sir.

11        Q        And flipping to page 22 of 33 --

12   22 of 33?.

13        A        Give me a second.  It's one by

14   one, it doesn't have like a click.  Yes, I am

15   on that page.

16        Q        Schedule G, executory contracts

17   and unexpired leases.  Are you there?

18        A        Yes.

19        Q        And you checked off no.

20                 Do you see that?

21        A        Yes.

22        Q        And no executory contracts or

23   unexpired leases were referenced in the

24   schedule, correct?

25        A        At that point they weren't,

– Goldwasser, p. 70, ll. 16-21 (video)

Page 70

1                    DAVID GOLDWASSER

2    now I don't know.

3           Q      Do you recall seeing anything?

4           A      I do not recall seeing anything,

5    but that doesn't mean there wasn't.

6           Q      Do you recall Ms. Moskovits and

7    Mr. Lichtenstein ever providing you a copy of

8    any loan agreement between them and the Debtor?

9           A      I do not recall seeing that,

10   sir.

11          Q      And flipping to page 22 of 33 --

12   22 of 33?.

13          A      Give me a second.  It's one by

14   one, it doesn't have like a click.  Yes, I am

15   on that page.

16          Q      Schedule G, executory contracts

17   and unexpired leases.  Are you there?

18          A      Yes.

19          Q      And you checked off no.

20                 Do you see that?

21          A      Yes.

22          Q      And no executory contracts or

23   unexpired leases were referenced in the

24   schedule, correct?

25          A      At that point they weren't,

– Goldwasser, p. 72, l. 5 through p. 73, l. 7 (video)

Page 72

1                    DAVID GOLDWASSER

2    management agreement between the Debtor and the

3    management company?

4              A       Yes.

5              Q       So, at least as of May 5, when

6    you signed these schedules, nobody had provided

7    you with a copy of that management agreement.

8    Is that fair?

9                    MS. PARLOVECCHIO:  Objection.

10             A       That's correct, otherwise we

11   would have put it on.

12             Q       And when were you first advised

13   of the existence of a management agreement

14   between the Debtor and the management company?

15             A       I do not have a date that I can

16   give you.

17                    I just don't have a date I can

18   give you.

19             Q       Did someone eventually provide

20   you a copy of a management agreement between

21   the Debtor and the management company?

22             A       We did get to get a copy of the

23   management agreement during the case, I don't

24   remember exactly when.

25             Q       And who provided you that?

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 73

DAVID GOLDWASSER

2      A      Specifically, I don't remember,
3   it would have either been -- it would have
4   either been to -- at that point I think Mark
5   Frankel was the attorney, and I don't know who
6   it would have come from, but I believe he and I
7   received it simultaneously.
8            Q      So, when you prepared and signed
9   these bankruptcy schedules back in May 5, 2021,
10  you understood that the management company was
11  managing the hotel, right?
12           A      Yes.
13           Q      And did you ask anyone at that
14  point in time whether there was a written
15  agreement for the management of the hotel
16  between the management company and the hotel,
17  and the Debtor, that is?
18                 MS. PARLOVECCHIO:   Objection.
19           A      As I look at the document, I
20  don't know why it's not on here.
21                 I believe there was -- I did
22  understand that there was a management
23  agreement, but to my knowledge it wasn't --
24  well, I don't know why it's not on here.
25                 I don't remember specifically

– Goldwasser, p. 73, l. 8 through p. 74, l. 18 (video)

Page 73

1                    DAVID GOLDWASSER
2          A        Specifically, I don't remember,
3    it would have either been -- it would have
4    either been to -- at that point I think Mark
5    Frankel was the attorney, and I don't know who
6    it would have come from, but I believe he and I
7    received it simultaneously.
8          Q        So, when you prepared and signed
9    these bankruptcy schedules back in May 5, 2021,
10   you understood that the management company was
11   managing the hotel, right?
12         A        Yes.
13         Q        And did you ask anyone at that
14   point in time whether there was a written
15   agreement for the management of the hotel
16   between the management company and the hotel,
17   and the Debtor, that is?
18                  MS. PARLOVECCHIO:   Objection.
19         A        As I look at the document, I
20   don't know why it's not on here.
21                  I believe there was -- I did
22   understand that there was a management
23   agreement, but to my knowledge it wasn't --
24   well, I don't know why it's not on here.
25                  I don't remember specifically

Page 74

DAVID GOLDWASSER

1

2  then what I asked or didn't ask at that point

3  in time.

4                    But it's a very good point that

5  it's not on here, and it should have been here.

6          Q       And the bankruptcy schedules

7  have never been amended to include the

8  management agreement, correct?

9          A       I think that's been a bone of

10  contention between the lender and the Debtor

11  and the management company for a period of

12  time, of which they are claiming that's not a

13  valid management agreement, and there has been

14  a dispute over this agreement.

15          Q       Do you still have my question in

16  mind, which was simply --

17          A       I don't believe that we amended

18  it, that's correct.

19          Q       And who designated you as the

20  representative of the Debtor to appear on its

21  behalf at the meeting of creditors on March 18,

22  2021?

23          A       Who designated -- I think in the

24  original resolution that was filed that was

25  signed by Mr. Lichtenstein and Ms. Moskovits,

– Goldwasser, p. 75, l. 10 through p. 77, l. 9 (video - p. 75, ll. 10-15; p. 75, l. 20 through p. 77, l. 9 only)

Page 75

```
 1                    DAVID GOLDWASSER
 2      they designated me to act on their behalf in
 3      the capacity of CRO, which I have appeared at
 4      many 341 meetings for this capacity.
 5                   I don't -- it's been a general
 6      practice that I go to the 341 meetings.  As of
 7      late, we have been changing that, but that's a
 8      general practice, especially in a larger case
 9      where there is a lot of moving parts.
10              Q      Going back to Exhibit 3, the
11      bankruptcy schedules.
12              A      Yes, sir.
13              Q      If you look at, let's start on
14      page 24 of 33.
15              A      Okay.
16              Q      Let me know when you are there.
17              A      I'm not used to this system,
18      hold on.
19                     Yes, sir.
20              Q      If you look at the bottom of
21      page item 4.
22              A      Um-hum.
23              Q      Payments or other transfers of
24      property made within one year before filing
25      this case that benefited any insider.
```

Page 76

DAVID GOLDWASSER

1    Says, lists payments or

2    transfers, including expense reimbursements

3    made within one year before the filing of this

4    case on debts owed to insiders or guaranteed or

5    co-signed by insiders unless aggregate value is

6    less than, let's call it $7,000.

7                    So you check off none there,

8    right?

9         A       That is checked off none.    We

10   didn't have the time to go through every

11   detail.

12                   Each case is a little different,

13   some are very clean and some are not very

14   clean, with all of their records.

15                   So this was not something we

16   could get to in any fell swoop in a short

17   amount of time.

18                   There is not a box for other.

19        Q       Has item 4 of the statement of

20   financial affairs been amended?

21        A       The truth is I don't remember.

22        Q       Let me ask it differently.

23                   Has item 4 of the statement of

24   financial affairs been amended to reflect

Page 77

DAVID GOLDWASSER

1
2    payments made to Ms. Moskovits,
3    Mr. Lichtenstein or any of their affiliated
4    entities within a year of the bankruptcy
5    filing?
6           A       I don't believe it has, as there
7    were more inflows than outflows, and the
8    reconciliation which obviously, as we know, is
9    part and parcel to the examiner report.
10          Q       There is nothing in item 4 that
11   talks about reconciliation.  It just asks
12   you --
13          A       Hold on.  You are asking a
14   question.  I'm answering your question with,
15   actuality, not with trying to give you a bum
16   answer.
17                  If you want a bum answer, I'll
18   say they didn't take anything.  So I'm not
19   trying to give you a bum answer.
20                  I have had this in many other
21   cases where we do use reconciliation to get to
22   the bottom line of what was actually
23   transferred in and what was transferred out.
24                  So it just depends on the
25   specific case.

– Goldwasser, p. 79, ll. 3-18 (video)

Page 79

1                    DAVID GOLDWASSER

2    of what you're trying to ask.

3         Q        I am just trying to understand,

4    sir, did you actually undertake that analysis

5    to see whether any money went directly from the

6    Debtor to Moskovits or Lichtenstein or any

7    company which they are affiliated with within a

8    year of the bankruptcy filing?

9         A        The answer is within the year of

10   the bankruptcy filing there was a receiver, and

11   there was nothing to look for specifically from

12   the Debtor going to them directly, because

13   everything was covered under the receiver

14   reports that we were given.

15                 And that's where we ascertained

16   that there was nothing to show that they got,

17   because the receiver was in charge of all of

18   the money for the past year.

19        Q        So you relied upon the

20   receiver's reports, is that fair?

21        A        Yes, for this specific question.

22                 THE WITNESS:   Is it possible to

23        take a bathroom break in the next five

24        or ten minutes?

25                 MR. FREEDMAN:   Lets' do it now.

– Goldwasser, p. 83, l. 16 through p. 87, l. 14 (video – p. 83, l. 25 through
p. 84, l. 16 and 85, l. 3 through p. 87, l. 13 only)

Page 83

DAVID GOLDWASSER

1

2   equity, and I don't know that there will be any

3   additional benefit, because a class of

4   creditors doesn't really affect much.

5                So I would assume that's why

6   they specifically, or not specifically, but

7   generally just didn't add it in.

8                They have always maintained and

9   I think I stated it on the record earlier they

10  lent money into the hotel.

11         Q     My specific question to you was,

12  sir, and I ask that you listen to my specific

13  question and try to answer it.

14         A     Please, absolutely.

15         Q     That would be helpful.

16                Did they ever tell you that on

17  the date of filing that the Debtor owed them

18  approximately $6 million?

19         A     I think they stated a number

20  more than $6 million.

21                I believe it's always been more

22  than $6 million, as per our discussions, but

23  not to be listed, not that they asked to be

24  listed on the creditor list.

25         Q     Isn't it your obligation to

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 84

DAVID GOLDWASSER

1   provide creditors true and correct information

2

3   on the bankruptcy schedules?

4            A       Yes.

5            Q       And if the Debtor owes Ms.

6   Moskovits and Mr. Lichtenstein or their

7   companies any money, it's your obligation as

8   CRO when you signed those schedules, under the

9   threat of perjury, to list those obligations,

10  correct?

11           A       Yes.

12           Q       But in this instance you decided

13  not to list them, correct?

14           A       I didn't have evidence of them

15  being given and we did not list them on the

16  schedules.

17           Q       Now, going back to the statement

18  of financial affairs, item number 4.  You have

19  indicated that if the Debtor owed Ms. Moskovits

20  or Mr. Lichtenstein or the companies more than

21  what they received from the Debtor within the

22  year, you would reconcile those numbers and not

23  list the transfers.

24                   Do I have that correct?

25                   MS. PARLOVECCHIO:  Objection.

Page 85

DAVID GOLDWASSER

1

2      A        I did not say that.

3      Q        So, tell me, sir, what analysis

4    did you undertake to determine whether or not

5    insiders received transfers from the Debtor

6    within one year of the bankruptcy filing?

7      A        I stated clearly on the record

8    that the receiver was in possession of the

9    property for the year prior to the filing, and

10   no disbursements were made to the persons for

11   that year.

12              I gave an example for context as

13   far as the other reference you made.

14              But when I answered you with

15   specificity, it was directly that the receiver

16   report showed no money going directly to

17   Mr. Lichtenstein or Mrs. Moskovits.

18      Q        We are going to pull up exhibit

19   number 6.

20              (The above described document was

21          marked Exhibit 6 for identification as of

22          this date.)

23      Q        So Exhibit 6 was provided to us

24   last week.  It bears Bates stamp Williamsburg

25   Hotel supplemental production 28, entitled "96

Page 86

DAVID GOLDWASSER

1

2  Wythe Acquisition Equity and Loans Report."

3          Do you have it up, sir?

4      A      I am looking at it, sir.

5      Q      So if you look at the first box,

6  it shows owners loans-repayment from 96 Wythe

7  in the year 2020/21.

8      A      Um-hum.

9      Q      They received a total of

10  $102,610, correct?

11          That's what the report shows?

12     A      That's what the report shows.

13     Q      How do you know as you sit here

14  today as the Debtor's CRO that none of those

15  monies were received within a year of the

16  bankruptcy filing, which was February 23, 2021?

17     A      If you would like to show me a

18  specific document to show that versus the

19  payment that has reconciliations, I'm more than

20  happy to discuss each one.

21     Q      This is what the Debtor provided

22  to us last week.

23     A      Okay, so it's a reconciliation

24  that was done last week.  So if you want to

25  show me the backup as to how the

Page 87

DAVID GOLDWASSER

1
2 reconciliation, I'm more than happy to answer
3 your question.
4          Q      Did you ever do a reconciliation
5 like this?
6          A      You're showing me something they
7 did last week, and no, I didn't do this a year
8 and a half ago, when the case was filed.
9          Q      Had you ever seen this document
10 before?
11          A      You are showing it to me now.
12          Q      Had you ever seen it before now?
13          A      I did not see it before now.
14 You just showed it to me now.
15          Q      I want to go back to your
16 authority.  Is it your understanding that you
17 have the authority to make any definitive
18 decisions on behalf of the Debtor?
19                 MS. PARLOVECCHIO:  Objection.
20          A      It's not my understanding I have
21 the definitive authority to make any decision
22 for the Debtor, no.
23          Q      All ultimate decisions are still
24 within the discretion of Ms. Moskovits and
25 Mr. Lichtenstein, is that correct?

– Goldwasser, p. 89, l. 19 through p. 90, l. 16 (video)

Page 89

1                    DAVID GOLDWASSER

2          A      No, I did not say that, sir, but

3    it a good try to recharacterize what I said.

4          Q      I'm not trying to do anything,

5    sir, I'm just trying to listen to your

6    testimony.

7                  So let's go back, and I will

8    actually take a look at what you just testified

9    to.

10                 So, just to be clear, do you

11   have ultimate authority to make decisions with

12   respect to the reorganization or restructuring

13   of the Debtor?

14         A      Ultimate --

15                 MS. PARLOVECCHIO:  Objection.

16                 THE WITNESS:  I'm sorry.

17         A      I do not have authority to make

18   ultimate decisions to the Debtor.

19         Q      Let me ask you, if Moskovits and

20   Lichtenstein have a $6 million claim in the

21   bankruptcy case, that would be, what, the third

22   largest claim against the bankruptcy estate?

23         A      Okay.

24         Q      And is it your practice in your

25   50 cases where you've been CRO to just omit the

Page 90

1                    DAVID GOLDWASSER
2    third largest claim in the case?
3            A       My practice as CRO, I've never
4    seen equity loans that have any credence to
5    equity, so it's a non-event in the case.
6                    If you want to say it was an
7    omission and I have a black mark as a CRO, you
8    can say that.
9                    It has no effect on the case.
10   Insider debt never has any effect on the case.
11                   It's meant for statement, and it
12   pretty much in itself, they are not going to
13   get any treatment, they are not going to get
14   any money, they are not going to get anything,
15   so in my practice of what actually happens,
16   zero.
17           Q       So it's your understanding that
18   that loan, if scheduled, would just be treated
19   as equity and --
20           A       It would be one level below
21   equity, but it would have no credence, because
22   it's an insider claim, and all the other claims
23   would have precedence.  It becomes a
24   subordinated class.
25           Q       Below equity?

IV.  **Tax Evasion**

    a.  **Exhibits**

- ➢ BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418]

- ➢ BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465]

- ➢ JOINT EXHIBIT 39 – Debtor IRS Form 1065 – 2017 dated 2/24/2022

- ➢ JOINT EXHIBIT 45 – Debtor IRS Form 1065 – 2018 dated 2/24/2022

- ➢ JOINT EXHIBIT 48 – Debtor IRS Form 1065 – 2019 dated 2/24/2022

- ➢ JOINT EXHIBIT 22 – Debtor IRS Form 1065 – 2020 dated 9/13/2021

- ➢ JOINT EXHIBIT 49 – Debtor IRS Form 1065 – 2020 (amended) dated 2/24/2022

- ➢ JOINT EXHIBIT 42 – TWH IRS Form 1065 – 2017 dated 2/24/2022

- ➢ BSP EXHIBIT 45 – TWH IRS Form 1065 – 2018 dated 2/24/2021

- ➢ JOINT EXHIBIT 51 – TWH IRS Form 1065 – 2018 dated 2/24/2022

- ➢ BSP EXHIBIT 46 – TWH IRS Form 1065 – 2019 dated 2/24/2021

- ➢ BSP EXHIBIT 55 – TWH IRS Form 1065 - 2019 dated 5/4/2021

- ➢ JOINT EXHIBIT 50 – TWH IRS Form 1065 – 2020 dated 2/24/2022

- ➢ BSP EXHIBIT 56 – BKC Schedules ECF 31

- ➢ BSP EXHIBIT 29 - Notice of Filing Amended Disclosure Statement (Third Amended Disclosure Statement and Plan) [ECF No. 196]

- ➢ BSP EXHIBIT 61 - Proof of Claim #10-1 filed by NYC Department of Finance

- ➢ BSP EXHIBIT 62 - Proof of Claim #11-1 filed by NYC Department of Finance (Administrative)

- ➢ BSP EXHIBIT 84 - Proof of Claim #14-1 filed by NYC Department of Finance

- ➢ BSP EXHIBIT 85 - Proof of Claim #18-1 filed by NYC Department of Finance

➢     BSP EXHIBIT 97 - NYC Department of Finance's Response in Opposition to Debtor's Objection to Proofs of Claim Nos. 10 and 11 [ECF No. 328]

➢     BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022

➢     BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022

➢     BSP EXHIBIT 74 – Transcript - Deposition Via Zoom of Michael Lichtenstein, Esq. taken on 10/1/2021

➢     BSP EXHIBIT 125 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/10/2022

➢     BSP EXHIBIT 132 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/23/2022

➢     BSP EXHIBIT 135 – Transcript and Video of Zoom Videoconference - Videotaped Deposition Michael Lichtenstein, Esq. taken on 3/29//2022

b. **Testimony**

1. *Lichtenstein*

– Lichtenstein p. 231, l. 22 through p. 237, l. 16 (video - p. 231, l. 22
through p. 232, l. 4; p. 232, ll. 21-25; p. 235, ll. 22-24 and p. 236, l. 4
through p. 237, l. 16 only)

```
                                                    Page 231
 1                      M. LICHTENSTEIN
 2    2017, 2018 -- let me ask it differently.
 3              We have copies of returns for 2017,
 4    2018, 2019, and 2020.
 5              Were they all filed, all four returns,
 6    sir?
 7         A.    Yes.
 8         Q.    And they're all dated, I believe,
 9    February 24, 2022.
10              Why did the debtor file all four
11    returns --
12              MR. FREEDMAN:  Let me strike and say it
13        differently.
14         Q.    Why didn't the debtor file these returns
15    timely?
16              MR. KELLEY:  Objection to the form.
17              You may answer.
18         A.    I'm not sure what the word "timely"
19    means.
20         Q.    All right.  Forget it.  I will ask a
21    different question.
22              Why did the debtor prepare and
23    presumably file its 2017 return not until February
24    24, 2022?
25         A.    Because it didn't need to be filed until
```

Page 232

M. LICHTENSTEIN

1
2      stabilization.  And now as part of emerging from
3      bankruptcy, the asset will be stabilized, and so we
4      filed the returns.
5          Q.     Who told you that it didn't need to be
6      filed until stabilization?
7                 MR. KELLEY:  Out of a cautionary -- if
8             it involves speaking with some counsel
9             somewhere -- and I don't know if it does or
10            doesn't.  You will know that.  He's not
11            asking you to reveal privilege or the source
12            of that, and you shouldn't be talking about
13            the substance of any communication you may
14            have had with legal counsel.
15                I don't know that that's involved, but
16            that's just a reminder.  So other than --
17            outside of referring to any legal counsel,
18            can you respond to Mr. Freedman's question,
19            answer the question?
20         A.     I think I responded enough.
21         Q.     So someone told you back in 2018 that the
22     debtor was not required to file its 2017 US return
23     until the hotel was stabilized?
24                Do I have that correct?
25         A.     You could say that, yes.

Page 233

M. LICHTENSTEIN

2          Q.    And it's your testimony that that advice
3      came from an attorney?
4          A.    It is my testimony that I am not going to
5      share with you details about this conversation as
6      it's privileged, and that's it.
7          Q.    My question is:  Did that advice come
8      from an attorney?
9                MR. KELLEY:  I think he's saying that
10              anything reveals communications with counsel,
11              and on that basis, I have to assert that he
12              should not respond to something that seeks
13              communications with counsel.
14              MR. FREEDMAN:  Well, if it didn't come
15              from an attorney, I'm entitled to inquire.
16              I'm just trying to determine whether it's --
17              whether he can't answer the question because
18              the advice came from an attorney.
19              How else am I going to voir dire the
20              witness?
21              MR. KELLEY:  I'm not going to paint for
22              you a picture, but all I can say is if the
23              witness -- the witness is instructed not to
24              provide substance of communications with
25              counsel.

Page 234

M. LICHTENSTEIN

1          And I'm not sure which counsel would
2    have been involved in the time frame, but I'm
3    just saying I have to preserve the company's
4    privilege at this point in time it's not
5    waiving.
6          MR. FREEDMAN:  Well, that's a great, so
7    let me ask it differently.
8          Q.    What counsel did the debtor have engaged
9    in 2017, 2018 with respect to tax advice?
10          A.    I think this entire conversation is
11    privileged, and I am not going to have this
12    discussion with you other than saying that all taxes
13    have been filed.  There are no tax liabilities, and
14    that is all that matters at the end of day.
15          Q.    So you're refusing to answer the
16    question?
17          MR. KELLEY:  I think he's refusing
18    because he's following my instructions that
19    to do so would reveal communications with
20    counsel is my interpretation of his answer.
21          If that's the case, then I would
22    instruct the witness not to respond if it's
23    going to reveal privileged communication.
24          MR. FREEDMAN:  Asking what counsel the

(line numbers as shown: 1-25)

Page 235

M. LICHTENSTEIN

2    debtor had for tax advice at relevant periods

3    of time is not asking for privileged

4    communications, just as an engagement letter

5    is not privileged.  Typically invoices and

6    bills are not privileged.  It falls within

7    the same parameters.

8        But if that's the advice you're going

9    to give the witness --

10       MR. KELLEY:  Without knowing more about

11   the response, all I can do is react to what

12   the witness said.

13       MR. FREEDMAN:  Do you want to take a

14   moment to speak with him?

15       MR. KELLEY:  We'll talk at the next

16   break.

17       MR. FREEDMAN:  So let's put up 2017 ad

18   Exhibit 13, please.

19       (Whereupon, Form 1065 for 2017 was

20   marked as Lichtenstein Exhibit 13 for

21   identification, as of this date.)

22   Q.    You should have up in a moment Exhibit

23   13, which is the Form 1065, return for the debtor,

24   dated the 2017 year.

25       Let me know when you have it, sir.

Page 236

M. LICHTENSTEIN

```
 1
 2      A.    (No verbal response given.)
 3      Q.    Do you have it, sir.
 4      A.    Which exhibit?
 5      Q.    13, sir.
 6      A.    Yes.
 7      Q.    This is the debtor's 2017 return?
 8      A.    I don't know.
 9      Q.    If you don't know, who would know?
10      A.    I don't know what you're putting up, you
11  know.
12      Q.    I don't understand your --
13      A.    Assuming that this is it, go ahead.
14            MR. KELLEY:  Can you flip through it
15  quickly, Mr. Lichtenstein, and tell me if it
16  looks like the document that he's indicating
17  it is so we can move past that.
18      A.    Seems to be.
19            MR. KELLEY:  Feel free to flip through
20  the pages just to make sure it looks like
21  what you expect it to.
22            MR. FREEDMAN:  For the record, it bears
23  Bates stamp Williamsburg supplemental
24  production 8157 through 8170, indicating that
25  this document was provided to us by the
```

Page 237

M. LICHTENSTEIN

1

2    debtor.

3        Q.    So does it appear to be a true and

4    correct copy of the 2017 return, sir?

5        A.    It appears to be.

6        Q.    Okay.  And you recognize Ms. Moskovits'

7    signature?

8        A.    Yes.

9        Q.    And it looks like the return was prepared

10   on February 24, 2022?

11       A.    Okay.  Could be.

12       Q.    That's what it shows, though, right, sir?

13       A.    Seems to be, yes.

14       Q.    Well, it seems to be.  Doesn't it show

15   2/24/2022?

16       A.    Yes.

17       Q.    Great.  Thanks.

18             Now, in the later returns, we have

19   electronic confirmation of the filing of the

20   return.  We don't have that here.

21             Was this return electronically filed?

22       A.    I don't think you could electronically

23   file in 2017.

24       Q.    You mean there was no ability to

25   electronically file tax returns back in 2017?  Is

– Lichtenstein p. 239, l. 1 through p. 245, l. 22 (video - p. 239, l. 20 through p. 241, l. 3 and p. 243, l. 16 through p. 245, l. 19 only)

Page 239

M. LICHTENSTEIN

1

2      A.    I don't know which line you're reading

3   from.

4      Q.    It's 1A.

5      A.    Okay.

6      Q.    Do you agree with me it shows zero

7   receipts there?

8      A.    Seems to show zero, yes.

9      Q.    So is it your testimony that the debtor

10  had zero receipts in 2017?

11     A.    No.  It is my testimony that the tax

12  return is prepared in the way the -- the way a tax

13  return is done, and this is what it shows here in

14  this line item.

15     Q.    I don't know what that means.

16           If an entity has receipts, it's

17  supposed to be reflected on the return, no?

18     A.    Yes, and everything is reflected on this

19  return.  You're asking me about one line item.

20     Q.    Right.  And if you look at -- just look

21  at the income section, 1 through 8.  The only income

22  or receipts reflected on this 2017 return is

23  $180,000, correct?

24     A.    Yes.

25     Q.    Okay.  So that was the total amount of

Page 240

M. LICHTENSTEIN

1
2    receipt or income that the debtor had in 2017,
3    correct?
4        A.    No.   I think you don't know how to read a
5    tax return.
6        Q.    Well, teach me, then.   Where is the
7    reflection of --
8        A.    I don't think this deposition is a lesson
9    on how to read tax returns.
10       Q.    Show me, sir, where on this return it
11   reflects that the debtor had other income or
12   receipts in 2017 other than the $180,000.
13       A.    I'm not going to spend time now teaching
14   you how to read tax returns.
15       Q.    You're refusing to answer the question?
16             MR. KELLEY:  He's asking you to flip
17        through the document and direct him where you
18        need to direct him, if you would.
19       A.    You can look at Schedule L.   You can look
20   at any other pages other than the first page.
21       Q.    Take me to those pages that you think
22   reflect income or receipt of funds for the debtor in
23   2017 other than the first page where it reflects
24   only $180,000.
25       A.    The tax return consists of about 20

Page 241

M. LICHTENSTEIN

```
 1
 2   pages, so feel free to flip through it and go
 3   through it.
 4        Q.    I did, sir.  I couldn't find anything
 5   else.  That's why I'm asking you.
 6        A.    Okay.  So maybe you should ask an
 7   accountant to review with you the tax return.
 8        Q.    I have, and their conclusion was no
 9   different than mine.
10        A.    Okay.
11        Q.    So as a debtor's representative --
12        A.    You can have your tax expert reach out to
13   my accountant to review.
14        Q.    Are you refusing to answer the question,
15   sir?  This is a problem.  You are here as the
16   debtor's representative.  This is a very important
17   issue with respect to confirmation.
18             If you don't want to engage in these
19   very direct questions, that's your prerogative;
20   we'll deal with it at the appropriate time.  I
21   just want to give you fair warning that we will be
22   dealing with this and we will be opposing
23   confirmation because of your reluctance and
24   failure to answer very straightforward questions
25   which relate to income and reporting of income by
```

Page 242

M. LICHTENSTEIN

1
2   the debtor.

3           MR. KELLEY:  I'm going to object to the
4       sidebar.

5           But, Mr. Lichtenstein, how are you
6       feeling?  Are you tired?  Do you need to take
7       a break?  Or do you want to proceed with
8       answering this question?  How would you
9       like --

10          THE WITNESS:  We can take a break if
11      the parties want.

12          MR. KELLEY:  I'm fine.  It's up to you.

13          THE WITNESS:  I am merely saying that I
14      will not spend the next half hour reviewing a
15      tax return with Mr. Freedman.  That is not
16      the purpose of this deposition.

17      A.    If you want tax advice, then go and ask
18  some -- an accountant, and we can have conversations
19  with accountants by the tax returns.

20          MR. KELLEY:  Mr. Lichtenstein, let's --
21      I'm just going to do this once on the record
22      and then we can take a break and talk about
23      it.

24          It's Mr. Freedman's time.  He can waste
25      it any way he wants.  If he wants to ask you

Page 243

M. LICHTENSTEIN

1
2      questions about the tax documents and knows
3      you're not a lawyer, know's you're not a CPA,
4      he's just asking you to answer factual
5      answers, based upon putting the return in
6      front of you.  He's entitled to ask those
7      questions.
8             Can you respond to it?
9             THE WITNESS:  He's asking me questions
10     about the accounting and questions about how
11     the CPA did the document and prepared the tax
12     return, and I am not going to answer
13     questions that should be discussed with
14     accountants.
15            MR. FREEDMAN:  I'll keep going.
16     Q.     The $180,000, and if you flip to the last
17  page, 8170, where it says Property Fee From the
18  Williamsburg Hotel BK, LLC.
19            What is that?
20     A.     Which page?
21     Q.     The last page of the return Bates-stamped
22  8170?
23     A.     That's the money that was -- that went to
24  the debtor from the management company.
25     Q.     Why is it described as a property fee?

Page 244

M. LICHTENSTEIN

1

2       A.       Because the money went through the

3   management company and it went to the debtor.   It's

4   the debtor's money.   So the management company is

5   just -- the management company is just accepting the

6   money and then it transfers the money to the debtor.

7       Q.       Is that the income that the management

8   company collected on behalf of the debtor for 2017?

9       A.       The answer is giving -- I'm still --

10  pursuant to my previous statement that I will not

11  respond on accounting related to the -- not an

12  accounting, but on -- to the question, the answer is

13  yes.

14      Q.       And if you flip to one page up, 8169.

15      A.       Okay.

16      Q.       You'll see at the bottom Schedule L, line

17  19A, loan from partners.

18               Do you see that?

19      A.       Uh-huh.

20      Q.       Is that a yes, sir?

21      A.       That's a yes.

22      Q.       Okay.

23               And it reflects at the beginning of the

24  year, there's no outstanding loan from partner,

25  correct?

Page 245

M. LICHTENSTEIN

1

2      A.    Yes.

3      Q.    And at the end of year, the loan from

4  partners is $4,482,723?

5      A.    Yes.

6      Q.    And when we looked at it earlier, we saw

7  the line of credit agreement was dated June of 2016.

8            So did you and Ms. Moskovits not have

9  any outstanding loans to the debtor going into

10 2017?

11     A.    Who says we didn't?  I don't understand

12 your question.  How does this 2017 return show that

13 there were no loans before?

14     Q.    Because they would be fronted -- if there

15 were outstanding loans as of January 1, 2017, they

16 would be reflected as beginning of the year loans.

17 That's how.

18     A.    I will not respond to how tax returns

19 were prepared without my accountant.

20           (Whereupon, a 2018 Tax Return was

21           marked as Lichtenstein Exhibit 14 for

22           identification, as of this date.)

23           MR. FREEDMAN:  By the way, Mr. Kelley,

24      I've tried to be cordial and professional

25      with you.  When you call my questioning a

– Lichtenstein p. 246, l. 17 through p. 248, l. 25 (video - p. 246, l. 17 and
p. 247, l. 9 through p. 248, l. 24 only)

---

Page 246

M. LICHTENSTEIN

1

2  waste of time on the record, that's

3  pejorative and offensive and combative, and I

4  don't appreciate it.

5      I've let it go.  I've been sitting here

6  thinking about it.  You want us to be cordial

7  and move this along.  Those type of comments

8  are not necessary.

9      MR. KELLEY:  It wasn't really directed

10  substantively at you.  I was trying to

11  explain to the client that what -- his

12  perspective of them shouldn't be a conclusion

13  as to how he responds to the questions.

14      And if that was the way you interpreted

15  my comment, that's not how I intended.  So my

16  apologies.

17  Q.   You have before you Exhibit 14, sir.

18  A.   Were you talking to me?

19  Q.   Yes, sir, Mr. Lichtenstein.

20  A.   Yes.

21  Q.   You have Exhibit 14 --

22  A.   I didn't hear what you said.  Do I have

23  what?

24  Q.   Exhibit 14.  Do you have it up?

25      MR. KELLEY:  Can you by chance not move

---

Page 247

M. LICHTENSTEIN

1

2         your microphone back to where you're sitting,

3         because you're hard to hear right now, Mr.

4         Freedman.

5                  MR. FREEDMAN:    Same place that I was,

6         but I'll move it closer.    Thanks for letting

7         me know.

8         A.     Okay.

9         Q.     This is the 1065 form for the debtor for

10   2018, correct?

11        A.     Yeah.

12        Q.     And again, this return shows no gross

13   receipts or sales, correct?

14        A.     It's going to be the same response as

15   before.

16        Q.     Just confirm for me, sir.    It shows no

17   gross receipts or sales, correct?

18        A.     No, I think that's not a true

19   characterization.    It shows line 1A as being zero.

20        Q.     Right.    Gross receipts --

21        A.     It's not a general statement about

22   income.

23        Q.     Well --

24        A.     You're trying to conflate the lack of a

25   number in line 1A as if the tax return says that

Page 248

M. LICHTENSTEIN

1

2   there was no income.

3       Q.   I never used the word "income," sir.  I

4   said the return shows no gross receipts or sales,

5   correct?

6       A.   That line is empty.  That's all it says.

7   Doesn't say the hotel didn't have gross receipts or

8   sales.

9       Q.   It doesn't reflect a number in there,

10  right?

11      A.   So the incomes and sales are reflected in

12  other places in the tax return.

13      Q.   Sir, 1A doesn't have a number in it,

14  right?

15      A.   1A doesn't have a number in it.  That's a

16  fact.

17      Q.   And the only income reflected on this tax

18  return is $1,450,000 on line 7, correct?  Other

19  income.

20      A.   I will not answer to that question.

21      Q.   What is that other income from?

22      A.   As I said, I will not be having a

23  discussion with you about tax returns and how they

24  were prepared.

25          THE WITNESS:  I have to wash my hands.

– Lichtenstein p. 250, ll. 11-24 (video)

Page 250

1                    M. LICHTENSTEIN

2        could let us know how long we've been on.

3               THE COURT REPORTER:  I think Bob can

4        help you out with that.

5               THE VIDEOGRAPHER:  The time is 4:56.

6        We're off the record.

7               (Whereupon, there was a pause in the

8        proceeding.)

9               THE VIDEOGRAPHER:  Time is 5:15.  We're

10       back on the record.

11       Q.      So, Mr. Lichtenstein, you indicated that

12       the debtor's tax returns for 2017, 2018, 2019, and

13       2020 were not filed when required because you were

14       waiting for the hotel to stabilize, and now these

15       returns were filed in February 2022.

16               So is the hotel now stabilized?

17       A.      We'll be going towards stabilization

18       after the confirmation.

19       Q.      The hotel is not yet stabilized, but

20       nevertheless, you filed these four returns; is that

21       correct?

22       A.      Well, we made a profit in 2021 of about

23       $3 million over the summer, so we're definitely

24       getting much closer to stabilization.

25       Q.      By the way, when you accrued that $3

– Lichtenstein p. 252, l. 13 through p. 256, l. 11 (video – p. 25, ll. 7-23 and
p. 256, ll. 6-11 only)

---

Page 252

1                    M. LICHTENSTEIN

2        Q.    Well, I wouldn't ask the question, sir,

3    if I had it.  I've been asking your counsel for it

4    for at least a week.  That's why I'm asking you.

5    I'm not asking questions just to ask questions.

6              All I want to know is is there an

7    e-file confirmation for the 2018 return?

8        A.    Well, I don't know if I agree with your

9    characterization that you don't just ask questions

10   for the sake of asking questions, but we can resend

11   you confirmations of filing.

12       Q.    Okay.  Good.  Thank you.

13             So I'm going to refer to the Bates

14   stamps on the bottom again.  I'm looking at the

15   page 8176, which is Schedule L.

16       A.    It's actually difficult to see the Bates

17   stamps because they're overlapping, but which page

18   on the tax return are you talking about?

19       Q.    5.

20       A.    Okay.  Yeah.

21       Q.    So it shows that the loans from the

22   beginning of 2018 to the end of 2018 went up from

23   $4,482,723 to $9,605,037.

24             Do you see that?

25       A.    Yes.

Page 253

M. LICHTENSTEIN

1

2    Q.    Line item 19A, correct?

3    A.    Yes.

4    Q.    The next actual entry below that is

5    Partners' capital accounts, line item 21.

6          Do you see that?

7    A.    Uh-huh.

8    Q.    Is that a yes, sir?

9    A.    That's a yes.

10   Q.    And the capital account went down from

11   twenty-one thousand, two hundred and seventy-four

12   thousand, three hundred thirty-six dollars to

13   $11,409,750.

14         Do you see that?

15         MR. KELLEY:    I think you may have

16    misspoke.    You said 21,000 when you meant 21

17    million.

18         MR. FREEDMAN:    Thanks.    When I said it,

19    it actually dawned on me that's the way it

20    came out, so let me try again.

21   Q.    $21,274,336.    And it went down to, at the

22    end of 2018, $11,459,750.

23         Do you see that?

24   A.    Yes.

25   Q.    How did the partners' capital accounts

Page 254

M. LICHTENSTEIN

1
2  drop over $10 million from the beginning of 2018 to
3  the end of 2018?
4      A.     So as I said, I will not be responding on
5  behalf of my accountant in detail.  But overall, it
6  could have been simply depreciation or other
7  accounting reasons or mechanisms why the capital
8  account is shown as going down by this much.
9      Q.     Did any of that capital account get
10  rolled into the loans?  In other words, did any of
11  that capital account get recharacterized to a loan
12  during 2018?
13      A.     No.
14      Q.     You're sure of that?
15      A.     Yes, I'm sure.
16      Q.     And your only explanation, as you sit
17  here today, for the reduction of the capital account
18  is perhaps depreciation, correct?
19      A.     I said that there might be a myriad of
20  explanations for how the tax returns are structured,
21  one of them which might be depreciation and other
22  explanations.
23          I will not be responding on behalf of
24  my -- of the accountant, as I said already.
25      Q.     Would you flip to the last page.

Page 255

M. LICHTENSTEIN

```
 1
 2              MR. KELLEY:  Page 17 of 17?  Sorry.
 3      Just to make sure we're clear.
 4              MR. FREEDMAN:  8187 Bates stamp.
 5              MR. KELLEY:  Thank you.
 6      A.    Okay.
 7      Q.    You'll see in the middle description
 8  Property Fee from the Williamsburg Hotel BK, LLC, of
 9  $1,450,000.
10              What is that, sir?
11              (Technical interruption.)
12      Q.    Williamsburg BK, LLC.
13              What is that, sir?
14      A.    That is the income that was left after
15  expenses that came from the management company.
16      Q.    Why does the description called -- calls
17  it a property fee?
18      A.    You can ask the accountant if you want.
19  If Benefit Street insists, they can rename it to a
20  different name.
21      Q.    Do you know, sir?
22      A.    It's just a random description.  Just a
23  random description.
24      Q.    To the IRS.
25      A.    As I said, if Benefit Street, the lender,
```

Page 256

M. LICHTENSTEIN

1  insists, we can name it a different way.
2          (Whereupon, the 2019 Tax Return was
3      marked as Lichtenstein Exhibit 15 for
4      identification, as of this date.)
5      Q.     Exhibit 15 is the 2019 return for the
6  debtor.  Let me know when you have it up, please.
7      A.     Yup, I have it.
8      Q.     This starts with Bates stamp 3199.  Is
9  that a true copy of the debtor's 2019 return?
10     A.     Seems like it.
11     Q.     Okay.  And you see the first page?  This
12 is actually Acknowledgment and General Information
13 for Entities That File Returns Electronically, and
14 it has a return number.
15          Do you see that, sir?
16     A.     Yes.
17     Q.     Do you have a document like that for the
18 2018 return?
19     A.     Well, we just looked at it together.  I
20 don't think I saw it there.
21     Q.     I meant does the debtor have a document
22 like that in its possession, the 2018 return?
23     A.     I don't know.  I can check.  We already
24 agreed we'll send you the proof of filing or proof

– Lichtenstein p. 257, l. 3 through 270, l. 3 (video - 257, l. 24 through
p. 259, l. 14; p. 259, l. 20 through p. 261, l. 13; p. 263, ll. 11-13 and p.
263, l. 16 through p. 267, l. 17 and p. 268, ll. 2-12 and p. 268, l. 25
through p. 270, l. 3; only)

**Page 257**

```
 1                    M. LICHTENSTEIN
 2   of mail or whatever it is.
 3        Q.     If you flip to the next page, that's your
 4   name there on the bottom?
 5        A.     Yes.  I see it.
 6        Q.     3120.  But there's no signature.
 7               Did you actually sign this return?
 8        A.     If stuff is filed electronically, there's
 9   no signature, actually.
10        Q.     Did you sign a copy for your accountant?
11        A.     Could be.  I don't remember now.  But if
12   it's filed electronically, there's no signature.
13        Q.     Mine's filed electronically.  I sign it.
14        A.     Okay.
15               MR. KELLEY:  And mine's not, so --
16        Q.     And why does a 2019 return bear your
17   signature but the 2018 and 2017 returns bear Toby's
18   signature?
19        A.     I don't know.  I don't think there's any
20   -- I don't think there's any calculation in there.
21        Q.     Any what?
22        A.     I don't think there's any calculation or
23   strategy there.
24        Q.     On that same page, sir, line item 15
25   shows interest, $2,186,159.
```

Page 258

M. LICHTENSTEIN

2          Do you see that?

3     A.   Which page?

4     Q.   Same page, line item 15.

5     A.   Okay.

6     Q.   Who was that interest paid to?

7     A.   Well, if it was 2019, then probably

8  Benefit Street.

9     Q.   Do you know that for a fact?

10    A.   I don't know that, no.  As we're sitting

11 here, I don't know.

12    Q.   If you flip to page 3124 --

13    A.   Which page on the return?

14    Q.   5.

15    A.   Okay.

16    Q.   So you see that same line item 19A, Loans

17 from Partners?  At the beginning of the year, the

18 loan account was $9,605,000.37 and it went down at

19 the end of year to $6,383,928, correct?

20    A.   Yes.

21    Q.   And the capital account went from

22 $11,400- million down to $8,800,000?

23    A.   Yes.

24    Q.   Do you know why the capital account went

25 down?

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 259

M. LICHTENSTEIN

1

2      A.      I will -- again, I will not get into

3  CPA-level analysis of the tax return.

4      Q.      My question is:  Do you know why it went

5  down?  If you don't, you don't.

6      A.      I said I will not be responding on behalf

7  of my CPA.  I can tell you that some of it is

8  depreciation.  There's other accounting principles

9  that can be involved, and that is it.

10      Q.      If you flip to Bates stamp 3137.

11      A.      Yeah.

12      Q.      You see description property fee from the

13  Williamsburg Hotel BK, LLC, $500,000?

14      A.      Yes.

15      Q.      Is that the income --

16      A.      It's freezing up.  One minute.  3145?

17  Which page are you talking about now?

18      Q.      3137, sir.

19      A.      Okay.  What's your question?

20      Q.      So I'm assuming, based upon your prior

21  testimony, that that's the income generated at the

22  hotel for 2019?

23      A.      That's what's left.  The income is filed

24  under -- income and expenses are filed under the

25  management company and this is what's left at the

Page 260

M. LICHTENSTEIN

1
2    end of --
3         Q.    The profit, you mean?
4         A.    Yes.
5         Q.    And I know when we spoke last time, you
6    agreed with me that --
7         A.    I just want to correct you.  I wouldn't
8    describe it as profit in terms of taxes.  It's
9    income.  The hotel, there is no profit here from a
10   tax perspective.  But you can keep going with your
11   question.  I wanted to correct that.
12        Q.    Thank you for dealing with that
13   accounting question.
14               So the last time when we met, you told
15   me that 2019 was a good year for hotels, including
16   hotels in New York City, right?
17        A.    Right.
18        Q.    Can you explain to us why the income in
19   2018 was $1,450,000 and why it went down to $500,000
20   in 2019?
21        A.    Because we -- because loans were repaid
22   in 2019.
23        Q.    Insider loans?
24        A.    Excuse me.  I couldn't hear you.
25        Q.    The insider loans is what you're

Page 261

M. LICHTENSTEIN

1
2  referring to?
3      A.    Referring to loans that are owed that
4  were repaid.
5      Q.    To the insiders, you and Toby, correct?
6      A.    Some of it was that.
7      Q.    What else?
8      A.    I have to look at the backup tax return.
9  I don't remember the exact breakdown, but it was
10  definitely some of the line of credit that was paid
11  in 2019, yes.
12      Q.    Who else did the debtor repay in 2019?
13      A.    I don't remember.
14      Q.    So in 2019 the debtor wasn't paying his
15  real estate taxes, right?
16      A.    The debtor was assuming the City of New
17  York real estate taxes, which the city was
18  overcharging the debtor by $5 million.
19      Q.    The debtor didn't pay its real estate tax
20  ins 2019, correct?
21      A.    That is not correct.  The debtor paid its
22  rightful real estate taxes and disputes its
23  overbilling of the real estate taxes.
24      Q.    And in 2019, the debtor didn't pay its
25  corporate tax to the City of New York, correct?

Page 262

M. LICHTENSTEIN

2      A.      There was no corporate tax owed to the

3  City of New York in 2019.

4      Q.      And in 2019, the debtor didn't turn over

5  the hotel occupancy tax to the City of New York,

6  correct?

7      A.      That is in dispute.  The debtor was

8  disputing the real estate taxes and occupancy taxes

9  with the State of New York.

10      Q.      But at the same time, the debtor managed

11  to pay down you and Toby about $3,300,000 on the

12  insider loans, right?

13      A.      The debtor paid legitimate loans that it

14  owed and was disputing loans or taxes that were

15  legitimately not owed.  So the debtor did what it

16  was supposed to do.

17      Q.      It was being a good corporate citizen in

18  not paying its taxes, right?

19          MR. KELLEY:  That's argumentative,

20      Gary.

21      Q.      Is that your position, Mr. Lichtenstein?

22      A.      The debtor was fulfilling its duties, and

23  it was paying whatever it needed to pay and it

24  wasn't paying what was not necessary to pay.

25      Q.      In fact, sir, you, in respect to your

Page 263

M. LICHTENSTEIN

 2   various real estate development projects, have a

 3   history of not paying taxes, correct?

 4        A.      That is flat-out wrong, but okay.

 5        Q.      Okay.  We'll get to those documents,

 6   then.  We'll see how wrong that is.

 7        A.      Okay.

 8                (Whereupon, a 2020 Tax Return was

 9        marked as Lichtenstein Exhibit 16 for

10        identification, as of this date.)

11        Q.      You should have Exhibit 16 in front of

12   you, sir, which is the return for 2020 for the

13   debtor.

14                Do you have it up, sir?

15        A.      Okay.

16        Q.      Do you have an explanation for -- and I'm

17   going to go backwards for a second, but the 2017

18   return dated 2/24/2022 has Toby's signature.  The

19   same for 2018, same date.

20                The 2019 return that we just saw has

21   your name on it, and now this return has Yechial

22   Lichtenstein on it.  So we have four returns all

23   dated the same date with three different

24   signatures.

25                Can you explain that for us.

Page 264

M. LICHTENSTEIN

2     A.     Actually, the electronic ones, the

3   program spits out the signatory name.   Yechial

4   Michael Lichtenstein, that is my name.   They're both

5   my name.   I'm not sure what you're alluding to or

6   trying to say.

7        Q.     I just want to know why four returns have

8   three different names on them.

9        A.     They have two name.   The first two are

10  signed by one partner and the last two are signed by

11  the other partners.

12            But if you want to make a big issue of

13  it, that's fine.   You like to make big issues of

14  issues.   So it's perfectly fine.   And like I said,

15  if Benefit insists, we can amend the tax returns

16  signed by one person.

17       Q.     No other explanation, correct?

18       A.     There is no explanation, no.

19       Q.     Right?

20       A.     It's random.   That's the explanation.

21       Q.     So if you flip to page 5, again, Schedule

22  L.

23       A.     Excuse me.

24       Q.     Page 5, please.

25       A.     Yes.

Page 265

M. LICHTENSTEIN

2     Q.     This return shows the partner's capital

3     account going from $8,869,000 down to $4,819,000.

4           Do you see that?

5     A.     Yes.

6     Q.     Do you know why that went down?

7     A.     I'm going to repeat again the same

8     answer.

9     Q.     The loan account pretty much stayed the

10     same for that year?

11     A.     Uh-huh.  Yup.

12     Q.     And there's no property fee from the

13     management company in 2020, right?

14     A.     Well, there was COVID.  There was no --

15     Q.     Am I right?

16     A.     I don't know.  I'm looking at it now, but

17     I'm assuming you're right.  Which page are you

18     talking about?

19     Q.     Well, it's been on the last page, which

20     is the federal supporting statements on the other

21     ones.  I don't see it.  I just want to make sure you

22     agree with me.

23     A.     You seem to be right.

24     Q.     Sir, your 2020 return, Exhibit Number 16,

25     is an amended return, right?

Page 266

M. LICHTENSTEIN

1

2      A.   I don't remember now.

3      Q.   You can look at the second page, which is

4   the actual first page of the return.  You'll see box

5   5 checked, amended return.

6      A.   Okay.

7           (Whereupon, a 2020 Form 1065 was marked

8      as Lichtenstein Exhibit 17 for

9      identification, as of this date.)

10     Q.   And you should have now Exhibit 17, which

11   looks like the amended return?

12     A.   Looks like --

13          MR. KELLEY:  What do you mean?  Are you

14      saying '16's not the amended return?

15          MR. FREEDMAN:  I'm sorry.  Thank you.

16      It's the original return, at least a piece of

17      the original return that was provided to us.

18     Q.   Let me know when you have it, please.  It

19   starts Bates stamp 3127.  And you see that this was

20   filed on September 16, 2021, right?

21     A.   Okay.

22     Q.   Tell me, sir, why was the original 2021

23   filed on September 16, 2021, but all the other

24   returns weren't filed until February 24, 2022?

25     A.   Because at the time they were saying for

Page 267

M. LICHTENSTEIN

2    bankruptcy court purposes you must file the 2020.

3    Something along those lines.

4        Q.    Have you filed your 2021 return?

5        A.    I think so.

6        Q.    The debtor has a copy of that?

7        A.    If we filed, there's a copy of that, yes.

8        Q.    You can provide it to us?

9        A.    If we filed it, yeah.

10       Q.    Do you know if you filed it or not?

11       A.    I don't know right now.

12       Q.    Who on behalf of the debtor would know?

13       A.    Me.   I will check my records.

14       Q.    Why don't you flip to page 5 of this

15    return.

16       A.    What's this return?   Which exhibit?

17       Q.    Exhibit 17.

18       A.    Yes.

19       Q.    Do you have it up now?   I thought you had

20    it up.   I can start again.   Does this appear to be a

21    true and correct copy of the debtor's original 2020

22    return?

23       A.    One second.   I'm pulling it up.

24       Q.    Yes, sir.

25       A.    Which page are you talking?

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400

Page 268

M. LICHTENSTEIN

Q.   My first question is:  Does this appear
to be a true and correct copy of the debtor's
original 2020 return?

A.   I don't remember what that was.

Q.   This was produced by the debtor.  It
bears Bates stamp Williamsburg supplemental
production 3218.

     Do you have any reason to doubt this is
a true and correct copy of the debtor's original
2020 return?

A.   It seems like the original one.

Q.   You will recall at the beginning of your
deposition today we talked about the line of credit
agreement that was not reflected on the prescription
schedules, wasn't reflected in the disclosure
statement, and Mr. Rauch and Mr. Goldwasser
testified that it was first provided to them a
couple of weeks ago.

     Do you remember that general line of
questioning?

A.   I remember telling you that I highly
doubt that Mr. Rauch testified he only saw it a few
weeks ago.

Q.   Okay.  Go to page 5 of this return, this

Page 269

M. LICHTENSTEIN

1
2  return that was filed before all of the other
3  returns we've gone through today.
4          Let me know when you're there.
5      A.   Okay.  I'm here.
6      Q.   Line item 19A, loans from partners, what
7  does it say?
8      A.   It says zero.
9      Q.   And above that, other current
10  liabilities, 17.
11          Do you see that line item?
12      A.   Yeah.
13      Q.   $83,517,770?
14      A.   Yeah.
15      Q.   That's the debt owed to Benefit Street?
16      A.   Yeah, but that's an incorrect number
17  also.  It was amended because it's not correct.
18      Q.   Okay.
19          When you filed your 2020 return,
20  there's no expression or reflection of any
21  shareholder loans on this return, correct?
22      A.   This return was filed in a rush.  It had
23  many errors.  That's why it was amended.  It's
24  missing a lot of information and had many errors.
25      Q.   Just like your bankruptcy schedules?

Page 270

M. LICHTENSTEIN

2      A.      I don't think the bankruptcy schedules
3   had errors.

4      Q.      Well --

5      A.      What errors did the bankruptcy schedules
6   have?

7      Q.      We'll go through them.

8      A.      So on February 21, the debtor filed its
9   motion to extend exclusivity, which is docket 398,
10   and we could bring this up if you would like to see
11   it.

12           It says at paragraph 34:  The debtor's
13   plan provides for, quote, the preservation of tens
14   of millions of dollars of equity.

15           Sir, we're pulling it up right now for
16   you.  It's doc entry 398, and it's being published
17   as Exhibit 18.

18           (Whereupon, a motion was marked as
19       Lichtenstein Exhibit 18 for identification,
20       as of this date.)

21      Q.      Let me know when you have it, sir.  Do
22   you have it, sir?

23      A.      I'm pulling it up.

24      Q.      Thank you.

25      A.      Okay.

2.    _Moskovits_

–    Moskovits, p. 80, l. 14 through p. 81, l. 16 (no video)

Page 80

```
        1              TOBY MOSKOVITS
        2   record, I do not recall.
        3              What I said is that she
        4   certainly played a role during the construction
        5   period.
        6              I cannot tell you when she
        7   became an employee of the management company; I
        8   would have to check the records.
        9         Q      Since that point in time, has
       10   Miriam Gross provided services on any of your
       11   other projects?
       12         A      No, she works full-time for the
       13   Williamsburg Hotel.
       14         Q      And since the time that
       15   Mr. Kirschner became an employee of the
       16   management company, has he provided services on
       17   any of your other projects?
       18         A      Mr. Kirschner works for the
       19   Williamsburg Hotel.
       20         Q      So the answer is no?
       21         A      No.
       22         Q      And Mr. Rauch, since he became
       23   an employee of the management company, has he
       24   provided any services on any of your other
       25   projects?
```

Page 81

**TOBY MOSKOVITS**

1

2      A      Mr. Rauch rarely gets to sleep

3  because he's been in a series of abusive

4  interactions with the --

5      Q      Ma'am, stop.

6      A      (Continuing) --  who we learned

7  now is taking direction from your law firm.

8      Q      Ma'am, stop, stop.

9      A      Mr. Rauch effectively works

10  until midnight or 1:00 a.m.

11      Q      A simple question, ma'am, was

12  since Mr. Rauch became an employee of the hotel

13  management company, has he provided services on

14  any of your other projects?

15      A      No, he works 14 to 16 hour days

16  doing his job.

17          MS. PARLOVECCHIO:  Gary, we have

18      been going over an hour, I think it

19      would make sense to have a quick break.

20          I understand we are under time

21      constraints.

22          MR. FREEDMAN:  I offered that,

23      Gina, I would ask you take the

24      opportunity to talk to your client, not

25      about her testimony, but if you could

– Moskovits, p. 133, l. 10 through p. 141, l. 22 (video - p. 134, l. 10 through
p. 136, l. 3; p. 137, l. 4 through p. 138, l. 9 and p. 139, l. 24 through p.
140, l. 24 only)

Page 133

|     | TOBY MOSKOVITS |
| --- | --- |
| 1   | TOBY MOSKOVITS |
| 2   | designate months ago, we designated |
| 3   | topics, we designated the witnesses on |
| 4   | February 24th, and then we made an |
| 5   | amendment prior to this deposition |
| 6   | beginning, for the record. |
| 7   | MR. FREEDMAN:  Again, we can ask |
| 8   | the judge to deal with it, if it becomes |
| 9   | an issue. |
| 10  | Q       Ms. Moskovits, does the Debtor |
| 11  | have income? |
| 12  | A       There is the management company |
| 13  | in place, that has been the case from the date |
| 14  | of opening, even predating the closing of the |
| 15  | loan with Benefit Street, that handles the |
| 16  | income and expenses on behalf of the Debtor. |
| 17  | MR. FREEDMAN:  Is she freezing |
| 18  | just for me or everyone? |
| 19  | THE VIDEOGRAPHER:  She is frozen, |
| 20  | but I think she's back now. |
| 21  | A       I'm here. |
| 22  | Q       Ms. Moskovits, you froze. |
| 23  | A       Did you hear my -- I will ask |
| 24  | the court reporter -- |
| 25  | THE WITNESS:  Mr. Court |

Page 134

### TOBY MOSKOVITS

1
2      Reporter --

3      Q       Ms. Moskovits, you glitched in
4  the middle of your testimony, so we didn't get
5  it all.

6              But I had hoped that during the
7  break there could be a discussion between you
8  and your counsel and an attempt to streamline
9  this.

10             So my question was -- it called
11 for a yes or no, and then to the extent that
12 you feel you need to clarify, you certainly
13 have that right.

14             My simple question was, and you
15 asked for simple questions, was does the Debtor
16 have income?

17     A       You're asking questions that a
18 proper response does not allow for a yes or no,
19 so I will repeat my answer, because I'm not
20 sure when it froze.

21             What I said is from the date of
22 the opening of the hotel through the time when
23 Benefit Street gave the loan, so they were
24 fully aware of this, the management company
25 deals with the income and expenses on behalf of

Page 135

TOBY MOSKOVITS

1
2    the Debtor.

3         Q        Does the Debtor have income,

4    ma'am?

5                  Yes or no.

6                  MS. PARLOVECCHIO:    Objection.

7         A        I believe that I answered that

8    question already.

9         Q        So you are refusing to answer

10   the question?

11        A        No, I --

12                 MS. PARLOVECCHIO:    Objection.

13        A        I answered the question and I

14   told you that the management company, which is

15   pretty standard in this industry, and certainly

16   predated Benefit Street's participation in the

17   loan, so they were aware of this, and they are

18   familiar with this because they lend on many

19   hotels, the management company handles the

20   income and expenses on behalf of the Debtor,

21   which is the owner of a piece of real estate

22   with no employees and a hotel is a business.

23                 It's not just an entity that

24   collects rent, it's a business, and the income

25   and expenses is handled by the management

Page 136

TOBY MOSKOVITS

1

2  company and has been the case from the date of

3  openingment.

4          Q       I'm going to try one last time.

5                  Putting aside the management

6  company, does the Debtor itself have income?

7          A        To the extent that there would

8  be excess cash flow beyond the income and

9  expenses paid by the management company, the

10  Debtor would have income.

11                  Unfortunately, Benefit Street

12  attempted to derail our path to stabilization,

13  which you don't want to hear about, so I won't

14  go into that, but I will repeat again so there

15  is no -- first of all, I dispute the fact that

16  you continue to essentially insult me and my

17  attorney by stating that we are not responding

18  when we are responding.

19                  You are asking me questions that

20  don't -- aren't respondable with a simple yes

21  or no.

22                  Income and expenses are run

23  through the management company, and I said that

24  very clearly.

25                  And I'm sorry if it's frozen and

Page 137

TOBY MOSKOVITS

1
2    glitched.

3                    Hopefully it won't happen again.

4         Q         So, the revenues that are

5    reflected in the Debtor's monthly operating

6    reports, are those revenues of the Debtor or

7    revenues of the management company?

8         A         The income and expenses are

9    handled by the management company.

10        Q         Let me try my question again.

11                   The revenues reflected on the

12   Debtor's monthly operating reports filed with

13   the court, are those revenues that are owned by

14   the Debtor or the management company?

15        A         I'm not sure what you're asking.

16                   Is it a question of legal

17   control of the money?

18                   A DIP account is in place now

19   that all the money is running through.    It

20   sounds like you are asking me a legal question

21   and I am giving you a practical response.

22        Q         I am asking, to the best of your

23   understanding as a 50 percent owner of the

24   Debtor and its corporate representative here

25   today, in those monthly operating reports

Page 138

TOBY MOSKOVITS

1

2  reflecting revenues, who owns the revenue?

3          A       Until the entity went into

4  bankruptcy and from the first date of opening,

5  all of the income and expenses ran -- were

6  handled by the management company.

7                  Once the entity went into

8  bankruptcy, we were instructed to set up DIP

9  accounts and that change was made.

10         Q       My question is who owns that

11 revenue?

12                 Is it the Debtor or is it the

13 management company?

14                 MS. PARLOVECCHIO:   Objection.

15         A       I think I have answered that.

16                 What I said is that the

17 management company from the date of opening

18 collected and handled all income and expenses

19 on behalf of the business running this hotel.

20                 The changeover to DIP accounts

21 in the name of the Debtor took place after the

22 filing of the bankruptcy, at the instruction of

23 the CRO and the lawyers involved in the case.

24         Q       And assuming the plan gets

25 confirmed on April 7, 2022, are you going back

Page 139

### TOBY MOSKOVITS

1
2  to the pre-bankruptcy way that the revenues
3  were maintained?
4          A          I'm not a lawyer, but I assume
5  that they are no longer DIP accounts when a
6  bankruptcy ends.
7          Q          And so are you going back to the
8  prepetition way of handling cash and revenue?
9          A          Like many hotels in this
10 industry, from the date of opening the
11 management company handled expenses and income.
12                    So, to the extent that a
13 bankruptcy ends and they are no longer DIP
14 accounts, then there will be no more DIP
15 accounts.
16                    I'm not sure if you are asking
17 me -- I'm not a lawyer, so I don't know the
18 mechanics of how this would even work.
19                    But I have been advised that DIP
20 accounts are standard procedure during a
21 bankruptcy.
22                    So there wouldn't be DIP
23 accounts after the bankruptcy.
24          Q          A simple question, ma'am, is
25 after the bankruptcy is over, are you going

Page 140

TOBY MOSKOVITS

1

2  back, is the Debtor going back to the way it

3  handled its revenues and financial accounts the

4  way it did prepetition?

5           MS. PARLOVECCHIO:   Objection,

6        asked and answered.

7           MR. FREEDMAN:   It's definitely

8        not been answered, it's definitely been

9        asked.

10       A      It's been answered.   There was a

11  change made to the use of DIP accounts based on

12  the bankruptcy status and the instructions we

13  were given by our counsel.

14           And prior to that, from the date

15  of opening and including during the period that

16  Benefit Street, who is a sophisticated lender

17  in the hotel industry, reviewed our systems and

18  process, themselves and with third parties, we

19  have a management company in place that runs

20  the hotel and handles income and expenses.

21       Q      So --

22       A      When there are no more DIP

23  accounts, that's how it's going to be, the way

24  it was.

25       Q      It's going back, then it's going

Page 141

TOBY MOSKOVITS

1
2  back the same way, right?

3       A       My response to you is the change

4  was made to accommodate requirements of the

5  bankruptcy and the use of DIP accounts.

6       Q       And is it going back to the

7  prepetition way after this bankruptcy?  It's a

8  simple question, yes or no?

9                MS. PARLOVECCHIO:  Objection to

10          form.

11      A       If there are going to be no DIP

12  accounts, then we are no longer going to use

13  DIP accounts to collect the money.

14                The structure -- I'm trying to

15  respond to you again, because maybe I'm not

16  being clear, maybe the phone is freezing over.

17                The structure that existed from

18  the day we opened that was evident to Benefit

19  Street which they were very familiar with when

20  they did their due diligence, is the existing

21  management company that runs the business of

22  the hotel and handles all income and expenses.

23      Q       Prepetition, Ms. Moskovits, how

24  many bank accounts did the Debtor have?

25      A       I don't have exact number in

– Moskovits, p. 533, l. 19 through p. 540, l. 19 (video – p. 533, l. 19 through
p. 538, l. 14 only)

Page 533

1           TOBY MOSKOVITS VOL. II

2    signed on behalf of the Debtor, correct?

3         A.  I believe that is correct, yeah.

4         Q.  And you actually --

5         A.  They're filed -- they're filed

6    electronically.  So it's not actually signed.

7         Q.  But it's under your signature, right?

8         A.  Correct.

9         Q.  And you're actually the tax partner

10   -- the designated tax partner or tax manager for

11   the Debtor LLC, correct?

12        A.  I believe --

13            MS. PARLOVECCHIO:  Objection.

14        A.  I believe that's the case.

15        Q.  Tax matters partner?

16        A.  I'm actually not sure.  I would have

17   to see the document.  But if you tell me that

18   that's what it says, then that's the case.

19        Q.  Okay.  So tell me as a tax matters

20   partner or manager, what have you done over the

21   past four years to fulfill your obligations to

22   make certain that timely tax returns are filed

23   for the Debtor?

24            MS. PARLOVECCHIO:  Objection.

25        A.  It was our practice to file tax

Page 534

TOBY MOSKOVITS VOL. II

2  returns when the property started to cash flow.

3  During that time we were dealing with a lot of

4  crisis created by your client and then COVID hit.

5  We have subsequently caught up on all of our

6  taxes and, frankly, no taxes are due.  It was

7  just about the filing.

8         Q.  What does that mean that you would

9  "file tax returns when the property started to

10 cash flow"?

11        A.  You would need to speak with -- I

12 need to consult with my accountant, but that's

13 been our practice.  I'm not giving you -- I'm

14 explaining to you the practice.

15        Q.  Well, what was your understanding of

16 the concept as the tax matters partner?

17        A.  I did what my accountant told me to

18 do.

19        Q.  So you can't tell me anything more

20 than that?

21        A.  I am -- I am confirming that all the

22 tax returns have been filed.

23        Q.  No, not my question.  [MOTION] Move

24 to strike.

25        A.  There is no money owed during the

Page 535

TOBY MOSKOVITS VOL. II

1
2    previous period.

3        Q.   [MOTION] Move to strike.   Move to

4    strike.   Move to strike.

5            MS. PARLOVECCHIO:   Objection.

6        Q.   Can you tell me anything more about

7    your testimony a moment ago that you were waiting

8    for the property to start cash flowing before

9    filing tax returns for the Debtor?

10       A.   You would have to ask -- I would have

11   to consult with my accountant.

12       Q.   Did you in accepting that advice or

13   recommendation have any understanding of what it

14   meant in abiding by that instruction or

15   recommendation?

16       A.   No taxes were due and the filings

17   have all been brought current.

18       Q.   Not my question.

19            The concept of not filing returns

20   until the "property started to cash flow," what

21   was your understanding of that concept in making

22   a determination as the tax matters partner for

23   the Debtor not to file returns for the past four

24   years until February of 2022?

25            MS. PARLOVECCHIO:   Objection, form.

Page 536

TOBY MOSKOVITS VOL. II

1

2        A.   I would have to consult with my

3   accountant.   There were no monies due for the

4   periods and all the filings have been caught up.

5        Q.   Okay.   All I'm trying to understand,

6   ma'am, is your understanding of the concept that

7   you testified to in respect to no returns were

8   required until "the property started to cash

9   flow."   Do you --

10        A.   I'm not an accountant.

11        Q.   Did you ask what that concept meant

12   in trying to comply with your obligations as the

13   tax matters partner for the Debtor?

14        A.   I was too busy trying to understand

15   your client's refusal to tell us how to cure

16   these purported defaults and --

17        Q.   Anything more you can testify as to

18   that?

19        A.   You asked me the same question again

20   and again and again.   So you want me to not

21   respond with something else, then don't ask the

22   same question.

23            I would have to consult with my

24   accountant.   Subsequently -- at this moment,

25   every single tax return has been filed and there

Page 537

TOBY MOSKOVITS VOL. II

1
2    was no monies due for the periods that we caught
3    up on.
4         Q.   So what event -- well, let me ask it
5    differently.
6              If you weren't required to file tax
7    returns for 2017 because the property wasn't cash
8    flowing, if you didn't have to file a tax return
9    for 2018 because the property wasn't cash
10   flowing, if you didn't have to file a tax return
11   for 2019 because the property wasn't cash flowing
12   and you didn't have to file a return for 2020
13   because the property wasn't cash flowing, what
14   event all the sudden caused you to file tax
15   returns for the Debtor for those four years in
16   February 2022?
17             MS. PARLOVECCHIO:   Object to form.
18        A.   That's a question for my accountant.
19        Q.   You as a corporate representative for
20   the Debtor cannot provide any additional
21   information on that?
22        A.   It was the property -- actually 20 --
23   that year was the year we started stabilizing and
24   we started pulling together getting all of our
25   records in order.

Page 538

TOBY MOSKOVITS VOL. II

1

2      Q.   What year was that?

3      A.   Whenever it was that you -- we

4   started pulling -- filing our taxes.

5      Q.   That was a month ago.

6           That was the first time you started

7   pulling records together?

8      A.   No, the taxes -- I have --

9           MS. PARLOVECCHIO:  Objection.

10     A.   I would have to see it in front of

11  me, but I do not believe it is correct that taxes

12  were not filed on the entity in any fashion until

13  a month ago.  I don't believe that that's

14  correct.

15     Q.   Well --

16     A.   But I would have to check with my

17  accountant.

18     Q.   You want us to show the tax returns?

19     A.   I don't -- I would have to check with

20  my accountant as to when they were filed.

21          At this time, all tax returns have

22  been -- to the best of my knowledge -- have been

23  made current and for the previous periods, there

24  were no taxes due.

25     Q.   Okay.  Anything more you can tell me

Page 539

1                TOBY MOSKOVITS VOL. II

2    about why the Debtor didn't file returns for four

3    years?

4              MS. PARLOVECCHIO:  Objection.

5         A.  All taxes have been made current and

6    there was no monies due for the previous periods.

7    All taxes have been made current.

8         Q.  Why does the management company

9    reflect income if all of the revenues of the

10   hotel are managed by the management company?  Let

11   me ask it differently.

12             If the Debtor had no income requiring

13   it to file tax returns, why does the management

14   company's returns reflect income?

15             MS. PARLOVECCHIO:  Objection.

16        A.  You actually that -- first of all,

17   that's not what I said.  What I said is --

18        Q.  No, no, no, my question --

19        A.  -- that there were no taxes due.

20   You're putting words in my mouth.  I said there

21   were no taxes due.

22        Q.  Okay.  So --

23        A.  Please don't -- please don't --

24   please put words in my mouth.

25        Q.  Why -- why --

Page 540

TOBY MOSKOVITS VOL. II

1

2      A.   You're not supposed to be answering

3   the questions.  You're supposed to be asking

4   them.   I said there were no taxes due.   It was

5   very clear in my response.

6      Q.   Please don't -- please don't get

7   nasty.  I'm almost done.

8           All I'm trying to understand is if

9   the Debtor didn't have income requiring it to

10  file tax returns, why does the management

11  company's returns reflect that it had income when

12  all it's doing is managing the business of the

13  hotel?

14           MS. PARLOVECCHIO:  Objection, form.

15      A.   The taxes were filed as per my

16  accountant and what I said clearly was that there

17  was no taxes due.  I didn't say that there was no

18  income.  The taxes were filed as per my

19  accountant.  I'm not an accountant.

20      Q.   Why did -- by the way, why didn't you

21  and Michael file proof of claim in the bankruptcy

22  case?

23           MS. PARLOVECCHIO:  Objection --

24      A.   What are you referring to?

25      Q.   Why didn't you --

3.   _Lichtenstein – MC_

–   Lichtenstein MC, p. 21, l. 12 through p. 25, l. 17 (no video)

---

Page 21

1                MICHAEL LICHTENSTEIN

2   file a Proof of Claim in this Debtor case,

3   correct?

4           A        Possible, I don't remember now.

5           Q        Was that a decision that you and

6   Ms. Moskovits made?

7           A        I don't remember who made the

8   decision, but if the management company did not

9   file claims and the management company was owed

10  money, it was because insider claims were not

11  filed.

12          Q        Does the management company

13  presently receive any revenue that is not

14  specifically related to the operations of the

15  Williamsburg Hotel?

16                  MR. KELLEY:   Objection to form.

17          You can answer the question.

18          A        I'm not sure what that question

19  refers to, and to what time period that

20  question refers to.

21          Q        I asked you now.

22                  Are there any monies that flow

23  through the -- sorry, the management company

24  bank accounts that are not generated at the

25  hotel?

Page 22

MICHAEL LICHTENSTEIN

1

2          A          There definitely were bank

3    accounts and funds coming in that were not

4    generated from the Debtor's revenue; yes.

5          Q          Were those monies generated

6    through other businesses?

7          A          Yes; they were generated from

8    other businesses.

9          Q          What businesses were those?

10         A          Other hotel deals.

11         Q          What hotel deals had revenue

12   that were being deposited into the management

13   company's accounts?

14         A          You interrupted my answer.

15                     I started saying that there

16   would be either revenue from other hotel deals

17   or from other sources.

18                     I don't remember now all the

19   sources.

20         Q          Can you tell me any sources?

21         A          Other hotel deals, the Eidolon

22   was one source of funds of the management

23   company, and such other -- I don't remember now

24   any other sources.

25         Q          Okay.  I had asked you a moment

Page 23

MICHAEL LICHTENSTEIN

2   ago what hotel deals are you referring to?

3          A        Well, we just discussed, it was

4   a hotel deal in Brooklyn, there was a hotel

5   deal in Miami.

6                   I don't remember now all the

7   deals that were discussed in the last five

8   years.

9          Q        And you said something like the

10  Eidolon.

11                  What was that?

12         A        You know very well what the

13  Eidolon is, because you asked me about it.

14         Q        I don't know, sir, so what is

15  it?

16         A        I would appreciate if you don't

17  lie, since you very well know what it is,

18  because you asked me about it.

19                  So the Eidolon was a source of

20  funds of the management company.

21         Q        What is the Eidolon, sir?  I

22  don't know, and this is your deposition, so I

23  need an answer to the question so I can move

24  on.

25         A        I would appreciate again if you

Page 24

MICHAEL LICHTENSTEIN

1

2    stop lying.  You know very well what the

3    Eidolon is, it is a loan provided by the SBA to

4    the management company.

5            Q       The EIDL loan, that's what you

6    are referring to?

7            A       I really don't appreciate your

8    playing dumb and lying to me three times as if

9    you didn't know what I'm talking about.

10           Q       All right.

11                   Does the management company have

12   a specific bank account associated with the

13   Miami project?

14           A       Not that I remember now.

15           Q       Does the management company have

16   a specific bank account associated with the

17   Bushwick project?

18           A       I don't remember now which

19   accounts were associated with what, and frankly

20   it's none of your business if it's not related

21   to the Debtor.

22           Q       Did the management company ever

23   receive a fee for any work it did on the

24   Bushwick project?

25           A       I will not answer that question

Page 25

MICHAEL LICHTENSTEIN

2  now, A, because I don't remember these, if

3  anything was incurred in the last few years.

4           B, sources of income of the

5  management company that are unrelated to the

6  Debtor are none of your business.

7       Q       Did the management company ever

8  receive a fee in respect to the Miami project?

9       A       Same answer applies to this,

10 too.

11      Q       You are refusing to answer the

12 question, sir?

13      A       I am answering the question,

14 that it's none of your business if the

15 management company had sources of funds from

16 other places that are not related to the

17 Debtor.

18      Q       Well, sir, since you brought up

19 the EIDL loan, do I have it correct that there

20 was a $350,000 loan that was made under the

21 EIDL, E-I-D-L, program to the management

22 company in July 2021, correct?

23      A       Yes.

24      Q       And the funds for that loan were

25 received into a management company account,

– Lichtenstein MC, p. 42, l. 6 through p. 43, l. 11 (no video)

Page 42

| | |
|---|---|
| 1 | MICHAEL LICHTENSTEIN |
| 2 | In other words, does the |
| 3 | management company have it in its possession? |
| 4 | A    It would have it, yeah.  I don't |
| 5 | have anything in my possession right now. |
| 6 | Q    Does the -- did the management |
| 7 | company file a tax return for 2017? |
| 8 | A    As far as I remember, yes. |
| 9 | Q    We have received neither, |
| 10 | notwithstanding our request. |
| 11 | Do you know why? |
| 12 | A    I have no clue why. |
| 13 | Q    Exhibit 3 is the management |
| 14 | company's 2018 return. |
| 15 | (The above described document was |
| 16 | marked Exhibit 3 for identification as of |
| 17 | this date.) |
| 18 | Q    Let me know when you have it, |
| 19 | please. |
| 20 | A    Okay. |
| 21 | Q    In 2018, did the management |
| 22 | company have receipts or sales not otherwise |
| 23 | relating to the Williamsburg Hotel? |
| 24 | A    I don't remember now. |
| 25 | Q    You don't know, sir? |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 43

MICHAEL LICHTENSTEIN

1

2          A          I said I don't remember now the

3     breakdown, that's what I said.   Please don't

4     put words in my mouth.

5          Q          What other sources of receipts

6     or sales would the management company have in

7     2018 other than its relationship with the

8     Williamsburg Hotel?

9          A          Hello?

10               You're freezing, I can't hear

11     you.

12               MR. KELLEY:  You're freezing on

13          his screen.   Hold on.

14                    THE VIDEOGRAPHER:  Would you like

15          to go off the record?  The witness is

16          frozen on mine.  I think he's having a

17          connection issue.

18                    MR. FREEDMAN:  Yes, off the

19          record, please.

20                    THE VIDEOGRAPHER:  He just came

21          back.

22               MR. KELLEY:  You had internet

23          interruption.

24                    THE WITNESS:  Me?

25               MR. KELLEY:  Let's go back on the

– Lichtenstein MC, p. 44, l. 12 through p. 55, l. 20 (video – p. 44, l. 12 through p. 47, l. 13; p. 47, l. 22 through p. 48, l. 2; p. 48, l. 13 through p. 49, l. 10; p. 50, l. 17 through p. 51, l. 11; p. 51, l. 22 through p. 54, l. 2; p. 55, ll. 3-13 only)

---

Page 44

1              MICHAEL LICHTENSTEIN

2        record.

3              THE VIDEOGRAPHER:   He's still

4        having it.   We are now off the record.

5        The time is 12:02 p.m.

6              (At this point in the proceedings

7        there was a recess, after which the

8        deposition continued as follows:)

9              THE VIDEOGRAPHER:   We are now

10       back on the record.   The time is 12:04

11       p.m.

12       Q      The question that was pending

13  when you froze, Mr. Lichtenstein, was what

14  other sources of receipts or sales did the

15  management company have in 2018 other than its

16  relationship with the Williamsburg Hotel?

17       A      I wouldn't remember now.   Most

18  of it would be from hotel operations.   I have

19  to get back to you if some of it is from other

20  sources.

21       Q      So, I'm looking at the first

22  page of the 2018 return that is marked as

23  Exhibit 3.

24              Do you see that, sir?

25       A      Yes.

Page 45

MICHAEL LICHTENSTEIN

1

2          Q        Line 1A, gross receipts of sales

3    says $15,117,101.  Do you see that?

4          A        Yes.

5          Q        And to the best of your

6    recollection, all or most of that would have

7    come from the Williamsburg Hotel?

8          A        Most of it, yeah, all or most of

9    it would come from the Williamsburg Hotel.

10         Q        What contract or agreement

11   provides for the management company to make a

12   claim of ownership of the gross receipts of

13   sales generated at the Williamsburg Hotel?

14         A        First of all, this is not a

15   claim of ownership, necessarily.

16                  But the money flows through the

17   Williamsburg Hotel, and as such the accountants

18   decided to book it this way.

19         Q        It flows through as a

20   pass-through entity, correct?

21         A        I don't want to get into

22   accounting terms, and I don't want to take

23   responsibility for accounting terms now.

24         Q        Does the management company have

25   an ownership interest in any of the funds that

Page 46

MICHAEL LICHTENSTEIN

2  flow through its accounts that are generated at

3  the Williamsburg Hotel?

4              MR. KELLEY:   Objection to form.

5         Go ahead, you can answer.

6         A      As I said, there might be some

7  funds in some years that are not sourced by the

8  Debtor.

9              As to the Debtor's funds that

10  are flowing through the management company, I

11  will not respond as to classifications for tax

12  purposes without an accountant.

13        Q      I'm asking a different question,

14  sir.

15              I'm asking you based upon a

16  representative of the management company here

17  today, what is your understanding of the

18  management company's ownership interest in any

19  funds flowing through its accounts that are

20  generated at the Williamsburg Hotel?

21              MR. KELLEY:   Objection to form.

22        A      And I'm answering as a

23  representative of the management company that I

24  will not respond as to classifications of

25  funding or funds flowing through as it refers

Page 47

MICHAEL LICHTENSTEIN

1   to tax returns and such without an accountant.

2

3            Q       On line 22, ordinary business

4   income, $54,460, do you see that?

5            A       Okay.

6            Q       Is that ordinary business income

7   generated by anything other than the management

8   company's relationship with the Williamsburg

9   Hotel?

10           A       I already responded that I am

11  not sure if there was other income in 2018,

12  therefore I cannot answer this question right

13  now with certainty.

14           Q       You are familiar with the

15  bankruptcy schedules filed in this case, sir?

16           A       Not really that familiar.

17           Q       You reviewed them, we talked

18  about them last time we took your deposition,

19  right?

20           A       We talked about them.  I don't

21  remember reviewing them.

22           Q       I will show you Exhibit 4 and

23  ask you to flip to page 24 of 33.

24                   (The above described document was

25           marked Exhibit 4 for identification as of

Page 48

MICHAEL LICHTENSTEIN

1
2          this date.)
3               MR. KELLEY:  Gary, I couldn't
4          hear the page number.  Could you repeat
5          that, please?
6               MR. FREEDMAN:  24 of 33.
7               MR. KELLEY:  Thank you.
8          A     For the record, I'm pretty
9     positive that we did not review them last time,
10    but which page are you talking about?
11         Q     Still 24 of 33.
12         A     Okay.
13         Q     So, you see part 1, income,
14    gross revenue from business?
15         A     Excuse me, which part?
16         Q     Part 1, gross revenue from
17    business.
18         A     Yes.
19         Q     What is the Debtor's or was the
20    Debtor's gross revenue from business for the
21    fiscal year 2018?
22         A     Okay.
23         Q     What is it, sir?  Please read it
24    out loud.
25         A     It shows here $15,117,524.

Page 49

MICHAEL LICHTENSTEIN

1

2        Q        And what did the management

3  company show as gross receipts of sales?  Flip

4  back to Exhibit 3.

5        A        $15,117,101.

6        Q        It's $15,117,101, correct?

7        A        Um-hum, yes.

8        Q        So, the difference is about

9  $400, correct?

10        A        I guess.

11        Q        So, it's fair to say that the

12  $15,117,101 reflected on the management

13  company's 2018 return was generated at the

14  hotel, correct?

15        A        Again, actually my thing jumped

16  to page 1.

17                 Which page did you say on the

18  schedules, 24?

19        Q        I'm on the 2018 return, sir.

20        A        You wanted to flip back to the

21  schedule, right?

22        Q        No.  The 2018 return, Exhibit 3.

23        A        Okay.  So let's find -- so

24  what's your question?

25        Q        The $15,117,101 on line item 1A

Page 50

MICHAEL LICHTENSTEIN

1

2  of the management company's 2018 return

3  corresponds other than $400 with the same

4  number on the bankruptcy schedules reflecting

5  gross revenue for the Williamsburg Hotel Debtor

6  business, correct?

7         A      Okay.

8         Q      So, can you tell me why the

9  bankruptcy schedules are showing that the

10 Debtor had, I'm just rounding off, $15 million

11 in gross revenue for 2018, and the management

12 company's tax return for 2018 reflects the same

13 amount of gross receipts for sales?

14        A      I'm not understanding the

15 question.  What do you mean why?  What's the

16 question?

17        Q      How can the Debtor file

18 bankruptcy schedules saying it had $15 million

19 of gross revenue for 2018, and the management

20 company also say that it had $15 million of

21 gross receipts for the same year?

22        A      The Debtor is disclosing the

23 full revenues that are related to the Debtor.

24        Q      Okay.  And the $15 million on

25 the management company's tax return for 2018

Page 51

MICHAEL LICHTENSTEIN

1

2  also relates to revenues generated at the

3  hotel, correct?

4         A        I don't know now the exact

5  details, but it seems so, yes.

6         Q        So my question is how could two

7  entities claim the same receipts?

8         A        They are claiming -- they are

9  saying the same numbers in answer to very

10  different questions and in answer to two

11  different things.

12                 So I am not understanding the

13  point that you are trying to make.

14         Q        Line item 15, interest,

15  $1,073,714, who was the management company

16  paying interest to in 2018?

17         A        I am going back to the return,

18  one second.  Which line item?

19         Q        15.

20         A        Okay.  What's the question,

21  repeat the question again?

22         Q        Let me try again.

23                 Line item 15 of the 2018 return

24  shows interest of $1,073,714.

25                 Do you see that, sir?

Page 52

MICHAEL LICHTENSTEIN

1
2
3        A        Yes.

3        Q        Who was the management company
4    paying interest to in 2018?

5        A        I don't remember at all.    It
6    could have been to Benefit Street, mezz loan, I
7    don't even know.

8                  I don't know, you have to check
9    with the accountant.

10       Q        Did the Williamsburg Hotel BK
11   LLC have a lending relationship with Benefit
12   Street?

13       A        No.

14       Q        Did the management company have
15   a lending relationship with the mezz company,
16   the mezz lender?

17       A        No; but it could have made a
18   payment on behalf of the Debtor.

19                I don't know what it is, I have
20   no clue, I have to check with the accountant.

21       Q        So assuming all of the revenue
22   reflected on this 2018 return related directly
23   to the operations at the Williamsburg Hotel,
24   how did the management company earn $54,460 in
25   business income?

Page 53

MICHAEL LICHTENSTEIN

1

2      A      As I said, I will not be

3   answering such questions without an accountant.

4      Q      Where was that business income

5   deposited?

6             MR. KELLEY:  Objection to form.

7      A      Either in the management

8   company's account or back to the Debtor.

9      Q      Do you know as you sit here?

10     A      Nope, I have no clue, I don't

11  remember now.

12     Q      If you flip to page 5 of the

13  2018 return, sir --

14     A      Yes.

15     Q      -- the balance sheet, schedule

16  A, the cash, $92, 887.

17     A      Did you say page 5?

18     Q      5 of the return, balance sheet,

19  schedule L, cash, beginning of the year,

20  $92,887, at the end of the year, $93,562.

21             What was the source of that cash

22  other than operations at the Williamsburg

23  Hotel?

24     A      I can't answer you right now

25  about 2018 sources of cash.

Page 54

MICHAEL LICHTENSTEIN

2          I can check and get back to you.
3      Q       Line -- you've been telling me
4  you are going to get back to me, and you
5  haven't gotten back to me with any of the
6  answers to any of the questions I have asked.
7          But if you can, that would be
8  great?
9      A       That is a false statement.
10         MR. GLUCKSMAN:  Argumentative,
11     argumentative.
12     Q       12 --
13     A       One minute.  We got back to you
14  with plenty of answers.
15     Q       No, sir, but I don't want to
16  argue.
17     A       We did.  We provided you
18  information.  I know for a fact my lawyers
19  provided you information.
20         In fact you just went through
21  information of an EIDL loan document that was
22  provided to you following the past deposition.
23     Q       That I had asked for six times.
24     A       I would appreciate, Mr.
25  Freedman, if you stopped announcing false

Page 55

MICHAEL LICHTENSTEIN

1
2  statements.  Thank you.
3        Q       12A, intangible assets, $8,750
4  at the beginning of the year, $10,500 at the
5  end of the year.
6                What are those assets?
7        A       You said $2,500.  It says
8  $10,500.
9        Q       I said $10,500, but if I said it
10  incorrectly, I will say it again.  $10,500.
11        A       And the answer is that I'm not
12  going to answer such questions without my
13  accountant.
14        Q       Is it fair to say you're not
15  going to answer any questions with respect to
16  the management company's tax returns?
17        A       That is not fair to say at all.
18                I said I won't answer any of
19  these questions right now in this deposition
20  without discussing with my accountant.
21                MR. GLUCKSMAN:  Mr. Freedman,
22        this is argumentative.  You are not
23        during -- this is not a cage match.
24                MR. FREEDMAN:  I didn't hear
25        anything you just said, Mr. Glucksman.

– Lichtenstein MC, p. 56, l. 9 through p. 62, l. 13 (video – p. 56, l. 20 through p. 59, l. 13; p. 59, l. 19 through p. 60, l. 9; p. 62, ll. 4-13 only)

Page 56

```
 1              MICHAEL LICHTENSTEIN
 2              MR. GLUCKSMAN:  Mr. Glucksman
 3       said this is not a cage match, and I
 4       would appreciate if you wouldn't badger
 5       my witness.
 6              MR. FREEDMAN:  I'm not going to
 7       even dignify that with a response, sir.
 8              MR. KELLEY:  Let's proceed.
 9       Q       By the way, why did the
10   management company wait until February 2022 to
11   file its 2018 return?
12       A       As I said, I will not be
13   responding on any questions about the
14   management company that are not related to the
15   Debtor.
16              And I will not be responding on
17   any questions on the tax returns without my
18   accountant.
19       Q       We have just marked Exhibit 5,
20   which is the Debtor's 20 -- Exhibit 5 is the
21   management company's tax return for 2019.
22              Is it a true and correct copy,
23   sir?
24              (The above described document was
25       marked Exhibit 5 for identification as of
```

Page 57

MICHAEL LICHTENSTEIN

1
2              this date.)
3         A         It seems like it is.
4         Q         And again, if I ask you any
5    questions about this return, you are not going
6    to answer them, is that correct?
7         A         I will not be answering specific
8    questions about these tax returns that are not
9    related to the Debtor or that I -- or that are
10   related to tax matters of classifications or
11   such matters where I would rely on my
12   accountant.
13                  You can ask the question and
14   either I'll answer or I won't answer.
15        Q         Here is a question.
16                  Line item 1A on the second page
17   shows gross receipts of $20,034,954, and if you
18   flip back to the bankruptcy schedules, for
19   2019, the Debtor reflects gross revenues of the
20   same exact amount.
21                  How is that -- how can that be,
22   sir?
23        A         As I said, these are two
24   different forms, two different questions.
25                  So I'm not really understanding

Page 58

MICHAEL LICHTENSTEIN

1
2   your question and I will not respond any
3   further on this.
4        Q       If the management company is a
5   pass-through entity, receiving the -- taking in
6   the receipts from the hotel and paying
7   expenses, how is the management company
8   claiming ordinary business income of $94,698
9   for 2019?
10        A       The management company is not
11   claiming generally any income from the hotel
12   revenues and, if anything, it is transferring
13   that to the Debtor, which is on the last page,
14   which we went through last time, where we chose
15   I think for this year $1.5 million, or I don't
16   know, some large sum that was transferred to
17   the Debtor.
18                We went through this actually in
19   the last deposition, so --
20        Q       My question is, though, sir, how
21   is the management company claiming that it had
22   income of $94,698 in 2019?
23                MR. KELLEY:  If you know.  I
24        don't think he's asking you to formulate
25        a legal conclusion, but if you know, go

Page 59

MICHAEL LICHTENSTEIN

2    ahead and answer.

3        A        I think that the question the

4    way it's asked is not a correct question, and I

5    will not respond on tax matters and tax

6    classifications without my accountant.

7        Q        And this return is dated May 4,

8    2021, and the first page shows it was filed on

9    May 26, 2021.

10                Do you see that, sir?

11       A        Could be.

12       Q        Do you see it, sir?

13       A        Okay, I'm not --

14       Q        So why did the management

15   company file its 2019 return in May 2021, but

16   filed its 2018 return in February of 2022?

17       A        I don't remember now the timing

18   when the tax returns were filed.

19       Q        You will have up in a moment

20   Exhibit 6.  Let me know when you have it.

21                (The above described document was

22       marked Exhibit 6 for identification as of

23       this date.)

24       A        Exhibit number 6?

25       Q        Yes, sir.

Page 60

MICHAEL LICHTENSTEIN

1

2          A        Are you planning on wasting the

3    next hour going through tax returns?

4          Q        Let me know when you have

5    Exhibit number 6, please.

6          A        I have Exhibit number 6, and I

7    think this is a waste of time, but if you want

8    to spend your entire deposition going through

9    tax returns, that is fine with me.

10         Q        Okay, this is another copy of

11   the management company's 2019 return, correct?

12         A        I have no clue.

13         Q        Does it appear to you to be

14   another copy of the 2019 return, sir?

15         A        I wasn't so focused on the

16   previous one.  So I can look at the previous

17   one?

18                  There might have been some

19   returns that were amended, and that's all I'm

20   going to say about that.

21         Q        Well, this return doesn't

22   reflect it as an amended return, does it?

23                  The box up on top is not

24   checked?

25         A        I wouldn't know enough to answer

Page 61

MICHAEL LICHTENSTEIN

1

2  about that.

3         Q       Well, you don't see -- if you go

4  back up to the top, sir, you don't see box 5

5  checked that says amended return, correct?

6                 MR. GLUCKSMAN:   Objection.

7         A       Okay.

8         Q       Okay.   And this return is dated

9  February 24, 2021, correct?

10        A       Okay.

11        Q       So why is the Debtor filing a

12 new return on February 24, 20 -- sorry, why is

13 the management company filing a new return for

14 2019 on February 24, 2021?

15                MR. KELLEY:   Objection to form.

16        A       I actually am not understanding

17 your question.   What's the date of -- this is

18 February.

19                What's your question?   The date

20 of the previous one is what?

21        Q       It's May 2021, and now we see

22 another return that was provided to us dated

23 February 24 -- I'm on the wrong date.

24        A       '21, actually.

25        Q       You are right, sir.

Page 62

MICHAEL LICHTENSTEIN

1

2          A          They are both -- I don't

3     understand your question.

4          Q          Why were two returns provided to

5     us for the management company for 2019 with two

6     different dates on them?

7          A          I have no clue.  Maybe one was a

8     draft, one was actually filed.  I'm not sure.

9          Q          Who would know on behalf of the

10    management company, who would be able to answer

11    that question?

12         A          Me.  I'll check into it and get

13    back to you.

14         Q          What position does Mr. Rauch

15    have with the management company?

16         A          He's the, if I remember

17    correctly, his title is finance manager or -- I

18    don't remember the exact title.

19         Q          How long has he been an employee

20    of the management company?

21         A          A few years, I don't remember

22    exactly when he started, but it's been a few

23    years.

24         Q          You can't tell me when he

25    started?

– Lichtenstein MC, p. 68, l. 9 through p. 70, l. 25 (video – p. 68, l. 9 though p. 70, l. 11 only)

Page 68

MICHAEL LICHTENSTEIN

1
2    not just as a 30(b)(6) witness for the
3    management company.
4            A        And in my individual capacity I
5    see zero relevance to respond about Mr.
6    Kirschner's past employment prior to his
7    involvement with the management company of the
8    Debtor.
9            Q        Does Mr. Kirschner in his role
10    with the management company provide services
11    other than those related directly to the
12    operations of the Williamsburg Hotel?
13                    MR. KELLEY:  Objection to form.
14            You can answer.
15            A        You love asking overbroad
16    questions, but I will say that Mr. Kirschner,
17    like Mr. Rauch, is quite busy and works
18    full-time and more than full-time for the hotel
19    and for the management company in the
20    management of the Debtor's asset.
21            Q        Does Mr. Kirschner provide any
22    services for any of your other projects?
23            A        Sometimes, on his off time, if I
24    ask him, sometimes.
25            Q        How often does that happen?

Page 69

MICHAEL LICHTENSTEIN

1

2        A        Not that often, and I don't have

3   to respond on such matters that don't relate to

4   the Debtor.

5        Q        Is Mr. Kirschner separately

6   compensated for those services?

7        A        Sometimes he is, sometimes he

8   isn't.  I'm not going to answer on Mr.

9   Kirschner's personal finances that have no

10  connection to the management of the hotel or to

11  the Debtor.

12       Q        Does Mr. Kirschner receive a set

13  amount of compensation for this other work per

14  month?

15       A        I don't think that Mr.

16  Kirschner's compensation for or any funds that

17  Mr. Kirschner receives that are not related to

18  his full-time job that relates to the Debtor

19  have any relevance to this deposition.

20       Q        For this other work that Mr.

21  Kirschner performs from time to time, is he

22  ever compensated out of the management company?

23       A        Absolutely not.

24       Q        Is he ever compensated out of

25  the Debtor's funds?

Page 70

MICHAEL LICHTENSTEIN

1
2          A          Mr. Kirschner works full-time
3    for the management company and it's a full-time
4    job.  Actually it's more than a full-time job.
5                    He is paid by the management
6    company for the full-time job that he provides
7    in the accounting department.
8                    His personal finances are
9    absolutely none of your business and not part
10   of this deposition and I will not answer any
11   questions about it.
12         Q          Let me make sure I get my
13   question out so you have it in mind.
14                    For this other work that Mr.
15   Kirschner performs from time to time not
16   directly related to the Williamsburg Hotel, is
17   he ever compensated from funds that are derived
18   from the operations at the Williamsburg Hotel?
19         A          And I answered that already.
20   The answer is no.
21                    Mr. Kirschner gets paid by the
22   Williamsburg Hotel for more than a full-time
23   job that he puts in on the accounting
24   department where he stays very late hours and
25   works overtime most of the time.

– Lichtenstein MC, p. 92, l. 6 through p. 94, l. 3 (no video)

```
                                    Page 92

 1                MICHAEL LICHTENSTEIN

 2    other unrelated businesses that are not related

 3    to the Debtor.

 4                  And the court will have no

 5    problem with that.

 6          Q       Has the management company

 7    actively engaged in tax evasion, sir?

 8                  MR. KELLEY:  Objection, that's

 9          either harassment or argumentative.

10                  You can answer the questions, but

11          we are not going to be on this line of

12          questioning very long.

13                  Go ahead.

14                  MR. FREEDMAN:  Hold on, let me

15          deal with that.

16                  The examiner has opined that he

17          believes that there is tax evasion.

18                  Mr. Rauch testified that he had

19          concerns that there was tax evasion at the

20          management company and, in fact, he spoke

21          to Mr. Lichtenstein about it.

22                  So, I'm certainly -- it's relevant

23          in respect to this management company

24          managing this hotel in the future.

25                  MR. KELLEY:  I'm not going to
```

Page 93

MICHAEL LICHTENSTEIN

2   respond, I'll reserve, but I've already

3   indicated -- Mr. Lichtenstein, go ahead

4   and answer this question.

5         A        The examiner's report has been

6   taken apart and proven to be a series of lies,

7   falsehoods, and nonsense and completely

8   self-contradictory.

9                  So, the examiner's report is not

10  worth anything, and whatever conclusion the

11  examiner comes to is worthless.

12                 Mr. Rauch, while I have not read

13  his deposition, I am certain that he did not

14  say that there was tax evasion.

15                 I am pretty certain that you

16  harassed him and bamboozled him and put words

17  in his mouth and made it sound like he said

18  something which he didn't mean to say at all,

19  because that's what you do.

20                 And Mr. Rauch doesn't have that

21  much experience with depositions.

22                 So, both of your previous

23  statements are false.

24                 And the answer is that there was

25  no tax evasion, and you are just trying to

Page 94

MICHAEL LICHTENSTEIN

1

2  create a story line because you're pretty much

3  losing the case.

4            MR. FREEDMAN:  I move to strike

5       as unresponsive.

6       Q       If you would confine yourself to

7  my specific question, sir.

8       A       I responded to your question.

9       Q       You asked me about the --

10           MR. FREEDMAN:  Move to strike,

11      unresponsive.

12      A       You asked me about the

13  examiner's statement, and you asked me about

14  Mr. Rauch's statement, and I responded --

15           MR. FREEDMAN:  Move to strike.

16      A       -- and I responded to the two

17  statements which you claim to quote.

18           MR. FREEDMAN:  Again, I move to

19      strike as unresponsive.

20      Q       There is no question pending.

21  You are just using up my time now.

22           What's the status of the payment

23  of the occupancy taxes?  In other words, what's

24  the status of those negotiations?

25      A       Can you please repeat the

– Lichtenstein MC, p. 121, l. 2 through p. 130, l. 11 (video – p. 125, l. 17 through p. 129, l. 24 only )

Page 121

MICHAEL LICHTENSTEIN

1

2      Q       So, why were there, for

3   instance, 14 transfers between Northside and

4   the management company in any given day of

5   magnitudes of $100,000?

6              What would be that purpose?

7      A       To fund the operations of the

8   hotel.  I'm not sure what you are referring to,

9   but some days there were many transfers and

10  some days there were not a lot of transfers, as

11  was necessary.

12     Q       Why wouldn't you make one single

13  transfer?

14             Why would you have to make 14

15  transfers between the same parties in one day?

16     A       I have no clue what you are

17  referring to.

18             And I am assuming that it was

19  necessary either because they came in from

20  different accounts or they were going to

21  different accounts or they were going for

22  different purposes.

23     Q       How about if it's the same

24  account, same exact account.

25     A       Or -- I would appreciate --

Page 122

MICHAEL LICHTENSTEIN

1

2          Q          Sir, this is in the reports that

3     you provided to rebut the examiner's report.

4          A          I would appreciate if you

5     stopped interrupting my answer.

6          Q          I would appreciate if you could

7     answer my specific question.

8          A          I was in the middle of that.

9                     MR. KELLEY:   I think he's

10                    trying -- I understand you're pressed

11                    for time, but please allow him to

12                    finish.

13         A          I was in the middle of answering

14    your question.

15                    This could have been coming in

16    in smaller pieces for many different reasons.

17         Q          Like what?

18         A          Either --

19         Q          Like what?

20         A          Either the funds were coming in

21    that way from different accounts, or they were

22    going to different accounts, or they were

23    needed for different purposes.

24                    It can be a million and one

25    different explanations for why this was

Page 123

MICHAEL LICHTENSTEIN

2   happening this way.

3        Q        So what books and records would

4   we go to to figure out the reasons why, for

5   instance, 14 transfers were made between the

6   management company and Northside from single

7   accounts in one day?

8                How do we -- what books and

9   records do we go to to figure out why that

10  happened?

11       A        Well, one simple answer can be

12  the money came into the management company in

13  bits and pieces.

14               That can be a very simple answer

15  right there, which is probably what happened

16  most of the time.

17               Not all the money cleared in the

18  accounts in one shot, so, your question is

19  really, not really a question.

20       Q        And then why would the money

21  come in from the management company to

22  Northside and then Northside turn around and

23  send a portion of that money right back to the

24  Debtor?

25       A        I don't know what you are

Page 124

MICHAEL LICHTENSTEIN

2    referring to.

3         Q         It's in your reports.

4         A         You ask me about specific -- you

5    would have to ask me about a specific

6    transaction and I can respond.

7         Q         It's in the reports that you

8    just provided two weeks ago.

9         A         We gave you a report of 500

10   pages with I think about 10,000 transactions,

11   so I do not remember any transactions

12   specifically.

13                  If you have a question about a

14   specific transaction, and are not just asking

15   for the sake of posing and making a show, then

16   you can point out specific transactions and I

17   can get back to you with responses.

18        Q         How about this, March 12, 2018,

19   10 separate transactions going from the

20   management company to Northside totaling

21   $76,677.73.

22                  Why would that be?

23        A         The simple answer is that the

24   money didn't clear, in the management company,

25   in bits and pieces, but I would have zero clue

Page 125

MICHAEL LICHTENSTEIN

1
2  now about something that happened five years

3  ago.

4              We will be happy, if you send us

5  that transaction, those 14 transactions or 10

6  transactions, to come back with an answer.

7        Q      If you go to page 2910 in

8  Exhibit 10 that we are just putting up.

9        A      Exhibit -- which exhibit?

10       Q      It will be Exhibit 10.

11              8, sorry.

12              (The above described document was

13        marked Exhibit 8 for identification as of

14        this date.)

15       A      Actually I am in Exhibit 10.  Is

16  it 8 or -- sorry, 8.

17       Q      So Exhibit 8, I'm sorry, sir.

18       A      Um-hum.

19       Q      So, go to page 2910.

20       A      It 2910, yes.

21       Q      You see in the middle of the

22  page between March 12, 2018 and March 14, 2018,

23  10 transactions of funds going from --

24       A      March which date, March?

25       Q      March 12, 2018, it's the middle

Page 126

MICHAEL LICHTENSTEIN

1
2    of the page.
3         A      Yes.
4         Q      You will see 10 transactions
5    between March 12, 2018 and March 14, 2018 --
6         A      Um-hum.
7         Q      -- of $76,677.73 going from the
8    management company to the Northside account?
9         A      I have no clue now, but I can
10   get back to you with answers.
11        Q      What are you going to look at,
12   sir?
13        A      At the bank statements, at
14   the --
15        Q      What documents do you have that
16   will show for each of these transactions, for
17   instance, the purpose of it?
18        A      I'm going to look up in the
19   books and records and come back with answers.
20        Q      What particular -- what specific
21   books and records are you going to look at?
22        A      The books and records -- I don't
23   know now, I'm going to see what is involved in
24   this, what are the bank statements, if there
25   are invoices, if there is any explanation, and

Page 127

MICHAEL LICHTENSTEIN

1  
2    I'll get back to you.

3          Q        In compiling this report you

4    didn't under undertake that analysis, right,

5    the purpose of the transactions?

6          A        Of course we did.

7          Q        Where is that report, where is

8    that report?

9          A        That report is in the books and

10   records.  It's relevant to the loans and

11   exchanges, every breakdown of every $287.73,

12   what it was used for, or the $180.

13                  I mean, there are basically 25

14   transactions just on this page, and it's

15   irrelevant what exactly every dollar was used

16   for for showing a loans and exchanges report.

17                  So your question is misleading.

18         Q        And then the next date March 15,

19   2018, $60,000 goes back from Northside to the

20   management company.

21                  Why?

22         A        $60,000, which transaction goes

23   back from --

24         Q        The next day, March 15, 2018,

25   $60,000 goes back from Northside to the

Page 128

MICHAEL LICHTENSTEIN

2  management company.

3              Why?

4       A      Well, the simple answer is

5  because it was a line of credit that was going

6  back and forth, but that's without even knowing

7  what it is.

8              I would have to look at it and

9  get back to you.

10       Q      Page 2938 --

11       A      29 what?

12       Q      38.

13              Are you there?

14       A      I am, I am going to 38 -- I'm

15  not on 2938, no.

16              2937, 2938.

17       Q      On the bottom of the page,

18  starting October 10, 2019, going over to the

19  next page, 2939, just on October 10, 2019 there

20  are 14 transfers from the management company to

21  Northside totaling $112,655.

22              Why would that happen?

23       A      I can look into it and get back

24  to you.

25       Q      And you can't tell me exactly

Page 129

MICHAEL LICHTENSTEIN

1

2    what you are going to look at, right?

3         A       I said I'm going to look at the

4    books and records.

5         Q       What specific book or what

6    specific record do you believe will provide you

7    the information relating to the purpose of each

8    of those transfers?

9         A       The books and records are going

10   to provide the information, and I will get back

11   to you with the information.

12        Q       Specifically what book or what

13   record are you going to look at?  That's all

14   I'm trying to understand, sir.

15        A       Books and records is a general

16   description of records, and you are asking me

17   now to answer you about records from 2019,

18   which is basically three years ago.

19                I have no clear idea.  I'm going

20   to go and look at the records and see what the

21   breakdown is and what the explanation is.

22        Q       Are you sure there is an

23   explanation in those books and records, sir?

24        A       Yes, I'm sure.

25        Q       So if Mr. Rauch and Mr.

Page 130

MICHAEL LICHTENSTEIN

1

2    Kirschner told me that there is none, they are

3    wrong and you are right?

4         A        I have no clue what Mr. Rauch

5    and Mr. Kirschner told you.

6         Q        I am telling you.

7         A        I am pretty positive that you

8    manipulated them and harassed them and put

9    words in their mouth.

10              And I will get back with answers

11   to these questions.

12              MR. FREEDMAN:   Okay.   Other than

13        reserving my rights, I have nothing

14        further.

15              MR. KELLEY:   All right, let's

16        close down the deposition.

17              We are going to reserve our

18        questions to time of trial, obviously, in

19        accordance with Judge Drain's rules.

20        Thanks.

21              MR. FREEDMAN:   I don't know what

22        that means.

23              THE VIDEOGRAPHER:   If there are

24        no objections I will close out the video

25        record.

V.    **Post-Petition Conversion of Hotel Occupancy Taxes**

a.    **Exhibits**

- ➢    BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418]

- ➢    BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465]

- ➢    JOINT EXHIBIT No. 2 – Chase Statement - X9022 dated 7/30/2016

- ➢    JOINT EXHIBIT No. 3 – Chase Statement - X9022 dated 1/31/2017

- ➢    JOINT EXHIBIT No. 4 – Chase Statement – X8662 dated 1/31/2017

- ➢    BSP EXHIBIT No. 26 – Bank of America Statement - X4102 dated 2/29/2020

- ➢    BSP EXHIBIT No. 31 – Bank of America Statement – X2855 dated 4/30/2020

- ➢    JOINT EXHIBIT No. 14 – Bank of America Statement – X0102 dated 4/30/2020

- ➢    BSP EXHIBIT No. 33 – Bank of America Statement – X0102 dated 5/31/2020

- ➢    BSP EXHIBIT No. 36 – Bank of America Statement – X0102 dated 6/30/2020

- ➢    BSP EXHIBIT No. 38 – Bank of America Statement – X0102 dated 7/31/2020

- ➢    BSP EXHIBIT No. 39 – Bank of America Statement – X0102 dated 8/31/2020

- ➢    BSP EXHIBIT No. 40 – Bank of America Statement – X0102 dated 9/30/2020

- ➢    BSP EXHIBIT No. 41 – Bank of America Statement – X0102 dated 10/31/2020

- ➢    BSP EXHIBIT No. 42 – Bank of America Statement – X0102 dated 11/30/2020

- ➢    BSP EXHIBIT No. 167 – Chase Bank Statements (produced by bank through Subpoena)

- ➢ BSP EXHIBIT No. 168 – Bank of America Statement (produced by bank through subpoena)

- ➢ BSP EXHIBIT No. 179 – Bank of America Statements – X4400 for the period 2020-2021

- ➢ BSP EXHIBIT No. 180 – Bank of America Statements – X4662 for the period 2018-2021

b.    **Testimony**

1.    _Lichtenstein_

–    Lichtenstein p. 104, l. 9 through p. 113, l. 17 (video - p. 104, ll. 9-22; p. 108, l. 3-19 p. 111, ll. 5-10 only)

```
                                              Page 104

1                      M. LICHTENSTEIN
2        A.    I've reviewed Mr. Huebscher's bogus
3    report and supplemental report, and I have drafted a
4    response to his bogus report and supplemental
5    report.
6        Q.    Anything else, sir?
7        A.    That's pretty much it.
8        Q.    Thank you.
9              And speaking of Mr. Huebscher's report,
10   there's a reference on page 3 to the transfer of
11   $252,100 from a management company account at Bank
12   of America, account 4400, to a North Side
13   Management, LLC, account.
14             And when I took Mr. Rauch's deposition,
15   he indicated and confirmed that those were funds
16   collected and segregated from hotel occupancy tax
17   collections.
18             Is that your understanding as well,
19   sir?
20       A.    Those were funds of the debtor that were
21   used for expenses, and the matter of the occupancy
22   tax is being settled now with New York City.
23       Q.    Let's go back a second.
24             The $252,100, those were funds that
25   were collected as hotel occupancy taxes, correct?
```

Page 105

M. LICHTENSTEIN

2      A.      Not necessarily.  I'm not sure about

3    that.  Money doesn't have a bar code, so I'm not

4    sure what your presumption is.

5      Q.      Sorry.  Go ahead.  Finish.

6      A.      The hotel occupancy tax matter is being

7    settled now with New York City.

8      Q.      That's not my question, sir, so I would

9    ask, because we have limited time and I really want

10   to get this done -- as I told Mr. Kelley before we

11   began, I have a commitment to see my son who's home

12   from college who I have not really had the

13   opportunity to see at 6:30 tonight, so I want to get

14   through this.

15           So Mr. Rauch, your financial director

16   and director of finance, testified last week that

17   that $252,100 constituted collected hotel

18   occupancy taxes.

19           Are you contesting his testimony in

20   that regard, sir?

21     A.      I am not contesting any of his testimony.

22   I did not read his transcript.  I don't know what he

23   said.

24           All I am saying is that I don't

25   remember now what this 250,000 -- as it being

Page 106

M. LICHTENSTEIN

2  hotel occupancy tax funds, what that even means.

3  Money doesn't have a bar code, so I'm not sure

4  where your presumption is even coming from, how

5  you're asking such a question.

6       Q.    That's what Mr. Rauch testified to, and

7  he said that money was collected as hotel occupancy

8  tax the dollars a night plus the 785 percent of the

9  revenue of the room, and it was segregated into that

10  account, 4400.

11          Do you have a reason to contest his

12  testimony in that regard?

13       A.    I would appreciate if you stop putting

14  words in my mouth, which you have a strong tendency

15  to do.  I'm not contesting anything.  I said that I

16  don't have any clue what this money was.  I said I

17  did not read Jeremy Rauch's transcript.

18          I don't necessarily trust you of all

19  people to trust you that you didn't put words in

20  Jeremy Rauch's mouth.

21          What I'm saying is that this $250,000

22  was there and we are resolving any occupancy tax

23  issues as part of a settlement with New York City.

24  That's all I am saying.

25       Q.    Do you agree that that $252,100 was swept

Page 107

M. LICHTENSTEIN

1

2    out of account 4400 into a North Side Management,

3    LLC, account two days after filing the bankruptcy

4    petition in this case?

5        A.    Our debtor's weekly payroll is between

6    200,000 and $300,000 a week on a weekly basis.  So

7    the obsession of Huebscher and you with this

8    $250,000, which is exactly one week's payroll in

9    this business, is quite remarkable.

10            And if that is the only thing that

11   Huebscher found in his entire bogus report, which

12   I'm not accepting it as true -- if this is the

13   only thing he could find, this $250,000, after six

14   months of investigation, then we are in very good

15   shape.

16       Q.    Again, sir, I would ask that you listen

17   to my question and answer my question.

18       A.    I just answered it.

19             (Simultaneous crosstalk.)

20             MR. KELLEY:  One at a time.

21             Go ahead, Gary.

22             MR. FREEDMAN:  Yes.  Thank you.

23       Q.    I'm going to redact my question I had

24   asked you and ask my specific question.  I'm going

25   to read back my question, and I ask you to answer my

Page 108

                        M. LICHTENSTEIN

2   specific question.

3           Do you agree that that $252,100 was

4   swept out of account 4400 into a North Side

5   Management, LLC, account two days after the

6   bankruptcy petition was filed in this case?

7           MR. KELLEY:  Objection to the form of

8       the question.

9           You can go ahead and answer.

10      A.    I don't remember exactly the day when it

11  was swept.  I wouldn't describe it as being swept.

12  That's a wrong description.

13          As I said, it was used for expenses,

14  and it was -- and all these issues of the

15  occupancy tax are being resolved with New York

16  City as a general settlement of the occupancy tax

17  issues and the real estate tax issues, which New

18  York has overbilled us by $5 million of real

19  estate taxes.

20      Q.    Once again, you're not answering my

21  question.  Listen to my question, keep it in mind,

22  and answer my specific question.

23          Was it you, sir, that gave the

24  direction to transfer the $252,100 out of the 4400

25  into the North Side Management, LLC, account?

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

Page 109

M. LICHTENSTEIN

1

2        MR. KELLEY:  One, I'm going to object

3    to the sidebar.  I didn't get an opportunity

4    to do it.  I don't think those are

5    appropriate.

6        And two, Gary if you're representing

7    that's the specific transfer, it may be

8    helpful to put the document as to the amount,

9    because I'm not sure he's adopting your

10   representation, that was the specific amount

11   being wired amount.

12        Because that's what he said in his

13   prior answer, so if there's a document to

14   show the amount, because -- well, I'm not

15   going to elaborate further, but if there's a

16   document that you could put in front of him

17   if you want him to accept that premise that

18   was the transferred, that specific amount, I

19   think that would be important, based on his

20   prior response.

21   Q.    Sir, would it be helpful to put up page 3

22   of the examiner's report so you can see the exact

23   amount referenced therein?

24   A.    If you want, go ahead.

25   Q.    If you're in dispute of the amount, I'm

Page 110

M. LICHTENSTEIN

1
2  happy to put it up.  If you have it in mind, and
3  since you just looked at it, the first thing you
4  said you did in preparing for the deposition was
5  looking at the examiner's report, the supplement,
6  your response in drafting a new response, I thought
7  you may have it in mind.  If you don't, I'm happy to
8  put it up.  I just want to move it along.
9          MR. FREEDMAN:  The only reason I
10     mentioned it is you mentioned a specific
11     dollar figure.
12     Q.    Mr. Lichtenstein?
13     A.    As I said, the examiner's report is
14  chockfull of lies.  It has a lot of facts in it that
15  are not true.  I remember him mentioning the amount
16  of 250, 252,000.
17          You're welcome to put it up on the
18  screen if I need to see.  It's not going to change
19  my answer, which is that all these issues of the
20  occupancy tax are being resolved with New York
21  now, and it's irrelevant.
22     Q.    It's not irrelevant to me, and I don't
23  think it's going to be irrelevant to the Court.  But
24  my simple question, so I can move on, sir:  Are you
25  the one that gave direction for the transfer of

Page 111

M. LICHTENSTEIN

1
2  those funds?

3      A.    I will assume responsibility for whoever
4  gave direction, yes.

5      Q.    That wasn't my question, sir.  My
6  question is:  Did you give the direction?

7      A.    I do not remember now who gave direction
8  to who two years ago and who did what exactly two
9  years ago.  I said I will assume responsibility for
10 any such action.

11     Q.    Well, there are --

12           MR. FREEDMAN:  Strike that.

13     Q.    First of all, it was on or about February
14 25, 2021, so it wasn't two years ago.  It was less
15 than -- it was less than a year ago.

16           But all I want to know, sir, is do you
17 know either who made the transfer or who
18 authorized the transfer?  Simple question.  I'm
19 not asking for responsibility.  I just want to
20 know who did it.

21     A.    As I said, I do not remember now from a
22 year ago or two years ago or nine months ago.  I
23 wouldn't remember who said what to who and who
24 pressed which button.

25           As I said, our weekly payroll is about

Page 112

M. LICHTENSTEIN

1

2  this amount on average.  This is a business

3  running between 20 and 25 million a year in

4  revenue, so 250,000 is not a huge amount that I

5  will remember from a year ago who said what to

6  who.

7           I would assume responsibility as the

8  owner and manager of the management company and

9  the owner of the debtor for whatever transfers

10 were made.  Yes.

11     Q.    So you said two or three times the money

12 was transferred to cover payroll?

13     A.    I did not --

14     Q.    You didn't say that?

15     A.    I said expenses.  I did not say payroll.

16 I said that you're obsessing about an amount of

17 $250,000 when that is only a payroll weekly average

18 cost.  The weekly average expenses are -- run

19 between 300 and 350,000 a week.

20           This obsession with $250,000, if that

21 is the only thing that you have, then we are

22 absolutely in great shape and it just shows what

23 an amazing operation we're running.

24     Q.    Sir, you're being extremely

25 argumentative, and I would appreciate, again, if you

Page 113

M. LICHTENSTEIN

1
2  stopped and just answered the question.

3          A.    I'm going to stop you right there.

4  Please do not say false statements.  I'm responding

5  to your questions and I'm responding and providing

6  information.

7                  You don't like the answers, and you

8  will not like most of my answers, actually,

9  because you are representing a lying, thieving

10  entity who is trying to steal my building away

11  from me.

12                  So you will not like most of my

13  answers, and I will continue answering with the

14  truth, which you will not like.

15          Q.    So --

16          A.    Please do not say I'm not responding to

17  your questions.

18                  MR. KELLEY:  I appreciate that response

19      from both of you all, but I'm going to say

20      Gary, please, I will instruct my witness.  If

21      you have an objection, you're familiar with

22      the protocols.  Please assert it or exercise

23      it, but please proceed with the questions.

24      But please do not give instruction to my

25      witness.

– Lichtenstein p. 115, p. 17 through p. 117, l. 8 (video - p. 115, l. 17 through
p. 117, l. 4 only)

---

Page 115

1                           M. LICHTENSTEIN

2      don't think he's being nonresponsive.  I

3      don't think -- is he answering more

4      information provided?  Yes.  But there's a

5      process for that, Gary.  I'm asking you to

6      focus on the Q&A and let's get through it.

7      There will be answers in here, and let's keep

8      moving.

9           MR. FREEDMAN:  I'm telling you,

10     Charles, I'm not going to put up with

11     narrative responses that are unresponsive to

12     the questions.  I'm not doing it.

13          MR. KELLEY:  Object to the

14     responsiveness and we can take that to the

15     Court.  I'm fine with that, but please

16     proceed.

17     Q.     Whose expenses did that $250,000 go to

18     pay?

19     A.     I don't remember now.

20     Q.     So you know it was transferred to pay

21     expenses, but you can't tell me whose expenses they

22     went to pay; is that fair?

23     A.     I don't remember now a year later which

24     expenses exactly it paid.  That's all I'm saying.

25     Q.     Was it transferred out to pay expenses of

Page 116

M. LICHTENSTEIN

1
2    the debtor?

3        A.    Of course.

4        Q.    So why were the funds transferred to an

5    account in the name of North Side Management, LLC?

6        A.    Because they always went through the

7    North Side account.  I don't understand the

8    question.

9        Q.    All the monies to pay expenses of the

10   debtor were transferred to North Side Management,

11   LLC?

12       A.    I don't remember which account exactly it

13   was transferred to.  And, as I said already --

14       Q.    All I'm trying to understand now, sir, is

15   if the $252,000 was transferred out to pay expenses

16   of the debtor, why would you be transferring them to

17   an account in the name of North Side Management,

18   LLC?

19       A.    I don't remember now which account

20   exactly it was transferred to, and I don't remember

21   now the exact trail of how the money went.

22             You're asking me questions about wires

23   from a year ago, so I don't know the answers to

24   exactly what went where and what expenses went.  I

25   don't remember now exactly what went where.

Page 117

M. LICHTENSTEIN

2          As I said, we resolved with the City of

3    New York all occupancy tax and real estate tax

4    matters, and that's resolving all these issues.

5          MR. FREEDMAN:  Objection.  And move to

6       strike the balance of that answer as

7       unresponsive, as have many of your answers

8       been, sir.

9       Q.    What the status of the negotiations with

10   Lockwood?

11      A.    I'm not sure what that question even

12   means.

13      Q.    Well, we're two weeks away from the

14   confirmation hearing.  Have the documents with

15   Lockwood been finalized?

16          MR. KELLEY:  I think he's looking for a

17       little context.  Sorry, Gary.

18          MR. FREEDMAN:  Context in what?  I mean

19       --

20          MR. KELLEY:  You're referring to the

21       funding?

22      Q.    You don't understand what I'm referring

23   to when I say Lockwood, sir?

24      A.    You're asking an overly broad question.

25   But the answer to your overly broad question is

2.    _Moskovits_

–    Moskovits, p. 105, l. 25 through p. 107, l. 6 (video)

```
                                          Page 105
1                          TOBY MOSKOVITS
2      design and development of these other hotels,
3      who are they?
4               A       Michael Lichtenstein and myself.
5               Q       Well, you're not an employee of
6      the management company, are you?
7                       We just went through this?
8               A       We do this as owners, okay?  We
9      do this as owners, that's a big portion of our
10     business, is developing and sourcing additional
11     projects for development within the hotel
12     industry.
13              Q       And other than you and
14     Mr. Lichtenstein --
15              A       Not as an employee, as an owner.
16              Q       (Continuing) -- who else at the
17     management company level have been involved in
18     the design and development of the hotel
19     properties?
20                      MS. PARLOVECCHIO:  Objection.
21              A       Mr. Lichtenstein and myself.
22                      MS. PARLOVECCHIO:  Objection to
23          form.
24              A       Michael Lichtenstein and myself.
25              Q       And looking at the next bullet
```

Veritext Legal Solutions
www.veritext.com

212-267-6868                                             516-608-2400

Page 106

TOBY MOSKOVITS

1

2  point on page 5 of 36, what is Northside

3  Management LLC?

4        A       That's an entity through which

5  Michael Lichtenstein and I do business.

6        Q       And what business does Northside

7  Management LLC do?

8        A       It's in the related real estate

9  management industry.

10       Q       And what properties?

11       A       Northside is an LLC, I'm not

12  sure if it has actual -- if it has an actual

13  operating business, I would have to confirm.

14       Q       And why did the management

15  company wire $252,100 to Northside Management

16  LLC on February 25, 2021?

17       A       I don't have that information in

18  front of me, so I can't tell you.  I would have

19  to go check the record.

20       Q       And in February 2021 was

21  Northside Management LLC involved in any actual

22  business enterprise?

23       A       I would have to check the

24  records.

25       Q       You have no recollection as you

```
                                              Page 107

1                        TOBY MOSKOVITS
2    sit here today, correct?
3          A      We have dozens of LLCs, I would
4    have to get more information with that specific
5    transaction in order to respond to this
6    question.
7          Q      And who was it that authorized
8    the transfer of the $350,000 from the
9    management company to the -- to Northside
10   Acquisition Partners LLC?
11         A      It wasn't me, so I'm assuming
12   that it was Michael Lichtenstein.
13         Q      And who authorized the transfer
14   of $252,100 from the management company to
15   Northside Management LLC on February 25, 2021?
16         A      I have to check the records.
17   I'm not familiar with that, I need to check the
18   records.
19                You asked me very specifically
20   about the EIDL, but on this transaction I would
21   have to check the records.
22         Q      If you flip to page 7 of 36,
23   please.
24         A      No.  Okay.
25         Q      You will see in the second
```

– Moskovits, p. 107, ll. 13-18 (video)

```
                                           Page 107

1                    TOBY MOSKOVITS

2    sit here today, correct?

3           A        We have dozens of LLCs, I would

4    have to get more information with that specific

5    transaction in order to respond to this

6    question.

7           Q        And who was it that authorized

8    the transfer of the $350,000 from the

9    management company to the -- to Northside

10   Acquisition Partners LLC?

11          A        It wasn't me, so I'm assuming

12   that it was Michael Lichtenstein.

13          Q        And who authorized the transfer

14   of $252,100 from the management company to

15   Northside Management LLC on February 25, 2021?

16          A        I have to check the records.

17   I'm not familiar with that, I need to check the

18   records.

19                   You asked me very specifically

20   about the EIDL, but on this transaction I would

21   have to check the records.

22          Q        If you flip to page 7 of 36,

23   please.

24          A        No.  Okay.

25          Q        You will see in the second
```

3.   *Lichtenstein MC*

–   Lichtenstein p. 39, l. 15 through p. 41, l. 7 (video)

```
                                              Page 39

 1                   MICHAEL LICHTENSTEIN
 2    providing any information about the EIDL loan
 3    or the management company that is not related
 4    to the Debtor.
 5              Q       The $252,100 that the management
 6    company had segregated in occupancy tax funds,
 7    you know what I'm talking about in that regard,
 8    sir?
 9              A       I responded already in the
10    previous deposition on that matter, and I will
11    not be responding on that matter again.
12              Q       And those funds were transferred
13    a couple of days after the bankruptcy filing in
14    this case to Northside Management LLC, correct?
15              A       I will only respond to say that
16    it was transferred at the same time that the
17    bankruptcy filing was done, and I will not be
18    responding more, since we already had a half
19    hour discussion about this topic.
20              Q       And what did Northside
21    Management LLC do with the $252,100, sir?
22              A       Actually I will correct the
23    record.
24                      I think we had a 45 minute
25    conversation about this topic already, and I
```

Page 40

MICHAEL LICHTENSTEIN

1
2   will not be responding any further on this
3   topic.
4           Q       The funds that were transferred
5   to Northside Management LLC never found their
6   way back into the management company, correct?
7           A       As I said already, we had a long
8   conversation about this topic, and I will not
9   be responding any further about this topic.
10          Q       And they weren't used for any
11  purposes related to the Debtor, correct?
12          A       That is not necessarily a true
13  statement that you made, which you tend to make
14  many false statements, and I will not respond
15  any further about this topic.
16          Q       Well, tell me about any use of
17  the $252,100 in respect to the Debtor's
18  business.
19          A       As I said, we already had a long
20  conversation about this topic, and I'm not
21  going to respond about it.
22          Q       And just so we are clear, for
23  every question that you are refusing to answer,
24  I'm going to ask that the court invoke a
25  negative inference or otherwise strike your

Page 41

MICHAEL LICHTENSTEIN

1
2   testimony.

3                  I don't want to debate it, I'm
4   just letting you know.

5          A      Since I already discussed this
6   with you for at least 45 minutes, there is
7   nothing more to say about this topic.

8          Q      Unfortunately, sir, what I
9   provided to your counsel last Friday pursuant
10  to a discovery stipulation, I'm trying to come
11  to an agreement on the use of prior testimony,
12  and being adopted by the management company.

13                 Although Mr. Kelley told me
14  before we went on the record he believes he
15  will be able to do it, he hasn't received your
16  authorization to do that yet.

17                 So we are not there quite yet,
18  sir.

19         A      I have no clue what you just
20  said, but we can move on.

21         Q      Has the management company filed
22  a tax return for 2016?

23         A      I think so.

24         Q      Do you have it in your
25  possession?

VI.    **Prepetition Use of Hotel Occupancy Taxes**

    a.    **Exhibits**

> ➢    JOINT EXHIBIT 27 - NYC-HTX Hotel Room Occupancy Tax Return - The Williamsburg Hotel BK LLC for the periods: 12/01/2016-02/28/2017; 03/01/2017-05/31/2017; 06/01/2017-08/31/2017; 09/01/2017-11/30/2017; 2/01/2017-02/28/2018; 03/01/2018-05/31/2018; 06/01/2018-08/31/2018; 09/01/2018-11/30/2018; 12/01/2018-02/28/2019; 03/01/2019-05/31/2019; 06/01/2019-08/31/2019; 09/01/2019-11/30/2019; 12/01/2019-02/28/2020; 03/01/2020-05/31/2020; 06/01/2020-08/31/02020; 09/01/2020-11/30/2020; 12/01/2020-02/28/2021; 03/01/2021-05/31/021; 06/01/2021-08/31/2021; 09/01/2021-11/30/2021

> ➢    JOINT EXHIBIT 33 – Checks drawn to TD Bank Account for the Williamsburg Hotel to the New York City Department of Finance

> ➢    JOINT EXHIBIT 58 - NYC-HTX Hotel Room Occupancy Tax Return - The Williamsburg Hotel BK LLC for the period: 12/01/2021 - 2/28/2022

> ➢    BSP Exhibit 84 – Proof of Claim #14-1 filed by NYC Department of Finance

> ➢    BSP Exhibit 85 – Proof of Claim #18-1 filed by NYC Department of Finance

> ➢    BSP Exhibit 92 – Debtor Objection to Proof of Claim #14-1 [ECF No. 302]

> ➢    BSP Exhibit 97 – NYC Department of Finance Response [ECF No. 367]

> ➢    BSP Exhibit 119 – Report of Examiner, Eric M. Huebscher [ECF No. 418]

> ➢    BSP Exhibit 130 – Report of Examiner, Eric M. Huebscher [ECF No. 465]

> ➢    JOINT EXHIBIT No. 2 – Chase Statement - X9022 dated 7/30/2016

> ➢    JOINT EXHIBIT No. 3 – Chase Statement - X9022 dated 1/31/2017

> ➢    JOINT EXHIBIT No. 4 – Chase Statement – X8662 dated 1/31/2017

> ➢    BSP EXHIBIT No. 26 – Bank of America Statement - X4102 dated 2/29/2020

➢ BSP EXHIBIT No. 31 – Bank of America Statement – X2855 dated 4/30/2020

➢ JOINT EXHIBIT No. 14 – Bank of America Statement – X0102 dated 4/30/2020

➢ BSP EXHIBIT No. 33 – Bank of America Statement – X0102 dated 5/31/2020

➢ BSP EXHIBIT No. 36 – Bank of America Statement – X0102 dated 6/30/2020

➢ BSP EXHIBIT No. 38 – Bank of America Statement – X0102 dated 7/31/2020

➢ BSP EXHIBIT No. 39 – Bank of America Statement – X0102 dated 8/31/2020

➢ BSP EXHIBIT No. 40 – Bank of America Statement – X0102 dated 9/30/2020

➢ BSP EXHIBIT No. 41 – Bank of America Statement – X0102 dated 10/31/2020

➢ BSP EXHIBIT No. 42 – Bank of America Statement – X0102 dated 11/30/2020

➢ BSP EXHIBIT No. 167 – Chase Bank Statements (produced by bank through Subpoena)

➢ BSP EXHIBIT No. 168 – Bank of America Statement (produced by bank through subpoena)

➢ BSP EXHIBIT No. 179 – Bank of America Statements – X4400 for the period 2020-2021

➢ BSP EXHIBIT No. 180 – Bank of America Statements – X4662 for the period 2018-2021

b. **Testimony**

1. *Moskovits*

–   Moskovits, p. 238, l. 18 through p. 259, l. 3 (video p. 238, l. 18 through
    p. 242, l. 24; p. 247, l. 13 through p. 248, l. 8; p. 249, l. 14 through p.
    251, l. 6; p. 258, l. 2 through p. 258, l. 19 only)

```
                                          Page 238

 1                    TOBY MOSKOVITS

 2    of the operations.

 3                  So I'm assuming that they are a

 4    sophisticated party, they have done many loans,

 5    had they had an issue with this structure of

 6    management and payment and collection of

 7    revenue, they would have made it clear to us

 8    prior to signing off and closing a loan.

 9          Q      We are going to get to the

10    management and the management agreement in a

11    moment.

12                  Okay, we will take your

13    testimony and we will use it at confirmation

14    for what its worth.

15                  Do you understand that the

16    occupancy --

17                  MR. FREEDMAN:  Well, strike that.

18          Q      To the best of your knowledge,

19    was the occupancy tax collected?

20          A      I can't confirm that, because I

21    wasn't involved in it, but I am aware that at

22    least during one period the city -- during

23    COVID there were limitations on the

24    requirement, but I was not involved personally

25    in collecting this tax.
```

Page 239

### TOBY MOSKOVITS

1

2          Q          As the Debtor's representative

3    here today, what did you attempt to learn prior

4    to today's deposition in respect to whether or

5    not the management company, in fact, collected

6    the occupancy tax?

7                    MS. PARLOVECCHIO:   Objection.

8          A          I have confirmed, as I stated

9    earlier, that all the tax returns have been

10   filed.

11                   We have worked hard to get that

12   done, make sure that was done, and that the

13   postpetition amounts have been paid and that

14   there are negotiations and discussions on

15   resolving a payment plan to make payment on the

16   balance owed.

17         Q          All right, listen to my specific

18   question.

19                   During the operations of the

20   hotel, what, if anything, did you do as the

21   owner of the hotel to make certain that the

22   hotel's obligation to collect the occupancy tax

23   was being fulfilled, if anything?

24         A          I was not involved in that.   I

25   was actually very focused on another issue we

Page 240

TOBY MOSKOVITS

1

2  had with the City, which is the city's --

3          Q      Stop, stop, stop, you are

4  anticipating something else again.

5          A      Okay, then my response is that

6  this was handled by Michael Lichtenstein on the

7  management side of the business, I was not.

8          Q      And who handled it on behalf of

9  or on the side of the Debtor?

10          A      This was being handled by the

11  management company.

12          Q      But who on the side of the

13  Debtor was making certain that these

14  obligations were being fulfilled?

15          A      This was being handled by the

16  management company.

17          Q      Okay, ma'am, we are going around

18  in circles.

19                 You are the management company

20  as well, right?

21                 MS. PARLOVECCHIO:  Objection.

22          Also I just want to note, I don't know

23          if you realize, Toby, that your screen

24          is off.

25                 I think maybe you're --

Page 241

TOBY MOSKOVITS

1
2          THE WITNESS:  I am looking at the
3     exhibit.
4          MS. PARLOVECCHIO:  That's what I
5     figured.
6          MR. FREEDMAN:  Thank you for
7     that.
8          Q     You understand that the
9     occupancy tax collected is a trust fund tax?
10          MS. PARLOVECCHIO:  Objection,
11     calls for a legal conclusion.
12          Q     I didn't ask her conclusion, I
13     asked what her understanding is.
14          Is that your understanding,
15     ma'am?
16          A     I think the name of what it is
17     speaks for itself.
18          It's a tax that is collected,
19     yes.
20          Q     You know what trust fund tax is,
21     correct?
22          A     No, I'm not familiar with that
23     term.
24          Q     Okay, you're telling me that as
25     the owner of a what you value a $113 million

Page 242

TOBY MOSKOVITS

2  hotel in Brooklyn, New York, you don't know

3  whether or not the occupancy tax collected at

4  that hotel is to be maintained as a trust fund

5  tax; is that your testimony?

6            MS. PARLOVECCHIO:  I object to

7       form.

8       A     My testimony is that everything

9  related to the collection of the occupancy tax

10  was handled -- was under the auspices of

11  Mr. Lichtenstein's work at the management

12  company.

13       Q     Not my question, ma'am?

14       A     That is my testimony.

15       Q     I'm asking as the representative

16  of the Debtor here today, in respect to

17  occupancy tax, and I am looking at what your

18  attorney sent to me at 4:30 yesterday, that's

19  what it says, are you telling me that you have

20  no understanding one way or the other whether

21  occupancy taxes collected at the hotel are

22  trust fund taxes?

23       A     What I am telling you is that

24  Michael Lichtenstein handled the matters

25  relating to the occupancy tax.

Page 243

### TOBY MOSKOVITS

2  I've heard the term trust fund

3  tax, I'm not sure if you are asking me a legal

4  question or a factual question, I'm giving you

5  a practical response.

6  Q  I'm asking as the owner of the

7  hotel.

8  A  I have also said repeatedly --

9  what I said repeatedly is that all of the tax

10  returns have been caught up to date, and the

11  postpetition amounts have been paid in full,

12  and we are in discussions with the city on the

13  payment plan that we hope to resolve shortly to

14  get the balance caught up.

15  Q  Move to strike as unresponsive.

16  We are going down that slippery slope again,

17  ma'am.

18  I'm just trying to understand as

19  the representative of the Debtor, and one of

20  the people who are the sponsors of the plan,

21  whether you understand the very crucial issue

22  that the tax -- the occupancy taxes collected

23  at the hotel are trust fund taxes.

24  And you seem either to not know

25  the answer to that question or --

Page 244

TOBY MOSKOVITS

```
1
2        A       Sir, you are asking the
3   question -- every time you ask the question,
4   it's a different question.
5                You have asked a series of
6   questions.
7        Q       Or you are refusing to answer
8   the question?
9        A       You said I am aware of the fact
10  that it is a tax we are collecting on behalf of
11  the city, I said that.
12               You asked a different question
13  every time.  You said -- you are asking the
14  question differently every time.
15               You asked it, then you asked me
16  if I --
17       Q       Stop yelling at me, please.
18       A       I don't yell.  I'm speaking in a
19  very measured voice.  The yelling is only
20  happening in one direction on this call.
21       Q       You are yelling at me.
22               Can you just tell me one way or
23  the other whether you know whether or not the
24  occupancy tax is designated as a trust fund
25  tax?
```

Page 245

1                   TOBY MOSKOVITS

2          A          What time frame are you asking

3   this about?

4                      I told you that all the taxes

5   collected in the postpetition period have been

6   paid.

7          Q          Not my question, ma'am.

8          A          The period that were not paid

9   prior to that, those tax returns are filed.

10         Q          Not my question.   Trust fund

11  taxes, like sales tax, you know sales tax

12  collected are trust fund taxes, right?

13         A          Are you asking -- I apologize,

14  I'm not understanding your question.

15                    Are you asking me if I

16  understand what the meaning of that word is, or

17  if I know it's being collected.

18                    Please clarify your question.

19         Q          Sure.

20                    Do you understand as an owner of

21  the hotel and the corporate representative of

22  the hotel here on item 14, that the occupancy

23  taxes collected by the hotel are designated as

24  trust fund tax?

25         A          Is the question asked of me,

Page 246

**TOBY MOSKOVITS**

2    asked as a representative of the Debtor, you

3    said the hotel.

4                    Is your question directed to the

5    management company?

6                    I responded earlier I'm aware of

7    the fact that by definition taxes are being

8    collected on behalf of the city.

9                    So if that's the question, then

10    the answer is yes.

11         Q        No, I'm asking trust fund,

12    you're answering a different question.

13                    Do you understand it to be a

14    trust fund tax; yes or no?

15         A        I'm not sure that I understand

16    the question, because I feel that I have

17    responded to it.

18                    I am not sure that I understand

19    the question you are asking.

20         Q        That's fine, we will address

21    this with the judge at confirmation, because

22    clearly you're not either willing to

23    acknowledge or are unaware that occupancy taxes

24    collected at the hotel are designated as trust

25    fund taxes, which is a huge problem which leads

Page 247

TOBY MOSKOVITS

1
2  me into my next question.

3        A        You are putting words in my -- I

4  would like to speak to my lawyer, I would like

5  a break to confer with my lawyer.  You are

6  putting words in my mouth.

7                  What I said is I'm not familiar

8  with that exact term, it's a legal term, and

9  that I am aware of the fact that the taxes

10  collected are on behalf of the city.

11                  That's what I have said to you,

12  you keep putting word in my mouth.

13        Q        Let me ask you this, would the

14  occupancy taxes collected at the hotel, were

15  they put in a segregated account?

16        A        What I said is that this was

17  handled by the management company, by Michael

18  Lichtenstein, that's what I said.

19                  I believe they were, but I was

20  not -- I was not doing it myself and I wasn't

21  overseeing these accounts myself; I believe

22  that they were.

23        Q        What did you do to educate

24  yourself to be able to testify here today on

25  the topic of occupancy taxes collected at the

Page 248

TOBY MOSKOVITS

```
 1   hotel?
 2
 3          A        I reviewed the tax returns that
 4   were filed to ensure that we have caught up and
 5   have done everything we needed to comply with
 6   the fulfilling the requirements and
 7   postpetition amounts confirmed that all the
 8   postpetition amounts have been paid.
 9          Q        And I'm trying to figure out
10   what happened before that happened, before the
11   returns were just prepared and filed a couple
12   of months ago.
13               MS. PARLOVECCHIO:  Objection.
14               MR. FREEDMAN:  Objection to what?
15               MS. PARLOVECCHIO:  Objection, I
16          don't know if there is a question.
17               MR. FREEDMAN:  I'm not sure what
18          you objected to.
19          Q        As the representative of the
20   Debtor, do you have any understanding of what
21   protocols were in place for making sure the
22   occupancy taxes were segregated?
23          A        So, the problem with these
24   questions is you're asking me about something
25   that requires a description to explain what
```

Page 249

TOBY MOSKOVITS

1

2  happened, but you are refusing to allow me to

3  respond in anything other than monosyllabic

4  answers.

5           So therefore, and I think that's

6  the meaning of my attorney's frustration, so to

7  get into the background you asked me in circles

8  and your conclusion is I'm not answering, when

9  that's not the case.

10       Q       Because you keep going back to

11 the refrain of the fact that the tax returns

12 were just filed and payment were just made, and

13 that's not my question.

14           My question is, this is a yes or

15 no question, ma'am, as the Debtor's

16 representative here today in respect to

17 occupancy taxes at the hotel, do you have an

18 understanding of what protocol was used for

19 making certain that the occupancy taxes

20 collected were segregated?

21       A       And I responded to that very

22 specific question, that that was handled by

23 Michael Lichtenstein on behalf of the

24 management company as part of the overseeing of

25 the management company.

Page 250

TOBY MOSKOVITS

1

2          To my knowledge, as I said

3   again, is --

4      Q     So you have no understanding?

5      A     I didn't say that, I said that

6   my direct knowledge was related to what -- you

7   asked me, for example, what did I do to get up

8   to speed prior to this hearing, and I reviewed

9   the returns and I confirmed that the full

10  period has been filed and the postpetition

11  amount were paid.

12          I individually did not handle

13  the collection of those taxes, or overseeing

14  those accounts.

15      Q     But you are here as a corporate

16  representative, so can you tell me anything

17  about the protocols that were provided to make

18  certain that the occupancy taxes were

19  segregated; anything?

20      A     So what I said is this was

21  handled by the management company, okay, that's

22  what I said.

23          What I could -- I will let you

24  continue asking your questions, because you

25  don't want me to give any more background than

Page 251

TOBY MOSKOVITS

1
2   that.

3            I also confirmed numerous times
4   that I understand what tax is and that the tax
5   is collected on behalf of the city; I did
6   confirm that.

7        Q      You keep using the term tax and
8   I keep using the term trust fund tax.

9        A      I clarified I'm not familiar
10  with that legal term.  You are asking me to
11  make a statement about a legal term, and I
12  guess you expected me to confer with my lawyer
13  to have her explain it to me to make sure I'm
14  agreeing to something that I actually
15  understand.

16       Q      Are you testifying here today
17  under oath that you have never heard the
18  concept of a trust fund tax?

19            MS. PARLOVECCHIO:  Objection,
20       that misstates the testimony.

21            MR. FREEDMAN:  I am just asking
22       for her to confirm one way or the other.

23       A      That's not what I said.

24       Q      Please tell me.

25       A      You are asking me, I said I have

Page 252

TOBY MOSKOVITS

1
2  heard the term, but you are asking me -- I'm a
3  very simple person, I answer in very simple
4  words that I understand.
5            That's part of the disconnect
6  over here, you try to frame things out, you
7  force a yes or no and you refuse to allow me to
8  express myself or accept my answers.
9        Q    No not at all, ma'am.
10       A    I answered very clearly in words
11 that I understand, because I'm not in the
12 business of agreeing to things that I don't
13 understand, or using, accepting terms to
14 ascribe to my words that I'm not 100 percent
15 sure I know what they mean.
16       Q    So what is your understanding of
17 a trust fund tax?
18                 MS. PARLOVECCHIO:  Objection.
19                 MR. FREEDMAN:  She just testified
20      she knew what it was.
21       A    What I said is that you asked
22 specifically about the use, the occupancy tax,
23 that it was collected on behalf of the city,
24 that's what I said.
25       Q    That's not my question, ma'am.

Page 253

TOBY MOSKOVITS

1

2          My question now is what is your

3    understanding of the term trust fund tax?

4          A       I don't know -- I'm not a

5    lawyer, I'm not going to respond to that and

6    tell what you it means.

7          Q       What is your understanding of a

8    lay person of a trust fund tax?

9          A       I keep repeating, I keep

10   repeating that.  You asked me what was done,

11   what I did was I made sure before I came here.

12         Q       Stop, stop.  You're answering a

13   different question again.

14         A       I'm not answering that question

15   because I'm not a lawyer and I don't feel

16   comfortable telling you what that means.

17         Q       Well --

18         A       I told you my understanding of

19   the actual monies collected, how it needs to be

20   treated, that's what I told you.

21                 I've answered that question

22   repeatedly.

23         Q       I'm entitled to know your

24   understanding of that term.

25                 So, I am going to ask you one

Page 254

**TOBY MOSKOVITS**

1

2  last question, and then I am going to ask the

3  court to invoke a negative inference -- let

4  me --

5        A        It's a legal term.  What I told

6  you is I understand -- you asked me about the

7  occupancy tax, and I said I understand that

8  that tax is collected on behalf of the city.

9                  I'm not comfortable telling you

10  the meaning of a legal term.  And I don't know

11  why I'm even being asked that.

12                  If you ask me about the actual

13  money -- sorry?

14        Q        Do you understand that you and

15  Mr. Lichtenstein have individual liability for

16  the occupancy taxes collected but not remitted

17  to the City of New York; do you understand

18  that?

19                  MS. PARLOVECCHIO:  Objection,

20          calls for a legal conclusion.

21        Q        Do you understand that, ma'am?

22                  MS. PARLOVECCHIO:  Objection.

23        A        You've asked me a legal

24  conclusion.  I have to consult with an attorney

25  on that.

Page 255

1                    TOBY MOSKOVITS
2          Q        I'm asking if you have an
3     understanding?
4                    MS. PARLOVECCHIO:   Objection to
5          form.
6          A        You are asking me for a legal --
7     you are asking me a question that I believe to
8     be a legal question and I'm not comfortable
9     answering that.
10         Q        You have no understanding of
11    that, ma'am, is that your testimony under oath?
12         A        I have --
13                   MS. PARLOVECCHIO:   Objection.
14         A        I explained to you what my
15    understanding is of the occupancy tax, and now
16    you are asking me a bunch of legal questions
17    that I am not comfortable responding to.
18                   I think I've been very clear and
19    very specific and you continue to ask questions
20    that I don't feel comfortable answering, and I
21    don't think you belong asking me to begin with,
22    and my lawyer clearly concurs.
23         Q        I think you don't like the
24    questions because they make you uncomfortable.
25                   I think that --

Page 256

TOBY MOSKOVITS

1

2        A        I've been very, very, blunt and

3   I've been very specific and I'm being very

4   careful with my words, because I can give you a

5   soliloquy, but you made it clear you don't want

6   to hear from me.

7                I've been very specific, I told

8   you the taxes were not properly filed, I made

9   sure that that was done, and all the

10  postpetition monies were paid.

11               And yourare putting words in my

12  mouth doesn't change the fact and you trying to

13  ask me to describe words that I'm not familiar

14  with when I'm using plain English and telling

15  you what it means and what I understand it to

16  mean is inappropriate.

17               And frankly it's bullying.

18       Q        What assurance -- well, let me

19  ask you this, why wasn't the occupancy tax

20  collected at the hotel from 2017 through the

21  end of 2021 not remitted to the City of New

22  York?

23       A        So, first of all, your statement

24  is not correct.

25               Because the occupancy tax for

Page 257

**TOBY MOSKOVITS**

1

2   the entire postpetition period has been paid.

3       Q    It just was paid, it just was

4   paid.

5           It was late and it was filed --

6           MS. PARLOVECCHIO:  Objection, it

7   wasn't filed late.

8       Q    And it was remitted after you

9   got into a dispute with the City of New York

10  over that obligation, right?

11       A    That's actually not correct,

12  because it was many returns and they were

13  prepared over time before anybody even asked

14  about it.

15       Q    Okay, so put aside that.

16       A    And the money was put aside --

17  you don't like my answer so you put it aside.

18           Excuse me, you don't like my

19  answer, so you put it aside.

20           You asked me a question and I

21  gave you an answer, I don't even understand put

22  it aside, so I am telling you, you asked me a

23  question and your question is factually

24  incorrect.

25           So, please --

Page 258

TOBY MOSKOVITS

1

2         Q         Why wasn't the occupancy tax

3    paid prepetition to the City of New York?

4         A         The hotel was struggling to

5    cover its bills because the city withdrew an as

6    of right tax abatement that we were relying on

7    that would have set the property taxes at $200

8    or $250,000, instead of the $1.2 million, $1.6

9    million, $1.8 million that the property taxes

10   were due, and it put the hotel in a very

11   difficult position in terms of being able to

12   cover its expenses.

13        Q         So the Debtor used self-help in

14   deciding not to remit the occupancy tax

15   collected at the hotel as a result of the issue

16   that you just described, is that what happened?

17                  MS. PARLOVECCHIO:   Objection.

18        A         We were trying to keep the

19   business afloat and doing our best to comply.

20        Q         Did you --

21        A         And frankly, frankly, I've not

22   finished my answer.

23        A         Frankly there was a period of

24   time where the city said we didn't have to

25   collect it and we continued to collect it.

Page 259

TOBY MOSKOVITS

1
2              So we were doing our best to
3   stay alive.
4              MS. PARLOVECCHIO:  Objection.
5         Q    I'll talk about the summer of
6   2021 in a moment, because that's what you're
7   referring to, right, the abatement on occupancy
8   tax in the summer of 2021, right?
9         A    Yes.
10        Q    Okay.
11             But my question was prepetition,
12   so that was before the summer of 2021?
13        A    Well, you basically laid out
14   dates in your question starting from 2017
15   through the end of 2021, so you want to declare
16   if there is an open question I haven't
17   answered, would you like to clarify, please.
18        Q    There is a lot of questions you
19   haven't answered, but I don't want to go back
20   through the past five hours.
21             But I do want to know in respect
22   to this dispute where the city of New York --
23   where you were using the occupancy taxes
24   collected at the hotel for other purposes, did
25   someone file, someone, did the Debtor, or the

– Moskovits, p. 517, l. 5-21 (video)

```
                                        Page 517
1                TOBY MOSKOVITS VOL. II
2     this question three or four times last time.
3               MR. FREEDMAN:  I disagree, but I'll
4     ask the next question.
5          Q.  And you would agree with me that when
6     the hotel occupancy tax is collected, it's
7     collected on behalf of the City of New York,
8     correct?
9          A.  I'm not understanding the question.
10    You want to ask me a question?
11         Q.  When the hotel collects hotel
12    occupancy taxes, it's collected on behalf of the
13    City of New York, correct?
14         A.  That is my understanding, correct.
15         Q.  And so it's supposed to be
16    segregated, correct?
17         A.  Correct.
18         Q.  And so it's supposed to be held in
19    trust until it's paid over to the City of New
20    York, correct?
21         A.  Correct.
22         Q.  And for every guest that stayed in
23    the hotel since 2017, other than possibly the
24    abatement during the summer of 2021, the hotel
25    collected its occupancy taxes on behalf of the
```

– Moskovits, p. 524, l. 20 through p. 530, l. 11 (video p. 526, l. 23 through
p. 528, l. 11 only)

```
                                              Page 524

  1                 TOBY MOSKOVITS VOL. II
  2              MR. FREEDMAN:  [MOTION] Move to
  3      strike, move to strike.
  4          A.  -- including beverage operations
  5      simply shut down.
  6              MR. FREEDMAN:  [MOTION] Move to
  7      strike as unresponsive, once again.
  8          Q.  So let me ask you this question,
  9      ma'am.
 10              With all of the claims that continue
 11      to accrue and weren't paid over the past three
 12      years, at least, before the bankruptcy including
 13      my client, to creditors, to the New York City
 14      Taxing Authority, what did you and Mr.
 15      Lichtenstein do with the millions of dollars that
 16      were taken out of the hotel?
 17              MS. PARLOVECCHIO:  Objection to form.
 18          A.  If you're referring to
 19      Mr. Huebscher's report, it's full of lies.
 20          Q.  What did you do and Mr. Lichtenstein
 21      do with the millions of dollars taken out of the
 22      hotel?
 23              MS. PARLOVECCHIO:  Objection.
 24          Q.  What did you use the money for?  What
 25      did you -- who did you pay with those funds?
```

Page 525

TOBY MOSKOVITS VOL. II

1

2      A.   There were no "millions of dollars
3  taken out of the hotel."  We took a return of a
4  small portion of the money we lent for
5  operations.  There were no "millions of dollars
6  taken out of the hotel."  Mr. Huebscher put forth
7  the report that we -- that Mr. Lichtenstein
8  responded to in great detail.  It's full of lies.
9          And for a man of that's 70 plus years
10  old with so many acronyms after his name, he's
11  failed at basic accounting.
12          MR. FREEDMAN:   [MOTION] Move to
13  strike as unresponsive.
14      Q.   So how much money did you and Mr.
15  Lichtenstein take out of the hotel to repay
16  yourself?
17          MS. PARLOVECCHIO:   Objection.
18      A.   There was a report -- there was a
19  report provided.
20      Q.   I'm asking you, ma'am.  I'm asking
21  you.
22      A.   There was a report provided with
23  great detail --
24      Q.   How much?
25      A.   -- as to the debt and equity.

Page 526

TOBY MOSKOVITS VOL. II

1

2       Q.   How much?

3       A.   There was a report provided.

4       Q.   How much, ma'am?

5       A.   A very detailed report provided.

6       Q.   I'm not -- how much was taken?  How

7  much --

8       A.   There was a very detailed report

9  provided with exact transactions and exact dates

10  as to --

11      Q.   And you can't tell me?  You can't

12  tell me?

13      A.   There was a very detail report

14  provided and I actually testified to this at

15  great length in a previous deposition.

16      Q.   Okay.  So the --

17      A.   There was very detailed report

18  provided that Mr. Huebscher refused to review as

19  to transactions.

20      Q.   So --

21           MR. FREEDMAN:   Alright.   [MOTION]

22  Move to strike as unresponsive.

23      Q.   So rather than playing my client,

24  rather than turning over hotel occupancy taxes to

25  the City of New York, rather than paying other

Page 527

TOBY MOSKOVITS VOL. II

2  tax obligations, including real estate taxes, you

3  and Mr. Lichtenstein decided to pay yourselves

4  back millions of dollars?  Do I have that

5  correct?

6          MS. PARLOVECCHIO:  Objection.

7      Q.  Do I have that correct?

8      A.  Michael and I invested close to $30

9  millions into a hotel and found ourselves

10  victimized less than 90 days after the closing by

11  a predatory lender, who has testified I

12  understand from my attorneys --

13          MR. FREEDMAN:  [MOTION] Move to

14  strike.  Move to strike.

15      A.  -- that his own advisors told him he

16  would never be able to make debt service.

17          MR. FREEDMAN:  [MOTION] Move to

18  strike.

19      A.  And went ahead with an intention to

20  undermine our business.

21      Q.  Are you refusing to answer my

22  question, ma'am?

23      A.  I answered your question.

24      Q.  No, you didn't.

25      A.  We invested -- we invested and lent

Page 528

TOBY MOSKOVITS VOL. II

2  close to $30 million into this property.

3      Q.  And you paid yourselves back --

4      A.  (INAUDIBLE DUE TO CROSS-TALK.)

5      Q.  You paid yourself back millions of

6  dollars when you weren't paying back other

7  creditors, right?

8      A.  We paid ourselves back years before

9  the bankruptcy, a very modest amount of the money

10  that was invested, a modest amount of the

11  $30 million.

12      Q.  And would it be also accurate to say

13  that you and Mr. Lichtenstein misappropriated

14  funds that were held in trust for the City of New

15  York that were supposed to be paid over to them?

16      MS. PARLOVECCHIO:  Objection.

17      A.  We paid over 5 --

18      THE WITNESS:  I'm sorry, Gina.  What

19  did you say?

20      MS. PARLOVECCHIO:  I objected.

21      THE WITNESS:  Okay.

22      A.  We paid over $5 million in excess tax

23  to the City of New York that put the hotel in a

24  very perilous state and that is all being

25  disputed and is going to be resolved with the

Page 529

TOBY MOSKOVITS VOL. II

1    
2    City.

3           Q.   How about the trust fund taxes, the

4    City -- hotel occupancy taxes?

5           A.   We overpaid -- we overpaid

6    $5 million --

7                MS. PARLOVECCHIO:   Objection.

8    Objection.

9           A.   -- in tax to the City.

10               THE WITNESS:   I'm sorry.

11               MS. PARLOVECCHIO:   Objection.

12               Again, Gary, this topic has been

13   revisited now five times, six times.

14               MR. FREEDMAN:   I'm almost done, Gina,

15   so -- almost done.   I'm just trying to get an --

16          A.   The matter is being all -- all --

17          Q.   I'm just trying to get an answer to

18   any question I've asked today.

19          A.   I've answered.   I've always answered.

20   I'll graciously do it a sixth time.

21               All post-petition occupancy tax has

22   been paid.   All tax returns have been filed.   And

23   we are in negotiating a settlement with the City.

24   And, frankly, we overpaid by $5 million in taxes

25   to the Department of Finance.

Page 530

TOBY MOSKOVITS VOL. II

```
 2          Q.   What gave you the right to take trust
 3     fund taxes to use for your own purpose?
 4               MS. PARLOVECCHIO:   Objection.
 5          Q.   What agreement -- what agreement did
 6     you have with the City to take their money,
 7     ma'am?
 8               MS. PARLOVECCHIO:   Objection.
 9          A.   This matter is going to be addressed
10     in papers that we're filing shortly.   And my
11     lawyer --
12               MR. FREEDMAN:   Let's -- let's take a
13     minute break.
14               THE WITNESS:   How much time is left
15     in the deposition?
16               THE VIDEOGRAPHER:   Just a moment.
17     I'll take us off the record and then I'll give
18     you a number.
19               The time 12:05 --
20               MS. PARLOVECCHIO:   I'm sorry.  I'm
21     sorry.  Before we go off the record -- I'm sorry.
22               THE VIDEOGRAPHER:   Oh.
23               MS. PARLOVECCHIO:   Before we go off
24     the record, I just want to note for the record
25     that we have in addition to Mr. Freedman,
```

2.   _Lichtenstein MC_

–   Lichtenstein MC, p. 95, l. 2 through p. 98, l. 22 (no video)

Page 95

MICHAEL LICHTENSTEIN

2    question?  I didn't hear the question.

3         Q       Yes, the outstanding hotel

4    occupancy taxes, what's the status of the

5    negotiations in respect to the payment of

6    those?

7         A       Well, I am not going to disclose

8    to you where we are in negotiations, since I

9    would not say that you are on our side, so I

10   will let Mayer Brown provide you with that

11   information.

12        Q       You understand that you have

13   personal liability for those hotel occupancy

14   taxes, sir?

15        A       I understand that I have

16   personal liability.

17               MR. GLUCKSMAN:  Objection,

18        irrelevant.

19               He's being deposed as a 30(b)(6)

20        for the corporation, not as a person.

21               MR. FREEDMAN:  No, that's where

22        you're wrong, Mr. Glucksman.  He's also

23        noticed individually.

24               MR. GLUCKSMAN:  You and I can

25        agree to disagree.

Page 96

MICHAEL LICHTENSTEIN

1

2          MR. FREEDMAN:   Okay.

3               If you just take a look at the

4       notice, though, maybe you will get it

5       right.

6               I'm going to move on.

7          Q       What's the status of discussions

8    in respect to the resolution of the real estate

9    taxes?

10         A       Let Mayer respond to your

11   questions on these matters.

12         Q       So, sir, with respect to the

13   hotel occupancy taxes, is the management

14   company going to be the entity that is a party

15   to whatever agreement comes out of those

16   negotiations?

17         A       I will let Mayer Brown respond

18   to these questions.

19         Q       And what is the source of funds

20   that the management company is going to use to

21   repay the outstanding hotel occupancy taxes?

22         A       I will let Mayer Brown respond

23   to these questions.

24         Q       And, in fact, talking about

25   source of funds, what's going to be the source

Page 97

MICHAEL LICHTENSTEIN

1
2    of funds for the management company to pay back
3    the $824,000 under the settlement on the PPP
4    loan if the Debtor's plan is not confirmed?
5                    MR. GLUCKSMAN:  Objection.
6                    THE WITNESS:  Go ahead, James.
7                    MR. GLUCKSMAN:  I object on the
8          ground it's a hypothetical question.
9                    MR. FREEDMAN:  No, it not
10         hypothetical.  It's in the plan, sir.
11         Q       Please answer the question,
12   Mr. Lichtenstein.
13         A       I already responded to that
14   question.  We had that conversation already in
15   the previous deposition.
16         Q       Are you refusing to answer it
17   now?
18         A       I said I already responded at
19   length about this matter, and in summary --
20         Q       If you can just respond to it
21   now so I can move on?
22         A       Yes, if you would stop
23   interrupting my answer I would be able to
24   answer it.
25         Q       Please stop yelling at me, sir.

Page 98

MICHAEL LICHTENSTEIN

1

2          A          And I did not yell at you, for
3    the record.
4          Q          Yes, you did.  You're raising
5    our voice.
6          A          If you stop interrupting my
7    answers I can finish my answers without
8    interrupting.
9          Q          Sir, what's the source of funds,
10   sir?
11         A          And I responded already that
12   it's an irrelevant question because our plan is
13   going to be confirmed.
14         Q          If it's not confirmed what's the
15   source of funds?
16         A          We already dealt with that
17   question at length in the last deposition.
18         Q          You are refusing to answer the
19   question, then?
20         A          No, I am not refusing to answer
21   the question.  I already answered that question
22   at length in the previous deposition.
23         Q          How long have you been a
24   developer?
25         A          I don't know, about 20 years.

VII.    **Fabricated November 2017 Management Agreement**

    a.    **Exhibits**

> ➢    JOINT EXHIBIT 11 - Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees w/ Hotel Management Agreement

> ➢    BSP EXHIBIT 64 - Motion to Authorize Intercompany Transfers [ECF No. 83]

> ➢    BSP EXHIBIT 22 - Fourth Amendment to Operating Agreement of 96 Wythe Acquisition LLC

> ➢    JOINT EXHIBIT 8 - Loan Agreement between 96 Wythe Acquisition and Benefit Street Partners Realty Operating Partnership, L.P.

> ➢    BSP EXHIBIT 24 – Loan Closing Binder with FedEx delivery confirmation

> ➢    BSP EXHIBIT 7 – Email chain from M. Wainger to T. Moskovits re: BSP/ Williamsburg Hotel - Management Agreement dated 10/30/2017 (Moskovits deposition exhibit TM-0010)

> ➢    BSP EXHIBIT 8 - Email chain from M. Wainger to N. Kaiser and E. Balshem re: BSP doc comments - Management Agreement dated 11/2/2017 (Moskovits deposition exhibit TM-0011)

> ➢    BSP EXHIBIT 12 - Email from M. Wainger to N. Kaiser re: BSP/Williamsburg - Assignment of Management Agreement with attached draft Agreement dated 12/5/2017 (Moskovits deposition exhibit TM-0012)

> ➢    BSP EXHIBIT 13 - Email chain from N. Kaiser to M. Wainger re: BSP/Williamsburg - Assignment of Management Agreement dated 12/5/2017 (Moskovits deposition exhibit TM-0013)

> ➢    BSP EXHIBIT 14 - Email chain from M. Wainger to N. Kaiser, M. Lichtenstein, and T. Bolles re BSP/Williamsburg – Mortgage Loan Documents with attached executed copies of mortgage loan documents dated 12/12/2017

> ➢    BSP EXHIBIT 9 - BSP Drop Box screenshot reflecting last date documents provided

> ➢    BSP EXHIBIT 56 - Schedules of Assets and Liabilities and Statement of Financial Affairs - Reporting Period 04/01/2021 - 04/30/2021 [ECF No. 31]

➢ JOINT EXHIBIT 30 - Amended Schedule E/F: Creditors Who Have Unsecured Claims [ECF No. 205]

➢ BSP EXHIBIT 117 - Amended Schedule D: Creditors Who Have Claims Secured by Property [ECF No. 411]

➢ BSP EXHIBIT 51 – Transcript of 341 Meeting of Creditors

➢ BSP EXHIBIT 129 – Transcript and Video of Videotaped Virtual Deposition of David Goldwasser taken on 3/15/2022

➢ BSP EXHIBIT 123 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume I taken on 3/4/2022

➢ BSP EXHIBIT 137 – Transcript and Video of Videotaped Deposition of Toby Moskovits Volume II taken on 4/1/2022

b.    **Testimony**

1.    *Lichtenstein*

–    Lichtenstein p. 162, l. 17 through p. 168, l. 5 (video p. 162, l. 17; p. 162,
l. 24 through p. 164, l. 14; p. 164, ll. 22-25; p. 165, l. 19 through p. 166,
l. 25 and p. 167, ll. 21-24 only)

```
                                              Page 162

 1                    M. LICHTENSTEIN
 2    we have provided these documents.  We have provided
 3    the books and records.  We have provided the bank
 4    statements.  This is a fact that these $10 million
 5    were provided to the debtor.  And Benefit Street and
 6    you, Mr. Freedman, are simply trying to deny facts.
 7            MR. KELLEY:  Let's not characterize --
 8    A.    I can't help you with that.
 9            MR. KELLEY:  Let's just stop at the
10    response.  Let's not characterize what
11    they're trying to do.  We will deal with
12    that.  Let the lawyers deal with that.
13    Please just respond to his question.
14            (Whereupon, a motion was marked as
15    Lichtenstein Exhibit 6 for identification, as
16    of this date.)
17    Q.    You should have up Exhibit Number 6, sir.
18    Let me know when you have it, please.
19            Do you have it, sir?
20    A.    I'm reading it, looking at it.
21    Q.    Let me know when I may proceed, sir.
22    A.    Okay.
23    Q.    Okay.
24            So you have in front of you docket
25    entry 83, which is Motion to Authorize
```

Page 163

M. LICHTENSTEIN

2    Intercompany Transfers, and attached as Exhibit A

3    is a document entitled Hotel Management and

4    Services Agreement, dated November 21, 2017.

5            Do you recognize the document, sir?

6            MR. KELLEY:   The exhibit or the motion?

7            MR. FREEDMAN:   Both.

8        A.    My computer actually froze.   I'm trying

9    to look.   Okay.   It's moving now.

10           Okay.

11       Q.    Do you recognize that?

12       A.    Yes.

13       Q.    Okay.

14           Did you provide Mr. Goldwasser a copy

15    of the management agreement when he was compiling

16    the information for preparation of the debtor's

17    bankruptcy schedules?

18       A.    I would think so.   I don't know -- why

19    would the management be relevant to the schedule of

20    debts?

21           MR. KELLEY:   Sorry.   Mr. Lichtenstein,

22       forgive me.   We want to move through this.

23       He's asking if you provided it.   We'll worry

24       about the relevance.

25           Did you provide it?

Page 164

M. LICHTENSTEIN

1

2      A.    The answer is I don't remember.

3      Q.    Okay.

4            Was the management agreement in effect

5      at the time that the debtor filed for bankruptcy?

6      A.    Yes.   It's been in effect since it was

7      signed.

8      Q.    Can you tell me why it's not listed on

9      Exhibit G to the debtor's bankruptcy schedules

10     that's the schedule of executory contract and

11     leases?

12     A.    I'm not claiming to be a bankruptcy

13     process expert, and I have no clue why it's not

14     there or if it should be there.   I don't know.

15     Q.    Can you tell me why when the debtor filed

16     for bankruptcy on February 23, 2021, that the first

17     notice of the existence of the management agreement

18     attached to docket entry 83 was the filing of this

19     exact paper, document entry 83, on August 11, 2021?

20           MR. KELLEY:   Objection.   Form.

21     A.    I have no clue.

22     Q.    And is money owed to the management

23     company by the debtor under this management

24     agreement?

25     A.    Yes.

Page 165

M. LICHTENSTEIN

1

2    Q.    Can you tell me why the management

3    company did not file a proof of claim in this

4    bankruptcy case?

5            MR. KELLEY:  I think this is the third

6        time you've asked that question, isn't it?

7            MR. FREEDMAN:  Not even close.  The

8        prior question, Mr. Kelley, was in respect to

9        the debtor's principal's purported loans.

10           MR. KELLEY:  Okay.  Fair enough.

11           You can answer the question.

12    A.    Well, I cannot answer the question,

13    because I don't claim to be an expert --

14           (Technical interruption.)

15    A.    I do not claim to be an expert on how

16    stuff should be filed in bankruptcy.  Perhaps I was

17    given bad advice, but I don't know what to tell you.

18    Maybe we need to -- maybe it needs to be amended.

19    Q.    And the amount owed by the debtor to the

20    management company would be an unsecured debt; is

21    that correct?

22    A.    Well, I will not answer legalistic

23    bankruptcy questions.

24    Q.    Okay.  It would be a debt, though?

25    A.    But the amount owed is about $2 million.

Page 166

M. LICHTENSTEIN

2    It's a very significant amount of money.  It's about

3    $2 million.

4        Q.    Okay.

5              And it would be a debt that is owed by

6    the debtor to the management company; is that

7    correct?

8        A.    It would be a debt that is owed to the

9    management company, yes, indeed.

10       Q.    Can you tell me why that's not reflected

11   on the bankruptcy schedules filed by the debtors in

12   this case or any of the subsequent amendments to

13   schedules filed in this case?

14       A.    I don't know why it wasn't there.

15   Perhaps we were given bad advice.  Okay.

16             Is that what you're saying?  We were

17   given bad advice?  Could be.

18             MR. KELLEY:  Mr. Lichtenstein, I think

19        he's just asking if you know why it wasn't

20        there.  If your answer is "I don't know,"

21        let's stop there.  I don't think you have to

22        go beyond that.

23       A.    He was -- oh, okay.  I will take that

24   back.  I was being sarcastic.  The answer is I don't

25   know.

Page 167

M. LICHTENSTEIN

2    Q.    And I would appreciate it if you limited

3    the sarcasm, sir.

4         MR. KELLEY:   That's all reserved

5    entirely for me.   I'm the only one on this

6    whole transcript that's allowed to be

7    sarcastic, not you.

8         THE WITNESS:   Okay.

9    Q.    Did you ever provide a copy of this

10   management agreement to Mr. Rauch?

11   A.    I assume he's seen it.

12   Q.    My question is:   Do you recall providing

13   a copy of the management agreement to Mr. Rauch?

14   A.    I don't recall now a specific time or

15   date that it was provided.   I mean, everyone knows

16   about the management agreement.   Benefit Street also

17   knows about the management agreement, and this is

18   the management agreement.

19        MR. FREEDMAN:   Move to strike.

20        I will ask my question again.

21   Q.    Do you recall providing a copy of this

22   management agreement to Mr. Rauch?

23   A.    I do not recall a time or date at which I

24   provided the management agreement to Mr. Rauch.

25   Q.    Do you recall providing a copy of this

Page 168

1                        M. LICHTENSTEIN

2    management agreement to Mr. Kirschner?

3         A.    I do not recall on what date and what

4    time and where I provided this management agreement

5    to anyone.

6         Q.    And when was the management agreement

7    attached to Exhibit --

8              MR. FREEDMAN:  Strike that.

9         Q.    -- Number 6?  When was it prepared, sir?

10             MR. KELLEY:  That came out a little

11        garbled.  Are you referring to when --

12             MR. FREEDMAN:  I will do it again.

13        It's easier for me just to do it again.

14             MR. KELLEY:  That's fine.

15        Q.    The management agreement that we're

16   talking about, sir, when was it prepared?

17        A.    Obviously it was prepared around the date

18   it was signed.

19        Q.    Are you testifying that this document was

20   prepared or about November 21, 2017?

21        A.    I am testifying that it was prepared on

22   or about the time that it was signed.

23        Q.    Tell me when was it signed, sir.  I don't

24   want to joust with you on this.

25        A.    Well, I have to look for the date.

– Lichtenstein p. 168, l. 15 through p. 172, l. 19 (video p. 168, ll. 15-18; p. 169, l. 13 through p. 170, l. 14 and p. 172, ll. 13-19 only)

Page 168

1                    M. LICHTENSTEIN

2   management agreement to Mr. Kirschner?

3         A.    I do not recall on what date and what

4   time and where I provided this management agreement

5   to anyone.

6         Q.    And when was the management agreement

7   attached to Exhibit --

8              MR. FREEDMAN:  Strike that.

9         Q.    -- Number 6?  When was it prepared, sir?

10             MR. KELLEY:  That came out a little

11      garbled.  Are you referring to when --

12             MR. FREEDMAN:  I will do it again.

13      It's easier for me just to do it again.

14             MR. KELLEY:  That's fine.

15        Q.    The management agreement that we're

16   talking about, sir, when was it prepared?

17        A.    Obviously it was prepared around the date

18   it was signed.

19        Q.    Are you testifying that this document was

20   prepared or about November 21, 2017?

21        A.    I am testifying that it was prepared on

22   or about the time that it was signed.

23        Q.    Tell me when was it signed, sir.  I don't

24   want to joust with you on this.

25        A.    Well, I have to look for the date.

Page 169

M. LICHTENSTEIN

1

2    Q.   Can you answer the question?

3    A.   I'm looking at the exhibit, and I'm

4  looking for the date of the document.  I guess it's

5  in the beginning, so I'm going back to the

6  beginning.

7         MR. KELLEY:  He's not asking you to

8     guess.  Do you know when it was signed or

9     not, sir?

10   A.   I'm looking at the document.  It keeps

11  freezing.

12         Well, November 21, 2017.

13   Q.   And who prepared this document?

14   A.   I don't remember now who prepared it

15  exactly.  I mean, I was involved in some of it.  I

16  don't remember who prepared it.

17   Q.   Do you recall who was involved in the

18  preparation of the document?

19   A.   I don't remember now.  I mean, I

20  definitely was involved.  I don't remember if there

21  was anyone else and who.

22   Q.   Are there any drafts of this management

23  agreement?

24   A.   I'm sure there were drafts at the time.

25   Q.   Where would those drafts be now?

Page 170

M. LICHTENSTEIN

2      A.      I have no clue.

3      Q.      On whose computer system was this

4  document prepared?

5      A.      You're asking me now to remember on whose

6  computer system was a document prepared on November

7  21 of 2017 or at any time in 2017, I wouldn't know

8  that.

9      Q.      Are there any emails or correspondence or

10  communication that relate to the drafting,

11  negotiation, or preparation of this management

12  agreement?

13      A.      I don't know, and I'm assuming that it

14  would have been provided already if there are.

15      Q.      Do you recall having seen any such

16  documents?

17      A.      I don't remember now, but it's a pretty

18  straightforward, simple agreement, so I'm not sure

19  why you think it would be lots of communication

20  about this.  It's a pretty standard hotel management

21  agreement.

22      Q.      How do you know, sir, what a standard

23  hotel management agreement looks like?

24      A.      Because I've reviewed hotel management

25  agreements in this context of this hotel and in the

Page 171

M. LICHTENSTEIN

1
2      context of other hotels.
3          Q.     What hotel management agreements did you
4      review prior to the preparation and execution of
5      this management agreement?
6          A.     I didn't say the timing of when I
7      reviewed it.  I said over the past few years I
8      reviewed hotel management agreements, and this is a
9      pretty standard, straightforward management
10     agreement.
11         Q.     What hotel management agreements did you
12     review prior to the preparation and execution of
13     this management agreement?
14         A.     I don't remember now exactly, but I have
15     reviewed hotel management agreements as it pertains
16     to other hotels.  I reviewed management agreements
17     as it pertains to hotels that we were going to
18     manage in New York or Miami.  I've reviewed hotel
19     management agreements of other chains.  I'm not sure
20     how else belter to answer your question.
21         Q.     Prior to the preparation and execution of
22     this management agreement, can you identify a single
23     hotel management agreement that you reviewed?
24             MR. KELLEY:  Do you mean by name?  I'm
25         sorry.  I just want to understand what he

Page 172

M. LICHTENSTEIN

1
2    means.

3          MR. FREEDMAN:  I don't care.  Any way
4    he can describe it for me.

5    A.    I don't remember now what I reviewed in
6    2016.

7    Q.    You mean 2017?

8    A.    2016 or 2017.  I'm not sure what your
9    question is.  You're asking me an overly broad
10   question which doesn't have an answer.

11   Q.    I'm assuming --

12          MR. FREEDMAN:  Well, strike that.

13   Q.    The debtor was represented by Nicholas
14   Kaiser in respect to the loan closing with Benefit
15   Street Partners, correct?

16   A.    Yes.

17   Q.    I assume that you provided a copy of this
18   management agreement to Mr. Kaiser in that regard?

19   A.    I don't remember.

20   Q.    But you recall the management agreement
21   being an issue in respect to the documentation and
22   closing of the Benefit Street loan, though, correct?

23          MR. KELLEY:  Objection.  Vague.

24   A.    No, I don't recall it being an issue.
25   They wanted a management agreement.  There was no

– Lichtenstein p. 173, l. 3 through p. 178, l. 9 (video p. 173, l. 19 through p. 174, l. 10; p. 175, ll. 7-12; p. 177, ll. 6-25 only)

Page 173

M. LICHTENSTEIN

2  issue.  What was the issue?

3      Q.      So it's your testimony, sir, that you

4  have no recollection of providing this November 21,

5  2017, management agreement to Mr. Kaiser?  Do I have

6  that correct?

7      A.      You have that wrong.  You have put words

8  in my mouth once again.  I said I don't remember

9  when and if I provided it to Mr. Kaiser six years

10  ago.

11      Q.      So it's possible that you never provided

12  this management agreement to Mr. Kaiser, correct?

13      A.      It's probable that I provided it to him.

14  It's possible that I didn't.  I would not remember

15  now what I provided to my lawyer amongst a multitude

16  of probably hundreds of loan documents in relation

17  to this closing, what exactly I provided to him six

18  years ago.

19      Q.      Well, in that regard, do you recall

20  providing a copy of this November 21, 2017,

21  management agreement to Benefit Street?

22      A.      I'm positive that we provided it, yes.

23      Q.      So you have no recollection of whether or

24  not you provided it to your own attorney, but you

25  have a specific recollection that you provided it to

Page 174

M. LICHTENSTEIN

1

2    Benefit Street?  Do I have that correct?

3         A.      You have it incorrect.  You're asking me

4    to remember exactly what and when I provided what to

5    my lawyer.  My response was I don't remember exactly

6    when I provided what to my attorney.

7              I am positive that we provided this to

8    Benefit Street, because it was required as part of

9    the closing.  They wanted to see a management

10   agreement in place.

11        Q.      Okay.  And --

12        A.      I don't remember how, when, and where we

13   provided, but I'm positive that it was provided.

14        Q.      I want to go back to Mr. Kaiser for a

15   second, because you seemed to rephrase my question

16   as to whether and when, and I only asked you whether

17   you have a recollection of providing the management

18   agreement to your attorney, Mr. Kaiser.  I have not

19   asked you yet when you provided it to Mr. Kaiser.

20              So I just want to make certain that

21   we're clear on the record on that question of

22   whether you have a recollection of the debtor

23   providing a copy of the November 21, 2017,

24   management agreement to your attorney, Mr. Kaiser?

25              MR. KELLEY:  Objection.  Form.

Page 175

M. LICHTENSTEIN

```
 1
 2        Go ahead.
 3    A.        If you're asking as a general question,
 4    then I recollect providing it for the closing, which
 5    was to the lender and to Kaiser.  I do not remember
 6    details or dates or when it was provided.
 7    Q.        Do you have any documentary proof that
 8    the November 21, 2017, management agreement was
 9    provided to my client?
10    A.        Yes.  We closed the loan, and I doubt
11    Benefit Street would close the loan without a
12    management agreement in place.
13    Q.        Okay.  Not my question.
14              My question is:  Do you have any
15    documentary proof that the November 21, 2017,
16    management agreement was provided to my client?
17              MR. KELLEY:  Objection.  Form.
18              You may answer.
19    A.        My answer is that the fact that there was
20    a closing statement that was signed is documentary
21    proof that a management agreement was provided.
22    They wouldn't close without it.
23    Q.        So I would have to go look at the closing
24    statement and the related closing documents to
25    determine if what you said was accurate, right?
```

Page 176

M. LICHTENSTEIN

1
2      A.      No, because it seems like you guys have

3   simply replaced the management agreement with a

4   shortened version of the management agreement, which

5   you're claiming now is the real management agreement

6   which, by the way, has similar terms to this

7   management agreement.  So I don't know what the

8   point of this whole discussion is.  It has the

9   closing management fee and similar terms.

10     Q.      Not even close.  I'm not going to debate

11  that with you, sir.  Let's go back to my original

12  question.

13          Other than the closing documents or the

14  closing statements, do you have a single document

15  that would verify that debtor provided a copy of

16  the November 21, 2017, management agreement to my

17  client?

18          MR. KELLEY:  Objection.  Form.

19          You can answer.

20     A.      As I said, we closed the loan, and

21  Benefit Street required a management agreement in

22  place to close the loan.

23     Q.      I'm going to assume the answer to that

24  question is no, you don't have any, because I would

25  expect that you would tell me otherwise, sir.  But I

Page 177

M. LICHTENSTEIN

1
2  will give you one last chance.
3       A.    I repeatedly have said that this was
4  provided for the closing.  There was a closing.
5  This is the management agreement.
6       Q.    Do you have proof that it was provided
7  for the closing?
8       A.    I don't know what you mean by proof.  You
9  have proof that I ate breakfast today?  What does
10 that even mean?  There was a closing and a
11 management agreement was provided.
12      Q.    Do you have an email?  A letter?  Some --
13      A.    I --
14      Q.    Let me finish.
15           MR. KELLEY:  Let him finish his
16      question.
17      Q.    -- proof that that management agreement
18 was transmitted to my client prior to closing?  It's
19 a very simple question, sir.  It's like the fourth
20 time I've had to reask it.
21           MR. KELLEY:  Objection.  Form.
22           You can answer.
23           Please proceed.
24      A.    I assume that whatever was -- proof we
25 had was provided already.

Page 178

M. LICHTENSTEIN

1

2      Q.    It wasn't, and that's why I'm asking.

3  You are here as the debtor's representative to

4  answer those questions, so if you know something,

5  tell me.  If you don't, then tell me you're not

6  aware of anything.

7      A.    I assume that whatever we had was

8  provided, and I don't have anything more to answer

9  on the subject.

10      Q.    How about the transmittal to Mr. Kaiser

11  of the November 17, 2021, agreement?  Have you seen

12  anything in that regard?

13          MR. FREEDMAN:  I said it wrong.  Let me

14      try it again.

15      Q.    How about in respect to Nicholas Kaiser,

16  your attorney?  Have you seen any transmittal or

17  proof that the November 21, 2017, management

18  agreement was transmitted to him?

19          MR. KELLEY:  And I'm just going to

20      caution the witness.  He's just simply asking

21      if you if you recall that a transmittal

22      exists.  He's not asking for the content of

23      it, which would reveal privileged

24      information.

25          So do not reveal the content.  But if

– Lichtenstein p. 178, l. 15 through p. 179, l. 17 (no video)

Page 178

1                    M. LICHTENSTEIN

2        Q.    It wasn't, and that's why I'm asking.

3    You are here as the debtor's representative to

4    answer those questions, so if you know something,

5    tell me.  If you don't, then tell me you're not

6    aware of anything.

7        A.    I assume that whatever we had was

8    provided, and I don't have anything more to answer

9    on the subject.

10       Q.    How about the transmittal to Mr. Kaiser

11   of the November 17, 2021, agreement?  Have you seen

12   anything in that regard?

13           MR. FREEDMAN:  I said it wrong.  Let me

14       try it again.

15       Q.    How about in respect to Nicholas Kaiser,

16   your attorney?  Have you seen any transmittal or

17   proof that the November 21, 2017, management

18   agreement was transmitted to him?

19           MR. KELLEY:  And I'm just going to

20       caution the witness.  He's just simply asking

21       if you if you recall that a transmittal

22       exists.  He's not asking for the content of

23       it, which would reveal privileged

24       information.

25           So do not reveal the content.  But if

Page 179

M. LICHTENSTEIN

1

2          you recall if a document or a transmittal

3          exists is what I will allow you to answer.

4          A.      I already answered that question earlier.

5     I don't remember any communications with Mr. Kaiser

6     from six years ago when we were talking about

7     hundreds or probably over a thousand pages of loan

8     documents about this closing.

9          Q.      And my question was a little different,

10    sir.

11              Have you seen anything that reflected

12    the transmittal of this management agreement to

13    Mr. Kaiser?

14         A.      All documents were provided by a Dropbox,

15    so I'm not sure there would even be any transmittal,

16    per se.  It was a Dropbox, and anything was put in

17    the Dropbox.

18              So I'm not sure what you mean by

19    transmittal.  But as I said, I don't remember now

20    how the stuff was sent six years ago, so --

21         Q.      At the time that you were involved with

22    the preparation and then the execution of this

23    management agreement, that was at the time during

24    which the debtor and Benefit Street were advancing

25    the loan transaction, correct?

– Lichtenstein p. 180, l. 24 through p. 183, l. 9 (no video)

Page 180

1               M. LICHTENSTEIN

2          MR. KELLEY:  Objection.  Form.

3      A.   Can you repeat the question.  I didn't

4  follow.

5      Q.   Yes.

6          At the time that you prepared this

7  November 21, 2017, management agreement was right

8  in the middle of the time where the debtor and

9  Benefit Street were moving forward with the

10  closing of the loan transaction, correct?

11     A.   Well, I don't remember the exact dates of

12  when we started --

13          (Technical interruption.)

14     A.   Someone has a computer that's constantly

15  beeping.  Someone has to shut off their sound.

16          THE COURT REPORTER:  I hear it, too.

17          MR. KELLEY:  I hear it as well.

18     Someone's computer is chiming.

19     A.   Yes, someone has to shut off their chime.

20          However, I was in the middle of saying

21  before we were interrupted that -- what was the

22  question again?  Repeat it again.  I lost my train

23  of thought.

24     Q.   At the time that you prepared and

25  executed this November 21, 2017, management

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 181

M. LICHTENSTEIN

1
2  agreement, it was right in the middle of the time

3  where the debtor and Benefit Street were moving

4  forward with the closing of the loan transaction,

5  correct?

6       A.    Well, I don't remember when we started

7  moving towards the closing, but it was around that

8  time.  I mean, I'm not going to answer as to dates

9  and et cetera.

10      Q.    Would it be your belief that -- well, let

11  me represent to you that I have correspondence --

12  and I can show it to you in a moment -- that -- let

13  me make sure I get this right.

14            So I have email communication as of

15  October 30th between counsel including you and Ms.

16  Moskovits with respect to due diligence and

17  related issues with respect to the loan.

18            So this November management agreement

19  was prepared right in the middle of the

20  underwriting and the closing of the loan; is that

21  fair?

22      A.    I said that I don't remember the exact

23  dates of when we started moving towards the closing.

24  That's all I said.  I don't want to testify as to

25  dates.

Page 182

M. LICHTENSTEIN

1

2       But it was, you know -- part of the

3  discussion of the closing was the management

4  agreement, and yes, we provided --

5       Q.   So the management agreement was prepared

6  in part for purposes of closing on the loan

7  transaction, correct?

8       A.   Well, we were going to do it anyway.  But

9  I guess in part, you can say it was from that, yes.

10      Q.   And you would think that upon preparation

11 and execution of the management agreement that you

12 would provide a copy to your attorney, Mr. Kaiser,

13 so he could advance that closing, right?

14      A.   I think I said I definitely -- I actually

15 used the words before "I'm positive that it was

16 provided" to the attorney and to Benefit Street.

17      Q.   And that would have --

18      A.   You're asking me -- you're asking me

19 when, how, what date, what time.  I'm telling you I

20 don't remember what happened six years ago, but it

21 was absolutely provided for the closing purposes --

22      Q.   But that's --

23           (Simultaneous crosstalk.)

24      A.   It was absolutely provided as part of the

25 closing to the lender and to the attorneys.  I just

Page 183

M. LICHTENSTEIN

1

2    don't remember dates or times.

3        Q.    It would be fair to assume you would have

4    provided it to your attorneys shortly after it was

5    prepared, correct?

6        A.    I just said that I will not respond on

7    dates and times and when exactly stuff was sent,

8    because I don't remember what happened six years

9    ago.

10       Q.    Okay.

11            MR. FREEDMAN:  Let's go off the record

12       so our court reporter can wave to the bus.

13            THE COURT REPORTER:  I'm sorry.  It

14       will just take a minute.

15            MR. KELLEY:  No, no, no.  No need to

16       apologize.  That's important.  Go ahead,

17       Missy.  We're going off the record.

18            THE VIDEOGRAPHER:  The time is 3

19       o'clock.  We're off record.

20            (Whereupon, there was a lunch break

21       taken in the proceeding.)

22            THE VIDEOGRAPHER:  The time is 3:23.

23       We're back on the record.

24            (Whereupon, a Document was marked as

25       Lichtenstein Exhibit 7 for identification, as

– Lichtenstein p. 184, l. 3 through p. 188, l. 16 (no video)

Page 184

```
1                      M. LICHTENSTEIN

2          of this date.)

3          Q.     Mr. Lichtenstein, you should have Exhibit

4    7 up on your screen.   Confirm when you do, please.

5          A.     Exhibit 7?

6          Q.     Yes, sir.

7          A.     Yes.

8          Q.     If you go back to page 4, you'll see an

9    email from Margot Wainger dated October 27, 2017.

10                Let me know when you're there.

11         A.     October 30th?

12         Q.     27th, sir.

13         A.     Yes.

14         Q.     Okay.  So you see the email from Ms.

15   Wainger to a host of people, including your partner,

16   Toby Moskovits?

17                Do you see her name there?

18         A.     Okay.

19         Q.     And you are on this as well at

20   nycdevmanager@gmail.com.

21                That's your email address, sir?

22         A.     Yes.

23         Q.     And Nicholas Kaiser, your attorney, next

24   to you?

25         A.     Uh-huh.
```

Page 185

M. LICHTENSTEIN

2       Q.      Yes, sir?

3       A.      Yes.

4       Q.      Thank you.

5               It starts off:  Nicholas, SSL -- which

6    I will tell you refers to Strook and Strook &

7    Lavan -- will be serving as outside counsel to

8    Benefit Street Partners in connection with the

9    above-referenced transaction and will be working

10   with BSP's internal personnel as they finalize the

11   underwriting, due diligence, and credit approval

12   process on the proposed loan.

13              Have I read that correctly, sir?

14      A.      Yes.

15      Q.      And then it goes on:  Also, for our

16   mutual convenience and in anticipation of our

17   kickoff call today, I've drafted a list of items

18   that, together with anything required by our client,

19   will be necessary to close this transaction.

20              Did I read that correctly?

21      A.      Yes.

22      Q.      And then on page 5, there's a list of

23   items going on to page 6, 20 items.

24              Do you see that?

25      A.      Uh-huh.  Yeah.

Page 186

M. LICHTENSTEIN

2    Q.   On page 6, item 14 is identified,
3    Property Management Agreement.
4         Do you see that?
5    A.   Okay.  I don't see it, but okay.  Which
6    number?
7         MR. KELLEY:  14.
8    Q.   14 on page 6.
9         Do you have it?
10   A.   Okay.
11   Q.   Okay.  So then if you would move back to
12   page 2 --
13   A.   Yes.
14   Q.   -- you'll see an email dated October 30,
15   2017, between Margot Wainger and Miriam Gross at 11
16   a.m.
17        Do you see that?
18   A.   Okay.
19   Q.   It says:  Thanks, Miriam.  I believe on
20   our call you mentioned that the management agreement
21   was uploaded to the Dropbox site.  I can't seem to
22   locate it.  Could you please circulate a copy by
23   email.
24        So the reference to the Dropbox, is
25   that what you were referring to earlier?

Page 187

M. LICHTENSTEIN

2    Documents loaded into a Dropbox?

3        A.    Well, every closing was like that, so

4    yes.  I wasn't referring specifically to this email.

5    I was just generally speaking.

6        Q.    But that comports with your prior

7    testimony about documents being uploaded into a

8    Dropbox?

9        A.    I guess, yes.

10       Q.    Okay.

11       A.    It's a pretty standard procedure for

12   closings, but yes.

13       Q.    And then your partner, Ms. Moskovits, at

14   11:02 the same day, October 30, writes:  We do not

15   have a management agreement in place.

16             Do you see that?

17       A.    Uh-huh.

18       Q.    Yes, sir?  You need to respond verbally,

19   please.

20       A.    Yes.

21       Q.    And you're copied on all of these emails,

22   right?  You see your email on Toby Moskovits's email

23   nycdevmanager@gmail.com?

24       A.    Yes.

25       Q.    Then if you flip to the first page,

Page 188

M. LICHTENSTEIN

1

2   you'll see an email from Margot Wainger, October 30,

3   2017, at 11:54.  You're copied on here as well.

4              It says:  My apologies.  I now recall

5   that Nicholas mentioned he put one together

6   memorializing the terms.  Nicholas, please send

7   over a draft once prepared.  Thanks.

8              Did I read that correctly?

9       A.    Yes.

10      Q.    So this is an email chain that you and

11  Ms. Moskovits were a part of, right?

12      A.    Seems like it, yes.  I mean, I'm reading

13  it.  The documents speak for themselves.

14      Q.    Documents don't really speak for

15  themselves.

16      A.    The emails speak for themselves, but yes.

17              MR. FREEDMAN:  The next one, please.

18              (Whereupon, an email was marked as

19       Lichtenstein Exhibit 8 for identification, as

20       of this date.)

21      Q.    And please let me know when you have

22  Exhibit 8 showing.

23      A.    Exhibit 8?

24      Q.    Yes, sir.  Do you have it, sir?

25      A.    Yes.

– Lichtenstein p. 188, l. 21 through p. 194, l. 15 (no video)

```
                                                    Page 188
 1                      M. LICHTENSTEIN
 2     you'll see an email from Margot Wainger, October 30,
 3     2017, at 11:54.  You're copied on here as well.
 4              It says:  My apologies.  I now recall
 5     that Nicholas mentioned he put one together
 6     memorializing the terms.  Nicholas, please send
 7     over a draft once prepared.  Thanks.
 8              Did I read that correctly?
 9         A.    Yes.
10         Q.    So this is an email chain that you and
11     Ms. Moskovits were a part of, right?
12         A.    Seems like it, yes.  I mean, I'm reading
13     it.  The documents speak for themselves.
14         Q.    Documents don't really speak for
15     themselves.
16         A.    The emails speak for themselves, but yes.
17              MR. FREEDMAN:  The next one, please.
18              (Whereupon, an email was marked as
19         Lichtenstein Exhibit 8 for identification, as
20         of this date.)
21         Q.    And please let me know when you have
22     Exhibit 8 showing.
23         A.    Exhibit 8?
24         Q.    Yes, sir.  Do you have it, sir?
25         A.    Yes.
```

Page 189

**M. LICHTENSTEIN**

2    Q.    Okay.  If you flip to the third page, a

3    November 1, 2017, email, from your attorney,

4    Nicholas Kaiser.

5    A.    Uh-huh.

6    Q.    It reads in part:  Toby and Michael do

7    not intend to enter into a written management

8    agreement at this time.  BSP can insert reasonable

9    convenance to ensure that the affiliated entities

10    supply sufficient personnel and transfer all

11    revenues to the required accounts.  The borrower

12    will enter into an assignment of management

13    agreement if it engages a third-party unaffiliated

14    management company.

15    Did I read correctly what your attorney

16    wrote, sir?

17    A.    It seems like you did, yes.

18    Q.    And if you flip up to page 2, you look at

19    the bottom email from Eugene Balshem from Strook &

20    Strook & Lavan dated November 1, 2017, he writes

21    back to your attorney, Mr. Kaiser, and states:  Any

22    objection to doing a simple one-page management

23    agreement that essentially says what you pointed out

24    to document an arm's length relationship?  We have a

25    simple form we can send.

Page 190

M. LICHTENSTEIN

1

2          Did I read that correctly?

3     A.    Yes.

4     Q.    And if you look up one email above that

5  from Mr. Kaiser dated November 1, 2017, at 10:48 to

6  Mr. Balshem, your attorney writes:  Thanks for the

7  super quick response.  Why don't you draft those

8  provisions into the loan agreement and we could add

9  the affiliated entity as a signatory to the loan

10  agreement solely with respect to those several

11  provisions.

12          Did I read that correctly?

13     A.    It seems like you did read that

14  correctly.

15     Q.    And then if you look at the bottom of the

16  first page, it's an email from Ms. Wainger dated

17  November 2, 2017, at 10:02 to Mr. Kaiser and others,

18  and she writes:  Nicholas, attached is the form

19  management agreement Eugene mentioned in his email

20  below.

21          And if you look at the last two pages,

22  you'll see that form management agreement.

23     A.    Okay.

24     Q.    Did I read that email correctly, sir?

25     A.    You read that email correctly, yes.

Page 191

M. LICHTENSTEIN

1

2          MR. FREEDMAN:  Next one, please.

3          (Whereupon, an email was marked as

4    Lichtenstein Exhibit 9 for identification, as

5    of this date.)

6    Q.    Let me know when you have Exhibit 9, sir.

7          Do you have it up, sir?

8    A.    Yes.

9    Q.    Okay.

10         If you look at the first page of

11   Exhibit 9, it's an email from Ms. Wainger to Mr.

12   Kaiser dated December 5, 2017, at 2:11 p.m.

13         Do you see that?

14   A.    Yes.

15   Q.    It says:  Subject: BSP/Williamsburg

16   assignment of management agreement.

17         Is that correct?

18   A.    Yes.

19   Q.    And Ms. Wainger writes:  Nicholas,

20   attached is a revised draft of the assignment and

21   subordination of management agreement along with a

22   redline marked to the last draft circulated.  Please

23   note the attached remains subject to client review

24   and comment.

25         Did I read that correctly?

Page 192

M. LICHTENSTEIN

2    A.    Yes, you read an email that shows drafts
3  going around.
4    Q.    Well, if you give me a second, sir, I
5  will get to the point.
6    A.    Okay.  Meanwhile, you've only shown
7  drafts going around, but keep going.
8    Q.    If you give me a second, I'll get to the
9  point, sir.
10         One of the drafts is an assignment of
11  hotel management agreement and subordination of
12  hotel management fees, along with the one-page
13  hotel management agreement, correct?
14    A.    Yes, along with a note -- that was wrong.
15  Along with a draft hotel management agreement that
16  is not signed and not proof of anything.  So I'm not
17  sure what you're trying to say, but keep going.
18         MR. FREEDMAN:  Move to strike as
19     unresponsive.
20    A.    What you said is false.
21         MR. KELLEY:  Mr. Lichtenstein, he gets
22     to make his objections.  You don't get to
23     rule on them.
24    A.    I can object, too.
25    Q.    No, that's my job.

Page 193

M. LICHTENSTEIN

1

2          MR. FREEDMAN:   Exhibit 10, please.

3          (Whereupon, an email was marked as

4     Lichtenstein Exhibit 10 for identification,

5     as of this date.)

6     Q.   Let me know when you have 10, please.

7     A.   Yes.

8     Q.   If you look at the second page, the

9     second page is that same email from Exhibit 9 from

10    Ms. Wainger to Mr. Kaiser with the draft --

11    A.   Yeah.

12    Q.   -- with a draft assignment and management

13    agreement, correct?

14    A.   Well, it's referring to the assignment of

15    the management agreement, not the management

16    agreement.  But keep going.

17    Q.   Well, when we looked at Exhibit 9, you

18    saw as part of that draft assignment was that

19    one-page draft management agreement, correct?

20    A.   As part of what was sent by Benefit

21    Street, there was a draft, that unsigned management

22    agreement.  But the subject of the emails is about

23    the assignment of the management agreement, not

24    about the actual management agreement itself.

25    Q.   I just want to make sure we're clear,

Page 194

M. LICHTENSTEIN

1   sir.  Okay?

2

3       A.    I am being very clear, Mr. Freedman.

4             This email refers -- this email refers

5   to the draft of the assignment and subordination

6   of management agreement.

7       Q.    Which --

8       A.    It does not refer to the management

9   agreement.

10      Q.    Which in Exhibit 10 --

11      A.    Yes, Exhibit 10, which you asked me to

12   read now, refers to the --

13            MR. KELLEY:  I'm going to --

14      A.    Provides the draft of the assignment and

15   subordination management agreement.

16            MR. KELLEY:  Mr. Lichtenstein, I'm

17        going to make this question on behalf of

18        Missy.  You all have to let each other

19        finish, because she can only type what one

20        person says at a time.

21            THE WITNESS:  Missy, did you get what I

22        said?  What's the last sentence?

23            (Whereupon, the requested portion of

24        the record was read.)

25      Q.    Do you want to go back to Exhibit 9 for a

– Lichtenstein p. 194, l. 25 through p. 206, l. 7 (no video)

```
                                          Page 194

1                      M. LICHTENSTEIN
2     sir.  Okay?
3          A.     I am being very clear, Mr. Freedman.
4                 This email refers -- this email refers
5     to the draft of the assignment and subordination
6     of management agreement.
7          Q.     Which --
8          A.     It does not refer to the management
9     agreement.
10         Q.     Which in Exhibit 10 --
11         A.     Yes, Exhibit 10, which you asked me to
12    read now, refers to the --
13                MR. KELLEY:  I'm going to --
14         A.     Provides the draft of the assignment and
15    subordination management agreement.
16                MR. KELLEY:  Mr. Lichtenstein, I'm
17          going to make this question on behalf of
18          Missy.  You all have to let each other
19          finish, because she can only type what one
20          person says at a time.
21                THE WITNESS:  Missy, did you get what I
22          said?  What's the last sentence?
23                (Whereupon, the requested portion of
24          the record was read.)
25         Q.     Do you want to go back to Exhibit 9 for a
```

Page 195

M. LICHTENSTEIN

2  second, sir, just to make certain that you are aware

3  and familiar with the draft hotel management

4  agreement that's attached to the draft assignment

5  document?

6      A.    Yes.  I'm in Exhibit 9.

7      Q.    All I'm asking, sir, is I want to make

8  certain then when we go back to Exhibit 10, the

9  first email on that chain is the same email from

10 Margot Wainger to Nicholas Kaiser dated December 5,

11 2017, which attaches the draft of the assignment and

12 subordination of management agreement that also

13 includes the draft hotel management agreement.

14          That's all I'm trying, to give you

15 context, sir.  Do you have it?

16     A.    You're referring to Exhibit 9?  Exhibit

17 10?  What are you referring to now?

18     Q.    The second email on Exhibit 10 is the

19 same email that we just looked at in Exhibit 9,

20 correct?  Or do you want me to take you through it

21 again?

22     A.    The second email in Exhibit 10?

23     Q.    Yes.

24     A.    In Exhibit 10, yes.  It's the same email

25 as which exhibit?  I didn't follow.

Page 196

M. LICHTENSTEIN

1

2      Q.     9.

3      A.     Yes.

4      Q.     Okay.  Great.  Thank you.

5             And then if you just look up the first

6   page, your attorney, on December 5, 2017 --

7      A.     First page of which exhibit?

8      Q.     10, sir.

9      A.     Okay.

10     Q.     You see an email from Mr. Kaiser to Ms.

11  Wainger dated December 1, 2017, at 4:38 p.m.?

12     A.     Yes.

13     Q.     And Mr. Kaiser writes in respect to the

14  assignment of management agreement:  Thanks.

15  Subject to client's final approval, this document is

16  fine.

17            Do you see that?

18     A.     Yes, I see it.

19     Q.     Okay.

20            So nowhere in this communication

21  between counsel for the debtor and counsel for

22  Benefit Street Partners does your attorney say,

23  hold it, I have a new November 21, 2017,

24  management agreement between the parties?

25            It doesn't say anything like that,

Page 197

M. LICHTENSTEIN

1

2    right?

3          A.      Can I answer now?

4          Q.      I appreciate you answering yes or no.

5          A.      Nowhere in this email exchange is there a

6    discussion about the management agreement.  The

7    entire discussion in this email exchange is about

8    the assignment and subordination of the management

9    agreement.

10          Q.      Right.  And --

11          A.      And no, it doesn't include anything.

12    It's about the one document.  It's about the

13    assignment and subordination management agreement,

14    and note that Nicholas Kaiser response says subject

15    to our approval, this document -- and this document

16    refers to the document that Margot Wainger, which is

17    the --

18                  (Technical Interruption.)

19          A.      -- previous email from Margot Wainger,

20    which refers only to the revised draft of the

21    assignment and subordination of the management

22    agreement.

23                  There is no reference in any of these

24    emails to the actual management agreement.

25          Q.      Let's go back --

Page 198

M. LICHTENSTEIN

2      A.   Could have very well been replaced with

3   the real management agreement.  Which, by the way,

4   both management agreements have very similar terms,

5   so I still don't understand, after six months of you

6   guys wasting so much time on this management

7   agreement, what the difference is between drafts and

8   management agreements and why you're wasting so much

9   time on this matter to begin with.

10       MR. FREEDMAN:  Move to strike as

11     unresponsive, and this is going to serve as

12     predicate for our motion to strike your

13     declaration.

14     Q.   Let's go back to Exhibit 9, because I

15  thought you understood, but let's try it again.  Let

16  me know when you have Exhibit 9 back up, sir.

17     A.   Yes, I have it up.

18     Q.   Okay.

19       You see the December 5, 2017, 2:11 p.m.

20  email from Ms. Wainger to your attorney, Mr.

21  Kaiser, correct?

22     A.   Yes.

23     Q.   Okay.

24       And the document attached to that email

25  is the draft assignment of hotel management

Page 199

M. LICHTENSTEIN

1

2  agreement and subordination of hotel management

3  fees, correct?

4      A.   Yes.

5      Q.   And attached to that draft assignment of

6  hotel management agreement and subordination of

7  hotel management fees is Exhibit A entitled Hotel

8  Management Agreement, correct?

9      A.   I'm looking for the exhibit.  Which page?

10     Q.   Second to last page, sir.

11     A.   Yes.

12     Q.   And in response to that email that we

13 just went through together, going back to Exhibit

14 10, your attorney writes in response:  Thanks.

15 Subject to client's final approval, this document is

16 fine.

17          Correct?

18     A.   He is referring to --

19     Q.   No, sir.  I just want to know if I read

20 correctly.

21     A.   -- the email.

22     Q.   Sir, did I read --

23     A.   This document refers to the assignment as

24 per the emails.  It doesn't refer to the actual

25 management agreement.

Page 200

M. LICHTENSTEIN

1

2          MR. KELLEY:  He's just asking you did

3      he read the language correctly.

4      A.      You are trying to take an email that is

5   talking about one document and claim that he's

6   talking about different document, which is untrue.

7          MR. KELLEY:  Did Mr. Freedman read it

8      correctly, though, into the record?

9          THE WITNESS:  Mr. Freedman has read it

10     correctly into the record a few times, and

11     he's trying to read into the record that this

12     email refers to a different document which it

13     doesn't refer to.

14     Q.      And you would agree with me that nowhere

15   in Mr. Kaiser's response to Ms. Wainger does he

16   mention the existence of a November 21, 2017,

17   management agreement, correct?

18     A.      There is no discussion of the actual

19   management agreement in any of these emails.  The

20   only thing being discussed is the assignment of the

21   management agreement.

22          MR. FREEDMAN:  Move to strike as

23      unresponsive.

24     Q.      I would again ask you, sir, to listen to

25   the question and try to answer my specific question.

Page 201

M. LICHTENSTEIN

2          MR. KELLEY:  I think he's answered it,

3    but I don't think he's answered it yes/no.

4    But I don't think it's unproductive.  If you

5    want to ask it again, ask it one more time.

6          MR. FREEDMAN:  I don't find those

7    comments productive, Charles, in all honesty.

8    I don't appreciate you directing me how to

9    ask questions.  And the gratuitous comments,

10   in light of your client's lack of responding

11   to questions, is not productive, either.

12   It's just posturing.  That's all it is and

13   you know it.

14         MR. KELLEY:  No.  As a matter of fact,

15   it's not.  I find that you're wanting to

16   engage in a sparring debate with the witness,

17   and I'm trying to get through the Q&A.

18         MR. FREEDMAN:  It would be good if you

19   can take time with your client and try to get

20   him to respond properly to a question.

21   That's your obligation as counsel for the

22   debtor in respect to a 30(b)(6) deposition,

23   to control your client.

24         MR. KELLEY:  Let's just summarize what

25   just occurred.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 202

M. LICHTENSTEIN

1

2        You asked him if it made any reference

3    to the management agreement.

4        MR. FREEDMAN:  I don't need you to

5    summarize.

6        MR. KELLEY:  No.  You invited this

7    discussion, Gary.

8        MR. FREEDMAN:  No.  You started,

9    actually, Mr. Kelley.  You started.

10        MR. KELLEY:  I'm trying to get you to

11    move through.

12        MR. FREEDMAN:  And if you can get your

13    client to listen to the question and answer

14    the question, we can move very quickly.  But

15    you can't, obviously.

16        MR. KELLEY:  Actually, his answer was

17    nowhere in the email does it reference the

18    management agreement and proceeded to

19    continue with a further response.

20        MR. FREEDMAN:  And that wasn't my

21    question.

22        MR. KELLEY:  If you want to object to

23    the responsiveness of what followed, do what

24    you want to do, but don't tell the client, my

25    client or the witness, how they must answer

Page 203

M. LICHTENSTEIN

1   the question.

2   

3       MR. FREEDMAN:   Sure.   I have that

4   prerogative.   It's a deposition.

5       MR. KELLEY:   You're right.   You get to

6   ask the question and object to the answer.

7   You don't get to give instruction.

8       MR. FREEDMAN:   But you should control

9   your client.   That's your obligation.

10      MR. KELLEY:   We can speak -- and I'm

11  engaging the questioner when I believe the

12  behavior of the questioner is inappropriate.

13  That's what I'm doing.

14      Q.   Let's go back, then, because I just want

15  to make sure I'm clear.

16           On Exhibit 9, Ms. Wainger's email to

17  your client -- your counsel, Mr. Kaiser, is the

18  draft assignment and the draft management

19  agreement, correct?

20      A.   Wrong.

21      Q.   That's what's there.

22      A.   That's wrong.   That's not what the email

23  says.

24      Q.   I didn't ask you what the email says.

25  That is the problem.

Page 204

M. LICHTENSTEIN

2      THE WITNESS:  Missy, you want to read

3   back Mr. Freedman's question, because that's

4   what he just said.

5      Missy, can you read back Mr. Freedman's

6   question.

7      (Whereupon, the requested portion of

8   the record was read.)

9   Q.   How is that wrong that "attached to Ms.

10  Wainger's email is a draft assignment and a draft

11  hotel management agreement"?

12  A.   Because you didn't say that it was

13  attached.  If Missy will read it again, you said --

14  you attempted to say that Ms. Wainger emailed about

15  the assignment and the management agreement, which

16  is wrong.

17      She was emailing about the assignment.

18  And you are constantly trying to conflate the two

19  and claim that Nicholas Kaiser's email was also

20  about the management agreement, which is false.

21  Q.   So let me try again, because this is so

22  not very productive.

23  A.   Mr. Freedman, I find that whenever I

24  don't respond with what you want to hear, you claim

25  that it's unproductive.  So I have news for you:

Page 205

M. LICHTENSTEIN

1

2  most of my responses are going to be unproductive,

3  because your terminology of what's unproductive is

4  when something doesn't go your way.

5          MR. FREEDMAN:   I'm going to ignore that

6      narrative and move to strike it.

7      Q.    So here's the question:   Attached to Ms.

8  Wainger's email to Mr. Kaiser dated December 5,

9  2017, at 2 p.m. -- and I'm referring to Exhibit 9 --

10  is a draft assignment of hotel management agreement

11  and subordination of hotel management fees, and

12  attached is -- Exhibit A to the assignment is a

13  hotel management agreement, correct?

14      A.    Is a draft proposed hotel management

15  agreement, which was never agreed to.

16      Q.    And in response to Ms. Wainger's email,

17  your attorney writes, Exhibit 10:   Thanks.   Subject

18  to client's final approval, this document is fine.

19          Correct?

20      A.    Yes, that is the email.

21      Q.    Have you ever seen an email from Mr.

22  Kaiser to Strook & Strook & Lavan or Benefit

23  Street's counsel saying that there's a November 21,

24  2017, management agreement?

25      A.    I don't know.   You're asking me if I

Page 206

M. LICHTENSTEIN

2  remember any emails from six years ago.  I don't

3  remember that.

4      Q.    So you do recall that the closing took

5  place on December 13, 2017, sir?

6      A.    I don't remember the exact date, but

7  possibly.

8              (Whereupon, a Document was marked as

9       Lichtenstein Exhibit 11 for identification,

10      as of this date.)

11      Q.    Let me know when you have Exhibit 11 up,

12  sir.

13      A.    Okay.

14      Q.    The first page is an email from Ms.

15  Wainger dated December 12, 2017, at 7:11 p.m. to Mr.

16  Kaiser.

17              Do you see that?

18      A.    Okay.

19      Q.    The next address on the email is you,

20  NYCDEV.

21      A.    Okay.

22      Q.    And then you see down on the copy is Toby

23  Moskovits.

24              Do you see her email address?

25      A.    Okay.

– Lichtenstein p. 206, l. 4 through p. 216, l. 4 (video p. 206, l. 4-7; p. 206,
l. 11 through p. 207, l. 10; p. 208, l. 3 through p. 209, l. 19 and p. 210, l.
17 through p. 212, l. 9 only)

---

Page 206

1                          M. LICHTENSTEIN

2    remember any emails from six years ago.  I don't

3    remember that.

4        Q.     So you do recall that the closing took

5    place on December 13, 2017, sir?

6        A.     I don't remember the exact date, but

7    possibly.

8               (Whereupon, a Document was marked as

9        Lichtenstein Exhibit 11 for identification,

10       as of this date.)

11       Q.     Let me know when you have Exhibit 11 up,

12   sir.

13       A.     Okay.

14       Q.     The first page is an email from Ms.

15   Wainger dated December 12, 2017, at 7:11 p.m. to Mr.

16   Kaiser.

17              Do you see that?

18       A.     Okay.

19       Q.     The next address on the email is you,

20   NYCDEV.

21       A.     Okay.

22       Q.     And then you see down on the copy is Toby

23   Moskovits.

24              Do you see her email address?

25       A.     Okay.

---

Page 207

M. LICHTENSTEIN

2      Q.      And do you see the email from Ms.

3   Wainger?  Going to the second page, it says:

4   Nicholas, attached are executed PDFs of the mortgage

5   loan documents, which have been dated for tomorrow.

6   I will circulate the final closing instruction

7   letter tomorrow as soon as I receive final executed

8   settlement statements.

9               Do you see that language?

10     A.      Yes.

11     Q.      Unfortunately, these pages aren't

12  numbered, but if you go in -- I'd say about 20, 30

13  pages -- you'll see that same assignment of

14  management agreement.

15              Let me know when you're there.

16     A.      Which page?

17     Q.      47.  My paralegal tells me it's the

18  assignment of hotel management agreement.

19     A.      Okay.

20     Q.      Let me know when you're there, please.

21     A.      It's freezing.  Okay.  It's freezing, but

22  what's your point?  What's your question?

23     Q.      Are you there, sir?

24     A.      It's freezing again.  I guess it's a big

25  file, so the folder Veritext is taking time to

Page 208

M. LICHTENSTEIN

1

2    upload it.

3            Okay.  I'm in the assignment now.

4        Q.    Okay.

5            And if you flip to the end of the

6    assignment, I just want to verify your signature

7    on behalf of the management company and Ms.

8    Moskovits' signature on behalf of the borrower and

9    the debtor.

10       A.    Okay.

11       Q.    Do you recognize those two signatures?

12       A.    Okay.  I mean, they look like -- they

13   look like our signatures.

14       Q.    Then the next page, you'll see a

15   signature of Micah Goodman on behalf of Benefit

16   Street Partners.

17            Do you see that?

18       A.    Okay.

19       Q.    And the next page, Exhibit A, hotel

20   management agreement, do you see that?

21       A.    Okay.  I see an unsigned document and a

22   draft sent by BSP.  So what?

23       Q.    Just to be clear, do you see attached to

24   the assignment of hotel management agreement and

25   subordination of hotel management fees that you and

Page 209

M. LICHTENSTEIN

1

2    Ms. Moskovits signed, attached as Exhibit A, a

3    one-page document titled Hotel Management Agreement?

4            Do you see that?

5        A.    Yes, I see that Margot --

6        Q.    Thank you.

7        A.    -- sent us a draft set of documents for

8    execution, and she attached that.  It doesn't mean

9    anything.

10       Q.    Did you ever see Mr. Kaiser write back to

11   Ms. Wainger in response to this email indicating

12   that the hotel management agreement attached to the

13   assignment of hotel management agreement and

14   subordination of hotel management fees was not the

15   correct document?

16       A.    I don't remember now the emails.  It

17   could have been by email.  It could have been by

18   phone.  It could have simply been replacing in the

19   Dropbox documents.  I mean, there's five --

20       Q.    Simple question, sir.

21            Did you ever see correspondence or

22   communication from Mr. Kaiser disputing the hotel

23   management agreement that's attached to the

24   assignment of hotel management agreement document?

25            MR. KELLEY:  Objection to the form.

Page 210

M. LICHTENSTEIN

1
2            Go ahead.  You can answer.  You have to
3      let me get his objection in.
4            Thank you, Mr. Lichtenstein.
5      A.     As I said numerous times, I don't
6  remember all the emails from Mr. Kaiser about this
7  closing six years ago.
8      Q.     Do you recall you or Ms. Moskovits
9  responding to this December 12, 2017, 7:11 p.m.
10  email that you both were copied on claiming that the
11  management agreement attached to the assignment
12  document was not the appropriate or proper
13  management agreement?
14            MR. KELLEY:  Objection to the form.
15            You may answer.
16      Q.     Let me break that down.
17            Do you recall you, Mr. Lichtenstein, at
18  NYCDEV, upon receipt of this email, ever asserting
19  in any form or fashion that the hotel management
20  agreement attached to the assignment in this
21  package of documents was not the correct hotel
22  management agreement?
23            MR. KELLEY:  Objection.  Form.
24      A.     There were probably hundreds of emails
25  about this closing.  You have latched onto one

Page 211

M. LICHTENSTEIN

2   single email chain out of hundreds because this has

3   the document that fits what you're trying to claim

4   now.  It's meaningless.

5            There's hundreds of emails that --

6   about this closing.  There were probably dozens of

7   phone calls, if not more, that were made about the

8   closing, as is the process in every single

9   closing.

10           So your showing me one email which says

11  that attached are revised drafts of loan documents

12  doesn't mean anything.  Meaningless.

13           MR. FREEDMAN:  Move to strike as

14     unresponsive.  I'm going to try it again.

15     Q.    You see this email from Ms. Wainger

16  indicating that the closing is going to happen the

17  next day.

18           Do you recall, upon receipt of this

19  email with the assignment document attaching the

20  one-page hotel management agreement, ever

21  communicating to anyone in respect to having an

22  issue with that hotel management agreement?

23           MR. KELLEY:  Objection.  Form.

24     A.    The answer is I don't even remember

25  receipt of this email at all, because I must have

Page 212

M. LICHTENSTEIN

2  received 20 emails from Margot Wainger over that

3  two- to three-day span.

4       Q.    So the answer to my question is no, you

5  don't recall ever doing that, correct?

6       A.    No.  You are putting words in my mouth

7  again.  I said I don't even remember receiving this

8  email.  Never mind if I responded or how I

9  responded.

10       Q.    Have you ever -- in producing documents

11  in this matter, did you come across any

12  communication or email whereby you responded to the

13  receipt of this December 12, 2017, email, taking

14  issue with the hotel management agreement included

15  here?

16            MR. KELLEY:  Objection.  Form.

17       Q.    Did you ever see that, sir?

18            MR. KELLEY:  Same objection.

19       A.    The communication could have been by

20  phone.  It could have been by --

21       Q.    I didn't ask you, sir.  I'm asking did

22  you see anything in writing.

23       A.    The answer is yes, I clearly remember

24  saying that we're going to use this management

25  agreement, and no one even cared which management

Page 213

M. LICHTENSTEIN

2  agreement form we're going to use.  It didn't make

3  an iota of a difference.

4            And that communication could have

5  happened either by email or by phone or by simply

6  replacing stuff in the Dropbox.

7      Q.    This is way beyond Dropbox, sir.  This is

8  the night before closing.  What Dropbox are you

9  referring to now?

10     A.    You have apparently not really done real

11 estate closings.  The night before a closing,

12 there's still documents that are replaced and

13 changed.  And by the way, even after closing,

14 there's sometimes documents that are also exchanged

15 and replaced and changed.

16     Q.    Okay.  Wonderful.

17           What proof do you have --

18     A.    So what you're trying to say: one email

19 out of 500 that came, and you're latching onto it

20 like as if it's the coming of the Messiah.

21     Q.    What document or proof do you have that

22 the November 21, 2017, management agreement was ever

23 replaced or substituted for the one that's included

24 in this binder of documents the evening before

25 closing?

Page 214

M. LICHTENSTEIN

1
2          MR. KELLEY:    Objection.    Form.
3      A.      I didn't say when it was done.    I didn't
4  say it was done the evening before the closing or
5  the day of or the day after.    Or I didn't say a
6  time.    I don't remember the time.    As I said again
7  and again, I don't remember the dates of what was
8  done exactly.
9              That's all I have to answer on that,
10 other than saying whatever we have is provided
11 already.
12     Q.      There's nothing provided, so that's why
13 I'm asking, sir.
14             How about Ms. Moskovits?    Did you see
15 her sending any type of communication disputing
16 the validity of the hotel management agreement
17 included in this document, this Exhibit 11?
18             MR. KELLEY:    Objection.    Form.
19     A.      As I said already, I don't remember the
20 details of how, when, where exactly this was
21 communicated.    I do remember that no one really
22 cared one way or the other.
23             This is a straightforward, typical
24 management agreement that has the same terms as
25 the one-pager that you're obsessing about, and no

Page 215

M. LICHTENSTEIN

1
2    one really cared much either way.

3        Q.    So if nobody cared either way, you're

4    okay with the one-page document, then, right?

5            MR. KELLEY:   Objection to form.

6        A.    I prefer to have a real signed management

7    agreement that has real substance to it rather than

8    a one-pager that is not signed that you guys are now

9    trying to claim is the management agreement, as if

10   it's going to help you in any way, shape, or form,

11   make a difference to your case, which management

12   agreement is the management agreement, even.

13            But I would love to understand why you

14   guys are so busy with this management agreement.

15   I'm just going to probably -- I would love to

16   understand what you are trying to achieve with

17   this management agreement discussion and how it's

18   going to make a difference to your case and how

19   you're going to be off any better with the other

20   management agreement versus this management

21   agreement.  I'm not understanding this whole

22   position of you guys.

23            MR. FREEDMAN:  Move to strike as

24       unresponsive.

25       Q.    Please, sir, listen to the question and

Page 216

M. LICHTENSTEIN

1
2    try to respond to the question.

3        A.    I responded already to the question, and

4    I stand on the response.

5            MR. FREEDMAN:  We're uploading the next

6        document.  It's rather lengthy, so it's

7        taking a moment.

8        Q.    While that's being uploaded, sir, how did

9    the debtor determine that the November 21, 2017,

10   management agreement --

11           MR. FREEDMAN:  Strike that.

12       Q.    The debtor's seeking to assume the

13   November 21, 2017, management agreement as part of

14   its confirmation, correct?

15       A.    Yes.

16       Q.    Who on behalf of the debtor was involved

17   in that decision-making process?

18       A.    I'm not understanding your question.

19       Q.    Who on behalf of the debtor was involved

20   in the decision-making process to assume the

21   November 21, 2017, management agreement?

22       A.    Everyone -- that is the management

23   agreement.  So we're just continuing the management

24   agreement.  I'm not understanding what your question

25   is.

– Lichtenstein p. 223, ll. 9–10 (no video)

```
                                              Page 223
 1                      M. LICHTENSTEIN
 2     process now.
 3               MR. FREEDMAN:  Just give me a moment.
 4         I just don't have this document, so I have to
 5         look at it on the screen.
 6                (Whereupon, a package receipt was
 7         marked as Lichtenstein Exhibit 12 for
 8         identification, as of this date.)
 9         Q.    You should have Exhibit 12 in front of
10     you, Mr. Lichtenstein.
11               MR. KELLEY:  He's off camera.
12         Q.    Mr. Lichtenstein, can you come back,
13     please.
14         A.    I'm right here.  What's up?
15         Q.    We're in a deposition.  Can you look at
16     Exhibit 12, please.
17         A.    Yup.
18         Q.    You see the first page, it shows a FedEx
19     confirmation?
20               MR. KELLEY:  Mine's not open yet.  It's
21         taking a while to open.  Sorry.
22               MR. FREEDMAN:  Just let me know when
23         it's open, please.
24         A.    Okay.
25         Q.    I need to wait for Mr. Kelley to have it.
```

– Lichtenstein p. 224, l. 4 through p. 225, l. 15 (no video)

```
                                                    Page 224

 1                      M. LICHTENSTEIN

 2              MR. KELLEY:  Okay.  It's just now shown

 3      up.

 4      Q.      So the first page reflects a delivery

 5      from Margot Wainger at Strook & Strook & Lavan to

 6      your attorney, Mr. Kaiser, at Cohen & Gresser on

 7      April 6, 2018.

 8              Do you see that, sir?

 9      A.      Yes.

10      Q.      The next, page 3, you'll see a letter

11      from Ms. Wainger dated April 5, 2018, to Mr. Kaiser

12      at Cohen & Gresser.

13              Do you see that?

14      A.      Yes.

15      Q.      And it's Re: loan file Williamsburg

16      Hotel, property address --

17              (Technical interruption.)

18      Q.      Williamsburg loan name -- Williamsburg --

19              MR. KELLEY:  You're really cutting in

20      and out.

21              MR. FREEDMAN:  Is that better?  I'm

22      right next to the microphone.

23      Q.      Loan name Williamsburg Hotel, property

24      address 96 Wythe Avenue, Brooklyn, New York.

25              So far so good, Mr. Lichtenstein?
```

Page 225

M. LICHTENSTEIN

2      A.     (No verbal response given.)

3      Q.     Are you still with us, sir?

4      A.     Yes.

5      Q.     And it says:  Dear Nicholas, In

6  connection with the above-referenced transaction,

7  enclosed is one copy of the CD closing binder for

8  your files.  Please do not hesitate to contact me

9  with any questions.  Margot Wainger.

10         Did I read that correctly?

11      A.     Yes.

12      Q.     And if you would scroll down to page 312,

13  let me know when you're there.

14      A.     It's freezing.

15      Q.     The good news is we're going to be done

16  with this document in a moment.

17         MR. KELLEY:  Sorry, Gary.  I was on

18      mute.  I had a call come in, but I'm

19      listening.

20      Q.     Let me know when you're there, Mr.

21  Lichtenstein.

22      A.     It's constantly freezing.  It's the

23  document, I guess.

24      Q.     If it's easier, and Charles doesn't have

25  an issue, we can just share the screen, do it that

– Lichtenstein p. 225, l. 24 through p. 229, l. 13 (no video)

Page 225

```
 1                    M. LICHTENSTEIN
 2        A.    (No verbal response given.)
 3        Q.    Are you still with us, sir?
 4        A.    Yes.
 5        Q.    And it says:  Dear Nicholas, In
 6   connection with the above-referenced transaction,
 7   enclosed is one copy of the CD closing binder for
 8   your files.  Please do not hesitate to contact me
 9   with any questions.  Margot Wainger.
10              Did I read that correctly?
11        A.    Yes.
12        Q.    And if you would scroll down to page 312,
13   let me know when you're there.
14        A.    It's freezing.
15        Q.    The good news is we're going to be done
16   with this document in a moment.
17              MR. KELLEY:  Sorry, Gary.  I was on
18         mute.  I had a call come in, but I'm
19         listening.
20        Q.    Let me know when you're there, Mr.
21   Lichtenstein.
22        A.    It's constantly freezing.  It's the
23   document, I guess.
24        Q.    If it's easier, and Charles doesn't have
25   an issue, we can just share the screen, do it that
```

Page 226

M. LICHTENSTEIN

1

2    way.  But he's -- I guess he's on the phone.

3        A.    I'm here.  What are you talking about?

4              MR. KELLEY:  I don't have any problem

5        if you want to do a shared screen.  I think

6        it --

7        A.    It's fine.  It's unfroze.  What page did

8    you say?

9        Q.    We're going to do a shared screen.

10             MR. KELLEY:  He's saying his --

11       A.    It unfroze.  What page?

12       Q.    It's page 312, sir.  Are you there, sir?

13       A.    I'm up to page --

14       Q.    We can share our screen with you, sir.

15   It would be quicker.  Can we do that?

16       A.    There's no page numbers there, actually,

17   now.  Which document is this?  After the loan

18   agreements?

19       Q.    It's the assignment document.

20       A.    Let me see.  Promissory note.

21       Q.    There should be numbers on the bottom

22   when you toggle through.

23       A.    It disappeared now.  Anyway, I'm up to

24   spreader and extension agreement.

25       Q.    What page are you on, sir, so I can help

Page 227

M. LICHTENSTEIN

1
2  orient you?
3       A.   I'm oriented.  I'm just -- there's no
4  pages here.
5            MR. KELLEY:  If you hover your arrow
6       over the picture on Veritext, the little
7       black box will show towards the bottom.
8       It'll tell you page what of what.
9       A.   Okay.  I'm up to 250.
10      Q.   Go to 312, please.
11      A.   Got it.
12      Q.   We can share the screen with you.
13      A.   I'll be there in a second.
14      Q.   Okay.  I'm just trying to move this
15  along.
16      A.   Okay.
17      Q.   Are you there, sir?
18      A.   I'm on page 300, 305.  312, you said?
19      Q.   Yes, sir.
20      A.   Okay.
21      Q.   So in this closing binder that was sent
22  from Margot Wainger to your attorney, Nicholas
23  Kaiser, what is the title of the document that we've
24  identified as page 312?
25      A.   Yeah.  The assignment document again.

Page 228

M. LICHTENSTEIN

2      Q.    Can you read that entire title, please,
3   sir.
4      A.    Let me go back to the first page.
5   Assignment of Hotel Management Agreement and
6   Subordination Hotel Management Fees.
7      Q.    Okay.  And read into the record, please,
8   item C under Recitals.  Read that into record.
9      A.    Borrower and --
10          MR. KELLEY:  Read a little bit louder,
11      because your voice is trailing off.
12      A.    Borrower and manager have agreed that the
13   manager will manage the property on terms set forth
14   on Exhibit A attached hereto and manager is entitled
15   to certain hotel management fees thereunder.
16      Q.    Then if you flip a few pages back, tell
17   me the name of Exhibit A.
18      A.    Back or front?  You mean -- down, you
19   meant.
20      Q.    Down.  It's page 321.
21      A.    Yeah.  Hotel Management Agreement, the
22   same as the one we were arguing about before.
23      Q.    The one-page document, correct?
24      A.    The same one-page document that we were
25   arguing about before, sent by Margot once again.

Page 229

M. LICHTENSTEIN

1

2      Q.      Thank you, sir.

3              Final question, or I hope, on this:

4      Have you ever seen a written agreement or

5      acknowledgment by Benefit Street Partners

6      accepting or ratifying the November 21, 2017,

7      management agreement as the operative hotel

8      management agreement?

9      A.      I said --

10             MR. KELLEY:  You need to move closer to

11        the microphone, please.

12      A.      I said already numerous times I don't

13     remember now.

14      Q.      Has the debtor filed a tax return for

15     2016?  An IRS return.

16      A.      I think so, but I'm not sure it matters

17     to you what we did prior to the loan period.

18      Q.      Sir, I'm just asking, simply, did the

19     debtor file an IRS return for 2016?

20      A.      And I responded that I don't think I have

21     to answer your questions about eight years ago prior

22     to your even being the lender.

23             MR. KELLEY:  Can you just -- Mr.

24        Lichtenstein, this will go much faster.  If

25        you know the answer, please respond.