**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                      :
*In re:*                             :
                                      : Chapter 11
**96 WYTHE ACQUISITION LLC,**    :
                                      : Case No. 21-22108 (RDD)
                     Debtor.       :
                                      :
---------------------------------------------------------------- x

**LENDER'S RESPONSE TO DEBTOR'S MEMORANDUM OF LAW IN SUPPORT**
**OF CONFIRMATION OF THE SECOND AMENDED**
**<u>CHAPTER 11 PLAN OF REORGANIZATION</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 4

I.     Recent Revelations Confirm That the Plan Is Unconfirmable—Even Accepting the Debtor's Version of the Emerging Facts. ............................................. 4

II.    The Debtor's Plan Remains Unconfirmable. ................................................. 7

    A.    The Plan Fails to Comply with All Applicable Bankruptcy Provisions (Section 1129(a)(1)). ............................................................................ 8

        1.    The Proposed Operating Agreement Governing the Borrower After Confirmation Does Not Comply with the Bankruptcy Code. ............................................................. 8

            a.    The Debtor's Operating Agreement unfairly and inequitably pays equity holders years before Benefit Street. ............................................................. 8

            b.    The Debtor has failed to provide Benefit Street information to conduct its normal and necessary diligence on Lockwood. ...................................................... 10

            c.    The Operating Agreement permits potentially impermissible transfers. ........................................ 10

        2.    The Debtor Has Not Established "Adequate Means" for Plan Implementation. .......................................... 11

    B.    The Plan Fails to Comply with Disclosure Requirements (Section 1129(a)(2)). ......................................................... 12

    C.    The Plan Is Not Proposed in Good Faith (Section 1129(a)(3)). ...................... 12

    D.    Continued Management by the Insiders Is Contrary to Creditors' Interests and Public Policy (Section 1129(a)(5)). ........................................... 14

    E.    Plan Fails the Best Interests Test (Section 1129(a)(7)). ................................ 16

    F.    The Plan's Treatment of Priority Tax Claims Is Improper (Section 1129(a)(9)(C)). .......................................................... 16

    G.    The Plan Is Not Feasible (Section 1129(a)(11)). ........................................... 16

    H.    The Debtor Fails to Satisfy Cram Down Requirements (Section 1129(b)). .............................................................. 18

   1. The Plan Is Not Fair and Equitable Because It Fails to Compensate Benefit Street for Assuming All the Risk of Plan Failure. ............................................................................ 18

   2. The Plan Is Further Not Fair and Equitable to Benefit Street Because the Debtor Refuses to Provide Benefit Street with Replacement Loan Documents. ......................................... 19

    a. Benefit Street's Loan Documents and business model require its borrowers be special purpose entities. .................. 20

    b. The Loan Documents contemplate an in-place cash management system to protect Benefit Street's interests in Hotel revenues. ................................................ 21

    c. Benefit Street's mortgage will not be a first priority lien if the Plan is confirmed. ........................................ 22

    d. Without appropriate replacement loan documents, BSP cannot generate its bargained-for return. .............................. 23

   3. The Plan Violates the Absolute Priority Rule (Section 1129(b)). ................................................................. 24

  I. Plan Has an Improper Purpose of Avoiding Taxes (Section 1129(d)). .......... 25

  J. The Plan's Releases Are Improper. ............................................. 25

  K. The Exculpation Provision Is Improper. ....................................... 26

  L. Assumption of the Purported Hotel Management Agreement Is Improper. ................................................................................ 27

 III. The Debtor's Request to Waive the 14-Day Stay Should Be Denied. ....................... 28

CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ......................................................................29

*In re Chemtura Corp.*,
  439 B.R. 461 (Bankr. S.D.N.Y. 2010) ......................................................................26

*In re Comu*,
  No. 09-38820-SGJ-7, 2014 WL 3339593 (Bankr. N.D. Tex. July 8, 2014) .............6

*In re Deluxe Media*,
  No. 19-23774 (Bankr. S.D.N.Y. Oct. 23, 2019), ECF No. 96 ................................25

*In re Euro-Am. Lodging Corp.*,
  365 B.R. 421 (Bankr. S.D.N.Y. 2007) ......................................................................15

*In re N. Star Contracting Corp.*,
  128 B.R. 66 (Bankr. S.D.N.Y. 1991) ........................................................................15

*In re Penton Bus. Media Holdings, Inc.*,
  No. 10-10689 (AJG), 2010 WL 2881419 (Bankr. S.D.N.Y. Mar. 5, 2010) ...........28

*In re Residential Cap., LLC*,
  No. 12-12020 (MG), 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013) .........28

*U.S. v. Lake*,
  571 F. App'x 303 (5th Cir. 2014) ..............................................................................6

*In re Washington Mutual, Inc.*,
  442 B.R. 314 (Bankr. Del. 2011) .............................................................................26

**Statutes**

11 U.S.C. 1129(a)(7) ...................................................................................................16

11 U.S.C. § 1125 .........................................................................................................12

18 U.S.C. § 152 .........................................................................................................6, 7

18 U.S.C. § 153 .............................................................................................................7

18 U.S.C. § 154 .............................................................................................................7

18 U.S.C. § 157 .............................................................................................................7

11 U.S.C. § 1123(a)(5) ....................................................................................................11

11 U.S.C. § 1129(a)(1) ......................................................................................................7

N.Y. U.C.C. Law § 9-102(61) .........................................................................................24

N.Y. U.C.C. Law § 9-102(47) .........................................................................................24

**Rules**

Fed. R. Bankr. P. 3020(e) ...........................................................................................28, 29

Fed. R. Bankr. P. 3019(a) ...............................................................................................12

**Other Authorities**

Collier's 16th ed. ¶ 1129.02 ..............................................................................................8

Benefit Street Partners Realty Operating Partnership, L.P. ("**Benefit Street**" or "**Lender**") submits this response to the Debtor's Memorandum of Law in Support of Confirmation of the Second Amended Chapter 11 Plan of Reorganization [ECF No. 472] (the "**Confirmation Brief**") and in further support of its objection to confirmation of the Debtor's[1] Plan.[2]

## PRELIMINARY STATEMENT

1.      The upbeat and matter-of-fact Confirmation Brief reflects a Debtor in denial, acting as if this were a routine confirmation of a plan promulgated by reputable sponsors.  The Debtor simply ignores the Insiders' still-unfolding litany of pre- and post-petition misconduct— malfeasance so egregious that a neutral Examiner has suggested they committed *tax evasion*, *fraud*, and *bankruptcy crimes*.  This, and the evidence Benefit Street will present at the confirmation hearing are more than a red flags—they are a stop sign—that should halt the Plan in its tracks.

2.      The Court is asked to confirm a Plan that takes the Lender's 18-month bridge loan and turns it into a forced six-year loan on terms that could *never be obtained in the market*, including no amortization, a *reduced* interest rate that would be available only to the most stable and qualified borrowers, and a huge balloon payment that leaves the Debtor overleveraged.  This would put the Lender, with a loan and borrower with no governance or operational safeguards, totally at the mercy of the same Insiders who defrauded it into making the loan, looted the Debtor, and drove the business into the ground—all at the Debtor's say-so that everything will be okay. But recent revelations only confirm that nothing here is normal, and nothing the Insiders say or do can be trusted.

---

[1] Capitalized terms not defined herein shall having the meaning given to such term in Benefit Street's sur-reply in support of its supplemental confirmation objection [ECF No. 467] ("**BSP Supplemental Objection Sur-Reply**"), or the Debtor's Plan, as applicable.

[2] The Debtor filed the Third Amended Plan on May 12, 2022. [ECF No. 551].  All references to the "Plan" are to the Third Amended Plan.

3.      The Insiders' habitual concealment and obstruction of the Examiner's investigation

may obscure the full extent of their misconduct.  But the evidence will show unexplained, likely

avoidable transfers *larger than* the full amount the Insiders are purporting to "contribute" to obtain

the equity in the reorganized entity, fund the Plan, and get sweeping control over releases.

4.      The Insiders' appalling conduct has been set forth in various filings, and Benefit

Street will not repeat it at length here.[3]  Just the headlines, however, make clear that *this* Plan

proposed by *these* sponsors cannot possibly be confirmed:

- The Insiders improperly diverted *all* of the Debtor's pre-petition revenues—plus dedicated trust fund tax receipts and PPP loan proceeds—to a web of other accounts (most unrelated to the Debtor's business), and shuffled money around for their own purposes in thousands of individual transactions, with a net unexplained outflow from the Management Company of millions of dollars.  *See* Testimony of Jeremy Rauch, May 17, 2022 Hr'g Tr. at 84:8-25;  90:10-93:1; 94:21-103:10; 107:5-109:9; 126:25-129:24; 142:20-145:23 ("**Rauch Testimony**"), relevant portions attached as Exhibit 1; Debtor's Exhibit 22 to the Trustee Motion attached as Exhibit 2.

- A year after the Petition Date, the Insiders now characterize $4.5 million in net unexplained payments that they *acknowledge* taking as partial repayment of alleged "loans" to the Debtor.  Debtor's Omnibus Objection to Lender's and United States Trustee's Motions for Appointment of a Chapter 11 Trustee ¶ 38 [ECF No. 539]; Debtor's Counter Report and Response to Examiner Report [ECF No. 420] ("**Counter Report**") ¶ 17.  But these "loans" were never disclosed prior to *or even during the bankruptcy* and are likely fabricated.  BSP Supplemental Objection Sur-Reply ¶¶ 6-7, 21 n.4.[4]  If the Insiders did not fraudulently create the loan documentation in 2022, then they defrauded the Lender by concealing the loans in 2017.  *Id.* at 7, 21.

- The mysterious surfacing of these "loans" parallels the unexplained materialization of the previously concealed Purported Hotel Management Agreement, which imposes grossly non-market terms on the Debtor and improperly strips it of the Hotel's

---

[3] This response incorporates arguments contained in Benefit Street's prior plan confirmation objections: ECF No. 307 ("**BSP Confirmation Objection**"); ECF No. 425 ("**BSP Confirmation Objection Sur-Reply**"); ECF No. 428 ("**BSP Supplemental Objection**"); and the BSP Supplemental Objection Sur-Reply.

[4] As the evidence will show at the hearing on the Trustee Motion (defined herein), the sudden, belated appearance of "loans" that were not scheduled as debts, not the subject of proofs of claim, and never disclosed (even in the Debtor's own Disclosure Statement) or documented to the Examiner—that the Insiders are perpetrating a fraud on the Court. The Examiner reached the same conclusion:  "The only reasonable inference that can be drawn is that the loan documents did not exist prior to or during the investigation period."  Supplemental Report at 5.

2

intellectual property.  Again, this agreement was either fraudulently created during the bankruptcy or fraudulently concealed from the Lender—there is no other alternative. *Id.* at 21; BSP Confirmation Objection ¶ 2 n.3.

- Post-petition, the Insiders improperly transferred over $600,000 (including $252,100 in hotel occupancy taxes) from the Debtor to a non-debtor affiliate of the Insiders, with no documentation, assurance of repayment, or disclosure in the Debtor's monthly operating report.  BSP Supplemental Objection Sur-Reply ¶¶ 4, 27.

- The Insiders admit willfully failing to pay millions of dollars in state and city taxes, including trust fund taxes for which the Insiders have personal liability, and failing to file tax returns for years.  Counter Report ¶ 12; BSP Supplemental Objection Sur-Reply ¶ 28; *see* Rauch Testimony at 113:9-114:4.

5.    The Insiders have run this case as they ran the Hotel pre-petition—for their own benefit—and ask that the Court simply excuse their reckless (and possibly criminal) behavior.  The implications of the Insiders' misconduct cut across virtually every confirmation issue—including good faith, the retention of current management, feasibility, fair and equitable treatment, the releases, and adequate disclosure.  The Insiders' pre- and post-petition conduct confirms they are not appropriate estate fiduciaries and would be improper stewards of the reorganized entity.[5]

6.    The Debtor's Plan was unconfirmable before the Examiner's Report was issued; the Report and the evidence at the hearing on the Trustee Motion only makes the Plan's infirmities that much clearer, including: (1) the Debtor has violated confirmation standards by failing to disclose material transactions; (2) the Plan was not proposed in good faith; (3) continuation of current management is not in the best interests of creditors or public policy; (4) the Plan fails the best interests test; (5) the Plan is not feasible; (6) the Plan is not fair and equitable; (7) the Plan violates the absolute priority rule; (8) assumption of the Purported Hotel Management Agreement

---

[5] Ms. Moskovits has testified that if the plan is confirmed, the reorganized Debtor will handle its revenues and financial accounts "the way it was" pre-petition.  Toby Moskovits Deposition Transcript dated March 4, 2022 ("**Moskovits Dep.**") 140:10-24, relevant portions attached as Exhibit 7.

is improper; (9) the Plan's release and exculpation provisions are improper; and (10) the Plan continues an improper purpose of tax avoidance.

7.      Finally, there is no basis to grant the Debtor's request for a waiver of the 14-day stay of the confirmation order because confirmation is heavily disputed, the Debtor has failed to show any grounds that would justify waiving the stay, and such relief would prejudice creditors.

## ARGUMENT

### I.      Recent Revelations Confirm That the Plan Is Unconfirmable—Even Accepting the Debtor's Version of the Emerging Facts.

8.      Recent revelations, including the Examiner's Report and the evidence introduced at the hearing of the Trustee Motion, are devastating to an already weak Plan. They reveal a course of misconduct that affects numerous confirmation requirements. Additionally, the nondisclosed "loans" and further mismanagement of the Hotel (including misappropriating trust fund taxes) raise significant concerns that preclude confirmation and expose the Insiders to criminal liability. None of the Insiders' attempts to spin the emerging facts reduce these grave concerns.

9.      ***Improper Pre-Petition Transfers.*** The evidence will show over $12.5 million in potentially avoidable net transfers out of the Management Company, which itself improperly took *all* of the Debtor's revenues. Thus, the amounts subject to potential avoidance actions may be materially *higher. Id.* These improper transfers are relevant to multiple confirmation objections, including the impropriety of the proposed releases, the lack of good faith, and the inappropriateness of the Insiders continuing as management.[6]

---

[6] As discussed in more detail below, *infra* Section II.J (*see also* BSP's Supplemental Objection Sur-Reply ¶¶ 35-38; BSP Supplemental Objection ¶¶ 39-40), the Debtor relies on the $10 million cash infusion to justify releasing any claims identified by the Examiner's Report. Confirmation Br. ¶ 36. Putting aside that the cash infusion is $2 million *less* than the identified potential avoidable transfers, the Debtor also claims that the Plan Sponsor is receiving the equity in the reorganized Debtor "*exclusively* on account of the $10 million cash infusion." Confirmation Br. ¶ 105. The Debtor cannot simultaneously claim that the cash infusion is consideration for releases while also sufficient to satisfy the exclusive purchase of equity under the "new value" exception to the absolute priority rule.

10.    ***Previously Undisclosed Insider Loans.***  The Debtor now claims that approximately $4.5 million of the over $12 million in net pre-petition transfers represents repayment of alleged loans made to the Debtor—despite having never disclosed the existence of these loans to the Examiner, creditors, or this Court *at any time during the bankruptcy*.  In fact, the Debtor disclosed the purported loan documentation, supposedly executed in 2016 and 2017, only a few weeks ago. Even the Management Company's own finance director *never saw the documentation* until just before his March 15, 2022 deposition.  Nor had the Debtor's CRO—charged with preparing the Debtor's bankruptcy schedules—ever seen the documents.   David Goldwasser Deposition Transcript ("**Goldwasser Dep.**") 67:23-70:10, 80:19-82:20, relevant portions attached as Exhibit 4.[7]

11.    If the loan documentation is legitimate (highly improbable), it means only that the Lender was defrauded into making the bridge loan.  BSP Supplemental Objection Sur-Reply ¶¶ 7, 21.  The alleged loans would also violate the Debtor's operating agreement and the BSP loan.  *See id.* ¶ 22.  And given that the Debtor's own CRO testified that these "loans" were not scheduled as debts because they should be characterized as capital contributions or subordinated loans, *see* Goldwasser Dep. 90:3-91:24, it was even more clearly improper to repay any portion of them— let alone through the Insiders' unilateral action while creditors were not being paid.

12.    The discovery of these previously hidden loans augments the grounds to deny confirmation based on lack of good faith, inadequate disclosure, the impropriety of the releases, and the inappropriateness of the Insiders' continued control, each discussed below.

---

[7] The fact that these "loans"—if valid—would have been one of the largest unsecured claims in the case and *were not initially scheduled nor ever listed in an amendment*, plus the fact that the Insiders *never filed a proof of claim for this alleged debt*—reflects that they did not actually exist until the Examiner caught the missing money.  Even if the loans were valid, based upon the accounting reports provided, there is a lack of mutuality between the lenders and borrowers.

13.    ***Improper Post-Petition Transfers.***  The Insiders improperly swept $252,100 in hotel occupancy trust funds from the Management Company's account to Northside Management, LLC (a non-debtor affiliate of the Insiders).  *See supra* ¶ [4]; *see also* BSP Supplemental Objection Sur-Reply ¶ 27; Goldwasser Dep. 137:2-138:10 (transfer of $252,100 in hotel trust fund taxes to Northside was a "bad decision").  The Examiner also noted an unrecorded EIDL loan in the amount of $350,000 diverted to Northside five months into the bankruptcy—for a total of more than $600,000 in unexplained, likely improper post-petition transfers.  Rauch Testimony at 130:24-133:7.  The Management Company's Director of Finance stated that, to his knowledge, this loan was not used for operating expenses of the Debtor or Management Company.  Deposition of Jeremy Rauch ("**Rauch Dep.**") 161:12-16, relevant portions attached as Exhibit 6.  Even if the EIDL funds were Management Company funds, they were loaned upon the operations of the Hotel under a government-sponsored program to benefit the Hotel.  The Insiders as fiduciaries used the funds for their own purposes rather than injecting them into the Debtor's estate, despite the millions of dollars of unpaid priority tax claims, administrative fees, and the failure to pay Lender debt service for four years.  This new evidence strengthens the same grounds to deny confirmation implicated by the improper pre-petition transfers and undisclosed loans.

14.    Indeed, Luis Rivera, a former senior agent at the IRS Criminal Investigation Division, will testify that this and other largely undisputed misconduct may point to *a large-scale tax evasion scheme perpetrated by the Debtor's Principals.*[8]

15.    Further, the post-petition transactions, "on their face raise possible bankruptcy criminal issues."  *Id.*; *see United States v. Lake*, 571 F. App'x 303, 305 (5th Cir. 2014) (debtor's failure to disclose transfer from day before bankruptcy filing served as basis for bankruptcy crime,

---

[8] Mr. Rauch testified to similar concerns.  Rauch Dep. 163:8-164:4 (testifying that "at some point in time," he expressed concern about tax evasion to the Insiders and "that the taxes needed to be remitted").

for which he was convicted); *In re Comu*, No. 09-38820-SGJ-7, 2014 WL 3339593, at *54 (Bankr. N.D. Tex. July 8, 2014) ("Failure to make a full and accurate disclosure constitutes a bankruptcy crime under 18 U.S.C. § 152."). The bankruptcy crimes potentially implicated include the concealment of assets, false oaths and claims (18 U.S.C. § 152), embezzlement against the debtor's estate (18 U.S.C. § 153), adverse interest and conduct of officers (18 U.S.C. § 154), and bankruptcy fraud (18 U.S.C. § 157).

## II.    The Debtor's Plan Remains Unconfirmable.

16.    Blithely ignoring the stench of corruption and misconduct engulfing this case, the Debtor cites the Hotel's survival and moderately positive performance during this case as evidence supporting confirmation. Confirmation Br. ¶ 3. But as will be shown at the confirmation hearing, the Hotel's purported success is overstated, and the suggestion that this was achieved without any debtor-in-possession financing (*id.*) is misleading; the Debtor has had the free use of cash collateral with no obligation to pay current any of Benefit Street's expenses or post-petition interest.

17.    The Debtor's Plan remains unconfirmable for the reasons stated in Benefit Street's prior confirmation objections and additional grounds discussed below, and the modifications to the Plan do not alleviate any of these infirmities.[9] Thus, the Debtor has failed to satisfy its burden of proof to establish that the confirmation requirements are met, and confirmation should be denied.

---

[9] The Debtor's suggestion that increasing the new cash contribution from $9 million to $10 million resulted from Benefit Street's input (Confirmation Br. ¶ 58) is another disingenuous attempt to feign good-faith negotiations with parties-in-interest; the Debtor never discussed this increase with Benefit Street. In fact, the Debtor has made no plan proposal to Benefit Street since filing the Plan (despite the Debtor's request to mediate) and has never acknowledged Benefit Street's response to the one "idea" the Debtor did float. *It is Benefit Street that has made numerous good faith and detailed proposals to resolve this case.*

A.    **The Plan Fails to Comply with All Applicable Bankruptcy Provisions (Section 1129(a)(1)).**

18.    Section 1129(a)(1) of the Bankruptcy Code requires a plan of reorganization to comply with all applicable provisions of the Bankruptcy Code.  Legislative history suggests the applicable provisions are those governing the plan's internal structure and drafting, such as sections 1122 and 1123.  Collier's 16th ed. ¶ 1129.02.

1.    **The Proposed Operating Agreement Governing the Borrower After Confirmation Does Not Comply with the Bankruptcy Code.**

19.    Shortly prior to the confirmation hearing scheduled for June 7, the Debtor filed a signed amended and restated operating agreement for 96 Wythe Partners, LLC (the "**Operating Agreement**"), which is the entity contemplated to own the Hotel and be Benefit Street's borrower upon confirmation (the "**NewCo**").  Plan Supplement, Exhibit A [ECF No. 541].  Review of the Operating Agreement demonstrates serious violations of the Bankruptcy Code.

a.    **The Debtor's Operating Agreement unfairly and inequitably pays equity holders years before Benefit Street.**

20.    The Debtor's proposed self-serving treatment at the expense Benefit Street is shocking.  Specifically, before Benefit Street receives a dime of repayment of principal, which has been outstanding since 2017, the Debtor proposes to make substantial distributions on the equity to the Insiders under the Operating Agreement.  Clearly this proposal is not fair and equitable to a creditor forced to wait eleven years after closing to be repaid on an eighteen-month loan.

21.    Section 5.2 of the Operating Agreement governs "Distributions."  Until Lockwood Williamsburg Hotel LLC ("**Lockwood**") has its $11,252,000 contribution repaid in full, together with its 8% per year preferred return, Section 5.2(a) calls for Lockwood to split distributions of the Hotel's net cash flow 50-50 with the Insiders.  After Lockwood is repaid in full, the Insiders

and Lockwood are to be paid in proportion to their respective interests, with Lockwood retaining 20% of the equity. All the while, Benefit Street receives no repayment on principal for six years.

22.    In a further attempt to pilfer the estate at Benefit Street's expense, the calculation of the Insiders' *pro rata* distributions is based upon their supposed post-confirmation capital accounts, which are laid out in Exhibit A of the Operating Agreement. A review of this exhibit is baffling: although not contributing any of their own funds beyond their shares of the $11,252,000 to be injected by Lockwood, each of the Insiders is deemed to have an opening capital account of $10,000,000. There is no indication—and no other evidence—as to the source of that collective $20,000,000 or whether it is actually being contributed. Indeed, the most likely answer is that there is no new money contributed. Rather, it appears that these "contributions" are a mere roll-over of the Insiders' purported pre-petition contributions to the Debtor—to the extent they ever existed at all—and otherwise a pure fabrication.

23.    The result of these $20 million of fictitious and improper capital accounts is that the Insiders will receive distributions from the Hotel while Benefit Street effectively receives *nothing—no* repayment of principal, and payment of interest at a rate so low that it does not even keep pace with inflation.[10].

24.    If the Insiders' "contributions" are just rolled-over pre-prepetition contributions—as Benefit Street is forced to assume given the Debtor's steadfast refusal to provide disclosure—then post-Effective Date, before Benefit Street is paid a dime towards principal, the Insiders will receive a return on their *pre-petition* equity *in exchange for nothing at all*.

---

[10] As an example, if the Hotel generated $100 in net cash flow, *prior to* Lockwood being paid in full, Lockwood would receive $50 to apply to return of preferred equity and preferred return, and the Insiders would receive $50 to split *pro rata* based on their (contrived) capital contributions. Conversely, if the Hotel generated $100 *after* Lockwood is paid in full, Lockwood and the Insiders would each split the $100 *pro rata* based on their respective unreturned capital contributions, or otherwise, based upon their respective holdings of common equity, with Lockwood holding a now 20% share of common equity.

**b.  The Debtor has failed to provide Benefit Street information to
conduct its normal and necessary diligence on Lockwood.**

25.   The Debtor has failed and refused to provide Benefit Street with information to
conduct its normal and necessary diligence on Lockwood, which is proposed to be a major equity
holder of the borrower on a $90 million loan that the Debtor seeks to force Benefit Street to hold
for six years.  Benefit Street normally requires diligence on holders of equity in their borrowers to
ensure compliance with basic Know Your Customer (KYC) and PATRIOT Act requirements
under federal law.  Among other things, Benefit Street requires that the major equity holders of its
borrowers complete a credit authorization form requesting various information—including names,
addresses, social security and tax identification numbers and addresses—in addition to a diligence
questionnaire.

26.   To that end, on April 25, 2020, Benefit Street sent a letter to the Debtor requiring
visibility into Lockwood's organizational structure to satisfy Benefit Street's programmatic and
legal requirements.  The Debtor has failed to deliver any of this information to Benefit Street.

27.   The Debtor's failure and refusal to provide visibility so Benefit Street may satisfy
its internal diligence requirements for Lockwood is illustrative of the bad faith and malicious
manner in which the Debtor has prosecuted this case and the Plan process.  And, it is not fair and
equitable to Benefit Street.

**c.  The Operating Agreement permits potentially impermissible
transfers.**

28.   Section 11.1(b) of the Operating Agreement permits the Insiders to freely transfer
their interests in the NewCo among their entities.  There is no provision permitting Benefit Street
to run the above-referenced KYC and PATRIOT Act diligence or conduct its credit searches.  The
Insiders own and control dozens of companies, many without any apparent business purpose.  To
permit them to freely transfer equity in the NewCo—which is Benefit Street's proposed

10

borrower—without any restriction runs afoul of Benefit Street's program, internal policies, and regulatory framework.  As a consequence, the Loan is rendered even less saleable, and is made into poorer collateral, for any warehouse lender or CLO issuer to which Benefit Street may turn for leverage.

### 2.   The Debtor Has Not Established "Adequate Means" for Plan Implementation.

29.    The Debtor contends that Bankruptcy Code section 1123(a)(5), which requires there be "adequate means" for Plan implementation, is satisfied because the Insiders will contribute $11 million in new cash and ongoing income will be used to fund operating expenses and Plan payments.  Confirmation Br. ¶¶ 17, 18.  It further states that the Debtor and Management Company agreed (i) to defer repayment of over $2 million in claims, and (ii) that post-confirmation, upon a sale (if any) to an "arm's-length third party," the Debtor may terminate the Purported Hotel Management Agreement.  Confirmation Br. ¶ 18; Plan § 5.7.  But these random observations do not establish that the means being used to implement that Plan are appropriate.

30.     First, the use of ongoing income only highlights that the Lender's cash collateral is improperly being used to pay creditors that are junior to it.  Second, the purported "deferral" of claims is meaningless because the Debtor's own witnesses have testified that the Management Company's claims have been waived—and, in fact, *they are already barred*; the Management Company, which clearly knew of the bar date, never filed a proof of claim (nor did the Debtor schedule the alleged claims), showing the Insiders' arrogant disregard for bankruptcy process.[11] Thus, any claim for management fees is barred, cannot create value through a purported subordination or waiver, and does nothing to establish that adequate means exist to satisfy the

---

[11] *See* Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof at 4 [ECF No. 41]; Supplemental Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof at 4 [ECF No. 177].

Debtor's actual obligations.  Finally, the agreement to amend the Purported Hotel Management Agreement assumes a sale *by the Debtor* (*i.e.*, would not apply in a foreclosure) and does not address Benefit Street's concerns with assumption of the Purported Hotel Management Agreement.  It still requires the Debtor's cooperation in a voluntary sale.  Thus, the Debtor has failed to show that it has adequate means to implement the Plan.  *See infra* Section II.H.

### B.    The Plan Fails to Comply with Disclosure Requirements (Section 1129(a)(2)).

31.    Section 1129(a)(2) requires plan proponents to comply with the disclosure requirements under sections 1125 and 1126.  Section 1125 requires disclosure of "adequate information" related to a proposed plan.  11 U.S.C. § 1125. The Debtor fails to satisfy this requirement because the Disclosure Statement omits, and in fact conceals, the Insider "loans" (the alleged basis for the Insiders' unilaterally paying themselves over $4 million of Hotel revenues) or any analysis of the potential claims against the Insiders, like those identified by the Examiner. The Debtor failed to disclose these material insider loans even in response to the Examiner's inquiries—first mentioning them only a few weeks ago, more than a year into this case, in an attempt to (partially) justify the millions of dollars in suspicious Insider transfers described in the Examiner's Report.  *See supra* ¶¶ 10-11; BSP Supplemental Objection Sur-Reply ¶¶ 5-7.

32.    The Debtor argues there is no need to resolicit the Plan because the modifications do not "adversely change the treatment of the claim of any creditor . . . who has not accepted in writing the modification."  Confirmation Br. ¶ 52 (citing Fed. R. Bankr. P. 3019(a)).  But in view of the massive potential claims that the sponsors essentially seek to settle *with themselves* for a $1 million incremental payment, resolicitation is clearly necessary.

### C.    The Plan Is Not Proposed in Good Faith (Section 1129(a)(3)).

33.    Even under the narrow good faith standard espoused by the Debtor—that the plan be "proposed with honesty and good intentions and with a basis for expecting that a reorganization

can be effected" (Confirmation Br. ¶ 53) (internal citation omitted)—the Plan fails.[12]  The Debtor

ignores the Insiders' misconduct, documented by a neutral Examiner, and proven by the evidence

at the hearing on the Trustee Motion, speaking directly to the Debtor's failure to propose the Plan

in good faith:  the Insiders were aware of the facts underlying this misconduct yet did not disclose

the transactions to creditors or conduct any investigation into the potential claims.  *See*

Supplemental Objection ¶¶ 25-28.  They then resisted appointment of an Examiner and fought to

stymie his investigation.  This misconduct relates directly to the plan proposal and amply shows a

lack of good faith, even leaving aside the bad faith baked into the Plan's structure and treatment

of Benefit Street.  *See* BSP Confirmation Objection ¶¶ 43-49; BSP Confirmation Objection Sur-

Reply ¶¶ 6-11; BSP Supplemental Objection Sur-Reply ¶¶ 25-28.

34.    The Debtor's suggestion that the Plan was proposed in good faith because it

purports to pay all allowed claims in full (Confirmation Br. ¶ 56) is meaningless in light of the

Plan's obvious lack of feasibility (pending unsecured claims vastly exceed the funds available to

pay them) and the unfair risks of nonpayment imposed upon the estate's largest creditor, Benefit

Street.  *See* BSP Confirmation Objection ¶¶ 59-68, 76-82; BSP Confirmation Objection Sur-Reply

¶¶ 18-23, 24-31.

35.    The Debtor falsely suggests that the Plan is the result of good faith negotiations

(Confirmation Br. ¶ 57), but capitulating on a handful of smaller claims is not meaningful.  *See*

March 8, 2022 Hr'g Tr. 15:2-16:2 (court noting concern "that the settlements really weren't

settlements.  The Debtor just caved"), relevant portions attached as Exhibit 5.  Nor do the Debtor's

fights with New York City over material unpaid taxes—which remain unresolved—demonstrate

progress in Plan negotiations.

---

[12] The Debtor is wrong on the law as shown in the BSP Confirmation Objection Sur-Reply ¶¶ 6-10.

36.    And the suggestion that the Debtor has worked to reach a consensual resolution with Benefit Street (Confirmation Br. ¶ 58) turns reality on its head.  To the contrary, Benefit Street has tried to work constructively with the Debtor throughout this bankruptcy case, but the Debtor has stonewalled at every turn: ignoring Benefit Street's proposals, fighting discovery, working to thwart the Examiner—in short doing everything in its power to avoid and block fair resolution of the parties' disputed issues.  The Debtor's request to mediate was a façade, but Benefit Street nonetheless embraced the opportunity to make numerous good faith proposals.

37.    The Debtor's goal in the Plan is purely to serve the interests of its principals by (1) providing sweeping releases to bury their gross misconduct; (2) permitting them to retain their equity interests for a peppercorn (indeed, for a payment likely *less* than their true liability to the estate); and (3) shifting all the risks of reorganization onto the secured lender (Benefit Street) while garnering the support of a handful of unsecured creditors with an offer of payment in full that may well prove illusory.  None of this reflects good faith.

**D.    Continued Management by the Insiders Is Contrary to Creditors' Interests and Public Policy (Section 1129(a)(5)).**

38.    The Debtor studiously ignores that the Insiders' egregious misconduct revealed in the Examiner's Report and at the hearing on the Trustee Motion renders them obviously unsuitable stewards for the reorganized company.  It argues only (in completely conclusory terms) that their service has been "instrumental to the Hotel's profitable operations,"[13] and their retention necessary to obtain the $10 million cash infusion.  Confirmation Br. ¶ 67.

39.    Leaving aside that the Hotel's recent performance has been so-so at best and that the $11 million contribution does not even cover what the principals likely *owe* for avoidable

---

[13] Numerous third party hotel managers can be brought in to run the Hotel, preserve jobs, and increase values.

transfers, it is astonishing to argue that fiduciaries can be left in charge of a reorganized company after chronic non-payment and misappropriation of taxes,[14] commingling and siphoning of Debtor funds, and chronic disregard of governing documents and laws—practices facilitated by the Debtor's admitted habit of failing to document material transactions. *See* Moskovits Dep. 258:2-259:9 (insiders used hotel trust fund taxes to cover Hotel's operating expenses), 352:2-355:8 (admitting to commingling Debtor and Management Company funds); Michael Lichtenstein Deposition dated March 10, 2022 37:18-38:5 (testifying that Debtor money is commingled with Management Company), relevant portions attached as Exhibit 3; Rauch Dep. 64:18-72:21, 119:4-123:5, 127:8-20 (admitting lack of documentary evidence for loans and transfers); Debtor's Response to BSP Supplemental Objection ¶¶ 16-17 [ECF No. 464] (discussing breaches and covenant defaults).  The Insiders' own recently filed adversary proceeding against the New York City Department of Finance regarding the Debtor's entitlement to tax abatements is yet another example of the Insiders' poor operation and mismanagement.  Adv. Proc. No. 22-07027, ECF No. 1.  If, as the Debtor contends, the Debtor lost the benefit of at least $32 million in tax abatements, *id.* ¶ 9, it is a further example of the Insiders' inability to properly manage the Debtor.

40.     The retention of a Financial Reviewer, Plan § 5.8, does not address the governance, control and conflicts issues.  The Financial Reviewer reports to the Debtor and has no governance rights.  It does nothing to alleviate the concern over ongoing conflicts of interest.

---

[14] While *In re Euro-Am. Lodging Corp.*, 365 B.R. 421 (Bankr. S.D.N.Y. 2007), and *In re N. Star Contracting Corp.*, 128 B.R. 66 (Bankr. S.D.N.Y. 1991), do not address section 1129(a)(7), they do support that gross management includes the "failure to pay taxes," especially where it "leads to interest and penalties," *In re Euro-Am. Lodging Corp.*, 365 B.R. at 426, and the failure to "maintain complete and accurate financial records, or . . . to substantiate undocumented transactions, so that there appears to be a confusion in the debtor's accounting system." *In re N. Star Contracting Corp.*, 128 B.R. at 70.

**E.    Plan Fails the Best Interests Test (Section 1129(a)(7)).**

41.    The Debtor's best interests argument assumes that a chapter 7 sale would result in a 35% discount from appraised value.  Confirmation Br. ¶ 70.  But Benefit Street has demonstrated that this is predicated on the faulty premise that the trustee[15] would have to sell the Hotel within 90 days in a "non-functional" hospitality market.  *See* BSP Confirmation Objection ¶¶ 54-58; BSP Confirmation Objection Sur-Reply ¶¶ 15-17.  The Debtor's own appraiser testified that, after a 6-12 month sale process in the current market, a buyer would pay $113.3 million for the Hotel—and if that is correct, a sale of the Hotel would pay every creditor in full, in cash, plus a distribution for equity.  *See* BSP Confirmation Objection Sur-Reply ¶ 15.  Thus, the Debtor has not shown impaired creditors will receive value under the Plan "not less than the amount that such holder would receive . . . if the debtor were liquidated under chapter 7."  11 U.S.C. 1129(a)(7).

**F.    The Plan's Treatment of Priority Tax Claims Is Improper (Section 1129(a)(9)(C)).**

42.    The Plan provides that holders of Allowed Priority Tax Claims will receive deferred cash payments over five years of a value, as of the Plan Effective Date, equal to the allowed amount of such claims.  Plan § 3.1(b).  But Section 1129(a)(9)(C)(iii) requires that such priority tax claims cannot receive treatment less favorable than "the most favored nonpriority unsecured claim provided for by the plan;" thus, the Plan must pay these claims in full within six months of the Effective Date (which would be yet another factor rendering the plan infeasible).

**G.    The Plan Is Not Feasible (Section 1129(a)(11)).**

43.    The Debtor's Plan is not feasible because, as will be shown at the confirmation hearing, (i) it fails to address upwards of $16 million in unsecured claims and $10 million in

---

[15] Benefit Street has filed a renewed request  (the "**Trustee Motion**") for the appointment of a Chapter 11 Trustee (the "**Trustee**").  *See* ECF Nos. 476, 533.  The U.S. Trustee has also filed a request for the appointment of a Trustee.  *See* ECF No. 491.  The Lender is prepared to work with the Trustee for an unrushed marketing process that would allow the Hotel to operate for an extended period to maximize values, while also allowing the Trustee to explore refinancing.

administrative and priority claims[16], which, if allowed, will leave the Debtor with insufficient cash to satisfy its Plan obligations; (ii) if Benefit Street's claim is amortized, as is customary, the Debtor will have a cash deficit beginning in year four; (iii) the Debtor has not demonstrated that it will be able to sell or refinance to pay Benefit Street when its claim matures in year six; and (iv) increasing the interest rate on Benefit Street's claim to an appropriate *Till*-rate causes the Plan to fail.

44.    The Debtor states that it will have enough cash to pay allowed claims even if the total amount of allowed unsecured claims is "modestly higher" than estimated.  Confirmation Br. ¶ 83.  But it is far from guaranteed that allowed claims will be only "modestly higher."  Nor does the Debtor's conclusory statement that allowed claims will likely be covered by insurers or co-defendants (*id.*) relieve the Debtor of the need to demonstrate its ability to satisfy its obligations, particularly since its insurance coverage is threatened by misrepresentations made by the Insiders in coverage applications.[17]  Motion to Direct Debtor to Assign Rights Under Insurance Policies and Thereafter for Relief from Stay ¶ 6, Ex. D [ECF No. 163].

45.    In addition, as will be shown at the confirmation hearing, the Debtor relies on unrealistic projections and faulty assumptions to support its feasibility claim.  BSP Confirmation Objection Sur-Reply ¶¶ 18-23.  Once these assumptions are corrected, the Plan is not feasible.

46.    Finally, the Plan contemplates that the Effective Date may occur even before Lockwood has disbursed any money to the Debtor's estate.  Plan § 5.1 (requiring only that Lockwood financing be "fully committed" and all documents necessary executed).  The Plan should not go effective unless and until the $11.252 million is actually funded to the Debtor's estate.

---

[16] These amounts are based on claims as presently asserted.

[17] The Debtor now concedes that the determination of the disputed insurance coverage issues is necessary for confirmation—despite this having been known for months.  *See* Debtor's Expedited Motion ¶ 23.

**H.**    **The Debtor Fails to Satisfy Cram Down Requirements (Section 1129(b)).**

47.    The Plan cannot be crammed down over Benefit Street's objection because it is not fair and equitable and violates the absolute priority rule.

**1.    The Plan Is Not Fair and Equitable Because It Fails to Compensate Benefit Street for Assuming All the Risk of Plan Failure.**

48.    As demonstrated in prior submissions, the Plan's treatment of Benefit Street's secured claim is inherently unfair and inequitable because it impermissibly shifts reorganization risk onto Benefit Street without providing a new note on terms adequately compensating it for that risk.  *See* BSP Confirmation Objection Sur-Reply ¶¶ 24-32.

49.    As will be shown at the confirmation hearing, the terms of the proposed note do not comport with the *Till* analysis.  Confirmation Br. ¶ 101-04.  The proposed interest rate of 4.5%– 5.0% is far short of an appropriate risk-adjusted *Till*-rate and does not comport with market practices for real estate mortgage loans.  Based on the circumstances of the Debtor's estate, the nature of the security, feasibility, and duration, the *minimum* appropriate rate would be 10.30%. *See* BSP Confirmation Objection ¶¶ 83-93; BSP Confirmation Objection Sur-Reply ¶¶ 27-31.[18] Performing loans hospitality properties are currently priced at much higher rates, with the last five such loans closed by Benefit Street at rates hundreds of basis points higher than the rates proposed by the Plan.

50.    The Debtor's proposed interest rate ignores critical risks associated with the Plan that would likely make it impossible for these sponsors to obtain credit at all, and at minimum require a materially higher rate, including: feasibility risks, the Insiders' involvement in numerous lawsuits and bankruptcy proceedings, the conduct revealed in the Examiner Report and at the

---

[18] Under the Plan, Benefit Street will be second in priority to secured property tax claims, which are receiving 18% interest and are amortized.

18

hearing on Trustee Motion, the nearly 100% LTV ratio and low debt yield of the proposed loan, and any duration risk.  The Alternate Treatment Option for treatment of Benefit Street's claims provided for in the most recent Plan does nothing to ameliorate Benefit Street's objections to the Plan and does not render the Plan less unconfirmable.  Plan § 3.2(b)(ii)(3)-(4).

## 2. **The Plan Is Further Not Fair and Equitable to Benefit Street Because the Debtor Refuses to Provide Benefit Street with Replacement Loan Documents.**

51.    The Debtor's refusal to provide Benefit Street with replacement loan documents is highly irregular, creates severe problems, and further renders the Plan not fair and equitable.  At closing of the Loan, the Debtor signed, among other things, an extensive loan agreement promissory note, mortgage, and assignment and subordination of management agreement, not to mention the various guaranties, the environmental indemnity agreement of the Insiders, and a suite of opinions (collectively, the "**Loan Documents**").  The Loan Documents, which took roughly ten weeks to negotiate, are detailed and purposefully conform to Benefit Street's business model. While the Loan Documents reflect Benefit Street's business deal with the Debtor, which the Debtor clearly ignored, they also are critical to Benefit Street's bargained-for return.

52.    While the Plan proposes to delay repayment of Benefit Street for six years, the Debtor refuses to provide Benefit Street replacement loan documents, even though Benefit Street has been requesting replacement loan documents from the Debtor for months.[19]  The Debtor instead takes the position that the pre-petition Loan Documents will govern, subject to modifications made implicitly by the Plan.  This position is completely unworkable.

---

[19] The Court has recognized the importance of seeing those documents.  March 31, 2022 Hr'g Tr. 39:17-23, relevant portions attached as Exhibit 8 (stating it is "important" that the forms of documents like the plan supplement, revised loan documents, and documents with Lockwood be provided to the Lender).  The Debtor stated to the Court at the March 31, 2022 status conference that these were "all our agreements which we are ready to file," *id.* 40:14-16.

53.     From a legal perspective, the Plan does very little to revise the Loan Documents, other than extending the maturity date, adjusting the interest rate, and adding an interest reserve. Plan § 3.2(b).  Otherwise, the balance of the Loan Documents remain unmodified and will control, which would place the Reorganized Debtor in default immediately upon the Effective Date.  If it is the Debtor's position that every aspect of default is tacitly modified by the Plan due to the Plan's silence on that issue, such position is clearly untenable, as it will leave the parties in a position of perpetual uncertainty until Benefit Street is repaid, if ever.  Moreover, absent replacement loan documents, Benefit Street will have no debt instrument with concrete governing terms to sell or pledge on the secondary market, which is a critical piece of Benefit Street's business model.

### a.  Benefit Street's Loan Documents and business model require its borrowers be special purpose entities.

54.     Under the Loan Agreement, Benefit Street's borrowers are each required to be and remain a "Special Purpose Entity" (as defined in the Loan Agreement).  *See* Loan Agreement, §§ 3.24 and 4.23.  The definition of Special Purpose Entity is provided in in Exhibit C to the Loan Agreement.  Included among this definition are prohibitions on 24 separate acts, including prohibitions on material debt other than Benefit Street's Loan, plus comprehensive organizational requirements.  Indeed, Benefit Street, like its peer set, requires "non-consolidation opinions" be delivered in connection with large loans (including the Loan) that opine on the special purpose nature of the applicable borrower and likelihood of substantive consolidation with affiliates.  These opinions are required both by Benefit Street underwriting and the secondary market into which Benefit Street sells its loans.

55.     The Debtor proposes to afford Benefit Street none of these special purpose protections under the Plan or a new non-consolidation opinion.  In fact, the Debtor appears to contemplate imposing a new borrower upon Benefit Street, with organizational documents that

Benefit Street has never seen, but which presumably would not conform to the special purpose restrictions required by the Loan Agreement. Failure to comply with these special purpose provisions of the Loan Agreement constitutes an immediate event of default under Section 10.1(d)(i) thereof.

56.     Special purpose restrictions are necessary for Benefit Street to securitize its loans or pledge them to warehouse lenders. Utilizing this leverage is crucial for Benefit Street to achieve its underwritten return on capital. Indeed, Benefit Street, like its peer set, would never contemplate holding the entirety of a $68 million (or more) bridge loan on its balance sheet, unleveraged, through its maturity date. Doing so would deprive Benefit Street of the leverage that it uses to support its business model by maximizing liquidity to drive further returns.

57.     However, without replacement loan documents, Benefit Street cannot leverage or sell the Loan. No warehouse lender or trustee in a securitization would accept the Loan Documents years post-maturity that are in immediate default loaded with now irrelevant and questionably modified provisions. Refusing to provide Benefit Street with replacement loan documents would dramatically impair Benefit Street's return on capital.

   **b.   The Loan Documents contemplate an in-place cash management
          system to protect Benefit Street's interests in Hotel revenues.**

58.     The Loan Documents contemplate an involved cash management system negotiated at closing to protect Benefit Street's interest in the revenues generated by the Hotel. *See generally* Article 8 of the Loan Agreement. Specifically, upon an Event of Default, the Debtor is required to establish a "Clearing Account," over which the Lender holds a perfected security interest, into which the Debtor is required to deposit all Hotel revenue. *Id.* §§ 8.5(a) and 8.6(a) and (b). All funds on deposit in the Clearing Account are transferred to a Cash Management

Account, which is an account established by Benefit Street on the Debtor's behalf and under Benefit Street's control.  *Id.* §§ 8.1(a), 8.6(c) and 8.7.

59.    Cash management is part of Benefit Street's program; indeed, each loan extended by Benefit Street requires some structured cash management.  Cash management is also expected by Benefit Street's own financing sources, whether its warehouse lenders or the trustees in securitizations.  The Loan is even less marketable for sale and leverage without cash management.

60.    Clearly, the Debtor has never complied with this cash management system.  While the parties apparently dispute when the first default under the Loan occurred, it is indisputable that the Debtor defaulted upon its June 2019 maturity date, but the Debtor refused to establish the cash management system mandated by the Loan Documents in the event of a default.  Indeed, the Debtor has exhibited a total lack of compliance with any rational or economically justified cash management system.   And as a matter of greater concern, Ms. Moskovits testified during deposition that, upon exit from this bankruptcy case, she intends for the Debtor's cash management system to revert back to the system existing prepetition.  *See* Moskovits Dep. 140:10-24.

61.    The Loan Documents contemplate cash management.  The Debtor has no intention to cooperate with any cash management at any time.  The deprivation of this critical negotiated feature of the Loan while permitting it to linger in the parties' governing documents is nonsensical, renders the Loan unmarketable, and is not fair and equitable to Benefit Street.

### c.    <u>Benefit Street's mortgage will not be a first priority lien if the Plan is confirmed.</u>

62.    The Debtor seeks under the Plan the approval of a purported settlement agreement between the Debtor and New York City Department of Finance to resolve the Debtor's $3,928,923.57 liability for unpaid prepetition property taxes.  If approved, this tax liability would

constitute a multi-million-dollar first priority secured claim—senior to Benefit Street's mortgage—that accrues interest rate at 18% per year and compounds daily.

63.    Benefit Street underwrote its Loan upon a first priority security interest.  *See* Loan Agreement, § 3.5(i) and definition of "Security Instrument."  The Debtor is expressly prohibited from encumbering the Hotel with any other liens.  *Id.* § 6.1 and definition of "Prohibited Transfer." This prohibition is so important to Benefit Street that the violation of it constitutes a full recourse event under this otherwise limited recourse loan.  *Id.* § 12.1(b)(ii).  The Debtor, and its insiders, were clearly aware of this, as Mr. Moskovits and Mr. Lichtenstein executed guaranties making themselves personally liable to Benefit Street for prohibited transfers.

64.    Refusing to deliver replacement loan documents will put the Debtor in default immediately upon the Effective Date due to the priority tax lien.  It is entirely nonsensical and not fair and equitable to Benefit Street, which bargained for a first priority lien in its collateral when it extended the $68 million Loan to the Debtor, now outstanding at over $90 million.

### d.  Without appropriate replacement loan documents, BSP cannot generate its bargained-for return.

65.    Without appropriate replacement loan documents, BSP cannot achieve the return that it bargained for when it loaned the Debtor $68 million.  With respect to short term bridge loans such as the Loan, Benefit Street's business model is to leverage such loans via securitizing them through Collateralized Loan Obligations ("**CLO's**") or pledging them via warehouse lending facilities to major financial institutions, including national banks.  This practice is standard in the industry in which Benefit Street operates.

66.    Benefit Street will be wholly unable to securitize or leverage the Loan without appropriate replacement loan documents.  In connection with securitization or pledging onto a warehouse facility, Benefit Street is required to make various representations and warranties,

including regarding the existence of loan documents and absence of default thereunder. It will be impossible for Benefit Street to do so without a clear understanding of the terms of the replacement loan, which will be extraordinarily confusing given the Debtor's position that certain terms are tacitly modified by the Plan while others are not.

67.    Furthermore, it is highly questionable whether rights to payment under a plan, which would be a payment intangible, can even be pledged or securitized since, without a new promissory note, Benefit Street will have no promissory note to actually securitize. *Compare* N.Y. U.C.C. Law § 9-102(61) (defining payment intangible) *with* N.Y. U.C.C. Law § 9-102(47) (defining instrument).

68.    In summary, the Debtor's refusal to provide Benefit Street with replacement loan documents, and instead insisting that Benefit Street look to the prior Loan Documents as amended by a largely silent plan, to govern the parties' post-confirmation relationship is unworkable and nonsensical. It will deprive Benefit Street of any ability to sell or leverage the Loan and achieve its negotiated return. Worse, this arrangement will render it impossible to determine whether the post-confirmation borrower is in default of the post-confirmation loan. The Debtor's refusal under the Plan to provide replacement loan documents is not fair and equitable to Benefit Street.

### 3.    **The Plan Violates the Absolute Priority Rule (Section 1129(b)).**

69.    The Plan runs afoul of the Bankruptcy Code's absolute priority rule because the Plan Sponsor will receive 100% of the equity in the reorganized Debtor without satisfying the "new value" exception. Benefit Street addressed this confirmation infirmity in prior filings and will not restate those arguments here. *See* BSP Confirmation Objection ¶¶ 94-102; BSP Confirmation Objection Sur-Reply ¶¶ 33-39. However, to be clear, mere inclusion of the Benefit Street term sheet as an exhibit to the Disclosure Statement, at the request of the Court, does not satisfy the "market test" requirement under the new value exception.

**I.      Plan Has an Improper Purpose of Avoiding Taxes (Section 1129(d)).**

70.     Both the Examiner and BSP's tax fraud expert, Luis Rivera have concluded that the Debtor's bank transfers and tax filings were riddled with red flags of a possible ongoing tax evasion scheme.  Examiner Supplemental Report at 7.  It is undisputed that the Insiders failed to file tax returns for the Debtor for many years and, in connection with that failure, misappropriated trust fund taxes.  This is in addition to countless suspect affiliate transfers.  Given this evidence, the Plan, allowing the Insiders to retain control of the Debtor, appears to be motivated by the improper purpose of permitting the Insiders to continue their ongoing tax fraud and tax evasion.

**J.      The Plan's Releases Are Improper.**

71.     The Debtor argues the releases are justified because the Released Parties contributed substantial time and effort to the restructuring, and the Debtor's management supposedly has extensive industry knowledge.  Confirmation Br. ¶ 37.  But the evidence at the confirmation hearing will show that the Insiders did far more harm than good in the reorganization —obstructing the Examiner's investigation, resisting discovery, misappropriating funds, and generally acting to further their own interests over the estate's to an extent that may constitute bankruptcy crimes.  *See* Examiner Report at 3, 10; Supplemental Report at 6-8.  Indeed, the Insiders seek to *bury* claims against themselves that are estate asset for the benefit of creditors.

72.     It is thus absurd to suggest that courts have approved third-party releases in "similar circumstances."  Confirmation Br. ¶ 38.  The cases cited by the Debtor did not involve situations where an independent third-party expert concluded that significant potential causes of action existed against the Debtor's insiders.  In fact, the cited order in *In re Deluxe Media*, Case No. 19-23774 (Bankr. S.D.N.Y. Oct. 23, 2019), ECF No. 96, approved a consensual, pre-packaged plan.

73.     The Debtor conclusorily argues that the releases are reasonable and were necessary to obtain the dubious and inadequate $10 million contribution.  Confirmation Br. ¶¶ 44-45.  The

Debtor also oddly argues that the releases are supposedly "limited to claims relating to the PPP Settlement." Confirmation Br. ¶ 45.  This is simply false.  *See* Plan § 5.10.  Perhaps most absurd is the Debtor's contention that the releases preserve the estate causes of action, like those identified in the Examiner Report.  Confirmation Br. ¶ 43.  But these claims will simply pass through to a company under the *complete domination of the defendant-Insiders, who cannot be expected to pursue these causes of action against themselves*.  *See* BSP Supplemental Objection Sur-Reply ¶ 35.  And any claims for ordinary negligence are permanently released.  *Id.* ¶ 35 n.8; Plan § 5.10.  Presumably, the release for ordinary negligence claims includes any claim for the over $32 million of benefits of tax abatements that the Debtor contends it has lost.  *See* Complaint ¶ 9, Adv. Proc. No. 22-07027, ECF 2.  The release of such a potential claim is a prime example of why granting an outright release for ordinary negligence releases valuable claims.

### K.    The Exculpation Provision Is Improper.

74.    The Plan's exculpation provision is impermissibly broad in extending exculpation to the Debtor and Released Parties[20] for any act or omission in connection with, or arising out of, the Debtor's chapter 11 case, Plan confirmation, consummation of the Plan, administration of the Plan, or property to be distributed under the Plan.  Plan § 5.12.  It thus extends beyond "the fiduciaries who have served during the chapter 11 proceeding."  *In re Washington Mutual, Inc.*, 442 B.R. 314, 351 (Bankr. Del. 2011).  Exculpation provisions are not "proper as a general rule," and while "permissible under some circumstances," they are not allowed as a "routine matter."  *In re Chemtura Corp.*, 439 B.R. 461, 610-11 (Bankr. S.D.N.Y. 2010).

75.    Particularly in these circumstances, there is no basis to exculpate any of the Insiders or their affiliates, including the Management Company, for misconduct that continued post-

---

[20] Released Parties is defined as "the Debtor and the Management Company and each of their respective agents, managers, members, officers, directors, shareholders, advisors, attorneys, and representatives."  Plan § 1.70.

petition.  In particular, the Management Company should not be exculpated for failure to operate the business appropriately, including by paying trust fund taxes.

76.    The cases cited by the Debtor to support approval of an exculpation provision that covers both estate and non-estate fiduciaries are inapposite—none of them involved an investigation and subsequent report of a neutral Court-appointed expert that found significant pre- and post-petition misconduct on the part of the parties who would be exculpated.

**L.    Assumption of the Purported Hotel Management Agreement Is Improper.**

77.    A detailed discussion of the dubious origins of the Purported Hotel Management Agreement is set forth in prior filings.[21]  Although it was clearly a significant executory contract, the Debtor did not disclose the agreement in its schedules—and has not subsequently amended its schedules to do so.  Further discovery revealed that even the Debtor's own CRO never analyzed its terms to see whether they were market.  Goldwasser Dep. 102:23-103:2.  Moreover, it is no surprise that the Purported Hotel Management Agreement provides rich benefits to the Insiders while disadvantaging the Debtor's estate—it was negotiated by and among the Insiders.  Moskovits Dep. 364:19-370:24.  The evidence at the confirmation hearing will confirm that it would be contrary to the best interests of creditors to saddle the reorganized company with this disadvantageous contract.

78.    First and foremost, the Management Company lacks the skills to manage the Hotel.  Expert testimony will show that properties like The Williamsburg Hotel require managerial expertise beyond the abilities of one or two individuals and the on-premises team.  Rather, the industry norm is that such hotels are managed by an experienced third-party management company that maintains expertise in a wide range of necessarily disciplines.  That is not the case here—

---

[21] *See* BSP Confirmation Objection Sur-Reply ¶¶ 40-42; BSP Confirmation Objection ¶¶ 103-16.

where the Management Company has no employees of its own and no resources comparable to those of a professional hotel management company.[22]

79.    Moreover, expert testimony will establish that the terms of the Purported Hotel Management Agreement are off-market, skew significantly in favor of the Management Company, and, if imposed on the Hotel through assumption of the contract, will depress the Hotel's market value and significantly compromise viability of the Plan.    Assumption of this fraudulently concealed (or concocted) insider agreement is improper for the reasons stated in the BSP Confirmation Objection Sur-Reply ¶¶ 40-42 and BSP Confirmation Objection ¶¶ 103-16.

### III.    The Debtor's Request to Waive the 14-Day Stay Should Be Denied.

80.    The Debtor seeks a waiver of Bankruptcy Rule 3020(e), which provides that a confirmation order is stayed for 14 days from the date of entry of the order, unless the court orders otherwise.  The Debtor argues that "[t]he Plan has been vigorously negotiated and contested among sophisticated parties, and the immediate effectiveness of the Plan will allow the Debtor to mitigate administrative and professional costs while not prejudicing any party in interest."  Confirmation Br. ¶ 110.  But waiving the stay is inappropriate here precisely because the Plan *is* vigorously contested, and there are material objections to confirmation by the estate's largest creditor.  *See, e.g.*, *In re Residential Capital, LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *54 (Bankr. S.D.N.Y. Dec. 11, 2013) (waiving stay given "the absence of any material objections to confirmation of the Plan"); *In re Penton Bus. Media Holdings, Inc.*, No. 10-10689 (AJG), 2010 WL 2881419, at *11 (Bankr. S.D.N.Y. Mar. 5, 2010) (appropriate to waive stay in light of "overwhelming support by" all classes entitled to vote on plan).

---

[22] The evidence suggests that the Management Company has no business operations other than managing the Hotel. *See also* Examiner's Report at 1, 9 n.15; Rauch Testimony at 84:22-25, 85:18-25.

28

81.     Nor was the Plan "vigorously negotiated"; the Debtor did not negotiate with *any* party in interest prior to filing its Plan.  Further, the Debtor has offered no explanation of the amount of administrative and professional costs that it contends would be saved by a waiver nor any basis for its statement that waiver would not cause any party prejudice.  Finally, the confirmation hearing has been repeatedly delayed; there is also no credible claim that the Debtor would suffer prejudice if the confirmation order is subject to the 14-day stay.

82.     In fairness to those parties that have objected to confirmation, this Court should not waive the 14-day stay.  *See In re Adelphia Cmmc'ns Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (concluding "fairness to" objecting bondholders, and district court, required court to "not take an affirmative step that would foreclose all opportunities for judicial review," and denying request for waiver of Bankruptcy Rule 3020(e)).  Creditors should have sufficient time to seek relief from the District Court for any appeal and could suffer prejudice if the Debtor seeks to close before creditors can seek appellate relief.

## <u>CONCLUSION</u>

For these reasons, Benefit Street respectfully requests that the Court deny confirmation of

the Debtor's Plan.

Dated: May 23, 2022
       New York, New York

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

<u>/s/ P. Bradley O'Neill</u>
Adam C. Rogoff
P. Bradley O'Neill
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000
Email: arogoff@kramerlevin.com
       boneill@kramerlevin.com

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

*Co-counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 23, 2022, I caused a true and correct copy of the foregoing

document to be served by the Bankruptcy Court's ECF system and by e-mail to all parties that

have filed a notice of appearance in this case.


<u>/s/ P. Bradly O'Neill</u>
P. Bradly O'Neill

**EXHIBIT 1**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 21-22108-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   96 WYTHE ACQUISITION LLC,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  May 17, 2022

17                  9:15 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  UNKNOWN

Page 84

1   Freedman, why don't you ask it over again so that the

2   witness can hear it.

3          MR. FREEDMAN:  Yes, sir.

4   BY MR. FREEDMAN:

5   Q    Are the expenses that are incurred at the management

6   company, are those expenses paid through revenues generated

7   at the hotel?

8   A    Any revenue generated at the hotel pays for the hotel

9   operations expenses.  I'm not aware of any additional

10  expenses incurred by the management company.

11  Q    And also in addition as director of finance of the

12  management company, to the best of your acknowledged, has

13  the management company -- or does the management company

14  have any of its own independent income separate and apart

15  from the revenues generated at the hotel?

16  A    Just to be clear, my position is director of finance

17  for the hotel.  Even though I work for the management

18  company, my position is director of finance for the hotel.

19  Q    I understand, sir.  (Indiscernible) can you answer the

20  question?

21  A    Can you repeat it one more time?

22  Q    Yes, sir.  To the best of your knowledge, does the

23  management company have any of its own independent income

24  other than the income generated at the hotel?

25  A    Not that I'm aware.

Page 85

1   Q    And again, based upon your being director of finance of

2   the management company since the end of 2019, ever seen any

3   source of funds for the management company other than those

4   funds generated at the hotel?

5              MR. KELLEY:  Objection.  I think it misstates the

6   record.  I thought the witness said twice he's the director

7   of finance for the hotel.

8              THE COURT:  Well, let's just get this clear.  What

9   is your title, Mr. Rauch?

10             THE WITNESS:  Director of finance.

11             THE COURT:  For which entity?

12             THE WITNESS:  It's for the Williamsburg Hotel.

13             THE COURT:  But you're working for the management

14  company, right?

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.

17  BY MR. FREEDMAN:

18  Q    The simple question, sir, is based upon the accounting

19  functions that you provide, have you ever seen the

20  management company have a source of income other than the

21  funds generated at the hotel?

22  A    No.

23  Q    And to the best of your knowledge, does the management

24  company have any of its own assets?

25  A    Not that I'm aware of.

Page 90

1          THE COURT:  Try it now.  Okay.

2          MR. FREEDMAN:  Great.

3    BY MR. FREEDMAN:

4    Q    So we're referring to this as Exhibit 26.  But Mr.

5    Rauch, the reason why it has Exhibit 11 on it is because

6    that was during the course of your deposition back on March

7    14.  Do you remember talking about this document?  Is that a

8    yes?  I just didn't hear you.

9    A    Yes.

10   Q    Thank you.  So just for the record, this is an account

11   statement from Bank of America at Northside Acquisition

12   Partners LLC account ending in 4102 for the period of

13   February 1, 2020 to February 29, 2020.  I would ask that we

14   go -- start on Page 4 of 14.

15        Mr. Ruach, if you could look at the top of Page 4,

16   you'll see a number of transfers from checking 4331 starting

17   on February 11, 2020.  Do you see that?

18   A    Yes.

19   Q    And do you recognize Checking Number 4831 to be an

20   account held by the management company?

21   A    Yes.

22   Q    And we're going to go through the same basically Q&A

23   that we went through during your deposition.  So starting on

24   February 11, you'll see all in that one day seven transfers

25   from the management company -- make sure I got this right --

Page 91

1    from the management company to this account, 4102 held by

2    Northside Acquisition Partners LLC, correct?

3    A    Yes.

4    Q    And when we did this last time, I added up those seven

5    transactions, and it was $62,100.  You can add it up

6    yourself, but could you accept my representation to you,

7    sir?

8    A    Yes.

9    Q    Then if you would go to Page 6 of the account

10   statement, at the bottom starting on February 11, 2020,

11   you'll see on the same day the $23,000 that went from

12   Checking Account 4831, the management company account, to

13   Northside Acquisition.  Then it goes out to Account 4483.

14   Do you see that at the bottom?

15   A    Yes.

16   Q    I'm sorry.  I'm just having a difficult time hearing

17   you.

18   A    Yes.

19   Q    Thank you.  And do you recognize that Account 4483 to

20   be an account held by a company called 215 Moore Street

21   Acquisition LLC?

22   A    I'd have to look that up.  I don't know that offhand.

23   Q    Just give me a moment, please.  Would you agree with me

24   that Account 4483 is not an account of the management

25   company?

Page 92

1   A    Yes.

2   Q    It's not an account of the Debtor?

3   A    Yes.

4   Q    To the best of your knowledge, would that be an account

5   of a company owned or held by Toby and Michael?

6   A    I believe so.

7   Q    And then if you look at the next page, you'll see

8   corresponding with $15,000 transferred from the management

9   company to Northside Acquisition, on the same day, $15,000

10  goes back out to a company identified as York Street

11  Property Development; do you see that?

12  A    I don't see that.  Hold on.

13  Q    So the very first entry on the top of Page --

14  A    Okay.  Yeah, I see that.

15  Q    And what is York Street Property Development?

16  A    I'm not exactly sure.

17  Q    You've never heard of that entity?

18  A    I think it might be an entity owned by Michael.

19  Q    And then under that, the very same day, you'll see a

20  transfer from Checking number 7358 of $5,000; do you see

21  that?

22  A    Yes.

23  Q    And 7358 is an account held by the Debtor?

24  A    Yes.

25  Q    And similarly, that same day you'll see another

Page 93

1   transfer of $2,600 to the same account, 7358, the Debtor?

2   A    Yes.

3   Q    So can you explain to us in respect to those, why is

4   the -- why is the management company transferring the funds

5   to Northside Acquisition and then on the same day turning

6   around and sending that same amount of funds to the Debtor?

7   A    The money was moved from the management company to the

8   Debtor to pay a Debtor-related bill.  It was paying a

9   property rental bill of the Debtor.  It was moved through

10  Northside Acquisition only because that's how it was set up,

11  and that's how money was being moved.  But ultimately, the

12  money was moved through Northside to the Debtor to pay a

13  Debtor's bill.

14  Q    What is the business of Northside Acquisition LLC?

15  A    As far as I know, it's another company entity owned by

16  Toby and Michael.

17  Q    Is there any type of contractual relationship between

18  Northside Acquisition and the management company on one

19  hand, and Northside Acquisition and the Debtor on the other

20  hand providing for this flow of funds?

21  A    Not that I'm aware of.

22  Q    So I want to go back to the very first transfer on the

23  bottom of Page 6.  That's the $23,000 that was transferred

24  from the management company to Northside Acquisition, and

25  then transferred that same day to Account 4483.

Page 94

1       When I took your deposition back on March 14, at Page

2    171, I asked you the same question at Page 15 -- at Line 15,

3    I asked, "You see on 2-6-20, there was a transfer of $23,000

4    in from Account 4483; do you see that?"  Answer, "I see

5    that, yes."  Question, "And we trace that to 215 Moore

6    Street.  You are familiar with that company?"  Answer, "I'm

7    familiar with the company, not the transfer."  Does that

8    refresh your recollection on the relationship between

9    Account 4483 and 215 Moore Street?

10           MR. KELLEY:  Objection, Your Honor.  That's

11   improper impeachment.  If he's using the prior statement to

12   show an inconsistent testimony, that's one thing.  But to

13   use it to refresh recollection is inappropriate.  It's an

14   improper impeachment tool.

15           THE COURT:  I think that's right.  I think the

16   statement's not inconsistent.  It just said he wasn't

17   familiar.  He was familiar with the name Moore Street but

18   not where the transaction went to.

19           MR. FREEDMAN:  I'll move on, Your Honor.

20   BY MR. FREEDMAN:

21   Q   And again on the same day, you'll see transfers of

22   $2,600 to Account 588.  Are you familiar with that account,

23   sir?

24   A   What account did you say, 588?

25   Q   Yes, sir.  Back on -- if you could move to the next

1     page, it's Page 7.

2     A     0588?

3     Q     Yes, sir.

4     A     I don't recall about that.

5     Q     Would it be your belief that that's a company owned --

6     or an account owned -- an entity owned by Toby and Michael

7     as well?

8     A     I believe so.

9     Q     And then under that, you'll see another transfer of

10    $3,750 to Account 2536.  Do you know that account?

11    A     I'm not sure which one that is.

12    Q     Would it be your belief that that's an account of an

13    entity owned by Toby and Michael as well?

14          MR. KELLEY:  Your Honor, I don't mind the --

15    objection.  I don't mind the exploring with the witness of

16    what he knows, but once he says he doesn't know, further

17    questioning seems to ask for speculation.

18          THE COURT:  No.  Let me -- Mr. Rauch, let me be

19    clear.  You should only answer the question if you have a

20    reasonable belief that the answer is accurate.  If you're

21    just guessing or speculating, then just say that, or if you

22    have a reasonable belief that that account is for a company

23    that is owned or controlled by Ms. Moskovits or Mr.

24    Lichtenstein or both of them, you can answer the question.

25    BY MR. FREEDMAN:

Page 96

1    Q    With that clarification, can you answer the question,

2    Mr. Rauch?

3    A    Can you repeat it one more time?

4    Q    Yes, sir.  The -- I just -- I'm trying to remember

5    which one I'm on.  So let's start with 588.  Do you have a

6    reasonable belief that that account is associated with an

7    entity owned by Toby and Michael?

8    A    I believe so, yes.

9    Q    And the following account below that, 236, do you have

10   a reasonable belief that that account is owned by or held by

11   an entity that's owned by Toby and Michael?

12   A    Yes.

13   Q    And same thing for 5051, the $10,000 under that.  Do

14   you have a reasonable belief that that -- do you recognize

15   that account?  Let's start there.

16   A    I don't recall exactly which entity it's owned by.

17   Q    Okay.  But do you have a reasonable belief that that's

18   an account held by an entity owned by Toby and Michael as

19   well?

20   A    Yes.

21   Q    And so I want to go back to where we started back on

22   Page 4, and if you look at February 18 -- well, let me ask

23   you this question.  Going back to the top, 2-11-20, those

24   seven transfers of $62,100 from the management company to

25   Northside Acquisition, do you know why those transfers were

Page 97

1    made from the management company in seven separate

2    transactions in one single day?

3    A    I'd have to look at the exact transactions and what's

4    surrounding them, but I can venture to say that I believe

5    these transactions we actually were making -- we're moving

6    money in small amounts to be able to track -- to track what

7    it was being used for, or what it was either repaying, or

8    what bill it was going to pay.

9    Q    And so the other entities you saw on Page 6 and 7, now

10   they're Toby and Michael entities where these monies were

11   going out to.  Then that should be acknowledged.  Did those

12   entities have any contractual relationship with the

13   management company?

14   A    It's possible that some of them might in that there are

15   some entities that -- through which some payroll-related

16   expenses are paid.

17   Q    By the management company?

18   A    Yes.

19   Q    Have you seen any agreements between any of -- any of

20   Toby's entities -- Toby and Michael's entities in the

21   management company?

22   A    Not a written agreement, no.

23   Q    Then you go down to February 18, 2020.  You'll see an

24   account, eight transfers from the management company to this

25   Northside Acquisition account.  And I added them up at

Page 98

1    $67,300; do you see that?

2    A    Yes.

3    Q    Did you respond, Mr. Rauch?  I didn't hear you.

4    A    I said yes, I see them.

5    Q    Okay.  Thank you.  And do you see that the first

6    transaction is $27,000?

7    A    Yes.

8    Q    Okay.  If you would flip to Page 7 of 14.  The

9    transactions or the transfers from the management company to

10   Northside Acquisition that we're looking at, both on

11   February 11 and February 18, and all of the transactions

12   from the management company to Northside Acquisition

13   reflected on this bank account statement that was marked as

14   Exhibit 26.

15        All those funds -- did all those funds originate

16   through the Debtor's -- through the hotel operations?  Let

17   me ask it that way.

18   A    I'm sorry.  Referring to -- I'm a little confused what

19   you're referring to.  Are you referring to the money that

20   came in or the money that went out?

21   Q    Money going from the management company to Northside

22   Acquisition, did all those funds originate through hotel

23   operations?

24   A    I believe so.  Well, not necessarily.  Some of it

25   could've come from line-of-credit funds.

Page 99

1    Q    The management -- well, what line of credit does the

2    management company have?

3    A    It's not specifically a line of credit.  It's -- it's

4    basically the line of credit that Toby and Michael have with

5    the Debtor and the management company.

6    Q    I'm focusing on what specific line of credit does the

7    management company have with Michael and Toby?

8    A    I'm not sure I understand the question.

9    Q    Something was closing, and I couldn't hear your answer,

10   sir.

11   A    I'm not sure I understand the question.  There's a line

12   of credit from Toby and Michael either to the Debtor or the

13   management company.

14   Q    And that's what I'm trying to say.  You say either.

15   I'm familiar with the allegation that there's a line of

16   credit between Toby and Michael and the Debtor.  This is the

17   first I'm hearing about a line of credit between Toby and

18   Michael and the management company, so I'm focused on that

19   piece.  So can you give us any details of any specific line-

20   of-credit agreement between the management company, Toby

21   Moskovits, and/or Michael Lichtenstein?

22   A    Well, there were funds transferred from the management

23   company to Northside, and then (indiscernible) transferred

24   back.  So I'm not sure that it has to necessarily be on

25   their specific line-of-credit agreement, but that's how some

Page 100

1    of the funds were transferred.

2    Q    I'm not sure if that answered the question.  What line

3    -- what do you know about any specific line of credit

4    between the management company, and Toby and Michael?

5    A    I guess there is no specific line of credit with that,

6    no.

7    Q    And I asked you earlier in your testimony whether all

8    the funds that go through the management company originated

9    with the hotel, and I thought you said yes.

10   A    Well, they do originate with the hotel, but there are

11   instances where the funds would be moved to Northside, and

12   then occasionally would go in the reverse direction.  But

13   all the funds are sourced from revenue.

14   Q    So all the funds reflected on this account statement as

15   an example from the management company to Northside would

16   originate through the hotel, right?

17   A    Yes.

18   Q    Okay.  So if we could go back to Page 7, you'll see on

19   the same date, February 18, 2020 is $7,500 that's

20   transferred from Northside Acquisition to 7358.  That's the

21   Debtor, right?

22   A    Oh, okay.  Correct.  Yes.

23   Q    So Mr. Rauch, why -- if the Debtor needed money -- I'm

24   a bit confused because if the money originated with the

25   Debtor, went to the management company, went to Northside,

Page 101

1    and then went back to the management company, what's the

2    purpose of that long transaction?

3    A    Well, in this instance, it would originate from the

4    hotel's revenue.

5    Q    Right.  And it went to the management company.

6    A    It goes to the management company.

7    Q    Management company sends it to Northside, right?

8         MR. KELLEY:  Can we let the witness finish?  I'm

9    sorry, Your Honor.  It's getting hard to follow in the

10   record.

11        THE COURT:  Go ahead, Mr. Freedman.  I think he

12   can follow.

13        MR. FREEDMAN:  Thank you.

14   BY MR. FREEDMAN:

15   Q    Then it goes from Northside back to the Debtor, right?

16   A    Yes.

17   Q    What would be the purpose of that roundhouse

18   transaction?

19   A    I think that it was -- it was just decided that money

20   was going to move to Northside Acquisition.  That's how it

21   was done.

22   Q    To your knowledge, is there any business purpose for

23   that?

24   A    My only thought was -- at the time -- that I believe at

25   the time we might've felt that it could simplify the

Page 102

1    tracking of the money being moved.

2    Q    How so?

3    A    It was all moved through one central location, so it

4    was able -- we were able to track it through that central

5    location.

6    Q    Well, if the money went from the Debtor to the

7    management company, from the management company to the

8    Debtor, you could track it that way as well, right?

9    A    Correct.  Correct.

10   Q    You wouldn't have to track -- you wouldn't have to

11   track it through a number of transactions.  It would just be

12   one transaction, right?

13   A    Right.  Correct.  It could have been done that way.

14   Yes.

15   Q    And similarly, under that, you see another transfer of

16   $2,000 to New York Street Property Development.  That's the

17   same entity that we looked at above that you believed --

18   reasonably believed could be related to Toby and Michael,

19   right?

20   A    Yes.

21   Q    And under that, you'll see the same $27,000 that went

22   from the management company to Northside on February 18,

23   2020 then goes from Northside to the Debtor.  Is that right?

24   A    Correct.

25   Q    Same thing for -- you see $4,300 that went from the

Page 103

1    management company to Northside then goes back to the Debtor

2    on the same day.

3    A    Correct.

4    Q    And then just to finish it out, you see $4,300 going

5    through the Checking Account 9 -- all on February 18 --

6    9641.  Do you know what account that is?

7    A    I'm not sure what the entity is.

8    Q    Do you reasonably believe that that's an account

9    associated with an entity owned by Toby and Michael?

10   A    I believe so, yeah.

11   Q    Then we see $13,000 -- the same $13,000 transferred

12   from the management company to Northside.  You see it going

13   to Account 4483.  Do you recognize that account?

14   A    I'm not sure what the entity is.

15   Q    Do you reasonably believe that's an account of an

16   entity owned by Toby and Michael?

17   A    Yes.

18   Q    And then finally, you see $7,500 on that same date

19   going to Checking Account 2536.  Do you know what account

20   that is?

21   A    I don't know what the account is.

22   Q    Do you reasonably believe that that's an account -- or

23   an entity owned by Toby and Michael?

24   A    Yes.

25   Q    And I've just taken you through an example of this, but

Page 107

1    the Debtor and the management company had not timely filed

2    its tax returns?

3    A    I don't believe I asked that.  That was under their

4    control.

5    Q    Mr. Rauch, are you familiar with the hotel -- the New

6    York City hotel occupancy tax collected at the hotel?

7    A    Yes.

8    Q    And I'm -- am I correct that for every room that's

9    rented at the hotel, the hotel collects $2 per room?

10   A    Yes.

11   Q    And 5.875 percent of the room rate?

12   A    Yes.

13   Q    And before mid-2020, were those hotel occupancy taxes

14   collected at the hotel -- were they deposited in a separate

15   or segregated account?

16   A    I'm sorry.  Which time period did you say?

17   Q    Before mid-2020.

18   A    They were not being segregated.

19   Q    Were the hotel occupancy taxes collected at the hotel

20   comingled with other revenue collected at the hotel?

21   A    It was in a -- it was in the same account.

22   Q    With all the other revenue, correct?

23   A    Other revenue, yes.

24   Q    At some point in mid-2020, did the management company

25   open up a separate account for the collection and receipt of

Page 108

1    the hotel occupancy taxes collected at the hotel?

2    A    Yes.

3    Q    And you have a good understanding that there's a

4    requirement to file quarterly returns for the City of New

5    York in respect to those hotel occupancy taxes?

6    A    Yes.

7    Q    And make a quarterly remittance, correct?

8    A    What was that?

9    Q    And make a quarterly remittance.

10   A    Quarterly, yes.

11   Q    So from mid-2020 when the management company opened up

12   a segregated account for the hotel occupancy taxes, did

13   either the management company or the Debtor regularly

14   provide the City of New York with those quarterly tax

15   returns?

16   A    No, they did not.

17   Q    Did it make its quarterly required remittance to the

18   City of New York of the collected -- hotel occupancy taxes

19   collected at the hotel?

20   A    No, it did not.

21   Q    And you're aware that the Debtor, 96 Wythe Acquisition,

22   filed for bankruptcy on February 23, 2021, right?

23   A    Yes.

24   Q    Okay.  And are you aware at around that time, that the

25   management company was holding in that segregated account

Page 109

1    $252,100 in hotel occupancy tax revenues collected at the

2    hotel?

3    A    Yes.

4    Q    Can you tell the Court what happened to that $252,100

5    in hotel occupancy tax revenue a few days after the Debtor

6    filed the bankruptcy?

7    A    It was transferred to another entity.

8    Q    And what entity was that, sir?

9    A    I believe it was Northside Management.

10   Q    Okay.  Northside Management LLC?

11   A    Yes.

12   Q    And is Northside Management LLC an entity owned by Toby

13   and Michael?

14   A    I believe so.

15   Q    Okay.  What -- to your knowledge, what is the business

16   of Northside Management LLC?

17   A    It's property management or other project-management-

18   related management company.

19   Q    Does Northside Management LLC have any contractual

20   relationship with the management company?

21   A    I don't believe so.

22   Q    Does Northside Management LLC have any contractual

23   relationship with the Debtor?

24   A    I don't believe so.

25   Q    Do you know what happened to that $252,100 of hotel

Page 113

1    Q     And did you do that on more than one occasion?

2    A     Have that discussion?

3    Q     Yes, sir.

4    A     I'm not sure.  It may have only been one occasion.

5    Q     And prior to the hotel occupancy taxes being maintained

6    in a segregated account, what did the management company or

7    hotel do with those funds?

8    A     It was generally utilized for hotel expenses.

9    Q     And the hotel occupancy taxes from 2017 through at

10   least the date of bankruptcy filing, February 2021, were not

11   remitted to the City of New York; do I have that right?

12   A     Correct.

13   Q     Instead, they were used to -- for hotel operations,

14   correct?

15   A     Yes.

16   Q     The obligation to the City of New York in respect to

17   the hotel occupancy tax collections, were those liabilities

18   quoted in the books and records of the management company?

19   A     Yes.

20   Q     Were they booked as -- were they accepted as a

21   liability of the management company or a liability of the

22   Debtor?

23   Q     And about -- there was some discussion about a real

24   estate abatement that sold by the State of New York to the

25   hotel, right?

Page 114

1    A      Right.

2    Q      And that would be an entitlement that would be

3    attributed to the hotel, the Debtor in other words, right?

4    A      Yes.

5    Q      And was there a discussion between (Indiscernible) and

6    you in some form or fashion that the hotel occupancy taxes

7    didn't have to be remitted because of an issue with respect

8    to the potential of a real estate abatement?

9    A      Not necessarily that they didn't have to be remitted,

10   but more so that pending with -- of that issue we would be

11   able to either use that money for hotel operating expenses

12   or to remit the payments for occupancy tax.

13   Q      That is right.  The potential of the real estate

14   abatement isn't an attribute of the Debtors, right?

15   A      Correct.

16   Q      Okay.  And you were hooking the liability when you said

17   to them there are occupancy taxes as a liability of the

18   management company, right?

19   A      That's correct.

20           MR. FREEDMAN:  Do you have that testimony?

21           WOMAN 1:  Yeah, (indiscernible).

22           MR. FREEDMAN:  Excuse me for one second, Your

23   Honor.

24   BY MR. FREEDMAN:

25   Q      Can you explain to us why we are reporting the

Page 126

1    A    Interest was not recorded.

2    Q    Did you know the terms of the loans?

3    A    No.

4    Q    And the loans that you were recording, were the loans

5    actually made by Toby and Michael individually?

6    A    Some of the transfers were individual.

7    Q    A lot weren't, right?

8    A    Correct.

9    Q    Most weren't, right?

10   A    Correct.

11   Q    And once the examiner's report was provided, Michael

12   asked you to take an analysis of those loans, right?

13   A    We already had done an analysis prior to the issuance

14   of the report.

15   Q    And when did you start that analysis?

16   A    I don't recall exactly.  Maybe it was the end of 2021.

17   Q    That would've been the first time that an analysis was

18   undertaken?

19   A    To that extent, yes.

20            MR. FREEDMAN:  Can you bring up the joint equity

21   report?  Sorry, Your Honor.  One moment, please.

22            THE COURT:  Sure.  Does this have an exhibit

23   number?

24            WOMAN 1:  Debtor's 22.

25            MR. FREEDMAN:  Debtor's 22, and we're not moving

Page 127

1    it into evidence, Your Honor.

2              THE COURT:  Okay.

3    BY MR. FREEDMAN:

4    Q    Was this the report that you prepared, Mr. Rauch?

5    A    It's the summary page of it.

6    Q    And was this prepared under the supervision of Mr.

7    Lichtenstein?

8    A    Yes.

9              MR. FREEDMAN:  Can we just have a copy of it?  I

10   can't see it because (indiscernible).

11   BY MR. FREEDMAN:

12   Q    So I just want to make certain I understand this

13   report.  On the top box, owners' loans to 96 Wythe and

14   payments, you see where I'm at?

15   A    Yes.

16   Q    Owners loans -- go -- by the way, all of the

17   information on this report would've been based on what you

18   just testified earlier is information that Michael told you,

19   right?

20   A    And was then recorded in the books and records.

21   Q    Michael told you what was a loan and then it was

22   recorded in the books and records of the Debtor and the

23   management company, right?

24   A    At the time the money was transferred, yes.

25   Q    Would -- but Michael didn't give you any documents to

Page 128

1    show that?

2    A    I didn't -- at the time I didn't feel it was necessary.

3    And no, he did not provide.

4    Q    So when you say owner's loans advances to 96 Wythe,

5    right, those owners' loans, owner's -- you're talking about

6    Toby and Michael, right?

7    A    Correct.

8              MAN 2:  Your Honor, I have no problem with him

9    questioning a witness from an exhibit, but we ought to admit

10   this in evidence.  I don't know how you conduct an inquiry

11   of a witness using a document that's not admitted in

12   evidence.  So we have no objection to it being admitted, but

13   I don't think making inquiry from an unadmitted document is

14   appropriate for the record.

15             MR. FREEDMAN:  Your Honor, I don't have a problem

16   marking it, but I'm not admitting it.  I think that's

17   proper.  I can inquire of a witness of a document that's not

18   admitted.

19             THE COURT:  Let's just --

20             MR. FREEDMAN:  That's proper.

21             THE COURT:  Let's just -- well, it's marked as

22   Debtor's 22, so that's sufficient.

23             MR. FREEDMAN:  Thank you.

24   BY MR. FREEDMAN:

25   Q    So when you say owners' loans as you'd stated earlier

Page 129

1    -- well, first of all, owners are referring to Toby and

2    Michael, right?

3    A    Yes.

4    Q    The majority of the loans didn't come from Toby and

5    Michael's accounts.  They came from related entity accounts,

6    right?

7    A    (Indiscernible) they have ownership interest in, yes.

8    Q    You've seen the line documentation proving that Toby

9    and Michael have an ownership interest in every entity that

10   made transfers to the Debtor?

11   A    Not every single one.  I have not seen every single

12   one, no.

13   Q    And owners' loan with payment from 96 Wythe, those

14   payments weren't always made to Toby and Michael either,

15   right?

16   A    Correct.

17   Q    The majority weren't made to Toby and Michael, right?

18   A    Correct.

19   Q    And then the last item, owners' loans repayments from

20   hotel operations, and you (indiscernible), right?

21   A    Correct.

22   Q    When we say hotel operations, what are you referring

23   to?

24   A    The revenue of the hotel.

25   Q    Okay, but I thought the box above shows advances to the

Page 130

1    Debtor and repayments from the Debtor.  So what's the

2    difference between that and hotel operations?

3    A    The repayments from the Debtor are not from hotel

4    revenue.

5    Q    Who are the payments from?

6    A    It could be from other sources.  It could be from the

7    original money that came in itself.

8    Q    You mean -- well, was that money segregated somehow?

9    A    I don't think so.

10   Q    So how do you know it was repayment from money that

11   (indiscernible) in itself?

12   A    I'm not exactly sure what the source was.  I'm saying

13   it could've been.

14   Q    So I'm just trying to understand.  When you say hotel

15   operations, it's not money from the Debtor, correct?

16   A    Correct.

17   Q    And then transfers from Northside to 96 Wythe, that

18   would be like transfers that we saw before in the Bank of

19   America account statement, right?  Or some money going from

20   the management company to Northside, Northside to other

21   entities, and other entities back, and then to the Debtor,

22   right?  That's what you're referring to?

23   A    Yes.

24   Q    You're familiar with the $350,000 IDL loan that the

25   management company took out in July of 2021, sir?

Page 131

1    A    I am aware of it.

2    Q    And that loan was taken out in the name of the

3    management company?

4    A    Yeah.

5    Q    And to the best of your knowledge, did the management

6    company have any other active businesses in July of 2021

7    other than operating the hotel?

8    A    As I said before, there may be other projects that Toby

9    and Michael were working on, but not other specific

10   properties that were being managed.

11   Q    And when this money came into the management company,

12   did it stay with the management company?

13   A    I don't believe it did, but I did not track every

14   dollar of this amount.

15   Q    Okay.  Are you generally aware that the money quickly

16   was transferred to an entity called Northside Acquisition

17   Partners LLC?

18   A    I can't say exactly without looking at it.  I don't

19   recall.

20   Q    Did -- as the record finance for the management

21   company, did you record the receipt of that $350,000 in the

22   books and records of the management company?

23   A    No.

24   Q    Why not?

25   A    It wasn't part of the regular (indiscernible).

Page 132

1    Q    Well, the loan was taken out in the name of the

2    management company, right?

3    A    Right.

4    Q    It was received into a bank account in the name of the

5    management company, right?

6    A    Correct.

7    Q    But now the receipt of that $350,000 was never recorded

8    in the books and records of the management company

9    (indiscernible), correct?

10   A    Correct.

11   Q    Did someone at the management company tell you not to

12   record it into the books and records of the management

13   company?

14   A    No.

15   Q    You just took it upon yourself to do that?

16   A    Yes, because I was overseeing the hotel's operating

17   account.

18   Q    Well, who was overseeing -- but who would've been

19   responsible for recording the receipt of the $350,000 into

20   the books and records of the management company if not you?

21   A    It could've been Michael who recorded it.

22   Q    But he didn't.

23   A    Not that I'm aware of.

24   Q    And the account, the management company account where

25   the $350,000 was received, was that a standard operating

Page 133

1    account for the management company?

2    A    No, it was a separate account.

3    Q    So was it an account that was just established shortly

4    before the receipt of the $350,000?

5    A    I'm not sure exactly when it was established.  It

6    could've been a little -- it could've been months before

7    that also.

8    Q    Were you even aware of the existence of this account at

9    the time?

10   A    I don't believe that I was at the time.

11   Q    So to the best of your knowledge, is this an account

12   that Michael would've established?

13   A    Well, I mean, Michael and Toby opened all of the

14   accounts.

15   Q    But they didn't tell you about this one.

16   A    Not specifically.

17   Q    Well, not specifically, but did they tell you about it

18   generally?

19   A    Well, not because it wasn't an operating account.

20   Q    It was an account just used for the receipt of the

21   $350,000, right?

22   A    I believe so.

23          MR. FREEDMAN:  Your Honor, may I have one moment

24   to confer with my colleagues?  I think I'm done.

25          THE COURT:  Okay.

Page 142

1          THE COURT:  And so how would you know that the

2    source of the payment was not from the Debtor's operations?

3          THE WITNESS:  It's money that comes from

4    (indiscernible) entity into the Debtor.

5          THE COURT:  But once it's in the Debtor, it didn't

6    come out the next minute, right?  It was in there for a

7    while.

8          THE WITNESS:  Exactly.

9          THE COURT:  So how did you figure out that it was

10   money coming out from another entity as opposed to --

11   another entity's money as opposed to from operations?

12         THE WITNESS:  It's recorded on the books that way.

13         THE COURT:  But it's comingled, so how could it be

14   recorded in any way other than just money in the Debtor?

15         THE WITNESS:  Knowing the source of the money,

16   it's recorded as a loan.

17         THE COURT:  So you backed into concluding that the

18   payments were on a -- were from money that had been lent.

19         THE WITNESS:  What do you mean by the payment?

20         THE COURT:  Well, you -- on the exhibit that was

21   designated Exhibit 22, right, there was a column, a

22   horizontal line that said from operations, but you testified

23   it really wasn't from operations, it was from third party

24   money, right?

25         THE WITNESS:  Repayments from the Debtor, yes.

Page 143

1           THE COURT:  Repayments by the Debtor, not out of

2      the Debtor's operating income, but from third party money.

3           THE WITNESS:  (Indiscernible) --

4           THE COURT:  But the money was not kept.  That

5      money that's on that line was not kept in an account that

6      said this is third party money, right?  It was kept in a co-

7      mingled account.

8           THE WITNESS:  Correct, but it went back.

9      Generally speaking, it went back to where it came from.

10          THE COURT:  Well, but how do you know?  I mean,

11     the Debtor made various payments, right?  Some -- how did

12     you distinguish between money that was paid from operations

13     and money that was paid in essence, according to that chart,

14     just going back again?

15          THE WITNESS:  Well, that was only from the

16     Debtor's perspective.  So the operation's money was kept --

17     the operation's money was separate from this money.

18          THE COURT:  Why would the money have been lent

19     unless it was for operations?

20          THE WITNESS:  It may have gone to pay construction

21     bills or other Debtor related expenses.

22          THE COURT:  And that doesn't count as operations?

23          THE WITNESS:  No.  From our standpoint, we --

24     operations is only operating revenue and expenses.

25          THE COURT:  But again, if it all goes into Debtor

Page 144

1    accounts that's comingled with the Debtor's own money that

2    it generates, how would you know that it's a payment from

3    itself, which I think was the basis for that line, right?

4    It's just...

5                THE WITNESS:  Well, generally speaking, the money

6    that came into the Debtor was their equity, a loan from Toby

7    and Mike from insiders, or a loan from another source.

8                THE COURT:  Right.

9                THE WITNESS:  So it's recorded as money in from

10   one of those sources.  And then when the money went back out

11   to the original account that it came from, that is the

12   (indiscernible) payments on that specific loan.

13               THE COURT:  But I guess that's my question.  Why

14   would it be counted as a payment?  It's counted as a

15   payment, but why is it counted as a payment for a specific

16   loan?

17               THE WITNESS:  I would say it's the same way we are

18   (indiscernible) in that Michael would say that this is a

19   specific loan from this specific entity.

20               THE COURT:  Right.

21               THE WITNESS:  This is why the money went out to

22   that entity to be recorded as this is a loan repayment.

23               THE COURT:  So it's really he just -- he said this

24   is how it should be done.

25               THE WITNESS:  He said that this money that went

Page 145

```
 1    back to this entity was a repayment on account of the

 2    original loan.

 3              THE COURT:  Right.  And it wasn't always the same

 4    entity, right?

 5              THE WITNESS:  Correct.

 6              THE COURT:  It could've been various other

 7    entities that they controlled.

 8              THE WITNESS:  Correct.

 9              THE COURT:  So it wasn't necessarily even a

10    payment on the loan.

11              THE WITNESS:  Well, (indiscernible) --

12              THE COURT:  It could've been a payment to some

13    other entity that owed money to someone else.

14              THE WITNESS:  It could be, but generally speaking,

15    the original source is where the money went back to.

16              THE COURT:  How do you know that?

17              THE WITNESS:  Because you can see the money came

18    in from one specific entity, let's say an entity owned by

19    564 St. John's, and the money went back to that same entity.

20              THE COURT:  But the account statement actually

21    shows the same money then going right out again, right?

22              THE WITNESS:  In some instances yes and some

23    instances no.

24              THE COURT:  Okay.  So -- and it's not according to

25    any sort of payment terms on the loan, right?  There's no
```

**EXHIBIT 2**

**CONFIDENTIAL**

## 96 Wythe Acquisition - Equity & Loans Report

BS"D

| Owner's Loans to 96 Wythe & Repayments | Prior to 2017 | 2017 | 2018 | 2019 | 2020/21 | TOTAL |
|---|---|---|---|---|---|---|
| Owner's Loans - Advances to 96 Wythe | 1,500,000.00 | 3,301,473.03 | 5,635,264.92 | 271,560.00 | 213,486.15 | 10,921,784.10 |
| Owner's Loans - Repayments from 96 Wythe | - | (298,584.71) | (409,448.20) | (834,806.32) | (102,610.00) | (1,645,449.23) |
| Owner's Loans - Repayments from Hotel Operations (See Detail Below) | - | (20,175.47) | (103,502.82) | (2,657,862.13) | (115,815.16) | (2,897,355.58) |
| Net Owner's Loans | 1,500,000.00 | 2,982,712.85 | 5,122,313.90 | (3,221,108.45) | (4,939.01) | 6,378,979.29 |

*Backup for Owner's Loans Advances to & Repayments from 96 Wythe are located in folder number 2*

| Owner's Loans - Repayments from Hotel Operations (Detail) | Prior to 2017 | 2017 | 2018 | 2019 | 2020/21 | TOTAL |
|---|---|---|---|---|---|---|
| Hotel Operations Transfers to Northside | | (1,605,398.50) | (3,790,242.58) | (5,891,969.63) | (311,679.16) | (11,599,289.87) |
| Transfers from Northside to 96 Wythe (To Cover Property-Level Expenses) | | 1,585,223.03 | 3,686,739.76 | 3,234,107.50 | 195,864.00 | 8,701,934.29 |
| Net Amount of Loan Repayment | | (20,175.47) | (103,502.82) | (2,657,862.13) | (115,815.16) | (2,897,355.58) |

*Backup for the transfers from Hotel Operations & the transfers into 96 Wythe are located in folder number 3*

| Equity | Prior to 2017 | 2017 | 2018 | 2019 | 2020/21 | TOTAL |
|---|---|---|---|---|---|---|
| Owner's Equity | 17,309,087.89 | | | | | 17,309,087.89 |
| Other Equity | | 4,000,000.00 | | | | 4,000,000.00 |
| Total | 17,309,087.89 | 4,000,000.00 | - | - | - | 21,309,087.89 |

**Debtor's Ex 22**

**Williamsburg Hotel Supplemental Production - 000028**

**EXHIBIT 3**

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -----------------------------------X

5    IN RE:

6    96 WYTHE ACQUISITION, LLC,            Chapter 11

7                        Debtor.

8    CASE NO.: 21-22108(RDD)

     -----------------------------------X

9

10                ZOOM VIDEOCONFERENCE

11

                          March 10, 2022

12                        9:43 a.m.

13

14           VIDEOTAPED DEPOSITION of MICHAEL

15    LICHTENSTEIN, individually and as designated

16    corporate representative of the debtor, before

17    Melissa Gilmore, a Stenographic Reporter and

18    Notary Public of the State of New York.

19

20

21

22

23

24

25

Page 37

1                     LICHTENSTEIN

2               Do you know if you're an employee of

3    the debtor?

4         A.    I guess the answer is I'm not an

5    employee of the debtor.

6         Q.    Thank you.

7               Have you ever been an employee of

8    the debtor?

9         A.    I'm not sure what that question

10   means, but the answer is probably no.

11        Q.    Do you have a position or a title

12   with the debtor?

13        A.    Yes, owner.

14        Q.    Anything else?

15        A.    Manager.

16        Q.    Anything else?

17        A.    Not that I recall now.

18        Q.    Mr. Lichtenstein, who owns the

19   revenue generated at the hotel, the debtor or

20   the management company?

21              MR. KELLEY:  Objection, form.

22              Go ahead.  You may respond.

23        A.    Ultimately, the debtor.

24        Q.    Why did you clarify your answer with

25   "ultimately the debtor"?

Page 38

1                    LICHTENSTEIN

2        A.    Because as is usual in hotels, the

3    money flows through the management company on

4    behalf of the owner, which is the debtor in

5    this case.

6        Q.    Thank you.

7              THE WITNESS:  By the way, Melissa,

8        if I am not speaking loudly enough, feel

9        free to demand loudness.

10             THE REPORTER:  Thank you very much.

11       Q.    Have you ever received any

12   compensation from the debtor, either directly

13   or indirectly?

14             MR. KELLEY:  Objection, form.

15             You may answer, Michael.

16       A.    No.

17       Q.    Have you ever received any

18   distributions from the debtor, either directly

19   or indirectly?

20       A.    Well, given the circumstances and

21   the behavior of the lender in this case,

22   coupled with the COVID situation, there were

23   never -- there was never a possibility to take

24   any distributions.

25       Q.    So the answer to that question is

**EXHIBIT 4**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   --------------------x
    IN RE:

5                            Chapter 11
    96 WYTHE ACQUISITION,

6   LLC,                     Case No. 21-22108(RDD)
     Debtor.

7   --------------------x

8

9                  12:00 p.m.
                   March 15, 2022

10

11

12        VIDEOTAPED VIRTUAL DEPOSITION of DAVID

13   GOLDWASSER, a Witness in the above entitled

14   matter, pursuant to Rule (30(b)(6) and in his

15   individual capacity, before Stephen J. Moore, a

16   Registered Professional Reporter, Certified

17   Realtime Reporter and Notary Public of the State

18   of New York

19

20

21

22

23

24

25

Page 67

1                          DAVID GOLDWASSER
2    relationship with or what was it in respect of
3    this transaction?
4          A       For layman's terms, it was the
5    syndicator who arranged the transaction and
6    managed the transaction.
7          Q       The FIA/Heritage transaction?
8          A       Yes.
9          Q       And did you get or did that
10   company receive a fee for that syndication?
11         A       Yes.
12         Q       How much?
13         A       I believe it was either $50 or
14   $75,000.
15         Q       Now, on the bankruptcy
16   schedules, I don't see either Ms. Moskovits or
17   Mr. Lichtenstein reflected as a creditor
18   anywhere.
19                 Would you agree with me there?
20         A       I don't recall seeing them as a
21   creditor on an individual basis, that's
22   correct.
23         Q       Did Mr. Lichtenstein or Ms.
24   Moskovits ever tell you that they had a claim
25   against the Debtor?

Page 68

1                          DAVID GOLDWASSER

2           A          So, using the word claim, they

3      have never said, they said they have lent --

4      from my knowledge and understanding, they have

5      lent money or put money into the -- into the

6      entity.

7                          As far as I remember, the word

8      claim was never used, to my knowledge, that I

9      remember.

10          Q          So, in respect to any lending

11     transaction that Ms. Moskovits or

12     Mr. Lichtenstein may have had with the Debtor,

13     did they express to you in your efforts to

14     gather information and prepare the bankruptcy

15     schedules that were verified as true and

16     correct, whether or not the Debtor still owed

17     them any money?

18                          MS. PARLOVECCHIO:  Objection.

19          A          Somebody has their e-mail

20     working.

21                          They have always told me that

22     they have either lent money to the hotel, I

23     don't know if it was in their direct name, or

24     if it was some other entity.

25                          I know that this is one of the

Page 69

1                    DAVID GOLDWASSER

2    highlights of question within the examiner

3    report, but they never felt of putting a claim,

4    per se, against the -- against the entity that

5    owned the hotel.

6                    They definitely have made

7    statements that they lent money to the hotel or

8    they, you know, in order to keep it afloat.

9                    But never that they wanted to

10   put a claim on their own hotel.

11        Q        When you were gathering this

12   information pursuant to the checklist that you

13   provided --

14        A        Um-hum.

15        Q        -- were you ever provided any

16   documentation that evidenced loans that Ms.

17   Moskovits and Mr. Lichtenstein made to the

18   Debtor?

19        A        That was not a focus that we

20   had.

21                    Could there be something?  There

22   could.

23        Q        The question simply was did they

24   provide you anything?

25        A        I don't know, sitting here right

Page 70

DAVID GOLDWASSER

1
2    now I don't know.

3         Q       Do you recall seeing anything?

4         A       I do not recall seeing anything,

5    but that doesn't mean there wasn't.

6         Q       Do you recall Ms. Moskovits and

7    Mr. Lichtenstein ever providing you a copy of

8    any loan agreement between them and the Debtor?

9         A       I do not recall seeing that,

10   sir.

11        Q       And flipping to page 22 of 33 --

12   22 of 33?.

13        A       Give me a second.  It's one by

14   one, it doesn't have like a click.  Yes, I am

15   on that page.

16        Q       Schedule G, executory contracts

17   and unexpired leases.  Are you there?

18        A       Yes.

19        Q       And you checked off no.

20                Do you see that?

21        A       Yes.

22        Q       And no executory contracts or

23   unexpired leases were referenced in the

24   schedule, correct?

25        A       At that point they weren't,

Page 80

1                    DAVID GOLDWASSER

2          I don't want you to go off your flow of

3          thoughts.  I am pretty adaptable.

4                    THE WITNESS:  I try to respect

5          everybody.

6                    MR. FREEDMAN:  Let's come back in

7          five minutes.

8                    THE WITNESS:  Perfect.  Five

9          minutes is great.

10                   THE VIDEOGRAPHER:  The time is

11         1:18 p.m. Eastern time March 15, 2022.

12         We are now off the record.

13                   (At this point in the proceedings

14         there was a recess, after which the

15         deposition continued as follows:)

16                   THE VIDEOGRAPHER:  The time is

17         now 1:33 p.m.  You are back on the

18         record.  You may proceed.

19         Q    Mr. Goldwasser, you should have

20    Exhibit 4 up now.

21                   (The above described document was

22         marked Exhibit 4 for identification as of

23         this date.)

24         A    All right.  Okay.

25         Q    Exhibit 4 is a line of credit

Page 81

1                    DAVID GOLDWASSER

2    agreement and note between Toby Moskovits and

3    Michael Lichtenstein as lender and the Debtor

4    as borrower.

5                    Have you seen this document

6    before?

7          A      This is the first that I am

8    seeing this.

9          Q      So in compiling the documents to

10   prepare the schedule and the subsequent

11   documents that you received to amend the

12   schedules, no one ever provided you with a copy

13   of this agreement?

14         A      I don't remember seeing this

15   agreement, no.

16                    MR. FREEDMAN:  Let's show him

17            Exhibit 5, please.

18                    (The above described document was

19            marked Exhibit 5 for identification as of

20            this date.)

21         Q      Tell me when you have Exhibit 5.

22         A      I have it.

23         Q      It's a modification to the other

24   exhibit and yes, Exhibit 5 is first amendment

25   to the line of credit agreement and note, is it

Page 82

                    DAVID GOLDWASSER

1

2    fair to say that you have never seen this

3    document either?

4         A     I don't remember seeing the

5    document, that's correct.

6         Q     I want to go back to your

7    testimony about reflecting obligations owed to

8    the Debtor's principals, Ms. Moskovits and

9    Mr. Lichtenstein.

10              Mr. Lichtenstein testified last

11   week that the Debtor owes he and Ms. Moskovits

12   $6 million.

13              Before today, were you aware of

14   that?

15        A     I think I stated before that

16   they have always maintained and stated that

17   they had lent money into the hotel.

18              I did not know there was a

19   formalized document, I don't remember seeing a

20   formalized document.

21              They have always told me they

22   lent money into the hotel from a long time ago

23   through now.  That's never changed.

24              As far as them being creditors,

25   I think insider creditors are really deemed as

Page 90

                        DAVID GOLDWASSER

1

2     third largest claim in the case?

3          A      My practice as CRO, I've never

4     seen equity loans that have any credence to

5     equity, so it's a non-event in the case.

6                 If you want to say it was an

7     omission and I have a black mark as a CRO, you

8     can say that.

9                 It has no effect on the case.

10    Insider debt never has any effect on the case.

11                It's meant for statement, and it

12    pretty much in itself, they are not going to

13    get any treatment, they are not going to get

14    any money, they are not going to get anything,

15    so in my practice of what actually happens,

16    zero.

17         Q      So it's your understanding that

18    that loan, if scheduled, would just be treated

19    as equity and --

20         A      It would be one level below

21    equity, but it would have no credence, because

22    it's an insider claim, and all the other claims

23    would have precedence.  It becomes a

24    subordinated class.

25         Q      Below equity?

Page 91

1                      DAVID GOLDWASSER

2          A       Yes.

3          Q       In your experience, when equity

4   provides a loan and the entity files for

5   bankruptcy, is that loan ever treated as an

6   unsecured claim against the estate?

7          A       It's treated as an unsecured

8   claim, but at a different class level.

9          Q       Below equity?

10         A       So, general unsecured creditors

11  is, I'm just going to use for layman's

12  perspective, I'm not an attorney, but when you

13  have a pool of general unsecured creditors

14  which are unaffiliated, then that makes up one

15  class.

16                 When you have insider creditors,

17  that's generally a different class, that's

18  removed higher, above -- it might be right

19  below the equity class, but it's subordinated

20  to every other creditor and/or claim that's in

21  the case.

22                 So that the effect of it is a

23  treatment effect, more than an actual voting

24  and plausibility effect for any other reason.

25                 MR. FREEDMAN:  Whoever typing,

Page 102

1                     DAVID GOLDWASSER

2                 "Coupled with the independent

3     review by the Debtor's advisors, including the

4     CRO, the Debtor's counsel and Getzler Henrich &

5     Associates LLC with the market and current

6     trend in the hotel industry, the terms of the

7     management agreement are consistent with

8     market."

9                 So it says, "Coupled with the

10    independent review, including the CRO."

11                You didn't do any independent

12    review, correct?

13         A     If you continue to read the

14    sentence, you will get the entire context and

15    not take it out of place.

16         Q     Did you do any independent

17    review, sir?

18                MS. PARLOVECCHIO:  Objection.

19                Gary, you've been reading these

20          lengthy passages.  Could you please share

21          the document so we can see what you're

22          reading from.

23         Q     Did you do any independent

24    review of the management agreement, sir?

25         A     I did not do any independent

Page 103

1                    DAVID GOLDWASSER

2    review of the management agreement.  It is not

3    to be taken out of context to the fact you are

4    reading something I'm not looking at, and

5    you're basing your questions on something you

6    are trying to take out of context.

7           Q      Thank you for answering the

8    question, sir.

9                  Do you know why the management

10   company did not file a Proof of Claim in the

11   case?

12          A      I think you should ask their

13   counsel.

14          Q      I'm asking you if you know.

15          A      I don't.

16          Q      Do you know why Toby and Michael

17   didn't file a Proof of Claim in the case?

18          A      I do not.

19          Q      Were you involved in

20   negotiations and discussions relating to the

21   PPP stipulation referenced in the Disclosure

22   Statement?

23                 MS. PARLOVECCHIO:  Objection,

24          calls for privileged communication.

25          A      I was.

Page 137

1                    DAVID GOLDWASSER
2           Q       So the plan that you are talking
3     about getting confirmed in a couple of weeks is
4     a plan that contemplates the assumption of the
5     management agreement, correct?
6                    MS. PARLOVECCHIO:   Objection.
7           A       If you would like to show me
8     where in the plan you are asking me to confirm,
9     I'm more than happy to confirm.
10          Q       Do you have an understanding
11    that the plan contemplates the assumption of
12    the management agreement that I've shown you
13    here today?
14          A       Yes, I do.
15          Q       Okay.
16                   And the management agreement on
17    one side has the Debtor and on the other side
18    has the management company, right?
19          A       Okay.
20          Q       And it's the same management
21    company that stole $252,100 of trust fund money
22    and transferred it to Northside Management LLC,
23    correct?
24                   MS. PARLOVECCHIO:   Objection.
25          A       You are using the word stole.  I

Page 138

1                    DAVID GOLDWASSER
2    didn't see the word stole anywhere, and I'm not
3    putting a definition.
4          Q      What in your mind is it called
5    when you take $252,100 of trust fund and
6    transfer it to a non-Debtor, non-management
7    company affiliated entity?
8                 What do you call that, sir?
9                 MS. PARLOVECCHIO:   Objection.
10         A      A bad decision.
11         Q      And that management company that
12   made that bad decision is the same management
13   company that you're advocating continue to
14   manage this hotel, correct?
15         A      Yes.
16         Q      And continue to handle hotel
17   occupancy tax trust funds, correct?
18         A      Yes.
19         Q      That hasn't managed them at all
20   since the beginning -- hasn't managed them well
21   at all since the beginning of the operations of
22   this hotel, correct?
23                MS. PARLOVECCHIO:   Objection.
24         A      That's a subjective discussion
25   by you.  As I said, it's all been rectified,

**EXHIBIT 5**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------X   Case No.  21-22108-rdd
IN RE:                           .  Chapter 11
                                 .  300 Quarropas Street
96 WYTHE ACQUISITION, LLC,       .  White Plains, NY  10601
                                 .
          Debtor.                .  March 8, 2022
--------------------------------X  10:12 a.m. - 11:30 a.m.
```

**21-22108-rdd     96 Wythe Acquisition LLC**     *Ch. 11*

Notice of Agenda for March 8, 2022 Hearing (related document(s)
367, 4, 336, 422, 439, 432, 351, 302, 247, 406, 295, 417, 310,
441, 398, 389, 370, 371, 136, 369, 374, 328, 353, 376, 293,
431, 429, 393, 343, 305, 424, 320, 400, 253, 327, 324, 377,
390, 423, 375, 294, 433, 254, 333, 436, 430, 248, 435, 306,
382, 388, 325)

 [*DOCKET MATTERS AND APPEARANCES CONTINUED ON SUCCEEDING PAGES*]

                    HONORABLE ROBERT D. DRAIN
                 UNITED STATES BANKRUPTCY JUDGE


VIRTUAL APPEARANCES (VIDEO/ZOOM):

```
FOR THE DEBTOR AND          DOUGLAS E. SPELFOGEL, ESQ.
DEBTOR IN POSSESSION:       Mayer Brown LLP
                            1221 Avenue of the Americas
                            New York, New York  10020-1001

FOR CITY OF NEW YORK:       HUGH H. SHULL, III, ESQ.
                            New York City Law Department
                            100 Church Street
                            New York, New York  10007


FOR CREDITOR, BENEFIT       P. BRADLEY O'NEILL, ESQ.
STREET PARTNERS REALTY      ADAM C. ROGOFF, ESQ.
OPERATING PARTNERSHIP       Kramer Levin Naftalis & Frankel LLP
L.P.:                       1177 Avenue of the Americas
                            New York, New York  10036


U.S. TRUSTEE:               GREG M. ZIPES, ESQ.
                            Office of the U.S. Trustee
                            201 Varick Street, Suite 1006
                            New York, New York  10014
```

*Proceedings digitally recorded.*
*Transcript produced by:  Catherine M. Griffin*

1  short one-week -- and maybe in one case, less than one-week

2  notice period.  And I was concerned in that the settlements

3  really weren't settlements.  The Debtor just caved; there was

4  no -- there was no consideration to the Debtor's estate.

5       So I have not entered those orders yet.  I wanted to

6  make sure that people had sufficient and sufficient opportunity

7  if they had questions to speak with the Debtor's Counsel about

8  them.  And I think going forward if -- if -- if the settlements

9  are like that, I -- I'm gonna need a little bit more in the

10 motion papers; or alternatively more notice, one or the other.

11       MR. SPELFOGEL:  Very well, Your Honor.  I think we do

12 submit -- perhaps there wasn't enough information -- we did

13 submit declarations with those settlements to (inaudible) --

14       THE COURT:  I know, but the declarations just say:

15 this -- this resolves an issue.  And it doesn't -- it resolves

16 it by the Debtor agreeing to the claim that it had previously

17 objected to.  So I -- you know, I -- it's not helpful to me.

18       MR. SPELFOGEL:  Understood.  We can -- we can provide

19 more notice, and/or more detail.

20       THE COURT:  No.  I appreciate some of those claims

21 were relatively modest, but the same costs are borne by the

22 Creditor as borne by the Debtor's estate.  And if, you know, if

23 -- if -- I understand that sometimes you may bring a claim

24 objection and then learn of facts that warrant withdrawing the

25 objection.  But if there's no real settlement, I -- you know, I

*American Legal Transcription*

1  -- I need to know why the Debtor's, in essence, withdrawing the

2  objection.

3          MR. SPELFOGEL:  Very well, Your Honor.

4    COURT'S SUMMARY OF MIRIAM GROSS'S MOTION TO QUASH SUBPOENA

5          THE COURT:  Okay.  All right.  So the next matter on

6  the calendar is a motion by Miriam Gross to quash a subpoena

7  issued by the Examiner, which is objected to by the Examiner.

8  Do I have Ms. Gross's Counsel on -- on the --

9          MR. KOHN (Video):  Yes.  Good morning, Your Honor.

10 Mayer Kohn, Saul Ewing Arnstein & Lehr, on behalf of Miriam

11 Gross.  Here with me is also my colleague Steve Ravin.

12         THE COURT:  Okay.  All right.  So I -- I -- I guess I

13 have a basic question about this.  I -- I set a deadline for

14 the Examiner's report.  The Examiner has filed his report.  It

15 notes that he did not have compliance with this subpoena.  He

16 notes that he has other information that he would've like to

17 have obtained; that, as he's entitled to do, has informed his

18 opinion in the report.  I'm not sure, though, why at this

19 moment we are fighting about this issue given that the report

20 has been filed.

21         MR. KOHN:  Well, I -- I think that was a question

22 that we had as well.  The simple fact that the Examiner filed

23 an objection to the motion --

24         THE COURT:  I just said it, so I'd really like to

25 hear from the Examiner's Counsel on this point.

*American Legal Transcription*

**EXHIBIT 6**

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4  ----------------------------x

   IN RE:

5                                Chapter 11

   96 WYTHE ACQUISITION, LLC

6                                Case No. 21-22108(RDD)

              Debtor.

7  ----------------------------x

8

9            12:00 p.m.

             March 14, 2022

10

11

12       VIDEOTAPED VIRTUAL DEPOSITION of JEREMY

13  RAUCH, a Witness in the above entitled matter,

14  pursuant to Rule 30(b)(6) and in his individual

15  capacity, before Stephen J. Moore, a Registered

16  Professional Reporter, Certified Realtime Reporter

17  and Notary Public of the State of New York.

18

19

20

21

22

23

24

25

```
                                              Page 64

  1                      JEREMY RAUCH

  2    sitting in Quickbooks, but may be able to be

  3    retrieved.

  4                  You know, a few missing invoices

  5    here or there that could be retrieved.

  6                  Some credit card charges may not

  7    have the backup attached in Quickbooks.

  8                  But that type of backup was able

  9    to be retrieved.

 10         Q     So, for the missing invoices,

 11    you can retrieve those missing invoices,

 12    correct?

 13         A     Yes.

 14         Q     For missing credit card

 15    statements, you can retrieve those credit card

 16    statements, correct?

 17         A     Yes.

 18         Q     But that may not apply to loan

 19    payables and transfers, correct?

 20         A     I may not be able to pull that

 21    backup myself, correct.

 22         Q     And is that -- reflecting loan

 23    payables and transfers without supporting

 24    backup, is that an accepted bookkeeping

 25    methodology?
```

Page 65

1                           JEREMY RAUCH
2                     MS. PARLOVECCHIO:  Objection.
3          A        It's not preferred.
4          Q        It's not what you were taught in
5     school, right, right?
6                     MS. PARLOVECCHIO:  Objection.
7          A        I mean, it's always best to have
8     all the backup organized in one fashion.
9          Q        Right.  It's not what you were
10    taught in school, correct?
11                    MS. PARLOVECCHIO:  Objection.
12         Q        Am I correct, sir?
13         A        I don't think we spoke about
14    that specific issue as it relates to loan
15    payables, but the preference is to have
16    everything attached in one location.
17         Q        How about when you got your
18    certification from the CFA, that's not
19    something they taught you for that
20    certification, is it, the lack of backup for
21    entries in the business' books and records?
22                    MS. PARLOVECCHIO:  Objection to
23         form.
24         A        That wasn't a topic that was
25    specifically touched upon.

Page 66

1                          JEREMY RAUCH

2          Q          Generally I understand that you

3    are supposed to have backup for entries in a

4    business' books and records, correct?

5          A          Yes.

6                      MS. PARLOVECCHIO:  Objection.

7          Q          And in these instances when you

8    are making these entries into the management

9    company's books and records reflecting

10   transfers and loans, where is the source of

11   information then that you are relying upon?

12         A          Generally relying upon

13   ownership.

14         Q          Michael and Toby?

15         A          Yes.

16         Q          And what documentation do they

17   provide to you to support these loan payables

18   and transfers?

19         A          Depends on the situation.

20                     There are loans for which there

21   is backup and documentation, there are times

22   where there may be backup and documentation,

23   but just wasn't necessarily reviewed as it was

24   entered into the Quickbooks software.

25                     I believe generally speaking

Page 67

1                         JEREMY RAUCH
2    that there is documentation on the records, but
3    given that, you know, it's a small company, and
4    there are some transactions that may be with
5    friends and family, it could be that because of
6    that nature it wasn't recorded with the backup.
7            Q       Did you ask for the backup?
8                    In other words, if
9    Mr. Lichtenstein, for instance, says, you know,
10   show $10,000 loan from the management company
11   to Northside Development, for instance, do you
12   say okay, by the way do you have some type of
13   documentation evidencing that transaction or
14   supporting it?
15                   Is that something that you would
16   typically say?
17           A       It depends on the situation.
18                   There could be certain things
19   that I didn't necessarily record myself.
20           Q       Well, if you are not recording
21   them it would be somebody on your staff, right?
22           A       Or there were things recorded
23   prior to my time at the company, or there could
24   be things that Michael recorded directly
25   himself.

Page 68

1                              JEREMY RAUCH

2           Q        Does it make you uncomfortable

3      that there are recordings in the books and

4      records of the management company for which

5      there is no backup?

6                         Does that bother you?

7                         MS. PARLOVECCHIO:  Objection.

8           A        To some extent.

9                         I mean, generally speaking, I

10     want to have backup for servicing, that's my

11     goal.

12          Q        And that's the proper procedure,

13     right, when you are recording this type of

14     information, to ask for the backup?

15                        MS. PARLOVECCHIO:  Objection.

16          A        To my knowledge that's usually

17     how it's done, correct.

18          Q        Right.

19                        And so, to the extent there is

20     backup, you would want it, correct?

21                        MS. PARLOVECCHIO:  Objection,

22          asked and answered.

23          A        I would want it, in order to

24     attach it in the Quickbooks file, but there are

25     times where the backup could be recorded

```
                                      Page 69

 1                      JEREMY RAUCH
 2    elsewhere.
 3         Q       Backup recorded elsewhere.
 4                 Have you seen instances where
 5    loan payables are recorded elsewhere as you can
 6    tell us about?
 7                 MS. PARLOVECCHIO:  Objection.
 8         A       There are server -- there are
 9    files that contain other documents that I may
10    not have gone through myself.
11         Q       Who on your team or staff has
12    gone through those records to make certain that
13    there is appropriate backup for these entries?
14                 MS. PARLOVECCHIO:  Objection.
15         A       We haven't done so.
16         Q       It's never been done, to your
17    knowledge, correct?
18                 MS. PARLOVECCHIO:  Objection.
19         A       There may be some entries that
20    were missing backup that were corrected to
21    reflect --
22         Q       Tell me about those
23    specifically, what you recall in that regard.
24                 MS. PARLOVECCHIO:  Objection to
25         form.
```

```
                                            Page 70

 1                     JEREMY RAUCH
 2          A        I don't recall specific
 3     examples.
 4          Q        It's generally true, sir, that
 5     Mr. Lichtenstein will come to you and say this
 6     transfer was made by the management company to,
 7     again, for instance, Northside, reflect it as a
 8     loan payable.
 9                    And you are required to reflect
10     that in the books and records of the management
11     company, right?
12                    MS. PARLOVECCHIO:  Objection.
13          Q        That's how it's worked, right?
14                    MS. PARLOVECCHIO:  Objection.
15          A        Yes, but most of the instances
16     of loans are, to my knowledge, in the Debtor's
17     books and records.
18          Q        The Debtor's books and records?
19          A        As well as some in the
20     management company's.
21          Q        So, all -- let me put it this
22     way.  All intercompany transfers, you have the
23     backup for all of those somewhere?
24          A        No.
25          Q        In fact, sir, you don't have the
```

Page 71

1                      JEREMY RAUCH

2    backup for most of the intercompany transfers,

3    right?

4                    MS. PARLOVECCHIO:  Objection.

5         Q       Am I right, sir?

6                    MS. PARLOVECCHIO:  Objection.

7         A       I believe so.

8         Q       And you record them because

9    Michael tells you to record them, correct?

10                   MS. PARLOVECCHIO:  Objection.

11        A       There are instances of transfers

12   that are recorded just from the bank

13   statements.

14        Q       But the bank statements don't

15   reflect the reason for the transfers, right?

16        A       Correct.

17                   MS. PARLOVECCHIO:  Objection.

18        Q       So Michael would say reflect

19   this as a loan payable, or something like that,

20   without the backup, again, the simple question

21   is these recordings of intercompany transfers,

22   whether they are reflected as transfers or

23   loans, you're generally recording them in that

24   manner because Michael is telling you to,

25   correct?

Page 72

1                    JEREMY RAUCH

2              MS. PARLOVECCHIO:  Objection,

3         asked and answered.

4         A      Yes, generally speaking.

5         Q      Thank you.

6                Would you agree with me that

7    that process doesn't comply with GAAP, does it?

8              MS. PARLOVECCHIO:  Objection,

9         foundation.

10        Q      You know what GAAP is, right,

11   sir?

12        A      Yes.

13        Q      What is GAAP?

14        A      Generally accepted accounting

15   principles.

16        Q      Okay, and reflecting these types

17   of transactions without supporting backup and

18   characterizing them as loans or payables

19   without the backup does not comply with GAAP,

20   correct, sir?

21        A      To my knowledge.

22        Q      Now, all of these people that

23   provide services at the management level to the

24   hotel, that's the sole -- that's the sole

25   relationship --

Page 119

1                       JEREMY RAUCH

2                  MS. PARLOVECCHIO:   Objection.

3           A       Yes.

4           Q       Have you ever undertaken any

5    analysis to determine whether Toby and Michael

6    actually made the loan disbursements that are

7    reflected in your general ledger for the

8    Debtor?

9                  MS. PARLOVECCHIO:   Objection.

10          A       Can you rephrase?  I'm not sure

11   what you mean.

12          Q       Yes.

13                 Have you ever been provided the

14   actual documentary support showing that Toby

15   and Michael actually made loan disbursements to

16   the Debtor that correspond with the journal

17   entries that you have made in the Debtor's

18   books and records?

19                  MS. PARLOVECCHIO:   Objection.

20          A       Only the knowledge that it was

21   coming from one of their entities.

22          Q       And that knowledge is based upon

23   what?

24          A       Which knowledge are you

25   referring to?  Are you referring to the

Page 120

1                          JEREMY RAUCH

2      transfer, are you referring to the entity?

3           Q       Both.

4                   Yeah, I just, again, and I just

5      want to try to understand what backup or

6      support did you see to verify that Michael and

7      Toby were actually making these loans to the

8      Debtor?

9           A       All I would see is the transfer

10     made from the entity that they own into the

11     Debtor's entity.

12          Q       And what would be that document

13     that you would see?

14          A       Usually a bank statement.

15          Q       And I take it from your

16     testimony that some of these loans didn't come

17     directly from Toby and Michael, but came from

18     an entity in which they had an interest, is

19     that fair?

20          A       Yes.

21                  MS. PARLOVECCHIO:  Objection.

22          A       Can I clarify for a second?

23          Q       Of course.

24          A       I just want to say that there

25     may have been some money that came directly

Page 121

1                    JEREMY RAUCH
2    from them, but most of it was from their
3    entities that they had an interest in.
4         Q       What entities do you recall the
5    monies coming from?
6         A       Northside Acquisition LLC, 564
7    St. John's Partners LLC.  To my knowledge most
8    of them came from Northside Acquisition.
9         Q       So, at a time when these loans
10   were being made from Northside Acquisition, you
11   were employed by, at least during a portion of
12   the time you were employed by Northside
13   Acquisition, right?
14        A       No.  I was employed by Northside
15   Development Holdings.
16        Q       I see.
17                What's the relationship between
18   Northside Acquisition and Northside
19   Development?
20        A       They are both companies that
21   Toby and Michael have interests in.
22        Q       But are they related?  Does one
23   own the other?
24        A       I don't believe so.
25        Q       Exhibit 6 should be popping up.

Page 122

1                          JEREMY RAUCH

2                   (The above described document was

3            marked Exhibit 6 for identification as of

4            this date.)

5            A       I have it.

6            Q       So this is entitled "First

7   Amendment to the Line of Credit Agreement" and

8   I note the Bates stamp, 8155.

9                   Have you seen this document as

10  well?

11           A       Similar to the way I saw the

12  first document, it was provided at a different

13  time with the other one.

14           Q       By Debtor's counsel,

15  approximately a week ago?

16           A       Yes, within the last week.

17           Q       And that is the first time you

18  had seen this document as well, right?

19           A       Yes.

20           Q       And nobody had ever told you

21  specifically that there existed a first

22  amendment to the line of credit agreement and

23  note between Toby Moskovits and Michael

24  Lichtenstein on one hand as lender, and

25  borrower, 96 Wythe Acquisition LLC, is that

Page 123

1                              JEREMY RAUCH

2      fair?

3                  MS. PARLOVECCHIO:  Objection.

4          A      Not that I recall to this

5      specific amendment.

6          Q      Mr. Rauch, are you typing?

7                  MS. PARLOVECCHIO:  I am.

8                  MR. FREEDMAN:  Somebody is

9          typing.

10                 MS. PARLOVECCHIO:  It's me?  I'm

11         sorry, I am allowed to type?

12                 MR. FREEDMAN:  You are allowed to

13         type, just try to type a little softer.

14         Q      Exhibit 7 is entitled "96 Wythe

15     Acquisition Equity and Loans Report."

16                 (The above described document was

17         marked Exhibit 7 for identification, as of

18         this date.)

19         Q      Is this the report that you

20     prepared and you mentioned a couple of minutes

21     ago?

22         A      Hold on one second, let me pull

23     it up.

24         Q      Yes, sir.

25         A      This is the summary page, yes,

Page 127

1                    JEREMY RAUCH

2   credit agreement and note and line of credit

3   agreement and note, you saw that those -- we

4   went through this, that was between Toby and

5   Michael as lender and the Debtor as borrower,

6   right?

7          A      That is correct.

8          Q      Okay, have you ever seen any

9   loan agreements between Toby and Michael's

10  companies and the Debtor?

11         A      I'm not entirely familiar with

12  how this line of credit is written, so I'm not

13  sure that I can opinionate on that.

14         Q      Well, I guess my simple question

15  is have you seen for instance in a loan

16  agreement between Northside and the Debtor?

17         A      I don't believe so.

18         Q      Or between St. John's and the

19  Debtor?

20         A      I don't believe so.

21         Q      And then the next line item,

22  owners' loans, repayments from hotel

23  operations, a total of almost $2.9 million,

24  what does that mean, repayment from hotel

25  operations?

Page 161

1                    JEREMY RAUCH

2    receipt of those funds, transferred them out

3    shortly to a related company called Northside

4    Acquisition Partners LLC, and those monies were

5    never used for the benefit of the management

6    company or the Debtor, correct?

7                    MS. PARLOVECCHIO:   Objection.

8        A        You asked a whole bunch of

9    different questions.

10       Q        What part of that did I get

11   wrong?

12       A        I can't speculate on exactly

13   what Michael did, but I could say that to my

14   knowledge I don't believe it was used for

15   operating expenses of the management company or

16   the Debtor.

17       Q        Did the management company

18   and/or the Debtor ever get kicked out of Chase

19   Bank, JPMorgan Chase?

20                   MS. PARLOVECCHIO:   Objection to

21       form.

22       A        I don't think -- I don't think

23   we were kicked out.  To my knowledge we moved

24   to Bank of America because we were getting a

25   better deal with Bank of America.

Page 163

1                          JEREMY RAUCH

2           Q        Why wouldn't it -- why would

3      there be eight transfers between Northside and

4      the management company in one day?

5                     MS. PARLOVECCHIO:  Objection.

6           A        I don't recall why there would

7      be specifically that much.

8           Q        Did you learn about money

9      laundering when you went to school?

10          A        I don't think I learned about

11     it.  I'm familiar with the concept.

12          Q        Did the number of transactions,

13     daily transactions between related companies

14     cause you concern about the possibility that

15     money laundering was happening?

16                    MS. PARLOVECCHIO:  Objection.

17          Q        Did it ever pop into your head,

18     sir?

19          A        I don't think so.

20          Q        How about tax evasion, did that

21     concern ever pop into your head?

22                    MS. PARLOVECCHIO:  Objection.

23          A        I guess it did at some point in

24     time.

25          Q        Did you ever express that

Page 164

1                         JEREMY RAUCH

2     concern to Mr. Lichtenstein or Ms. Moskovits?

3          A       I believe I did at some point in

4     time, and that the taxes needed to be remitted.

5          Q       Did they ever explain to you why

6     there was such a volume of transactions between

7     related entities on any given day?

8                  MS. PARLOVECCHIO:  Objection.

9                  MR. FREEDMAN:  Strike that, I'll

10         pull out a statement in a second.

11         Q       Now, you understand that there

12    is a settlement agreement between the

13    management company and the Debtor that if the

14    Debtor's plan isn't confirmed, the management

15    company is going to pay $823,000 to the Debtor

16    over a year.

17                 Do you have that general

18    understanding of that agreement?

19                 MS. PARLOVECCHIO:  Objection.

20         A       I believe I've seen it, but I

21    don't remember the specifics.

22         Q       It's like $50,000 a month for 12

23    months, and then a balloon payment, I think

24    about $240,000, right?

25                 That's your general

**EXHIBIT 7**

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4    --------------------x

     IN RE:

5                          Chapter 11

     96 WYTHE ACQUISITION,

6    LLC,                  Case No. 21-22108(RDD)

      Debtor.

7    --------------------x

8

9                  9:00 a.m.

                   March 4, 2021

10

11

12          VIDEOTAPED VIRTUAL DEPOSITION of TOBY

13   MOSKOVITS, a Witness in the above entitled matter,

14   pursuant to Rule 30(b)(6) and in her individual

15   capacity, before Stephen J. Moore, a Registered

16   Professional Reporter, Certified Realtime Reporter

17   and Notary Public of the State of New York.

18

19

20

21

22

23

24

25

```
                                              Page 140

 1                    TOBY MOSKOVITS

 2     back, is the Debtor going back to the way it

 3     handled its revenues and financial accounts the

 4     way it did prepetition?

 5              MS. PARLOVECCHIO:  Objection,

 6          asked and answered.

 7              MR. FREEDMAN:  It's definitely

 8          not been answered, it's definitely been

 9          asked.

10          A     It's been answered.  There was a

11     change made to the use of DIP accounts based on

12     the bankruptcy status and the instructions we

13     were given by our counsel.

14              And prior to that, from the date

15     of opening and including during the period that

16     Benefit Street, who is a sophisticated lender

17     in the hotel industry, reviewed our systems and

18     process, themselves and with third parties, we

19     have a management company in place that runs

20     the hotel and handles income and expenses.

21          Q     So --

22          A     When there are no more DIP

23     accounts, that's how it's going to be, the way

24     it was.

25          Q     It's going back, then it's going
```

Page 258

1                        TOBY MOSKOVITS

2          Q        Why wasn't the occupancy tax

3    paid prepetition to the City of New York?

4          A        The hotel was struggling to

5    cover its bills because the city withdrew an as

6    of right tax abatement that we were relying on

7    that would have set the property taxes at $200

8    or $250,000, instead of the $1.2 million, $1.6

9    million, $1.8 million that the property taxes

10   were due, and it put the hotel in a very

11   difficult position in terms of being able to

12   cover its expenses.

13         Q        So the Debtor used self-help in

14   deciding not to remit the occupancy tax

15   collected at the hotel as a result of the issue

16   that you just described, is that what happened?

17                  MS. PARLOVECCHIO:  Objection.

18         A        We were trying to keep the

19   business afloat and doing our best to comply.

20         Q        Did you --

21         A        And frankly, frankly, I've not

22   finished my answer.

23         A        Frankly there was a period of

24   time where the city said we didn't have to

25   collect it and we continued to collect it.

Page 259

1                    TOBY MOSKOVITS

2                  So we were doing our best to

3      stay alive.

4                  MS. PARLOVECCHIO:  Objection.

5          Q      I'll talk about the summer of

6      2021 in a moment, because that's what you're

7      referring to, right, the abatement on occupancy

8      tax in the summer of 2021, right?

9          A      Yes.

10         Q      Okay.

11                 But my question was prepetition,

12     so that was before the summer of 2021?

13         A      Well, you basically laid out

14     dates in your question starting from 2017

15     through the end of 2021, so you want to declare

16     if there is an open question I haven't

17     answered, would you like to clarify, please.

18         Q      There is a lot of questions you

19     haven't answered, but I don't want to go back

20     through the past five hours.

21                 But I do want to know in respect

22     to this dispute where the city of New York --

23     where you were using the occupancy taxes

24     collected at the hotel for other purposes, did

25     someone file, someone, did the Debtor, or the

Page 352

1                        TOBY MOSKOVITS

2         Q        Other than after you filed for

3    bankruptcy, you've testified that the Debtor's

4    revenues were in the management company's

5    accounts?

6         A        Yes, but the revenue from the

7    operation of the hotel flowed through the

8    management company, and the management company

9    collected that revenue and paid expenses.

10                  That is correct, I testified to

11   that and I will repeat that again now.

12                  So what exactly is your

13   question?

14        Q        Did the Debtor always hold its

15   assets and conduct its business solely in its

16   own name?

17        A        As I tried to explain earlier,

18   you need to clarify what period you are talking

19   about.

20                  And during the construction

21   phase.

22        Q        Since the signing of this

23   operating agreement on December 13, 2017, did

24   the Debtor always hold its assets and conduct

25   its business solely in its own name?

Page 353

1                      TOBY MOSKOVITS

2          A       I've already responded to that.

3    There was a period of time during which there

4    was construction being completed only and that

5    was when any monies that came in, which was

6    monies that were either lender funds, monies

7    that were equity contributed, or loans that

8    went into 96 Wythe, which was a Debtor, for

9    which the development and the construction was

10   conducted.

11                   At a certain point in time the

12   hotel opened.

13                   The preopening started and

14   monies started being sent on manpower and

15   branding and other elements in 2016.

16                   There was a period of time of an

17   overlap when the hotel was still under

18   construction and it was under operation.

19                   So that's, I think, very clear

20   and I testified to this during this deposition.

21                   What is the exact question?

22         Q       Isn't it true that the

23   management company held assets that belong to

24   the Debtor?

25                   MS. PARLOVECCHIO:  Objection,

Page 354

1                          TOBY MOSKOVITS

2           vague.

3           A       I'm not sure what that question

4     means, I testified that the income --

5           Q       Isn't it -- I will try to

6     rephrase it.

7                    Isn't it true that the

8     management company held funds, money that

9     belonged to the Debtor?

10          A       I think you are asking me to

11    make a legal conclusion.

12                  What I described was in layman's

13    terms the flow of funds that existed from the

14    date the hotel became operational, that was in

15    place when the Benefit Street loan prior and

16    post the Benefit Street loan closing, and what

17    was in effect until the DIP accounts were put

18    in place, and that was that the management

19    company collected the income and paid the

20    expenses.

21          Q       Isn't it also true that the

22    management company conducted the business of

23    the hotel in its own name?

24                  MS. PARLOVECCHIO:  Objection.

25          A       I'm not sure -- beyond these

Page 355

                            TOBY MOSKOVITS

1    questions.  I'm not sure what these questions

2    are.

3                    I think I clarified to you in

4    layman's terms the flow of funds and what

5    happened up until the bankruptcy, so these

6    are -- I'm not sure I understand what I'm being

7    asked.

8         Q       Looking at 12 on page 253, isn't

9    it true that the Debtor failed to file its own

10   tax returns?

11        A       Can you slow down, is that 12 as

12   in XII?

13        Q       Yeah, we just keep going down

14   these numbers.

15                    MS. PARLOVECCHIO:  That wasn't

16            clear to me, so you're looking at

17            Exhibit 8?

18                    MR. FREEDMAN:  I am looking at

19            the same document and working my way

20            down the document.

21                    MS. PARLOVECCHIO:  I am just

22            clarifying, I'm trying to understand and

23            follow along, that's all.

24                    MR. FREEDMAN:  Thank you.

Page 364

                         TOBY MOSKOVITS

1

2          A       Yes.

3          Q       Do you recognize your signature

4     there?

5          A       Yes.

6          Q       And you recognize

7     Mr. Lichtenstein's signature on behalf of

8     manager, Williamsburg Hotel?

9          A       Yes, I believe that's his

10    signature, yes.

11         Q       And do you generally recognize

12    this document?

13         A       Actually, I am familiar with it,

14    I know it was filed, but I'm not -- I would

15    have to read it, if there are any specific

16    questions about the document.

17         Q       First of all, do you know when

18    this document was executed?

19         A       Oh, I misunderstood, I thought

20    you were asking about the document above from

21    Mr. Backenroth.

22                 If you are asking about the

23    management agreement, I am familiar with the

24    management agreement, yes.

25                 I thought you were referring to

Page 365

1                       TOBY MOSKOVITS
2    the legal document that's attached to it, I
3    apologize.
4                    Yeah, I'm familiar with the
5    exhibit, the hotel management and services
6    agreement, yes.
7          Q      Thanks for clarifying.
8                    Do you know when this document
9    was executed?
10         A      It's dated November 21, 2017.
11         Q      Is that the date it was
12   executed?
13         A      To the best of my knowledge.
14   Let me look down at the signature page.
15                   If that also has a signature
16   page on it, to the best of my knowledge that is
17   also the case.
18         Q      Do you know who prepared this
19   document?
20         A      It was prepared by Michael
21   Lichtenstein.
22         Q      Who specifically negotiated the
23   terms of this hotel management and services
24   agreement?
25         A      It was negotiated between the

Page 366

                              TOBY MOSKOVITS

1

2    two of us, Michael, himself, is an attorney.

3           Q       So, who negotiated on behalf of

4    the Debtor?

5           A       I signed it and I negotiated on

6    behalf of the Debtor, and Michael negotiated on

7    behalf of the manager.

8                   And it was -- that is -- as is

9    reflected in the signature.

10          Q       And at the time that you and

11   Mr. Lichtenstein negotiated this hotel

12   management and service the agreement, you both

13   were owners of the owner, correct?

14          A       Correct.

15                  MS. PARLOVECCHIO:  Objection.

16          Q       And you are both owners of the

17   manager, correct?

18          A       That's a factual reality.

19          Q       Did you have any third-party

20   neutral or fiduciary that assisted in the

21   negotiation of this agreement?

22                  MS. PARLOVECCHIO:  Objection.

23          A       The agreement is between two

24   parties, two entities, and we are members in

25   both entities, and there is no other individual

Page 367

1                          TOBY MOSKOVITS

2    who should have a say in this matter.

3         Q       Do you know where the form of

4    this management agreement came from?

5         A       I'm not sure.

6         Q       Were drafts of this agreement

7    exchanged between you and Mr. Lichtenstein?

8         A       We sit in the same office, so

9    it's -- it was done, it was done basically

10   together.

11        Q       My question is did you and he

12   exchange drafts of this agreement?

13        A       It was done like it was done, as

14   a collaborative effort.  So we worked through

15   it together.

16        Q       Before this document was

17   published in the Bankruptcy Court, August 11,

18   2021, had you ever provided a copy of this

19   hotel management and services agreement to

20   Benefit Street Partners?

21        A       Absolutely, it was provided with

22   the rest of the materials as relates to the

23   closing.

24                It was put into the Drop Box

25   that we were using to communicate with them on

Page 368

1                         TOBY MOSKOVITS

2    the requested items.

3         Q       Do you have evidence of that?

4                 MS. PARLOVECCHIO:  Objection.

5         Q       I missed your testimony, ma'am.

6         A       No, this goes back to the

7    closing date.

8         Q       Do you have any evidence

9    whatsoever that this hotel management and

10   services agreement that was marked as part of

11   Exhibit 9, was provided to my client at any

12   time prior to the closing?

13                MS. PARLOVECCHIO:  Objection.

14        A       Generally Drop Boxes expire, so

15   that wouldn't be -- the link would no longer be

16   active.

17                So I don't know how else we

18   would be able to demonstrate that it was there,

19   other than to tell you that it was, I don't

20   know, 40 plus page assignment of an agreement.

21                So there would have to have been

22   a management agreement in place signed by the

23   parties, and I am representing to you that this

24   was it.

25        Q       Was the owner represented by

Page 369

1                          TOBY MOSKOVITS
2     counsel at the closing?
3          A       The owner was represented by
4     counsel at the closing, yes.
5          Q       And who is that?
6          A       That was an attorney by the name
7     of Nicholas Kaiser at a firm called Cohen &
8     Gresser.
9          Q       And have you gone back to Cohen
10    & Gresser and asked them if they have any
11    evidence of whether this agreement was provided
12    to my client prior to closing?
13         A       Well, Cohen & Gresser wasn't
14    dealing with my Drop Box, Cohen & Gresser was
15    reviewing the loan agreements and dealing with
16    the interaction with the lender.
17         Q       It's not my question.
18         A       Not doing due diligence on
19    specific documents.
20         Q       Did you go to Cohen & Gresser --
21    what's the last name again?
22         A       Gresser.
23         Q       Cohen & Gresser, did you ever go
24    back to Cohen & Gresser and ask them if they
25    have any evidence that this agreement was

Page 370

1                         TOBY MOSKOVITS

2    provided to my client prior to closing?

3            A       You broke up for one second, can

4    you repeat the last question?

5            Q       Did you go to Cohen & Gresser

6    and ask them if they happen to have any

7    evidence that this hotel management services

8    agreement was provided to my client prior to

9    closing?

10           A       Cohen & Gresser wasn't involved

11   in the --

12           Q       Simple question, did you ask --

13           A       The answer is they weren't

14   playing that role.

15                   There is a Drop Box to which we

16   were sending all the due diligence materials

17   and in the closings that we do, Cohen & Gresser

18   is not involved in that.

19                   There is a due diligence request

20   list and we provide it to the lender by setting

21   up a Drop Box link, and Cohen & Gresser is not

22   part of that process.

23                   Cohen & Gresser deals with the

24   loan negotiation.

25           Q       Do you have a copy of the actual

**EXHIBIT 8**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
IN RE:                            : Case No.:  21-22108-(rdd)
                                  : Chapter 11
96 WYTHE ACQUISITION, LLC,        : US Bankruptcy Court
                                  : 300 Quarropas Street
                                  : White Plains, NY 10501
           Debtor.               : March 31, 2022
----------------------------------X 02:30 P.M. - 03:30 P.M.

**21-22108-rdd 96 Wythe Acquisition LLC** *Ch. 11*

• Notice of Pre-Trial Conference filed by Lee Hart on behalf of Benefit
  Street Partners Realty Operating Partnership, L.P.. with hearing to be
  held on 3/31/2022 at 02:30 P.M. at Videoconference (ZoomGov) (ECF
  #484)
  Related Documents:

• Letter Request for Pre-Trial Conference Filed by Lee Hart  on behalf
  of Benefit Street Partners Realty Operating Partnership, L.P.
  (ECF #479)

• Third Amended Disclosure Statement (related document(s)116, 167, 148)
  filed by Douglas E. Spelfogel on behalf of 96 Wythe Acquisition LLC.
  (ECF #196)

• Motion to Approve /Motion of Debtor Pursuant to 11 U.S.C. § 105 and
  Federal Rule of Bankruptcy Procedure 9019 Authorizing and Approving a
  Settlement Between the  Debtor and  Williamsburg Hotel BK LLC filed by
  Douglas E. Spelfogel on behalf of 96 Wythe Acquisition LLC  (ECF #153)

• Motion for Objection to Claim(s) Number: 18 /Debtor's (I) Objection to
  Claim No. 18 Filed by NYC Department of Finance and (II) Motion to
  Estimate Claim No. 18 Pursuant to Sections 105 and 502 of the
  Bankruptcy Code with hearing to be held on 2/15/2022 at 10:00 AM at
  Videoconference (ZoomGov) (RDD) Responses due by 2/8/2022, filed by
  Douglas E. Spelfogel on behalf of 96 Wythe Acquisition LLC. (ECF #306)

*[DOCKET MATTERS AND APPEARANCES CONTINUED ON SUCCEEDING PAGES]*

**BEFORE THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

APPEARANCES (VIDEO/ZOOM):
FOR DEBTOR
AND DEBTOR IN POSSESSION:      DOUGLAS E. SPELFOGEL, ESQ.
                               Mayer Brown, LLP
                               1221 Avenue of the Americas
                               New York, New York  10020-1001

FOR CREDITOR,                  RANDY M. KORNFELD, ESQ.
GERSON MENCIA                  Kornfeld Associates, P.C.
                               32 Long Lots Road
                               Westport, Connecticut 06880-3829

*Proceedings digitally recorded.*
*Transcript produced by:  Debra S. Nieves*

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel.: (845) 452-3090 - Fax: (845) 452-6099*
amlegaltrans@aol.com

1        MR. HART:  Well, without a doubt --

2        THE COURT:  The debtor has -- the debtor has an

3   incentive to get it out early, so you can focus on it and

4   discuss it, if they don't, that's their problem.

5        MR. HART:  Well, I --

6        THE COURT:  I don't think it's up (inaudible) you

7   guys, unless I'm missing something.

8        MR. HART:  Yeah, well, I -- I want to add, and maybe

9   this is what I'm not articulating appropriately, there are

10  documents that we've expected to see in connection with a

11  plan supplement, revised loan documents, documents with --

12  you know, documents with the exit investor, Lockwood

13  Capital, that are (inaudible) --

14       THE COURT:  Okay.

15       MR. HART:  -- we've been asking for months and --

16  and --

17       THE COURT:  All right.  That's, I think -- that's a

18  fair point.  I think -- look, I think the forms of those

19  documents should be provided promptly.  They may change in

20  the sense of getting better, or blanks may be filled in,

21  in terms of dollars, but the forms should be provided

22  promptly, Mr. Spelfogel.  I just, you know, I think -- I

23  think that's important.

24       MR. SPELFOGEL:  Yes, I'm (inaudible) --

25       THE COURT:  So --

1        MR. SPELFOGEL:  -- (inaudible) --

2        THE COURT:  -- and I would think before the 7th.

3        MR. SPELFOGEL:  We were looking to file an amended

4    plan early next week in terms of --

5        THE COURT:  Okay.

6        MR. SPELFOGEL:  -- (inaudible).

7        THE COURT:  All right.  But it's less the plan,

8    because the plan you could read quickly.  Now I understand

9    Mr. Hart's point, if there's like a management agreement

10   that's single spaced and 15 pages or, you know, a loan

11   agreement and security agreement that are, you know,

12   combined 45 pages, I think that's -- the forms of those

13   should be provided.

14       MR. SPELFOGEL:  Our only concern -- and there's --

15   they're all our agreements which we are ready to file, our

16   only concern is to the extent there is some -- still some

17   ongoing discussion that's being finalized and obviously

18   (inaudible) --

19       THE COURT:  Well, if it's -- if it's -- it's a lot

20   easier for them to review a black line, after they have

21   looked at the basic form, than to review it from scratch.

22   And they can give you comments on the basic form and say,

23   you know, if you -- you do it this way, we have much less

24   of a concern, for example.

25       MR. SPELFOGEL:  Understood, Your Honor.