**Hearing Date and Time: May 25, 2022 at 9:00 a.m. (prevailing Eastern Time)**

**MAYER BROWN LLP**
Douglas Spelfogel
Gina Parlovecchio
Charles S. Kelley (*pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

**BACKENROTH FRANKEL &
KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

*Co-Counsel to the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 Wythe Acquisition LLC,<br><br>            Debtor. | Chapter 11<br><br>Case No.: 21-22108 (RDD) |

**AMENDED DECLARATIONS OF DAVID GOLDWASSER, TOBY MOSKOVITS, AND MICHAEL LICHTENSTEIN IN SUPPORT OF DEBTOR'S OMNIBUS OBJECTION TO LENDER'S AND UNITED STATES TRUSTEE'S MOTIONS FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

96 Wythe Acquisition LLC, Debtor and Debtor in Possession hereby files its Amended Declarations of (1) David Goldwasser, (2) Toby Moskovits, and (3) Michael Lichtenstein in support of *Debtor's Omnibus Objection to Lender's and United States Trustee's Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539], attached hereto.[1]  Debtor respectfully

---

[1] The Mark Podgainy declaration filed on May 12, 2022 [Docket No. 558] has not been revised.

states that at the time of the original filing, the parties' Joint Exhibit List had not yet been finalized.

Once the Joint Exhibit List was finalized, Debtor renumbered its Exhibit List for the Hearing,

which is the Exhibit List timely submitted to, and currently before, the Court.  Thus, the Amended

Declarations have been revised only to reflect Debtor's final proposed exhibit list and numbers.  A

redline of these changes is attached hereto for the Court and the parties' convenience.

Dated:  May 24, 2022
        New York, New York

Respectfully submitted,

By:  /s/ *Douglas Spelfogel*
Douglas Spelfogel
Gina Parlovecchio
Charles S. Kelley (admitted *pro hac vice*)
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
Email: dspelfogel@mayerbrown.com
       gparlovecchio@mayerbrown.com
       ckelley@mayerbrown.com

Mark Frankel
**BACKENROTH FRANKEL &
KRINSKY, LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Debtor and Debtor in
Possession*

## **ATTACHMENT 1**

### **DAVID GOLDWASSER AMENDED DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter -11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

## AMENDED DECLARATION OF DAVID GOLDWASSER

I, David Goldwasser, declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer ("CRO") of 96 Wythe Acquisition LLC, as debtor and debtor-in-possession (the "Debtor").

2.      Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "Lender Motion"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("Benefit Street"), and (ii) the motion of the United States Trustee (the "UST") for appointment of a Chapter 11 trustee [Docket No. 491] (the "UST Motion" and, together with the Lender Motion, the "Trustee Motions").

3.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my regular interactions and discussions with other representatives of the Debtor during the course of this bankruptcy proceeding, including the Debtor's counsel and other professionals. If called as a witness, I would testify competently thereto.

## I.      BACKGROUND

4.      I believe that the Debtor stands on the verge of a major achievement, which is to confirm a chapter 11 plan of reorganization that, among other things, provides for a fresh start,

747743196

will provide pursuant to a third amended plan for an increased cash infusion in the amount of $11,252,000 to pay creditors in full, with interest, and preserves jobs, essential vendor relationships, and the Hotel.  I believe the Plan positions the Debtor for growth and long-term viability, maximizing value as it emerges from the catastrophic effects of the COVID-19 pandemic that hammered the hospitality industry in particular.

5.      Today, the hotel is fully operational and operating successfully.  It is a very unique property with a fantastic skyline view of New York, over the East River.  It is highly regarded in the Brooklyn market.  The Hotel outperforms its competitors, is regularly ranked as a top hotel in Brooklyn, and enjoys strong customer reviews and regular viewed as a local destination spot given its one-of-a-kind bar on top of the hotel.  In the last three quarters of 2021, the Hotel exceeded its projections on all key metrics, generating net profits (and cash on hand) of more than $3 million, despite the absence of any debtor-in-possession financing.  To further support the Plan and viability of the emerging entity, the Debtor will be receiving a cash infusion of $11,252,000, which will bring total cash on hand to approximately $14,252,000, thus positioning the Debtor to implement the Plan and perform fully thereunder.

6.      I was appointed as the Debtor's CRO on February 22, 2021, to advise the Debtor in connection with this Reorganization Case.  I serve as the CRO through G.C. Realty Advisors L.L.C., of which I am the principal and sole member.

7.      As CRO, I have had considerable authority over the Debtor's post-petition operations and restructuring efforts.  My service as CRO for the Debtor has included, among other things, preparing and signing the chapter 11 petition and preparing and signing each monthly operating report.  I also interact regularly with the Debtor's management, as well as with the Management Company, which operates the Hotel, and with the Debtor's counsel and other

professionals (including Getzler Henrich and Hilco Realty) in overseeing this Reorganization Case. Most recently, I have been directly engaged in assisting the Debtor with formulation of the Plan and our continued effort to strengthen the Plan for the creditors.

8.      It is my belief that appointment of a trustee would add expense and destroy value while not providing any tangible benefits to creditors or other interested parties. I understand Benefit Street is not happy with its treatment under the Plan and has vigorously opposed Debtor's efforts to reorganize under the Plan. Thus, appointment of a trustee would facilitate Benefit Street's efforts to force a fire sale and undermine the cram-down plan proposed by Debtor in regards to derailing its proposed treatment under indubitable equivalence. There is no doubt that if a trustee were appointed, any subsequent sale efforts would result in a discounted purchase price to the hotel, should any third party seek to try and outbid Benefit Street if it were to credit bid. Such a sale would impair recoveries to the creditor body as a whole.

9.      As discussed below, the allegations of misconduct by Debtor's principals and affiliates mischaracterize and exaggerate their actions, while trying to assert behavior that suits only Benefit Street's desired outcome of this case. And the so-called misconduct does not account for harm to Debtor and its stakeholders, the majority of which support the restructuring. Nor do the UST's and Benefit Street's claims address the longstanding efforts by Debtor and its principals to preserve and maximize value in Debtor as a going concern for all such stakeholders, and the fact that existing management has been operating the Hotel profitably, as one of the top-rated boutique hotels in New York City, with sustained occupancy rates often nearly twenty percent higher than the city average.

## II.    TRANSFERS NOTED IN EXAMINER'S REPORT AND TRUSTEE MOTIONS

10.     Before turning to the benefits that I believe existing management provide (and have provided) to the Debtor and its stakeholders, including the proposed plan of reorganization for

3

which they are essential, I first wish to discuss certain of the allegations asserted in the Trustee motions, which I understand from a review of them are based primarily upon the *Report of Eric M. Huebscher, Examiner* [Docket No. 418] (the "Examiner's Report").

11.    The most glaring error in the Trustee Motions—is the failure to acknowledge Debtor's principal's line of credit funding to the Hotel and its operations in the amount of millions of dollars, *over and above the required initial capital funding*. More specifically, the closing statement prepared by Benefit Street identifies the approximately $17 million in capital invested into Debtor at the time of the closing of the Benefit Street loan in December 2017. *See* Asset Summary, Debtor's Ex. 1 pp. 6-7.[1] The capital infusion is also confirmed and reflected in Debtor's books and records. *See* Equity Report, Debtor's Ex. 28. In addition, as detailed in a report of loans and repayments prepared by Debtor, with some 500 pages of back-up, and reviewed by Getzler Henrich to tie in the transfers with the bank accounts, the report tracks some $11 million in net infusions of cash by the equivalent of a line of credit loan over a five-year period addressing and covering advances by Debtor's principals to cover expense timing and other periodic shortfalls from operations of the Debtor (listing advances and repayments, tracked to the actual bank accounts). *See* Loan Transfer Report & Backup Materials, Debtor's Ex. 22-27. Debtor's independent expert Mark Podgainy reviewed the transfers as set forth in his previously filed declaration [Docket No. 268-2] (the "Podgainy Declaration"). Debtor Ex. 96, Podgainy Declaration p. 3.[2] Context and timing regarding the Debtor's use of the line of credit from its principles is important. In fact, more than half of these loans were made in 2018 when the Hotel's

---

[1] An additional $4 million was invested by non-insiders.

[2] Mr. Podgainy's assessment was based upon a review of the books and records of Debtor and its affiliates, including bank account statements detailing the flow of funds. *Id.* As previously noted, Mr. Podgainy did not—and, as a nonlawyer, could not—opine as to the legal status of the loans as loans and equity as equity.

747916209

operations were just ramping up and Debtor's finances had been artificially constrained by Benefit Street's conduct and improperly inflated interest charges and contrived defaults. *Id.* What commenced as access to cash to address timing of expenses as they came due, became a necessary line of credit to address the ongoing dispute with the lender Benefit Street that has been ongoing for four (4) years. Thereafter, in connection with its response to the instant motions, Mr. Podgainy also undertook a further review of all transfers into and out of the Debtor and Hotel Manager during the period of covered by the Trustee Motions (which were tied to the period of the Examiner's review), which confirmed the conclusions reached through his earlier review, discussed further below.

12.     As Mr. Podgainy confirmed, from time to time, Debtor draw and occasionally pay back a net payment amount of these borrowings under the Line of Credit of only roughly $4.5 million, leaving approximately $6.5 million in the advanced funds under that line of credit to the Hotel outstanding and owed to Debtor's principals at the time of this bankruptcy filing, which amounts Debtor's principals did not anticipate they would be repaid as part of the bankruptcy process and anticipated would be deeply subordinated.[3] The review by Mr. Podgainy confirms that Debtor's principles provided prepetition far more money overall than any of these repayments.

13.     As to the foregoing loan repayments and the other transfers alleged in the Trustee Motions, I see no benefit in pursuing avoidance actions, whether under the Bankruptcy Code or otherwise, against the Debtor's principals or their other business entities. Based upon my review

---

[3] As provided in the Podgainy Declaration, the Loan Transfer Report and Backup Materials includes advances and repayments to cover operating expenses of the Hotel operations by and repaid generally through the Northside Loan Account. The Loan Transfer Report includes advances by the insiders from the Loan Account of some $8.7MM and transfers back to the Loan Account of $11.6MM (for a net of $2.9MM). Together with other loans as detailed therein, the net loan balance due to insiders is approximately $6.5 million. Mr. Podgainy undertook a separate analysis of monies in and out of the Debtor's and Management Company's bank accounts as part of the response to the instant motions, wherein he concluded that the total amounts owed to the Debtor's insiders approximated $6.5 million.

747916209

of these payments, I believe that all of them represent repayment of legitimate debts or reimbursement of legitimate expenses advanced on behalf of the Debtor. Accordingly, I believe that the only conceivable basis for avoiding these payments is as preferences—not as fraudulent transfers. Even given the one-year lookback period for insider preferential payments, I do not see how these payments could be recoverable as preferences. First, less than $1 million of the transfers was made during the year preceding the Debtor's bankruptcy filing. Second, I believe the Debtor's principals would have good defenses in any preference action on account of the fact that they made additional loans to the Debtor in a similar amount over the same period. Although insider loans, these loans were akin to a revolving line of credit that was regularly drawn down on and repaid, in short succession, depending on available cash flows. I see nothing wrong with the Debtor and its principals having engaged in these transactions prior to the Debtor's bankruptcy filing.

14.      The other claims asserted in the Trustee Motions have even less merit. For example, Benefit Street asserts that the Debtor's principals are somehow liable for $53 million in damages based on the collection of Hotel revenues in the Hotel Manager's accounts rather than the Debtor's, in violation of the Debtor's operating agreement. Frankly, this assertion is preposterous, because the Debtor was not harmed by the use of Hotel Manager bank accounts. The vast majority of the funds collected were used to pay the Hotel's operating expenses, and the remaining amounts were used for proper purposes as discussed above. Since the Debtor was not harmed, there can be no damages due solely to a technical violation of the Debtor's operating agreement, and there would certainly not be anywhere near $53 million in damages.

15.      The case for prosecuting any such actions against the Debtor's principals is further weakened by the fact that the Plan is a 100% plan that proposes to pay all creditors in full over time. Given that any litigation surplus would primarily inure to the benefit of the Debtor's

747916209

principals (whether on account of their existing equity or their equity in the reorganized debtor), this would at best be a matter of expending significant litigation expenditures to move funds from one pocket to another.

16.     To be clear, I have no "skin in the game," in that if the actions discussed above were successfully pursued against the Debtor's principals, I would not be personally liable for any such amounts. My independent perspective allows me to see this issue clearly, untainted by the principals' pecuniary interests or Benefit Street's apparent longstanding vendetta against the Debtor and its principals (or opposition to the Plan). Further, as noted above, as CRO, I asked Getzler Henrich to review and analyze these transactions, and they confirmed the facts set forth above based on the Debtor's actual bank statements and other books and records. Accordingly, I have no reason to question the validity of the loans (or repayment thereof) and related documentation.

17.     It is from my independent perspective that I conclude that the Debtor's decision not to prosecute any actions against its principals is a sound exercise of its business judgment, and that such decision is in the best interests of the Debtor's creditors and other stakeholders because it will not waste vast sums of money on attorneys' fees to pursue claims lacking any significant merit. And for the same reason, the release of those claims under the very Plan proposed, to the extent that they are not preserved under the Plan, would not harm the Debtor in any way whatsoever.

18.     Debtor does acknowledge one error on its part, or more specifically that of the Hotel Manager, when it advised it inadvertently expended certain funds within approximately forty-eight hours of the case filing, while case and financial controls were being implemented—as discussed in greater detail below—and those funds (roughly $252,000) are being replaced by Debtor's principals under the Plan. This one error has been acknowledged and is being rectified as part of

the Plan.  As CRO for the Debtor I have no role in transferring funds from the Hotel Manager into other non-Debtor entitles.  Nevertheless, I understand that the funds related to occupancy taxes, that was an obligation of the Hotel Manager as operator and that the Hotel Manager had personal liability for and would cover any such amount.  I believe that the transfer of these funds was an honest mistake (that the Hotel Manager and Debtor's principals maintain personal liability for such), and it is one that has not been repeated during this bankruptcy case.

19.    Upon learning of the transfer of such funds away from Hotel-related accounts, I investigated the foregoing transfer and worked with the Debtor's principals to ensure that the principals would make the Debtor and Hotel Manager whole.  To address the foregoing, Debtor's principals have increased their contribution to the Debtor under the Plan and reserved funds specifically for reimbursement of this amount. Given that there is no conceivable harm to the Debtor or its creditors resulting from the referenced transfer, and my belief that the transfer was an honest mistake, I do not believe that the $252,100 transfer provides any grounds for appointment of a trustee.

20.    As to the EIDL loans noted in the Examiner's Report and the Trustee Motions, I have no reason to believe that these loans are obligations of the Debtor or were necessarily used for payment of Hotel or Debtor expenses.  I understand they are personally guaranteed by Debtor's principle, Ms. Toby Moskovitz.  Accordingly, I see nothing wrong with the Hotel Manager obtaining the EIDL loans after the filing of this bankruptcy case and using those loans for its independent business purposes or other uses unrelated to the operation of the Hotel.

## III.    THE PLAN

21.    In this section, I will discuss why I believe the Debtor's plan of reorganization can and should be confirmed, and why it represents the best possible outcome for creditors and other interested parties.

A.    **Solicitation and Acceptance of the Plan**

22.    Based upon the Certificate of Service of Solicitation Materials filed on December 6, 2021, Docket No. 213, I understand that the Debtor transmitted all of the materials to be transmitted to those holders of Claims and Interests entitled to vote on the Plan (collectively, the "Solicitation Materials") in accordance with the order approving the Disclosure Statement.

23.    Furthermore, I understand based upon my review of the voting report filed on March 29, 2022, Docket No. 481 (the "Voting Report") that at least two-thirds in amount and more than one-half in number of the creditors who voted on the Plan with Allowed Claims in Class 4, Secured M&M Claims and Class 5 Unsecured Claims voted to accept the Plan. Class 2 BSP Claim voted against the Plan. Class 1 Priority Claims are unimpaired and deemed to accept the Plan. Class 3 Secured Property Tax Claim did not indicate an acceptance or rejection of the Plan. The other classes include Class 6 Subordinated Claims which are deemed to reject, and Class 7 Equity Interests consisting of insiders and not entitled to vote on the Plan.

B.    **Plan Modifications**

24.    The Debtor filed a modified version of the Plan that increases the cash infusion from the original amount of $8 million to $11,252,000, includes an alternative treatment to Benefit Street (providing the option for an accelerated payout in forty-two (42) months subject to agreement settling the pending adversary proceeding against it in the amount of $75 million), confirms the waiver by Debtor's principles upon the effective date of the roughly $6.5 million in outstanding amounts of the net loans or lines of credit advanced by Debtor's insiders to the Hotel, provides a mechanism for post-confirmation termination of the Management Agreement in the event of a sale to an arm's-length third party that requests such termination (an issue that Benefit Street claimed impaired the Hotel value), makes technical clarifications and enhancements, and resolves certain formal and informal comments to the Plan by parties in interest. As CRO, I have

participated in the negotiation and documentation of these modifications  and have given guidance

to the professionals to prepare and implement those changes to the Plan.

25.     Enhanced terms include as follows:

(a)     an increase in the cash infusion to $11,252,000 (from $8 million under the original plan);

(b)     assumption of an amended and restated management agreement with the Management Company which provides for the post-confirmation termination of the Management Agreement in the event that the Reorganized Debtor negotiates an arm's length sale of the Hotel to a non-affiliated third party;

(c)     includes an alternative treatment to Benefit Street, providing the option for an accelerated payout in forty-two (42) months subject to agreement settling the pending adversary proceeding against it in the amount of $75 million[4];

(d)     confirms the waiver upon the effective date of the $6.5 million in net loans advanced by the Debtor's insiders; and

(e)     engagement of Getzler Henrich post-confirmation in an expanded role to provide third party oversight in connection with review and oversight of the reorganized Debtor's financials on a go forward basis upon confirmation.

26.     ***Third Party Releases***.  I understand that the Plan provides consensual third-party

releases (the "Third-Party Releases") to the Released Parties, who have played an essential role in

this Reorganization Case.

27.     I understand that the Disclosure Statement and ballots distributed to holders of

Claims entitled to vote conspicuously quoted the Third-Party Releases from Article 5.10 of the

Plan and clearly informed holders to simply check a box if they did not consent to the Third-Party

Releases.

---

[4]  Benefit Street has the option of either the original treatment and/or the alternative treatment under the Plan.

747916209

28.     In addition, I believe that the Third-Party Releases are reasonable and appropriate. They exclude claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct[.]"   Additionally, each Released Party has made significant contributions to the Debtor's restructuring efforts that I believe supports their release, including, but not limited to, negotiating and formulating the terms of the Plan that provides for a $11,252,000 cash infusion by the Plan Sponsor, payment of Allowed Claims of creditors in full over time with interest, the preservation of critical business relationships, and a prompt emergence from chapter 11.

29.     The Released Parties also have made substantial commitments of time and effort in the Debtor's restructuring efforts.   For example, the Management Company manages all relationships with Hotel vendors and employees, and contracts directly with vendors for services required and employees approximately eighty (80) to one-hundred twenty (120) full-time employees (and more employees seasonally) dedicated to servicing the Hotel and its guests. Further, the Debtor's management has applied its extensive industry knowledge during this Reorganization Case and will carry out the restructuring after it concludes.

30.     I further believe that the Released Parties' contributions to the Debtor's restructuring is borne out by the fact that the Hotel is open and fully operational, outperforming the overall New York hotel market, operating profitably, and exceeding financial projections.

31.     Based on the above and my discussions with the Debtor and its counsel, I believe that the Third-Party Releases are consensual, consistent with the requirements of case law in this District, reasonable, and in the best interests of the Debtor's estate.

32.     ***The PPP Settlement is a Sound Exercise of the Debtor's Business Judgment***.   As part of the Plan, I understand that the Debtor will be providing a release of its claims and causes of action against the Released Parties (the "<u>Debtor Releases</u>") that is limited to claims regarding

the PPP Settlement, which are being settled pursuant to the Plan in exchange for a cash payment of the full amount asserted paid as part of the PPP Loans.  I believe that such payment is an essential component of the Plan and constitutes a sound exercise of the Debtor's business judgment.

33.     It is my understanding that the Plan excludes from the Debtor Releases claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct as determined by a final order of a court of competent jurisdiction," and that Article 6 of the Plan preserves the Debtor's, Claims, and estate causes of action as detailed therein.

34.     In addition, I believe that without the Debtor Releases, the Debtor and its stakeholders would not have been able to obtain the substantial benefits provided by the Plan, including allowing the Debtor to emerge from chapter 11, and the cash infusion in the amount of $1,438,000 (for a total cash infusion under the Plan of $11,252,000), that will be used to fund distributions to creditors whose Allowed Claims will be paid in full over time with interest.  The Debtor Releases also provide finality and avoid potentially significant delay in consummating the Plan.  Accordingly, I believe that the Debtor Releases will benefit all of the Debtor's stakeholders, constitutes a sound exercise of the Debtor's business judgment, and is fair and equitable and in the best interests of the estate.

### C.     The Plan Presents the Best Possible Resolution of this Bankruptcy Case.

35.     *First*, the Debtor retained me to provide independent business judgment and as described above I have been involved in the Debtor's restructuring efforts throughout this Reorganization Case.  I have exercised my independent business judgment in an effort to maximize value for the Debtor's estate.

36.     *Second*,  I believe that there is no question that, facing a matured mortgage loan held by an aggressive lender, and just beginning to come off of the worst of the COVID-19 pandemic, the Debtor is in need of a financial restructuring.

12

747916209

37.    *Third*, the Plan provides for the payment of all Allowed Claims in full.  The Debtor could easily have justified short-changing its unsecured creditors and paying them a fraction of what is owed.  Instead, the Debtor formulated its plan to pay unsecured creditors in full over a relatively short period of time, which I understand is a rarity in chapter 11 cases.

38.    *Fourth,* while the Plan does not reflect a negotiated agreement with BSP, the Plan is nevertheless the product of significant arm's-length negotiations with stakeholders over more than a year.  The Debtor has engaged continuously with unsecured creditors on claims allowance issues (and has objected to claims as necessary).  As a result, the Debtor has agreed to stipulations with creditors (or otherwise obtained orders) to reduce the allowed amount of claims by more than $16 million.  The Debtor has also negotiated a settlement with the City of New York to satisfy unpaid property taxes—a first priority secured claim—over time rather than up front, which resulting effect on cash flow benefits the Debtor, creditors, and the estate.

39.    Lastly, I believe appointment of a chapter 11 trustee would be severely detrimental to the value of the Hotel, which would likely result in liquidation in a sale on a relatively short time horizon.  I believe value would be depressed not only due to the likely asset sale rather than a going concern sale, especially because the Hotel's management, including the Hotel Manager, would likely be replaced by a third-party manager less familiar with the hotel's brand and clientele and the nature of operating a boutique hotel in the trendy Williamsburg neighborhood of Brooklyn.

40.    I hereby reserve my right to amend the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
       May 24, 2022

747916209

*/s/ David Goldwasser*
David Goldwasser
Chief Restructuring Officer

747916209

## **ATTACHMENT 2**

## **TOBY MOSKOVITS AMENDED DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

96 WYTHE ACQUISITION LLC,

Debtor.

Chapter -11

Case No.: 21-22108 (RDD)

## <u>AMENDED DECLARATION OF TOBY MOSKOVITS</u>

Pursuant to 28 U.S.C. § 1746, I, Toby Moskovits, hereby declare as follows under penalty of perjury:

1.    I am a managing member of 96 Wythe Acquisition LLC ("<u>Debtor</u>"), which is the owner of the real estate and hotel located at 96 Wythe Avenue, Brooklyn, New York (the "<u>Hotel</u>"). I am a co-founder and developer of the Debtor since its formation. I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. I work with Michael Lichtenstein (collectively with myself, the "<u>Principals</u>"), another principal of the Debtor, and David Goldwasser, the Debtor's Chief Restructuring Officer. I have reviewed and am generally familiar with the Debtor's operations, including the operation of the Hotel, and the Debtor's related financial records, agreements, and other related documents.

2.    Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "<u>Lender Motion</u>"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("<u>Benefit Street</u>"), and (ii) the motion of the United States Trustee (the "<u>UST</u>") for appointment of a Chapter 11 trustee [Docket No. 491] (the "<u>UST Motion</u>" and, together with the Lender Motion, the "<u>Trustee Motions</u>") and in support of *Debtor's Omnibus Objection to Lender's And United States Trustee's Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539] (the

"Omnibus Objection") .  My testimony is based on my personal knowledge of the facts set forth below.

3.      I have reviewed the Omnibus Objection and, to the best of my knowledge, each of the facts set forth therein is true and correct in all respects.[1]  The following represents my direct testimony in further support of the Omnibus Objection, and in opposition to the Trustee Motions.

4.      I am a third generation business owner in Williamsburg, Brooklyn, and have been a developer of residential and commercial properties in the neighborhood since after the market crashed in 2008.  I developed the first commercial office building built in Williamsburg since the Great Depression—25 Kent Avenue—which is located just a block from the Hotel.

5.      My connection to Brooklyn runs much deeper than purely business or transactional. Over the last decade, I have played an active role in the community through my volunteer work, and more recently by serving on Community Board 1 in Brooklyn.  I serve on the Board of Directors of the Brooklyn Chamber of Commerce, and am an active member of the advisory board of Sustainable United Neighborhoods, a local non-profit, where I support this organization's efforts to create new economy job opportunities for residents of North Brooklyn. In addition, throughout COVID I provided a space for Sustainable United Neighborhoods that served as the hub for over 700,000 meals given out in partnership with Jose Andres' World Central Kitchen and served as food bank through the end of 2021.[2]

---

[1]  Capitalized terms used but not defined herein have the meanings given in the Omnibus Objection.  Exhibit Numbers refer to the numbering pursuant to the Debtor's proposed exhibits attached to the Omnibus Objection.

[2]  I am a born and bred Brooklynite, and a first generation American whose Jewish-Polish grandfather opened a business in Williamsburg, across from the Williamsburg Hotel  in the 1960s after arriving in New York as an immigrant with my then-three-year-old father in 1952.

**Appointment of a Trustee is Unwarranted**

6.      I believe that appointing a chapter 11 trustee to manage Debtor's affairs would impose significant costs, increase risks that creditors are not made whole, and severely impair the Hotel's financial prospects, while serving no real benefit other than arranging for Benefit Street to be paid back a little bit sooner.

7.      First, as discussed below, not only would the appointment of a trustee chill the going concern value of the Hotel and result in the loss of a significant cash infusion provided for under the Plan, in still uncertain times given the lingering impact from COVID-19, it would be unsurprising if a trustee sought to transition management of the Hotel away from the Hotel Manager. This would come with significant transaction costs while the trustee sought to interview management companies and candidates and bring them up to speed with the Hotel's operations. Aside from direct costs, operational efficiency would likely suffer in the course of transitioning from one manager to another, making it more difficult for the Hotel to break even or generate positive cash flows. Under such conditions, it is doubtful the unsecured creditors would enjoy the same assured treatment as compared to the present Plan on file.

8.      As explained below, even (or especially) with the replacement of the Hotel Manager with an experienced third-party hotel management company, the Hotel's revenues would likely suffer significantly without the involvement of the Principals. As I, and the Debtor, have stressed throughout this case, the Principals are deeply familiar with the Williamsburg Hotel brand and what it means in the tech and local community, and our connections in the Williamsburg community have been essential to the performance of the Hotel, especially through the Principals' use of our connections in the community to draw profitable group events at the Hotel, and drive direct bookings well beyond the industry norms which have a direct impact on profit margins.

3

**Catering and Event Business**

9.      The Principals, as well as the "Williamsburg Hotel" brand, are affiliated with Heritage Equity Partners ("Heritage"), a socially conscious real estate developer aimed at building community-focused developments in Brooklyn, supporting the new economy companies that create new economy jobs by engaging with the tech ecosystem, as well as providing opportunity for economically disadvantaged members of the community to access these career paths.

10.     Consistent with these goals, Heritage, with my direct involvement developed and built a full square block, 500,000 square foot office building campus, located one block away from the Hotel, which has Amazon Music as its tenant, as well as fashion brands. This office campus has hosted for about a year the first Street Art museum in NYC—a 100,000 square foot museum of street art featuring many street artists from Williamsburg, Bushwick, and Wynwood, Miami, which are the street art centers of the world. Heritage, along with the Williamsburg Hotel brand, has hosted tech boot camps in partnership with tech companies for thousands of kids, teenagers, and adults from all walks of life, from the surrounding neighborhoods of Williamsburg and Bushwick.[3] My connections with the businesses in the community have assisted my efforts to book and obtain revenues from local businesses.

11.     The Hotel was also designed with that in mind, and Debtor, through the Hotel Manager provides programming that meaningfully benefits the surrounding community. The Hotel features community programming, classes, parties, concerts, events and other programming designed to encourage interaction between the Hotel and tech companies, local businesses, and local residents. For example, the Hotel, with my direct involvement, launched "Crypto Monday,"

---

[3] The Principals, through Heritage, again, with my direct involvement, are also developing an office and retail complex in Bushwick, which featured a partnership with Google and other tech companies.

which has attracted thousands of people over the past few months, as every week hundreds of crypto enthusiasts and members of the tech ecosystem come to the Hotel for a weekly series of talks by leading crypto company entrepreneurs and thought leaders.  As another example, the Hotel is hosting "Candlelight," a series of about 25 scheduled concerts (done by LED candlelight only) in the Hotel's event/party space, with classical music ensembles and quartets performing pop music acts and covers for hundreds of ticket-paying attendees. I have been personally involved in the establishing the partnership that brought the "Candlelight" series to the Hotel.  These performances have already drawn thousands of people, as these concerts started in February, and these are scheduled to continue for another year. As another example, the Hotel hosts wine tasting dinners, in partnership with local wineries from the North Fork of Long Island and the surrounding areas, a series I launched and oversee, which serve to introduce more and more members of the community to the Hotel.

12.     As a result of the deep roots and connections, Debtor, through the Principals' efforts, has had significant success in bringing in name brands for paid events that serve both to fill the hotel rooms and also bring revenue to the food and beverage operations (discussed further below), which creates significant additional revenues and branding as the Hotel seeks to emerge as a reorganized entity.  For example, in the past few months alone, during COVID, the Hotel's Events/Nightlife team has hosted paid events in the events spaces of the Hotel from the likes of the following brands and companies: Yves Saint Laurent, Van Leeuween, Seat Geek, BMW, Vice, IAC, Red Bull, Yext, Happify, iHeart Radio, and Jamestown, and the prestigious jewelry brand Van Cleef & Arpel has done a series of dinner and client events at the Hotel – all of this in the past few months alone, despite COVID.  I am one of the key reasons these businesses engage with the Hotel for events.  These events are only projected to increase in numbers and revenues as NYC

recovers from COVID, and are dependent upon the close personal involvement of the Hotel's management, including the Hotel Manager and the Principals.

**Food and Beverage Operations**

13.     In addition to the valuable, profitable, brand-enhancing events at the Hotel that the Principals facilitate, the Hotel Manager also runs the food and beverage operations for the benefit of Debtor, with all revenue inflowed into operations, which creates another payment stream of millions of dollars, which would likely be outsourced and lost absent continuation of existing management.  Here, the Hotel Manager is one out of a select few hotel management companies that have experience in running food and beverage operations, which produce about 40% of the revenue of the Hotel. The vast majority of hotel management companies either lease out their spaces for minimal rent or do partnerships where the profit goes to the operators upfront and only a minimal revenue stream  goes to the hotel owner.  Generally, hotel brands and hotel management companies do not know how to operate or manage nightlife or food and beverage operations that produce millions of dollars in profits, as they manage hotels and "heads in beds" and require operators who know the restaurant and bar/club business to manage the nightlife and food/beverage operations.

14.     If the Plan is permitted to be executed on, and as the Hotel's projections show, during 2022, about $11 million in revenues will be generated by the Debtor/Management Company just from the nightlife, clubs, events and food and beverage business alone, separate from the rooms revenue which is projected to be approximately $13.5 million in 2022 (due to COVID lower rates and lower occupancy, and which rooms revenue is projected to increase in the years thereafter).[4]  The projected food/beverage/nightlife revenue of about $11 million is based

---

[4]  Projections run from March 2022 through February 2023 under the Plan.

upon past performance of the Debtor during 2019 and 2021. Our new series and events discussed above are only going to increase our likelihood of attaining those projected numbers.

15.     Any trustee that would be appointed would likely only have the option of leasing out the food and beverage spaces to operators for fixed rent, as hotel management companies usually do, which would severely decrease the Hotel's income.    Any lease to a food/beverage/nightlife operator, or any partnership with such operator, would understandably result in the operator's taking the profits upfront and leaving a minimal income stream for the Debtor.    Thus, taking away the involvement of the Principals and the Hotel Manager would almost certainly result in reducing the Hotel revenues by approximately *40%*, and reduce the Hotel's profitability by millions of dollars, as any trustee and new manager would likely not be able to operate the rooftop bar/club, as well as the Water Tower venue, and all other food and beverage venues, which requires experience in managing events and nightlife venues.    Further, while Benefit Street claims that the food and beverage business has a low profit margin, they use as their data point February 2022, which is in the middle of the winter slow season and while the omicron variant was proliferating the metropolitan area.

16.     Additionally, I do not believe that creditors are likely to end up being paid or made whole were a trustee appointed.    First, rather than rely upon the equity investment from the Principals (which is over $11 million under the Plan) and going-forward operating cash flows to pay unsecured creditors, unsecured creditors, among others, would have to rely on the proceeds of a sale of the Hotel exceeding the amount of secured debt, priority claims (including significant administrative expenses incurred through appointment of a trustee), and costs of sale in order to see any recoveries.    As discussed in the Debtor's Disclosure Statement (and as the Debtor's experts will explain in respect of confirmation), it is highly unlikely that a prompt sale of the Hotel (or

747916322.3

even one conducted after an extended marketing process during the current market still recovering from COVID-19) would generate sufficient funds to provide payment in full of claims as the Plan does.

17.     The Principals' involvement in the case will also benefit the estate and its creditors through Debtor's pursuit of the adversary proceeding against Benefit Street.    Through this proceeding, in addition to trying to eliminate or subordinate inequitable and unlawful portions of Benefit Street's asserted claim, Debtor is trying to recover for the benefit of the estate actual damages caused by Benefit Street's longstanding misconduct.    While Benefit Street asserts that the adversary proceeding is meant to "deflect" from other issues in this case, Debtor's goal—and the Principals' motivation—in pursuing the adversary proceeding is to maximize value and put the estate in the best possible position to continue as a going concern for the benefit of all creditors and other stakeholders.

18.     Here, in contrast, Debtor is on the verge of confirming its Plan with the support of at least one impaired accepting class, as well as nearly all noncontingent unsecured creditors, which will provide significant benefits to the entire creditor body while bringing an end to the accrual of administrative expenses with statutory priority payment rights.    On the other hand, as discussed above, the appointment of a trustee would end the Plan process and result, in all likelihood, in a deeply distressed and/or fire sale of the Hotel and in increased administrative costs exacerbated by lower cash inflows in the short-term and long-term, resulting in significantly reduced recoveries for creditors.

**The Management Agreement**

19.     While Benefit Street takes issue with the *form of the management agreement*, in an effort to challenge the continuation of the Hotel Manager, it acknowledges that there is and should be a management agreement in place that provides materially the same terms for the Hotel to be

managed by the Hotel Manager for a standard, market-typical 3% fee of all revenues.  Here, the

Management Agreement that governs the relationship between the Debtor and Hotel Manager was

drafted and executed in connection with Debtor's documentation of the mortgage loan from

Benefit Street, and was negotiated fairly among the Principals to reflect our understanding of

standard market terms.  While I believe the agreement was in fact previously shared with Benefit

Street long ago, I do not believe it is plausible that Benefit Street or any other party would have

believed that Debtor-Hotel Management relationship would have been governed by a one-page,

unsigned placeholder document that contained a four-paragraph summary of certain, limited terms

relevant to Benefit Street's underwriting process.

20.     With respect to the form of agreement itself, in connection with the underwriting

process, and to satisfy Benefit Street's request, a short summary outlining a limited number of key

terms of a management agreement was prepared simply as a placeholder to insert into certain loan

documents.  This summary was neither dated nor signed, and was never intended by the Principals

(or, to our knowledge, by Benefit Street) to function as the governing management agreement.  We

certainly did not construe that agreement as limiting our ability to execute and operate under a

more robust and detailed management agreement under equivalent economic terms.

21.     The one-page placeholder laid out at an extremely high level certain terms relating

to the management of the Hotel, including allocation of responsibilities, fees, and renewability.

Assignment of Management Agreement, Joint Ex. 11 p. 10.  At no point did Benefit Street's

attorneys convey to the Principals their (or their client's) intent or belief that the placeholder would

serve as the comprehensive and operative agreement between Debtor and Hotel Manager.  At no

point did the Principals, Debtor, or Hotel Manager contemplate or intend that this one-page

placeholder document would constitute the entirety and extent of the terms governing the

747916322.3

management of the Hotel. Indeed, this document was never even executed nor did it even have signature blocks for execution as such.[5]

22.    Instead, in connection with the December 13, 2017 closing of the Benefit Street loan, Debtor, Hotel Manager, and Lender executed a document entitled "Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees" (the "Assignment of Management Agreement"). The Assignment of Management Agreement (which is essentially a subordination agreement) recites that Debtor and Hotel Manager "have agreed that the Manager will manage the Property [*i.e.*, the Hotel] on terms set forth on Exhibit A attached hereto[.]" Assignment of Management Agreement, Joint Ex. 11. The purpose, according to the Assignment of Management Agreement itself, was to note certain commercial terms applicable to that affiliate relationship. As noted above, Exhibit A to the Assignment of Management Agreement is also a one-page placeholder document, similar to the one provided by Benefit Street's counsel, but it omits both the signature page and the preamble indicating from the November 2 form, both of which would have indicated that the exhibit is an actual agreement, thus suggesting that none of the parties actually viewed the exhibit to be an agreement and to contend otherwise in respect to relatively sophisticated parties defies logic.[6]

---

[5]  On October 30, 2017, Benefit Street's deal counsel, Stroock, Stroock & Lavan LLP, asked for a copy of the management agreement between Debtor and the Hotel Manager. Debtor's Ex. 2. Just two minutes later, I responded that there was no management agreement in place. *Id.* Then, in separate attorneys-only correspondence, on November 2, 2017, Debtor's attorney suggested that Benefit Street "can insert reasonable covenants to insure that the affiliated entity [*i.e.*, the Hotel Manager] supplies sufficient personnel and transfers all revenues to the required accounts." Debtor's Ex. 3 p. 3. Benefit Street's attorney responds to ask if Debtor has any "objection to doing a simple one page management agreement that essentially says what you pointed out . . . ?" *Id.* p.2  Debtor's attorney then responds asking to "draft those provisions into the Loan Agreement[.]" *Id.* In response to that email, Benefit Street's attorney then responded to provide the one-page placeholder form (plus a signature page) in response to the foregoing request. *Id.* pp. 1, 5-6.

[6]  Specifically the November 2 form begins with the following paragraph, which is not included in Exhibit A to the Assignment of Management Agreement: "This Agreement entered into effective the _____ day of November, 2017, by and between 96 WYTHE  ACQUISITION LLC, a New York limited liability company (the "Owner")

23.     In addition, my understanding is that the purpose of this Exhibit A placeholder document was merely to confirm the Hotel management terms that Benefit Street was most concerned with—a rough allocation of duties between Debtor and Hotel Manager, the size of the fee to be earned by the affiliated Hotel Manager, and the automatic continuation of Debtor-Hotel Manager relationship. *Id.* at 248.  Debtor's view had always been that this one-page list of terms was merely a summary, intended as a placeholder to satisfy Benefit Street's underwriting requirements, and not as an operative agreement that governed the entirety of the relationship between  Debtor and Hotel Manager.

24.     Debtor's interpretation is also consistent with the correspondence between the transaction counsel.  On November 2, 2017, Debtor's attorney indicated that Benefit Street "can insert reasonable covenants to insure that the affiliated entity [i.e., the Hotel Manager] supplies sufficient personnel and transfers all revenues to the required accounts."  Debtor's Ex. 3 p. 3 Benefit Street's attorney responds to ask if Debtor has any "objection to doing a simple one page management agreement that essentially says what you pointed out . . . ?" *Id.* p. 2  Debtor's attorney then responds asking to "draft those provisions into the Loan Agreement[.]" *Id.* p. 1  Benefit Street's attorney then emailed the one-page form in response to the foregoing request, but did not convey any intent or belief that the form would be the comprehensive and operative agreement between Debtor and Hotel Manager. *Id.* pp 1, 5-6.

25.     Meanwhile, while Benefit Street's underwriting and documentation process was ongoing, we were separately advised that a formal management agreement would be beneficial, so we undertook to document a comprehensive agreement along the lines of what would be

---

and_____, a _____ ("Property Manager"), as follows[.]:" Debtor's Ex. 3 p. 6.

747916322.3

expected between an unaffiliated owner and hotel manager. This process culminated with our execution, on behalf of Debtor and Hotel Manager, of the Management Agreement, which sets forth terms consistent with those identified on Exhibit A to the Assignment of Management Agreement, but includes significantly more detail, more types of terms, and other provisions important to setting forth the relationship between the two parties in a meaningful way.

26. While Benefit Street claims that the Management Agreement was provided during this bankruptcy case "when it benefited Debtor and Insiders" those benefits remain a mystery, and in both versions, there is no substantial difference between the placeholder document and the primary terms regarding fees and management. Contrary to Benefit Street's implications, it is hard to see how a robust Management Agreement harms the estate or its creditors.

27. Irrespective of the foregoing, to address Benefit Street's so-called objection to the form of agreement, the Debtor and Hotel Manager have entered into an amended and restated management agreement dated May 1, 2022 to, among other things, amend and restate the agreement upon the Effective Date of the Plan, limit aggregate fees to 3% of revenues (as provided for under the Plan) and make the agreement terminable upon thirty (30) days' notice of the sale of the Hotel to an arm's length third party post-confirmation, which was a primary concern raised by Benefit Street. See, Amended and Restated Management Agreement, Debtor's Ex. 4.

28. In addition, the proof of the extraordinary success of the management team of the hotel is self-evident. First, occupancy at the Hotel is about 20% higher on average relative all hotels in NYC. Second, and more importantly, direct bookings count for about 50% of the Hotel's bookings on average. This is as opposed to regular independent hotel management companies that average only 25% direct bookings, with a high percentage of their bookings coming from online travel agencies; i.e. OTA's, where the hotel management companies are merely competing on

12

pricing. This means that thousands of people are booking rooms directly with the Hotel, because they want to stay at the Hotel, and experience it, as opposed to merely going to an OTA and booking the cheapest room. This attests to the level of services and experience that the Debtor and the Management Company have achieved, in attracting most of its guests to the brand and experience.

29.     Such a disparity in direct bookings can only be achieved through a unique management strategy. This consists of a "secret sauce" which is a mix of factors, including curation of programming such as dinners, High Tea, parties, events, along with emphasis on style, presentation, great service and a "cool factor." This is also due to the great team assembled by the Principals, and the work of the Hotel employees, many of whom have been with the hotel since 2017. It is also important to note that many of employees of the Hotel, and the management team, have been working as a team for the Management Company for more than five years, and work hand in hand with the Principals to create this unique experience and environment for that the Hotel's guests seek and have come to expect.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 24, 2022

_____
Toby Moskovits

747916322.3

## **ATTACHMENT 3**

## **MICHAEL LICHTENSTEIN AMENDED DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

## <u>AMENDED DECLARATION OF MICHAEL LICHTENSTEIN</u>

Pursuant to 28 U.S.C. § 1746, I, Michael Lichtenstein, hereby declare as follows under penalty of perjury:

1.      I am a managing member of 96 Wythe Acquisition LLC ("<u>Debtor</u>"), which is the owner of the real estate and hotel located at 96 Wythe Avenue, Brooklyn, New York (the "<u>Hotel</u>"). I am a co-founder and developer of the Debtor since its formation.  I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.  I work with Toby Moskovits (collectively with myself, the "<u>Principals</u>"), another principal of the Debtor, and David Goldwasser, the Debtor's Chief Restructuring Officer.  I have reviewed and am generally familiar with the Debtor's operations, including the operation of the Hotel, and the Debtor's related financial records, agreements, and other related documents.

2.      Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "<u>Lender Motion</u>"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("<u>Benefit Street</u>"), and (ii) the motion of the United States Trustee (the "<u>UST</u>") for appointment of a Chapter 11 trustee [Docket No. 491] (the "<u>UST Motion</u>" and, together with the Lender Motion, the "<u>Trustee Motions</u>") and in support of *Debtor's Omnibus Objection to Lender's And United States Trustee's Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539] (the

747916419

"Omnibus Objection").  My testimony is based on my personal knowledge of the facts set forth

below.

3.      I have reviewed the Omnibus Objection and, to the best of my knowledge, each of

the facts set forth therein is true and correct in all respects.[1]  The following represents my direct

testimony in further support of  the Omnibus Objection, and in opposition to the Trustee Motions.

## I.      **INTRODUCTION**

4.      In my view, the Trustee Motions represent yet another effort by Benefit Street,

aided by the UST, in its long-standing vendetta against the Debtor and its principals. This is merely

another attempt to prevent an orderly end to this bankruptcy case that maximizes value for all

creditors, preserves employment for over 100 employees, and provides stability in the

Williamsburg, Brooklyn community. Debtor has a plan in prospect, which is being modified and

enhanced, and is set for confirmation in less than thirty (30) days.

5.      Debtor owns the boutique, luxury hotel called the Williamsburg Hotel (the "Hotel")

located at 96 Wythe Avenue, Brooklyn, New York, and it operates the Hotel through its non-debtor

affiliate The  Williamsburg  Hotel  BK  LLC  (the  "Hotel Manager").   Just over a year ago, in the

throes of the COVID-19 pandemic that has decimated the hotel industry, Debtor commenced this

bankruptcy case when it filed a voluntary petition for reorganization pursuant to chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for

the Southern District of New York (the "Court").

6.      Today, as it operates profitably, exceeding its financial projections, Debtor seeks

to continue its successful operations though its *Third Amended Chapter 11 Plan of Reorganization*

---

[1] Capitalized terms used but not defined herein have the meanings given in the Omnibus Objection.  Exhibit references refer to the Debtor's proposed exhibit list annexed to the Omnibus Objection (denoted Debtor Ex.).

[Docket No. 551] (as modified, amended, or supplemented from time to time, all of the foregoing, collectively, the "Plan"), that, amongst other things, provides for a cash infusion of more than $11 million in new money ($3 million more than under the original plan) to pay the allowed claims of creditors in full over time, with interest, preserve jobs and essential vendor relationships, plus $3 million which is in the bank, for a total of more than $14 million. This will position Debtor for its growth through stabilization of revenues and long-term viability following its emergence from the pandemic, preserve all the employee jobs, and get all creditors paid in full.

7.      As part of the Plan, the Principals executed an operating agreement with an affiliate of Lockwood Development Partners, LLC ("Lockwood") whereby as plan sponsors, with the backing of Lockwood, they have committed to funding the new money infusion and to the long-term success of the Hotel through the Plan.  A copy of the operating agreement and supporting bank letter with proof of funds was filed as part of the Debtor's Plan Supplement [Docket No. 541].

8.      The Principals' management of the Debtor has resulted in the Debtor successfully turning the Hotel around during some of the darkest days in the hospitality sector caused by the COVID-19 pandemic. The Hotel is now operating profitably on an annual basis, with occupancy rates significantly higher than its competitors across the city, its customer reviews exceed its competitors.

## II.    OPERATIONS

9.      Notwithstanding allegations of mismanagement, I believe Debtor's existing management, as well as the Hotel Manager, have done an exceptional job of managing the Hotel during the postpetition period, despite COVID and the pendency of this bankruptcy case.  The Hotel has outperformed its competitors, is regularly ranked as a top hotel in New York City, and enjoys strong customer reviews, despite the absence of any debtor-in-possession financing. Debtor

has far exceeded the performance metrics set forth in the budget as provided for as part of Debtor's consensual use of cash collateral, with net profits from April 2021 through December 2021 around $3,000,000, with approximately $3,000,000 cash in the bank. *See* Podgainy Report filed in support of Debtor's Omnibus Objection ("Podgainy Report"); Joint Ex. 16-18, 20-21, 25-26, 28, 34-35, 55, Debtor Ex. 88-90.

10.     Given the cyclical nature of the hotel industry in this market, and as Debtor projected, Debtor typically suffers losses during the winter months which are covered by excess cash accumulated during the peak seasons (with a profit throughout the entire year including December 2021, and modest losses in January and February 2022).[2]   Debtor's projections are based upon an analysis of historic performance, as well as adjustments regarding anticipated growth as the hospitality industry continues to emerge from the devastating impact of COVID-19.[3]   Overall, the Hotel occupancy for June through December 2021 was nearly 83% (approximately 73% for the 2021 year January-December period, including periods prior to the governor lifting COVID-19 restrictions), which is significantly higher than the NYC average of about 60% occupancy.  Podgainy Declaration.

11.     As will be discussed by the Debtor's experts at confirmation, the Hotel has been appraised at approximately $113 million as of February 2022, with a reasonably projected value

---

[2] The Hotel was not immune to the uptick in the omicron variant of COVID-19 that gripped the world, and, coupled with the traditional winter seasonal decrease in hotel occupancy as New Yorkers leave the city for holiday travel elsewhere, the Hotel's net operating profit was just under $260,000 for the period ending December 31, 2021, a loss of around $377,000 for the period ending January 31, 2022, and a smaller loss for the period ending February 28, 2022 of approximately $183,000.  The Hotel has begun its recovery and expects to continue seeing higher net monthly profits as it emerges from COVID-19 and tourism and business travel return to New York City in the spring months.

[3] Similarly, as detailed in the amended Disclosure Statement, the Hotel outperformed the performance metrics set forth in the cash collateral budgets for the April 5, 2021 to September 26, 2021 period, as provided below:

- Gross revenue exceeded budget by 30%
- Gross operating income exceeded budget by 51.4%
- Gross operating profit exceeded budget by 413%

of over $152 million at the end of the Plan. Debtor's Third Amended Disclosure Statement, Debtor Ex. 128.  I believe that the strong valuation of the Hotel, including the anticipated increase in value over time, is the product of a unique management team that includes the developers and builders of the property (i.e., the Principals), who have deep and vibrant connections to the community and the tech/entertainment ecosystem, which brings a significant number of guests and business to the Hotel, as discussed in more detail below.

12.     The proof of the extraordinary success of the management team of the hotel is self-evident. First, is the fact that occupancy at the Hotel is about 20% higher on average relative to all hotels in NYC. Second, and more importantly, is the fact that direct bookings count for about 50% of the Hotel's bookings on average. This is as opposed to regular independent hotel management companies that average only 25% direct bookings, with a high percentage of their bookings coming from OTA's, where the hotel management companies are merely competing on pricing. This means that thousands of people are booking rooms directly with the Hotel, because they want to stay at the Hotel, and experience it, as opposed to merely going to an OTA and booking the cheapest room. This attests to the level of services and experience that the Debtor and the Management Company have achieved, in attracting most of its guests to the brand and experience.

13.     Such a disparity in direct bookings can only be achieved through a unique management strategy.  As Ms. Moskovits also states, this consists of a "secret sauce" which is a mix of factors, which include curation of programming such as dinners, High Tea, parties, events, along with emphasis on style, presentation, great service, a "cool factor." This is also due to the great team assembled by the Principals, and the work of the Hotel employees, many of whom have been with the hotel since 2017.

### III.    THE INSIDER LOAN DOCUMENTS ARE GENUINE AND THE UNDERLYING RELATIONSHIPS ARE VALID AND PROPER

14.    The Principals spent years conceiving of and developing the Williamsburg Hotel, building it up from what was an empty patch of land in 2013.  Although the Principals were able to help the Debtor obtain financing to facilitate construction of the Hotel, third-party debt financing seldom covers all costs associated with a new project, because lenders want to ensure that there is a sufficient equity cushion supporting repayment of their debt, and because lenders want to make sure that equity owners have "skin in the game."  As a result, the Principals were required (and, indeed, desired) to make an equity investment to support construction of the Hotel.

15.    However as the construction project developed, more funds were needed so, among other things, the Principals contributed additional equity to the Debtor and also made loans to the Debtor.  These loans were originally intended as a line of credit, short-term working capital loans, that would be promptly repaid as the Hotel's cash flows stabilized, and were documented as such at the time the Principals initially started making advances on the Line of Credit loans (which documentation was subsequently amended to provide additional flexibility for advances and repayments).  In total, the Principals infused nearly $30 million into the Hotel: approximately $21 million in equity ($17 million from the Principals directly) and $11 million in net line of credit loans.  The capital infusion and line of credit loans were all recorded as such in the Debtor's books and records at or about the time that such amounts were advanced to the Debtor.

16.    More specifically, the closing statement prepared by Benefit Street identifies the approximately $17 million in capital invested into Debtor at the time of the closing of the Benefit Street loan in December 2017.  *See*, Asset Summary, Debtor Ex. 1, pp. 6-7.  The capital infusion is also reflected in Debtor's books and records.  *See*, Equity Report, Debtor's Ex 28.  In addition, as detailed in a report of loans and repayments of the line of credit loans, prepared by Debtor, with

some 500 pages of back-up, and reviewed by Getzler Henrich to tie in the transfers with the bank accounts, the report tracks some $11 million in net loans over a five year period advanced by Debtor's principals to cover shortfalls from operations of the Debtor (listing advances and repayments, tracked to the actual bank accounts). See, Loan Transfer Report & Backup Materials, Debtor Ex. 22-27.  Debtor's independent expert Mark Podgainy, of Getzler Henrich, reviewed the transfers as set forth in his previously filed declaration [Docket No. 268-2] (the "Podgainy Declaration").  Podgainy Declaration, p. 3.  Debtor Ex. 96.  More than half of these line of credit loans were made in 2018 when the Hotel's operations were just ramping up and Debtor's finances had been artificially constrained by Benefit Street's improperly inflated interest charges and contrived defaults.  Thereafter, in connection with its response to the instant motions, Mr. Podgainy also undertook a further review of all transfers into and out of the Debtor and Hotel Manager during the period of the Examiner's review, which confirmed the conclusions reached through his earlier review, discussed further below.  Podgainy Report.

17.    The flow of funds from Debtor's principals, through a "loan account" held by affiliate Northside Acquisition, into Debtor (or Hotel Manager) accounts to support Hotel operations is indisputable, and is supported by, among other things, bank statements and books and records.  Bank statements demonstrating the flow of funds were provided by the Debtor and/or Hotel Manager to Benefit Street  and, accordingly, neither party has any basis on which to dispute that the funds were actually transferred.

18.    I also believe it is irrelevant that the Principals' loans to the Debtor were never included on Debtor's schedules, or that we never filed a proof of claim for recovery of such amounts in the bankruptcy case.  My understanding is that any such insider claims would likely be deeply subordinated and that, even if they were not, the existence of additional debt would have

made confirmation of the Plan more difficult. Our primary concern was and is ensuring that Debtor

can continue to operate as a going concern so that its ownership of the Hotel can continue to benefit

all parties including employees, creditors and other stakeholders, including the surrounding

Williamsburg community—all of which was why loans were advanced in the first instance. In

any event, the remaining approximately $6.5 million in loans is being waived and discharged upon

the effective date of the Plan, following Confirmation, which is consistent with our commitment

to the Hotel, its business plan, and the benefits that continuity in the Hotel can provide to the many

employees and the surrounding Williamsburg community.

## IV.    **MOVANT'S IMPROPERLY RELY UPON EXAMINER'S REPORT**

19.    The Trustee Motions improperly rely upon certain allegations which I understand

are based primarily upon the deeply flawed and factually inaccurate report (the "Examiner's

Report) authored by examiner Eric Huebscher (the "Examiner") in support of their meritless

conclusory statements of alleged misconduct.

20.    Specifically, Benefit Street and the UST state they rely on the statements in the

Examiner report to support their baseless claims which primarily show only out-bound transfers

without regard for monies transferred into the Hotel. However, the evidence clearly and

indisputably shows the Principals' line of credit funding to the Hotel and its operations in the

amount of millions of dollars, *over and above the required initial capital funding*. In particular,

as noted above, Debtor was capitalized with an infusion of $21 million, approximately $17 million

of which was from the Principals (which was required as part of the loan closing requirements by

Benefit Street in or about 2017). In addition, in order to address liquidity during early operations

of the Hotel, the Principals (i.e., including myself personally through entities I owned) also

provided an additional approximately $11 million in net additional loans or funding, drawn over a

period of time as needed, which advances were referred to as the "Line of Credit" funding by the

Principals. Joint Ex. 1, 6. The amount of these advances are evidenced by the various bank records provided to, among others, Benefit Street (and, as required by the Court, the Examiner).

21.    Notwithstanding the more than $30 million advanced and funded, and without factual basis, Benefit Street and UST assert falsely that the Principals and Debtor's other insiders are liable for at least $12.5 million in avoidable transfers made over the course of the period investigated, without acknowledging in that context the recognized influx of millions of dollars in additional funds.[4] However, in the face of funds injected by Debtor's insiders, it is patently false to conclude, as Benefit Street and UST do, that this $12.5 million amount was owed, especially in the face of at least $7.3 million indisputably were paid by the Debtor's insiders , but which those challenging Debtor's management through their Trustee motions completely ignore (on top of the other loans advanced) in their baseless conclusions. Benefit Street latches onto and repeats this false claim in its Lender Motion, but, as Debtor and the Principals have repeatedly explained, even accepting the premise (which Debtor and Principals do not), the $12.5 million in net funds transferred out of the Hotel Manager accounts must be reduced by the $7.3 million in net funds transferred back into Debtor and which were used to cover Debtor expenses.

22.    In addition to the foregoing, the Debtor's records provide that certain of the other amounts paid to insiders are also accounted for as legitimate payments or reimbursements of reasonable expenses incurred by or for the benefit of Debtor. For example, approximately $800,000 were for payroll expenses reimbursed through Northside Acquisition and approximately $150,000 was for payroll advanced through Mint Construction. These are all legitimate transfers, for legitimate expenses and employee payroll incurred on behalf of the Debtor, supported by bank statements and other evidence, that cannot reasonably be disputed as proper uses of Debtor funds,

---

[4] The UST appears to recognize some influx into the Debtor.

but are nevertheless used by Benefit Street (and the Examiner) without proper context to make false allegations of misconduct.

23.    The Principals freely acknowledge that the balance of the transfers to Northside Acquisition years prior to the bankruptcy filing—about $4.5 million—were used as part of the ongoing handling of the line of credit loans to reduce amounts due under that line of credit.  And I have been consistent on that point.  Further, as I note above, Benefit Street's (and the Examiner's) position that these lines of credit were somehow made up is contradicted by bank statements, books and records, tax returns, and other information provided to such parties, in which the flow of funds from the Principals to the Debtor has been thoroughly documented.

24.    Thus, as of the Debtor's bankruptcy filing, approximately $6.5 million was owed to myself and Ms. Moskovits.  At that time, and at all times thereafter, I did not expect that we would receive any of that $6.5 million as part of the bankruptcy process, given the likely subordination of insider loans.  Consequently, neither I, nor Ms. Moskovits filed or sought repayment through proofs of claim, or included the loans in Debtor's schedules of liabilities. Frankly, we were not looking to have these amounts repaid once the bankruptcy was filed.  To avoid any question about the issue and to prevent an indebtedness the principles were never interested in collecting from Debtor as somehow a hurdle to restructuring, we have agreed that, upon the effective date of the Plan and following Confirmation, we expressly waive any right to repayment of such amounts.

25.    Accordingly, given the breadth and totality of the Principals' advances to Debtor, and despite Benefit Street's and the UST's failure to account for and reconcile these amounts, there is no basis whatsoever to conclude that that *any* of the $12.5 million in transfers was unsupported by consideration.  In addition, as discussed above, Mr. Podgainy undertook an independent

analysis of the transfers among the Principals, on the one hand, and the Debtor and Hotel Manager, on the other. The review included a detailed analysis of all of the bank statements for the Debtor and Hotel Manager during the period of the Examiner's review. Based upon such review, Mr. Podgainy confirmed, and I understand he will testify, that there are net amounts due to the Principals approximately $6.5 million which match the conclusions from the Loan Transfer Report and Backup Materials Debtor provided months ago.

## V.    THE DEBTOR'S TAX LIABILITIES ARE BEING ADDRESSED

26.    The Principals have also been working diligently with the Debtor's professionals to reconcile and address all issues pertaining to outstanding real estate, occupancy, and income taxes, if any. This is still a work in process, on account of certain errors (discussed below) that we have identified in the claims asserted by the NYC DOF and, accordingly, the below presents the most current (but not necessarily final) status of these issues, and is subject to further refinement as discussions with the NYC DOF progress. But, to summarize, I believe that the vast majority of the Debtor's (and Hotel Manager's) tax issues have been addressed and, for various reasons, as detailed below, the NYC DOF vastly overstates the amounts owed to it. NYC DOF acknowledges as much in its so-called joinder to the Trustee Motions (which confirms that its claims are overstated, that all post-petition taxes have been paid, and that discussions are ongoing with respect to the resolution of disputed pre-petition taxes) [Docket No. 545].

27.    With respect to real estate taxes, Debtor is current on all outstanding real estate taxes, which includes (i) its obligations under Debtor's property payment plan dated June 23, 2021 that was entered into between Debtor and NYC DOF, which payment plan is incorporated in the Plan and subject to Debtor's assumption under the Plan; and (ii) its current 2022 real property tax obligations. *See, e.g.,* Real Estate Tax Payment Confirmations, Debtor's Ex. 12-16.

11

28.     NYC DOF also asserted estimated claims for UBT and partnership income taxes. Debtor filed objections disputing these claims and asserts that according to the NYC DOF's own website, no amounts are outstanding.  In addition, based on the state and city tax returns filed there are no UBT or partnership income taxes due at all.  See 2017-2020 Tax Returns, Joint Ex. 22-24, 38-41, 45-49.

29.     NYC DOF further asserted a claim relating to pre-petition hotel occupancy taxes. As a preliminary matter, the Hotel Manager, rather than the Debtor, is primarily responsible for collection and payment of occupancy taxes, and the Hotel Manager has paid all undisputed post-petition hotel taxes (other than that a dispute is pending over a relatively small post-petition claim relating to interest and penalties, which is anticipated will be resolved pursuant to agreement).

30.     Further, with respect to the outstanding pre-petition hotel taxes, (i) a significant amount of taxes were already remitted by third-parties who collected and were obligated to pay such amounts (e.g., Expedia, Hotel Tonight and other online booking companies) to the NYC DOF on behalf of Hotel or substantial amounts were exempt from such tax such as during the pandemic. Consequently, I believe the NYC DOF's claim is erroneous and overblown by about $1 million or more (on top of erroneous amounts asserted based upon estimates), as it counts such amounts that were remitted and exempt and (ii) approximately $800,000.00 relate to penalties, but a substantial amount of the penalties are on monies not even owed.  Debtor and Hotel Manager are working with NYC DOF to reconcile any open amounts due and to discuss entering into a payment plan with respect to the foregoing, as permitted under the Plan.

A.     **Additional Details of Taxes and Payments of NYC Taxes**

31.     In terms of additional detail,  in 2017, when the loan from Benefit Street was put into place, the Hotel was barely operating, with significant construction yet to be completed.  Upon completion of the Hotel, many aspects of Debtor's finances got worse, rather than better.  Although

Debtor's operational financial performance steadily improved, Debtor was not yet turning a profit from operations, and was therefore unable to manage the additional interest charges and other expenditures unjustifiably assessed by Benefit Street.  Benefit Street's filing of a foreclosure action, and the subsequent appointment of a receiver, further strained Debtor's finances—again, even though operational performance continued to improve.  But then, when the COVID-19 pandemic hit, and the hospitality industry ground to a halt (both by virtue of the pandemic itself and because of forced closures imposed by state and local governments) the ability of Debtor to operate was further strained.

32.     With that background, it is unsurprising, and ultimately irrelevant, that Debtor previously failed to file federal income tax returns in prior years before the bankruptcy filing. Debtor had no taxable net income, so it had no income to report.  It is not uncommon for nascent businesses—especially those tight on cash—to hold off on filing tax returns until their business has stabilized, and they have generated taxable net income that supports reporting (and necessitates either the payment of taxes or the application of net operating loss carryforwards). With my direct personal involvement, Debtor subsequently filed its income tax returns from the date of the start of the Hotel operations through the 2020 tax year (with the 2021 year returns not yet due) which, unsurprisingly, demonstrated that no income taxes were owed. The examiner reports conclusions about tax evasion are therefore baseless, as the claims parroted by BSP in its Motion. The failure to file income tax returns (and any mistakes in the filings, if any) could not possibly constitute some sort of scheme to evade tax liabilities—as there are no taxes owed (for what are pass through entities for tax purposes), and there were no such liabilities to evade.

33.     In addition, Debtor's ability to pay its real estate taxes was hindered not only by its constrained cash flows, as discussed above, but also by the City of New York's improper denial

of a valuable tax abatement to which Debtor was entitled as a matter of right. Under New York's

Industrial and Commercial Abatement Program (the "ICAP") certain property tax abatements for

periods of up to 25 years are available to property owners who build, modernize, expand or

otherwise physically improve industrial or commercial buildings in certain neighborhoods

throughout the five boroughs.

34.    Although Debtor was eligible for the ICAP tax abatement as a matter of right,

provided the application was timely submitted within one year after the issuance of the first

operative building permits, the administrator of the ICAP wrongly denied Debtor's application as

untimely. Specifically, the NYC Department of Finance claimed that Debtor's ICAP application

was late because it was submitted more than one year after earlier permits—which had been

revoked—were originally issued, even though the application was timely based upon the operative,

and significantly modified, permit.

35.    Debtor's belief, and my personal belief, has always been that the denial of the ICAP

tax abatement should and would be reversed, which would result in an estimated $30 million in

lifetime tax savings to the Debtor along with an entitlement to the refund of several million dollars

for earlier amounts improperly assessed and already paid. To that end, Debtor has filed an

adversary proceeding (Adv. Proc. No. 22-07027, "ICAP Adversary Proceeding") to seek to have

Debtor's entitlement to the ICAP tax abatement resolved judicially, if necessary. I believe that the

Debtor should prevail in that litigation and, as a result, will have even better finances than the

projections under the Plan (which already demonstrate a reorganized Debtor positioned for

success).[5]

---

[5] While as detailed in the ICAP Adversary Proceeding, an appeal of the denial of the abatement was upheld by the Appellate Division, the court at that time denied the Debtor's motion to supplement the record with new regulations that support the tax abatement, and accordingly, the determination is distinguishable from the instant lawsuit.

36.     The favorable resolution of the ICAP tax abatement have other beneficial downstream effects as well.  It will moot the settlement of prepetition real estate taxes that Benefit Street objects to, provide for more cash on hand and lower expenses going forward, and provide a credit against other prepetition taxes that are asserted to be outstanding.  But even if the issue is resolved unfavorably, and the property tax settlement agreement must remain in effect, the deferral of payment of prepetition property taxes serves only to benefit Debtor's estate and its creditors, including Benefit Street, because it allows these amounts to be paid over time instead of up front, which improves Plan feasibility and preserves cash flows for operations pending the refinance and/or sale of the Hotel once the market has stabilized. Either way, the claims Benefit Street is making about the real estate taxes are baseless and false.

37.     As noted above, there are no UBT or partnership taxes due, and I expect the NYC DOF's overly inflated claim to be modified to address the foregoing.

38.     Lastly, with respect to NYC DOF's claim relating to pre-petition hotel occupancy taxes, the claim is disputed as overblown by about $1 million, and irrespective, Debtor and Hotel Manager (including myself) are working with NYC DOF to resolve the dispute and with respect to a payment plan as to any amounts actually owed.  Again, the hotel occupancy taxes were generally collected by, and are an obligation of, the Hotel Manager rather than Debtor, and all undisputed post-petition occupancy taxes due have been paid.

39.     As was made clear in a prior deposition, Debtor and Hotel Manager were doing the best they could to stay afloat during serial financial challenges not of their own making, as discussed above, rather than trying to expropriate trust fund taxes for personal uses.  Indeed, in addition to other pre-bankruptcy financial challenges, the COVID-19 pandemic was so bad for

hotels citywide, many of which also fell behind on paying occupancy taxes, that Mayor De Blasio temporarily suspended all hotels' occupancy tax obligations city wide during the pandemic.

40.     I also believe that the unpaid occupancy tax amounts asserted by the NYC Department of Finance are significantly overstated.  (Recently, NYC filed pleadings admitting their claims are overstated.  [Docket No. 545].  First, it appears that the asserted amounts include no less than $555,000 in occupancy taxes that were collected and remitted by third-party booking services like Expedia and Hotel Tonight, but for which the Hotel was not properly given credit.[6] The $555,000 figure reflects only the occupancy tax collected as a percentage of room revenues, and does not include the fixed $2 per room per night tax, which the Hotel Manager is in the process of calculating.  Accordingly, the actual amount of improperly asserted unpaid occupancy taxes is significantly higher than $555,000.

41.     Second, I believe that the NYC Department of Finance failed to account for the fact that some revenues from which it computed purportedly unpaid occupancy taxes actually resulted from a 2020 agreement with New York City to put up or offer hospitality for essential workers during the height of the COVID-19 pandemic, which was on a tax-free basis.  We are continuing to work on computing the amount properly deducted on account of this arrangement from the asserted unpaid occupancy taxes.   In any case, the claim is overblown by about $1 million. Interestingly, I saw that Debtor's positions are acknowledged when New York City recently filed pleadings conceding its claims for occupancy taxes were inflated.  [Docket No. 545].

---

[6]  When bookings are made through such services, neither Debtor nor the Hotel Manager collects room revenues and the associated occupancy taxes directly.  Instead, the booking service collects the revenues and all applicable taxes, including occupancy taxes, remits such taxes to the applicable taxing authority, and pays the balance (less booking fees or commissions) to the Hotel Manager.  Thus, if, as it appears, the NYC Department of Financed merely looked at the Hotel's total occupancy and room revenues and calculated occupancy taxes based on those amounts without giving credit for occupancy taxes collected and remitted by the booking services, the asserted unpaid amounts would significantly overstate the actual unpaid occupancy taxes, if any.

42.     Finally, I believe that a refund of excessive property taxes paid, following the allowance of the ICAP tax abatement, would certainly offset, and be more than, the limited amount of outstanding occupancy taxes (especially after the improperly asserted amounts are eliminated). And, as with the real estate taxes and other amounts owed, we are in discussions with the City of New York to clarify the amounts owed and priority status of such amounts, and for the payment of reduced amounts on favorable terms, which will serve to benefit all interested parties, including Benefit Street.

43.     With respect to a transfer of $252,100 made from funds in one of Hotel Manager's accounts, this transfer by the Hotel Manager was an inadvertent use of funds it was holding in reserve to cover pre-petition occupancy taxes.  It was always understood that the occupancy tax obligations was an obligation of the Hotel Manager to pay as the Hotel operator, and that the Hotel Manager (and its principals) had personal liability for and would cover any amounts due for occupancy taxes, if any.  I acknowledge the transfer was in error and wish our adjustment to bankruptcy procedures had been in place to prevent such transfer, but would point out that it was an inadvertent error and isolated one-time incident which occurred within approximately the first forty-eight (48) hours of the bankruptcy case while the Hotel Manager was still in the process of instituting financial controls as part of the Debtor's transition into this bankruptcy case.   As our position regarding occupancy taxes has been confirmed that the Hotel Manager has been overcharged for occupancy taxes, and during the intervening time period as bankruptcy discovery has allowed us to confirm, the occupancy tax bills have turned out to be inflated by the City by about  $1  million (in addition to  a potential multi-million  refund  that  would  be  due  upon successful adjudication of the separate abatement adversary proceeding), as the taxing authority did not account for funds that have been paid towards occupancy taxes by certain third party

booking organizations and have also billed for income that was protected from taxation by New York. As such, the amount of $252,100 has been set aside and reserved to be paid towards the payment plan of whatever amount of occupancy taxes is owed, if any, as part of the Plan.

44.     Further, under the Plan, a highly regarded and well recognized restructuring company, with particular expertise in the hospitality/hotel industry as an operating company, Getzler Henrich, will provide oversight as to Debtor's financial operations under the amended Plan (including monthly review of the Reorganize Debtor's financials), and will ensure that all amounts, whether relating to taxes or otherwise, are properly accounted for and paid. In other words, I wish to ensure the estate and parties in interest that, allegations or innuendo aside, the Debtor will retain recognized professional to play an oversight role on transactions as set forth therein. Thus, the Principals have taken the initiative to ensure that any prior errors are corrected and remedied, while seeking to minimize any harm inadvertently done to Debtor or its stakeholders.

## VI.     ANY ISSUES CONCERNING THE EIDL ARE NON-EXISTENT AND PPP LOANS HAVE BEEN RESOLVED

45.     Contrary to Benefit Street's baseless claim that the EIDL was taken out "in the name of the Williamsburg Hotel," Lender Motion pp. 18, 30, it was in fact taken out in the name of the Hotel Manager company, and given as a loan to the Hotel Manager's company, and was and remains an obligation to be repaid by the non-debtor Hotel Manager, not Debtor itself. See, EIDL Documents, Joint Ex. 15, 19, Debtor's Ex. 30. Both prior to and following the Debtor's bankruptcy filing, the Hotel Manager obtained loans from the U.S. Small Business Administration through their EIDL program. EIDL funds are loans, not grants, and these loans were incurred by the Hotel Manager (and not in the name of the Debtor or the Hotel) to support the Hotel Manager, which engages in activities other than operation of the Hotel. I have no reason to believe that the Debtor would ever have had any legal interest in the EIDL funds obtained by the Hotel Manager.

46.    There is also no reason that Debtor funds collected by the Hotel Manager would need to be used to pay back the EIDL obtained by the Hotel Manager.  First, once the Plan is confirmed, the Hotel Manager will be able to receive its 3% management fee and will therefore have its own funds available to repay the EIDL.  Second, the Hotel Manager is and has been in the process of expanding to management of businesses other than the Hotel, and anticipates generating additional free cash flows therefrom (including management fees from other hotels and food/beverage operations in NYC and Miami) that can be used for repayment of the EIDL.  Third, Toby Moskovits personally guaranteed repayment of the EIDL, providing another non-Debtor source for repayment.  Accordingly, there are at least three potential sources of cash flows other than funds to which Debtor is entitled from which the EIDL will be repaid, and Debtor and its Principals will ensure that no Debtor funds are used to repay the EIDL.  Finally, the monthly payment on the EIDL funded shortly after the Petition Date is only $2,528, so it will be a relatively minor burden for Ms. Moskovits or the Hotel Manager to ensure that monthly EIDL payments are made when required.

47.    As to the PPP loan, this is also a non-issue being resolved under the Plan and PPP settlement through the payment into Debtor's estate of the full $1.438 million advanced in connection with the PPP loan, even though nearly half of the PPP loan was reinvested into the Debtor.  In addition, as discussed above, the Hotel Manager has the means to satisfy its obligations under the PPP loan settlement, if needed, as do the Principals, who provided bank statements establishing that they have sufficient liquidity to make any required payments under the PPP Settlement.  *See* Proof of Funds, Debtor Ex. 38.[7]

---

[7] On or about April 2020, the Hotel Manager applied for, and received, certain Paycheck Protection Program loans (the "PPP Loans") in the total amount of $1,438,000.00.  Of this amount, the Hotel Manager reinvested approximately $613,758.93 (the "Debtor Advance") in the Debtor.  The Hotel Manager then disbursed the remaining amount, approximately $824,241.07 (the "Remaining Amount"), into other business activity of the Hotel Manager.  Pursuant

## VII.    RELEASES ARE DISGUISED CONFIRMATION OBJECTION

48.    While a Plan objection, the fact that the Debtor sees no value in prosecuting claims in the context of a 100% payout plan does not mean that others cannot, even (or especially) if the Trustee Motions are denied and the Plan is confirmed.  The Plan allows creditors to opt-out from non-Debtor releases, which Benefit Street has done.  Likewise, as Benefit Street notes, the Plan does not release the Debtor's principals from fraud or gross negligence claims.

49.    In addition, I believe the position in the Trustee Motions that any material claims against the Principals are released is without merit and, in any case, is at best a plan objection. Here, the limited releases are proper and exclude claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct[.]"  Additionally, any released parties have made significant contributions to the Debtor's restructuring efforts that I believe supports the limited release, including, but not limited to, negotiating and formulating the terms of the Plan that provides for a $11,252,000 cash infusion by the Plan Sponsor, payment of Allowed Claims of creditors in full over time with interest, the preservation of critical business relationships, and a prompt emergence from chapter 11.

50.    One last point needs to be made about Benefit Street's claims in their Motion, where they claim they have almost no foreclosures, and that this case is a rare case for them. This is a false statement for the following reason. Benefit Street has made it their practice to issue default notices to a very large percentage of their borrowers. However, most borrowers don't wish to get

---

to the PPP Settlement as provided under the Plan, the Debtor will be paid $1,438,000.00, together with the deferral and/or subordination of any claims by the Hotel Manager against the Debtor through the Effective Date of the Plan regarding unpaid management fees under the Management Agreement.  Accordingly, as part of the Plan, any purported claim against the Hotel Manager would be offset by the infusion of $1,428,000.00 and amounts due to the Hotel Manager amongst other things.  In addition to entering into the PPP Settlement, the Debtor and Hotel Manager agreed, without admission of liability, to enter into the PPP Stipulation to provide for a guaranty of the Hotel Manager's obligations under the PPP Settlement as provided for in the Plan, net of amounts reinvested in the Debtor.  The PPP Stipulation is consistent with the Plan's provisions on the PPP Settlement.

into a legal battle with Benefit Street, and either settle the manufactured claims by Benefit Street, or just pay up the claimed default interest, whether it's true or not, to avoid a full legal confrontation. It might be true that there is a low percentage of Benefit Street loans that go into foreclosure, but that does not mean that Benefit Street acts appropriately to its borrowers. *Also See*, Debtor's Adversary Proceeding against Benefit Street, No. 22-07002 (asserting claims against Benefit Street relating to predatory lending practices, contrived defaults, and unreasonable default interest, fees, and other charges).

51.    In fact, to the contrary, Benefit Street has issued default notices to a high percentage of its borrowers. As a matter of fact, over 2017 to 2020, it is a fact that Benefit Street issued default notices to all of its borrowers in NYC, which were three loans on three properties to the best of my knowledge. The only one of those properties that went into foreclosure is the Hotel, but Benefit Street issued default notices to all other borrowers it had loans for properties in NYC during this time period, and forced through its predatory practices millions of dollars of extra payments through these manufactured default notices from their borrowers, without the loans going into foreclosure. In fact, the reason why they wrested this money successfully was because the borrowers wanted to avoid foreclosure. In summary, the question is not how many active foreclosure lawsuits Benefit Street has, but the question is how many default notices to how many borrowers have been issued by Benefit Street as a part of their predatory practices.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 24, 2022

_____
Michael Lichtenstein

21

## **ATTACHMENT 4**

## **REDLINE OF REVISIONS TO DECLARATIONS**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>Debtor. | Chapter -11<br><br>Case No.: 21-22108 (RDD) |

**AMENDED DECLARATION OF DAVID GOLDWASSER**

I, David Goldwasser, declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer ("CRO") of 96 Wythe Acquisition LLC, as debtor and debtor-in-possession (the "Debtor").

2.      Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "Lender Motion"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("Benefit Street"), and (ii) the motion of the United States Trustee (the "UST") for appointment of a Chapter 11 trustee [Docket No. 491] (the "UST Motion" and, together with the Lender Motion, the "Trustee Motions").

3.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my regular interactions and discussions with other representatives of the Debtor during the course of this bankruptcy proceeding, including the Debtor's counsel and other professionals. If called as a witness, I would testify competently thereto.

**I.      BACKGROUND**

4.      I believe that the Debtor stands on the verge of a major achievement, which is to confirm a chapter 11 plan of reorganization that, among other things, provides for a fresh start,

will provide pursuant to a third amended plan for an increased cash infusion in the amount of $11,252,000 to pay creditors in full, with interest, and preserves jobs, essential vendor relationships, and the Hotel.  I believe the Plan positions the Debtor for growth and long-term viability, maximizing value as it emerges from the catastrophic effects of the COVID-19 pandemic that hammered the hospitality industry in particular.

5.    Today, the hotel is fully operational and operating successfully.  It is a very unique property with a fantastic skyline view of New York, over the East River.  It is highly regarded in the Brooklyn market.  The Hotel outperforms its competitors, is regularly ranked as a top hotel in Brooklyn, and enjoys strong customer reviews and regular viewed as a local destination spot given its one-of-a-kind bar on top of the hotel.  In the last three quarters of 2021, the Hotel exceeded its projections on all key metrics, generating net profits (and cash on hand) of more than $3 million, despite the absence of any debtor-in-possession financing.  To further support the Plan and viability of the emerging entity, the Debtor will be receiving a cash infusion of $11,252,000, which will bring total cash on hand to approximately $14,252,000, thus positioning the Debtor to implement the Plan and perform fully thereunder.

6.    I was appointed as the Debtor's CRO on February 22, 2021, to advise the Debtor in connection with this Reorganization Case.  I serve as the CRO through G.C. Realty Advisors L.L.C., of which I am the principal and sole member.

7.    As CRO, I have had considerable authority over the Debtor's post-petition operations and restructuring efforts.  My service as CRO for the Debtor has included, among other things, preparing and signing the chapter 11 petition and preparing and signing each monthly operating report.  I also interact regularly with the Debtor's management, as well as with the Management Company, which operates the Hotel, and with the Debtor's counsel and other

professionals (including Getzler Henrich and Hilco Realty) in overseeing this Reorganization Case. Most recently, I have been directly engaged in assisting the Debtor with formulation of the Plan and our continued effort to strengthen the Plan for the creditors.

8.      It is my belief that appointment of a trustee would add expense and destroy value while not providing any tangible benefits to creditors or other interested parties. I understand Benefit Street is not happy with its treatment under the Plan and has vigorously opposed Debtor's efforts to reorganize under the Plan. Thus, appointment of a trustee would facilitate Benefit Street's efforts to force a fire sale and undermine the cram-down plan proposed by Debtor in regards to derailing its proposed treatment under indubitable equivalence. There is no doubt that if a trustee were appointed, any subsequent sale efforts would result in a discounted purchase price to the hotel, should any third party seek to try and outbid Benefit Street if it were to credit bid. Such a sale would impair recoveries to the creditor body as a whole.

9.      As discussed below, the allegations of misconduct by Debtor's principals and affiliates mischaracterize and exaggerate their actions, while trying to assert behavior that suits only Benefit Street's desired outcome of this case. And the so-called misconduct does not account for harm to Debtor and its stakeholders, the majority of which support the restructuring. Nor do the UST's and Benefit Street's claims address the longstanding efforts by Debtor and its principals to preserve and maximize value in Debtor as a going concern for all such stakeholders, and the fact that existing management has been operating the Hotel profitably, as one of the top-rated boutique hotels in New York City, with sustained occupancy rates often nearly twenty percent higher than the city average.

## II.    TRANSFERS NOTED IN EXAMINER'S REPORT AND TRUSTEE MOTIONS

10.     Before turning to the benefits that I believe existing management provide (and have provided) to the Debtor and its stakeholders, including the proposed plan of reorganization for

which they are essential, I first wish to discuss certain of the allegations asserted in the Trustee motions, which I understand from a review of them are based primarily upon the *Report of Eric M. Huebscher, Examiner* [Docket No. 418] (the "Examiner's Report").

11.    The most glaring error in the  Trustee Motions—is the failure to acknowledge Debtor's principal's line of credit funding to the Hotel and its operations in the amount of millions of dollars, *over and above the required initial capital funding*.  More specifically, the closing statement prepared by Benefit Street identifies the approximately $17 million in capital invested into Debtor at the time of the closing of the Benefit Street loan in December 2017. *See* Asset Summary, Debtor's Ex. 1 pp. 6-7.[1]  The capital infusion is also confirmed and reflected in Debtor's books and records.  *See* Equity Report, Debtor's Ex. 4828.  In addition, as detailed in a report of loans and repayments prepared by Debtor, with some 500 pages of back-up, and reviewed by Getzler Henrich to tie in the transfers with the bank accounts, the report tracks some $11 million in net infusions of cash by the equivalent of a line of credit loan over a five-year period addressing and covering advances by Debtor's principals to cover expense timing and other periodic shortfalls from operations of the Debtor (listing advances and repayments, tracked to the actual bank accounts).  *See* Loan Transfer Report & Backup Materials, Debtor's Ex. 42-4522-27.  Debtor's independent expert Mark Podgainy reviewed the transfers as set forth in his previously filed declaration [Docket No. 268-2] (the "Podgainy Declaration").    Debtor Ex. 12996, Podgainy Declaration p. 3.[2] Context and timing regarding the Debtor's use of the line of credit from its principles is important.  In fact, more than half of these loans were made in 2018 when the Hotel's

---

[1] An additional $4 million was invested by non-insiders.

[2] Mr. Podgainy's assessment was based upon a review of the books and records of Debtor and its affiliates, including bank account statements detailing the flow of funds.  *Id.*  As previously noted, Mr. Podgainy did not—and, as a nonlawyer, could not—opine as to the legal status of the loans as loans and equity as equity.

747916209

operations were just ramping up and Debtor's finances had been artificially constrained by Benefit

Street's conduct and improperly inflated interest charges and contrived defaults. *Id.* What

commenced as access to cash to address timing of expenses as they came due, became a necessary

line of credit to address the ongoing dispute with the lender Benefit Street that has been ongoing

for four (4) years. Thereafter, in connection with its response to the instant motions, Mr. Podgainy

also undertook a further review of all transfers into and out of the Debtor and Hotel Manager

during the period of covered by the Trustee Motions (which were tied to the period of the

Examiner's review), which confirmed the conclusions reached through his earlier review,

discussed further below.

12.     As Mr. Podgainy confirmed, from time to time, Debtor draw and occasionally pay

back a net payment amount of these borrowings under the Line of Credit of only roughly $4.5

million, leaving approximately $6.5 million in the advanced funds under that line of credit to the

Hotel outstanding and owed to Debtor's principals at the time of this bankruptcy filing, which

amounts Debtor's principals did not anticipate they would be repaid as part of the bankruptcy

process and anticipated would be deeply subordinated.[3]  The review by Mr. Podgainy confirms

that Debtor's principles provided prepetition far more money overall than any of these repayments.

13.     As to the foregoing loan repayments and the other transfers alleged in the Trustee

Motions, I see no benefit in pursuing avoidance actions, whether under the Bankruptcy Code or

otherwise, against the Debtor's principals or their other business entities. Based upon my review

---

[3]  As provided in the Podgainy Declaration, the Loan Transfer Report and Backup Materials includes advances and repayments to cover operating expenses of the Hotel operations by and repaid generally through the Northside Loan Account. The Loan Transfer Report includes advances by the insiders from the Loan Account of some $8.7MM and transfers back to the Loan Account of $11.6MM (for a net of $2.9MM). Together with other loans as detailed therein, the net loan balance due to insiders is approximately $6.5 million. Mr. Podgainy undertook a separate analysis of monies in and out of the Debtor's and Management Company's bank accounts as part of the response to the instant motions, wherein he concluded that the total amounts owed to the Debtor's insiders approximated $6.5 million.

747916209

of these payments, I believe that all of them represent repayment of legitimate debts or reimbursement of legitimate expenses advanced on behalf of the Debtor.  Accordingly, I believe that the only conceivable basis for avoiding these payments is as preferences—not as fraudulent transfers.  Even given the one-year lookback period for insider preferential payments, I do not see how these payments could be recoverable as preferences.  First, less than $1 million of the transfers was made during the year preceding the Debtor's bankruptcy filing.  Second, I believe the Debtor's principals would have good defenses in any preference action on account of the fact that they made additional loans to the Debtor in a similar amount over the same period.  Although insider loans, these loans were akin to a revolving line of credit that was regularly drawn down on and repaid, in short succession, depending on available cash flows.  I see nothing wrong with the Debtor and its principals having engaged in these transactions prior to the Debtor's bankruptcy filing.

14.     The other claims asserted in the Trustee Motions have even less merit.  For example, Benefit Street asserts that the Debtor's principals are somehow liable for $53 million in damages based on the collection of Hotel revenues in the Hotel Manager's accounts rather than the Debtor's, in violation of the Debtor's operating agreement.  Frankly, this assertion is preposterous, because the Debtor was not harmed by the use of Hotel Manager bank accounts. The vast majority of the funds collected were used to pay the Hotel's operating expenses, and the remaining amounts were used for proper purposes as discussed above.  Since the Debtor was not harmed, there can be no damages due solely to a technical violation of the Debtor's operating agreement, and there would certainly not be anywhere near $53 million in damages.

15.     The case for prosecuting any such actions against the Debtor's principals is further weakened by the fact that the Plan is a 100% plan that proposes to pay all creditors in full over time.  Given that any litigation surplus would primarily inure to the benefit of the Debtor's

principals (whether on account of their existing equity or their equity in the reorganized debtor), this would at best be a matter of expending significant litigation expenditures to move funds from one pocket to another.

16.     To be clear, I have no "skin in the game," in that if the actions discussed above were successfully pursued against the Debtor's principals, I would not be personally liable for any such amounts.  My independent perspective allows me to see this issue clearly, untainted by the principals' pecuniary interests or Benefit Street's apparent longstanding vendetta against the Debtor and its principals (or opposition to the Plan).  Further, as noted above, as CRO, I asked Getzler Henrich to review and analyze these transactions, and they confirmed the facts set forth above based on the Debtor's actual bank statements and other books and records.  Accordingly, I have no reason to question the validity of the loans (or repayment thereof) and related documentation.

17.     It is from my independent perspective that I conclude that the Debtor's decision not to prosecute any actions against its principals is a sound exercise of its business judgment, and that such decision is in the best interests of the Debtor's creditors and other stakeholders because it will not waste vast sums of money on attorneys' fees to pursue claims lacking any significant merit. And for the same reason, the release of those claims under the very Plan proposed, to the extent that they are not preserved under the Plan, would not harm the Debtor in any way whatsoever.

18.     Debtor does acknowledge one error on its part, or more specifically that of the Hotel Manager, when it advised it inadvertently expended certain funds within approximately forty-eight hours of the case filing, while case and financial controls were being implemented—as discussed in greater detail below—and those funds (roughly $252,000) are being replaced by Debtor's principals under the Plan.  This one error has been acknowledged and is being rectified as part of

747916209

the Plan. As CRO for the Debtor I have no role in transferring funds from the Hotel Manager into other non-Debtor entitles. Nevertheless, I understand that the funds related to occupancy taxes, that was an obligation of the Hotel Manager as operator and that the Hotel Manager had personal liability for and would cover any such amount. I believe that the transfer of these funds was an honest mistake (that the Hotel Manager and Debtor's principals maintain personal liability for such), and it is one that has not been repeated during this bankruptcy case.

19.    Upon learning of the transfer of such funds away from Hotel-related accounts, I investigated the foregoing transfer and worked with the Debtor's principals to ensure that the principals would make the Debtor and Hotel Manager whole. To address the foregoing, Debtor's principals have increased their contribution to the Debtor under the Plan and reserved funds specifically for reimbursement of this amount. Given that there is no conceivable harm to the Debtor or its creditors resulting from the referenced transfer, and my belief that the transfer was an honest mistake, I do not believe that the $252,100 transfer provides any grounds for appointment of a trustee.

20.    As to the EIDL loans noted in the Examiner's Report and the Trustee Motions, I have no reason to believe that these loans are obligations of the Debtor or were necessarily used for payment of Hotel or Debtor expenses. I understand they are personally guaranteed by Debtor's principle, Ms. Toby Moskovitz. Accordingly, I see nothing wrong with the Hotel Manager obtaining the EIDL loans after the filing of this bankruptcy case and using those loans for its independent business purposes or other uses unrelated to the operation of the Hotel.

## III.    THE PLAN

21.    In this section, I will discuss why I believe the Debtor's plan of reorganization can and should be confirmed, and why it represents the best possible outcome for creditors and other interested parties.

747916209

A. **Solicitation and Acceptance of the Plan**

22.    Based upon the Certificate of Service of Solicitation Materials filed on December 6, 2021, Docket No. 213, I understand that the Debtor transmitted all of the materials to be transmitted to those holders of Claims and Interests entitled to vote on the Plan (collectively, the "Solicitation Materials") in accordance with the order approving the Disclosure Statement.

23.    Furthermore, I understand based upon my review of the voting report filed on March 29, 2022,  Docket No. 481 (the "Voting Report") that at least two-thirds in amount and more than one-half in number of the creditors who voted on the Plan with Allowed Claims in Class 4, Secured M&M Claims and Class 5 Unsecured Claims voted to accept the Plan.  Class 2 BSP Claim voted against the Plan.  Class 1 Priority Claims are unimpaired and deemed to accept the Plan.  Class 3 Secured Property Tax Claim did not indicate an acceptance or rejection of the Plan. The other classes include Class 6 Subordinated Claims which are deemed to reject, and Class 7 Equity Interests consisting of insiders and not entitled to vote on the Plan.

B. **Plan Modifications**

24.    The Debtor filed a modified version of the Plan that increases the cash infusion from the original amount of $8 million to $11,252,000, includes an alternative treatment to Benefit Street (providing the option for an accelerated payout in forty-two (42) months subject to agreement settling the pending adversary proceeding against it in the amount of $75 million), confirms the waiver by Debtor's principles upon the effective date of the roughly $6.5 million in outstanding amounts of the net loans or lines of credit advanced by Debtor's insiders to the Hotel, provides a mechanism for post-confirmation termination of the Management Agreement in the event of a sale to an arm's-length third party that requests such termination (an issue that Benefit Street claimed impaired the Hotel value), makes technical clarifications and enhancements, and resolves certain formal and informal comments to the Plan by parties in interest.  As CRO, I have

participated in the negotiation and documentation of these modifications and have given guidance

to the professionals to prepare and implement those changes to the Plan.

25.     Enhanced terms include as follows:

(a)     an increase in the cash infusion to $11,252,000 (from $8 million under the original plan);

(b)     assumption of an amended and restated management agreement with the Management Company which provides for the post-confirmation termination of the Management Agreement in the event that the Reorganized Debtor negotiates an arm's length sale of the Hotel to a non-affiliated third party;

(c)     includes an alternative treatment to Benefit Street, providing the option for an accelerated payout in forty-two (42) months subject to agreement settling the pending adversary proceeding against it in the amount of $75 million[4];

(d)     confirms the waiver upon the effective date of the $6.5 million in net loans advanced by the Debtor's insiders; and

(e)     engagement of Getzler Henrich post-confirmation in an expanded role to provide third party oversight in connection with review and oversight of the reorganized Debtor's financials on a go forward basis upon confirmation.

26.     ***Third Party Releases***.  I understand that the Plan provides consensual third-party

releases (the "Third-Party Releases") to the Released Parties, who have played an essential role in

this Reorganization Case.

27.     I understand that the Disclosure Statement and ballots distributed to holders of

Claims entitled to vote conspicuously quoted the Third-Party Releases from Article 5.10 of the

Plan and clearly informed holders to simply check a box if they did not consent to the Third-Party

Releases.

---

[4]  Benefit Street has the option of either the original treatment and/or the alternative treatment under the Plan.

28.     In addition, I believe that the Third-Party Releases are reasonable and appropriate. They exclude claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct[.]"   Additionally, each Released Party has made significant contributions to the Debtor's restructuring efforts that I believe supports their release, including, but not limited to, negotiating and formulating the terms of the Plan that provides for a $11,252,000 cash infusion by the Plan Sponsor, payment of Allowed Claims of creditors in full over time with interest, the preservation of critical business relationships, and a prompt emergence from chapter 11.

29.     The Released Parties also have made substantial commitments of time and effort in the Debtor's restructuring efforts.   For example, the Management Company manages all relationships with Hotel vendors and employees, and contracts directly with vendors for services required and employees approximately eighty (80) to one-hundred twenty (120) full-time employees (and more employees seasonally) dedicated to servicing the Hotel and its guests. Further, the Debtor's management has applied its extensive industry knowledge during this Reorganization Case and will carry out the restructuring after it concludes.

30.     I further believe that the Released Parties' contributions to the Debtor's restructuring is borne out by the fact that the Hotel is open and fully operational, outperforming the overall New York hotel market, operating profitably, and exceeding financial projections.

31.     Based on the above and my discussions with the Debtor and its counsel, I believe that the Third-Party Releases are consensual, consistent with the requirements of case law in this District, reasonable, and in the best interests of the Debtor's estate.

32.     ***The PPP Settlement is a Sound Exercise of the Debtor's Business Judgment***.  As part of the Plan, I understand that the Debtor will be providing a release of its claims and causes of action against the Released Parties (the "<u>Debtor Releases</u>") that is limited to claims regarding

11

the PPP Settlement, which are being settled pursuant to the Plan in exchange for a cash payment of the full amount asserted paid as part of the PPP Loans.  I believe that such payment is an essential component of the Plan and constitutes a sound exercise of the Debtor's business judgment.

33.     It is my understanding that the Plan excludes from the Debtor Releases claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct as determined by a final order of a court of competent jurisdiction," and that Article 6 of the Plan preserves the Debtor's, Claims, and estate causes of action as detailed therein.

34.     In addition, I believe that without the Debtor Releases, the Debtor and its stakeholders would not have been able to obtain the substantial benefits provided by the Plan, including allowing the Debtor to emerge from chapter 11, and the cash infusion in the amount of $1,438,000 (for a total cash infusion under the Plan of $11,252,000), that will be used to fund distributions to creditors whose Allowed Claims will be paid in full over time with interest.  The Debtor Releases also provide finality and avoid potentially significant delay in consummating the Plan.  Accordingly, I believe that the Debtor Releases will benefit all of the Debtor's stakeholders, constitutes a sound exercise of the Debtor's business judgment, and is fair and equitable and in the best interests of the estate.

C.     **The Plan Presents the Best Possible Resolution of this Bankruptcy Case.**

35.     *First*, the Debtor retained me to provide independent business judgment and as described above I have been involved in the Debtor's restructuring efforts throughout this Reorganization Case.  I have exercised my independent business judgment in an effort to maximize value for the Debtor's estate.

36.     *Second*,  I believe that there is no question that, facing a matured mortgage loan held by an aggressive lender, and just beginning to come off of the worst of the COVID-19 pandemic, the Debtor is in need of a financial restructuring.

37.     *Third*, the Plan provides for the payment of all Allowed Claims in full.  The Debtor could easily have justified short-changing its unsecured creditors and paying them a fraction of what is owed.  Instead, the Debtor formulated its plan to pay unsecured creditors in full over a relatively short period of time, which I understand is a rarity in chapter 11 cases.

38.     *Fourth,* while the Plan does not reflect a negotiated agreement with BSP, the Plan is nevertheless the product of significant arm's-length negotiations with stakeholders over more than a year.  The Debtor has engaged continuously with unsecured creditors on claims allowance issues (and has objected to claims as necessary).  As a result, the Debtor has agreed to stipulations with creditors (or otherwise obtained orders) to reduce the allowed amount of claims by more than $16 million.  The Debtor has also negotiated a settlement with the City of New York to satisfy unpaid property taxes—a first priority secured claim—over time rather than up front, which resulting effect on cash flow benefits the Debtor, creditors, and the estate.

39.     Lastly, I believe appointment of a chapter 11 trustee would be severely detrimental to the value of the Hotel, which would likely result in liquidation in a sale on a relatively short time horizon.  I believe value would be depressed not only due to the likely asset sale rather than a going concern sale, especially because the Hotel's management, including the Hotel Manager, would likely be replaced by a third-party manager less familiar with the hotel's brand and clientele and the nature of operating a boutique hotel in the trendy Williamsburg neighborhood of Brooklyn.

40.     I hereby reserve my right to amend the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
            May ~~12~~24, 2022

_____
David Goldwasser
Chief Restructuring Officer

747916209

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>96 WYTHE ACQUISITION LLC,<br><br>Debtor. | Chapter -11<br><br>Case No.: 21-22108 (RDD) |

<u><span style="color:red">AMENDED</span> DECLARATION OF  TOBY MOSKOVITS</u>

Pursuant to 28 U.S.C. § 1746, I, Toby Moskovits, hereby declare as follows under penalty of perjury:

1.      I am a managing member of 96 Wythe Acquisition LLC ("<u>Debtor</u>"), which is the owner of the real estate and hotel located at 96 Wythe Avenue, Brooklyn, New York (the "<u>Hotel</u>"). I am a co-founder and developer of the Debtor since its formation.  I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.  I work with Michael Lichtenstein (collectively with myself, the "<u>Principals</u>"), another principal of the Debtor, and David Goldwasser, the Debtor's Chief Restructuring Officer.  I have reviewed and am generally familiar with the Debtor's operations, including the operation of the Hotel, and the Debtor's related financial records, agreements, and other related documents.

2.      Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "<u>Lender Motion</u>"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("<u>Benefit Street</u>"), and (ii) the motion of the United States Trustee (the "<u>UST</u>") for appointment of a Chapter 11 trustee [Docket No. 491] (the "<u>UST Motion</u>" and, together with the Lender Motion, the "<u>Trustee Motions</u>") and in support of *Debtor's Omnibus Objection to Lender's And United States Trustee's Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539] (the

"Omnibus Objection") . My testimony is based on my personal knowledge of the facts set forth

below.

3.      I have reviewed the Omnibus Objection and, to the best of my knowledge, each of

the facts set forth therein is true and correct in all respects.[1] The following represents my direct

testimony in further support of the Omnibus Objection, and in opposition to the Trustee Motions.

4.      I am a third generation business owner in Williamsburg, Brooklyn, and have been

a developer of residential and commercial properties in the neighborhood since after the market

crashed in 2008. I developed the first commercial office building built in Williamsburg since the

Great Depression—25 Kent Avenue—which is located just a block from the Hotel.

5.      My connection to Brooklyn runs much deeper than purely business or transactional.

Over the last decade, I have played an active role in the community through my volunteer work,

and more recently by serving on Community Board 1 in Brooklyn. I serve on the Board of

Directors of the Brooklyn Chamber of Commerce, and am an active member of the advisory board

of Sustainable United Neighborhoods, a local non-profit, where I support this organization's

efforts to create new economy job opportunities for residents of North Brooklyn. In addition,

throughout COVID I provided a space for Sustainable United Neighborhoods that served as the

hub for over 700,000 meals given out in partnership with Jose Andres' World Central Kitchen and

served as food bank through the end of 2021.[2]

---

[1] Capitalized terms used but not defined herein have the meanings given in the Omnibus Objection. Exhibit Numbers refer to the numbering pursuant to the Debtor's proposed exhibits attached to the Omnibus Objection.

[2] I am a born and bred Brooklynite, and a first generation American whose Jewish-Polish grandfather opened a business in Williamsburg, across from the Williamsburg Hotel in the 1960s after arriving in New York as an immigrant with my then-three-year-old father in 1952.

747916322.2

**Appointment of a Trustee is Unwarranted**

6.       I believe that appointing a chapter 11 trustee to manage Debtor's affairs would impose significant costs, increase risks that creditors are not made whole, and severely impair the Hotel's financial prospects, while serving no real benefit other than arranging for Benefit Street to be paid back a little bit sooner.

7.       First, as discussed below, not only would the appointment of a trustee chill the going concern value of the Hotel and result in the loss of a significant cash infusion provided for under the Plan, in still uncertain times given the lingering impact from COVID-19, it would be unsurprising if a trustee sought to transition management of the Hotel away from the Hotel Manager.  This would come with significant transaction costs while the trustee sought to interview management companies and candidates and bring them up to speed with the Hotel's operations.  Aside from direct costs, operational efficiency would likely suffer in the course of transitioning from one manager to another, making it more difficult for the Hotel to break even or generate positive cash flows.  Under such conditions, it is doubtful the unsecured creditors would enjoy the same assured treatment as compared to the present Plan on file.

8.       As explained below, even (or especially) with the replacement of the Hotel Manager with an experienced third-party hotel management company, the Hotel's revenues would likely suffer significantly without the involvement of the Principals.  As I, and the Debtor, have stressed throughout this case, the Principals are deeply familiar with the Williamsburg Hotel brand and what it means in the tech and local community, and our connections in the Williamsburg community have been essential to the performance of the Hotel, especially through the Principals' use of our connections in the community to draw profitable group events at the Hotel, and drive direct bookings well beyond the industry norms which have a direct impact on profit margins.

747916322.2

**Catering and Event Business**

9.      The Principals, as well as the "Williamsburg Hotel" brand, are affiliated with Heritage Equity Partners ("Heritage"), a socially conscious real estate developer aimed at building community-focused developments in Brooklyn, supporting the new economy companies that create new economy jobs by engaging with the tech ecosystem, as well as providing opportunity for economically disadvantaged members of the community to access these career paths.

10.     Consistent with these goals, Heritage, with my direct involvement developed and built a full square block, 500,000 square foot office building campus, located one block away from the Hotel, which has Amazon Music as its tenant, as well as fashion brands.  This office campus has hosted for about a year the first Street Art museum in NYC—a 100,000 square foot museum of street art featuring many street artists from Williamsburg, Bushwick, and Wynwood, Miami, which are the street art centers of the world.  Heritage, along with the Williamsburg Hotel brand, has hosted tech boot camps in partnership with tech companies for thousands of kids, teenagers, and adults from all walks of life, from the surrounding neighborhoods of Williamsburg and Bushwick.[3]  My connections with the businesses in the community have assisted my efforts to book and obtain revenues from local businesses.

11.     The Hotel was also designed with that in mind, and Debtor, through the Hotel Manager provides programming that meaningfully benefits the surrounding community.  The Hotel features community programming, classes, parties, concerts, events and other programming designed to encourage interaction between the Hotel and tech companies, local businesses, and local residents.  For example, the Hotel, with my direct involvement, launched "Crypto Monday,"

---

[3] The Principals, through Heritage, again, with my direct involvement, are also developing an office and retail complex in Bushwick, which featured a partnership with Google and other tech companies.

which has attracted thousands of people over the past few months, as every week hundreds of crypto enthusiasts and members of the tech ecosystem come to the Hotel for a weekly series of talks by leading crypto company entrepreneurs and thought leaders.  As another example, the Hotel is hosting "Candlelight," a series of about 25 scheduled concerts (done by LED candlelight only) in the Hotel's event/party space, with classical music ensembles and quartets performing pop music acts and covers for hundreds of ticket-paying attendees. I have been personally involved in the establishing the partnership that brought the "Candlelight" series to the Hotel.  These performances have already drawn thousands of people, as these concerts started in February, and these are scheduled to continue for another year. As another example, the Hotel hosts wine tasting dinners, in partnership with local wineries from the North Fork of Long Island and the surrounding areas, a series I launched and oversee, which serve to introduce more and more members of the community to the Hotel.

12.    As a result of the deep roots and connections, Debtor, through the Principals' efforts, has had significant success in bringing in name brands for paid events that serve both to fill the hotel rooms and also bring revenue to the food and beverage operations (discussed further below), which creates significant additional revenues and branding as the Hotel seeks to emerge as a reorganized entity.  For example, in the past few months alone, during COVID, the Hotel's Events/Nightlife team has hosted paid events in the events spaces of the Hotel from the likes of the following brands and companies: Yves Saint Laurent, Van Leeuween, Seat Geek, BMW, Vice, IAC, Red Bull, Yext, Happify, iHeart Radio, and Jamestown, and the prestigious jewelry brand Van Cleef & Arpel has done a series of dinner and client events at the Hotel – all of this in the past few months alone, despite COVID.  I am one of the key reasons these businesses engage with the Hotel for events.  These events are only projected to increase in numbers and revenues as NYC

747916322.2

recovers from COVID, and are dependent upon the close personal involvement of the Hotel's management, including the Hotel Manager and the Principals.

**Food and Beverage Operations**

13.     In addition to the valuable, profitable, brand-enhancing events at the Hotel that the Principals facilitate, the Hotel Manager also runs the food and beverage operations for the benefit of Debtor, with all revenue inflowed into operations, which creates another payment stream of millions of dollars, which would likely be outsourced and lost absent continuation of existing management.  Here, the Hotel Manager is one out of a select few hotel management companies that have experience in running food and beverage operations, which produce about 40% of the revenue of the Hotel. The vast majority of hotel management companies either lease out their spaces for minimal rent or do partnerships where the profit goes to the operators upfront and only a minimal revenue stream  goes to the hotel owner.  Generally, hotel brands and hotel management companies do not know how to operate or manage nightlife or food and beverage operations that produce millions of dollars in profits, as they manage hotels and "heads in beds" and require operators who know the restaurant and bar/club business to manage the nightlife and food/beverage operations.

14.     If the Plan is permitted to be executed on, and as the Hotel's projections show, during 2022, about $11 million in revenues will be generated by the Debtor/Management Company just from the nightlife, clubs, events and food and beverage business alone, separate from the rooms revenue which is projected to be approximately $13.5 million in 2022 (due to COVID lower rates and lower occupancy, and which rooms revenue is projected to increase in the years thereafter).[4]  The projected food/beverage/nightlife revenue of about $11 million is based

---

[4] Projections run from March 2022 through February 2023 under the Plan.

747916322.2

upon past performance of the Debtor during 2019 and 2021. Our new series and events discussed above are only going to increase our likelihood of attaining those projected numbers.

15.    Any trustee that would be appointed would likely only have the option of leasing out the food and beverage spaces to operators for fixed rent, as hotel management companies usually do, which would severely decrease the Hotel's income.    Any lease to a food/beverage/nightlife operator, or any partnership with such operator, would understandably result in the operator's taking the profits upfront and leaving a minimal income stream for the Debtor.  Thus, taking away the involvement of the Principals and the Hotel Manager would almost certainly result in reducing the Hotel revenues by approximately *40%*, and reduce the Hotel's profitability by millions of dollars, as any trustee and new manager would likely not be able to operate the rooftop bar/club, as well as the Water Tower venue, and all other food and beverage venues, which requires experience in managing events and nightlife venues.  Further, while Benefit Street claims that the food and beverage business has a low profit margin, they use as their data point February 2022, which is in the middle of the winter slow season and while the omicron variant was proliferating the metropolitan area.

16.    Additionally, I do not believe that creditors are likely to end up being paid or made whole were a trustee appointed.  First, rather than rely upon the equity investment from the Principals (which is over $11 million under the Plan) and going-forward operating cash flows to pay unsecured creditors, unsecured creditors, among others, would have to rely on the proceeds of a sale of the Hotel exceeding the amount of secured debt, priority claims (including significant administrative expenses incurred through appointment of a trustee), and costs of sale in order to see any recoveries.  As discussed in the Debtor's Disclosure Statement (and as the Debtor's experts will explain in respect of confirmation), it is highly unlikely that a prompt sale of the Hotel (or

even one conducted after an extended marketing process during the current market still recovering from COVID-19) would generate sufficient funds to provide payment in full of claims as the Plan does.

17.    The Principals' involvement in the case will also benefit the estate and its creditors through Debtor's pursuit of the adversary proceeding against Benefit Street.  Through this proceeding, in addition to trying to eliminate or subordinate inequitable and unlawful portions of Benefit Street's asserted claim, Debtor is trying to recover for the benefit of the estate actual damages caused by Benefit Street's longstanding misconduct.  While Benefit Street asserts that the adversary proceeding is meant to "deflect" from other issues in this case, Debtor's goal—and the Principals' motivation—in pursuing the adversary proceeding is to maximize value and put the estate in the best possible position to continue as a going concern for the benefit of all creditors and other stakeholders.

18.    Here, in contrast, Debtor is on the verge of confirming its Plan with the support of at least one impaired accepting class, as well as nearly all noncontingent unsecured creditors, which will provide significant benefits to the entire creditor body while bringing an end to the accrual of administrative expenses with statutory priority payment rights.  On the other hand, as discussed above, the appointment of a trustee would end the Plan process and result, in all likelihood, in a deeply distressed and/or fire sale of the Hotel and in increased administrative costs exacerbated by lower cash inflows in the short-term and long-term, resulting in significantly reduced recoveries for creditors.

**The Management Agreement**

19.    While Benefit Street takes issue with the *form of the management agreement*, in an effort to challenge the continuation of the Hotel Manager, it acknowledges that there is and should be a management agreement in place that provides materially the same terms for the Hotel to be

managed by the Hotel Manager for a standard, market-typical 3% fee of all revenues. Here, the Management Agreement that governs the relationship between the Debtor and Hotel Manager was drafted and executed in connection with Debtor's documentation of the mortgage loan from Benefit Street, and was negotiated fairly among the Principals to reflect our understanding of standard market terms. While I believe the agreement was in fact previously shared with Benefit Street long ago, I do not believe it is plausible that Benefit Street or any other party would have believed that Debtor-Hotel Management relationship would have been governed by a one-page, unsigned placeholder document that contained a four-paragraph summary of certain, limited terms relevant to Benefit Street's underwriting process.

20.    With respect to the form of agreement itself, in connection with the underwriting process, and to satisfy Benefit Street's request, a short summary outlining a limited number of key terms of a management agreement was prepared simply as a placeholder to insert into certain loan documents. This summary was neither dated nor signed, and was never intended by the Principals (or, to our knowledge, by Benefit Street) to function as the governing management agreement. We certainly did not construe that agreement as limiting our ability to execute and operate under a more robust and detailed management agreement under equivalent economic terms.

21.    The one-page placeholder laid out at an extremely high level certain terms relating to the management of the Hotel, including allocation of responsibilities, fees, and renewability. Assignment of Management Agreement, ~~Debtor's Ex. 2~~Joint Ex. 11 p. 10. At no point did Benefit Street's attorneys convey to the Principals their (or their client's) intent or belief that the placeholder would serve as the comprehensive and operative agreement between Debtor and Hotel Manager. At no point did the Principals, Debtor, or Hotel Manager contemplate or intend that this one-page placeholder document would constitute the entirety and extent of the terms governing

9

the management of the Hotel. Indeed, this document was never even executed nor did it even have signature blocks for execution as such.[5]

22.    Instead, in connection with the December 13, 2017 closing of the Benefit Street loan, Debtor, Hotel Manager, and Lender executed a document entitled "Assignment of Hotel Management Agreement and Subordination of Hotel Management Fees" (the "Assignment of Management Agreement"). The Assignment of Management Agreement (which is essentially a subordination agreement) recites that Debtor and Hotel Manager "have agreed that the Manager will manage the Property [i.e., the Hotel] on terms set forth on Exhibit A attached hereto[.]" Assignment of Management Agreement, Debtor's Joint Ex. 211. The purpose, according to the Assignment of Management Agreement itself, was to note certain commercial terms applicable to that affiliate relationship. As noted above, Exhibit A to the Assignment of Management Agreement is also a one-page placeholder document, similar to the one provided by Benefit Street's counsel, but it omits both the signature page and the preamble indicating from the November 2 form, both of which would have indicated that the exhibit is an actual agreement, thus suggesting that none of the parties actually viewed the exhibit to be an agreement and to contend otherwise in respect to relatively sophisticated parties defies logic.[6]

---

[5]  On October 30, 2017, Benefit Street's deal counsel, Stroock, Stroock & Lavan LLP, asked for a copy of the management agreement between Debtor and the Hotel Manager. Debtor's Ex. 32. Just two minutes later, I responded that there was no management agreement in place. Id. Then, in separate attorneys-only correspondence, on November 2, 2017, Debtor's attorney suggested that Benefit Street "can insert reasonable covenants to insure that the affiliated entity [i.e., the Hotel Manager] supplies sufficient personnel and transfers all revenues to the required accounts." Debtor's Ex. 3A p. 3. Benefit Street's attorney responds to ask if Debtor has any "objection to doing a simple one page management agreement that essentially says what you pointed out . . . ?" Id. p.2 Debtor's attorney then responds asking to "draft those provisions into the Loan Agreement[.]" Id. In response to that email, Benefit Street's attorney then responded to provide the one-page placeholder form (plus a signature page) in response to the foregoing request. Id. pp. 1, 5-6.

[6]  Specifically the November 2 form begins with the following paragraph, which is not included in Exhibit A to the Assignment of Management Agreement: "This Agreement entered into effective the _____ day of November, 2017, by and between 96 WYTHE  ACQUISITION LLC, a New York limited liability company (the "Owner")

23.    In addition, my understanding is that the purpose of this Exhibit A placeholder document was merely to confirm the Hotel management terms that Benefit Street was most concerned with—a rough allocation of duties between Debtor and Hotel Manager, the size of the fee to be earned by the affiliated Hotel Manager, and the automatic continuation of Debtor-Hotel Manager relationship. *Id.* at 248.  Debtor's view had always been that this one-page list of terms was merely a summary, intended as a placeholder to satisfy Benefit Street's underwriting requirements, and not as an operative agreement that governed the entirety of the relationship between  Debtor and Hotel Manager.

24.    Debtor's interpretation is also consistent with the correspondence between the transaction counsel.  On November 2, 2017, Debtor's attorney indicated that Benefit Street "can insert reasonable covenants to insure that the affiliated entity [i.e., the Hotel Manager] supplies sufficient personnel and transfers all revenues to the required accounts."  Debtor's Ex. 3A p. 3 Benefit Street's attorney responds to ask if Debtor has any "objection to doing a simple one page management agreement that essentially says what you pointed out . . . ?" *Id.* p. 2  Debtor's attorney then responds asking to "draft those provisions into the Loan Agreement[.]" *Id.* p. 1  Benefit Street's attorney then emailed the one-page form in response to the foregoing request, but did not convey any intent or belief that the form would be the comprehensive and operative agreement between Debtor and Hotel Manager.  *Id.* pp 1, 5-6.

25.    Meanwhile, while Benefit Street's underwriting and documentation process was ongoing, we were separately advised that a formal management agreement would be beneficial, so we undertook to document a comprehensive agreement along the lines of what would be

---

and_____, a _____ ("Property Manager"), as follows[.]:" Debtor's Ex. 3A p. 6.

expected between an unaffiliated owner and hotel manager.  This process culminated with our execution, on behalf of Debtor and Hotel Manager, of the Management Agreement, which sets forth terms consistent with those identified on Exhibit A to the Assignment of Management Agreement, but includes significantly more detail, more types of terms, and other provisions important to setting forth the relationship between the two parties in a meaningful way.

26.     While Benefit Street claims that the Management Agreement was provided during this bankruptcy case "when it benefited Debtor and Insiders" those benefits remain a mystery, and in both versions, there is no substantial difference between the placeholder document and the primary terms regarding fees and management.  Contrary to Benefit Street's implications, it is hard to see how a robust Management Agreement harms the estate or its creditors.

27.     Irrespective of the foregoing, to address Benefit Street's so-called objection to the form of agreement, the Debtor and Hotel Manager have entered into an amended and restated management agreement dated May 1, 2022 to, among other things, amend and restate the agreement upon the Effective Date of the Plan, limit aggregate fees to 3% of revenues (as provided for under the Plan) and make the agreement terminable upon thirty (30) days' notice of the sale of the Hotel to an arm's length third party post-confirmation, which was a primary concern raised by Benefit Street.  See, Amended and Restated Management Agreement, Debtor's Ex. 54.

28.     In addition, the proof of the extraordinary success of the management team of the hotel is self-evident. First, occupancy at the Hotel is about 20% higher on average relative all hotels in NYC. Second, and more importantly, direct bookings count for about 50% of the Hotel's bookings on average. This is as opposed to regular independent hotel management companies that average only 25% direct bookings, with a high percentage of their bookings coming from  online travel agencies; i.e. OTA's, where the hotel management companies are merely competing on

pricing. This means that thousands of people are booking rooms directly with the Hotel, because they want to stay at the Hotel, and experience it, as opposed to merely going to an OTA and booking the cheapest room. This attests to the level of services and experience that the Debtor and the Management Company have achieved, in attracting most of its guests to the brand and experience.

29.     Such a disparity in direct bookings can only be achieved through a unique management strategy. This consists of a "secret sauce" which is a mix of factors, including curation of programming such as dinners, High Tea, parties, events, along with emphasis on style, presentation, great service and a "cool factor." This is also due to the great team assembled by the Principals, and the work of the Hotel employees, many of whom have been with the hotel since 2017. It is also important to note that many of employees of the Hotel, and the management team, have been working as a team for the Management Company for more than five years, and work hand in hand with the Principals to create this unique experience and environment for that the Hotel's guests seek and have come to expect.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May ~~12~~24, 2022

_____
Toby Moskovits

747916322.2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 96 WYTHE ACQUISITION LLC, | Case No.: 21-22108 (RDD) |
| Debtor. | |

<u>AMENDED</u> DECLARATION OF MICHAEL LICHTENSTEIN

Pursuant to 28 U.S.C. § 1746, I, Michael Lichtenstein, hereby declare as follows under penalty of perjury:

1.     I am a managing member of 96 Wythe Acquisition LLC ("Debtor"), which is the owner of the real estate and hotel located at 96 Wythe Avenue, Brooklyn, New York (the "Hotel"). I am a co-founder and developer of the Debtor since its formation. I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. I work with Toby Moskovits (collectively with myself, the "Principals"), another principal of the Debtor, and David Goldwasser, the Debtor's Chief Restructuring Officer. I have reviewed and am generally familiar with the Debtor's operations, including the operation of the Hotel, and the Debtor's related financial records, agreements, and other related documents.

2.     Pursuant to this Court's scheduling order entered April 25, 2022 [Docket No. 529], this Declaration constitutes my direct testimony in opposition to (i) the *Lender's Renewed Motion for the Appointment of a Chapter 11 Trustee Based on Continuing Malfeasance* [Docket No. 476] (the "Lender Motion"), filed by lender Benefit Street Partners Realty Operating Partnership LP ("Benefit Street"), and (ii) the motion of the United States Trustee (the "UST") for appointment of a Chapter 11 trustee [Docket No. 491] (the "UST Motion" and, together with the Lender Motion, the "Trustee Motions") and in support of *Debtor's Omnibus Objection to Lender's And United States Trustee's Motions for Appointment of a Chapter 11 Trustee* [Docket No. 539] (the

747916419

"Omnibus Objection")-.  My testimony is based on my personal knowledge of the facts set forth

below.

3.      I have reviewed the Omnibus Objection and, to the best of my knowledge, each of

the facts set forth therein is true and correct in all respects.[1]  The following represents my direct

testimony in further support of the Omnibus Objection, and in opposition to the Trustee Motions.

## I.    **INTRODUCTION**

4.      In my view, the Trustee Motions represent yet another effort by Benefit Street,

aided by the UST, in its long-standing vendetta against the Debtor and its principals. This is merely

another attempt to prevent an orderly end to this bankruptcy case that maximizes value for all

creditors, preserves employment for over 100 employees, and provides stability in the

Williamsburg, Brooklyn community. Debtor has a plan in prospect, which is being modified and

enhanced, and is set for confirmation in less than thirty (30) days.

5.      Debtor owns the boutique, luxury hotel called the Williamsburg Hotel (the "Hotel")

located at 96 Wythe Avenue, Brooklyn, New York, and it operates the Hotel through its non-debtor

affiliate The Williamsburg Hotel BK LLC (the "Hotel Manager").  Just over a year ago, in the

throes of the COVID-19 pandemic that has decimated the hotel industry, Debtor commenced this

bankruptcy case when it filed a voluntary petition for reorganization pursuant to chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for

the Southern District of New York (the "Court").

6.      Today, as it operates profitably, exceeding its financial projections, Debtor seeks

to continue its successful operations though its *Third Amended Chapter 11 Plan of Reorganization*

---

[1] Capitalized terms used but not defined herein have the meanings given in the Omnibus Objection.  Exhibit references refer to the Debtor's proposed exhibit list annexed to the Omnibus Objection (denoted Debtor Ex.).

[Docket No. 551] (as modified, amended, or supplemented from time to time, all of the foregoing, collectively, the "Plan"), that, amongst other things, provides for a cash infusion of more than $11 million in new money ($3 million more than under the original plan) to pay the allowed claims of creditors in full over time, with interest, preserve jobs and essential vendor relationships, plus $3 million which is in the bank, for a total of more than $14 million. This will position Debtor for its growth through stabilization of revenues and long-term viability following its emergence from the pandemic, preserve all the employee jobs, and get all creditors paid in full.

7.      As part of the Plan, the Principals executed an operating agreement with an affiliate of Lockwood Development Partners, LLC ("Lockwood") whereby as plan sponsors, with the backing of Lockwood, they have committed to funding the new money infusion and to the long-term success of the Hotel through the Plan.  A copy of the operating agreement and supporting bank letter with proof of funds was filed as part of the Debtor's Plan Supplement [Docket No. 541].

8.      The Principals' management of the Debtor has resulted in the Debtor successfully turning the Hotel around during some of the darkest days in the hospitality sector caused by the COVID-19 pandemic. The Hotel is now operating profitably on an annual basis, with occupancy rates significantly higher than its competitors across the city, its customer reviews exceed its competitors.

## II.    OPERATIONS

9.      Notwithstanding allegations of mismanagement, I believe Debtor's existing management, as well as the Hotel Manager, have done an exceptional job of managing the Hotel during the postpetition period, despite COVID and the pendency of this bankruptcy case.  The Hotel has outperformed its competitors, is regularly ranked as a top hotel in New York City, and enjoys strong customer reviews, despite the absence of any debtor-in-possession financing.  Debtor

has far exceeded the performance metrics set forth in the budget as provided for as part of Debtor's consensual use of cash collateral, with net profits from April 2021 through December 2021 around $3,000,000, with approximately $3,000,000 cash in the bank.  *See* Podgainy Report filed in support of Debtor's Omnibus Objection ("Podgainy Report"); Joint Ex. 16-18, 20-21, 25-26, 28, 34-35, 55, Debtor Ex. 111-123 88-90.

10.     Given the cyclical nature of the hotel industry in this market, and as Debtor projected, Debtor typically suffers losses during the winter months which are covered by excess cash accumulated during the peak seasons (with a profit throughout the entire year including December 2021, and modest losses in January and February 2022).[2]  Debtor's projections are based upon an analysis of historic performance, as well as adjustments regarding anticipated growth as the hospitality industry continues to emerge from the devastating impact of COVID-19.[3]  Overall, the Hotel occupancy for June through December 2021 was nearly 83% (approximately 73% for the 2021 year January-December period, including periods prior to the governor lifting COVID-19 restrictions), which is significantly higher than the NYC average of about 60% occupancy.  Podgainy Declaration.

11.     As will be discussed by the Debtor's experts at confirmation, the Hotel has been appraised at approximately $113 million as of February 2022, with a reasonably projected value

---

[2]  The Hotel was not immune to the uptick in the omicron variant of COVID-19 that gripped the world, and, coupled with the traditional winter seasonal decrease in hotel occupancy as New Yorkers leave the city for holiday travel elsewhere, the Hotel's net operating profit was just under $260,000 for the period ending December 31, 2021, a loss of around $377,000 for the period ending January 31, 2022, and a smaller loss for the period ending February 28, 2022 of approximately $183,000.  The Hotel has begun its recovery and expects to continue seeing higher net monthly profits as it emerges from COVID-19 and tourism and business travel return to New York City in the spring months.

[3]  Similarly, as detailed in the amended Disclosure Statement, the Hotel outperformed the performance metrics set forth in the cash collateral budgets for the April 5, 2021 to September 26, 2021 period, as provided below:

- Gross revenue exceeded budget by 30%
- Gross operating income exceeded budget by 51.4%
- Gross operating profit exceeded budget by 413%

4

of over $152 million at the end of the Plan. Debtor's Third Amended Disclosure Statement, Debtor Ex. 128. I believe that the strong valuation of the Hotel, including the anticipated increase in value over time, is the product of a unique management team that includes the developers and builders of the property (i.e., the Principals), who have deep and vibrant connections to the community and the tech/entertainment ecosystem, which brings a significant number of guests and business to the Hotel, as discussed in more detail below.

12.     The proof of the extraordinary success of the management team of the hotel is self-evident. First, is the fact that occupancy at the Hotel is about 20% higher on average relative to all hotels in NYC. Second, and more importantly, is the fact that direct bookings count for about 50% of the Hotel's bookings on average. This is as opposed to regular independent hotel management companies that average only 25% direct bookings, with a high percentage of their bookings coming from OTA's, where the hotel management companies are merely competing on pricing. This means that thousands of people are booking rooms directly with the Hotel, because they want to stay at the Hotel, and experience it, as opposed to merely going to an OTA and booking the cheapest room. This attests to the level of services and experience that the Debtor and the Management Company have achieved, in attracting most of its guests to the brand and experience.

13.     Such a disparity in direct bookings can only be achieved through a unique management strategy. As Ms. Moskovits also states, this consists of a "secret sauce" which is a mix of factors, which include curation of programming such as dinners, High Tea, parties, events, along with emphasis on style, presentation, great service, a "cool factor." This is also due to the great team assembled by the Principals, and the work of the Hotel employees, many of whom have been with the hotel since 2017.

### III.    THE INSIDER LOAN DOCUMENTS ARE GENUINE AND THE UNDERLYING RELATIONSHIPS ARE VALID AND PROPER

14.    The Principals spent years conceiving of and developing the Williamsburg Hotel, building it up from what was an empty patch of land in 2013.  Although the Principals were able to help the Debtor obtain financing to facilitate construction of the Hotel, third-party debt financing seldom covers all costs associated with a new project, because lenders want to ensure that there is a sufficient equity cushion supporting repayment of their debt, and because lenders want to make sure that equity owners have "skin in the game."  As a result, the Principals were required (and, indeed, desired) to make an equity investment to support construction of the Hotel.

15.    However as the construction project developed, more funds were needed so, among other things, the Principals contributed additional equity to the Debtor and also made loans to the Debtor.  These loans were originally intended as a line of credit, short-term working capital loans, that would be promptly repaid as the Hotel's cash flows stabilized, and were documented as such at the time the Principals initially started making advances on the Line of Credit loans (which documentation was subsequently amended to provide additional flexibility for advances and repayments).  In total, the Principals infused nearly $30 million into the Hotel: approximately $21 million in equity ($17 million from the Principals directly) and $11 million in net line of credit loans.  The capital infusion and line of credit loans were all recorded as such in the Debtor's books and records at or about the time that such amounts were advanced to the Debtor.

16.    More specifically, the closing statement prepared by Benefit Street identifies the approximately $17 million in capital invested into Debtor at the time of the closing of the Benefit Street loan in December 2017.  *See*, Asset Summary, Debtor Ex. 1, pp. 6-7.  The capital infusion is also reflected in Debtor's books and records. *See*, Equity Report, Debtor's Ex 4828.  In addition, as detailed in a report of loans and repayments of the line of credit loans, prepared by Debtor, with

some 500 pages of back-up, and reviewed by Getzler Henrich to tie in the transfers with the bank accounts, the report tracks some $11 million in net loans over a five year period advanced by Debtor's principals to cover shortfalls from operations of the Debtor (listing advances and repayments, tracked to the actual bank accounts). See, Loan Transfer Report & Backup Materials, Debtor Ex. ~~42-45~~22-27.    Debtor's independent expert Mark Podgainy, of Getzler Henrich, reviewed the transfers as set forth in his previously filed declaration [Docket No. 268-2] (the "Podgainy Declaration"). Podgainy Declaration, p. 3.  Debtor Ex. 96~~129~~. More than half of these line of credit loans were made in 2018 when the Hotel's operations were just ramping up and Debtor's finances had been artificially constrained by Benefit Street's improperly inflated interest charges and contrived defaults.  Thereafter, in connection with its response to the instant motions, Mr. Podgainy also undertook a further review of all transfers into and out of the Debtor and Hotel Manager during the period of the Examiner's review, which confirmed the conclusions reached through his earlier review, discussed further below.  Podgainy Report.

17.    The flow of funds from Debtor's principals, through a "loan account" held by affiliate Northside Acquisition, into Debtor (or Hotel Manager) accounts to support Hotel operations is indisputable, and is supported by, among other things, bank statements and books and records.  Bank statements demonstrating the flow of funds were provided by the Debtor and/or Hotel Manager to Benefit Street  and, accordingly, neither party has any basis on which to dispute that the funds were actually transferred.

18.    I also believe it is irrelevant that the Principals' loans to the Debtor were never included on Debtor's schedules, or that we never filed a proof of claim for recovery of such amounts in the bankruptcy case.  My understanding is that any such insider claims would likely be deeply subordinated and that, even if they were not, the existence of additional debt would have

made confirmation of the Plan more difficult.  Our primary concern was and is ensuring that Debtor

can continue to operate as a going concern so that its ownership of the Hotel can continue to benefit

all parties including employees, creditors and other stakeholders, including the surrounding

Williamsburg community—all of which was why loans were advanced in the first instance.  In

any event, the remaining approximately $6.5 million in loans is being waived and discharged upon

the effective date of the Plan, following Confirmation, which is consistent with our commitment

to the Hotel, its business plan, and the benefits that continuity in the Hotel can provide to the many

employees and the surrounding Williamsburg community.

## IV.    **MOVANT'S IMPROPERLY RELY UPON EXAMINER'S REPORT**

19.    The Trustee Motions improperly rely upon certain allegations which I understand

are based primarily upon the deeply flawed and factually inaccurate report  (the "Examiner's

Report) authored by examiner Eric Huebscher (the "Examiner") in support of their meritless

conclusory statements of alleged misconduct.

20.    Specifically, Benefit Street and the UST state they rely on the statements in the

Examiner report to support their baseless claims which primarily show only out-bound transfers

without regard for monies transferred into the Hotel.  However,  the evidence clearly and

indisputably  shows  the Principals' line of credit funding to the Hotel and its operations in the

amount of millions of dollars, *over and above the required initial capital funding*.  In particular,

as noted above, Debtor was capitalized with an infusion of $21 million, approximately $17 million

of which was from the Principals (which was required as part of the loan closing requirements by

Benefit Street in or about 2017).  In addition, in order to address liquidity during early operations

of the Hotel, the Principals (i.e., including myself personally through entities I owned) also

provided an additional approximately $11 million in net additional loans or funding, drawn over a

period of time as needed, which advances were referred to as the "Line of Credit" funding by the

Principals.  ~~Debtor Ex. 46~~Joint Ex. 1, ~~476~~.  The amount of these advances are evidenced by the various bank records provided to, among others, Benefit Street (and, as required by the Court, the Examiner).

21.    Notwithstanding the more than $30 million advanced and funded, and without factual basis, Benefit Street and UST assert falsely that the Principals and Debtor's other insiders are liable for at least $12.5 million in avoidable transfers made over the course of the period investigated, without acknowledging in that context the recognized influx of millions of dollars in additional funds.[4]  However, in the face of funds injected by Debtor's insiders, it is patently false to conclude, as Benefit Street and UST do, that this $12.5 million amount was owed, especially in the face of at least $7.3 million indisputably were paid by the Debtor's insiders , but which those challenging Debtor's management through their Trustee motions completely ignore (on top of the other loans advanced) in their baseless conclusions.  Benefit Street latches onto and repeats this false claim in its Lender Motion, but, as Debtor and the Principals have repeatedly explained, even accepting the premise (which Debtor and Principals do not), the $12.5 million in net funds transferred out of the Hotel Manager accounts must be reduced by the $7.3 million in net funds transferred back into Debtor and which were used to cover Debtor expenses.

22.    In addition to the foregoing, the Debtor's records provide that certain of the other amounts paid to insiders are also accounted for as legitimate payments or reimbursements of reasonable expenses incurred by or for the benefit of Debtor.  For example, approximately $800,000 were for payroll expenses reimbursed through Northside Acquisition and approximately $150,000 was for payroll advanced through Mint Construction.  These are all legitimate transfers, for legitimate expenses and employee payroll incurred on behalf of the Debtor, supported by bank

---

[4]  The UST appears to recognize some influx into the Debtor.

statements and other evidence, that cannot reasonably be disputed as proper uses of Debtor funds, but are nevertheless used by Benefit Street (and the Examiner) without proper context to make false allegations of misconduct.

23.     The Principals freely acknowledge that the balance of the transfers to Northside Acquisition years prior to the bankruptcy filing—about $4.5 million—were used as part of the ongoing handling of the line of credit loans to reduce amounts due under that line of credit.  And I have been consistent on that point.  Further, as I note above, Benefit Street's (and the Examiner's) position that these lines of credit were somehow made up is contradicted by bank statements, books and records, tax returns, and other information provided to such parties, in which the flow of funds from the Principals to the Debtor has been thoroughly documented.

24.     Thus, as of the Debtor's bankruptcy filing, approximately $6.5 million was owed to myself and Ms. Moskovits.  At that time, and at all times thereafter, I did not expect that we would receive any of that $6.5 million as part of the bankruptcy process, given the likely subordination of insider loans.  Consequently, neither I, nor Ms. Moskovits filed or sought repayment through proofs of claim, or included the loans in Debtor's schedules of liabilities. Frankly, we were not looking to have these amounts repaid once the bankruptcy was filed.  To avoid any question about the issue and to prevent an indebtedness the principles were never interested in collecting from Debtor as somehow a hurdle to restructuring, we have agreed that, upon the effective date of the Plan and following Confirmation, we expressly waive any right to repayment of such amounts.

25.     Accordingly, given the breadth and totality of the Principals' advances to Debtor, and despite Benefit Street's and the UST's failure to account for and reconcile these amounts, there is no basis whatsoever to conclude that that *any* of the $12.5 million in transfers was unsupported

21-22108-rdd    Doc 588    Filed 05/24/22    Entered 05/24/22 22:11:21    Main Document
Pg 92 of 102

by consideration.  In addition, as discussed above, Mr. Podgainy undertook an independent analysis of the transfers among the Principals, on the one hand, and the Debtor and Hotel Manager, on the other.  The review included a detailed analysis of all of the bank statements for the Debtor and Hotel Manager during the period of the Examiner's review.  Based upon such review, Mr. Podgainy confirmed, and I understand he will testify, that there are net amounts due to the Principals approximately $6.5 million which match the conclusions from the Loan Transfer Report and Backup Materials Debtor provided months ago.

## V.    THE DEBTOR'S TAX LIABILITIES ARE BEING ADDRESSED

26.    The Principals have also been working diligently with the Debtor's professionals to reconcile and address all issues pertaining to outstanding real estate, occupancy, and income taxes, if any.  This is still a work in process, on account of certain errors (discussed below) that we have identified in the claims asserted by the NYC DOF and, accordingly, the below presents the most current (but not necessarily final) status of these issues, and is subject to further refinement as discussions with the NYC DOF progress.  But, to summarize, I believe that the vast majority of the Debtor's (and Hotel Manager's) tax issues have been addressed and, for various reasons, as detailed below, the NYC DOF vastly overstates the amounts owed to it.  NYC DOF acknowledges as much in its so-called joinder to the Trustee Motions (which confirms that its claims are overstated, that all post-petition taxes have been paid, and that discussions are ongoing with respect to the resolution of disputed pre-petition taxes) [Docket No. 545].

27.    With respect to real estate taxes, Debtor is current on all outstanding real estate taxes, which includes (i) its obligations under Debtor's property payment plan dated June 23, 2021 that was entered into between Debtor and NYC DOF, which payment plan is incorporated in the Plan and subject to Debtor's assumption under the Plan; and (ii) its current 2022 real property tax obligations. *See, e.g.,* Real Estate Tax Payment Confirmations, Debtor's Ex. 21-2512-16.

11

28.    NYC DOF also asserted estimated claims for UBT and partnership income taxes. Debtor filed objections disputing these claims and asserts that according to the NYC DOF's own website, no amounts are outstanding.  In addition, based on the state and city tax returns filed there are no UBT or partnership income taxes due at all.  See 2017-2020 Tax Returns, ~~Debtor Ex. 8-20~~Joint Ex. 22-24, 38-41, 45-49.

29.    NYC DOF further asserted a claim relating to pre-petition hotel occupancy taxes. As a preliminary matter, the Hotel Manager, rather than the Debtor, is primarily responsible for collection and payment of occupancy taxes, and the Hotel Manager has paid all undisputed post-petition hotel taxes (other than that a dispute is pending over a relatively small post-petition claim relating to interest and penalties, which is anticipated will be resolved pursuant to agreement).

30.    Further, with respect to the outstanding pre-petition hotel taxes, (i) a significant amount of taxes were already remitted by third-parties who collected and were obligated to pay such amounts (*e.g*., Expedia, Hotel Tonight and other online booking companies) to the NYC DOF on behalf of Hotel or substantial amounts were exempt from such tax such as during the pandemic. Consequently, I believe the NYC DOF's claim is erroneous and overblown by about $1 million or more (on top of erroneous amounts asserted based upon estimates), as it counts such amounts that were remitted and exempt and (ii) approximately $800,000.00 relate to penalties, but a substantial amount of the penalties are on monies not even owed.  Debtor and Hotel Manager are working with NYC DOF to reconcile any open amounts due and to discuss entering into a payment plan with respect to the foregoing, as permitted under the Plan.

A.    **Additional Details of Taxes and Payments of NYC Taxes**

31.    In terms of additional detail,  in 2017, when the loan from Benefit Street was put into place, the Hotel was barely operating, with significant construction yet to be completed.  Upon completion of the Hotel, many aspects of Debtor's finances got worse, rather than better.  Although

Debtor's operational financial performance steadily improved, Debtor was not yet turning a profit from operations, and was therefore unable to manage the additional interest charges and other expenditures unjustifiably assessed by Benefit Street. Benefit Street's filing of a foreclosure action, and the subsequent appointment of a receiver, further strained Debtor's finances—again, even though operational performance continued to improve. But then, when the COVID-19 pandemic hit, and the hospitality industry ground to a halt (both by virtue of the pandemic itself and because of forced closures imposed by state and local governments) the ability of Debtor to operate was further strained.

32.     With that background, it is unsurprising, and ultimately irrelevant, that Debtor previously failed to file federal income tax returns in prior years before the bankruptcy filing. Debtor had no taxable net income, so it had no income to report. It is not uncommon for nascent businesses—especially those tight on cash—to hold off on filing tax returns until their business has stabilized, and they have generated taxable net income that supports reporting (and necessitates either the payment of taxes or the application of net operating loss carryforwards). With my direct personal involvement, Debtor subsequently filed its income tax returns from the date of the start of the Hotel operations through the 2020 tax year (with the 2021 year returns not yet due) which, unsurprisingly, demonstrated that no income taxes were owed. The examiner reports conclusions about tax evasion are therefore baseless, as the claims parroted by BSP in its Motion. The failure to file income tax returns (and any mistakes in the filings, if any) could not possibly constitute some sort of scheme to evade tax liabilities—as there are no taxes owed (for what are pass through entities for tax purposes), and there were no such liabilities to evade.

33.     In addition, Debtor's ability to pay its real estate taxes was hindered not only by its constrained cash flows, as discussed above, but also by the City of New York's improper denial

13

of a valuable tax abatement to which Debtor was entitled as a matter of right. Under New York's Industrial and Commercial Abatement Program (the "ICAP") certain property tax abatements for periods of up to 25 years are available to property owners who build, modernize, expand or otherwise physically improve industrial or commercial buildings in certain neighborhoods throughout the five boroughs.

34.    Although Debtor was eligible for the ICAP tax abatement as a matter of right, provided the application was timely submitted within one year after the issuance of the first operative building permits, the administrator of the ICAP wrongly denied Debtor's application as untimely. Specifically, the NYC Department of Finance claimed that Debtor's ICAP application was late because it was submitted more than one year after earlier permits—which had been revoked—were originally issued, even though the application was timely based upon the operative, and significantly modified, permit.

35.    Debtor's belief, and my personal belief, has always been that the denial of the ICAP tax abatement should and would be reversed, which would result in an estimated $30 million in lifetime tax savings to the Debtor along with an entitlement to the refund of several million dollars for earlier amounts improperly assessed and already paid. To that end, Debtor has filed an adversary proceeding (Adv. Proc. No. 22-07027, "ICAP Adversary Proceeding") to seek to have Debtor's entitlement to the ICAP tax abatement resolved judicially, if necessary. I believe that the Debtor should prevail in that litigation and, as a result, will have even better finances than the projections under the Plan (which already demonstrate a reorganized Debtor positioned for success).[5]

---

[5]  While as detailed in the ICAP Adversary Proceeding, an appeal of the denial of the abatement was upheld by the Appellate Division, the court at that time denied the Debtor's motion to supplement the record with new regulations that support the tax abatement, and accordingly, the determination is distinguishable from the instant lawsuit.

36.     The favorable resolution of the ICAP tax abatement have other beneficial downstream effects as well.  It will moot the settlement of prepetition real estate taxes that Benefit Street objects to, provide for more cash on hand and lower expenses going forward, and provide a credit against other prepetition taxes that are asserted to be outstanding.  But even if the issue is resolved unfavorably, and the property tax settlement agreement must remain in effect, the deferral of payment of prepetition property taxes serves only to benefit Debtor's estate and its creditors, including Benefit Street, because it allows these amounts to be paid over time instead of up front, which improves Plan feasibility and preserves cash flows for operations pending the refinance and/or sale of the Hotel once the market has stabilized. Either way, the claims Benefit Street is making about the real estate taxes are baseless and false.

37.     As noted above, there are no UBT or partnership taxes due, and I expect the NYC DOF's overly inflated claim to be modified to address the foregoing.

38.     Lastly, with respect to NYC DOF's claim relating to pre-petition hotel occupancy taxes, the claim is disputed as overblown by about $1 million, and irrespective, Debtor and Hotel Manager (including myself) are working with NYC DOF to resolve the dispute and with respect to a payment plan as to any amounts actually owed.  Again, the hotel occupancy taxes were generally collected by, and are an obligation of, the Hotel Manager rather than Debtor, and all undisputed post-petition occupancy taxes due have been paid.

39.     As was made clear in a prior deposition, Debtor and Hotel Manager were doing the best they could to stay afloat during serial financial challenges not of their own making, as discussed above, rather than trying to expropriate trust fund taxes for personal uses.  Indeed, in addition to other pre-bankruptcy financial challenges, the COVID-19 pandemic was so bad for

hotels citywide, many of which also fell behind on paying occupancy taxes, that Mayor De Blasio temporarily suspended all hotels' occupancy tax obligations city wide during the pandemic.

40.    I also believe that the unpaid occupancy tax amounts asserted by the NYC Department of Finance are significantly overstated. (Recently, NYC filed pleadings admitting their claims are overstated. [Docket No. 545]. First, it appears that the asserted amounts include no less than $555,000 in occupancy taxes that were collected and remitted by third-party booking services like Expedia and Hotel Tonight, but for which the Hotel was not properly given credit.[6] The $555,000 figure reflects only the occupancy tax collected as a percentage of room revenues, and does not include the fixed $2 per room per night tax, which the Hotel Manager is in the process of calculating. Accordingly, the actual amount of improperly asserted unpaid occupancy taxes is significantly higher than $555,000.

41.    Second, I believe that the NYC Department of Finance failed to account for the fact that some revenues from which it computed purportedly unpaid occupancy taxes actually resulted from a 2020 agreement with New York City to put up or offer hospitality for essential workers during the height of the COVID-19 pandemic, which was on a tax-free basis. We are continuing to work on computing the amount properly deducted on account of this arrangement from the asserted unpaid occupancy taxes. In any case, the claim is overblown by about $1 million. Interestingly, I saw that Debtor's positions are acknowledged when New York City recently filed pleadings conceding its claims for occupancy taxes were inflated. [Docket No. 545].

---

[6]  When bookings are made through such services, neither Debtor nor the Hotel Manager collects room revenues and the associated occupancy taxes directly. Instead, the booking service collects the revenues and all applicable taxes, including occupancy taxes, remits such taxes to the applicable taxing authority, and pays the balance (less booking fees or commissions) to the Hotel Manager. Thus, if, as it appears, the NYC Department of Financed merely looked at the Hotel's total occupancy and room revenues and calculated occupancy taxes based on those amounts without giving credit for occupancy taxes collected and remitted by the booking services, the asserted unpaid amounts would significantly overstate the actual unpaid occupancy taxes, if any.

42.     Finally, I believe that a refund of excessive property taxes paid, following the allowance of the ICAP tax abatement, would certainly offset, and be more than, the limited amount of outstanding occupancy taxes (especially after the improperly asserted amounts are eliminated). And, as with the real estate taxes and other amounts owed, we are in discussions with the City of New York to clarify the amounts owed and priority status of such amounts, and for the payment of reduced amounts on favorable terms, which will serve to benefit all interested parties, including Benefit Street.

43.     With respect to a transfer of $252,100 made from funds in one of Hotel Manager's accounts, this transfer by the Hotel Manager was an inadvertent use of funds it was holding in reserve to cover pre-petition occupancy taxes.  It was always understood that the occupancy tax obligations was an obligation of the Hotel Manager to pay as the Hotel operator, and that the Hotel Manager (and its principals) had personal liability for and would cover any amounts due for occupancy taxes, if any.  I acknowledge the transfer was in error and wish our adjustment to bankruptcy procedures had been in place to prevent such transfer, but would point out that it was an inadvertent error and isolated one-time incident which occurred within approximately the first forty-eight (48) hours of the bankruptcy case while the Hotel Manager was still in the process of instituting financial controls as part of the Debtor's transition into this bankruptcy case.   As our position regarding occupancy taxes has been confirmed that the Hotel Manager has been overcharged for occupancy taxes, and during the intervening time period as bankruptcy discovery has allowed us to confirm, the occupancy tax bills have turned out to be inflated by the City by about $1 million (in addition to a potential multi-million refund that would be due upon successful adjudication of the separate abatement adversary proceeding), as the taxing authority did not account for funds that have been paid towards occupancy taxes by certain third party

booking organizations and have also billed for income that was protected from taxation by New York. As such, the amount of $252,100 has been set aside and reserved to be paid towards the payment plan of whatever amount of occupancy taxes is owed, if any, as part of the Plan.

44.     Further, under the Plan, a highly regarded and well recognized restructuring company, with particular expertise in the hospitality/hotel industry as an operating company, Getzler Henrich, will provide oversight as to Debtor's financial operations under the amended Plan (including monthly review of the Reorganize Debtor's financials), and will ensure that all amounts, whether relating to taxes or otherwise, are properly accounted for and paid. In other words, I wish to ensure the estate and parties in interest that, allegations or innuendo aside, the Debtor will retain recognized professional to play an oversight role on transactions as set forth therein. Thus, the Principals have taken the initiative to ensure that any prior errors are corrected and remedied, while seeking to minimize any harm inadvertently done to Debtor or its stakeholders.

## VI.    ANY ISSUES CONCERNING THE EIDL ARE NON-EXISTENT AND PPP LOANS HAVE BEEN RESOLVED

45.     Contrary to Benefit Street's baseless claim that the EIDL was taken out "in the name of the Williamsburg Hotel," Lender Motion pp. 18, 30, it was in fact taken out in the name of the Hotel Manager company, and given as a loan to the Hotel Manager's company, and was and remains an obligation to be repaid by the non-debtor Hotel Manager, not Debtor itself. See, EIDL Documents, Joint Ex. 15, 19, Debtor's Ex. 50 5230. Both prior to and following the Debtor's bankruptcy filing, the Hotel Manager obtained loans from the U.S. Small Business Administration through their EIDL program. EIDL funds are loans, not grants, and these loans were incurred by the Hotel Manager (and not in the name of the Debtor or the Hotel) to support the Hotel Manager, which engages in activities other than operation of the Hotel. I have no reason to believe that the Debtor would ever have had any legal interest in the EIDL funds obtained by the Hotel Manager.

46.     There is also no reason that Debtor funds collected by the Hotel Manager would need to be used to pay back the EIDL obtained by the Hotel Manager. First, once the Plan is confirmed, the Hotel Manager will be able to receive its 3% management fee and will therefore have its own funds available to repay the EIDL. Second, the Hotel Manager is and has been in the process of expanding to management of businesses other than the Hotel, and anticipates generating additional free cash flows therefrom (including management fees from other hotels and food/beverage operations in NYC and Miami) that can be used for repayment of the EIDL. Third, Toby Moskovits personally guaranteed repayment of the EIDL, providing another non-Debtor source for repayment. Accordingly, there are at least three potential sources of cash flows other than funds to which Debtor is entitled from which the EIDL will be repaid, and Debtor and its Principals will ensure that no Debtor funds are used to repay the EIDL. Finally, the monthly payment on the EIDL funded shortly after the Petition Date is only $2,528, so it will be a relatively minor burden for Ms. Moskovits or the Hotel Manager to ensure that monthly EIDL payments are made when required.

47.     As to the PPP loan, this is also a non-issue being resolved under the Plan and PPP settlement through the payment into Debtor's estate of the full $1.438 million advanced in connection with the PPP loan, even though nearly half of the PPP loan was reinvested into the Debtor. In addition, as discussed above, the Hotel Manager has the means to satisfy its obligations under the PPP loan settlement, if needed, as do the Principals, who provided bank statements establishing that they have sufficient liquidity to make any required payments under the PPP Settlement. *See* Proof of Funds, Debtor Ex. 6038.[7]

---

[7] On or about April 2020, the Hotel Manager applied for, and received, certain Paycheck Protection Program loans (the "PPP Loans") in the total amount of $1,438,000.00. Of this amount, the Hotel Manager reinvested approximately $613,758.93 (the "Debtor Advance") in the Debtor. The Hotel Manager then disbursed the remaining amount, approximately $824,241.07 (the "Remaining Amount"), into other business activity of the Hotel Manager. Pursuant

## VII.    RELEASES ARE DISGUISED CONFIRMATION OBJECTION

48.    While a Plan objection, the fact that the Debtor sees no value in prosecuting claims in the context of a 100% payout plan does not mean that others cannot, even (or especially) if the Trustee Motions are denied and the Plan is confirmed.  The Plan allows creditors to opt-out from non-Debtor releases, which Benefit Street has done.  Likewise, as Benefit Street notes, the Plan does not release the Debtor's principals from fraud or gross negligence claims.

49.    In addition, I believe the position in the Trustee Motions that any material claims against the Principals are released is without merit and, in any case, is at best a plan objection. Here, the limited releases are proper and exclude claims "for any act or omission that constitutes fraud, gross negligence, or willful misconduct[.]"  Additionally, any released parties have made significant contributions to the Debtor's restructuring efforts that I believe supports the limited release, including, but not limited to, negotiating and formulating the terms of the Plan that provides for a $11,252,000 cash infusion by the Plan Sponsor, payment of Allowed Claims of creditors in full over time with interest, the preservation of critical business relationships, and a prompt emergence from chapter 11.

50.    One last point needs to be made about Benefit Street's claims in their Motion, where they claim they have almost no foreclosures, and that this case is a rare case for them. This is a false statement for the following reason. Benefit Street has made it their practice to issue default notices to a very large percentage of their borrowers. However, most borrowers don't wish to get

---

to the PPP Settlement as provided under the Plan, the Debtor will be paid $1,438,000.00, together with the deferral and/or subordination of any claims by the Hotel Manager against the Debtor through the Effective Date of the Plan regarding unpaid management fees under the Management Agreement.  Accordingly, as part of the Plan, any purported claim against the Hotel Manager would be offset by the infusion of $1,428,000.00 and amounts due to the Hotel Manager amongst other things.  In addition to entering into the PPP Settlement, the Debtor and Hotel Manager agreed, without admission of liability, to enter into the PPP Stipulation to provide for a guaranty of the Hotel Manager's obligations under the PPP Settlement as provided for in the Plan, net of amounts reinvested in the Debtor.  The PPP Stipulation is consistent with the Plan's provisions on the PPP Settlement.

into a legal battle with Benefit Street, and either settle the manufactured claims by Benefit Street, or just pay up the claimed default interest, whether it's true or not, to avoid a full legal confrontation. It might be true that there is a low percentage of Benefit Street loans that go into foreclosure, but that does not mean that Benefit Street acts appropriately to its borrowers. *Also See*, Debtor's Adversary Proceeding against Benefit Street, No. 22-07002 (asserting claims against Benefit Street relating to predatory lending practices, contrived defaults, and unreasonable default interest, fees, and other charges).

51.    In fact, to the contrary, Benefit Street has issued default notices to a high percentage of its borrowers. As a matter of fact, over 2017 to 2020, it is a fact that Benefit Street issued default notices to all of its borrowers in NYC, which were three loans on three properties to the best of my knowledge. The only one of those properties that went into foreclosure is the Hotel, but Benefit Street issued default notices to all other borrowers it had loans for properties in NYC during this time period, and forced through its predatory practices millions of dollars of extra payments through these manufactured default notices from their borrowers, without the loans going into foreclosure. In fact, the reason why they wrested this money successfully was because the borrowers wanted to avoid foreclosure. In summary, the question is not how many active foreclosure lawsuits Benefit Street has, but the question is how many default notices to how many borrowers have been issued by Benefit Street as a part of their predatory practices.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May —24-, 2022

_____
Michael Lichtenstein