TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Bryan M. Kotliar
Amanda C. Glaubach

*Attorneys for Stephen S. Gray,*
*Not Individually But Solely in His Capacity*
*as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
::
In re:                                            :    Chapter 11
::
96 WYTHE ACQUISITION LLC,                         :    Case No. 21-22108 (SHL)
::
Debtor.                              :
::
---------------------------------------------------------------x

# DECLARATION OF EMILIO AMENDOLA IN SUPPORT OF
# CHAPTER 11 TRUSTEE'S BID PROCEDURE MOTION

I, Emilio Amendola, pursuant to section 1746 of title 28 of the United States Code, hereby declare:

1. I am a co-President at A&G Realty Partners, LLC ("A&G").

2. I make this declaration (this "Declaration") in support of the *Chapter 11 Trustee's Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of Substantially all of the Debtor's Assets; (B) Establishing Procedures to Designate a Stalking Horse Bidder and Enter into a Stalking Horse Agreement with Bid Protections; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; (E) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (F) Granting Related Relief; and (II)(A) Approving the Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances; (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*

[Docket No. 752] (the "Motion"),[1] which was filed on October 21, 2022, as it relates to entry of the proposed Bid Procedures Order, a copy of which is attached as Exhibit A to the Motion, including the Bid Procedures, a copy of which is attached as Exhibit B to the Motion.

3. Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief or opinion or information that I received from the Trustee's professionals or advisors or the employees of A&G working directly with me or under my supervision, direction, or control.

4. As a professional retained by the Trustee, A&G is charging a fee in connection with the sale of Property, but I am not being compensated for providing this Declaration or testimony. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of A&G.

**I. Professional Background and Qualifications**

5. I have been in the commercial real estate business for almost 40 years. In 2012, I co-founded A&G. I am the head of A&G's real estate disposition and due diligence groups. My key areas of expertise include real estate sales, lease renegotiations and terminations, portfolio optimization, due diligence, and valuation. During my career, I have worked with more than 750 clients and generated successful outcomes for individual asset and portfolio sales, as well as lease mitigation projects, valued at more than $10 billion.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2

6. A&G is a well-known, reputable and diversified real estate consulting and advisory firm. The principals of A&G, combined, have over 50 years of experience in all facets of the commercial real estate industry. A&G evaluates, restructures, facilitates the acquisition of, and disposes of all types of commercial real estate.

7. A&G regularly represents chapter 11 debtors, trustees, and receivers in the marketing and disposition of real estate pursuant to section 363 of the Bankruptcy Code. A&G has extensive experience marketing and selling various types of real estate in and out of bankruptcy, including hotels and hospitality assets.

## II. Sales & Marketing Efforts

8. On August 12, 2022, the Court entered the *Order Authorizing the Retention and Employment of A&G Real Estate Partners, LLC and Eastdil Secured, LLC as Real Estate Co-Brokers* [Docket No. 651] (the "Co-Broker Retention Order") authorizing the Trustee to retain and employ A&G and Eastdil Secured, LLC (together, the "Co-Brokers"), to market and sell the Assets. The Co-Brokers began their work marketing the Assets for sale immediately after signing their Engagement Agreement with the Trustee, and thereafter engaged in informal discussions with various parties that the Co-Brokers believed would be interested in purchasing a hotel.[2]

9. On September 6, 2022, the Co-Broker's formal marketing efforts began when they distributed a one-pager mailing brochure they prepared with input from the Trustee and his advisors to more than 600 parties, consisting of a mix of potential financial and strategic buyers that the Co-Brokers believed would be potentially

---

[2] I understand that even prior to the Co-Brokers commencing formal marketing efforts, potential purchasers have been following the Chapter 11 Case, and have been in contact with the Trustee and his professionals about their interest in the Assets. I further understand that this is consistent with the public statements made by the Trustee to the Court about his intention to run a sale process for the Assets.

3

interested in submitting a bid. In addition, the Co-Brokers also listed the Property on their respective websites and then discussed the Property with any parties that had expressed an interest in assets similar to the Property but were not on the list of potential investors and brokers previously contacted.

10. Following distribution of the marketing materials, more than 180 potential bidders entered into confidentiality agreements and received confidential information memoranda and similar marketing material packages. The Co-Brokers populated a data room with key financial and operational diligence information and any other diligence information requested by the potential bidders was made available to all potential bidders through the data room. In connection with its marketing efforts, 30 interested parties conducted inspection tours of the Property escorted or arranged by the Co-Brokers.

11. The Co-Brokers continue to market the Assets to various potential bidders and will continue to do so following entry of the Bid Procedures Order. Such marketing will include us and our Co-Broker: (a) continuing to contact a broad range of potential buyers that may have an interest in bidding for the Assets; (b) continuing to distribute in-depth and detailed marketing materials with respect to the Assets to persons who express interest in the Assets, provided that they executed confidentiality agreements; (c) providing other relevant information and marketing materials to potential bidders; (d) responding to diligence information and other information requests from potential bidders; and (e) facilitating on-site visits to the Property. In this way, we intend to maximize the number of participants who may participate as bidders at the Auction and thereby maximize the value to be achieved from the Sale and the Auction.

### III. Proposed Bid Procedures and Proposed Bid Procedures Timeline

12. In support of the Sale process, the Trustee, with the assistance of his professionals, including the Co-Brokers, developed the bid and auction procedures set forth in the Bid Procedures Order and the Bid Procedures to maximize value for the Debtor's estate and ensure an orderly Sale process. I understand that counsel for the Trustee also provided a copy of the proposed Bid Procedures to Benefit Street, the Debtor's largest secured creditor, for review and input.

13. I believe that the Bid Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly Sale process. The Bid Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bids become Qualified Bids (as defined in the Bid Procedures), the receipt and negotiation of bids received, the conduct of any Auction, the selection and designation of a Stalking Horse Bidder or Stalking Horse Bidders, the selection and approval of any ultimately Successful Bidder, and the deadlines with respect to the foregoing.

14. The Bid Procedures also contain certain proposed dates and deadlines regarding the Sale process. Based on feedback from several potential bidders, I am informed that counsel for the Trustee, in consultation with his advisors, including the Co-Brokers, has decided to slightly revise the proposed dates and deadlines regarding the Sale process to give potential bidders additional time to complete diligence to make a binding noncontingent offer. The proposed revised dates are as follows:

| Key Event | Deadline |
|---|---|
| Bid Deadline | Thursday, December 8, 2022 at 4:00 p.m. (ET) |
| Sale Objection Deadline | Thursday, December 8, 2022 at 4:00 p.m. (ET) |

| Key Event | Deadline |
|---|---|
| Proposed Assumption / Cure Amounts Objection Deadline | Thursday, December 8, 2022 at 4:00 p.m. (ET) |
| Deadline for Trustee to notify bidders of their status as Qualified Bidders | Friday, December 9, 2022 at 12:00 p.m. (ET) |
| Auction (if necessary) | Monday, December 12, 2022 at 10:00 a.m. (ET) |
| File Notice of Successful Bidder | Wednesday, December 14, 2022 at 4:00 p.m. (ET) |
| Supplemental Sale Objection Deadline | Friday, December 16, 2022 at 4:00 p.m. (ET) |
| Adequate Assurance of Future Performance Objection Deadline | Friday, December 16, 2022 at 4:00 p.m. (ET) |
| Sale Briefing and any Replies | Monday, December 19, 2022 at 12:00 p.m. (ET) |
| Sale Hearing | Tuesday, December 20, 2022 at 2:00 p.m. (ET) |

15. I believe that conducting the Sale process within the time period set forth above is reasonable and will provide potential bidders with sufficient time and information necessary to formulate a bid. We are committed to continue working with potential bidders to provide access to confidential information on the Assets so that they can perform the diligence necessary to submit a timely bid.

16. In formulating the procedures and bid and sale timeline set forth in the revised Bid Procedures, the Trustee and his professionals, including the Co-Brokers, balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell the primary Assets and exit this Chapter 11 Case. In addition, I understand that the procedures and time periods are supported by the Debtor's largest secured creditor, Benefit Street.

6

17.     In light of the foregoing, I believe that the proposed Sale process offers the best chance of obtaining the highest or otherwise best bid for the Assets.

### IV. Designation of Stalking Horse Bidder

18.     As set forth in the Bid Procedures, the Trustee requests authority to designate a Stalking Horse Bidder or Stalking Horse Bidders, with the prior consent of Benefit Street, or further order of the Court, and make certain payments to the Stalking Horse Bidder(s), including (a) a break-up fee in the range of 1% to 3% in the Trustee's discretion, in consultation with the Consultation Parties, of the cash consideration to be paid (the "Break-Up Fee") and (b) reimbursement of reasonable, documented and necessary out-of-pocket expenses incurred in connection with such Stalking Horse Bid not to exceed $150,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections").

19.     I believe that offering the Bid Protections is a necessary inducement to incentivize a party or parties to serve as a Stalking Horse Bidder or Stalking Horse Bidders. I further believe that having a Stalking Horse Bidder or Stalking Horse Bidders would help facilitate a competitive Auction by setting a minimum price for the applicable Assets covered by any such Stalking Horse Bid at the Auction. No other bidder, nor any party making a credit bid (irrespective of whether it is a Stalking Horse Bidder) will be entitled to any Bid Protections or any other expense reimbursement, break-up fee, termination fee or payment.

20.     I believe that the Bid Protections are fair and reasonable in light of the circumstances because, in the event that the Bid Protections are triggered, any Stalking Horse Bidder's efforts will have promoted more competitive bidding, and thereby increased the chances that the Trustee will receive the highest or otherwise best offer for the Sale contemplated by such Stalking Horse Bid, to the benefit of the Debtor's

7

creditors. In my experience, the proposed Bid Protections in this case are consistent with the amount of break-up fees and expense reimbursements offered to stalking horse bidders in connection with the sale of similar assets.

21. Having the ability to offer the Bid Protections to a Stalking Horse Bidder or Stalking Horse Bidders will ensure the Trustee's ability to maximize the realizable value of the Assets for the benefit of the estate, creditors and other parties in interest. Approval of break-up fees and expense reimbursements and other forms of bid protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases. Such bid protections encourage potential purchasers to invest the substantial time, money, and effort to negotiate a binding stalking horse bid with the Trustee.

22. For the foregoing reasons, I believe that the Bid Protections are actual and necessary to preserve the value of the estate.

### V. The Assumption and Assignment Procedures

23. The consummation of a Sale will likely involve the assumption and assignment of the Assigned Contracts to the Successful Bidder.

24. If the Trustee decides to consummate a Sale, it is my understanding that the Trustee proposes to file with the Court, and serve on: (a) all counterparties to Assigned Contracts; (b) all entities reasonably known to have expressed an interest in the acquisition, directly or indirectly, of the Assets; (c) all entities known to have asserted any claims, liens, interests or encumbrances on any of the Assets; (d) the Office of the United States Trustee for the Southern District of New York, Region 2; (e) counsel to Benefit Street; (f) the Internal Revenue Service; (g) all other parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof, the Contract Assumption Notice, which shall inform each recipient of the timing and procedures

relating to the potential assumption and assignment of the Assigned Contracts to a Successful Bidder or Successful Bidders upon entry of the Sale Order, and, to the extent applicable, (i) the Trustee's good faith estimates of the Cure Payments (if any) required in connection with the executory contract or unexpired lease, as applicable, (ii) whether the potential Assigned Contract is anticipated to be assumed and assigned to any Stalking Horse Bidder in connection with a Stalking Horse Bid; (iii) the Cure Objection Deadline; and (iv) the Sale Objection Deadline.

25. Based on my experience in the commercial real estate business for almost 40 years, including in connection with real estate lease assumptions and assignments, I believe that the Assumption and Assignment Procedures are reasonable and appropriate under the circumstances.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED:  New York, New York
         November 2, 2022

By:    /s/ Emilio Amendola
       Emilio Amendola
       A&G Realty Partners, LLC
       445 Broadhollow Rd. Ste. 410
       Melville, NY 11747
       (631) 420-0044
       emilio@agrep.com

9