UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                               :

In re:                            :       Chapter 11
                                 :

96 WYTHE ACQUISITION LLC,       :       Case No. 21-22108 (SHL)
                                 :

                    Debtor.       :
                                 :

----------------------------------------------------------------x

## ORDER (A) APPROVING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Upon the motion [Docket No. 752] (the "Motion")[1] of Stephen S. Gray, not

individually but solely in his capacity as the Chapter 11 Trustee (the "Trustee") of the estate of

96 Wythe Acquisition LLC (the "Debtor") in the above-captioned case (the "Chapter 11 Case"),

for entry of an order (this "Sale Order"):  (a) approving the sale (the "Sale") of the Debtor's real

property located at 96 Wythe Avenue, Brooklyn, New York (the "Property") and certain related

assets free and clear of all liens, claims, interests, and encumbrances, (b) authorizing and

approving the assumption or assumption and assignment of executory contracts and unexpired

leases to the Successful Bidder, and (c) granting related relief, all as set forth more fully in the

Motion; and pursuant to the terms of the (a) Purchase and Sale Agreement, dated as of January

11, 2023, between the Trustee and Quadrum Development Corp. (the "Purchaser"), a copy of

which is attached hereto as **Exhibit A** (the "Purchase Agreement"), which provides for the Sale

of the Property and certain related assets (collectively, the "Purchased Assets") and the

assumption and assignment of certain executory contracts and unexpired leases (collectively, the

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Bid Procedures Order (as defined below), as applicable.

"Assigned Contracts") as more fully set forth therein; and a hearing to approve the Sale pursuant to the Purchase Agreement having been held before the Court on January 17, 2022 (the "Sale Hearing"); and this Court having reviewed and considered the Motion, the *Declaration of Stephen S. Gray in Support of the Sale*, filed on January 12, 2022 [Docket No. 873] (the "Gray Declaration"), the objections to the Motion and the Sale, all responses or replies to objections to the Motion or the Sale and any statements in support thereof, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing and any other hearing related to the Motion; and the Court having determined that the legal and factual bases set forth therein establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.      This Court has jurisdiction to hear and determine the Motion and to grant the relief set forth herein pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 6006.

C.      Proper, timely, adequate and sufficient notice of the Motion, the Sale pursuant to the Sale Notice (as defined in the Bid Procedures Order), the assumption and assignment of the Assigned Contracts, the Auction, and  the Sale Hearing has been provided in accordance

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

with section 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 6006 and in compliance with the Bid Procedures Order.

D.      On November 15, 2022, the Court entered an order [Docket No. 752] (the "Bid Procedures Order"), (i) approving the bidding and auction procedures set forth on Exhibit 1 to the Bid Procedures Order (the "Bid Procedures") relating to the Sale of the Purchased Assets, (ii) approving procedures for the assumption and assignment of the Assigned Contracts, (iii) scheduling the Auction and Sale hearing, (iv) approving the form and manner of notice thereof, and (v) granting related relief.

E.      As demonstrated by (i) the testimony and/or other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Trustee and his professionals marketed the Purchased Assets and conducted the sale process in accordance with the Bid Procedures Order.  The Trustee and his professionals have afforded potential purchasers a full and fair opportunity to make higher and better offers.

F.      The Trustee has the authority to consummate the Sale pursuant to the Purchase Agreement and all other documents contemplated thereby and hereby, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Trustee to consummate the Sale.

G.      Approval of the Purchase Agreement and consummation of the Sale of the Purchased Assets on the terms and conditions set forth therein are in the best interests of the Debtor's estate, its creditors, and other parties in interest.

H.      The Trustee has demonstrated (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to sections 363(b) and

(f) of the Bankruptcy Code.

I.      The Purchase Agreement was negotiated, proposed and entered into by and between the Trustee and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the avoidance of the Purchase Agreement or the consummation of the Sale, or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.

J.      The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in that: (i) the Purchaser recognized that the Trustee was free to deal with any other party interested in a transaction regarding the Sale; (ii) the Purchaser agreed to provisions in the Purchase Agreement that would enable the Trustee to accept a higher or better offer in respect of the Sale; (iii) the Purchaser made the highest or best bid at the Auction; (iv) all payments to be made (or credits to be given) by or to the Purchaser and other agreements or arrangements entered into by the Purchaser with the Trustee in connection with the transaction have been disclosed; and (v) the negotiation and execution of the Purchase Agreement and any other agreements or instruments related thereto were in good faith and at arm's length transaction between the Purchaser and the Trustee.  The Purchaser has acted in good faith and will continue to be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement.

K.      The terms and conditions of the Purchase Agreement are fair and reasonable. The consideration provided by the Purchaser for the Purchased Assets pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or best offer for the Purchased Assets, (iii) will provide a greater recovery for creditors than would be provided by any other practical

available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

L.      The Purchaser is not and will not be liable to any agent, broker, person or firm acting or purporting to act on behalf of either the Trustee or the Purchaser for any commission, broker's fee or finder's fee respecting the Sale.

M.      The Purchased Assets constitute property of the Debtor's estate and the Debtor's estate is the sole and lawful owner of the Purchased Assets, and the Debtor's estate holds good title thereto.  As of the date hereof, (i) no person or entity has any lease or license to any part of the Purchased Assets or other right to use or occupy the Purchased Assets in whole or in part; and (ii) the Trustee is the only person lawfully entitled to use or occupy all or any part of the Purchased Assets.  The Trustee is duly authorized to act on behalf of the Debtor and the Debtor's estate in all respects.  As set forth more fully in this Sale Order, the transfer of the Purchased Assets by the Trustee to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Purchaser with all rights, title, and interests of the Trustee, the Debtor, and the Debtor's estate in and to the Purchased Assets free and clear of any and all liens, claims, interest, encumbrances, obligations, rights (including, without limitation, any right to possess or use any part of the Purchased Assets, whether pursuant to any lease, license agreement or otherwise) unless otherwise provided herein, charges and encumbrances whatsoever, except as specifically provided in the Purchase Agreement.  After the Closing (as defined below) of the Sale under the Purchase Agreement, the Purchaser shall have no liability whatsoever for any claims of any kind asserted against or liabilities of the Trustee, the Debtor or the Debtor's estate.

N.      Except as otherwise provided in Section 3.3 of the Purchase Agreement, the

Trustee's Sale of the Purchased Assets to the Purchaser pursuant to this Sale Order shall be

free and clear of all liens, claims (as used herein "claim" shall have the meaning set forth in §

101(5) of the Bankruptcy Code), interests, encumbrances, property interests, rights, liabilities,

agreements, licenses, leases, pledges, and other interests of any kind or nature whatsoever

against the Debtor or the Purchased Assets, including, without limitation, any debts, claims,

rights, causes of action, and/or suits arising under or out of, in connection with, or in any way

relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual

commitments, restrictions, product liability claims, environmental liabilities, employee

retirement or benefit plan claims, workers' compensation claims, severance claims, retiree

healthcare or life insurance claims, and/or claims for taxes of or against the Debtor and/or the

Purchased Assets, and any derivative, vicarious, transferee, or successor liability claims,

rights, or causes of action (whether in law or in equity, under any law, statute, rule, or

regulation of the United States, any state, territory, or possession thereof or the District of

Columbia), whether arising prior or subsequent to the commencement of this Chapter 11 Case,

whether known or unknown, whether fixed or contingent, whether anticipated or

unanticipated, whether yet accrued or not, and whether imposed by agreement, understanding,

law, equity or otherwise arising under or out of, in connection with, or in any way related to

the Debtor, the Debtor's interests in the Purchased Assets, the operation of the Debtor's

business before the Closing (as defined below), or the transfer of the Debtor's interests in the

Purchased Assets to the Purchaser (collectively, "Liens/Interests"), except for the

Consolitdated Mortgage made by 96 Wythe Acquisition LLC to Benefit Street Partners Realty

Operating Partnership, L.P., in the amount of $68,000,000.00, dated as of December 13, 2017

and recorded in the Office of the City Register, Kings County on December 18, 2017 as CRFN

2017000461674, which shall remain a valid and subsisting lien upon the Property

("Mortgage"), and which shall  be assigned to Purchaser's lender.

O.      Parties with Liens/Interest in or with respect to the Purchased Assets who did

not object, or who withdrew their objections to the Sale or the Motion, are deemed to have

consented to the sale of the Purchased Assets free and clear of those parties' Liens/Interest in

the Purchased Assets pursuant to section 363(f)(2) of the Bankruptcy Code.  Parties with any

Liens/Interests in or with respect to the Purchased Assets who objected to the Motion, but who

did not withdraw any such objection, are in bona fide dispute or otherwise satisfy the

requirements of section 363(f) of the Bankruptcy Code and any such objections are hereby

overruled.  Except as otherwise provided in Section 3.3 of the Purchase Agreement the

Secured Lender has consented to the sale of the Purchased Assets free and clear under section

362(f) of the Bankruptcy Code.

P.      Pursuant to the Bid Procedures Order, notice of the assumption, assignment,

transfer and/or sale to the Purchaser of the Purchased Assets and the Assigned Contracts, as

applicable, has been provided to each non-Debtor party thereto, together with a statement

therein from the Trustee with respect to the Cure Payment.  Each of the non-Debtor parties to

the Assigned Contracts has had an opportunity to object to the Cure Payments and assumption

and assignment of its Assigned Contract.

Q.      The Trustee has demonstrated that it is an exercise of his business judgment to

assume and assign the Assigned Contracts to the Purchaser in connection with the

consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in

the best interests of the Debtor and its estate.

R.      The Trustee has (i) cured, or provided adequate assurance of cure, of any

7

default existing prior to the date hereof under any of the Assigned Contracts, within the

meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided

compensation or adequate assurance of compensation to any party for any actual pecuniary

loss to such party resulting from a default prior to the date hereof under any of the Assigned

Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser

has provided or will provide adequate assurance of future performance of and under the

Assigned Contracts assigned to it within the meaning of sections 365(b)(1)(C) and

365(f)(2)(B) of the Bankruptcy Code.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted and the Purchase Agreement is approved in its entirety.

2.      Other than the Oracle Limited Objection (as defined below), all objections, if any,

to the Motion, the Auction and the results thereof, the Sale Hearing or the relief requested in the

Motion that have not been withdrawn, waived, or settled, and all reservations of rights included

in such objections, are hereby overruled on the merits with prejudice, and in each case, all parties

which asserted such objections and reservations of rights are enjoined from taking any action

against the Purchased Assets, the Purchaser or any other purchaser of the Purchased Assets, their

affiliates, successors and assignees, or any agent of any of the foregoing, to recover any

Liens/Interest which such person or entity has against the Purchased Assets, the Trustee, the

Debtor or the Debtor's estate or otherwise concerning the Purchased Assets.

3.      Based on the record before the Court, the Purchaser's offer for the Purchased

Assets, as embodied in the Purchase Agreement, is the highest or otherwise best offer for the

Purchased Assets.

4.       The Sale, and all of the terms and conditions and transactions contemplated by the Purchase Agreement, are hereby authorized and approved pursuant to Sections 105(a) and 363 of the Bankruptcy Code.

5.       Pursuant to section 363 of the Bankruptcy Code, the Trustee (or any successor trustee) is authorized to consummate the Sale, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

6.       The Trustee (or any successor trustee) is authorized to execute and deliver, and empowered to perform under, and consummate the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary to consummate the Sale and the transactions contemplated by the Purchase Agreement.

7.       This Sale Order shall be binding in all respects upon (i) the Trustee, (ii) the Debtor, (iii) the Debtor's estate, (iv) all creditors of the Debtor, all holders of any Liens/Interests, whether known or unknown, (v) the Purchaser and all successors and assigns of the Purchaser, and (vi) any other trustees, if any, subsequently appointed in the Chapter 11 Case or upon a dismissal or conversion of this case under chapter 7 of the Bankruptcy Code.

8.       The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full.  Therefore, the Trustee may sell the Purchased Assets free and clear of any and all Liens/Interest against, in or concerning the Purchased Assets, except for the Mortgage, which shall remain a valid and subsisting lien upon the Property and be assigned to Purchaser's lender.

9.       Except as expressly provided in Section 3.3 of the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing of the Sale (the "Closing"), the Purchased Assets (and good and marketable title to the Purchased Assets) and all of the rights, title and interests of the Trustee, the Debtor and the Debtor's estate therein shall be

9

transferred to the Purchaser free and clear of any and all Liens/Interests whatsoever, with all such

Liens/Interests to attach to the net cash proceeds of the Sale in the order of their priority, with the

same validity, force and effect which they now have as against the Purchased Assets, subject to

any claims and defenses, setoffs or rights of recoupment that the Trustee or the Debtor's estate

may possess with respect thereto, if any.

10.    Except as expressly provided in the Purchase Agreement, all persons and entities

(and their respective successors and assigns) including, but not limited to, all governmental, tax,

and regulatory authorities, lenders, trade and other creditors, and interest holders, holding any

Liens/Interests (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, senior or subordinated) against, in or with respect to the Trustee,

the Debtor, the Debtor's estate and/or the Purchased Assets arising or accruing under or out of, in

connection with, or in any way relating to, the Trustee, the Debtor, the Debtor's estate, the

Purchased Assets, the right to use or occupy the Purchased Assets (in whole or in part), or the

transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped, and

permanently enjoined from asserting such persons' or entities' Liens/Interests (as applicable)

against the Purchased Assets or the Purchaser or any of the Purchaser's successors or assigns, or

any of their respective agents or affiliates.  Following the Closing of the Sale under the Purchase

Agreement, no holder of any Liens/Interests shall interfere with the Purchaser's exclusive title to

or exclusive use and enjoyment of the Purchased Assets based on or related to any

Liens/Interests or any actions that the Debtor or the Trustee has taken at any time prior to the

date hereof or may hereafter take at any time.  Effective upon the Closing, the Purchaser shall

have no liability for any Liens/Interest against, in or concerning the Purchased Assets, the

Trustee, the Debtor, the Debtor's estate or in any way concerning or relating to the Trustee, the Debtor, the Debtor's estate or the Purchased Assets.

11. The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with sole ownership, possession and use of the Purchased Assets, including, without limitation, all rights, title, and interests of the Trustee, the Debtor and the Debtor's estate in and to the Purchased Assets.

12. This Sale Order (i) shall be effective as a determination that, upon the Closing, all Liens/Interests with respect to the Purchased Assets, the Debtor and the Debtor's estate have been transferred to the proceeds of Sale, and that the conveyances described herein have been effected, and (ii) shall be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets.

13. Each and every federal, state, and local governmental agency or department or office is hereby directed to accept this Sale Order, any deed, and any and all other documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement, and to record this Sale Order, any deed, and all such other documents and instruments without the payment of any fee, charge or tax.

14.     The Purchased Assets shall be conveyed by the Trustee to, and accepted by the Purchaser, on an "AS IS WHERE IS" basis, except as expressly provided in the Purchase Agreement and this Sale Order.

15.     This Court hereby retains exclusive jurisdiction to enforce and implement this Sale Order and other prior related orders, the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining exclusive jurisdiction to (i) compel compliance with this Sale Order and the Purchase Agreement, (ii) resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof, and (iii) interpret, implement, and enforce the provisions of this Sale Order and resolve any disputes related hereto.

16.     The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser.

17.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Purchase Agreement, of its Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

18.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections

12

365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment

or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor and its estate shall

be relieved from any further liability with respect to the Assigned Contracts after such

assignment to and assumption by the Purchaser, except as provided in the Purchase Agreement.

19.     All counterparties to the Assigned Contracts shall be deemed to have consented to

such assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code and any

other applicable law, and the Purchaser shall enjoy all of the Debtor's rights, benefits, and

privileges under each Assigned Contract as of the Closing without the necessity to obtain any

non-Debtor parties' written consent to the assumption or assignment thereof.

20.     Upon the assignment of the Assigned Contracts under the provisions of this Sale

Order, no Debtor default shall exist under any Assigned Contract and no counterparty to any

such Assigned Contract shall be permitted to declare or enforce a default by the Debtor or the

Purchaser thereunder or otherwise take action against the Purchaser relating to any of the

Debtor's financial condition, change in control, bankruptcy or failure to perform any of its

obligations under the relevant Assigned Contract.  Any provision in an Assigned Contract that

prohibits or conditions the assignment or sublease of such Assigned Contract (including the

granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any

penalty, declare a default, condition on renewal or extension, or modify any term or condition

upon such assignment, sublease, or change of control, constitutes an unenforceable anti-

assignment provision that is void and of no force and effect only in connection with the

assumption and assignment of such Assigned Contract to the Purchaser.  Nothing in this Sale

Order, the Motion, or in any notice or any other document is or shall be deemed an admission by

the Trustee that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

21.     All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Trustee (as provided in the Purchase Agreement) on or prior to the Closing or as soon thereafter as reasonably practicable, and the Purchaser shall have no liability or obligation arising or accruing prior to the Closing, except as otherwise expressly provided in the Purchase Agreement.

22.     As applicable, the Sale and assumption and assignment of the Assigned Contracts approved herein includes conveyance of all beneficial rights, easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights, and all contracts, agreements, and instruments by which they are bound, appurtenant to, and used or held for use in connection with the Assigned Contracts.

23.     Each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against the Trustee, the Debtor, its estate, the Purchaser or the property of such parties, any assignment fee, default, breach or claim of pecuniary loss, penalty, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated by the Purchase Agreement, including the Sale and the assumption and assignment of the Assigned Contracts.  The Purchaser shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security

with respect to any of the Assigned Contracts to the extent not previously provided by the Trustee or the Debtor.

24.     To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Payment, such Cure Payment shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Payment at any time, and such Cure Payment, when paid, shall completely cure any Debtor breach of any Assigned Contract to which it relates.  Nothing in this Sale Order shall relieve the Debtor's obligations, to the extent applicable and as set forth in the Purchase Agreement, to pay any such Cure Payment.

25.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, (i) the Trustee, (ii) the Debtor, (iii) the Debtor's estate, (iv) all creditors, all holders of any Liens/Interests, whether known or unknown, (v) the Purchaser, and (vi) any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors and interest holders, and all persons and entities receiving notice of the Motion and/or the Sale Hearing, as well as on any trustee(s), examiner(s), or receiver(s), all whether known or unknown and whether now or hereafter existing.

26.     The Trustee is authorized to close the Sale, subject to the satisfaction of the conditions set forth in the Purchase Agreement, under and pursuant to a chapter 11 plan for the Debtor; *provided* that, absent alternative agreement between the Trustee and Purchaser, if the Trustee fails to confirm a chapter 11 plan by March 31, 2023 or if at any time it becomes evident that a chapter 11 plan cannot be confirmed by such date (pursuant to section 21.1.1 of the Purchase Agreement), the Sale will be consummated outside of a chapter 11 plan within five (5)

business days after the satisfaction of the condition precedent in Section 5.1 of the Purchase

Agreement (subject to the Purchasers waiver of any such conditions), pursuant to section 363 of

the Bankruptcy Code and pursuant to this Sale Order, and no other further order or Court

approval is necessary (an "Outside Plan Sale").  Notwithstanding anything herein to the contrary,

the Trustee and Purchaser may agree to pursue and Outside Plan Sale at any time after entry of

this Order. To the extent that the Trustee consummates the Sale under and pursuant to a

confirmed chapter 11 plan, pursuant to section 1146(a) of the Bankruptcy Code, the Sale of the

Purchased Assets shall not be subject to any stamp tax or other similar tax or governmental

assessment in the United States. To the extent that the Trustee consummates an Outside Plan

Sale or any Sale In which section 1146(a) of the Bankruptcy Code is not applicable, then,

pursuant to section 7.7 of the Purchase Agreement, (a) the Trustee shall pay all applicable

transfer taxes, or (b) the Purchaser will receive a credit against the Purchase Price simultaneously

with closing in the amount otherwise due on account of applicable transfer taxes, and Purchaser

shall be responsible for payment of such taxes.

27.     At the Closing of the Sale, the Trustee shall remit to the Secured Lender the

proceeds of the Sale without further order of the Court, net of any payments to third parties

required to be paid out of such Sale proceeds as approved by the Secured Lender.

28.     Nothing contained in any chapter 11 plan confirmed in this case or in the order of

this Court confirming any such plan shall conflict with or derogate from the provisions of the

Purchase Agreement or the terms of this Sale Order.

29.     The failure specifically to include any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

30.     The Trustee and the Purchaser have the power and authority to make all non-substantive (*i.e.,* pagination, typographical, *etc.*) changes and edits to the Purchase Agreement and all related documents prior to Closing without the need for further order of this Court or notice to parties.

31.     Notwithstanding anything to the contrary herein or in the Purchase Agreement, the limited objection filed by Oracle America, Inc., successor in interest to MICROS Systems, Inc. ("Oracle") on December 12, 2022 [Docket No. 834] (the "Oracle Limited Objection") is adjourned and all parties' rights are reserved with respect to the Oracle Limited Objection.  The Oracle Limited Objection may be resolved by agreement of the parties without further order of the Court, or failing such agreement, as determined by the Court following a further hearing.

Dated:  January 26, 2023
   White Plains, New York        */s/ Sean H. Lane*
                  HONORABLE SEAN H. LANE
                  UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

### Purchase and Sale Agreement

# PURCHASE AND SALE AGREEMENT

### BY

### AND

### BETWEEN

### STEPHEN S. GRAY, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE OF THE ESTATE OF 96 WYTHE ACQUISITION LLC, as Seller

### AND

### QUADRUM DEVELOPMENT CORP., as Buyer

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this **"Agreement"**) is entered into as of January 11, 2023 (**"Effective Date"**), by and between **STEPHEN S. GRAY, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE OF THE ESTATE OF 96 WYTHE ACQUISITION LLC ("Seller")**, and **QUADRUM DEVELOPMENT CORP.,** a Delaware corporation, **("Buyer")**. Seller and Buyer are sometimes hereinafter referred to individually as a **"Party"** and collectively as the **"Parties"**.

## R E C I T A L S:

A.      Seller is the Chapter 11 Trustee (the **"Trustee"**) of the estate of 96 Wythe Acquisition LLC (the **"Debtor"**), which is the fee title owner of that certain hotel property known as "The Williamsburg Hotel" (the **"Hotel"**) located at 96 Wythe Avenue, Brooklyn, New York 11249 as more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (the **"Land"**)

B.      On February 23, 2021 (the **"Petition Date"**), the Debtor filed a voluntary petition for Chapter 11 relief (the **"Bankruptcy Case"**) under Title 11, United States Code (the **"Bankruptcy Code"**) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**).

C.      On May 27, 2022, the Bankruptcy Court entered an Order Granting Motions to Appoint a Chapter 11 Trustee, and on May 31, 2022, the United State Trustee filed his Notice of Appointment of Chapter 11 Trustee pursuant to which Stephen S. Gray was designated as the proposed Trustee. Thereupon, the Bankruptcy Court entered an Order Granting the Application for Appointment of Chapter 11 Trustee, and Stephen S. Gray assumed the role of Trustee.

D.      Pursuant to the Bankruptcy Code, the Trustee succeeds to all of the rights and interests of the Debtor, including all right and authority to convey and transfer the Debtor's assets, including, without limitation, the Hotel and the Property (as hereinafter defined), subject to the requirements of the Bankruptcy Code and requisite orders of the Bankruptcy Court.

E.      Subject to the entry of an order confirming a plan of liquidation in the Bankruptcy Case or a separate sale order entered by the Bankruptcy Court approving the sale and conveyance of the Property to Buyer as the successful bidder, and approving the terms of this Agreement and all terms and conditions hereof (in either case, the **"Sale Order"**), Seller shall have the right and authority to sell the Property to Buyer pursuant to the terms and conditions herein contained.

F.      In exchange for, among other things, payment of the Purchase Price (as hereinafter defined), Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Property from Seller, in each case upon the terms and conditions set forth in this Agreement, and subject further to the approval of this Agreement by the Bankruptcy Court as set forth more fully hereinbelow.

G.      The Parties desire to enter into this Agreement to document the purchase and sale of the Property between Seller and Buyer, subject to all of the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

## AGREEMENT

1.    <u>Purchase and Sale of Property</u>.  Seller hereby agrees to sell, grant and convey to Buyer, and Buyer hereby agrees to purchase from Seller, at a price and upon the terms and conditions set forth in this Agreement, a fee simple interest in the Land described in <u>Exhibit "A"</u> annexed hereto and made a part hereof, together with all of the right, title and interest, if any, of Seller in and to:

1.1.    <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now and hereinafter erected or located on the Land (collectively the "**Improvements**");

1.2.    <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever with respect to the Land or Improvements, and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the  estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possessions, claim and demand whatsoever, both at law and in equity, of Seller of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto (the "**Easements**");

1.3.    <u>Personal Property</u>. All tangible personal property owned or leased by Seller that is now or hereafter placed or installed in, on or about the Land and Improvements and used in connection with the use, ownership, operation, management, maintenance and/or repair of the Land and Improvements and the operation of the Hotel, including, without limitation, to the extent located on the Land and/or Improvements and owned or leased by Seller: (i) all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furnishings, inventory and other property of every kind and nature whatsoever, and (ii) all of the paper goods, linens, maintenance equipment and supplies, uniforms, office supplies and all similar items used in operation of the Hotel (collectively, the "**Personal Property**");

1.4.    <u>Intangible Property</u>.  To the extent assignable, all of Seller's right, title and interest in, to and arising out of, the property and/or development entitlements related to the Property, including, but not limited to, all permits, licenses (including the liquor license), rights of way, plans, maps, specifications, surveys, warranties, guaranties, agreements, contracts, air rights, if any, off-site parking rights, approvals, utility rights, development rights and similar rights related to the Property, whether granted by governmental or quasi-governmental authorities or private persons, including, without limitation, (i) all of Seller's right, title and interest to all guest and customer lists, reservations, bookings and inquiries, licenses, telephone numbers, concessions, and other intangible property, if any, used in or arising out of the operation of the Hotel and (ii) to the extent a current ownership dispute is determined in Seller's favor and Seller is deemed to own and control the Debtor's intellectual property, trade names, trademarks, and service marks, the sale shall

include all property rights, title and interest of Seller in and to the trade names, trademarks and service marks of Seller with respect to "The Williamsburg Hotel" and all of Seller's right, title interest in and to all domain names, registrations or address used in connection with the Property and the Hotel, including, without limitation, www.thewilliamsburghotel.com (the items described in this clause (ii), the **"Intellectual Property"**) (the items described in this clause 1.4, collectively, the **"Intangible Property"**);

1.5.    Records.    All records, statements, invoices, files, books and other data in Seller's possession or control, including, but not limited to, delimited data reports and individual productivity reports for all guests dating back to the inception of the Hotel to the extent readily available, and such items as are in the possession or under the control of The Williamsburg Hotel BK LLC (the **"Management Company"**), and associated primarily with the ownership, use and operation of the Land, Improvements and/or Hotel, including the plans, specifications, architectural drawings, environmental reports, surveys, engineering reports and notices from any governmental authority relating to environmental matters, and general records relating to the construction of any proposed or actual Improvements (collectively, the **"Records"**). Buyer agrees to preserve at the Property, to the extent required by the Bankruptcy Court, all employment records and sales records conveyed by Seller until entry of a final decree in the Bankruptcy Case. Where there is a legitimate purpose not injurious to the other party or if there is a tax audit, other governmental inquiry, or litigation or prospective litigation to which Seller is, or may become, a party, making necessary Seller's access to such records, Buyer will allow representatives of Seller access to such records during regular business hours at Buyer's place of business for the sole purpose of obtaining information for use as aforesaid;

1.6.    Property.    The Land, together with the Improvements, Easements, Personal Property, Intangible Property, Records and the Management Company Records (as hereinafter defined) are collectively hereinafter referred to as the **"Property"**; and

1.7.    Disclaimer of Records with Management Company.    Seller does not represent or warranty any ability to deliver any records in the possession or under the control of the Management Company (collectively, the **"Management Company Records"**). Buyer shall be conveyed all of Seller's right, title and interest in and to the Management Company Records at Closing to the extent readily available.

2.    Purchase Price.    The purchase price for the Property to be paid to Seller by Buyer shall be Ninety-Six Million Dollars and No/100s ($96,000,000.00) (the **"Purchase Price"**), plus or minus any applicable prorations and adjustments calculated and payable as hereinafter provided.

2.1.    Payment of Purchase Price.    The Purchase Price shall be payable upon the Closing Date in accordance with the following procedures:

2.1.1.    Earnest Money.    Buyer has deposited into escrow (the **"Escrow"**) with the Title Company (as hereinafter defined) as Escrow Holder (**"Escrow Holder"**), in immediately available funds, the sum of Four Million Two Hundred Fifty Thousand and No/100s Dollars $4,250,000.00, together with any interest earned thereon, if any, the **"Earnest Money"**). Upon the closing of the transaction contemplated by this Agreement, the Earnest Money shall be paid to Seller and Buyer

shall receive a credit against the Purchase Price in the amount thereof. If the transaction does not so close, the Earnest Money shall be disbursed in accordance with the terms of this Agreement.

2.1.2.  <u>Balance of Purchase Price</u>. The balance of the Purchase Price ("**Balance**"), together with all other funds necessary on the part of Buyer, shall be paid by Buyer to Escrow Holder for delivery to Seller (or its designee) in immediately available funds on or before the Closing Date, or as otherwise provided in this Section 2.1.2. For purposes of calculating the Balance of the Purchase Price payable by Buyer hereunder, Buyer shall be credited with (i) the Earnest Money, and (ii) Buyer's share of the prorations and adjustments in Buyer's favor and other credits described in Section 11 hereof and otherwise in this Agreement. The parties hereby agree that all investment earnings, if any, on the Earnest Money that are earned while in escrow shall be payable to the party entitled to the Earnest Money and, if paid to Seller, shall be a credit against the Purchase Price. Subject to the provisions of this Agreement and by accepting the instruments of transfer to be delivered by Seller to Buyer pursuant to this Agreement, on the Closing Date:

(i)    The Earnest Money shall be paid over free of escrow and delivered by Escrow Holder to Seller (or Seller's designee) for application toward the Purchase Price due at Closing; and

(ii)    Buyer shall pay Seller (or Seller's designee) in immediately available funds, a sum equal to the Balance <u>plus</u> or <u>minus</u> prorations, adjustments and other credits described in Section 11 hereof and otherwise in this Agreement, in immediately available funds for payment of the balance of the Purchase Price due at Closing.

2.1.3.  <u>Allocation of Purchase Price</u>. Seller and Buyer hereby agree that for applicable State, city and/or county transfer and sales tax purposes, the Purchase Price shall be allocated between the fee simple interest(s) and Personal Property by Buyer, within thirty (30) days following the Effective Date. Seller and Buyer hereby agree that each will reflect the allocation of the Purchase Price in a manner consistent herewith on any of their respective transfer and sales tax returns. Seller and Buyer agree that Seller shall be responsible for all applicable State, city and/or county transfer taxes payable in connection with the transactions contemplated hereby and the Buyer shall be responsible for all applicable sales taxes payable in connection with the transaction contemplated hereby

3.    <u>Title to Property</u>.

3.1.    <u>Title and Survey</u>. Buyer agrees that any examination of title with respect to the Property it may make or cause to be made for the purpose of obtaining title insurance in connection with the acquisition by the Buyer of the Property pursuant to the provisions hereof will be made and the title policy in respect thereof (the "**Title Policy**") will be issued through Lincoln Land Services, as agent for First American Title Insurance Company (the "**Title Company**"). Buyer acknowledges that (i) it has received and revised the certificate of title (the "**Title Report**") with respect to the Property and (ii) it approves the Permitted Exceptions (as hereinafter defined). Except as expressly set forth herein, all of the foregoing shall be accomplished at Buyer's cost and expense and without contribution by Seller, as shall any survey (the "**Survey**") of the Property ordered or obtained by Buyer or the Title Company.

3.2.   <u>Title and Survey Exceptions</u>.   Seller shall, at or prior to the Closing Date and pursuant to the Sale Order, (A) remove the following title exceptions ("**Mandatory Removal Exceptions**") (i) any and all monetary liens, including, without limitation, all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Property (or any portion thereof) and all real estate taxes (subject to adjustment), and monetary fines or penalties in respect of a state or municipal violations (without requiring correction or removal of record thereof), (ii) without limitation of the Mandatory Removal Exceptions described in preceding clause, (i) any and all of the non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record against the Property, and (B) remove any and all other non-Permitted Exceptions that may be removed by the entry of the Sale Order; provided, however, if the Sale Order does not remove any Non-Permitted Exception (as hereinafter defined), Buyer shall not be obligated to close with such exceptions.   In the event that (1) any update to the Title Report or the (2) Survey or any update to the Survey discloses title exceptions (each a "**Title Objection**") encumbering the Property (other than any resulting from Buyer's activities on the Land and Improvements, and other than the exceptions set forth in the original Title Report (that are not Mandatory Removal Exceptions) and any exception expressly agreed to in writing by Buyer to be a "**Permitted Exception**" or as expressly set forth by this Agreement) (each, a "**Non-Permitted Exception**"), Seller shall have a period of ten (10) business days following its receipt of the update to the Title Report to notify Buyer in writing that Seller elects not to remove any Non-Permitted Exceptions which are not Mandatory Removal Exceptions ("**Title Objection Response**").   Seller's failure to timely provide a Title Objection Response with respect to a Non-Permitted Exception will be deemed as Seller's response that Seller is not willing to remove (or, if alternatively permitted by Buyer in writing per the Title Objection Response, alter, modify or otherwise mitigate) any Title Objections.   In the event that Seller is not (or is deemed to be not) willing to remove (or, if alternatively  permitted by Buyer in writing, alter, modify or otherwise mitigate) any Title Objections (other than Mandatory Removal Exceptions which Seller shall be obligated to remove) to the satisfaction of Buyer and Title Company, Buyer shall elect, prior to the expiration of the date that is five (5) business days after Buyer's receipt of the Title Objection Response or the expiration of the period for the delivery of the Title Objection Response, whichever is later, to either (i) waive its disapproval of such exception, in which case such exception shall then be deemed to be a Permitted Exception, or (ii) terminate this Agreement and its obligation to purchase the Property.   Buyer's failure to give such notice shall be deemed a waiver of its disapproval of such exception deeming it a Permitted Exception.   In the event Buyer elects to terminate its obligation to purchase the Property in accordance with this Section 3.2, Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, the Earnest Money shall be returned to Buyer, Buyer shall be reimbursed for its actual out of pocket costs for the Title Report and Survey, up to $1,500.00 (the "**Title Fees**") and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement.

3.3.   <u>Existing Mortgage</u>.   Seller shall cause the holder (each, an "**Existing Lender**") of any existing mortgage encumbering the Property (collectively, the "**Existing Mortgages**") to assign that portion of the Existing Mortgages to Buyer's lender in the amount requested by Buyer up to that portion of the Purchase Price delivered to such Existing Lender upon the Closing hereof; provided, however, (a) Buyer shall pay any out of pocket fees, charges, costs and expenses of the Existing Lender in connection with such assignment of the Existing Mortgages and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and

the recording thereof, as the Existing Lender may have the right to impose pursuant to the Existing Mortgages, and (b) Buyer shall accept title to the Property subject to the Existing Mortgages assigned at the Closing and the promissory note(s) secured thereby. Such assignment of the Existing Mortgages and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law. Seller shall provide the Title Company and the Buyer with proposed copies of the Sale Order, Chapter 11 Plan, or other bankruptcy filings for their respective advice and input, to the extent such filings may impact the assignability of the Existing Mortgages.

4.    Due Diligence.

4.1.    Inspections. During the period commencing on the Effective Date hereof until Buyer's rights to purchase the Property have terminated in accordance herewith, Buyer (and its agents and representatives) may, but shall not be obligated to, enter onto the Land and Improvements during reasonable business hours and upon reasonable prior notice to Seller to perform a complete review of the Land and Property and all matters related to Buyer's acquisition of the Property in Buyer's sole and absolute discretion and to perform non-invasive inspections of the Land and Improvements in Buyer's sole and absolute discretion, all at Buyer's sole cost and expense. Buyer agrees that it shall, at its sole cost and expense, repair any damage to the Land and Improvements that was caused by any inspection of the Land and Improvements by or at the direction of Buyer. NOTWITHSTANDING ANYTHING CONTAINED IN THIS SECTION 4.1 TO THE CONTRARY, EXCEPT AS EXPRESSLY PROVIDED BY THIS AGREEMENT, BUYER SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT BASED UPON ANY FURTHER INSPECTIONS OR DUE DILIGENCE CONDUCTED BY BUYER AS PERMITTED UNDER THIS AGREEMENT FOLLOWING THE EFFECTIVE DATE.

4.1.1.    Inspection Conditions. Buyer's right to enter upon the Property to conduct the inspections is subject to the following conditions:

(a)    Buyer shall provide Seller with reasonable advance notice of any entry by Buyer, and Seller may, at its election, have an authorized representative present during any such entry;

(b)    All investigations and other activities conducted by Buyer shall be at Buyer's sole cost and expense, and Buyer shall keep the Property free of any liens that may be asserted against Seller or the Property as a result thereof;

(c)    Buyer shall exercise due care with respect to the Property in connection with its entry thereon so as to minimize any damage caused to the Property and any interference with the use thereof by Seller. Promptly following any test or other examination that results in any alteration of the Property, Buyer will promptly restore the Property at Buyer's sole cost and expense to the condition that existed prior to such test or examination; and

(d)    Buyer agrees that neither Buyer nor its representatives will contact any utilities or governmental authority unless required by applicable laws or otherwise approved by Seller in writing, such approval not to be unreasonably withheld, and in all events Buyer agrees not to make such contact without first notifying Seller of its intention to do so and providing Seller or its

representatives with a reasonable opportunity to be present at and participate in such discussion at a time and location reasonably acceptable to all parties.

4.1.2.  Indemnity.  To the fullest extent permitted by law and in addition to all other indemnities provided for at law or in equity, Buyer shall protect, indemnify and hold the Seller, and Seller's respective members, participants and affiliates, and the officers, directors, shareholders, employees, agents, attorneys, representatives, and contractors (collectively, "**Seller Parties**") harmless from and against any and all claims, damages (excluding punitive, special or consequential damages), liens, liabilities, actual losses, out-of-pocket costs and expenses including, without limitation, reasonable attorneys' fees and court costs, that Seller shall actually suffer or incur as a result of or otherwise arising out of any acts or omissions committed by Buyer or its representatives or agents in connection with the exercise of the rights granted to Buyer in this Article 4.  In the event this Agreement is terminated, this indemnification obligation shall survive the termination of this Agreement.   If this Agreement is not terminated, this indemnification obligation shall survive the closing.

4.1.3.  Confidentiality. All information obtained by Buyer through its inspections of the Property (including, without limitation, financial matters such as, but not limited to, costs, expenses and income of the Property and/or other matters obtained by Buyer pertaining to Seller) shall be deemed Transaction Materials as defined in Section 22.13 (Confidentiality) below.

4.2.  Review of Documents.  At Buyer's request, Seller shall make available to Buyer copies of all books, files, records, documents, agreements, contracts, reports and other materials related to the Land and/or Property that are in Seller's possession or control, applicable to the Property (collectively, the "**Due Diligence Items**"), which Due Diligence Items shall be deemed Transaction Materials as defined in Section 22.13 (Confidentiality) below.  During the period commencing on the Effective Date hereof until Buyer's rights to purchase the Property have terminated in accordance herewith, Buyer (and its agents and representatives) shall have the opportunity to review any items delivered to Buyer pursuant to this Article 4, the Due Diligence Items, and any other materials Buyer may elect to obtain and review with respect to the Land and/or Property; PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED BY THIS AGREEMENT, BUYER SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT BASED UPON ANY FURTHER INSPECTIONS OR DUE DILIGENCE CONDUCTED BY BUYER AS PERMITTED UNDER THIS AGREEMENT FOLLOWING THE EFFECTIVE DATE.

4.3.  Due Diligence.  Buyer shall continue to have the right to conduct any and all inspections, tests and due diligence investigations that Buyer is otherwise permitted to perform under this Agreement prior to the Closing Date; PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED BY THIS AGREEMENT, BUYER SHALL NOT HAVE A RIGHT TO TERMINATE THIS AGREEMENT BASED UPON SUCH INSPECTIONS.

5.  Conditions Precedent; Closing.  The following shall be the conditions precedent to the Parties' obligations to consummate the purchase and sale transaction contemplated herein:

5.1.  Conditions to Buyer's Obligations. Buyer's obligations hereunder, including, but not limited to, its obligation to consummate the purchase transaction provided for herein, are subject

to the satisfaction, in Buyer's reasonable discretion, of each of the following conditions, each of which is for the sole benefit of Buyer and may only be waived by Buyer in writing:

5.1.1.  <u>Due Performance</u>. Seller shall have duly performed in all material respects each and every covenant, undertaking and agreement to be performed by it prior to the Closing Date hereunder.

5.1.2.  <u>Seller's Representations and Warranties</u>. Each representation and warranty made in this Agreement by Seller shall be true and correct in all material respects at the time as of which the same is made and as of the Closing Date.

5.1.3.  <u>Condemnation/Casualty</u>. This Agreement shall not have been terminated by Buyer as a result of any casualty, condemnation or threatened condemnation of the Land as described in Article 16 hereof.

5.1.4.  <u>Seller Deliveries</u>.  Seller shall have delivered the items described in Article 7 hereof.

5.1.5.  <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have approved the sale, transfer and conveyance of the Property to Buyer in accordance with the terms of this Agreement and the Order Approving Bidding Procedures, etc. entered on November 15, 2022 (Doc. # 784) (the **"Bidding Procedures Order"**) and as confirmed by entry of a final, non-appealable Sale Order entered in the Bankruptcy Case.

5.1.6.  <u>Acquisition Financing</u>. Existing Lender (as defined herein) or its affiliate or designee shall provide financing to Buyer on terms substantially consistent with the draft loan document forms last provided to Buyer on or prior to the Effective Date, subject to any substantive and structural changes (including the creation of an operating lease structure and addition of such operating lessee as a borrower under the loan) necessitated by the issuance of a liquor license deliverable to Buyer as a condition precedent to closing hereunder.

5.1.7.  <u>Temporary Certificate of Occupancy</u>. A temporary certificate of occupancy shall have been issued for the entire Property, with a remaining term which does not expire any earlier than twenty-five (25) days following the Closing Date.

5.1.8.  <u>Liquor License</u>.       The New York State Liquor Authority shall have approved Purchaser's application for a temporary liquor license permit for on-premises consumption of beer, wine, and liquor on the same terms and conditions as currently provided under Seller's liquor license and the Community Board shall approve Buyer's application for a full hotel liquor license on terms and conditions substantially consistent with the Stipulation Agreement entered into between the Debtor and Community Board No. 1, dated as of January 7, 2015. Seller shall not be on the "COD" (i.e. delinquent list) with the New York State Liquor Authority nor shall there be any disciplinary charges pending against Seller at the New York State Liquor Authority.

5.1.9.  <u>Assignment of Mortgage</u>.       The Existing Mortgage shall be assigned to Purchaser's lender in at least the amount of Purchaser's mortgage such that no mortgage recording tax is due on Purchaser's mortgage.

5.2.  <u>Buyer's Waiver of Conditions</u>. Buyer may at any time or times on or before the Closing Date, at its election, waive any of the conditions precedent to Buyer's obligations under Section

5.1 or otherwise and consummate the sale, but any such waiver shall be effective only if contained in a writing signed by Buyer and delivered to Seller. In the event any of the conditions precedent for the benefit of Buyer that are contained in this Agreement are not fulfilled, then Buyer may terminate this Agreement and its obligation to purchase the Property, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, the Earnest Money shall be returned to Buyer, Buyer shall be reimbursed its Title Fees and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement.

5.3.   <u>Conditions to Seller's Obligations</u>.   Seller's obligations hereunder, including, but not limited to, its obligation to consummate the purchase transaction provided for herein, are subject to the satisfaction, in Seller's sole and absolute discretion, of each of the following conditions, each of which is for the sole benefit of Seller and may be waived by Seller in writing:

5.3.1.   <u>Buyer Deliveries</u>.   Buyer shall have delivered the items required to be delivered by Buyer pursuant to Article 8 hereof.

5.3.2.   <u>Due Performance</u>. Buyer shall have duly performed in all material respects each and every covenant, undertaking and agreement to be performed by it prior to the Closing Date hereunder.

5.3.3.   <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have approved the sale, transfer and conveyance of the Property to Buyer in accordance with the terms of this Agreement and the Bidding Procedures Order as confirmed by entry of the Sale Order entered in the Bankruptcy Case.

5.3.4.   <u>Buyer's Representations and Warranties</u>.   Each representation and warranty made in this Agreement by Buyer shall be true and correct in all material respects at the time as of which the same is made and as of the Closing Date.

5.4.   <u>Seller's Waiver of Conditions</u>.   Seller may at any time or times on or before the Closing Date, at its election, waive any of the conditions precedent to Seller's obligations under Section 5.3 or otherwise and consummate the sale, other than the condition of receiving Bankruptcy Court approval in accordance with the Bidding Procedures Order, but any such waiver shall be effective only if contained in a writing signed by Seller and delivered to Buyer. In the event any of the conditions precedent for the benefit of Seller that are contained in this Agreement are not fulfilled, then Seller may terminate its obligation to sell the Property, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, the Earnest Money shall be refunded to Buyer, Buyer shall be reimbursed its Title Fees and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement.

5.5.   <u>Closing Date</u>. The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on a date mutually agreed upon between Seller and Buyer (the "**Scheduled Closing Date**") but no later than the earlier of (x) ten (10) business days following the satisfaction of all of the Conditions to Buyer's obligation to close as set forth in Section 5.1 of this Agreement, (y) one hundred fifty (150) days following the Effective Date hereof, or (z) such later date as may be mutually agreed to in writing by the Parties (the "**Outside Closing Date**"). The Scheduled Closing Date may be adjourned upon either Party's request, one or more times up to and including the Outside Closing Date. The date upon which title is conveyed by Seller to Buyer is referred to herein as the "**Closing Date**". The Closing shall be held at the offices of

Buyer's lender or such lender's counsel provided such offices are located in New York City or Nassau County, New York, otherwise at the offices of Togut, Segal & Segal LLP, One Penn Plaza, Suite 3336, New York, New York 10119.

6.     Seller's Covenants.

6.1.    Operation of the Property Prior to Closing Date. From and after the Effective Date until the earlier of the Closing Date or the termination by Buyer or Seller of this Agreement and its obligation to complete the transfer of the Property:

6.1.1. Insurance, Encumbrances, Intangible Property and Agreements. Seller shall (A) manage, repair and maintain the Property and the Hotel in the ordinary course of business and in a manner consistent with the current management of the Property and the Hotel (including without limitation continue to diligently pursue the permanent Certificate of Occupancy), (B) maintain property and liability insurance related to the Land, Improvements and Personal Property at the level and with the insurance companies that Seller currently maintains, (C) comply with all federal, state, local and other laws, ordinances, rules, regulations and orders affecting or governing the use, occupancy, ownership or maintenance of the Land and Improvements in all material respects and promptly furnish Buyer with copies of any and all written notices or communications that it receives from any governmental or quasi-governmental entities regarding any violation by Seller of any such laws and maintain all licenses and permits currently held by or on behalf of Seller with respect to the Property and Hotel, (D) not (unless terminated on or prior to the Closing Date by Seller and except as otherwise specifically permitted or required pursuant to this Agreement, or as otherwise agreed or permitted by Buyer in writing in Buyer's discretion) (i) grant or create any lease, easement, right-of-way, encumbrance, lien, restriction, or assessment on title that affects the Land and/or Improvements, (ii) amend, extend or otherwise modify the terms of any existing lease, easement, right-of-way, encumbrance, lien, restriction or assessment that affects the(except as required under Section 3.3 with respect to delinquent taxes and assessments and other monetary liens), (iii) sell, remove, transfer or otherwise convey or terminate, amend or otherwise modify any Personal Property or Intangible Property, (iv) enter into any further or amend any existing agreements, contracts or leases with respect to the Property or Hotel, (v) allow or take Hotel room or event reservations or bookings at discounted rates, (vi) allow or take Hotel room or event reservations or bookings with a duration of more than two (2) weeks or for groups of ten (10) or more persons  (E) shall operate the Hotel as currently operated and shall utilize its normal servicing, repair and administrative procedures from the date hereof to and through the Closing Date, (F) shall carry on the business of the Hotel, as has been conducted by the Trustee, in a good and diligent manner and shall use commercially reasonable efforts to preserve its business organization intact and preserve the good will of its suppliers, customers and others having business relations with the Hotel, and (G) will cause the continuation of the normal practices, as has been conducted by the Trustee, with respect to the purchase and replacement of supplies, maintenance of inventories  and the continuation of normal practices with respect to the maintenance and repairs of the Personal Property, except for normal wear and tear. Buyer (or the affiliate designed by Buyer in whose name the liquor license will be issued) shall promptly prepare or cause to be prepared and submit all filings and applications, and pay all fees and make all deposits required to transfer the liquor license to Buyer or its designated individual promptly after the Effective Date, and thereafter diligently pursue the necessary procedures, in connection with the issuance of a liquor license. Seller shall reasonably cooperate with Buyer in connection with

the transfer of the liquor license which shall in no event be effective unless and until the Closing Date occurs.

6.1.2.   Transfer of Property.  Except as otherwise provided in Section 21 herein in connection with agreements with other Qualifying Bidders under the Bidding Procedures Order, or as may otherwise be consented to by Buyer in writing, Seller will not (i) enter into any contract for the sale or of the Property to any person other than Buyer, or (ii) sell, convey, lease or otherwise transfer all or any part of the Property to any person other than Buyer.

6.1.3.   Cooperation with Buyer.  Subject to Section 22.13 below, Buyer and its representatives, employees, agents and independent contractors may meet with all applicable governmental and quasi-governmental agencies and entities, and all other persons or entities with whom Seller or others have contractual arrangements in connection with or relating to the Land and/or Property; provided that in each case Buyer gives Seller prior reasonable notice of any such meetings and the right to have a representative of Seller attend such meetings.

6.2.   Additional Disclosures.  Seller shall promptly advise Buyer in writing of any material adverse change in the condition of the Land or any of the Property, the occurrence of any event or the discovery of any fact which would render any representation or warranty of Seller to Buyer in this Agreement untrue or materially misleading, and any written notice or other communication from any third person alleging that the consent of such third person is or may be required in connection with the transactions contemplated by this Agreement.

6.3.   Additional Covenants.

6.3.1.   Contracts Covenants. To the extent transferable at no cost to Seller (including if Buyer agrees to reimburse Seller for any such cost) and to the extent Buyer has  notified Seller no later than ten (10) days prior to the Closing Date (the "**Contract Assumption Notice Date**") that is electing to assume any Contract and Seller's obligations under such  applicable Contract (as defined below) accruing on and after the Closing Date, then  on the Closing Date and subject to the terms and conditions of this Agreement and the entry of the Sale Order or any other Order of the Bankruptcy Court approving the assumption and assignment of the Contracts, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assign to Buyer, without recourse, representation or warranty (except as expressly set forth in this Agreement or such instruments), all of Seller's right, title and interest in, any such  written service, maintenance, supply and other agreements relating to the ownership, use or operation of the Property, including all guarantees and warranties, together with all modifications and amendments thereof and supplements relating thereto (collectively, the "**Contracts**") which are in effect as of the Closing Date and described on Schedule 6.3.1 attached hereto and made part hereof, which contains a true, accurate and complete list of the Contracts as of the Effective Date (which schedule shall be updated as of the Closing Date), together with a description of the nature of the contract, the parties, the date(s) of the contract and amendments, if any, the contract term, the contract sum, termination right, if any, and termination penalty, if any.  To the extent Buyer has not affirmatively notified Seller in writing that it is assuming any such Contract prior to the Contract Assumption Notice Date, such Contract shall be terminated by Seller prior to Closing and Buyer shall have no responsibility therefore. For the avoidance of doubt, any contracts or Contracts whether known or unknown, unless expressly assumed by Buyer pursuant to this Section, are expressly rejected by Buyer. Buyer shall be

responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Buyer providing the necessary evidence as required by the Bankruptcy Code and Bankruptcy Court in connection with the approval of this Agreement and the transactions contemplated herein.

6.3.2.  The cure amounts (collectively, the "**Cure Amounts**"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults under the Contracts shall be the responsibility of and shall be paid (or reserved for) by Seller at or before the later of closing (except as otherwise agreed to by the other party to any Contracts) or the date such Cure Amount is finally agreed to by the parties to any Contract as determined by order of the Bankruptcy Court and Buyer shall have no liability for any such cure amount.  To the knowledge of Seller, an estimate as of the date hereof of the Cure Amounts described in this section is set forth on **Exhibit "E"**.

6.3.3.  Seller shall file a motion in the Bankruptcy Court and take such other steps as are necessary to obtain an Order of the Bankruptcy Court finally determining and fixing the Cure Amounts, which Order shall include approval of any Cure Amount notice and dispute procedures as may be required under applicable law, on or before the Contract Notice Assumption Date.

6.4.    Tax Certiorari Proceedings.  At any time hereafter and prior to the Closing, Buyer (or its representatives) shall have the right, in the name and on behalf of Seller or otherwise as a contract vendee, to institute tax reduction or other proceedings to reduce the assessed valuation of the Property with respect to the period ending at the end of the current fiscal year and/or any period thereafter.  If necessary, Seller shall maintain such proceedings directly utilizing counsel and representatives selected by Buyer at Buyer's sole cost and expense.  Seller shall cooperate with Buyer (and its representatives) in any such proceedings, as reasonably requested by Buyer (or its representatives).  To the extent that any tax reduction or other proceedings to reduce the assessed valuation of the Property are pending on the Closing Date, Seller shall execute and deliver at Closing such documents as reasonably requested by Buyer to substitute Buyer in such proceedings.

6.5.    Bulks Sales.  At least ten (10) days prior to the Closing Date, the Buyer shall file with the New York Department of Taxation and Finance (the "**Department**") a Notification of Sale, Transfer, or Assignment in Bulk (Form AU-196.10; the "**Bulk Sale Form**"), together with an executed copy of this Agreement. Buyer and Seller shall cooperate fully in preparing and filing the Bulk Sale Form and Seller shall promptly provide any information reasonably necessary for each party to complete the Bulk Sale Form and Buyer is specifically authorized to disclose a copy of this Agreement as required in connection with the filing of Form AU-196.10. In the event that, prior to the Closing, the Department issues one or more notices requiring any funds be withheld from the Purchase Price at Closing with respect to sums relating to the period prior to the Closing (each, an "**Escrow Notice**"), the party receiving the Escrow Notice shall immediately deliver a copy of same to the other party and the amount set forth in the most recent Escrow Notice shall be withheld from the Purchase Price at Closing and such amount shall be delivered to Escrow Agent (the "**Bulk Sale Escrow Agent**"), to be held in escrow pursuant to the instructions of the Escrow Notice, and pursuant to a mutually satisfactory escrow agreement to be signed at Closing by Seller, Buyer and the Bulk Sale Escrow Agent (the "**Bulk Sale Escrow**"). Thereafter, as and when the Department issues a demand for payment of some or all of the Bulk Sale Escrow (a "**Demand for Payment**"), the party receiving the Demand for Payment shall immediately deliver a copy of same

to the other party and the Bulk Sale Escrow Agent, and the Bulk Sale Escrow Agent shall promptly pay and disburse such amount to the Department from the Bulk Sale Escrow in accordance with the instructions set forth in the Demand for Payment. Upon receipt of a tax clearance letter issued by the Department confirming there is no further requirement to hold any remaining Bulk Sale Escrow (the "**Tax Clearance Letter**"), the party receiving the Tax Clearance Letter shall promptly deliver a copy of same to the other party and the Bulk Sale Escrow Agent, and the Bulk Sale Escrow Agent shall promptly release any remaining balance of the Bulk Sales Escrow to Seller. Notwithstanding anything contained in this Section 6.5, any sales tax attributable to the sale and transfer of the Personal Property hereunder, shall be the responsibility of, and paid by, the Buyer. The obligations of the parties hereto and the Bulk Sale Escrow Agent under this paragraph shall survive the Closing.

6.6.   <u>Intellectual Property</u>. Seller shall, at its sole cost and expense, continue to pursue in a commercially reasonable manner, the Intellectual Property described in Section 1.4(ii), including without limitation pursuing and/or defending, as applicable, any claims and filing and/or defending, as applicable, an appeal prior to  Closing. In the event the Intangible Property is received by the Seller after the Closing, it shall promptly convey it to the Buyer and execute any instruments necessary to effectuate the transfer thereof. After Closing, upon request of Buyer, Seller shall continue to pursue and/or defend, as applicable, any unresolved claims related to the Intellectual Property. All costs and expenses incurred by Seller (including professional fees and trustee fees) in pursuing and/or defending any Intellectual Property litigation after the Closing, to the extent the same have been approved by Buyer in writing before the same are incurred, shall be the obligation of Buyer. Seller shall keep Buyer reasonably updated and informed on the status and progress of the Intellectual Property litigation and shall consult with Buyer in good faith regarding the same bother prior to and following Closing.  This Section shall survive Closing for a period of 12 months.

6.7.   <u>Press and Media</u>. Seller shall not make any public statements, press releases or otherwise regarding the Property, the Hotel or the transactions contemplated hereby, without the Buyer's written approval, not to be unreasonably withheld. Seller shall provide Buyer with information at its request, regarding social media accounts (e.g. Instagram, TikTok, and Facebook) managed by Seller or its agents, including any requested reports or other data. At Buyer's request and with Seller's approval, not to be unreasonably withheld, Seller shall make one or more social media posts up to and through Closing (e.g., announcing that the Williamsburg Hotel is to become part of the Arlo family).  For the avoidance of doubt, nothing in this Section 6.7 shall impair or restrict any press releases or securities disclosures that the Seller's mortgage lender determines in its discretion to be required or prudent regarding the transactions contemplated hereby.

7.   <u>Seller's Closing Deliveries</u>.  On the Closing Date, Seller shall deliver or cause to be delivered to the Buyer the following items:

7.1.   One (1) Seller-executed and acknowledged counterpart original of a bargain and sale deed with covenants against grantor's acts for the conveyance of a fee simple interest in the Land and any Improvements to Buyer, free and clear of all liens and encumbrances other than Permitted Exceptions, in the form attached as Exhibit "B" and which shall be duly executed and acknowledged by Seller so as to convey to Buyer the fee simple interest in the Land and any Improvements (the "**Deed**");

7.2.    A Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, (the "**Non-Foreign Affidavit**");

7.3.    Two (2) Seller-executed counterpart originals of an assignment agreement (the "**Assignment**") conveying to Buyer the Intangible Property in the form attached hereto as **Exhibit "C"**;

7.4.    One (1) fully-executed original of a bill of sale (the "**Bill of Sale**") whereby Seller quitclaims to Buyer the Personal Property and Records in the form attached hereto as **Exhibit "D"**;

7.5.    Originals of all Intangible Property and other Due Diligence Items in Seller's possession;

7.6.    To the extent not previously delivered to Buyer, all originals (or copies if originals are not available) of the Intangible Property and Records,  including, without limitation, delimited data reports and individual productivity reports for all guests dating back to the inception of the Hotel to the extent readily available, it being agreed that the foregoing which are located at the Property on the Closing Date shall be deemed to be delivered to Buyer or its permitted designee upon delivery of possession of the Property;

7.7.    Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and/or Sale Order, New York State and any applicable county or city sales tax and real property transfer tax returns and forms required to be completed by Seller, together with payment to the Title Company or the appropriate governmental authority an amount necessary to pay all real property and personal property transfer taxes (and to the extent (i) the transaction is not effected pursuant to a Chapter 11 Plan and (ii) Seller does not pay all applicable transfer taxes pursuant to this Agreement (which, for the avoidance doubt, may be paid by Seller out the sale proceeds from this transaction), then Buyer shall receive a credit against the Purchase Price simultaneously with Closing in the amount otherwise due on account of transfer taxes and Buyer shall be responsible for payment of such transfer taxes to the applicable Governmental agency);

7.8.    A certificate from Seller to Buyer certifying that all of Seller's representations and warranties set forth in this Agreement are true and correct in all material respects as of the Closing Date except as otherwise disclosed in such certificate;

7.9.    To the extent not previously delivered to Buyer, and to the extent in Seller's possession or control, all originals (or copies if originals are not available) of the Contracts, licenses, permits Records, all keys lock combinations or codes to all doors to, all rooms and other secured areas at the Hotel, software and hardware systems, all passwords used in the operation of the Hotel, including, but not limited to those needed to change, update or otherwise revise e-mail and social media accounts websites, including the logon credentials for the Instagram Account and/or domains to be conveyed to Buyer pursuant to the terms of this Agreement;

7.10.    An owner's affidavit in the form required by the Title Company

7.11.    Liquor License Related Deliverables:

7.11.1. An executed surrender petition for Seller's liquor license,

7.11.2.  An executed liquidator's permit (or a Statement of No Transfer) itemizing each item being sold (brand, size, quantity, price) hereunder,

7.11.3.  A letter of authorization for Buyer's counsel to surrender Seller's liquor license

7.11.4. Seller's original liquor license certificate; and

7.12.  Any other document, instrument or agreement necessary to consummate the transactions contemplated herein reasonably requested by Buyer or the Title Company and agreed to by Seller.

8.    Buyer's Closing Deliveries.  On or prior to the Closing Date, Buyer shall deliver to Seller the following items:

8.1.    Two (2) Buyer-executed counterpart originals of the Assignment;

8.2.    Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and/or Sale Order, New York State and any applicable county or city sales tax and real property transfer tax returns and forms required to be completed by Buyer, together with payment to the appropriate governmental authority an amount necessary to pay all sales taxes;

8.3.    A certificate from Buyer to Seller certifying that all of Buyer's representations and warranties set forth in this Agreement are true and correct as of the Closing Date except as otherwise disclosed in such certificate (it being agreed that any such disclosures shall not permit Seller to terminate this Agreement unless they result in the failure of a condition under Section 5.3 hereof); and

8.4.    Any other documents, instruments or agreements necessary to consummate the transactions contemplated herein reasonably requested by Seller or the Title Company.

9.    Escrow of Earnest Money.  The Earnest Money shall be held by Escrow Holder, in trust, in an interest bearing account pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Buyer and Escrow Holder (the "**Escrow Agreement**") substantially in the form attached hereto as **Exhibit "F"**.

10.    Closing Costs.  Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and/or the Sale Order, Buyer shall pay (i) all assignment fees relating to the assignment of the Existing Mortgage; (ii) Title Company's charges for the Title Report and the premium for an owner's and lender's Title policy; and (iii) the cost of the Survey and any updates thereto, and (iv) the sales tax associated with Personal Property.  Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and Sale Order, Seller shall pay all city, county, state and/or other documentary transfer stamps, taxes (excluding sales taxes) and/or fees, if any, related to the transfer of the Property to Buyer. Anything herein to the contrary notwithstanding, Buyer and Seller shall each pay their own attorneys' fees in connection with the preparation and negotiation of this Agreement and in connection with the consummation of the transactions contemplated hereby.

11.    Prorations.  All taxes and assessments applicable to the Land and/or Property, including, without limitation, all property taxes and assessments and other charges and expenses payable by

Seller, shall be prorated as of the Closing Date on the basis of the actual number of days of the month that have elapsed as of the Closing Date and based upon a three hundred sixty-five (365) day year. With respect to prorations related to real property taxes and assessments, the basis for said proration shall be the amount shown for real property taxes and assessments in the most recent installment for the fiscal year in which the Closing Date occurs. If no installment for the fiscal year in which Closing Date occurs is available, Buyer and Seller shall reasonably estimate such installment which shall be used to prorate taxes and assessments. No adjustment shall be made for any change in the real property taxes and assessments occurring by virtue of the sale of the Property to Buyer. The amount of such prorations shall be subject to adjustment in cash as and when complete and accurate information becomes available, if such information is not available on the Closing Date. Seller and Buyer agree to cooperate and use their best efforts to make such adjustments prior to forty-five (45) days after the Closing Date.

11.1.   <u>Bookings</u>.  Buyer shall receive a credit for all prepaid deposits and advance payments for bookings scheduled to occur on or after the Closing Date; travel agents' commissions, if any, shall be apportioned consistent with the allocation of Hotel room revenues referable to each such travel agent.

11.2.   <u>Vending Machines</u>. As and to the extent applicable, Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin-operated equipment as of the Closing Date and shall retain all monies collected therefrom as of the Closing Date, and Buyer shall be entitled to any monies collected therefrom after the Closing Date.

11.3.   <u>Gift Certificates</u>.  Seller shall give Buyer a credit at Closing for any gift certificates or similar items which allow a person to use the hotel's room and facilities after Closing at no cost or at a discounted price except that there shall be no proration or credit for discounts on any bookings made prior to the date hereof for periods after Closing which were offered in the ordinary course of business as part of promotions by the hotel. Within ten (10) days prior to the Closing Date, Seller shall provide Buyer with a schedule of any and all outstanding gift certificates or similar items.

11.4.   <u>Guest Ledgers</u>. All amounts in the Guest Ledger (including charges for rooms, food, beverage, telephone charges and otherwise) accruing prior to the Closing Date, shall be credited to Seller (in the amount thereof), and all amounts in the Guest Ledger accruing after the Closing Date shall belong to Buyer. The entire Guest Ledger shall thereupon become the property of Buyer. **"Guest Ledger"** shall mean any accounts of registered guests of the hotel who have not checked out as of the Closing Date. All amounts in the City Ledger accruing prior to the Closing Date shall be credited to Seller (in the amount thereof) and shall become the property of Buyer upon the occurrence of the Closing hereunder. **"City Ledger"** shall mean all accounts receivable of non-registered guests and/or patrons of the hotel who have received hotel services but not yet paid their bills. All other accounts receivables with respect to the Property and Hotel shall become the property of Buyer upon Closing. The provisions of this Section 11.4 shall survive the Closing.

11.5.   <u>Guests' Baggage</u>. On the Closing Date, authorized representatives of Buyer and Seller shall take inventory of and tag (a) all baggage, suitcases, luggage, valises and trunks of hotel guests checked or left in the care of Seller, (b) all luggage or other property of guests retained by Seller as security for unpaid accounts receivable, and (c) the contents of any storage room; <u>provided</u>,

however, that no such baggage, suitcases, luggage, valises or trunks shall be opened. All such baggage and other items shall be sealed and listed in an inventory prepared and signed jointly by the representatives of Buyer and Seller as of the Closing Date, and any such items shall be the responsibility of Buyer from and after such date, and Buyer agrees to indemnify and hold Seller, harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorney's fees, in connection therewith or arising from and after the Closing Date and Seller hereby agrees to indemnify and hold Buyer harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorneys' fees, in connection therewith arising prior to the Closing Date. The provisions of this Section 11.5 shall survive the Closing.

11.6.    Guests' Safe Deposits. On the Closing Date, Seller shall send written notice to guests or tenants or other persons who have safe deposit boxes that are located in the hotel, advising of the sale of the hotel to Buyer and requesting immediate removal of the contents thereof or the removal thereof and concurrent re-deposit of such contents pursuant to new safe deposit agreements with Buyer within two (2) calendar days after the Closing Date. All such removals and verifications shall be under the supervision and control of one representative each of Seller and Buyer. Safe deposit boxes of guests who have not responded to such written notice by so removing and verifying the contents thereof shall be removed by Buyer in the presence of a representative of Seller, and listed on a separate sheet and verified and signed jointly by the representatives of Buyer and Seller effective as of the Closing Date (the "**Unclaimed Safe Contents List**"). Buyer shall be solely responsible from and after the Closing Date for the verified contents of all such boxes that are on the Unclaimed Safe Contents List, and Buyer hereby agrees to indemnify and hold Seller harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorneys' fees, in connection therewith arising from and after the Closing Date and Seller hereby agrees to indemnify and hold Buyer harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorneys' fees, in connection therewith arising prior to the Closing Date. The provisions of this Section 11.6 shall survive the Closing.

11.7.    Consumables; Food and Beverage. Seller shall receive a credit at Closing for the cost of any inventories of all Consumables and Food and Beverage whether located at the Hotel or prepaid and in transit or to be delivered to the Hotel. "**Consumables**" and/or "**Food and Beverage**" means unopened alcohol and beverage items.

11.8.    Other Receivables.  Buyer shall receive, included as part of this purchase, all the receivables of the Hotel as of the Closing Date, other than Guest Ledger and City Ledger receivables which are dealt with pursuant to Section 11.4 hereof. Seller agrees that it shall promptly remit to Buyer in accordance with written instructions from Buyer any funds received by Seller in payment of such accounts receivable received after the Closing Date.

11.9.    Other Adjustments and Prorations. All income, expense or other item with respect to the Hotel shall be adjusted and prorated between Seller and Buyer in accordance with Uniform System of Accounts for the Lodging Industry.

The provisions of this Section 11 shall survive Closing for a period of ninety (90) days following the Closing.

12.    Representations and Warranties.

12.1.    Representations and Warranties of Seller.    Seller hereby makes the following representations and warranties to the best of Seller's knowledge and belief, which representations Seller believes in good faith to be true in all respects as of the date hereof and on the Closing Date:

12.1.1. Organization.    Seller is duly organized, validly existing and in good standing under the laws of the State of New York.  Subject to the applicable provisions of bankruptcy law, the Bankruptcy Case and the Sale Order, Seller has all requisite corporate or limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

12.1.2. Authorization and Validity.    Subject to the applicable provisions of bankruptcy law, the Bankruptcy Case and the Sale Order, Seller has all requisite corporate or limited liability company power and authority to enter into this Agreement and any ancillary agreements to which Seller is or will become a party and, subject to the (i) Bankruptcy Court's entry of the Sale Order, and (ii) receipt of all consents to perform Seller's obligations hereunder and thereunder, the execution and delivery of this Agreement and each ancillary agreement to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary action of Seller, and no other proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. Subject to the applicable provisions of bankruptcy law, the Bankruptcy Case and the Sale Order, this Agreement and each ancillary agreement to which Seller is or will become a party have been, or on the Closing Date will be, duly executed by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed and delivered constitute, Seller's valid and binding obligation, enforceable against Seller in accordance with their respective terms.

12.1.3. Contracts.    To the knowledge of Seller, Schedule 6.3.1 sets forth a true, correct and complete list of the Contracts, together with a description of the nature of the contract, the parties, the date(s) of the contract and amendments, if any, the contract term, the contract sum, the termination right, if any, and termination penalty, if any.  To the knowledge of Seller, each Contract is in full force and effect and constitutes the valid and binding legal obligation of the parties thereto, enforceable against them in accordance with its terms.  To the knowledge of Seller, there are no understandings, oral or written, between the parties to each such Contract, which in any manner vary the obligations or rights of either party as set forth in such Contract.  Except as indicated on Schedule 6.3.1, to the knowledge of Seller, no party is in default under each such Contract, and, to the knowledge of Seller, no controversy, claim, dispute or disagreement exists between the parties to any Contract.  To the knowledge of Seller, no event has occurred which with the passage of time or giving of notice, or both, would constitute a default under any Contract, and there are no past due amounts with respect to any Contract.

12.1.4. Occupancy Agreements. As of the Effective Date, there are no leases, licenses or other occupancy affecting Seller's use, operation and ownership of the Property or providing a third party the right to occupy the Hotel other than hotel guests in the ordinary course of business.

12.1.5. Brokerage and Finder's Fees. Except as concerns any commission due to the Broker (as hereinafter defined), Seller, and none of Seller's affiliates or any of the officers or directors of

Seller or any affiliate of Seller, has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement. Seller shall pay any commission payable to the Broker pursuant to a separate written agreement which is subject to the approval of the Bankruptcy Court.

12.1.6. <u>Title</u>.  Upon approval of the Bankruptcy Court, at the Closing, Buyer will acquire all of Seller's right, title and interest in and to all the Property, free and clear of any liens, claims or encumbrances other than the Permitted Exceptions, as provided in the Sale Order.

12.1.7. <u>Eminent Domain</u>.  There is no existing, nor, to the knowledge of Seller, any proposed or threatened, eminent domain or similar proceeding, or private purchase in lieu of such a proceeding, which would materially adversely affect the Property.

12.1.8. <u>Tax Certiorari</u>.  There are currently no Tax Certiorari proceedings pending for the Property.

12.1.9. <u>Consents</u>.  Except for the approval of the appropriate Governmental Authorities in connection with the transfer of the licenses and permits, and the recordation of the Deed, to Seller's knowledge, no filing with, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Seller of the Seller Documents, or the performance by Seller of any of its obligations under any of the Seller Documents, or the consummation by Sellers of the transactions described in this Agreement, except to the extent the failure to obtain such permit, Authorization, consent or approval would not have a material adverse effect on the Hotel, or Seller's ability to consummate the transactions described in this Agreement, or which consent or approval would otherwise be obtained prior to Closing.

12.1.10.      <u>Franchise Agreement</u>.  The Hotel is not subject to a franchise agreement.

12.1.11.      <u>Litigation</u>. Except as set forth on Schedule 12.1.11 attached hereto and for the Bankruptcy Action, no litigation which has been filed against Seller or against the Property or Hotel which remains outstanding as of the Effective Date and, to Seller's knowledge, except as set forth on Schedule 12.1.11, no such matter is pending or threatened in writing against Seller, the Hotel or the Property that arises out of the ownership or operation of the Property or the Hotel.

12.1.12.      <u>Financial Statements</u>. To Seller's knowledge, the financial statements for the Hotel previously delivered to Buyer are true and correct in all material respects.

12.1.13.      <u>Employment Matters</u>.

(i)      Except as set forth on Schedule 12.1.13 attached hereto ("Employees"), Seller has no employees. All employees are employed by Seller.

(ii)     Employees are not represented by a union or labor organization, and have not designated a union or a labor organization as their collective bargaining representative. There is no actual or threatened organizing activity by a union or labor organization by or of any Employees or otherwise affecting the Hotel. There is no demand for recognition or application for certification as the collective bargaining representative with respect to any of the Employees.

(iii)     Seller is not a party to or bound by, and the Hotel is not subject to or bound by, any collective bargaining, labor or employment, or development, card check, or neutrality agreement with respect to any employees currently employed to provide services to the Hotel or that may in the future be employed to provide services to the Hotel, or with respect to the Hotel itself.

(iv)     Seller has not experienced any strikes, committed any unfair labor practices, and is not aware of any allegations it, or its Manager, has committed any unfair labor practice or experienced any strikes within the period of six months prior to the execution of this Agreement related to the Employees.

(v)     Neither Seller, nor its Manager, has received any written notice claiming any violation of any applicable law related to any Employee, except as set forth on Schedule 12.1.13(v) attached hereto.

(vi)     Seller has no liability arising from the Seller's status as a successor employer, joint employer, alter ego or other legal doctrine that would cause the Seller to have any co-liability with or liability derived from the employment of any employees by another entity under applicable law.

(vii)     With respect to the Hotel or any employees of the Hotel, no party (including without limitation Seller or Manager) currently has or has had in the past six (6) years any obligation to contribute to any plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). With respect to any stock purchase, stock option, restricted unit, profits interest, severance, retention, employment, consulting, change-of-control, collective bargaining, bonus, incentive, deferred compensation, employee loan, material fringe benefit, retirement, supplemental retirement, health and welfare, vacation, pension, profit-sharing and other benefit plan, agreement, program, policy, or other arrangement, whether oral or written, in each case, that is sponsored, maintained, contributed or required to be contributed to by or on behalf of Seller with respect to current or formers Employees and their dependents and beneficiaries (each a "Seller Benefit Plan"), Seller has timely made or caused to be made all contributions, payments, reimbursements and accruals required under the terms thereof. **Schedule 12.1.3 sets forth a list of each Seller Benefit Plan.** Each Seller Benefit Plan has been funded, maintained and administered in accordance with its terms and applicable law. With respect to each Seller Benefit Plan, (i) no proceeding or claim (other than any routine claim for benefits in the ordinary course of business) is pending or threatened, (ii) no facts or circumstances exist that would reasonably be expected to give rise to any such proceeding or claim, and (iii) there is no pending or threatened audit by a governmental authority. With respect to the Hotel or any employees of the Hotel, no Seller Benefit Plan provides medical, health, life insurance or other welfare-type benefits to current or future retired or terminated employees or their dependents (except for limited continued medical benefit coverage required to be provided under Section 4980B of the Code or as required under applicable law for which the recipient pays the full premium cost). Each Seller Benefit Plan can be amended, terminated or otherwise discontinued at any time in accordance with its terms, without any material liability to Seller or Buyer.

12.1.14.     Liquor License. There are no pending violations or proceedings affecting the Hotel or the liquor license under which Seller is currently operating.  Seller is not currently on the "COD" (i.e. delinquent list) with the New York State Liquor Authority.

The representations and warranties of Seller to Buyer contained in this Section 12.1 hereof, as modified by the certificate referenced in Section 7.8, shall survive the Closing and the delivery of the Deed for a period of ten (10) days following the Closing. Seller shall indemnify Buyer for a breach of these representations and warranties, with such indemnification period to survive for a period of 10 days after Closing, unless an indemnity claim is made hereunder, in which case it will survive until resolution.

It is expressly agreed that Seller is not making any representations or warranties with respect to the Intellectual Property and any rights or ownership with respect thereto.

12.2.    Buyer's Representations and Warranties. As a material inducement to Seller's decision to enter into this Agreement, Buyer represents and warrants to Seller the following, which shall be true and correct on the Effective Date and on the Closing Date:

12.2.1. Due Authorization. The execution, delivery and performance of this Agreement by Buyer have been duly authorized by the requisite action on the part of Buyer, and no other authorization or consent is required therefor.

12.2.2. Violation of Agreements. To Buyer's knowledge, neither this Agreement nor anything provided to be done hereunder, including but not limited to, the transfer, assumption and purchase of the Property, violates or shall violate any contract, agreement or instrument to which Buyer is a party.

12.2.3. Intentionally Omitted.

12.2.4. Financial. Buyer will have at Closing, sufficient liquid assets available to complete the purchase of the Property in accordance with the terms of this Agreement. To Buyer's knowledge, there are no judgments, orders, or decrees of any kind against Buyer unpaid or unsatisfied of record, nor any actions, suits, or other legal or administrative proceedings pending or, to the best of Buyer's knowledge, threatened against Buyer, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Buyer or the ability of Buyer to consummate the transactions contemplated by this Agreement.

12.3.    Schedules. Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not be effective until Buyer has received all of the Schedules to be attached hereto and the same have been approved by Buyer. Buyer shall respond with approval or any comments to such schedules within (2) business days of receipt. Seller shall provide Buyer with drafts of all schedules within five (5) business days following the execution and delivery of this Agreement to Seller.

13.    Further Assurances; Development Cooperation. Seller will, whenever and as often as it shall be requested to do so by Buyer, and Buyer will, whenever and as often as it shall be requested to do so by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further conveyances, assignments, confirmations, satisfactions, releases, instruments of further assurance, approvals, consents, and any and all such further instruments and documents as may be reasonably necessary, expedient or proper in order to complete any and all conveyances, transfers, sales and assignments herein provided, and to do any and all other acts and to execute, acknowledge and deliver any and all documents as so reasonably

requested in order to carry out the intent and purpose of this Agreement, provided that such shall not increase Seller's or Buyer's respective obligations or liability or decrease their respective rights hereunder or thereunder. From and after the Effective Date, Seller shall not, without the Buyer's prior written consent, increase or decrease the number of employees providing services to the Hotel or materially increase or decrease the compensation of any Employee providing services to the Property except in the ordinary course of business. From and after the Effective Date, Seller shall not enter into any collective bargaining agreement or other agreement with any union or labor organization with respect to the Hotel without Buyer prior written consent, which consent may be withheld in Buyer's sole discretion. From the Effective Date until the Closing or earlier termination of this Agreement, the parties agree to reasonably cooperate and also to consult on a regular basis and coordinate their activities relating to Employee matters so as to facilitate a smooth transition of operations and the continued proper performance by the Employees of their respective duties up to Closing. Seller shall promptly deliver to Buyer copies of any written materials delivered or received relating to any claims by current or former Employees, or any labor organization seeking to represent any Employees and Seller shall keep Buyer substantially informed with respect to the status of any discussions or communications with any union or labor organization and/or the National Labor Relations Board with respect to the Hotel.

14.   <u>Employees and Employee Benefits</u>

14.1.   <u>Offers of Employment</u>. On the Effective Date, and, if applicable, as updated no later than three (3) business days prior to the Closing Date, Seller shall deliver to Buyer a schedule that reflects the following:  (i) the names of all employees of the Hotel (the "**Employees**") as of the Closing Date; and (ii) their address, date of hire, positions and rates of pay.  Buyer covenants and agrees that, on the Closing Date, Buyer shall offer to hire a sufficient number of Employees (such employees that accept employment with Buyer, collectively, "**Transferred Employees**") so that obligations under the Worker Adjustment and Retraining Notification Act and/or the New York State Worker Adjustment and Retraining Notification Act (collectively, "**WARN**") and any comparable New York State legislation are not triggered as a result of the sale. Buyer shall recognize service by Transferred Employees with Seller for purposes of eligibility to participate and vesting under any employee plans in which a Transferred Employee becomes eligible to participate after the Closing Date; provided, however, that, in no event shall any Transferred Employees be entitled to any credit to the extent that it would result in duplication of benefits with respect to the same period of service.

14.2.   <u>Employee Liabilities</u>. Effective as of the Closing Date, Buyer shall be responsible for all compensation, benefits and taxes arising from employment, including, without limitation, wages, vacation, bonuses, holiday pay, FICA contributions, workers' compensation premiums, payroll taxes, unemployment compensation, and social security (collectively, "**Employee Liabilities**") that relate to Transferred Employees and that arise or accrue on or after the Closing Date.  Seller shall remain responsible for all Employee Liabilities which arise or accrue prior to the Closing Date, except as provided with respect to the PTO Amount in the immediately succeeding sentence. Buyer agrees to assume as part of the purchase and be responsible for all accrued and unused vacation, holiday time, sick time and other paid time off owing to all Transferred Employees under Seller's employment policies as of the Closing Date (collectively, "**PTO Amount**"); provided that, no later than three (3) business days prior to the Closing, Seller shall provide a schedule showing the PTO Amount by Transferred Employee as of the Closing Date and shall pay to Buyer  any

portion of the PTO Amount in excess of $150,000 (the "**Excess PTO Amount**") accrued as of the Closing with Buyer receiving a credit against the Purchase Price equal to the Excess PTO Amount. The PTO Amount shall include any applicable payroll taxes or other ancillary payroll costs arising from or related to the PTO Amount, and the payment of such payroll taxes shall be the sole responsibility of Buyer when and if such payroll taxes become due. Ninety (90) days after the Closing, Buyer and Seller shall review the exact amount of the PTO Amount that Buyer has assumed and will finalize the sum that was taken by Buyer as a credit at Closing by either an increase or decrease to such credit depending on the exact PTO Amount accrued as of the Closing Date compared to the credit. Such amount shall be paid to the applicable party within ten (10) days of such calculation. Anything to the contrary in respect to the Transferred Employees, any PTO Amount to be credited to Buyer plus any PTO Amount to be paid by Seller to Buyer shall not exceed the PTO Amount that Seller would have paid to the Transferred Employees had Seller terminated the Transferred Employees as of the Closing Date.

14.3.   Employee Interviews. Upon advance reasonable notice to Seller and at such time as mutually acceptable between the Parties, Buyer shall have access to the Employees prior to the Closing Date for the purposes of interviewing and evaluating such employees, and for making offers and related matters; provided that Buyer does not materially interfere with ongoing operations. The interview of any employee shall not occur during the employee's working hours without Seller's consent, which consent will not be unreasonably withheld, conditioned or delayed. Buyer shall make it clear during interviews that it is not acting as an agent of Seller. Buyer shall be responsible for compliance with WARN and comparable New York State legislation with respect to events that occur after the Closing.  Seller shall cooperate in making available any notices that Buyer may desire to provide prior to the Closing in connection with actions by Buyer after the Closing that would result in a notice requirement under such Laws.

14.4.   Employment Terms; Employee Benefits. Each Transferred Employee shall cease to be an active participant in any Seller Benefit Plan in accordance with the terms of Seller's Benefit Plan. To the extent available, Seller shall be solely responsible for making available continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA") to all employees of Seller (and other "qualified beneficiaries" under COBRA with respect to such employees) who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to or in connection with the Closing.  Notwithstanding the preceding, nothing contained herein shall obligate Seller to continue to maintain any medical insurance plan previously provided or offered to Employees after the Closing and any continuing coverage under COBRA. Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any of the employees or Transferred Employees (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

14.5.   Seller and Buyer (on their own behalf and/or through their respective property managers) agree to cooperate reasonably with each other to the extent legally permissible in the defense of any claims, grievances, lawsuits or other charges brought by or on behalf of any current or former Employees. Such cooperation shall include providing: (i) workers' compensation claims processing; (ii) access to and copying of personnel records and other documents that either party has in its possession which related to any such claims, lawsuits or charges to the extent legally

permissible regardless of whether such materials are proprietary material (provided that, upon the request of the other party, such accessing party shall execute a customary form of non-disclosure agreement with respect to such access); and (iii) availability of employees of the aforementioned entities for such matters as interviews, depositions and to testify. No party shall have the duty to cooperate with the others if the dispute is between the parties themselves.

15.    Indemnification.

15.1.    Indemnity.  Buyer shall indemnify, defend and hold Seller and Seller Parties (as defined herein), harmless from all actual losses, out-of-pocket costs, expenses (including, without limitation, reasonable attorneys' fees, costs and expenses), liabilities, damages (excluding punitive, special or consequential damages), claims, causes of action and other obligations whatsoever arising out of, resulting from, or related in any manner to:  (i) claims of mechanics and materialmen based on work performed on or contracted for the Land and/or Property by Buyer; (ii) Buyer's act or omission, including, without limitation, claims for personal injury, wrongful death, property damage or other tort claims against Seller Parties based on Buyer's act or omission and/or third party causes of action against Buyer arising subsequent to the Effective Date to the extent same result from Buyer's activities; and (iii) Buyer's breach of any covenants of Buyer contained in this Agreement which survive the Closing; except to the extent any of the same arises from the gross negligence or willful misconduct of Seller or as a result of a breach of this Agreement by Seller.

15.2.    Indemnification Procedure.  If any of the Seller Parties (the "Indemnitee") is entitled to defense or indemnification under this Article 15 or any other express provision in this Agreement (each, an "Indemnification Claim"), Buyer shall not be obligated to indemnify and hold harmless such Indemnitee unless and until such Indemnitee provides written notice to Buyer promptly after such Indemnitee has actual knowledge of any facts or circumstances on which such Indemnification Claim is based (the "Third-Party Claim"), describing in reasonable detail such facts and circumstances and including copies of all notices and documents (including court papers) received by the Indemnitee in connection therewith.  Buyer shall have the right (but not the obligation) to assume the defense of a Third-Party Claim, at its cost and expense, and shall use good faith efforts consistent with prudent business judgment to defend a Third-Party Claim, provided that (i) the counsel for Buyer who shall conduct the defense of the Third-Party Claim shall be reasonably satisfactory to the Indemnitee (unless selected by Buyer's insurance company), (ii) the Indemnitee, at its cost and expense, may participate in, but shall not control, the defense of the Third-Party Claim, and (iii) without Indemnitee's consent, Buyer shall not enter into any settlement or other agreement which requires any performance by the Indemnitee, other than the payment of money to be paid by Buyer.  If Buyer has assumed the defense of the Third-Party Claim as set forth above, the Indemnitee shall not enter into any settlement agreement with respect to the Third-Party Claim, without Buyer's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  If Indemnitee elects, Indemnitee shall have the right to retain the defense of the Third-Party Claim at Buyer's expense, and may defend and/or settle the Third-Party Claim as it deems reasonably appropriate.

16.    Damage, Destruction or Condemnation.

16.1.   Risk of Loss.  Until the Closing, the risk of loss by fire or other casualty to the Property, and liability for personal injury or damage to property of others at the Property, shall be borne by Seller, except as expressly provided for herein.  If prior to Closing the Property is damaged by fire or other casualty, Seller shall estimate the cost to repair and the time required to complete repairs and will provide Buyer written notice of Seller's estimation (the "Casualty Notice") within twenty (20) days after the occurrence of the casualty.

16.2.   Material Damage.  In the event of any Material Damage to or destruction of the Property or any portion thereof prior to Closing, Buyer may, at its option, terminate this Agreement by giving notice to Seller on or before the expiration of fifteen (15) days after the date Seller delivers the Casualty Notice to Buyer (and, if necessary, the Closing Date shall be extended to give Buyer the fifteen-day period to give such notice).  Upon any such termination, the Earnest Money shall be returned to Buyer promptly and the parties hereto shall have no further rights or obligations hereunder, other than those that by their terms survive the termination of this Agreement.  If Buyer does not terminate this Agreement within said fifteen (15) day period or if such liability or damage does not give rise to Buyer's right to terminate, then the parties shall proceed under this Agreement and close on schedule (subject to extension of Closing as provided above), and as of Closing Seller shall, at Buyer's election, credit Buyer with the applicable deductible or retention and pay over (to the extent already received by Seller and not used to repair the casualty)  or assign to Buyer, without representation or warranty by or recourse against Seller, all of Seller's rights in and to any resulting insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction (provided that if such proceeds are not assignable, then Seller shall pay such proceeds to Buyer when received by Seller), and Buyer shall assume full responsibility for all needed repairs.  For the purposes of this Agreement, "Material Damage" or "Materially Damaged" means damage which exceeds $1,000,000 to repair.

16.3.   No Material Damage.  If the Property is not Materially Damaged, then neither Buyer nor Seller shall have the right to terminate this Agreement, and Seller shall, at its option, either (i) repair the damage before the Closing in a manner reasonably satisfactory to Buyer, or (ii) credit Buyer at Closing for the reasonable cost to complete the repair and the amount of rent to be abated under the Leases and the insurance proceeds in accordance with Section 16.2 hereof.

16.4.   Condemnation.  If proceedings in eminent domain are threatened (in writing by the condemning authority) or instituted with respect to the Property or any portion thereof, Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  If the Property is subject to a Major Condemnation, Buyer may, at its option, by notice to Seller given within fifteen (15) days after Seller notifies Buyer of such proceedings (and if necessary the Closing Date shall be automatically extended to give Buyer the fifteen-day period to make such election), either: (i) terminate this Agreement, in which case the Earnest Money shall be promptly returned to Buyer and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Buyer its entire right, title and interest in and to any condemnation award, and Buyer shall have the sole right after the Closing, and pay over such award (to the extent already received by Seller), to negotiate and otherwise deal with the condemning authority in respect of such matter.  If Buyer does not give Seller written notice of its election within the time required above, or if the condemnation is not a Major Condemnation, then

Buyer shall be deemed to have elected option (ii) above. For purposes of this Agreement, "Major Condemnation" means any condemnation or eminent domain proceedings that occurs after the Effective Date, if and only if, in Buyer's reasonable estimation, the portion of the Property that is the subject of such proceedings has a value in excess of $1,000,000, as determined by the demand or pleading of the condemning authority.

16.5. The provisions of this Section 16 constitute an express agreement superseding any provisions of law to the contrary, including, without limitation, the provisions of Section 5-1311 of the General Obligation Law of the State of New York.

17.   Buyer Default; Liquidated Damages. BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT, WITH THE FLUCTUATION IN LAND VALUES, THE UNPREDICTABLE STATE OF THE ECONOMY AND OF GOVERNMENT REGULATIONS, THE FLUCTUATING MONEY MARKET FOR REAL ESTATE LOANS OF ALL TYPES, AND OTHER FACTORS THAT DIRECTLY AFFECT THE VALUE AND MARKETABILITY OF THE PROPERTY, IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN WITH ANY DEGREE OF CERTAINTY THE AMOUNT OF DAMAGES THAT WOULD BE SUFFERED BY SELLER IN THE EVENT OF THE FAILURE OF THE TRANSACTION WHICH IS THE SUBJECT OF THIS AGREEMENT TO CLOSE AS A RESULT OF BUYER'S DEFAULT IN ITS OBLIGATION UNDER THIS AGREEMENT TO PURCHASE THE PROPERTY.   THE PARTIES, HAVING MADE DILIGENT BUT UNSUCCESSFUL ATTEMPTS TO ASCERTAIN THE ACTUAL COMPENSATORY DAMAGES SELLER WOULD SUFFER IN THE EVENT OF BUYER'S DEFAULT OF ITS OBLIGATION HEREUNDER TO PURCHASE THE PROPERTY, HEREBY AGREE THAT (A) THE REASONABLE ESTIMATE OF SAID DAMAGES IS EQUAL TO THE EARNEST MONEY, AND (B) IN THE EVENT THAT ALL OF THE CONDITIONS TO BUYER'S OBLIGATIONS CONTAINED IN THIS AGREEMENT HAVE BEEN SATISFIED OR WAIVED, IF BUYER DEFAULTS IN ITS OBLIGATION UNDER THIS AGREEMENT TO PURCHASE THE PROPERTY AND FAILS TO CURE THE SAME WITHIN A PERIOD OF FIFTEEN (15) BUSINESS DAYS AFTER WRITTEN NOTICE FROM SELLER, SELLER SHALL, AS ITS SOLE AND EXCLUSIVE REMEDY, BE ENTITLED TO TERMINATE THIS AGREEMENT AND RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES. SUCH AMOUNT HAS BEEN DETERMINED WITH REFERENCE BY THE PARTIES TO THE ABOVE CONSIDERATIONS IN ESTABLISHING A REASONABLE SUM AS LIQUIDATED DAMAGES. THE FOREGOING CONTAINED IN THIS ARTICLE 17 DOES NOT LIMIT BUYER'S LIABILITY UNDER ANY INDEMNITY OR OTHER PROVISION OF THIS AGREEMENT THAT BY ITS TERMS SURVIVES A TERMINATION OF THIS AGREEMENT OR IS TO BE PERFORMED AFTER THE CLOSING.

Initials: _____      _____
　　　　　　　　　Seller　　　　　　　　Buyer

18.   Seller's Breach. In the event Seller materially breaches any representation, warranty or covenant under this Agreement for a period of ten (10) days after written notice from Buyer (collectively a "**Default**"), and the closing under this Agreement fails to occur because of such

Default, Buyer may elect to: (a) if applicable, sue for specific performance, or (b) terminate this Agreement and its obligation to purchase the Property by giving Seller written notice describing Seller's Default and setting forth Buyer's election to immediately terminate its obligation to purchase the Property and cancel the transaction contemplated by this Agreement upon which the Earnest Money shall be refunded to Buyer and Buyer shall be reimbursed for the Title Fees and other reasonable documented out-of-pocket costs and expenses incurred in the transactions contemplated by this Agreement, not to exceed $100,000.00 in the aggregate. The foregoing contained in this Article 18 does not limit Seller's liability under Article 19 of this Agreement.

19.    Broker.  Buyer and Seller each acknowledge that A&G Real Estate Partners ("**A&G**") and Eastdil Secured, LLC ("**Eastdil**", and together with A&G, the "**Co-Brokers**") have been engaged in connection with the transactions contemplated by this Agreement. In the event of any claim for broker's, consultant's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement by any party other than Co-Brokers, then Buyer shall indemnify, save harmless and defend Seller from and against such claim if it shall be based upon any statement, representation or agreement made by Buyer, and Seller shall indemnify, save harmless and defend Buyer from and against such claim if it shall be based upon any statement, representation or agreement made by Seller.  Seller shall pay Co-Brokers pursuant to a separately negotiated agreement.  The provisions of this Article 19 shall survive the Closing.

20.    Notices.  Any notice, request, demand, instruction or other document (each of which is herein called a "**Notice**") to be given hereunder to any Party shall be in writing and shall be delivered to the person at the appropriate address set forth below by personal service (including courier service), by electronic mail, by certified mail, postage prepaid, return receipt requested, or by overnight delivery by a nationally-recognized overnight courier, as follows:

> If to Seller, to:

>> Stephen S. Gray
>> Gray & Company LLC
>> 207 Union Wharf
>> Boston, MA 02109
>> Email: ssg@grayandcompanyllc.com

> With a copy to:

>> Garfunkel Wild, P.C.
>> 111 Great Neck Road, Suite 600
>> Great Neck, NY 11021
>> Attention: Burton S. Weston, Esq.
>> Email: bweston@garfunkelwild.com

> And:

>> Togut, Togut & Segal LLP
>> One Pennsylvania Plaza
>> Suite 3335

New York, NY 10119
Attention: Frank Oswald
Email: frankoswald@teamtogut.com

If to Buyer, to:

Quadrum Development Corp.
c/o Quadrum Global
261 Fifth Avenue, Suite 1802
New York, New York 10016
Attention: Anoop Rustgi
Jared White, Esq
Email: arustgi@quadrumglobal.com
jwhite@quadrumglobal.com

With a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Attention: Adam Feimer, Esq.
Email: adam.feimer@haynesboone.com

If to Escrow Holder, to:
Lincoln Land Services, LLC
422 Conklin Street
Farmingdale, NY 11735
Attention: Susan Donofrio
Email: sdonofrio@lincolnlandservices.com

Notices so submitted shall be deemed to have been given (i) on the date personally served, if by personal service, (ii) on the date a delivery receipt is obtained, if sent before 5:00 pm New York time on a business day, or otherwise on the next business day, by electronic mail, (iii) on the third business day after deposit in any such post office box, or (iv) the next business day to the extent delivered by overnight delivery by a nationally-recognized overnight courier. The addresses for the purpose of this Article 20, may be changed by giving written notice of such change in the manner herein provided for giving notice. Unless and until such written Notice of change is received, the last address and addressee stated by written Notice, or provided herein if no such written Notice of change has been received, shall be deemed to continue in effect for all purposes hereunder. Each Party agrees that the attorney for such party shall have the authority to deliver notices on such Party's behalf to the other party hereto.

21.    Expense Reimbursement; Additional Termination Rights

21.1.    Competing Transaction.

21.1.1. This Agreement is subject to approval by the Bankruptcy Court and Seller has selected and will recommend for approval to the Bankruptcy Court this Agreement as reflecting the highest or otherwise best offer for the purchase of the Property (the "**Successful Bid**") and shall ask the Bankruptcy Court to enter an order approving the same, which order shall approve this Agreement and all of the terms and conditions hereof and approve and authorize Seller to consummate the transactions contemplated hereby, and such order shall be substantially in the form of the sale order (the "**Sale Order**") attached hereto as **Exhibit "G"**, which shall approve of and authorize Seller to consummate the transactions contemplated hereby under Section 363 of the Bankruptcy Code in the event the chapter 11 reorganization plan is not confirmed March 31, 2023.

21.1.2. Seller is permitted to cause its representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Buyer and its representatives) in connection with any sale or other disposition of all or any part of the Property. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Property to prospective purchasers.

21.2.    Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file as part of its disclosure statements and the Bankruptcy Case and seek the approval of the Bankruptcy Court for the transactions contemplated hereby. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

21.3.    Notice of Sale.  Notice of the sale of the Property contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

21.4.    If this Agreement is terminated in accordance with this Agreement, then from and after such termination neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Buyer shall receive a return of the Earnest Money upon such termination.

21.5.    The terms of this Article 21 shall survive the termination of this Agreement.

22.    Miscellaneous Provisions.

22.1.    No Waiver.  The waiver by one Party of the performance of any covenant, condition or promise shall not invalidate this Agreement nor shall it be considered a waiver by such Party of any other covenant, condition or promise hereunder. The waiver by either or both Parties of the time for performing any act shall not constitute a waiver of the time for performing any other act or identical act required to be performed at a later time. The exercise of any remedy provided by

law and the provisions of this Agreement for any remedy shall not exclude other consistent remedies unless they are expressly excluded.

22.2.  Construction.  As used in this Agreement, the masculine, feminine or neuter gender and the singular or plural numbers shall each be deemed to include the other whenever the context indicates.  This Agreement shall be construed as a whole and in accordance with its fair meaning, the captions being for convenience only and not intended to fully describe or define the provisions in the portions of the Agreement to which they pertain. Each Party hereto, and counsel for each Party hereto, has reviewed and revised this Agreement, and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation or construction of this Agreement. This document shall, in all respects, be governed by the laws of the State of New York applicable to agreements executed and to be wholly performed within the State of New York. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the Parties have no legal right to contract, the latter shall prevail but the provision of this document that is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

22.3.  Merger/AS IS, WHERE IS.  All understandings and agreements heretofore had between the parties hereto are merged in this Agreement, which alone fully and completely expresses their understanding and agreement.  Except as otherwise provided in this Agreement, this Agreement is entered into after full investigation, neither party relying upon any statement or representation, not embodied in this Agreement, made by the other.

Buyer acknowledges and agrees that Seller shall convey to Buyer and Buyer shall accept the Property **"AS IS, WHERE IS, WITH ALL FAULTS"** and there are no oral agreements, warranties or representations, collateral to or affecting the Property by Seller or any third party. Except as expressly stated in this Agreement, Buyer has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto made or furnished by Seller or any real estate broker or agent representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing, unless specifically set forth in this Agreement.

Buyer confirms to the Seller that Buyer, acting directly or through its qualified representatives, will conduct such investigations of the Property, including but not limited to, the physical and environmental conditions and land use characteristics thereof and its suitability for Buyer's intended use thereof, as Buyer deems reasonably necessary or desirable and when it has reached a favorable conclusion as to the condition of the Property and the existence or nonexistence with respect to any Hazardous Materials, and will rely solely upon such investigations, with which it shall be satisfied fully and in all respects and not upon any information, if any, provided by or on behalf of Seller or its agents or employees with respect thereto. Except as expressly stated in this Agreement, Buyer agrees that upon closing, Buyer shall assume the risk that adverse matters, including but not limited to, construction defects, title and adverse physical and environmental conditions, may not have been revealed by Buyer's investigations or that of its representatives, and that Buyer, upon closing, shall be deemed to have

waived, relinquished and released Seller and Seller Parties from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of laws and any and all other acts, omissions, events, circumstances or matters regarding the Property. Buyer further acknowledges that it has satisfied itself, after consultation with counsel as to the nature and state of title of the Property it will obtain from Seller and is satisfied with such title. Moreover, Buyer has reached a satisfactory determination as to value of the Property.

**WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER, WITH RESPECT TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY OR ANY WARRANTY AS TO MATTERS OF TITLE, ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITION (INCLUDING, WITHOUT LIMITATION, LAWS, RULES, REGULATIONS, ORDERS AND REQUIREMENTS PERTAINING TO THE USE, HANDLING, GENERATION, TREATMENT, STORAGE OR DISPOSAL OF ANY TOXIC OR HAZARDOUS WASTE OR TOXIC, HAZARDOUS OR REGULATED SUBSTANCE), VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. IN ADDITION, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE INTANGIBLE PROPERTY AND ANY RIGHTS OR OWNERSHIP WITH RESPECT THERETO.**

THE TERMS AND CONDITIONS OF THIS SECTION 22.3 SHALL EXPRESSLY SURVIVE THE CONSUMMATION OF THE PURCHASE AND SALE OF THE PROPERTY ON THE CLOSING DATE, THE DELIVERY OF THE DEED AND THE PAYMENT OF THE PURCHASE PRICE, WITHOUT REGARD TO ANY LIMITATIONS UPON SURVIVAL SET FORTH IN THIS AGREEMENT.

22.4.   _Amendments_. No change in or addition to this Agreement or any part hereof shall be valid unless in writing and signed by or on behalf of Seller and Buyer.

22.5.   _Counterparts_. This Agreement may be executed in any number of counterparts. Each such counterpart hereof shall be deemed to be an original instrument but all such counterparts together shall constitute but one agreement. Execution of counterparts of this Agreement may be by electronic mail transmission. Executed counterparts of this Agreement bearing only the electronic mail signatures of the Parties' duly authorized representatives shall be effective and binding on such Parties as though they bore original signatures.

22.6.   _Computation of Periods_. All periods of time referred to in this Agreement shall include all Saturdays, Sundays and State or National holidays, unless the period of time specifies "**business**

days", in which case such period of time shall exclude Saturdays, Sundays and State and National holidays; provided that if the date or last date to perform any act or give any notice with respect to this Agreement shall fall on a Saturday, Sunday or State or National holiday, such act or notice may be timely performed or given on the next succeeding day that is not a Saturday, Sunday or State or National holiday. For purposes of this Agreement, the phrase "**State and National holiday**" shall refer to any day in which the Title Company, banks and/or the Office of the County Recorder for the County for the Property is/are closed for business.

22.7. <u>INDEPENDENT COUNSEL</u>. EACH PARTY TO THIS AGREEMENT ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH AND BE REPRESENTED BY INDEPENDENT COUNSEL OF SUCH PARTIES' CHOICE IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT. EACH PARTY FURTHER ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR STATEMENT MADE BY ANY OF THE ATTORNEYS AND REPRESENTATIVES OF THE OTHER PARTY WITH REGARD TO THE SUBJECT MATTER, BASIS, OR EFFECT OF THIS AGREEMENT.

22.8. <u>Assignment by Buyer</u>. Buyer shall have the sole and absolute discretion to assign this Agreement and any of its rights, duties or obligations hereunder without the prior written consent of Seller; <u>provided, however</u>, that Buyer shall provide written notice of such assignment to Seller not later than ten (10) business days following the effectiveness of any such assignment. Upon an assignment by Buyer, such assignee shall assume all of the original Buyer's rights, duties and obligations hereunder, all references in this Agreement to "Buyer" shall refer to such assignee and the original Buyer shall thereupon be released from any and all liability under this Agreement and shall have no further rights under this Agreement.

22.9. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Seller and Buyer.

22.10. <u>No Obligation to Third Parties</u>. Except as expressly set forth in this Agreement, the execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate either of the Parties hereto, to any person or entity other than each other.

22.11. <u>No Partnership</u>. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest.

22.12. <u>JURY WAIVER</u>. **BUYER AND SELLER EACH WAIVES THE RIGHT TO A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT, OR THE PROPERTY, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. BUYER AND SELLER EACH ACKNOWLEDGE THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.**

22.13. <u>Confidentiality</u>. Buyer and Seller agree to keep in strict confidence all terms and conditions of the transactions that are the subject of this Agreement ("**Transactions**") and the contents of the Due Diligence Items delivered by Seller to Buyer and all information obtained by Buyer through its inspections of the Property (including, without limitation, financial matters such as but not limited to costs, expenses and income of the Property and/or other matters obtained by Buyer

pertaining to Seller) ("**Transaction Materials**"); provided, however, that Buyer and Seller shall be permitted to disclose the terms and conditions of the Transactions and the contents of the Transaction Materials to their respective members, managers, employees, contractors, agents, attorneys, accountants, consultants, permitted assignees, brokers, potential investors, investors, potential lenders and lenders in the event that such disclosure is reasonably necessary in connection with the consummation of the Transactions, provided that Buyer or Seller (as applicable) advises such members, managers, employees, contractors, agents, attorneys, accountants, consultants, permitted assignees, brokers, potential investors, investors, potential lenders and lenders that such terms and conditions and Transaction Materials are confidential and shall not be disclosed to any other person or entity; and provided further, however, that Seller and Buyer may disclose the existence of this Agreement (but not the terms or conditions hereof or thereof) to applicable governmental agencies or entities in the event that, with respect to Buyer, such disclosure is reasonably necessary in connection with the performance of Buyer's due diligence investigations with respect to the Property as permitted under the Agreement, and in the event that, with respect to Seller and Buyer, such disclosure is reasonably necessary in connection with consummation of the Transactions; and provided further, however, that Seller and Buyer may disclose the terms and conditions of this Agreement and the contents of the Transaction Materials as may be required in response to a subpoena or other court process or as otherwise required by law or regulatory requirement or to the extent such information is otherwise publicly available, disclosed by persons other than Borrower. Buyer's and Seller's confidentiality obligations under this Agreement shall survive the termination of this Agreement in the event that the closing of the Transactions does not occur in accordance with this Agreement. Notwithstanding the foregoing, Buyer and Seller agree that this Agreement, and all the terms hereof and diligence provided in connection herewith, may be (a) disclosed to Seller's secured lender, Benefit Street Partners Realty Operating Partnership, L.P., and (b) filed of record in the Bankruptcy Case if and to the extent necessary to obtain the Sale Order approving this Agreement and the transactions contemplated hereby or otherwise required to be disclosed in connection with the Bankruptcy Case Notwithstanding anything contained herein to the contrary, without disclosing the terms hereof, Buyer may inform its vendors and potential customers that Buyer is under contract to acquire the Property.

22.14. Bankruptcy Court Approval. The obligation of Seller and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the issuance and entry by the Bankruptcy Court of one or more orders providing for, inter alia, (a) approval of the transactions contemplated by this Agreement, including, but not limited to, the sale of the Property to the Buyer, with such sale to be free and clear of any and all liens, claims and encumbrances, subject only to the Permitted Exceptions, in accordance with sections 363(b) and (f) of the Bankruptcy Code (collectively, "**Bankruptcy Court Approval**"). In the event that Bankruptcy Court Approval cannot be obtained, this Agreement shall be automatically deemed terminated, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, the Earnest Money will be returned to Buyer and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement.

22.15. Tax-Free Exchange. Buyer may, at its sole cost and expense, consummate the transaction as part of a like-kind exchange (the "**Exchange**") pursuant to Section 1031 of the Code, provided that: (i) the Exchange is effected through a qualified intermediary (as defined in Treas. Reg. Section 1.1031(k)-1(g)(4)(iii)) and Buyer is not be required to: (A) acquire or hold title to any real property other than the Property; or (B) incur any costs to third parties (other than such party's

obligation under this Agreement for the benefit of the qualified intermediary) for purposes of consummating, or otherwise in connection with, the Exchange.  Seller shall reasonably cooperate with the other, at Buyer's cost and expense, to effectuate the Exchange, including the execution of a trust or escrow agreement or any other document or instrument customarily entered into with a qualified intermediary to effectuate the Exchange, provided that the Exchange and the related documentation shall not be contrary to or inconsistent with the terms of this Agreement, Seller shall not be obligated to incur any liability, cost or expense in connection with any such Exchange and the Closing Date shall be not delayed due to such Exchange.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

SELLER:

_____

Stephen S. Gray, Solely as Trustee

_____

By:_____
Name:_____
Its:_____

[Signature Page to Purchase and Sale Agreement]

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER:**

_____

Stephen S. Gray, Solely as Trustee

**BUYER:**

**QUADRUM DEVELOPMENT CORP.,**
a Delaware corporation

By: _____
Name:  ANOOP RUJBI
Its:  MANAGING DIRECTOR

By: _____
Name:  JARED WHITE
Its:  MANAGING DIRECTOR

**[Signature Page to Purchase and Sale Agreement]**

## EXHIBIT "A"

## DESCRIPTION OF LAND

ALL that certain plot, piece, or parcel of land, situate, lying, and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Wythe Avenue, distant 25 feet northerly from the corner formed by the intersection of the westerly side of Wythe Avenue with the northerly side of North 10th Street;

RUNNING THENCE northerly along the westerly side of Wythe Avenue, 100 feet 3 inches;

THENCE westerly parallel with North 10th Street, 75 feet;

THENCE southerly parallel with Wythe Avenue, 25 feet 3 inches;

THENCE westerly parallel with North 10th Street, 150 feet;

THENCE southerly parallel with Wythe Avenue, 100 feet to the northerly side of North 10th Street;

THENCE easterly along the northerly side of North 10th Street, 125 feet;

THENCE northerly parallel with Wythe Avenue, 25 feet;

THENCE easterly parallel with North 10th Street, 100 feet to the westerly side of Wythe Avenue, the point or place of BEGINNING.

## EXHIBIT "B"

## DEED

**THIS INDENTURE**, made the ____ day of _____, 2023, between **STEPHEN S. GRAY, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE OF THE ESTATE OF 96 WYTHE ACQUISITION LLC,** as debtor pursuant to a Chapter 11 Case (the "Case") filed in the United States Bankruptcy Court for the Southern District of New York on February 23, 2021 Case No. 21-22108 (SHL), a Delaware corporation, with offices c/o Gray & Company, LLC, 207 Union Wharf, Boston, Massachusetts 02109 party of the first part, and [_____], a _____, with offices at c/o Quadrum Global, 261 Fifth Avenue, Suite 1802, New York, New York 10016, party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL THE CERTAIN PLOT OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF**

**BEING** and intended to be the same premises conveyed to 96 Wythe Acquisition LLC by deed recorded in the Office of the City Registrar of Kings County on July 16, 2012 as CRFN 2012000276594.

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** this conveyance is made pursuant to the Bankruptcy Order dated _____, 2023, Case No. 21-22108 (SHL), titled United States Bankruptcy Court of the Southern District of New York In Re: 96 Wythe Acquisition LLC, Debtor.  Order pursuant to Sections 105(a), 363(b), 365 and 1146(c) of the Bankruptcy Code approving the sale of 96 Wythe Avenue, Brooklyn, New York, a copy of which is attached hereto as Schedule B.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed as of the day and year first above written.

**STEPHEN S. GRAY, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE OF THE ESTATE OF 96 WYTHE ACQUISITION LLC**

By: _____

      Name:

      Title:

STATE OF NEW YORK   )
                      ) ss:
COUNTY OF NEW YORK )

On the ____ day of _____, 2023, before me, the undersigned, a Notary Public in and for said state, personally appeared Stephen S. Gray, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

## SCHEDULE A

### LAND

ALL that certain plot, piece, or parcel of land, situate, lying, and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Wythe Avenue, distant 25 feet northerly from the corner formed by the intersection of the westerly side of Wythe Avenue with the northerly side of North 10th Street;

RUNNING THENCE northerly along the westerly side of Wythe Avenue, 100 feet 3 inches;

THENCE westerly parallel with North 10th Street, 75 feet;

THENCE southerly parallel with Wythe Avenue, 25 feet 3 inches;

THENCE westerly parallel with North 10th Street, 150 feet;

THENCE southerly parallel with Wythe Avenue, 100 feet to the northerly side of North 10th Street;

THENCE easterly along the northerly side of North 10th Street, 125 feet;

THENCE northerly parallel with Wythe Avenue, 25 feet;

THENCE easterly parallel with North 10th Street, 100 feet to the westerly side of Wythe Avenue, the point or place of BEGINNING.