**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Co-Counsel for Benefit Street Partners Realty*
*Operating Partnership, L.P.*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443
*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

96 WYTHE ACQUISITION, LLC,                Chapter 11

        Debtor.                Case No.: 21-22108 (SHL)

------------------------------------------------------------x

**BENEFIT STREET PARTNERS REALTY OPERATING PARTNERSHIP, L.P.'S**
**JOINDER TO CHAPTER 11 TRUSTEE'S OBJECTION TO PROOF OF CLAIM NO. 39**
**FILED BY CONSTANTINO SAGONAS**

Benefit Street Partners Realty Operating Partnership, L.P. ("Benefit Street") hereby files

this joinder (the "Joinder") to the *Objection to Proof of Claim No. 39 Filed by Constantino Sagonas*

[ECF No. 916] (the "Objection") filed by Stephen S. Gray in his capacity as the Chapter 11 Trustee

(the "Trustee") in the above-captioned case (the "Bankruptcy Case") filed by the Debtor on February 23, 2021 (the "Petition Date").

## Introduction

During his tenure as a temporary receiver over the Hotel during the pendency of Benefit Street's prepetition foreclosure action, Constantino Sagonas (the "Receiver")—who was hand-picked by the Debtor's insiders, Toby Moskovits and Michael Lichtenstein (the "Insiders")—ultimately cost the estate at least $5.8 million by ignoring his duties to take control of the Hotel's revenue and expenditures and ensure the payment of senior and necessary expenses such as real estate taxes. The Receiver never acted in the interests of the Debtor or Hotel; instead, his priority all along was to further the interests of the Insiders over his fiduciary duties to the court. He left the Insiders in control over the Hotel's cash flows and payables with little to no supervision, resulting in substantial misapplication and conversion of funds during his tenure. At the same time, the Receiver failed to ensure basic payments of property taxes, statutorily required payments accruing interest and penalties at high rates and secured by a senior statutory lien, while approving highly inappropriate payments discussed below upon practically no diligence, resulting in substantial harm to the estate. The Receiver accepted payment from the Insiders in excess of what was disclosed to and approved by the Supreme Court. Indeed, for these reasons and others, the Debtor's estate holds millions of dollars in claims against the Receiver.

The Receiver is only entitled to compensation as an administrative priority to the extent his services directly benefited the estate. If the Receiver had taken possession over the Hotel's revenues, as he was required to do, and blocked the ongoing theft of funds by the Insiders, then the Receiver may have provided value to the Debtor warranting compensation. Indeed, if the Receiver—again, the Insiders' hand-picked choice—had done his job and properly diligenced the

Hotel's revenues, he would have discovered the Insiders' substantial fraud and misconduct and been duty-bound to report them to the Supreme Court, very possibly avoiding this Bankruptcy Case and the tens of millions of dollars of harm to the estate that has accompanied it.

But the Receiver did none of these things. And instead, the estate was directly harmed by the Receiver's mismanagement. For this reason, the Trustee's Objection should be granted. Benefit Street, as the party with personal experience of the Receiver's malfeasance, files this Joinder to supplement the record with various facts pertinent to the Objection.

**Background**

Benefit Street is the Debtor's single largest creditor and its primary pre-petition secured creditor, by virtue of a loan made to the Debtor in the face principal amount of $68,000,000.00 (the "Loan") secured by first-priority liens and security interests in The Williamsburg Hotel, located at 96 Wythe Avenue, Brooklyn, New York 11249 (the "Hotel") and other assets described in the documents governing the Loan. The Debtor defaulted on the Loan, and on June 17, 2019, Benefit Street filed a lawsuit in the Supreme Court of the State of New York, County of New York (the "Supreme Court"), styled *Benefit Street Operating Partnership, L.P. v. 96 Wythe Acquisition LLC, et al.* (Index No. 653396/2019) (the "Foreclosure Action"). On Benefit Street's motion, the Supreme Court appointed the Receiver on February 21, 2020. *See* Exhibit "A", *Order Appointing a Receiver in a Non-residential Mortgage Foreclosure Action* ("Receivership Order").[1]

The Supreme Court allowed the Insiders to suggest a receiver before making its appointment. The Receiver was the Insiders' pick and recommendation. *See Affidavit of Toby Moskovits Providing Proposed Receiver Credentials*, Docket No. 29, Ex. I. The importance of this point cannot be understated: the Receiver, who permitted the Insiders to direct the Hotel's

---

[1] Exhibits cited herein are voluminous and are being filed as a separate appendix.

cash to be used for highly questionable purposes benefitting the Insiders throughout the receivership while at the same time failing to make necessary payments to tax authorities (all discussed in greater detail below), <u>was the Insiders' hand-picked selection</u>.  The Debtor did not benefit from the Receiver; the Insiders did.  Indeed, the Receiver was selected due to his relatively low price tag, which the Insiders endorsed, only to pay him more compensation than approved and disclosed to the Supreme Court during the state court case.

It is not the estate that owes the Receiver money; it is in fact the Receiver who owes the estate money, and those damages will range into the millions of dollars.  This Joinder provides facts supporting the following points:[2]

- The Receiver left the Insiders in control of use of the Hotel's cash flow by failing to appropriately monitor revenues and expenses, causing the loss of millions of dollars in value during his tenure;

- The Receiver harmed the estate by failing to pay real estate taxes during the Receivership, while authorizing other improper payments upon limited or no diligence; and,

- Fees for the Receiver's attorney should be denied because the Receiver has no allowable claim under Section 503(b)(3).

The Objection should be granted, and the Receiver's claim disallowed.

---

[2] The full extent of the Receiver's malfeasance exceeds the facts set forth in this Joinder.  However, Benefit Street has endeavored to cite to facts that are undisputed, of record and/or part of court rulings, and directly relevant to the Receiver's lack of benefit to the estate in order to avoid a protracted factual dispute.  Benefit Street submits that even the undisputed facts set forth herein are sufficient to grant the Trustee's Objection.  Benefit Street reserves the right to supplement the record with additional Receiver malfeasance as necessary or appropriate.

**Legal Standard**

A receiver's compensation is only entitled to administrative expense priority if the receiver conferred an actual and direct benefit to the estate. *See In re 29 Brooklyn Ave.*, 535 B.R. 36, 42 (Bankr. E.D.N.Y. 2015) (citing *In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 674 (5th Cir. 2009)). The Receiver shoulders the burden of proving entitlement to an administrative expense. *Id.* (quoting *In re S&Y Ents., LLC*, 480 B.R. 452, 462 (Bankr. E.D.N.Y. 2012) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) ("The burden of proof for 'entitlement to an administrative expense is on the claimant and the measure of proof is a preponderance of the evidence.'"))).

Not only did the Receiver's "services" not benefit the estate, his gross mismanagement of the Debtor's finances and dereliction of his assigned duties facilitated the theft perpetrated by the Insiders resulting in millions of dollars lost that the estate must now seek to recover, where possible, from the recipients of improper transfers, and years of additional litigation, gamesmanship and value loss to the estate. Moreover, while the Receiver was authorizing these improper payments without any due diligence, the Receiver neglected to pay tax claims, further subordinating and harming the estate and its creditors due to accrual of interest and penalties and diminution in available working capital. The Receiver deserves no compensation because he has failed to meet his *prima facie* burden of demonstrating benefit to the Debtor's estate, and when all is said and done the Receiver is likely to be found liable to the estate for his failure to properly take custody of Hotel revenues, facilitating millions of dollars' worth of misappropriation and misapplication of revenue on his watch.

**Factual Support for Joinder**

A.   **The Receiver left the Insiders in control of the Hotels' revenues and expenses, facilitating millions of dollars of loss in value during his tenure.**

One of the Receiver's core duties under the Receivership Order was to take control of the Hotel's revenue and use it only to pay ordinary and necessary operating expenses. *See* Receivership Order, Ex. A at p.4, 7-8. The Receiver justifies his failure to take control of Hotel revenue by hiding behind the Hotel's management company. But that argument is absurd, because, as the Receiver knew, the management company—just like the Hotel—*was under the control of the Insiders*. Indeed, throughout the receivership, the Receiver took requests and instruction from Jeremy Rauch—an employee of the Insiders and their management company—whom he was charged with replacing. And if the Receiver argues that he did not know that Rauch was taking direct instruction from the Insiders, a position which would be hard to believe, even a small amount of diligence and review of the Hotel and management company's books and records would have made that clear, as it became abundantly clear to this Court during trial as quoted, in part, below.

The Trustee's accountant, CohnReznick, has analyzed the Receiver's "control" over the Hotel's revenue and expenditures. CohnReznick partner Chris Creger ("Mr. Creger") will establish through testimony and evidence that, during the Receiver's tenure, the Hotel collected $6,904,925 in total revenue, accounts receivable, and cash, of which only $5,481,707 made its way into the Receiver's bank account. This alone represents a loss of $1,423,218.00 to the estate, funds which were diverted away from the Receivership during the Receiver's tenure despite his charge to secure Hotel revenue. Mr. Creger will also establish that $3,161,613 in unapproved disbursements were made under the Receiver's watch.

Thus, the Receiver's failure to control the Hotel's revenue and expenditures, as he was charged with doing under the Receivership Order, resulted in an almost $4.6 million direct cash

loss to the estate, before accounting for the tax and other senior payments he failed to make during his tenure. As discussed below, the Receiver's complete lack of control over the Hotel's (really, the Insiders') spending enabled this enormous depletion of the estate's value.

### 1. The Receiver conducted no diligence into or third-party verification of Hotel expenses.

The Receiver conducted no diligence into or third-party verification of Hotel expenses. The Receiver's process for approving Hotel expenses appears to have been limited to weekly emails and meetings with Jeremy Rauch ("Rauch"), the Hotel's CFO.[3] These meetings and accompanying emails, which are attached as Exhibit "B", were insufficient to properly protect against misapplication and conversion of the Hotels' revenue.

For example, starting in June 2020, Rauch's expense requests began to include requests for "bonus" payments to Hotel back office staff, including Rauch himself. On July 24, 2020, the Receiver approved Rauch's request for payment to himself for $5,000 in past-due salary (despite payroll having been approved and funded for each preceding week, and despite Rauch being employed by a different company) and another $5,000 for "bonus payment due to the finance manager." Exh. B at 000046. The next week, on July 31, 2020, the Receiver approved Rauch's request for $2,500 in past-due salary and another $2,500 bonus. Exh. B at 000050. Rauch again requested and received $2,500 in past-due salary and a $2,500 bonus on August 14, 2020. Exh. B at 000058. Then another $5,000 bonus on August 20, 2020. Exh. B at 000061. Rauch is merely one example; the expense approval emails reflect thousands of dollars paid to several Hotel staff

---

[3] Despite being the Hotel's CFO, Rauch alleges that he was in fact not an employee of the Hotel but rather was employed by The Williamsburg Hotel BK LLC, which was another of the Insiders' entities. *See* Transcript of May 17, 2022 hearings, 71:22-23 ("Q: And who is your present employer, Mr. Rauch? A: The Williamsburg Hotel BK LLC.")

members, for bonuses and other stated reasons, outside of regular payroll and without ever being questioned by the Receiver.

The expense approval emails contain other oddities that the Receiver apparently never questioned. The Receiver approved thousands of dollars in credit card payments to reduce balances owing on various cards for charges incurred before his appointment. The Receiver never attempted to substantiate that the charges being paid down had been incurred for legitimate Hotel operational purposes. For example, on July 10, 2020, the Receiver approved Rauch's request for payment of "$6,000 towards the credit card balances" (without any specificity even as to which cards were being paid). Exh. B at 000039. And in cases where there were new charges on the credit cards, the Receiver does not appear to have investigated whether they were appropriate as ordinary and necessary Hotel expenses. The June 2020 statement for a Chase Ink credit card—a card in Moskovits' name—shows, for example, two charges to "WWW.GILT.COM," a discount designer fashion website, for nearly $600. In July 2020 the same card was used to charge more than $1,350 in a single transaction at Anthropologie, another clothing store. In August 2020, the same card was used for a purchase of nearly $1,250 at Anthropologie. The relevant Insider Chase Ink statements are attached as Exhibit "C".

The examples cited above are not exhaustive; they simply reflect a theme—a theme that the Receiver paid no attention towards, or at least did insufficient diligence into, the way the Debtor's funds (and Benefit Street's collateral) were being spent during a time of economic turmoil. And these losses were incurred at the same time that the Receiver was neglecting the Hotel's real estate taxes and business tax obligations, and not paying Benefit Street on its properly perfected, senior mortgage, which was in the midst of a hotly contested (and ultimately successful) foreclosure proceeding, and for whose benefit the Receiver was appointed to begin with.

2. **The Receiver's approval processes and controls were a sham.**

The Receiver's approval processes and controls were a complete sham. The Receiver points to his weekly review of the Hotel's expenses as evidence that he did his diligence into the Hotel's revenues and expenses. These reviews were limited to "weekly correspondence between the Chief Financial Officer for the hotel, [Rauch], indicating line by line item when I reviewed and approved payments to vendors and payroll expenses, including the identity of the vendors and the amounts approved." *See* Exhibit "D", *Declaration of Temporary Receiver Constantino Sagonas in Further Support of the Motion to Approve the Receiver's Final Accounting* [ECF No. 59] ("Sagonas Declaration").

However, based on the millions of dollars in unauthorized payments that Mr. Creger will testify to, and as illustrated by the examples noted above, it is clear that the Receiver did no real diligence and simply approved every expense requested by Rauch. In short, while the Receiver trusted Rauch (unjustifiably), he failed to verify. Had he verified, the Receiver quickly would have discovered that Rauch was simply a puppet for the Insiders, doing their bidding without himself asking for a business justification.

Indeed, from April 2020, when Rauch's weekly email expense requests to the Receiver begin, through February 2021, when the Bankruptcy Case was filed, the Receiver did not reject a *single* request received from Rauch. *See generally* Exh. B. In fact, it does not appear that he ever even sought supporting documentation for any of the requests. On many occasions, the Receiver's approval was provided so quickly that there could not have possibly been time to conduct any meaningful review of Rauch's requests.

If the Receiver had asked any follow up questions regarding the use of Hotel funds, he would have learned that Rauch was simply acting as a front for the Insiders. As noted in the *Report*

*of Examiner, Eric M. Huebscher* filed February 28, 2022 [ECF No. 418] (the "Examiner's Report"), Rauch acted at the Insiders' direction to conceal and falsify the hotel's financial operations. *See, e.g.*, Examiner Report at pp. 19 (describing that schedules purporting to show alleged loan repayments to yet another entity controlled by Moskovits and Lichtenstein were prepared by Rauch at Lichtenstein's direction), 20 ("Rauch, at Lichtenstein's direction, determined which of these amounts were 'loans.'"), 31 ("When the Examiner asked why there were millions of dollars transacted between the Debtor, Manager and Northside, Rauch referred the question to Lichtenstein"). If the Receiver had actually taken control of the bank accounts into which Hotel revenues were flowing, he would have seen the Insiders' theft and misapplication of funds first-hand, reported them to the Supreme Court and avoided tens of millions of dollars of subsequent loss in value.

The extreme to which the Insiders and Rauch reached to cover up this fraud took hours of testimony before this Court. During the hearings on Benefit Street and the United States Trustee's motions to appoint the Trustee, almost an entire day was spent on Rauch's examination, trying to unwind the incomprehensible web of bank accounts, entities and transactions that the Court ultimately viewed as nonsensical, as illustrated by, among others, the following observations of the Court:

> THE COURT: And was it ever booked as a line of credit, a specific dollar line of credit?
> THE WITNESS: We always put it on the books as loans and exchanges is actually what we called it. It wasn't specifically booked as line of credit.
> THE COURT: So did you ever monitor whether you were getting up against -- running up against the limits of the line of credit?
> THE WITNESS: I think we monitored it mentally more than on paper.
> THE COURT: It's really not reflected on paper, right?
> THE WITNESS: Running balances are not reflected on paper without doing more analyses.
> THE COURT: And is it fair to say that you did that because it was all in the family?
> THE WITNESS: Yes.

May 17, 2022 Hearing Transcript, pp. 146:11-147:1.

THE COURT: But I can understand individual payments. I can understand the debit and credit columns. I don't understand the balance column or the title of the report, and I don't for any of these reports. That's the problem. It's taking checks of money in and out from various related entities and two various related entities and saying that those checks equal a running account that shows credits and debits and an ultimate balance. And that -- I don't see it. That doesn't happen. It's not – those columns just don't make sense.

*Id.*, p. 229:3-12.

THE COURT: All right. So my inclination is to admit all of these just to show the utter morass of trying to figure out from the Debtor's own books and records what is owed and what is claimed to be owed as a defense to substantial claims of avoidable transfers. I just – I think there is some information that's pulled from QuickBooks accounts, but the characterization of it is just -- it's totally unreliable and I think it's -- it comes in as a part of trying to develop a litigation document not anything more than that and it's -- the characterizations just don't hold up.

*Id.*, p. 231:15-25.

The Receiver relied solely on Rauch, as keeper of the Hotel's books and records, to justify expenditure approvals. But Rauch's books, records, and accountings were so indecipherable that not even the Court could make sense of them after hours of live testimony. Had the Receiver done appropriate due diligence into Rauch's requests for disbursements and record-keeping, he would have learned exactly what the Examiner and Court learned and what Benefit Street was shouting to anyone that would listen: that Rauch was simply covering up the Insiders' gamesmanship with the Hotel's revenue and expenses.

And the Receiver's failure to perform sufficient diligence behind Rauch's disbursement requests facilitated the ongoing misapplication and conversion of Hotel revenues that this Court ultimately uncovered years later, and after millions of dollars of damage was done to the estate. If the Receiver had done his diligence and uncovered the massive fraud being perpetrated in plain sight before him, the Receiver could have put a stop to this entire process years ago, likely avoiding

this Bankruptcy Case and the tens of millions of dollars' worth of accrued interest, fees and value loss that has accompanied it.  But instead, the Insiders' hand-picked Receiver simply, and blindly, failed to take control over more than $1.4 million in Hotel revenue and allowed an additional more than $3.1 million in inappropriate disbursements, harming the estate.

**B.    The Receiver harmed the estate by failing to pay real estate and business taxes during the Receivership.**

At the same time he was allowing more than $4.5 million to be siphoned from the Hotel, the Receiver also harmed the estate by failing to pay real estate and business taxes during the Receivership.  After the Petition Date, the New York Department of Revenue (the "DOR") filed a proof of claim for unpaid real estate taxes totaling $3,125,061.56, which included taxes that became due while the Receiver was in charge of the Hotel's operations.  *See* Proof of Claim No. 10-2.[4]  It appears that $1,347,268.01 of real estate taxes accrued during the receivership.  The DOR also filed a proof of claim for unpaid hotel occupancy taxes and business taxes in the amount of $6,520,449.01.  *See* Proof of Claim No. 18-1.[5]  It also appears that $27,804.01[6] of unincorporated business taxes ("UBT") accrued during the receivership.

While failing to pay real estate taxes, which accrued penalties and interest at 14% *compounded daily*, with Hotel cash flow is problematic in its own right, it is particularly egregious here where the Receiver was failing to make these payments while authorizing payments for

---

[4] Proof of Claim No. 19-1 is a duplicate of Proof of Claim 10-2.  Proof of Claim No. 19-1 was deemed withdrawn pursuant to a stipulation between the Trustee and the NYC Department of Finance.  *See* ECF No. 678 at p. 11, ¶ 10.
[5] Proof of Claim No. 14-1 is a duplicate of Proof of Claim No. 18-1.  Proof of Claim No. 14-1 was disallowed pursuant to a stipulation between the Trustee and the NYC Department of Finance.  *See* ECF No. 678 at p. 11, ¶ 7.
[6] Proof of Claim No. 14-1 lists amounts due both for corporation and UBT because the Debtor had not elected either treatment.  Subsequently, the Debtor elected to be treated as a partnership and therefore corporation taxes are not due.  *See* ECF No. 678 at p. 8, ¶ AA.

improper expenditures including employee bonuses, Insider credit cards, and designer fashion purchased on Gilt.com and Anthropologie.  And it goes without saying that, during this time, the Receiver did not authorize a single cent of payment to Benefit Street – the Debtor's senior secured mortgage lender whose debt was accruing interest at the default rate.  In short, the Receiver authorized payments in the opposite priority to that required by law, with payments to equity and unsecured creditors paid first, while paying the tax authorities and senior mortgage lender last (or, in this case, not at all).

The Receiver's credentials as a hospitality expert were highly touted by the Insiders as a basis for his selection (*see Affidavit of Toby Moskovits Providing Proposed Receiver Credentials*, Docket No. 29, Ex. I).  However, a closer review belies those purported credentials, demonstrating that the Receiver was involved more in the <u>development</u> of hotels than the <u>operation</u> of hotels over his career.  Regardless, it is unfathomable that a hotel operator of any level of experience would simply overlook the payment of real estate taxes while paying employee bonuses and personal expenses of insiders.  The only explanation for the Receiver's failure to pay these expenses is that he was simply acting to benefit the Insiders, and not the Hotel, which is consistent with his rubber-stamp approval of the substantial questionable expenses identified by Mr. Creger and illustrated by the examples above.

As with the harm resulting from the Receiver's failure to control Hotel revenue and expenditures, the harm to the estate from his failure to meet the Hotel's tax obligations is tangible and quantifiable.  Early on in his appointment, in order to avoid continued accrual of penalties and interest, the Trustee made a $4,436,690.19 payment to the DOR in satisfaction of the real estate tax claim, reducing substantially the estate's working capital.  If the Receiver had done his job and paid the real estate taxes as they came due, this post-petition payment would have been

approximately $1.3 million less, providing the estate more working capital and assets to make distributions to creditors that it so badly needs. Here again, not only did the Receiver fail to benefit the estate, but his tenure did it actual harm.

C.     **The Receiver's Request for Post-petition Attorney's Fees Should be Denied.**

More than half of the Receiver Claim consists of the Receiver's alleged post-petition attorney's fees. For the reasons set forth above, the entire Receiver Claim should be denied administrative priority based on the lack of benefit conveyed by the Receiver and the Receiver's likely (and vastly) offsetting liability to the estate. His post-petition attorney's fees should be denied under Section 503(b)(4) of the Bankruptcy Code and for other, more traditional reasons.

The Receiver's counsel is entitled to administrative priority compensation only to the extent that the Receiver himself has a valid claim. *See* 11 U.S.C. § 503(b)(4) ("reasonable compensation for professional services rendered by an attorney or an accountant of an entity *whose expense is allowable* under subparagraph…(E) of paragraph (3) of this subsection…") (emphasis added); *In re American Preferred Prescription, Inc.*, 194 B.R. 721, 724 (Bankr. E.D.N.Y. 1996) (holding that an administrative claim for professional fees under section 503(b)(4) requires an allowed claim under section 503(b)(3) as a predicate). In other words, the Receiver's counsel's claim is derivative of the Receiver's own claim. Since the Receiver has failed to satisfy his *prima facie* burden that he provided any benefit to the estate – and in fact could not satisfy such burden in light of the millions of dollars' worth of damage he caused – the Receiver's counsel should be afforded no claim administrative priority compensation.

Moreover, to supplement the Trustee's arguments, *see* Objection at ¶¶ 53—54, Benefit Street observes and agrees with the Trustee that much of the time billed by the Receiver's attorneys

was unnecessary, conveyed no benefit to the estate and in any event is impermissibly billed under the Bankruptcy Code and United States Trustee guidelines.

The post-petition invoice submitted by the Receiver reflects that his counsel billed many hours, across multiple attorneys, to review pleadings and attend hearings in the Bankruptcy Case that had nothing to do with the Receiver. In essence, counsel for the Receiver—whose tenure ended on the Petition Date—behaved and billed as though the Receiver were a full party in interest through the remainder of the Bankruptcy Case. To the extent any of the Receiver Claim is allowable, post-petition attorney's fees should only be awarded where they were reasonable, necessary, and benefited the estate.

## Conclusion

Receivers are described as "custodians" under the Bankruptcy Code. But the Receiver never managed, or bothered, to obtain custody over the Hotel's revenues and expenditures, permitting them to remain under control of the Insiders who hand-selected him. The Receiver's complete lack of control allowed the Insiders to benefit from over $4.5 million in uncaptured revenue and unauthorized expenditures, at the very same time that secured priority tax claims accrued by approximately $1.3 million, not to mention continued accrual of interest under Benefit Street's senior secured claim at the default rate. The upshot has been a very real, multimillion-dollar harm to the estate, draining the estate of necessary working capital and impairing the recoveries of each of the estate's legitimate creditors. And yet the Receiver and his counsel argue that they should step in front of everyone else in the case to be paid in full.

The Receiver did not benefit the estate; he harmed it. The Objection should be granted and the Receiver's claim disallowed and expunged.

WHEREFORE Benefit Street requests that this Court treat the foregoing as a joinder in the Trustee's Objection, grant the relief sought in the Objection, and for such other relief as the Court deems appropriate.

Respectfully submitted this 8th day of March 2023.

[SIGNATURES ON FOLLOWING PAGE]

21-22108-shl    Doc 947    Filed 03/08/23    Entered 03/08/23 17:19:42    Main Document
Pg 17 of 17

NELSON MULLINS RILEY &
SCARBOROUGH, LLP

    */s/ Lee B. Hart*
Lee B. Hart, Esq.
201 17th Street, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050

Gary M. Freedman, Esq.
2 South Biscayne Blvd., 21st Floor
Miami, Florida 33131
Telephone: (305) 373-9400
Facsimile: (305) 373-9443

Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Co-Counsel for Benefit Street Partners*
*Realty Operating Partnership, L.P.*